# EXHIBIT 1(A)

Exhibit 1(a)
19

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 21

In the Matter of:

| | |
|---|---|
| Mason-Dixon Intermodal d/b/a Universal Intermodal Services, Respondent, and | Case Nos. 21-CA-252500<br>21-CA-252574<br>21-CA-264164<br>21-CA-253662<br>21-CA-259130 |
| Mason-Dixon Intermodal d/b/a Universal Intermodal Services and Southern Counties Express, Inc., Respondent, and | 21-CA-254813<br>21-CA-255151 |
| Roadrunner Intermodal Services, LLC, Respondent, and | |
| Universal Truckload, Inc., Respondent, and | |
| International Brotherhood of Teamsters, Charging Party. | |

_____

_____

Place: Los Angeles, California (via Zoom videoconference)
Dates: June 14, 2021
Pages: 1 through 7
Volume: 1

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

Exhibit 1(a)
20



www.escribers.net | 800-257-0885

1

**UNITED STATES OF AMERICA**

2

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

3

**REGION 21**

4

5 | In the Matter of:

6 | MASON-DIXON INTERMODAL D/B/A     Case Nos.   21-CA-252500
  | UNIVERSAL INTERMODAL SERVICES,              21-CA-252574
7 |                   Respondent,               21-CA-264164
  | and                                         21-CA-253662
8 |                                             21-CA-259130
  | MASON-DIXON INTERMODAL D/B/A                21-CA-254813
9 | UNIVERSAL INTERMODAL SERVICES               21-CA-255151
  | AND SOUTHERN COUNTIES EXPRESS,
10 | INC.,
   |                   Respondent,
11 | and

12 | ROADRUNNER INTERMODAL SERVICES,
   | LLC,
13 |                   Respondent,
   | and
14 |
   | UNIVERSAL TRUCKLOAD, INC.,
15 |                   Respondent,
   | and
16 |
   | INTERNATIONAL BROTHERHOOD OF
17 | TEAMSTERS,
   |                   Charging Party.

18

19   The above-entitled matter came on for hearing, pursuant to

20   notice, via Zoom videoconference, before **MICHAEL A. ROSAS**,

21   Administrative Law Judge, at the National Labor Relations

22   Board, Region 21, 312 North Spring Street, 10th Floor, Los

23   Angeles, CA 90012, on Monday, **June 14, 2021, 4:20 p.m.**

24

25

Exhibit 1(a)
21

escribers
www.escribers.net | 800-257-0885

1

2                    <u>A P P E A R A N C E S</u>

3    **On behalf of the Charging Party:**

4        **JULIE GUTMAN DICKINSON, ESQ.**
         **JASON WOJCIECHOWSKI, ESQ.**
5        BUSH GOTTLIEB
         801 North Brand Blvd., Suite 950
6        Glendale, CA 91203-1260
         Tel. (818)973-3200
7
     **On behalf of the Respondent:**
8
         **DANIEL A. ADLONG, ESQ.**
9        **HARRISON KUNTZ, ESQ.**
         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
10       Park Tower, Fifteenth Floor
         695 Town Center Drive
11       Costa Mesa, CA 92626
         Tel. (714)800-7900
12
     **On behalf of the General Counsel:**
13
         **PHUONG DO, ESQ.**
14       **MOLLY KAGEL, ESQ.**
         NLRB REGION 21
15       312 N Spring Street, 10th Floor
         Los Angeles, CA 90012-4701
16       Tel. (213)894-5200

17

18

19

20

21

22

23

24

25

Exhibit 1(a)
22



1                             <u>E X H I B I T S</u>

2

3       <u>EXHIBIT</u>                              <u>IDENTIFIED</u>      <u>IN EVIDENCE</u>

4       **General Counsel:**

5           GC-1(a)  through 1(bbb)                    5                 5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(a)
23

escribers
www.escribers.net | 800-257-0885

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | JUDGE ROSAS:  On the record.  I am Judge Michael A. Rosas |
| 3 | of the National Labor Relations Board Division of Judges.  This |
| 4 | is a hearing in the matter of United States of America before |
| 5 | the National Labor Relations Board, Mason-Dixon Intermodal |
| 6 | D/B/A Universal Intermodal Services, cases 21-CA-252500, |
| 7 | 252574, and 264164, and Mason-Dixon Intermodal D/B/A Universal |
| 8 | Intermodal Services and Southern Counties Express, Inc., cases |
| 9 | 21-CA-253662, 21-CA-259130, and Roadrunner Intermodal Services, |
| 10 | LLC, 21-CA-254813, and Universal Truckload, Inc., 21-CA-255151, |
| 11 | and International Brotherhood of Teamsters. |
| 12 | General Counsel, state your appearance. |
| 13 | MR. DO:  Yes, Your Honor.  My name is Phuong Do and that's |
| 14 | spelled P-H-U-O-N-G, last name D-O, for the Acting General |
| 15 | Counsel. |
| 16 | MS. KAGEL:  Molly Kagel, Your Honor.  M-O-L-L-Y, last name |
| 17 | K-A-G-E-L, for the Acting General Counsel. |
| 18 | JUDGE ROSAS:  Counsel for the Charging Party, a name and |
| 19 | law firm and city. |
| 20 | MS. DICKINSON:  Your Honor, Julie Gutman Dickinson, |
| 21 | Glendale, California, Bush Gottlieb for the Charging Party. |
| 22 | MR. WOJCIECHOWSKI:  And Jason Wojciechowski also of Bush |
| 23 | Gottlieb, Glendale, California for the Charging Party. |
| 24 | JUDGE ROSAS:  Respondent. |
| 25 | MR. ADLONG:  Daniel Adlong, Ogletree, Deakins, Nash, Smoak |

Exhibit 1(a)
24

www.escribers.net | 800-257-0885

1   & Stewart, Costa Mesa.

2       MR. KUNTZ:  Harrison Kuntz also Ogletree, Deakins, Saint

3   Louis, Missouri.

4       JUDGE ROSAS:  Okay.  Counsel for the General Counsel, have

5   you distributed the -- the formal papers?

6       MR. DO:  Yes, Your Honor.

7       JUDGE ROSAS:  And can you identify them for the record?

8       MR. DO:  Yes.  I offer into evidence the formal papers in

9   this case.  They have been marked for identification as General

10  Counsel's Exhibit Number 1(a) through 1(bbb) with the latter

11  being the index and description of the documents.  This exhibit

12  has been sent to all parties.  I can put that on screen if you

13  like.  Okay.

14      JUDGE ROSAS:  All right.  Has everyone had an opportunity

15  to review them?  Any objection?  No objection.

16      MR. ADLONG:  No objection.

17      JUDGE ROSAS:  General Counsel's Exhibit 1(a) through

18  1(bbb) is received in evidence without objection.

19      **(General Counsel Exhibit Number 1(a) through 1(bbb) Received**

20      **into Evidence)**

21      JUDGE ROSAS:  Okay.  Let's go off the record.

22  (Off the record at 4:23 p.m.)

23      JUDGE ROSAS:  All right.  So we're back on the record.  At

24  this time, if there's nothing else, we're going to adjourn to

25  tomorrow, June 15th, to resume this case.  I expect opening

Exhibit 1(a)
25

www.escribers.net | 800-257-0885

1   statements at that time, at 11:00 Eastern Standard Time, 8 a.m.

2   Pacific Standard Time or Pacific Time.

3        There being nothing else, off the record.

4   **(Whereupon, the hearing in the above-entitled matter was**

5   **recessed at 4:26 p.m. until Tuesday, June 15, 2021 at 8:00**

6   **a.m.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(a)
26

www.escribers.net | 800-257-0885

1       **C E R T I F I C A T I O N**

2       This is to certify that the attached proceedings before the

3       National Labor Relations Board (NLRB), Region 21, Case Numbers

4       21-CA-252500, 21-CA-252574, 21-CA-264164, 21-CA-253662, 21-CA-

5       259130, 21-CA-254813, 21-CA-255151, Mason-Dixon Intermodal

6       d/b/a Universal Intermodal Services and Mason-Dixon Intermodal

7       d/b/a Universal Intermodal Services and Southern Counties

8       Express, Inc. and Roadrunner Intermodal Services, LLC and

9       Universal Truckload, Inc. and International Brotherhood of

10      Teamsters, held at the National Labor Relations Board, Region

11      21, 312 North Spring Street, 10th Floor, Los Angeles, CA 90012,

12      on June 14, 2021, at 3:51 p.m. was held according to the

13      record, and that this is the original, complete, and true and

14      accurate transcript that has been compared to the reporting or

15      recording, accomplished at the hearing, that the exhibit files

16      have been checked for completeness and no exhibits received in

17      evidence or in the rejected exhibit files are missing.

18

19

20

21      _____

22      TROY RAY

23      Official Reporter

24

25

Exhibit 1(a)
27


www.escribers.net | 800-257-0885

# EXHIBIT 1(B)

Exhibit 1(b)
28

# OFFICIAL REPORT OF PROCEEDINGS

## BEFORE THE

## NATIONAL LABOR RELATIONS BOARD

## REGION 21

In the Matter of:

| | |
|---|---|
| Mason-Dixon Intermodal d/b/a Universal Intermodal Services, | Case Nos.  21-CA-252500 |
| Respondent, | 21-CA-252574 |
| and | 21-CA-264164 |
| | 21-CA-253662 |
| | 21-CA-259130 |
| Mason-Dixon Intermodal d/b/a Universal Intermodal Services and Southern Counties Express, Inc., | 21-CA-254813 |
| | 21-CA-255151 |
| Respondent, | |
| and | |
| Roadrunner Intermodal Services, LLC, | |
| Respondent, | |
| and | |
| Universal Truckload, Inc., | |
| Respondent, | |
| and | |
| International Brotherhood of Teamsters, | |
| Charging Party. | |

———————————————

———————————————

Place: Los Angeles, California (via Zoom videoconference)
Dates: June 15, 2021
Pages: 8 through 204
Volume: 2

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

Exhibit 1(b)
29

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 21**

| | |
|---|---|
| In the Matter of: | |
| MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES, | Case Nos.   21-CA-252500<br>21-CA-252574<br>21-CA-264164 |
| Respondent, | 21-CA-253662<br>21-CA-259130 |
| and | 21-CA-254813<br>21-CA-255151 |
| MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES AND SOUTHERN COUNTIES EXPRESS, INC., | |
| Respondent, | |
| and | |
| ROADRUNNER INTERMODAL SERVICES, LLC, | |
| Respondent, | |
| and | |
| UNIVERSAL TRUCKLOAD, INC., | |
| Respondent, | |
| and | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | |
| Charging Party. | |

The above-entitled matter came on for hearing, pursuant to notice, via Zoom videoconference, before **MICHAEL A. ROSAS**, Administrative Law Judge, at the National Labor Relations Board, Region 21, 312 North Spring Street, 10th Floor, Los Angeles, CA 90012, on **Tuesday, June 15, 2021, 8:04 a.m.**

Exhibit 1(b)
30

eScribers
www.escribers.net | 800-257-0885

1                    <u>A P P E A R A N C E S</u>

2      **On behalf of the Charging Party:**

3          **JULIE GUTMAN DICKINSON, ESQ.**
           **JASON WOJCIECHOWSKI, ESQ.**
4          BUSH GOTTLIEB
           801 North Brand Blvd.
5          Suite 950
           Glendale, CA 91203-1260
6          Tel. (818)973-3200

7      **On behalf of the Respondent:**

8          **DANIEL A. ADLONG, ESQ.**
           **HARRISON C. KUNTZ, ESQ.**
9          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
           Park Tower, Fifteenth Floor
10         695 Town Center Drive
           Costa Mesa, CA 92626
11         Tel. (714)800-7900

12     **On behalf of the General Counsel:**

13         **PHUONG DO, ESQ.**
           **MOLLY KAGEL, ESQ.**
14         NLRB REGION 21
           312 N. Spring Street
15         10th Floor
           Los Angeles, CA 90012-4701
16         Tel. (212)894-5200

17

18

19

20

21

22

23

24

25

Exhibit 1(b)
31



www.escribers.net | 800-257-0885

1                                  <u>I N D E X</u>

2

3    <u>WITNESS</u>              <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>   <u>VOIR DIRE</u>

4    Dennis Glackin          40

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(b)
32

<center>**E X H I B I T S**</center>

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---------|-----------|-------------|
| Joint: | | |
| J-1 | 13 | 14 |
| J-2 | 13 | 14 |
| J-3 | 13 | 14 |
| J-4 | 13 | 14 |
| J-5 | 13 | 14 |
| J-6 | 13 | 14 |
| J-7 | 13 | 14 |
| J-8 | 13 | 14 |
| J-9 | 13 | 14 |
| J-10 | 13 | 14 |
| J-11 | 13 | 14 |
| J-12 | 13 | 14 |
| J-13 | 13 | 14 |
| J-14 | 13 | 14 |
| J-15 | 13 | 14 |
| J-16 | 13 | 14 |
| J-17 | 13 | 14 |
| J-18 | 13 | 14 |
| J-19(a)-19(g) | 13 | 14 |
| J-20(a)-20(c) | 13 | 14 |
| J-21(a)-21(e) | 13 | 14 |

Exhibit 1(b)
33

1    **General Counsel:**

2        GC-3                                    43              46

3        GC-2                                    80

4        GC-2(a)                                 81              86

5        GC-2(b)                                 82              86

6        GC-25(a) through (c)                    129             131

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(b)
34

www.escribers.net | 800-257-0885

1                    P R O C E E D I N G S

2          HEARING OFFICER ROSAS:  All right, let's go on the record.

3          All right.  This is a resumption in the matter of Mason-

4    Dixon, et cetera.

5          Go ahead, General Counsel.

6          MR. DO:  Good morning, Your Honor.  So first we would --

7    we would like to enter as an exhibit Joint Exhibit 1, which has

8    been conveyed to the parties, and I will put it up on the

9    screen now.

10         So this is an 11-page document.  It is a joint stipulation

11   for the admissions of documents.  It covers exhibit -- Joint

12   Exhibit 2 to Joint Exhibit 21, all which has been conveyed to

13   all parties.  The document is full -- wait, my apology, this is

14   the one.  So this is the one that's been signed by all parties,

15   and I want to make it clear for you, Your Honor, that the

16   parties are also requesting that Joint Exhibit 19 through Joint

17   Exhibit 21(a) through (e) be admitted under seal.

18         HEARING OFFICER ROSAS:  Run that by me again, 19?

19         MR. DO:  Yes, Your Honor.  So Joint Exhibit 19(a) through

20   (g), and then Joint Exhibit 20(a) through (c), and then Joint

21   Exhibit 21(a) through (e).

22         HEARING OFFICER ROSAS:  Okay.  Does everybody agree that

23   that's the case?

24         MR. ADLONG:  Yes.

25         MR. WOJCIECHOWSKI:  Yes, Your Honor.

Exhibit 1(b)
35



www.escribers.net | 800-257-0885

1          HEARING OFFICER ROSAS:  Okay, all right.  So that -- those

2     are -- those are in agreement that are under seal; they do not

3     require a so ordering; is that correct?

4          MR. DO:  Yes, Your Honor, as long as they're admitted

5     under seal.  Thank you, Your Honor.

6          HEARING OFFICER ROSAS:  Okay.  They're -- they're admitted

7     without objection.

8          **(Joint Exhibit Numbers 1 through 18 Received into Evidence)**

9          **(Joint Exhibit Numbers 19(a)-19(g), 20(a)-20(c) and 21(a)-21(e)**

10    **Received into Evidence)**

11         HEARING OFFICER ROSAS:  So 1 is the index, 2 through the

12    21 are the actual joint exhibits, and they include the items at

13    19, 20, and 21 within those that are specifically under seal,

14    as you indicated.

15         MR. DO:  Thank you, Your Honor.

16         HEARING OFFICER ROSAS:  Next.

17         MR. DO:  All right.  The next item is (indiscernible)

18    production of responsive document to the hearing subpoenas,

19    issued by the counsel for the Acting General Counsel.  The

20    Respondent agreed to amend its answer in regard to the 2(11)

21    super -- supervisory status, and 2(13), agency status, of its

22    representative listed in paragraph 7(a) and 7(b) of the

23    complaint.  So I will turn it over to Mr. Adlong.

24         MR. ADLONG:  So I'm going to do that.  I don't have my

25    note here that has the information that I need, so if we can do

Exhibit 1(b)
36

escribers
www.escribers.net | 800-257-0885

1    that after lunch, if that's okay, I'll take care of this.

2         HEARING OFFICER ROSAS:  Okay, so -- so what my practice

3    is, any -- any additional pleadings or modified pleadings,

4    they'll actually go in as a separate pleading.  You would tack

5    them on to the end of the formal papers, so they'll become,

6    what CCC, 1CCC?

7         MR. DO:  Yes, Your Honor, triple C.

8         HEARING OFFICER ROSAS:  Okay.

9         MR. ADLONG:  Your Honor, if the parties just stipulate to

10   the status of individuals rather than amending the answer, do

11   you still want that?

12        HEARING OFFICER ROSAS:  I -- I think it's cleaner.  When

13   one is looking through the formal papers for one of the papers

14   of a case, they're all in one place.  And while we're at it,

15   let me just give you a little further instruction as to should

16   this be seen through to the end.  What I will expect will be

17   yet another document that will be added to the end of the

18   pleadings that would be redlined, with -- with any and all

19   changes as the final pleading for the answer and/or the ans --

20   for the complaint and/or the answer, okay?  But we can -- we

21   can talk about that later, should that be the case.

22        Okay, next?

23        MR. DO:  All right.  And Your Honor, the counsel for the

24   General Counsel is going to make a motion for -- to sequester

25   the witness, pursuant to Rule 615.

Exhibit 1(b)
37

escribers
www.escribers.net | 800-257-0885

 1      HEARING OFFICER ROSAS:  Okay.  Given the nature of the

 2   case, that -- that motion is granted.  If you'll give me a

 3   minute.

 4      MR. DO:  Got it.  I also want to flag for you, Your Honor,

 5   Ms. Julie Dickinson is going to be a witness for the General

 6   Counsel later in the case.  She's going to be testifying

 7   primarily for paragraph 17 and 18 of the consolidated

 8   complaint.  I will turn it over to Ms. -- Jason and Julie to

 9   present their position on --

10      HEARING OFFICER ROSAS:  Let's -- let's keep the names

11   formal at this point, okay?

12      MR. DO:  Yes, Your Honor.

13      HEARING OFFICER ROSAS:  Okay.

14      MR. WOJCIECHOWSKI:  Your Honor, right.  Ms. Gutman

15   Dickinson is counsel to the Teamsters.  She has been involved

16   in this case from the beginning, before the representation case

17   actually.  And it -- it would kind of be in a hybrid counsel

18   representative role.  The Teamsters don't have -- Charging

19   Party does not have another -- you see Mr. Rodriguez is here,

20   but he's not a witness, so this would be Charging Party's only

21   individual who is both a witness and -- and a representative.

22   So we think it would be appropriate for Ms. Gutman Dickinson to

23   be able to be here for -- for the trial.

24      HEARING OFFICER ROSAS:  Okay.  Let me -- let's go off the

25   record for a minute.

Exhibit 1(b)
38



www.escribers.net | 800-257-0885

1    (Off the record at 8:10 a.m.)

2    HEARING OFFICER ROSAS:  We're ready to go on the record.

3    Okay, at this point, I am issuing a sequestration order in

4    this case, so from this point on, all persons who expect to be

5    called as witnesses in this proceeding, other than persons who

6    are designated as essential to the presentation of a party's

7    case, i.e., party representatives, will be required to remain

8    outside the courtroom whenever testimony or other proceedings

9    are taking place.

10   Limited exception applies to witnesses who are party

11   representatives and/or discriminatees.  They may be present in

12   the courtroom at all times, except when witnesses for that

13   party is giving testimony regarding the same events that those

14   individuals are expected to testify about.  As I indicated

15   previously, matters that counsel reasonably believe are in

16   dispute, okay?

17   The sequestration order also prohibits all witnesses from

18   discussing with any other witness, or possible witnesses, the

19   testimony that they have already given or will give.

20   Similarly, counsel for a party may not disclose to any witness

21   the testimony of any other witness.  Counsel may, however,

22   inform his or her own witness of the content of testimony given

23   by an opposing party's witness to prepare to rebut that

24   testimony.  It is Counsel's responsibility to make sure that

25   they and their witnesses comply with this sequestration rule.

Exhibit 1(b)
39

www.escribers.net | 800-257-0885

1        All right, so Counsel, at this point, if you haven't

2   already identified those individuals, identify those party

3   representatives for the record, or who they are now, or who

4   they may be going forward.

5        MR. DO:  General Counsel does not have a designated

6   representative, Your Honor.

7        HEARING OFFICER ROSAS:  Okay.  Charging Party?

8        MR. WOJCIECHOWSKI:  Charging Party doesn't have -- doesn't

9   have a representative expected to testify, other than Ms. --

10  Ms. Gutman Dickinson, who is, you know, as -- as noted, kind

11  of --

12       HEARING OFFICER ROSAS:  Right.

13       MR. WOJCIECHOWSKI:  -- in a counsel representative role.

14       HEARING OFFICER ROSAS:  Okay.  Respondent?

15       MR. ADLONG:  We would have -- we will potentially have

16  Mike Vagts as a company representative who would testify.

17       HEARING OFFICER ROSAS:  Okay.  And -- okay, we have

18  nonparticipant observers.  There are no party representatives

19  that are appearing here today.

20       Mr. Mayorga, are you a nonparticipant observer?

21       MR. RODRIGUEZ:  No.

22       HEARING OFFICER ROSAS:  What is Mr. Mayorga's role?

23       MR. WOJCIECHOWSKI:  No, that's -- that's right.  He --

24  he's a -- well, he's not an observer.  He -- he's -- he's a

25  nonparticipant, you know, Charging Party rep, but he's not

Exhibit 1(b)
40

escribers
www.escribers.net | 800-257-0885

1    expected to testify.

2        HEARING OFFICER ROSAS:  So he's not a witness and he's not

3    a party representative in this case, so he's a nonparticipant

4    observer.

5        MR. WOJCIECHOWSKI:  Okay.

6        HEARING OFFICER ROSAS:  Mr. Mayorga, you need to be -- you

7    need to remain on muted, and your video off, please.

8        MS. GUTMAN DICKINSON:  And just for the record, Your

9    Honor, his -- his name is Eddie Rodriguez, but he -- I believe

10   he's using someone named Jorge May -- Mayorga's -- yeah.

11       HEARING OFFICER ROSAS:  Okay.

12       Mr. Rodriguez, you'll -- you'll be muted and video off.

13       MR. RODRIGUEZ:  Okay.

14       HEARING OFFICER ROSAS:  Okay.  Okay, so at this time,

15   there are no excusals based on the order.  Anything else?

16   General Counsel, you had some items that you wanted to put on

17   the record?

18       MR. DO:  No other items to put on the record, Your Honor.

19   We would just like to request any documents responsive to our

20   subpoena from the Respondent and Universal Logistics Holding

21   and Universal Management Service be turned over, and as I

22   represented to you previously, I believe they've just been

23   conveyed to us.

24       MR. ADLONG:  I'll just -- for the -- we're -- in as much

25   as documents, we're trying to get you everything we have, and

Exhibit 1(b)
41

www.escribers.net | 800-257-0885

1    some of the documents you requested would require extensive,

2    extensive, kind of like, searching and gathering.  So that's

3    why you -- you got those ones so late, and if there are others,

4    we'll produce them as soon as we have them, in a format that's,

5    like, manageable for everybody involved.

6         HEARING OFFICER ROSAS:  All right.  So just -- just so

7    Counsel's aware, if I haven't made this clear previously in

8    pre-conferencing, General Counsel, any party, is entitled to

9    all the documents that they've subpoenaed for a case, and

10   they're not going to be required to close out their case until

11   they've had an opportunity to review it, which means that as we

12   proceed forward, that party will be given an opportunity to

13   recall witnesses at any time, based on a reasonable opportunity

14   to absorb the material and information, okay?

15        All right, so are we ready for opening statements at this

16   time?

17        MR. DO:  Yes, Your Honor.

18        HEARING OFFICER ROSAS:  Go ahead, General Counsel.

19        MR. DO:  Okay.  Your Honor, this case is about a puppet of

20   a corporate master, whose singular focus in the ten -- the end

21   of 2019 was maintaining a nonunion workforce in Southern

22   California.

23        The workforce at issue in this case includes employees of

24   three trucking companies:  Universal Intermodal Services,

25   Universal Truckload, and Roadrunner Express.  A total of 63

Exhibit 1(b)
42

escribers
www.escribers.net | 800-257-0885

1    employees, all truck drivers, lost their jobs because of their

2    employer's insatiable desire for control:  control of the

3    market, control of their clients, and control of their workers.

4         When Respondent's control over their workers waver because

5    of their employee's unionization efforts, the Respondent

6    responded by getting rid of those employees and subcontracting

7    their work to workers who, at least on paper, were independent

8    contractors outside the ambit of the National Labor Relations

9    Act.

10        The Respondent took this action unilaterally and

11   decisively, despite its employees being represented by the

12   Brotherhood of Teamsters.

13        Your Honor, there are multiple Respondents in this case:

14   Mason-Dixon Intermodal, doing business as Universal Intermodal

15   Services.  Throughout this case, I'm sure I will be calling

16   them Universal Intermodal, and sometimes UI.  There are --

17   there is Southern Counties Express, oftentimes called Southern

18   Counties Express, and sometimes SCE.  Roadrunner Intermodal

19   Services, Roadrunner, and Universal Trunk -- Truckload, Inc.,

20   called Universal Truckload.

21        Your Honor, during this hearing, the evidence will show

22   that Universal Intermodal, Roadrunner, Southern Counties

23   Express, and Universal Truckload, are all subsidiaries of

24   Universal Logistics Holdings.  The evidence will show that

25   Universal Logistics Holdings controlled all of its subsidiaries

Exhibit 1(b)
43

www.escribers.net | 800-257-0885

1    through its management company, Universal Management Services.

2        The evidence will demonstrate that U -- that Universal

3    Logistics Holdings through Universal Management Services,

4    dictated and controlled its subsidiaries' business and labor

5    decisions, including the decision to close plants and lay off

6    employees.

7        The evidence will show that the operations of the

8    Respondents are interrelated, and that equipment, plants,

9    customer, work, and even workers themselves, were often

10   comingled and shared.

11       First, for clarity's sake, these cases primarily relate to

12   Universal Logistics Holdings' port and rail operations in

13   Southern California.  Specifically, the port (audio

14   interference) consists of drivers picking up ship boarding

15   containers from the Ports of Long Beach and the ports of

16   Long -- Los Angeles and taking these loads to various customers

17   throughout Southern California.  This port operation fell under

18   the umbrella of Universal Intermodal, Southern Counties

19   Express, and Roadrunner.

20       The rail and drainage operations consists of taking loads

21   to and from rail yards, and local deliveries of light

22   containers.  This operation fell under the umbrella of

23   Universal Truckload; however, as it will be shown during this

24   hearing, the distinction between the port and rail operation

25   was illegal fiction.  Port drivers will testify that they often

Exhibit 1(b)
44

www.escribers.net | 800-257-0885

1    had to do rail work when there was a low in port work.

2        Until late 2019, Universal Intermodal operated a facility

3    located at 20 -- 2035 East Vista Bella Way in Compton,

4    California.  The Compton facility was operated by Universal

5    Intermodal as a working hub for approximately 18 port drivers.

6    Another eight port drivers who are also employed by Universal

7    Intermodal but were dispatched by a dispatcher working out of

8    the Compton facility, worked out of a facility that was

9    operated by Universal Truckload, located at 15033 Slover

10   Avenue, Fontana, California.  The Slover Avenue facility was

11   also the home base for approximately 12 Universal Truckload

12   employee drivers.

13       Starting in 2018 through the end of 2019, in order to

14   strengthen its position in the intermodal port business,

15   Universal Logistics went on an acquisition binge, and acquired

16   Southern Counties Express in 2018, and Roadrunner in late 2019.

17   The acquisition of Roadrunner include Roadrunner's facility,

18   located at 11272 Calabash Avenue, Fontana, California, which

19   was only two-and-a-half miles away from the Universal Truckload

20   Slover Avenue facility, and was the base for approximately 26

21   employee drivers.

22       In 2019, prior to the Roadrunner acquisition, Universal

23   Logistics consolidated its port operation under Southern

24   Counties Express.  Specifically, Universal Intermodal

25   terminated most, if not all, of its Southern California

Exhibit 1(b)
45

www.escribers.net | 800-257-0885

1    intermodal office staff, including managers, supervisors, and

2    dispatcher.  When this occurred, the evidence will show that

3    Southern Counties Express dispatchers and managers took over

4    the responsibility of controlling and directing the Compton and

5    Slover Avenue port workforce.

6         Following this consolidation, employees will testify that

7    any distinction between Southern Counties Express and Universal

8    Intermodal as separate entities ended.  The employees will

9    testify that they began using Southern Counties Express

10   equipment, answering to Southern Counties Express management,

11   and servicing Southern Counties Express customers.

12        While this consolidation was good for Universal's bottom

13   line, it was not good for the employees, who found that they no

14   longer had a management structure that could address any issues

15   they had in the workplace.

16        Given Universal Intermodal's employees' dissatisfaction

17   working -- working under Southern Counties Express, it should

18   come as little surprise that soon thereafter, the employees

19   began to discuss bringing in the International Brotherhood of

20   Teamsters as their representative.

21        The Union began its campaign around late September 2019,

22   and it developed quickly.  Despite the fact that when hiring

23   its employees, Universal Intermodal required them to sign an

24   unlawful document titled Agreement to Waive Participation in

25   Class and Collection Actions, which requires employees "waive

Exhibit 1(b)
46

escribers
www.escribers.net | 800-257-0885

1  any right they may have to bring or participate in any class or

2  collective action, group action, or join with any other current

3  or former employee to bring a lawsuit or asserting a claim

4  against the company."

5       Your Honor, when you see this document, it will be readily

6  apparent that all aspects of this agreement violates the Act.

7  Witness testimony will also demonstrate that this agreement was

8  understood by the employees to bar them from engaging in lawful

9  union and protected concerted activity.

10      On November 8th, 2019, the Union filed a petition for

11  election in case 21-RC-251460.  In this petition, the Union

12  sought to represent a unit that included all Universal

13  Intermodal drivers that worked both at the Compton facility and

14  the Slover Avenue facility.  The parties agreed that the unit

15  would encompass all of those drivers that worked out -- out of,

16  or were dispatched, out of the Compton facility, which included

17  the eight port drivers that worked out of the Slover facility.

18      Witness testimony will illustrate that following the

19  Union's filing of its petition, the Union and its supporter

20  began openly campaigning for unionization.  As part of this

21  campaign, the Union set up tents at the entrances of both the

22  Compton and Slover Avenue facilities.  They distributed safety

23  vests and other apparel with union logos, signs, and bumper

24  sticker.

25      The employees will testify that they wore their union vest

Exhibit 1(b)
47



1      proudly and displayed their union in front of -- signs proudly

2      while at work.  Because Universal Truckload drivers also worked

3      out of the Slover Avenue facility, and Roadrunner drivers

4      worked only a short distance away, both Universal Truckload and

5      Roadrunner employees were exposed to the Union's campaign.

6          The evidence will show that several employees of both

7      Universal Truckload and Roadrunner expressed interest in being

8      represented by the Teamsters, going as far as exchanging

9      contact information and speaking regularly to Union

10     representative about bringing the Union into their workplace.

11     Interest was so great that the Union internally designated

12     organizers to focus on the beginning stages of a campaign at

13     both Universal Truckload and Roadrunner; however, the evidence

14     will show that those efforts were cut stagger -- staggeringly

15     short.

16         In response to the Union's campaign, Universal Intermodal

17     launched its own anti-union campaign November 2019.

18     Specifically, the evidence will demonstrate that following

19     Universal's launching of its anti-union campaign, a morning

20     shift employee at the Slover Avenue facility was approached by

21     a Universal Intermodal agent at the end of his shift, asking

22     him if he knew about the Union coming to the facility, and how

23     he felt about the Union.  That agent then offered to pay the

24     same employees to attend an anti-union meeting to be held that

25     same night.

Exhibit 1(b)
48

www.escribers.net | 800-257-0885

1        Following this interrogation, the evidence will show that

2   Universal Intermodal transferred a manager from its Texas

3   operation, an individual by the name of Joe Lugo, to the

4   Compton facility.  The evidence will show that as soon as Lugo

5   showed up at the Compton facility, he unlawfully solicited

6   employee complaints and grievances, promising them increased

7   benefits and improved terms and conditions of employment.  Lugo

8   did this on two occasions:  once around November 14, and a

9   second time on November 25th.

10       During these meetings, Lugo spoke to employees, asked them

11  about their work issues, offering them his cell phone number,

12  and promising them that any issues they raised with him would

13  be taken care of.  Employees will testify that this has never

14  happened prior to the Union.

15       As a part of its campaign, Universal Intermodal began

16  holding anti-union meetings with its employees, hiring two

17  labor consultants, one of them named Kirk Cummings, who

18  lectured the employees about the supposed danger of uni --

19  unionization.  While the employees were told -- were not told

20  that these meetings were mandatory, employees will testify they

21  repeatedly listened to Cummings and his associate espouse false

22  truths about the Union, when it was clear that these employees

23  supported the Union.

24       Not satisfied with simply running an anti-union campaign

25  and unlawfully interrogating and soliciting complaints from its

Exhibit 1(b)
49



1    employees, Universal Intermodal also went so far as to

2    terminate employees who supported the Union, to send a clear

3    message to its workforce about the price of supporting the

4    Union.

5        Romel Mallard was a driver for Universal Intermodal,

6    working out of the Compton facility.  He was a leader of the

7    Union's campaign, regularly speaking to his coworker about the

8    Union, proudly wearing his Union safety vest to work, and

9    standing up for the Union during Respondent's anti-union

10   campaign -- union meetings.

11       During the anti-union meetings, Ma -- Mallard regularly

12   rebuffed the labor consultant -- consultant's melodramatic and

13   hostile claims about the Union.  The evidence will show that

14   Mallard and his fellow morning shift drivers attended an anti-

15   union meeting on November 25th, 2019.

16       Mallard and his coworkers will testify that they were

17   never told that their attendance at this meeting was mandatory.

18   During this meeting, Mallard again spoke up and contested an --

19   the information that labor consultant Cummings was presenting.

20   During this exchange, labor consultant Cummings told Mallard

21   that this was his meeting, and that Mallard could not speak.

22   In response, Mallard told Cummings that he -- if he, as a

23   driver, could not speak, he could not listen.  Mallard then

24   proceeded to leave the meeting and went into his truck to wait

25   to be dispatched.

Exhibit 1(b)
50

escribers
www.escribers.net | 800-257-0885

1        Corroborating testimony will show that when Mallard left

2    this meeting, no one tried to stop him, and no one told him

3    that he could be disciplined for leaving.  On November 26th,

4    2019, a mere two days before Thanksgiving, Mallard was

5    terminated for insubordination; insubordination for leaving a

6    meeting after challenging the labor consultant, insubordination

7    for leaving a meeting that he was never told he could not

8    leave.

9        The evidence will clearly show that Universal Intermodal's

10   basis for terminating Mallard was a mere pretense, and that it

11   terminated him, not because he left the November 25th meeting,

12   but because he supported the Union.  In fact, testimony will

13   show that a group of employees in another shift also walked out

14   of a similar anti-union meeting and were not disciplined in any

15   way.

16       Mallard was not the only victim of Universal Intermodal's

17   anti-union campaign.  The evidence will show that Jonathon

18   Ledesma, a Compton driver, and a leading vocal Union supporter,

19   was also unlaw -- unlawfully terminated by Universal

20   Intermodal.  Like Mallard, Ledesma drew the ire of Universal

21   Intermodal when he spoke to his coworkers about the Union,

22   proudly wore a Union vest, and even openly told Universal

23   Intermodal's labor consultant at a -- at an anti-union meeting

24   that he and his coworkers wanted a union, and that these

25   meetings were a waste of time.  In fact, Ledesma led his

Exhibit 1(b)
51

escribers
www.escribers.net | 800-257-0885

1    coworkers on a walkout during an anti-union meeting.

2          Unlike -- unlike Mallard, Ledesma was not terminated for

3    insubordination.  Instead, Universal Intermodal created a

4    pretense for Ledesma's termination so transparent, its own

5    recor -- its own records belie its reasoning.

6          On November 25th, 2019, one day before it would terminate

7    Mallard, Universal Intermodal suspended Ledesma for having an

8    Arizona commercial driver's license, instead of a California

9    commercial driver's license.  Universal claimed that it

10   discovered this fact when it was auditing its drivers' records

11   in anticipation for a California Highway Patrol inspection;

12   however, the evidence will show that Universal Intermodal knew

13   about Ledesma's Arizona's license since at least 2018,

14   possessing a copy of his Arizona license in his employment

15   records, and speaking to him about it several times, and

16   allowing him to work for more than a year on the Arizona

17   driver's license without issue.

18         Without giving Ledesma any opportunity to remedy the

19   issue, on November 27, the day before Thanksgiving, one week

20   before the Union election, and on the same day that Ledesma had

21   his last test to obtain a California driver's license,

22   Universal Intermodal terminated Ledesma.

23         With two of their vocal Union leaders gone, employees will

24   testify that these terminations had the effect of discouraging

25   their support for the Union.  Employees will testify that after

Exhibit 1(b)
52

www.escribers.net | 800-257-0885

1    termina -- after the terminations, they no longer spoke up

2    during anti-union meetings, and they were concerned that they

3    could be next.

4        During these events, Universal Intermodal also began

5    telling the employees that the Compton facility would be

6    closing in December 2019.  They explained that it was because

7    the lease was expiring; however, despite the impending closure,

8    Universal Intermodal managers and dispatcher reassured the

9    employees about their jobs and told them that the company would

10   likely move the operations to a nearby Southern Counties

11   Express location, called Southern Counties Express Yard 5.  At

12   no point prior to the Union election on December 4, 2019, did

13   Universal Intermodal tell the employees, the Union, or even the

14   Board, that the -- that the unit employees may lose their job

15   due to the closure of the facility.

16       Let me emphasize.  Despite cessation of business being a

17   valid reason to request dismissal of a petition, at no point

18   prior to the election did Universal Intermodal raise this

19   possibility.  Rather, Universal Intermodal entered into a

20   stipulated election agreement on November 11, 2019, ran a full

21   anti-union campaign, hired new management at the Compton

22   facility, and allowed the NLRB election to go forward.

23       Respondent may argue that they've been considering this --

24   this decision since March of 2019.  If this was true, then they

25   could've raised it with the Board, and with the parties, yet

Exhibit 1(b)
53

escribers
www.escribers.net | 800-257-0885

1   they did not.

2       On December 4, 2019, the NLRB election was held at

3   Universal Intermodal's Compton facility.  The tally of ballots

4   showed that out of 28 eligible voters, 20 voted in favor of the

5   Union, four voted against the Union, and there were three

6   challenges.  After the election, the Employer filed objections,

7   one of which was set for hearing; however, on the eve of the

8   hearing, and after the -- after the Compton facility closure,

9   the Employer withdrew its objection, which led the Region to

10  certify the Union as the representative of the Compton

11  employee -- of the Compton dispatch employees' unit on January

12  8, 2020.

13      Following the December 4, 2019 vote, the evidence will

14  show that Universal Intermodal and Southern Counties Express,

15  who were the ones dispatching the -- the employees, began to

16  substantially reduce the work being assigned to the new Union

17  employees.  Universal Intermodal and Southern Counties Express

18  unilaterally, and without notification to the Union, began to

19  shift the unit's employees' work to owner operators.

20  Essentially, Universal Intermodal and Southern Counties Express

21  were unilaterally and unlawfully subcontracting out the unit's

22  work without first bargaining with its employees' collective

23  bargaining agent.

24      Universal and Southern Counties Express subcontracted out

25  the unit's work to set the stage for their final act, which

Exhibit 1(b)
54

www.escribers.net | 800-257-0885

1    would completely obliterate their employees' Section 7 rights.

2    On December 20th, 2019, five days before Christmas, at the

3    instruction of Universal Logistics Holding, Universal

4    Intermodal and Southern Counties Express unilaterally closed

5    the Compton facility, and unceremoniously laid off all the unit

6    employees.

7         In its feeble explain -- explanation to the unit

8    employees, Universal Intermodal and Southern Counties Express

9    blamed the closure and layoff on the lease expiration and poor

10   business conditions; however, the evidence will show that these

11   reasons are nothing more but a pretext.

12        First, the evidence will show that prior to the layoff,

13   Universal Intermodal officially, repeatedly told employees that

14   it would be relocated.  Second, the evidence will also show

15   that despite the Slover facility's continued operation, the

16   eight unit drivers out of that facility were also laid off.

17   Third, the evidence will show that immediately following the

18   layoff, Universal Intermodal began recruiting new company

19   drivers at another facility.  Fourth, multiple drivers will

20   testify that immediately before being notified of their layoff,

21   they were directed to report -- to report to work on a

22   different shift the following week.  Lastly, the evidence will

23   show that despite Universal Intermodal's claim of poverty, its

24   parent company was, at that time, making records amount of

25   profit from its intermodal operations.  Profits that it was

Exhibit 1(b)
55

escribers
www.escribers.net | 800-257-0885

1    clearly unwilling to share with its new unionized workforce.

2         Compared to its layoff of the Universal Intermodal

3    employees, the General Counsel will show that Universal

4    Logistics Holding, at its highest level, also instructed its

5    subsidiaries, Universal Truckload and Roadrunner, to lay off

6    any of their employees who were exposed to the Teamsters

7    campaign.  Namely, the evidence will show that on December 18,

8    2019, 26 Roadrunner drivers were laid off, and on December

9    20th, 2019, 12 Universal Truckload drivers were laid off.

10        Perhaps unsurprisingly, Universal Truckload and Roadrunner

11   could not use the closure of the Compton facility as an excuse

12   for laying off these employees.  Accordingly, it instead blamed

13   the layoffs at Universal Truckload and Roadrunner on soft

14   freight conditions; however, unlike the Universal Intermodal

15   drivers, the Universal Truckload and Roadrunner drivers will

16   testify that there have been absolutely no change in their work

17   prior to their layoff.  In fact, the Roadrunner drivers will

18   testify that they were currently being onboarded by Universal

19   Intermodal into its core operations.

20        Given Universal Truckload and Roadrunner's weak

21   justifications for its devastating business decision, it is

22   clear that their reasons were nothing more than a pretext to

23   terminate employees who it knew would likely be the next in

24   line to unionize.

25        Again, Respondents took these actions unilaterally and

Exhibit 1(b)
56



www.escribers.net | 800-257-0885

1  without any notice to the Union.  Since the dissolution of the

2  unit, the evidence will show that since January 18, 2020, the

3  Union requested bargaining with the Respondent.  On the same

4  date, the Union also sent Universal Intermodal an extensive

5  request for information related to bargaining; however,

6  Universal Intermodal has categorically refused to bargain with

7  the Union over a contract for the unit.

8      Consistent with its position, Universal Intermodal has

9  refused to provide the Union with information relevant and

10  necessary for bargaining, including presumptively relevant

11  information.

12      The evidence will show that Universal Intermodal has only

13  agreed to meet with the Union to negotiate over the effects of

14  its closure decision and provide information that's relevant to

15  that effects bargaining.  The evidence will show that this

16  purported effects bargaining ultimately achieved no results.

17      Lastly, to add insult to injury, the evidence will show

18  that in July 2020, Respondent Universal Intermodal unlawfully

19  engaged in direct dealing with a unit employee over a matter of

20  unpaid expenses.  The evidence will show that in response to a

21  unit employee's request for unpaid reimbursement, instead of

22  just paying that employee what he was owed, Respond --

23  Respondent unlawfully tried to get him to sign a general

24  release of claims.  The evidence will show that this was a

25  procedurally and substantively unconscionable attempt by the

Exhibit 1(b)
57

escribers
www.escribers.net | 800-257-0885

1    Respondent to offer a unit employee, without legal counsel, a

2    mere $250 in exchange for a general release of any other claims

3    that he -- he might have had, including the NLRB claim.  And

4    this -- and it did so behind the Union's back.

5        The evidence will show that once the Union learned about

6    Universal Intermodal's unlawful conduct, on July 15, 2020, it

7    requested Universal Intermodal bargain with it instead of the

8    employee.  On that same day, the Union also requested relevant

9    and necessary information.  To date, Respondent Universal

10   Intermodal has categorically refused to bargain with the Union,

11   or to provide the Union with any of its requested information.

12       Overall, Your Honor, the evidence in this case will show

13   that -- that the Respondents have great animosity toward their

14   employees' exercise of Section 7 rights.  All in all, in the

15   weeks before Christmas, 63 hardworking men and women found

16   themselves without a job, not because they did something wrong,

17   but rather, because they dared to exercise their Section 7

18   rights.

19       The General Counsel will show in the coming days that the

20   Respondents have committed multiple unfair labor practices, and

21   complete disregard for their employees' protected rights.

22   Accordingly, the General Counsel asks, Your Honor, to grant the

23   request of relief, including the remedy of reestablishment of

24   the unit, back pay to these employees, and full reinstatement

25   to this workforce.

Exhibit 1(b)
58

escribers
www.escribers.net | 800-257-0885

1          Thank you, Your Honor.

2          HEARING OFFICER ROSAS:  Charging Party, do you have an

3    opening that you want to give at this time?  Do you want to

4    wait until your case, or do you waive opening?

5          MR. WOJCIECHOWSKI:  I'd like to give a brief opening now,

6    thank you.

7          HEARING OFFICER ROSAS:  Okay.

8          MR. WOJCIECHOWSKI:  The Union doesn't want to belabor the

9    points that have already been made very well by counsel for the

10   Acting General Counsel, and -- and lard up the transcript with

11   a repetitive statement of the issues, but just to -- to bring

12   it back again to the big picture here, Universal Intermodal

13   drivers voted overwhelmingly for the Union, notwithstanding an

14   employer campaign that included, as you heard, firing open

15   Union supporters.  Rather than bargain with the Union, the

16   Employer decided to fire -- follow-up firing two Union

17   supporters with firing the entire unit, transfer or subcontract

18   the work, and also fire employees at its two nearby related

19   companies, likely serving the dual purpose of avoiding

20   unionization at those companies, and also attempting to mask

21   the unlawfulness of the mass discharge at Universal Intermodal

22   by cloaking it in the excuse of changing to an independent

23   contractor model.

24          As Your Honor heard from the General Counsel, none of this

25   withstands even the least bit of scrutiny.  On top of -- of

Exhibit 1(b)
59

www.escribers.net | 800-257-0885

1    the -- the sort of -- that -- those 8(a)(3) violations, the

2    company's failure to bargain with the Union shows its animus

3    and serves as an independent reason to restore the status quo

4    and -- and make the unionized drivers whole.  The company was

5    obligated to bargain over its actions, and it acted at its

6    peril by taking unilateral action in the period between the

7    election and the certification.

8         Even after belatedly acknowledging a duty to bargain over

9    the effects of the decision, the company didn't engage in that

10   bargaining in good faith, showing up for one meeting, making

11   one offer, hearing a Union counter, and then walking away,

12   never providing another response, so obviously not good faith

13   bargaining, particularly in the context of having already

14   expressly refused to bargain over the decision, and having

15   failed to provide the Union notice and opportunity in the first

16   place.  The Union had to find out about all of these

17   terminations from the drivers themselves.

18        In short, this is -- this is not going to be a case as --

19   as I think Your Honor's probably getting the sense of a -- a

20   reasonable -- reasonable dispute over fine distinctions in the

21   law.  It -- it's a plain and obvious lawbreaker employer hiding

22   behind corporate shells with little meaning, daring the Union,

23   the Board, and the drivers to do something about it.  And

24   thankfully, here today, that moment to do something has come,

25   and we're here so that the employees' rights enshrined in the

Exhibit 1(b)
60

eScribers
www.escribers.net | 800-257-0885

1   Act be vindicated and some measure of justice can be served.

2       Thank you.

3       HEARING OFFICER ROSAS:  Respondent, do you desire an

4   opening at this time, do you waive, or do you want to do yours

5   later?

6       MR. ADLONG:  We will do ours later, Your Honor.  Thank

7   you.

8       HEARING OFFICER ROSAS:  Okay.  Let's go off the record.

9   (Off the record at 9:23 a.m.)

10      JUDGE ROSAS:  Okay.  Back on record.

11  General Counsel?

12      MR. DO:  Thank you, Your Honor.  Counsel for the General

13  Counsel call Mr. Dennis Glackin under Section 611(c).

14      JUDGE ROSAS:  Okay.  Sir, please raise your right hand.

15  Whereupon,

16                          **<u>DENNIS GLACKIN</u>**

17  having been duly sworn, was called as a witness herein and was

18  examined and testified, telephonically as follows:

19      JUDGE ROSAS:  All right.  Please state and spell your name

20  and provide us with an address, business is fine.

21      THE WITNESS:  Dennis Glackin, first name Dennis,

22  D-E-N-N-I-S.  Last name Glackin, G-L-A-C-K-I-N.  Address, 12755

23  East Nine Mile Road, Warren, Michigan.

24      JUDGE ROSAS:  Go ahead, General Counsel.

25      MR. DO:  Thank you, Your Honor.  Just before we begin, I

Exhibit 1(b)
61



1    just wanted to point out that there is an additional person in

2    the room with the Respondent.  I -- I don't think that person

3    has been identified yet.

4        MR. ADLONG:  That's Mike Vagts, the company

5    representative.  I had him sit there just because I figured, as

6    I understood it, if a person's going to participate in the

7    proceeding, you want to have them on camera at all times and

8    that allows him to be on camera at all times.

9        MR. DO:  Thank you.  I just want to confirm.  Okay.

10                    **DIRECT EXAMINATION**

11   Q    BY MR. DO:  Mr. Glackin, thank you for being here.  Who is

12   your current employer?

13   A    Universal Management Services.

14   Q    And what is your role at Universal Management Services?

15   A    Role, you mean title, or?

16   Q    Yes, what is your current job title?

17   A    Vice president of Labor Relations.

18   Q    And how long have you been in that role?

19   A    Roughly since about October of 2018.

20   Q    And Universal Management is the management company for

21   Universal Logistics Holding; isn't that right?

22   A    What do you mean by management company, I guess?

23   Q    Sure.  Does Universal Logistics Holding have staff -- have

24   employees?

25   A    No, it does not.

Exhibit 1(b)
62



www.escribers.net | 800-257-0885

1  Q    And the -- the -- the agents, supervisory managers, and

2  officers of the -- who control Universal -- Universal Logistics

3  Holding, they work under the umbrella of Universal Management

4  Services; isn't that right?

5       MR. ADLONG:  Objection.  Calls for a legal conclusion.

6       JUDGE ROSAS:  Are you calling this witness as a 611(c)?

7       MR. DO:  Yes, Your Honor.

8       JUDGE ROSAS:  All right.  Overruled.

9  Q    BY MR. DO:  Please answer that question, Mr. Glackin.

10 A    Could you say the -- could you ask the question more time?

11 Sorry.

12 Q    Sure.  So the officers, managers, and employees who

13 control Universal Logistics Holding's operation, they -- they

14 work under the umbrella -- they're employed by -- they're paid

15 by Universal Management Services; isn't that right?

16      MR. ADLONG:  Objection.  Lacks foundation.  Assumes facts

17 not in evidence.

18      JUDGE ROSAS:  Overruled.  He can lead.

19      Go ahead.  You can lead.  Go ahead.

20 Q    BY MR. DO:  Okay.  Mr. Glackin, can you answer the

21 question, please?

22 A    I would say I -- I -- I don't know the exact function of

23 it or the exact group of people that's under it.  I -- I know

24 that I'm under that company.

25 Q    All right.  The executive of Universal Logistics Holding,

Exhibit 1(b)
63



1    they -- they -- they are -- they work under and they're paid by

2    Universal Management Service; isn't that right?

3         MR. ADLONG:  Obj -- I'm going to continue to object.  That

4    assumes facts not in evidence.

5         JUDGE ROSAS:  Overruled.

6         If you know.

7    A    I -- I don't know.  I'm not sure.

8    Q    BY MR. DO:  You're an executive of Universal Logistics

9    Holding us well, right?

10   A    I'm the vice president of labor relations, yes.

11   Q    And you're paid by Universal Management Services; isn't

12   that right?

13   A    Yes.

14   Q    And you're employed by Universal Management; isn't that

15   right?

16   A    Yes.

17   Q    All right.  I'm going to put up for identification what's

18   previously been marked and identified as Joint Exhibit 10(a).

19   Give me one moment, let me pull that up.  Mr. Glackin, can you

20   see what I'm placing in front of you?  I can zoom in, if you

21   like.

22   A    Yeah, could you zoom in, please?  Thank you.

23   Q    All right.  Do you recognize this document?  Do you want

24   me to zoom in some more?

25   A    Yes.  Can you, please?

Exhibit 1(b)
64



1    Q    Sure.  This is the document that you -- your company

2    provided to the National Labor Relations Board during it -- its

3    investigation, right?

4    A    I would assume so.  I --

5    Q    And this is an exhibit to Universal Logistics fiscal year

6    2019 10-K filing with the SEC; isn't that right?

7         JUDGE ROSAS:  Counsel, you're referring to Joint Exhibit

8    10(a); is that correct?

9         MR. DO:  Correct, Your Honor.

10   Q    BY MR. DO:  Mr. Garskin (sic)?

11   A    It appears to be -- without seeing the exact title, it

12   appears to be.

13   A    Okay.  Who -- Okay.  Let me mark for identification as GC

14   Exhibit 2.  Well, let -- let me put that on screen.  Sorry.  GC

15   Exhibit 3.  Do you see what I'm putting in front of you, sir?

16   **(General Counsel Exhibit Number 3 Marked for Identification)**

17   A    Yes.

18   Q    BY MR. DO:  So this is a copy of the 10-K filing that your

19   company filed with the sen -- my apologies -- the SEC for

20   fiscal 2019; isn't that right?

21   A    I see it says Form 10-K.  I don't know when it was filed.

22   I can't see the -- the all the information on it, the date on

23   it.

24   Q    If you need to -- if you need to see anything more

25   particular, just let me know when I can zoom in for you.

Exhibit 1(b)
65



1   A    Okay.  It says for the fiscal year ended December 31,

2   2019.  That's what it says on there.

3   Q    Okay.  And I just want to scroll down to the exhibits.

4   Bear with me here.  All right.  You see what is marked as --

5   I'm on -- as part of your 10 -- of your company's 10-K filing

6   as Exhibit 21.1 to that filing?

7   A    I see the exhibit, yes.

8   Q    And that exhibit is a list of your company's subsidiary;

9   isn't that right?

10  A    It appears to be.

11  Q    And this 10-K filing was something that you provided to

12  the National Labor Relations Board during its investigation,

13  right?

14       JUDGE ROSAS:  Counsel, hold on one second.  All right, so

15  this exhibit, General Counsel's 3, for identification --

16       MR. DO:  Yes, Your Honor.

17       JUDGE ROSAS:  -- this is not stipulated into evidence yet;

18  is that correct?

19       MR. DO:  It -- it is not.  I didn't know if I -- if I had

20  written it out --

21       JUDGE ROSAS:  Okay.  So --

22       MR. DO:  -- for completeness.

23       JUDGE ROSAS:  Again, when I ask you all yes or no

24  questions, just answer yes or no.

25       MR. DO:  Yes, Your Honor.

Exhibit 1(b)
66



www.escribers.net | 800-257-0885

```
1        JUDGE ROSAS:  So therefore, it has not been stipulated

2    into evidence.  So -- but it's been produced by the Respondent.

3        Is that correct, Mr. Adlong?

4        MR. ADLONG:  We have produced a 10-K with exhibits, Your

5    Honor.

6        JUDGE ROSAS:  Okay.  So there's no issue as to the

7    authenticity.  Are you offering this into evidence?

8        MR. DO:  Yes, Your Honor.

9        JUDGE ROSAS:  Okay.  It states principal subsidiaries of

10   Universal Logistic Holdings, Inc.  Okay.

11       Is there any objection?

12       MR. ADLONG:  We would object as to relevance.

13       JUDGE ROSAS:  General Counsel?

14       MR. DO:  Your Honor, we -- I mean, at this point, there --

15   there are -- this -- this document lists out the company's

16   operation and obviously its -- its fiscal situation at the

17   time, which we think is relevant.  But furthermore, in light of

18   Mr. Glackin's --

19       JUDGE ROSAS:  Not -- not what you think, Counsel.  What --

20   what is the connection to the point that you're trying to

21   establish here of this document?  What's the relevance?

22       MR. DO:  The relevance is that the -- what has been

23   admitted as Joint Exhibit 10 -- 10k (sic), Mr. Glackin was

24   unwilling to testify to the fact that it's a complete doc --

25   you know, it was an attachment to their 10-K filing.  And this
```

Exhibit 1(b)
67
www.escribers.net | 800-257-0885

1    is being offered for completeness, to kind of lay context for

2    that particular incident.

3         JUDGE ROSAS:  Again, what is the relevance to the

4    allegations in the complaint?  What's introduced?

5         MR. DO:  Well, relevance is -- sure, this is the single

6    Employer and joint Employer, Your Honor.

7         JUDGE ROSAS:  Okay.  Overruled.  General Counsel's 3 is

8    received.

9    **(General Counsel Exhibit Number 3 Received into Evidence)**

10        JUDGE ROSAS:  Next question.

11   Q    BY MR. DO:  Okay.  And with regard to this list of

12   subsidiary.  This is a accurate list of all Universal

13   Logistics, wholly owned subsidiaries at the end of fiscal year

14   2019, right?

15   A    I don't know that to be.  I -- I don't know.  I'm not

16   sure.

17   Q    This 10-K outlines the financial situation of your company

18   for the fiscal year of 2019, which is the same time -- the same

19   year that you closed the -- the facility in Compton,

20   California; isn't that right?

21        MR. ADLONG:  Objection.  As to you.

22        JUDGE ROSAS:  Overruled.

23        If you know.

24   A    I don't know.

25   Q    BY MR. DO:  All right.  Taking this thing off screen.  You

Exhibit 1(b)
68



www.escribers.net | 800-257-0885

1    testified that you're the vice president of labor relations for

2    Universal Management Services; isn't that right?

3    A    Yes.

4    Q    You don't hold any position at Universal Intermodal,

5    Southern Counties Express, Universal Truckload, or Roadrunner;

6    isn't that right?

7    A    That's correct.

8    Q    Tim Phillips is the CEO of Universal Logistics Holdings,

9    Inc.; isn't that right?

10   A    As a -- at present time, you're talking?

11   Q    Yes.

12   A    Yes.

13   Q    And to the best of your understanding, he doesn't have any

14   position at Universal Intermodal, Southern Counties Express,

15   Universal Truckload, or Roadrunner; isn't that right?

16   A    No, not that I'm aware of, correct.

17   Q    And Michael Vagts, he is the director of contractor

18   relations for Universal Management Services; isn't that right?

19   A    Yes.

20   Q    And Michael Vagts doesn't have any position at Universal

21   Intermodal, Southern Counties Express, Universal Truckload, or

22   Roadrunner; isn't that right?

23   A    That's right.  Correct.

24   Q    Chris Howder is the director of Universal -- is a director

25   of Universal Management Services; isn't that right?

Exhibit 1(b)
69



1       MR. ADLONG:  Objection.  Vague as to time.

2       JUDGE ROSAS:  Rephrase.

3       MR. DO:  Okay.

4    Q    BY MR. DO:  Chris Howder, at the end of 2019, when the

5    business decision at issue in this case was being made, he was

6    the director of the Universal Management Services; isn't that

7    right?

8       MR. ADLONG:  Objection.  Assumes facts not in evidence.

9       JUDGE ROSAS:  Overruled.

10   A    I -- I'm --

11   Q    BY MR. DO:  Mr. Glackin?

12   A    -- not sure.  I'm not sure exactly at that time what his

13   title was.  I'm not sure.

14   Q    What is Mr. Howder's current position at Universal

15   Management Services?

16   A    He's no longer employed with the company.

17   Q    Okay.  Prior to -- prior to him leaving Universal

18   Management Services, what was his title?

19   A    I'm not sure.  I -- I'm not sure.

20   Q    To the best of your understanding, did he have any job

21   title at Universal -- or have any position at Universal

22   Intermodal, Southern Counties Express, Universal Truckload, or

23   Roadrunner, right?

24      MR. ADLONG:  Objection.  Vague as to time.

25      JUDGE ROSAS:  Rephrase.

Exhibit 1(b)
70



1      MR. DO:  Sure.

2    Q  BY MR. DO:  Prior to Mr. -- prior to Mr. Howder's leaving

3  the company, to -- to the best of your understanding, did he

4  have any position at Universal Intermodal, Southern Counties

5  Express, Universal Truckload, or Roadrunner?

6      MR. ADLONG:  Again, objection.  Vague as to time.  Prior

7  as to -- prior to leaving could -- that -- that could be, like,

8  a 20-year time span or 40-year time span.

9      JUDGE ROSAS:  Quote it down.

10     MR. DO:  Okay.

11   Q  BY MR. DO:  Immediately before -- at the time of him

12  leaving Universal Management Services, he did not have any job

13  title at Universal Intermodal, Southern Counties Express,

14  Universal Truckload, or Roadrunner, right?

15   A   I don't know exactly -- I don't know exactly his position

16  or -- or the time frame or -- or -- or what company he was

17  with, exactly.  I -- I'm not sure.

18   Q   Okay.  Give me one moment; let me check something.  Tony

19  Milles is the regional director of the West Coast for Universal

20  Intermodal; isn't that right?

21     MR. ADLONG:  Objection.  Relevance.  Vague as to time.

22     JUDGE ROSAS:  Overruled.

23     We're talking about present, right?

24     MR. DO:  Yes, Your Honor.

25   Q  BY MR. DO:  Mr. Glackin?

Exhibit 1(b)
71



```
 1    A    Okay.  Are you asking his present title and position?

 2    Q    Correct?

 3    A    Say it again and what -- what you say -- stated was what?

 4         JUDGE ROSAS:  Counsel, no cross discussion.  Do you have

 5    an objection?

 6         MR. ADLONG:  No.  I was trying to speak to my cocounsel.

 7    I'm sorry.

 8    Q    BY MR. DO:  Tony Milles is the regional director of the

 9    West Coast for Universal Intermodal; isn't that right?

10    A    I believe so.

11    Q    And Tony Milles doesn't have any position with Universal

12    Management Services, Southern Counties Express, Universal

13    Truckload, or Roadrunner, or Universal Logistics Holding; isn't

14    that right?

15    A    Correct.

16    Q    And how long -- to the best of your understanding, how

17    long has he held the position of regional director?

18    A    I'm unsure.  I don't know.

19    Q    Don Taylor is the pres -- in the -- at the present time,

20    Don Taylor is the president of Universal Intermodal, right?

21    A    Yes.

22    Q    And Don Taylor doesn't have any position at Universal

23    Logistics Holding, Universal Management Services, Southern

24    Counties Express, Universal Truckload, or Roadrunner; isn't

25    that right?
```

Exhibit 1(b)
72



www.escribers.net | 800-257-0885

1    A    Correct.

2    Q    Mike Erskine is the vice president of Universal Truckload;

3    isn't that right?

4    A    Present time?

5    Q    At present time.

6    A    That's not correct, no.

7    Q    And what is his current job title?

8    A    He's no longer employed with the company.

9    Q    Prior to his separation, the day of his separation, he was

10   the vice president of Universal Truckload; isn't that right?

11   A    I believe so.

12   Q    And at the time of his separation, he did not have any job

13   title at -- or position at Universal Logistics Holding,

14   Universal Management Services, Southern Counties Express,

15   Universal Intermodal, or Roadrunner; isn't that right?

16       MR. ADLONG:  I'm going to object again as to relevance.

17   If we -- if we don't know if it's within the time period of the

18   res gestae of the complaint allegations.

19       JUDGE ROSAS:  Rephrase.

20       MR. DO:  Okay.  And Your Honor, so one thing that is kind

21   of -- kind of what we're going through here is the stipulation

22   that -- well, the amendment that Respondent's counsel was

23   supposed to make on the record would have covered these

24   individuals' job title for the relevant time period.  Since we

25   haven't had -- gotten that entered yet, that's why I'm going

Exhibit 1(b)
73

escribers
www.escribers.net | 800-257-0885

1    through these -- this line of inquiry.  But anyhow --

2         JUDGE ROSAS:  But I mean, not -- we're -- we're talking

3    about time frames here to the extent --

4         MR. DO:  Correct.

5         JUDGE ROSAS:  -- Counsel's seeking clarification.

6         MR. DO:  Got it.

7    Q    BY MR. DO:  So for the time period from November 2019

8    through the end of 20 -- 2020, Mike Erskine did not hold any

9    position at Universal Logistics Holding, Universal Management

10   Services, Southern Counties Express, Universal Intermodal, or

11   Roadrunner; isn't that right?

12        MR. ADLONG:  Let me object as compound.

13        JUDGE ROSAS:  Overruled.

14        If you can answer.

15   A    Not that I'm aware of.

16   Q    BY MR. DO:  All right.  And Joe Lugo, when he was employed

17   at Universal Intermodal, so around November of 2019 to December

18   of 2019, or during that relevant period, he was the general

19   manager of Universal Intermodal; isn't that right?

20   A    I'm unsure of that -- of his exact title.  I'm not sure.

21   Q    Okay.  One moment.  Give me one moment, I'm trying to pull

22   up an exhibit.  All right, to the best of your understanding,

23   during the period from November 2019 to December 2019, Joe Lugo

24   didn't have any job position at Universal Logistics Holding,

25   Universal Management Services, Southern Counties Express,

Exhibit 1(b)
74

1    Universal Truckload, or Roadrunner; isn't that right?

2    A    Not that I'm aware of.

3    Q    Who is the director of labor relations responsible for

4    Mason-Dixon, doing business at Universal Intermodal?

5         MR. ADLONG:  Objection as to time.

6         JUDGE ROSAS:  We're talking present.  Overruled.

7         MR. ADLONG:  I'm going to object as to relevance, then.

8    Doesn't go to the res gestae of the complaint.

9         JUDGE ROSAS:  Overruled.

10   A    What was the question again?

11   Q    BY MR. DO:  Who is the director of labor relations

12   responsible for Mason-Dixon Intermodal doing business as

13   Universal Intermodal?

14   A    I'm sorry, one more time, what was the time frame again?

15   Q    The present time, sir.

16   A    Michael Vagts.

17   Q    And Michael Vagts -- wait, hang on, did we establish that

18   already?  Mr. Vagts reports directly to you; isn't that right?

19   A    Yes.

20   Q    In your role as vice president of labor relations, you

21   frequently provide advice and guidance regarding the operation

22   of Universal Intermodal; isn't that right?

23        MR. ADLONG:  Vague and ambiguous as to operation.

24        JUDGE ROSAS:  Give it a little tweaking, Counsel.

25        MR. DO:  Sure.

Exhibit 1(b)
75


www.escribers.net | 800-257-0885

1    Q    BY MR. DO:  In your role as vice president of labor

2    relations, you frequently provide advice and guidance regarding

3    the business operation and labor relations policies of

4    Universal Intermodal; isn't that right?

5         MR. ADLONG:  Now I'm going to object as to compound.

6         JUDGE ROSAS:  Overruled.

7         If you can answer.

8    A    I offered guidance and advice, yes.

9    Q    BY MR. DO:  And what is the scope of your (audio

10   interference) advice?

11   A    It depends.  I mean, it -- it depends.

12   Q    Who is the labor -- director of labor relations

13   responsible for Southern Counties Express?

14        MR. ADLONG:  I'm going to object -- well, no.  Forget it.

15   I withdraw the objection.

16   A    Overseeing -- in that same capacity, overseeing Southern

17   Counties Express would be Michael Vagts.

18   Q    BY MR. DO:  And in your role as vice president of labor

19   relations, you frequently provide advice and guidance regarding

20   the business operation and labor relations policies of Southern

21   Counties Express; isn't that right?

22   A    Yes.

23   Q    Who is the director of -- of labor relations responsible

24   for Universal Truckload?

25   A    Michael Vagts.

Exhibit 1(b)
76



www.escribers.net | 800-257-0885

1    Q    And again, in your role as vice president of labor

2    relations for UMS, you frequently provide advice and guidance

3    regarding the operation -- the business operations and labor

4    relations policies of Universal Truckload, right?

5         MR. ADLONG:  Wait.  I'm going to object.  You started with

6    UMS, and then you ended with UT.  Is that -- you're talking

7    about --

8         MR. DO:  But no, the question was, is his -- in his

9    current role at UMS, he provide advice and guidance regarding

10   the business operation and the labor relations policy of

11   Universal Truckload.

12        MR. ADLONG:  I'm going to object as to business

13   operations.  Vague and ambiguous.

14        JUDGE ROSAS:  Break that question down, Counsel.

15        MR. DO:  Sure.

16   Q    BY MR. DO:  In your role as the vice president of labor

17   relations, you provide advice regarding the -- the -- the labor

18   relations policies of Universal Truckload; isn't that right?

19   A    Advice and guidance for labor relations functions, yes.

20   Q    Who is the director of labor relations responsible for

21   Roadrunner?

22   A    Michael Vagts.

23   Q    And in your role as the vice president of labor relations,

24   you frequently provide advice regarding labor relations

25   functions for Roadrunner; isn't that right?

Exhibit 1(b)
77



1    A    Yes.

2    Q    In 2020, were you aware that the National Labor Relations

3    Board invested -- investigated cases alleging that Universal

4    Intermodal, Universal Truckload, and Roadrunner violated the

5    National Labor Relations Act?

6    A    In -- any time during 2020, was I aware?

7    Q    Yes.

8    A    Yes.

9    Q    And in 2020, were you -- you were aware that the National

10   Labor Relations Board issued investigative subpoenas to

11   Universal Intermodal, Universal Truckload, Roadrunner, Southern

12   Counties Express, and its parent corporation, Universal

13   Logistics Holding; isn't that right?

14   A    Yes.

15   Q    And do you -- in 2021, do you recall being presented as

16   the -- the custodian of records for Universal Intermodal,

17   Universal Truckload, Southern Counties Express, Roadrunner, and

18   Universal Logistics Holding for these subpoenas?

19   A    Yes.

20   Q    And that's also true for Southern Counties Express; isn't

21   that right?

22   A    Same statement you're saying for Southern Counties?

23   Q    Yes.

24   A    Yes.

25   Q    Yes.  In 20 -- in 2020 through 2021, do you recall being

Exhibit 1(b)
78



1   responsible for collecting the responsive documents for these

2   investigative subpoenas?

3   A    Yes, I was tasked with collecting responsive documents,

4   yes.

5   Q    In May of 2021, are you aware that the National Labor

6   Relations Board issued hearings subpoenas for Universal

7   Intermodal, Universal Truckload, Roadrunner, Southern Counties

8   Express, and its parent corporation, Universal Logistics

9   Holding and Universal Management Services regarding the current

10  hearing?

11  A    I don't recall the exact time frame, but I -- I was aware,

12  yes.

13  Q    Were you responsible for collecting document

14  responsivities hearing subpoenas?

15  A    I was tasked with collecting documents, yes.

16  Q    Are you familiar with Universal Logistics Holding,

17  Universal Management Services, Universal Intermodal, Southern

18  Counties Express, Universal Truckload, and Roadrunner's

19  response to these requests?

20  A    Am I familiar?  I mean, through the -- through the process

21  and the depositions, yes.

22  Q    All right.  So I'm going to put on the screen what's been

23  marked and identified as Joint Exhibit 14(c), which is already

24  admitted into evidence.  Do you recognize this hearing subpoena

25  which was issued to Universal Intermodal?

Exhibit 1(b)
79



 1    A     If you could just blow it up a little bit.  I apologize.

 2    It's hard to see.

 3    Q     No worries, no worries.  Just let me know what you want to

 4    see.  I can also scroll down to the text, if you like.

 5    A     Yes, I'm aware of it, yes.

 6        Q     And is it accurate to say that requests 1 through 21

 7    of the subpoena match requests 4 through 5 of the investigative

 8    subpoena, which is already marked and admitted as Joint Exhibit

 9    14(a).

10        MR. ADLONG:  Objection.

11        JUDGE ROSAS:  What's the basis?

12        MR. ADLONG:  The documents speak for themselves.

13        JUDGE ROSAS:  I assume he's going somewhere.

14        Go ahead, overruled.

15    A     I'm sorry, what -- what was the question again?  1

16    through, what was it?

17    Q     BY MR. DO:  Sure.  So let me show you what's been marked

18    and admitted as 14(a).  So this is the investigative subpoena.

19    Or -- yes, the investigative subpoena, which has 26 requests.

20    Do you see that?

21    A     I can see 26 items, yes.

22    Q     And then with regard to the hearing subpoena, I just

23    wanted to confirm that in your role as the person responsible

24    for collecting document, responsible to these requests,

25    requests number 1 through 24 -- 21 of the hearing subpoena is

Exhibit 1(b)
80

www.escribers.net | 800-257-0885

 1   substantially similar to requests 4 through 25 of the

 2   investigative subpoena; isn't that right?

 3   A    I mean, I'd have to see them side by side.  I'm not sure.

 4   I -- I'm not sure.

 5   Q    And is it correct that you did not provide any further

 6   response to these requests, as far as you're aware?

 7   A    Any response of documents we had, the company provided.

 8   I --

 9   Q    Right, but you haven't produced any more documents during

10   this hearing that would be responsive to the requests that were

11   substantially similar to the investigative subpoena; isn't that

12   right?

13        MR. ADLONG:  I'm going to just object as to relevance.

14   What does the production have to do with the complaint

15   allegations?  The production might provide facts that can be

16   used to substantiate the allegations, but the production and

17   what was or was not produced does nothing to prove the

18   allegations of the complaint.

19        JUDGE ROSAS:  Counsel, do you want the witness be excused?

20        MR. ADLONG:  Are you asking me or the GC?

21        JUDGE ROSAS:  General Counsel.

22        MR. DO:  Yes, if you would like to discuss off the record.

23        JUDGE ROSAS:  Ms. Bridge, can you put -- well, he can't go

24   into a waiting room.  All right.  Just step outside the old-

25   fashioned way.

Exhibit 1(b)
81



1         THE WITNESS:  Okay.

2         JUDGE ROSAS:  I guess, this is a hybrid hearing.

3         All right.  General Counsel, what's the relevance of your

4    line of questioning there?

5         MR. DO:  Sure, Your Honor, I'm just trying to establish

6    here that the -- well, the main relevance is that the lack of

7    documents in this case is indicative of potential animus.  So I

8    want to be able to go through the hearing subpoena and identify

9    specifically which paragraph did not really receive a response.

10   And this was what I was alluding to when we were -- during off-

11   the-record discussion that we have to review the current

12   production to see, you know, which request is it responsive to.

13   And I had originally drafted the hearing subpoena with the

14   direct intent of making sure that they stay substantially

15   similar to the investigative subpoenas so that we can go

16   through this quickly and just establish, look, these are the

17   same.  And then let me ask you about your response to request 1

18   of the -- or request 4 of the hearings -- of the investigative

19   subpoena was in responsive documents.  I'm just lying -- trying

20   to lay the foundation for that, Your Honor.

21        JUDGE ROSAS:  Okay.  Well, that's -- that's fair enough.

22   Now, you had me a little confused at the -- however, with the

23   point that you're -- I think you initially made, which is that

24   the failure to provide information is evidence of animus.

25        MR. ADLONG:  Your Honor?

Exhibit 1(b)
82



1    MR. DO:  No, the lack of documents, Your Honor.

2    JUDGE ROSAS:  I'm sorry, what?

3    MR. DO:  The -- the lack of documents, the lack of any

4    production, the lack of any -- basically a lot of these

5    documents would be going to their defense, but they didn't give

6    us any defensive documents --

7    JUDGE ROSAS:  Well --

8    MR. DO:  -- documents, you know -- go ahead.

9    JUDGE ROSAS:  No.  I -- I -- I -- I understand the

10   relevance to an 8(a)(5), information request or the lack

11   thereof, but are you saying that you're going to be seeking to

12   establish the failure to provide information requested that is

13   the subject of 8(a)(5) as evidence of animus?

14   MR. DO:  It's not just the 8(a)(5), Your Honor.  It's

15   things -- for instance, we're going to establish through Mr.

16   Glackin's testimony, for instance, that Mr. -- Mr. Ledesma was

17   terminated and the Respondent was not able to provide us with

18   any defenses, any document to an investigation, you know, any

19   disciplinary history, which again, tends to prove more -- more

20   likely than not that his termination was pretextual.

21   JUDGE ROSAS:  Well, you're entitled to establish what --

22   what was provided and what wasn't provided.  So I'll overrule

23   the objection.

24   MR. ADLONG:  Your Honor, is -- if I just -- are -- if he's

25   doing this on the basis to draw an adverse inference, the mere

Exhibit 1(b)
83
www.escribers.net | 800-257-0885

1    lack of documents does not create -- or is insufficient to

2    establish an adverse inference.

3        JUDGE ROSAS:  Well, wait a second.  So your -- is the

4    General Counsel talking about the failure to provide

5    information requested that's part of the 8(a)(5) charge, or you

6    referring to a subpoena noncompliance?

7        MR. DO:  No, Your Honor, this is -- we're offering it for

8    the substance, which is -- and -- and just to be clear, Your

9    Honor, this doesn't just apply to 8(a)(5).  It applies to

10   8(a)(5), 8(a)(3), and 8(a)(1) because --

11       JUDGE ROSAS:  But you're talking about subpoena

12   production.  You're not talking about subpoena production.

13       MR. DO:  Correct.  And -- and just to be clear, we -- we

14   believe that the Respondent has provided what responsive

15   documents it has.  We're simply trying to establish that the

16   absence of business record that would exist itself is pertinent

17   to the inquiry.

18       JUDGE ROSAS:  Pertinent to the complaint allegation of --

19       MR. DO:  Correct.

20       JUDGE ROSAS:  -- a failure to provide information

21   requested?

22       MR. DO:  No, no, Your Honor, it also encompassed like the

23   8(a)(3).  For instance, the termination of an employee without

24   an investigation; the termination of an employee without any

25   documents supporting that termination.  The --

Exhibit 1(b)
84

www.escribers.net | 800-257-0885

1      MR. ADLONG:  Your Honor, if I may, there's multiple cases

2  on point that establish that.  The mere nonexistence of

3  documents is insufficient to establish an adverse inference.

4  There's a 2018 case called Shamrock Foods, 366 NLRB Number 117,

5  North Hill's Office Services, 344 NLRB 1083, that's a 2005

6  case.  And there's a 1988 case called Champ Corp, 291 NLRB

7  Number 119.  Again, each of these cases stands for the

8  proposition that the mere failure to have documents is not

9  sufficient to establish an adverse inference, which is what the

10  General Counsel's -- is seeking.  These aren't being used to

11  attack an 8(a)(5) claim.  These are being used to prove up an

12  8(a)(3) claim.

13      JUDGE ROSAS:  Is that -- is that what the General Counsel

14  is trying to do in part here, is build up towards a McCallister

15  Towing adverse inference?  Or --

16      MR. DO:  Your Honor, that's --

17      JUDGE ROSAS:  -- are you addressing the substantive

18  charges in the complaint, that's 8(a)(5) and 8(a)(3)?

19      MR. DO:  We are trying to attack this case on -- and --

20  and this line of inquiry is meant to go to the substance of the

21  allegation.

22      JUDGE ROSAS:  Anything else, Respondent?

23      MR. ADLONG:  No, Your Honor just that we think that this

24  is an inappropriate line of inquiry.

25      JUDGE ROSAS:  Okay.  Overruled.

Exhibit 1(b)
85


www.escribers.net | 800-257-0885

1      Bring the witness back, please.

2      Okay, go ahead.

3      MR. DO:  Thank you, Your Honor.

4   Q    BY MR. DO:  So, Mr. Glackin, thank you again.  The last

5   question I asked was, is it -- is it fair to say that requests

6   1 through 21 of the hearings subpoena for Universal Intermodal

7   closely track requests 4 through 25 of the investigative

8   subpoena issued during the Universal Intermodal -- during the

9   investigation?

10  A    Again, without seeing them side by side and looking at

11  each point, I -- I don't -- I'm not sure.

12  Q    And to the best of your knowledge, your company has not

13  provided any further responsive documents to these requests;

14  isn't that right?

15  A    From what time frame, I guess, from when?

16  Q    Since the start of this hearing?

17  A    Correct.

18  Q    All right.  Let me show you what is -- what has been

19  marked and admitted as Joint Exhibit 15(c).  So do you -- do --

20  isn't this the hearing subpoena that was issued to Universal

21  Logistics Holding it -- for this hearing; isn't that right?

22  A    It looks like it, yes.

23  Q    And then 15(a) is the subpoena issued to Universal

24  Logistics Holding during the investigative subpoena; isn't that

25  right?

Exhibit 1(b)
86



1    A    It looks like it.

2    Q    All right.  Let me scroll you to show you that the

3    investigative subpoena has 10 requests.  Do you see that?

4    A    I see 10 requests, yes.

5    Q    All right.  So the hearing subpoena to Universal Logistics

6    Holding have a grand total of many requests, clearly -- 36

7    requests.  But importantly, is it fair to say that the first 10

8    requests of the hearing -- hearing subpoena subst -- is

9    substantially similar to requests made in the investigative

10   subpoena process?

11   A    Sir, again, if I -- without seeing them by each -- next to

12   each other and going line by line, I'm -- I'm not sure.

13   Q    Sure.

14        MR. DO:  Mr. Adlong, are you able to give the witness

15   these documents so that he can verify side by side?

16        MR. ADLONG:  I don't have the documents printed.

17        MR. DO:  Okay.

18   Q    BY MR. DO:  And then, let me just refer --

19        MR. ADLONG:  We'll continue to interpose the best evidence

20   objection, Your Honor.  Like, the documents are into the

21   record, and they speak for themselves.

22        JUDGE ROSAS:  Well, they speak for themselves only to the

23   extent, General Counsel, that you're asking the question in

24   order to -- as a foundation to move on from there.

25        MR. DO:  Yes, Your Honor.  Yes, Your Honor.  And I'm --

Exhibit 1(b)
87

www.escribers.net | 800-257-0885

1   quite honestly, that -- this initial line inquiry will end, you

2   know, after I ask regarding four more companies.  So there is

3   not many more question under this line of inquiry.

4        JUDGE ROSAS:  Go ahead.

5        MR. DO:  So thank you, Your Honor.

6   Q    BY MR. DO:  Mr. Glackin, do you recognize the document I

7   placed in front of you, which is marked and admitted as Joint

8   Exhibit 15(d) as the sub -- hearing subpoena issued to

9   Universal Management Services Inc.?

10  A    Yes.

11  Q    And again, this one has the same request as the Universal

12  Logistics Holding subpoena, but the key question is, is it fair

13  to say that requests 1 through 10 of the Universal Management

14  Service subpoena is substantially similar to the requests 1

15  through 10 of the investigative subpoena?

16       MR. ADLONG:  Objection.  Vague and ambiguous as to fair.

17       JUDGE ROSAS:  If you can answer that.

18       MR. ADLONG:  And best evidence rule.

19       JUDGE ROSAS:  Overruled.

20       If you can answer.

21  A    I'm not sure.

22  Q    BY MR. DO:  To the best of your knowledge, did Universal

23  Logistics Holding provide any other response that would have

24  been responsive to subpoena hearings, Universal Logistics

25  Holding, and Universal Management Services during subpoena

Exhibit 1(b)
88



www.escribers.net | 800-257-0885

1    requests 1 through 10, or investigative subpoena requests 1

2    through 10?

3    A    Not that I'm aware of.

4    Q    Let me move on to 16(a).  Let me show you 16(a).  Do you

5    recognize this as the hearing subpoena that was issued to

6    Southern Counties Express during the investigative process?

7    A    Yes.

8    Q    And let me show you that this request has six requests; is

9    that right?

10    A    Six requests, yes.

11    Q    All right.  And I'm going to mark and show you what has

12    already been admitted into evidence as Joint Exhibit 16(c).  Do

13    you recognize this as the subpoena that was issued to Southern

14    Counties Express for this hearing?

15    A    Yes.

16    Q    And again, this -- this request has a total of 19

17    requests.  But isn't it true that requests 1 through 6 of the

18    subpoena is the -- is substantially similar to the request made

19    in the investigative subpoena?

20    A    I'm not sure.  Again, if -- without seeing them side by

21    side, I'm not sure.

22    Q    Isn't it correct that Universal -- Southern Counties

23    Express did not produce any further documents that would have

24    been responsive to requests 1 through 6 prior to the start of

25    this hearing?

Exhibit 1(b)
89



www.escribers.net | 800-257-0885

1    A    Yes, not that I'm aware of.

2    Q    All right.  Let's move on to 17(a).  Do you recognize this

3    as the investigative subpoena issue to Universal Truckload

4    during the investigative process?

5    A    Yes.

6    Q    And do you see that this request only has eight requests?

7    A    Eight requests, yes.

8    Q    All right.  Jumping to what's been identified and admitted

9    as Joint Exhibit 17(c).  Do you recognize this as the hearing

10   subpoena issued to Universal Truckload in the current hearing?

11   A    Yes.

12   Q    And do you see that this request has a total of 15

13   requests?

14   A    15 requests, yes.

15   Q    Is it correct that requests 1 through 8 of Exhibit 17(c)

16   for the subpoena issued to Universal truckload is substantially

17   similar to requests 1 through 8 of the investigative subpoena

18   process?

19        MR. ADLONG:  Objection.  Best evidence rule.

20        JUDGE ROSAS:  Overruled.

21        If you know.

22   A    I'm not sure.

23   Q    BY MR. DO:  Okay.  And to the best of your knowledge,

24   isn't it right that your comp -- that Universal Truckload have

25   not provided any documents responsive to requests 1 through 8

Exhibit 1(b)
90



1    that has not previously been provided to the General -- the

2    General Counsel prior to the start of the hearing?

3    A    Not that I'm aware of.

4    Q    So moving on.  18(a).  Do you recognize this as the

5    investigative subpoena issued to Roadrunner Intermodal

6    Services?

7    A    Yes.

8    Q    And then do you see that this request has a total of eight

9    requests?

10   A    Eight requests, yes.

11   Q    Jumping to Joint Exhibit 18(c).  Do you recognize this as

12   the hearing subpoena issued to Roadrunner Intermodal Services

13   in this case?

14   A    Yes.

15   Q    And do you see that this request have a total of 15

16   requests?

17   A    Yes.

18   Q    Is it correct to say that requests 1 through 8 of the

19   hearing subpoena issued to Road -- Roadrunner Intermodal is

20   the -- is substantially similar to a requests made in the

21   investigative subpoena?

22        MR. ADLONG:  Objection.  Best evidence rule.

23        JUDGE ROSAS:  If you know.

24   A    I'm not sure.

25   Q    BY MR. DO:  And is it correct to say that other than any

Exhibit 1(b)
91

www.escribers.net | 800-257-0885

1    documents you provided in response to the investigative

2    subpoena prior to the start of this hearing, Roadrunner has not

3    produced any other document responsive to these requests; isn't

4    that right?

5    A    Not that I'm aware of.

6    Q    Okay.  As the custodian of records for Universal

7    Intermodal, Universal Logistics Holding, Universal Truckload,

8    Roadrunner, and Southern Counties Express, you appeared in

9    front of an agent of the National Labor Relations Board to

10   testify about the company's search for document responsive to

11   the five investigative subpoena that we just went through;

12   isn't that right?

13   A    Yes.

14   Q    And your interview for that case took two days; isn't that

15   right?

16   A    Yes.

17   Q    Once on January 22nd, 2021, and the second time on

18   February 10, 2021; isn't that right?

19   A    I don't recall the exact dates.

20   Q    You were under -- you were under oath to tell the truth,

21   the whole truth and nothing but the truth during that

22   interview; isn't that right?

23   A    Yes.

24   Q    Do you understand that this case is about Universal

25   Intermodal's decision to suspend and terminate two employees,

Exhibit 1(b)
92



 1   specifically Mr. Romel Mallard and Mr. Jonathon Ledesma; isn't

 2   that right?

 3   A    Am I aware that that's -- I'm sorry, what was the question

 4   again?

 5   Q    You understand that this case is about Universal

 6   Intermodal's decision to suspend and terminate Mr. Romel

 7   Mallard and Mr. Jonathon Ledesma; isn't that right?

 8   A    Yes.

 9   Q    And you understand that this case is also about Universal

10   Intermodal's decision to close the facility formerly located at

11   20 zero -- 2035 East Vista Bella Way, Compton, California,

12   right?

13   A    Yes.

14   Q    You understand that this case is about Universal

15   Intermodal's decision to lay off employees who were working at

16   that closed Compton facility, right?

17   A    Yes.

18   Q    You understand that this case is also about Universal

19   Intermodal's decision to lay off employees who were dispatched

20   out of the Compton facility but worked at a Universal Truckload

21   facility located on 15033 Slover Avenue, Fontana, California,

22   right?

23        MR. ADLONG:  I'm going to object.  The line of questioning

24   just goes his -- to his subjective understanding.  I think you

25   said we're here to get to the facts, not what he thinks or

Exhibit 1(b)
93



1    understands.

2          JUDGE ROSAS:  All right.

3          You can rephrase that.

4    Q    BY MR. DO:  All right.  Just to be clear, there were

5    Universal Intermodal who were dispatched by a dispatcher

6    working at the Compton facility, but they worked out of the

7    Slover facility, right?

8    A    I'm not sure.

9    Q    This case is about Universal Truckload's decision to lay

10   off employees working at the same Slover Avenue facility,

11   right?

12         MR. ADLONG:  Objection.  Again, relevance.

13         JUDGE ROSAS:  You can move on from the interpretation of

14   the pleadings.

15         MR. DO:  Yes, Your Honor.

16   Q    BY MR. DO:  Isn't it true that the Slover Avenue facility

17   consisted of Universal Truckload employees and Universal

18   Intermodal employees who began and ended their day there?

19         MR. ADLONG:  Objection.

20         JUDGE ROSAS:  Time frame.

21         MR. DO:  Sure.

22   Q    BY MR. DO:  For the period -- from the period -- from

23   November 2019 to December 2019, is it correct to say that at

24   the Fontana facility, which is the one located at 1500 -- 15033

25   Slover Avenue, Fontana, California, there were Universal

Exhibit 1(b)
94
www.escribers.net | 800-257-0885

1    Truckload employees working out of that facility and then eight

2    Universal Intermodal employees working at that facility?

3        MR. ADLONG:  Objection.  Lacks foundation, vague, and

4    ambiguous as to working.

5        JUDGE ROSAS:  Overruled.

6        If you can answer that.

7    A    I'm not sure.

8    Q    BY MR. DO:  Okay.  Give me one moment.  I just want to

9    cross-reference something.  All right.  I'm going to show you

10   what is -- well, it's not an exhibit, but do you see that this

11   is a copy of your -- a transcript of your interview on January

12   22nd, 2021?

13   A    Do I see that?  I mean, I can -- I can't.  Can you -- I

14   can't read the text on it.

15   Q    Sure, okay.  Are you able to see now?

16   A    Yes.

17   Q    Let me just go through.  Let me represent that this is the

18   record for your interview as the custodian of records.  Do you

19   see the part that I'm highlighting, which is on page 95?

20       JUDGE ROSAS:  Hold on, Counsel.  This is General Counsel's

21   Exhibit --

22       MR. DO:  This -- we're not offering, Your Honor, we're not

23   actually offering this as an exhibit.

24       JUDGE ROSAS:  You're not offering.  Okay.  So now you're

25   dealing with a document that's not in evidence.  Okay.  Go

Exhibit 1(b)
95



1    ahead.  I don't want anything read into the record if it's not

2    in evidence, unless you establish another basis to do so.

3         MR. DO:  Yes.

4    Q    BY MR. DO:  Mr. Glackin, do you -- do you see the part I'm

5    highlighting, which is the question and answer?

6    A    I see the highlighted section, yes.

7    Q    And is it correct that you previously answered, as the

8    custodian of record, when I asked you is -- if the Fontana

9    facility had Universal Truckload employees and also Universal

10   Intermodal employees who were laid off, you answered yes?

11   A    Are you asking me to validate the transcript, the

12   highlighted section?  Is that what you're asking?

13   Q    Yes, I'm asking if that -- is that a -- a accurate

14   recollect -- I'm trying to refresh your memory.  Is this an

15   accurate representation of what you said when I asked you if

16   there were employees (indiscernible) Fontana --

17        JUDGE ROSAS:  Does that refresh your recollection, sir?

18   A    I don't recall it exactly, but it looks like we were

19   talking about a document.  I don't -- I mean, I don't recall.

20   I don't recall that exact line of questioning.

21        MR. DO:  All right.  Your Honor, now I'm going to be using

22   this for impeachment.

23   Q    BY MR. DO:  Mr. Glackin, isn't it correct that during your

24   custodial record interview, I asked you the question, "Is this

25   the Fontana location?" referring to the -- the Slover Avenue

Exhibit 1(b)
96



1    location where Universal Truckload employees were also --

2         MR. ADLONG:  Your Honor, I'm going to object.  We can --

3    and I'm sorry to interject before he reads it into the --

4    before he finishes the question, but he can -- it seems

5    inappropriate to have him try to use this as impeachment when

6    the question that started this line was --

7         JUDGE ROSAS:  Hold on, hold on, hold on.  Let's put the

8    witness --

9         If you can excuse yourself, sir, for a minute?

10        THE WITNESS:  Okay.

11        JUDGE ROSAS:  Go ahead, Respondent.

12        MR. ADLONG:  The question he asked was -- and this is why

13   I objected as to as to rele -- as to vague and ambiguous as to

14   working, is that he -- the question was, isn't it true that you

15   had employees working out in Fontana and I don't know the other

16   locations -- that they were working there?  He, I think,

17   answered, I don't know.  The question that you -- the -- the

18   text that you can see up on the screen does not speak to

19   working.  This speaks to laid off, which is something

20   different.  And in addition, the reason why working is so

21   important here is because of the fact that there are multiple

22   locations at issue.  So --

23        JUDGE ROSAS:  Hold on, Counsel.  You don't need to go in

24   depth again.

25        MR. ADLONG:  Okay.

Exhibit 1(b)
97



1      JUDGE ROSAS:  So procedurally, General Counsel, it --

2   it -- it -- it is a correct point by the Respondent that if a

3   witness's answer is that he or she doesn't recall, then that's

4   not something that appears to be right for impeachment.  I

5   think you'd need to go to the next level, which is to establish

6   whether it's something that reflects his past recollection

7   recorded because that's all I think you can deal with at this

8   point.  You've got something up on the screen that's not

9   evidence.  So I'm not recognizing it, you know.  As the finder

10  of fact, you're just showing it to the witness.  In the

11  ordinary course, I wouldn't see it.

12      MR. DO:  Right.

13      JUDGE ROSAS:  Okay?  So you know what I am representing to

14  the parties.  I am superimposing you all over that document and

15  so I'm not seeing it.  So you know, I mean, unless he can give

16  me a different spin or some more facts to say that something --

17  it has -- has not been established as -- as within the person's

18  recollection or something that the person insists is the case,

19  then, you know, you -- you need to establish perhaps past

20  recollection.  I -- I don't think it's right for impeachment.

21      MR. DO:  Right, Your -- Your Honor.  So part of the reason

22  I was reading this into evidence at this point is under the

23  federal rule of evidence, there's a hearsay exception that

24  exists that allow a witness as to read a writing -- into a

25  writing, if the witness attests, and that when -- when this was

Exhibit 1(b)
98

escribers
www.escribers.net | 800-257-0885

1   made, it was accurate.  And I believe the witness had said

2   that.  He said, yes, this is a -- an accurate recording of

3   what -- what -- I was asking what my response was that day.

4   I'm just trying to get him to affirm it at this point.

5       JUDGE ROSAS:  Well, you're entitled to do that.

6       MR. DO:  Okay, Your Honor.

7       JUDGE ROSAS:  All right.  Let's bring the witness back.

8       MR. ADLONG:  Wait.  Can I just ask a question, Your Honor?

9       JUDGE ROSAS:  Sure.

10      MR. ADLONG:  So then what's going to be put into the

11  record if that's -- if that is the avenue he's going to pursue?

12      JUDGE ROSAS:  I -- I -- I -- I don't have anything in the

13  record at this time, other than counsel's questions and

14  uncertainty by the witness.  So let's see where the next

15  question takes us.  I think I've given you all the guidance

16  that I'm able to give you at this point, which is that I don't

17  see any basis for impeachment at this time.  So you can pursue

18  your next question.

19      MR. ADLONG:  Okay, let me go get him.  Your Honor?  Your

20  Honor, I'm going to take three minutes to use the restroom.

21  I'll be right back to you, while I'm going to go grab the

22  witness, if that's okay.

23      JUDGE ROSAS:  Okay, off the record, back at 1:35.

24  Instruct the witness not to have any discussions with anyone.

25  (Off the record at 10:28 p.m.)

Exhibit 1(b)
99


www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  All right.  We're back on.

2        MR. DO:  Okay.

3                  **RESUMED DIRECT EXAMINATION**

4    Q    BY MR. DO:  All right.  Let me try this a little different

5    way.  Mr. Glackin, you gave testimony as the custodian of

6    records for Universal Logistics Holding, Universal Intermodal,

7    Southern Counties, Truckload, and Roadrunner to the National

8    Labor Relations Board, right?

9    A    Yes.

10   Q    And your testimony at that time was being transcribed by a

11   court reporter; isn't that right?

12   A    Yes.

13   Q    And again, I'm going to mark -- well, not going to mark,

14   but I'm going to show you a part of that transcript.  All

15   right.  If you can read -- on page 95, read lines 4 to 11 to

16   yourself.  Let me know when you're ready.

17   A    Okay.

18   Q    Isn't it correct that the only truckload facility at issue

19   here is a facility on 15033 Slover Avenue?

20        MR. ADLONG:  Ob -- objection.  That's calling again for

21   him to interpret the pleadings, like, the --

22        MR. DO:  Your -- Your Honor, you're muted.

23        JUDGE ROSAS:  Repeat the question.

24        MR. DO:  Sure.  The question is, isn't it correct that the

25   only Universal Truckload at issue today is the facility located

Exhibit 1(b)
100



1    on 15033 Slover Avenue, Fontana, California location?

2         JUDGE ROSAS:  Rephrase the question; take out --

3         MR. DO:  Oh.

4         JUDGE ROSAS:  -- "at issue".

5         MR. DO:  Okay.  Understood, Your Honor.

6    Q    BY MR. DO:  Isn't it true that there were some Universal

7    Truckload employees who were laid off at a facility located on

8    15033 Slover Avenue, Fontana, California?

9    A    Yes.

10   Q    And isn't it true that there were some Universal

11   Intermodal port drivers who were working at that same facility?

12        MR. ADLONG:  Objection.  Vague and ambiguous as to working

13   out of -- lacks foundation.

14        JUDGE ROSAS:  At -- at what time, Counsel?

15        MR. DO:  During the period from November 2019 to December

16   2019, Your Honor.

17        JUDGE ROSAS:  Overruled.

18        You can answer.

19        THE WITNESS:  Okay.

20   A    Yes.

21   Q    BY MR. DO:  And in the investigative subpoena and the

22   trial subpoena that we just went through, the National Labor

23   Relations Board asked your companies for internal

24   communications between your representative, both within the

25   same company and across companies, about these decisions,

Exhibit 1(b)
101



1    right?

2    A    Yes.

3    Q    Okay.

4         MR. DO:  And let me mark for identification as GC Exhibit

5    2.

6    **(General Counsel Exhibit Number 2 Marked/Identified for**

7    **Identification).**

8    Q    BY MR. DO:  In fact, during the whole investigation,

9    the Re -- the Respondent -- specifically, Universal

10   Intermodal -- provided the National Labor Relations Board with

11   only two pages of internal emails and one internal draft

12   memoranda about the decision to close the Compton facility;

13   isn't that right?

14        MR. ADLONG:  Objection as to relevance.  Specifically, the

15   amount of documents that he's -- the -- the question attacks

16   the amount of documents, not the substance or the factual

17   underpinning of any of it.  It's -- it's going to the adverse

18   inference again.

19        MR. DO:  Your -- Your Honor, you're muted.

20        JUDGE ROSAS:  Yep.

21        So does this relate to the allegations in the complaint?

22        MR. DO:  Yes, Your Honor.

23        JUDGE ROSAS:  Failure to provide information?

24        MR. DO:  Lack -- lack of business records, Your Honor.

25   Again, we're attacking the substance.

Exhibit 1(b)
102



1          JUDGE ROSAS:  Okay.  Overruled.

2          MR. ADLONG:  Your Honor, if -- just to make sure, he's not

3     going to the 8(a)(5), he's going to prove the 8(a)(3) through

4     these out -- throrgh these documents?

5          JUDGE ROSAS:  That's what he said, yes.

6          MR. ADLONG:  Okay.

7     Q    BY MR. DO:  Okay, so let me reset the question.  Mr.

8     Glackin, isn't it true that during the whole investigation the

9     Respondent -- and specifically, Universal Intermodal --

10    provided the National Labor Relations Board with only two pages

11    of internal emails and one internal draft memorandum about the

12    decision to close the facility located on 2035 East Vista Bella

13    Way, Compton, California?

14    A    I don't recall the exact amount of -- of -- of documents;

15    if that's what we provided, that's what we provided.

16    Q    And I just want to confirm, do you recall providing

17    National Labor Relations Board with the two page of emails,

18    which is marked as GC Exhibit 2(a), which is an email dated

19    February 26th, 2019 -- well, starting from February 25th, 2019

20    and ending on the same -- on the following day, February 26th.

21    Do you see that?

22    A    I see it.

23    Q    And these are the documents that you provided to the

24    National Labor Relations Board relating to the decision to

25    close the Compton facility; isn't that right?

Exhibit 1(b)
103



1    A    I mean, these were responsive documents that we provided

2    through the process; I don't recall exactly when or -- or -- or

3    under what request.

4    Q    Okay.  Let -- let me ask you specifically.  End of 2 line:

5    Dennis Glackin; is that you?

6    A    Yes.

7    Q    Okay.  And you were included into this chain of

8    communication, right?

9    A    It appears so, yes.

10   Q    And then let me move on to ask you about Joint Exhibit --

11   or General Counsel Exhibit 2(b).  This is a mar -- a memo dated

12   March 6th, 2019.  Do you recognize that?

13   A    I have seen it before, yes.

14   Q    And this is a draft of a -- of the notice that you would

15   have sent to employees had you decided to close the Vista Bella

16   location in March of 2019; isn't that right?

17        MR. ADLONG:  Objection.  Calls for speculation, lacks

18   foundation.

19        JUDGE ROSAS:  I'll allow it.

20        You can answer.

21        THE WITNESS:  What was the question again?

22   Q    BY MR. DO:  The question's that this is a -- this is a

23   copy of a do -- of a draft memorandum that you would have sent

24   to employees had you guys decided to lay them off in March of

25   2019; isn't that right?

Exhibit 1(b)
104



```
 1    A    It appears to be.

 2    Q    All right.  And let me confirm again, isn't it correct

 3    that Joint -- General Counsel Exhibit 2(a) and Joint Exhibit --

 4    General Counsel Exhibit 2(b) are the only three pages of

 5    document that you provided that relates to internal

 6    communication within Universal Intermodal about the decision to

 7    close the Compton facility?

 8         MR. ADLONG:  Objection.  Asked and answered.

 9         JUDGE ROSAS:  Overruled.

10    A    If that -- if those are the documents, and -- and that's

11    what we provided, then yes.

12    Q    Okay.

13         JUDGE ROSAS:  Counsel -- General Counsel, I assume you

14    have subpoenas that -- that are in evidence -- they're --

15    they're in evidence, and that they encompass the subject of

16    this line of questioning, they include responses from the

17    Respondent, if any, right, regarding --

18         MR. DO:  We did not --

19         JUDGE ROSAS:  -- the presence of such documents?

20         MR. DO:  Your Honor, we did not try to admit all -- all of

21    the responsive documents here because quite frankly, they'll

22    probably add about 2,000 pages to --

23         JUDGE ROSAS:  No, I'm talking about the Respondent's

24    response to the subpoena.  There was -- there was -- well,

25    there are responses to your subpoena request by the Respondent
```

Exhibit 1(b)
105

1 indicating what they gave you; is that right?

2   MR. DO:  Your Honor, we -- actually, we tried to get a

3 stipulation for admission, something on that line.  I was --

4 one, that effort failed, and I was hoping to go through Mr.

5 Glackin's testimony, and if we need to do that --

6   JUDGE ROSAS:  So --

7   MR. ADLONG:  -- then we'll do a separate stipulation.

8   JUDGE ROSAS:  So all I'm asking you is, you've entered

9 into evidence, subpoenas?

10   MR. DO:  Yes.

11   JUDGE ROSAS:  And that evidence does not also encompass

12 what the responses were from the Respondent.  Is that what

13 you're saying?

14   MR. DO:  Yes, correct.

15   JUDGE ROSAS:  Okay.

16   Go ahead.

17   MR. DO:  Okay.

18 Q BY MR. DO:  And I just want to confirm, so in this email,

19 there is a code that's 9004 (phonetic throughout), that's a

20 code referring to the exer -- 2035 East Vista Bella, Compton

21 facility of Universal Intermodal; isn't that right?

22 A Yes.

23 Q And then Tim Monahan, who is copied on this email, he is

24 a -- the VP of legal for Universal Management Services; isn't

25 that right?

Exhibit 1(b)
106



1    A    I mean, I'm not sure of his exact title.

2         JUDGE ROSAS:  All right.  Let's -- let's hold off for a

3    second.  This document's not in evidence yet, right?

4         MR. DO:  Yes, Your Honor, I was going to try to get it

5    admitted after I finish this up.

6         JUDGE ROSAS:  Okay.  No, we --

7         MR. DO:  It's part of our --

8         JUDGE ROSAS:  -- we -- we have to get documents admitted

9    before we start reading from them because we don't know if

10   they're going to go into evidence.  If they don't go into

11   evidence, in theory, all the evidence has to then be stricken,

12   okay?  So --

13        MR. DO:  Okay.

14        JUDGE ROSAS:  -- is there any objection to General

15   Counsel's 2?

16        MR. DO:  All right, Your Honor, we're going to move for

17   GC-2 to be admitted into evidence.

18        JUDGE ROSAS:  Well --

19        Respondent, is there any objection?

20        MR. ADLONG:  I'm thinking about this right now, Your

21   Honor.

22        Your Honor, again, we're not going to object to, like, the

23   document in and of itself, but we'll certainly object to the

24   purpose for which it's being sought to be used for the basis of

25   an adverse inference.

Exhibit 1(b)
107



1    JUDGE ROSAS:  Okay.  Overruled.

2    General Counsel's 2(a) and (b) are received.

3    **(General Counsel Exhibit Numbers 2(a) and 2(b) Received into**

4    **Evidence)**

5    MR. DO:  All right.  Thank you, Your Nonor (sic).

6    Let -- then let me reaffirm my line of inquiry.

7    Q    BY MR. DO:  So again, the 9004 LA, that code is referring

8    to the 2035 East Vista Bella Way, Universal Intermodal Compton

9    facility, right?

10   A    Yes.

11   Q    And then Mr. Tim Monahan, which is included in this email,

12   is the VP of legal for Universal Logistics Holding, correct?

13   A    Again, sir, I -- I don't know his exact title.

14   Q    Okay.  Give me one moment.  All right.  I'm going to show

15   you a part of your transcript again.  Give me one moment.  All

16   right.  Do you see the part that I'm highlighting, which is on

17   page 194, line 11 to 12?

18   A    Yes.

19   Q    Can you read that to yourself and let me know when you're

20   ready?

21   A    Yes.  Ready.

22   Q    Okay.  So let me ask my question again.  Is it correct

23   that Mr. Tim Monahan is the vice president of legal?

24   MR. ADLONG:  Objection as to time.  And if -- that's the

25   first objection.  I think that I'm going to pivot to relevance

Exhibit 1(b)
108



1    depending on the answer.

2         JUDGE ROSAS:  So there's a question about timing there.

3         Okay, go ahead.  Re -- rephrase that.

4         MR. DO:  Sure.

5    Q    BY MR. DO:  At the time that you gave your -- well, from

6    November of 2019 to -- through March 20 -- no, through the end

7    of February 2021, which is the day that you gave the last --

8    the last month that you gave that -- or your interview, isn't

9    it correct that Mr. Monohan was the vice president legal for

10   Universal Management Services?

11   A    Yes.

12   Q    And let me put up GC Exhibit 2 again.  And at the time

13   that he received this email -- so February 26th, 2019 -- was

14   Mr. Monahan the vice president of legal at the time?

15   A    I -- I believe so.

16   Q    And is it correct that he doesn't have any job title with

17   Universal Intermodal, with Southern Counties Express,

18   Roadrunner, or Universal Truckload; isn't that right?

19   A    Not that I'm aware of.

20   Q    Okay.  So in your custodian of record interview, you

21   explained that there was not much communication records because

22   the decisions that are the basis of this case -- the closure,

23   the layoffs -- were made at the executive level, right?  Mr.

24   Glackin?

25   A    Yeah.

Exhibit 1(b)
109



1   Q    And -- and you explained that these executive staff

2   leadership sat -- sat -- of the companies you represent --

3   sat -- sat next door to each other; isn't that right?

4   A    I said some members did, yes.

5   Q    And you explained that these executives would verbally

6   communicate to each other on a day-to-day basis about these

7   decisions, right?

8   A    Yes.

9   Q    And without having any kind of email communication, text,

10  or anything like -- or any kind of written communication; isn't

11  that right?

12       MR. ADLONG:  Objection.  Vague and ambiguous as to that's

13  what they did or that's what he testified to.

14       JUDGE ROSAS:  Rephrase.

15       MR. DO:  Sure.

16  Q    BY MR. DO:  Isn't it correct that you previously testified

17  that the executives who made this decision and the reason you

18  don't have these documents is because they would communicate

19  without having email, text, or any other written form

20  communication; isn't that right?

21       MR. ADLONG:  Objection.  It's an improper form of

22  impeachment; it's not the facts at issue.  We're getting to the

23  facts, not what he testified to previously.

24       JUDGE ROSAS:  Can you answer that?

25  A    For those -- for the specific cases when I was interviewed

Exhibit 1(b)
110



1    last time, yes.

2    Q    BY MR. DO:  Okay.  And you explained at the time of your

3    custodian of record interview when an executive at the top

4    level give a directive, they would just call the next-level

5    manager to ex -- execute that ex -- that directive, right?

6    A    Yes.

7    Q    And you explained that this is true, communication is

8    happening within the same companies, within the same silo of

9    Universal Intermodal, for instance, right?

10        MR. ADLONG:  Objection as to "silo".

11        JUDGE ROSAS:  What is that word?

12        MR. DO:  I'm just referring to one company.  This is

13   actually a word that we used during the custodian record

14   interview, so that's why I'm hoping it -- that will jog his

15   memory, Your Honor.  The word is "silo".

16        JUDGE ROSAS:  Do -- do you understand what that word is,

17   sir?

18        THE WITNESS:  We -- yes.

19        JUDGE ROSAS:  Okay.

20        Overruled.

21        Rephrase -- re -- repeat the question.

22        MR. DO:  Sure.

23   Q    BY MR. DO:  And you explained during the custodian of

24   record interview that this communication is true when it's

25   happening within the same company, so within the same silo of

Exhibit 1(b)
111

eScribers
www.escribers.net | 800-257-0885

1    the company, right?

2    A    Yes.

3    Q    You also explained that this is true of communication that

4    is happening across companies.  So communication from Universal

5    Logistics Holding to Universal Intermodal, that would also be

6    mostly verbal, right?

7    A    Yes, I believe so.

8    Q    And just to be clear, the executives you're referring to

9    are those that work and -- most work at Universal Logistics

10   Holding corporate headquarters located at 12755 East Mile (sic)

11   Road, Warren -- Warren, Mex -- Michigan, right?

12   A    For the two --

13        MR. ADLONG:  I'm going to object vague and ambiguous as

14   to, like, who he's identifying as these actors.

15        JUDGE ROSAS:  Rephrase; take out the word "most".

16        MR. DO:  Okay.

17   Q    BY MR. DO:  And just be clear, your testimony is that the

18   executive here you're referring to are those that work at

19   Universal Logistics Holding corporate headquarters in Michigan,

20   right?

21   A    I'm getting a li -- I'm a little confused at the -- when

22   you're talking about -- are you talking about now -- that

23   document or custodian of records interview?  I'm sorry.

24   Q    At the time of your custodian of record interview --

25   A    Yep.

Exhibit 1(b)
112



www.escribers.net | 800-257-0885

1    Q    -- you testified that communication between executive at

2    your company happened mostly verbally, and you said that they

3    ha -- that you explained that that's because they work next to

4    each other.  And I'm just trying to confirm, when you were

5    testifying there, you were referring to the people who worked

6    at your corporate headquarters in Michigan; isn't that right?

7    A    I was referring to two people during that interview.  We

8    were having conversation about specific individuals, if I

9    recall correctly.

10   Q    And who are these two individuals?

11   A    It was Tim Phillips and Don Taylor at that time.

12   Q    And just to confirm, Mr. Phillips is the CEO of Universal

13   Logistics Holding?

14   A    As of the present time?

15   Q    Yes.

16   A    Yes.

17   Q    And I just want to confirm, the executives who makes the

18   business decision for Universal Logistics Holding work out of

19   your corporate headquarters, right?

20   A    Yes.

21   Q    And the -- and the executives who makes decision for

22   Universal Management Services works out of your headquarters,

23   right?

24   A    For the most part, I believe, yes.

25   Q    And the executive who makes the business decision for

Exhibit 1(b)
113



1    Universal Intermodal -- so Mason-Dixon doing business as

2    Universal Intermodal -- works at that Michigan facility, right?

3         MR. ADLONG:  I'm going to object as to the decisions.

4    What decisions are we talking about?  It's vague -- it's vague

5    and ambiguous.  And "the executives"; what executives are we

6    talking about?  It's -- it's compound, too.

7         JUDGE ROSAS:  Well, he's -- he's felt comfortable

8    responding as to "executives".

9         Rephrase or amplify what you mean by "decisions".

10        MR. DO:  Sure.

11   Q    BY MR. DO:  So executive who makes the business decision,

12   for instance, the decision to close the facility, decision to

13   lay off employees -- those kind of executives, you previously

14   testified to who have these verbal communication.  So those

15   people from Universal Intermodal also worked at Un --

16   Universal -- your Michigan facility, right?

17   A    Yes.

18   Q    And then with regard to Southern Counties Express, the

19   executive who makes the bus -- business decision, such as the

20   decision to take on work for Southern Counties Express, those

21   individual also works out of the Michigan facility, right?

22   A    To take on work?  What do -- what do you mean by "take on

23   work"?

24   Q    Sure.  So when you -- so you know, when, for instance,

25   when Universal Intermodal was laid off and work was

Exhibit 1(b)
114



1    transferred, the -- the people who makes those decision, they

2    work out of Michigan, right?

3         MR. ADLONG:  Objection.  Assumes facts not in evidence,

4    lacks foundation.

5         JUDGE ROSAS:  If you know.

6         Overruled.

7    A    I'm not sure.  I --

8    Q    BY MR. DO:  All right.  And then with regard to executive

9    who makes business decisions, such as decision to lay off

10   employees at Universal Truckload, those executives work at the

11   Mi -- the Michigan facility, right?

12   A    Yes.

13   Q    And then lastly, for the executives who makes business

14   decision for Roadrunner, such as the decision to lay off the

15   Roadrunner employees -- that's at issue in this case, those

16   individual work that the Mi -- out of your Michigan

17   headquarters, right?

18        MR. ADLONG:  Objection.  Lacks foundation.

19        JUDGE ROSAS:  Overruled.

20   A    Yes.

21   Q    BY MR. DO:  With regard to your company's search for

22   responsive document to subpoena requests seeking internal

23   communication about the business decisions that are at issue in

24   this case -- so closure, layoff, taking on work, transferring

25   work, transferring asset -- you explained that you -- during

Exhibit 1(b)
115

www.escribers.net | 800-257-0885

1    your custodian of record interview, you explained that you

2    primarily did two kind of search:  a verbal inquiry to certain

3    individuals, and an email search of certain individual

4    executives, right?

5    A    Yes.

6    Q    And you -- you testified previously that other than email,

7    you did not try to search any other type of communications

8    records, such as text message, instance (sic) messaging, or

9    anything else like that, right?

10   A    That was the initial response, yes.

11   Q    And you explained that this was because other than email,

12   these are the type of commun -- electronic communication

13   method -- is an approved mode of communication between a

14   company -- a company official, right?

15   A    Yes, that's -- I think -- I believe that was covered

16   during the first part of the deposition, yes.

17   Q    And with regard to the verbal component of your search,

18   you explained that what you did was for each subpoena and each

19   subpoena request, you would just ask the executives who you

20   believe would have made those decision if they had any

21   responsive documents, right?

22   A    Yes.

23   Q    And in that meeting, you would have just asked them about

24   the subpoena for communication in the record, and they would

25   tell you whether you had responsive documents or not, right?

Exhibit 1(b)
116



1    A    I don't recall.  I mean, I don't recall the exact nature

2    of the conversation.  I -- I know -- again, I was tasked with

3    collecting documents, I would mention there is a subpoena, and

4    I would ask if there were responsive documents or they could

5    assist with responsive documents, yes.

6    Q    And given your company's lack of production of anything

7    other than except the three documents that we identify in GC-2,

8    is it fair to say that the executives you asked for documents

9    just didn't have any?

10   A    Is it fair -- I mean --

11        MR. ADLONG:  Objection.  Calls for speculation.

12        JUDGE ROSAS:  Rephrase that.

13        MR. DO:  Sure.

14   Q    BY MR. DO:  So again, as we just kind of went -- is it

15   accurate to say that based on your company's failure to

16   produce, and lack of any documents -- doc -- lack of any

17   production of internal communication about the business

18   decision in this case, is it accurate to say that the

19   executives -- their answer to you and she -- with regard to

20   your verbal inquiry for these documents is that they didn't

21   have any?

22   A    If -- if we didn't -- if I didn't provide anything, then

23   there wasn't any documents provided to me.

24   Q    Okay.  With regard to the email component of your search,

25   you explained that you enlisted the help of your IT department

Exhibit 1(b)
117

1    and some executive administrative assistant, right?

2    A    Yes.

3    Q    And you explained during the custodian of record interview

4    that for each subpoena you gave your IT department a parameters

5    of individuals who you wanted them to search, and a date range,

6    and then they would pull those individuals' email, right?

7         MR. ADLONG:  Objection.  Compound.

8         JUDGE ROSAS:  Overruled.

9         If you can answer.

10   A    I -- I -- yes.

11   Q    BY MR. DO:  And then once your IT department pulls these

12   emails from that date range, there -- the IT and the executive

13   administrative assistant will then go through those emails

14   looking for key -- running keyword searches to find responsive

15   document; isn't that right?

16   A    A little bit off.

17   Q    So then how -- how -- what -- what would happen after IT

18   provided you with the e-mails from these individuals from that

19   date range?

20   A    I just wanted to clarify, I would provide criteria as far

21   as individuals, date range, key search, and the IT department

22   would -- would search based under those criteria.  Is that what

23   you're saying?

24   Q    Yes.  I'm just trying to understand your search.

25   A    Yeah, so that -- I mean, that -- how I just explained it,

Exhibit 1(b)
118



1    that's -- that's the process -- that was the process, yes.

2    Q    And then again, given your company's lack of production of

3    any internal communication about these business decisions, is

4    it accurate to say that those search didn't yield any

5    particular result?  They didn't yield any responsive document?

6    A    Had they yielded responsive documents, we would have

7    provided them.

8    Q    Okay.  Universal Intermo -- Universal Intermodal keeps

9    personnel files of -- for all of its employees, correct?

10   A    Yes.

11   Q    And during your custodian of record interview, you

12   testified that when Universal Intermodal is going to terminate

13   an employee, it might do an investigation on an employee,

14   right?

15        MR. ADLONG:  Objection.  Lacks foundation, calls for

16   speculation.

17        JUDGE ROSAS:  If you recall.

18        THE WITNESS:  I'm sorry, can you say the -- ask the

19   question again?

20        MR. DO:  Sure.

21   Q    BY MR. DO:  During your custodian of record interview, you

22   testified that when Universal Intermodal is going to terminate

23   an employee, it may do an investigation on that employee,

24   right?

25   A    If I recall, I -- I believe I said on a case-by-case based



1    on the -- the incident.

2    Q    But you sometime would do an investigative interview -- or

3    an investigation into an employee before terminating an

4    employee, right?

5    Q    Objection.  Calls for speculation, lacks foundation.

6         JUDGE ROSAS:  I'll sustain that.

7         MR. DO:  Okay.

8    Q    BY MR. DO:  So on a case-by-case basis, as you testified,

9    has your company ever conducted an investigation prior to

10   terminating an employee?

11        MR. ADLONG:  Objection.  Calls for speculation, lacks

12   foundation --

13        JUDGE ROSAS:  Overruled.

14        MR. ADLONG:  -- vague and ambiguous as to his company.

15        JUDGE ROSAS:  Overruled.

16   A    Have we ever?

17   Q    BY MR. DO:  Yes.

18   A    Yes.

19   Q    And so -- and you testified that when such an

20   investigation occur, there may be emails about that

21   investigation, right?

22        MR. ADLONG:  Objection.  Calls for speculation.

23        JUDGE ROSAS:  Overruled.

24   A    Potentially.

25   Q    BY MR. DO:  And you testified that when such an

Exhibit 1(b)
120



1    investigation occur, there potentially may be reports about

2    that investigation, right?

3        MR. ADLONG:  Objection.  Calls for speculation, lacks

4    foundation, assumes facts not in evidence, incomplete

5    hypothetical.

6        JUDGE ROSAS:  Overruled.

7    A    Potentially?

8    Q    BY MR. DO:  Yes.

9    A    Yes, potentially, yes.

10   Q    Okay.  So when such an investigation would occur, you

11   testified that there may be internal communication?  And note,

12   I said, "may" have internal communication about that potential

13   action, right?

14   A    Yes, potentially, yes.

15   Q    And you testified that if those documents exist, it would

16   be in an employee's personnel file, right?

17   A    We would like to hope they would make their way to the

18   employee personnel file.

19   Q    You are aware that Universal Intermodal terminated an

20   employee by the name of Romel Mallard in November 2019, right?

21   A    I'm aware.

22   Q    And you're aware the request 4 of the investigative

23   subpoena and request 1 of the trial subpoena to Universal

24   Intermodal asked you for copies of Romel -- Mr. Mallard's

25   personnel file, and specifically, copies of any discipline and

Exhibit 1(b)
121



1    termination notices issued to Mr. Mallard, right?

2    A    I'm aware.

3    Q    Okay.  Let me put on screen what has been marked and

4    admitted as Joint Exhibit 5(a).  Give me one moment.  All

5    right.  So do you see the document I'm placing in front of you,

6    Mr. Glackin?

7    A    Yes.

8         MR. DO:  I'll represent for the record that this is a -- a

9    50-page document in total, and if you want me to just go

10   through it, I can, just let me know.

11   Q    BY MR. DO:  But these are the documents that you provided

12   in response to this request, the -- and you represented

13   these -- well, let me ask that first.  These were the document

14   you provided in your response to those requests, right?

15   A    I believe so.

16   Q    And in this 50-page personnel record --

17        JUDGE ROSAS:  Counsel, you referred to 5(a); are you also

18   referring to 5(b)?

19        MR. DO:  Oh, no, I'm referring to 5(a).  I think 5(b) was

20   just accidentally clicked, Your Honor.  I just did 5(b) because

21   I know it's a longer document, so it's easier for me to get to

22   the end that way.

23   Q    BY MR. DO:  Okay.  So you previously testified that in

24   this -- that these document were collected in a narrow date

25   range, and they appear to be documents collected during the

Exhibit 1(b)
122



1    hiring process, right?

2       MR. ADLONG:  Objection.  Vague and ambiguous as to "narrow

3    date range".

4       JUDGE ROSAS:  If he knows.

5    A    Are you asking about previous testimony?  I recall us

6    trying to establish a date range.  Beyond that, I -- I mean,

7    again, I -- I'm not --

8    Q    BY MR. DO:  Right.

9    A    -- exactly sure.

10   Q    Sure.  And isn't it right that you previously testified

11   that these document appear to be document collected primarily

12   during the hiring process, right?

13   A    I recall that, yes.

14   Q    Okay.  And in this 50-page personnel file, there is no

15   disciplinary notice within this file; isn't that right?

16      MR. ADLONG:  Objection.  The documents speak for

17   themselves.

18      JUDGE ROSAS:  Well, the document's not in evidence.

19      Are you offering it?

20      MR. DO:  Yeah, Your Honor, they -- they all are; they're

21   admitted as part of Joint Exhibit 5.

22      JUDGE ROSAS:  It's Joint Exhibit 5, not GC Exhibit 5?

23      MR. DO:  Yes, Your Honor.  Yes, Your Honor, this is Joint

24   Exhibit 5(a).

25      JUDGE ROSAS:  Okay.  Repeat the question.

Exhibit 1(b)
123



 1       MR. DO:  Sure.

 2   Q   BY MR. DO:  Wouldn't this 50-page document that you

 3   produced, that you represent at the time as Mr. Mallard's

 4   personnel file, there was no disciplinary document within it;

 5   isn't that right?

 6       MR. ADLONG:  Objection.  The document speaks for itself.

 7       JUDGE ROSAS:  Why don't you ask -- why don't you just tell

 8   the witness that there's no document in there.  Go ahead.

 9       MR. DO:  Sure.

10       JUDGE ROSAS:  This is -- this is -- 611(c) questioning.

11   Go ahead.

12       MR. DO:  Sure.

13   Q   BY MR. DO:  So I'll represent, Mr. Glackin, that there

14   is -- as far as I can tell, there's no disciplinary notices, or

15   disciplinary termination notices, suspension notices, verbal

16   warnings, or any kind of disciplinary notice within this 50-

17   page document.  Is it accurate that -- that this document

18   doesn't contain those doc -- those type of -- well, have you

19   produced everything that you believe is the complete personnel

20   file for Mr. Mallard?

21   A   To the best of my knowledge, yes.

22   Q   Okay.  Let me identify -- well, let me show you what has

23   already been admitted as Joint Exhibit 5(b).  This letter that

24   I put in front of you, do you see that?

25   A   I do.

Exhibit 1(b)
124


www.escribers.net | 800-257-0885

1   Q    This is a -- this is the termination letter that you sent

2   to Mr. Mallard; isn't that right?

3   A    If you don't mind, could you blow it up a little bit?

4   I -- it's hard to see the text.

5   Q    I'm sorry.  Just let me know, because whenever I blow it

6   up, it starts to cut off things, that's why I don't --

7   A    Yeah.

8   Q    -- but let me know.

9   A    That's good.  That's good.  Thank you.

10       MR. ADLONG:  And vague and ambiguous as to "you".

11       MR. DO:  Your Honor, you're muted, so I don't know if you

12   ruled on that.

13       JUDGE ROSAS:  What's the question?

14       MR. DO:  The -- the question was, this is the termination

15   notice that you issued -- that Mr. Glackin's company -- and

16   specifically, Universal Intermodal -- issued to Mr. Mallard;

17   isn't that right?

18       JUDGE ROSAS:  And there's an objection?

19       MR. ADLONG:  Compound, assumes facts not in evidence

20   regarding Mr. Glackin's company.

21       JUDGE ROSAS:  If you know.

22   A    It appears to be a termination letter that -- I can speak

23   to that.

24   Q    BY MR. DO:  Okay.  Other than this termination letter, are

25   you aware of any other disciplinary documents relating to Mr.

Exhibit 1(b)
125



1    Mallard?

2    A    Again, as I previously previou -- previously mentioned, if

3    it wasn't in that employee file and produced previously, I'm

4    not aware of any other documents.

5    Q    Okay.  Request 5 of the investigative subpoena and request

6    2 of the trial subpoenas to Universal Intermodal as the

7    documents reflecting any communication, internal communication

8    among your representative regarding the decision to terminate

9    Mr. Romel Mallard; isn't that right?

10   A    Again, off the top of my head, I don't recall exactly

11   the -- the -- the numbers or -- I recall the request.

12   Q    And isn't it correct that you -- that your -- that you did

13   not produce any documents responsive to that request?

14   A    If we had the documents, I would have provided them.

15   Q    And just to repeat, you conducted a search for documents

16   responsive to this request -- so internal communication about a

17   decision to terminate Mr. Mallard -- and you didn't find any

18   emails, texts, or any other kind of communication record about

19   that decision, right?

20   A    Correct, it was a pretty basic termination, I mean it

21   was --

22   Q    So Universal Intermodal request 6 of the investigate a

23   subpoena and request 3 of the trial subpoena asked for doc --

24   internal documents regarding any investigation conducted by the

25   Employer -- so in this case Universal Intermodal -- into the

Exhibit 1(b)
126



1   termination of Mr. -- Mr. Mallard; isn't that right?

2   A   I believe so, yes.

3   Q   And you provided no documents responsive to this request;

4   isn't that right?

5   A   Again, if we had documents, I would have provided them.

6   Q   And you conducted a search for documents responding to

7   this request and found no email or any other kind of

8   communication records about it; isn't that right?

9   A   Again, if we had responsive documents, I would have

10  provided them.

11  Q   But in fact, you didn't.  You didn't provide anything;

12  isn't that right?

13  A   If they're -- I provided so many documents, if they're --

14  if it -- if they weren't provided, then -- then we didn't have

15  them.

16  Q   You te -- during the custodian of record interview, you

17  testified that Mr. La -- Mr. Mallard's termination was a very

18  rudimentary violation, so that -- there was no investigation;

19  isn't that right?

20      MR. ADLONG:  Objection.  Assumes facts not in evidence,

21  (indiscernible, simultaneous speech).

22      JUDGE ROSAS:  You're going to have to repeat -- you're

23  going to have to repeat that question.

24      MR. DO:  Sure, Your Honor.

25  Q   BY MR. DO:  In fact, Mr. Glackin, you te -- you previously

Exhibit 1(b)
127



1    testified that Mr. Mallard was terminated for a very

2    rudimentary violation, so there was no investigation, right?

3         JUDGE ROSAS:  The question is whether that's what you

4    previously testified.

5    A    I believe so, if that's -- if that's what the record was,

6    then yes.

7    Q    BY MR. DO:  Based on the result of your search for these

8    three requests that we just talked about regarding Mr. Mallard,

9    would it be accurate to say that other for a single termination

10   letter, Universal Intermodal terminated Mr. Mallard without --

11   out -- without any documentation whatsoever?

12        MR. ADLONG:  Objection.  Calls for speculation, lacks

13   foundation.

14        JUDGE ROSAS:  You're going to have to rephrase that one.

15        MR. DO:  Sure.

16   Q    BY MR. DO:  So based on the result of your -- of -- Mr.

17   Glackin, your search for responsive documents in -- into Mr.

18   Mallard, is it inac -- is it accurate to say that Universal

19   Intermodal terminated Mr. Mallard with only a single

20   termination letter and that there are no other responsive

21   document?

22        MR. ADLONG:  Objection.  Calls for speculation, lacks

23   foundation.

24        MR. DO:  The --

25        JUDGE ROSAS:  You're asking, is that the only document in

Exhibit 1(b)
128



www.escribers.net | 800-257-0885

1    their records that relates to the termination?

2         MR. DO:  Correct, Your Honor.

3         JUDGE ROSAS:  All right.

4         Can you answer that?

5         THE WITNESS:  Yes, I can answer if there were any other

6    documents, we would have provided them.

7    Q    BY MR. DO:  And to the best of your recollection, in fact,

8    you -- you -- did you?

9    A    Again, sir, I provided so many documents, there's been so

10   many requests, I don't recall each of them individually.  What

11   I do recall is if we did have the documents, we would have

12   provided them.

13   Q    Okay.  You are aware that Universal Intermodal terminated

14   an employee by the name of Jonathon Ledesma in November of

15   2019; isn't that right?

16   A    I'm aware of that, yes.

17   Q    And request 7 of the investigative -- and request 4 of the

18   trial subpoenas asked for a copy of Mr. Ledesma's personnel

19   file, and specifically, copies of all discipline and

20   terminate -- termination notices issued to Mr. Ledesma; isn't

21   that right?

22   A    Again, if that's -- if -- if those are the correct numbers

23   in those requests, I recall the crest -- I recall the request,

24   not the exact numbers or parts of the subpoena, but yes.

25   Q    Okay.  One moment.  I am going to put on screen a document

Exhibit 1(b)
129



1    that's already been admitted as Joint Exhibit 4.

2       MR. DO:  So I represent to the record that Joint Exhibit 4

3    is 4 -- a 47-page document, and I can scroll through them if

4    you like.

5    Q    BY MR. DO:  These are the -- this was -- you provided this

6    in response to the request as Mr. Ledesma's personnel file;

7    isn't that right?

8    A    I believe so.

9    Q    Okay.  And you previously testified that based on the

10   dates of these documents, they appear to be collected primarily

11   during the hiring process, right?

12   A    I do recall that during the custodian of records

13   interview.

14      MR. DO:  And let me represent for the record that there

15   wasn't any disciplinary notices, any kind of termination,

16   suspension notices within this record.

17   Q    BY MR. DO:  So there was no documents in -- within this --

18   you're not aware of any suspension and -- or any other

19   disciplinary documents relating to Mr. Ledesma; isn't that

20   right?

21   A    If there were other documents, we would have provided

22   them.

23   Q    And there was no documents in here showing in this series

24   of documents that told Mr. Ledesma -- that indicated that Mr.

25   Ledesma's Arizona commercials (sic passim) driver's license was

Exhibit 1(b)
130



1    an issue for a company, right?

2         MR. ADLONG:  Objection.  The document speaks for itself.

3         JUDGE ROSAS:  Overruled.

4         THE WITNESS:  Can you ask the question again, please?

5         MR. DO:  Sure.

6    Q    BY MR. DO:  There was no document within Mr. Ledesma's

7    personnel file that indicated at any point that Mr. Ledesma

8    Arizona commercials driver's license was an issue for Universal

9    Intermodal; isn't that right?

10   A    In that file, specifically, not to the best of my

11   recollection, no.

12   Q    And I'm going to show you what's been marked and admitted

13   as Joint Exhibit 4(b).  And again, I can zoom that in.  This is

14   the termination letter that your -- that Universal Intermodal

15   mailed to Mr. Ledesma; isn't that right?

16   A    It appears to be a termination letter, yes.

17   Q    And other than this termination later, are you aware of

18   any other disciplinary documents relating to Mr. Ledesma?

19   A    I'm not aware.  If we had them, we would have provided

20   them.

21   Q    Okay.  Request 8 of the investigative and request 5 of the

22   trial subpoena to Universal Intermodal asked for documents

23   reflecting any communications among representative, the

24   Employer -- of Universal Intermodal -- regarding to -- the

25   decision to terminate Mr. Ledesma; isn't that right?

Exhibit 1(b)
131



1   A    I believe so.

2   Q    And you provided no response -- no documents responsive to

3   this request; isn't that right?

4   A    Again, if we had them, we would have provided them.

5   Q    To the best of your knowledge, did you provide any

6   documents responsive to that request?

7   A    Again, there have been dozens and dozens of requests; I

8   don't re -- recall each of them specifically.  If we had them,

9   we would have provided the documents.

10  Q    So to the best of your recollection, when you conducted

11  the search, you didn't -- did you find -- did you -- you didn't

12  find an email or any written communication record about any

13  investigation into Mr. Ledesma; isn't that right?

14  A    Not to the -- to the best of my recollection, I don't

15  recall.

16  Q    All right.  Request 9 of the investigative subpoena and

17  requ -- and request 6 of the trial subpoena to Universal

18  Intermodal asked for documents regarding any investigation

19  conducted by the Employer which led to the termination of Mr.

20  Ledesma, correct?

21  A    I believe so -- without seeing the exact subpoenas.

22  Q    And to the best of your knowledge, you didn't provide any

23  responsive documents to that request, right?

24  A    If we had documents, I would have provided them.

25  Q    Well, in fact, when you did your search, you didn't find

Exhibit 1(b)
132



1    any emails or written communications about --

2        MR. DO:  I withdraw that question.  I -- I already asked

3    it.

4    Q    BY MR. DO:  Request 10 of the investigative subpoena and

5    request 7 of the trial subpoena to Universal Intermodal

6    requests documents from 2018 about any time that you suspended

7    Mr. Ledesma for issues with his commercials driver's license,

8    right?

9        MR. ADLONG:  Objection.  The documents speak for

10   themselves.

11       JUDGE ROSAS:  Overruled.

12       MR. ADLONG:  Your Honor, if we just might have a

13   continuation objection to like, this line of questioning with

14   respect to the -- to the pursuit of an adverse inference and to

15   the continuing use of his prior testimony, rather than actually

16   ask -- actually asking about the factual underpinnings of what

17   were going on.  We're talking about you previously testified to

18   whatever it might be, which doesn't necessarily prove up the

19   underlying fact.

20       JUDGE ROSAS:  That's sufficient.  You have a continuing

21   objection.

22   Q    BY MR. DO:  All right, Mr. Glackin, can you answer the

23   question, please?

24   A    I'm sorry, yeah.  What was the question again?

25   Q    Sure.  Request 10 of the investigative subpoena and

Exhibit 1(b)
133



www.escribers.net | 800-257-0885

1   request 7 of the trial subpoena asked you for documents from

2   20 -- from 2018 to the current day about any time you suspended

3   Mr. Ledesma for issues relating to his commercials driver's

4   license, right?

5   A    I recall the request -- and again, without seeing the

6   exact subpoena.  I recall the request, though,

7   Q    And you didn't -- you didn't provide any responsive

8   documents to this request; isn't that right?

9   A    Again, if we had documents, I would have provided them.

10      MR. DO:  And I represent to the record that I -- we

11  haven't received anything.

12  Q    BY MR. DO:  But Universal Intermodal requires all company

13  drivers to maintain a valid commercials driver's license,

14  right?

15      MR. ADLONG:  Objection.  Calls for -- assumes facts not in

16  evidence, lacks foundation.

17      JUDGE ROSAS:  Overruled.

18      If you know.

19  A    I would assume you -- for our business, you have to have a

20  CDL license.

21  Q    BY MR. DO:  All right.  Let me show you -- all right.

22  Give me one moment.  All right.  Let me show you a part of your

23  transcript.  Mr. Glackin, do you see the document I just put in

24  front of you?

25  A    Yes.

Exhibit 1(b)
134



www.escribers.net | 800-257-0885

1   Q    So on page 81, line 23 to 25, which I highlighted for you,

2   can you read it to yourself and let me know when you're ready?

3   A    Yes.

4   Q    All right.  So let me ask my question again.   Universal

5   Intermodal requires all company drivers to maintain a valid

6   commercials driver's license, right?

7   A    Yes.

8   Q    And when you were looking for documents relating -- and

9   responsive to the requests relating to Mr. Ledesma, you didn't

10  find any documents about Mr. Ledesma being suspended or issues

11  relating to his co -- commercials driver's license, right?

12  A    If we had the documents, I would have provided them to

13  you.

14  Q    You -- when you look for document you -- for Mr. Ledesma,

15  you didn't find any documents relating to a safety inspection

16  involving Mr. Ledesma, right?

17  A    Again, not that I recall; and if we had them, I would have

18  provided them.

19  Q    Based on your search for documents related to Mr. Ledesma,

20  is it accurate to say that the only document relating to his

21  termination is this termination notice?

22  A    If that's what was provided.

23  Q    So is that a yes?

24  A    Yeah, if that's what we provided, yes.

25  Q    All right.  Request 11 of the investigative subpoena and

Exhibit 1(b)
135



1    request 8 of the hearing subpoena requested all agreement to

2    waive participation in collective actions, right?

3         MR. ADLONG:  Objection.  Vague and ambiguous.

4         JUDGE ROSAS:  Repeat that question.

5         MR. DO:  Sure.  Request 11 of the investigative and

6    request 8 of the hearing subpoena requested all agreement --

7    copies of all agreement to waive participation in collective

8    actions, right?

9         MR. ADLONG:  Objection.  Vague and ambiguous.

10        JUDGE ROSAS:  Okay, just --

11        MR. ADLONG:  There's --

12        JUDGE ROSAS:  -- just have the witness assume that that's

13   what they are, and go to the question.

14        MR. ADLONG:  No, Your Honor, he's not identifying which

15   subpoenas.  He's saying -- there's -- I mean, he went through

16   at the beginning like, 10 and 20 subpoenas.  Which subpoenas

17   are you talking about?

18        JUDGE ROSAS:  Okay.  Well, all right.

19        Tell General Counsel what you're referring to, and then

20   just have the witness assume that this is what they are, okay?

21   And then --

22        MR. DO:  Sure.

23        JUDGE ROSAS:  -- try to elicit --

24        MR. DO:  Okay.

25        JUDGE ROSAS:  -- what else there is.  Okay.

Exhibit 1(b)
136



www.escribers.net | 800-257-0885

1          MR. DO:  So let me represent for the record that request

2     11 of the investigators subpoena and request 8 of the hearing

3     subpoena issued to Universal Intermodal requested all copies of

4     all agreements to waive participation in collective actions?

5          And I'm going to put up what has already been admitted as

6     Joint Exhibit 3.  Let me go ahead and put that up.

7     Q    BY MR. DO:  Mr. Glackin, you -- you -- in response to the

8     subpoena, your company provided the National Labor Relations

9     Board with six signed agreements of this type; isn't that

10    right?

11    A    I don't recall the exact amount; I recall -- I recall that

12    document.

13    Q    Okay.  And -- and this is one of those -- one of those

14    signed agreement to waive participation in class -- in

15    collective actions that you provided to the National Labor

16    Relations Board, right?

17    A    It appears to be.

18    Q    Okay.  And just ignoring the employee's signature for now,

19    textually, all the ones that you provided to the National Labor

20    Relations Board, the content are the same; isn't that right?

21    A    I don't know for sure.  I'm not sure.

22    Q    Okay.  Since at least the date of this signed copy, which

23    is dated May 14, 2019, Universal Intermodal have required all

24    companies to sign this agreement during their hiring process,

25    right?

Exhibit 1(b)
137



www.escribers.net | 800-257-0885

1       MR. ADLONG:  Objection.  Calls for speculation, lacks

2  foundation, assumes facts not in evidence.

3       JUDGE ROSAS:  If you know.

4       This document's in evidence.

5       THE WITNESS:  The question was, during the new hire

6  process, are they all required to sign?  Is that what you said?

7  Q    BY MR. DO:  Yes, from at least May 14, 2019, which is the

8  date that this individual signed it.

9  A    I'm not exactly for sure.

10  Q    But you previously testified that these -- that these

11  agreements are collected in -- by Universal Intermodal in the

12  normal course of its business, right?

13       MR. ADLONG:  Objection.  Vague and ambiguous as to normal

14  course of business.

15       JUDGE ROSAS:  Overruled.

16  A    If I testified to collect it, I -- I think -- that feels

17  different than every single one has in a new hire packet and

18  has signed it.

19  Q    But you previously testified that it's collected in the

20  normal course of business, right?

21       MR. ADLONG:  Objection.

22       JUDGE ROSAS:  Counsel, the -- the document -- and it

23  appears, I assume, that all the rest of the ones that you're

24  referring to like this -- this sheet, Joint Exhibit 3, signed

25  by a David Johnson (phonetic), are dated, so you don't have to

Exhibit 1(b)
138



 1   establish date.  You're just seeking, I think at this point, to

 2   establish whether employees were required to sign it; is that

 3   correct?

 4        MR. DO:  Yes, Your Honor.  And also, in the spirit of

 5   judicial efficiency, we actually, as a part Joint Exhibit 3,

 6   did not offer the other five page of the document because we

 7   thought they were duplicative, so that's part of what I'm

 8   trying to establish here.

 9        JUDGE ROSAS:  What do you need to establish?

10        MR. DO:  Just that this was being collected as a normal

11   course of its business and it was requiring employees -- or

12   since at least May of 2019 -- for employees to sign these.

13        JUDGE ROSAS:  Let me ask the witness.

14        Were employees required to sign this as a condition of

15   their continuing employment?  If you know.

16        THE WITNESS:  I'm not exactly sure.

17        JUDGE ROSAS:  All right.

18        THE WITNESS:  I -- I don't know for sure.

19        JUDGE ROSAS:  He doesn't -- he doesn't know that.

20        All right.  Move on.  Let's go.

21        MR. DO:  Okay.

22   Q    BY MR. DO:  Well, so then let me show you page 86 of your

23   question (sic).  Go ahead and read from page 85 to 86 -- the

24   part that's highlighted.  Let me know when you're ready.

25   A    Okay.

Exhibit 1(b)
139



www.escribers.net | 800-257-0885

1    Q    So --

2         MR. DO:  If you -- if you'd humor me, Your Honor, for

3    one -- one more -- one more attempt.

4    Q    BY MR. DO:  Mr. Glackin, isn't it correct that you

5    testified that these documents are collect -- the agreement to

6    waive participate in class -- in collective actions were

7    created and collected in Universal Intermodal's normal course

8    of business, day-to-day operation; isn't that right?

9         MR. ADLONG:  Object -- I'm going to object.  Misstates

10   prior testimony.  It's up there in black and white.  That is

11   not there.

12        JUDGE ROSAS:  Well, Counsel, unless I'm missing something,

13   they're -- they're clearly collected in the ordinary course of

14   business if they're a form of the company and -- and employees

15   are signing them; they -- they were produced by the company.

16   You're just trying to establish whether they were required.

17   Something kept --

18        MR. DO:  Correct.

19        JUDGE ROSAS:  -- in the regular course of business could

20   have been -- the employee might have generated it on their own

21   and said, here, here's my agreement to do this, that, and the

22   other; keep it.  You know, that --  that's a business record,

23   too.  So you're trying to establish whether it was required,

24   right?

25        MR. DO:  Yes, Your Honor.

Exhibit 1(b)
140



www.escribers.net | 800-257-0885

```
1           JUDGE ROSAS:  611(c).  Go to it.

2           MR. DO:  All right.

3           JUDGE ROSAS:  And if -- and if -- and if you've exhausted

4     his knowledge, if you don't have anything else, then you need

5     to have somebody else if that's what you're pursuing.

6           MR. DO:  That's -- Your Honor, that is the plan, but I

7     just wanted to exhaust this particular witness's recollection.

8           All right.  I will move on.

9     Q    BY MR. DO:  Let me put on the screen what has already been

10    marked and admitted as Joint Exhibit 11(a).  Give me one

11    moment.  Mr. Glackin, do you see what I just put on screen?

12    A    Yes.

13    Q    So these questions aren't specific to the Universal

14    Intermodal request because these requests were made to all five

15    companies, including Universal Logistics Holding and Universal

16    Management Services.  But just so that we can understand this

17    document -- again, the code 9 -- 9004, that's a facility code

18    referring to the East Vista Bella Way location; isn't that

19    right?

20    A    The Compton location, yes.

21    Q    And then this date next to this, that refers to the date

22    when this leadership chart was generated and valid for that --

23    at least that time period; isn't that right?

24    A    I believe -- yeah, valid for that time period, yes.

25    Q    Right, and then you provided updated list for March 2019
```

Exhibit 1(b)
141



www.escribers.net | 800-257-0885

1    through November of 2019, right?

2    A    Yes.

3    Q    Okay.

4         MR. ADLONG:  Excuse me, Your Honor?

5         Mr. Do, on our screen, on your right, that search tool, it

6    doesn't seem like you use it that much.  If you were able to

7    get rid of that, it would probably facilitate our ability to

8    view things.  Thank you very much.

9         MR. DO:  No worries.  Just let me know.

10   Q    BY MR. DO:  All right.  Continuing with the questioning.

11   I want to also confirm, so on page 4 -- or for Exhibit 11(b),

12   which is another leadership organizational chart, 9237

13   Truckload, that's a facility code referring to the Slover

14   Avenue facility, right?

15   A    To the Truckload group, yes.

16   Q    Okay.  And I just want to confirm that the -- so on the

17   top of this chart is Mr. Tim Phillips, and he had the job title

18   of COO transportation.  This is because at the time that's

19   captured by these charts -- so for instance, November 2019 to

20   December of 2019 -- he -- he hadn't yet been promoted to CEO,

21   isn't that right?

22   A    Yeah, that was his current title at that time for those

23   date ranges captured.

24   Q    And just to confirm, he was the chief operating officer

25   for the transportation group for Universal Management Services,

Exhibit 1(b)
142



1    right?

2         MR. ADLONG:  Objection.  Lacks foundation.

3         JUDGE ROSAS:  Overruled.

4         If you know.

5    A    He was the -- here's what -- he was the -- the chief

6    operations officer.  I don't recall, again, if it was under the

7    Universal Management Services tag.  I apologize for that.

8    Q    BY MR. DO:  Okay.  But as far as you know, did he have any

9    position when he was COO with Universal Intermodal, Universal

10   Truckload, or Roadrunner?

11   A    Not that I'm aware of.

12   Q    So request 14 of the investigative subpoena and request 11

13   of the hearing subpoena issued to Universal Intermodal

14   requested all documents about Universal Intermodal's

15   relationship with its parent and sister companies; isn't that

16   right?

17   A    Again, I don't recall the exact numbers; I recall the

18   requests.

19   Q    When you consu -- conducted that search, you didn't find

20   any kind of interline agreement or formal contractual agreement

21   between Universal Intermodal and any of the other U --

22   Universal Logistics Holding subsidiaries; isn't that right?

23   A    Not that I recall.

24        JUDGE ROSAS:  Counsel, let's --

25        MR. ADLONG:  I didn't catch that.



Exhibit 1(b)
143

www.escribers.net | 800-257-0885

1          MR. DO:  He's on mute.

2          UNIDENTIFIED SPEAKER:  I assume we're taking a short

3     break.

4          Troy, did you go off the record?

5          JUDGE ROSAS:  All right.  Back on.

6          MR. DO:  Okay.  Give me one moment.

7                    **RESUMED DIRECT EXAMINATION**

8     Q    BY MR. DO:  I -- I don't think I got an answer to this

9     final question, so I'll reask it.  In your search for

10    documents, you know, responsive to Subpoena Request 14 and

11    Hearing Request 11, which request for all documents regarding

12    Universal Intermodal's relationship with any other company or

13    any other Universal Logistics Holdings company, you didn't find

14    any kind of interline agreement or formal contracts between

15    Universal Intermodal and any of these other companies; isn't

16    that right?

17    A    Not that I recall.

18    Q    Okay.  Request -- request 16 of the invest -- of the

19    investigative subpoena and requests 13 of the hearing subpoena

20    requested all documents about what happened to the equipment

21    being used as a part of the Universal Intermodal Compton

22    operations back in late 2019; isn't that right?

23    A    Yeah, again, I recall the request, don't recall the exact

24    numbers.

25    Q    Okay.  Let me put it on the screen what's already been

Exhibit 1(b)
144



www.escribers.net | 800-257-0885

1    admitted as Joint Exhibit 13(d).  And I just want to ask some

2    clarifying questions about this document.  Do you see the

3    document I've placed in front of you, Mr. Glackin?

4    A    Yes.

5    Q    Okay.  In this document, unit number, what is that

6    referring to?

7    A    The unit, the number on the unit, which would be the

8    number on the left-hand side, the -- whatever number was

9    allocated to that unit.

10   Q    Got it.  Am I right -- is my understanding correct that

11   this is a list of all company owned trucks that was previously

12   being utilized either at the -- by the Universal port drivers

13   and Universal Truckload employee at the Fontana facility and

14   the Compton facility that were laid off?

15        MR. ADLONG:  Objection.  Compound.

16        JUDGE ROSAS:  Repeat it.

17        MR. DO:  Sure.

18   Q    BY MR. DO:  Let me rephrase.  Is it correct that this --

19   this list includes all company trucks that was previously being

20   used by the company drivers working at the -- the Compton

21   facility?

22   A    I know it was -- I know it was in response to a subpoena

23   request, and I believe for a date range, I -- I believe.

24   Q    Right.  So the subpoena request asked for documents

25   showing what happened to this equipment.  And I'm just trying

Exhibit 1(b)
145



1    to confirm that this is a list of equipment that you provided

2    to show that -- that these equipment, which was current --

3    which was formerly used at the facility in Compton and the

4    facility in Fontana by employee drivers and what happened to

5    them, where they were sent.  And I just want to confirm that

6    that -- my understanding is correct; isn't that right?

7    A    Yes.

8    Q    Okay.  And the new physical location refers to where that

9    truck was sent, right, the destination of that truck?

10   A    Yes.

11   Q    And on the bottom, it identify LGSI Equipment of Indiana,

12   LLC.  You see that?

13   A    Yes.

14   Q    And LGSI Equipment of Indiana, LLC is a wholly owned

15   subsidiary of Universal Logistics Holding; isn't that right?

16        MR. ADLONG:  Objection.  Lacks foundation.

17        JUDGE ROSAS:  If you know.

18   A    I believe it was on the 10-K as such.

19   Q    BY MR. DO:  Then the answer is yes?

20        MR. ADLONG:  Objection.  Asked and answered.

21        JUDGE ROSAS:  He's entitled.  Overruled.

22   A    Yes.

23   Q    BY MR. DO:  And I want to go to what's been marked as

24   GC -- or I'm sorry, Joint Exhibit 13, I believe, 13(a).  This

25   is a document you produced responsive to that request, and it

Exhibit 1(b)
146



1    covers equipment, computer equipment that was being used at the

2    Compton facility; isn't that right?

3    A    I believe so, yes.

4    Q    And I just want to confirm that this shows that the -- the

5    bulk of that equipment is now currently located at Southern

6    Counties Express N, which you previously explained as a code

7    for their warehouse; isn't that right?

8    A    I believe so, yes.

9    Q    Okay.

10        MR. DO:  And let me represent for the record that Joint

11   Exhibit 13(b) and Joint Exhibit 13(c) was part of the same

12   production.  There was a massive spreadsheet, but we converted

13   it into a PDF, just for ease of the record.  But 13(b) was

14   under a tab with -- titled, active.  And 13(c) was under a tab

15   that has the title of 06.2 All.

16   Q    BY MR. DO:  Okay.  Mr. Glackin, with regard to this

17   document, this is a document showing the ownership and cost

18   center of usage center -- center of company owned chassis;

19   isn't that right?

20   A    Again, if you don't mind, I -- I can't read the text on

21   there at all.

22   Q    Sure, sure, sure.  I'll try.

23   A    I see name, cost center, unit number.  Yes.

24   Q    Okay.  And you explained that what's been identified as

25   13(b), which again, I represent as being in the original Excel

Exhibit 1(b)
147



1   spreadsheet, that's under the Active tab, that these were

2   chassis that we're currently under use and wheels rolling,

3   right?

4   A    Yeah, it appears in that status shows active.  Yes.

5   Q    Okay.  And then for 13(c), which again, is under -- was

6   under 0- -- 06.20 All column.  This -- this list is more

7   encompassing than the -- than what's been marked as 13(b);

8   isn't that right?

9   A    Appears to be, yes.

10  Q    And you briefly testified that this -- this is because

11  this list includes the current status of chassis, including

12  those that aren't currently in use because of maintenance issue

13  or in this case, missing or stolen; isn't that right?

14  A    I do recall that.

15  Q    Okay.  So I just want to confirm with regard to these

16  columns.  Company name, you testified that this refers to who

17  actually -- which company, quote/unquote, owns this chassis,

18  right?

19  A    I -- yeah, I believe so.

20  Q    And then the cost center is where -- and locations where

21  it's actually being used, which company is actually using it,

22  right?

23  A    I believe so.

24  Q    Okay.  And then the year column, that is the year when

25  this equipment was acquired, right?

Exhibit 1(b)
148



1    A    I don't recall exactly that.

2    Q    Okay.  So what does the year column refers to?

3    A    I believe --

4         MR. ADLONG:  Objection.  Lacks foundation.

5         JUDGE ROSAS:  What -- what does the year refer to?

6         MR. ADLONG:  Yeah, yes.

7         JUDGE ROSAS:  Overruled.

8    A    I believe it was the -- the year of -- of the piece of

9    equipment, but I could be --

10   Q    BY MR. DO:  Okay.  You --

11   A    -- I could be wrong.  I don't really -- I don't recall.  I

12   was a little bit sharper at the time with some of these items.

13   Q    And when you say the year of this equipment, you're --

14   you're referring to when they were acquired or when they were

15   put on the books as some may say, right?

16   A    Well, for example, like a 2020 Ford car, a 2012 53-inch

17   chassis.  But again, I don't --

18   Q    But --

19   A    -- recall exactly.

20   Q    Oh, okay.  So it refers to the -- the actual model, like

21   the year model --

22   A    Again, I apologize.

23   Q    -- correct?

24   A    I don't recall which one it was.  I apologize.

25   Q    Okay.  All right.  Let me go to page 23 of this document.

Exhibit 1(b)
149



1    Oh, I'm sorry, wrong document.  Okay.  During the custodial

2    record interview, you recall that I asked you regarding one

3    specific line, just at -- just so that we can have a better

4    understanding of this document?

5    A    I do remember more detailed conversation.  I don't recall

6    exactly what it was.

7    Q    Okay.  I'll represent for the record that I was asking

8    specifically about this line.  And looking at the row that says

9    Universal Intermodal under the company name, and then I see

10   Rancho Dominguez, California, SEZZ2001.  I asked you that

11   the -- the way to understand this is that this is a chassis

12   that's currently under the umbrella of Universal Intermodal,

13   but is currently being used by Southern Counties Express at

14   Rancho Dominguez, right?  That's how I should understand this

15   line?

16   A    I believe so.

17   Q    Okay.  Just to clarify and just be clear for the record,

18   we're referring to the third line from the bottom, page 23 of

19   Joint Exhibit 13(b) and Bates stamp numbers 00682.  Okay.  Let

20   me stop sharing.

21        With regard to all the trucks and computer equipment, you

22   did not find any records documenting their transfer from one

23   location to another, right?

24   A    Not that I recall.

25   Q    And with regard to the chassis that you previously

Exhibit 1(b)
150



1    testified to that we just went through, you didn't find any

2    documentation about them being transferred from one company to

3    another, right?

4    A    Not that I recall,

5        MR. DO:  Your Honor, I'm going to move to another line of

6    inquiry, which is longer than five minutes, would you like for

7    us to stop here for now?

8        JUDGE ROSAS:  Sounds good.  Let's go off the record.

9    (Off the record at 11:55 a.m.)

10        JUDGE ROSAS:  Okay.  Back on the record.  General Counsel.

11        MR. DO:  Thank you, Your Honor.

12                  **RESUMED DIRECT EXAMINATION**

13    Q    BY MR. DO:  Mr. Glackin, thank you again for being here.

14    Request 13 of the investigative subpoena and request 10 of the

15    hearing subpoena, requests sent to you, Universal Intermodal,

16    requested documents listing the geographic operations of

17    Universal Intermodal; isn't that right?

18    A    I -- I do recall the request.  I don't recall the exact

19    numbers.

20    Q    Sure.  And do you recall that we also asked for a similar

21    list of geographic location for Universal Truckload,

22    Roadrunner, and Southern Counties Express?

23    A    I do recall.

24    Q    Okay.  I'm going to mark the identification of what's been

25    marked as GC Exhibit 25(a) through (c).  And I'm going to put

Exhibit 1(b)
151



1   that on screen.  All right.  Mr. Glackin, do you see the

2   document I'm putting in front of you?

3   A    Yes.  I'll represent for the record that this is a

4   document that -- well, it's converted from an Excel spreadsheet

5   that you provided to the National Labor Relations Board and

6   20- -- document 25(a) is what was listed under the title,

7   Truckload, parentheses, UCS.  And then 25(b) is a list of

8   locations that was under the header of Intermodal.  And then

9   25(c) was part of the same Excel spreadsheet, but under the

10  title of Roadrunner.  These are the documents you produced

11  res -- in response to those requests for your geographic

12  location; isn't that right?

13  A    I believe so.

14      MR. DO:  Your Honor, I'm going to move for the admission

15  of GC Exhibit 25(a) through (c) into evidence.

16      JUDGE ROSAS:  Any objections, voir dire?

17      MR. ADLONG:  Can I see B, please?

18      MR. DO:  Yes.  It's just the third column, isn't on the

19  third page.

20      MR. ADLONG:  And C.

21      MR. DO:  C, there you go.

22      MR. ADLONG:  All right.  Give me one second.  Let me look

23  at something.  Mr. Do, do you know what number docu -- what

24  number that was when I sent it to you?

25      MR. DO:  It was 8.

Exhibit 1(b)
152



www.escribers.net | 800-257-0885

1      MR. ADLONG:   Thank you.

2      MR. DO:  Not a problem.  That is C -- can I see -- okay.

3  Yeah.  Can I see B, please?  How many pages is B?

4      MR. DO:  Three pages in total.

5      MR. ADLONG:  All right.  No objection.

6      JUDGE ROSAS:  General Counsel's 25 is received.

7  **(General Counsel Exhibit Number 25(a) through (c) Received into**

8  **Evidence)**

9  Q    BY MR. DO:  All right.  Mr. Glackin, General Counsel

10  Exhibit 25(a), is it the list of all Universal Truckload

11  locations in the United States, correct?

12      MR. ADLONG:  Objection.  Vague and ambiguous as to time.

13      JUDGE ROSAS:  Repeat the question.

14      MR. DO:  Sure.  And -- and I can rephrase.

15  Q    BY MR. DO:  At the time of this production, which was

16  around March of -- February of 2021, is this a comprehensive

17  list of all Universal's truckload location within the

18  continental US?

19  A    I believe so, based --

20  Q    Okay.

21  A    -- on the requests, yes.

22  Q    And then at the time of production or at least, current in

23  the time production, which is around February 2021, 25- --

24  General Counsel Exhibit 25(b), that is a comprehensive list of

25  all Universal Intermodals' facilities and locations in the

Exhibit 1(b)
153



www.escribers.net | 800-257-0885

1    U.S.; isn't that right?

2    A    I believe so.

3    Q    And then 25(c), at the time of its production, which is

4    around February 2021, this is a list of all Roadrunner

5    locations in the U.S., right?

6    A    I believe so.

7    Q    Okay.  Requests 20 of the investigative subpoena and

8    request 17 of the hearing subpoena sent to Universal Intermodal

9    requested documents showing -- and showing enlisting former and

10   current clients that were being serviced by the laid off

11   employees of the Comp -- at the Compton and Fontana facilities;

12   isn't that right?

13   A    I do recall a request.

14   Q    And in response to this request, Universal Intermodal

15   specifically provided three sets of documents, namely two

16   customer charts and some customer contracts; isn't that right?

17   A    I do recall that.

18   Q    Okay.  Let me put it up.  So I'm going to be putting on

19   the screen what's been marked and admitted under seal as

20   General Counsel -- or I'm sorry, Joint Exhibit 19(a).  Do you

21   see the -- the document I'm putting in front of you, sir?

22   A    Yes.

23   Q    And I'm going to scroll through it.  It's approximately

24   five pages and it goes from January to December.  Do you see

25   that?

Exhibit 1(b)
154



www.escribers.net | 800-257-0885

1    A    I -- I mean, I do.

2    Q    Okay.  Is this one of the client lists for Universal

3    Intermodal that you provided to the National Labor Relations

4    Board?

5    A    I believe so.

6    Q    And for clarification and for the record, on the top, it

7    says UISI Compton Customer List for 2019.  This list is to be

8    understood as a list of customer who are being serviced by the

9    employees at the Compton facility in 2019; isn't that right?

10   Mr. Glackin?

11   A    We got muted.  Sorry about that.  Do you want to repeat

12   the question?

13   Q    Sure.  I was going to point to the top of Joint -- Joint

14   Exhibit 19(a).  It says UISI Compton Customer List for 2019.

15   Is it correct that this list should be understood to include by

16   month the customers who were being serviced by the employees

17   who were working out of the Universal Intermodal Compton

18   facility throughout 2019?

19   A    That was the customers for that specific month for that

20   location.

21   Q    Well, in -- in fact, it's for the particular -- the entire

22   year; isn't that right?

23   A    Yes.  For the date range provided, yes, that's correct.

24   Q    Okay.  And I just want to confirm to be clear for the

25   record, UISI refers to who?



1    A    Universal Intermodal Services.

2    Q    Thank you.  Looking at what has been marked and admitted

3    as Joint Exhibit 19(b), so this list, it says UISI Fontana

4    Customer List for 2019.  And again, it's a -- I believe it's a

5    six-page document.  Yes, it's a six-page document.  Based on

6    the heading of this list -- well, first of all, is this one of

7    the customer lists that you provided to the National Labor

8    Relations Board pursuant -- pursuant to its request?

9    A    I believe so.

10   Q    And based on the title of this list, is this the list of

11   customer who are being serviced by the Universal Intermodal

12   employees who were working out of the Fontana facility?

13   A    It was the customers by month for that year that were

14   based out of that location.

15   Q    Okay.  So I just want to clarify.  Does this include the

16   customers who were being serviced by Universal Truckload as

17   well or just the customer of -- of the drivers for Universal

18   Intermodal?

19        MR. ADLONG:  Objection.  Lacks foundation.

20        JUDGE ROSAS:  Overruled.  Overruled.

21   A    I'm not sure.  I guess it was based on the subpoena

22   request, whatever that specific request was.

23   Q    BY MR. DO:  Well, so the reason I want to ask you to

24   clarify this is in the Universal Intermodal subpoena, we

25   requested the client list with Universal Intermodal.  For the

Exhibit 1(b)
156



1    Universal Truckload subpoena, we asked for the client list for

2    Universal Truckload.  And this is one of the response, and I

3    just want to clarify, based on the top, is this -- does this

4    list include customers for both Universal Truckload and

5    Universal Intermodal at the Fontana facility or just the

6    Universal Intermodal drivers?

7    A    I'm not fully sure.  I'm not fully sure.

8    Q    And then let me draw your attention to Joint Exhibit

9    19(c).  It again, had the heading of UISI Fontana Customer List

10   of 2020.  So again, the same question based on the top, which I

11   understand this to, you know, apply to -- that these were the

12   customers of just Universal Intermodal or Universal Intermodal

13   and Universal Truckload at that facility?

14   A    I'm not fully for sure.

15   Q    Okay.  And just to be clear, these lists only went to

16   March of 2020 because that -- that was the timing scope of the

17   subpoena request and not because the work of these clients went

18   away or the facility was closed or something, right?

19   A    Basically, I -- if we adhered to the -- we adhered to the

20   time frame that was requested.

21   Q    Okay.  Well, let me ask it this way.  Just to be clear for

22   the record, the Slover Avenue facility, that's still in

23   operations, correct?

24   A    Slover, it's still in operations.

25   Q    So that's a yes.

Exhibit 1(b)
157



www.escribers.net | 800-257-0885

1   A    You're saying -- I'm -- I'm saying, what was the question

2   again?  You're asking is Slover still --

3   Q    The Slover Avenue facility, the Universal Truckload

4   facility located at 15033 Slover Avenue, Fontana, California;

5   that facility is still in operations, correct?

6   A    I guess I'm getting confused here.  We're talking about

7   Truck -- we're talking about Truckload.

8   Q    I'm talking about that Truckload facility where, you know,

9   there were some Universal Truckload employees, and where there

10  were some Universal Intermodal employee, and both set were laid

11  off.  But I just want to confirm that that facility, the one

12  located at 15033 Slover Avenue, Comp -- Fontana, California,

13  that Universal Truckload facility is still in operations,

14  correct?

15  A    Yes.

16  Q    Okay.  And so I just want to confirm that these lists,

17  they end on March 2020, but they only ended on March 2020

18  because the scope of the -- of these subpoena requests only

19  requires the document from January of 2019, 29- -- 2019 to

20  March of 2020, correct?

21  A    I believe so.

22  Q    Okay.  And then in response to the -- the request for

23  client lists and information, you als -- your company also

24  provides some client contracts, right?

25  A    I believe so.

Exhibit 1(b)
158



www.escribers.net | 800-257-0885

1    Q    All right.  I'm just going to show you what's been marked

2    and identified as Joint Exhibit 20(a).  This is a service

3    agreement between Universal Intermodal and Air Express

4    International USA, Inc.  This was one of the contract that you

5    provided in response to the subpoena request; isn't that right?

6    A    I believe so.

7    Q    All right.  And then 20(b) is a contr -- service provider

8    agreement that is between Expeditor International of

9    Washington, Inc., and Universal Intermodal.  This is another

10   contract you provide to the NLRB pursuant to those requests,

11   right?

12   A    I believe so.

13   Q    All right.  And then lastly, 20(c), there's a (audio

14   interference) Intermodal or specifically, Mason Dixon

15   Intermodal, this is another contract that you provided to us in

16   res -- in response to this request, right?

17        MR. DO:  Your Honor, Troy --

18        JUDGE ROSAS:  Hold -- hold up a second.

19        MR. DO:  Yes.

20        THE COURT REPORTER:  I apologize.  Everyone froze.  If you

21   can repeat the last question that you -- start the last

22   question over, please.

23        MR. DO:  Sure.  Troy, just to confirm -- okay.  Never

24   mind.  That's fine.

25   Q    BY MR. DO:  Okay.  So what's been identified, marked, and

Exhibit 1(b)
159



1    admitted as Joi -- as Joint Exhibit 20(c), the quality

2    agreement between Kuehne -- Kuehne + Nagel, Inc. and Mason-

3    Dixon, Inc. D/B/A, that's another contract that you provided to

4    the National Labor Relations Board responsive to this request,

5    correct?

6    A    I believe so.

7    Q    And to the best of your knowledge, your company did not

8    provide any additional responsive document to these requests

9    before the start of this hear -- before the start of the

10   current hearing; isn't that right?

11   A    Not that I'm aware of.

12   Q    Okay.  Request 21 of the investigative and request 18 of

13   the hearing subpoena request document showing any communication

14   between your company, the Universal Intermodal, and its client

15   regarding the closure of the -- of the Compton facility, right?

16   A    I do recall the request.

17   Q    You didn't produce any document responsive to this

18   request, correct?

19   A    If we had documents, we would have provided them.

20   Q    But in fact, you did not produce any communication between

21   your -- yourself, between Inter -- Universal Intermodal and its

22   clients, correct?

23   A    Again, if we had them, we would have provided them.

24   Q    And to your knowledge, nothing further responsive to this

25   request was provided prior to the start of this hearing; isn't

Exhibit 1(b)
160



1   that right?

2   A     Not that I'm aware of.

3   Q     And you -- you did a verbal and email search for

4   responsive documents, right?

5   A     For this specific -- for which request or what -- for

6   what --

7   Q     Sure, the request that asks for communication between your

8   company -- between Universal Intermodal and its client about

9   the closure of Comp -- of the Compton facility.

10   A     Correct.

11   Q     And specifically, in this request, you only searched the

12   record of -- of the chief executive officer, Tim Phillips, Mr.

13   Michael Vagts, and Mr. Don Taylor; isn't that right?

14   A     I -- I believe it's what I testified -- it earlier, I

15   believe.

16   Q     So that's a yes?

17   A     I believe so.

18   Q     Okay.  Request 22 of the investigative subpoena and

19   request 19 of the hearing subpoena requested documents showing

20   any communication between Universal Intermodal and with its

21   client regarding the reassignment of any work formerly done --

22   done by the Universal Intermodal employee at Compton; isn't

23   that right?

24   A     I recall the request.

25   Q     And again, you did not produce any resp -- document

Exhibit 1(b)
161



1    responsive to this request, correct?

2    A    Yeah.  And if we had responsive documents, I would have

3    provided those.

4    Q    And to your knowledge, nothing further was provided to the

5    National Labor Relations Board in response to this request

6    prior to the start of the hearing; isn't that right?

7    A    Not that I'm aware of.

8    Q    And again, for this request, you did a verbal and an email

9    search for the responsive document, right?

10   A    Yes.

11   Q    And again, in this particular case, you only searched the

12   records of Mr. Phillips, Mr. Vagts, and Mr. Taylor; isn't that

13   right?

14   A    I believe so.

15   Q    And you specifically did not search the records of any of

16   their subordinates or any of your local managers, correct?

17   A    I believe so.  It's correct.

18   Q    And you did not do so despite local managers being the

19   ones who have traditional transact -- transactional

20   communication with clients, right?

21        MR. DO:  Objection.  Vague and ambiguous as to

22   transactional communication.

23        JUDGE ROSAS:  Let's take the argumentative out of it.

24   Rephrase.

25        MR. DO:  Sure.  Thank you, Your Honor.

Exhibit 1(b)
162



1    Q    BY MR. DO:  You previously testified that you did not

2    search the local managers records even though they are the ones

3    who may have the transactional communi -- communication, right?

4    A    I recall previously testifying I didn't search those --

5    those individuals.  I recall that, yes.

6    Q    And you explained that you only searched the records of

7    Mr. Phillips, Mr. Vagts, and Mr. Taylor because something of

8    this magnitude would come from someone higher in the

9    organization versus a facility manager or a terminate -- a

10   terminal manager, right?

11   A    I do recall that.

12   Q    And again, so to the best of your understanding, you did

13   not -- you didn't -- you don't remember producing any document

14   responsive to this request, correct?

15   A    Again, if we -- if there -- if responsive documents had

16   been produced, I would have provided them.

17   Q    And do you recall producing anything?

18   A    Not that I recall.

19   Q    Okay.  And so based on your search for responsive to

20   document responsive requests 22, is it fair to say that

21   Universal Intermodal closed the Compton facility without

22   notifying its clients in any way?

23        MR. ADLONG:  Objection.  Calls for speculation.  Lacks

24   foundation.

25        JUDGE ROSAS:  Rephrase.

Exhibit 1(b)
163



www.escribers.net | 800-257-0885

1      MR. DO:  Okay.

2      Q    BY MR. DO:  Based on the fact that you -- you don't recall

3   providing any documents to us, is it accurate to say that

4   Universal Intermodal closed its Compton facility without

5   notifying its clients?

6      MR. ADLONG:  Objection.  Lacks foundation.

7      JUDGE ROSAS:  I'm going to sustain the form of that

8   question.  You can ask it in two parts.

9      MR. DO:  Okay.

10     Q    BY MR. DO:  So you said that you searched for documents of

11  communication between Universal Intermodal and its client about

12  the closure of the Compton -- Compton facility, correct?

13     A    Correct.

14     Q    And you don't recall providing anything responsive to that

15  request, correct?

16     A    I don't recall providing anything, correct.

17     Q    So to the best of your knowledge, Universal Intermodal

18  doesn't have any records of communication with -- with its

19  client about the Compton closure, correct?

20     A    To the best of my -- again, if we had any responsive

21  documents, I would have provided -- provided that.

22     Q    Okay.  And you testified that you -- you -- you did a

23  search for documents between Universal Intermodal

24  representatives and its clients about the transfer of any work

25  from the Compton and -- that would -- what -- that was being

Exhibit 1(b)
164



1   done by the Compton employees, correct?

2   A    I do recall that.

3   Q    And to the best of your recollection, you didn't produce

4   any document responsive to that request, correct?

5   A    Again, if we had responsive documents, we would have

6   provided them.

7   Q    And -- and the -- the question I'm posing to you, sir, is

8   to the best of your recollection, did you in fact, provide a

9   responsive document.

10   A    Not that I recall.

11   Q    And then is it accurate to say then that, you know, to the

12   best of your knowledge, Universal Intermodal did not

13   communicate with its client or at least has no document of any

14   communication between itself and its client about the transfer

15   of work from the laid off Compton employees?

16       MR. ADLONG:  Objection.  Compound, lacks foundation, calls

17   for -- and assumes facts not in evidence.

18       MR. DO:  Your Honor, you were muted.  I don't think we

19   heard your ruling.

20       JUDGE ROSAS:  Sustained as to form.

21       MR. DO:  Okay.

22   Q    BY MR. DO:  Mr. Glackin, based on your search, is it to

23   your understanding that you -- that you -- never mind.

24       MR. DO:  Strike that, Your Honor.  I'll move on.

25   Q    BY MR. DO:  So let me draw your attention back to Joint

Exhibit 1(b)
165



1   Exhibit 20(a), which I'll put that on screen.  So your

2   testimony today is, as far as you know, Universal Intermodal

3   shifted the work under this contract to Southern Counties

4   Express without any notification to -- or I'm -- to -- wait,

5   I'm sorry.  This is the wrong document.  Let me restart my

6   question.

7        Joint (audio interference) your attention again back to

8   Joint Exhibit -- Joint Exhibit 20(a), which is the service

9   agreement between Universal Intermodal and Air Express

10  International USA.  Is it -- is it to your understanding that

11  there is no communication between Universal Intermodal and Air

12  Express International about the work being shifted over to

13  Southern -- Southern Counties Express?

14       MR. ADLONG:  Objection.  Calls for -- assumes facts not in

15  evidence, lacks foundation.  And --

16       MR. DO:  You're not -- Your Honor, we still can't hear.

17       JUDGE ROSAS:  Repeat -- repeat the question.

18       MR. DO:  Sure.

19  Q    BY MR. DO:  So is it your testimony today based on your

20  research that you did not find any document showing that when

21  Southern Counties Express took over the work that was being

22  done by the -- the -- the laid off Compton employees that there

23  was no communication between your company and Air Express

24  International USA telling them that change was going to occur?

25       MR. ADLONG:  Again, objection.  Assumes facts not in

Exhibit 1(b)
166



1   evidence.  Lacks foundation.  They have not established that

2   Southern Counties took over the work.  It has not been

3   established.  It's an assumption that he's making.  And he's

4   trying -- it's compound for that matt -- and for that matter,

5   too.  They have not established that.  They haven't even

6   established that he has knowledge about any of that.

7       JUDGE ROSAS:  Repeat the question one more time.

8       MR. DO:  Sure.

9   Q   BY MR. DO:  Based on your search for -- for documents

10  responsive to the -- to these requests, which requests

11  communication between Universal Intermodal and its client, is

12  it your testimony that you did not find any documents showing

13  any communication between Universal Intermodal's representative

14  and Air Express International USA documenting any change with

15  regard to who was going to be doing Air Express International's

16  work?

17      MR. ADLONG:  Again, objection.  Assumes facts not in

18  evidence.  Lacks foundation.

19      JUDGE ROSAS:  Overruled.  You can answer.

20  A   I don't know.  I'm -- I'm un -- I'm not sure.

21  Q   BY MR. DO:  To the best of your recollection, did you

22  produce any documents of communication between Universal

23  Intermodal Representative and Air Express International USA?

24  A   Not to my knowledge.

25  Q   And just to draw your attention to specifically Section



 1    18.6 -- 18.6 of this contract -- and so your testimony is

 2    consistent, despite the fact that this contract between

 3    Universal Intermodal and Air Express International has an -- an

 4    assignment clause that provides for nonassignment of Air

 5    Express International's work; isn't that right?

 6        MR. ADLONG:  Objection.  Lacks foundation.  Calls for

 7    speculation.

 8        JUDGE ROSAS:  Overruled.

 9    A    Could you ask the question again?  I --

10    Q    BY MR. DO:  Sure.  So it is your testimony that you did

11    not find any document between Universal Intermodal

12    representative and Air Express International, that is true

13    despite the fact that such an 18.6 of this agreement provides

14    for the nonassignment of Air Express International's work

15    without notification; isn't that right?

16    A    Yeah, I -- if we had responsive documents, I would've

17    provided them.  That's what I do know.

18    Q    I'm sorry.  That -- that wasn't the question.  I just want

19    to confirm that your testimony is consistent despite the fact

20    that this agreement contains a nonassignment clause, correct?

21        MR. ADLONG:  Objection.  Calls for speculation.  Lacks

22    foundation.  It continue --

23        JUDGE ROSAS:  That question's confusing.  Next question.

24    Sustained.

25        MR. DO:  All right.

Exhibit 1(b)
168



www.escribers.net | 800-257-0885

1    Q    BY MR. DO:  You did not -- Mr. Glackin, you did not find

2    any communication between Universal Intermodal and Air Express

3    International that notified them of any change to who they're

4    doing -- who's going to be doing their work, correct?

5         MR. ADLONG:  Again, objection.  Lacks foundation.  Assumes

6    facts not in evidence.

7         JUDGE ROSAS:  Sustained.  I'm sorry.  Overruled, I meant.

8    You can answer if you know.

9    A    Not to my knowledge.

10   Q    BY MR. DO:  Okay.  And request 17 of the investigative

11   subpoena and request 14 of the hearing subpoena to Universal

12   Intermodal requested documents showing any internal

13   communication about the transfer of any equipment from the

14   Compton facility and Fontana facility; isn't that right?

15   A    I do recall that.

16   Q    And you did not produce any internal communication

17   regarding the decision to transfer this -- these equipment;

18   isn't that right?

19   A    If there was correspondence or communication, I would have

20   provided it.

21   Q    And to the best of your recollection, did you provide any

22   documents responsive to that particular request?

23   A    Not to my knowledge.

24   Q    And to the best of your knowledge, did Universal

25   Intermodal provide additional documents responsive to that

Exhibit 1(b)
169



1    request prior to the start of the current hearing?

2    A    Not to my knowledge.

3    Q    Request 19 of the investigative subpoena and request 16 of

4    the hearing subpoena requested documents showing any internal

5    communication about the relocation or subcontracting of the

6    Compton employee -- the Compton and Fontana's employees work;

7    isn't that right?

8    A    I do recall the request.

9    Q    And you didn't produce any document responsive to this

10   request, right?

11   A    If there were any documents to provide, we would have

12   provided them.

13   Q    And to the best of your recollection, did you provide any

14   responsive document to this request?

15   A    Not to my knowledge.

16   Q    And to the best of your knowledge, did Universal

17   Intermodal provide any additional responsive document to this

18   request prior to the start of this hearing?

19   A    Not to my knowledge.

20   Q    And this is a request that you, again, did a verbal and an

21   email search for the document; isn't that right?

22   A    Yes.

23   Q    And in this request, you again specifically searched the

24   records of Mr. Phillips, Mr. Vagts, Mr. Taylor, and Mr. Erskine

25   and Mr. Howder; isn't that right?

Exhibit 1(b)
170



1    A    I believe so.

2    Q    Request 23 of the investigative and request 20 of the

3    hearing subpoena requested documents showing any internal

4    communication regarding the closure of the Compton facility,

5    right?

6         MR. ADLONG:  Objection.  Lacks --

7         JUDGE ROSAS:  What's the --

8         MR. ADLONG:  -- it's -- it's vague and ambiguous.  He's --

9    he's naming subpoena paragraphs without identifying to whom the

10   subpoenas address.

11        JUDGE ROSAS:  Why don't you rephrase that.

12        MR. DO:  Sure.

13   Q    BY MR. DO:  Request 23 of the investigative and request 20

14   of the hearing subpoena directed to Universal Intermodal

15   requested documents showing any internal communication about

16   the closure of the Compton facility, right?

17   A    I -- I do recall the request.

18   Q    And other than docu -- other than the documents that we

19   discussed in General Counsel Exhibit 2, which are the three

20   pages, you did not produce any other internal communication

21   responsive to this request; isn't that right?

22   A    If there were any other documents, we would have provided

23   them.

24   Q    So then, other than the three documents that we identified

25   and spoke about in GC-2, do you recall producing any other

Exhibit 1(b)
171



www.escribers.net | 800-257-0885

1      documents responsive to this request?

2      A     I do not recall.

3      Q     And to the best of your knowledge, did Universal

4      Intermodal provide any additional document responsive to these

5      requests prior to the start of this hearing?

6      A     Not to my knowledge.

7      Q     And again, you did a verbal and email search for these

8      documents, correct?

9      A     Yes.

10     Q     And in this particular case, you searched the records of

11     Mr. Phillips, Mr. Vagts, and Mr. Don Taylor, right?

12     A     Yes, I believe so.

13     Q     And you testified that you, again, did not search the

14     records of any of their -- of any of their subordinates or any

15     of your local managers; isn't that right?

16     A     I believe so.

17     Q     And you explained that you did not do so because decisions

18     like the decision to close the facility would not have come

19     from local management, right?

20     A     I believe so.

21     Q     And you explained that you only searched the emails of Mr.

22     Phillips, Mr. Vagts, and Mr. Taylor because they were the

23     representative that would have had knowledge and would have

24     been influential in that decision, right?

25            MR. ADLONG:   Objection.   Misstates prior testimony.

Exhibit 1(b)
172



www.escribers.net | 800-257-0885

1          JUDGE ROSAS:  Well, it -- can you answer that?

2     A    Yeah, I don't recall.  Can you say that one more time?

3     There -- I got lost in the last part.  Something was --

4     Q    BY MR. DO:  Sure, sure.  You explained that you searched

5     only the emails of Mr. Phillips, Mr. Vagts, and Mr. Taylor

6     because they were the company representatives that would have

7     had knowledge and would have been influential in that decision,

8     right?

9     A    I don't recall that that piece of knowledge and

10    influential.

11    Q    Okay.  I am going to show a part of your transcript.  Give

12    me one moment.  Let me get to it.  So from page 189 through

13    page 190 of the transcript of your previous testimony, can you

14    read the highlighted part to yourself?

15    A    Okay.  Okay.

16    Q    Does that reflect your -- refresh your recollection?

17    A    It does, yes.  Thank you.

18    Q    Okay.  And so let me ask you again.  You explained that

19    you only searched the emails of Mr. Vagts, Mr. Phillips, and

20    Mr. Taylor because they were the representative that would have

21    had knowledge and would have had been influential in that

22    decision, correct?

23    A    Yes.

24    Q    In fact, when you were conducting your search, you believe

25    that the people who are -- who would have been involved in

Exhibit 1(b)
173



1    finalizing the closure would have been Mr. Phillips and Mr.

2    Taylor, right?

3         MR. ADLONG:  Objection.  Vague and ambiguous as to

4    finalize.

5         JUDGE ROSAS:  If you know.

6    A    I'm not -- I'm not aware.

7    Q    BY MR. DO:  All right.  Then give me one moment.  I'm

8    going to show you a part of your custodial record interview.

9    All right.  This is on page 197 through 198.  Can you please

10   read the highlighted portion to yourself and let me know when

11   you're ready?

12        MR. ADLONG:  Wait.  You just said it, page 197 to 198, and

13   you only have one page up there.  And you only have --

14        MR. DO:  It -- it --

15        MR. ADLONG:  -- barely half the line highlighted.

16        MR. DO:  Well, before that, I initially, had all of this

17   highlighted, and this is what I'm -- oh, excuse me.  This is

18   what I'm -- this is -- this -- excuse me.  There you go.  This

19   is what I'm trying to get him to read to himself.

20   Q    BY MR. DO:  Are you able to see that, sir, or do I need to

21   zoom in?

22   A    No -- yeah.  Can you blow it up a little bit?  I

23   appreciate it.

24   Q    Sure.  And then tell -- tell me if you need me to scroll

25   down.

Exhibit 1(b)
174



www.escribers.net | 800-257-0885

1      JUDGE ROSAS:  Might be easier for the witness to just read

2   from line 10 down to a certain point without the high -- dark

3   highlighting.

4      MR. DO:  Yes, Your Honor.

5      JUDGE ROSAS:  Can you see the line numbers?

6      THE WITNESS:  I can, yes.  Okay.

7   Q    BY MR. DO:  All right.  Does that re -- refresh your

8   recollection, sir?

9   A    Do you mind if I just go down to the next section you were

10   referencing?

11   Q    Sure.

12   A    Thank you.  Okay.

13   Q    All right.  So again, did that refresh your recollection?

14   A    Yes, thank you.

15   Q    Not a problem.  So let me ask you again, isn't it true

16   that when you were conducting your search, you believed that

17   the people who would have been involved in finalizing the

18   closure decision would have been Mr. Phillips and Mr. Taylor?

19   A    Yes.

20   Q    When you searched -- when you conducted your search for

21   document responsive to this request, you didn't find any

22   documents related to a search for an alternative facility,

23   correct?

24   A    For an alternative facility?

25   Q    An alternative location for the Compton employees?

Exhibit 1(b)
175



1      MR. ADLONG:  I'm going to object.  I don't think we've

2  established that there's any duty to find something related to

3  an alternative or that he should have been seeking that.

4      JUDGE ROSAS:  Repeat that question.

5      MR. DO:  Sure.

6  Q    BY MR. DO:  Just in -- in your search for documents

7  responsive to this request, Mr. Glackin, do you recall finding

8  anything related to a search for an alternative facility for

9  the laid off Compton employees?

10     JUDGE ROSAS:  You object to that?

11     MR. ADLONG:  Yes.

12     JUDGE ROSAS:  Overruled.

13  A    Not that I recall.

14  Q    BY MR. DO:  All right.  Moving along.  Request 24 of the

15  investigative subpoena and request 21 of the hearing subpoena

16  directed to Universal Intermodal requested internal

17  communication about Universal Intermodal's decision to lay off

18  the Universal Intermodal employees, correct?

19  A    I do recall that.

20  Q    And again, other than the documents that we discussed in

21  General Counsel Exhibit 2, you did not produce any other

22  responsive documents to this request, correct?

23  A    If any -- if we have responsive documents, I would have

24  provided them.

25  Q    To the best of your recollection, did you provide any

Exhibit 1(b)
176



1   responsive documents and to this request other than what we

2   talked about in GC-2?

3   A    Not that I recall.

4   Q    And to the best of your knowledge, did Universal

5   Intermodal provide any other responsive document to this

6   request prior to the start of this hearing?

7   A    Not to my knowledge.

8   Q    And again, you did a verbal and email search for these

9   documents, correct?

10   A    Yes.

11   Q    And in -- and in this, when you were doing that search,

12   you only searched the records of Mr. Phillips, Mr. Vagts, and

13   Mr. Taylor, right?

14   A    I believe so.

15   Q    And you explained that you only searched their emails

16   because you thought they would be the one involved in making

17   that decision, correct?

18   A    I believe so.

19   Q    And you did not search the records of any of their

20   subordinates or your local managers; isn't that right?

21   A    That is correct.

22   Q    And you explained that that was because decisions, like

23   the decision for layoff, would have gone out from the higher-

24   level people, right?

25   A    That's correct.

Exhibit 1(b)
177



www.escribers.net | 800-257-0885

1    Q    And in fact, you said -- you previously stated that they

2    come from people hired in Joe Lugo, who was the terminal

3    manager -- terminal manager of the Universal Intermodal Compton

4    facility at the time of its closure, right?

5    A    I do -- I do not recall that exactly.

6    Q    Okay.  Give me one moment.

7         MR. ADLONG:  Your Honor, I just want to make sure we --

8    it's clear we have a continuing objection to the continual

9    failure to question him about the facts, and just question him

10   about something he's said in the past.  They're two different

11   things.

12        JUDGE ROSAS:  Understood.

13        MR. DO:  One moment.

14   Q    BY MR. DO:  All right.  I'm going to be showing you page

15   202 to 203 of your transcript.  If you can read everything

16   below line 17 through line 3 of your transcript.  And once

17   you're through, let me know when you're done.

18   A    Okay.

19   Q    Does that refresh your recollection?

20   A    Yes, it does.  Thank you.

21   Q    Not a problem.  So let me ask you again.  You indicated

22   that you did not -- the decision, such as the decision to

23   layoff, would come from people higher than Joe Lugo, who was

24   the terminal manager of the Compton facility at the time,

25   right?

Exhibit 1(b)
178



www.escribers.net | 800-257-0885

1    A    Yes.

2         MR. DO:  Your Honor, before I begin asking my last line

3    inquiry, I would ask the -- that Ms. Gutman Dickinson be

4    excused for the next five minutes or so.  We can't hear you,

5    Your Honor.

6         JUDGE ROSAS:  Can you send Ms. Gutman Dickson -- Dickinson

7    to the waiting room.

8         MS. BRIDGE:  Judge, could you make me the host?

9         JUDGE ROSAS:  Oh, so we've lost that power.  Okay.  There

10   you go.  Go ahead.

11        MR. DO:  Thank you, Your Honor.

12   Q    BY MR. DO:  Request 25 of the investigative and request 22

13   of the hearing subpoena directed to Universal Intermodal

14   requested communication between Universal Intermodal

15   representative and the Union about the closure and layoff

16   decision; isn't that right?

17   A    I recall that.

18   Q    You didn't produce any document responsive to this

19   request, correct?

20   A    Not that I'm aware of.

21   Q    And to the best of your knowledge, did Universal

22   Intermodal provide any additional responsive documents prior to

23   the start of this hearing?

24   A    Not to my knowledge.

25   Q    And you did a verbal and email search for these documents,

Exhibit 1(b)
179



1    right?

2    A    Yes.

3    Q    And in this case, you searched the records of Mr. Phillips

4    and Mr. Taylor; isn't that right?

5    A    I believe so.

6    Q    And again, you did not search the records of any of their

7    subordinates or local managers, such as Mr. Joe Lugo; isn't

8    that right?

9    A    I believe so.

10   Q    And you explained that this was because those

11   communication would have come from Mr. Phillips or Mr. Taylor;

12   isn't that right?

13   A    I believe so.

14   Q    All right.

15        MR. DO:  Your Honor, Ms. Dickinson can return.

16        MR. ADLONG:  Your Honor, while we wait for her to come

17   back, do you mind if we take a five-minute break?

18        MR. DO:  Your Honor, we didn't hear your order.

19        JUDGE ROSAS:  Yes.  Off the record.

20        MR. ADLONG:  Thank you.

21   (Off the record at 2:46 p.m.)

22        JUDGE ROSAS:  All right.

23                    **RESUMED DIRECT EXAMINATION**

24   Q    BY MR. DO:  Okay.  Last request regarding Universal

25   Intermodal.  Request 26 of the investigative subpoena and

Exhibit 1(b)
180



1    request 25 of the hearing subpoena directed to Universal

2    Intermodal requested any documents from Universal Intermodal

3    that explained the -- Universal Intermodal's decision to layoff

4    the Universal Intermodal employees, correct?

5    A    I recall that.

6    Q    And other than some position statements that was produced

7    by your former counsel, Mr. John Ferrer, you did not produce

8    any other documents responsive to these requests, correct?

9    A    Not that I'm aware of.

10   Q    And to the best of your knowledge, since the start of this

11   hearing -- well, prior to the start of this hearing, have

12   Universal Intermodal provided any other responsive document to

13   this request?

14   A    Not to my knowledge.

15   Q    And you explained that you did a verbal and email search

16   for these documents, correct?

17   A    Yes.

18   Q    And you -- this -- with regard to this request, you only

19   searched the records of Mr. Phillips, Mr. Vagts, and Mr. Don

20   Taylor, correct?

21   A    I believe so.

22   Q    And you did so because they would have been the ones with

23   the documents related -- related to the reason -- the reasoning

24   behind the layoff, correct?

25   A    Correct.

Exhibit 1(b)
181



www.escribers.net | 800-257-0885

1    Q    On March 16, 2021, you provided a declaration to the

2    National Labor Relation -- Relations Board and to the federal

3    court about the investigative subpoena; isn't that right?

4    A    I do recall that.

5    Q    And in that declaration, you, as Universal Intermodal's

6    custodian of record, stated as Mar -- as of March 26, 2021

7    Universal Intermodal had conducted an exhaustive search of its

8    records and that all responsive records to those subpoena

9    requests had been produced in the National Labor Relations

10   Board, right?

11   A    I do recall that.

12   Q    And that as of March 16, 2021, you were not aware of any

13   other responsive documents, correct?

14   A    Correct.

15   Q    And for all the subpoena requests that we discussed

16   with -- with regard to Universal Intermodal, to the best of

17   your understanding, have Universal Intermodal produced any

18   additional documents to those requests that mirror the

19   investigative subpoena requests prior to the start of this

20   hearing?

21   A    Not to my knowledge.

22   Q    Okay.  Request 1 of the investigative and hearing

23   subpoena, the -- Universal Logistics Holding requested all

24   documents about Universal Logistics Holding relationship with

25   subsidiaries, right?

Exhibit 1(b)
182



1    A    I recall that.

2    Q    And other than the 10-K attachment, you did not provide

3    any kind of interline agreement or formal contracts with

4    Universal Logistics Holding or any of its subsidiaries,

5    correct?

6    A    Not to my knowledge.

7    Q    Request 7 of the investigative subpoena and hearing

8    subpoena directed to Universal Logistics holding requested

9    documents showing any communication between Universal Logistics

10   Holding and its client regarding the closure of the Compton

11   facility, right?

12   A    I do recall that.

13   Q    And you -- you didn't produce any document responsive to

14   this request, correct?

15   A    Not to my knowledge.

16   Q    And to the best of your understanding, did the -- did

17   Universal Logistics Holding provide any new responsive

18   documents to this request prior to the start of the current

19   hearing?

20   A    Not to my knowledge.

21   Q    Request 8 of the investigative and hearing subpoena

22   directed to Universal Logistics Holding requested documents

23   showing any internal communications with clients about the

24   relocation and the subcontracting of the laid-off -- of the

25   laid-off Universal In -- Intermodal employees, the Universal

Exhibit 1(b)
183



1    Truckload employees, and Roadrunner employees, correct?

2    A    I do recall that.

3    Q    And you didn't produce any documents related to this

4    request; isn't that right?

5    A    Not to my knowledge.

6    Q    To your knowledge, did Universal Logistics Holding provide

7    any documents related to this request prior to the start of

8    this hearing?

9    A    Not to my knowledge.

10   Q    Request 3 of the investigative and hearing subpoena

11   related -- requested documents showing any internal

12   communication about the transfer of any equipment from the

13   Compton and from -- and Fontana facility, right?

14   A    I do recall that.

15   Q    And you didn't produce any document responsive to this

16   request, correct?

17   A    Not to my knowledge.

18   Q    And to the best of your knowledge, have the -- have

19   Universal Logistics Holding provided any newly res -- new

20   responsive documents to this request prior to the start of this

21   hearing?

22   A    Not to my knowledge.

23   Q    Okay.  I'm just going to go back to request 8 of the

24   investigators subpoena, which relate to communication with

25   clients about the relocation or subcontracting of any work.  To

Exhibit 1(b)
184



www.escribers.net | 800-257-0885

1    the best of your understanding, did you find any communication

2    between anyone at Universal Logistics Holding and any of their

3    clients about the -- these layoff employees' work?

4    A    Not that I recall.

5    Q    Request 5 of the investigative hearing subpoena requested

6    documents showing any internal communication about the transfer

7    of the Universal Intermodal, the Universal Truckload, and

8    Roadrunner employees -- laid-off employees' work, correct?

9    A    Was that -- I'm sorry, are we -- was that for the ULH

10   subpoena?  Are we still --

11   Q    Correct.

12   A    -- on that?

13   Q    Yes, correct, we're still on UH.

14   A    I recall that.

15   Q    And you didn't produce any documents responsive to this

16   request, correct?

17   A    Not that I recall.

18   Q    And to the best of your knowledge, have any new documents

19   been produced prior to the start of this hearing?

20   A    Not to my knowledge.

21   Q    Request 9 of the investigative subpoena and hearing

22   subpoena directed to Universal Logistics Holding requested

23   internal communication about the decision to layoff the

24   Universal Intermodal, Universal Truckload, and Roadrunner

25   employees, right?

Exhibit 1(b)
185



www.escribers.net | 800-257-0885

1   A     I recall that.

2   Q     Again, other than the position statement from your former

3   counsel, you didn't produce any other internal communication

4   regarding this decision, correct?

5   A     Not to my knowledge.

6   Q     And to your -- to the best of your knowledge, have any new

7   documents related to this request been produced prior to the

8   start of this hearing?

9   A     Not to my knowledge.

10   Q     You explained that for Universal Logistics Holding, you

11   didn't even perform a search for requests 3 through 10 of that

12   subpoena, correct?

13        MR. ADLONG:  Objection.  Argumentative.

14        JUDGE ROSAS:  Can you rephrase it?

15        MR. DO:  Sure.

16   Q     BY MR. DO:  Isn't it correct that you previously explained

17   to the National Labor Relations Board that for requests 3 to 10

18   of the Universal Logistics Holding investigative subpoena that

19   you didn't even perform the se -- a search for those documents?

20   A     Again, if I -- if -- if that's what I testified to -- I

21   don't recall that exactly.  I -- I -- I apologize.

22   Q     Well, isn't it correct that you explained to the National

23   Labor Relations Board that you didn't conduct a search because

24   the logic was that Universal Logistics Holding doesn't have any

25   personnel because it's a holding company, right?

Exhibit 1(b)
186



1    A    I do recall that, yes.

2    Q    So you're aware that the National Labor Relations Board

3    sent a hearing subpoena to Universal Management Services that

4    had the same reque -- that have contained substantially similar

5    requests, right?

6    A    For Universal Management Services?

7    Q    Yes.

8    A    Recent -- is that recently, or this was previous?

9    Q    Again, so are you aware that the National Labor Relations

10   Board -- well, you previously testified that you were aware

11   that Universal Management Services received a hearing subpoena

12   from the National Labor Relations Board.  I'm just --

13   A    I re --

14   Q    -- asking -- okay.

15   A    I recall that.

16   Q    And you're awa -- you're aware that requests 1 through 10

17   of that Universal Management subpoena -- Universal Management

18   Services subpoena -- contains substantially the same request

19   that was asked from Universal Logistics Holding, correct?

20   A    Again, I -- I don't know that I ever looked at them side

21   by side, I --

22   Q    Okay.  And so let me ask you regarding the Universal

23   Management Services subpoena.  For Universal subpoena requests

24   7 and 8, which we went through for Universal Logistics Holding,

25   which -- so 7 and 8 requested communication reca -- regard --

Exhibit 1(b)
187



1   between Universal Management Services and clients, and requests

2   3, 5, 9, and 10, which request internal communication about

3   company decision to close the facility, to layoff the

4   employees, the transfer of equipment, and the transfer of work,

5   to the best of your knowledge, did Universal Management

6   Services provide re -- any responsive documents to these

7   requests?

8   A    Not to my knowledge.

9   Q    To the best of your understanding, Universal Logistics --

10  has Universal Logistics Holding provided the General Counsel

11  with any new information requests with relation to the request

12  that we just spoke about prior to the start of this hearing?

13       MR. ADLONG:  Objection as to requests that we just spoke

14  about.

15       JUDGE ROSAS:  You're going to have to explain that

16  objection, Counsel.

17       MR. ADLONG:  Well, he's just numbered somewhere in the

18  range of five to ten requests, and he's been jostling between a

19  bunch of different subpoenas.  I mean, it -- it's just kind of

20  unreasonable to expect a witness -- a lay witness, for that

21  matter -- to keep track of (audio interference).

22       JUDGE ROSAS:  I think the -- the bottom line here is going

23  to be, unless I'm missing something, the documents in evidence

24  and -- which indicate what was requested during the events at

25  issue, what was requested during a subpoena, what was or was

Exhibit 1(b)
188



1    not provided if there was something missing, the bottom line is

2    it better be forthcoming from the Respondent before the --

3    before the GC closes their case-in-chief or nothing else is

4    getting in.  The assumption is that's it, right?  So I'll --

5    I'll -- I'll give the GC some more leeway, but it's -- it's his

6    job to obviously establish what the -- they're entitled to get

7    pursuant to subpoena and what they -- what they have or have

8    not gotten for the record, because should you decide to

9    introduce records later and turns out that they've been

10   subpoenaed and not provided, you may have a problem.

11        Okay, so I'm going to overrule the objection.

12        You can an --

13        Well, repeat the question at this point.

14        MR. ADLONG:  Your Honor?

15        MR. DO:  Okay.

16        MR. ADLONG:  If I may, I was going to say, I think the

17   issue pending, though, right now is not the fact that there are

18   documents to be produced and we're withholding them, it's just

19   we're going through over and over the fact that there's just no

20   documents that exist.

21        JUDGE ROSAS:  So I take it, Mr. Do, you're being

22   exhaustive in terms of establishing that nothing else exists?

23        MR. DO:  Yes, Your Honor.  These -- I mean, these are, of

24   course, the requests that we care about, so yes, that's the

25   intent.

Exhibit 1(b)
189



www.escribers.net | 800-257-0885

1          JUDGE ROSAS:  Go ahead, continue.

2          MR. DO:  Okay.

3     Q    BY MR. DO:  Let me restate the -- the question.  To the

4     best of your understanding, Universal Logistics Holding has not

5     provided the General Counsel with any new information in

6     response to the Universal Logistics Holding hearing subpoena

7     requests that are similar to the ones that was in the Universal

8     Logistics Holding investigative subpoena request, correct?

9     A    I mean, I can answer.  Again, if we had responsive

10    documents, we would have provided them.

11    Q    To the best of your recollection, has Universal Logistics

12    Holding provided the General Counsel with any further

13    responsive documents that would -- that covers the request in

14    the investigative subpoena?

15    A    Not to my knowledge.

16    Q    Okay.  On March 16, 2021, you provided a declaration to

17    the National Labor Relations Board and the federal Court about

18    the investigative subpoena, correct?

19    A    I do recall that.

20    Q    And in that declaration, you, as the Universal Logistics

21    Holding custodian of record, dated as March 16, 2021, Universal

22    Logistics Holding had conducted an exhaustive search of its

23    record and all responsive documents to the subpoena -- the

24    subpoena request, and has -- then those those have been

25    provided to the National Labor Relations Board, correct?

Exhibit 1(b)
190



1    A     I do recall that.

2    Q     And in that same declaration, you stated that as of March

3    16, 2021 you were not aware of any other responsive documents,

4    right?

5    A     I do recall that.

6    Q     Okay.  Request 3 of the investigative and hearing

7    subpoena -- and we're moving on to the Southern Counties

8    Express subpoenas -- request 3 of the investigative and hearing

9    subpoena for Southern Counties Express asked for all documents

10   relating to Southern Counties Express' relationship with its

11   parent and sister's corporate companies, correct?

12   A     I do recall that.

13   Q     Okay.  And other than for the 10-K attachment, which has

14   already been marked and identify -- and admitted as Joint

15   Exhibit 10(a), Southern Counties Express did not provide any

16   other responsive documents to this request; isn't that right?

17   A     Not to my knowledge.

18   Q     In your search for documents responding to this request,

19   you do not find any interline agreement or any kind of formal

20   contractual agreement between Southern Counties Express and any

21   other Universal Logistics Holding subsidiaries; isn't that

22   right?

23   Q     Not to my knowledge.

24   Q     Request 4 of the investigative and hearing subpoena for

25   Southern Counties Express requested documents showing any

Exhibit 1(b)
191



www.escribers.net | 800-257-0885

1    internal communication about the transfer of the Universal

2    Intermodal, Universal Truckload, and Roadrunner layoff

3    employees' work, correct?

4    A    I do recall that request.

5    Q    And you did not produce any document responsive to this

6    request, correct?

7    A    Not to my knowledge.

8    Q    And prior to the start of this hearing, did Southern

9    Counties Express provide any other responsive documents to

10   these requests?

11   A    Not to my knowledge.

12   Q    And you explained that you did a verbal and email search

13   for these documents, correct?

14   A    Yes.

15   Q    And you indicated you only searched -- for this particular

16   request, you only searched the records of Mr. Phillips, Mr.

17   Vagts, and Mr. Taylor, correct?

18   A    I believe so.

19   Q    And you explained that you only searched their records

20   because the decision of this type would have been pushed out to

21   the facility from the level of Mr. Phillips and Mr. Taylor,

22   right?

23   A    I believe that's correct.

24   Q    And so just to confirm, Mr. Phillips and Mr. Taylor has

25   the ability to make certain decision for Southern Counties

Exhibit 1(b)
192



 1    Express, right?

 2        MR. ADLONG:  Objection.  Calls for speculation, lacks

 3    foundation, assumes facts not in evidence.

 4        JUDGE ROSAS:  If you know.  Any decisions.

 5    A    I'm not -- I'm not fully for sure.

 6    Q    BY MR. DO:  All right.  Give me one moment.  All right.

 7    I'm going to show you what it is page 244 of a transcript of

 8    your custodian of record interview.  On that page, can you

 9    please read the highlighted part, which is line 10 through 14,

10    through yourse -- to yourself?  And let me know when you're

11    ready.

12        MR. ADLONG:  Okay.  I'm just going to object to -- well,

13    ask the question, and then I'll see if I have an objection; how

14    about that?

15        MR. DO:  Okay.

16    Q    BY MR. DO:  Does that refresh your recollection, Mr.

17    Glackin?

18    A    I recall that.

19    Q    Okay.  So let me confirm again.  So Mr. Phillips and Mr.

20    Taylor have the ability to make certain business decisions for

21    Southern Counties Express, right?

22        MR. ADLONG:  I'm going to object to the extent that what

23    you're seeking to elicit from him and what you just put up on

24    the board, they're different things; they -- they call for

25    different answers, they're phrased differently to -- to -- to

Exhibit 1(b)
193



1    try to -- so on that basis, I'll object.

2         JUDGE ROSAS:  Hold on one second.  Let me look at it.

3         MR. DO:  Do you want me to put that up on the screen, Your

4    Honor?  All right.  Give me one moment.  There you are.

5         JUDGE ROSAS:  So the question is whether --

6         MR. DO:  Mr. Phillips and Mr. Taylor --

7         JUDGE ROSAS:  -- the transcript --

8         MR. DO:  Go ahead.

9         JUDGE ROSAS:  -- whether that transcript refreshes the

10   witness's recollection?

11        MR. DO:  My understanding is I already refreshed his

12   recollection, so now I'm just asking him, is it correct that

13   Mr. Phillips and Mr. Taylor can make decisions for Southern

14   Counties Express?

15        JUDGE ROSAS:  Okay.  Overruled.

16        MR. ADLONG:  Vague and ambiguous -- I'm going to object as

17   to vague and ambiguous as to decisions.

18        JUDGE ROSAS:  Overruled.

19   Q    BY MR. DO:  All right, Mr. Glackin, let me ask my question

20   again.  So Mr. Phillips and Mr. Taylor has the ability to make

21   decisions for Southern Counties Express, right?

22   A    Yes.

23   Q    Request 6 of the investigative hearing subpoena for

24   Southern Counties Express requested for the period of January

25   2019 to the current date, showing any communication between

Exhibit 1(b)
194



1    Southern Counties Express and its client regarding the

2    assignment of work being -- formally being done by Universal

3    Intermodal employee; is that correct?

4    A    I recall the request.

5    Q    And you didn't produce any document responsive to this

6    request, right?

7    A    Not to my knowledge.

8    Q    And prior to the start of this hearing, are you aware of

9    any newly-responsive document that's been provided to the

10    General Counsel?

11    A    Not to my knowledge.

12    Q    And again, for this request, you performed a verbal and a

13    email search, correct?

14    A    Yes, I believe so.

15    Q    And in this request -- in this request, you only searched

16    the record of Mr. Phillips, Mr. Vagts, and Mr. Taylor, correct?

17    A    I believe so.

18    Q    And for request 6, you did not search the record of any of

19    your su -- their subordinates or your local managers, right?

20    A    Correct.

21    Q    And you explained that you only searched the record of Mr.

22    Phillips, Mr. Vagts, and Mr. Taylor because that -- that is

23    something would come -- that would come from them, right?

24    A    I believe so.

25    Q    All right.  Request 5 of the investigative and hearing

Exhibit 1(b)
195



1    subpoena requested documents showing and listing former and

2    current clients that were being serviced by the employees of --

3    at the -- at the Compton and Fontana; isn't that right?

4    A    I recall the request.

5    Q    And in response to this request, Southern Counties

6    provided three sets of documents; namely, two customer charts

7    and some customer contracts; isn't that right?

8    A    I believe so.

9    Q    All right.  And let me put on the screen what's already

10   been identified and admitted as 19(f).  Do you see what I just

11   put in front of you?

12   A    I do.

13   Q    And I'm going to scroll through that for you.  I'm sorry,

14   Joint Exhibit 19(f), not General Counsel.  My apologies.  So

15   you see that this document have columns relating to specific

16   months?

17   A    I do.

18   Q    All right.  I just want to ask with regard to, go into

19   Exhibit 19(f).  At the top, it says, "Southern Counties Express

20   customer list for 2019".  Is -- is it accurate for me to say

21   that this is -- is this accurate for us to understand -- for

22   the record to understand that this is a customer list for the

23   year 2019 of all Southern Counties Express customer that were

24   being serviced by the Compton and Fontana employees?

25   A    If that's what the request was, that was the document

Exhibit 1(b)
196



1    provided for it.

2    Q    Okay.  And then let me draw your attention to what's been

3    marked and admitted as Joint Exhibit 19(g).  So this is again

4    another list, but it only encompasses January, February and

5    March of 2020.  Should -- is it -- just to be clear, does it

6    reflect all Southern Counties Express work that at one point in

7    time was being done by the Universal Intermodal Compton and

8    Fontana drivers, correct?

9         MR. ADLONG:  Objection.

10        JUDGE ROSAS:  What's the basis?

11        MR. ADLONG:  Lack of foundation assumes facts, not in

12   evidence?

13        JUDGE ROSAS:  Overruled.

14        You can answer if you know.

15   A    I don't know for sure.  I guess I'm confused on the

16   question.  It's a customer list.  You're asking if it was

17   performed by certain drivers, though, weren't you?

18   Q    BY MR. DO:  Oh, My apologies.  No I see.  So let me

19   rephrase that question.  I just want to confirm that we should

20   understand that this is a list of Southern Counties Express

21   customers being done on January, February, March of 2020 in

22   Southern California; isn't that right?

23   A    Yeah.  It's -- it's a list of customers by month for that

24   year that were under southern counter -- parts of Southern

25   Counties.

Exhibit 1(b)
197



www.escribers.net | 800-257-0885

1    Q     Okay.

2    A     Does that make sense?

3    Q     Yes.  And just to be clear, again, this list ended on

4    March 2020.  That's because the -- because of the timing scope

5    of the subpoena request, not because Southern Counties went out

6    of business or something, right?

7    A     Correct.

8    Q     Okay.  And with regard to the contracts that you

9    provide -- that Southern Counties Express provided in response

10   to this request, I just want to confirm.  Going to Exhibit

11   21(a), it's an agreement, a three-year transportation agreement

12   between Southern Counties Express and Big Lots store.  This is

13   one of the contracts that Southern Counties Express provided to

14   the National Labor Relations Board; isn't that right?

15   A     I believe so.

16   Q     And then Joint Exhibit 21(b) and (c) are two agreement --

17   transportation agreements between Southern Counties Express and

18   Lowe's home centers.  These are agreement that Southern

19   Counties Express provided to the board in response to its

20   subpoena request, correct?

21   A     I believe so.

22   Q     And then lastly, Joint Exhibit 21(d) and 21(e) which are

23   two agreements between Walmart transportation and Southern

24   Counties Express.  These were also agreement that you provided

25   in response to the subpoena request, correct?

Exhibit 1(b)
198



www.escribers.net | 800-257-0885

1    A    I believe so.

2    Q    During your search for documents response to request 6,

3    did you find any communication between Southern Counties

4    Express and its client telling the client that Universal

5    Intermodal employees will be performing their work?

6        MR. ADLONG:  Objection.  Calls for speculation.  Lacks

7    foundation.  Assumes facts not in evidence.

8        JUDGE ROSAS:  Repeat that question.

9        MR. DO:  Sure.  During Mr. Glackin's search for response

10   of document to request 5 -- I'm sorry --5, did he find any

11   communication between Southern Counties Express and its client

12   regarding Universal Intermodal employees performing their work?

13       JUDGE ROSAS:  You said a client, singular?

14       MR. DO:  Clients, any of them.

15       JUDGE ROSAS:  Any clients at any time prior to what?

16       MR. DO:  In 2019 -- let's say in 2019.

17       JUDGE ROSAS:  Can you answer that?

18       MR. ADLONG:  Well, I don't think we -- is that -- we're

19   going through the subpoena request, but the subpoena request

20   has no -- it asked for communication with clients, but I don't

21   think it asked for communication with clients with respect to

22   the question that he's asking.  So even if there were -- like,

23   he -- we don't even know if we had -- that we have a duty to

24   produce what he's asking.  That's the premise of the questions

25   he's asking.

Exhibit 1(b)
199



1        JUDGE ROSAS:  Well, it was -- was it subpoenaed?

2        MR. DO:  Your Honor, to request -- ask for communication

3    between the client and Southern Counties Express regarding the

4    reassignment of work done by the Universal Intermodal employees

5    who were laid off.  And that's essentially what I'm asking.

6        JUDGE ROSAS:  Has it been revoked?

7        MR. DO:  It has not.

8        MR. ADLONG:  Again, this -- this one, Your Honor, goes to

9    Southern Counties.  What he just talked about was Universal

10   Intermodal.  This -- these -- these are -- these are Southern

11   County contracts that he's talking about.  He just talked about

12   reassignment of Universal Intermodal work.  But this is

13   Southern -- according to him, this is Southern Counties work.

14   And in addition to this, he hasn't even established that the

15   work was reassigned or transferred to anybody.

16       JUDGE ROSAS:  Right.

17       MR. ADLONG:  Those are further facts that he's just

18   assuming.

19       JUDGE ROSAS:  Right.  But you can do that reasonably so on

20   611(c) questioning.  Overruled.

21       Can you answer that?

22       THE WITNESS:  One more time -- I apologize.  One more time

23   for the question?

24       MR. DO:  Not a problem.

25   Q    BY MR. DO:  During your search for document response to

Exhibit 1(b)
200



www.escribers.net | 800-257-0885

1    the request -- request 6, which is the one that requested

2    communication between Southern Counties Express and its client,

3    did you find any communication between Southern Counties

4    Express and its customer from the start of 2019 about Universal

5    Intermodal employee doing their work?

6    A    Not that I recall.

7    Q    Okay.  And just to draw your attention to section 6 of the

8    Walmart contract, which is the one that's marked as 21(d).

9    Your testimony is true despite the fact that this contract

10   contains a nonsubcontracting clause, correct.

11       MR. ADLONG:  Objection lacks foundation, vague and

12   ambiguous.

13       JUDGE ROSAS:  All right.  You're going to have to rephrase

14   that.  It's a little confusing with the prefatory question of

15   something being true.

16       MR. DO:  Okay.

17       JUDGE ROSAS:  So let's just -- let's just take it one step

18   at a time.

19       MR. DO:  Sure.

20   Q    BY MR. DO:  So drawing your attention to section 6 of

21   what's been marked and admitted as Joint Exhibit 21(d), can you

22   see that the contract contains a subcontracting clause?

23   A    I can see it.

24   Q    And let me zoom in.  And do you see that that it states

25   that the carrier, which in this case is Southern Counties

Exhibit 1(b)
201



1    Express, agrees to not broker or subcontract any shipment

2    without prior written approval from Walmart?

3    A    I see that.  I do.

4    Q    And despite that -- that provision during your search for

5    document response to request 6, you didn't find any

6    communication between Southern Counties Express and Walmart

7    about Universal empl -- Intermodal employees doing Walmart's

8    work, correct.

9         MR. ADLONG:  Objection.  Lacks foundation regarding

10   Universal Intermodal employees doing their work.  Assumes the

11   same facts not in evidence.  And argumentative.  And in

12   addition, it doesn't go to this.  This is talking about

13   brokering or subcontracting, which could be entirely different

14   than doing the work.

15        JUDGE ROSAS:  Counsel, it's not pre-supposing anything as

16   far as the immediate question's concerned.  It's asking whether

17   contracts exist that reflect those kind of transactions.  So

18   just for that purpose, so I'm going to sus -- I'm going to

19   overrule the objection.

20        You can answer.

21        MR. ADLONG:  The question didn't go to whether or not a

22   contract exists.  The contract -- excuse me.  The question went

23   to whether or not the work was being done and there was there

24   was communication given.  That's --

25        JUDGE ROSAS:  Right.  Right, any records reflecting that.

Exhibit 1(b)
202



1      MR. DO:  Mr. Glackin, you can answer.

2   A    Not that I'm aware of.

3   Q    BY MR. DO:  Okay.  On March 16, 2021, you provided a

4   declaration to the National Labor Relations Board and to the

5   Federal Court about the Southern Counties Express investigative

6   subpoena, isn't that right?

7   A    I recall that.

8   Q    And in that declaration, you provided as the custodian of

9   record for Southern Counties Express that as of March 16, 2021

10  Southern Counties Express has conducted an exhaustive search of

11  its record and that all response of documents to the subpoena

12  has been provided to the National Labor Relations Board at the

13  time; isn't that right?

14  A    I recall that.

15  Q    And as of March 16, 2021, you are not aware of any other

16  response of documents, right?

17  A    Not that I'm aware of,

18  Q    To the best of your knowledge, prior to the start of this

19  hearing, did Southern Counties Express provide the General

20  Counsel with any other documents that would be responsive to

21  the investigative subpoena request and a hearing request which

22  substantially near to them?

23  A    Not that I'm aware of.

24  Q    Okay.  Request 3 -- we're moving on to the Universal

25  Truckload subpoenas.  Request 3 of the investigative and

Exhibit 1(b)
203



1    hearing subpoena directed to Universal Truckload requested all

2    documents about Universal Truckload's relationship with its

3    parent and sister companies, correct?

4    A    I recall the request

5    Q    And other than the 10-K that you provided, your Universal

6    Truckload did not provide any other response of documents to

7    this request; isn't that right?

8    A    I have no knowledge.

9    Q    You did not provide any kind of interline agreement or a

10   formal contract between Universal Truckload and any of the

11   other Universal logistics subsidiary companies; isn't that

12   right?

13   A    Not to my knowledge.

14   Q    Request 4 of the investigative and hearing subpoena to

15   Univer -- to Universal Truckload requested documents showing

16   any internal communication about the transfer of a Universal

17   Truckload laid-off employees' work, correct?

18   A    I recall the request.

19   Q    Other than some separation agreements, you didn't produce

20   any internal communication about the transfer of their work;

21   isn't that right?

22   A    Not to my knowledge.

23   Q    And to the best of your knowledge, has the Universal

24   Truckload provided to General Counsel with any other documents

25   responsive to this request prior to the start of the hearing?

Exhibit 1(b)
204



www.escribers.net | 800-257-0885

1  A    Not to my knowledge.

2  Q    And you did a verbal and e-mail search for these

3  documents, correct?

4  A    I believe so.

5  Q    And you explained that you only searched the records of

6  Mr. Phillips, Mr. Mike Erskine and Mr. Chris Howder; isn't that

7  right?

8  A    I believe so.

9  Q    And you explained that you only searched their records

10  because the decision of this type would have been pushed out to

11  the facility from the level Mr. Phillips, Mr. Erskine or Mr.

12  Howder; isn't that right?

13  A    I believe so.

14  Q    Request 5 of the investigative and hearing subpoena for

15  Universal Truckload requested documents showing a listing of

16  former and current clients that were being serviced by the

17  employees -- the laid-off employees of the Fontana facilities;

18  isn't that right?

19  A    I recall a request.

20  Q    And just to be clear, you did not provide any response of

21  document to this request; isn't that right?

22  A    Not to my knowledge.

23  Q    Okay.  And you explained that there wasn't anything

24  documenting the clients of Universal Truckload because their

25  work is mostly transactional in nature; isn't that right?

Exhibit 1(b)
205



www.escribers.net | 800-257-0885

1   A    I believe so.

2   Q    Okay.  Request 6 of the investigative and hear -- hearing

3   subpoena issued to Universal Truckload, requested for the

4   period of January 1, 2019 to the current date, documents

5   showing any communication between the Universal Truckload and

6   its client regarding the reassignment of work formerly done by

7   Universal Truckload employees; isn't that right?

8   A    I recall the request.

9   Q    And you did not provide any document responsive of this

10   request; isn't that right?

11   A    Not -- not to my knowledge.

12   Q    But to the best of your knowledge, did Universal Truckload

13   provide any response of documents to these requests prior to

14   the start of this hearing?

15   A    Not to my knowledge.

16   Q    And you explained that you only did a verbal inquiry for

17   these documents; isn't that right?

18        MR. ADLONG:  Objection.

19        JUDGE ROSAS:  What's the basis?

20        MR. ADLONG:  Misstates prior testimony.

21        JUDGE ROSAS:  Let's -- let's rephrase it then.

22        MR. DO:  Sure.

23   Q    BY MR. DO:  Isn't it correct that you previously told the

24   National Labor Relations Board that you only conducted a verbal

25   inquiry for these requests -- for documents responsive to this

Exhibit 1(b)
206



1    request?

2        MR. ADLONG:  Objection.  Argumentative.  Continued use of

3    the word only -- only.

4        JUDGE ROSAS:  All right.  Rephrase it further.

5        MR. DO:  Okay.

6    Q    BY MR. DO:  Isn't it correct that you testified that the

7    search that you conducted for these requests was a verbal

8    inquiry?

9    A    I don't exactly recall.

10   Q    Okay.  Give me one moment.  I'm sorry I had this up the

11   entire time.  Okay.  I'm going to show you what is page 100 --

12   265 of your -- it's on the record interview.  You may need me

13   to zoom on to this.  If you do, let me know.  But can you read

14   basically from this entire page, which is on line 1 to line 25?

15   A    Okay.

16   Q    All right.  Did that refresh your recollection, sir?

17   A    Yes, thank you.

18   Q    No worries.  So just to confirm, what search did you

19   conduct to find documents responsive to Universal Truckload

20   request 6?

21   A    Verbal.

22   Q    And you did not do an e-mail search; isn't that right?

23   A    Correct.

24   Q    And in this particular case, you only did a verbal request

25   to Mr. Phillips, Mr. Erskine and Mr. Howder; isn't that right?

Exhibit 1(b)
207



1    A    Yes.

2    Q    And you did not search the records of any of their

3    subordinates or the local managers; isn't that right?

4    A    Correct.

5    Q    And you explained that you only spoke to Mr. Philips, Mr.

6    Erskine and Mr. Howder, because this is something that would

7    come from them, right?

8    A    I believe so.

9    Q    And they explained to you that there wasn't any written

10   documents because of the trans -- transactional nature of your

11   work; isn't that right?

12   A    Yes.

13   Q    Okay.  Request 7 of the investigative and hearing subpoena

14   directed to Universal Truckload requested internal

15   communication about Universal Truckload's decision to lay off

16   the Universal Truckload employees, correct?

17   A    I recall the request.

18   Q    And you did not produce any documents responsive to this

19   request, correct?

20   A    Not to my knowledge.

21   Q    And the best of your knowledge, has Universal Truckload

22   produced any further response of documents to these requests

23   prior to the start of this hearing?

24   A    Not to my knowledge.

25   Q    And for this particular request, you conducted a verbal

Exhibit 1(b)
208



1    and an e-mail search for response of documents, right?

2    A    I believe so.

3    Q    And again, you explained that you only searched the

4    records of Mr. Phillips, Mr. Vagts, Mr. Erskine and Mr. Howder,

5    isn't that right?

6    A    I believe so.

7    Q    And again for request 7, you did not search the record of

8    their subordinates or of your local managers, right?

9    A    Correct.

10   Q    And you explained that you did this because this type of

11   decision, so the decision to lay off would have come from Mr.

12   Phillips, Mr. Vagts, Mr. Erskine and Mr. Howder.  Right.

13   A    I believe so.

14   Q    Request 8 of the Universal Truckload investigative

15   subpoena and a hearing subpoena directed to Universal Truckload

16   requested any documents explaining Universal Truckload's

17   decision to lay off the Universal Truckload employees, right?

18   A    I recall a request.

19   Q    And again, other than the position statement that was

20   produced during the investigation, you did not produce any kind

21   of documents responsive to this request, correct?

22   A    Not to my knowledge.

23   Q    And prior to the start of this hearing, are you aware of

24   any other responsive document that has been provided to the

25   General Counsel?

Exhibit 1(b)
209



1    A    Not to my knowledge.

2    Q    And again, you did a verbal and e-mail requests for

3    documents responsive to this request; isn't that right?

4    A    I believe so.

5    Q    And in this case, you again only searched Mr. Phillips,

6    Mr. Vagts, and Mr. Erskine; isn't that right?

7    A    I believe so.

8    Q    And you explained that you did this because the decision

9    to lay off employees would have -- would have been between Mr.

10   Phillips and Mr. Erskine, isn't that right?

11   A    I believe so.

12   Q    On March 20 -- on March 16, you provided a declaration to

13   the National Labor Relations Board and to the Federal Court

14   about the Universal Truckload investigative subpoena; isn't

15   that right?

16   A    I recall that

17   Q    In that declaration, you asked Universal Truckload's

18   custodian of record stated as of March 16, 2021, Universal

19   Truckload had conducted an exhaustive search of its records and

20   all responsive documents to the subpoena requests were provided

21   to the National Labor Relations Board, correct?

22   A    I recall that

23   Q    In that -- in that same declaration, you stated that as of

24   March 16, 2021, you were not aware of any other responsive

25   documents, correct?

Exhibit 1(b)
210



www.escribers.net | 800-257-0885

1    A    I recall that

2    Q    To the best of your understanding, Universal Truckload has

3    not provided the General Counsel with any new information in

4    response to the -- the Universal Truckload hearing subpoena

5    request that are similar to the Universal Truckload

6    investigative subpoena request; isn't that right?

7    A    Not to my knowledge.

8    Q    I am going to move on to the last subpoena.  So this is

9    the subpoena directed to Roadrunner Intermodal.  Request 3 of

10   the investigative and hearing subpoena requests to Roadrunner

11   Intermodal requested that all documents in Roadrunner's -- that

12   all the doc -- that documents of Roadrunner's relationship with

13   its parents and sister companies, correct?

14   A    I recall -- excuse me.  I recall the request.

15   Q    And other for the -- other than for the 10-K attachment,

16   that you did not provide any other response of documents to

17   this request; isn't that right?

18   A    Not to my knowledge

19   Q    In your search, you did not find any interline agreement

20   or any formal contracts between Road Runner or any of the other

21   Universal Logistics Holdings subsidiaries; isn't that right?

22   A    Yeah, not to my knowledge.

23   Q    Requests for the investigative and hearing subpoena

24   directed to Roadrunner request of documents showing any

25   internal communication about the transfer of the Roadrunner



Exhibit 1(b)
211

www.escribers.net | 800-257-0885

1    laid-off employees work, correct?

2    A    I recall the request.

3    Q    And other than the separation agreement that you

4    provide -- that you provided, you didn't produce any internal

5    communications about this decision, isn't that right?

6    A    Not to my knowledge.

7    Q    And to the best of your knowledge, prior to the start of

8    this hearing, has Roadrunner provided any additional responsive

9    documents?

10   A    Not to my knowledge.

11   Q    And this is, again, one of the requests that you only did

12   a verbal inquiry, isn't that right?

13   A    I believe so.

14   Q    And specifically, you only spoke to Mr. Phillips and Mr.

15   Taylor, isn't that right?

16   A    I believe so.

17   Q    And you explained again that there wasn't any responsive

18   document because the Roadrunner -- Roadrunner's work, like a

19   Universal Truckload, is transactional in nature; isn't that

20   right?

21   A    I believe so.

22   Q    Request 5 of the investigative hearings subpoena directed

23   to Roadrunner Intermodal request as -- requested documents

24   showing and listing former and current clients that were being

25   serviced by the laid-off Roadrunner employees, right?

Exhibit 1(b)
212



www.escribers.net | 800-257-0885

1    A    I recall the request.

2    Q    And in response to this request, Roadrunner provided to us

3    a new customer list; isn't that right?

4    A    I believe so.

5    Q    All right.  Let me put up on screen what has been marked

6    and admitted as Board Exhibit 19(b).  You see the document I'm

7    putting in front of you.

8    A    I do.

9    Q    This is the document you provided in response to the

10   subpoena request; isn't that right?

11   A    I believe so.

12   Q    And based on the title of this document, which is Our

13   Customer List for 2019, this is the document of the customer

14   that were being serviced out of the Calabash Avenue facility in

15   Fontana, California; isn't that right?

16   A    I believe so.

17   Q    All right.  I'm going to show you what has been marked and

18   admitted as Joint Exhibit 19(e).  This is the Roadrunner

19   customer -- well, is this one of the customer lists that you

20   provided in response to General Counsel's subpoena.

21   A    I believe so.

22   Q    And this is a list of customers that were being serviced

23   by -- the by drivers, not necessarily employees, but drivers

24   working out of these Calabash Avenue facility in Fontana,

25   California from January to March of 2020; isn't that right?

Exhibit 1(b)
213



www.escribers.net | 800-257-0885

1     A     Yeah, it's a customer list by month for 2020 for those

2     three months of customers at that location, correct.

3     Q     And again, this list only went -- only goes to March 2020

4     because of the timing scope of the request and not because the

5     Calabash Avenue facility closed.  Isn't that right?

6     A     Correct.

7     Q     And just to confirm, the -- the Roadrunner facility on

8     Calabash Avenue in Fontana, California, that is still in

9     operations, correct?

10    A     Correct.

11    Q     Request 6 of the investigative and hearings subpoena

12    related to -- my apologies -- directed to Roadrunner Express

13    requested from the period of January 1, 2019 to the current

14    date showing any communications between Roadrunner and its

15    clients regarding the reassignment of work that was previously

16    done by the laid-off employees, correct?

17    A     I recall the request.

18    Q     And you did not provide any documents responsive to this

19    request, right?

20    A     Not to my knowledge.

21    Q     And you can find -- my apologies.  Prior to the --

22          MR. DO:  Strike that.

23    Q     BY MR. ADLONG:  Prior to the start of this hearing, to the

24    best of your knowledge, did Road Runner provide any other

25    responsive documents to this request?

Exhibit 1(b)
214



www.escribers.net | 800-257-0885

1    A    Not to my knowledge.

2    Q    This is one of the requests that you explained that you

3    conducted a verbal and e-mail search for records, correct?

4    A    I believe so.

5    Q    And you explained that you only spoke to Mr. Phillips and

6    Mr. Taylor; isn't that right?

7    A    I believe so.

8    Q    And again, you did not search the records of any of their

9    subordinates or their local managers, right?

10   A    Correct.

11   Q    And you explained that you only searched the record of Mr.

12   Phillips and Mr. Taylor because the decision with regard to the

13   reassignment of -- with regard to the reassignment of work

14   would have been -- would have come from Mr. Phillips or Mr.

15   Taylor, right?

16   A    I believe so.

17   Q    Request 7 of the investigative hearing subpoena requested

18   internal communications about Roadrunner's decision to lay off

19   the Roadrunner employees, right?

20   A    I recall the request.

21   Q    And you -- you didn't produce any documents responsive to

22   this request, right?

23   A    Not to my knowledge.

24   Q    And prior to the start of this hearing, are you aware of

25   Roadrunner providing any further responsive documents to this

Exhibit 1(b)
215



www.escribers.net | 800-257-0885

1    request?

2    A    Not to my knowledge.

3    Q    And again, you did a verbal and e-mail search for these

4    documents, right?

5    A    I believe so.

6    Q    But in this particular case, you only searched the records

7    of Mr. Phillips, Mr. Vagts, and Mr. Taylor, isn't that right?

8    A    I believe so.

9    Q    And again, you did not search the record of their

10    subordinates or their -- or your local managers, right?

11    A    Correct.

12    Q    And you explained that because decision of this type would

13    have come from Phillips, Vagts, or Taylor to the field, right?

14    A    I believe so.

15    Q    Request 8 of the investigative and hearing subpoena for

16    Road -- directed to Roadrunner Intermodal Express (sic)

17    requested any documents explaining Roadrunner's decision to lay

18    off the Roadrunner employees, correct?

19    A    I recall the request?

20    Q    Again, other than the position statements provided by your

21    former counsel, you didn't produce any documents responsive to

22    this request, right?

23    A    Not to my knowledge.

24    Q    And to your knowledge, nothing further -- prior to the

25    start of this hearing, did -- were any additional responsive

Exhibit 1(b)
216



www.escribers.net | 800-257-0885

1   documents produced to the General Counsel?

2   A    Not to my knowledge.

3   Q    And again, you did a verbal and e-mail re -- search for

4   these documents, right?

5   A    I believe so.

6   Q    And in this -- in this request, you only searched the

7   records of Mr. Tim Phillips, Mr. Vagts, and Mr. Taylor; isn't

8   that right?

9   A    I believe so.

10  Q    And you did that because the documents containing the

11  reasons behind the layoff would have come from either Mr.

12  Phillips, Mr. Vagts, or Mr. Taylor; isn't that right?

13  A    I believe so.

14  Q    On March 16, 2021, you provided a declaration to the

15  National Labor Relations Board and the Federal Court about the

16  investigative subpoena directed to Roadrunner Intermodal; isn't

17  that right?

18  A    I recall that.

19  Q    And in that -- in that declaration, you as Roadrunner's

20  custodian of the record stated as of March 16, 2021 Roadrunner

21  had provided -- has conducted an exhaustive search of its

22  record and all responsive documents to the subpoena requests

23  were provided to the National Labor Relations Board, right?

24  A    I recall that.

25  Q    And as of March 16, 2021, you were not aware of any other

Exhibit 1(b)
217



1    responsive documents, correct?

2    A    I recall that.

3    Q    To the best of your understanding, Roadrunner has not

4    provided General Counsel with any new information in response

5    to the Roadrunner hearing subpoena requests that are similar to

6    the Roadrunner investigative subpoena request, correct?

7    A    Not to my knowledge.

8    Q    So we're done with a specific question.  I want to ask a

9    couple clarifying questions at the end.  Can you describe for

10   the record how you conducted your e-mail search?

11   A    Which specific search?

12   Q    How did you -- so for any of these requests when you

13   conducted an e-mail search for the records of Mr. Phillips, Mr.

14   Vagts, and Mr. Taylor, how would you conduct that search?

15       MR. ADLONG:  I'm going to object.  It's -- in essence,

16   it's a compound question.  He's asking, how did he -- and it's

17   vague and ambiguous.  He's asking, how did he conduct his

18   search?  We've just spent, I don't know, close to six hours

19   going through e-mail searches on a variety of different

20   requests --

21       JUDGE ROSAS:  That's fair.

22       MR. ADLONG:  -- in getting --

23       JUDGE ROSAS:  That's fair.  Sustained.

24       MR. DO:  All right.  Give me one moment, Your Honor.

25       Okay, Your Honor.  So I am done with my questioning of



1    this witness at this time.  But the counsel for the General

2    Counsel wants to retain the right to recall this witness in

3    light of the amended pleadings, because we thought we would

4    have been able to place in the amended answer onto the record

5    just verbally.  But in light of the fact that we need to do it

6    on document, we want to retain the right so we can call this

7    witness later.

8        JUDGE ROSAS:  Understood.

9        Charging Party, do you have any questions of the witness

10   at this time?

11       MR. WOJCIECHOWSKI:  First, I'd like to request that we be

12   provided with the -- the deposition transcript and any other

13   Jencks material for this witness as well as time to review it.

14   And I don't know, given that it's quarter to 4 here, what Your

15   Honor wants to do about that time to review it and whether

16   we're going to keep going today.

17       MR. ADLONG:  Your Honor, we would object to the extent

18   that the deposition testimony doesn't constitute a Jencks

19   statement.  And they're Charging Party, too.

20       MR. WOJCIECHOWSKI:  Charging Party definitely has access

21   to -- to Jencks material for -- for GC witnesses.  There's --

22   there's certainly -- there's material cited to that effect in

23   the -- in the Bench Book.  And I think under 102.118(g),

24   stenographic, recording or transcription, verbatim recital of

25   an oral statement made by the witness to an agent of the party

Exhibit 1(b)
219



1    obligated to produce a statement, i.e. to -- to an agent of the

2    NLRB, I think that deposition transcript is -- falls well

3    within the definition.

4         JUDGE ROSAS:  General Counsel, you certainly have an

5    interest in this information; what's your position?

6         MR. DO:  Your Honor, our understanding is that if you

7    order it, we would hand it over.

8         JUDGE ROSAS:  Is it your position that it constitutes

9    Jencks material?

10        MR. DO:  Your Honor, we did some research.  Mainly, this

11   was a question that came up.  We did some significant research.

12   Our understanding that it is based on current law.

13        JUDGE ROSAS:  The witness was sworn, correct?

14        MR. DO:  Yes, Your Honor.

15        JUDGE ROSAS:  So, sir, I have a question for you.  Did you

16   have an opportunity to review your transcript?

17        THE WITNESS:  For me?

18        JUDGE ROSAS:  Yes.

19        THE WITNESS:  No.

20        JUDGE ROSAS:  So he did not have an opportunity to attest

21   to its accuracy?

22        MR. DO:  No, Your Honor.  It's -- it was done in light of

23   just essentially what we have here, which is that there was a

24   court reporter.  And then after that, the interview was

25   completed.  We -- Mr. Adlong got a copy and their counsel got a

Exhibit 1(b)
220



 1    copy, and then we have a copy.

 2        MR. ADLONG:  We -- we never received a copy after the --

 3    after it.  I had to request it only like three days ago,

 4    because it was never received.  It's not in --

 5        JUDGE ROSAS:  So Respondent --

 6        MR. ADLONG:  And I will tell you, we did not subpoena him.

 7    We did not ask for his deposition that was the GC's job to get

 8    the subpoena and make sure it was accurate.

 9        JUDGE ROSAS:  Wait, wait.  Let me -- let me understand.

10    So what were the circumstances by which General Counsel

11    released the transcript to you, Mr. Adlong?

12        MR. ADLONG:  To me, he never did.  I had to go out and

13    seek it.

14        JUDGE ROSAS:  So you sought it -- you sought it from the

15    General Counsel, and the General Counsel provided it?

16        MR. ADLONG:  No, he never -- I never sought it from the

17    General Counsel.  I had to go to the court reporting service to

18    get it.

19        MR. DO:  But Your Honor, that -- I'm just going to say

20    that that's not accurate, because prior to this testimony, I

21    made an attempt to negotiate with Mr. Adlong to enter these --

22    the transcript instead of going through all this testimony.

23    And at the time, Mr. Adlong indicated that he was not

24    interested in doing that, which is kind of why we end up going

25    this route.  So I did actually provide it to him during that

Exhibit 1(b)
221



1    time, particularly, volume 2 and volume 3 which are the

2    substantive testimony.

3         MR. ADLONG:  I think, as I understood the question from

4    the judge was, was it provided to us for review to substantiate

5    that the transcript accurate -- accurately reflected the

6    testimony given by Mr. Glackin and on day one -- on the days

7    that he testified.  That was that I understood the question.

8         JUDGE ROSAS:  Well, it doesn't sound like he's had an

9    opportunity to review the transcript; is that right, General

10   Counsel?

11        MR. DO:  I mean, like I said, Your Honor, I am assuming

12   that's true.  That's how their -- that's their representation.

13        JUDGE ROSAS:  Well, that's -- this is an interesting

14   question.  It's -- it's one of first impression to me.

15        MR. DICKINSON:  Your Honor, if I may?

16        JUDGE ROSAS:  Go ahead.

17        MS. DICKINSON:  Yeah, I just -- I would note, though,

18   under the Jencks rule, right, third -- the first category, a

19   written statement made by the witness and signed or otherwise

20   adopted -- approved by the witness.  But the second category,

21   you know, explicitly says stenographic, mechanical, electrical,

22   or other recording, or a transcription thereof, which is a

23   substantially verbatim recital of an oral statement made by the

24   witness to an agent of the party obligated to produce the

25   statement and recorded contemporaneously in the making of the

Exhibit 1(b)
222



1    oral statement.  It doesn't say anything then about them

2    reviewing or -- it's different than part one.

3         So I would argue that the way that it was done, it's -- it

4    fit every definition of part two.  And so I would argue that it

5    falls under Jencks and that there's clear case law, Parts Depot

6    332 NLRB 670, 200 (sic), that make it clear that a witness --

7    an adverse witness by the General Counsel, that the Charging

8    Party -- that the General Counsel must provide the Charging

9    Party for purposes of cross-examination and impeachment with

10   the pre-trial affidavit, or in this case the transcription.

11        JUDGE ROSAS:  Okay, Mr. Adlong, do you want to be heard

12   further?

13        MR. ADLONG:  I mean, I think we've -- we've stated our

14   position.  I mean, if you believe it's appropriate, maybe to

15   take it under consideration for the evening and then come back

16   with a --

17        JUDGE ROSAS:  Well, you've -- you've -- so you've gotten

18   it, right?

19        MR. ADLONG:  Yeah.  I think I got it like two or three

20   days ago.

21        JUDGE ROSAS:  Okay.  So -- so my concerns, notwithstanding

22   falling into the second category as counsel -- as you indicate,

23   the witness's verification or acknowledgment of it having been

24   a prior sworn statement, not one in writing, but one pursuant

25   to testimony -- prior testimony, the fact that counsel has

Exhibit 1(b)
223



 1    it -- is -- is assuring enough to me to -- to meet that

 2    concern.  And even then, the witness could still disavow, if

 3    the witness hasn't seen it before.  So I mean, that's always

 4    potentially the case.  It'll either refresh his recollection or

 5    not or, you know.  It -- and it may or may not go in as

 6    evidence in chief, as a past recollection recorded failing,

 7    all -- all everything else.  Right?  So I'm going to grant the

 8    application over --

 9        It's over objection, Mr. Adlong or not?

10        MR. ADLONG:  Yeah, it will be over objection.

11        JUDGE ROSAS:  Okay.  So over objection, I'm going to

12    direct -- instruct the General Counsel to produce it to the

13    Charging Party for review.

14        How extensive is it?

15        MR. DO:  Your Honor, give me one moment.  So the -- the

16    two volumes of substantive testimony are -- it ends at page

17    297, but I believe it starts at page -- well, basically page

18    18, so about 280 pages of transcript.

19        JUDGE ROSAS:  That's enough to rest on.  Provide that to

20    the Charging Party and -- for review.  And like I indicated --

21    the Respondent established that they -- they've gotten it.  So

22    transmit it to the -- to the Charging Party.  They'll review it

23    over -- overnight.

24        And is there -- are there any other Jenks statements?

25        MR. DO:  Your Honor, there -- I believe the declaration

Exhibit 1(b)
224



1    that Mr. Glackin gives are also Jencks statement because they

2    are written documents that he provided during the

3    investigation.  So those would also be provided.

4         JUDGE ROSAS:  Yep, okay.  So provide it to them, and

5    they'll have an opportunity to have reviewed them before they

6    have any questioning tomorrow.  Okay?

7         MR. DO:  Thank you, Your Honor.

8         MS. KAGEL:  And Your Honor, if I may, I know you made your

9    decision.  I just wanted to add for the record that Mr. Adlong

10   was present during that custodian of records interview as well

11   to ensure its accuracy.  I just wanted to make sure that was

12   clear.

13        JUDGE ROSAS:  All right.  So let's -- let's adjourn at

14   this point till 11 a.m. Eastern Standard Time, 8 a.m. Pacific

15   Time tomorrow.  Those will be transmitted.  And the Charging

16   Party will resume with their questioning of the witness.  Okay?

17        MR. DO:  Thank you, Your Honor.

18        MR. KUNTZ:  Thank you, Your Honor.

19        MS. DICKINSON:  Thank you, Your Honor.

20        JUDGE ROSAS:  Off the record.

21   **(Whereupon, the hearing in the above-entitled matter was**

22   **recessed at 3:56 p.m. until Wednesday, June 16, 2021 at 8:00**

23   **a.m.)**

24

25



Exhibit 1(b)
225

www.escribers.net | 800-257-0885

1          **C E R T I F I C A T I O N**

2     This is to certify that the attached proceedings before the

3     National Labor Relations Board (NLRB), Region 21, Case Numbers

4     21-CA-252500, 21-CA-252574, 21-CA-264164, 21-CA-253662, 21-CA-

5     259130, Mason-Dixon Intermodal d/b/a Universal Intermodal

6     Services, Respondent; Mason-Dixon Intermodal d/b/a Universal

7     Intermodal Services and Southern Counties Express, Inc.,

8     Respondent; Roadrunner Intermodal Services, LLC, Respondent;

9     Universal Truckload, Inc., Respondent; and International

10    Brotherhood of Teamsters, Charging Party, held at the National

11    Labor Relations Board, Region 21, 312 North Spring Street, 10th

12    Floor, Los Angles, California 90012, on June 15, 2021, at 8:04

13    a.m. was held according to the record, and that this is the

14    original, complete, and true and accurate transcript that has

15    been compared to the reporting or recording, accomplished at

16    the hearing, that the exhibit files have been checked for

17    completeness and no exhibits received in evidence or in the

18    rejected exhibit files are missing.

19

20

21

22    _____
      
23    TROY A. RAY

      Official Reporter
24

25

Exhibit 1(b)
226

# EXHIBIT 1(C)

Exhibit 1(c)
227

OFFICIAL REPORT OF PROCEEDINGS
BEFORE THE
NATIONAL LABOR RELATIONS BOARD
REGION 21

In the Matter of:

| | | |
|---|---|---|
| Mason-Dixon Intermodal d/b/a | Case Nos. | 21-CA-252500 |
| Universal Intermodal Services, | | 21-CA-252574 |
| Respondent, | | 21-CA-264164 |
| | | 21-CA-253662 |
| and | | 21-CA-259130 |
| | | 21-CA-254813 |
| Mason-Dixon Intermodal d/b/a | | 21-CA-255151 |

Universal Intermodal Services
and Southern Counties Express,
Inc.,
                Respondent,


and


Roadrunner Intermodal Services,
LLC,
                Respondent,
and


Universal Truckload, Inc.,
                Respondent,
and


International Brotherhood of
Teamsters,
           Charging Party.
           _____


           _____


Place: Los Angeles, California (via Zoom Videoconference)

Dates: June 16, 2021

Pages: 205 through 335

Volume: 3

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885

Exhibit 1(c)
228



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 21**

In the Matter of:

MASON-DIXON INTERMODAL D/B/A      Case Nos.   21-CA-252500
UNIVERSAL INTERMODAL SERVICES,                21-CA-252574
                    Respondent,                21-CA-264164
                                               21-CA-253662
and                                            21-CA-259130
                                               21-CA-254813
MASON-DIXON INTERMODAL D/B/A                   21-CA-255151
UNIVERSAL INTERMODAL SERVICES
AND SOUTHERN COUNTIES EXPRESS,
INC.,
                    Respondent,

and

ROADRUNNER INTERMODAL SERVICES,
LLC,
                    Respondent,

and

UNIVERSAL TRUCKLOAD, INC.,
                    Respondent,

and

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
                    Charging Party.

The above-entitled matter came on for hearing via Zoom

videoconference, pursuant to notice, before **MICHAEL ROSAS**,

Administrative Law Judge, at the National Labor Relations

Board, Region 21, 312 N. Spring Street, 10th Floor, Los

Angeles, CA 90012, on **Wednesday, June 16, 2021, 8:29 a.m.**

Exhibit 1(c)
229

eScribers
www.escribers.net | 800-257-0885

1                     <u>A P P E A R A N C E S</u>

2     **On behalf of the Charging Party:**

3          **JULIE GUTMAN DICKINSON, ESQ.**
           **JASON WOJCIECHOWSKI, ESQ.**
4          BUSH GOTTLIEB
           801 North Brand Boulevard, Suite 950
5          Glendale, CA 91203
           Tel. (818)973-3200
6
      **On behalf of the Respondents:**
7
           **DANIEL A. ADLONG, ESQ.**
8          **HARRISON KUNTZ, ESQ.**
           OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
9          Park Tower, Fifteenth Floor
           695 Town Center Drive
10         Costa Mesa, CA 92626
           Tel. (714)800-7900
11
      **On behalf of the General Counsel:**
12
           **PHUONG DO, ESQ.**
13         **MOLLY KAGEL, ESQ.**
           NATIONAL LABOR RELATIONS BOARD, REGION 21
14         312 North Spring Street, 10th Floor
           Los Angeles, CA 90012
15         Tel. (213)894-5200

16

17

18

19

20

21

22

23

24

25

Exhibit 1(c)
230



www.escribers.net | 800-257-0885

1                          I N D E X

2

3    **WITNESS**              **DIRECT**  **CROSS**  **REDIRECT**  **RECROSS**  **VOIR DIRE**

4    Dennis Glackin            209    232,240   327        329

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(c)
231

escribers
www.escribers.net | 800-257-0885

1                          **E X H I B I T S**

2

3        **EXHIBIT**                          **IDENTIFIED**      **IN EVIDENCE**

4        **General Counsel:**

5            GC-26                              222              223

6            GC-27(a) through (f)              223              229

7            GC-1(ccc)                          333              333

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(c)
232

www.escribers.net | 800-257-0885

1                          <u>P R O C E E D I N G S</u>

2          JUDGE ROSAS:  All right.  On the record.  Mr. Glackin, I

3   remind you, you're still under oath.

4          General Counsel, you're going to resume your questioning.

5   Go ahead.

6          MR. DO:  Thank you.  Thank you, Your Honor.  Right before

7   I start, can I ask that Ms. Dickinson be excused for

8   approximately, really two minutes.

9          JUDGE ROSAS:  Can we send Ms. Dick -- Gutman Dickinson to

10  the waiting room, please?

11         Okay.

12         MR. DO:  All right.

13  Whereupon,

14                          <u>**DENNIS GLACKIN**</u>

15  having been previously sworn, was called as a witness herein

16  and was examined and testified, telephonically as follows:

17                  <u>**RESUMED DIRECT EXAMINATION**</u>

18         Q    BY MR. DO:  I'm going to put on screen, which is the

19  filed subpoena issued to Universal Intermodal.  Mr. Glackin,

20  request 43 of the subpoena requests "for the period between

21  December 1, 2019 until the present day, communications between

22  representative of the Respondent and the Union regarding

23  changes to unit's employees' terms, conditions of employment,

24  including but not limited to reduction in work, relocation of

25  work or layoffs".  Do you see that?

Exhibit 1(c)
233



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    It appears that the General Counsel has not received any

3    document responsive to this request.  Was there any document

4    that was -- are you aware of any documents that we should have

5    received?

6    A    Not that I'm aware of.

7    Q    Have you produce all documents that --

8         JUDGE ROSAS:  Hold on once second.  General Counsel, hold

9    on one second.  Do you have a series of questions that you

10   think you know the answer to?

11        MR. DO:  Ye -- yes, Your Honor, mainly because I haven't

12   received a response.

13        JUDGE ROSAS:  Okay.  Do you need a second to group them

14   all together, so we can do this en masse, or do you need a

15   minute?

16        MR. DO:  They are already grouped.

17        JUDGE ROSAS:  Okay.  Let's do it.  Okay?

18        MR. DO:  Okay.  So -- all right.  Let me confirm.

19   Q    BY MR. DO:  So was -- were we supposed to do -- excuse me.

20   Are there any -- are there any responsive documents to request

21   43?

22   A    Not that I'm aware of.

23   Q    Okay.  Request 46 of the Universal Intermodal trial

24   subpoena, requests "for the period between December 1st, 2019

25   until the present day, communication between representative of

Exhibit 1(c)
234



1    Respondent and the Union regarding bargaining over the layoff

2    of unit employees".  Are there any documents that the General

3    Counsel should have received?

4    A    Not that I'm aware of.

5         JUDGE ROSAS:  Okay.  May -- Counsel, maybe you didn't

6    understand me.  It seems like you -- you know the answer to

7    these questions, or the likely answer to these questions.  So

8    I'm going to ask you to just group them all together, whether

9    it means that you have to recite 99 items --

10        MR. DO:  I see.

11        JUDGE ROSAS:  -- just do it.  And then, see what happens.

12   Okay?

13        MR. DO:  Understood, Your Honor.

14        JUDGE ROSAS:  All right.  Let's get this --

15        MR. DO:  At this --

16        JUDGE ROSAS:  -- let's get this done.

17        MR. DO:  Okay.  At this point, we can bring Ms. Dickinson

18   back.  I just didn't want her here for these two requests.

19        JUDGE ROSAS:  Okay.  If we could bring her back from the

20   waiting room.  Thank you.

21        MR. DO:  Okay.  Give me one moment, Your Honor.  Let me

22   see if I can do this.

23        JUDGE ROSAS:  Does the witness have this document in front

24   of him?  Well, he -- you see it on the screen; is that right?

25        THE WITNESS:  Yes, that's correct.

Exhibit 1(c)
235



1        JUDGE ROSAS:  Okay.

2        MR. DO:  All right.  Your Honor, for some of these, the

3   requests are the same, so I'm going to group them by the ones

4   that are the same across multiple subpoenas.  But there are a

5   couple where it's not quite the same.  So those I'll put up

6   in -- individually.  So that's up to you --

7        JUDGE ROSAS:  Well, it seems to me, Counsel, that -- well,

8   this document is a joint exhibit; is it not?

9        MR. DO:  Yes, I believe it's Joint Exhibit 14(c), which --

10       JUDGE ROSAS:  Okay.

11       MR. DO:  -- let me bring that up.

12       JUDGE ROSAS:  So -- so it's in evidence?

13       MR. DO:  Yes, Your Honor.

14       JUDGE ROSAS:  -- therefore, and the witness can see it,

15   knows what you're referring to, I'm not even sure that you need

16   to read these items verbatim, but --

17       MR. DO:  Okay.

18       JUDGE ROSAS:  -- but -- but group it together as best you

19   can and let's just get an answer if there is one that is common

20   to all of them.

21       MR. DO:  Understood.

22       MR. ADLONG:  Your Honor, I'm just -- I thought we tread

23   this ground yesterday.

24       JUDGE ROSAS:  What is that, establishing whether there

25   were any other documents aside from those that have been

Exhibit 1(c)
236



1    produced to the Government?

2         MR. ADLONG:  Yeah.

3         JUDGE ROSAS:  Okay.  And I believe I ruled that the

4    General Counsel's entitled to do it, but I'm going to -- I'm

5    going to require that the General Counsel proceed a little more

6    efficiently at this point.

7         MR. DO:  Yes, Your Honor.  And furthermore, I should note,

8    Your Honor, that these are actually requests that we did not

9    cover yesterday because these are the new ones in the subpoenas

10   that I just had a chance to review the production for

11   yesterday.  So these have not been covered in the record.

12        JUDGE ROSAS:  Understood.

13        MR. DO:  All right.  Let me confirm.

14   Q    BY MR. DO:  Request 9 of the Roadrunner subpoena; request

15   9 of the Universal Truckload subpoena; request 33 of the

16   Universal Intermodal subpoena, which is the same as request 21

17   of the Universal Logistic and Universal Management Services

18   subpoena; request 42, which is the same as Request 29 of the

19   Universal Logistics and Universal Management subpoena; and

20   request 15 Southern Counties subpoena, the General Counsel did

21   not receive any document to any of these requests.  Were there

22   any documents that was supposed to provide -- be provided to

23   the General Counsel in regard to these requests?

24   A    What was the req -- again, I -- I guess without knowing

25   the request, I -- what's the request?

Exhibit 1(c)
237


www.escribers.net | 800-257-0885

1    Q    Sure.  Let me show you them on --

2         JUDGE ROSAS:  He doesn't see them on the screen.

3         MR. DO:  Yes, Your Honor, there's just no easy way for me

4    to do it without jumping between a bunch of documents.

5         JUDGE ROSAS:  Well, you could scroll -- you could scroll

6    down the text of the request.

7         MR. DO:  Right, right.  Give me one second.

8    Q    BY MR. DO:  So let me show you the Roadrunner request

9    for --

10        JUDGE ROSAS:  Instead of looking at the index.

11   Q    BY MR. DO:  Scrolling -- so request 9 of the Roadrun --

12   runner -- runner subpoena request; do you see that?  Sorry.

13        MR. ADLONG:  Wait.  Can you identify, is this an

14   investigative subpoena, is this a hearing subpoena?

15        MR. DO:  These are the hearing subpoenas, Mr. Adlong.  All

16   these requests relate to that.

17        MR. ADLONG:  When you say "that", what is that?

18        MR. DO:  All of these questions relates to the hearing

19   subpoena.

20        MR. ADLONG:  Okay.

21   Q    BY MR. DO:  Have you had a chance to --

22   A    Okay.  I see --

23   Q    Okay.

24   A    -- number 9.

25   Q    All right.  And then, this is the exact same request

Exhibit 1(c)
238



1    just -- here, let me actually just show you the first so we can

2    see.  Do you see request 9 in Joint Exhibit 17(c)?

3    A    I do.

4    Q    All right.  Let me move --

5         MR. ADLONG:  Wait, what is -- what is 17(c), like --

6         MR. DO:  Joint Exhibit --

7         MR. ADLONG:  Yeah, but you're -- I would be willing to bet

8    if you asked Mr. Glackin, he could not identify to you what

9    17(c) is.  You just put up a subpoena there with a number.

10   Like, let's identify --

11        JUDGE ROSAS:  Counsel, no cross discussion.  Do you have

12   an objection?

13        MR. ADLONG:  Yeah.  I'm objecting that he's -- he's

14   putting incomplete information.  It's incomplete.

15        JUDGE ROSAS:  Well, I don't know.  You're testifying for

16   the witness.  And I -- I asked you to refrain from

17   inadvertently coaching the witness.  This is obviously --

18        MR. ADLONG:  Okay.

19        JUDGE ROSAS:  -- not critical testimony as far as things

20   go, but just as a -- as an example, let's just keep it to

21   objections.  Okay.  Counsel, no cross discussion.

22        Now, General Counsel, you're referring to items in a trial

23   subpoena; is that correct?  And only --

24        MR. DO:  Yes, Your Honor.

25        JUDGE ROSAS:  -- that, right?

Exhibit 1(c)
239



1          MR. DO:  Correct, Your Honor.

2          JUDGE ROSAS:  Okay.  And if one were to compare this

3    subpoena that you have on the screen, that's Joint Exhibit

4    17(c), there would be a correlation if one were to look at

5    other documents that are in evidence that it would correspond

6    to, correct?

7          MR. DO:  With regard to the Universal Truckload hearing --

8          JUDGE ROSAS:  No, no, no.

9          MR. DO:  -- subpoena.

10          JUDGE ROSAS:  Just -- just -- just answer me --

11          MR. DO:  Yes.

12          JUDGE ROSAS:  -- conceptually.  So --

13          MR. DO:  Yes.

14          JUDGE ROSAS:  -- you're referring -- you're referring to a

15    hearing subpoena.  And then, you're referring to the matching

16    or corresponding items in other subpoenas, correct --

17          MR. DO:  Yes, but I just --

18          JUDGE ROSAS:  -- or other requests?

19          MR. DO:  Yes.  I just want to clarify one thing, Your

20    Honor.  These requests that I'm asking about today, these

21    requests were not in the corresponding investigative subpoena.

22    These --

23          JUDGE ROSAS:  Okay.

24          MR. DO:  -- are the ones that we added for the trial

25    subpoena only.

Exhibit 1(c)
240



1      JUDGE ROSAS:  Okay.  Are those other documents that you're

2   referring to that requested information that correspond to

3   the -- the items in this subpoena; are those in evidence?

4      MR. DO:  Yes, because tho -- those trial subpoenas are

5   also here.

6      JUDGE ROSAS:  Okay.  And -- and they're identical wording?

7      MR. DO:  Yes, Your Honor.

8      JUDGE ROSAS:  Okay.  So just ask him about this subpoena,

9   and then you could match -- you can just match --

10      MR. DO:  Okay.

11      JUDGE ROSAS:  -- based on -- on the -- on the wording of

12   the documents, correct?

13      MR. DO:  Yes.  Your Honor, can I just -- I was

14   anticipating that this may be an issue.  May I get -- may I

15   have permission to go ahead and go through it, request per

16   request, identifying the one that matches.  This way, I think

17   it actually will be more efficient because it's easier for me

18   to identify to the witness.

19      JUDGE ROSAS:  Go ahead.

20      MR. ADLONG:  Your Honor, if -- if -- if I might just ask

21   that if that's going to be done, this is -- like, we just

22   request that we're able to see -- for example, on 17(c), not

23   only the request, but before that, to whom they issued the

24   subpoena.  That's all we're asking.

25      JUDGE ROSAS:  Counsel -- Mr. Adlong, do you have these

Exhibit 1(c)
241



www.escribers.net | 800-257-0885

1    documents printed out?

2        MR. ADLONG:  I do have one set printed out.

3        JUDGE ROSAS:  I mean, if the witness can have these

4    different documents in front of them, it might --

5        MR. ADLONG:  Sure.

6        JUDGE ROSAS:  -- be easier.

7        MR. ADLONG:  They have my notes all over them.

8        MR. DO:  Your Honor, I'll identify the -- the -- the

9    specific --

10       JUDGE ROSAS:  Go ahead.

11       MR. DO:  -- recipient --

12       JUDGE ROSAS:  Go ahead.

13       MR. DO:  -- of my subpoena in my --

14       JUDGE ROSAS:  Go ahead.

15       MR. DO:  -- question.  Thank you, Your Honor.  All right.

16   Let me try this there, my original plan.

17   Q    BY MR. DO:  All right.  Let's go to the Universal

18   Intermodal hearing subpoena, which is identified as GC Exhibit

19   14(c).  Request 23 of this subpoena directed to Universal

20   Intermodal, do you see that, Mr. Glackin?

21   A    Yes.

22   Q    Other than the document, which I'll pull -- pull up to on

23   the screen, which is previously been identified and marked as

24   Exhibit 6(a).  Other -- other than this document, are you aware

25   of any other responsive document to this request?

Exhibit 1(c)
242



www.escribers.net | 800-257-0885

1    A    Not that I'm aware of.

2    Q    At this time, have you provided the General Counsel with

3    all documents responsive to this request?

4    A    To the best of my knowledge.

5    Q    Request 24 of the Universal Intermodal trial subpoena, do

6    you see that request?

7    A    Yes.

8    Q    Other than the document that's already been admitted as

9    part of Joint Exhibit 6(b), are you aware of any other document

10   responsive to this request?

11   A    Not that I'm aware of.

12   Q    At this time, have you provided the General Counsel with

13   all documents responsive to these req -- to this request?

14   A    To the best of my knowledge.

15   Q    Again, going back to the Roadrunner -- the trial subpoena

16   issued to Roadrunner Intermodal, which has been admitted as

17   Joint Exhibit 18(c), do you see request 9 within this document?

18   A    Yes.

19   Q    Were there any documents responsive to this request that

20   was supposed to be provided to the General Counsel?

21   A    Not that I'm aware of.

22   Q    Drawing your attention to request 10 of the subpoena

23   issued to Roadrunner Intermodal, which has been identified as

24   Joint Exhibit 18(c).  Can you see that request?

25   A    Yes.

Exhibit 1(c)
243



1 Q Other than what has been identified as, I believe, 6(d),

2 are there any other documents that's responsive to this

3 request?

4 A Not that I'm aware of.

5 Q At this time, have you provided the General Counsel with

6 all documents responsive to this request?

7 A To the best of my knowledge.

8 Q Drawing your attention to seven -- Joint Exhibit 17(c),

9 which is the hearing subpoena issued to Universal Truckload.

10 Again, drawing your attention to request 9, do you see that

11 request?

12 A Yes.

13 Q Have you responded to the General Counsel with any

14 documents responsive to this request?

15 A Not to my knowledge.

16 Q Drawing your attention to request 10 of the subpoena

17 issued to Universal Truckload, do you see that request?

18 A Yes.

19 Q Other than the document that's already been admitted as

20 Joint Exhibit 6(c), are you aware of any other documents that's

21 responsive to this request?

22 A Not to my knowledge.

23 Q At this time, have you provided the General Counsel with

24 all documents responsive to this request?

25 A To the best of my knowledge.

Exhibit 1(c)
244



www.escribers.net | 800-257-0885

1    Q    All right.  Drawing your attention back to the un --

2    the -- the document that's been marked and identified as Joint

3    Exhibit 14(c), this is the Universal -- subpoena issued to

4    Universal Intermodal.  Looking at request 33, do you see that

5    request?

6    A    Yes.

7    Q    Let me identify for the record that this request is the

8    same as request 21 of the Universal Logistics Holding and

9    Universal Management Services hearing subpoena.  Have you

10   produce any document responsive to these requests?

11   A    Not to my knowledge.

12   Q    Drawing your attention to request 42 of the subpoena

13   issued to Universal Intermodal, which is the same request as

14   request 29 of Universal Logistics Holding and Universal

15   Management Services subpoena and request 15 of the Southern

16   Counties trial subpoena.  Do you see that request?

17   A    Yes.

18   Q    Have you provided any document responses to this request?

19   A    Not to my knowledge.

20   Q    All right.  Drawing -- this is for the -- for additional

21   production.  So request 36 of the Universal Intermodal

22   subpoena, do you see that request?

23   A    Yes.

24   Q    Your company provided the General Counsel with two page of

25   sign-in sheet in response to this request; isn't that right?

Exhibit 1(c)
245



1   I'm sorry.

2      MR. DO:  Let me mark it for identification as Joint -- GC

3   Exhibit 26.

4   **(General Counsel Exhibit Number 26 Marked for Identification)**

5   Q   BY MR. DO:  And I'm putting that on screen.  So let me ask

6   my question again.  Mr. Glackin, your company provided two page

7   of sign-in sheet in response to subpoena request 36, correct?

8   A   I'm not sure.

9   Q   Are these documents that you -- your company provided in

10  response to Universal Intermodal's trial subpoena request 20-

11   -- 36?

12  A   I'm -- I'm not sure.  I've not seen those documents

13  before.

14  Q   Okay.

15     JUDGE ROSAS:  We'll take a representation by counsel,

16  General Counsel, as to what you've been provided with.

17     MR. DO:  Thank you, Your Honor.  This is a document that

18  we received from Mr. Adlong yesterday.  It's my -- I -- I was

19  under the assumption that these were document responsive to the

20  subpoena request.  So I would like to get them admitted into

21  evidence, but I think I may have to do it through stipulation.

22     JUDGE ROSAS:  Is there any objection?  Is there a request

23  for voir dire or something else?

24     MR. ADLONG:  No.  We're not going to object if he wants to

25  put them into evidence.

Exhibit 1(c)
246



1    JUDGE ROSAS:  Okay.  You've designated this document as

2    what, GC-26?

3    MR. DO:  Yes, Your Honor.

4    JUDGE ROSAS:  General Counsel's 26 is received into

5    evidence without objection.

6    **(General Counsel Exhibit Number 26 Received into Evidence)**

7    MR. DO:  Thank you, Your Honor.

8    Q    BY MR. DO:  Going back to request 17 of the Universal

9    Intermodal subpoena, do you see this request?

10   A    Yes.

11   Q    This is substantially similar to request 5 of the subpoena

12   of Southern Counties Express.

13   MR. DO:  I'll -- I'll make a representation to the record

14   that yesterday, General Counsel received, I believe, six

15   spreadsheets showing moves from the Universal Intermodal

16   employees at Compton and Fontana.  And those have been marked

17   and identified for the record as General Counsel Exhibit 27(a)

18   through (f).

19   Q    BY MR. DO:  Do you recognize these documents?

20   A    Yes.

21   Q    Okay.  Did you provide this -- these documents in response

22   to request 17 of the Universal Intermodal hearing subpoena?

23   A    If you -- if you don't mind, may I see request 17 one more

24   time, please?

25   Q    Yes.

Exhibit 1(c)
247



1    A    Thank you.

2    Q    Not a problem.

3         MR. ADLONG:  Your Honor, I'm going to object to this

4    question that it essentially calls for a legal conclusion.

5    There were -- can we ask the -- can we ask our -- the witness

6    to leave, Your Honor, so we can address an issue?

7         JUDGE ROSAS:  If you could step out, Mr. Glackin.

8         MR. ADLONG:  Thank you.  I'm trying to figure out how to

9    approach this without, kind of like -- bottom line is I don't

10   believe it's necessarily appropriate to ask him what subpoena

11   response it was responsive to directly.  There were conver --

12   like, in his role in collecting documents and our role as legal

13   counsel, there are conversations that happen regarding what

14   his -- what must and must not be produced.  And I don't think

15   that necessarily is ever a conversation of, this document's

16   responsive to this, as much it is based off what's in this

17   hearing subpoena that was not in the investigative subpoena, it

18   would be appropriate to produce, for example, which was what

19   was produced.

20        JUDGE ROSAS:  You're talking about this specific document

21   that the General Counsel had up.

22        MR. ADLONG:  Yeah.  And so for example --

23        JUDGE ROSAS:  Well, hold on.  Where is that document?  Can

24   you put it back up?

25        MR. DO:  Yes, Your Honor.  Give me one moment.

Exhibit 1(c)
248



1      JUDGE ROSAS:  All right.

2      MR. DO:  Your Honor --

3      JUDGE ROSAS:  Go ahead, Mr. Adlong.  Yeah.

4      MR. ADLONG:  So Mr. Do, if you don't mind, which subpoena

5  paragraph did you direct the witness to?

6      MR. DO:  I directed him to what I believe was Uni -- well,

7  I don't believe, but Universal Intermodal subpoena request 17.

8  And this was because when we received these -- these response,

9  despite instruction, you know, regarding identifying which

10  paragraphs the -- any production is responding to, we actually

11  did not receive that indication.  So I just made my fir -- best

12  guess of what that document was responsive to.

13      MR. ADLONG:  Okay.  Well, then if you want to give us ten

14  minutes, I'll go through the subpoena that we believe it's

15  responsive to and I'll tell you.

16      JUDGE ROSAS:  Wait --

17      MR. ADLONG:  If that'll make it easier for you, because we

18  do not believe it's responsive to 17.

19      JUDGE ROSAS:  Well, your objection is relating to the

20  witness's testimony --

21      MR. ADLONG:  Yeah.

22      JUDGE ROSAS:  -- right, the question that was asked?  What

23  was the -- what was the objection?

24      MR. ADLONG:  That it calls for a legal conclusion, saying

25  that this document is responsive to this.  If he's trying to --



1    he's going to use -- the basis of the question is to use the

2    substance of the request at -- to like, make it a legal

3    assertion as to what the documents do or do not show.

4         JUDGE ROSAS:  Well, hold on a second.  So I thought the

5    question, if I recall, the question as to that document -- that

6    was 27, correct?  General Counsel's 27?

7         MR. DO:  Yes.  Yes --

8         JUDGE ROSAS:  Okay.

9         MR. DO:  -- Your Honor.

10        JUDGE ROSAS:  And -- and -- and you're -- the -- the

11   General Counsel elicited that -- or was asking whether there

12   was anything else produced in response to item number 17 in the

13   subpoena other than General Counsel's 27; was that not the

14   question?

15        MR. ADLONG:  That was not the question.  General Counsel

16   asked --

17        JUDGE ROSAS:  So what -- what relationship does General

18   Counsel's 27 have to item 17, Mr. Do?

19        MR. DO:  Thank you, Your Honor.  Again, the -- when we

20   received what's been marked as General Counsel 27, we didn't

21   have -- did not have an indication of which paragraph it was

22   responsive to.  So last night when I reviewed this, I went

23   through the subpoena and determined that in light of the fact

24   that General Counsel Exhibit 27 lists former clients, you know,

25   who was performing that work, the number paragraph that it

Exhibit 1(c)
250



www.escribers.net | 800-257-0885

1    appears to be responsive to was request number 17.

2         JUDGE ROSAS:  So you're -- you're --

3         MR. DO:  So that's who it relates then.

4         JUDGE ROSAS:  -- you're trying to -- you're trying to

5    correspond General Counsel -- the production of General

6    Counsel's 27 for ID to a specific item in the subpoena?

7         MR. DO:  Correct, Your Honor, because that --

8         JUDGE ROSAS:  All right.

9         MR. DO:  -- was not identified to us during the

10   production.

11        JUDGE ROSAS:  So Mr. Adlong, do you know?

12        MR. ADLONG:  What subpoena paragraph it is?

13        JUDGE ROSAS:  Why was that document produced?

14        MR. ADLONG:  I do know.  I could -- I just have to find

15   the subpoena and the subpoena paragraph.  I don't know right

16   off --

17        JUDGE ROSAS:  Okay.

18        MR. ADLONG:  -- the top of my head.  I can do that,

19   though, if that's all that -- that's what this is.  You just

20   need to ask.  And I can provide that information.

21        JUDGE ROSAS:  Okay.  So -- so that's the question.

22        MR. ADLONG:  Okay.  Well --

23        JUDGE ROSAS:  Counsel trying to determine what has been

24   produced in response to what items, so that seems to be over

25   the witness's head at this point, as you indicated, legal



 1    interpretations.  What's -- what's calling for what?  So you're

 2    going to have to tell us.  Let's --

 3           MR. ADLONG:  Okay.

 4           JUDGE ROSAS:  -- go off the record for a minute.

 5           MR. ADLONG:  Okay.

 6           JUDGE ROSAS:  We'll take a five-minute break?

 7           MR. DO:  Thank you, Your Honor.

 8    (Off the record at 8:54 a.m.)

 9           JUDGE ROSAS:  Okay.  Back on the rec -- record.  Mr.

10    Adlong.

11           MR. ADLONG:  So we believe that document is most -- we

12    produced it because we believed it was responsive to subpoena

13    paragraph 7 of the SCE trial subpoena.

14           MR. DO:  All right.  Understood.  Thank you.  May I

15    continue, Your Honor?

16           JUDGE ROSAS:  Go ahead.

17           MR. DO:  All right.  So in light of counsel's

18    representation, Your Honor, I'm going to move for the admission

19    of GC-27(a) through (f).

20           Your Honor, I just moved for the admission of the exhibit.

21           JUDGE ROSAS:  Any --

22           MR. ADLONG:  No objection.

23           JUDGE ROSAS:  -- any objection?

24           MR. ADLONG:  No objection.

25           JUDGE ROSAS:  General Counsel's 27 is received.

Exhibit 1(c)
252



www.escribers.net | 800-257-0885

1     **(General Counsel Exhibit Number 27 (a) through (f) Received**

2     **into Evidence)**

3                          <u>**RESUMED DIRECT EXAMINATION**</u>

4     Q     BY MR. DO:  Okay.  Mr. Glackin, I'm going to put General

5     Counsel 27 back on the screen.  I just want to ask some clarify

6     ques -- clarifying question to understand the document.  In

7     this sheet, what does pro mean, P-R-O?

8     A     Pro number.

9     Q     What is a pro number?

10    A     The closest equivalent would be a tracking number.

11    Q     Understood.  And then, the -- what is LEC stand for?  I

12    can zoom in if you'd like.

13    A     I don't know exactly.

14    Q     Okay.  What about HD?

15    A     I'm not sure.

16    Q     FS?

17    A     I'm not sure.

18    Q     Total?

19    A     Looks to be the total of HD and FS, it appears.

20    Q     So HD and FS appears to be some kind of monetary amount.

21    Do you know what they could correspond to at all?

22    A     I'm not sure.

23          MR. DO:  Okay.  Your Honor, we have no further questions

24    of this witness.  We will reserve the right to recall him in

25    light of the -- we'll work on the stipulation.

Exhibit 1(c)
253



www.escribers.net | 800-257-0885

 1          JUDGE ROSAS:  All right.  You want to remove your

 2     screenshare?

 3          MR. DO:  Oh, I'm sorry.  Thank you, Your Honor.

 4          JUDGE ROSAS:  General Counsel, you're complete.

 5          Charging Party, you have questions, correct?

 6          MR. WOJCIECHOWSKI:  I do, yes.  I -- I can -- I can wipe

 7     out my first area if the stipulation is going to be received.

 8     I don't -- so now might be a good time to do that.

 9          JUDGE ROSAS:  Can you explain further?

10          MR. WOJCIECHOWSKI:  Well, it's -- it's -- it's -- it would

11     be questions about the 2(11) status, related to the 2(11)

12     status of a particular individual that I don't think was fully

13     addressed in General Counsel's questioning.  And that's covered

14     in the stipulation.  So we can -- we could dispense with that

15     if that's going to be received as is.

16          MR. DO:  Your Honor, the General Counsel has a couple

17     minor adjustments, I think, we need to be made to that

18     stipulation.  So if you want to get that signed and dealt with

19     right now, if we can have about ten minutes in the breakout

20     room with the parties, I think we can get that --

21          JUDGE ROSAS:  No.

22          MR. DO:  -- worked out.

23          JUDGE ROSAS:  Let's go off the record for a second.

24     (Off the record at 9:10 a.m.)

25          JUDGE ROSAS:  Charging Party, as Julio Iglesias once sang,

Exhibit 1(c)
254


www.escribers.net | 800-257-0885

1    "It's now or never."

2    MR. WOJCIECHOWSKI:  Thank you, Your Honor.  I'm going to

3    ask if Ms. Bridge can -- can assist in the -- in the putting of

4    exhibits on the screen.  I'm not as adept as counsel for the

5    AGC.  Is that all right, Ms. Bridge?

6    MS. BRIDGE:  Yes.  Can you just give me a moment to get to

7    SharePoint and go from there?

8    MR. WOJCIECHOWSKI:  Sure.  Thank you.

9    MS. BRIDGE:  Um-hum.  Okay.  I'm on SharePoint.  You can

10   go ahead.

11   MR. WOJCIECHOWSKI:  I'd like to start with General Counsel

12   Exhibit 2(b).

13   MS. BRIDGE:  I don't see 2(b).  I see 1, which has all the

14   letters, and then 2-24 -- can the GC help me with where that

15   would be?

16   MS. KAGEL:  It would be in the 2 to 24.

17   MS. BRIDGE:  Okay.

18   MS. KAGEL:  And then, it should be booked-marked (sic).

19   MS. BRIDGE:  Really --

20   JUDGE ROSAS:  Do you want to go off the record?

21   MS. BRIDGE:  I -- I found it.  I'm sorry.  2(b)?

22   MR. WOJCIECHOWSKI:  That's right.

23   MS. BRIDGE:  Okay.  Sorry about the delay.

24   MR. DO:  Ms. Bridge, if you like, I have all the exhibit

25   up, I can do it.  Oh, never mind.  You just got it working.

Exhibit 1(c)
255



1      MS. BRIDGE:  Finally.  Sorry.

2                   **CROSS-EXAMINATION**

3   Q   BY MR. WOJCIECHOWSKI:  Mr. Glackin, do you see -- do you

4   see General Counsel 2(b), the -- the Mar -- it's dated March

5   6th, 2019, and I think you testified it's a draft -- a draft

6   letter in front of you?

7   A   I see it.

8   Q   Do you know who drafted this -- this document?

9      MR. ADLONG:  Objection.  Relevance.

10     JUDGE ROSAS:  Let me see the rest of the document.  So

11  this is in evidence, correct?

12     MR. WOJCIECHOWSKI:  That's right.

13     JUDGE ROSAS:  Overruled.

14  Q   BY MR. WOJCIECHOWSKI:  Mr. Glackin, do you need me to

15  reask the question?

16  A   No.  I'm not exactly for sure who drafted that document.

17  Q   Okay.  Did you have any input on the drafting of the

18  document?

19  A   I don't recall.

20  Q   Okay.

21     MR. WOJCIECHOWSKI:  Ms. Bridge, if we could turn to Joint

22  Exhibit 5(b).  And I believe that's in a -- in a document that

23  is Joint 5 and 6 or Joint 5 through 6.  Ms. Bridge, I believe

24  we're looking at 5(a).  I don't know if your bookmark is

25  working.  5(b) is --

Exhibit 1(c)
256



www.escribers.net | 800-257-0885

1       MR. DO:  Are you --

2       MR. WOJCIECHOWSKI:  -- is page --

3       MR. DO:  -- you just have to click in a different bookmark

4   and then click back on 5(b) and it'll take you there.

5       MR. WOJCIECHOWSKI:  Thank you, Ms. Bridge.  Can we scroll

6   to the -- the bottom of this letter?

7   Q   BY MR. WOJCIECHOWSKI:  Mr. Glackin, do you see at the

8   bottom of this -- of this letter, which is the -- the letter to

9   Romel Mallard about his discharge from employment, that you're

10   listed in the -- the cc's?

11   A   Yes.

12   Q   Do you recall receiving a copy of this letter?

13   A   I don't recall.

14   Q   Okay.  Do you recall in late 2019 being copied on other

15   letters to employees of Universal Intermodal regarding their

16   discharge from employment?

17   A   Could you ask that question one more time?

18   Q   Sure.  In late 2019, do you recall being copied on any

19   other letters to employees of Universal Intermodal informing

20   them that they had been discharged?

21   A   I don't recall.

22   Q   What about for any other subsidiaries of Universal

23   Logistics Holdings?

24   A   Is the question that I did -- do I recall receiving this

25   document for other subsidiary companies?

Exhibit 1(c)
257



1    Q    Similar documents, documents terminating the employment

2    of -- of employees of those other subsidiaries?

3         MR. ADLONG:  Objection.  Relevance.

4         JUDGE ROSAS:  Overruled.

5    A    Is there a specific -- like, a specific subsidiary or --

6    Q    BY MR. WOJCIECHOWSKI:  Well, the -- I mean, let's start --

7    I -- I -- I would start with it broad.  I didn't -- it -- did

8    you receive any for -- for -- for any of -- any subsidiaries?

9    A    I don't recall exactly.

10   Q    Did you have any input on -- on the decision to discharge

11   Mr. Mallard?

12   A    Not to my knowledge.

13   Q    Do you have any input on the drafting of the letter?

14   A    Not that I recall.

15   Q    Do you have any present understanding of why you're listed

16   in the cc's for this letter?

17   A    I don't.

18   Q    And who is Richard Silverwood?

19   A    At the time?

20   Q    Sure.  Let's start with at the time.

21   A    He was my manager.

22   Q    Are you aware of whether he was copied on other -- other

23   such letters?

24   A    I'm not sure.

25        MR. WOJCIECHOWSKI:  Okay.  Ms. Bridge, if we can look at

Exhibit 1(c)
258



1    Joint Exhibit 13(d), as in dog.

2    Q    BY MR. WOJCIECHOWSKI:  Mr. Glackin, do you -- do you see

3    the -- the Compton and Fontana relocated trucks document table

4    in front of you?

5    A    Yes, I do.

6    Q    Thank you.  Do you know what entity assigns the -- the

7    number that is listed in the unit number column?

8    A    I do not know that.

9    Q    Do you know whether those numbers are unique across

10   various Uni -- Universal Logistics Holdings subsidiaries?

11        MR. ADLONG:  Objection.  Relevance.

12        JUDGE ROSAS:  Overruled.

13   A    I don't know that.

14   Q    BY MR. WOJCIECHOWSKI:  Do you know whether there could be

15   a truck used, just for example, by Roadrunner Express and a

16   different truck used by Universal Intermodal that have the same

17   unit number?

18        MR. ADLONG:  Objection.  Calls for speculation.  Lacks

19   foundation.

20        JUDGE ROSAS:  If you know.

21   A    I don't know.

22   Q    BY MR. WOJCIECHOWSKI:  Was this table or extracted from --

23   from some sort of database?

24   A    I'm not sure.

25        MR. WOJCIECHOWSKI:  Ms. Bridge, if we could just jump up

Exhibit 1(c)
259



www.escribers.net | 800-257-0885

1    to 13 -- Joint Exhibit 13(c).  Thank you.

2    Q    BY MR. WOJCIECHOWSKI:  Mr. Glackin, in the second column,

3    Cost Center, the acronym UCS, is that, as suggested by the

4    first column, Universal Capacity Solutions?

5    A    To the best of my knowledge.

6    Q    And is Universal Truckload a subsidiary of Universal

7    Capacity Solutions?

8    A    I'm not exactly for sure.

9    Q    Do you know if there's a different acronym anywhere on

10   this document that would indicate Universal Truckload

11   equipment?

12   A    Not that I'm aware of.

13        MR. WOJCIECHOWSKI:  And Ms. Bridge, if we could look at

14   page 15 of this -- this document, which is also Bates stamped

15   page 727.  Actually, why don't I ask the question and we might

16   not even need the -- the -- the document.

17   Q    BY MR. WOJCIECHOWSKI:  Mr. Glackin, elsewhere in this

18   document, there's the acronym RRIS.  Is that Roadrunner

19   Intermodal Services?

20   A    I believe so.

21        MR. WOJCIECHOWSKI:  And last area, Ms. Bridge, if we could

22   look at Joint Exhibit 19(a), which I believe is in a different

23   PDF, with my apologies.

24        MS. BRIDGE:  Counsel, could you remind me again, Joint

25   Exhibit 19?

Exhibit 1(c)
260



1        MR. WOJCIECHOWSKI:  (a); you're -- you're -- you're on it.

2        MS. BRIDGE:  Okay.

3        MR. WOJCIECHOWSKI:  Thank you.

4    Q    BY MR. WOJCIECHOWSKI:  In the February column here, Mr.

5    Glackin, there's an entry for Container Connection.  And is --

6    is that a subsidiary of Universal Intermodal Services?

7        MR. ADLONG:  Objection.  Relevance.

8        JUDGE ROSAS:  Overruled.

9    A    I'm not exactly for sure.

10   Q    BY MR. WOJCIECHOWSKI:  Okay.  How about -- how about

11   Southern Counties Express, is that a subsidiary of Universal --

12   Universal Intermodal Services?

13   A    I'm not -- I'm not exactly for sure.

14   Q    All right.  Do you know what it means for a subsidiary of

15   Universal Intermodal Services to be a customer of Universal

16   Intermodal Services?

17       MR. ADLONG:  Objection.  Vague and ambiguous as to what it

18   means to be a customer.

19       JUDGE ROSAS:  Rephrase.

20   Q    BY MR. WOJCIECHOWSKI:  Mr. Glackin, do you know why

21   subsidiaries of Universal Intermodal Services would be listed

22   on a list of Universal Intermodal Services customers?

23       MR. ADLONG:  Objection.  Assumes facts not in evidence.

24   Lacks foundation.

25       JUDGE ROSAS:  Repeat that question again.

Exhibit 1(c)
261



www.escribers.net | 800-257-0885

1    Q    BY MR. WOJCIECHOWSKI:  Do you know why subsidiaries of

2    Universal Intermodal Services would be listed on a list of

3    Universal Intermodal Services customers?

4         MR. ADLONG:  Again --

5         JUDGE ROSAS:  Sustain the objection.  And on this one, I'm

6    going to ask you to take a step back, lay some foundation as to

7    what you're doing with this document.

8         MR. WOJCIECHOWSKI:  I'll -- I'll just -- I'll withdraw the

9    question.  And -- and I don't actually -- I have nothing

10   further, Your Honor.  Thank you.

11        JUDGE ROSAS:  Your testimony's conclude -- your

12   questioning's concluded?

13        MR. WOJCIECHOWSKI:  It is.  Thank you.

14        JUDGE ROSAS:  Okay.  Respondent, any questions of this

15   witness at --

16        MR. ADLONG:  Yeah.

17        JUDGE ROSAS:  -- this time?

18        MR. ADLONG:  We'll have questions for him.  We'll need a

19   little bit of time to prepare.  It's what, right now, it's

20   9:45.  Can you give --

21        JUDGE ROSAS:  Off the record.

22   (Off the record at 9:45 a.m.)

23        JUDGE ROSAS:  All right.  On the record.  Respondent.

24        MR. WOJCIECHOWSKI:  I'm -- I'm sorry to interrupt, Your

25   Honor, but before -- at the end of cross, I -- I should have

Exhibit 1(c)
262


www.escribers.net | 800-257-0885

```
 1   raised this.  Counsel for the General Counsel, in providing the

 2   Jencks material, instructed us to delete it at the end of

 3   our -- at the end of our examination.  But in light of the

 4   possibility of this witness being recalled, we would just ask

 5   that we be allowed to hold on to it, not delete it through the

 6   end of trial or at least through the end of this portion if we

 7   wind up taking a long recess next week.

 8       JUDGE ROSAS:  Well, Respondents got a permanent copy of

 9   it, do they not?

10       MR. ADLONG:  Yeah, but I'm not sure how us having a

11   permanent copy would affect the Union having a permanent copy.

12   Our request would be --

13       JUDGE ROSAS:  Well, General Counsel, it's up to you as to

14   whether they should hold on to it now or you'll just give it

15   back to them upon request.

16       MR. DO:  Your Honor, could -- I -- well, I would say that

17   they probably should hold on to it until after the cross-

18   examination to see if they have any further recross.  But

19   consistent with your order is that I think -- I think your

20   order is to delete it after all cross-examination.  And I'm

21   willing to abide by your order.

22       JUDGE ROSAS:  Okay.

23       MR. WOJCIECHOWSKI:  Okay.

24       JUDGE ROSAS:  Hold on to it for the time being.  All

25   right.
```

Exhibit 1(c)
263



www.escribers.net | 800-257-0885

1          MR. WOJCIECHOWSKI:  Thank you.

2          JUDGE ROSAS:  Go ahead, Mr. Adlong.

3          MR. ADLONG:  All right.

4                         **CROSS-EXAMINATION**

5     Q    BY MR. ADLONG:  Mr. Glackin, I'm going to ask you some

6     questions.  And just as I ask questions, can you please ensure

7     to answer an audible form, whatever it may be, so the court

8     reporter can catch it?

9     A    Yes.

10    Q    Okay.  And to the extent possible, even if you know the

11    question that I'm asking, if you can guess it, and you know

12    what the answer is, can you please wait until I conclude before

13    you answer?

14    A    Yes.

15    Q    Okay.  Mr. Glackin, do you know what ownership interest

16    UI -- Universal Intermodal Services has in Universal Truckload?

17    A    I do not.

18    Q    Do you know what ownership interest Universe Intermodal

19    Services has in Roadrunner?

20    A    I do not.

21    Q    Do you know what ownership interest UIS has in SCE?

22    A    I do not.

23    Q    Do you know what ownership interest UIS has in Universal

24    Management Services?

25    A    I do not.

Exhibit 1(c)
264



www.escribers.net | 800-257-0885

1    Q    Do you know what ownership interest Universal Truckload

2    has in UIS?

3    A    I do not.

4    Q    Do you know what ownership interest Universal Truckload

5    has in Roadrunner?

6    A    I do not.

7    Q    Do you know what ownership interest Universal Truckload

8    has SCE?

9    A    I do not.

10    Q    Do you know what ownership interest Universal Truckload

11    has in Universal Management Services?

12    A    I do not.

13    Q    Do you know what ownership interest Roadrunner has in UIS?

14    A    I do not.

15    Q    Do you know what ownership interest Roadrunner has in

16    Universal Truckload?

17    A    I do not.

18    Q    Do you know what ownership interest Roadrunner has in SCE?

19    A    I do not.

20    Q    Do you know what ownership interest Roadrunner has in

21    Universal Management Services?

22    A    I do not.

23    Q    Do you know what ownership interests SCE has in Universal

24    Intermodal Services?

25    A    I do not.

Exhibit 1(c)
265



www.escribers.net | 800-257-0885

1    Q    Do you know what ownership interest SCE has in Universal

2    Truckload?

3    A    I do not.

4    Q    Do you know what ownership interest SCE in Roadrunner?

5    A    I do not.

6    Q    Do you know what ownership interest SCE has in Universal

7    Management Services?

8    A    I do not.

9    Q    Do you know what ownership interest Universal Management

10   Services has in UIS?

11   A    I do not.

12   Q    Do you know what ownership interest Universal Management

13   Services has in Universal Truckload?

14   A    I do not.

15   Q    Do you know what ownership interest Universal Management

16   Services has in Roadrunner?

17   A    I do not.

18   Q    Do you know what ownership interest Universal Management

19   Services has in Southern Counties?

20   A    I do not.

21        MR. ADLONG:  Ms. Bridge?

22        MS. BRIDGE:  Yeah.  Yes.

23        MR. ADLONG:  Could you please bring up the General

24   Counsel's exhibits?

25        MS. BRIDGE:  Which -- which number would you like?

Exhibit 1(c)
266



1          MR. ADLONG:  Number 3 please.

2          MS. BRIDGE:  Sure.

3          MR. ADLONG:  Is it okay if I proceed?

4          MS. BRIDGE:  Yes.

5          MR. ADLONG:  Thank you, Ms. Bridge.

6     Q    BY MR. ADLONG:  Mr. Glackin, do you recognize this

7     document?

8     A    Yes.

9     Q    What is this document?

10    A    Universal Logistics Holdings, Inc. Form 10-K.

11    Q    What role did you play in preparing this document?

12    A    None.

13    Q    What responsibility do you have for reviewing this

14    document?

15    A    None.

16         MR. ADLONG:  Ms. Bridge, can you turn -- there should be,

17    on -- I -- I think it's called an attachment that has a list of

18    companies on there.

19         MR. DO:  Just to assist, Your Honor, it is on page 123 out

20    of 170.

21    Q    BY MR. ADLONG:  Do you recognize this list, Mr. Glackin?

22    A    Yes.

23    Q    What role do you have in formulating the structure of

24    these companies?

25    A    I have no role.

Exhibit 1(c)
267



1    Q    And what -- in your -- okay.  How often are you

2    responsible to be acquainted with this list of companies and

3    understand the corporate structure?

4    A    Never, outside of this process.

5    Q    Okay.

6         MR. ADLONG:  That's good for now, Ms. Bridge.  Thank you.

7    Q    BY MR. ADLONG:  There -- there were some questions

8    earlier, Mr. Glackin, and testimony about Intermodal -- about

9    Intermodal drivers working out -- working out of the Fontana

10   location.  What role do you have in determining whether

11   Intermodal drivers worked out of a specific location?

12   A    I do not have a role in that.

13   Q    What knowledge did you have regarding Intermodal drivers

14   working at a -- a specific location?

15   A    I did not have any knowledge.

16   Q    In your role as custodian of records and preparing

17   documents, is it possible that you provided documents to the

18   General Counsel, and you can't remember them?

19   A    That's possible.

20        MR. ADLONG:  Ms. Bridge?

21        MS. BRIDGE:  Yes.

22        MR. ADLONG:  Can you please pull up Joint Exhibit 21(a)

23   please?

24        MS. BRIDGE:  Sure.

25        MR. ADLONG:  All right.  Okay.

Exhibit 1(c)
268



```
 1   Q    BY MR. ADLONG:  Mr. Glackin, do you know --
 2        MR. DO:  One question, Your Honor.  I just want to
 3   confirm, are we speaking about Joint Exhibit 21(a) or 20(a)?
 4   Because what's on screen right now is 20(a).
 5        JUDGE ROSAS:  Mr. Adlong?
 6        MR. ADLONG:  I understand that that's -- what is 21(a)?
 7        MR. DO:  That is the agreement between Southern Counties
 8   Express and Big Lots.
 9        MR. ADLONG:  Can you send us, Phuong -- excuse me, Mr. Do,
10   that PDF with the 19 through 21 sealed?
11        MR. DO:  I just sent that to you earlier today.
12        MR. ADLONG:  Did you?  Okay.  I wasn't sure.  I thought
13   I'd asked for it.  And then --
14        MR. DO:  I think you -- Your Honor, Respondent should have
15   also received multiple copies throughout the -- the last couple
16   of weeks.
17        JUDGE ROSAS:  Okay.
18        MR. ADLONG:  Oh, this just came.  Okay.  So 20(a) is fine.
19   Q    BY MR. ADLONG:  Do you recognize this document, Mr.
20   Glackin?
21   A    Yes.
22   Q    Okay.  What is it?
23   A    Seems to be an agreement between -- a -- a service
24   agreement.
25   Q    Okay.  Whose handwriting is that on there?
```

Exhibit 1(c)
269



www.escribers.net | 800-257-0885

 1    A    I have no idea.

 2    Q    Okay.  What role did you play in negotiating this?

 3    A    I played no role.

 4    Q    Okay.  What role did you play in enforcing this?

 5    A    I played no role.

 6    Q    What role did you play in determining whether or not we

 7    complied with this?

 8    A    I played no role.

 9    Q    What role did you play in determining whether or not work

10    under this agreement did or did not allegedly go to a different

11    provider?

12    A    I played no role.

13         MR. ADLONG:  Ms. Bridge, could you please go to 20(b)?

14         JUDGE ROSAS:  Counsel, let's take five.  I have to address

15    something really quickly.  We'll go off the record for five

16    minutes.

17    (Off the record at 10:53 a.m.)

18         JUDGE ROSAS:  Okay.  Back on the record.

19         MR. ADLONG:  Ms. Bridge, can you please pull up Joint

20    Exhibit 20(b)?

21         MS. BRIDGE:  Sure.

22         MR. ADLONG:  Thank you.

23                       **RESUMED CROSS-EXAMINATION**

24    Q    BY MR. ADLONG:  You recognize this document, Mr. Glackin?

25    A    Yes.

Exhibit 1(c)
270



1    Q    What is it?

2    A    Service provider agreements.

3    Q    What role did you play in negotiating this agreement?

4    A    I played no role.

5    Q    What role did you play in enforcing this agreement?

6    A    I played no role.

7    Q    And what role did you play in ensuring that -- that any

8    potential Universal company complied with its obligation?

9    A    I played no role.

10   Q    Okay.

11        MR. ADLONG:  Can we go to Joint Exhibit 20(c), please, Ms.

12   Bridge?  Thank you.

13   Q    BY MR. ADLONG:  Do you recognize this document, Mr.

14   Glackin?

15   A    Yes.

16   Q    What is this document?

17   A    Quality agreement -- service agreement.

18        MR. ADLONG:  Ms. Bridge, can you please -- I think --

19   would it be scroll up a little bit?  Or maybe make it a little

20   bit smaller so we can view a little bit?  Scroll down, then.

21   I'm sorry.  I -- like, I guess I'm directionally challenged.

22   Perfect.  Thank you.

23   Q    BY MR. ADLONG:  Do you, Mr. Glackin, know whose

24   handwriting that is on that agreement?

25   A    I do not.

Exhibit 1(c)
271



www.escribers.net | 800-257-0885

1    Q    What role did you play in negotiating this agreement for

2    Universal Intermodal Services?

3    A    I played no role.

4    Q    What role did you play in determining whether or not

5    Kuehne Nagel complied with its obligation under this agreement?

6    A    I played no role.

7    Q    What role did you play in determining whether or not

8    Universal Intermodal complied with this agreement?

9    A    I played no role.

10   Q    What role did you play in determining whether or not any

11   driver from any entity other than Universal Intermodal moved

12   freight under this agreement?

13   A    I played no role.

14   Q    All right.  I'm going to turn your --

15        MR. ADLONG:  Ms. Bridge, could you please go to Joint

16   Exhibit 21(a)?  Thank you, Ms. Bridge.

17   Q    BY MR. ADLONG:  Do you recognize this document, Mr.

18   Glackin?

19   A    Yes.

20   Q    What is this document?

21   A    Trades (phonetic) transportation agreement.

22   Q    Do you know with whom this agreement is?  Like, what -- do

23   you know who the parties are to this agreement?

24        MR. ADLONG:  Strike that.

25   Q    BY MR. ADLONG:  Let me ask you another question.

Exhibit 1(c)
272



www.escribers.net | 800-257-0885

1    Actually -- no, you know what?  Do you know who are parties to

2    this agreement?

3    A    Based on the first paragraph, Southern Counties and Big

4    Lots.

5    Q    Okay.  What role did you play in negotiating this

6    agreement?

7    A    I played no role.

8    Q    What role did you play in determining whether or not Big

9    Lots complied with its obligations under this agreement?

10   A    I played no role.

11   Q    What role did you play in determining whether or not

12   Southern Counties Express complied with its obligations under

13   this agreement?

14   A    I played no role.

15        MR. ADLONG:  Ms. Bridge, can you please turn to paragraph

16   22 of Joint Exhibit 21(a)?  Thank you, Ms. Bridge.

17   Q    BY MR. ADLONG:  Mr. Glackin, what role did you play in

18   ensuring that Southern Counties Express did or did not comply

19   with paragraph 22 of this agreement?

20   A    I played no role.

21   Q    What role did you play in determining who, if anybody,

22   moved freight under this agreement?

23   A    I played no role.

24        MR. ADLONG:  Mr. Glackin -- excuse me, Ms. Bridge, can you

25   please go to join Exhibit 21(b)

Exhibit 1(c)
273



1    Q    BY MR. ADLONG:  Mr. Glackin, do you recognize this

2    agreement?

3    A    Yes.

4    Q    Who are parties to this agreement, Mr. Glackin?

5    A    Lowe's and Southern Counties Express.

6    Q    Do you know whose handwriting that is on this agreement?

7    A    No, I do not.

8    Q    What role did you play in negotiating this agreement?

9    A    I played no role.

10   Q    What role did you play in ensuring that Lowe's complied

11   with the terms of this agreement?

12   A    I played no role.

13   Q    What role did you play in ensuring that Southern Counties

14   Express complied with this agreement?

15   A    I played no role.

16       MR. ADLONG:  Ms. Bridge, can you please turn to paragraph

17   20 of this exhibit?

18   Q    BY MR. ADLONG:  Mr. Glackin, what role did you play in

19   ensuring that Southern Counties Express complied with paragraph

20   20 of Joint Exhibit 21(b)?

21   A    I played no role.

22   Q    What role, Mr. Glackin, did you play in determining what

23   drivers delivered freight under the contract that's been marked

24   as Joint Exhibit 21B?

25   A    I played no role.

Exhibit 1(c)
274



www.escribers.net | 800-257-0885

1           MR. ADLONG:  Ms. Bridge, can you please turn to Joint

2    Exhibit 21(c)?

3    Q    BY MR. ADLONG:  Mr. Glackin, do you recognize this

4    document?

5    A    Yes.

6    Q    What is it?

7    A    Transportation agreement.

8    Q    And who is this transit -- portation agreement between?

9           MR. DO:  Your Honor, I haven't been objecting to this

10   question, but I'm going to object to the document speaks for

11   themselves.

12          JUDGE ROSAS:  What's the purpose, Mr. Adlong?

13          MR. ADLONG:  Just to lay foundation as I start to ask

14   questions regarding obligations and --

15          JUDGE ROSAS:  Overruled.  Overruled.

16          THE WITNESS:  Lowe's Home Center and Southern Counties

17   Express.

18   Q    BY MR. ADLONG:  Okay.  Do you see the handwriting on that

19   document, Mr. Glackin?

20   A    Yes.

21   Q    Whose handwriting is that?

22   A    I don't know.

23   Q    What role, Mr. Glackin, did you play in negotiating this

24   agreement?

25   A    I played no role.

Exhibit 1(c)
275



www.escribers.net | 800-257-0885

1    Q    And what role, Mr. Glackin, did you play in determining

2    whether or not Southern Counties Express should even enter into

3    this agreement?

4    A    I played no role.

5    Q    What role did you play in ensuring that Lowe's complied

6    with its obligations under this agreement?

7    A    I played no role.

8    Q    And what role did you play, Mr. Glackin, in ensuring that

9    Southern Counties Express complied with the terms of this

10   agreement?

11   A    I played no role.

12       MR. ADLONG:  Ms. Bridge, can you please turn to paragraph

13   20 of Joint Exhibit 21(c)?

14   Q    BY MR. ADLONG:  Do you see paragraph -- do you see

15   paragraph 20?

16   A    Yes?

17   Q    What role did you play in ensuring that Southern Counties

18   Express complied with paragraph 20?

19   A    I played no role.

20   Q    What role did you play in determining who moved freight

21   for Lowe's under this agreement?

22   A    I played no role.

23   Q    By chance, Mr. Glackin, did you happen to notice that

24   21(b) and 21(c) look similar?

25   A    I did.

Exhibit 1(c)
276



www.escribers.net | 800-257-0885

1    Q    Do you know why that is?

2    A    I don't.

3         MR. ADLONG:  Ms. Bridge, can you please go to Joint

4    Exhibit 21(d)?  Thank you, Ms. Bridge.

5    Q    BY MR. ADLONG:  Do you recognize this document, Mr.

6    Glackin?

7    A    Yes.

8    Q    What is this document?

9    A    Service addendum.

10   Q    Between whom is the service addendum?

11   A    Walmart Transportation and Southern Counties Express.

12   Q    Do you know whose handwriting is on that agreement?

13   A    I don't.

14   Q    What role did you play in negotiating this agreement?

15   A    I played no role.

16   Q    What role did you play in ensuring that Walmart complied

17   with this agreement?

18   A    I played no role.

19   Q    What role did you play in ensuring that Southern Counties

20   Express complied with this agreement?

21   A    I played no role.

22        MR. ADLONG:  Ms. Bridge, can you please go to -- it's

23   paragraph VI, Roman numeral VI?

24   Q    BY MR. ADLONG:  Mr. Glackin, do you see this paragraph?

25   A    Yes, I do.

Exhibit 1(c)
277



www.escribers.net | 800-257-0885

1    Q    What role did you play in ensuring that Southern Countries

2    Express complied with this agreement?

3    A    I played no role.

4    Q    Excuse me.  How about for this paragraph, Roman numeral

5    VI?

6    A    For Roman numeral VI, I played no role.

7    Q    What role did you play in determining who, if anyone,

8    would carry freight under this agreement?

9    A    I played no role.

10        MR. ADLONG:  Ms. Bridge, can you please turn to Joint

11   Exhibit 21(e)?

12   Q    BY MR. ADLONG:  Mr. Glackin, do you recognize this

13   document?

14   A    Yes.

15   Q    What is it?

16   A    Transportation agreement.

17   Q    Between who?

18   A    Walmart and Southern Counties Express.

19   Q    Do you see the handwriting on this document?

20   A    Yes.

21   Q    Who wrote that?

22   A    I don't know.

23   Q    What role did you play in negotiating this agreement?

24   A    I played no role.

25   Q    What role did you play in ensuring that Walmart complied

Exhibit 1(c)
278



1   with the terms of the -- this agreement?

2   A    I played no role.

3   Q    What role did you play in ensuring that Southern Counties

4   express complied with the terms of this agreement?

5   A    I played no role.

6   Q    Mr. Glackin, what role did you play in determining who

7   would move freight under this agreement?

8        MR. DO:  Your Honor, I don't know if we got the answer on

9   the record.  The audio cut out for me for his response.

10       JUDGE ROSAS:  I didn't hear a response.

11       THE WITNESS:  I played no role.

12       MR. ADLONG:  Ms. Bridge, can you please get up Joint

13   Exhibit 14(c)?

14       MR. ADLONG:  Your Honor, while she does that, do you mind

15   if I take a brief break?  I need to use the restroom.

16       JUDGE ROSAS:  Okay.  We'll take five.

17       MR. ADLONG:  Thank you.

18   (Off the record at 11:19 a.m.)

19       JUDGE ROSAS:  Okay.  Back on the record.  We're on the

20   record.

21       MR. ADLONG:  Yeah.  Yeah, I'm sorry.  I got a little

22   flustered.  I apologize.  All right.

23                    **RESUMED CROSS-EXAMINATION**

24   Q    BY MR. ADLONG:  Do you recognize this document, Mr.

25   Glackin?

Exhibit 1(c)
279



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    What is this?

3    A    A subpoena.

4    Q    Okay.  So I'm going to turn your attention to --

5         MR. ADLONG:  Can you go to the section, Ms. Bridge that

6    says "documents produced"?

7    Q    BY MR. ADLONG:  Okay.  See number 2, Mr. Glackin?

8    A    Yes.

9    Q    All right.  What role did you play in communications

10   regarding the decision to terminate Mr. Mallard?

11   A    I do not play any role.

12        MR. DO:  Your Honor, I'm going to object to relevance.

13   His role in those communications doesn't matter here.  He

14   was -- no response for collecting the document, and that's what

15   he testified to.

16        JUDGE ROSAS:  Well, the question was whether he had any

17   role.

18        MR. DO:  In the actual communications, though.

19        JUDGE ROSAS:  In the termination?  Wait, repeat the

20   question.

21        MR. ADLONG:  I asked, what role did he have in the

22   communications regarding the decision to terminate Mr. Mallard?

23        JUDGE ROSAS:  That's -- that's a little vague for me.

24   Rephrase.

25   Q    BY MR. ADLONG:  What role did you play in the decision to

Exhibit 1(c)
280



1    terminate Mr. Mallard?

2    A    I did not play a role.

3    Q    Okay.  Now, what role did you play in the investigation

4    that led to the termination of Mr. Mallard?

5    A    I did not play a role.

6    Q    What firsthand knowledge did you have regarding how

7    Universal Intermodal Services conducts investigations?

8    A    I had no knowledge.

9         MR. DO:  Objection, Your Honor, and motion to strike.

10   That is inconsistent with his previous testimony.

11        JUDGE ROSAS:  Testimony on the General Counsel's

12   case-in-chief?

13        MR. DO:  No, on direct.  He was questioned regarding the

14   investigative process.  And he just testified that he don't

15   have any knowledge, and that's not consistent with our

16   testimony.

17        JUDGE ROSAS:  So you're saying that he gave a different

18   answer when you asked the question; is that right?

19        MR. DO:  Yes, Your Honor.  Correct, Your Honor.

20        JUDGE ROSAS:  The record is what it is.  Overruled.

21   Q    BY MR. ADLONG:  Now, how would you have any knowledge

22   regarding an investigation at a universal entity, Mr. Glackin?

23   A    I -- I wouldn't have knowledge unless it was sent directly

24   to me.

25   Q    Okay.  And in your role, have you seen investigations sent

Exhibit 1(c)
281



 1    directly to you that are not part of the transportation

 2    division?

 3    A    Yes.

 4    Q    Okay.  And have you ever participated in an investigation

 5    that's not part of the transportation division?

 6    A    Yes.

 7    Q    Okay.  And to the extent you have knowledge regarding an

 8    investigation or how it works out, where would you have gotten

 9    that knowledge?

10    A    At the facility level.

11    Q    Okay.  Would any of those facilities be part of the

12    transportation division?

13    A    No.

14    Q    Okay.  In Universal Intermodal, what division was it part

15    of?

16    A    Transportation division.

17    Q    Okay.  So to the extent you ever testify regarding what

18    you understand regarding an investigation, from where does that

19    understanding come from?

20    A    The other division I oversee.

21    Q    Okay.  What role, Mr. Glackin, did you play in the

22    decision to terminate Mr. Ledesma?

23    A    I did not play a role.

24    Q    What role did you play in investigating the termination of

25    Mr. Ledesma?

Exhibit 1(c)
282


www.escribers.net | 800-257-0885

```
 1    A     I did not play a role.

 2    Q     What firsthand knowledge do you have regarding the

 3    investigation into Mr. Ledesma?

 4    A     I don't have any firsthand knowledge.

 5    Q     All right.  Mr. Glackin, I'd like to direct your attention

 6    to paragraph 8 of the subpoena.

 7          MR. ADLONG:  Ms. Bridge, if you could please take us to

 8    that.  Thank you.  Paragraph 8, that's good.  Thank you.

 9    Q     BY MR. ADLONG:  Mr. Glackin, what role did you have in

10    having employees sign agreement to waive participation in class

11    and collective action documents?

12          MR. DO:  Objection.  Relevance.

13          JUDGE ROSAS:  Question was what role?

14          MR. ADLONG:  Yeah.

15          JUDGE ROSAS:  Overruled.

16          MR. DO:  Okay.

17          MR. ADLONG:  I didn't finish the question, so I'll restart

18    it.

19    Q     BY MR. ADLONG:  Mr. Glackin, what role did you play in

20    having employees sign an agreement to waive participation in

21    class and collective actions?

22    A     I played no role.

23    Q     What role, Mr. Glackin, did you play in enforcing any

24    agreement at Universal Intermodal to waive participation in

25    class and collective actions?
```

Exhibit 1(c)
283



www.escribers.net | 800-257-0885

1    A    I played no role.

2         MR. ADLONG:  Ms. Bridge, if you can, please advance to

3    paragraph 11.

4    Q    BY MR. ADLONG:  What role, Mr. Glackin, did you play in

5    negotiating interline agreements for Universal Intermodal

6    Services?

7    A    I played no role.

8    Q    What knowledge, if any, do you have --

9         MR. ADLONG:  -- strike that.

10   Q    BY MR. ADLONG:  What role, Mr. Glackin -- or what

11   understanding, if any, do you have, Mr. Glackin, regarding

12   whether or not Universal Intermodal has interline agreements?

13   A    None.  I have no understanding of that.

14   Q    Okay.  What role, Mr. Glackin, did you play in negotiating

15   contracts for Universal Intermodal Services?

16   A    I played no role.

17        MR. ADLONG:  All right.  If we can move up to paragraph

18   12, please, Mr. -- Ms. Bridge.

19   Q    BY MR. ADLONG:  Mr. Glackin, in what role, if any, did you

20   play in the work performed by owner-operators at the Compton

21   facility?

22   A    I played no role.

23   Q    What role, Mr. Glackin, did you play in the work, if any,

24   by owner-operators at the Fontana facility?

25   A    I played no role.

Exhibit 1(c)
284



1    Q     What role, if any, did you play, Mr. Glackin, regarding

2    the relationship between owner-operators at the Compton

3    facility with Universal Intermodal Services?

4    A     I played no role.

5    Q     What role, if any, did you play, Mr. Glackin, regarding

6    the relationship between owner-operators and Universal

7    Intermodal Services at the Fontana facility?

8    A     I played no role.

9    Q     What knowledge do you have, Mr. Glackin, regarding

10   owner-operators working out of --

11        MR. ADLONG:   -- Okay.  Strike that.

12   Q     BY MR. ADLONG:  What knowledge do you have, Mr. Glackin,

13   regarding specific locations where the owner-operators who are

14   assigned to Compton are working out of?

15   A     I have no knowledge.

16   Q     What knowledge, Mr. Glackin, do you have regarding the

17   specific location where owner-operators who are assigned

18   Fontana are working at?

19   A     I have no knowledge.

20   Q     Mr. Glackin, for the time period from October 21, 2019 to

21   the current date, what communications did you have with

22   Universal Intermodal Representatives about the relocation of

23   equipment used at the Compton facility?

24   A     None.

25   Q     Mr. Glackin, for the time period from October 1, 2019 to

Exhibit 1(c)
285



1    the current date, what communication did you have with

2    Universal Intermodal representatives about the location of

3    equipment at the Compton facility?

4    A    None.

5    Q    Mr. Glackin, for the time period from October 2019 to the

6    current date, what communication did you have with Universal

7    Intermodal Service representatives about the sale of equipment

8    used at the Compton location?

9    A    None.

10   Q    Mr. Glackin, for the time period from October 1, 2019 to

11   the current date, what communication among Universal Intermodal

12   Services did you have about the sale of equipment used at the

13   Compton location?

14   A    None.

15   Q    Mr. Glackin, for the time period from October 1, 2019 to

16   the current date, what communication did you have with

17   Universal Intermodal representatives about the lease of

18   equipment located at the Compton facility?

19   A    None.

20   Q    Mr. Glackin, for the time period of October 1, 2019 to the

21   current date, what communication did you have among Universal

22   Intermodal representatives about the lease of equipment used at

23   the Compton location?

24   A    None.

25   Q    Mr. Glackin, for the time period from October 1, 2019 to

Exhibit 1(c)
286


www.escribers.net | 800-257-0885

1    the current date, what communications did you have with

2    Universal Intermodal Services about the relocation of equipment

3    located at the Fontana facility?

4    A    None.

5    Q    Mr. Glackin, for the time period from October 1, 2019 to

6    the current date, what communication did you have with

7    Universal Intermodal Services about the relocation of equipment

8    used at the Fontana location?

9    A    None.

10   Q    Mr. Glackin, and for the time period from October 1, 2019,

11   to the current date, what communication did you have with

12   Universal Intermodal Service representatives about the sale of

13   equipment located at the Fontana facility?

14   A    None.

15   Q    Mr. Glackin, for the time period from October 1, 2019 to

16   the current date, what communications did you have with

17   Universal Intermodal Service representatives about the lease of

18   equipment located at the Fontana facility?

19   A    None.

20   Q    Mr. Glackin, for the time period from October 1, 2019 to

21   the current date, what communication did you have with

22   Universal Intermodal representatives regarding the lease of

23   equipment used at the Fontana facility?

24   A    None.

25   Q    Mr. Glackin, for the time period from October 1, 2019 to

Exhibit 1(c)
287



1    the current date, what communication did you have among

2    Universal Intermodal Service representatives about the

3    relocation of equipment formerly kept at the Compton location?

4    A    None.

5    Q    Mr. Glackin, for the time period from October 1, 2019 to

6    the current date, what communication did you have among

7    Universal Intermodal Service representatives about the

8    relocation of equipment formerly used at the Compton location?

9         MR. DO:  Your Honor, I'm going to object to the form of

10   the question because it's asking for communication among, so it

11   calls for speculation.  If it's communication with him, then

12   that's a different question.

13        JUDGE ROSAS:  Rephrase.

14   Q    BY MR. ADLONG:  For the time period from October 1, 2019

15   to the current date, what communication did you have with

16   representatives of Universal Intermodal services about the

17   relocation of equipment formerly used at the Compton location?

18   A    None.

19   Q    For the time period from October 1, 2019 to the current

20   date, what communication did you have with representatives of

21   Universal Intermodal Services about the relocation of equipment

22   formerly located at the Fontana facility?

23   A    None.

24   Q    For the time period from October 1, 2019 to the current

25   date, what communication did you have with representatives of



1    Universal Intermodal Services about equipment formerly used at

2    Fontana facility?

3    A    None.

4    Q    For the time period from October 1, 2019 to the current

5    date, what communication among respondents represent --

6         MR. ADLONG:   -- strike that.

7    Q    BY MR. ADLONG:  For the time period from October 1, 2019,

8    to the current date, what communication did you have with

9    Universal Intermodal service representatives about the sale of

10   equipment formerly located at the Compton facility?

11   A    None.

12   Q    For the time period from October 1, 2019 to the current

13   date, what communications did you have with Universal

14   Intermodal Service representatives about the sale of equipment

15   formerly used at the Compton location?

16   A    None.

17   Q    For the time period from October 1, 2019 to the current

18   date, what communications among Universal Intermodal Service

19   representatives did you have about the sale of equipment

20   formerly located at Fontana?

21   A    None.

22   Q    For the time period from October 1, 2019 to the current

23   date, what communication did you have with Universal Intermodal

24   service representatives about the sale of equipment formerly

25   kept -- formerly located at the Fontana facility?

Exhibit 1(c)
289



www.escribers.net | 800-257-0885

1    A    None.

2    Q    For the time period from October 1, 2019 to the current

3    date, what communications among Universal Intermodal Service

4    representatives did you have about the sale of equipment

5    formerly located at Fontana?

6    A    None.

7    Q    For the time period from October 1, 2019 to the current

8    date, what communication among --

9         MR. ADLONG:  -- excuse me.  Strike that.

10   Q    BY MR. ADLONG:  For the time period from October 1, 2019

11   to the current date, what communication with Universal

12   Intermodal Service representatives did you have about the lease

13   of equipment formerly located at Compton?

14   A    None.

15        MR. DO:  Objection, Your Honor, that's asked answered.  I

16   believe he meant to say Fontana.  But that question is already

17   asked and answered.

18        JUDGE ROSAS:  Sustained.

19   Q    BY MR. ADLONG:  For the time period from October 1, 2019

20   to the current date, what communication with Universal

21   Intermodal Service representatives have you had about the

22   leasing of equipment formerly located at Fontana?

23   A    None.

24   Q    For the time period from October 1, 2019 to the current

25   day, what communications have you had with Universal Intermodal

Exhibit 1(c)
290



www.escribers.net | 800-257-0885

1    Service representatives about the lease of equipment formerly

2    used at Fontana?

3    A    None.

4    Q    For the time period from January 1, 2019 to the current

5    date, what communications have you had with representatives of

6    Universal Intermodal Services regarding the relocation of work

7    performed by employee drivers at Compton?

8    A    None.

9    Q    For the time period from January 1, 2019 to the current

10   date, what communications have you had with Universal

11   Intermodal Service representatives about the relocation of

12   employee drivers at Fontana?

13   A    None.

14   Q    For the time period from January 1, 2019 to the current

15   date, what communications have you had with Universal

16   Intermodal Service representatives about the termination of a

17   contract of work performed by employee drivers at the Compton

18   facility?

19       MR. DO:  Your Honor, this has been going on for a bit.

20   I'm going to check on the relevance.  Because quite frankly,

21   what communication Mr. Glackin has or not doesn't matter, at

22   least with regard to the subpoena production.

23       JUDGE ROSAS:  Can we generalize it some?  Make it all

24   encompassing somehow, Mr. Adlong?

25       MR. ADLONG:  I don't --

Exhibit 1(c)
291



1      JUDGE ROSAS:  To get to the bottom line?

2      MR. ADLONG:  I -- I feel like I'm getting to the bottom

3  line quickly to make sure we cover each point if I did it --

4      JUDGE ROSAS:  Okay.

5      MR. ADLONG:  -- what the General -- so --

6      JUDGE ROSAS:  All right.  Overruled.

7  Q    BY MR. ADLONG:  All right.  For the time period from

8  January 1, 2019 to the current date, what communication did you

9  have among Universal Intermodal Service representatives --

10      MR. DO:  Objection.  Calls for speculation.  It's -- it's

11  the "among" language again.

12      JUDGE ROSAS:  Repeat the question.

13      MR. ADLONG:  Sure.  For the time period from January 1,

14  2019 to the current date, what communications did you have with

15  Universal Intermodal Service representatives about the

16  relocation -- excuse me, about the termination of contract --

17   of contracted work for employee drivers at the Fontana

18  facility?

19      MR. DO:  I'll withdraw my objection, Your Honor.

20  Q    BY MR. ADLONG:  For the time period -- for the time period

21  from January 1, 2019 to the current date, what communications

22  did you have with Universal Intermodal Service representatives

23  regarding the subcontracting of work performed by employee

24  drivers at the Compton facility?

25  A    None.

Exhibit 1(c)
292



1   Q    From January 1, 2019 to the current date, what

2   communication did you have with Universal Intermodal Service

3   representatives regarding the subcontracting of work performed

4   by employee drivers at the Com -- at the Compton facility?

5       MR. DO:  Objection.  Asked and answered.  That was a

6   previous question, Your Honor.

7       JUDGE ROSAS:  Sustained.

8       MR. ADLONG:  Yeah.

9   Q   BY MR. ADLONG:  From the time period to January 1, 2019 to

10  the current date, what communications did you have among rep --

11  what communications did you --

12      MR. ADLONG:  -- strike that.  I'm going to start over.

13  Q   BY MR. ADLONG:  From January 1, 2019 to the current date,

14  what communications did you have with representatives of

15  Universal Intermodal services regarding the subcontracting of

16  work of employee drivers at the Fontana facility?

17  A   None.

18  Q   For the time period of January 1, 2019 to the current

19  date, what communications did you have with Universal

20  Intermodal Service representatives about the relocation of work

21  performed by owner-operators at the Compton facility?

22  A   None.

23  Q   For the time period from January 1, 2019 to the current

24  date, what communication with Universal Intermodal Service

25  representatives did you have about the relocation of work

Exhibit 1(c)
293



www.escribers.net | 800-257-0885

1    performed by owner-operators at the Fontana facility?

2    A    None.

3    Q    For the time period from January 1, 2019 to the current

4    date, what communication did you have with Universal Intermodal

5    Service representatives about the termination of contracting --

6    of contracted work for owner-operators at the Compton facility?

7    A    None.

8    Q    For the time period from January 1, 2019 to the current

9    date, what communication did you have with representatives of

10   Universal Intermodal services about the termination of

11   contracted work for owner-operators at the Fontana facility?

12   A    None.

13   Q    For the time period from January 1, 2019 to the current

14   date, what communication did you have with Universal Intermodal

15   Service representatives about the subcontracting work of

16   owner-operators at the Compton facility?

17   A    None.

18   Q    For the time period from January 1, 2019 to the current

19   date, what communications did you have with representatives of

20   Universal Intermodal Services regarding the subcontracting of

21   work at the -- for owner-operators at the Fontana facility?

22   A    None.

23   Q    What communications did you participate in to the clients

24   of Universal Intermodal Services in late 2019 regarding the

25   closure of the Universal Intermodal location at the Compton

Exhibit 1(c)
294



1    facility?

2    A    None.

3    Q    What communications did you participate in to the clients

4    of Universal Intermodal Services in late 2019 regarding any

5    changes to the facility that serviced work Universal Intermodal

6    Service was contracted to perform?

7    A    None.

8    Q    What communication did you have with Universal Intermodal

9    Service clients in late 2019 regarding changes to the drivers

10   who would service the clients contracted to be performed by

11   Universal Intermodal Services?

12   A    None.

13        MR. ADLONG:  You Honor, I think right here would probably

14   be a good time to break, before I get into my next line of

15   questions, for lunch, if that's okay.

16        JUDGE ROSAS:  Let's go off the record.

17   (Off the record at 11:54 a.m.)

18        JUDGE ROSAS:  All right.  On the record.  Mr. Adlong.

19        MR. DO:  You were muted, Your Honor.

20        JUDGE ROSAS:  Mr. Adlong, let's go.

21        MR. ADLONG:  Thank you.  I'm looking -- I'm getting --

22                    **RESUMED CROSS-EXAMINATION**

23   Q    BY MR. ADLONG:  Mr. Glackin, what communications did you

24   have with representatives of Universal Intermodal Services

25   regarding the decision to close the Compton facility?

Exhibit 1(c)
295



1    A    None.

2    Q    What communications did you have with representatives of

3    Universal Intermodal regarding the actual closure of the

4    Compton facility?

5    A    None.

6    Q    What communications did you have with Universal Intermodal

7    representatives regarding finalizing the decision to close the

8    Compton facility?

9    A    None.

10   Q    Mr. Glackin, what communications did you have with

11   representatives of Universal Intermodal Services regarding the

12   decision to lay off employee drivers who worked at the Compton

13   facility in December 2019?

14   A    None.

15   Q    What communications did you have with representatives of

16   Universal Intermodal regarding the decision to lay off employee

17   drivers who worked at the Fontana facility in December 2019?

18   A    None.

19   Q    Mr. Glackin, what communications did you have with the

20   Union --

21       MR. ADLONG:  Excuse me.  Strike that.

22   Q    BY MR. ADLONG:  Mr. Glackin, what communications did you

23   have with representatives of Universal Intermodal Servias --

24   Services and employee drivers that worked at the Compton

25   facility regarding Universal Intermodal Services' lease?

Exhibit 1(c)
296



1    A    None.

2        MR. DO:  Objection, your -- ob -- objection, Your Honor.

3    That's a compound question.

4        JUDGE ROSA: He already answered it, so --

5        MR. DO:  That's fine.

6    Q    BY MR. ADLONG:  Mr. Glackin, from the time period of

7    January 1, 2019 to December 2019, what communications did you

8    have with representatives of Universal Intermodal Services and

9    employee drivers who worked at the Fontana facility regarding

10   Universal Intermodal Services Compton lease at --

11       MR. DO:  Objection.  Compound.  He's asking about

12   communication with their representative and employees.

13       JUDGE ROSAS:  So all of the above.  Well --

14       MR. DO:  Right.

15       MR. ADLONG:  You know what?  Let's just -- I -- I'll break

16   it into three questions.  I'm happy to do that.

17   Q    BY MR. ADLONG:  So what communicate -- Mr. Glackin, for

18   the time period from January 1, 2019 to December 31, 2019, what

19   communications did you have with representatives of Universal

20   Intermodal Services about --

21       MR. ADLONG:  Strike that.

22   Q    BY MR. ADLONG:  From December -- from January 1, 2019 to

23   December 31, 2019, what communications did you have with

24   employee drivers who worked at the Compton facility about the

25   decision --

Exhibit 1(c)
297



1          MR. ADLONG:   Strike that again.   I apologize.

2     Q     BY MR. ADLONG:   From January 1, 2019 to December 31, 2019,

3     what communications did you have with employee drivers who

4     worked at the Compton facility about Universal Intermodal's

5     lease at the Compton facility?

6     A     None.

7     Q     From January 1, 2019 to December 31, 2019, what

8     communication did you have with employee drivers who worked at

9     the Fontana facility regarding Universal Intermodal Services

10    lease at the Compton facility?

11    A     None.

12    Q     From January 1, 2019 to December 31, 2019, what

13    communication did you have with representatives of Universal

14    Intermodal Services and employee drivers, together, who worked

15    at the Compton facility regarding Universal Intermodal faci --

16    lease at Compton?

17    A     None.

18    Q     From January 1, 2019 to December 31, 2019, what

19    communications did you have with representatives of Universal

20    Intermodal Services and employee drivers who worked at the

21    Fontana facility regarding -- meaning those together --

22    regarding Universal Intermodal Services' lease at the Compton

23    facility?

24    A     None.

25    Q     For the time period from January 1, 2019 to December 31,

Exhibit 1(c)
298



1    2019, what communications did you have with representatives of

2    Universal Intermodal Services regarding the decision to lay off

3    drivers who worked at the Compton facility?

4        MR. DO:  Objection.  Asked and answered.  I -- I believe

5    this was gone through.

6        JUDGE ROSAS:  I believe so.  Sustained.

7    Q    BY MR. ADLONG:  Okay.  For -- for the time period from

8    January 1, 2019 to December 31, 2019, what communications did

9    you have with employee drivers who worked at the Comp --

10   Compton facility regarding the decision to lay off employee

11   drivers?

12   A    None.

13   Q    From January 1, 2019 to December 31, 2019, what

14   communications did you have with employee drivers who worked at

15   Fontana regarding the decision to lay off employee drivers at

16   the Compton facility?

17   A    None.

18   Q    from January 1, 2019 to December 31, 2019, what

19   communications did you have with employee drivers who worked at

20   the Compton facility regarding the decision to lay off employee

21   drivers at the Fontana facility?

22   A    None.

23   Q    From January 1, 2019 to December 31, 2019, what

24   communications did you have with employee drivers who worked at

25   the Fontana facility regarding the decision to lay off



 1    employees at the Fontana facility?

 2    A    None.

 3    Q    From January 1, 2019 to December 31, 2019, what

 4    communications did you have with employee drivers who worked at

 5    the Fontana facility regarding the decision to lay off employee

 6    drivers at the Compton facility?

 7         MR. DO:  Objection.  Asked and answered.

 8         JUDGE ROSAS:  I -- I'm not --

 9         MR. DO:  That sounds like --

10         JUDGE ROSAS:  -- sure.  I'll -- I'll allow it.

11         MR. DO:  -- the same question --

12         JUDGE ROSAS:  You can answer.

13    A    None.

14    Q    BY MR. ADLONG:  Mr. Glackin, from January 1, 2019 to

15    December 31, 2019, what communications did you have with

16    Universal Intermodal Service representatives and employee

17    drivers, together, who worked at the Compton facility regarding

18    the decision to lay off employee drivers at the Compton

19    facility?

20    A    None.

21    Q    From January 1, 2019 to December 31, 2019, what

22    communications did you have with representatives of Universal

23    Intermodal Services, together with employee drivers at the

24    Compton facility, regarding the decision to lay off employee

25    drivers at the Fontana facility?

Exhibit 1(c)
300



www.escribers.net | 800-257-0885

1  A    None.

2  Q    From January 1, 2019 to December 31, 2019, what

3  communication did you have with Universal Intermodal

4  representatives, together with employee drivers who worked at

5  the Fontana facility, regarding the decision to lay off

6  employee drivers at the Compton facility?

7      MR. WOJCIECHOWSKI:  I'm going to object that it's asked

8  and answered in a logical sense in -- in that each of the two

9  pieces have been addressed, and if -- if reps have not -- if

10  there were no communications with reps and there were no

11  communications with employees, then how could there be

12  communications with reps and employees together?

13      JUDGE ROSAS:  I don't know.  Overruled.  You can answer.

14  A    None.

15  Q    BY MR. ADLONG:  From January 1, 2019 to December 31, 2019,

16  what communications did you have with representatives of

17  Universal Intermodal Services employee drivers who worked at

18  the Fontana facility regarding the decision to lay off employee

19  drivers at the Fontana facility?

20  A    None.

21  Q    For the time period between January 1, 2019 until December

22  31, 2019, what communications did you have with Universal

23  Intermodal Services and its landlord for the Compton facility

24  about the termination of the lease for the Compton facility?

25  A    None.

Exhibit 1(c)
301



1       MR. ADLONG:  Ms. Bridge, could you please pull up what's

2   been marked as the Joint Exhibit C, please?

3       MS. BRIDGE:  Joint Exhibit C?

4       MR. ADLONG:  Oh, excuse me.  Joint Exhibit 15(c).

5       MS. BRIDGE:  Okay.

6       MR. ADLONG:  I think I ate too much lunch.  Brain's not

7   working.

8       Ms. Bridge, is that the document that you think is Joint

9   Exhibit 15(c)?  I just want to make sure -- like, I'm not --

10      MS. BRIDGE:  Yes.

11      MR. ADLONG:  -- trying to hurry you up.  I just want to

12  make sure that I'm not confused because what I have is --

13      MS. BRIDGE:  Oh, I'm sorry.  You're right.  Sorry.

14      MR. ADLONG:  No, no sweat at all.  I just wanted to make

15  sure we're on the same page.

16      JUDGE ROSAS:  Diane, if you could just leave the index up

17  so, you know, I can tell at all times what exhibit it is.

18      MS. BRIDGE:  Be glad to.

19      JUDGE ROSAS:  Thank you.

20      MR. ADLONG:  Thank you for getting that up for me, Ms.

21  Bridge.

22  Q   BY MR. ADLONG:  Do you recognize this document, Mr.

23  Glackin?

24  A   Yes.

25  Q   What is this document?

Exhibit 1(c)
302



www.escribers.net | 800-257-0885

1    A    A hearing subpoena.

2    Q    For which entity?

3    A    Universal Logistics Holdings.

4    Q    I'm going to turn your attention --

5         MR. ADLONG:  And Ms. Bridge, can you please turn it to

6    the -- I think it's Bates labeled page 807.

7         MS. BRIDGE:  And tell me what paragraph you're looking

8    for.

9         MR. ADLONG:  3, please.

10        MS. BRIDGE:  Is this it?

11        MR. ADLONG:  Yes, ma'am.

12   Q    BY MR. ADLONG:  Mr. Glackin, did you -- you know what, let

13   me ask you this, Mr. Glackin.  With respect to number 3, what

14   communications did you have with representatives of Universal

15   Logistics Holdings about the relocation of equipment formerly

16   kept at the Compton facility?

17   A    None.

18   Q    What communication did you have with representatives of

19   Universal Logistics Holding (sic throughout) about equipment

20   formerly used at the Compton facility?

21   A    None.

22   Q    What communications did you have with representatives of

23   Universal Logistics Holding regarding equipment formerly kept

24   at the Fontana facility?

25   A    None.

Exhibit 1(c)
303



www.escribers.net | 800-257-0885

1    Q     What communication -- what communication did you have with

2    representatives of Universal Logistics Holding regarding

3    equipment formerly used at the Fontana facility?

4    A     None.

5    Q     For the jan -- for the -- for the -- okay.  What

6    communications did you have with representatives of Universal

7    Logistics Holding regarding the sale of equipment formerly kept

8    at the Compton facility?

9    A     None.

10    Q     What communications did you have with representatives of

11    Universal Logistics Holding regarding equipment formerly used

12    at the Compton facility?

13          MR. DO:  Objection.  Asked and answered.

14          JUDGE ROSAS:  Sustained.

15          MR. ADLONG:  Okay, that's right.

16    Q     BY MR. ADLONG:  Mr. Glackin, what communications did you

17    have with representatives of Universal Logistics Holding

18    regarding equipment formerly used at the Fontana facility?

19          MR. DO:  Ob -- ob -- no, never mind.  That was already --

20          MR. ADLONG:  Strike that.

21          MR. DO:  -- there.

22          MR. ADLONG:  Strike that.  I -- I think I -- I'm sorry.  I

23    just made a mistake.

24    Q     BY MR. ADLONG:  Mr. Glackin, what communications did you

25    have with representatives of Universal Logistics Holdings

Exhibit 1(c)
304



www.escribers.net | 800-257-0885

1   regarding the sale of equipment formerly located at the Fontana

2   facility?

3   A    None.

4   Q    What communications, Mr. Glackin, did you have with

5   representatives of Universal Logistics Holding regarding the

6   sale of equipment formerly used at the Fontana facility?

7        MR. DO:  Objection, Your Honor.  This is also asked and

8   answered.  It's just the same question.

9        JUDGE ROSAS:  I'll allow it.

10  A    None.

11  Q    BY MR. ADLONG:  Mr. Glackin, what communications did you

12  have with representatives of Universal Logistics Holding

13  regarding the lease of equipment formerly kept -- formerly

14  located at the Compton facility?

15  A    None.

16  Q    Mr. Glackin, what communications did you have with

17  representatives of Universal Logistics Holding regarding the

18  lease of equipment formerly used at the Compton facility?

19  A    None.

20  Q    Mr. Glackin, what communications did you have with

21  representatives of Universal Logistics Holding regarding

22  equipment formerly used -- formerly located, excuse me, at the

23  Fontana facility?

24  A    None.

25  Q    Mr. Glackin, what communication did you have with

Exhibit 1(c)
305



1    representatives of Universal Logistics Holding regarding

2    equipment formerly used at the Fontana facility?

3         MR. DO:  Objection.  Asked and answered.

4         JUDGE ROSAS:  It's not the same question?

5         MR. ADLONG:  That is not the same question.

6         JUDGE ROSAS:  Okay, I'll allow it.

7    A    None.

8    Q    BY MR. ADLONG:  All right.  Mr. Glackin, what

9    communications did you have with representatives of Universal

10   Logistics Holding regarding equipment formerly maintained at

11   the Compton location?

12   A    None.

13   Q    Mr. Glackin, what communications did you have with

14   representatives regarding Universal Logistics Holding regarding

15   equipment formerly maintained at the Fontana facility?

16   A    None.

17   Q    Mr. Glackin, for the time period of January 1, 2019 to the

18   current date, what communications did you have with

19   representatives of Universal Logistics Holding regarding the

20   relocation of work formerly performed by employee drivers at

21   the Compton location?

22   A    None.

23   Q    Mr. Glackin, for the time period from January 1, 2019 to

24   the current date, what communications did you have with

25   representatives of Universal Logistics Holding regarding the

Exhibit 1(c)
306



www.escribers.net | 800-257-0885

1    relocation of work formerly performed by employee drivers at

2    the Fontana fa -- facility?

3    A    None.

4    Q    Mr. Glackin, for the time period from January 1, 2019 to

5    the current date, what communications did you have with the

6    Universal Logistics Holding representatives regarding the

7    relocation of work formerly performed by owner-operators at the

8    Compton facility?

9    A    None.

10   Q    BY MR. ADLONG:  Mr. Glackin, for the time period from

11   January 1, 2019 to the current date, what communications did

12   you have with Universal Logistics Holding representatives

13   regarding the relocation of work formerly performed by owner-

14   operators at the Compton facility?

15       MR. DO:  Objection.  Asked and answered.  I believe you

16   meant Fontana --

17       MR. ADLONG:  (Indiscernible, simultaneous speech) --

18       MR. DO:  -- but that one is.

19       MR. ADLONG:  Strike that.  I'll just ask it again so the

20   record's clear.

21   Q    BY MR. ADLONG:  For the time period from January 1, 2019

22   to the current date, what communications did you have with

23   Universal Logistics Holdings regarding --

24       MR. ADLONG:  Strike that.  I'll do it again.

25   Q    BY MR. ADLONG:  For the time period from January 1, 2019,

Exhibit 1(c)
307



1    to the current date, what documents --

2        MR. ADLONG:  Strike.  Excuse me.

3    Q    BY MR. ADLONG:  For -- for the time period from January 1,

4    2019 to the current date, what communications did you have with

5    representatives of Universal Logistics Holding regarding the

6    relocation of work formerly performed by owner-operators at the

7    Fontana facility?

8    A    None.

9    Q    Mr. Glackin, for the time period from January 1, 2019 to

10   the current date, what communications did you have with

11   representatives of Universal Logistics Holding regarding the

12   termination of contracted work formerly performed by employee

13   drivers at the Compton facility?

14   A    None.

15   Q    Mr. Glackin, from January 1, 2019 to the current date,

16   what communications did you have with representatives of

17   Universal Logistics Holding regarding the termination of

18   contracted work formerly performed by drivers at the Fontana

19   facility?

20   A    None.

21   Q    For the time period from January 1, 2019 to the current

22   date, what communication did you have with representatives of

23   Universal Logistics Holding regarding the termination of

24   contracted work by employee drivers at the Compton facility?

25       MR. DO:  Objection.  Asked and answered.

Exhibit 1(c)
308



1       JUDGE ROSAS:  Sustained.

2   Q    BY MR. ADLONG:  The jan -- for the time period from

3   January 1, 2019 to the current date, what communications did

4   you have with representatives of Universal Logistics Holding

5   regarding the termination of contracted work formerly performed

6   by owner-operators at the Compton facility?

7   A    None.

8   Q    For the time period from January 1, 2019 to the current

9   date, what communications did you have with representatives of

10  Universal Logistics Holding regarding the termination of

11  contracted work performed by owner-operators at the Compton

12  fac -- at the Fontana --

13      MR. DO:  Objection.

14  Q    BY MR. ADLONG:  -- facility?

15      MR. DO:  I withdraw my objection.

16  A    None.

17      MR. ADLONG:  Yeah, let's clean up the record because we

18  got a lot of extra superfluous stuff.

19  Q    BY MR. ADLONG:  From the jan -- from the -- from January

20  1, 2019 to the current date, what communications did you have

21  with representatives of Universal Logistics Holding regarding

22  the termination of contracted work performed by owner-operators

23  at the Fontana facility?

24  A    None.

25  Q    BY MR. ADLONG:  For the time period from January 1, 2019

Exhibit 1(c)
309



1    to the current date, what communications did you have with

2    representatives of Universal Logistics Holdings regarding the

3    subcontracting of work formerly performed by employee drivers

4    at the Compton facility?

5    A    None.

6    Q    For the time period from January 1, 2019 to the current

7    date, what communications did you have with representatives of

8    Universal Logistics Holding regarding the subcontracting of

9    work formerly performed by employee drivers at the Fontana

10   facility?

11   A    None.

12   Q    For the time period from January 1, 2019 to the current

13   date, what communications did you have with representatives of

14   Universal Logistics Holding regarding the subcontracting of

15   work formerly performed by owner-operators at the Compton

16   facility?

17   A    None.

18   Q    For the time period of January 1, 2019 to the current

19   date, what communications did you have with representatives of

20   Universal Logistics Holding regarding the subcontracting of

21   work formerly performed by owner-operators at the Fontana

22   facility?

23   A    None.

24   Q    In late ju -- in late 2019 -- hold on.

25        MR. ADLONG:  Strike that.

Exhibit 1(c)
310



1   Q    BY MR. ADLONG:   In late 2019, what communications did you

2   have with any clients of Universal Logistics Holding regarding

3   Universal Logistics Holding closure of the Compton facility?

4   A    None.

5   Q    In late 2019, what communications did you have with

6   clients of Universal Logistics Holding regarding Universal

7   Logistics Holding alleged changes to the facility that would

8   service Universal Logistics Holdings' clients' freight?

9   A    None.

10   Q    In late 2019, what communication did you have with clients

11   of Universal Logistics Holding regarding alleged changes to

12   drivers who would service the clients of Universal Logistics

13   Holding?

14   A    None.

15   Q    For the time period from January 1, 2019 until January

16   2020, what communications did you have with representatives of

17   Universal Logistics Holding regarding the decision to close the

18   Compton facility?

19   A    None.

20   Q    From January 1, 2019 to January 2020, what communications

21   did you have with representatives of Universal Logistics

22   Holding regarding the actual closure of the Compton facility?

23   A    None.

24   Q    From January 1, 2019 till January 2020, what communication

25   did you have with representatives of Universal Logistics

Exhibit 1(c)
311



www.escribers.net | 800-257-0885

1    Holding regarding finalizing the decision to close the Compton

2    facility?

3    A    None.

4    Q    From January 1, 2019 till January 2020, what

5    communications did you have with representatives of Universal

6    Logistics Holdings regarding the search for alternative

7    facilities for potential relocation from Compton?

8    A    None.

9    Q    In December 2019, what communications did you have with

10   representatives of Universal Logistics Holding regarding the

11   decision to lay off employee drivers that worked at the Compton

12   facility?

13   A    None.

14   Q    From January 1, 2019 -- excuse me.  For the time period of

15   December 2019, what communications did you have with

16   representatives of Universal Logistics Holding regarding the

17   decisua -- decision to lay off employees who worked at the

18   Fontana facility?

19   A    None.

20   Q    For December 2009 -- during December 2019, what

21   communications did you have with representatives of Universal

22   Logistics Holding regarding the decision to lay off employees

23   who worked at the facility located at 1127 (sic) Calabash

24   Avenue, Fontana?

25   A    None.

Exhibit 1(c)
312


www.escribers.net | 800-257-0885

1    Q    For the time period of January 1, 2019 to December 31,

2    2019, what communications did you have with representatives of

3    Universal Logistics Holding regarding employee drivers who

4    worked at the fon -- at the Comp --

5         MR. ADLONG:  Strike that.  I'm kind of a mess.

6    Q    BY MR. ADLONG:  For the time period of January 1, 2019 to

7    December 31, 2019, what communications did you have with

8    representatives at Universal Logistics Holding regarding

9    employee drivers who worked at the Compton facility and

10   Universal Logistics Holdings' alleged lease expiring at the

11   Compton facility?

12   A    None.

13   Q    For the time period of January 1, 2019 to December 31,

14   2019, what communications did you have with employee drivers

15   who worked at the Fontana facility regarding Universal

16   Logistics Holdings' lease -- alleged lease expiring at the

17   Compton facility?

18   A    None.

19   Q    For the time period from January 1, 2019 to December 31,

20   2019, what communications did you have with representatives of

21   Universal Logistics Holding --

22        MR. ADLONG:  Strike that.  Excuse me.

23   Q    BY MR. ADLONG:  For the time period from January 1, 2019

24   to December 31, 2019, what communications did you have with

25   employee drivers who worked at the Compton facility regarding

Exhibit 1(c)
313



www.escribers.net | 800-257-0885

1    the decision to lay off employees at the -- employee drivers at

2    the Compton facility?

3    A    None.

4    Q    For the time period from January 1, 2019 to December 31,

5    2019, what communications did you have with employee drivers

6    who worked at the Compton facility regarding the decision to

7    lay off employee drivers who worked at the Fontana facility?

8    A    None.

9    Q    For the time period from January 1, 2019 to December 31,

10    2019, what communications did you have with employee drivers

11    who worked at the Compton facility regarding the decision to

12    lay off employee drivers at 11272 Calabash Avenue in Fontana?

13    A    None.

14    Q    For the time period from January 1, 2019 to December 31,

15    2019, what communications did you have with employee drivers

16    who worked at the Fontana facility regarding the decision to

17    lay off employee drivers at the Compton facility?

18    A    None.

19    Q    For the time period from January 1, 2019 to December 31,

20    2019, what communications did you have with employee drivers at

21    the Fontana facility regarding the decision to lay off employee

22    drivers at the Fontana facility?

23    A    None.

24    Q    From January 1, 2019 to December 31, 2019, what

25    communications did you have with employee drivers working at

Exhibit 1(c)
314



1    the Fontana facility regarding the decision to lay off employee

2    drivers that worked at 11272 Calabash Avenue in Fontana?

3    A    None.

4    Q    For the time period from January 1, 2019 to December 31,

5    2019, what communication did you have with employee drivers who

6    worked at the 11272 Calabash Avenue facility regarding the

7    decision to lay off employee drivers at the Compton facility?

8    A    None.

9    Q    From January 1, 2019 to December 31, 2019, what

10   communication did you have with employee drivers who worked at

11   11272 Calabash Avenue regarding the decision to lay off

12   employees who worked at the Fontana facility?

13   A    None.

14   Q    From January 1, 2019 to December 31, 2019, what

15   communications did you have with drivers who worked at the

16   11272 Calabash facility in Fontana regarding the decision to

17   lay off employee drivers who worked at the facility located at

18   11272 Calabash Avenue in Fontana?

19   A    None.

20   Q    Thank you.  Did you ever have communications with

21   representatives of Universal Logistics Holding and employee

22   drivers together who worked at the Compton facility regarding

23   the decision to lay off employee drivers who worked at the

24   Compton facility?

25   A    No.

Exhibit 1(c)
315



1    Q    Did you ever have communications with representatives of

2    Universal Logistics Holding and employee drivers who worked at

3    the Compton facility regarding the decision to lay off employee

4    drivers that worked at the Fontana facility?

5    A    No.

6    Q    Did you ever have communications with employees --

7         MR. ADLONG:   Strike that.

8    Q    BY MR. ADLONG:   Did you ever have communications with

9    representatives of Universal Logistics Holding and employee

10   drivers who worked at the Fontana facility -- excuse me -- at

11   the Compton facility regarding the decision to lay off employee

12   drivers that worked at 11272 Calabash Avenue?

13   A    No.

14   Q    Did you ever have communications between representatives

15   of Universal Logistics Holding and employee drivers who worked

16   at the Fontana facility regarding the decision to lay off

17   employees who worked at the Compton facility?

18   A    No.

19   Q    For the time period from January 1, 2019 to December 31,

20   2019, did you ever have communications with Universal Logistics

21   Holding and employee drivers who worked at the Fontana facility

22   regarding the decision to lay off employee drivers that worked

23   at the Compton facility?

24        MR. DO:   Objection.   Asked and answered.

25        JUDGE ROSAS:   Sustained.

Exhibit 1(c)
316



www.escribers.net | 800-257-0885

1    Q    BY MR. ADLONG:  For the time period from January 1, 2019

2    to December 31, 2019, what communications did you have with

3    Universal Logistics Holding representatives and employee

4    drivers employed at the 11272 Calabash Avenue facility in

5    Fontana to lay off -- regarding the decision to lay off

6    employee drivers who worked at the Compton facility?

7    A    None.

8    Q    For the time period from January 1, 2019 to December 31,

9    2019, what communications did you have with representatives of

10   Universal Logistics Holding and employee drivers at the 11272

11   Calabash Avenue regarding the decision to lay off employee

12   drivers at the Fontana facility?

13   A    None.

14   Q    For jan -- from January 1, 2019 to December 31, 2019, what

15   communication did you have with employee drivers who worked at

16   11272 Calabash Avenue regarding the decision to lay off

17   employee drivers who worked at 11272 Calabash Avenue in

18   Fontana?

19   A    None.

20   Q    From January 1, 2019 to December 31, 2019, what

21   communication did you have with employee drivers who worked at

22   11272 Calabash Avenue regarding the decision to lay off

23   employee drivers who worked at 11272 Calabash Avenue in

24   Fontana?

25   Q    Thank you.  Have you ever heard of the term "franco

Exhibit 1(c)
317



www.escribers.net | 800-257-0885

1    storage yard" (phonetic)?

2    A    No.

3        MR. ADLONG:  Ms. Bridge, can you please put up Joint

4    Exhibit 18(c)?

5    Q    BY MR. ADLONG:  Do you recognize this document, Mr.

6    Glackin?

7    A    Yes.

8    Q    What is this document?

9    A    A hearing subpoena for Roadrunner Intermodal Services.

10        MR. ADLONG:  All right, Mr. Glackin.  Ms. Bridge, can you

11    please put this to page 855 so we can start seeing paragraph 3,

12    please?  Thank you.

13    Q    BY MR. ADLONG:  Mr. Glackin, what role do you play in

14    negotiating interline agreements for Roadrunner Intermodal

15    Services?

16        MR. DO:  Objection.  Relevance.

17        JUDGE ROSAS:  Repeat the question?

18        MR. ADLONG:  What role do you play in negotiating

19    interline agreements for Roadrunner Intermodal Services?

20        I guess I don't understand the --

21        JUDGE ROSAS:  What's the relevance, Counsel?

22        MR. ADLONG:  This is easy.  They've asked Mr. Glackin

23    questions during his examination that go to his position and

24    authority in a bid to prove up their single employer

25    allegation, so this goes to his authority within the different

Exhibit 1(c)
318



1    organizations to rebut any allegations of single employer

2    status.

3        JUDGE ROSAS:  Talking about what he does?

4        MR. ADLONG:  Yes.

5        MR. DO:  Your Honor, our -- our question on direct was

6    regarding the production of documents, not necessarily his

7    individual role in negotiating these --

8        JUDGE ROSAS:  I'll tell --

9        MR. DO:  -- agreements.

10       JUDGE ROSAS:  -- you what I'll do.  I'll let you ask a

11   global question, okay?  Who -- who does he have any role in

12   negotiating -- you said negotiating contracts?

13       MR. ADLONG:  Yeah, we -- Your Honor, I'm asking -- I think

14   that's going to actually make it take longer than just ask the

15   one question about Roadrunner Intermodal.

16       JUDGE ROSAS:  Okay, I'll allow it.  See where it goes.

17   Q    BY MR. ADLONG:  Mr. Glackin, what role do you have in

18   negotiating interline agreements for Roadrunner Intermodal

19   Services?

20   A    I have no role.

21   Q    Mr. Glackin, what role do you have in negotiating

22   contracts for Roadrunner Intermodal Services?

23   A    I have no role.

24   Q    Mr. Glackin, what role do you have in determining the

25   geographic operations of Roadrunner Intermodal Services?

Exhibit 1(c)
319



```
 1        MR. DO:  Objection.  Relevance.

 2        MR. ADLONG:  This goes to the same point, Your Honor.

 3        JUDGE ROSAS:  Okay.  Overruled.

 4   A    I have no role.

 5   Q    BY MR. ADLONG:  What role do you have in determining the

 6   geographic operations of Universal Intermodal Services?

 7   A    I have no role.

 8   Q    What role do you have in determining the gerry --

 9   geographic operations of Universal Logistics Holding?

10   A    I have no role.

11   Q    What role do you have in determining the management

12   structure of Roadrunner Intermodal Services?

13   A    I have no role.

14   Q    What role do you have in determining the management

15   structure of Universal Intermodal Services?

16   A    I have no role.

17   Q    What role do you have in determining the management

18   structure of Universal Logistics Holding?

19   A    I have no role.

20   Q    For the time period from January 1, 2019 to the current

21   date, what communications did you have with representatives of

22   Roadrunner Intermodal Services regarding the relocation of work

23   formerly performed by employee drivers of Roadrunner Intermodal

24   Services located at 11272 Calabash Avenue in Fontana?

25   A    None.
```

Exhibit 1(c)
320



www.escribers.net | 800-257-0885

1   Q    For the time period from January 1, 2019 to the current

2   date, what documents do you have --

3        MR. ADLONG:  Excuse me.  Strike that.

4   Q    BY MR. ADLONG:  For the time period from January 1, 2019

5   to the current date, what communications do you have --

6        MR. ADLONG:  Again, strike that again.  I apologize.

7   Q    BY MR. ADLONG:  For the time period from January 1, 2019

8   to the current date, what communications did you have with

9   representatives of Roadrunner Intermodal Services regarding the

10  relocation of work formerly performed by employee drivers at

11  Roadrunner Intermodal Services' location at 11272 Calabash

12  Avenue in Fontana?

13  A    None.

14  Q    For the time period from January 1, 2019 to the current

15  date, what communications did you have with representatives of

16  Roadrunner Intermodal Services regarding the termination of

17  contracted work performed by employee drivers at Roadrunner

18  Intermodal Services' location at 11272 Calabash Avenue?

19  A    None.

20       MR. KUNTZ:  Can I interrupt for one second?  It's going to

21  shut off.  Sorry about that.  Our screen was about to shut off.

22  Q    BY MR. ADLONG:  For the time period from January 1, 2019

23  to the current date, what communications did you have with

24  Roadrunner Intermodal Services representatives regarding the

25  termination of contracted work performed by owner-operators at

Exhibit 1(c)
321


www.escribers.net | 800-257-0885

1    Roadrunner Intermodal Services' facility located at 11272

2    Calabash Avenue?

3    A     None.

4    Q     For the time period from January 1, 2019 to the current

5    date, what communications did you have with representatives of

6    Roadrunner Intermodal Services regarding the subcontracting of

7    work formerly performed by employee drivers at Roadrunner

8    Intermodal Services' facility located at 11272 Calabash Avenue

9    in Fontana.

10    A     None.

11    Q     For the time period from January 1, 2019 to the current

12    date, what communications did you have with representatives of

13    Roadrunner Intermodal Services regarding the subcontracting of

14    work formerly performed by owner-operators at Roadrunner

15    Intermodal Services' facility located at 11272 Calabash Avenue,

16    Fontana, California?

17    A     None.

18    Q     For the time period from January 1, 2019 to the current

19    date, what communications did you have --

20          MR. ADLONG:  Okay.  Strike that.  Excuse me.

21    Q     BY MR. ADLONG:  From January 1, 2019 to the current date,

22    what communications did you have with clients of Roadrunner

23    Intermodal Services regarding the relocation of work formerly

24    performed by employees who worked at the facility located at

25    11272 Calabash Avenue in Fontana?

Exhibit 1(c)
322



www.escribers.net | 800-257-0885

1    A    None.

2    Q    For the time period from January 1, 2019 to the current

3    date, what communications did you have with clients of

4    Roadrunner Intermodal Services regarding the relocation of work

5    formerly performed by owner-operators who worked at the

6    facility located at 11272 Calabash Avenue in Fontana?

7    A    None.

8    Q    For the time period -- for the time period from January 1,

9    2019 to the current date, what communications did you have with

10   clients of Roadrunner Intermodal Services regarding the

11   termination of contracted work formerly performed by employee

12   drivers who worked at the facility located at 11272 Calabash

13   Avenue in Fontana?

14        MR. DO:  Objection.  Asked and answered.

15        JUDGE ROSAS:  Sustained.

16        MR. ADLONG:  Excuse me.  I'm sorry about that.

17   Q    BY MR. ADLONG:  For the time period from January 1, 2019

18   to the current date, what communications did you have with

19   representatives --

20        MR. ADLONG:  Strike that.  Excuse me.

21   Q    BY MR. ADLONG:  For the time period from January 1, 2019

22   to the current date, what communication did you have with

23   clients of Roadrunner Intermodal Services regarding the

24   termination of contracted work formerly performed by owner

25   operators who worked at the facility located at 1112 -- 11272

Exhibit 1(c)
323



1    Calabash Avenue in Fontana?

2    A    None.

3    Q    The time period from January 1, 2019 to the current day,

4    what communications did you have with clients of Roadrunner

5    Intermodal Services regarding the subcontracting of work

6    formerly performed by employee drivers who worked at the

7    facility located at 11272 Calabash Avenue in Fontana?

8    A    None.

9    Q    For the time period from January 1, 2019 to the current

10   date, what communications did you have with clients of

11   Roadrunner Intermodal Services regarding the subcontracting of

12   work formerly performed by owner operators who worked at the

13   facility located at 11272 Calabash in Fontana?

14   A    None.

15   Q    November 1, 2019 to December 31, 2019, what communications

16   did you have with representatives of Roadrunner Intermodal

17   Services regarding its decision to lay off drivers who worked

18   at the facility located at 11272 Calabash Avenue in Fontana?

19   A    None.

20   Q    What role did you play in determining the reason for

21   laying off employee drivers in December 2019, who worked at the

22   facility located at 11272 Calabash Avenue in Fontana?

23   A    I played no role.

24   Q    From June 1, 2019 to December 31, 2019, what role did you

25   play in the decision to alleged (audio interference) to shift

Exhibit 1(c)
324



1    operations at the facility located at 11272 Calabash Avenue in

2    Fontana from a mixed employee driver model to an owner-operator

3    model, exclusively?

4    A    I played no role.

5    Q    What communications did you have with employee drivers who

6    worked at the facility located at 11 -- okay.

7         MR. ADLONG:  Strike that.

8    Q    BY MR. ADLONG:  From January 1, 2019 to December 31, 2019,

9    what communications did you have with employee drivers of

10   Roadrunner Intermodal Services who worked at the facility

11   located at 11272 Calabash Avenue in Fontana regarding the

12   decision to lay off employee drivers who worked for Roadrunner

13   Intermodal Services --

14        MR. DO:  Objection.  Asked and answered.

15        JUDGE ROSAS:  Sustained.

16        MR. ADLONG:  Your Honor, I may have asked similar

17   questions, but I haven't asked specific questions about

18   Roadrunner Intermodal Services drivers and communications with

19   him.

20        JUDGE ROSAS:  You just asked a whole slew of them.

21        MR. ADLONG:  I didn't ask about the --

22        JUDGE ROSAS:  Roadrunner?

23        MR. ADLONG:  Yeah, about -- let's see.  I didn't ask

24   anything about the communication with Mr. Glackin and employee

25   drivers of Roadrunner Intermodal Services and the decision to

Exhibit 1(c)
325



1    lay those runners -- Roadrunner Intermodal Services drivers

2    off.

3         JUDGE ROSAS:  Go ahead.

4    Q    BY MR. DO:  Mr. Glackin, what communication did you have

5    with drivers employed by Roadrunner --

6         MR. ADLONG:  Strike that.

7    Q    BY MR. ADLONG:  Mr. Glackin, what communication did you

8    have with employee drivers employed by Roadrunner Intermodal

9    Services at 11272 Calabash Avenue regarding the decision to lay

10   off the Roadrunner Intermodal Services employee drivers working

11   at 11272 Calabash Avenue?

12   A    None.

13        MR. ADLONG:  Your Honor, do you mind if we take a ten-

14   minute break here, so I can kind of, like, get my bearings and

15   quit doing the strike this-and-that and make sure I can follow

16   where I'm at to facilitate this process?

17        JUDGE ROSAS:  We'll resume at 2:52 Pacific time.

18        Off the record.

19   (Off the record at 2:42 p.m.)

20        JUDGE ROSAS:   All right.  Back on the record.

21        MR. ADLONG:  Ms. Bridge, can you please pull up Joint

22   Exhibit D?

23        MS. BRIDGE:  Counsel, could you repeat that for me,

24   please?

25        MR. ADLONG:  Yes, ma'am.  Joint Exhibit D, as in Dinosaur.

Exhibit 1(c)
326



www.escribers.net | 800-257-0885

1      MR. DO:  Mr. Adlong, I think you're going to need to

2   identify a number as well.

3      MR. ADLONG:  Oh, excuse me.  15.

4                  **RESUMED CROSS-EXAMINATION**

5   Q    BY MR. ADLONG:  All right.  Mr. Glackin do you recognize

6   this document?

7   A    Yes.

8   Q    What is this document?

9   A    Hearing subpoena for Universal Management Services.

10     MR. ADLONG:  Ms. Bridge, could you please turn this to

11   page 815 and show us paragraph 3, please?  Thank you, Ms.

12   Bridge.

13   Q    BY MR. ADLONG:  Mr. Glackin, what communications did --

14   for the time period from January 1, 2019 to December, 31 2019,

15   what communications -- hold on.

16     MR. ADLONG:  Strike that.

17   Q    BY MR. ADLONG:  All right.  For the time period for

18   January 1, 2019 to December 31, 2019, what communications did

19   you have with other representatives of Universal Management

20   Services regarding the relocation of equipment formerly kept at

21   the Compton facility?

22   A    None.

23   Q    For the time period from January 1, 2019 to December 31,

24   2019, what communications did you have with other Universal

25   Management Services representatives regarding the relocation of

Exhibit 1(c)
327



www.escribers.net | 800-257-0885

1    equipment formerly used at the Compton facility

2    A    None.

3    Q    From January 1, 2019 to December 31, 2019, what

4    communication did you have with other representatives of

5    Universal Management Services regarding the relocation of

6    equipment formerly located at the Fontana facility?

7    A    None.

8    Q    For the time period of January 1, 2019 to December 31,

9    2019, what communications did you have with other

10   representatives of Universal Management Services regarding

11   equipment formerly used at the Fontana facility?

12   A    None.

13   Q    For the time period from January 1, 2019 to December 31,

14   2019, what communications did you have with other

15   representatives of Universal Management Services regarding the

16   sale of equipment formerly located at the Compton facility?

17   A    None.

18   Q    For the time period from January 1, 2019, to December 31,

19   2019, what communication did you have with other

20   representatives of Universal Management Services regarding

21   equipment formerly used at the Compton facility?

22        MR. DO:  Objection.  Asked and answered.

23        JUDGE ROSAS:  Sustained.

24   Q    BY MR. ADLONG:  For the time period from January 1, 2019

25   to December 31, 2019, what communications did you have with

Exhibit 1(c)
328



1       other representatives of Universal Management Services

2       regarding the sale of equipment formerly used at the Compton

3       facility?

4              MR. DO:  Objection.  Asked and answered.

5              JUDGE ROSAS:  Sustained.

6       Q    BY MR. ADLONG:  From the time period of January 1, 2019 to

7       December 31, 2019, what communications did you have with other

8       Universal Management Services representatives regarding

9       equipment -- regarding equipment formerly located at the

10      Compton facility?

11             MR. DO:  Objection.  Asked and answered.

12             I believe you're missing words there, Mr. Adlong.  But

13      asked and answered.

14             JUDGE ROSAS:  What's that, Counsel?

15             MR. DO:  I said that I think Mr. Adlong may be skipping

16      words when he's stating his question, which is why it's coming

17      up as the same question.  But I'm objecting on asked and

18      answered.

19             JUDGE ROSAS:  Sustained

20      Q    BY MR. ADLONG:  All right.  All right.  Well, let's try

21      again.  We'll just keep on trying.  For commun -- for January

22      1, 2019 to December 31, 2019, what communications did you have

23      with repre -- with other representatives of Universal

24      Management Services regarding the sale of equipment formally

25      located at Compton?

Exhibit 1(c)
329



1    A    None.

2    Q    For the time period, from January 1, 2019 to December 31,

3    2019, what communication did you have with other

4    representatives of Universal Management Services regarding the

5    sale of equipment formerly used at Compton?

6        MR. DO:  Objection.  Asked and answered.

7        JUDGE ROSAS:  How's that different?

8        MR. ADLONG:  Ones located and one's used.

9        MR. DO:  And I believe the used has actually already been

10   asked about six questions ago.

11       JUDGE ROSAS:  Killing me here.

12       MR. ADLONG:  Yeah.

13       JUDGE ROSAS:  I'll allow it.

14       MR. ADLONG:  Yeah.

15   A    None.

16       MR. ADLONG:  Killing us both.

17   Q    BY MR. ADLONG:  So from January 1, 2019 to December 31,

18   2019, what communications did you have with representatives

19   with other -- excuse me, from January 1, 2019 to December 31,

20   2019 what communications did you have with other

21   representatives of Universal Management Services about the

22   lease of equipment formerly located at the Compton facility?

23   A    None.

24   Q    For January 1, 2019 to December 31, 2019, what

25   communications did you have with other representatives of

Exhibit 1(c)
330



www.escribers.net | 800-257-0885

1    Universal Management Services regarding the sale of equipment

2    formerly located at the Fontana facility?

3    A     None.

4    Q     For January 1, 2019 to December 31, 2019, what

5    communication did you have with other representatives of

6    Universal Management Services regarding the sale of equipment

7    formerly used at the Fontana facility?

8    A     None.

9    Q     For January 1, 2019 to December 31, 2019, what

10   communications did you have with represent -- with other

11   representatives of Universal Management Services regarding the

12   lease of equipment formerly used at the Compton facility?

13         MR. DO:  Objection.  Asked and answered.

14   A     None.

15         JUDGE ROSAS:  I'm not sure.  I'll allow it.

16   A     None.

17   Q     BY MR. ADLONG:  For the time period of January 1, 2019 to

18   December 31, 2019, what communications did you have with other

19   representatives of Universal Management Services regarding the

20   lease of equipment formerly located at the Fontana facility?

21   A     None.

22   Q     From January 1, 2019 for December 31, 2019, what

23   communications did you have with other representatives of

24   Universal Management Services regarding the release of

25   equipment formerly used that the Fontana facility?

Exhibit 1(c)
331



www.escribers.net | 800-257-0885

1    A    None.

2    Q    From January 1, 2019 to December 31, 2019, what

3    communications did you have with other representatives of

4    Universal Management Services regarding equipment formerly

5    maintained at the Compton facility?

6    A    None.

7    Q    From January 1, 2019 to December 31, 2019, what

8    communications did you have with other representatives of

9    Universal Management Services regarding equipment formerly

10   maintained at the Fontana facility?

11   A    None.

12   Q    From the time period of January 2019 to the current day,

13   what communications do you have with other representatives --

14        MR. ADLONG:  Strike that.

15   Q    BY MR. ADLONG:  What communications did you have with

16   clients of Universal Management Services in late 2019 regarding

17   the closure of Uni -- of the alleged Universal Management

18   Service location in Compton?

19   A    None.

20   Q    What communications did you have with clients of Universal

21   Management Services in late 2019 regarding changes to the

22   drivers who would service alleged Universal Management Service

23   contracts?

24   A    None.

25   Q    What communications did you have with Universal Management

Exhibit 1(c)
332



www.escribers.net | 800-257-0885

1    Service clients in late 2019 regarding the changes to the

2    facility where the freight of alleged Universal Management

3    Service clients would be serviced?

4         MR. DO:  Objection.  Vague.

5         JUDGE ROSAS:  Agreed.  Sustained.

6    Q    BY MR. ADLONG:  What communications did you have to

7    Universal Management Service clients in late 2019 regarding

8    changes to the facility that would service the Universal

9    Management -- Universal Management Service contracts with

10   Universal Management Services?

11        MR. DO:  Objection.  Vague.

12        JUDGE ROSAS:  I need you to repeat that question.  I kind

13   of lost it at the end.

14        MR. ADLONG:  What communications did you have with

15   Universal Management Services in late 2019 regarding changes to

16   the facility that would service the universal management -- the

17   alleged Universal Management Service contracts between the

18   clients and Universal Management Services?

19        JUDGE ROSAS:  So you're asking about his communications,

20   but you're ending it with communications between the clients

21   and Universal Management Services; is that what you're asking?

22        MR. ADLONG:  No.  I'm asking if communication with clients

23   regarding changes to the facility that would service the

24   freight between Universal Management Services and the client --

25        JUDGE ROSAS:  End it there.  Hold on.  That would

Exhibit 1(c)
333



www.escribers.net | 800-257-0885

1    service -- service who?

2        MR. ADLONG:  The freight that Universal Management Service

3    allegedly moves for the client.

4        JUDGE ROSAS:  Okay.  Answer that question.

5    A    None.

6    Q    BY MR. ADLONG:  What communications did you have -- from

7    January 1, 2019 to December 31, 2019, what communications did

8    you have with other representatives of Universal Management

9    Services --

10       MR. ADLONG:  Strike that.  We're just going to move on.

11   Okay.

12       Ms. Bridge, can you please pull up Joint Exhibit 16 --

13   Joint Exhibit 16(c), please?

14       MR. ADLONG:  Do you recognize this document, Mr. Glackin?

15   A    Yes.

16   Q    BY MR. ADLONG:  What is this document?

17   A    A hearing subpoena for Southern Counties Express.

18       MR. ADLONG:  Ms. Bridge, can you please turn it to

19   paragraph 4, please?

20   Q    BY MR. ADLONG:  First off, Mr. Glackin, what

21   responsibility do you have for determining the management

22   structure of SCE?

23   A    I have no responsibility.

24   Q    And what responsibility do you have for determining the

25   geographic operations of SCE?

Exhibit 1(c)
334



www.escribers.net | 800-257-0885

```
 1   A    I have no responsibility.

 2   Q    What responsibility do you have for negotiating an

 3   interline agreement for SCE?

 4   A    I have no responsibility.

 5   Q    What responsibility do you have for negotiating contracts

 6   for SCE?

 7   A    I have no responsibility.

 8   Q    What responsibility for enforcing interline agreements

 9   with S -- for SCE?

10   A    I have no responsibility.

11   Q    And what responsibility you have for enforcing contracts

12   for SCE?

13        MR. DO:  Objection.  Asked and answered.

14        JUDGE ROSAS:  Sustained.

15   Q    BY MR. ADLONG:  For the time period from January 1, 2019

16   to December 31, 2019, what communications did you have with

17   representatives of SCE regarding the reassignment --

18        MR. ADLONG:  Strike that.

19   Q    BY MR. ADLONG:  From January 1, 2019 to December 31, 2019,

20   what communications did you have with representatives of SCE

21   regarding the alleged reassignment of work formerly performed

22   by employees of Universal Intermodal?

23   A    None.

24   Q    For the time period from January 1, 2019 to December 31,

25   2019, what communications did you have with representatives of
```

Exhibit 1(c)
335



1    SCE regarding the alleged reassignment of work formerly

2    performed by employee drivers of Universal Truckload?

3    A    None.

4    Q    From the time period from January 1, 2019 to the current

5    date, what communications did you have with representatives of

6    SCE regarding the alleged reassignment of work formerly

7    performed by employee drivers at Roadrunner Intermodal

8    Services?

9    A    None.

10   Q    For the time period from January 1, 2019 to the current

11   date, what communications did you have with representatives of

12   SCE regarding the assumption of work formerly performed by

13   employee drivers at Universal Intermodal?

14   A    None.

15   Q    For the time period from January 1, 2019 to the current

16   date, what communications did you have with representatives of

17   SCE regarding the assumption of work formerly performed by

18   employee drivers at Universal Truckload?

19   A    None.

20   Q    For the time period of January 1, 2019 to the current

21   date, what communications did you have with representatives of

22   SCE regarding the assumption of work of employee drivers at

23   Roadrunner Intermodal Services?

24   A    None.

25   Q    Okay.  For the time period from January 1, 2019 to the



1   current date, what communications did you have with

2   representatives of --

3       MR. ADLONG:  Strike that.

4   Q   BY MR. ADLONG:  From January 1, 2019 to the current date,

5   what communications did you have with clients of SCE regarding

6   the assumption of work formerly performed by employee drivers

7   of Universal Intermodal Services?

8   A    None.

9       Q    For the time period from January 30, 20- --

10      MR. ADLONG:  Strike that.

11  Q    BY MR. ADLONG:  From the time period from January 1, 2019

12  to the current date, what communications did you have with

13  clients of SCE regarding the assumption of work formerly

14  performed by Universal Truckload drivers?

15  A    None.

16  Q   For the time period from January 1, 2019 to the current

17  date, what communications did you have with clients of SCE

18  regarding the assumption of work of employee drivers of

19  Roadrunner Intermodal Services?

20  A    None.

21  Q   For the time period from January 1, 2019 to the current

22  date, what communications did you have with clients of SCE

23  regarding the relocation of work formerly performed by employee

24  drivers of Universal Intermodal Services?

25  A    None.

Exhibit 1(c)
337



www.escribers.net | 800-257-0885

1    Q    For the time period from January 1, 2019 to the current

2    date, what communications did you have with clients of SCE

3    regarding the relocation of work of employee drivers of

4    Universal Truckload?

5    A    None.

6    Q    For the time period from January 1, 2019 to the current

7    date, what communications did you have with SCE clients

8    regarding the relocation of work formerly performed by employee

9    drivers of Roadrunner Intermodal Services?

10   A    None.

11   Q    For the time period from January 1, 2019 to the current

12   date, what communications did you have with clients of SCE

13   regarding the termination of contracted work formerly performed

14   by employee drivers of Universal Intermodal Services?

15   A    None.

16   Q    For the time period from January 1, 2019 to the current

17   date, what communications did you have with SCE clients

18   regarding the termination of contracted work formerly performed

19   by employee drivers of Universal Truckload?

20   A    None.

21       Q    For the time period from January 1, 2019 to the

22   current date, what communications did you have with

23   Universal --

24       MR. ADLONG:  Strike that.

25       Q    BY MR. ADLONG:  From January 1, 2019 to the current

Exhibit 1(c)
338



1    date, what communications did you have with SCE clients

2    regarding the termination of contracted work formerly performed

3    by employee drivers of Roadrunner Intermodal Services?

4    A    None.

5    Q    For the time period from January 1, 2019 to the current

6    date, what communications did you have with SCE clients

7    regarding the subcontracting of work formerly performed by

8    employee drivers of Universal Intermodal Services?

9    A    None.

10    Q    For the time period from January 1, 2019 to the current

11    date, what communications did you have with clients of SCE

12    regarding the alleged subcontracting of work formerly performed

13    by employee drivers of Universal Truckload?

14    A    None.

15    Q    For the time period from January 1, 2019 to the current

16    date, what communications did you have with SCE clients

17    regarding the alleged subcontracting of work formerly performed

18    by employee drivers of Roadrunner Intermodal Services.

19    A    None.

20    Q    For the time period from January 1, 2019 to the current

21    date, what communications did you have with SCE dispatchers

22    regarding the assignment of work for employee drivers of

23    Universal Intermodal Services?

24    A    None.

25    Q    For the time period from January 1, 2019 to the current

Exhibit 1(c)
339



1   date, what communications did you have with dispatchers of SCE

2   regarding the assignment of work of owner-operators of

3   Universal Intermodal Services?

4   A    None.

5   Q    For the time period from January 1, 2019 to the current

6   date -- do you need to take a break?

7        For the time period from January 1, 2019 to the current

8   date, what communications did you with representatives -- with

9   SCE dispatchers regarding the assignment of work of employee

10  drivers for Universal Truckload?

11  A    None.

12  Q    For the time period from January 1, 2019 to the current

13  date, what communications did you have with SCE dispatchers

14  regarding the assignment of work of owner-operators of

15  Universal Truckload?

16  A    None.

17  Q    For the time period from January 1, 2019 to the current

18  date, what communications did you have with SCE dispatchers

19  regarding the assignment of work of owner-operators of

20  Universal Truckload?

21  A    None.

22  Q    From January 1, 2019 to the current date, what

23  communications did you have with SCE dispatchers regarding the

24  assignment of work of employee drivers of Roadrunner Intermodal

25  Services?

Exhibit 1(c)
340



www.escribers.net | 800-257-0885

```
 1    A      None.

 2    Q      From January 1, 2019 to the current date, what

 3    communications did you have with SCE drivers regarding the

 4    assignment of work of owner-operators of Roadrunner Intermodal

 5    Services?

 6    A      None.

 7    Q      For the time period between January 1, 2019 until the --

 8    until December 31, 2019, what communications did you have with

 9    SCE representatives about its termination of the lease at the

10    Compton Facility?

11    A      None.

12    Q      From January 1, 2019 to the current date, what

13    communications did you have with the landlord at the Compton

14    Facility about the termination of the lease at the Compton

15    Facility?

16           MR. DO:   That's been asked and answered.  He asked this

17    back when we were going through the Universal Intermodal

18    subpoena, Your Honor.

19           MR. ADLONG:   I was asked -- okay, I'll clean it up then.

20    I can ask again.

21           JUDGE ROSAS:   I'll allow it.  Go ahead.

22    A      None.

23           MR. ADLONG:   Ms. Bridge, can you please pull up Joint

24    Exhibit 17(c)?  Thank you, Ms. Bridge.

25    Q      BY MR. ADLONG:   Mr. Glackin, do you recognize this
```

Exhibit 1(c)
341



1  document?

2  A    Yes.

3  Q    What is this document?

4  A    The hearing subpoena for Universal Truckload.

5       MR. ADLONG:  Okay.  Ms. Bridge, could you please turn to

6  the documents to be produced section, it's page 842.  And show

7  us paragraph 3, please.  Thank you, Ms. Bridge.

8  Q    BY MR. ADLONG:  Mr. Glackin, what responsibility do you

9  have for the management structure of Universal Truckload?

10 A    No responsibility.

11 Q    Mr. Glackin, what responsibility do you have for

12 determining the geographic operations of Universal Truckload?

13 A    No responsibility.

14 Q    Mr. Glackin, what responsibility do you have for

15 negotiating interline agreements for Universal Truckload?

16 A    No responsibility.

17 Q    Mr. Glackin, what responsibility do you have for

18 negotiating contracts for Universal Truckload?

19 A    No responsibility.

20 Q    Mr. Glackin, what responsibility do you have for enforcing

21 interlines on behalf of the Universal Truckload?

22 A    No responsibility.

23 Q    Mr. Glackin, what responsibility do you have for enforcing

24 contracts of Universal Truckload?

25 A    No responsibility.

Exhibit 1(c)
342



www.escribers.net | 800-257-0885

1   Q    Mr. Glackin, for the time period from January 1, 2019 to

2   the current date, what communications did you have with

3   representatives of Universal Truckload regarding the relocation

4   of work formerly performed by employee drivers at the Fontana

5   facility?

6   A    None.

7   Q    For the time period from January 1, 2019 to the current

8   date, what communications did you have with Universal Truckload

9   representatives regarding the relocation of work formerly

10  performed by owner-operators?

11  A    None.

12  Q    Mr. Glackin, for the time period from January 1, 2019 to

13  the current date, what communications did you have with

14  representatives of Universal Truckload regarding the

15  termination of contracted work formerly performed by employee

16  drivers at Fontana facility?

17  A    None.

18  Q    Mr. Glackin, for the time period from January 1, 2019 to

19  the current date, what communications did you have with

20  Universal Truckload regarding the termination of contracted

21  work formerly performed by owner-operators at the Fontana

22  facility?

23  A    None.

24  Q    Mr. Glackin, for the time period from January 1, 2019 to

25  the current date, what communications did you have with

Exhibit 1(c)
343



1    representatives of Universal Truckload regarding the

2    subcontracting of work formerly performed by employee drivers

3    at the Fontana facility?

4    A    None.

5    Q    Mr. Glackin, for the time period from January 1, 2019 to

6    the current date, what communications did you have with

7    representatives of Universal Truckload regarding the

8    subcontracting of work formerly performed by owner-operators at

9    the Fontana facility?

10    A    None.

11    Q    Mr. Glackin, for the time period between January 1, 2019

12    to the current date, what communications did you have with

13    clients of Universal Truckload regarding the relocation of work

14    formerly performed by drivers at the Fontana facility?

15    A    None.

16    Q    For the time period from January 1, 2019 to the current

17    date, what communications did you have with communications

18    (sic) of Universal Truckload regarding the relocation of work

19    formerly performed by owner-operators at the Fontana facility?

20        MR. DO:  Objection, vague.  He says of communication.

21        JUDGE ROSAS:  I agree, rephrase.

22    Q    BY MR. ADLONG:  Mr. Glackin, for the time period from

23    January 1, 2019 to the current date, what communications did

24    you have with clients of Universal Truckload regarding the

25    relocation of work formerly performed by owner-operators at the

Exhibit 1(c)
344



1    Fontana facility?

2    A    None.

3    Q    Mr. Glackin, for the time period from January 1, 2019 to

4    the current date, what communications did you have with clients

5    of Universal Truckload regarding the termination of contracted

6    work formerly performed by employee drivers at the Fontana

7    facility?

8    A    None.

9    Q    Mr. Glackin, for the time period from January 1, 2019 to

10   the current date, what communications did you have with the

11   clients of Universal Truckload regarding the termination of

12   contracted work formerly performed by employee drivers at the

13   Fontana facility?

14        MR. DO:  Objection.  Asked and answered.

15        JUDGE ROSAS:  Sustained.

16   Q    BY MR. ADLONG:  For the time period from January 1, 2019

17   to the current date, what communications did you have with

18   clients of Universal Truckload regarding the termination of

19   contracted work formerly performed by owner-operators at the

20   Fontana facility?

21   A    None.

22   Q    For the time period from January 1, 2019 to the current

23   date, what communications did you have with clients of

24   Universal Truckload regarding the ter -- regarding the

25   subcontracting of work formerly performed by employee drivers

Exhibit 1(c)
345



1    at the Fontana facility?

2    A    None.

3    Q    For the time period from January 1, 2019 to the current

4    date, what communications did you have with clients of

5    Universal Truckload regarding the subcontracting of work

6    formerly performed by owner operators at the Fontana facility?

7    A    None.

8    Q    Mr. Glackin, what communications did you have with

9    representatives of Universal Truckload regarding the decision

10   to lay off employee drivers who worked at the Fontana facility

11   in December of 2019?

12   A    None.

13   Q    Mr. Glackin, what role did you play for Universal

14   Truckload in deciding the reasons for laying off employee

15   drivers who worked at the Fontana facility in December of 2019?

16   A    I played no role.

17   Q    Mr. Glackin, what role did -- from June 1, 2019 to

18   December 31, 2019, what role did you play in Universal

19   Truckload's decision to shift its operation at the Fontana

20   facility from a mixed employee driver and owner-operator model

21   to an exclusively owner-operator model?

22   A    I played no role.

23   Q    From January -- excuse me -- from November 1, 2019 to

24   December 31, 2019, what communications did you have with

25   representatives of Universal Truckload?

Exhibit 1(c)
346



1      MR. ADLONG:  Strike that.

2  Q   BY MR. ADLONG:  All right.  From December -- January 1,

3  2019 to December 31, 2019, what communications did you have

4  with representatives of Universal Truckload regarding its

5  decision to lay off employee drivers who worked at the facility

6  located at 11272 Calabash Avenue in Fontana?

7  A     None.

8      MR. ADLONG:  Your Honor, do you mind if we take a 15-

9  minute break so I can just review my notes to see what, if any,

10  remaining questions I have based off the questioning of the

11  last couple of days?

12      JUDGE ROSAS:  We'll take ten.  Off the record.

13  (Off the record at 3:37 p.m.)

14      JUDGE ROSAS:  Okay, let's go back on the record.  What's

15  the story, Mr. Adlong?

16      MR. ADLONG:  I have a couple more questions, but we're

17  coming to an end.

18                    **RESUMED CROSS-EXAMINATION**

19  Q   BY MR. ADLONG:  So Mr. Glackin, there were some questions

20  earlier implying -- re -- rev -- revolving around why you

21  focused your email searches on Mr. Taylor, Phillips and other

22  represent -- like, other persons.  Can you explain to us why

23  you did that?

24  A     Yes, tho -- those individuals I felt would have knowledge

25  of the particular information based on the subpoena request.

Exhibit 1(c)
347



www.escribers.net | 800-257-0885

```
 1    Q    Okay.  And why did -- so what did that mean to you with
 2    respect to focusing your search on them?
 3    A    I mean, the initial thought was th -- was this, if they
 4    were the ones that had influence over, or could make a
 5    decision, and then there was correspondence via email going
 6    out, there would have -- to individuals, there would have been
 7    correspondence via email coming in from any individual that
 8    they had communicated to.
 9    Q    And what would the lack of communication with them mean?
10         MR. DO:  Objection.  Calls for a legal conclusion.
11         JUDGE ROSAS:  I'll sustain the form of that question.
12    Q    BY MR. ADLONG:  What would that mean to you with respect
13    to your search if you didn't find anything coming in -- coming
14    in or out of the -- from the --
15    A    That there wasn't any outbound or inbound communication on
16    that respective topic.
17    Q    Now, there were some questions earlier about text
18    messages.  At any point, did you look into the ability to
19    capture text message communication?
20    A    Yes.
21    Q    And what was -- what did you learn?
22    A    I believe it was after the first deposition, I'd gone back
23    to see a -- the ability to capture text message information,
24    and I was told that it would be impossible to ca -- capture the
25    contents of text -- of the text messages.
```



1    Q     And why is that?

2    A     The -- the information I got was it was -- there would

3    be -- there could be inbound and outbound numbers, but there

4    would be no -- no content.

5    Q    Okay.  Why would you not have searched --

6        MR. ADLONG:  Wait, Your Honor -- first off, Ms. Bridge, do

7    you mind if you take down that exhibit for me, please?  Thank

8    you.

9        Just to make sure I have this straight, Ms. Gutman, you're

10   going to testify regarding the alleged failure to bargain

11   allegation; is that correct?

12       MS. GUTMAN DICKINSON:  Yes.  Yeah, that will be one of the

13   things that I believe the General Counsel will be asking me

14   about.

15       MR. ADLONG:  I have, like, two questions for Mr. Glackin

16   on this issue, can we -- like, if you don't mind, like, just

17   stepping out, if that's okay?  Or I don't know how we do it.

18       JUDGE ROSAS:  Yeah.  Let's send Ms. Gutman Dickinson

19   temporarily to the waiting room.

20       MS. GUTMAN DICKINSON:  Thank you.

21       MR. ADLONG:  Okay.

22   Q    BY MR. ADLONG:  So Mr. Glackin, why would you have not

23   searched communication from Mr. Lugo regarding bargaining?

24   A    Mr. Lugo would not have been involved in that.

25   Q    Okay.

Exhibit 1(c)
349



```
 1        MR. ADLONG:  That's the question that I have for him on

 2   that topic, if you want to bring her back in.

 3   Q    BY MR. ADLONG:  At one point, you used the term

 4   "transactional", what were you -- what were you referring to

 5   when you talked about it being -- something being

 6   transactional?

 7   A    The business being -- the business being transactional?

 8   Q    Yeah.

 9   A    It was business that was not regular -- it was

10   transactional work in nature.  It didn't have a contract.  It

11   was -- we were able to perform the work we could, and if we

12   couldn't, we didn't.

13   Q    So that's what you mean when you say transactional?

14   A    Yes.

15        MR. ADLONG:  Your Honor, I think those are all the

16   questions I have for Mr. Glackin.

17        JUDGE ROSAS:  Okay.

18        MR. ADLONG:  I will say this, if you don't mind me -- we

19   would like to reserve the right to put him out on our case-in-

20   chief pending the testimony on different allegations, but at

21   this point, we don't think it's necessary to go further with

22   him.

23        JUDGE ROSAS:  Well, that will all depend.  You'll have the

24   opportunity to ask him questions that weren't asked during this

25   round.  Should there be something that may appear to duplicate,
```

Exhibit 1(c)
350



www.escribers.net | 800-257-0885

1    we'll have to examine the circumstances to see if there's an

2    objection based on that or some other grounds.  Sounds like

3    this could get a little -- this could kind of grow into a mish-

4    mash of -- of production, nonproduction, excluding testimony,

5    things of that sort.  I -- I don't know what lies ahead, but

6    just so you know, that will all depend.

7         Okay.  We're going to adjourn at this point until 11 a.m.

8    Eastern Standard Time tomorrow.  That would be 8 a.m. Pacific

9    time tomorrow.  We'll go off the record.  Okay, so --

10   (Off the record at 4:00 p.m.)

11        JUDGE ROSAS:  I -- let's go back on the record.  Let's go

12   back on the record; see if we can get her done.  All right.  Go

13   ahead.

14        MR. DO:  Thank you, Your Honor.

15        JUDGE ROSAS:  Redirect.

16                        **REDIRECT EXAMINATION**

17   Q    BY MR. DO:  Mr. Glackin, so I'm going to put on screen

18   what has been marked and identified and admitted as Joint

19   Exhibit 20 and 21.  You provided some testimony regarding the

20   writings on these exhibits.  You indicated that you did not

21   recognize them, but I just wanted to confirm that these writing

22   were already on the exhibit, or at least on the contracts by

23   the time that you provided to the National Labor Relations

24   Board; isn't that correct?

25        JUDGE ROSAS:  Do you need to share the screen?

Exhibit 1(c)
351



www.escribers.net | 800-257-0885

1      MR. DO:  Oh, I did.  I think my computer might be frozen.

2    Give me one moment.  Uh oh.  I may have to re-log back in.

3    Give me one moment, Your Honor.  Huh, oh, okay.  Everything is

4    running again.  My apologies.

5    Q    BY MR. DO:  Okay, again, so my question is, with regard to

6    the testimony you provided about the writing on Joint Exhibit

7    20(a), you know, through 21(e), isn't it correct that that

8    writing was already on those contracts by the time it was

9    provided to the National Labor Relations Board pursuant to its

10   investigative subpoena and hearing subpoenas?

11   A    I believe so.

12   Q    In January 20 -- January 1st, 2019 through December 20th,

13   2020, who did you work for?

14   A    What -- I'm sorry, one more time, what was the timeframe?

15   Q    Sure.  From January 1st, 2019 through December 20th, 2020,

16   who did you work for?

17   A    January 1, '19 to December, 2020; is that correct?

18   Q    Yes, correct.

19   A    The executive vice president of labor relations.

20   Q    And under what company did you work for at the time?

21   A    Logistics Insight Corp.

22   Q    And then, what was your jo -- job title at the time?

23   A    Vice president, labor relations.

24   Q    And Logistics Insight Corp. is another Universal Logistics

25   Holding subsidiary; isn't that right?

Exhibit 1(c)
352



www.escribers.net | 800-257-0885

1        MR. ADLONG:  Objection.  With respect to lacks foundation.

2    What business -- we haven't identified a -- well --

3        JUDGE ROSAS:  Okay.  I'm not going to require the

4    foundation.  In this case, the -- the -- the question is -- is

5    an obvious one.  Go ahead, repeat the question.

6        MR. DO:  Sure.

7    Q    BY MR. DO:  You answered that you worked from Dec --

8    January 1st, 2019 through December, 2020 under Uni -- Lo --

9    Logistics Insight Corp.  Logistics Insight Corp. is a subsi --

10   wholly owned subsidiary of Universal Logistics Holding; isn't

11   that right?

12       JUDGE ROSAS:  If he knows.

13   A    I'm not fully sure.

14       MR. ADLONG:  No further question, Your Honor.

15       JUDGE ROSAS:  Charging Party, anything?

16       MR. WOJCIECHOWSKI:  One follow-up on that.

17                     **RECROSS-EXAMINATION**

18   Q    BY MR. WOJCIECHOWSKI:  Mr. Glackin, it -- the -- the job

19   title that you were -- the job that you were just talking about

20   from January, 2019 through December, 2020, is that a different

21   job than you have now?

22   A    What do you mean by different job?

23   Q    Well, it -- the -- the title, you -- you -- I believe

24   you -- your current -- is your current title vice president,

25   labor relations?

Exhibit 1(c)
353


www.escribers.net | 800-257-0885

 1    A     Yes.

 2    Q     Okay.  So for what -- for what entity or -- or -- or group

 3    of entities were you the vice president of labor relations

 4    in -- from 2019 -- in 2019 and 2020?

 5    A     What group of entities -- uh --

 6          MR. ADLONG:  I'm going to object.  It's been asked and

 7    answered.  He already answered what entity he works for.

 8          JUDGE ROSAS:  I'm going to overrule that; if you know,

 9    sir?

10    A     I mean, I was a -- I was -- I -- I worked for Logistics

11    Insight Corp.

12    Q     BY MR. WOJCIECHOWSKI:  And did you have labor relations

13    responsibilities in that role for other entities besides Lo --

14    Logistics Insight Corp.?

15    A     Not during that entire time.

16    Q     Dur -- did you have -- did you have such responsibilities

17    during a portion of that time?

18    A     One more time, and I apologize, on the timeframe?

19    Q     So the -- from the GC's questions, it was January 1, 2019

20    through December, 2020.

21    A     January 1, 2019 to December, 2020.  And then what was the

22    follow-up question?  I apologize.

23    Q     Whether for some portion of that time, you had labor

24    relations responsibilities for any -- for -- ov -- for other

25    entities besides Logistics Insight Corp.?

Exhibit 1(c)
354



www.escribers.net | 800-257-0885

1        MR. ADLONG:  I'm going to object.  Vague and ambiguous as

2    to labor relations.

3        JUDGE ROSAS:  Overruled.

4    A    A portion of that time.

5    Q    BY MR. WOJCIECHOWSKI:  Okay, so which -- what portion?

6    A    Towards the latter part of that time frame.

7    Q    Okay.  Do -- do you recall when -- when those

8    responsibilities began?

9    A    I don't recall the exact time frame; I -- I don't.

10   Q    Okay.  Was it after -- was it in 2020?

11   A    In 2020, yes.

12   Q    Okay.

13       MR. WOJCIECHOWSKI:  Then I don't have anything further.

14       JUDGE ROSAS:  Any follow-up to any of that, Mr. Adlong?

15       MR. ADLONG:  No, Your Honor.

16       JUDGE ROSAS:  Okay.  Mr. Glackin, your testimony is

17   complete at this point.  You're excused.  Do not discuss your

18   testimony with anyone, including counsel at this point.

19   However, we have an exception to the extent that you all are

20   involved in compromise discussions that would take place, as I

21   understand it, in the presence of Charging Party's counsel; is

22   that right?

23       MR. ADLONG:  Compromise discussions, are you saying

24   settlement discussions, Your Honor?

25       JUDGE ROSAS:  Right.

Exhibit 1(c)
355



1      MR. ADLONG:  There are discussions that involve settlement

2  that do -- may or may n -- uh, yeah, I think the ans -- the

3  short answer is yes.

4      JUDGE ROSAS:  Okay.

5      MS. GUTMAN DICKINSON:  At this point, the counsel haven't,

6  you know, been involved with the principals at the same time,

7  but it -- it could happen soon.

8      JUDGE ROSAS:  Well, I -- I was led to believe that Mr.

9  Glackin's involvement would be necessary in your ongoing

10  discussions; is that right?

11      MR. ADLONG:  Absolutely.

12      JUDGE ROSAS:  Okay.  So -- so any involvement on his part

13  would be exclusive of any discussion, or involving any of his

14  testimony, and to the extent that anything is exchanged,

15  discussed, or written, or exchanged during these discussions,

16  that would fall under the compromise protections, okay,

17  excluded from anything involving this hearing, okay?

18      All right, is there anything else before we adjourn for

19  the evening?

20      MR. DO:  Yes, Your Honor.  Oh, go ahead, Jason.

21      MR. WOJCIECHOWSKI:  Can I just state for the record that

22  we're -- we'll delete the Jencks material at this point, ju --

23  just so that's clear on the record that we're doing that now

24  according to Your Honor's instructions, unless -- unless those

25  are changed.

Exhibit 1(c)
356



www.escribers.net | 800-257-0885

1       MR. DO:  Okay, Your Honor, just one thing.  At this point

2   in time, I want to introduce -- mark and introduce as General

3   Counsel Exhibit 1(ccc), which has been uploaded to the

4   SharePoint.  This is a stipulation with regard to the 2(11) and

5   2(13) status of various individuals with Universal Intermodal

6   and its various other entities.  This is going to be amending

7   their -- the Respondent's answer with regard to paragraph 7(a)

8   and 7(b), and so I am going to move for the admission of that

9   as a part of the formal documents at this time.

10  **(General Counsel Exhibit Number 1(ccc) Marked for**

11  **Identification)**

12      JUDGE ROSAS:  All right.  Any objection to the admission

13  of General Counsel's 1(ccc)?

14      MR. ADLONG:  No objection.

15      JUDGE ROSAS:  Okay.  1(ccc) is received into evidence

16  without objection.  Okay, anything else?

17  **(General Counsel Exhibit Number 1(ccc) Received into Evidence)**

18      MR. DO:  Yes, I just -- in light of that receipt, we will

19  withdraw our reservation to call Mr. Glackin again with regard

20  to those subpoena items.

21      JUDGE ROSAS:  Okay.  All right, very good.  All right,

22  there being nothing else, we're adjourned for the day.  We'll

23  continue tomorrow at 8 a.m. Pacific time, 11 Eastern Standard

24  Time.  Off the record.

25      MS. GUTMAN DICKINSON:  Thank you, Your Honor.

Exhibit 1(c)
357



www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  Okay.

2        MR. DO:  Thank you, Your Honor.

3    **(Whereupon, the hearing in the above-entitled matter was**

4    **recessed at 4:10 p.m. until Thursday, June 17, 2021 at 8:00**

5    **a.m.)**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(c)
358

www.escribers.net | 800-257-0885

1       <u>C E R T I F I C A T I O N</u>

2       This is to certify that the attached proceedings before the

3       National Labor Relations Board (NLRB), Region 21, Case Numbers

4       21-CA-252500, 21-CA-252574, 21-CA-264164, 21-CA-253662, 21-CA-

5       259130, 21-CA-254813, 21-CA-255151, Mason-Dixon Intermodal

6       d/b/a Universal Intermodal Services, and Mason-Dixon Intermodal

7       d/b/a Universal Intermodal Services and Southern Counties

8       Express, Inc. and Roadrunner Intermodal Services, LLC and

9       Universal Truckload, Inc. and International Brotherhood of

10      Teamsters, held via Zoom videoconference at the National Labor

11      Relations Board, Region 21, 312 N. Spring Street, 10th Floor,

12      Los Angeles, CA 90012-4701, on June 16, 2021, at 8:29 a.m. was

13      held according to the record, and that this is the original,

14      complete, and true and accurate transcript that has been

15      compared to the reporting or recording, accomplished at the

16      hearing, that the exhibit files have been checked for

17      completeness and no exhibits received in evidence or in the

18      rejected exhibit files are missing.

19

20

21                                  

22

23                                  _____

24                                  TROY RAY

25                                  Official Reporter

Exhibit 1(c)
359

www.escribers.net | 800-257-0885

# EXHIBIT 1(D)

Exhibit 1(d)
360

**OFFICIAL REPORT OF PROCEEDINGS**
**BEFORE THE**
**NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

In the Matter of:

| | |
|---|---|
| Mason-Dixon Intermodal d/b/a | Case Nos.  21-CA-252500 |
| Universal Intermodal Services, | 21-CA-252574 |
| Respondent, | 21-CA-264164 |
| | 21-CA-253662 |
| and | 21-CA-259130 |
| | 21-CA-254813 |
| Mason-Dixon Intermodal d/b/a | 21-CA-255151 |

Universal Intermodal Services
and Southern Counties Express,
Inc.,
                    Respondent,
and

Roadrunner Intermodal Services,
LLC,
                    Respondent,
and

Universal Truckload, Inc.,
                    Respondent,
and

International Brotherhood of
Teamsters,
                    Charging Party.

—————————————————————

—————————————————————

Place: Los Angeles, California (via Zoom Videoconference)

Dates: June 17, 2021

Pages: 336 through 533

Volume: 4

**OFFICIAL REPORTERS**
eScribers, LLC
**E-Reporting and E-Transcription**
**7227 North 16th Street, Suite 207**
**Phoenix, AZ 85020**
**(602) 263-0885**

Exhibit 1(d)
361



www.escribers.net | 800-257-0885

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 21**

| | |
|---|---|
| In the Matter of: | |
| MASON-DIXON INTERMODAL D/B/A | Case Nos.   21-CA-252500 |
| UNIVERSAL INTERMODAL SERVICES, | 21-CA-252574 |
| Respondent, | 21-CA-264164 |
| | 21-CA-253662 |
| and | 21-CA-259130 |
| | 21-CA-254813 |
| MASON-DIXON INTERMODAL D/B/A | 21-CA-255151 |
| UNIVERSAL INTERMODAL SERVICES | |
| AND SOUTHERN COUNTIES EXPRESS, | |
| INC., | |
| Respondent, | |
| | |
| and | |
| | |
| ROADRUNNER INTERMODAL SERVICES, | |
| LLC, | |
| Respondent, | |
| | |
| and | |
| | |
| UNIVERSAL TRUCKLOAD, INC., | |
| Respondent, | |
| | |
| and | |
| | |
| INTERNATIONAL BROTHERHOOD OF | |
| TEAMSTERS, | |
| Charging Party. | |

The above-entitled matter came on for hearing via Zoom

videoconference, pursuant to notice, before **MICHAEL A. ROSAS**,

Administrative Law Judge, at the National Labor Relations

Board, Region 21, 312 N Spring Street, 10th Floor, Los Angeles,

CA 90012, on **Thursday, June 17, 2021, 8:05 a.m.**

Exhibit 1(d)
362



1                          <u>A P P E A R A N C E S</u>

2    **On behalf of the Charging Party:**

3        **JULIE GUTMAN DICKINSON, ESQ.**
         **JASON WOJCIECHOWSKI, ESQ.**
4        BUSH GOTTLIEB
         801 North Brand Boulevard, Suite 950
5        Glendale, CA 91203-1260
         Tel. (818)973-3200
6
     **On behalf of the Respondents:**
7
8        **DANIEL A. ADLONG, ESQ.**
         **HARRISON C. KUNTZ, ESQ.**
         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
9        Park Tower, Fifteenth Floor
         695 Town Center Drive
10       Costa Mesa, CA 92626
         Tel. (714)800-7900
11
     **On behalf of the General Counsel:**
12
13       **PHUONG DO, ESQ.**
         **MOLLY KAGEL, ESQ.**
         NATIONAL LABOR RELATIONS BOARD, REGION 21
14       312 N Spring Street, 10th Floor
         Los Angeles, CA 90012-4701
15       Tel. (213)894-5200

16

17

18

19

20

21

22

23

24

25

Exhibit 1(d)
363



www.escribers.net | 800-257-0885

1                                   **I N D E X**

2

3    **WITNESS**           **DIRECT**  **CROSS**  **REDIRECT**  **RECROSS**  **VOIR DIRE**

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Romel Mallard | 340,361, 366,378 | 389 | 437 | 438 | 361,363,376 |
| Jonathan Ledesma | 442,474 | 492 | 530 | 531 | 472 |

Exhibit 1(d)
364

www.escribers.net | 800-257-0885

1                    <u>E X H I B I T S</u>

2

3       <u>EXHIBIT</u>                                    <u>IDENTIFIED</u>        <u>IN EVIDENCE</u>

4       General Counsel:

5           GC-4                                         360              361

6           GC-5                                         363              366

7           GC-6                                         373              378

8           GC-8                                         469              469

9           GC-7                                         471              474

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(d)
365

www.escribers.net | 800-257-0885

```
 1                    P R O C E E D I N G S

 2         JUDGE ROSAS:  This is a resumption in a matter of Mason-

 3    Dixon.

 4         All right, General Counsel, who's your next witness?

 5         MR. DO:  Yes, Your Honor.  General Counsel would like to

 6    call Mr. Romel Mallard.  I spoke to him about five minutes ago.

 7    I'm hoping that he is already in the waiting room.  If he's

 8    not, let me know when I can get in touch with him.

 9    (Off the record at 7:58 a.m.)

10         JUDGE ROSAS:  General Counsel, who do you call?

11         MR. DO:   I'm calling Mr. Romel Mallard, Your Honor.

12         JUDGE ROSAS:  Sir, please raise your right hand.

13    Whereupon,

14                        ROMEL MALLARD

15    having been duly sworn, was called as a witness herein and was

16    examined and testified, telephonically as follows:

17         JUDGE ROSAS:  All right.  Please state and spell your name

18    and provide us with an address.

19         THE WITNESS:  My name is Romel, R-O-M-E-L.  Last name

20    Mallard, M-A-L-L-A-R-D.  ████  ████████  ████,

21    Paramount, California, 90723.

22         JUDGE ROSAS:  Go ahead.

23         MR. DO:  Thank -- thank you -- thank you, Your Honor.

24                      DIRECT EXAMINATION

25    Q   BY MR. DO:  Mr. Mallard, thank you for being here.  In
```



www.escribers.net | 800-257-0885

Exhibit 1(d)
366

1    2019, who did you work for?

2    A    That would be Universal Intermodal.

3    Q    When did you first started working for Universal

4    Intermodal?

5    A    That would be in May of 2018.

6    Q    What did you do for Universal Intermodal?

7    A    I was a driver.

8    Q    And what did you do as a driver?

9    A    As a driver, I would drive into the ports of Los Angeles

10   and get containers, bring back containers to the yard or to

11   different clients.

12   Q    Do you still currently work for Universal Intermodal?

13   A    No, sir.

14   Q    When did you stop working for Universal Intermodal?

15   A    That would be November of 2019.

16   Q    And why did you stop working for Universal Intermodal?

17   A    I was terminated.

18   Q    Prior to our termination, what was your pay rate?

19   A    $24 an hour.

20   Q    When you worked for Universal Intermodal, at what facility

21   did you work out of?

22   A    That would be the Compton, Rancho Dominguez area.  Bella

23   Way.

24   Q    When you say Bella Way, you're referring to, East Vista

25   Bella Way, the street?

Exhibit 1(d)
367



www.escribers.net | 800-257-0885

1    A    The street.  The street.  Vista Bella Way.

2    Q    Can you describe that facility for us?  What was kept

3    there?

4    A    At this facility, we had a large yard where we kept our

5    trucks.  And we kept containers on this yard as well at the

6    rear of a big warehouse facility.

7    Q    And who worked at that facility?

8    A    All Intermodal employees, all Universal drivers worked

9    there, and dispatch, so forth.

10   Q    Thank you.  At the time of your termination, were there

11   any managers at that facility?

12   A    Yes.

13   Q    And what was --

14   A    There was.

15   Q    -- that person's -- what was that person's name?

16   A    Joe Lugo.

17   Q    And do you know his job title?

18   A    Regional manager.

19   Q    You mentioned that there were dispatcher working out of

20   that facility.  Was -- is there a dispatcher that you work

21   with?

22   A    Yes, sir, it was.

23   A    And who's that person's -- what's that person's name?

24   A    That would be Walter (phonetic throughout).

25   Q    When you worked for Universal Intermodal, what days of the

Exhibit 1(d)
368



www.escribers.net | 800-257-0885

1    week did you normally work?

2    A    Monday through Thursday.

3    Q    From what time to what time?

4    A    From 5 p.m. to 2:30, 2:00 a.m.

5    Q    And is that the night shift?

6    A    Yes, sir.

7    Q    Did you work on the weekends?

8    A    Very, very seldom.

9    Q    Do you know about a company called Southern Counties

10   Express?

11   A    Yes, I do.

12   Q    Who are they?

13   A    Southern Counties Express is another company that was

14   bought by Universal Intermodal.

15   Q    Do you know -- do you know when that purchase occur?

16   A    Sometime in 2019.

17        MR. KUNTZ:  Objection.  Lack of foundation.

18        JUDGE ROSAS:  You could probe it on cross.

19   Q    BY MR. DO:  When Universal bought Southern Counties

20   Express, was there any change to your workplace?

21   A    Can you repeat that question one more time?

22   Q    Sure.  So when Universal Intermodal bought Southern

23   Counties Express, were there any staffing changes at your

24   workplace?

25   A    Yes.

Exhibit 1(d)
369


www.escribers.net | 800-257-0885

```
 1          MR. KUNTZ:  Objection.  Lack of --

 2     A    Yes, sir.  There was.

 3          MR. KUNTZ:  -- foundation.  Assumes facts not in evidence.

 4     We haven't even established when this happened.

 5          JUDGE ROSAS:  Did he not say 2019?

 6          MR. DO:  He did, Your Honor.

 7          JUDGE ROSAS:  So staffing changes, we'll find out what the

 8     extent of his knowledge is.  And you can probe on cross.

 9     That's fine with me.

10          Go ahead.

11     Q    BY MR. DO:  Mr. Mallard, can you answer the question or do

12     you want me to repeat it?

13     A    One more time, sir.

14     Q    Sure.  When Universal Intermodal purchased Southern

15     Counties Express, were there any staffing changes at Universal

16     Intermodal from that purchase?

17     A    Yes, there was.

18     Q    And what happened?

19     A    Entire change of staff, from dispatchers to coordinators

20     to manager.  Everything changed.

21     Q    And --

22     A    Everyb --

23     Q    Go ahead.

24     A    Yes, sir.  Everything that was Universal was -- was moved

25     out, and Southern Counties was moved in.
```

Exhibit 1(d)
370



www.escribers.net | 800-257-0885

1   Q     Understood.  So what happened to those -- those staff

2   members?

3         MR. KUNTZ:  Objection, lack of foundation.

4         JUDGE ROSAS:  Counsel, the question was, what happened to

5   those --

6         MR. DO:  Staff members, the ones that he just listed, that

7   there -- there was a change.  I'm just trying to clarify what

8   happened.

9         JUDGE ROSAS:  Okay.  That's -- so when you're talking

10  about staff members, there are different staff members.  So

11  that's a little -- you're going to have to take a step back at

12  that point, provide some foundation for each part there.

13        Go ahead.

14        MR. DO:  Sure.

15  Q     BY MR. DO:  Mr. Mallard, so you testified that there was

16  staffing changes with regard to dis -- Universal Intermodal

17  dispatcher, Universal Intermodal managers, and recruiters.

18  What happened to those people when Southern Counties --

19        MR. KUNTZ:  Objection.

20  Q     BY MR. DO:  -- was purchased?

21        JUDGE ROSAS:  Break it down.

22  A     Those people --

23        JUDGE ROSAS:  What happened to the dispatchers, only.  Go

24  ahead.

25        MR. DO:  Okay.

Exhibit 1(d)
371



www.escribers.net | 800-257-0885

1    A      Those people -- those peop --

2    Q      BY MR. DO:   What happened to the -- go ahead.

3    A      Those people were all fired.

4    Q      What happened to the Universal Intermodal managers?

5    A      The managers were all fired.

6    Q      What happened to the Universal Intermodal recruiters

7    A      Fired.

8           MR. KUNTZ:   Your Honor, we object to that -- that entire

9    line of questioning.   There's no foundation established that

10   Mr. Mallard has any basis to know what, quote unquote, happened

11   to those people.   In addition to that, when we say what

12   happened, that's an incredibly vague question.

13          JUDGE ROSAS:   So he worked there, right?

14          MR. DO:   Yes, Your Honor.

15          JUDGE ROSAS:   We have reason to believe, based on his

16   testimony, at least not in chief, that he worked there.   So on

17   that basis, I'm going to -- I'm going to provide for a little

18   bit of common sense reach here, which I think is subject to

19   your direct cross-examination.   Overruled.

20          MR. DO:   Thank you, Your Honor.

21   Q      BY MR. DO:   You mentioned that Southern Counties Express

22   staff came in.   What do you mean by that?

23   A      Can you repeat that, sir?

24   Q      Sure.   You mentioned that Southern Counties Express staff

25   came in.   What do you mean by that?

Exhibit 1(d)
372



www.escribers.net | 800-257-0885

1    A    I mean, that every staff that was Universal was no longer

2    there, and now there were Southern Counties employees doing

3    everything that Universal staff was doing, dispatchers, safety

4    managers, all the way down.  They're all -- all Southern

5    Counties.

6    Q    And you mentioned that you answer to a dispatcher by the

7    name of Walter.  Which company did he come from?

8    A    Southern Counties.

9    Q    Let me ask you about a typical day of work at Universal

10   Intermodal.  Step-by-step, what would your day be like?

11   A    Step-by-step, coming in at 5 p.m., I would step into the

12   office and get my -- my paperwork, which -- which -- for my

13   work load for the day.  And after I get my work load, I'd go

14   out and pre-trip my truck and go get the loads and bring them

15   back or whatever it is I have to do in regards to dispatch.

16   Q    And what -- where would you pick up the loads from?

17   A    A lot of them came from Port of -- Port of Los Angeles.  A

18   lot of them came from different Southern County (sic) yards.

19   Q    And normally, where would you take those loads?

20   A    Those loads -- a lot of loads, I take to the clients or

21   we'd park on -- on the yard so other drivers could take them --

22   take them in as well.

23   Q    When you worked for Universal Intermodal, what kind of

24   trucks did you use?

25   A    Peterbilt trucks.

Exhibit 1(d)
373



1    Q    Will you describe them?  What did they look like?

2    A    All white trucks with the Universal logos on them.

3    Q    Where were the Universal logos?

4    A    On the doors.

5         MR. KUNTZ:  Your Honor, I -- I want to object to these

6    questions as -- in terms of vague as to time.  Counsel has

7    asked some questions that establish that there were changes at

8    some point in time in 2019 regarding Southern Counties.  It's

9    not clear from these questions whether they're directed to the

10   time before or after that alleged change occurred.

11        JUDGE ROSAS:  Fair enough.

12        Go ahead, General Counsel.  Take a step back.

13        MR. DO:  Yes, Your Honor.

14        JUDGE ROSAS:  Establish that.

15        MR. KUNTZ:  Thank you.

16   Q    BY MR. DO:  Just to confirm, my questions here are right

17   before your termination.

18   A    Yes, sir.

19   Q    You told me you were terminated in November of 2019,

20   right?

21   A    Yes, sir.

22   Q    So prior to your termination, what did the truck that you

23   drove at that time look like?

24   A    It was white, Universal writing on the side -- white truck

25   with Universal writing -- logos -- letters on the side of the

Exhibit 1(d)
374



1    trucks, both doors.

2    Q    And how large was -- prior to your termination, that logo,

3    how large was that logo?

4    A    I'm going to say at least foot and a half -- a foot and a

5    half long on the door.

6    Q    And who owned that truck?

7    A    Universal.

8    Q    You mentioned that you would get your assignment in the

9    morning.  In what form would you get that assignment?

10   A    I would get those in a -- a paper.  You know, print it

11   out, they'd get the forms, print it out, and they'd give us --

12   give -- put our names on them and then set them on the table,

13   and we'd come grab our assignments from off the table --

14   Q    And --

15   A    -- in the dispatch office.

16   Q    But to the best of your understanding, who would create

17   those assignment sheets?

18   A    That would be any -- any one of those dispatchers could do

19   that.  It could have been Walter.  It could be Victor (phonetic

20   throughout).

21   Q    What information would be provided to you on those sheets?

22   A    On those sheets, we had load information, meaning con --

23   container information, SCAC codes, just every -- everything you

24   would need to pull a load out of Port of Los Angeles.

25   Q    So you mentioned a SCAC code.  What is a SCAC code?

Exhibit 1(d)
375



1    A    A SCAC code is what they call a company code.

2    Q    What is it used for?

3    A    It is actually used to just -- to let the port personnel

4    know who's getting this load, what company is taking this load.

5    Q    And I just want to clarify for the record, a SCAC -- SCAC

6    is spelled S-C-A-C, just to clarify.

7    A    Yes.  Yes, sir.

8    Q    And what -- what does the SCAC code consist of?  Is it

9    just letters; is it numbers?

10   A    Letters.

11   Q    When you worked for Universal Intermodal, did Universal

12   Intermodal have a SCAC code?

13   A    Yes, they did.

14   Q    Do you recall what it is?

15   A    I do recall --

16        MR. KUNTZ:  Objection.  Vague.  I believe the witness just

17   testified that there would be an individual code for each

18   route.  So when the -- when counsel's asking what it is, I'm

19   not sure what the -- what counsel's asking there.

20        MR. DO:  That's not correct, Your Honor.  That's not the

21   testimony.

22        JUDGE ROSAS:  Hold on one second.  Let me -- repeat the

23   question.

24   Q    BY MR. DO:  Sure.  The question was:  When you worked for

25   Universal Intermodal, did Universal Intermodal, have a SCAC

Exhibit 1(d)
376



www.escribers.net | 800-257-0885

1    code?

2    A    Yes, they did.

3         MR. DO:  Hang on.

4         JUDGE ROSAS:  Hold on, hold on.

5         You have an objection to that?

6         MR. KUNTZ:  Yes, Your Honor.  As I understood the

7    testimony, it sounds like there's an individual SCAC code for

8    each individual route or client, customer.  And so the question

9    of what is the code for Universal seems like a very vague

10   question.

11        JUDGE ROSAS:  Well, Counsel, maybe I misconstrued the

12   testimony, or maybe you're just clairvoyant as to what's coming

13   ahead.  But -- but all I've really got here is that it was

14   testimony that a company code was used to let port personnel

15   know which company load is going to.  So that's all I know at

16   this point.  So I'm going to overrule the objection.

17        Go ahead.  Repeat the question again.

18        MR. DO:  Thank you, Your Honor.

19   Q    BY MR. DO:  Did Universal Intermodal have a SCAC code?

20   Did it have a SCAC code?

21   A    Yes, they did.

22   Q    To the best of your recollection, what was it?

23   A    It all started with a U -- a UI, US, something of that

24   nature.

25   Q    And did Southern Counties Express have a SCAC code?

Exhibit 1(d)
377



1    A    Yes, they did.

2    Q    What is that SCAC code?

3    A    It started with, to my recollection, a SC or SCE.

4    Q    When you're pulling a load for Southern Counties Express,

5    did Southern Counties Express' SCAC code change between loads?

6    A    Can you repeat that for me one last time?

7    Q    Sure.  Did the -- so let's say, when you're using Southern

8    Counties Express' SCAC code, each time you use it, did that

9    code change?

10   A    No.

11   Q    So based on the information on the SCAC code, would you

12   know which company is responsible for a load?

13   A    Yes.

14   Q    So when you pick up a load using Southern Counties

15   Express' SCAC code, what does that mean?

16   A    That means that I actually went down to the port, and I

17   used their SCAC code to grab a load to take to any -- any

18   client or any yard.

19   Q    And based on the SCAC code, whose client would you be

20   delivering to when you're using Southern Counties Express' SCAC

21   code?

22   A    Southern Counties Express?  Oh, I've delivered to places

23   like Ontario, Toyota of Ontario, Walmart of Eastvale, Big Lots

24   of Fontana, places of that nature.

25   Q    Sure.  So my actual question was based on the information

Exhibit 1(d)
378



www.escribers.net | 800-257-0885

1    on the SCAC code that you use to pull out a load from the port,

2    what is your understanding of whose client does that -- that

3    Walmart belonged to?

4        MR. KUNTZ:  Objection, lack of foundation.  We haven't

5    established that there's any way to tell from the SCAG (sic)

6    code which customer the load is directed towards.

7        JUDGE ROSAS:  Rephrase.

8        MR. DO:  Sure.

9    Q    BY MR. DO:  When you pull -- when you're pulling a load

10   from the port, using Southern Counties Express' SCAC code, who

11   are you representing?

12   A    Universal.

13   Q    Just to clarify, so when you pull a load out of the port

14   with Universal's SCAC code, who are you representing?

15   A    Universal.

16   Q    And then let me clarify again, if you're using Southern

17   Counties Express' SCAC code, who are you representing?

18       MR. KUNTZ:  Objection.  Vague as to representing.  Your

19   Honor, you're on mute.

20       JUDGE ROSAS:  Refine representing.

21       MR. DO:  Understood.

22   Q    BY MR. DO:  When you're picking up a load at a -- at the

23   port using Southern Counties Expressing -- Express' SCAC code,

24   who are you pulling for?

25       MR. KUNTZ:  Objection.  Lack of foundation.  We haven't

Exhibit 1(d)
379


www.escribers.net | 800-257-0885

1   established there's any way that Mr. Mallard would be able to

2   know that information.

3       JUDGE ROSAS:  You know what that means, sir?  Pulling for?

4       THE WITNESS:  Yes, sir.

5       JUDGE ROSAS:  You can answer.  Overruled.

6   Q   BY MR. DO:  Go ahead and answer, Mr. Mallard.

7   A   I'd be pulling for Universal.

8   Q   Prior to your termination were you hired by Southern

9   Counties Express?

10  A   No, sir.

11  Q   Prior to your termination, did you ever apply to work for

12  Southern Counties Express?

13  A   No, sir.

14  Q   When you are pulling a load using Southern Counties

15  Express' SCAC code, who would pay you?

16  A   Could you repeat that to me?

17  Q   Sure.  When you are pulling a -- when you were pulling a

18  load using Southern Counties Express' SCAC code, who would pay

19  you?

20  A   Universal.

21  Q   Do you know who Container Connection is?

22  A   Yes, I do.

23  Q   Who are they?

24  A   That's another company, bought and acquired by Universal.

25  Q   Did -- did Container Connection have a SCAC code?

Exhibit 1(d)
380



www.escribers.net | 800-257-0885

 1    A    Yes, they did.

 2    Q    Do you know what it is?

 3    A    To the -- to the -- to my recollection, it started with a

 4    CC, CCI, CCU, something like that.

 5    Q    When you worked for Universal Intermodal, do you ever

 6    recall pulling a load using that SCAC code?

 7    A    Yes, sir.

 8    Q    And who would assign you these loads using Container

 9    Connections' SCAC code?

10    A    That would be dispatch, Walter.

11    Q    Prior to your termination, were you ever hired to work for

12    Container Connection?

13    A    No, sir.

14    Q    Prior to your termination, did you ever apply to work for

15    Container Connection?

16    A    No, sir.

17    Q    When you're pulling a Container Connection load, who would

18    pay you?

19    A    Universal.

20    Q    When you were pulling a load -- when you were working for

21    Universal Intermodal, did you have to keep a separate time

22    sheet for when you're pulling for Southern Counties Express,

23    when you're pulling for Container Connection, or when you were

24    pulling for Universal Intermodal?

25    A    No, sir.

Exhibit 1(d)
381



1    Q    When you were delivering a Southern Counties Express or

2    Container Connection load, what truck would you use?

3    A    The Universal truck.

4    Q    How often would you deliver a load directly to a client?

5    A    Every day.

6         JUDGE ROSAS:  Off the record.  Hold on.

7    (Off the record at 8:34 a.m.)

8         MR. DO:  Thank you, Your Honor.

9                     **RESUMED DIRECT EXAMINATION**

10   Q    BY MR. DO:  Mr. Mallard, what is a chassis?

11   A    A chassis is a metal frame with wheels on it in which

12   containers are placed on in order to make them mobile.

13   Q    Does Universal Intermodal have company chassis?

14   A    Yes, they do.

15   Q    And what did they look like?

16   A    They are all black.  They have yellow and reflective

17   coloring on the -- on the front with letters and numbers.

18   Q    And what -- what did the letter and numbers say?

19   A    The letter for Universal would be UISV or something like

20   that.

21   Q    Does Southern Counties Express have company chassis?

22   A    Yes, they do.

23   Q    What did those look like?

24   A    Those chassis are all black with pink highlight colors and

25   lettering and numbers.

Exhibit 1(d)
382



1    Q    What did the let -- what did the lettering say?

2    A    The lettering would say SCEZ with different combination of

3    numbers.

4    Q    And where would you normally get a chassis when you need

5    one?

6    A    To go straight to Southern Counties' yard.

7    Q    Do you know where that -- what yard?  What yard are you

8    referring to?

9    A    I believe it's yard 5, Del Amo.

10         MR. KUNTZ:  Your Honor, I don't believe we could

11   understand the end of the witness's answer there.

12         JUDGE ROSAS:  Can you repeat?

13   Q    BY MR. DO:  Mr. Mallard, can you repeat your answer?

14         JUDGE ROSAS:  Can you repeat?

15   A    Yes, sir.  That would be yard 5 on Del Amo Street.

16   Q    BY MR. DO:  And this is a yard owned by Southern Counties

17   Express?

18   A    Yes, sir.

19         MR. KUNTZ:  Objection.  Well, strike that.

20   Q    BY MR. DO:  When you had to use a company chassis, did it

21   matter if you'd use a Universal Intermodal chassis or Southern

22   Counties Express chassis?

23         MR. KUNTZ:  Objection.  Leading.

24         JUDGE ROSAS:  It's a little confusing.  Did it matter?  I

25   don't know what that means.

Exhibit 1(d)
383



www.escribers.net | 800-257-0885

1          MR. DO:  Sure, I'll rephrase.

2    Q    BY MR. DO:  When you were pulling a load and you had to

3    use a company chassis, did you have the option --

4          MR. DO:  Give me a moment, strike that.

5    Q    BY MR. DO:  Would you have to pull a load using a company

6    chassis?  Would it matter if you use -- would it matter -- did

7    it matter whose chassis you used?

8          MR. KUNTZ:  Objection.  Vague.

9    A    No, it didn't.

10         JUDGE ROSAS:  Hold on.  Hold on.  The answer's stricken.

11   Were you required to use a company chassis to pull a load?

12         THE WITNESS:  Yes, I was.

13         JUDGE ROSAS:  Next question.

14         MR. DO:  Thank you, Your Honor.

15   Q    BY MR. DO:  Were you required to use it -- when you --

16   when you pull a load using a Southern Counties Express SCAC

17   code, were you require to use Southern Counties Express

18   chassis?

19   A    No, sir.

20   Q    When you were pulling a load using Universal Intermodal

21   SCAC code, were you required to use Universal Intermodal

22   chassis?

23   A    No, sir.

24   Q    When you deliver to Walmart, to the best of your

25   recollection, did they care if you were using -- which

Exhibit 1(d)
384



www.escribers.net | 800-257-0885

1    company's chassis you were using?

2        MR. KUNTZ:  Objection.  Vague.

3    Q    BY MR. DO:  Did they care?

4        JUDGE ROSAS:  Let's stay with require -- let's stay with

5    require.  It's nice and simple.

6        MR. DO:  Thank you.  Okay, Your Honor.

7    Q    BY MR. DO:  When you delivered to Walmart, to the best of

8    your recollection, did they require you to use Southern

9    Counties Express SCAC -- chassis or Universal chassis?

10       MR. KUNTZ:  Objection, vague as to "they".  We don't know

11   if they're talking about Universal, about Southern Counties or

12   about Walmart

13       JUDGE ROSAS:  Overruled.

14   Q    BY MR. DO:  Go ahead, Mr. Mallard.

15   A    Can you repeat that one more time?

16   Q    Sure.  When you delivered it to Walmart, did Walmart

17   care -- did -- did Walmart require you to use Southern

18   Counties' chassis?

19   A    No, they didn't.

20   Q    When you delivered to Walmart, did Walmart require you to

21   use Universal chassis?

22   A    No, they didn't.

23   Q    Prior to your termination, approximately how many hours of

24   work did you do a day?

25   A    Anywhere between 10 and 12 hours.

Exhibit 1(d)
385



1    Q    And on average, how many deliveries did you do a day?

2    A    Two to three.

3    Q    When you worked for Universal Intermodal, do you recall a

4    union trying to organize the Universal Intermodal employees?

5    A    Yes, I do.

6    Q    What union was trying to organize the employees?

7    A    That would be the Teamsters Local 848 harbor division.

8    A    Did you supported that -- did you support that campaign?

9    A    Yes, I did.

10   Q    All right.  I'm going to put on the screen to be marked

11   for identification as GC Exhibit 4.

12        MR. DO:  And the parties -- this is one of the nonredacted

13   ones.  So you guys all should have it.

14   Q    BY MR. DO:  Do you see the document I'm putting in front

15   of you, Mr. Mallard?

16   A    Yes, sir.

17   Q    Is this your name?

18   A    Yes, sir, that it is.

19   Q    Do you recognize this signature?

20   A    Yes, I do.

21   Q    Is that your signature?

22   A    Yes, it is.

23   Q    And is this the date, November 2nd, 2019, is that the date

24   that you signed it?

25   A    Yes, sir.

Exhibit 1(d)
386



www.escribers.net | 800-257-0885

1      MR. DO:  Your Honor, I'm going to move for the admission

2  of Exhibit 4 into evidence.

3      JUDGE ROSAS:  Objection?  Voir dire?  No objection?

4      MR. KUNTZ:  Brief voir dire, Your Honor.

5                    **VOIR DIRE EXAMINATION**

6  Q    BY MR. KUNTZ:  Mr. Mallard, do you see on the card towards

7  the bottom right-hand corner, above your signature, the line

8  for shift?

9      MR. DO:  Let me highlight it.

10 A    Yes, sir.

11 Q    BY MR. KUNTZ:  Do you see that you checked graveyard on

12 that line?

13 A    Yes.

14 Q    What's your understanding of what graveyard means?

15 A    Graveyard would be a night shift.

16 Q    Could you give the approximate hours of that shift?

17 A    From 5 to -- 5 in the morning.

18 Q    Until when, sir?

19 A    5 till 5 in the morning is that --

20 Q    5 p.m. to 5 a.m.?

21 A    Yes, sir.

22     MR. KUNTZ:  No objection to the exhibit, Your Honor.

23     JUDGE ROSAS:  General Counsel's 4 is received.

24 **(General Counsel Exhibit Number 4 Received into Evidence)**

25                  **RESUMED DIRECT EXAMINATION**

Exhibit 1(d)
387



www.escribers.net | 800-257-0885

 1    Q    BY MR. DO:  To the best of your knowledge, when did the

 2    Union's campaign began?

 3    A    The best of my knowledge, that would be in September, is

 4    when I first became involved with speaking to the Union.

 5    Q    How were you introduced to the Union's campaign?

 6    A    I was introduced to them through -- through a coworker.

 7    Q    Who is that coworker?

 8    A    That would be Jonathan.

 9    Q    Do you remember Jonathan's last name?

10    A    Not offhand, no.

11    Q    Did you know it was Ledesma?

12    A    Ledesma.

13         MR. KUNTZ:  Objection.  Leading.

14         JUDGE ROSAS:  Stricken.

15         MR. DO:  Okay.

16    Q    BY MR. DO:  What -- what facility did Jonathan work out

17    of?

18    A    The Compton, Rancho Dominguez area, Vista Bella location.

19    Q    Is that the same facility that you worked out of?

20    A    Yes, it is.

21    Q    What shift did he work in?

22    A    At one time he worked the night shift.

23    Q    At the time he introduced you to the Union's campaign,

24    what shift did he work then?

25    A    Day shift.

Exhibit 1(d)
388



1        MR. DO:  Your Honor, I'm going to mark for identification

2   as GC Exhibit 5.  Do you see the document I'm putting in front

3   of you, sir?

4   A    Yes, sir.

5   Q    Do you see that's two pages?

6   A    Yes, I do.

7   Q    Okay.  Do you recognize this document?

8   A    Yes, I do.

9   Q    Are you on this flyer?

10  A    Yes, I am.

11  Q    Can you identify for the record which picture you are?

12  A    Bottom row, second from the left.

13  Q    So that's this one, correct?

14  A    Yes, sir.

15  Q    And do you know this flyer was distributed at your

16  workplace?

17  A    Yes, it was.

18       MR. DO:  Your Honor, I'm going to move for the admission

19  of GC-5 into evidence.

20       MR. KUNTZ:  One voir dire question, Your Honor.

21       MR. DO:  Let me put that back up.

22                    **VOIR DIRE EXAMINATION**

23  Q    BY MR. KUNTZ:  Mr. Mallard, do you know who wrote the

24  words on this document?

25  A    No, I don't.

Exhibit 1(d)
389



www.escribers.net | 800-257-0885

1    Q    Do you know who placed the pictures on this document?

2    A    No, I don't.

3         MR. KUNTZ:  So, Your Honor, we'll object to the exhibit as

4    hearsay, for which we have no identified declarant.

5         JUDGE ROSAS:  You're objecting to the substance of it, to

6    the extent that it's being offered for the truth of the matters

7    asserted?

8         MR. KUNTZ:  Correct, Your Honor.

9         JUDGE ROSAS:  Okay.  Any objection to the flyer, according

10   to the witness's testimony, having been something that was

11   distributed that he received?

12        THE WITNESS:  Excuse me?

13        JUDGE ROSAS:  Come again?

14        THE WITNESS:  I'm sorry, I didn't -- could you repeat that

15   question?

16        MR. DO:  It's not -- it's not directed toward you, Mr.

17   Mallard.

18        THE WITNESS:  Okay.

19        MR. KUNTZ:  Apologize, Your Honor.  I'm not sure what

20   happened with the microphone there.  We don't object on the

21   basis that it was received or not received by Mr. Mallard.  But

22   General Counsel is offering it for the truth of the matter

23   asserted in the sense that Mr. Mallard was an open Union

24   supporter.  And in that sense, he testified that he does not

25   know who authored the document, who put the pictures on the

Exhibit 1(d)
390



1    document.  And so this is hearsay in the sense of the truth of

2    the matter asserted.  And we don't know who the declarant was.

3         JUDGE ROSAS:  I assume the General Counsel is introducing

4    it to check off a box.  You know, one of those boxes at the

5    outset of a Wright Line analysis that regardless of whether the

6    Employer ever knew anything about it, I went to a meeting or

7    something to that effect, i.e., I engaged in Section 7

8    activity.  That doesn't prove knowledge on the part of the

9    employee.  It doesn't relate to any of the substance of the

10   matter as far as anything else.  But I'm going to receive it, I

11   guess, over objection.

12        MR. KUNTZ:  Your Honor, if -- if the --

13        JUDGE ROSAS:  Go ahead.

14        MR. KUNTZ:  -- if the General Counsel was offering it only

15   to establish that Mr. Mallard engaged in Union activities, we

16   don't object to that.  If the General Counsel was offering it

17   to establish Employer knowledge, then we do.  So perhaps we

18   could get clarification on that.

19        JUDGE ROSAS:  General Counsel?

20        MR. DO:  Your Honor, we -- I mean, we establish through

21   his testimony that this, you know, one, that it shows his

22   support for the Union; and not only his support, but his

23   leadership in the Union.  And then furthermore, I do think it

24   does establish Employer knowledge because he just admitted to

25   it as being distributed at the facility.  So it makes it more

Exhibit 1(d)
391



1    likely than not that they knew about it.

2         JUDGE ROSAS:  You know, maybe it's a sleeping Employer.  I

3    don't know.  But that's his testimony, that he distributed it.

4    So it -- it's -- it's -- it's relevant to the extent that the

5    witness is his -- his likeness is reflected on it.  It was a

6    piece of paper that he received that he says was distributed at

7    the facility.  And that's what we have.  That's what we have.

8    Okay.  Argue from that what you want.  Should there be nothing

9    else -- should there be nothing else coming into this -- into

10   this case as far as evidence is concerned on the part of

11   Employer knowledge, I will keel over in my chair.  But let's

12   just bel -- not belabor it and let's get this guy into

13   evidence.  General Counsel's 5 is received.

14   **(General Counsel Exhibit Number 5 Received into Evidence)**

15        MR. DO:  Thank you, Your Honor.

16        MS. BRIDGE:  Excuse me, Judge, there's someone in the

17   waiting room.

18   (Off the record at 8:48 a.m.)

19        JUDGE ROSAS:  Go ahead.  Go ahead.

20                    **RESUMED DIRECT EXAMINATION**

21   Q    BY MR. DO:  Other -- other than appearing in the flyer

22   that was admitted General Counsel Exhibit 5 and signing an

23   authorization card, what else did you do to show your support

24   for the Union?

25   A    I attended Union meetings.

Exhibit 1(d)
392


www.escribers.net | 800-257-0885

1    Q    Anything else?

2    A    I supported the Union vote, and I also wore a Union vest.

3    Q    So let me ask you about the Union meetings.  Approximately

4    how many Union meetings did you attend?

5    A    To my recollection, at least three.

6    Q    And without naming any employee in particular,

7    approximately how many employees were at these meetings?

8    A    At least seven to ten.

9    Q    And you testified to -- with regard to an individual by

10   the name of Jonathan.  Do you recall seeing him at these

11   meetings?

12   A    Yes.

13   Q    You testified that you wore a Union vest.  Can you

14   describe that vest for us?

15   A    A Union vest is orange in color, black trim, univ -- logos

16   on the back -- Teamster logos on the back and one small

17   Teamster logo on the front.

18   Q    Okay.  Do you recall if Jonathan wore a vest?

19   A    Yes, he did.

20   Q    To the best of your recollection, when did you get the

21   Union vest?

22   A    I'm going to say anywhere between mid -- mid-November, mid

23   to early November.

24   Q    And how did you get the vest?

25   A    I got the vest from Ricardo Hidalgo on my way in to work

Exhibit 1(d)
393



1    one particular day.

2    Q    Did you wear a vest -- did you wear the vest while you

3    were at work?

4    A    Yes, I did.

5    Q    To the best of your recollection, did other employees wear

6    the Union vest at work?

7    A    Yes, some did.

8    Q    When did the Union go public with its campaign?

9         MR. KUNTZ:  Objection.  Vague as to "go public".

10        JUDGE ROSAS:  Let's refine that a little bit.

11        MR. DO:  Sure, you honor.

12   Q    BY MR. DO:  When the Union gave you your Union vest, where

13   did they give it to you?

14   A    That will be directly in front of the main gate to enter

15   our premises at Vista Bella Way.

16   Q    What were they do -- what would -- what was the Union

17   doing in front of the Vista Bella Way location when they gave

18   you your vest?

19        MR. KUNTZ:  Objection.  Vague as to time.

20        MR. DO:  He testified to when he got the vest, Your Honor.

21        JUDGE ROSAS:  Let's just reestablish that.

22        MR. DO:  Sure.

23   Q    BY MR. DO:  You -- you testified that you received your

24   vest around the middle of November.  When you got your vest,

25   what was the Union doing in front of the Compton facility?

Exhibit 1(d)
394



www.escribers.net | 800-257-0885

 1   A    In front of the -- I think they were -- they were just --

 2   they weren't doing any picketing or anything like that, they

 3   were just -- they had a tent out there.  They had drinks for --

 4   for anybody that wanted to have a drink.  And they were just

 5   outside the facility doing their normal -- their normal day.

 6   They -- they -- no picketing, no nothing going on.

 7   Q    Do you rec -- did they have signs or banners?

 8   A    Yes, in -- in regards to the vote.

 9   Q    Can you describe those signs or banners for us?  What did

10   they look like?

11   A    They were square-type posters with vote Union on them.

12   Q    Could you have missed the Union when you were driving into

13   work -- or could you have not seen them?

14   A    No.  It's no way you could not see them.

15   Q    Did Universal Intermodal run an anti-Union campaign?

16   A    Yes, sir.

17   Q    What did they do?

18        MR. KUNTZ:  Objection.  Vague.

19   A    They had --

20        JUDGE ROSAS:  I'm sorry.  What's the -- the objection to

21   vague -- repeat the question.

22        MR. DO:  The current question is, what did they do?

23        JUDGE ROSAS:  What did the Union do?

24        MR. DO:  No.  What did the Employer do as a part of its

25   campaign?

Exhibit 1(d)
395



1        MR. KUNTZ:  It's a very broad question, Your Honor.

2        JUDGE ROSAS:  Let's --

3        MR. DO:  Well, Your Honor, I'm trying to ask an open-ended

4    question.  But if you want me to --

5        JUDGE ROSAS:  No.  Let's -- let's focus it in on, I guess,

6    geographic locations.

7        MR. DO:  Okay.

8    Q    BY MR. DO:  At your workplace, Mr. Mallard, which is the

9    Compton facility, what did the Union do -- what did the company

10   do as a part of its anti-union campaign?

11   A    Well, from what I recall, they had a couple a -- a couple

12   guys -- union buster fellas, to come down and talk to us.

13   Q    Do you recall -- well, you mentioned that they -- well, do

14   you recall them hiring any new managers?

15   A    No, not at all.

16   Q    When was the first time that you saw Joe Lugo?

17   A    The first time I saw Joe Lugo was probably mid -- mid-

18   November.

19   Q    Was that before or after the Union set up its tent outside

20   your -- the Compton facility?

21   A    That would be after.

22   Q    Prior to the Union setting up its tent outside the Compton

23   facility, had you seen Joe Lugo before?

24   A    No, sir.

25   Q    Do you recall -- do you recall seeing Mr. Lugo speak to

Exhibit 1(d)
396



1    employees?

2    A    Yes, I do.

3    Q    All right.  Let me ask you about that incident.  When did

4    that happen?

5    A    That happened -- well, coming in to work at 5 p.m., we all

6    had a -- a conversation with Joe Lugo, at least the employees

7    that were there, in front of the office on the stairs.

8    Q    And approx -- to the best of your recollection, how many

9    employees were a part of this conversation?

10   A    Again, I'm going to say at least 8, 8 to 12 people.

11   Q    And what did Joe Lugo say during this conversation?

12   A    Well, he -- he basically just let us know if we needed

13   anything to -- to come to him directly and he spoke on company

14   time, shouldn't be taking too long of lunch breaks.  He just

15   spoke about truck maintenance and paperwork for the truck

16   maintenance and things of that nature.

17   Q    What did Joe Lugo say about truck maintenance?

18   A    He said that if we had any trouble first to write it down

19   on the paperwork that we already have, but -- and then also

20   bring it directly to him, and he'd call the mechanic himself

21   and get it straightened out if he had to.  But just bring the

22   problem to him.

23   Q    During this conversation, do you remember Mr. Lugo taking

24   notes?

25   A    Yes, I do.

Exhibit 1(d)
397



www.escribers.net | 800-257-0885

```
1    Q    How was he taking notes?

2    A    On a clipboard -- had a pen and a clipboard.

3    Q    Do you recall Mr. Lugo passing anything out during this

4    conversation?

5    A    Yes, I do.

6    Q    What was he -- what did he pass out?

7    A    He passed out his business card.

8    Q    And when he was passing that out, did he say anything

9    about it?

10   A    He just said, if you -- if you need anything or you need

11   it done promptly, bring the problem directly to him.  Give him

12   a call.

13   Q    Prior to this conversation, have any managers ever given

14   employees their personal contact information to contact about

15   any maintenance issue?

16   A    No, sir.

17   Q    You mentioned that the company hired some people outside

18   to -- some anti-Union people to run its campaign.  How many

19   people did the company hire?

20        MR. KUNTZ:  Objection.  Lack of foundation.

21        JUDGE ROSAS:  Repeat the question.

22        MR. DO:  Sure.

23   Q    BY MR. DO:  Mr. Cummings (sic), you testified that the

24   company hired some people to run its Union campaign.  How many

25   people did they hire?
```

Exhibit 1(d)
398



escribers
www.escribers.net | 800-257-0885

 1   A      Two.

 2          MR. DO:  Sorry.  You've got to let the judge --

 3          JUDGE ROSAS:  You're saying two -- two -- two people

 4   showed up when you refer to union busters?  Or --

 5          THE WITNESS:  Yes, sir.

 6          JUDGE ROSAS:  -- you're referring to somebody else?

 7          THE WITNESS:  I'm referring to the union busters.

 8          JUDGE ROSAS:  Go ahead.  Next question.

 9   Q      BY MR. DO:  What was their name, to the best of your

10   recollection?

11   A      I only recall one gentleman's last name, and that was

12   Cummings.

13   Q      And what did these union busters do for the Employer?

14   A      Well, they came down to really talk us out of becoming

15   unionized, saying that we -- we probably wouldn't get anything

16   more, anything less than was going on right now, so.

17   Q      Do -- do you recall attending meetings held by these

18   individual?

19   A      Yes.

20   Q      Do you recall being notified about a meeting on November

21   20th, 2019?

22   A      Yes, I do.

23   Q      All right.  I'm going to put on the screen and mark it for

24   identification as GC Exhibit 6.  Do you see the document I'm

25   putting in front of you, Mr. Mallard?

Exhibit 1(d)
399



1   A    Yes, sir.

2   Q    Do you know what this is?

3   A    Yes, it's a text message.

4   Q    And then this text message is between who?

5   A    Myself and Walter.

6   Q    And when you say yourself, are you the person on the

7   right, or are you the person on the left of this text chain?

8   A    I'm the person on the right.

9   Q    And then the person on the left is who, again?

10  A    Walter, of dispatch.

11  Q    Who took this -- thank you, who took this screenshot?

12  A    Myself.

13        MR. DO:  Your Honor, I'm going to move for the admission

14  of Exhibit 6 into evidence.

15        MR. KUNTZ:  So, Your Honor, we -- we absolutely object to

16  the admission of this exhibit.  This is very clearly hearsay,

17  and it's not a statement of a party opponent, because I don't

18  believe there's any allegation that Walter is a Section 2(11)

19  supervisor or Section 2(13) agent.

20        JUDGE ROSAS:  Has that been alleged?

21        MR. DO:  Your Honor, we're -- we're just putting this in

22  to establish that he was notified about the meeting.

23        MR. KUNTZ:  Your Honor, I don't think that changes the

24  fact that it's hearsay.

25        JUDGE ROSAS:  Well, there's hearsay and then there isn't

Exhibit 1(d)
400



1  hearsay and then there are exceptions.  So it's -- it's --

2  you're saying that it's -- it's not a -- a party opponent's

3  statement because it's -- it's not being offered as -- as -- as

4  it -- as an admission or a statement by an agent or a

5  supervisor.  However, the General Counsel says that it's being

6  offered as evidence or corroboration for the meeting that the

7  witness has -- has referred to.

8      MR. DO:  Furthermore, Your Honor, I would like to point

9  out that in the staffing -- the staffing chart that the

10  Respondent provided, Mr. Walter is actually identified on those

11  staffing charts as a part of its supervisory structure.

12      MR. KUNTZ:  Well, Your Honor, there's been no complaint

13  allegation to that effect.

14      JUDGE ROSAS:  All right.  Well, it -- again, it's not

15  being offered under -- what is it -- Federal Evidence

16  801(d)(2).  However, let me ask the witness.

17      So you indicated that the text on the left-hand side are

18  those that came from Walter; is that correct?

19      THE WITNESS:  Yes, Your Honor.

20      JUDGE ROSAS:  Okay.  And when it states in the middle,

21  quote, "What time may you arrive?  We have a meeting today."

22  That appears to be in bold; is that correct?

23      THE WITNESS:  Yes, sir.

24      JUDGE ROSAS:  Is that how you received it in the text or

25  was that highlighted later?

Exhibit 1(d)
401



www.escribers.net | 800-257-0885

```
 1          THE WITNESS:  That's how I received it in the text, I

 2    believe.

 3          JUDGE ROSAS:  So --

 4          THE WITNESS:  Or might have --

 5          JUDGE ROSAS:  -- is this a copy of -- of a text that was

 6    extracted from your phone information?

 7          THE WITNESS:  Yes, it is.  It's a -- it's a copy of it has

 8    it.

 9          JUDGE ROSAS:  And has it been edited in any manner?

10          THE WITNESS:  No, sir.

11          JUDGE ROSAS:  Okay.  All right.

12          MR. KUNTZ:  Your Honor.

13          JUDGE ROSAS:  Anything else you want to add, Respondent?

14          MR. KUNTZ:  Yeah, Your Honor, may I ask a couple voir dire

15    questions before you make a ruling?

16          JUDGE ROSAS:  Go ahead.

17                        **VOIR DIRE EXAMINATION**

18    Q    BY MR. KUNTZ:  Mr. Mallard, do you see --

19          MR. KUNTZ:  Well, strike that.

20    Q    BY MR. KUNTZ:  You said that the text messages on the left

21    are Walter's; is that right?

22    A    Yes.

23    Q    And do you see next to those text messages, there appears

24    to be a letter D, as in dog?

25    A    Next to the text message.
```

Exhibit 1(d)
402



www.escribers.net | 800-257-0885

1   Q    I'm sorry, could you please repeat that?

2   A    No, I'm trying to understand exactly -- yeah, you say the

3   letter D?

4   Q    Yeah, and actually --

5   A    Yes.

6   Q    -- Ms. Bridge, helpfully, just highlighted what I'm

7   referring to.  Do you see that?

8   A    Yeah.

9        MR. DO:  That would have been me.

10  A    I see that.  Yes, sir.  That -- that D stands for

11  dispatch.

12  Q    BY MR. KUNTZ:  Understood.  Thank you.  And other than

13  that, is there anything on this document which would identify

14  from whom the messages on the left came?

15  A    No, sir.  All I have are D, for dispatch.

16       MR. KUNTZ:  Your Honor, we maintain our objection to

17  this -- this admission of this document.

18       JUDGE ROSAS:  Well, it -- it appears to have the -- at

19  least on the -- the testimony that I've heard, a sufficient

20  foundation to receive it, as a -- as a record generated in the

21  ordinary course of business.  Now, you can attack that on

22  cross-examination, but I have enough criteria in this testimony

23  to indicate that the document is more likely what it appears to

24  be than not.  So you know, that preponderance of the

25  determination at least gets it past voir dire, and it gets it

Exhibit 1(d)
403



www.escribers.net | 800-257-0885

1    into evidence as a document that the witness is saying at this

2    point was one that -- that reflects a text message that he got

3    from Walter on a particular date and time.  So the objection is

4    overruled.  General Counsel's 6 is received.

5    **(General Counsel Exhibit Number 6 Received into Evidence)**

6        JUDGE ROSAS:  And that would be Federal Rule of Evidence

7    803, subdivision 6 that I believe it -- it would qualify under.

8        Next question.

9        MR. DO:  Thank you, Your Honor.

10                 **RESUMED DIRECT EXAMINATION**

11    Q    BY MR. DO:  Mr. Mallard, was this the first time that you

12    learned about the November 20th, 2019 meeting?

13    A    Yes.

14    Q    Do you recall being told that attendance at this meeting

15    was mandatory?

16    A    No, sir.

17    Q    Do you recall being told what would happen if you didn't

18    attend this meeting?

19    A    No, sir.

20    Q    Did you attend this meeting?

21    A    Yes.

22    Q    You testified that you attended around three of these

23    meetings.  When was the second meeting?

24    A    The second meeting was in the month of November.  I really

25    don't remember the exact day.  For -- I think it might have

Exhibit 1(d)
404



1    been November 23rd or something like that.

2    Q    Sure.  And how did you learn about this second meeting?

3    A    The same way.  The same way, through text -- via text.

4    Q    And who texted you then?

5    A    That would be Walter again.

6    Q    Do you recall being told that attendance at this second

7    meeting was mandatory?

8    A    No, sir.

9    Q    Do you recall being told what would happen if you did not

10   attend the second meeting?

11   A    No, sir.

12   Q    Let me ask you, regarding the third meeting, you recall

13   when that meeting occurred?

14   A    Yes, sir.

15   Q    When did it occur?

16   A    That was November 25th of 2019.

17   Q    What time was this meeting held?

18   A    That meeting was held at 5:00, 5 p.m.

19   Q    And how do you learn about this meeting?

20   A    I learned of this meeting through other coworkers as I was

21   clocking in.

22   Q    And when you learned about this meeting, do you recall

23   being told that this meeting was mandatory?

24   A    No sir.

25   Q    Do you recall ever being told what would happen if you

Exhibit 1(d)
405



1    didn't attend this third meeting?

2    A    No, sir.

3    Q    Do you remember who -- who led this meeting?

4    A    Who led the meeting?

5    Q    Yes, sir.

6    A    That would be Mr. Cummings.

7    Q    And do you recall seeing Joe Lugo at this meeting?

8    A    No, not at this meeting.

9    Q    Other than Mr. Cummings, who else was at this meeting?

10   A    His other comrade which he came down here with, and most

11   of our -- our employees, most of our night shift workers.

12   Q    So let me ask you, what happened during this meeting?

13   A    Well, during this meeting, Mr. Cummings tried to paint a

14   pretty bad picture of the Union and -- and stated that, like,

15   we wouldn't get what we think we would get and just outright

16   badmouthing of the Union.  And also, he had his PowerPoint set

17   up to where he was showing this old footage from the 1960s,

18   trying to get -- trying to get us to -- to not want to become

19   Union, you know, by -- basically, that's it.

20   Q    Do you recall any employee speaking up during this

21   meeting?

22   A    I recall one of my -- one of my coworkers asking a

23   question.  And I do recall other people speaking up.  Todd

24   Ellis spoke up at one meeting, and Alex (phonetic throughout)

25   spoke up at another meeting, and I also spoke up by answering

Exhibit 1(d)
406



1    questions for my coworker when he asked it.

2    Q    Okay.  Okay.  So let me -- let's kind of pull it back a

3    bit.  When you said that there was -- during this third meeting

4    that you attend on November 25th, you said that an employee

5    asked a question during that meeting.  Do you remember what

6    that question was?

7    A    Yes.  He asked if we would be able to meet with -- with

8    the company without the Union being around.  And -- and -- and

9    I responded to him by telling him that if that were the case,

10   we wouldn't be where we are right now.  And -- and I also

11   brought -- brought to him the fact that he got shot in the head

12   figurative -- figuratively shot in the head last year by

13   talking to another manager who basically did nothing a year

14   prior to that -- than that.  And I told him that's all --

15   that's all you need to know is what -- what we just been

16   through.

17   Q    And after you answered this question, did any -- did Mr.

18   Cummings say anything in response?

19   A    Yes.  Mr. Cummings basically told me this was his

20   presentation, and I think he just didn't want me to speak

21   anymore.  You know, so all I did is tell them if -- if I can't

22   talk, then I can't listen.  And I walked out the -- I walked

23   out the meeting.

24   Q    When you were walking out of the meeting, were you told

25   what would happen if you left the meeting?

Exhibit 1(d)
407



1    A    No, sir.

2    Q    When you were walking out of the meeting, did anybody try

3    to stop you?

4    A    No, sir.

5    Q    When you were walking out of the meeting, did anyone tell

6    you that you have to stay for the meeting?

7    A    No, sir.

8    Q    What happened after you left that meeting?

9    A    After I left the meeting, I went out to the yard -- to

10   the -- and I was out there for about ten minutes before one of

11   my coworkers came and told me that it was another meeting that

12   was going to start up.  And this one had to -- had to do with

13   Joe Lugo.

14   Q    Did you attend that meeting with Joe Lugo?

15   A    Yes, I did.

16   Q    Where did that meeting take place?

17   A    That meeting took place in the breakroom dire -- ten

18   minutes after the meeting that we just had with the union

19   busters.

20   Q    And what did Joe Lugo say at this meeting?

21   A    Joe Lugo just innerated (sic) things that's going on about

22   us taking long lunch breaks and making sure we're not stealing

23   from the company, stealing time from the company, and also

24   reiterated if we having any troubles with the -- with -- with

25   the trucks and that he would also have new maintenance sheets

Exhibit 1(d)
408



1    out and reiterated to just bring all the problems to him and

2    he'd get it all taken care of.

3    Q    Do you recall him, Mr. Lugo, mentioning anything about the

4    mechanic?

5    A    Yes, I do.  I do.  He -- he -- he told me that -- he'd

6    even called the mechanic himself personally to get him to

7    handle what he needed him to handle, to fix whatever he needed

8    them to fix.  He did say that.

9    Q    How did you -- how did you first learn about your

10   termination?

11   A    The -- I got a phone call.  I had several phone calls

12   earlier that day, but I finally got around to answer the phone

13   about 3:00 on the 26th of November.  And it was Joe Lugo

14   telling me I was terminated for insubordination.

15   Q    All right.  Just a moment -- and did he tell you what

16   insubordination were you being terminated for?

17   A    No sir.  He did not.

18   Q    Do you recall speaking to anyone else regarding your

19   termination?

20   A    Yes.  It was another person from Southern Counties and

21   safety who -- who also called me and let me know that I was

22   terminated as well.

23   Q    All right.  I'm going to put on the screen what's been

24   already marked and admitted as Joint Exhibit 5(b).  Do you

25   recognize what I just put in front of you?

Exhibit 1(d)
409



www.escribers.net | 800-257-0885

1    A    Yes sir.

2    Q    What is it?

3    A    That is a termination letter.

4    Q    Do you recall receiving this letter?

5    A    Yes, I do.

6    Q    Do you know who Richard Silverwood is?

7    A    I have no clue.

8    Q    Do you know who Dennis Glackin is?

9    A    I had -- not in the slightest.

10   Q    Prior to your termination, had you ever been disciplined

11   by Universal Intermodal any other time?

12   A    No, sir.  I've only had one verbal warning.  And that was

13   just for taking a -- a -- a long lunch break.

14   Q    When you were hired by Universal Intermodal, were you

15   required to have a valid commercial driver's license?

16   A    Yes.

17   Q    To the best of your recollection, were you required to

18   provide a copy of your commercial driver's license?

19   A    Yes.

20   Q    Let me put on the screen what's been marked, identified,

21   and admitted as Joint Exhibit 5(a).  Let me scroll down.  So

22   this is on --

23        MR. DO:  I'm showing the witness the document that's on

24   page Bates stamped 000095.

25   Q    BY MR. DO:  Is this a -- is this the copy of your

Exhibit 1(d)
410



```
1     commercial's (sic) driver's license?

2     A    Yes, it is.

3     Q    When did you provide this picture?

4     A    I provided that picture in May of 2018.

5     Q    Was that when you filled out the job application?

6     A    Yes, that's while filling out the job application.

7     Q    Do you recall if Universal required you to have a

8     California's license?

9     A    No, I don't.

10         MR. KUNTZ:  Objection.  Lack of foundation.

11         JUDGE ROSAS:  You're objecting to the question of whether

12    or not the company required him to have a California's driver's

13    license?

14         MR. KUNTZ:  Correct, Your Honor.  We haven't established

15    that Mr. Mallard knows all of the company's hiring

16    requirements.

17         JUDGE ROSAS:  Well, did the company require him, just as

18    to what, if anything, they conveyed to him.  Overruled.

19    Q    BY MR. DO:  Mr. Mallard, can you answer the -- answer

20    the -- do you want me to repeat the question, Mr. Mallard?

21    A    Yes sir.

22    Q    Okay.

23    A    Please do.

24    Q    Do you -- do you recall Universal Intermodal requiring you

25    to have a California's license?
```

Exhibit 1(d)
411



www.escribers.net | 800-257-0885

1    A     Not at all.

2    Q     Do you remember Universal requiring you to have a license

3    from -- at a particular state?

4    A     Not at all.

5    Q     To the best of your knowledge, does Universal Intermodal

6    do interstate loads, the loads that end -- begin or end in one

7    state and end in another state?

8    A     Yes, they do.

9    Q     Do you know if these loads begin or end in Nevada or

10   Arizona?

11   A     Yes, both.

12   Q     Do you know of any driver who has been terminated from a

13   commer -- for having a commercial's driver's license from a

14   state other than California?

15   A     Can you repeat that for me one more time?

16   Q     Sure.  Do you know if any employee driver who has been

17   terminated for having a commercial's driver's license from a

18   state that's not California?

19   A     No, I haven't.  I mean, yes -- if -- I know of one

20   gentleman.

21   Q     And who is that?

22   A     That will be Jonathan L.

23   Q     Other than Jonathan, are you aware of any other drivers

24   through the entire time you was -- you were with Universal

25   Intermodal who's been terminated for having a non-California

Exhibit 1(d)
412



1    driver's license?

2    A     No sir.

3          MR. DO:  No further questions, Your Honor.

4          JUDGE ROSAS:  Charging Party, any questions?

5          MR. WOJCIECHOWSKI:  No, thank you, Your Honor.

6          JUDGE ROSAS:  Respondent.  Off the record.

7          MR. KUNTZ:  Your Honor -- Your Honor, could we have 30

8    minutes off the record, please?

9          JUDGE ROSAS:  Off the record.

10   (Off the record at 9:19 a.m.)

11         JUDGE ROSAS:  Okay.  Before we resume with the

12   Respondent's cross-examination of Mr. Mallard, let me just --

13   let me just say that it appears that the President of the

14   United States will be signing a newly passed law that will make

15   June 19, either starting this year or certainly by next year, a

16   federal holiday in commemoration of that famous general, Gordon

17   Granger, who announced, I don't know how many years ago 19- --

18   1865 was, but on June 19th, 1865, that all slaves were now

19   free.  And so that's going to be a federal holiday.

20         It may or may not be a holiday tomorrow, but and it --

21   in -- in -- in -- in commemoration of such a historic occasion,

22   I'm going to take annual leave if it is not a holiday.  And

23   there won't be any testimony in this case tomorrow unless there

24   were some exigent circumstances that y'all have to bring to my

25   attention at this time.

Exhibit 1(d)
413



1          MR. DO:  Your Honor, that's an issue for the General

2     Counsel because we have some witnesses who are only available

3     tomorrow --

4          JUDGE ROSAS:  Only available --

5          MR. DO:  -- we weren't anticipating --

6          JUDGE ROSAS:  -- tomorrow.  And they're only available

7     tomorrow and what other dates?  Are they going on vacation?

8          MR. DO:  No, Your Honor, one -- one of them has a funeral,

9     so that -- that blocks out most of next week for him.  So

10    that's the issue we have is we -- we have two witnesses that

11    outright just told us that they're only available on one day.

12         JUDGE ROSAS:  They're -- they're both occupied by a

13    funeral?

14         MR. DO:  No, one of them is occupied by a funeral.  The

15    other individual, quite -- quite frankly, I didn't ask.

16         MR. KUNTZ:  And Your Honor, as far as that goes,

17    Respondent would just like to express that, you know, it does

18    appear that it's unlikely that we conclude this hearing by

19    Tuesday.  Of course, we don't know at that point if we'll still

20    be on the General Counsel's case-in-chief, the Union's case-in-

21    chief, or on Respondent's case-in-chief.  But in any event, if

22    and when we need to resume the hearing, we'd be happy to

23    accommodate the witnesses' scheduling for the General Counsel,

24    even if it's not necessarily in the same traditional order in

25    which things go.

Exhibit 1(d)
414

escribers
www.escribers.net | 800-257-0885

1      JUDGE ROSAS:  Well, so General Counsel, you don't have any

2   other witnesses that you could shuffle?

3      MR. DO:  Not today, because there's one witness who has --

4   again, this is the individual I haven't spoke to regarding

5   other dates.  There's one witness who's only available

6   tomorrow.  And he's indicated that he's only available

7   tomorrow.  And we think that it's prejudicial to the General's

8   Counsel's case if we can't put him up tomorrow.

9      JUDGE ROSAS:  Well, I'm going to give you -- let's go off

10   the record.

11   (Off the record at 10:00 a.m.)

12      JUDGE ROSAS:  Respondent, cross-examination.  Mr. Mallard,

13   I remind you, you're still under oath.

14      THE WITNESS:  Yes sir.

15                       **CROSS-EXAMINATION**

16   Q     BY MR. KUNTZ:  Good morning, Mr. Mallard.

17   A     Good morning.

18   Q     My name's Harrison Kuntz.  I'm an attorney for the

19   Respondents in this case.  And I'm going to have a few cross-

20   examination questions for you.  Now, in our experience doing

21   these video hearings, we found that sometimes the lag on the

22   video can be a little bit of an issue.  So I'll just ask that

23   as I'm asking you questions, maybe you might want to give it a

24   second or two after I finish asking the question, just to make

25   sure that I've finished and we're not talking over each other.

Exhibit 1(d)
415



1    Is that okay?

2    A    Yes, sir.

3    Q    And in the event that the Union's attorneys or the

4    attorneys for the NLRB raise an objection, I'll just ask that

5    you stop speaking, don't answer the question, and allow all of

6    us and -- and Your Honor to work out that objection.  Is that

7    okay?

8    A    Yes, sir.  It is.

9    Q    Okay.  So I want to start by asking you about the

10   dispatcher that you identified as Walter.  Do you remember

11   discussing Walter in your direct testimony?

12   A    Yes.

13   Q    And for how long did you work with Walter?

14   A    Walter, I worked with him maybe about six to eight months.

15   Q    Okay.  Do you know Walter's last name?

16   A    No, I don't.

17        MR. KUNTZ:  Ms. Bridge, could you please pull up Joint

18   Exhibit 5(a), and specifically Bates page 85?

19        MR. DO:  Your Honor, I'm going to object to putting this

20   up on the screen because there's no foundation.  And I don't

21   think this witness know what that document is.

22        JUDGE ROSAS:  Hold on.  All right.  Let's place Mr.

23   Mallard in the waiting room.  Mr. Mallard, we're going to

24   basically ask you to virtually step aside for a moment.  And

25   we'll bring you right back.  Okay?



1          THE WITNESS:  Okay.  Yes, sir.

2          JUDGE ROSAS:  All right.  Okay.  So let's put that up on

3     the screen, so I could see what you all are talking about.

4          MR. DO:  Oh, wait, I actually want to withdraw my

5     objection.  I -- I -- I thought he was referring to the -- the

6     organizational chart.  This is the 5(a), correct, Harrison --

7          MR. KUNTZ:  Yes.

8          MR. DO:  -- Mr. Kuntz?

9          MR. KUNTZ:  That's correct.

10         MR. DO:  Okay.  Yeah, I withdraw my objection.  I thought

11    this was a different document.  My apologies --

12         JUDGE ROSAS:  Okay.

13         MR. DO:  -- Your Honor.

14         JUDGE ROSAS:  All right.  Thank you, Diane.  Are you

15    there?

16         MR. KUNTZ:  I believe the witness needs to be readmitted,

17    Your Honor.

18         JUDGE ROSAS:  Diane, are you bringing him back?

19         MS. BRIDGE:  I thought I brought him back.

20         MR. DO:  Your Honor, he -- normally when the breakout room

21    is closed, there's a prompt.  I'm assuming the witness might be

22    just careful and don't want to press anything.  So he's just

23    waiting for that to bring him back automatically.

24         JUDGE ROSAS:  You can end it, right, Diane?

25         MS. BRIDGE:  I guess I can.  Let's see here.

Exhibit 1(d)
417


www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  Or sometimes it gives you a countdown,

2    right?

3        MR. DO:  Yes, Your Honor, I believe that's how it works.

4        MS. BRIDGE:  It says that he's joining back in, but.

5        JUDGE ROSAS:  He really is in the abyss.

6        MS. BRIDGE:  Yeah, it's -- it looks like he's coming back

7    in, but he's not coming back in.

8        Mr. Do, do you know, should -- is there something else I

9    should be doing?

10        JUDGE ROSAS:  We're off the record, Troy.

11    (Off the record at 10:40 a.m.)

12        JUDGE ROSAS:  Okay.  Back on the record.

13                    <u>**RESUMED CROSS-EXAMINATION**</u>

14    Q    BY MR. KUNTZ:  Thank you, Mr. Mallard.  And apologies for

15    the technical difficulties there.  So I believe where we left

16    off was that Ms. Bridge was bringing onto the screen Joint

17    Exhibit 5(a), specifically Bates page 85.

18        MS. BRIDGE:  Counsel, can you remind me what page you want

19    on 5(a)?

20        MR. KUNTZ:  Bates page 85, please.

21        MS. KAGEL:  Ms. Bridge, I believe it's the 19th page of

22    that PDF.

23        MS. BRIDGE:  Thank you.  And I'll just type in the --

24        MR. KUNTZ:  Thank you, Ms. Bridge.  Now -- and could you

25    actually scroll down just a little bit and then scroll back up,

Exhibit 1(d)
418


www.escribers.net | 800-257-0885

1    so that we can see the full page, please?  Thank you.

2    Q    BY MR. KUNTZ:  Mr. Mallard, do you recognize --

3         MR. KUNTZ:  Or excuse me.  Strike that.

4    Q    BY MR. KUNTZ:  Do you see the document on the screen right

5    now?

6    A    Yes, I do.

7    Q    Do you recognize this document?

8    A    It looks like some of the paperwork from when I was being

9    hired.

10   Q    Isn't it true that this is the personal -- Personnel

11   Conduct Standards?

12   A    Yes sir.

13   Q    And that's for Universal Intermodal Services, correct?

14   A    Yes sir.

15   Q    And isn't it true that you received this document at the

16   time of your hire?

17   A    Yes, I did.

18        MR. KUNTZ:  And Ms. Bridge, if you'll scroll down to the

19   bottom of the page again, please.

20   Q    BY MR. KUNTZ:  Is that your signature, Mr. Mallard?

21   A    That it is.

22        MR. KUNTZ:  Ms. Bridge, could you now please scroll down

23   two pages to Bates page 87?  And would you mind slowly

24   scrolling down through Bates page 92, so that Mr. Mallard can

25   see the entire document?  Thank you, Ms. Bridge.

Exhibit 1(d)
419



1    Q    BY MR. KUNTZ:  Mr. Mallard, did you see those pages as Ms.

2    Bridge was scrolling?

3    A    Yes, I did.

4    Q    And do you recognize this document?

5    A    I've recognized it as being part of the paperwork for

6    hiring.

7    Q    And is this, in fact, a personal code of -- excuse me, a

8    Business Code of Conduct for Universal Intermodal Services?

9    A    Yes, it is.

10   Q    And did you also receive this document at the time of your

11   hire?

12   A    Yes, I do -- I did.

13   Q    And we can scroll back if you need to, but was the

14   signature on the last page of this document your signature?

15   A    Yes, it was.

16   Q    Okay.  Thank you.  Mr. Mallard, isn't it true that you

17   worked for a company by the name of AMR Staffing in Bellflower,

18   California as a forklift operator prior to your employment with

19   Universal?

20   A    Many years prior.

21   Q    In 2013, is that correct?

22   A    Yes, sir.

23   Q    And then from 2014 to 2015, you worked for CRST Expedited

24   in Riverside, California?

25        MR. DO:  Objection.  Relevance.

Exhibit 1(d)
420



www.escribers.net | 800-257-0885

```
1    A    Yes, sir.

2         JUDGE ROSAS:  Hold on.  I do this with cautious pessimism,

3    but can we send Mr. Mallard again to the waiting room?  Don't

4    go anywhere but stay in --

5         THE WITNESS:  I won't press anything.

6         JUDGE ROSAS:  -- (indiscernible, simultaneous speech).

7         THE WITNESS:  Yes, sir.

8         JUDGE ROSAS:  All right.  He's gone.  So what's the

9    relevance?

10        MR. KUNTZ:  Your Honor, I'm simply laying foundation for a

11   subsequent question.

12        JUDGE ROSAS:  What's the subsequent question going to be?

13        MR. KUNTZ:  It relates to his understanding of how

14   meetings are handled in terms of being mandatory or optional in

15   the workplace.

16        JUDGE ROSAS:  Okay.  It has nothing to do with credibility

17   or character?

18        MR. KUNTZ:  Correct, Your Honor.

19        JUDGE ROSAS:  Okay.  General Counsel.

20        MR. DO:  Your Honor, I -- I -- I don't -- I mean, maybe

21   I'm missing something, but I don't understand how his previous

22   work experience is going to relate to the issue of whether or

23   not he was told -- or at least the meetings at Universal

24   Intermodal were mandatory or not.

25        JUDGE ROSAS:  Are you referring to industry standards,
```

Exhibit 1(d)
421



www.escribers.net | 800-257-0885

1    Respondent?

2         MR. KUNTZ:  Essentially, Your Honor, and also the fact

3    that his prior employment almost certainly understood his

4    understanding of whether a meeting that he was asked to attend

5    was mandatory or optional.

6         JUDGE ROSAS:  I'll allow it.  Overruled.

7         MR. DO:  Well, then, Your Honor, can -- can I --

8         JUDGE ROSAS:  Go ahead.  Go ahead.

9         MR. DO:  -- flag that -- thank you, that I believe they're

10   just -- Respondent is just reading from what's essentially page

11   00071 of his application material, where he lists about five

12   jobs that he previously worked in.  So to the extent that

13   they're doing that, I'll object to -- for the document speaks

14   for itself.  And that's already in --

15        JUDGE ROSAS:  It speaks for --

16        MR. DO:  -- evidence.

17        JUDGE ROSAS:  -- speaks for itself in what respect?

18        MR. DO:  With respect to who he worked for, at what time

19   period.

20        JUDGE ROSAS:  But I think he's probing the witness'

21   practices at a previous employer, employers.  So I'm going to

22   overrule the objection.  Let's bring him back.

23        Okay.

24   Q    BY MR. KUNTZ:  Welcome back, Mr. Mallard.

25   A    Yes, sir.

Exhibit 1(d)
422



www.escribers.net | 800-257-0885

1    Q    So I believe the prior question was, isn't it true that

2    from July of 2014 to June of 2015, you worked as a driver for a

3    company by the name of CRST Expedited in Riverside, California?

4    A    Yes, sir.

5    Q    Isn't it also true that from June of 2015 to December of

6    2015, you worked for a company by the name of Fun Ship

7    Children's Center in Hawthorne, California as a driver?

8    A    Yes, sir.

9    Q    And isn't it also true that from July of 2016 to September

10   of 2017, you worked as a driver for a company by the name of CP

11   Trucking in Gardena, California?

12   A    Yes, sir.

13   Q    Isn't it also true that from February of 2016 to a

14   subsequent date, you worked as a driver for a company by the

15   name of Payne Trucking?

16   A    That is correct.

17   Q    And isn't it also true that from October of 2017 to

18   February of 2018, you worked as a driver for a company by the

19   name of Centerline Driving in Santa Ana, California?

20   A    Yes, sir, Bellflower.

21   Q    That was in Bellflower, California?

22   A    Yeah.  That's the Bellflower office.  They do have a Santa

23   Ana office, though.

24   Q    Understood.  Thank you.  So isn't it true that in all of

25   those prior jobs, if your employer told you to attend a

Exhibit 1(d)
423



1   meeting, your default assumption would be that that's a

2   mandatory meeting, correct?

3        MR. DO:  Objection.  Hypothetical.

4   A    No, sir.

5        JUDGE ROSAS:  Hold on.  Hold on.  Hold on.  Hold on.

6   There's an objection.  Don't -- don't answer if there's an

7   objection.  So the question is what the practices were of those

8   previous employers.

9        MR. KUNTZ:  Correct, Your Honor.

10       MR. DO:  Well --

11       JUDGE ROSAS:  Okay.  I'm going to sustain the objection.

12  This is cross-examination.  I understand that.  But the

13  question kind of requires some foundation, nevertheless.

14       MR. KUNTZ:  Sure.

15  Q    BY MR. KUNTZ:  Mr. Mallard, at your prior jobs, were you

16  ever told by an employer to attend meetings?

17  A    No, sir.  I never --

18  Q    You --

19  A    -- had one meeting.

20  Q    You never had --

21  A    No.

22  Q    -- any meeting at any prior --

23  A    Never.

24  Q    -- job?

25  A    Never.  I can't --

Exhibit 1(d)
424



www.escribers.net | 800-257-0885

1      MR. KUNTZ:  Apologies, Your Honor.  Our screen just shut

2  off.

3      JUDGE ROSAS:  Off the record.  Can you see us?

4      MR. KUNTZ:  We should be able to in one minute --

5      JUDGE ROSAS:  Oh, okay.

6      MR. KUNTZ:  -- we'll let you know (indiscernible) --

7      JUDGE ROSAS:  Okay.  Let us know.

8      MR. KUNTZ:  We are back.  Apologies for that.

9      JUDGE ROSAS:  Go ahead.

10  Q    BY MR. KUNTZ:  And Mr. Mallard, were you ever told to go

11  to meetings for Universal Intermodal Services prior to the

12  Union-related meetings you described in your direct testimony?

13  A    If there were, there would be very few meetings that we

14  had at Universal.

15  Q    But some did occur?

16  A    Yeah, yeah.  We had a couple, I believe.

17  Q    Okay.  And when you were told to attend those meetings,

18  did the supervisor or manager who told you that always specify

19  whether it was a mandatory or optional meeting?

20  A    No, they did not.

21  Q    But you attended those meetings, didn't you?

22  A    Yes.  Yes.

23  Q    Because if they told you to attend a meeting, the default

24  assumption would be that it's a mandatory meeting, correct?

25  A    Not necessarily, because when you hear about the meetings,



1    you're not hearing about it from the actual person that's doing

2    the meeting.  You're hearing about it maybe through dispatch or

3    your other coworkers, so nothing was ever clear on being

4    mandatory or not.

5    Q    Well, let's put it this way.  Let's limit it to dispatch.

6    If a dispatch representative told you to attend a meeting,

7    isn't it true that the default assumption would be that that's

8    a mandatory meeting?

9         MR. DO:  Objection.  Calls for speculation.

10        JUDGE ROSAS:  I'll allow him to answer that.  If -- if you

11   know, sir.

12   A    Okay.  Now, can you repeat that question again?

13   Q    BY MR. KUNTZ:  So limiting it only to dispatch.

14   A    Okay.

15   Q    Isn't it true that if a dispatch representative told you

16   at Universal to attend a meeting, that you would assume unless

17   told otherwise that it's a mandatory meeting?

18   A    Yes.

19   Q    And isn't the same also true if you were told to attend a

20   meeting by a manager or a supervisor of Universal?

21   A    Yes, even though they wouldn't say it, you would assume.

22   Q    Now, Mr. Mallard, do you recall testifying regarding the

23   purchase of Southern Counties Express?

24   A    Excuse me?  One more time.  Can you repeat that?

25   Q    No problem.  Do you recall testifying regarding the

Exhibit 1(d)
426



1    purchase of a company by the name of Southern Counties Express?

2    A    Yes, I do.

3    Q    And I believe you testified that that occurred sometime in

4    2019; is that right?

5    A    Yes.

6    Q    If I told you that that purchase actually occurred in

7    August of 2018, you wouldn't have any reason to doubt that;

8    would you?

9         MR. DO:  Objection.  Calls for speculation.

10        JUDGE ROSAS:  If you know, sir.

11   A    I wouldn't have no reason to doubt it.  No, sir, I

12   wouldn't.

13   Q    BY MR. KUNTZ:  And Mr. Mallard, you were not involved in

14   the corporate transaction that took place between Southern

15   Counties Express and Universal Intermodal Services; were you?

16   A    No, sir.

17   Q    And you don't know the details of how that played out in

18   terms of how the entities would relate to one another after the

19   purchase; do you?

20   A    No, sir.

21        JUDGE ROSAS:  Counsel, let me just interject at this point

22   to -- based upon what I'm hearing, I'm going to amplify my

23   previous ruling just on the testimony elicited from the witness

24   regarding interactions with the dispatcher, the previous ruling

25   regarding admissibility of communications from the dispatcher

Exhibit 1(d)
427



1   being admissible.  In addition, pursuant to Federal Rule of

2   Evidence D -- 801(d)(2), notwithstanding the Respondents'

3   position that the dispatcher was -- is not plead as an agent or

4   a supervisor.  Under that provision, the statement would be

5   admissible as a statement by an apparent -- apparently

6   authorized by -- by that individual -- by the Employer for that

7   individual to make those communications.  So I'm receiving it

8   under 801(d)(2)(C) as well.  Okay.  Go on.

9        MR. KUNTZ:  Thank you for the clarification, Your Honor.

10   And just to be clear, for the record, I believe you're

11   referring to General Counsel's Exhibit 6; is that correct?

12        JUDGE ROSAS:  That's with respect to the communications

13   from Walter --

14        MR. KUNTZ:  Yes, I -- I believe it was --

15        JUDGE ROSAS:  -- the text message -- the text message.

16   That's correct.  Correct.

17        MR. KUNTZ:  Thank you, Your Honor.

18   Q   BY MR. KUNTZ:  Now, Mr. Mallard, I believe you also

19   testified that certain changes at the Compton facility occurred

20   as a result of the Southern Counties Express purchase; is that

21   right?

22   A   Yes, sir.

23   Q   Isn't it true that those changes had occurred by February

24   of 2019?

25   A   By February of 2019?  I suppose that could be correct to

Exhibit 1(d)
428



1    my recollection.

2    Q    And certainly by March of 2019, correct?

3    A    Yes.

4    Q    Now, by March of 2019, isn't it true that you are now

5    carrying more Southern Counties Express loads than Universal

6    Intermodal Services loads?

7    A    To my recollection, it was all -- it was all equal amounts

8    of loads to whether it was Southern Counties, whether it was

9    Container Connection, whether it was -- you -- you get those

10   loads from anywhere, you know what I mean?  It was -- it was no

11   real -- no real -- the loads wouldn't always come from one

12   specific place.  We still get loads from Universal -- you still

13   get loads for Southern Counties.  You know, it just depends on

14   how your day was, how they set up your day.

15   Q    So -- and I'm not asking for an exact number here.  I know

16   that would not be a fair thing to ask.  But isn't it true that

17   from approximately that time in early 2019 through the duration

18   of your employment, the rough breakdown of the loads that you

19   were carrying was approximately one-third each to Southern

20   Counties Express loads, Containers Express (sic) loads, and

21   Universal Inter -- Intermodal Services loads?

22        MR. DO:  Objection asked and answered.  The witness

23   already says that he can't identify him.

24        JUDGE ROSAS:  Don't -- just --

25        MR. DO:  My apologies.



1    JUDGE ROSAS:  -- don't elaborate on the objection.  Okay.

2    Can you answer that, sir?  Can you -- can you make it a

3    percentage estimate at this point?

4    THE WITNESS:  I really -- I really can't.  I'm going to

5    say -- there are equal percentages of what -- what loads we

6    were doing according to how I was doing it -- equal

7    percentages.  Maybe --

8    JUDGE ROSAS:  No -- no maybe, sir.  Only if you --

9    THE WITNESS:  Okay.

10    JUDGE ROSAS:  -- only if you have a good idea.

11    THE WITNESS:  Okay.  Well, that's -- that's to the best of

12    my knowledge.

13   Q    BY MR. KUNTZ:  Okay.  Thank you.  If you know, isn't it

14    true that at the time of purchase, Southern Counties Express

15    had more than 200 owner-operators working in Southern

16    California?

17   A    You -- did I know that?

18   Q    Correct.

19   A    No, I didn't.

20   Q    Did you have any sense of how many owner-operators were

21    working for Southern Counties Express at the time of its

22    purchase?

23   A    I'm going to say I thought maybe at least 40 drivers or

24    so, because I -- that's what I might have thought.

25   Q    And it could be much higher than that; isn't that right?

Exhibit 1(d)
430



1    A    It sure could be.  Sure could be.

2    Q    And at that time, there were less than 30 drivers working

3    at the Compton facility, correct?

4    A    Yes, sir.

5    Q    Now, I believe you testified that the Container Connection

6    purchase also occurred in 2019; is that right?

7    A    Yes, sir.

8    Q    And if I told you that purchase actually occurred in

9    December of 2018, you wouldn't have any reason to doubt that;

10   would you?

11   A    I wouldn't have any reason to doubt it.

12   Q    And you were not involved in the details of that corporate

13   transaction either; would you -- were you?

14   A    No, sir.

15   Q    You don't know how Container Express (sic) was supposed to

16   relate to Universal Intermodal Services or its work after that

17   corporate transaction, correct?

18   A    No, sir.

19   Q    And you also testified, didn't you, that following that

20   purchase, certain changes occurred at the Compton facility; is

21   that right?

22   A    Yes, sir.

23   Q    And isn't it true that those changes had also occurred by

24   about February of 2019?

25   A    To my recollection, yes, you could say that.

Exhibit 1(d)
431



www.escribers.net | 800-257-0885

1   Q    And if you know, is it true that Container Connection also

2   had as many as 200 owner-operators working for it at the time

3   of the purchase?

4   A    Oh, had no clue.

5   Q    No idea at all how many owner-operators were working for

6   Container Connection at the time?

7   A    No, sir.  Not at the time.

8   Q    You don't have any knowledge, do you, of the nature of the

9   contracts between Universal Intermodal Services and its

10   customers?

11   A    I would not.

12   Q    And you wouldn't know any arrangements made between

13   Universal Intermodal Services and its customers; would you?

14   A    I would not.

15   Q    You also have no knowledge of the nature of contracts

16   between Southern Counties Express and its customers; do you?

17   A    Not at all.

18   Q    And you have no knowledge of any arrangements made between

19   Southern Counties Express and its customers; do you?

20   A    No, sir.

21   Q    And likewise, you have no knowledge of any contracts with

22   customers for Container Connection; do you?

23   A    No, sir.

24   Q    And you have no knowledge of any arrangements regarding

25   work made between Container Connection and its customers; do

Exhibit 1(d)
432



1    you?

2    A    No, sir.

3    Q    Based on your experience in the industry as a whole, isn't

4    it true that customers often utilize more than one trucking

5    company to carry their loads?

6        MR. DO:  Objection.  Calls for speculation.

7        JUDGE ROSAS:  If you know.

8    A    Yes, sir.

9    Q    BY MR. KUNTZ:  That is true?

10       JUDGE ROSAS:  We're -- we're -- we're specifically

11   referring to what, Southern California, Counsel?

12       MR. KUNTZ:  That's a good clarifying point, Your Honor.

13   Q    BY MR. KUNTZ:  Speaking the Southern California trucking

14   industry, in your experience, Mr. Mallard, isn't it true that

15   customers often use multiple trucking companies to carry their

16   loads?

17   A    Yes, they do.

18   Q    Mr. Mallard, I'd like to clarify some of the testimony you

19   gave regarding SCAC codes.  Do you recall that testimony?

20   A    Yes sir.

21   Q    And I believe you testified, correct me if I'm wrong, that

22   those codes allow port personnel to understand which customer

23   the freight belongs to; is that right?

24   A    Yes -- yes sir.

25   Q    So in order for the port -- port personnel to do that,

Exhibit 1(d)
433



 1   wouldn't each SCAC code have to be individually different?

 2   A    I'm trying to understand.  Can you repeat that one more

 3   time?

 4   Q    Sure.  In order for the port personnel to understand which

 5   customer each load of freight belongs to, doesn't each SCAC

 6   code have to be individually different in order to identify the

 7   end user customer?

 8        MR. DO:  Objection.

 9   A    Yes.

10        MR. DO:  Objection.  Speculative.  He's calling -- never

11   mind.

12        JUDGE ROSAS:  What's the basis?

13        MR. DO:  Speculation.

14        JUDGE ROSAS:  Repeat the question.

15   Q    BY MR. KUNTZ:  Isn't it true that in order for port --

16   port personnel to understand which end user customer the

17   freight belongs to each SCAC code would have to be individually

18   different from one another?

19        JUDGE ROSAS:  Overruled.  You can answer.

20        MR. WOJCIECHOWSKI:  Object that it misstates the

21   testimony.

22        JUDGE ROSAS:  Overruled.  You can answer if you know.

23   A    Yes.

24   Q    BY MR. KUNTZ:  During your time working out of the Compton

25   facility for Universal Intermodal Services, isn't it true that

Exhibit 1(d)
434



1    you used a Universal truck for all of your work?

2    A    Yes.

3    Q    And that included work, for example, Walmart as a

4    customer, correct?

5    A    Yes.

6    Q    And for Kuehne + Nagel, for example?

7    A    For who?

8    Q    Kuehne + Nagel?

9        MR. DO:  Objection.  Foundation.

10       JUDGE ROSAS:  Foundation as to that particular employer --

11   that particular customer?

12       MR. DO:  Correct.  I don't -- I don't believe this witness

13   testified to that.

14       JUDGE ROSAS:  Counsel.  Is this --

15       MR. KUNTZ:  I can move on, Your Honor.

16       JUDGE ROSAS:  Okay.

17   Q    BY MR. KUNTZ:  Mr. Mallard, do you recall testifying in

18   your direct testimony regarding interstate routes?

19   A    Yes.

20   Q    You never drove an interstate route yourself; did you?

21   A    No, sir.

22   Q    And isn't it true that most of the deliveries out of the

23   Compton facility went to the ports of Los Angeles and Long

24   Beach?

25       MR. DO:  Objection.  Misstate testimony.

Exhibit 1(d)
435



www.escribers.net | 800-257-0885

```
 1          JUDGE ROSAS:  Overruled.

 2          MR. KUNTZ:  Your Honor.

 3          JUDGE ROSAS:  You can answer.

 4     A    Okay.  Repeat the question.

 5     Q    BY MR. KUNTZ:  Isn't it true that most of the deliveries

 6     that ran out of the Compton facility went to the ports of Los

 7     Angeles -- excuse me, Los Angeles and Long Beach?

 8     A    Did they come from Long Beach?  All -- all of -- all of

 9     the loads come out of Long Beach.  The port of Long Beach, yes.

10     Q    Okay.  I want to change topics a little bit and ask about

11     those meetings with Mr. Cummings that you described on your

12     direct testimony.  Do you remember that?

13     A    Yes, I do.

14     Q    And during those meetings, correct me if I'm wrong, Mr.

15     Cummings tried to persuade employees not to vote for the Union,

16     right?

17     A    That's correct.

18     Q    But he did not say that employees were not allowed to vote

19     for the Union; did he?

20     A    No, he didn't say that at all.

21     Q    He told you that there was no guarantee in Union

22     negotiations, right?

23          MR. DO:  Objection.  Relevance.

24     A    That's correct.

25          JUDGE ROSAS:  What's the objection?
```

Exhibit 1(d)
436



www.escribers.net | 800-257-0885

1    MR. DO:  Relevance.  This is not part of any allegation in

2    the complaint, Your Honor.

3    JUDGE ROSAS:  Repeat the question.

4    Q   BY MR. KUNTZ:  Isn't it true that Mr. Cummings told you

5    during these meetings that there was no guarantee in collective

6    bargaining?

7    JUDGE ROSAS:  There's no guarantee in collective

8    bargaining.  And General Counsel, you're saying that's not

9    relevant?

10   MR. DO:  Your Honor, we did not actu -- we did not allege

11   any statement made by -- made by Cummings as part of --

12   JUDGE ROSAS:  Oh, okay.

13   MR. DO:  -- this complaint.

14   JUDGE ROSAS:  Well, you know, that cross-examination

15   isn't --

16   MR. DO:  I understand.

17   JUDGE ROSAS:  -- limited to the exact questions that you

18   asked.  But it is very closely related, or at least, it is not

19   completely unrelated to the subject matter involved here, which

20   is the Union.  And collective bargaining, we all know, is sort

21   of a part and parcel of what may happen if you become

22   unionized.  So I'm going to overrule the objection.  Go ahead.

23   You can answer if you know.

24   A   All right.  Repeat the question, please.

25   Q   BY MR. KUNTZ:  Isn't it true that during these meetings,

Exhibit 1(d)
437



1    Mr. Cummings told you that there was no guarantee in collective

2    bargaining?

3    A    Yes, he did.

4    Q    Isn't it also true that he told you that in union

5    negotiations, wages and benefits can go up, can go down, or can

6    stay the same?

7    A    That's correct.

8    Q    Isn't it true that he also told you that joining a union

9    is like buying a car without test driving it?

10   A    Yes.

11   Q    I want to turn your attention now to the meetings that you

12   described with Mr. Lugo.  Do you remember testifying regarding

13   those meetings?

14   A    Yes, sir.

15   Q    Now, the testimony that you gave regarding what was said

16   in those meetings, is that exact words of what was said, or is

17   that more of your general impressions?

18   A    That's more of -- of what I recall him speaking of.

19   Q    And when you say recall, what do you mean by that?

20   A    Meaning remember, recollect.

21   Q    But is your testimony recalling exact words by Mr. Lugo or

22   your general impressions of what Mr. Lugo said?

23        MR. DO:  Objection.  Asked and answered.

24        JUDGE ROSAS:  You're going to have to rephrase general

25   impressions.  Let's keep trying.

Exhibit 1(d)
438



1    Q    BY MR. KUNTZ:  Is your testimony regarding what Mr. Lugo

2    said in those meetings, your description of the exact words

3    that he said?

4    A    It's a description -- I -- I can't say exact words because

5    he wouldn't let --

6         JUDGE ROSAS:  Were you paraphrasing?  Were you

7    paraphrasing what he said?

8         THE WITNESS:  Yes, basically.

9         MR. KUNTZ:  Ms. Bridge, could you please pull up General

10   Counsel's Exhibit 5?

11        MS. BRIDGE:  I'm sorry.  I pulled up the joint exhibit.

12        JUDGE ROSAS:  Off the record.

13   (Off the record at 11:19 a.m.)

14        JUDGE ROSAS:  Back on the record.

15                    **RESUMED CROSS-EXAMINATION**

16   Q    BY MR. KUNTZ:  Mr. Mallard, do you see the document on the

17   screen right now?

18   A    Yes, I do.

19   Q    Isn't it true that you never gave this document to any

20   supervisors or managers?

21   A    Myself, no.

22   Q    You recall testifying regarding Union meetings that took

23   place, correct?

24   A    Yes.

25   Q    And isn't it true that no managers or supervisors ever

Exhibit 1(d)
439



1    attended those meetings?

2    A    Managers of -- or whom or what, Universal?

3    Q    Correct, of Universal.

4    A    No, sir.

5    Q    And no dispatchers ever attended those meetings; did they?

6    A    No, sir.

7    Q    And you never gave this flier that's still on the screen

8    to any dispatchers; did you?

9    A    Not myself.  No, sir.

10   Q    You recall also testifying regarding signs or banners that

11   the Union was holding outside of the Compton facility on

12   certain occasions?

13   A    Yes, sir.

14   Q    I just want to clarify.  Were those signs or were those

15   banners?

16   A    What's the difference between the two?  There -- it's all

17   one in the same.  Whether it's a sign or whether it's a banner,

18   it -- it -- it's all sitting on a stick.

19   Q    Okay.  So they were -- they were signs on sticks?

20   A    You could say that.

21   Q    Okay.  Isn't it true that on a normal day working for

22   Universal at the Compton facility, you would not actually

23   physically be at the facility for most of the day?

24   A    Yes, that's true.

25   Q    About how much time would you normally spend at the

Exhibit 1(d)
440



    1    facility on a normal day?

    2    A    On a normal day, probably about an hour throughout the

    3    day.

    4    Q    Would that be one hour all at one time or would that be on

    5    multiple occasions throughout the day?

    6    A    That'll be multiple occasions, going and coming.

    7    Q    So maybe two or three times during the day?

    8    A    Yes, sir.

    9    Q    Now, you also used the term "union busters" during your

    10   direct testimony.  Do you remember that?

    11   A    Yeah, I do.

    12   Q    And when you said that you weren't referring to Mr. Lugo;

    13   were you?

    14   A    No, sir.

    15   Q    And that was two individuals?

    16   A    Yes.

    17   Q    Mr. Cummings and someone else?

    18   A    Yes, sir.

    19   Q    Do you know the name of that other person?

    20   A    I can't recall his name, not at all.

    21   Q    Now, did they call themselves union busters?

    22   A    No, they did not.

    23   Q    Where did you hear the term union buster?

    24   A    That's just a term of which I heard that people who are

    25   hired to do a dirty job and -- and that's what they usually

Exhibit 1(d)
441



www.escribers.net | 800-257-0885

1    called, coming in to persuade people to -- to do -- not to

2    become unionized.

3    Q    Did anyone from Universal ever refer to those individuals

4    as union busters?

5    A    Employees or staff?

6    Q    Managers, supervisors, or dispatchers.

7    A    No, not at all.

8    Q    I want to revisit the first conversation with Ju -- Joe

9    Lugo that you described in your testimony.  This was the

10   conversation that, I believe, occurred on a set of stairs with

11   about 8 to 12 people present.  Do you recall testifying

12   regarding that?

13   A    Yes.

14   Q    Who were the 8 to 12 people that were present at that

15   meeting?

16   A    That will be most of the night shift.

17   Q    Do you recall their names?

18   A    Not everyone's name.  But there was a lot of us.  It was

19   the majority of our shift.

20   Q    Which names do you recall?

21   A    Let's see, Albert (phonetic), Alex, Dontae (phonetic),

22   myself, it was a few of us -- few of us.  More -- more -- more

23   names than I can remember right now.

24   Q    Understood.  Wouldn't you agree that in the trucking

25   industry, it's the normal function of a manager to address

Exhibit 1(d)
442



1    issues that employees have?

2        MR. DO:  Objection.  Calls for speculation.

3        JUDGE ROSAS:  Rephrase that question.

4    Q    BY MR. KUNTZ:  Isn't it true that -- and it's your

5    expectation as a truck driver that your managers will deal with

6    any issues that employees have?

7    A    Yes, it is my expectation.

8    Q    And isn't it also true that it's your expectation that

9    managers in the industry will deal with mechanical issues with

10   trucks?

11   A    It's kind of hard to explain because I never -- I never

12   gave any type of paperwork to a manager to get a truck fixed

13   for Universal.  I'd -- I'd give it to dispatch.  What they did

14   with it is what they did with it.  If they gave it to a

15   manager, I wouldn't know.  But --

16   Q    Okay.

17   A    -- that was my complaint.  Yes.  That's the best way I can

18   explain it.

19   Q    And in -- in your prior trucking industry jobs, would you

20   normally put maintenance paperwork in the hands of supervisors

21   or managers?

22   A    No, sir.  Wouldn't have to.

23   Q    Is that because they proactively addressed mechanical

24   issues with trucks?

25       MR. DO:  Objection.  Calls for speculation.

Exhibit 1(d)
443



```
 1        JUDGE ROSAS:  We're getting a little far afield at this
 2   point.
 3        MR. KUNTZ:  I apologize, Your Honor.  I was just seeking
 4   to clarify the witness' testimony.
 5        JUDGE ROSAS:  You can move on.
 6   Q    BY MR. KUNTZ:  Now, Mr. Mallard, do you recall also
 7   stating that during that first meeting with Joe Lug -- Lugo
 8   that you described, he gave you his business card?
 9   A    Yes.
10   Q    Did you previously have Mr. Lugo's contact information?
11   A    No, I did not.
12   Q    Now, you described a series of meetings with Mr. Cummings,
13   three, I believe; is that right?
14   A    Yes, sir.
15   Q    And during one of those meetings, isn't it true that a
16   employee by the name of Todd Ellis had a argument with Mr.
17   Cummings?
18   A    I wouldn't say an argument, an exchange of words, and a --
19   a disagreement.
20   Q    Isn't it true that that exchange of words became a bit
21   heated?
22   A    Slightly, yes.
23   Q    And did Mr. Ellis raise his voice during that
24   conversation?
25   A    Yeah, both of them.  Everybody had elevated voices during
```

Exhibit 1(d)
444



1    that time.

2    Q    And you're not aware of any other employees being

3    disciplined for their conduct during those meetings; are you?

4    A    No, sir.

5    Q    Now, you mentioned others.  About how many other employees

6    engaged in heated conversations with Mr. Cummings during these

7    meetings?

8    A    Well, I'm going to say it's -- it was a couple -- like,

9    the first meeting, Todd Ellis and him had an exchange.  Second

10   meeting, it was Alex who had an exchange.  And third meeting

11   was myself.

12   Q    Do you know Alex's last name?

13   A    I can't recall at the moment.

14   Q    Okay.  And to be clear, you're not aware of Alex being

15   disciplined for his conduct during that second meeting?

16   A    No, sir.

17   Q    Isn't it true that you were paid for attending these

18   meetings?

19   A    I believe I was.  I clocked in already, yes.  I was on the

20   clock already.

21        MR. KUNTZ:  Ms. Bridge, could you please put General

22   Counsel's Exhibit 6 on the screen?

23        MS. BRIDGE:  Could you repeat which exhibit?

24        MR. KUNTZ:  General Counsel 6, the next one down, please.

25        MS. BRIDGE:  Thank you.

Exhibit 1(d)
445



www.escribers.net | 800-257-0885

1    Q    BY MR. KUNTZ:  Now, this is the text message exchange we

2    discussed previously with dispatcher Walter, correct?

3    A    Yes, sir.

4    Q    And isn't it true that during this text message exchange,

5    Walter was seeking to ensure your attendance at this meeting,

6    correct?

7         MR. DO:  Objection.  Document speaks for itself.

8    A    Yes, sir.

9         JUDGE ROSAS:  I'll -- I'll allow it.  He answered.  Okay.

10   Q    BY MR. KUNTZ:  Now, specifically, regarding the third

11   meeting with Mr. Cummings on November 25th, before going to

12   that meeting, you understood what the subject of the meeting

13   would be; didn't you?

14   A    Didn't even know it was a meeting that day.  My last --

15   that last meeting, nobody informed us.  That was a rush moment

16   thing right there.  That's why it was staff who told us instead

17   of -- not staff, but my own colleagues, coworkers instead of

18   anybody in the office.

19   Q    Okay.  So your -- your coworkers told you that that

20   meeting was happening, correct?

21   A    Yes, sir.  Yes, sir.

22   Q    And obviously, when you told -- they told you that, you

23   knew to attend the meeting, correct?

24   A    Yes, everybody else did, so I did, too.

25   Q    And -- and going to attend the meeting, did you know what

Exhibit 1(d)
446



1    the content of the meeting would be about?

2    A    I'm going to say yes.  It would be about the same thing

3    that I've been hearing the last two meetings.

4    Q    But you still attended anyways?

5    A    Yes, I did.

6    Q    And when you learned that this meeting would be about the

7    Union campaign, you didn't want to attend; did you?

8    A    Didn't matter if I did or not, I was there.  I attended.

9    So wanting -- wanting to and not wanting to is -- is not a --

10   is not even an issue.  If it's a meeting, I'm going to attend

11   it.  I attended it.

12   Q    But the question, Mr. Mallard, is did you want to attend

13   the meeting?

14   A    Sure, I did.  Why not?  I wanted to hear more of what they

15   had to say.

16   Q    Okay.  And then after that meeting, I believe you

17   testified there was another separate meeting with Mr. Lugo; is

18   that right?

19   A    Yes, it was.

20   Q    Did you understand that meeting to be mandatory?

21   A    Nope.  Not at all.  Didn't even know it was a meeting till

22   after the fact.  You know, like I say, everything was done spur

23   of the moment because they had no game plan for the meeting.

24   But I think they threw one together real fast.  Didn't even --

25   Joe Lugo probably didn't know he was going to speak after that



1    meeting, but he called us -- we all dispersed.  And he called

2    us in and said he was throwing a meeting.  So that's when I

3    came back in to attend his meeting.

4    Q    So is it your testimony that you understood that when Joe

5    Lugo said he was calling a meeting, you did not have to attend

6    that meeting if you did not wish to?

7         MR. DO:  Objection.  That's misstate the testimony.

8         MR. KUNTZ:  Your Honor, that's the purpose of the question

9    is to clarify the testimony.

10        JUDGE ROSAS:  Hold on a second.  Let me -- about this

11   based on the prior testimony.  Based on General Counsel 6, I

12   think it's broad enough to permit this examination.  Go ahead.

13   Overruled.

14   Q    BY MR. KUNTZ:  Do you need me to repeat the question, Mr.

15   Mallard?

16        JUDGE ROSAS:  Oh, and --

17   A    Yes, sir.

18        JUDGE ROSAS:  -- General Counsel 6 and his testimony by

19   the General -- in response of General Counsel's questions.

20   Okay.  Go ahead.

21   Q    BY MR. KUNTZ:  Do you need to repeat, Mr. Mallard?

22   A    Yes, sir, please.

23   Q    So is it your testimony that when Mr. -- Mr. Lugo said he

24   was calling a meeting that day, you did not have to attend if

25   you did not wish to?

Exhibit 1(d)
448



www.escribers.net | 800-257-0885

1    A    No, nobody said that.  They just said he was throwing a

2    meeting.  And I walked back in.

3    Q    Well, Mr. Mallard, I'm asking what your understanding was.

4    Was it your understanding that you had the option of whether or

5    not to attend the meeting that Joe Lugo called?

6    A    Well, I considered -- since I just walked out of the

7    meeting with the -- Mr. Cummings, who -- who's not anything --

8    not an employer or anything of mine, I walked back in for Mr.

9    Lugo's meeting.  And there was no -- it wasn't a mandatory

10   thing.  He just said he was doing a meeting and I -- and I

11   walked in.

12   Q    So to be clear, your understanding is that it was your

13   choice of whether or not to attend that meeting with Mr. Lugo?

14        MR. DO:  Objection.  Asked and answered.

15        JUDGE ROSAS:  Sustained.

16   Q    BY MR. KUNTZ:  Do you recall testifying on your direct

17   testimony regarding a verbal warning you previously received?

18   A    Yes.

19   Q    (Audio interference) that occur?

20   A    I can't recall how long ago it was, but it was probably --

21   probably in the -- in the month of -- I'm going to say maybe

22   July, or something like that.  That was for taking a -- a lunch

23   break, probably 15 minutes over on my lunch break or something

24   like that.

25   Q    Are you referring to July of 2019?

Exhibit 1(d)
449



www.escribers.net | 800-257-0885

1    A    Yes, sir.

2    Q    Do you recall being asked on your direct testimony if you

3    were aware of other instances in which a employee was

4    discharged for not having a California license?

5    A    Yes, sir.

6    Q    Are you aware of all discipline issued to employees by

7    Universal Intermodal Services for Compton facility drivers?

8    A    Can you repeat that for me?

9    Q    Are you aware of all discipline at Universal Intermodal

10   Services issued to drivers at the Compton facility over time?

11   A    No, sir.

12   Q    Do you recall testifying regarding a second call that you

13   received after your discharge from a Southern Counties Express

14   representative?

15   A    Yes, I do.

16   Q    Who was that representative?

17   A    I don't recall his name, but from what he told me, he was

18   from the safety department for Southern Counties.

19   Q    When did that call occur in relation to the first call

20   that you received from Joe Lugo?

21   A    Oh, that call must have been probably less than an hour

22   after Joe Lugo called.  So I'm going to say Joe Lugo called me

23   about 3-something.  And I got that phone call maybe about 45

24   minutes after the fact, 3:45, close to 4:00.

25   Q    And the same message was conveyed to you in each of those

Exhibit 1(d)
450



1      two calls?

2      A    Yes.

3          MR. KUNTZ:  Ms. Bridge, could you please pull up the first

4      of Mr. Mallard's two Jencks statements?  This would not be the

5      one that includes the word "supplemental" in the title.  Thank

6      you.  And could you please scroll down on that first page to

7      line 4.

8      Q    BY MR. KUNTZ:  Now, Mr. Mallard, isn't it true that you

9      stated in your Board affidavit that your shift lasted from 5

10     p.m. to 2:30 a.m.?

11     A    Yes sir.

12     Q    And isn't it true that you had an opportunity to review

13     this affidavit?

14     A    Yes.

15     Q    And you signed this affidavit; didn't you?

16     A    Yes.

17     Q    And you understood it was important to tell the truth in

18     this affidavit?

19     A    Yes.

20     Q    Isn't it also true that you testified on direct

21     examination that your test -- that your shift ended at 5 a.m.?

22     A    No, sir.  What you misunderstand is we work between 10 and

23     12 hours a day.  If I'm -- if my last load takes me however

24     long to deliver for whatever reason, I'm still on the clock

25     until I get back to the -- and return that truck.  So that's

Exhibit 1(d)
451



1    the purpose of not working on Thursdays, so we can get no less

2    than ten hours a day.  So anywhere between 10 and 12 hours, I'm

3    there.

4         MR. KUNTZ:  Ms. Bridge, could you please scroll down to

5    page 4 of this document?  And specifically, lines 12 through

6    14.

7    Q    BY MR. KUNTZ:  Mr. Mallard, could you please read to

8    yourself the sentence that begins on line 12 with, "I recall,"

9    and let us know when you're finished?

10   A    Okay.  Yes, I do.

11   Q    Now, is the meeting that you're referring to there, the

12   same meeting on the stairs with 8 to 12 employees that you

13   described in your direct testimony?

14   A    Yes, that might have been that meeting for sure.

15   Q    And isn't it true that you stated in your affidavit that

16   you were not paying attention to the discussion during that

17   meeting?

18   A    And -- and that's -- yes, it is.  That's why I can't tell

19   you word for word what he said, only what I recollect.

20        MR. KUNTZ:  Ms. Bridge, could you please scroll down now

21   to page 5 of this document, and specifically, lines 20 and 21.

22   Q    BY MR. KUNTZ:  Actually, Mr. Mallard, could I ask you to

23   read to yourself the sentence that begins on line 19 with, "I

24   told," and let us know when you're finished.

25   A    Okay.  Yes.  Yes, I do.  I remember that.

Exhibit 1(d)
452



www.escribers.net | 800-257-0885

1    Q    And do you see the reference to Tony in that document?

2    A    Yes.

3    Q    And I believe your affidavit describes him as a West Coast

4    regional manager; isn't that right?

5    A    That's correct.

6    Q    So that would make Tony a relatively high-ranking

7    executive; wouldn't it?

8    A    I believe it would.

9    Q    And isn't it true that Tony told you that the company was

10   bleeding out and needed to be put back on track?

11   A    Among other things.

12        MR. DO:  Your Honor, Objection.  I don't think

13   foundation's been laid for this line of -- of inquiry with the

14   affidavit.

15        JUDGE ROSAS:  Repeat the question.

16   Q    BY MR. KUNTZ:  Isn't it true that you describe this

17   individual by the name of Tony telling you that the company was

18   bleeding out and needed to be put back on track?

19        JUDGE ROSAS:  Counsel, this relates to what testimony on

20   direct?

21        MR. KUNTZ:  Your Honor, this relates back to the

22   description of other companies performing work, which in turn

23   goes to the overall shutdown and layoff allegations of the

24   complaint.

25        JUDGE ROSAS:  Elaborate a little more.

Exhibit 1(d)
453



1          MR. KUNTZ:  So Your Honor, the General Counsel put on as

2     testimony -- and actually, Your Honor, perhaps it would be best

3     if the witness is excused to --

4          JUDGE ROSAS:  Okay.  Let's put him in the waiting room.

5          MR. KUNTZ:  So Your Honor, the General Counsel elicited

6     testimony regarding --

7          MS. BRIDGES:  He's not in the waiting room yet.  Please

8     wait.

9          MR. KUNTZ:  Oh, I'm sorry.

10         MS. BRIDGES:  Okay.

11         MR. KUNTZ:  Your Honor, the General -- the General Counsel

12    elicited testimony pertaining to Container Connection and

13    Southern Counties Express work being performed out of this

14    Compton Universal Intermodal Services facility.  Now our

15    understanding is that the purpose of that testimony is for the

16    General Counsel to -- to -- to support its allegations

17    regarding the shutdown of the Compton facility and the layoff

18    of the employees there.  This testimony regarding the financial

19    condition of the company, or at least, the representations

20    regarding the financial condition is -- is absolutely relevant

21    to that same allegation.

22         JUDGE ROSAS:  So the testimony on direct related to the

23    SCAC codes for different companies that were on trucks that he

24    was operating and referred to the chassis that were being used.

25    He talked about the -- the lar -- the trucks in the warehouse

Exhibit 1(d)
454



1    facilities.  So where does this fall in?

2        JUDGE ROSAS:  Well, and Your Honor, the overall

3    performance of work out of the Compton facility, work that was

4    related to Container Connection and to Southern Counties

5    Express.  That overall performance of the work, again, as I

6    understand, relates to the General Counsel's shutdown of the

7    facility and layoff allegations.

8        JUDGE ROSAS:  Well, so the testimony that he was

9    pulling -- he was pulling loads for them at different times

10   based on the SCAC codes, names, I guess, so -- so where does

11   this -- so you're saying that the fact that he testified about

12   doing work for trucks that had different labels on them opens

13   the door to an examination of the financial condition of the

14   Respondent?

15       MR. KUNTZ:  That's -- that's right, Your Honor, because

16   all of those issues relate back to this layoff and shutdown

17   allegation.  I -- I should also note for the sake of

18   efficiency, this is testimony that if not elicited at this

19   point, we would seek to put on as part of our case-in-chief.

20   And so that would necessitate recalling the witness.  And

21   that's probably not --

22       JUDGE ROSAS:  Oh.

23       MR. KUNTZ:  -- the most efficient way to do this.

24       JUDGE ROSAS:  Okay.  Well, that -- that's a little more

25   appealing to me.

Exhibit 1(d)
455



 1    General Counsel.

 2        MR. DO:  Your Honor, and -- and you -- quite honestly, if

 3    that's what they want to do, that's not a big concern to me.

 4    But part of it is I think this is improper impeachment.  They

 5    have -- and this is what I mean by my -- foundation.

 6        JUDGE ROSAS:  I -- Counsel, I -- I -- I -- I agree at this

 7    point.  I'm not seeing it.  But to the extent that the

 8    Respondent wants to elicit testimony that they would otherwise

 9    need from this witness, I'm -- I'm open to that.

10        MR. DO:  Well --

11        JUDGE ROSAS:  So -- so Respondent, you are clarifying

12    that -- well, let me put it to you this way.  I would -- I

13    would be sustaining the objection based upon my understanding

14    of what the witness' testimony was on direct as it relates to

15    relevant impeachment.  Okay?  But I'm -- I'm just not seeing

16    it.  But to the extent that you want to explore it as far as

17    the Respondent's defense with respect to legitimate business

18    justifications for its actions, that's what you're talking

19    about?

20        MR. KUNTZ:  That's correct, Your Honor.  We're not seeking

21    to impeach the witness.

22        JUDGE ROSAS:  Okay.  All right.  So let's bring him back.

23        MR. DO:  Your Honor --

24        JUDGE ROSAS:  Yeah, go ahead.

25        MR. DO:  -- may I be heard?

Exhibit 1(d)
456



www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  General Counsel, you have more?

2        MR. DO:  Yes.  I think that's fine.  They can solicit

3    (sic) that testimony.  But my concern is this is improper

4    impeachment because they haven't established the foundation.

5    They're showing the affidavit --

6        JUDGE ROSAS:  There's no impeachment.  There's no

7    impeachment.  I --

8        MR. DO:  But --

9        JUDGE ROSAS:  -- so --

10       MR. DO:  -- they're showing him the affidavit, Your Honor.

11       JUDGE ROSAS:  Okay.  So good point.  Good point.  So

12   Respondent, you're going to -- at this point, you're going to

13   have to examine him on these additional areas that you say is

14   additional area, right?  You clarified that at any given point

15   with your proffer.  And you're going to have to first, in the

16   first instance, obviously, try to elicit present recollection.

17   Failing that, you can go to -- to other options.  Okay?  But --

18       MR. KUNTZ:  Sure.

19       JUDGE ROSAS:  -- let's -- let's -- you know, I don't -- I

20   don't -- I -- I don't receive, generally, testimony from

21   affidavits as -- as evidence in chief unless it comes in under

22   something else.  Okay?

23       MR. KUNTZ:  Sure.  And given that, Your Honor, we don't

24   need the affidavit to be put back on the screen.

25       JUDGE ROSAS:  Okay.  All right.  Okay.  Let's bring him

Exhibit 1(d)
457



www.escribers.net | 800-257-0885

1    back.

2        While we're waiting for him to come back, let me also just

3    volunteer that you may have a limited scope of examination with

4    respect to this witness as to your -- your client's

5    justifications.  Okay.  So if he doesn't pres -- if he doesn't

6    have actual knowledge, you know, your client knows best, right?

7        MR. KUNTZ:  Understood, Your Honor.

8        JUDGE ROSAS:  As to what -- what it did and why it did it.

9    And so you know, we would in theory need to hear from your

10   client, unless this guy's loaded -- this witness is loaded

11   with -- with a lot of information that I'd be surprised he has.

12   But -- but then again, you know, there's always a first, so.

13       MR. KUNTZ:  Your Honor, not -- not to be glib but we

14   couldn't agree more that the best source of evidence about our

15   motives is our own witnesses.

16       JUDGE ROSAS:  All right.  And -- and you know, unless you

17   tell me you want to convert him into an expert witness, you

18   know, again, I suspect it's going to be a limited area, so.

19   All right.  The -- the -- the only risk here is getting the

20   witness back.

21       MS. KAGEL:  Your Honor, before we bring him back in, may I

22   ask a procedural question?  I -- I want to clarify, did

23   Respondent state that they wanted to use this witness for

24   efficiency because they were planning on calling him

25   themselves?  I don't believe -- and of course Respondent can

Exhibit 1(d)
458



1    correct me if I'm wrong -- I don't believe they subpoenaed this

2    witness.

3        MR. KUNTZ:  We didn't, Molly, but we're happy to do it

4    today if you want us to.  So we -- we can take care of it any

5    way you want.

6        MS. KAGEL:  I was just highlighting it for procedural

7    because they wouldn't be in -- you know, for direct they

8    wouldn't have access to his Jencks statements to question him

9    about this -- his not -- this line of questioning.

10       JUDGE ROSAS:  So Respondent, if -- if your -- I'm sorry,

11   General Counsel, if you're vehemently objecting because he

12   hasn't been subpoenaed, then he would have to be brought back.

13   But if, at the same time, the Respondent tells me they're in

14   the -- they're in the act of cranking out a subpoena, or -- or

15   can represent to me that one is generated before we excuse him

16   and we can hold him here for a little while, you know, it's all

17   about efficiency, right?  It's all about efficiency.  The

18   witness clearly isn't being harassed.  And you know, again, we

19   don't need to have somebody on the stand to waste his or our

20   time either.  But I'm willing to give the Respondent some

21   leeway here if it's, you know, if counsel are representing in

22   good faith that they think that there's something relevant that

23   they can elicit from him that relates to their defense.

24       MS. KAGEL:  Understood, Your Honor.

25       MR. KUNTZ:  Your Honor.  And Your Honor, I assure this

Exhibit 1(d)
459



www.escribers.net | 800-257-0885

1    will be a limited line of inquiry.

2         JUDGE ROSAS:  Again, the only task is somehow getting him

3    back here.  So.

4         MS. KAGEL:  Based on Respondent's representatives (sic),

5    yeah, a subpoena is not necessary.  I just wanted to highlight

6    that for the record.  Thank you.

7         MS. BRIDGE:  Judge, it looks like we lost the -- the

8    witness.  He was in the waiting room, and he was asked to join

9    back but it was joining but then he just disappeared.  So --

10        MR. KUNTZ:  Can we go off the record, Your Honor?

11        JUDGE ROSAS:  Sure.

12   (Off the record at 11:53 a.m.)

13                    **RESUMED CROSS-EXAMINATION**

14   Q    BY MR. KUNTZ:  Mr. Mallard, isn't it true that you once

15   spoke with a West Coast manager by the name of Tony regarding

16   business conditions?

17   A    Yes.

18   Q    Isn't it true that that conversation occurred sometime in

19   2018?

20   A    That's correct.

21   Q    And is it your understanding that the position of West

22   Coast manager is a relatively high-up executive position within

23   the company?

24   A    I believe so.

25   Q    And isn't it true that Tony told you that the company was

Exhibit 1(d)
460


www.escribers.net | 800-257-0885

1    bleeding out?

2    A    Yes, sir.

3    Q    Isn't it true that that statement by Tony was in response

4    to a question by you regarding wages?

5         MR. DO:  Objection, Your Honor, hearsay.

6         MR. KUNTZ:  Your Honor, this is -- you're on mute, Your

7    Honor.  And I would also add that this is --

8         JUDGE ROSAS:  It's not -- Mr. Mallard is not a party.

9         MR. KUNTZ:  He's -- he's not a party, Your Honor.  But

10   this isn't being offered for the truth of the matter asserted.

11   This is to explain the subsequent statement.

12        JUDGE ROSAS:  So it's not being offered for the truth of

13   the matter asserted --

14        MR. KUNTZ:  Right.

15        JUDGE ROSAS:  -- which is what Tony said to him.

16        MR. KUNTZ:  The question actually, Your Honor, was what

17   prompted Tony to say that specifically, a question by --

18        JUDGE ROSAS:  But why is it -- why -- why does it fall

19   under an exception?  Because it -- it's -- it's important to

20   show Mr. Mallard's state of mind?

21        MR. KUNTZ:  Essentially.  It's to explain subsequent

22   conduct which I believe under the rules, it's by definition,

23   not hearsay.

24        JUDGE ROSAS:  Subsequent conduct by whom?

25        MR. KUNTZ:  The statement by -- by Tony.

Exhibit 1(d)
461



www.escribers.net | 800-257-0885

1    JUDGE ROSAS:  Okay.  So I'm going to sustain that

2    objection.  Mr. Mallard, so we'll do it this way.  You had a

3    conversation with Tony.  Do you know Tony's last name?

4    THE WITNESS:  No, I don't.  Not at all.

5    JUDGE ROSAS:  Okay.  So Tony said to you that the company

6    was bleeding out, right?  We have that testimony.  Does

7    everybody agree that testimony is on the record?

8    MR. DO:  Yes, Your Honor.

9    JUDGE ROSAS:  Tony told the witness that the company was

10   bleeding out.  Okay.  And did you say something to Tony before

11   that?

12   THE WITNESS:  Actually, it was all of us in a group

13   meeting with Tony and Tony telling us all this.  One of my

14   colleagues is what asked him a question that prompted him to

15   let us know that.  And once he let us know that, you know, he

16   didn't really listen to any other grievances that was going on.

17   He told us that the company was bleeding out and needed to be

18   put back on track.

19   JUDGE ROSAS:  Okay.  Counsel, follow up with your question

20   now.

21   MR. KUNTZ:  I believe that answered my question, Your

22   Honor.

23   JUDGE ROSAS:  Okay.

24   MR. KUNTZ:  No further questions at this time, Your Honor,

25   subject to recross.

Exhibit 1(d)
462


www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  Redirect, General Counsel?

2        MR. DO:  Yes, Your Honor.  Just two quick question.

3                    **REDIRECT EXAMINATION**

4    Q    BY MR. DO:  Mr. Mallard, when you testified that the SCAC

5    codes were unique, did Southern Counties Express -- is Southern

6    Counties Express' SCAC code unique from Universal Intermodal's

7    SCAC code?

8    A    Yes, very unique.

9    Q    And is Universal Intermodal's SCAC code unique from

10   Southern Counties Express' SCAC code?

11   A    Can you repeat that one more time?

12   Q    Sure.  Is Universal's SCAC code different from Southern

13   Counties Express' SCAC code?

14   A    Yes, it is.

15   Q    Now, looking at just the containers for Southern Counties

16   Express, are the SCAC code among any containers when you are

17   assigned to pull Southern Counties Express container, is the

18   Southern Counties Express code for each load different?

19   A    One more time with that question.

20   Q    Sure.  So let's say in a day, you get assigned five

21   Southern Counties Express pull.  Are the SCAC code for each of

22   those pull different?

23   A    No.  They're the same.  If it's for Southern Counties,

24   it's the same.

25   Q    And when you were working for Universal, after the



1    acquisition of Southern Counties Express, and when you were

2    pulling Southern County -- Universal Intermodal, Southern

3    Counties Express, and Container Connection pull.  Did you at

4    the time care who you were pulling for?

5    A    Did I share who I was pulling for?

6    Q    Did you care who you were pulling for?  Did it matter to

7    you?

8         MR. KUNTZ:  Objection, objection, Your Honor.

9         JUDGE ROSAS:  I'm going to sustain -- I'm going to sustain

10    that objection.  Rephrase "care".

11        MR. DO:  Sure.

12    Q    BY MR. DO:  Did it -- did it matter to you, Mr. Mallard,

13    who you were pulling for when you were an employee for

14    Universal Intermodal?

15    A    No, it didn't.

16        MR. DO:  No further questions, Your Honor.

17        JUDGE ROSAS:  Charging Party, anything?

18        MR. WOJCIECHOWSKI:  No, no thank you, Your Honor.

19        JUDGE ROSAS:  Any follow-up on that, Respondent?

20        MR. KUNTZ:  Just very briefly, Your Honor.  The SCAC code

21    issue, I believe, is a bit confusing.

22                        **RECROSS-EXAMINATION**

23    Q    BY MR. KUNTZ:  Mr. Mallard, is it your testimony that

24    there's only one SCAC code that is used for Universal

25    Intermodal Services?

Exhibit 1(d)
464



1    A    No.  Universal Modal (sic) uses the SCAC codes of Southern

2    Counties, Container Connections, and Universal.

3    Q    Okay.  Is it your testimony that there's only one SCAC

4    code that's used to designate Southern Counties Express loads?

5    A    Yes.

6    Q    Okay.

7    A    It's one SCAC code per company.

8    Q    Okay.  So if there's only one SCAC code for a company,

9    then when the freight arrives at the port, how does the port

10   personnel know which customer that freight belongs to?

11   A    By the SCAC code, if it's a SC it's Southern Counties, if

12   it's a USIV or whatever, it's Universal.  If it's a CC, or

13   whatever, it's a Container Connection.  Each -- each company's

14   code -- let's just forget about SCAC code.  It's company code.

15   Q    Okay.

16   A    And those are the companies that -- that you get this load

17   for.  I can't get a -- a Universal load for a -- for a

18   Universal -- you know what I mean, unless it has Universal on

19   it, or Container Connection, or any of those three entities.

20   Q    Okay.

21   A    So but it's all different SCAC codes for each load.

22   Q    Yeah.  So I -- so I think I -- I think I understand you,

23   Mr. Mallard.  Just to clarify for the record, the SCAC code is

24   a series of letters, correct?

25   A    Yes.

Exhibit 1(d)
465



 1   Q    And the first few letters of that code designate whether

 2   it's for, for example, Southern Counties, Container Connection,

 3   or Universal, right?

 4   A    Yes.

 5   Q    But then the other letters or numbers that come after

 6   those initial letters would designate the customer that the

 7   load belongs to; is that right?

 8   A    I wouldn't know that.

 9        MR. DO:  Objection.  Misstate the --

10        JUDGE ROSAS:  Repeat the question.

11   Q    BY MR. KUNTZ:  So we have the first couple letters of the

12   SCAC code that designates whether it's Container Connection,

13   Southern Counties, or Universal, and then there are other

14   letters or numbers that come after that, correct?

15   A    No, sir.  The SCAC code stands alone on each -- on each --

16   through each company.  They don't have any numbers after them.

17   It's just simple letters.  The only thing that are different is

18   the chassis that we're pulling them with.  But the SCAC code is

19   the same with no numbers, all letters.

20        MR. KUNTZ:  No further questions, Your Honor.

21        JUDGE ROSAS:  All right.  Thank you, sir.  You're excused.

22   Your testimony is concluded.  Please don't discuss your

23   testimony with anyone until you're advised otherwise by

24   counsel, okay?

25        THE WITNESS:  Yes, sir.

Exhibit 1(d)
466



www.escribers.net | 800-257-0885

1   JUDGE ROSAS:  Have a good day.

2   THE WITNESS:  All right.

3  MR. DO:  Thank you, Mr. Mallard.

4   THE WITNESS:  Yes, sir.  Everybody have a good day.

5   JUDGE ROSAS:  Okay.  So off the record.

6 (Off the record at 12:03 p.m.)

7   JUDGE ROSAS:  All right.  Back on the record.  General

8 Counsel, next witness.

9  MR. DO:  Thank you, Your Honor.  General Counsel calls Mr.

10 Jonathan Ledesma.  He should already be in the waiting room.

11   JUDGE ROSAS:  He's not.

12  MR. DO:  Okay.  I just spoke to him about two minutes

13 before, before we got back.  But let me call him again.

14  MR. KUNTZ:  Your Honor, while we're on the record quickly,

15 Respondent just wanted to confirm for the record that we have

16 deleted the Jencks material from the previous witness.

17   JUDGE ROSAS:  Thank you.

18  MR. DO:  Your Honor, the witness is -- he's apparently in

19 the waiting room, so he's reclicking on the link to see if he

20 can reconnect.  He's waiting for the host to let him in.

21   JUDGE ROSAS:  Diane, do you see him?  Diane may not be

22 there at the moment.  Off the record.

23 (Off the record at 1:04 p.m.)

24   JUDGE ROSAS:  So we're on the record.  General Counsel,

25 who do you call?

Exhibit 1(d)
467



www.escribers.net | 800-257-0885

1      MR. DO:  Mr. Jonathan Ledesma, Your Honor.

2      JUDGE ROSAS:  Please raise your right hand.

3  Whereupon,

4                    **JONATHAN LEDESMA**

5  having been duly sworn, was called as a witness herein and was

6  examined and testified, telephonically as follows:

7      JUDGE ROSAS:  All right, please state and spell your name

8  and provide us with an address.

9      THE WITNESS:  Okay.  My name is Jonathan, last name

10  Ledesma.  Jonathan, you spell it J-O-N-A-T-H-A-N.  My last name

11  is Ledesma, L-E-D-E-S-M-A.  And my address is █████████████

12  █████████████████ in Phoenix, Arizona.  The zip code here is

13  85033.

14      JUDGE ROSAS:  Go ahead.

15      MR. DO:  Thank you, Your Honor.

16                   **DIRECT EXAMINATION**

17  Q    BY MR. DO:  Thank you for being here, Mr. Ledesma.  Where

18  are you currently employed?

19  A    I'm currently employed at a company called Copperstate

20  Truss in the city of Buckeye, Arizona.

21  Q    Did you ever work for Universal Intermodal?

22  A    Yes, I did.

23  Q    And when -- when did you work for them?

24  A    I worked for them -- I started in July of 2018, all the

25  way up to November 27th of 2019.

Exhibit 1(d)
468



www.escribers.net | 800-257-0885

1    Q    What was your job position when you were at Universal

2    Intermodal?

3    A    I was a port driver, a truck driver.

4    Q    What -- what did you do as a port driver?

5    A    I would go to the ports, to Los Angeles, Long Beach ports

6    to pick up containers and take it to the -- take it to the

7    customers.

8    Q    When did you stop working for Universal Intermodal?

9    A    I stopped working for them in November of 2019.

10   Q    And why did you stop working for Universal?

11   A    I stopped working for them because I was let go for -- for

12   having an out of state license.

13   Q    And at the time of your termination, what was your pay

14   rate?

15   A    It was $24 per hour.

16   Q    When you worked for Universal Intermodal, at what facility

17   were you working out of?

18   A    I was in the Compton facility.

19   Q    Do you know the address of that facility?

20   A    It's 2035, it's Bella Vista in Compton.  Or Vista Bella.

21   Q    Just to confirm, is that -- is that East Vista Bella Way?

22   A    Yes, it is, correct.

23   Q    Can you describe the Compton facility for us, what was

24   there?

25   A    There was offices for the -- for the dispatchers.  It was



```
1    a yard where we would park the trucks and also store
2    containers, and also chassis.
3    Q    And who worked out of that facility?
4    A    The -- most of the port drivers and dispatchers.
5    Q    When you were working for Universal Intermodal, what was
6    your schedule like?
7    A    I would start at 6 a.m. all the way to clock-out time.
8    Q    On what days of the week?
9    A    Monday through Friday.
10   Q    Let me mark for identif -- well, let me show you what's
11   been marked, identified, and admitted as Joint Exhibit 4(a).
12   Do you see the document I'm putting in front of you?
13   A    Yes, I do.
14   Q    I'm going to scroll through it a bit.  Do you recognize
15   these documents?
16   A    Yes, I do.
17   Q    What are these?
18   A    It -- it is my -- my employment application.
19   Q    Now let me show you a couple of the signature pages.  So
20   for instance, the page -- the document that's on Bate -- Bates
21   stamped number 00024, which is a authorization for criminal
22   background investigation.  When was that document signed?
23   A    July 16, 2018.
24   Q    And the second document, which is on Bates stamped 00026,
25   which is a meal break waiver, when was that signed?
```

Exhibit 1(d)
470



1   A   July 24, 2018.

2   Q   Why were these documents signed around July of 2018?

3   A   That's was a -- that's when I started employment.

4   Q   When you were filing out these application material,

5   did -- were you viewing -- were you completing them with

6   anybody at Universal Intermodal?

7   A   Yeah, with the -- with the recruiter.

8   Q   Who was the recruiter?

9   A   The recruiter was -- the recruiter was Javier Velasco.

10  Q   And how did you fill out that information?  Did you do it

11  in person?

12  A   No, actually, I was emailed by the recruiter, Mr. Velasco.

13  I was emailed.  I -- I did it at -- at home and I emailed it

14  back.

15  Q   At the time of your application to Universal Intermodal,

16  where were you living?

17  A   In Phoenix, Arizona.

18  Q   Is it the same address that you current -- that you're

19  currently residing in?

20  A   Yes.

21  Q   And let me pull that back up.  Drawing your attention

22  to -- attention to page 2 of the -- of Joint Exhibit 4(a),

23  which is Bates stamped 20.  If you were living in Arizona when

24  you were doing this application, why did you list a Los Angeles

25  address?

Exhibit 1(d)
471



www.escribers.net | 800-257-0885

1    A    I list -- that's actually my father's address, that's --

2    that's an address I was going to use.

3    Q    If you lived in Phoenix, Arizona, why did you apply for

4    this position?

5    A    I applied there because I -- I had moved to --

6         MR. ADLONG:  Objection, objection, relevance.

7         JUDGE ROSAS:  Why did he apply for this position, you

8    asked him?

9         MR. DO:  Yes, Your Honor.  May I be heard, Your Honor?

10        JUDGE ROSAS:  I -- I -- am fret with sending someone to

11   the waiting room, given our mechanics here.  Let me just think

12   about this for a second.  I'm going to sustain the objection.

13   If you're trying to get to something, try it another way.

14        MR. DO:  Your Honor, may I be heard?  (Indiscernible,

15   simultaneous speech) --

16        JUDGE ROSAS:  No, ask another question.  Ask him another

17   question.

18        MR. DO:  Okay.  Okay, Your Honor.

19        JUDGE ROSAS:  See -- see if you can accomplish what you're

20   trying to do that -- that doesn't sound to me like, you know,

21   people's goals and -- and desires in life.  Okay.  Just what

22   happened, you know, as Elliot Ness said, the facts, just the

23   facts.  Okay?

24        MR. DO:  Sure.

25   Q    BY MR. DO:  What were you trying to get -- why were you

Exhibit 1(d)
472



www.escribers.net | 800-257-0885

 1   trying to go to -- come to LA?

 2        MR. ADLONG:  Objection.  Relevance.

 3        JUDGE ROSAS:  Was it something other than work, sir?

 4        THE WITNESS:  Yes, it was, Your Honor.  It was actually my

 5   father's -- my father was very ill.  And that's why I got that

 6   job with Universal.

 7        JUDGE ROSAS:  Okay.  That's about all we're going to get

 8   into that, because you know, unless that became part of the --

 9   the whole employer-employee relationship, and -- the factor, I

10   mean, if this is a consideration on the discriminatee's part,

11   it is one that is unique to them at this point.  Okay?  Unless

12   it has something else to do with the Respondent's actions.

13        MR. DO:  It -- it does, Your Honor, which is why I would

14   ask you to excuse the witness, so that I can be heard on the

15   matter, please.

16        JUDGE ROSAS:  Okay.  We're going to have to send you to a

17   virtual waiting room.  Hopefully, we won't lose you.  Stay

18   where you are and stay with the connection.  You don't have to

19   do anything, okay?

20        THE WITNESS:  Okay.  Your Honor.

21        JUDGE ROSAS:  We'll be right back with you.

22        MR. DO:  All right.  It looks like the witness is out.

23   Your Honor, this line of inquiry relates to a defense that the

24   Employer is going to raise regarding this employee.  And -- and

25   that's the --

Exhibit 1(d)
473



1       JUDGE ROSAS:  When he lied about his -- he lied about his

2    address?

3       MR. DO:  Well, not necessarily lie, but the issue is their

4    defense is that he had an improper address at the time of his

5    hiring and when he worked for them.

6       JUDGE ROSAS:  What does that mean?  What does that mean,

7    improper?

8       MR. ADLONG:  Your Honor --

9       JUDGE ROSAS:  Hold on.  Let the GC finish.

10      MR. ADLONG:  I will.  And then, I'd like to respond to it.

11      JUDGE ROSAS:  You'll have the opportunity.

12      MR. DO:  They're -- rememb -- the basis for the

13   termination of Mr. Ledesma was that he had an Arizona

14   commercial driver's license instead of a California one.

15      JUDGE ROSAS:  Um-hum.

16      MR. DO:  And I'm just trying to establish why he has that

17   Arizona license.  And so since it goes to their defense and

18   particularly his domicile goes to, you know, whether or not he

19   should have had an Arizona's license or California license,

20   it's pertinent to that inquiry.  What -- I -- there is not that

21   many questions on this, to be honest.  I'm just trying to

22   establish for that -- for the record.

23      JUDGE ROSAS:  Respondent.

24      MR. ADLONG:  A couple of things.  He -- with respect to

25   why he was doing something, it's -- it -- it's -- it's a

Exhibit 1(d)
474



www.escribers.net | 800-257-0885

1    nonissue.  The facts are he identified himself as a California

2    resident and he was treated as a California resident.  And I

3    think it really boils down to that.  You know, if -- if --

4    if -- that's what it boils down to.  He listed that he -- he

5    has a California residence.  He applied under the guise of a

6    California resident, and that's what he was treated as.  With

7    respect to why he listed something, none of that matters.

8    Like, you -- the facts are the facts.  It's there in black and

9    white.  You know, and -- and if he thought it was important to

10   list that he was a Phoenix resident or Arizona resident, he

11   should have done so at the time.  So it just --

12       JUDGE ROSAS:  Well, he -- the -- is the Respondent going

13   to argue that the discriminatee's conduct forfeited or

14   disqualified his -- or essentially eradicated his protected

15   conduct?

16       MR. ADLONG:  No.  This doesn't go to dishonesty.  It -- it

17   merely goes to the fact that the regulation that applied --

18   it -- it -- the regulation that applied, applied to California

19   residents, and our motives, we understood him to be a

20   California resident.  And that's what it goes to, so why he did

21   something is -- it's -- it's be -- beyond the fact.  What we're

22   looking at are what were the facts that were articulated to us

23   with respect to his residence.

24       JUDGE ROSAS:  So let me -- let me understand the -- the

25   scope of your defense.  Are you saying that the Respondent is

Exhibit 1(d)
475



www.escribers.net | 800-257-0885

 1   going to argue that based on the discriminatee's actual

 2   address, he was ineligible for work?  That's one scenario.  A

 3   different scenario is one if you're going to pursue a defense

 4   that his -- his concealment of the address -- of the Phoenix

 5   address or his failure to report it was grounds for termination

 6   or it can be held against him was considered by the Respondent,

 7   right, was considered by the Respondent as a factor in his

 8   termination?  Was it considered or are you going to argue that

 9   it was considered by the Respondent as a factor in his

10   termination?  His failure to report it, as opposed to the fact

11   that, oh, you're just ineligible, you can't work here.

12      MR. ADLONG:  This -- we're not pursuing this as a

13   dishonesty issue.  That's -- that's what I, in essence, see you

14   breaking this down as.  Did he meet the re -- did we fire him

15   under the belief that he failed to meet the requirements, or

16   did we fire him -- or -- or -- and/or was dishonesty a part of

17   the motive?  And dishonesty was not a part of the motive.  It

18   was, there's a requirement, you didn't meet the requirement.

19   That's what motivated the decision.

20      MR. DO:  And Your Honor, if I may be heard.  And the

21   requirement they're referring to is the fed -- is the federal

22   statute on this matter.  And part of the -- part of the

23   standard that determines whether a driver needs to have a

24   California commercial's license or a driver's license in

25   another state, is his belief and his facts regarding his

Exhibit 1(d)
476

www.escribers.net | 800-257-0885

 1    domicile.  That's why this line of inquiry is relevant to their

 2    defense.

 3         JUDGE ROSAS:  Okay.  So it -- it doesn't appear that it

 4    is, based on their representations of that -- the Respondent's

 5    representation that the line of inquiry is necessary.  Now,

 6    having said that, I will also add that should there be a -- a

 7    defense that dishonesty was a factor, Board law can tend to

 8    evolve in this area.  And mine is always a cautious approach of

 9    making sure that the record is completely full.  Okay?  And

10    available to the Board for review based on all of the

11    circumstances as the parties argue with them.  So in the

12    scenario where his -- his misstatement or his failure to

13    report, rather, his failure to report his address is considered

14    by the Respondent as a factor in terminating him as opposed to

15    simply determining that he was ineligible to continue working

16    there because he did not have a California's license.  And

17    whether or not -- why that was raised then, why didn't they

18    raise it before?  I mean, that's your argument, General

19    Counsel, but --

20         MR. DO:  Correct, Your Honor.

21         JUDGE ROSAS:  -- what I'm going to do is I'm going to

22    conditionally overrule the objection.  I'm going to allow you

23    to elicit the testimony, and then I'm going to entertain a

24    motion to strike it.  Okay?

25         MR. DO:  Understood, Your Honor.

Exhibit 1(d)
477



```
 1        JUDGE ROSAS:  So it's in the record, but it does not

 2   appear to be something that I'm willing to rely upon going

 3   forward.  And -- and we're not -- and -- and -- and we're

 4   certainly not going to belabor the issue or the background as

 5   to the discriminatee's sentiments and -- and -- and motivations

 6   for going to California.  Okay?

 7        MR. DO:  Understood, Your Honor.

 8        JUDGE ROSAS:  For work.  All right?  All right.  So let's

 9   bring him back.  All right.  So the witness is back.

10        General Counsel, restate your question, which has been

11   objected to and has been overruled conditionally at this -- at

12   the moment.  So go ahead.

13        MR. DO:  Thank you, Your Honor.

14   Q    BY MR. DO:  Mr. Ledesma, if you were living in Phoenix,

15   Arizona, why did you apply for this position with Universal

16   Intermodal in Los Angeles?

17   A    Applied for it -- I applied for that -- for that position

18   due to my father being very ill.  And I wanted to be close to

19   father.

20   Q    Okay.  Drawing attention to page 3 of your application --

21   A    Yes.

22   Q    -- under the license information, which I'm highlighting.

23   Do you see that?

24   A    No, I don't see it.  Oh, yeah, I see it now.

25   Q    Okay.  When you wrote this information in there, was
```

Exhibit 1(d)
478



www.escribers.net | 800-257-0885

1    that -- the license listed in there, was it valid?

2    A    Yes, it was.

3    Q    All right.  Let me draw your attention to Joint Exhibit --

4    the page that's Bates stamped as 48.  Is this the California

5    driver's license that you listed in your application?

6    A    Yes, I did.  That's it.

7    Q    And what's the issuance date of this license?

8    A    The issuance date of the license is -- it's from -- it's

9    from 2016 -- I believe about March 2016.

10   Q    And when is the expiration date of this license?

11   A    It's July 31st, 2- -- 2020.

12   Q    At the time your application to Universal Intermodal, did

13   you have another commercial's driver's license?

14   A    Yes, I did.

15   Q    What state was that from?

16   A    From Arizona.

17   Q    And let me draw attention to what is Bates stamp as page

18   49.  Is this the license you're referring to?

19   A    That is -- yes, it is.

20   Q    And what is the issuance date of this license?

21   A    It's March 2018.

22   Q    And what is the expiration date of the license?

23   A    July 31st, 2023.

24   Q    And just to be clear, when you applied to work for

25   Universal for the first time, did you already have your

Exhibit 1(d)
479



1    Arizona's license?

2    A    Yes, I did.

3    Q    When you were hired by Universal Intermodal, was having a

4    valid commercial's driver's license a condition of employment?

5    A    Yes.

6    Q    To the best of your knowledge, did Universal Intermodal

7    check on the validity of its employees' commercial driver's

8    license?

9    A    Yes, sir.

10    MR. ADLONG:   Objection.   Lacks foundation.

11    JUDGE ROSAS:   Sustained.   Sustained as to any interactions

12    between the Respondent and other individuals.   Rephrase.

13    MR. DO:   Sure.

14    Q    BY MR. DO:   When you were hired by Universal Intermodal,

15    Mr. Ledesma, did Universal Intermodal require you to have a

16    commercial -- a valid commercial's driver's license?

17    A    Yes.

18    Q    And did Universal Intermodal collect any records relating

19    your commercial -- your commercial's driver's license?

20    A    Yes.

21    Q    What record that they collect?

22    A    Which is the driver's license record.   I believe it's MVR.

23    Q    Did any -- when you applied for work for Universal

24    Intermodal, before you start, did anyone at Universal

25    Intermodal tell you that there was a problem with your

Exhibit 1(d)
480



www.escribers.net | 800-257-0885

1    application?

2    A    No.

3    Q    Before you started working with Universal Intermodal, did

4    anyone from Universal Intermodal tell you there was a problem

5    with your commercial's driver's license?

6    A    No.

7    Q    When you worked for Universal Intermodal, do you recall

8    being given a company fuel card?

9    A    Yes, I do.

10   Q    Would anything happened to that fuel card if an employee

11   had an invalid commercial's driver's license?

12   A    Yes.  They would put a hold on the card.

13        JUDGE ROSAS:  What kind of card?  What kind of card?

14        THE WITNESS:  It's a fuel card.

15   Q    BY MR. DO:  Did that ever happen to you?

16   A    Yes, it did.

17   Q    Let me ask you about it.  When did that occur?

18   A    That occurred in October 2018.

19   Q    And tell us what happened.  So what happened when that --

20   what happened once -- once that occurred?  What happened with

21   you?

22   A    Okay.  So I was taking a load over to Shafter, California,

23   and I stopped at a truck stop.  I needed fuel.  Tried using

24   the -- the fuel card and did not work.  So I called -- I called

25   dispatch and they notified me that my California license was

Exhibit 1(d)
481



1    canceled, so for me to call corporate office.

2    Q    And then, what -- what happens after that?

3    A    Okay.  So I called corporate office over in Michigan.  I

4    spoke to somebody.  I do not recall their name.  And they

5    notified me the same thing, that my -- my fuel card was

6    canceled due to my -- it was -- a hold was placed on the fuel

7    card due to my California license was canceled.  So --

8    Q    And then, what happened?

9    A    Okay.  So I -- I told them I had a Arizona -- valid

10   Arizona commercial driver's license if that would be okay.  So

11   they asked me for the information on the license.  I gave it to

12   them.  I waited -- we hanged up.  I waited 30 minutes.  They

13   called me back.  And they told me I was good to go.  My fuel

14   card worked after that.

15   Q    Were you able to fuel up your truck after that call?

16   A    Yes, I was.

17   Q    Other than this instance in 2018, do you recall any other

18   time when you had to tell Universal Intermodal about your

19   Arizona's commercial's driver's license?

20   A    Yes, that was in May of 2019.  My license was suspended

21   due to a personal matter.

22   Q    And let me ask you a little bit into the detail of that.

23   So what happened?

24   Q    Okay.  So I had a -- I had an infraction -- I had an

25   infraction due to being off truck route.  And I was -- I had a

Exhibit 1(d)
482



1    court date.  I showed up to the court date.  They didn't have

2    no documents on file.  So a -- a few months passed by.  And

3    then, I was notified through you -- through a dispatcher that

4    it was a problem on my license, that it was suspended.

5    Q    And at that time, which license were they referring to?

6    A    To my Arizona commercial driver's license.

7    Q    So then, after the dispatcher notified you that there was

8    an issue, what happens next?

9    A    I actually went to go take care of it.  I went to the

10   courtroom that -- that -- where it was issued at.  I also had

11   my license -- the suspension on my license -- I had my license

12   reinstated that same exact day.  And I went back to work the

13   next day.

14   Q    And just to clarify again, did you have your Arizona --

15   Arizona commercial's driver's license the entire time you

16   worked for Universal Intermodal?

17   A    Yes, I did.

18   Q    At any point during the application process, were you ever

19   told that you needed to have a California commercial's driver's

20   license to work for Universal Intermodal?

21   A    No, I do not.

22   Q    When you first applied to work for Universal Intermodal,

23   did you live in Los Angeles full time?

24   A    No.

25   Q    Where would you go?

Exhibit 1(d)
483



 1    A    Phoenix, Arizona.

 2    Q    And how often would you go to Phoenix, Arizona?

 3         MR. ADLONG:  Objection.

 4    A    Sometimes, it --

 5         MR. ADLONG:  Relevance.

 6         JUDGE ROSAS:  What's the relevance?

 7         MR. DO:  It, again, relates to his belief regarding his

 8    domicile, which relates to the standard at issue.

 9         MR. ADLONG:  The -- the question is not regarding his

10    belief.  This is not a question with respect to his belief.

11    The question turns on the belief of the person that made the

12    alleged adverse action.

13         JUDGE ROSAS:  Okay.  I'm going to sustain that objection.

14    Next question.

15         MR. DO:  Okay.  Give me a moment, Your Honor.

16    Q    BY MR. DO:  When you worked for Universal Intermodal, do

17    you recall driving loads out of state?

18    A    Yes.

19    Q    Where would you take them to?

20    A    I would take them to Phoenix and also Las Vegas.

21    Q    All right.  Let me draw your atten -- how often would you

22    do that?

23    A    Pretty often.  Sometimes once or twice a week.

24    Q    All right.  Let me call your attention to what's been

25    marked and identified as Joint Exhibit 3.  Put that on the

Exhibit 1(d)
484



1    screen.  Do you see what I just placed in front of you?

2    A    Yes, I do.

3    Q    Setting aside signature and the name of who signed it, do

4    you recognize this document?

5    A    Yes, I do.

6    Q    And what is it?

7    A    It's an agreement to waive participation in class and

8    collective actions.

9    A    Were you ever given this document?

10   A    Yes, I was.  I was given to it -- I was given it -- it was

11   give it to me when I -- I first applied at the company.

12   Q    And who gave the document to you?

13   A    The recruiter, Javier Velasco.

14   Q    And did he tell you anything about this document?

15   A    I actually asked him what -- what was the meaning of this

16   document.  And he said, pretty much if -- if you sign it, you

17   can't -- you can't -- you can't sue the company.

18   Q    And did you have the option to not sign the document?

19   A    No, I did not.

20   Q    When you worked for Universal Intermodal, prior to your

21   termination, who was your supervisor?

22   A    Prior, it was a -- supervisor was named Sal (phonetic

23   throughout) from Southern Counties Express.

24   Q    Thank you.  Just going back one moment, just to follow up,

25   why do you not believe that you had the option to not sign that

Exhibit 1(d)
485



www.escribers.net | 800-257-0885

1    agreement?

2    A    I -- I -- I asked the -- the recruiter, Javier Velasco,

3    if -- what would happen if I didn't sign it.  And he said that

4    if I didn't sign it, I wouldn't get hired.

5    Q    You mentioned Sal.  What is Sal's job title?

6    A    I believe it was general manager.

7    Q    And then, did you call an individual by the name of Joe

8    Lugo?

9    A    Joe Lugo, yes.  I recall he was sent by Universal.  He was

10   in charge of the Central USA -- I believe he came from Central

11   Transport.

12   Q    To the best of your recollection, when was the first time

13   you jaw -- saw Joe Lugo?

14   A    I really don't re -- recall the exact date.

15   Q    When you worked for Universal Intermodal, do you recall a

16   union trying to organize the employees at Universal Intermodal?

17   A    Yes.

18   Q    The first time you saw Joe Lugo, was it before or after

19   that campaign?

20   A    It was after.

21   Q    Who is Southern Counties Express?

22   A    To my knowledge, it's a company that was purchased by

23   Universal.

24   Q    And when did the Southern Counties acquisition occur?

25   A    I -- I don't recall the exact date.

Exhibit 1(d)
486



1    Q    To the best of your recol -- to the best of your

2    recollection, after Southern Counties acquired -- or my -- my

3    apologies.

4         MR. DO:  Strike that.

5    Q    BY MR. DO:  To the best of your recollection, after

6    Universal Intermodal acquired Southern Counties Express, was

7    there any staffing changes at your workplace?

8    A    Yes --

9         MR. ADLONG:  Objection.

10   A    -- there was.

11        MR. ADLONG:  Leading.

12        JUDGE ROSAS:  Were there any staffing changes?

13        MR. ADLONG:  It presupposes staffing changes.

14        MR. DO:  I asked him if he recalls, Your Honor.

15        JUDGE ROSAS:  Were there any -- overruled.

16   Q    BY MR. DO:  So please answer the question, Mr. Ledesma.

17   A    I -- yes -- yes, there was.  There -- there was a change.

18   Q    What -- what kind of change was it?

19   A    Well, the Universal dispatchers, I did not recall their

20   names, Friday of -- Friday that we went in to work, they were

21   there.  When we came back from the weekend on a Monday, we had

22   new dispatchers from Southern Counties Express.

23   Q    And after that acquisition, who was your dispatcher?

24   A    A gentleman by the name of Alex, and also a gentleman by

25   the name of Walter.

Exhibit 1(d)
487



1    Q    Which company did they come from?

2    A    Southern Counties Express.

3    Q    Let me ask you about a typical day of work at Universal

4    Intermodal.  Step by step, can you describe what a day would be

5    like?

6    A    Yeah, we would come in at 6 a.m.  We would clock in by --

7    by telephone.  We would wait for dispatch to actually issue us

8    a -- issue us work, what we needed to do on a tablet.  And then

9    after that, we'll go outside to the yard to do a pre-trip on

10   our truck, make sure it was -- it was satisfactory to be able

11   to drive it.  We would go to our appoint -- appointment at the

12   ports, flood our containers, and go deliver it to the customer.

13   And -- and we'll do it all over again if -- if there was time

14   during the day.

15   Q    And on average when you were still working for Universal

16   Intermodal, how many loads do you do a day?

17   A    Sometimes one.  Sometimes two.  And if there was enough

18   time, we'll do a third -- a third load.

19   Q    On average, how many hours did you work a day?

20   A    A day, like, 12 hours a day sometimes.  Sometimes less

21   like 10 hours, 10 to 12 hours.

22   Q    When -- when you were making deliveries for Universal

23   Intermodal, what kind of truck did you use?

24   A    It was a -- it was a Peterbilt, white in color.  It had a

25   Universal logo -- logo stickers on the doors.  And also the

Exhibit 1(d)
488



1   number of the facility where we were.

2   Q    And who owned that truck?

3   A    Universal Intermodal.

4   Q    You mentioned that when you come in in the morning, you

5   would get your assignment.  In what form would you get your

6   assignment?

7   A    Before -- before Southern Counties took over, it would be

8   on a piece of paper.  After Southern Counties came in, we

9   started receiving our -- our work through a -- through a

10   tablet.

11   Q    When you're given your assignment, what information are

12   you given about a load?

13   A    The information that would -- that would come out on

14   the -- on the tablet or on the paper, it will tell us the name

15   of the customer, the -- the number of the container, the number

16   of chassis.  And also where were we going to pick it up at.

17   And also whose SCAC code we were going to use.

18   Q    And so you mentioned SCAC code.  What is that?  What is a

19   SCAC code used for?

20   A    A SCAC code, it's -- it's, like, a four -- four-letter

21   number -- four-letter code to actually be able to have access

22   inside the ports, inside all the terminals.

23   Q    And who would give you this SCAC code?

24   A    Dispatcher.

25   Q    And when do you worked for Universal Intermodal, did



1   Universal Intermodal have a unique SCAC code?

2   A    Yes, it did.

3   Q    To the best of your recollection, what was it?

4   A    I -- I can't -- I can't remember.  I believe it was USIZ.

5   Q    And when you were working for Universal Intermodal,

6   particularly after the merger with Southern Counties Express,

7   did Southern Counties Express have its own unique SCAC code?

8   A    Yes.

9   Q    And what was it?

10  A    I do not recall the -- the full -- the full, but I know it

11  was SCE -- or I -- I can't -- I can't recall the -- the -- the

12  SCAC code at this moment.

13  Q    When you were driving for Universal, particularly after

14  the acqu -- the merger with Southern Counties Express, who SCAC

15  code would you use when you're picking up a load?

16  A    Only Southern Counties.

17  Q    Prior to your termination, were you ever hired by Southern

18  Counties Express?

19  A    No, I was not.

20  Q    Prior to your termination, did you ever apply to work for

21  Southern Counties Express?

22  A    No, I do not.

23  Q    How often after the merger did you -- would you be pulling

24  loads for Southern Counties Express?

25  A    Always.

Exhibit 1(d)
490



www.escribers.net | 800-257-0885

1    Q    When you're pulling a load using Southern Counties

2    Express' SCAC code, who would pay you?

3    A    Universal Intermodal.

4    Q    When you're pulling a load using Southern Counties

5    Express' code, who's truck would you be using?

6    A    Universal's.

7    Q    After the acquisition of Southern Counties Express, who

8    were some clients that you would deliver to?

9    A    Walmart, Big Lots, I -- I can't remember the -- the rest

10   of them at this moment.

11   Q    Sure.

12   A    I --

13   Q    What is the --

14   A    -- I got one more.  It's Toyo -- Toyota as well.  Sorry

15   about that.

16   Q    Not a problem.  What is a chassis?

17   A    A chassis is a -- it's a trailer with a container, it sits

18   on top of it.

19   Q    And when you were working for Universal Intermodal, where

20   would you get your chassis from?

21   A    We would get it from Southern Count -- Counties' yard or

22   else right there in the -- in the Universal Compton facility.

23   Q    Did Universal Intermodal have company-owned chassis?

24   A    Yes, they did.

25   Q    What did they look like?

Exhibit 1(d)
491



1    A    They were black in color and yellow on both front and back

2    ends.

3    Q    Did Southern Counties Express have a company-owned -- have

4    company-owned chassis?

5    A    Yes, they did.

6    Q    What did they look like?

7    A    It was black in color and pink on front and -- and back

8    ends.

9    Q    To the best of your recollection, were there Southern

10   Counties Express chassis at the Universal Intermodal facility?

11   A    Yes, there was.

12   Q    To the best of your recollection, were there Universal

13   Intermodal chassis at the Southern Counties Express facility?

14   A    Yes, there was.

15   Q    When you had used a company chassis for a delivery, did it

16   matter if you used a Southern Counties Express chassis or

17   Universal --

18   A    No --

19   Q    -- chassis?

20   A    No, it did not.

21   Q    If a customer -- if Walmart -- when you made a delivery to

22   Walmart, did they care if you were using a Southern Counties

23   Express chassis?

24   A    To Walmart -- we didn't -- we didn't --

25        MR. ADLONG:  Objection.  Objection.  Lacks foundation.

Exhibit 1(d)
492



1      JUDGE ROSAS:  Repeat the question.

2      MR. ADLONG:  Calls for speculation.

3      JUDGE ROSAS:  Did you ask whether Walmart cared?

4      MR. DO:  Yes, because the -- yes, my -- the question was

5   when he delivered to Walmart, did Walmart care if he was using

6   a Southern Counties Express chassis.

7      JUDGE ROSAS:  I'm sure Walmart cares, but that's

8   irrelevant.  So rephrase the question.

9      MR. ADLONG:  Your -- Your Honor --

10      MR. DO:  Sure.

11      JUDGE ROSAS:  Rephrase the question.  Let's see the

12   objection after the question's rephrased.

13      MR. ADLONG:  I don't have any problem with rule -- I just

14   wanted to ask that I've noticed that I'll interpose objections

15   and we're getting answers before a ruling.  So I just ask if

16   you could please address that matter before --

17      JUDGE ROSAS:  Yeah.  So Mr. Ledesma, you have to wait.

18   Don't answer right away --

19      THE WITNESS:  Okay.

20      JUDGE ROSAS:  -- because there may be an objection.  And

21   if there's an objection that ends up being sustained, then your

22   testimony would basically be, you know, eliminated from the

23   record.  Okay?

24      THE WITNESS:  Okay.

25      JUDGE ROSAS:  So just take your -- take your time

Exhibit 1(d)
493



1    answering.  All right?

2        THE WITNESS:  All right.

3        JUDGE ROSAS:  Okay.

4        MR. DO:  All right.  Let me rephrase.

5    Q    BY MR. DO:  When you delivered to Walmart, did Walmart

6    require you to use the Southern Counties Express chassis?

7    A    No.

8    Q    When you delivered to Walmart, did Walmart require you to

9    use a Universal Intermodal chassis?

10   A    No.

11   Q    Typically, once you picked up a load from the port, where

12   would you deliver it?

13   A    We would deliver to -- we'd deliver it -- sometimes

14   deliver it to Compton facility, sometimes to Southern Counties,

15   or sometimes to the -- just straight to the customer.

16   Q    How regularly did you deliver straight to the customer?

17   A    Pretty regular.  That was a everyday thing.

18   Q    You've -- you previously mentioned that you would do out-

19   of-state deliveries.  Did you seek out those loads?

20   A    No.

21   Q    Okay.  When you worked for Universal Intermodal, do you --

22   I asked this.  My apologies.

23       MR. DO:  Strike that.

24   Q    BY MR. DO:  You mentioned that a Union -- that you recall

25   a union trying to organize the Universal Intermodal employees.

Exhibit 1(d)
494



www.escribers.net | 800-257-0885

1     What union was trying to organize those employees?

2     A     The Teamsters.

3     Q     Did you support that campaign?

4     A     Most definitely, yes.

5     Q     All right.  I'm going to show what's been marked for

6     identification as GC Exhibit 8.  Do you see the document I just

7     put in front of you?

8     A     Yes, I do.

9     Q     Is this your name?

10    A     Yes, it is.

11    Q     And let me zoom in some more.  And on the bottom right,

12    there's a signature, do you recognize that signature?

13    A     Yes, I do.

14    Q     And then, it's dated November 2, 2019.  Is that the date

15    that you signed this card?

16    A     Yes.

17          MR. DO:  Your Honor, I move for the admission of GC-8 into

18    evidence.

19          MR. ADLONG:  No objection, Your Honor.

20          JUDGE ROSAS:  General Counsel's 8 is received.

21    **(General Counsel Exhibit Number 8 Received into Evidence)**

22    Q     BY MR. DO:  To the best of your recollection, when did the

23    Union's campaign begin?

24    A     September 2019.

25    Q     And other than signing a Union authorization card, what

Exhibit 1(d)
495



www.escribers.net | 800-257-0885

1    else did he show your -- what else did you do to show your

2    support for the Union?

3    A    I wore a Union safety vest with the Teamsters logo on

4    front and back.

5    Q    Do you recall attending Union meetings?

6    A    Yes.

7    Q    Do you recall speaking to your coworkers about the Union?

8    A    Yes.

9    Q    And how often would you speak to your coworkers about the

10   Union?

11   A    As much as possible, every day.

12   Q    Do you recall connecting your coworkers with the Union?

13   A    Yes.

14   Q    And how many -- for how many of your coworkers did you do

15   that?

16   A    Quite -- I don't have an exact number, but it was quite --

17   quite a few of them.

18   Q    What's your best estimate?

19   A    Probably 10, 12, around there.

20   Q    And you mentioned you were a Union vest.  Did you wear it

21   while you were working?

22   A    Yes.

23   Q    You mentioned that you attended Union meetings.

24   Approximately how many of those did you attend?

25   A    Probably three of them.

Exhibit 1(d)
496



www.escribers.net | 800-257-0885

1    Q    And without naming any employee in particular, how many

2    employees did you see attending these meetings?

3    A    Like 14, sometimes 8, 9.

4    Q    To the best of your recollection, when did the Union

5    went -- go public with its campaign?

6    A    November 2019.

7    Q    And what did the Union do once they went public with its

8    campaign?

9    A    Started -- always started wearing -- wearing our vests

10    showing -- showing our support for the Union.  Also with

11    organizers out -- outside of the -- outside of the premises,

12    not -- not inside the Compton facility.

13    Q    Okay.  When you worked for Universal Intermodal, after the

14    Union went public with its campaign, did Universal Intermodal

15    do anything in response?

16    A    Yes, it did.  They actually hired labor consultants.

17    Q    And do you recall attending company-sponsored meetings

18    that talked about the Union?

19    A    Yes.  It was three of them.

20    MR. DO:   I'm going to mark for identification as what is

21    GC Exhibit 7.

22    Q    BY MR. DO:  Mr. Ledesma, do you see the document -- oh,

23    wait.  I'm -- I haven't put it up yet.  My apologies.  Mr.

24    Ledesma, do you see the document I just put in front of you?

25    A    Yes.

Exhibit 1(d)
497



www.escribers.net | 800-257-0885

1    Q    Do you recognize the person in this picture?

2    A    Yes.  That's one of the labor consultants.

3    Q    Do you recall his name?

4    A    I -- I don't know his name.  I remember his last name --

5    last name was Cummings.

6    Q    Thank you.

7         MR. DO:  Your Honor, I'm going to move for the admission

8    of GC Exhibit 7 into evidence.

9         JUDGE ROSAS:  All right.

10        MR. ADLONG:  We're going to object as to why a picture of

11   somebody is relevant to the record.  We're also -- lack the

12   foundation as to who took the picture, when --

13        JUDGE ROSAS:  You -- you want voir dire?  (Indiscernible).

14        MR. ADLONG:  Sure.

15                    **VOIR DIRE EXAMINATION**

16   Q    BY MR. ADLONG:  Mr. Ledesma, nice to meet you this

17   afternoon.  My name is Daniel Adlong.  I'm counsel for the

18   company.  I'm going to ask you some questions.  So if you can

19   just please answer my questions yes or no verbally rather than

20   a headshake because we're trying to create a record.  Can you

21   do that for me, please?

22   A    Yes, I can.

23   Q    Okay.  Thank you.  And then the other question -- the

24   statement is -- is even though you might know the answer to the

25   question before I conclude the question, could you please

Exhibit 1(d)
498



www.escribers.net | 800-257-0885

1    refrain from answering until I conclude my question?

2    A    Yes.

3    Q    Okay.  Mr. Ledesma, who took this picture?

4    A    I do not know.

5    Q    When was this picture taken?

6    A    I do not know.

7    Q    Where is this picture from?

8    A    I do not know.

9         MR. ADLONG:  So we're going to object as to lacks

10   foundation for the picture, Your Honor.

11        MR. DO:  Your Honor, may I be heard?  Your Honor, the

12   witness can authenticate this as long as he's familiar with the

13   subject matter and I will represent that this comes from Mr.

14   Cur -- Cummings' website.  This is meant for -- as an

15   illustrative exhibit.

16        MR. ADLONG:  Yeah, and Your Honor, I mean --

17        JUDGE ROSAS:  Mr. Ledesma, the question is, do you know

18   who this is in the picture?

19        THE WITNESS:  Yes, I do.

20        JUDGE ROSAS:  And who is it?

21        THE WITNESS:  He's a labor consultant.

22        JUDGE ROSAS:  But you don't know his name?

23        THE WITNESS:  Not his name, but I do know his last name.

24        JUDGE ROSAS:  You know his last name.  How do you know his

25   last name?

Exhibit 1(d)
499



1        THE WITNESS:  I didn't -- I didn't forget his last name.

2   I just don't remember his name.

3        JUDGE ROSAS:  It's not because somebody just told you,

4   right?

5        THE WITNESS:  No, no, not at all.  I actually --

6        JUDGE ROSAS:  You're just saying you remember his last

7   name?  What's his last -- what do you remember?

8        THE WITNESS:  Cummings.

9        JUDGE ROSAS:  Okay.  So Respondent, I'm going to receive

10  it over objection.  The witness has recognized the person

11  depicted in the photograph.  I understand you have questions

12  about the circumstances of the taking of the photograph, who

13  took it, when, where'd it come from.  But it goes in for the

14  purpose of this witness identifying a certain individual as

15  resembling a person named Cummings that's relevant to this

16  story.  So I'm going to overrule the objection.  General

17  Counsel 7 is received for that purpose.

18  **(General Counsel Exhibit Number 7 Received into Evidence)**

19        MR. DO:  Thank you, Your Honor.

20                  <u>**RESUMED DIRECT EXAMINATION**</u>

21  Q    BY MR. DO:  Mr. Ledesma, when was the first time that you

22  saw Mr. Cummings?

23  A    I don't recall the exact date, but I know it was in

24  November 2019.

25  Q    Prior to the Union's campaign, have you ever seen him

Exhibit 1(d)
500



www.escribers.net | 800-257-0885

1    before?

2    A    No.

3    Q    Approximately how many company-sponsored meeting about the

4    Union did you attend?

5    A    Three.

6    Q    To the best of your recollection, what dates were the

7    meeting?

8    A    I know there were -- there were in November.  I do not

9    recall the exact dates.

10    Q    When you were told about these meetings, do you recall

11    being told of any consequences for not attending the meeting?

12    A    No.

13    Q    Do you recall attending a company-sponsored meeting on or

14    around November 13, 2019?

15    A    Like I said, I -- I don't recall the exact date.  I know

16    it was in November but I --

17    Q    All right.  Let's -- let me change my question.  Let me

18    ask you about the first meeting that you guys had.  Where was

19    that meeting held?

20    A    Inside the -- the -- the meeting room in Compton -- in the

21    Compton facility.

22    Q    And when was that meeting held?

23    A    It was in -- in the -- during the morning shift at, like,

24    at 6 a.m.

25    Q    And how did you learn about the meeting?

Exhibit 1(d)
501



1    A    The dispatcher right there in the Compton facility named

2    Alex told us we were -- we came in, we clocked in.  We're

3    waiting for -- for dispatch, but he told us to hold on, that

4    there was a meeting.

5    Q    And when Alex told you about this meeting, do you -- do

6    you recall being told that the meeting was mandatory?

7    A    No.

8    Q    Do you recall -- did Alex tell you the consequences of not

9    attending the meeting?

10   A    No.

11   Q    Who was at this meeting?

12   A    It was two labor -- two labor consultants, gentleman --

13   gentleman -- the labor consultant by the last name Cummings,

14   and other -- the labor consultant, I -- I -- I don't remember

15   his name at all.

16   Q    Were there employees during -- at -- at this meeting?

17   A    Yes, there was.  It was around probably like, seven

18   employees around there.

19   Q    Sure.  What was said during this meeting?

20   A    The -- the meeting -- what was said there was the labor

21   consultant told us it was -- to -- to give us knowledge about

22   labor laws.

23   Q    Do -- do you recall saying anything during this meeting?

24   A    I -- yes.  The labor consultant told us if we knew what

25   Section 7 was and I -- I told him I -- I didn't know what

Exhibit 1(d)
502



1    Section 7 was.  But with our wages, we would probably qualify

2    for Section 8.  And the rest of the employees started laughing

3    at that.

4    Q    Did you say anything else?

5    A    In that meeting?  Yes.  I -- I also notified labor

6    consultant that -- that I could speak for all my coworkers.

7    And then I rephrased myself and I -- I told him, I -- I speak

8    for all my coworkers except him.  And I pointed at another

9    coworker named Lazaro.  He did not have a Union vest on.

10   Q    And what did you say?

11   A    That -- exactly that.  I -- I said I could speak -- I

12   could say -- okay.  And after -- after I told him that -- that

13   I could speak for everybody except for Lazaro, I said we were

14   already decided that we were going Union.

15   Q    And did -- did the Cummings respond to your comment?

16   A    He just said, okay.  And kept on going on with labor laws

17   that I -- I really don't recall what exactly was said.

18   Q    You mentioned that you attended three company-sponsored

19   meetings.  Let me ask you --

20   A    Yes.

21   Q    -- about the second of those meetings.  Where was that

22   meeting held?

23   A    In the same place, in the Compton facility.

24   Q    And when was that -- when was that meeting held?

25   A    I do not recall the exact date, but I know it was a few

Exhibit 1(d)
503



1    days later.

2    Q    And how do you learn about the second meeting?

3    A    Same -- same, we went in and -- and we're told again right

4    there at dispatch in the office that there was another company

5    meeting.

6    Q    And who's the dispatcher that told you about the meeting?

7    A    It was dispatcher Alex.

8    Q    And when dispatcher Alex told you about this second

9    meeting, did he tell you that the meeting was mandatory?

10    A    No.

11    Q    When dispatcher Alex told you about this second meeting,

12    did he tell you about the consequences of not attending the

13    meeting?

14    A    No.

15    Q    Who was at this meeting?

16    A    Again, both of -- the same labor consultants and the --

17    the same -- the same drivers from last time.

18    Q    And tell me what happened during this meeting.

19    A    Okay.  So one of the labor consultants asked if we had any

20    Spanish speakers.  And we all said, like, yes, our -- our

21    coworker Carlos (phonetic throughout) was only Spanish

22    speaking.  So -- so they said, okay.  So they're -- the -- one

23    of the labor consultants said that they would speak to him the

24    following day, so the meeting could go a lot faster.  So one of

25    my coworkers by the name Saul, he told them that we all were

Exhibit 1(d)
504



 1    Spanish speaking and that we to do the meeting tomorrow.  So

 2    the following day -- so I set up, and I told them, okay.  Let's

 3    go.  And we actually walked out.  And we noticed that another

 4    coworker by the name of Alex that only spoke English, he stayed

 5    behind.  So noticing that, another coworker by the name of

 6    Walter, he went back inside and joined the meeting with Alex.

 7    Q    And when you -- when you and your colleagues were walking

 8    out of that meeting, did anybody try to stop you?

 9    A    No.

10    Q    And were you and your colleagues ever disciplined for

11    walking out of that meeting?

12    A    No.

13    Q    Let me ask you about the third meeting that you mentioned,

14    when -- where was that meeting held?

15    A    In the same -- in the same location, the Compton facility.

16    Q    At what time was that meeting held?

17    A    At 6 a.m. when we first arrived to clock in.

18    Q    And how did you learn about that meeting?

19    A    Joe Lugo told us that there was going to be a company

20    meeting again.

21    Q    And when he first told -- when Joe Lugo first told you

22    about the meeting in the morning, did he tell you that the

23    meeting was mandatory?

24    A    Not at -- not at the -- at the start.  No, not at the

25    morning.

Exhibit 1(d)
505



1    Q    And when he first told you about the meeting, did Joe Lugo

2    tell you the consequences of not attending that meeting?

3    A    No.

4    Q    Who was at that meeting?

5    A    Again, the same labor -- both labor consultants and the

6    same -- the same drivers, except -- except Alex since it was

7    going to be a Spanish spoken meeting.

8    Q    And so then, what happened at that meeting?

9    A    So as soon as -- well, the drivers and I went in, I asked

10   the Spanish speaking labor consultant if the meeting was

11   mandatory.  So the labor consultant called Joe Lugo and Joe

12   Lugo came into the -- to the conference room.  And I asked

13   him -- I asked him, is this meeting mandatory?  And Joe Lugo

14   said, yes, this meeting is mandatory.  So we actually sat down.

15   Joe Lugo went out of the -- went out of the conference room.

16   Q    So prior to when Joe Lugo came into that meeting and told

17   you that the meeting was mandatory, have you ever heard that

18   attendance at these company-sponsored meetings were mandatory?

19   A    No.

20        MR. ADLONG:  Objection.  Vague and ambiguous as to "these

21   company-sponsored meetings".

22        JUDGE ROSAS:  Have you ever heard -- rephrase that.

23        MR. DO:  Sure.

24   Q    BY MR. DO:  Prior to Mr. Joe Lugo coming in and telling

25   you -- and answering your question about whether the meeting

Exhibit 1(d)
506


www.escribers.net | 800-257-0885

1     was mandatory, in the three meetings that you attended, that

2     you testified that you attended, at any previous point, were

3     you ever told that these meetings were mandatory?

4     A     No.

5     Q     All right.  November 25th, do you recall what happened on

6     that date?

7     A     Yes, I did.

8     Q     What happened?

9     A     Okay.  So I came in, I tried to -- at 6 a.m.  I try to --

10    I try to clock in.  I tried -- I -- and I had three different

11    attempts, and I wasn't able to clock in.  So I moved aside, so

12    my coworker, Horacia, could -- could clock in.  And meanwhile,

13    I moved aside.  Joe Lugo came to me and told me that -- that

14    we're -- they we're going to have a meeting with me inside --

15    inside one of the offices.  And I told him that I still hadn't

16    clocked in, that I wasn't sure if I was -- if I was able to go

17    and speak to him or not.  So he said that -- because I told him

18    I wasn't able to clock in.  So he said, don't worry about it.

19    The company is going to pay for -- for the time you're in the

20    office.  So I went into the office with him.

21    Q     And was there anybody else in the office with you?

22    A     Yes, gentlemen, I do not recall his name, but he did say

23    he was a -- he was a safety manager.

24    Q     And what happened during that meeting?

25    A     He -- the safety manager asked me if I knew what a -- what

Exhibit 1(d)
507



1    a CHP BIT inspection was.  And I said, yes, I do.  So he

2    started -- he then told me that he was going through -- through

3    the record -- company record.

4        MR. ADLONG:  Objection.  This is hearsay.

5        JUDGE ROSAS:  Okay.  The testimony is that a safety

6    manager asked him what a certain inspection was.  You object to

7    that?  Do you object to what the safety manager allegedly told

8    him or asked him?

9        MR. ADLONG:  We object to the entrance of hearsay

10   evidence.  We haven't established who the -- we -- we -- we

11   object to the end -- to the admission of hearsay evidence.

12   It's an out-of-court statement that's being offered for the

13   truth of the matter asserted.  There's -- we haven't

14   established any exception to the rule yet.

15       JUDGE ROSAS:  Well.

16       MR. DO:  Your Honor, may -- may I be heard.

17       JUDGE ROSAS:  Go ahead.

18       MR. DO:  My apologies.  Your Honor, this is a -- Joe Lugo

19   was at this meeting.  And this is being admitted as a party

20   admission and on the effects on the listener.

21       JUDGE ROSAS:  Look, the -- the individual, according to

22   the testimony, and again, you can, Respondent, cross-examine

23   regarding the circumstances of the statement to disprove

24   otherwise that it shouldn't be credited under 801(d)(2)(C), as

25   in cat, as the statement of someone who's at a meeting who

Exhibit 1(d)
508



1    appears to be authorized to make that statement according to

2    this witness's statement.  Okay?  So you can cross --

3        MR. ADLONG:  Your Honor --

4        JUDGE ROSAS:  -- that.  But it's clearly not -- it -- it

5    clearly falls under the rubric of party opponent statement.

6    Overruled.  Next question.

7        MR. DO:  Your Honor, so let me restate my question to the

8    witness.

9    Q    BY MR. DO:  Can you tell us what happened during this

10   meeting?

11   A    Yes.  Well, I was told that -- about the CHP BIT

12   inspection, if I knew what it was.  I said yes.  And general

13   manager -- I mean, the safety manager, sorry about that, told

14   me that he was going through the company records, and he

15   noticed I had an out-of-state license, and that that was

16   against federal regulations.

17   Q    And when he said this, what happens next?

18   A    He told me he was going to suspend me due to not following

19   federal regulations.  And I told him I -- if he was -- that he

20   needed to notify me, so he could give me days in order to

21   correct that and get a -- get a California commercial driver's

22   license.  And he told me he was informing me -- informing me

23   then.

24   Q    Okay.  And then, did anything else happen?

25   A    Yes, right in that office, there's a window that actually

Exhibit 1(d)
509



1    views the hallway.  And my coworkers, Carlos and Horacia, were

2    standing outside.  So as soon as I was -- I was told that I was

3    suspended, I stood up, I opened the doors to let Horacia and

4    Carlos in.  And I asked the safety manager to please repeat the

5    reason he was suspending me.  So -- and when that happened, Joe

6    Lugo stood up and he told me it was a closed-door meeting.  And

7    ask him again, can you please repeat it.  And they did not.  So

8    Joe Lugo stepped out of office.  And I stepped out of the

9    premises.  I -- I went home after that.

10   Q    Prior to this meeting, were you ever told that your

11   Arizona's commercial's driver's license was an issue?

12   A    Never.  No.

13   Q    Okay.  And did you ever make the offer to get a California

14   driver's license?

15   A    Yes, I did.

16   Q    After your suspension, do you take any steps to get a

17   California commercial's driver's license?

18   A    Yes.  Yes, I did.  Right that same day, November 25th, I

19   went to go get a -- a new DOT physical, so I could have a -- a

20   statement.

21        MR. ADLONG:  I'm going to object as to relevance.

22        JUDGE ROSAS:  Repeat the question.

23        MR. DO:  Sure, Your Honor.  I asked the witness that after

24   this meeting, after his suspension, did he make any effort to

25   obtain a California commercial's driver's license?

Exhibit 1(d)
510



1    JUDGE ROSAS:  So Respondent, you object to the witness

2    testifying as to what steps he took in order to rectify that?

3    MR. ADLONG:  Yeah.

4    JUDGE ROSAS:  Okay.

5    MR. ADLONG:  I mean, I don't see what the -- how this

6    affects -- his acts post-suspension affect the decision to

7    suspend.

8    JUDGE ROSAS:  Did you correct -- did you correct it, sir?

9    THE WITNESS:  Yes, I did.

10   JUDGE ROSAS:  Okay.  So we -- we have that testimony.

11   General Counsel, do you need anything else?

12   MR. DO:  I would like to establish the date of what -- of

13   what he actually did because it's -- you've got to remember

14   he's also subsequently terminated.

15   JUDGE ROSAS:  Okay.  So what date was this that you were

16   suspended, sir?

17   THE WITNESS:  November 25th, 2019.

18   JUDGE ROSAS:  What date did you have your California

19   license reinstated?

20   THE WITNESS:  December 2nd, 2019.

21   JUDGE ROSAS:  When, if at all, did you send or notify the

22   Respondent that it was reinstated?

23   THE WITNESS:  Right that same day, I -- I called multiple

24   times, I called Joe Lugo and I never had a response.

25   JUDGE ROSAS:  Okay.  Let's hold it there for a minute.

Exhibit 1(d)
511



1    Let's take a five-minute break.  I have to answer a couple of

2    questions on something else that's pending that's coming up.

3          MR. DO:  Okay.  Your Honor.

4          JUDGE ROSAS:  Off the record.

5    (Off the record at 2:10 p.m.)

6          JUDGE ROSAS:  We're back on the record.  I don't recall if

7    we had -- if I had resolved or -- or completed my ruling

8    relating to the objection.  I asked the witness a couple of

9    questions regarding the -- the suspension date, the

10   reinstatement of his California license, and when he sent it to

11   the Respondent.  Okay.  General Counsel.  Next question.

12         MR. DO:  Thank you, Your Honor.

13                     **RESUMED DIRECT EXAMINATION**

14   Q    BY MR. DO:  Mr. Ledesma, after your suspension, were you

15   ever able -- allowed to return to work?

16   A    No, I actually wasn't able to get a hold of Joe Lugo at

17   all.

18   Q    When were you ter -- how did you learn about being

19   terminated?

20   A    On November 27th, I received a phone call by Jule Logo --

21   Joe Lugo, but I -- I missed the call.  I noticed I had missed

22   call.  And I actually called him back.  So it was over -- by

23   telephone.

24   Q    And so did you ever get a chance to talk to Joe Lugo about

25   your termination?

Exhibit 1(d)
512



www.escribers.net | 800-257-0885

```
 1    A    After the termination, no.

 2    Q    No, no.  I mean about your termination.

 3    A    Yea -- well, November 27th, when I called him back, that

 4    is when he actually terminated me.

 5    Q    And what did he say to you?

 6    A    He said due to the -- due to the investigation of my

 7    suspension, that the company had decided to terminate me --

 8    terminate my employment.

 9    Q    And did he tell you the basis for your termination?

10    A    He said for not following a federal -- federal

11    regulations.

12    Q    And you testified that you live in Arizona now.  When did

13    you move to Arizona?

14    A    I moved to Arizona late February, about, 2020.

15    Q    Did losing your job at Universal Intermodal affect your

16    decision to move to Arizona?

17    A    Yes.

18    Q    How did it affect your decision?

19         MR. ADLONG:  Objection.  Objection.  Relevance.

20         JUDGE ROSAS:  Sustained.

21         MR. DO:  Your Honor, may I be heard on this?

22         JUDGE ROSAS:  Go ahead.

23         MR. DO:  Your Honor --

24         MR. ADLONG:  Your Honor, are we going to do this in front

25    of the witness?
```

Exhibit 1(d)
513


www.escribers.net | 800-257-0885

1      JUDGE ROSAS:  Excuse the witness, please.

2      MR. DO:  Your Honor, this line of inquiry, which is only

3   three questions, relates to chill evidence.  And that's

4   particularly problematic because of the potential 10(j) posture

5   of this case.

6      MR. ADLONG:  Your Honor, with respect --

7      JUDGE ROSAS:  To what evidence?

8      MR. DO:  Chill evidence, Your Honor.

9      JUDGE ROSAS:  A chilling -- chilling of --

10     MR. DO:  The --

11     JUDGE ROSAS:  -- activity?

12     MR. DO:  Correct.  Because this is disbursal of the unit,

13   Your Honor.

14     JUDGE ROSAS:  Repeat the question --

15     MR. DO:  The question was --

16     JUDGE ROSAS:  -- that was objected to.

17     MR. DO:  Sure.  The question was how did the -- how did

18   losing your job at Universal Intermodal affect your decision to

19   move to Arizona?

20     MR. ADLONG:  Your Honor, could I respond to that?

21     JUDGE ROSAS:  Go ahead.

22     MR. ADLONG:  With respect to chill, typically, those are,

23   like, nip-in-the-bud cases, or they're cases pre-election.

24   This here, we don't have any chill problems.  They voted on the

25   12th of December 2019, and according to the NLRB, voted

Exhibit 1(d)
514



www.escribers.net | 800-257-0885

1  resoundingly in favor.  This isn't an eviden -- this -- chill

2  is not even an issue.  What we're dealing now is with

3  bargaining.  And it is -- I mean, that's why you have Mar-Jac

4  remedies and things of that nature.  The Board can say, hey,

5  you need to you -- need to bargain with the unit that we've

6  been certified.  There -- there is no question of chill

7  anymore.

8       JUDGE ROSAS:  General Counsel, state your offer of proof.

9  If permitted to testify, what would he say?

10      MR. DO:  Sure.  He would say that the losing of his job,

11  you know, affected his decision.  And now even with the --

12  the -- the --

13      JUDGE ROSAS:  The -- the loss of his job affected his

14  decision to do what?

15      MR. DO:  The decision to move to Arizona.  And that even

16  if he was offered reinstatement, he might not want to go back

17  because he lives in Arizona now.

18      MR. ADLONG:  So doesn't that --

19      JUDGE ROSAS:  Why wouldn't that -- hold on one second.

20  Why wouldn't that be relevant to the -- to -- to remedy or

21  compliance if necessary?  How do we know -- how do we know

22  what's necessary -- it's necessary for a 10(j)?

23      MR. DO:  Correct, Your Honor.  The -- the General

24  Counsel -- this case has potential 10(j).  So the General

25  Counsel is simply trying to offer it in to, you know, potential

Exhibit 1(d)
515



1    chill evidence because that's relevant to that inquiry,

2    particularly if we're ordered to enter the transcript in for

3    that, you know, for that motion.

4        MR. ADLONG:  With respect, Your Honor, the -- what may or

5    may not happen in the future, depending on when a decision gets

6    issued here, because I -- I would be willing to bet if you

7    asked Mr. Do and Ms. Kagel that the Region is not going to go

8    10(j) until you issue an deci -- you issue a decision.  And

9    we -- we can't speculate what the circumstances will be of Mr.

10   Ledesma's life at that point in time when we finally get to the

11   conclusion of the proceeding, the briefing, and the writing of

12   a decision.

13       Now, if they want to enter in chill evidence, they're more

14   than capable of taking a -- a declarat -- taking an affidavit,

15   or taking a declaration, or submitting it to a federal court.

16   A federal court proceeding, we don't need to enter evidence in

17   here now for something that can be done in that proceeding

18   and -- and overburden the record, because if he's going to

19   ask -- if he's going to ask those questions now, I'm going to

20   cross.  So you want to start burdening the record for

21   unnecessary things.  We can get after it, or he can wait until

22   it's absolutely necessary.

23       JUDGE ROSAS:  All right.  So -- so the Region hasn't filed

24   a 10(j) application; is that right?

25       MR. DO:  Your Honor, we have not.  And let me emphasize

Exhibit 1(d)
516



1   that there is a --

2       JUDGE ROSAS:  That's a -- that's a -- that's a no.

3       MR. DO:  Correct.

4       JUDGE ROSAS:  And then, my next question is the witness

5   moved back to Arizona when?

6       MR. DO:  He testified about -- I believe, about two months

7   ago in 2020- --

8       JUDGE ROSAS:  2020.

9       MR. DO:  -- oh, no, I'm sorry, 2020.  My apologies.

10      JUDGE ROSAS:  Okay.  And he moved here to be near his

11  father.  That's what we have in the record those -- right?

12      MR. DO:  Correct.

13      JUDGE ROSAS:  All right.  The application -- the objection

14  is sustained.  Next question.  Let's bring him back.

15      Just to recap, the witness was terminated on November

16  27th, 2019, Mr. Ledesma?

17      THE WITNESS:  Yes.

18      JUDGE ROSAS:  Okay.  And what we'll put into the record is

19  that you returned to Arizona how long ago?

20      THE WITNESS:  I returned to Arizona late February, 2020.

21      JUDGE ROSAS:  Of 2020?

22      THE WITNESS:  Yes.

23      JUDGE ROSAS:  Okay.  So you -- so you've been there for

24  over a year?  You've been back home for over a year, right?

25      THE WITNESS:  Yeah.

Exhibit 1(d)
517



1        JUDGE ROSAS:  Okay.

2        THE WITNESS:  Yes.

3        JUDGE ROSAS:  All right.  Let's go.  Next question.

4        MR. DO:  Thank you, Your Honor.

5    Q    BY MR. DO:  In December 2018, do you recall your hours

6    being cut in any way?

7    A    No, I do not.

8    Q    In December 2018, do you recall the number of loads you

9    were driving being reduced in any way?

10   A    I do not recall.

11       MR. DO:  No further questions, Your Honor.

12       JUDGE ROSAS:  Charging Party.

13       MR. WOJCIECHOWSKI:  No questions.  Thank you.

14       JUDGE ROSAS:  Cross-examination.

15       MR. ADLONG:  I need the Jencks statement, Your Honor.

16       JUDGE ROSAS:  How many pages we got, General Counsel?

17       Let's go off the record.

18   (Off the record at 2:29 p.m.)

19       JUDGE ROSAS:  On the record.  Thank you, Troy.

20                    **CROSS-EXAMINATION**

21   Q    BY MR. ADLONG:  Mr. Ledesma, good afternoon.

22   A    Good afternoon.

23   Q    You know, the same admonitions that I gave you earlier

24   still apply.  If you could please answer my questions verbally

25   and wait till I complete my question, please.

Exhibit 1(d)
518


www.escribers.net | 800-257-0885

```
 1   A    Yes, sir.

 2   Q    All right.  I'll also remind you that you're still under

 3   oath.  Just as a first question, is anybody else present in the

 4   room with you while you've testified today?

 5   A    No.

 6   Q    Okay.  So Mr. Ledesma, you said you were hired in July

 7   2018, correct?

 8   A    Yes.

 9   Q    Okay.  And based on -- excuse me.  Based -- based on your

10   application, it looks like you applied on July 16th, 2018,

11   correct?

12   A    I do not recall the date.  I do not have the application

13   in front of me either.

14   Q    Okay.  And after applying, you probably didn't start work

15   for at least about two weeks, correct?

16   A    Yes.  Around there.

17   Q    Okay.  So --

18        MR. ADLONG:  Ms. Bridge?

19        MS. BRIDGE:  Yes.

20        MR. ADLONG:  Is there -- is there any way you can please

21   pull up the Joint Exhibit 3?

22        MS. BRIDGE:  Okay.

23   Q    BY MR. ADLONG:  And I would like to turn your attention to

24   what's been Bates labeled 20.  It looks like it's page 20 of

25   the PDF.
```

Exhibit 1(d)
519



www.escribers.net | 800-257-0885

```
 1          MS. BRIDGE:  It will be another minute.  I'm sorry.  I

 2   closed out the file.  I'll be --

 3          MR. ADLONG:  We're patient.

 4          Oh, you know what, Ms. Bridge, I'm sorry.  I didn't

 5   realize I did this.  If you'll just scroll down two pages.  I

 6   wanted Joint Exhibit 4(a).  It's the second page of it.  It's

 7   Bates labeled 20.  I apologize.

 8          MS. BRIDGE:  Counsel, did you want 4(a) or 4(b)?

 9          MR. ADLONG:  4(a).  So if you go down one page underneath

10   that, please, to start.

11          MS. BRIDGE:  Okay.

12          MR. ADLONG:  Okay.  Thank you, Your Honor.  Excuse me, Ms.

13   Bridge.

14   Q     BY MR. ADLONG:  Mr. Ledesma.

15   A     Yes, sir.

16          MR. ADLONG:  I don't know who I should address this to.

17   And maybe this is just on our side, but I would like to be able

18   to see Mr. Ledesma while I'm cross-examining him.  And at this

19   point, I -- I don't have -- I don't see him on my screen.  I

20   see ourselves, Judge Rosas, Mr. Do, and Union counsel.  Is

21   there any --

22          JUDGE ROSAS:  Let's go off the record.

23   (Off the record at 3:01 p.m.)

24          JUDGE ROSAS:  Back on.

25                      RESUMED CROSS-EXAMINATION
```

Exhibit 1(d)
520



www.escribers.net | 800-257-0885

1    Q    BY MR. ADLONG:  Mr. Ledesma, do you recognize this

2    document?

3    A    I recognize my name on there.  I -- I don't -- I don't

4    recognize the -- the exact document.

5    Q    Okay.

6         MR. ADLONG:  Ms. Bridge, can you scroll down a couple of

7    pages, so Mr. Ledesma can take a chance to view it, and see

8    what it is, and see if he can reflesh (sic) his -- refresh his

9    recollection regarding what it is?

10   A    Yeah, it's part of my application.

11        MR. ADLONG:  Okay.  Okay.  Can you, Ms. Bridge, please, go

12   back to the initial page we were at?  Okay.  That's good.

13   Thank you.

14   Q    BY MR. ADLONG:  So Mr. Ledesma, that signature right there

15   on the signature line, that is yours, correct?

16   A    That is correct.

17   Q    And that's your writing right there where it says 7/16/18,

18   correct?

19   A    Yes.

20        MR. ADLONG:  Okay.  And just so the record is clear, we're

21   talking about Joint Exhibit 4(a), Bates labeled page 20.

22   Q    BY MR. ADLONG:  Now, Mr. Ledesma, if we go down --

23        MR. ADLONG:  Ms. Bridge, if you can go down to the

24   personal data section.

25   Q    BY MR. ADLONG:  I just want to clarify something.  Again,

Exhibit 1(d)
521



www.escribers.net | 800-257-0885

1  you're the person who completed that section that says present

2  address, correct?

3  A    Yes.

4  Q    All right.

5      MR. ADLONG:   Then if you can go down further, Ms. Bridge.

6  Can you please go to the section that says, "Have you taken any

7  driving courses," right there?  So we're now on Bates labeled

8  page 20, so the record's clear.

9  Q    BY MR. ADLONG:  Do you see that top question right there,

10  Mr. Ledesma, that says, "Have you ever taken any driving

11  courses?"

12  A    Yes.

13  Q    Who completed that?

14  A    I did.

15  Q    Okay.

16      MR. ADLONG:  Ms. Bridge, if you can go down further,

17  remain on Bates labeled page 21, please.  If you can keep

18  going.  You're going to the section that says "license

19  information".

20  Q    BY MR. ADLONG:  Mr. Ledesma, you see where that says, "No

21  person who operates a commercial vehicle shall at any time have

22  more than one" -- "more than one driver's license.  I verify

23  that I do not have more than one motor vehicle license, the

24  information" -- "the information for which is listed below."

25  Do you see that section?

Exhibit 1(d)
522



www.escribers.net | 800-257-0885

1    A    I see the section.

2    Q    Okay.  Who completed that section right there regarding

3    your driver's license number?

4    A    I di --

5         MR. DO:  Your Honor, I'm going to -- objection.  I'm going

6    to object here because Mr. Adlong indicated to us that

7    dishonesty wasn't an issue here.  So I'm going to object on

8    relevance.

9         JUDGE ROSAS:  Do you want the witness to be excused, Mr.

10   Adlong?

11        MR. ADLONG:  If you're dissing -- if you're inclined to

12   overrule the objection, there's no need.  But if I need to be

13   heard on it, then yes.

14        JUDGE ROSAS:  You better be heard.  Let's excuse Mr.

15   Ledesma.  We'll be right back with you.

16        THE WITNESS:  Okay.

17        JUDGE ROSAS:  Okay.

18        MR. ADLONG:  So Your Honor, one of the issues here,

19   obviously, we have motive issues with respect to what actions

20   the Employer took.  And one of the issues will be regarding

21   what the Employer did or did not know.  And by asking him who

22   completed that section, it's to clarify for the record that he

23   was the person that completed it.  And it was him that made

24   this representation to the Employer.  And so we had nothing to

25   do with encouraging him or trying to persuade him to put this

Exhibit 1(d)
523



www.escribers.net | 800-257-0885

1    down.  It's just merely to say he wrote that down and you could

2    then, you know, that's stuff that you can brief.  There's other

3    sections of this -- excuse me, of this application that can be

4    used to kind of help establish the belief in -- or legitimate

5    belief with respect to his A, valid license, and B, his place

6    of residence.

7         JUDGE ROSAS:  All right.  So General Counsel, the proffer

8    is that it's to disprove or rule out any assertion that the

9    Respondent altered records or -- or created them.

10        MR. DO:  Your Honor, I -- I think it -- that's all the

11   representation, then that part -- that doesn't need to be read

12   into the record.  He can simply ask the witness did he fill out

13   that, you know, fill out those -- write those things.  And I

14   think the witness answered affirmatively to that.

15        JUDGE ROSAS:  Well, he can -- he can -- he can focus

16   him -- laser focus him on a particular section and confirm that

17   that's his -- in his writing.  And we -- and we move on.  Is

18   there anything else that you think we're going to need a ruling

19   on, Mr. Adlong, while we have him excused?

20        MR. ADLONG:  If -- I will ask about Bates labeled page 24,

21   Your Honor.

22        JUDGE ROSAS:  Is it the same concerns or same inquiry?

23        MR. ADLONG:  Yes, it's for the same proposition.

24        JUDGE ROSAS:  Authenticate handwriting?

25        MR. ADLONG:  Yeah, just confirm that he wrote it, he was

Exhibit 1(d)
524



www.escribers.net | 800-257-0885

1      the person that --

2           JUDGE ROSAS:  Okay.  Good.  All right.  Anything else?

3           By the way, Ms. Bridge, we're going to need that document

4      back up.  I'm not seeing it at the moment.

5           MR. ADLONG:  And you want to know what, Your Honor?

6           JUDGE ROSAS:  No, is there anything else?

7           MR. ADLONG:  There is a page -- page 29, again, this is

8      the address.

9           JUDGE ROSAS:  Same -- same -- business, was it his

10     writing?  Okay.

11          MR. ADLONG:  Yes.

12          JUDGE ROSAS:  All right.  Let's bring him back.  If we can

13     have that document up, please.  Okay.  Go ahead, Respondent.

14     Let's go off the record for a minute.

15     (Off the record at 3:10 p.m.)

16          JUDGE ROSAS:  Back on the record.

17                    **RESUMED CROSS-EXAMINATION**

18     Q    BY MR. ADLONG:  Mr. Ledesma, do you see the section where

19     it says "license information"?

20     A    Yes.

21     Q    Who completed the section where it says "license number"?

22     A    I did.

23     Q    In the -- in the section where it says, "state", you

24     completed that, too, correct?

25     A    Yes.

Exhibit 1(d)
525



1    Q    In the section where it says "endorsements, tank", you

2    completed that, too, also, correct?

3    A    Yes.

4    Q    In the section where it says "expiration date", you

5    completed that, too, correct?

6    A    Yes.

7        MR. ADLONG:  Ms. Bridge, if you can please take us to

8    page -- Bates labeled 24.  If you can go up further, please --

9    excuse me, I meant down, so we can see that full page 24 with

10   the boxes and his signature, please.

11       Thank you.  That's good.

12   Q    BY MR. ADLONG:  Mr. Ledesma, when you signed this page,

13   you were representing that your address was in Los Angeles,

14   California, correct?

15   A    Yes.

16   Q    That date right there, July 16th, 2018 -- that's the date

17   you completed that form, correct?

18   A    Yes.

19   Q    And then what you were saying is you didn't start working

20   until about two weeks after July 16th, 2018, correct?

21   A    I don't know the exact -- exact time it was, the

22   timeframe.

23   Q    But give or take, you would -- you would at least agree

24   that you did not start working for Universal Intermodal

25   Services until at least the tail end of July 2018, correct?

Exhibit 1(d)
526



     1   A    Yes.

     2   Q    Okay.  And isn't it true that -- okay, one more thing I'd

     3   like to show you.

     4        MR. ADLONG:  If we can go down to page Bates labeled 29.

     5        MS. BRIDGE:  Counsel, what -- what page are you looking

     6   for?

     7        MR. ADLONG:  Bates labeled 29.  The top right-hand corner

     8   has a sign that says, "Cherokee Insurance".

     9        MS. BRIDGE:  There we go.

    10   Q    BY MR. ADLONG:  Do you recognize this document, Mr.

    11   Ledesma?

    12   A    Yes.

    13   Q    What is this document?

    14   A    For enrollment in health insurance.

    15   Q    Okay.  And this was a document you turned into your

    16   employer to obtain health insurance, correct?

    17   A    I was actually waiving health insurance.

    18   Q    Okay.  And this is the document you used to waive health

    19   insurance?

    20   A    Yes.

    21   Q    Okay.  Now, you -- would you have any reason to disagree

    22   that SCE was acquired in August 2018?

    23        MR. DO:  Objection.  Calls for speculation.

    24   A    I have no --

    25        JUDGE ROSAS:  I'm going to sustain the objection.  The

Exhibit 1(d)
527



1    question is certainly confusing, in the context of the document

2    that we're reviewing.

3        MR. ADLONG:  Okay.  Well, we're -- I'm moving on to

4    another section now.  I'll -- I'll -- let's -- I'll build --

5    I'll see if I can build up to it a little bit.  How about that?

6    Q    BY MR. ADLONG:  So Mr. Ledesma, do you know --

7        MR. ADLONG:  If we scroll down a little bit, Ms. Bridge,

8    just to -- if we can go down to page Bates labeled 30, please.

9    Q    BY MR. ADLONG:  Do you see the date right there, Mr.

10   Ledesma?

11   A    Nope.

12   Q    On page Bates labeled 30, do you see your signature?

13   A    Yes.

14   Q    Okay.  If you move to the right of that, does -- there is

15   something that says "7/24/18", and it's under -- it's on top of

16   a word that says "Date".  Do you recognize that?

17   A    I see -- I see it now, but when you asked the question, it

18   wasn't on screen.

19   Q    Okay.  You turned this in before you started working,

20   correct?

21   A    I do not recall.

22   Q    Okay.  But you would agree you did not turn this document

23   in before you started working; you would --

24   A    I do not recall.

25   Q    Okay.  When you started working, you were working out of

Exhibit 1(d)
528



www.escribers.net  |  800-257-0885

1    the Compton yard, correct?

2    A    Yes.

3    Q    Okay.  And at some point, it's your testimony that -- who

4    was the first supervisor that you worked for?

5    A    I do not recall the name.

6    Q    Okay.  At some point, you started working for somebody

7    named Sal, correct?

8    A    That is correct.

9    Q    Okay.  And that occurred in or about the time that SCE was

10   acquired, correct?

11   A    I do -- I do not know if it was the date when it was

12   acquired.

13   Q    So did you have reason to -- at the time, did you believe

14   that SCE was unconnected to your employer, but they were just

15   dispatching work to you?

16   A    I do not understand that question.

17   Q    Okay.  You started receiving loads from a person named

18   either Alex or Walter, correct?

19   A    Yes.

20   Q    Okay.  They were SCE dispatchers, correct?

21   A    Southern Counties Express, yes.

22   Q    Okay.  When I say SCE, I'm referring to Southern Counties

23   Express.  Would you prefer that I just say Southern Counties

24   Express all the way, each time I ask a question?

25   A    It really doesn't matter.

Exhibit 1(d)
529



www.escribers.net | 800-257-0885

1    Q    Okay.  So when these Southern Counties Express dispatchers

2    started sending you loads to pull, you understood that this was

3    your job to pull these loads, correct?

4    A    Correct.  Those were the only dispatchers in office.

5    Q    Okay.  And you had no reason -- you did not believe at

6    that time you had changed the entity that you were working for,

7    correct?

8    A    My checks still said Universal Intermodal.  I had no

9    reason to think it had changed.

10   Q    Okay.  And around that time, when you were pulling loads,

11   did you receive a document that -- you testified that, at one

12   point, you received a document that showed the -- showed the

13   loads you were supposed to pull, correct?

14   A    As in a dispatch or --

15   Q    Yeah.

16   A    Yes, on paper.

17   Q    Okay.  And then, eventually, you started pulling loads,

18   and you were receiving those loads via a tablet, correct?

19   A    That is correct.

20   Q    Okay.  And those loads -- they would have a SCAC number,

21   correct?

22   A    Yes.

23   Q    Okay.  And that SCAC number would identify the entity --

24   is it appropriate to say it identified the entity responsible

25   for the load?

Exhibit 1(d)
530



1    A    Yes.

2    Q    Okay.  And when you first started pulling loads, you were

3    only pulling loads for Universal Intermodal, correct?

4    A    That's correct, before the change of dispatchers.

5    Q    Okay.  And then the change of dispatchers happened a month

6    or two after you started working for Universal Intermodal,

7    correct?

8    A    I did not --

9         MR. DO:  Objection.  Misstates the testimony.

10        JUDGE ROSAS:  Repeat the question.

11        MR. ADLONG:  I asked him that he had a change in

12   dispatcher a couple months after he started working for

13   Universal Intermodal, correct?

14        JUDGE ROSAS:  You can answer that.

15   A    I do not recall the exact date.

16   Q    BY MR. ADLONG:  Okay.  Well, let me ask you this.  Was it

17   more than one month or less than one month after you started

18   working for Universal Intermodal that you started having an SCE

19   dispatcher?

20        MR. DO:  Objection.  Asked and answered.

21        JUDGE ROSAS:  Overruled.

22        You can answer.

23   A    I would say it's more than -- more than two months.

24   Q    BY MR. ADLONG:  Okay.  So it's more than two months.  Was

25   it more than three months or less than three months when you

Exhibit 1(d)
531



 1    started working for Universal Intermodal that you started to

 2    work for an SCE dispatcher?

 3    A     I was always working for Universal Intermodal.  I was -- I

 4    was being dispatched by Southern Counties, but I always worked

 5    for Universal Intermodal.  And --

 6    Q     Okay.

 7    A     -- I do not recall the -- the date when that happened.

 8    Q     I'm just trying to -- trying to get a sense -- I

 9    appreciate that you don't know the exact date, but I'm trying

10    to get a sense of how long you believed you had been working at

11    Universal Intermodal before the change to receiving loads from

12    a SCE dispatcher.  So what I'm asking you is, do you believe

13    that you had been working for Universal Intermodal for less

14    than three months or more than three months, at the time when

15    you started receiving loads from an SCE dispatcher?

16         MR. DO:  Objection.  Asked and answered.  The witness

17    answered.

18         JUDGE ROSAS:  Let's just move on a little bit here, a

19    little -- a little longer.

20         Mr. Ledesma, the answers are either you don't know, or you

21    know.  And if you know, you can try to answer it.  Okay?

22         Was it more than a month, less than three months you said,

23    Counsel?

24         MR. ADLONG:  Yeah.

25    Q     BY MR. ADLONG:  More than three months or less than three

Exhibit 1(d)
532



1    months, if you know?

2    A    I -- I don't -- no, I don't -- I don't know.

3    Q    Was it more than four months or less than four months when

4    you started working for Universal Intermodal that you started

5    receiving loads from an SCE dispatcher?

6    A    I do not know.

7    Q    Okay.  So would you testify today -- is it your testimony

8    today that you cannot approximate how many months you had

9    worked for Universal Intermodal before you started receiving

10   loads from an SCE dispatcher?

11        MR. DO:  Objection.  Misstates the testimony.

12        JUDGE ROSAS:  Sustained.  Sustained.  Asked and answered

13   at this point.  We're -- we're exhausted in this area.  Move

14   on.

15        MR. ADLONG:  Okay.

16   Q    BY MR. ADLONG:  Mr. Ledesma, once you started receiving

17   loads from an SCE dispatcher, you received loads with a SCAC

18   code from Universal Intermodal, correct?

19   A    Can you repeat the question?

20   Q    Once you started pulling loads from an SCE dis -- once you

21   started receiving loads from an SCE dispatcher, you started

22   pulling loads with SCAC codes from Universal Intermodal,

23   correct?

24   A    No.

25   Q    No?  Would -- would you only pull loads with SCAC codes

Exhibit 1(d)
533



www.escribers.net | 800-257-0885

1    for SCE?

2    A    Yes.

3    Q    Okay.  Okay.  So you said, in October 2018, you had your

4    fuel card turned off, correct?

5    A    Yes.

6         MR. ADLONG:  Ms. Bridge, you can take down that exhibit

7    now, if you would please.

8    Q    BY MR. ADLONG:  And at that time when your fuel card was

9    turned off, Mr. Ledesma, you contacted somebody with Universal

10   Intermodal's corporate office; is that correct?

11   A    At first, I called dispatch in Compton.

12   Q    Okay.  They couldn't fix your problem, correct?

13   A    They told me I needed to call corporate.

14   Q    Okay.  And when you called corporate, what was the name of

15   the person you spoke to?

16   A    I do not remember -- recall the name at all.

17   Q    What was the position of the person you spoke to?

18   A    I do not recall.

19   Q    What role did they play for Universal Intermodal?

20   A    I do not recall.

21        MR. DO:  Objection.  Calls for speculation.

22        JUDGE ROSAS:  What role did they play, and you previously

23   asked what the position was.  He didn't know.

24        MR. ADLONG:  I view "position" as title and "role" as

25   duties.  So I can ask it differently.

Exhibit 1(d)
534



www.escribers.net | 800-257-0885

1    Q    BY MR. ADLONG:  What duties did that person perform for

2    Universal Intermodal?

3    A    I do not know.

4    Q    And that person told you that your fuel card had been

5    turned off because you didn't have a valid commercial driver's

6    license, correct?

7    A    That person told me that I -- my fuel card was turned off

8    because my California license was canceled.

9    Q    Okay.  And then you told them that I have an Arizona

10   license, correct?

11   A    Yes.

12   Q    And then they said, let me look into this, and I'll call

13   you back, correct?

14   A    They asked me for the information on the license, and I

15   gave them the information and they told me they would call me

16   back.

17   Q    And then that was the end of the phone call?

18   A    Yes.

19   Q    You don't know who that -- you don't know what that person

20   did after you hung up, correct?

21   A    No.

22        MR. DO:  Calls for --

23   Q    BY MR. ADLONG:  You don't know who that person

24   communicated with after you hung up --

25        MR. DO:  Objection.

Exhibit 1(d)
535



www.escribers.net | 800-257-0885

 1   Q   BY MR. ADLONG:  -- correct?

 2       MR. DO:  Calls for speculation.

 3       JUDGE ROSAS:  Well, may -- maybe he knows.  We don't know.

 4       Do you know?

 5       THE WITNESS:  No, sir.

 6   Q   BY MR. ADLONG:  And you don't know who that person called

 7   to look into your issue, correct?

 8       MR. DO:  Objection.  Calls for speculation.

 9       JUDGE ROSAS:  Asked and answered.  He doesn't know what

10   they did.

11       MR. ADLONG:  Okay.

12   Q   BY MR. ADLONG:  Well, let me ask it to you this way.  Once

13   you got off the phone, you have no idea who that person

14   communicated with or what that person did to look into your

15   issue, correct?

16       MR. DO:  Objection.

17   A   Correct.

18       MR. DO:  Asked and answered.

19       JUDGE ROSAS:  Sustained.

20   Q   BY MR. ADLONG:  Okay.  Now, what knowledge do you have

21   regarding what interaction happened between the person that you

22   spoke with in Michigan in communication with the Compton

23   office?

24       MR. DO:  Objection.  Asked and answered.

25       JUDGE ROSAS:  Repeat it.

Exhibit 1(d)
536



www.escribers.net | 800-257-0885

```
1           MR. ADLONG:  What knowledge does Mr. Ledesma have

2   regarding who -- what this person did that he spoke with and

3   their communication with the person in the Compton office?

4           JUDGE ROSAS:  I'll allow that.

5           Do you -- do you recall?

6           THE WITNESS:  No.

7   Q    BY MR. ADLONG:  Okay.  So then you testified -- you

8   testified that, in May 2019, you also had an issue where you

9   understood that your license was suspended, correct?

10  A    Yes.

11  Q    Okay.  And you were told by dispatch that you could not

12  drive because your license was suspended, correct?

13  A    Yes.

14  Q    And then you contacted somebody at corporate to look into

15  your license being suspended?

16  A    No.

17  Q    No?  Who did you contact?

18  A    I contacted the Department -- Department of Motor Vehicles

19  to see why it was suspended.

20  Q    Okay.  And then why was your license suspended?

21          MR. DO:  Objection.

22  A    Due to a citation.

23          MR. DO:  Relevance.

24  Q    BY MR. ADLONG:  What was the citation?

25          JUDGE ROSAS:  Was there an objection?
```

Exhibit 1(d)
537



www.escribers.net | 800-257-0885

1      MR. DO:  Yes, Your Honor.  Objection.  Relevance.

2      JUDGE ROSAS:  What's the relevance?

3      MR. ADLONG:  The -- I'm just trying to get the narrative

4    as to what happened and -- yeah, and -- I mean, this -- the

5    whole -- the whole issue is his license -- the validity of his

6    license and the -- his standing with respect to his license.  I

7    think it's -- it's fairly -- not even fairly -- it's right on

8    point regarding whether his license was suspended and the

9    reason why it was suspended.

10     JUDGE ROSAS:  Are you going to tell me that there's

11   something other than what you stated before as the reasons for

12   the witness's termination?

13     MR. ADLONG:  Your Honor, if we can address this issue

14   without him present, please.

15     JUDGE ROSAS:  Okay.  We can excuse you one more time, Mr.

16   Ledesma.

17     THE WITNESS:  Okay.

18     MR. ADLONG:  The -- the question has to do with the

19   validity of his license, so we're looking into that with

20   respect to the validity of his license.  If his license was

21   suspended, too, for something that otherwise would have made

22   him ineligible for employment, this could be potential after-

23   acquired evidence that we did not have knowledge of until this

24   point either.  So we're entitled to ask because it presents a

25   defense.  It might not present a defense to the actual

Exhibit 1(d)
538


www.escribers.net | 800-257-0885

1    decision, but it certainly could present a defense to other

2    issues with respect to backpay, reinstatement, and the remedies

3    that you order.  So we're entitled to pursue this.

4         JUDGE ROSAS:  Absolutely.  Absolutely.  You could

5    absolutely subpoena it for a compliance proceeding, should it

6    ever come to that, so I'm going to sustain the objection.

7         All right.  Let's bring him back.

8         Okay.  Next question.

9    Q    BY MR. ADLONG:  Mr. Ledesma, so you went, and you had your

10   license reinstated, correct?

11   A    Yes.

12   Q    Where did you go to have your license reinstated?

13   A    I did it over the telephone.

14   Q    Okay.  Okay.

15        MR. ADLONG:  Ms. Bridge, can you -- can you please pull up

16   Joint Exhibit 3, please?

17        If you can just maybe minimize it a little bit so we can

18   get a good sense of the whole document please, Ms. Bridge.

19   Q    BY MR. ADLONG:  Mr. Ledesma, aside from the signature, you

20   said you recognize this document, correct?

21   A    Yes.

22   Q    And you said you signed one of these documents, correct?

23   A    Yes.

24   Q    Did the -- did the company -- the company never used this

25   document to try to stop you from pursuing any legal action

Exhibit 1(d)
539



1    against them, correct?

2        MR. DO:  Objection.  Calls for a legal conclusion.

3        JUDGE ROSAS:  Let's sustain that objection.  I don't want

4    to get into anything superfluous and unnecessary for

5    determination as to the legality of the provision.

6    Q    BY MR. ADLONG:  Okay.  So Mr. Ledesma, isn't it correct

7    that Southern Counties Express employed about 200 owner-

8    operator drivers?

9        MR. DO:  Objection.  Foundation.

10       JUDGE ROSAS:  If you know.

11       Do you -- do you know, Mr. Ledesma?

12       THE WITNESS:  No.

13   Q    BY MR. ADLONG:  Mr. Ledesma, you would agree that, at some

14   point after August 2018, yourself and other Universal

15   Intermodal Service drivers would pull loads from the Compton

16   location, and there would be Southern Counties Express owner-

17   operators that would visit that location, too?

18       MR. DO:  Objection.  Misstates the testimony.

19       JUDGE ROSAS:  Overruled.

20       If you can answer.

21   A    Can you repeat the question please?

22   Q    BY MR. ADLONG:  You would agree that, after August 2018,

23   yourself and other Universal Intermodal drivers would see other

24   Southern Counties Express owner-operators at the Compton

25   facility, as each of the respective groups was receiving and

Exhibit 1(d)
540



1    pulling loads, correct?

2        MR. DO:  Objection.  Lacks foundation as to what other

3    drivers saw.

4        MR. ADLONG:  You're on mute, Your Honor.

5        JUDGE ROSAS:  Take out the word "other".  Did you see SCE

6    drivers, Southern County drivers, pulling loads?

7        THE WITNESS:  I do not recall the date.  I cannot agree to

8    the date, but I do agree to Southern County Express drivers

9    being on our -- on the yard pulling loads, as well.

10   Q    BY MR. ADLONG:  And that was readily apparent to anybody

11   at the yard; would you agree with that?

12   A    Yes.

13       MR. DO:  Objection as to vagueness.

14       JUDGE ROSAS:  Well, it -- it was readily apparent to him.

15   I'll take it that way.

16   Q    BY MR. ADLONG:  Now, Mr. Ledesma, before the Southern

17   Counties Express acquisition in receiving loads from

18   dispatchers, you would pull loads from Walmart; is that

19   correct?

20   A    Can you repeat the question?

21   Q    After Southern County -- after the acquisition of Southern

22   Counties -- excuse me.  Before the acquisition of Southern

23   Counties, you would pull loads for Walmart, correct?

24       MR. DO:  Objection.  Lacks foundation.

25       JUDGE ROSAS:  Overruled.

Exhibit 1(d)
541



www.escribers.net | 800-257-0885

1          Overruled.  You can answer if you know.

2     A    I don't know.

3     Q    BY MR. ADLONG:  Before the acquisition of Southern

4     Counties, you would pull loads for Walmart -- excuse me -- for

5     Big Lots, correct?

6     A    I do not recall.

7     Q    Before the acquisition of Southern Counties, you would

8     pull loads for Toyota, correct?

9     A    I do not recall that.

10    Q    Who do you remember pulling loads for before the

11    acquisition of Southern Counties?

12    A    Can you repeat the question?

13    Q    Who do you remember pulling loads for before the

14    acquisition of Southern Counties?

15    A    Universal.

16    Q    Okay.  And what Universal clients?

17    A    I do not recall at this moment.

18    Q    Okay.  But you do remember that you pulled loads for

19    Walmart after the acquisition of Southern Counties Express; is

20    that your testimony?

21    A    Yes.

22    Q    And it's also your testimony that you do though remember

23    that you pulled loads for Big Lots; is that your testimony?

24    A    I don't recall.

25    Q    Okay.  And the same is true for Toyota?

Exhibit 1(d)
542



www.escribers.net | 800-257-0885

1    A    That is correct.

2    Q    Okay.  You would agree that the companies that you pulled

3    loads for -- you had no reason to believe that Universal

4    Intermodal was the exclusive carrier of the freight for that

5    company, correct?

6    A    I do not agree with that.  I don't -- I don't know.

7    Q    Okay.  So you had no knowledge whether or not Universal

8    Intermodal was the exclusive carrier for any of the clients

9    that you pulled freight for; is that your -- is that correct?

10   A    I don't know.

11   Q    So you would agree, Mr. Ledesma, that the SCE owner-

12   operators, as owner-operators, had their own equipment?

13        MR. DO:  Objection.  Calls for speculation.

14        JUDGE ROSAS:  Sustained.

15   Q    BY MR. ADLONG:  Did you see SCE drivers at the Compton

16   facility, Mr. Ledesma?

17   A    Yes.

18   Q    Did you see them driving trucks?

19   A    Yes.

20   Q    You understood that they owned their own trucks, correct?

21   A    No.

22   Q    No?  No, they did not own them or no, you don't know?

23   A    I do not know.

24   Q    Okay.  Now, turning your attention to a meeting.  You said

25   that there was a meeting in or about mid-November 2019 with Mr.

Exhibit 1(d)
543



1      Cummings and a Spanish-speaking labor consultant, correct?

2      A     He was bilingual.

3      Q     He was what?

4      A     He was bilingual.  He spoke English and Spanish.

5      Q     Okay.  And you testified that during that meeting they

6      identified one speaker that was monolingual Spanish, correct?

7      A      In what meeting was that?  There were three meetings.

8      Q     Okay.  Well, why don't you tell me what meeting you

9      identified when there was a monolingual Spanish-speaker that

10     was identified by the labor consultant?

11          MR. DO:  Objection.  This misstates the testimony.

12          JUDGE ROSAS:  Was there one witness who was monolingual,

13     he only spoke one language?

14          THE WITNESS:  Yes, Your Honor.

15          JUDGE ROSAS:  Okay.  What meeting was --

16          THE WITNESS:  (Indiscernible, simultaneous speech) --

17          JUDGE ROSAS:  -- did you identify him as speaking only one

18     language?

19          THE WITNESS:  My coworker, by the name of Carlos, he only

20     spokes (sic) Spanish and he was in all three meetings.

21          JUDGE ROSAS:  Go ahead, Mr. Adlong.

22     Q     BY MR. ADLONG:  Isn't it correct that there was a meeting

23     where Carlos was told by one of the labor consultants that they

24     could speak to him tomorrow, individually, so that the meeting

25     would go faster?

Exhibit 1(d)
544



www.escribers.net | 800-257-0885

1   A   Yes.

2   Q   Isn't it correct that at that point Saul spoke up and said

3   that everybody could speak Spanish, so everybody could attend

4   the meeting tomorrow, to save time?

5   A   Yes.

6   Q   So Saul identified then that to save time, everybody would

7   attend the meeting tomorrow, and then it was at that point that

8   the group departed, correct?

9   A   I actually stood up after Saul and I said, so we'll do a

10   meeting tomorrow, and we left.

11   Q   Okay.  And you committed to attend the meeting tomorrow,

12   correct?

13   A   Yes.

14   Q   Now, each meeting that you attended, you attended after

15   you'd clocked in, correct?

16   A   The meetings with the labor consultants, yes.

17   Q   Okay.  And when you would clock in to work for Universal

18   Intermodal, it was at that point that you would expect to

19   receive direction regarding the work that you were expected to

20   perform, correct?

21   A   Yes.

22   Q   Okay.  And when they gave you a task, you understood that

23   it was your job to perform the task that was asked of you,

24   correct?

25   A   Yes.

Exhibit 1(d)
545



1    Q    Okay.  So if you were asked to attend a meeting that would

2    be a task that you would understood you were expected to

3    perform, correct?

4    A    I don't know.

5    Q    You know that a CHP BIT inspection refers to the

6    California Highway Patrol BIT inspection, correct?

7         MR. DO:  Objection.  Vague.

8         JUDGE ROSAS:  Do you know what that is, sir?

9         THE WITNESS:  I -- I have some -- some knowledge of what's

10   done in the CHP BIT inspection.  I do not have full legal

11   knowledge or anything like that.

12   Q    BY MR. ADLONG:  You would agree, Mr. Ledesma, that you

13   understand that a -- in a BIT inspection a CHP officer would go

14   through all the logs and service records of a truck, correct?

15   A    Yes.

16   Q    And you would understand that under certain circumstances,

17   a CHP office can put a truck out of commission if the records

18   are not properly kept, correct?

19   A    On the truck, yes.

20   Q    Okay.  And you would agree that on November 25th, 2019,

21   you were pulled into a meeting, correct?

22   A    Yes.

23   Q    Joe Lugo asked if you could speak to him in his office,

24   right?

25   A    No, it was not his office.

Exhibit 1(d)
546



1    Q    Okay.  He took you to the spare management office near his

2    entrance, right?

3    A    Yeah.  Yes.

4    Q    And it was at that point that you told him that you could

5    not clock in, so you didn't know if you could meet with him --

6    if you could meet with him yet, correct?

7    A    Yes.

8    Q    Lugo told you, don't worry about it, and that you would be

9    paid for your time that you were in the office, correct?

10   A    Yes.

11   Q    And then you went into the office, correct?

12   A    Yes.

13   Q    And you met a safety manager -- a person that you claim is

14   a safety manager in there, correct?

15       MR. DO:  Objection.  Cumulative, and asked and answered.

16       JUDGE ROSAS:  Overruled.  You can answer.

17   A    He -- he presented himself as a safety manager.

18   Q    BY MR. ADLONG:  Okay.  So you didn't know if he was really

19   the safety manager or not, correct?

20   A    No.

21   Q    No, you didn't, or no, you did not know?

22   A    He presented himself as a safety manager.  I have -- he

23   didn't show me any credential that stated so.

24   Q    Okay.  And you didn't know his name either, right?

25   A    No.

Exhibit 1(d)
547


www.escribers.net | 800-257-0885

1    Q    Is it correct or incorrect, you did not know what office

2    he was working out of, correct?

3    A    As -- office as in an office within the facility or an

4    office from some other company or -- can you rephrase the

5    question, please?

6    Q    Sure.  Did you know where -- did you know where the safety

7    manager worked out of?

8    A    No.

9    Q    Did you know what company he worked for?

10   A    I can't say I do.

11   Q    You don't know what job duties he had either, correct?

12   A    No.

13   Q    So in that meeting the safety manager asked if you knew

14   what a CHP BIT inspection was, right?

15   A    Yes.

16   Q    And you told him yes, right?

17   A    Yes.

18   Q    And the safety manager said that he was going through the

19   company records and noticed that you had an out-of-state

20   license, right?

21   A    Yes.

22   Q    And he said that you cannot drive in California with an

23   out-of-state license, correct?

24   A    He told me I was -- I was not -- said I was not compliant

25   wa fed -- with federal regulations.

Exhibit 1(d)
548



www.escribers.net | 800-257-0885

1    Q    Okay.  And he told you, you cannot drive in California

2    with an out-of-state license, right?

3    A    I do not recall that, if he said California or not.

4    Q    During that meeting, the safety manager told you that you

5    had had ten days to get a California license when you moved to

6    California, correct?

7    A    I do not recall if he told me in that -- in that way.

8    Q    Okay.  I'm going to ask you a question, and it just calls

9    for a yes or no answer.  The safety manager told you that you

10   had ten days to get a California license when you moved to

11   California, correct?

12   A    I don't know.

13   Q    Okay.  Mr. Ledesma, do you remember that you gave a sworn

14   affidavit to Board Agent Phuong Do?

15   A    Can you repeat that question, please?

16   Q    Do you remember that you gave a sworn affidavit to Board

17   Agent Phuong Do?

18   A    Yes.

19   Q    Okay.  And you gave that on December 5th, 2019, right?

20   A    I do not recall the date.

21        MR. ADLONG:  Okay.  Ms. Bridge, can you pull up the Jencks

22   statement for Mr. Ledesma, please?

23        Ms. Bridge, can you take this to page 10 of the affidavit,

24   please?

25   Q    BY MR. ADLONG:  Mr. Ledesma, do you recognize that

Exhibit 1(d)
549



1    signature there?

2    A    Yes.

3    Q    Whose signature is that?

4    A    That is my signature.

5        MR. ADLONG:  Ms. Bridge, can you please take this to page

6    7 of the PDF, and focus our -- Mr. Ledesma's attention on line

7    7, please?  If you can blow that up for him?

8    Q    BY MR. ADLONG:  Do you see line 7 right there, Mr.

9    Ledesma?

10   A    Yes, I do.

11   Q    Okay.  Can you read that line?

12   A    You want me to read it out loud?

13   Q    No, I just want you to read it to yourself to refresh your

14   memory.

15   A    Okay.  I read it.

16       MR. ADLONG:  All right.  Ms. Bridge, can you please take

17   down that document please?

18   Q    BY MR. ADLONG:  Having read that, Mr. Ledesma, you would

19   agree that the safety manager told you that you had ten days to

20   get the California license when you moved to California,

21   correct?

22   A    I -- I mean, it's on my affidavit.  That's -- I did --

23   I -- I answered it under oath, yes.

24   Q    Okay.  So the answer to the question that I just asked

25   you, yes or no?

Exhibit 1(d)
550



1    A    Yes.

2    Q    And it was during that meeting that you were suspended,

3    correct?

4    A    Yes.

5    Q    And the safety manager was the person who told you that

6    you were being suspended, correct?

7    A    Yes.

8    Q    Then on Sep -- on November 27th -- give me one second.

9    Actually, one more question.  You have no knowledge regarding

10   who the safety manager spoke to in making the determination to

11   suspend you, correct?

12        MR. DO:  Objection.  Calls for speculation.

13        JUDGE ROSAS:  You have no idea, what?

14        MR. ADLONG:  Who the safety manager talked to in making

15   the determination to suspend him?

16        JUDGE ROSAS:  If you know?

17        THE WITNESS:  No, I don't know.

18   Q    BY MR. ADLONG:  Mr. Ledesma, isn't it correct that when

19   Mr. Lugo -- you asked Mr. Lugo if you got your California

20   driver's license --

21        MR. ADLONG:  Strike that.

22   Q    BY MR. ADLONG:  Isn't it correct, Mr. Ledesma --

23        MR. ADLONG:  You know what, Your Honor, can we go off the

24   record for five minutes, to see if we actually have any more

25   questions for this witness?

Exhibit 1(d)
551



www.escribers.net | 800-257-0885

1       JUDGE ROSAS:  Sure.  Off the record.

2   (Off the record at 4:01 p.m.)

3       JUDGE ROSAS:  Okay.  Back on the record.

4               **RESUMED CROSS-EXAMINATION**

5   Q   BY MR. ADLONG:  Mr. Ledesma, you would agree that when you

6   gave your affidavit on December 5th, 2019, your memory of the

7   events was far better then than it is now, correct?

8   A   Yes.

9   Q   And you'd agree that at that time you did your best to

10  give all the facts that you possibly could, so the NLRB could

11  make the most appropriate determination regarding your

12  circumstances, correct?

13       MR. DO:  Objection.  Misstate -- misstate -- well,

14  misrepresentation and --

15       MR. ADLONG:  Misrepresentation isn't even a proper

16  objection.

17       JUDGE ROSAS:  Hold on.  Are you finished with your --

18       MR. DO:  No, sorry, Your Honor.  And improper impeachment.

19  We haven't established what -- what the impeachment is about

20  right now.

21       JUDGE ROSAS:  Overruled.  Go ahead.

22       Respondent, go ahead.

23   Q   BY MR. ADLONG:  You would agree that when you gave your

24  di -- your affidavit on December 5th, 2019, you did your best

25  to give all the facts, so the NLRB could make the most

Exhibit 1(d)
552



1    appropriate determination under the circumstances, correct?

2        MR. DO:  Objection.  Calls for a legal conclusion.

3        JUDGE ROSAS:  I'll allow it.

4    A    I do not understand the question.

5    Q    BY MR. ADLONG:  Okay.  You went to the NLRB to tell your

6    story, right?

7    A    Yes.

8    Q    And you were telling the truth when you were telling your

9    story, right?

10   A    Yes.

11   Q    And you were telling them your story because

12   potentially -- you understood that potentially you were

13   terminated for an unlawful reason, right?

14   A    I don't understand the question.

15   Q    When you went to speak with NLRB, you went to speak with

16   them because you understood that -- or you -- you understood

17   that potentially Universal had fired you for a reason that was

18   against the law, right?

19       MR. DO:  Objection.  Calls for a legal conclusion.

20       JUDGE ROSAS:  I'll allow one or two more questions like

21   this, sir, in order to establish the importance with which he

22   undertook his representations at that time.

23       Go ahead.  Overruled.  You can answer.

24   A    I don't know.

25   Q    BY MR. ADLONG:  Okay.  But you'd at least agree that you

Exhibit 1(d)
553



1    did your best to tell the truth, right?

2    A    I told the truth.

3    Q    Okay.  Isn't it true that between February 2019 and

4    November 2019, you didn't pull any interstate loads?

5    A    In February 2019, I do recall going to Phoenix, Arizona to

6    drop a load.  I just don't know in between those dates,

7    exactly, when they cut off.

8        MR. ADLONG:  Okay.  Ms. Bridge, can you please pull up Mr.

9    Ledesma's affidavit, again, please?  Can you please pull up

10    page 8, line 15?

11    Q    BY MR. ADLONG:  Okay.  Mr. Ledesma, on line 15 there's a

12    sentence that starts with, "for example", and then it concludes

13    with the word "Phoenix" on line 16.  Can you read that to

14    yourself, please?

15    A    Yes, I -- I do recall that.

16        MR. ADLONG:  Okay.  Ms. Bridge, can you please take that

17    down?

18    Q    BY MR. ADLONG:  You would agree, Mr. Ledesma -- does that

19    refresh your recollection, Mr. Ledesma?

20    A    It -- I'm -- I'm still standing by what I -- what I said

21    on my affidavit.

22    Q    Okay.  So you said in your affidavit, "for example, as

23    recently as February 2019, I completed an interstate route for

24    the Employer, driving from Los Angeles to Phoenix", correct?

25    A    Yes.

Exhibit 1(d)
554



1    Q   Okay.  And when you were making that statement, you're

2    providing the most recent example of when you pro -- had

3    driven --

4        MR. DO:  Objection.

5    Q   BY MR. ADLONG:  -- an interstate route --

6        MR. DO:  Argumentative.

7    Q   BY MR. ADLONG:  -- correct?

8        JUDGE ROSAS:  I'll allow that.  It's all right.

9    A   I don't know if it was the most recent.  Like I just said,

10   I do not recall the dates.

11   Q   BY MR. ADLONG:  Okay.  With that being said, Mr. Ledesma,

12   at the time of your affidavit, based on your statement, you

13   would agree that that was the last one that you remembered,

14   correct?

15   A   I remember in February 2019, I did go to Phoenix, but

16   like --

17   Q   Okay.

18   A   -- I said, I'm not sure if that's the most -- that was the

19   most recent one or not.

20   Q   Okay.  All right.  Isn't it true that you described that

21   as --

22       MR. ADLONG:  Okay.  Strike that.

23   Q   BY MR. ADLONG:  You grew up in Los Angeles, right, Mr.

24   Ledesma?

25       MR. DO:  Objection.  Relevance.

Exhibit 1(d)
555



www.escribers.net | 800-257-0885

1      MR. ADLONG:  He testified to that earlier.  If it was on

2  direct, I'm --

3      JUDGE ROSAS:  I'll give you -- I'll give you two or three

4  questions on this.  Let's see where it's going.

5  A    Yes, I did grow up in Los Angeles.

6  Q    BY MR. ADLONG:  People understood that you're a California

7  native, right?

8  A    Can you repeat the question?

9  Q    Your coworkers, the people at Universal, understood that

10  you're a California native, right?

11      MR. DO:  Objection.  Speculation.

12      JUDGE ROSAS:  Sustained.  Get -- get right to the point,

13  if you have one.

14      MR. ADLONG:  No further questions for this witness, Your

15  Honor.

16      JUDGE ROSAS:  Any redirect?

17      MR. DO:  Your Honor, can I have just like a minute to

18  converse?

19      JUDGE ROSAS:  Off the record.

20  (Off the record at 4:13 p.m.)

21      JUDGE ROSAS:  Okay.  Back on the record.

22                          **REDIRECT EXAMINATION**

23  Q    BY MR. DO:  Mr. Ledesma, when your fuel card was suspended

24  and you informed corporate of your -- when you were informed

25  that your California commercial's license was canceled, were

Exhibit 1(d)
556



www.escribers.net | 800-257-0885

1   you disciplined in any way?

2   A    No.

3   Q    And in May, 2019, when there was an issue with your

4   Arizona commercial's license and it was suspended, were you

5   disciplined in any way?

6   A    No.

7        MR. DO:  No further questions, Your Honor.

8        JUDGE ROSAS:  Charging Party?

9        MR. WOJCIECHOWSKI:  Nothing.  Thank you.

10       JUDGE ROSAS:  Respondent?

11                      **RECROSS-EXAMINATION**

12   Q    BY MR. ADLONG:  Mr. Ledesma, with respect to the person

13   that you spoke to in corporate when your fuel card was

14   canceled, what authority did that person have to discipline

15   you?

16       MR. DO:  Objection.  Outside the scope.

17       MR. ADLONG:  That's directly on point.  You asked if he

18   was disciplined, and we're going to the person who --

19       JUDGE ROSAS:  I'll allow it.  Go ahead.  If you know.

20   A    Can you repeat the question, please?

21   Q    BY MR. ADLONG:  With respect to your fuel card, the person

22   that you spoke to and helped you with your fuel card, what

23   authority did that person have to discipline?

24   A    I don't know.

25       MR. ADLONG:  No further questions, Your Honor.

Exhibit 1(d)
557



1        JUDGE ROSAS:  Thank you, sir.  You're excused.  Please do

2    not discuss your testimony with anyone until you're told by

3    counsel that the record in the case is closed or otherwise.

4    Okay?

5        THE WITNESS:  Thank you, Your Honor.

6        JUDGE ROSAS:  Have a good day.

7        THE WITNESS:  I appreciate it.

8        JUDGE ROSAS:  Thank you.

9        THE WITNESS:  Thank you.

10        JUDGE ROSAS:  Off the record.

11    **(Whereupon, the hearing in the above-entitled matter was**

12    **recessed at 4:24 p.m. until Monday, June 21, 2021 at 8:00 a.m.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(d)
558

www.escribers.net | 800-257-0885

1    **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 21, Case Numbers

4    21-CA-252500, 21-CA-252574, 21-CA-264164, 21-CA-253662, 21-CA-

5    259130, 21-CA-254813, 21-CA-255151, Mason-Dixon Intermodal

6    d/b/a Universal Intermodal Services and Mason-Dixon Intermodal

7    d/b/a Universal Intermodal Services and Southern Counties

8    Express, Inc. and Roadrunner Intermodal Services, LLC and

9    International Brotherhood of Teamsters, held via Zoom

10   videoconference at the National Labor Relations Board, Region

11   21, 312 N. Spring Street, 10th Floor, Los Angeles, CA 90012-

12   4701, on June 17, 2021, at 8:05 a.m. was held according to the

13   record, and that this is the original, complete, and true and

14   accurate transcript that has been compared to the reporting or

15   recording, accomplished at the hearing, that the exhibit files

16   have been checked for completeness and no exhibits received in

17   evidence or in the rejected exhibit files are missing.

18

19

20

21   _____

22   TROY A. RAY

     Official Reporter

23

24

25



Exhibit 1(d)
559

www.escribers.net | 800-257-0885

# EXHIBIT 1(E)

Exhibit 1(e)
560

OFFICIAL REPORT OF PROCEEDINGS
BEFORE THE
NATIONAL LABOR RELATIONS BOARD
REGION 21

In the Matter of:

| | |
|---|---|
| Mason-Dixon Intermodal d/b/a | Case Nos. 21-CA-252500 |
| Universal Intermodal Services, | 21-CA-252574 |
| Respondent, | 21-CA-264164 |
| | 21-CA-253662 |
| and | 21-CA-259130 |
| | 21-CA-254813 |
| Mason-Dixon Intermodal d/b/a | 21-CA-255151 |
| Universal Intermodal Services | |
| and Southern Counties Express, | |
| Inc., | |
| Respondent, | |

and

Roadrunner Intermodal Services,
LLC.,
                    Respondent,

and

Universal Truckload, Inc.,
                    Respondent,

and
International Brotherhood of
Teamsters,
                    Charging Party.

_____

_____

Place: Los Angeles, California (via Zoom Videoconference)

Dates: June 21, 2021

Pages: 534 Through 723

Volume: 5

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

Exhibit 1(e)
561

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 21**

| In the Matter of: | |
|---|---|
| MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES, Respondent, | Case Nos. 21-CA-252500 21-CA-252574 21-CA-264164 21-CA-253662 21-CA-259130 21-CA-254813 21-CA-255151 |

In the Matter of:

MASON-DIXON INTERMODAL D/B/A
UNIVERSAL INTERMODAL SERVICES,
                    Respondent,

and

MASON-DIXON INTERMODAL D/B/A
UNIVERSAL INTERMODAL SERVICES
AND SOUTHERN COUNTIES EXPRESS,
INC.,
                    Respondent,

and

ROADRUNNER INTERMODAL SERVICES,
LLC.,
                    Respondent,

and

UNIVERSAL TRUCKLOAD, INC.,
                    Respondent,

and

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
                    Charging Party.

Case Nos.        21-CA-252500
                 21-CA-252574
                 21-CA-264164
                 21-CA-253662
                 21-CA-259130
                 21-CA-254813
                 21-CA-255151

The above-entitled matter came on for hearing, via Zoom

videoconference, pursuant to notice, before **MICHAEL A. ROSAS**,

Administrative Law Judge, at the National Labor Relations

Board, Region 21, 312 N. Spring Street, 10th Floor, Los

Angeles, California 90012, on **Monday, June 21, 2021, 8:03 a.m.**

Exhibit 1(e)
562

www.escribers.net | 800-257-0885

```
 1                      A P P E A R A N C E S

 2    On behalf of the Charging Party:

 3         JULIE GUTMAN DICKINSON, ESQ.
           JASON WOJCIECHOWSKI, ESQ.
 4         BUSH GOTTLIEB
           801 North Brand Boulevard, Suite 950
 5         Glendale, CA 91203-1260
           Tel. (818)973-3200
 6
      On behalf of the Respondents:
 7
           DANIEL A. ADLONG, ESQ.
 8         HARRISON KUNTZ, ESQ.
           OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
 9         Park Tower, 15th Floor
           695 Town Center Drive
10         Costa Mesa, CA 92626
           Tel. (714)800-7900
11
      On behalf of the General Counsel:
12
           PHUONG DO, ESQ.
13         MOLLY KAGEL, ESQ.
           NATIONAL LABOR RELATIONS BOARD, REGION 21
14         312 North Spring Street, 10th Floor
           Los Angeles, CA 90012-4701
15         Tel. (213)894-5200

16

17

18

19

20

21

22

23

24

25
```



1                          **I N D E X**

2

3    **WITNESS**          **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**   **VOIR DIRE**

4    Julio Carlos         539,562    568                                      559

5    Leon Duran           591        603

6    Miguel Cubillos      611        640

7    Jose Torres          652        687,699
                          708,710
8                                    709,710                                  715
                                     716
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(e)
564

1                              E X H I B I T S

2

3      **EXHIBIT**                              **IDENTIFIED**        **IN EVIDENCE**

4      **Administrative Law Judge:**

5        ALJ-1(a)                                    638              Rejected

6        ALJ-1(b)                                    638              Rejected

7

8      **General Counsel:**

9        GC-10                                       547                  548

10       GC-11                                       558                  562

11       GC-24                                       658                  658

12

13     **Respondent:**

14       R-2                                         705                  707

15       R-3                                         708                  709

16       R-4                                         709                  710

17       R-5                                         710                  711

18       R-6                                         711                  712

19       R-7                                         712                  713

20       R-8                                         713                  716

21

22     **Exhibit ALJ-1(a) and (b) are under seal per Judge Rosas**

23

24

25

Exhibit 1(e)
565



```
 1                    P R O C E E D I N G S

 2         JUDGE ROSAS:  All right.  On the record.

 3         MR. DO:  Thank you, Your Honor.

 4         JUDGE ROSAS:  All right.  General Counsel, are you ready

 5    with your next witness?

 6         MR. DO:  Yes, Your Honor.  General Counsel would like to

 7    call Mr. Julio Carlos, who is currently in the waiting room.

 8         THE WITNESS:  Testing.  Testing.  Can you guys hear me?

 9    Can you hear?  Can you guys hear us?

10         JUDGE ROSAS:  We're off the record now.

11    (Off the record at 8:03 a.m.)

12         JUDGE ROSAS:  Back on the record.

13         MR. DO:  Thank you, Your Honor.  Again, General Counsel

14    calls Mr. Julio Carlos.

15         JUDGE ROSAS:  Sir, please raise your right hand.

16    Whereupon,

17                        JULIO CARLOS

18    having been duly sworn, was called as a witness herein and was

19    examined and testified, telephonically as follows:

20         JUDGE ROSAS:  Okay.  State and spell your name and provide

21    us with an address.

22         THE WITNESS:  My name is Julio Carlos, J-U-L-I-O

23    C-A-R-L-O-S.  My address is ███████████████, San Jacinto,

24    California 92583, I think.

25         MR. DO:  Thank you, Your Honor.
```

Exhibit 1(e)
566



| | |
|---|---|
| 1 | **DIRECT EXAMINATION** |
| 2 | Q   BY MR. DO:  Thank you for being here, Mr. Carlos.  In |
| 3 | 2019, who did you work for? |
| 4 | A   Universal Intermodal. |
| 5 | Q   And what did you do for Universal Intermodal? |
| 6 | A   I used to be a truck driver. |
| 7 | Q   And what did you do as a truck driver? |
| 8 | A   Take in and pull out containers out of the port. |
| 9 | Q   And when did you begin working for Universal Intermodal? |
| 10 | A   I began around September 26th, 2017. |
| 11 | Q   And when did you stop working for Universal Intermodal? |
| 12 | A   December 20th, 2019. |
| 13 | Q   Why did you stop working for Universal Intermodal? |
| 14 | A   I got laid off. |
| 15 | Q   And prior to your layoff, what was your pay rate? |
| 16 | A   24 an hour. |
| 17 | Q   When you were working for Universal Intermodal, at what |
| 18 | facility did you begin and end your day? |
| 19 | A   I would begin and end my day at Fontana facility. |
| 20 | Q   Do you know the address of that facility? |
| 21 | A   Yeah, it's 15033 Slover Avenue in Fontana. |
| 22 | Q   Can you describe the Slover Avenue facility for us?  What |
| 23 | was kept there? |
| 24 | A   It's a small building and -- with a big yard.  They stored |
| 25 | containers, dry ban. |

Exhibit 1(e)
567



www.escribers.net | 800-257-0885

1    Q    Was Universal Intermodal the only company that used the

2    Fontana -- the Slover Avenue facility?

3    A    Truckload used the Fontana facility also.

4    Q    When you're saying Truckload, are you referring to

5    Universal Truckload?

6    A    Yeah.

7    Q    Do you know if Universal Truckload is affiliated with

8    Universal Intermodal?

9    A    I believe so.  They -- they use the same logo.

10   Q    You mentioned that you did -- you did --

11        MR. DO:  Strike that.  Give me one moment.

12   Q    BY MR. DO:  What was the primary difference in your -- to

13   your understanding between Universal Truckload and Universal

14   Intermodal?

15        MR. KUNTZ:  Objection.  Lack of foundation.

16        JUDGE ROSAS:  Sustained.

17        THE WITNESS:  Answer?

18   Q    BY MR. DO:  No.  Give me one moment.

19        Did Universal Intermodal and Universal Truckload do

20   different work?

21   A    Yes, they did.

22   Q    And how did their work differ?

23   A    Well, Intermodal is nothing but port cooling containers,

24   and Truckload is mainly dry ban 53-footers and rail work --

25   what you would call rail work.

Exhibit 1(e)
568



www.escribers.net | 800-257-0885

1    Q    But -- or at least for the port operation, do you know if

2    Universal Intermodal had another facility with the drivers like

3    yourself?

4    A    Yeah.  The Compton facility.

5    Q    Do you know the address of that facility?

6    A    It's 2035 East Vista Bella Way in Compton.

7    Q    How did you start working at the Fontana facility?  Were

8    you hired there?

9    A    Yes, I -- yes, I was.

10   Q    During your entire tenure at Universal Intermodal, did you

11   work exclusively out of the Slover Avenue facility?

12   A    Yes.

13   Q    Before your layoff, who do you report to?

14   A    Walter (phonetic throughout).

15   Q    And what's his job title?

16   A    Dispatcher.

17   Q    Do you know his full name?

18   A    Not his last name.  I just know him by his first name.

19   Q    And for what company did Walter work for?

20   A    He worked for Southern Counties.

21   Q    And who is Southern Counties Express?

22   A    Southern Counties is -- it's just a company of Universal.

23   I think they went ahead and -- they bought them off.

24   Q    Do you know when that purchase occurred?

25   A    August 10th, 2018.

Exhibit 1(e)
569



www.escribers.net | 800-257-0885

1    Q    And when Universal Intermodal acquired Southern Counties

2    Express, was there any changes to staffing at your place?

3    A    Oh, yes, there was.

4    Q    What happened?

5    A    The Universal -- I mean, Southern Counties moved in.  All

6    the -- all of the Universal dispatchers got fired.  Everybody,

7    absolutely they just cleaned house, and Southern Counties took

8    over.

9    Q    And other than Walter, did you -- prior to your layoff,

10    did you have to report to any other managers?

11    A    There was a guy by the name of Joe Lugo.

12    Q    When was the first time that you saw Joe Lugo?

13    A    Like around August, October of 2019.

14    Q    Okay.

15    JUDGE ROSAS:  Counsel, hold off.  So the testimony that

16    you're eliciting from the witness regarding the individuals who

17    are, at this point, established to be supervisors and/or

18    managers, this -- this testimony is different from the two

19    previous witnesses because he worked primarily at Fontana; is

20    that right?

21    MR. DO:  Correct, Your Honor.  We -- we're trying to

22    establish that they're a similar working condition.

23    JUDGE ROSAS:  And this is a Fontana employee, correct?

24    MR. DO:  Correct, Your Honor.

25    JUDGE ROSAS:  The previous employees were Bella Vista

Exhibit 1(e)
570



1    (sic) and Compton?

2        MR. DO:  Both of them.  That -- that's actually the same

3    facility.

4        JUDGE ROSAS:  Same facility.  Okay.  All right.  Go on.

5        MR. DO:  Thank you, Your Honor.

6    Q    BY MR. DO:  Step-by-step, can you tell us what your day

7    was like at Universal Intermodal?

8    A    I will begin my day at 5 in the afternoon -- 5 p.m.  I

9    would wait for my semi.  Then I will get dispatch for Walter.

10   He will give me all the info, then I will go to the port, pick

11   up a container, deliver it.  Then if there was additional work,

12   I would go -- head back and pick up another container, then

13   take it to the -- the customer.

14   Q    And you indicated that Walter dispatched you.  How would

15   he provide you with dispatch information?

16   A    Through a tablet held at -- each semi had their own

17   tablet.

18   Q    Other than the tablet, did you use any other mode of

19   communication?

20   A    Cell phone, text messages, phone calls.

21   Q    And when Walter is dispatching you, what information would

22   he give you?

23   A    He would give me the port SCAC code and work -- what

24   customer I would deliver the container to.

25   Q    And when you were working for Universal Intermodal, what

Exhibit 1(e)
571



1     kind of truck were you using?

2     A     I was using Universal Intermodal's day cab Peterbilt.

3     Q     And what did they look like?

4     A     They look like a Peterbilt, white with the Universal logo

5     on the side -- both sides.

6     Q     Did you use the same truck every day?

7     A     Most of the time.

8     Q     And who owned that truck?

9     A     Universal Intermodal.

10    Q     Did Universal Intermodal company own chassis?

11    A     Yes, they did.

12    Q     And what did those look like?

13    A     It was just regular chassis with Universal, UISA on the

14    side.

15    Q     And did Southern County Express company own chassis?

16    A     Yes, they did.

17    Q     And what did they look like?

18    A     Just regular chassis with SOCN logo.

19    Q     You men -- thank you.  You mentioned a SCAC code.  Who

20    would provide you with a SCAC code?

21    A     Walter.

22    Q     Did Universal Intermodal have a unique SCAC code?

23    A     Yes.

24    Q     What was it?

25    A     UISA.

Exhibit 1(e)
572



www.escribers.net | 800-257-0885

1    Q    And did Southern County Express have a unique SCAC code?

2    A    Yes.  It was SOCN.

3    Q    And prior to your layoff, when you were working for

4    Universal Intermodal, whose SCAC code would you use?

5    A    I was using -- most of -- most of the time, I was using

6    the SOCN, Southern Counties, at the very end; uh-huh.

7    Q    When you were pulling a load using Southern Counties

8    Express SCAC code, were you required to use Southern Counties

9    Express chassis?

10    A    Not really.

11    Q    Prior to your layoff, who were some customers that you

12    would be dispatched to?

13    A    I would be -- be dispatched to Red Bull in Carson, Yang

14    Ming in Carson, Toyo Tires in Ontario, Toyota in Ontario,

15    Walmart in Mira Loma; those are just a few.

16    Q    So when you were delivering to Walmart, were you required

17    to use a Southern Counties Express chassis?

18    A    I don't -- I don't reca -- I don't recall.

19    Q    And when you were -- when you were delivering to Walmart,

20    were you required to use Universal Intermodal chassis?

21    A    No.

22    Q    When you made deliveries for Southern Counties Express,

23    what truck would you be using?

24    A    Universal Intermodal.

25    Q    And when you pulled a load for -- using Southern Counties

Exhibit 1(e)
573



1   Express SCAC code, who would pay you?

2   A    South -- Universal Intermodal.

3   Q    And would you -- your pay differ when you were move --

4   pulling a Southern Counties Express load?

5   A    No.

6   Q    But you had to keep a separate time report for when you

7   were pulling for Southern Counties Express?

8   A    Never.

9   Q    Other customer that you identified, approximately how

10  long -- how -- well, did you deliver directly to the client?

11  A    Yes.

12  Q    And how often would you do that?

13  A    Very often.  Very -- mostly every night.

14  Q    And other one -- other client that you identified

15  previously, how far were those facilities from the port?

16  A    The closest one would be Red Bull.  That would be like

17  around 15, 30 minutes.  And the farthest one would be the one

18  in Mira -- Ontario, Toyo Tires, which be -- will be like an

19  hour-and-a-half, or an hour.

20  Q    In 2019, what days of the week did you normally work?

21  A    I worked Monday through Friday.

22  Q    From what time to what time?

23  A    5 p.m. through 5 in the morning.

24  Q    And so approximately how many hours of work did you do a

25  day?

Exhibit 1(e)
574



1   A    10 to 12.

2   Q    And in 2019, on average, how many loads would you deliver

3   a night?

4   A    Two.

5   Q    When you worked for Universal --

6   A    In --

7   Q    -- Intermodal, do you recall a union trying to organize

8   the Universal Intermodal employees?

9   A    Yes, I do.

10  Q    What union was trying to organize the employees?

11  A    Local 848 Teamsters.

12  Q    Did you support that campaign?

13  A    Yes, I did.

14       MR. DO:  All right.  Your Honor, General Counsel is going

15  to mark for identification as GC Exhibit 10, which I will put

16  on the screen.

17  **(General Counsel Exhibit Number 10 Marked for Identification)**

18  Q    BY MR. DO:  Mr. Carlos, do you see the document I'm

19  putting in front of you?

20  A    Yes, I do.

21  Q    Is this your name?

22  A    Yes, it is.

23  Q    Do you recognize the signature on this card?

24  A    Yeah, that's mine.

25  Q    And then is November 3rd, 2019 the date that you signed

Exhibit 1(e)
575



1   this card?

2   A      Uh-huh.  Yes.

3          MR. DO:  Your Honor, I'm going to move for the admission

4   of GC-10 into evidence.

5          MR. KUNTZ:  No objection, Your Honor.

6          JUDGE ROSAS:  General Counsel's 10 is received.

7   **(General Counsel Exhibit Number 10 Received into Evidence)**

8   Q      BY MR. DO:  So when did you -- when did Union begin --

9   Union's campaign begin?

10  A      I remember somewhere around October.

11  Q      And other than signing the authorization card, what else

12  do you do to show your support for the Union?

13  A      I would join their meetings, the -- I would use their

14  safety vest, and I would use -- put up a sign on my windshield

15  in support of the Union.  It said Union Yes.

16  Q      So you mentioned the Union vest.  What did that look like?

17  A      It's the two horses with a shoe.  One on the left-hand

18  side of the chest, like around a fist size, and the same logo

19  on the back, covering mostly -- most of the back.

20  Q      And did you wear the Union vest at work?

21  A      Yes.

22  Q      Do you recall seeing your coworkers wear the vest at work?

23  A      Yes, all of them did.

24  Q      You mentioned that you attended some Union meetings.  How

25  many did you attend?

Exhibit 1(e)
576



www.escribers.net | 800-257-0885

1    A    Around six.

2    Q    And without naming any individual, approximately how many

3    employees do you recall being at those meetings?

4    A    At the Fontana, around ten.

5    Q    Okay.  Do you know who Romel Mallard is?

6    A    Yes, I do.

7    Q    Who is he?

8    A    He was a Universal Intermodal employee and a fellow

9    Teamster supporter.

10   Q    And how do you know that he supported the Teamsters?

11   A    Because I would see him in the meetings, and he would wear

12   the vest.

13   Q    And do you know who Kevin Poullard is?

14   A    Yes, he -- yes, I do.

15   Q    And who is he?

16   A    He was a Universal Intermodal employee and a fellow

17   Teamster supporter.

18   Q    And how do you know that he supported the Teamsters?

19   A    Because he would join our meetings and use the -- the

20   safety vest in -- in support.

21        JUDGE ROSAS:  Hold on one second.  Let's go off the record

22   and let's place the witness into the waiting room for one

23   second.

24        Sir, we're going to be right back to you, okay?

25        THE WITNESS:  All right.  Sounds good.

Exhibit 1(e)
577



```
 1          JUDGE ROSAS:  All right.

 2     (Off the record at 8:21 a.m.)

 3          JUDGE ROSAS:  Okay.  So Counsel, if I understand the

 4     allegations in this case, there were mass layoffs, or alleged

 5     that were implemented as a result of concerted protected

 6     action; is that right?

 7          MR. DO:  And Union activity, but, yes, Your Honor.

 8          JUDGE ROSAS:  Okay.  And -- and it applies to everybody,

 9     right, that's in the unit?

10          MR. DO:  Correct.

11          JUDGE ROSAS:  Okay.  So we don't have any special cases,

12     correct?

13          MR. DO:  What do you mean, Your Honor?

14          JUDGE ROSAS:  Any single instances of this individual or

15     that individual being laid off because they did this or that?

16          MR. DO:  Not with the unit as a whole.  It -- there is the

17     two witnesses that replace on -- on Thursday, which is the two

18     that were terminated.

19          JUDGE ROSAS:  There were some specific allegations

20     relating to them, correct?

21          MR. DO:  Yes, Your Honor.

22          JUDGE ROSAS:  And -- and what is the -- what is the

23     difference?  Is it just superfluous, essentially?

24          If one were to determine that there were Union activity in

25     an organized manner, and there were mass layoffs, either
```

Exhibit 1(e)
578



1    attributable to, or not attributable to Union activity, what

2    does individual activity matter?

3         MR. DO:  It doesn't, Your Honor.  We're just trying to

4    establish the overall campaign and just laying out that as

5    framework.  And so typically --

6         JUDGE ROSAS:  So -- so they've already testified.  Those

7    individuals testified as to their specific involvement as it

8    pertains to the complaint allegations, correct?

9         MR. DO:  Correct, Your Honor.

10        JUDGE ROSAS:  Okay.  And you're now starting to ask

11   individuals about them as if to corroborate their --

12        MR. DO:  Yes, Your Honor.

13        JUDGE ROSAS:  -- Union activity; is that right?

14        MR. DO:  Correct, Your Honor.

15        JUDGE ROSAS:  Now, let me ask the Respondent, do you take

16   any issue with the Union involvement of those two individuals?

17        MR. KUNTZ:  Mr. Ledesma and Mr. Mallard?

18        JUDGE ROSAS:  I don't recall -- I don't recall any

19   contentious cross-examination, seeming to question that

20   particular activity on their parts.

21        MR. KUNTZ:  I think the record is consistent with your

22   recollection, Mr. --

23        JUDGE ROSAS:  Yeah.  Yeah.  So -- so I don't want to have

24   18 witnesses come in here, corroborating their activity.  If

25   you want to have people testify that they were laid off, is it

Exhibit 1(e)
579



1    even necessary that they were involved in Union activity?  I

2    mean, if the Respondent isn't contesting that, you know, then

3    what -- what -- what do we need people to be testifying to?

4         I mean, I understand you're establishing as to the -- each

5    individual facility at this point.  You're now dealing with the

6    Fontana facility as to what -- what they did as it

7    interrelating with the various companies.  That's fine.  But

8    going forward, and you'll correct me if my understanding is

9    incorrect, okay, I don't want cumulative testimony, okay?

10        MR. DO:  Understood, Your Honor.

11        MR. KUNTZ:  Your Honor --

12        MR. DO:  Understood.

13        MR. KUNTZ:  Your Honor, may I interpose one comment?  So

14   obviously at the Compton facility -- the Universal Intermodal

15   Compton facility, there's clearly no dispute that there was

16   Union activity that Respondents had knowledge of, right?  We

17   had an NLRB election, of course.  The other two facilities,

18   there's a truck -- Universal Truckload facility in Fontana.

19   That's the Slover facility that this witness has been

20   discussing.  And then another Fontana facility that was a

21   Roadrunner facility.

22        Regarding those two facilities, we -- we think there may

23   be an issue regarding Union activity for employees of those

24   entities.

25        JUDGE ROSAS:  Okay.

Exhibit 1(e)
580



1      MR. KUNTZ:  And certainly regarding knowledge.

2      JUDGE ROSAS:  So -- so Universal -- Universal's Fontana

3  facility and the Roadrunner facility in Fontana?

4      MR. KUNTZ:  Correct.  And to be clear, you -- the Slover

5  facility that's been discussed is a Universal Truckload

6  facility.

7      JUDGE ROSAS:  Okay.  Okay.  All right.  Let's go back --

8  let's bring the witness back.

9      MR. DO:  Thank you, Your Honor.  All right.  Thank you,

10  Your Honor.

11                  **RESUMED DIRECT EXAMINATION**

12  Q    BY MR. DO:  Mr. Carlos, do you recall a Union election

13  being held for your -- for the port drivers on December 4,

14  2019?

15  A    Yes, I do.

16  Q    What was the outcome of that election?

17  A    We won.

18  Q    Going back a bit, you previous mentioned by -- an

19  individual by the name of Joe Lugo.  To the best of your

20  recollection, did he appear before or after the Union?

21  A    He appeared up around when we were trying to organize.

22  Q    Okay.  During the Union campaign, do you recall seeing

23  Teamster's representative at the Fontana facility?

24  A    Yes, I do.

25  Q    And what would it -- what would it -- what would they be

Exhibit 1(e)
581



1    doing there?

2    A     They were just -- the -- telling us how -- how the

3    Union -- what would they do, the benefits, the Union.

4    Q     And when would they be -- where would they -- where would

5    they be around -- in or around the facility?

6    A     They -- they would be in the front of the Fontana

7    facility, around the walk -- walkway.  Right in front of the

8    building, pretty much.

9    Q     And did they set up anything while they were there?

10   A     They set up a little tent, table, coffee.

11   Q     Did they have any kind of signs or banners?

12   A     Yes, the Union, yes.  The safety vests, everybody was

13   wearing the safety union vests.

14        MR. KUNTZ:  Your Honor, I'd like to object -- object as to

15   vagueness as to time and frequency.

16        JUDGE ROSAS:  We've got an initial time frame earlier in

17   the testimony.  I'll allow it.  You can pursue on cross.

18        Next question.

19        MR. DO:  Thank you, Your Honor.

20   Q     BY MR. DO:  Can you describe those signs or banners?

21   A     They were just the Union logos, Union Yes, to support the

22   Union.

23   Q     What were their size?  How big were they?

24   A     Oh, the -- like the -- the signs, like most -- like the

25   whole -- mostly real big, real visible.

Exhibit 1(e)
582



1    Q    Okay.  Have you seen a Union -- Union representative when

2    you were driving into the Fontana facility?

3    A    Oh, definitely.

4    Q    Could you miss them when you were driving into the

5    facility?

6    A    No, you couldn't.

7    Q    You mentioned that you parked -- where did you park your

8    car when you came into the Fontana facility?

9    A    Oh, we parked in the parking -- it's -- it's right in the

10   front of the -- of the building, parking lot.

11   Q    And you mentioned that you put up a sign.  What did that

12   sign look like?

13   A    It said "Union Yes" with a checkmark in it.

14   Q    And where would you put it?

15   A    I would put it right in front of my windshield to show

16   support of the Union.

17   Q    Did you know that there were -- you mentioned that

18   Universal Truckload shared that facility with you.  Do you know

19   if there were employee drivers at that facility?  Universal

20   Truckload employee drivers at that facility?

21   A    Yes, there was.

22   Q    Approximately how many?

23   A    There -- like around six.  But if you -- those --

24   Q    Thank you.  Did those Universal Truckload drivers know

25   about the Union?

Exhibit 1(e)
583



1    A    Oh, yes, they did.

2         MR. KUNTZ:  Objection.  Lack of foundation.  Calls for

3    speculation.

4         JUDGE ROSAS:  Sustained.

5    Q    BY MR. DO:  Okay.  Do you know if the Universal Truckload

6    drivers knew about the Union?

7    A    Yes, they do.

8         MR. KUNTZ:  Objection.  Same objection, Your Honor.

9         JUDGE ROSAS:  Rephrase.

10        MR. DO:  Sure.

11   Q    BY MR. DO:  Did you ever see a Universal Truckload driver

12   talk to the Union representative?

13   A    Yes, I did.

14   Q    And how often did you see them do that?

15   A    Every single time, I think.  Most of them -- we set up.

16   Q    Did the Fontana facility have security cameras?

17   A    Yes, they did.

18   Q    Did the Universal Truckload driver -- where did the

19   Universal Truckload drivers park their cars?

20   A    Right in front of building 2.

21   Q    Is that in the same lot that you use?

22   A    Yeah.  Fontana?

23   Q    Yeah.

24   A    The -- the parking lot is in the front of the building.

25   Q    After the Union election, which we -- which I asked about,



1    did the amount of work you were being assigned change in any

2    way?

3    A    Yes, it did.

4    Q    How did it change?

5    A    It changed by the load.  We were only asked to -- to pull

6    a -- just one load out of the port.

7    Q    And is that -- go ahead.

8    A    Which is less hours.

9    Q    So let's -- let me just confirm.  After the Union

10   election, approximately how many loads were you being assigned

11   a night?

12   A    Just one.

13   Q    And where -- where would you be delivering that load to?

14   A    The Franco yard.

15   Q    And who would be telling you to deliver to the Franco

16   yard?

17   A    Walter.

18   Q    Can you describe the Franco yard?  Where was it located?

19   A    It was in the corner and Q and E Street and Drum Avenue.

20   And can I describe it?  It's just a yard where you would store

21   containers.

22   Q    In what city?

23   A    In -- right there in Long Beach.

24   Q    And prior to the Union election, do you recall delivering

25   to this facility?

Exhibit 1(e)
585



www.escribers.net | 800-257-0885

1    A    Never.  Never.

2    Q    And how far was the Franco facility from the port?

3    A    Around 15 minutes.

4    Q    After the Union election, do you -- did you still deliver

5    to clients?

6    A    No.

7    Q    After the Union election, approximately how many hours of

8    work did you do a night?

9    A    Six to eight.

10    Q    Did you ever try to get more work?

11    A    Yes, I did.

12    Q    And who would you talk to?

13    A    Walter.

14    Q    And how would you communicate with Walter?

15    A    I would send him a text message, phone call.

16        MR. DO:  I'm going to mark for identification as GC

17    Exhibit 11.

18    **(General Counsel Exhibit Number 11 Marked for Identification)**

19        MR. DO:  I'll put it on the screen.

20    Q    BY MR. DO:  Do you see what I just put in front of you,

21    Mr. Carlos?

22    A    Yes, I do.

23    Q    I'm going to scroll through it.  It is a four-page

24    document.  Do you recognize this text exchange?

25    A    Yes, I do.

Exhibit 1(e)
586



www.escribers.net | 800-257-0885

1    Q    Who took these screenshots?

2    A    I did.

3    Q    And where -- who -- who is a part of this exchange?

4    A    Walter.

5    Q    And who else?

6    A    And me.

7    Q    And are you the individual on the right-hand side, or on

8    the left-hand side?

9    A    On the right-hand side.

10   Q    And so -- and Walter is the person on the right-hand side,

11   or the left-hand side?

12   A    Left-hand side.

13        MR. DO:  Your Honor, I'm going to move for the admission

14   of GC-11 into evidence.

15        MR. KUNTZ:  Voir dire, please, Your Honor.

16        JUDGE ROSAS:  Go ahead.

17                    **VOIR DIRE EXAMINATION**

18   Q    BY MR. KUNTZ:  Good morning, Mr. Carlos.  My name is

19   Harrison Kuntz.  I'll have a few more questions for you later,

20   but I am an attorney for the Respondents in this case.  I just

21   want to ask you a couple of questions about this document, if

22   that's okay.

23   A    Go ahead.

24   Q    So first of all, when did you take these screenshots?

25   A    I took them when the -- pretty much when he sent them to



1    me.

2    Q    Why did you do that?

3    A    Because we knew -- everybody knew what was going on, the

4    impact of work, the changes.

5    Q    Do you see the phone number at the top that's in sort of

6    bubble letters, starting with plus 1(586)?

7    A    Yeah.

8    Q    Do you know whose phone number that is?

9    A    I know the -- not exactly, but I know the area code, that

10   it's used by Universal Intermodal.

11   Q    What type of phone did you use to take these screenshots?

12   A    My -- my personal phone, Stylo.  Stylo --

13   Q    Did you say --

14   A    Go ahead.

15   Q    Is that a brand name?

16   A    Yeah, a make.  Well, it's my personal phone.  I took them

17   using my personal phone.

18   Q    All right.  Do you see the symbols at the bottom of the

19   page?  It appears to be a triangle, a circle, and a square?

20   A    Yeah.

21   Q    Do you know what those symbols signalize?

22   A    Yeah, it's part of the phone.  It's -- go back, the

23   middle, go to the -- go to the front of the -- or home, and the

24   square is to see other pages that you have on the side.

25   Q    So those are to navigate through your photos?

Exhibit 1(e)
588



```
 1    A     No, through my phone.

 2    Q     Okay.  Do you see on this page that's on the screen right

 3    now, the first page of the exhibit, on the right hand, one of

 4    your text messages references SCEZ450223?

 5    A     Uh-huh.

 6    Q     Is that a SCAC code?

 7          MR. DO:  Objection.  Goes past the point of voir dire.

 8          JUDGE ROSAS:  I'm -- I'm okay with going beyond the scope

 9    of voir dire if it saves cross-examination.  It will have be

10    deemed to have been asked and answered.

11          MR. DO:  Okay.

12          JUDGE ROSAS:  So I'll allow it.

13          THE WITNESS:  No, I don't recall -- that's not the SCAC

14    code.  The SCAC code for So -- for Southern Counties is SOCN.

15    I think that might -- must have been a chassis.

16    Q     BY MR. KUNTZ:  Okay.  Thank you for clarifying that.

17          MR. KUNTZ:  So Your Honor, we'll object on the basis of

18    hearsay.

19          JUDGE ROSAS:  Text message from Walter?

20          MR. KUNTZ:  That's right, Your Honor.

21          JUDGE ROSAS:  So it's -- it's coming from someone who,

22    according to the witness, appears to be authorized and

23    functioning on the part of the Respondent; is it not?  Am I

24    missing something?

25          MR. KUNTZ:  I understand that to have been your ruling
```

Exhibit 1(e)
589



1    from one of our sessions last week, Your Honor.  However, we're

2    going to maintain our objection on that.

3         JUDGE ROSAS:  Okay.  All right.  I want to make sure I'm

4    not missing anything.  Overruled.

5         General Counsel's 11 is received.

6    **(General Counsel Exhibit Number 11 Received into Evidence)**

7         MR. DO:  Thank you, Your Honor.

8                    **RESUMED DIRECT EXAMINATION**

9    Q    BY MR. DO:  Mr. Carlos, so based on looking at GC Exhibit

10   11, what would happen when you asked for additional work?

11   A    Most of the time, he would reply, no, bobtail back to the

12   yard, to Fontana.

13   Q    And let's just clarify for the Director, what is bobtail?

14   A    Bobtail means just go back on your day cab, don't haul

15   nothing.

16   Q    And what is BT?

17   A    BT means bobtail.

18   Q    Thank you.  Did -- did you -- after the Union election,

19   did the work ever pick back up?

20   A    Never.

21   Q    Did it get worse?

22        MR. KUNTZ:  Objection.  Vague.

23        JUDGE ROSAS:  Rephrase.

24        MR. DO:  Sure.

25   Q    BY MR. DO:  Did you receive less work?

Exhibit 1(e)
590



 1    A    It -- it was just the same, one load a day.

 2    Q    And when you delivered to the Franco store -- the Franco

 3    yard, did you recall taking -- do you recall seeing anyone

 4    taking containers out of that facility?

 5    A    Yes, Southern Counties and Container Connection.

 6    Q    And how do you know they were -- it was Southern Counties

 7    and -- or Container Connection?

 8    A    Because of the logo.  I mean, I recognize --

 9    Q    What --

10    A    -- the -- on the side.  It was written on the side of the

11    semis, Universal -- I mean, Southern Counties or Container

12    Connection.

13         MR. DO:  Give me one moment.

14    Q    BY MR. DO:  Do you -- let me put back GC Exhibit 11 back

15    on screen.  This is the third page of that same document, which

16    is Bate stamp as page 141.  Do you recognize this text message?

17         JUDGE ROSAS:  Hold on one second.  Hold on one second.

18    How many pages total to this exhibit?

19         MR. DO:  This exhibit has four pages in total, Your Honor.

20         JUDGE ROSAS:  All right.  Let's -- let's -- all right.

21    Counsel had his voir dire.  I received it into evidence.  It

22    wasn't clear that there was more than one page going in.  So

23    why don't you show the entirety of it before you keep working

24    with it to make sure that we're going to be able to have it in

25    evidence.

Exhibit 1(e)
591



```
 1        MR. DO:  Sure.

 2        MR. KUNTZ:  Your Honor -- Your Honor, in fairness, I -- I

 3    think I should say that counsel for the General Counsel did

 4    show us the four pages initially.

 5        JUDGE ROSAS:  Okay.  So you're -- do you have any other

 6    voir dire questions relating to General Counsel's 11?

 7        MR. KUNTZ:  No, Your Honor.

 8        JUDGE ROSAS:  Okay.  All right.

 9        Continue, General Counsel.

10        MR. DO:  Thank you, Your Honor.

11    Q    BY MR. DO:  Do you recog -- do you see this text from

12    December 16th?

13    A    Yes, I do.

14    Q    And who sent you -- who sent you that message?

15    A    Walter.

16    Q    What was Walter telling you in this message?

17    A    Oh, that we have to go to work to day shift, that there

18    was going to be -- not going to be any night shift work

19    available.  And if I --

20    Q    And what week -- and what week was he referring to?

21    A    16th.  The week of 16th.

22    Q    What --

23    A    Of the 23rd to the 27th.

24    Q    Okay.  At the time that you received this text message on

25    December 16th, had any managers, dispatcher, or supervisor tell
```

Exhibit 1(e)
592



1    you that you might be laid off?

2    A    No.

3    Q    Okay.  After the Union election in December of 2019, do

4    you ever recall being told that you couldn't use your truck for

5    work?

6    A    Yes, I did.

7    Q    What happened?

8    A    I was going in my regular shift, 5 p.m., and I was

9    approaching a semitruck.  The mechanic, Juan -- Juan, pretty

10   much jumped in front of me real aggressively, and he told me

11   that I couldn't get in, or use the trucks because they were

12   being shipped to Las Vegas.

13   Q    And what day did that happen?

14   A    I don't -- I don't -- I don't recall the exact date.  It

15   was close to the -- around the 23rd.  I mean, at the time --

16   almost before we got laid off.

17   Q    All right.  So drawing your attention to your layoff, how

18   do you learn about your layoff?

19   A    I -- I heard of my layoff through we Teamsters.  They have

20   a group chat called WhatsApp.  And I heard it through another

21   fellow employee, that he -- that the guys in Rancho Dominquez

22   had gotten their last check with -- with a paper, in that they

23   had been laid off.  So I heard it through -- through a fellow

24   employee through a group chat.

25   Q    And I just wanted to confirm, you mentioned the guys from



1    Rancho Dominquez.  Are those the same individuals that work out

2    at the Compton facility?

3    A    Yes.  And -- and for me, I never received any -- any paper

4    indicating that I was laid off.

5    Q    And so after you had learned about your layoff through

6    this WhatApp chat -- well, let me ask you, when did you -- when

7    did -- when did you learn about it?

8    A    I don't recall.  I -- know in December 20 -- like December

9    20th.

10   Q    Okay.  And once you learned about the layoff, did you --

11   did you contact anybody with Universal?

12   A    Yes, I did.

13   Q    And who did -- who do you contact?

14   A    I called Mike Vagts.  He's a -- a special relationships

15   manager.

16   Q    And what did Mr. Vagts tell you?

17   A    He said that the -- the leads on the yard with the

18   company, that the yard had -- that, I guess, that they weren't

19   able to re -- release it again, so that's why they were

20   closing.

21   Q    And did you work out at the Compton facility?

22   A    No, I worked at the Fontana -- Fontana facility.

23   Q    Prior to talking to Mr. Vagts, did anyone at Universal

24   Intermodal tell you about the lease at Compton expiring?

25   A    I heard -- I had heard it a year ago prior, but that's



1    about it.  I mean, it was up in the air, not -- about to be.

2    Q    And prior to talking to Mr. Vagts, did anyone at Universal

3    indicate to you that you might be laid off?

4    A    No.

5    Q    Mike Vagts, where does he work?

6    A    He works at the Michigan facility, corporate office.

7    Q    To the best of your knowledge, is the Fontana facility,

8    the Slover Avenue facility, still operating?

9    A    Oh, yes, it is.

10   Q    In your experience working for Universal Intermodal, when

11   during the year was work most busy?

12   A    In the middle of the year.

13   Q    And when -- when you worked for Universal Intermodal, when

14   was work most slow?

15   A    Towards the end of the year, Christmas time.

16   Q    And when the work slowed down, what would happen?

17   A    We were to get dispatched by -- by Truckload to do rail

18   work.

19   Q    Typically, did you do rail work?

20   A    No, I -- no, I did port work.

21   Q    And when you did this rail work, whose truck would you

22   use?

23   A    Universal Intermodal.

24   Q    And who paid you when you were doing the rail work?

25   A    Universal Intermodal.

Exhibit 1(e)
595



www.escribers.net | 800-257-0885

1    Q    What -- prior to your layoff, were you ever formally

2    employed by Universal Truckload?

3    A    No.

4    Q    Prior to your layoff, did you ever apply to work for

5    Universal Truckload?

6    A    No, never.

7         MR. DO:  I have no further questions, Your Honor.

8         JUDGE ROSAS:  Charging Party, anything?

9         MR. WOJCIECHOWSKI:  Nothing, Your Honor.  Thank you.

10        JUDGE ROSAS:  Respondent, cross.

11        MR. KUNTZ:  Could we just get the Jencks statement, Your

12   Honor?

13        JUDGE ROSAS:  Off the record.

14   (Off the record at 8:46 a.m.)

15        JUDGE ROSAS:  Okay.  On the record.  Cross-examination,

16   Respondent.

17                     <u>**CROSS-EXAMINATION**</u>

18   Q    BY MR. KUNTZ:  Good morning again, Mr. Carlos.

19   A    Good morning.

20   Q    So as I mentioned earlier, I'll have a few questions for

21   you.  Before we get started, I just wanted to remind you that

22   because we're doing this by video, it's helpful if you, after I

23   ask a question, wait a second or two to account for the lag

24   time that sometimes can become an issue in these.  Is that

25   okay?

Exhibit 1(e)
596



www.escribers.net | 800-257-0885

1    A    Yeah.

2    Q    And if another attorney raises an objection to a question

3    that I ask, will you please refrain from answering before I --

4    before the objection is ruled on by the judge?

5    A    Yeah.

6    Q    Great.  So Mr. Carlos, I just want to clarify one thing

7    very quickly.  I gather from your testimony that generally

8    speaking, when you were carrying loads for Universal Intermodal

9    Services, you were taking those loads from the port to a

10   customer, correct?

11   A    Yeah.

12   Q    You were generally not taking something from somewhere

13   else to the port; is that fair to say?

14   A    Yeah.  Some -- well, sometimes I will pick up an empty and

15   take it to the port from a customer.

16   Q    But that was not the typical load, was it?

17        MR. DO:  Objection.  Vague as to typical.

18        JUDGE ROSAS:  Do you understand the question, sir?

19        THE WITNESS:  He said the load -- well, to almost the end,

20   like I mentioned, I was just being told to go to the port and

21   just take a load.  Pick up a load from the port, and that's

22   about it.  Prior to that, when the work was good, sometimes we

23   were asked to pick up an empty from a customer, take it to the

24   port, and pick up a load.

25   Q    BY MR. KUNTZ:  You mentioned work being good just now.



1    Now, isn't it true that there were other times before the Union

2    election when work was slow for Universal Intermodal Services?

3    A    Never.  I can't really say it was slow.

4    Q    There was no other time when you didn't receive a number

5    of hours that you would typically want to receive?

6    A    No.

7         MR. KUNTZ:  Ms. Bridge, can you please pull up Mr. Carlos'

8    Jencks' statement?

9         JUDGE ROSAS:  Can we go off the record for just a moment?

10   (Off the record at 9:13 a.m.)

11                    **RESUMED CROSS-EXAMINATION**

12   Q    BY MR. KUNTZ:  So Mr. Carlos, do you recall testifying

13   that during the winter months, work often slowed down?

14   A    Work slowed down, like around Christmas to the beginning

15   of the year.

16   Q    And isn't it true that when the work slowed down, you

17   didn't work as many hours as you would have preferred to work?

18   A    Truckload would accommodate, and most of the time, I was

19   keep -- stay the same, around 50 to 55 hours -- hours a week.

20   Q    But -- but in any event, you would agree that during those

21   time periods, the amount of work available from Universal

22   Intermodal Services decreased as opposed to other parts of the

23   year?

24        MR. DO:  Objection.  Asked and answered.

25        JUDGE ROSAS:  I'll allow it.

Exhibit 1(e)
598



www.escribers.net | 800-257-0885

1        THE WITNESS:  Yeah, you said it was decrease because of

2    the port; yes, that was obvious.  I mean, it was a -- like

3    every year.

4    Q    BY MR. KUNTZ:  I believe you testified that the date of

5    the Southern Counties' purchase was August 10, 2018; is that

6    right?

7    A    Yeah.

8    Q    How do you remember that exact date?

9    A    Because I -- because between colleagues, we would inform,

10   you know, what was going on.  Actually, I remember once, I was

11   just scrolling through the -- through the Google, and that came

12   up, that Universal had acquired Southern Counties.

13   Q    And you described certain changes occurring after that

14   purchase took place, right?

15   A    Yeah.

16   Q    And those changes occurred within a few months of August

17   2018, correct?

18   A    No.  It was towards the end of December 2019.

19   Q    It wasn't until December 2019 that you began performing

20   Southern Counties' work?

21   A    Yes.  I didn't know -- I don't -- I don't recall that.  I

22   just recall the -- when Southern Counties started moving in,

23   into Universal -- the Universal facility towards December 20,

24   2019, and then -- then during that period, that was -- we began

25   to see the changes.

Exhibit 1(e)
599



1    Q    So it's your testimony that the Southern Counties'

2    purchase occurred in August of 2018, and you didn't see any

3    changes as a result of that until December of 2019?

4    A    Yeah.  The lack of work, yes.

5    Q    And you saw no Southern Counties' presence until December

6    of 2019?

7    A    Yeah.

8    Q    But after the Southern Counties' purchase in 2018, within

9    several months you began running loads with Southern Counties

10   SCAC codes, correct?

11   A    I don't recall.  Like, that year -- I only --

12   Q    So that --

13   A    I mean, because that was part of my issues.  I mean, it

14   wasn't that -- I mean, like I said -- like I mentioned, I just

15   noticed that they acquired Southern Counties.

16   Q    Do you recall using Southern Counties' SCAC codes in

17   November of 2019?

18   A    Yeah.

19   Q    October of 2019?

20   A    Around that time, yeah.

21   Q    What's the earliest month that you recall using Southern

22   Counties' SCAC codes?

23   A    Southern Counties, like around October.

24   Q    October of 2019?

25   A    Yeah.

Exhibit 1(e)
600



1    Q    You've never been part of any discussions between

2    Universal Intermodal Services and its customers regarding their

3    contracts, have you?

4    A    No.

5    Q    And you've never been part of any conversations between

6    Universal Intermodal Services and its customers regarding how

7    workloads would be handled, have you?

8    A    Yes.  I mean, who dispatched the loads?  Or --

9    Q    No, I'm -- I'm asking about conversations between the

10   company, Universal Intermodal Services, and customers?

11   A    No, I would never talk to customers.

12   Q    Okay.  You've never been involved in any conversations

13   with any -- any management representatives to those regarding

14   overall freight conditions; have you?

15   A    I kind of don't understand the question.

16   Q    You've never been involved in any conversations between

17   management of Universal Intermodal Services and anyone

18   regarding the total volume of freight that's being moved by the

19   company?

20   A    Oh, no.

21   Q    Is that also true of management of Southern Counties

22   Express?

23   A    Could you repeat that question?

24   Q    You've never been involved in any management conversations

25   regarding the total volume of freight that's being moved by

Exhibit 1(e)
601



 1    Southern Counties Express, have you?

 2    A    I mean, just now, what I -- what I mentioned about how

 3    many loads we would -- we used to do to how many loads we did

 4    at -- towards the end of the year.

 5    Q    I'm referring to conversations amongst representatives of

 6    the management of Southern Counties Express?

 7    A    No.

 8         MR. DO:  Objection.  Foundation.

 9         JUDGE ROSAS:  Did you ever talk to management about the

10    loads?

11         THE WITNESS:  No.

12         JUDGE ROSAS:  Did you ever hear management talking to any

13    customers about the loads?

14         THE WITNESS:  No.

15         JUDGE ROSAS:  Okay.

16    Q    BY MR. KUNTZ:  And likewise, you were never involved in

17    any conversations between Southern Counties Express and its

18    customers regarding the contracts between Southern Counties

19    Express?

20         MR. DO:  Objection foundation.

21         JUDGE ROSAS:  Counsel, you're going to have to break that

22    down, using terms when you're talking about multiple parties

23    and the term involved.

24         MR. KUNTZ:  Understood, Your Honor.

25         JUDGE ROSAS:  It can -- it can be a little confusing when

Exhibit 1(e)
602



www.escribers.net | 800-257-0885

 1    you're asking the witness about his particular actions and

 2    perceptions.

 3         MR. KUNTZ:  Understood, Your Honor.

 4    Q    BY MR. KUNTZ:  Mr. Carlos, are you aware that Southern

 5    Counties Express may have contracts with its customers?

 6    A    Do I know?

 7    Q    Are you aware of that?

 8    A    I mean, to tell you the truth, that's none of my business

 9    what -- I mean, what you guys -- I -- I was just -- what

10    Southern Counties did with its customers, I'm just a -- I was

11    just a truck driver.

12    Q    Okay.

13    A    I was not --

14    Q    So if those -- if those contracts existed, you had nothing

15    to do with their negotiation, correct?

16    A    No.

17         MR. DO:  Objection.  Calls for speculation.

18         JUDGE ROSAS:  I'm going to sustain the objection.  I don't

19    generally limit the -- the scope of cross too tightly to the

20    direct, but I'm not seeing anything in this witness' testimony

21    that should take us too far afield from his personal trucking

22    operations that he's testified to.  I -- I didn't get any sense

23    on his testimony that he was involved in any kind of executive

24    action, managerial functions, interaction with management.  He

25    interacted with a dispatcher.  So let's -- let's tow the line a

Exhibit 1(e)
603



1    little bit here.

2       MR. KUNTZ:  Of course, Your Honor.  That's what we're

3    seeking to establish.

4       JUDGE ROSAS:  I mean, if -- if you think that there's

5    something that he knows, that -- that is relevant to your case,

6    I mean, by all means, but I'm just not -- I'm just not seeing

7    where we're going with his perceptions about what management

8    did, why they did it.  He's -- he's given you the scope of

9    his -- the brush of his knowledge.

10       MR. KUNTZ:  So Your Honor, the -- the witness testified

11    regarding changes in work during December 2019.  We're simply

12    attempting to elicit testimony, establishing that his limited

13    knowledge regarding why that might have happened.  If you're

14    satisfied on that point, then we're happy to move on.

15       JUDGE ROSAS:  I mean, probe everything that he did.  You

16    know, by all means, any -- anything that you find important, by

17    all means, feel free to explore it until the cows come home,

18    but I think they've -- they're -- they're ready to get locked

19    in for the night.  So next question.

20    Q    BY MR. KUNTZ:  Mr. Carlos, you testified regarding your

21    loads after the Union election being only one load per day out

22    of the port; do you remember that?

23    A    Yes, that's correct.

24    Q    No one from management ever told you why that was the

25    case, did they?

Exhibit 1(e)
604



www.escribers.net | 800-257-0885

1    A    Never.

2    Q    And no one ever told you why you began delivering to the

3    Franco yard, did they?

4    A    No.  I do remember once asking.  I asked Walt --

5         MR. KUNTZ:  Your Honor -- Your Honor, there's no question

6    pending.  We'll move to strike that.

7         JUDGE ROSAS:  Stricken.

8    Q    BY MR. KUNTZ:  Mr. Carlos, isn't it true that most of the

9    drivers at the Slover, Fontana facility were employees of

10   Universal Truckload?

11   A    Yes.  I mean, there was Truckload and Universal

12   Intermodal.

13   Q    But most of those drivers were Truckload employees,

14   correct?

15   A    Yes.

16   Q    And the vast majority of Universal Intermodal Services

17   drivers in the area worked out of the Com -- Compton facility,

18   correct?

19   A    Company drivers worked out of the Compton facility.  I'm

20   not -- I -- I'm not aware or -- of who exactly or how many

21   employees worked out of the Compton facility because I'm from

22   the -- I was employed at the Fontana facility.

23   Q    Sure.  So you're aware that -- you're aware that there

24   were many more Universal Intermodal Services employees at

25   Compton than there were at Fontana, correct?

Exhibit 1(e)
605



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And there were no Universal Intermodal Services managers

3    or supervisors permanently stationed at the Fontana facility,

4    were there?

5    A    No.  There were Intermodal Truckload.

6    Q    For example, Joe Lugo worked out of the Compton facility,

7    correct?

8    A    Yes.

9    Q    And there were no Universal Intermodal Services

10   physically -- dispatchers physically stationed at the Slover

11   Fontana facility, were there?

12   A    No, from what I know, they were -- it was a guy named

13   Louis (phonetic) that will go -- sometimes go ahead and give us

14   our -- our load, and he worked out of the Fontana facility.

15   Q    During the time that you worked for Universal Intermodal

16   Services, did you also, at that time, live in San Jacinto?

17        MR. DO:  Objection.  Relevance.

18        JUDGE ROSAS:  I'll allow it.

19   A    During my employment with Universal, I used to live in

20   Hemet, then I moved to San Jacinto.

21   Q    BY MR. KUNTZ:  When did you move to San Jacinto?

22   A    About -- I think towards the third -- 2019.

23   Q    And how far is Hemet from San Jacinto?

24   A    Oh, like, 15 minutes away; they're like, the city next --

25   they're right next to each other.

Exhibit 1(e)
606



www.escribers.net | 800-257-0885

1    Q    And how far is it from the San Jacinto, Hemet area to

2    Compton?

3    A    About an hour and a half.

4    Q    How far is it from the Hemet, San Jacinto area to the

5    Fontana Slover facility?

6    A    45 to an hour.

7    Q    And to be clear, you started and ended each of your days

8    at the Fontana Slover facility, correct?

9    A    Yes.

10   Q    And that was more convenient for you than it would have

11   been to start and end your days at the Compton facility,

12   correct?

13   A    Yeah.

14   Q    And to be clear, all the work was dispatched out of

15   Compton for Universal Intermodal Services, correct?

16   A    Yeah.

17   Q    Are you familiar with the residences of the other

18   Universal Intermodal Services drivers who worked out of the

19   Fontana facility?

20        MR. DO:  Objection.  Relevance, calls for speculation.

21        JUDGE ROSAS:  The question is whether he's familiar with

22   the residences of the other drivers at Compton?

23        MR. KUNTZ:  Yes, Your Honor.  In other words, does he know

24   where they -- where the other Universal Intermodal Services

25   drivers who worked out of Fontana -- does he know where they

Exhibit 1(e)
607



```
 1    live?

 2         JUDGE ROSAS:  And we're talking about, what, about a half

 3    a dozen?

 4         MR. KUNTZ:  Fewer, I believe, Your Honor, but the -- of

 5    course, we can rely on the witness for that.

 6         JUDGE ROSAS:  Okay.  I'll allow it.

 7         If you know.

 8    A    No, I'm not familiar with other employees' residencies.

 9    Q    BY MR. KUNTZ:  You didn't know where any of them lived?

10    A    No, that's none of my business.

11    Q    You mentioned that the Fontana Slover facility is still

12    operating; is that right?

13    A    I guess.

14    Q    Do you have any understanding of the nature of its

15    continued operations?

16    A    No.

17    Q    Do you know if they're still using employee drivers?

18    A    I'm not sure.

19    Q    Very briefly, you mentioned having an interaction with a

20    mechanic during your direct testimony.  Do you recall that?

21    A    Yes.

22    Q    What is the job of the mechanic?

23    A    What was his name?

24    Q    What was the job of the mechanic?

25    A    Mechanic.
```

Exhibit 1(e)
608



www.escribers.net | 800-257-0885

1    Q     What type of work did that person perform?

2    A     He performed maintenance on Universal Intermodal's semi

3    vehicles.

4    Q     And was there a mechanic available to perform maintenance

5    on semis throughout the course of your employment with

6    Universal Intermodal Services?

7    A     Yes.

8    Q     Do you recall testifying regarding Union meetings that

9    took place during the campaign?

10   A     Yes.

11   Q     And you never saw any supervisors or managers attend those

12   meetings, did you?

13   A     From Universal Intermodal?

14   Q     Correct.

15   A     No.

16   Q     You never saw any dispatchers attend those meetings

17   either, did you?

18   A     No.

19   Q     Do you recall testifying regarding an employee by the name

20   of Kevin Poullard?

21   A     Yes.

22   Q     Kevin Poullard engaged in activities openly supporting the

23   Union, right?

24   A     Yes.

25   Q     So did Jonathan Ledesma?

Exhibit 1(e)
609



```
 1    A    Yes.

 2         MR. DO:  Objection.  Mr. Ledesma -- misstates the

 3    testimony.

 4         JUDGE ROSAS:  Hold on a second.  Let's -- let's put the

 5    witness into the waiting room.

 6         We'll be right back with you.

 7         THE WITNESS:  Okay.

 8         JUDGE ROSAS:  Mr. Poullard is somebody new, right?

 9         MR. DO:  Correct.

10         MR. KUNTZ:  That's correct, Your Honor.

11         JUDGE ROSAS:  So the record --

12         MR. KUNTZ:  Correct, and I -- I intend to elicit some

13    testimony regarding him, Your Honor.

14         JUDGE ROSAS:  And if you're permitted to ask the question

15    and have it answered, what -- what -- where are you going with

16    it?

17         MR. KUNTZ:  A couple of different places, Your Honor.  So

18    initially, I would like to establish that Mr. Mallard, Mr.

19    Ledesma, and Mr. Poullard were not the only individuals who

20    openly engaged in Union activities, but other individuals, to

21    the witness' knowledge, were not subject to any adverse

22    actions.

23         Secondary to that, Your Honor, I'll just represent to you

24    that Mr. Poullard was also discharged and there's no allegation

25    in the complaint that that was an unlawful discharge.
```

Exhibit 1(e)
610



www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  They cleaned house; is that right?

2        MR. KUNTZ:  There were eventually layoffs of all -- of all

3   drivers.  But prior to that, as I think counsel for the General

4   Counsel referenced earlier, Mr. Mallard and Mr. Ledesma were

5   discharged, as well as Mr. Poullard.

6        MR. DO:  Your -- Your Honor, may I be heard?  Sure.  With

7   regard to Mr. Poullard, we understand that they are soliciting

8   testimony regarding his termination.  I would object on

9   relevance because as they indicate, we did not issue a

10  allegation regarding his termination.

11       And then furthermore, I objected here because he's asking

12  about Mr. Ledesma, which I know I did not ask Mr. Mallard

13  about, so to the extent that he's saying that he testified

14  about Mr. Ledesma, that's simply not true on the record, Your

15  Honor.

16       JUDGE ROSAS:  Well, I'll -- I'll sustain the objection as

17  to Mr. Ledesma and ask him to rephrase that, but let me just

18  understand how it all factors into the allegations here.  So

19  Mr. Poullard, he was an employee, you think, at Fontana?

20       MR. KUNTZ:  Mr. Poullard --

21       MR. DO:  Correct.

22       MR. KUNTZ:  -- was -- yeah -- yeah -- well, yeah.  So Mr.

23  Poullard -- I would agree with the General Counsel raise to

24  relevance issue regarding him, given the fact that he's not in

25  the complaint.  And the General Counsel may have a point there,

Exhibit 1(e)
611



www.escribers.net | 800-257-0885

1    except that they opened the door regarding Mr. Poullard

2    becau -- by asking questions specifically about him on direct

3    examination.

4         JUDGE ROSAS:  Asking questions about Poullard?

5         MR. KUNTZ:  Correct, Your Honor.

6         JUDGE ROSAS:  So he -- he came up on direct?

7         MR. DO:  Yes, Your Honor.  And -- and just to give you

8    some context, there -- there is an allegation that does involve

9    him, but it does not involve his termination.

10        JUDGE ROSAS:  And what -- what else do you -- what -- what

11   else do you plan to ask about Mr. Poullard?  Just whether he

12   was active?

13        MR. KUNTZ:  Whether he was active, whether the witness is

14   aware that he was also discharged.

15        JUDGE ROSAS:  Okay.  This shouldn't take us too long.

16        Okay, let's go back on the record.  I mean, we're on the

17   record.  Let's bring him back.  I apologize.

18        Okay.  So Counsel, I think you have your ruling.  Go

19   ahead.

20   Q    BY MR. KUNTZ:  So Mr. Carlos, you're aware of other

21   employees of Universal Intermodal Services openly engaging in

22   Union support activities, correct?

23   A    Yeah.

24   Q    And those employees included Kevin Poullard?

25   A    Yeah.

Exhibit 1(e)
612



1    Q      And Ronald Mallard?

2    A      Yes.

3    Q      And Jonathan Ledesma?

4           MR. DO:   Objection.

5           JUDGE ROSAS:   Overruled.

6           If you know.

7    A      Yes.

8    Q      BY MR. KUNTZ:  But it wasn't just Mr. Poullard, Mr.

9    Mallard, and Mr. Ledesma, was it?

10   A      No, there was a few of us.

11   Q      And you're not aware of any of those other employees, who

12   openly engaged in Union activities, receiving discipline

13   from -- from Universal Intermodal Services, are you?

14   A      Yes, I do.

15   Q      What are you referring -- or --

16          MR. KUNTZ:  Strike that.

17          THE WITNESS:   Okay.

18   Q      BY MR. KUNTZ:  When you say discipline, are you referring

19   to the layoffs?

20   A      No.

21   Q      You're not aware of any other drivers who openly engaged

22   in Union support being discharged or fired by Universal

23   Intermodal Services, are you?

24   A      Well, everybody got fired on December 20th.

25   Q      Sure.  Other than those -- my question is pertaining to

Exhibit 1(e)
613



1   other than those layoffs, are you aware of any terminations of

2   other open Union supporters?

3   A    Yes, I am.

4   Q    Other than Poullard, Mallard, and Ledesma?

5   A    No, that's -- that's all I know.

6   Q    Okay; those three.  And to be clear, you are aware that

7   Mr. Poullard was terminated, correct?

8   A    Yes.

9   Q    Okay.  Now, to your knowledge, the Union never filed a

10  petition seeking to represent employees of Universal Truckload,

11  have they?

12  A    They did -- they did represent us.

13  Q    You -- excuse me, my question was regarding Universal

14  Truckload rather than Universal Intermodal Services.

15       MR. DO:  I'm going to object on foundation.

16       JUDGE ROSAS:  Sustained.

17       THE WITNESS:  From what I know, they were working on

18  sending --

19       JUDGE ROSAS:  There's no question, sir.  There's no

20  question.

21       THE WITNESS:  Oh.

22  Q    BY MR. KUNTZ:  Do you recall telling us about the process

23  of how you learned that you were laid off?

24  A    Um-hum.

25  Q    And I believe you said that you first found out that

Exhibit 1(e)
614



www.escribers.net | 800-257-0885

1    Compton drivers had been laid off, correct?

2    A    Yes.

3    Q    And in learning that, you knew that it was likely that you

4    were also laid off, correct?

5    A    Yes.

6    Q    That's because your employment was tied to the Universal

7    Intermodal Services operations at the Compton facility,

8    correct?

9        MR. KUNTZ:  Objection.  Calls for a legal conclusion.

10       JUDGE ROSAS:  If you know.

11   A    I'm not sure if it was tied to the Compton facility.

12   Q    BY MR. KUNTZ:  But you knew -- but when you found out that

13   the Compton drivers were laid off, you knew that it was likely

14   that that would affect you, correct?

15   A    No.

16   Q    But immediately after that, you sought to follow-up on

17   that information, didn't you?

18   A    Yes.

19   Q    In fact, you contacted Mike Vagts, with the company,

20   right?

21   A    Yes.

22   Q    And that's because you knew that those Compton layoffs

23   signaled that you were likely affected?

24   A    Correct.

25       MR. DO:  Objection.  Asked and answered.

Exhibit 1(e)
615



www.escribers.net | 800-257-0885

```
1          JUDGE ROSAS:  Sustained.

2          Next question.

3     Q    BY MR. KUNTZ:  I believe you testified that Joe Lugo began

4     working as a manager at the Compton facility during the course

5     of the Union campaign; is that right?

6     A    Yes.

7     Q    Now, Joe Lugo never told you, did he, that he was there

8     because of the Union?

9     A    No.

10         MR. KUNTZ:  Your Honor, could we have five minutes off the

11    record, please?

12         JUDGE ROSAS:  Off the record.

13    (Off the record at 9:41 a.m.)

14         JUDGE ROSAS:  Okay.  Back on the record.

15         MR. KUNTZ:  Your Honor, subject to recross, I have no

16    further questions of the witness.

17         JUDGE ROSAS:  All right.

18         Any redirect?

19         MR. DO:  No redirect from the General Counsel, Your Honor.

20         JUDGE ROSAS:  Charging Party?

21         MR. WOJCIECHOWSKI:  Same; no redirect.  Thank you.

22         JUDGE ROSAS:  All right.

23         Thank you, Mr. Carlos.  You're excused.  Please do not

24    discuss your testimony with anyone until you're advised by

25    counsel that the record in the case is closed, all right?
```

Exhibit 1(e)
616



1        THE WITNESS:  Sounds good.  Thank you.

2        JUDGE ROSAS:  Have a good day.

3        THE WITNESS:  You too.

4        MR. KUNTZ:  Your Honor, Respondent is deleting the Jencks

5    material of Mr. Carlos.

6        JUDGE ROSAS:  Next witness.

7        MS. KAGEL:  Yes, Your Honor, I believe it'll be Mr. Leon

8    Duran.  I believe that he is the "Derek" (phonetic) in the

9    waiting room that Ms. Bridge referred to.  I believe he's using

10   someone else's account.  And he will also have an interpreter;

11   it's Miriam Lev, L-E-V.

12       JUDGE ROSAS:  Okay.

13       Let's go off the record.

14   (Off the record at 9:46 a.m.)

15       JUDGE ROSAS:  General Counsel, who do you call?

16       MS. KAGEL:  General Counsel calls Leon Duran, Your Honor.

17       JUDGE ROSAS:  Okay.  And I understand you're presenting an

18   interpreter?

19       MS. KAGEL:  Yes, Your Honor.  Ms. Lev is our interpreter.

20       JUDGE ROSAS:  Ma'am -- Ms. Lev, can you raise your right

21   hand?

22   Whereupon,

23                          **MIRIAM LEV**

24   the interpreter, having been duly sworn, translated from

25   Spanish to English, as follows:

Exhibit 1(e)
617


www.escribers.net | 800-257-0885

1          JUDGE ROSAS:  Okay.  State and spell your name and your

2     agency, please.

3          THE INTERPRETER:  Miriam, Lev, M-I-R-I-A-M, last name,

4     L-E-V like Victor.  My agency is Schreiber Interpretates

5     (phonetic).

6          JUDGE ROSAS:  Okay.

7          Counsel, does anyone have any voir dire for, essentially,

8     this expert witness who's going to be interpreting testimony?

9     Because once we get going, it's going to be her word that

10    governs, okay, regardless of any -- anybody's extraneous

11    understandings.  Anybody have any questions of the witness --

12    of the interpreter?

13         MR. DO:  No, Your Honor.

14         MS. KAGEL:  No, Your Honor.

15         JUDGE ROSAS:  All right.  Okay.

16         So Mr. Duran, I'm going to ask you to raise your right

17    hand.

18    Whereupon,

19                          **LEON  DURAN**

20    having been duly sworn, was called as a witness herein and was

21    examined and testified, telephonically, by and through an

22    interpreter as follows:

23         JUDGE ROSAS:  All right.  Please state and spell your name

24    and provide us with an address.

25         THE WITNESS:  My name is Leon Duran, L-E-O-N, D like

Exhibit 1(e)
618



1    David, U-R-A, N like nanny.  My address is ▮▮▮▮▮▮▮▮

2    (phonetic) in San Bernardino.

3       MR. DO:  Your Honor?

4       JUDGE ROSAS:  Yes, Counsel.

5       MR. DO:  Your Honor?  Excuse me.  I just want to point out

6    there is obviously somebody in the room with him while he's

7    testifying and that just presents a problem for us not knowing

8    who it is and what role that they're playing during this time

9    and not having the ability to have them on camera.

10       JUDGE ROSAS:  All right.

11       Well, let's -- let's let the General Counsel explore that

12    right off the bat.

13       MS. KAGEL:  Yes, Your Honor, I can --

14       JUDGE ROSAS:  Go ahead, Counsel.

15       MS. KAGEL:  I can represent that his daughter was helping

16    him get on to the Zoom link.  And I -- I can ask Mr. Duran to

17    have her step out now.

18       JUDGE ROSAS:  All right.  Ask your question of the witness

19    now -- or your instruction to the witness.

20                **DIRECT EXAMINATION**

21    Q   BY MS. KAGEL:  Mr. Duran, is there someone else in the

22    room with you?

23    A   No.

24    Q   Was there someone in the room with you when you were

25    giving your address previously?

Exhibit 1(e)
619



```
 1    A    No, simply I was remembering the address.  I didn't

 2    remember.

 3    Q    Was your daughter in the room with you earlier?

 4    A    Yes.  Earlier, yes.

 5    Q    And what is her name?

 6    A    Javita (phonetic) Duran.

 7    Q    And is she in the room with you now?

 8    A    Not at this moment, no.

 9    Q    And to confirm, you are alone in your -- where you're

10    testifying right now?

11    A    Yes, that's the way.

12    Q    And Mr. Duran, do you also go by Leon Guzman Duran?

13    A    Yes, because Guzman is the last name of my mother and

14    Duran is the last name of my father.

15    Q    Mr. Duran, where are you currently employed?

16    A    In -- in the city of Fontana; the company's called TMP.

17    TNT.  Okay, I'm sorry, but the -- the name of the company is T

18    like Tom, M like Mary, and T like Tom.

19    Q    Were you ever employed by a company called Universal

20    Truckload?

21    A    Yes.

22    Q    And when did you start working for Universal Truckload?

23    A    It was in March 2019, the -- the day of the month, I don't

24    remember, but it was in March of 2019.

25    Q    When did you stop working for Universal Truckload?
```

Exhibit 1(e)
620



```
1    A    December 18 of the -- '20 -- no, I'm sorry, of 2019.

2    Q    And what was your job position at Universal Truckload?

3    A    I was a driver of trucks.

4    Q    And what city is Universal Truckload located?

5    A    In the city of Fontana, California.

6    Q    And what street is Universal Truckload on?

7    A    The address is 15034 -- 33 of Slogan -- Slover.

8    Q    And what did you do as a truck driver for Universal

9    Truckload?

10   A    I move, in general, all sorts of merchandise.

11   Q    And who did you report to?

12   A    The name of the dispatcher that I had was Jose, and also

13   Diana (phonetic throughout); there were two people there.

14   Q    And where did dispatchers Jose and Diana work?

15   A    In the same address, 15033 Slover in Fontana?

16   Q    Did you report to any other supervisors?

17   A    No.

18   Q    Did you get your assignments from the dispatchers?

19   A    That's right.

20   Q    And when you stopped working for Universal Truckload on

21   December 18th, 2020, why did you stop working for Universal

22   Truckload?

23   A    Because they told me that there was no more work for me.

24   Q    And who told you that?

25   A    Jose.
```

Exhibit 1(e)
621



www.escribers.net | 800-257-0885

1  Q    And how did he tell you?

2  A    He told me by phone, because I was coming with the

3  merchandise from Los Angeles to Fontana, and then he called me

4  and told me that there was no more work for me.

5  Q    Did he say there was no more work for the day or no more

6  work at all?

7       MR. ADLONG:  Objection leading.

8       JUDGE ROSAS:  Sustained.

9  Q    BY MS. KAGEL:  Did he tell you, too, if you would return

10  to work for your next shift?

11      MR. ADLONG:  Objection.  Leading.

12      MS. KAGEL:  He can say no, Your Honor.

13      JUDGE ROSAS:  Sustained.

14  Q    BY MS. KAGEL:  Do you know how many company drivers there

15  were for Universal Truckload that worked at the Fontana

16  facility?

17  A    I don't have a precise number, because I knew them very

18  little.  But I imagine that they can be from eight to ten.  I

19  cannot say anymore.

20  Q    Are you familiar with Universal Intermodal?

21      THE INTERPRETER:  Excuse me.  Can you repeat the question?

22  Q    BY MS. KAGEL:  Are you familiar with a company called

23  Universal Intermodal?

24  A    Yes, because they were in the same office but in different

25  desks.

Exhibit 1(e)
622



www.escribers.net | 800-257-0885

1    Q    Did Universal Intermodal have any drivers that worked at

2    the facility on Slover?

3    A    That's right.

4    Q    How many?

5    A    I don't have any idea.

6    Q    Were there any independent contractor drivers that worked

7    for Universal Truckload while you worked there?

8         MR. ADLONG:  Objection.  Lacks foundation.  Calls for

9    speculation.

10        JUDGE ROSAS:  Rephrase that as to independent drivers.

11   Foundationally, you need to take a step back.

12   Q    BY MS. KAGEL:  Mr. Duran, were there any other types of

13   drivers that worked for Universal Truckload?

14   A    Yes.  Owners of trucks.

15   Q    And how many of those owners of trucks worked?  Did any --

16   how many of them were there while you worked there?

17   A    I don't have an idea.

18   Q    And going back to when Jose told you there was no more

19   work on December 18th, 2020 -- 2019, did you try to go to work

20   after that phone call?

21   A    No, because there was no more work for me.

22   Q    Now, while you were working for Universal Truckload were

23   you represented by a union?

24   A    No.

25   Q    Did you ever see a union outside of the facility on

Exhibit 1(e)
623



1   Slover?

2   A    Yes, sometimes.

3   Q    And do you know which union?

4   A    Teamsters.

5   Q    Did you see the Teamsters there more than once?

6   A    Yes.

7   Q    When did you first see them outside of the Fontana

8   facility?

9   A    It was in the month of December, but I don't remember

10  exactly what day it was.

11  Q    How often would you see them outside of the Fontana

12  facility?

13  A    I could say that it was two or three times a week.

14  Q    Do you ever speak to anyone from the union when they were

15  outside the facility?

16  A    Yes.

17  Q    And who did you speak to?

18  A    Miguel is the name of the person.

19  A    No.

20  Q    Did you speak to Miguel more than once?

21  A    Yes.

22  Q    When was the first time?

23  A    Well, I can say that it was one day of December, but I

24  don't remember exactly the date.

25  Q    And to confirm, this is December 2019?

Exhibit 1(e)
624



1   A    That's right.

2   Q    And what did you speak about?

3   A    That if we were agreeing that the union will get in.

4   Q    And what did you say?

5        MR. ADLONG:  Objection.  Relevance.  Hearsay.

6        JUDGE ROSAS:  And General Counsel, what's the relevance?

7        MS. KAGEL:  The relevance, Your Honor, is Universal

8   Truckload -- the complaint alleges that Universal Truckload

9   employees were laid off, and the General Counsel's alleging

10  that it is because of their association and interest with the

11  union.

12       JUDGE ROSAS:  Okay.  Overruled on the ground of relevance,

13  but with respect to hearsay, that's also overruled, because I

14  suspect that this type of a transaction, this testimony, this

15  hearsay testimony would be corroborated by other evidence in

16  the record.  If it's not, you can move to strike it later on.

17       Next question.

18  Q    BY MS. KAGEL:  Mr. Duran, when you spoke to Miguel, and he

19  asked you about the union, what did you say?

20  A    I answered the questions that he made to me.

21  Q    And what were those questions?

22       MR. ADLONG:  Objection again.

23       JUDGE ROSAS:  Do we need the detail?

24       MS. KAGEL:  Yes.  Yes, Your Honor, we do.  It would be --

25  I don't know if we want to have the witness step out.

Exhibit 1(e)
625



www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  I think we're fine with him there.  He

2   doesn't understand.  What's the relevance of the detail?

3        MS. KAGEL:  To show that Universal Truckload drivers, Your

4   Honor, was interested in bringing in the union to represent

5   them.

6        JUDGE ROSAS:  Well, you have interaction with the union,

7   right?

8        MS. KAGEL:  Yes, Your Honor.

9        JUDGE ROSAS:  Okay.  You had conversations, at this point,

10  between the witness and union representatives, right?

11       MS. KAGEL:  Yes, Your Honor.

12       JUDGE ROSAS:  Okay.  So you can move on from there.  That,

13  in and of itself, means nothing.  Go ahead.

14       MS. KAGEL:  Yes, Your Honor.

15  Q    BY MS. KAGEL:  Mr. Duran, did you exchange phone numbers

16  with Miguel?

17       MR. ADLONG:  Objection.  Relevance.

18       JUDGE ROSAS:  I'll allow it.

19  Q    BY MS. KAGEL:  Mr. Duran, you can repeat the quest -- you

20  can answer the question, or I can repeat it.

21  A    Yes, that's the way it was.  We interchange number, phone

22  numbers with Miguel.

23  Q    How many times did you talk to Miguel when you worked at

24  Universal Truckload?

25  A    About three times, more or less.  I don't remember

Exhibit 1(e)
626



1    exactly.

2    Q    Was it always outside the Fontana facility?

3    A    Yes.

4    Q    Do you know if there were video cameras at the Fontana

5    facility that looked out onto the sidewalk?

6    A    There's some cameras that are in the corners of the

7    construction of the offices.

8    Q    How do you know that?

9    A    Because I saw them, and also, one time when I was getting

10    in or out of the facility, there was somebody that was

11    installing them or fixing them.

12    Q    When you were told there was no more work, and you stopped

13    working for Universal Truckload, were you receiving less work

14    at that time?

15        MR. ADLONG:  Objection.  Vague and ambiguous.

16        JUDGE ROSAS:  Repeat the question.

17    Q    BY MS. KAGEL:  When you were told there was no more work,

18    and you stopped working for Universal Truckload, were you

19    receiving less work at that time?

20        JUDGE ROSAS:  Let's rephrase that.  Let's take it out of

21    the discharge or the layoff and just establish what the

22    workflow or workload was at any given time.  Prior to that.

23    Q    BY MS. KAGEL:  In the --

24        MS. KAGEL:  Okay.

25    Q    BY MS. KAGEL:  In the time before December 18th, 2020,

Exhibit 1(e)
627



1    were you receiving less work?

2         THE INTERPRETER:  Sorry.

3         MR. ADLONG:  Objection.  Vague and ambiguous as to time.

4         JUDGE ROSAS:  Overruled.

5         THE INTERPRETER:  Okay.

6    A    Before they fire me?

7    Q    BY MS. KAGEL:  Yes.

8    A    No.  For me was normally everything.

9    Q    Had your job changed in any way during that time?

10        MR. ADLONG:  Objection.  Leading.

11        MS. KAGEL:  You're muted, Your Honor.

12        JUDGE ROSAS:  Repeat it one more time.

13   Q    BY MS. KAGEL:  Had your job changed in any way during that

14   time?

15        JUDGE ROSAS:  Rephrase as to time.

16   Q    BY MS. KAGEL:  Had your job changed in any way in the time

17   before December 18th, 2020?

18        THE INTERPRETER:  Sorry.  Is this December 2019, right?

19        MS. KAGEL:  Yes.  December 18th, 2019.

20        THE INTERPRETER:  Okay.

21   A    For me, if the work was -- normally there was no changes.

22   It was normal.

23   Q    BY MS. KAGEL:  Did you know you were going to be let go?

24   A    No.

25   Q    Did you meet with the Union after you were let go?

Exhibit 1(e)
628



www.escribers.net | 800-257-0885

1    A    Yes.  The Union made a meeting with all of us around one

2    week after we got fired, and it was in the City of Long Beach.

3    I don't remember exactly what day, but it was around a week

4    after of December.

5    Q    And when you said for all of us, who were you referring

6    to?

7         MR. ADLONG:  I'm going to object, Your Honor, as to

8    relevance.

9         JUDGE ROSAS:  General Counsel?

10        MS. KAGEL:  Your Honor, the witness will testify as to

11   which employee --

12        JUDGE ROSAS:  Hold on.  No, no.  Don't testify as to --

13   don't indicate what the witness will testify to.

14        MS. KAGEL:  Yes.

15        JUDGE ROSAS:  But just keep it very general.  What's the

16   general relevance here?

17        MS. KAGEL:  Continued support of Universal Truckload

18   employees and employees of Roadrunner for the Union.

19        JUDGE ROSAS:  And the import of that is?

20        MS. KAGEL:  The General Counsel is alleging that employees

21   of Universal Truckload and Roadrunner were laid off because of

22   their support for the Union.

23        JUDGE ROSAS:  Correct.  And so what does meeting with the

24   labor organization thereafter have to do with anything?

25        MS. KAGEL:  It shows the scale of support, Your Honor.

Exhibit 1(e)
629



www.escribers.net | 800-257-0885

 1       MR. ADLONG:  Again, Your Honor, we'd object.

 2       JUDGE ROSAS:  I'll sustain that objection.  Next question.

 3   Q    BY MS. KAGEL:  You said you currently work for T&T

 4   Trucking in Fontana.  Do you ever drive by the Universal

 5   Truckload facility?

 6   A    Yes.  That it is the way sometimes during the week.

 7   Q    How often do you drive by the Universal Truckload

 8   facility?

 9   A    Sometimes it is three or four times, because I have two

10   options.  I can go through there, or I have to turn around to

11   another street.

12   Q    Have you seen trucks going in and out of the facility when

13   you drive by?

14   A    Yes.

15   Q    Do you know who's driving these trucks?

16   A    No.  I don't know them.

17   Q    Do you still speak to Miguel from the Union?

18       MR. ADLONG:  Objection. Relevance.

19       MS. KAGEL:  Again, Your --

20       JUDGE ROSAS:  General Counsel?

21       MS. KAGEL:  Again, Your Honor, it just goes to the scale

22   of support and continued support from these employees.

23       JUDGE ROSAS:  Anything other than that?

24       MS. KAGEL:  No.  That's it, Your Honor.

25       JUDGE ROSAS:  So they didn't disavow the Union thereafter.

Exhibit 1(e)
630



www.escribers.net | 800-257-0885

1    Okay.  Overruled.  I mean sustained.  Sustained.

2         Next question.

3         MS. KAGEL:  No further questions, Your Honor.

4         JUDGE ROSAS:  Charging Party, anything?

5         MR. WOJCIECHOWSKI:  No questions.  Thank you.

6         JUDGE ROSAS:  Respondent -- Respondent cross.

7         MR. ADLONG:  I'd like the Jencks statements please, Your

8    Honor.

9         JUDGE ROSAS:  Off the record.

10   (Off the record at 10:27 a.m.)

11        JUDGE ROSAS:  Back on the record.

12        Respondent cross.

13                     **CROSS-EXAMINATION**

14   Q    BY MR. ADLONG:  Mr. Duran, nice to meet you.  My name is

15   Daniel Adlong.  I'm counsel for the Respondent, and I'll be

16   asking you some questions today.

17        When I ask you a question, I'm going to ask, if at all

18   possible, if you can make sure to answer verbally yes or no,

19   correct or incorrect, or whatever it might be.  Can you do that

20   for me, please?

21        THE INTERPRETER:  Mr. Duran, your microphone is off.

22        JUDGE ROSAS:  Let's go off the record.

23   (Off the record at 10:45 a.m.)

24        JUDGE ROSAS:  Okay.  Back on the record.

25        THE WITNESS:  Yeah.  You listen to me well?  Sorry.



1       JUDGE ROSAS:  Continue.

2                  **RESUMED CROSS-EXAMINATION**

3    Q    BY MR. ADLONG:  Mr. Duran, can you please make sure to

4    answer my questions verbally yes or no or correct or incorrect

5    or whatever it might be?

6    A    Yes.

7    Q    Okay.  Another thing I'd just say is as you're listening

8    to the questions, you may already understand what it is before

9    I finish or before the interpreter finishes, but if you could

10   please wait until she concludes before you give your answer.

11   Can you do that for us, please?

12   A    Yes.

13   Q    Okay.  And I'll remind you that you're still under oath.

14   A    Yes, fine.

15   Q    So Mr. Duran, you worked for Universal Truckload, correct?

16   A    That it is.

17   Q    And that was at the Fontana location, correct?

18   A    Yes.

19   Q    And there were mechanics at that location, correct?

20        MS. KAGEL:  Objection.  Relevance.

21        JUDGE ROSAS:  What's the basis for the objection?

22        MS. KAGEL:  Relevance, Your Honor, and outside of the

23   scope of direct, just to have that on the record.

24        You're muted, Your Honor.

25        JUDGE ROSAS:  Overruled.  You can answer.

Exhibit 1(e)
632



1    A    I think so.  I'm not sure, but I think so.

2    Q    BY MR. ADLONG:  And you said that at that location --

3         MR. ADLONG:  Strike that.

4    Q    BY MR. ADLONG:  At that location there were Universal

5    Intermodal Service drivers that parked their trucks there,

6    correct?

7         MS. KAGEL:  Objection.  Misstates testimony.

8         JUDGE ROSAS:  I'll allow it.

9    A    Yes, there was.

10   Q    BY MR. ADLONG:  There were about eight to ten Universal

11   Truckload drivers out of the Fontana facility, correct?

12        MS. KAGEL:  Objection.  Lacks foundation.

13        JUDGE ROSAS:  Overruled.

14   A    Yes, it's correct.

15   Q    BY MR. ADLONG:  And there were about three or four

16   Universal or Truck -- Universal Intermodal drivers that park

17   their vehicles at that location, correct?

18        MS. KAGEL:  Objection, Your Honor.  Misstates testimony

19   and lacks foundation.

20        JUDGE ROSAS:  Overruled.

21   A    I cannot answer that question.  I don't know.

22   Q    BY MR. ADLONG:  Mr. Duran, earlier you testified that

23   there were owner operators that worked out of the Fontana

24   location.  Do you remember that testimony?

25   A    Yes, it's correct.

Exhibit 1(e)
633



1    Q    Who did those drivers that you were referring to work for?

2    A    It could be that it will be Intermodal.

3    Q    Mr. Duran, is it -- do you believe it's more likely than

4    not that it was Universal Intermodal Service that the owner

5    operators worked for?

6         MR. ADLONG:  Objection.  Calls for speculation.

7         JUDGE ROSAS:  It's cross-examination.  He can probe.

8    Overruled.

9    A    I think they were working for Intermodal, but I don't

10   know.  I cannot -- I don't know how to answer that question.

11   Q    BY MR. ADLONG:  Mr. Duran, based off my questions and

12   being able to listen to you speak and give your answer in

13   Spanish and being able to speak Spanish; is it fair to say that

14   you're -- what you're trying to communicate to us is, you

15   believe that the drivers -- you believe that owner-operators

16   work for Universal Intermodal, but you're just not sure?

17        MS. KAGEL:  Objection, Your Honor, argumentative.  And

18   we've already gave the chance to voir dire the interpreter for

19   any -- and the questions on her interpretation skills.

20        MR. ADLONG:  I am not trying to --

21        JUDGE ROSAS:  That's objectionable three different ways,

22   Counsel.  Sustained.

23   Q    BY MR. ADLONG:  Based off your two answers, Mr. Leon, are

24   we to understand your answer to mean that, to the best of your

25   understanding, the owner-operators that worked out of Fontana,

Exhibit 1(e)
634



www.escribers.net | 800-257-0885

1      worked for Universal Intermodal, but you're just not exactly

2      sure?

3          MS. KAGEL:  Objection, Your Honor.  Asked and answered and

4      argumentative.

5          JUDGE ROSAS:  Not argumentative, but the question is

6      confusing and it's been asked and answered.  So I'm going to

7      sustain the objection.  You're going to have look elsewhere for

8      that evidence, overrule -- I mean, sustained.

9      Q    BY MR. ADLONG:  Mr. Duran, about how many owner-operators

10     do you believe worked at the Fontana facility?

11         MS. KAGEL:  Objection, Your Honor, asked and answered.

12         JUDGE ROSAS:  I'll allow that.

13     A    I don't have an idea how many there were.

14     Q    BY MR. ADLONG:  Were there more drivers than Universal

15     Truckload or less drivers than a Universal Truckload?

16     A    I don't exactly.  I never counted them.

17     Q    You would agree that the owner-operators owned their own

18     trucks, correct?

19         MS. KAGEL:  Objection.  Calls for speculation.

20         JUDGE ROSAS:  I'll allow that.

21     A    Yes, that is -- that's true.

22     Q    BY MR. ADLONG:  Now, Mr. Duran, you remember you testified

23     about some cameras, correct?

24     A    Yes.

25     Q    You were never responsible for reviewing the camera

Exhibit 1(e)
635



1    footage, correct?

2    A    Can you repeat the question?  I didn't understand.

3    Q    You were never responsible to review what the cameras

4    allegedly taped, correct?

5    A    Correct.

6    Q    And you never had any discussion with management regarding

7    what the cameras taped, correct?

8    A    Correct.

9    Q    And you can't say, for certain, what the cameras even

10   taped, correct?

11        MS. KAGEL:  Objection.  Asked and answered.  He already

12   testified that he's never reviewed the recordings.

13        JUDGE ROSAS:  Repeat that last question.

14   Q    BY MR. ADLONG:  Mr. Duran, you're never -- you are not

15   even sure what the cameras were able to record, correct?

16        JUDGE ROSAS:  Overruled.

17        MS. KAGEL:  It also calls for speculation, Your Honor.

18        JUDGE ROSAS:  You can answer.

19   A    Correct.

20        MR. ADLONG:  No further questions for this witness, Your

21   Honor.

22        JUDGE ROSAS:  Any redirect?

23        MS. KAGEL:  One moment, Your Honor.  No redirect.

24        JUDGE ROSAS:  Do you want to go to a breakout room with

25   Counsel?

Exhibit 1(e)
636



www.escribers.net | 800-257-0885

```
1          MS. KAGEL:  No, no, Your Honor, I'm fine. Thank you.  No

2     further questions from General Counsel.  You're muted, Your

3     Honor.

4          JUDGE ROSAS:  Charging party, anything?

5          MR. WOJCIECHOWSKI:  Nothing from Charging Party, thank

6     you.

7          JUDGE ROSAS:  All right.  Thank you, Mr. Duran.  You're

8     excuse.  Please do not discuss your testimony with anyone until

9     you're told that the case over; all right?  Thank you.

10         THE WITNESS:  So I see you later, thank you.

11         MS. KAGEL:  Thank you, Mr. Duran.

12         JUDGE ROSAS:  Thank you, Ms. Lev.

13         MS. LEV:  Okay.

14         MS. KAGEL:  And thank you, Ms. Lev.

15         MS. LEV:  You're welcome.

16         MS. KAGEL:  Your Honor, is there a way to move Mr. Duran

17    into the waiting room, please?

18         JUDGE ROSAS:  You want him in the waiting room?  He's got

19    to be --

20         MS. KAGEL:  Oh.

21         JUDGE ROSAS:  He's got to be excused as the witness.  So

22    Diane, if you could --

23         MS. KAGEL:  Oh, I'm sorry.

24         JUDGE ROSAS:  -- take Mr. Duran out?

25         General Counsel, next witness.
```

Exhibit 1(e)
637



www.escribers.net | 800-257-0885

1      MS. KAGEL:  Yes, Your Honor.  I believe there should be a

2  Mr. Miguel Cubillos in the waiting room.  If he's not, I'm

3  checking with him right now.

4      JUDGE ROSAS:  Off the record.

5  (Off the record at 10:59 a.m.)

6      JUDGE ROSAS:  General Counsel?

7      MS. KAGEL:  Thank you, Your Honor.  We call Miguel

8  Cubillos.

9      JUDGE ROSAS:  Mr. Cubillos, please raise your right hand.

10  Whereupon,

11               **MIGUEL CUBILLOS**

12  having been duly sworn, was called as a witness herein and was

13  examined and testified, telephonically as follows:

14      JUDGE ROSAS:  All right.  Please state and spell your name

15  and provide us with an address.

16      THE WITNESS:  I -- I'm sorry.  I didn't understand.

17      JUDGE ROSAS:  Can you spell your name for us?

18      THE WITNESS:  Okay, great.  M-I-G-U-E-L; last name

19  Cubillos, C-U-B-I-L-L-O-S.

20      JUDGE ROSAS:  Okay.  Where do you live?  What's the

21  address?

22      THE WITNESS:  ██████████████████, Los Angeles,

23  California 90007.

24      MS. KAGEL:  Your Honor, may we go off the record for one

25  moment?

Exhibit 1(e)
638



1        JUDGE ROSAS:  Sure.

2   (Off the record at 11:03 a.m.)

3        JUDGE ROSAS:  All right.

4                    **DIRECT EXAMINATION**

5   Q    BY MS. KAGEL:  Mr. Cubillos, thank you for being here with

6   us today.  You gave your name as Miguel Cubillos; is that your

7   full legal name?

8   A    No.

9   Q    What is your full legal name?

10  A    Miguel Angel Cubillos Molina.

11  Q    And what name do you go by?

12  A    Miguel Cubillos.

13  Q    Were you ever employed by the International Brotherhood of

14  Teamsters?

15  A    Yes.

16  Q    What was your job position with the Teamsters?

17  A    I was Union organizer.

18  Q    How long were you an organizer with the Teamsters?

19  A    About, probably six years.

20  Q    And when did you stop working as an organizer for the

21  Teamsters?

22  A    On June 11, 2021.

23  Q    What were your job duties as an organizer?

24  A    My job was to inform drivers, talk to especially, like,

25  poor drivers from each end Los Angeles.  To inform them about

Exhibit 1(e)
639



1   their rights to -- which also -- which other laws protect them

2   and help them with any, you know, kind of help that they might

3   need.  Like, how to request benefits; like, unemployment, like,

4   disability and also to help them to form the Union.

5   Q    I'm going to show you what's already been admitted as

6   Joint Exhibit 2(a).  This is the RC Petition filed in 21-RC-

7   251460.  Are you familiar with the Union's organizing campaign

8   of the drivers at Universal Intermodal?

9   A    Yes.

10   Q    And do you have any involvement with organizing the

11   drivers at Universal Intermodal?

12   A    Yes.

13   Q    What was your involvement?

14       MR. KUNTZ:  Your Honor, we're going to object to -- to

15   relevance of all this.  There's no dispute that there was an

16   organizing drive at that facility.

17       JUDGE ROSAS:  Okay.  Let's place the witness, if we could,

18   in a waiting room.

19       Mr. Cubillos, we'll be back with you in a minute.

20       THE WITNESS:  Okay, that's fine.

21       JUDGE ROSAS:  All right.  So Respondent, you're objecting

22   to testimony about the Union's role in engaging with the

23   employees?

24       MR. KUNTZ:  Your Honor, the General Counsel appears to be

25   eliciting testimony supporting the proposition that there was



1   an organizing drive at the Universal Intermodal Services

2   Compton Facility.  That -- that's not in dispute.  So we're

3   objecting as to relevance.

4      JUDGE ROSAS:  All right.  So is that just warm up

5   territory, Ms. Kagel, or what are we -- what are we doing here?

6      MS. KAGEL:  Yes, Your Honor.  It's establishing foundation

7   and -- and the questions will elicit testimony that it was not

8   just at the Compton facility; it was also at the Fontana

9   Facility.  And this witness will provide corroboration for

10   multiple witnesses that will proceed after him.

11      JUDGE ROSAS:  All right.  I'm going to instruct you to

12   lead; to refer to these as factual and get right to it.  All

13   right?

14      MS. KAGEL:  Okay.

15      JUDGE ROSAS:  Your interest is in the witnesses, right?

16   Not on what he does as a general proposition as part of his

17   work.  Just get in there and there's no dispute at this point,

18   apparently, that they were -- the employees who have testified

19   thus far had interaction with the Union.  So you need to do a

20   laser focus, right?  To when they were there at the such and

21   such facility and then, ask your question, okay?

22      MS. KAGEL:  Will do.

23      JUDGE ROSAS:  All right.

24      MS. KAGEL:  Thank you, Your Honor.

25      JUDGE ROSAS:  Let's bring him back, please.  All right.

Exhibit 1(e)
641



1    We're back and General Counsel, go ahead.

2    Q    BY MS. KAGEL:  Mr. Cubillos, did you ever campaign as part

3    of the Union, outside of the Fontana Facility on Slover Avenue?

4    A    Yes, I did.

5    Q    Did you start campaigning after the petition was filed on

6    November 8th, 2019?

7    A    After the petition was filed, I don't remember right now.

8    Q    When did you first start campaigning outside of the

9    Fontana Facility?

10   A    I would say, the beginning of November 2019.

11   Q    And you set up a -- a tent outside of the Fontana Facility

12   with signs and sometimes food and coffee for employees,

13   correct?

14   A    That's correct.

15   Q    Who else from the Union campaigned with you?

16   A    My coworker, Santos Casteneda.

17   Q    How often were you outside the facility in Fontana?

18   A    Almost every day.

19   Q    And when you were out there; how long would you be out in

20   your space?

21   A    For a few hours.  Sometimes in the morning; sometimes in

22   the afternoon.

23   Q    Did you stop campaigning outside the Fontana Facility

24   after the election on December 4th?

25   A    No.

Exhibit 1(e)
642



```
1    Q    Do you know if there were cameras outside where you would

2    set up?

3    A    That was -- that was I was told by -- by the drivers, that

4    there were cameras outside the facility.

5         MR. KUNTZ:  Objection, move to strike.  Hearsay.

6         MS. KAGEL:  Your Honor, it goes on --

7         JUDGE ROSAS:  There's already -- there's already

8    corroboration that there were cameras, but let's see what the

9    next question is.  Go ahead.  Again, what we receive in these

10   proceedings is -- is hearsay to the extent that the hearsay is

11   reliable or falls, clearly, under one of the recognized

12   exceptions.

13        Okay.  Go ahead.

14   Q    BY MS. KAGEL:  Do you know if Universal Intermodal had any

15   Union consultants visit its facilities after the Union filed

16   its petition on November 8th, 2019?

17        MR. KUNTZ:  Objection, foundation.

18   A    Yes.

19        JUDGE ROSAS:  If you know.

20   A    That's correct.

21   Q    And how do you know?

22   A    Well, the -- the drivers were letting us know about the

23   meetings that they were held in the facilities.  And some

24   drivers, also were approached by -- by those Union consultants.

25        MR. KUNTZ:  Your Honor, again, we're going to object and
```



1    move to strike based on hearsay.

2         JUDGE ROSAS:  I'll allow that to the extent, generally,

3    that that's corroborating.  Overruled.

4    Q    BY MS. KAGEL:  Do you know a Universal Intermodal driver

5    named, Kevin Poullard?

6    A    Yes.

7    Q    Do you know if you gave him -- you handed out safety vests

8    to employees to show their support for the Union, correct?

9    A    That's correct.

10   Q    Did you give one to Mr. Poullard?

11   A    Yes, I did.

12   Q    And when was that?

13   A    It was around November 13, 2019.

14   Q    Did you speak about anything when you gave him the vest?

15   A    Yes, I did.

16   Q    And what did you speak about?

17   A    Well, he -- when he arrived to the yard, he approached me,

18   like, you know, every time they see us outside.  And -- and let

19   me know that there was a question by one of the Universal

20   management that he didn't know.  And it was asked what he

21   thinks about the Union.  And -- and about the Union was bad and

22   the Union only just want, like, you know, the money.  And he

23   also said they wouldn't be better with the Union; that

24   wasn't  -- and he also invited him to attend to the meeting

25   that they were to have that day at 5 p.m.

Exhibit 1(e)
644



1    MR. KUNTZ:  Your -- Your Honor, again, objection; move to

2    strike.  This is all hearsay.  I don't know if the General

3    Counsel intends to call Mr. Poullard to testify, but certainly

4    if Mr. Poullard is going to testify, then that would be the

5    more reliable evidence of this nature.

6    JUDGE ROSAS:  General Counsel, is that Poullard or

7    Mallard?

8    MS. KAGEL:  It was Mr. Poullard, Your Honor.

9    JUDGE ROSAS:  Wait.  There's a Mr. Mallard.

10   MS. KAGEL:  Yes, but this is --

11   JUDGE ROSAS:  Are you asking about -- were you asking

12   about Poullard or Mallard?

13   MS. KAGEL:  Mr. Poullard, Your Honor.

14   JUDGE ROSAS:  That's a -- that's a different individual,

15   right?  I didn't mishear Mallard, right?

16   MS. KAGEL:  No, you did not.

17   JUDGE ROSAS:  Okay.  I'm going to --

18   MS. KAGEL:  It's Mr. Poullard.

19   JUDGE ROSAS:  -- I'm going to sustain that objection at

20   this point.

21   MS. KAGEL:  Your Honor, may I be heard?

22   JUDGE ROSAS:  Let's put the witness in the waiting room.

23   We'll be right back with you, Mr. Cubillos.

24   THE WITNESS:  Okay.

25   JUDGE ROSAS:  Go ahead.  Where'd she go?

Exhibit 1(e)
645



www.escribers.net | 800-257-0885

1       MR. DO:  I think she may have also been moved into the

2   waiting room, Your Honor.

3       MR. WOJCIECHOWSKI:  She got moved instead of Mr. Cubillos.

4       MR. DO:  Oh, yes.

5       JUDGE ROSAS:  Go ahead.

6       MS. KAGEL:  Okay.  Your Honor, this testimony by --

7       MR. WOJCIECHOWSKI:  Mr. -- Mr. Cubillos is still present.

8       JUDGE ROSAS:  Oh.

9       MS. KAGEL:  Oh.

10      THE CLERK:  I'm sorry.  I was trying to move him a

11  different way, but I shouldn't do that.  I'm going to move him

12  this way.  Sorry about that.  Okay.  He's in the waiting room.

13      JUDGE ROSAS:  Okay.  Thank you.

14      MS. KAGEL:  Your Honor, Mr. Cubillos' testimony about Mr.

15  Pieralled -- Poullard, excuse me, is corroborating and it is

16  also going to establish timing and identity.  We intend to call

17  Mr. Poullard at a later date.  We would not be able to get

18  him -- we weren't able to get him before his testimony.

19      JUDGE ROSAS:  So this conversation with Mr. Poullard, you

20  say, will be subsequently corroborated by Mr. Poullard so that

21  the Respondent will have an opportunity to cross-examine Mr.

22  Poullard regarding this conversation?

23      MS. KAGEL:  Yes, Your Honor.

24      JUDGE ROSAS:  Okay.

25      MR. KUNTZ:  And Your Honor, I want to point out, this is

Exhibit 1(e)
646



1   double hearsay.  I mean, we have this witness describing a

2   conversation in which Mr. Poullard allegedly told the witness

3   about what he was told by an unidentified declarant.

4       JUDGE ROSAS:  So it's anticipatorily corroborative.  I --

5   I hear what you're saying.  So we will -- we will see how that

6   hearsay goes down.  If that hearsay goes down for the count,

7   then this crumbles as well.

8       MS. KAGEL:  Yes.

9       JUDGE ROSAS:  Hopeful --

10      MS. KAGEL:  Yes, Your Honor, understood.

11      JUDGE ROSAS:  -- hold on, hold on.  Let me hear from

12  Respondent.  Is there something else on that?

13      MR. KUNTZ:  No, Your Honor.  I mean, this -- this -- yeah,

14  this testimony's inherently unreliable as hearsay.  And

15  especially, if we do have -- there's obviously no contention

16  that Mr. Poullard is unavailable.  So there -- there's really

17  no purpose in putting this testimony on.  Furthermore, I don't

18  know that we certainly haven't given any indication that

19  there's -- that there's a -- necessarily, a need for

20  corroboration at this point.

21      JUDGE ROSAS:  It's subject to.  And it's subject to being

22  stricken on motion should it not be corroborated pursuant to

23  hearsay, should that hearsay be admitted at a subsequent time

24  on the part of Mr. Poullard.  Okay.  So the --

25      MS. KAGEL:  Yes, Your Honor.

Exhibit 1(e)
647



www.escribers.net | 800-257-0885

```
 1        JUDGE ROSAS:  -- the objection is overruled.  Let's bring
 2   him back.
 3        MS. KAGEL:  Thank you.
 4        JUDGE ROSAS:  Do you recall the question, Mr. Cubillos?
 5        MS. KAGEL:  Your Honor, I don't believe there was a
 6   question.  I think he was -- the objection came after his
 7   answer.
 8        JUDGE ROSAS:  Oh, okay.  All right.  Move on then.
 9   Q    BY MS. KAGEL:  Was Universal Inter -- Intermodal the only
10   company that operated out of the facility in Fontana?
11        MR. KUNTZ:  Objection, foundation.
12        MS. KAGEL:  If you know --
13        JUDGE ROSAS:  Universal who?
14        MS. KAGEL:  I said, if you know, if it was Universal
15   Intermodal, the only company that operated out of the facility
16   in Fontana?
17        JUDGE ROSAS:  If you know, overruled.
18   A    Can I answer?  Okay.  Yes, there were another -- another
19   company also on that -- on that yard.
20   Q    BY MS. KAGEL:  And what company was that?
21   A    They're call them Truckload -- Truckload --
22   Q    Universal -- oh, excuse me.
23   A    -- and also -- there was also, I remember, also
24   misclassified drivers.
25   Q    When you refer to Truckload; is that Universal Truckload?
```

Exhibit 1(e)
648



1    A    Universal Truckload, that's correct.

2    Q    And when you say misclassified drivers, are you referring

3    to owner-operators?

4    A    That's correct.

5    Q    Do you know if Universal Truckload employed company

6    drivers?

7    A    Yes.

8    Q    And how do you know that?

9    Q    Well, we were outside the yard, other Universal Intermodal

10   drivers were bringing them to us because they want to know, you

11   know, what we're doing.  They were informed that -- the drivers

12   informed them that they want to form the Unions.  And they --

13   they told them -- they told drivers that they also want to be

14   part of the Union.  That's why they were coming to us; asking

15   us what else they can do to be part of the Union.

16       MR. KUNTZ:  Your Honor, we have to object again to

17   hearsay.  Again, we have unidentified declarants within this

18   hearsay testimony.

19       JUDGE ROSAS:  I'm going to sustain that objection.

20   Rephrase.

21       MS. KAGEL:  You -- Your Honor --

22       JUDGE ROSAS:  Next question.

23       MS. KAGEL:  Your Honor, may I be heard?

24       JUDGE ROSAS:  No, ask it again.

25   Q    BY MS. KAGEL:  Did you speak to any Universal Truckload

Exhibit 1(e)
649



1    company drivers?

2    A    Yes.

3    Q    How many Universal Trucklite -- excuse me.  How -- about

4    how many Universal Truckload company drivers did you speak to?

5    A    Around eight drivers.

6    Q    And who did you speak with?

7    A    The ones that I remember, if Leon Guzman, Tyler Ross

8    (phonetic), Ocean Ross (phonetic).  Those are the -- the names

9    that I remember.

10   Q    And what did you speak about?

11   A    About forming the Union.

12   Q    Did you take their contact information?

13   A    Yes, I did.

14   Q    What kind of contact information did you take from them?

15   A    We share phone numbers.  And yeah, that's -- that's what I

16   got from them.

17   Q    Did any Universal Truckload drivers get in contact with

18   you?

19   A    Yes.

20   Q    And how would they get in contact with you?

21   A    On the phone and also, you know, like outside the yard,

22   Fontana yard.

23   Q    Did you get in touch with any Universal Truckload drivers

24   after you got their contact information?

25   A    Yes.

Exhibit 1(e)
650



www.escribers.net | 800-257-0885

1  Q    How?

2  A    On the phone.

3  Q    Do you know if the Universal Truckload drivers, you spoke

4  to, talked to any other Universal Truckload drivers about the

5  Union?

6      MR. KUNTZ:  Objection.  Calls for speculation; lack of

7  foundation.

8      MS. KAGEL:  I said, do you know, Your Honor.

9      JUDGE ROSAS:  I'm going to sustain that objection.

10  Q    BY MS. KAGEL:  Did any Universal Trucklite dri --

11      MS. KAGEL:  Excuse me, strike that.

12  Q    BY MS. KAGEL:  Did any Universal Truckload drivers tell

13  you they spoke to their coworkers about the Union?

14      MR. KUNTZ:  Objection, hearsay.

15      JUDGE ROSAS:  Sustained.

16      MS. KAGEL:  Your Honor, it would go to the effect on the

17  listener and the intent of the Union at Universal Truckload.

18      JUDGE ROSAS:  Who's the listener?

19      MS. KAGEL:  Mr. Cubillos is the listener.

20      JUDGE ROSAS:  Sustained.  Next question.

21  Q    BY MS. KAGEL:  Do the Universal Truckload drivers that you

22  spoke to still work for Universal Truckload?

23  A    No.

24  Q    And why did they stop working for Universal Truckload?

25  A    They were terminated.

Exhibit 1(e)
651



www.escribers.net | 800-257-0885

1    Q    And when were they terminated?

2    A    They were terminated the same time the Universal

3    Intermodal Services drivers were terminated.

4    Q    And approximately how many conversations did you have with

5    Universal Truckload drivers before they were terminated?

6    A    About eight conversation.

7    Q    Did you even have a meeting with Universal Truckload

8    drivers about the Union before they were terminated?

9    A    No.

10   Q    Why not?

11   A    Because when we thought -- when I talked with them and my

12   coworker, we were letting them know that, you know, we

13   understand that they want to form the union and -- because they

14   were mistreated and didn't get paid well, but we have to wait

15   till we're finished, you know, with the election of the

16   Universal Intermodal Services drivers.

17        And after that we will call for a meeting to talk about

18   the process.

19   Q    Are you familiar with a company called Roadrunner?

20   A    Yes.

21   Q    What is Roadrunner?

22   A    Roadrunner is another company that belongs to Universal.

23   Q    And what kind of company is it?

24   A    It's a trucking company.

25   Q    Are there -- do you know if there are drivers that work

Exhibit 1(e)
652



1    for Roadrunner?

2    A    Yes, I do.

3    Q    Are there?

4    A    Can you --

5    Q    Are there -- are there drivers that work for Roadrunner?

6    A    It --

7    Q    Do drivers work for Roadrunner?

8    A    Oh, yes.

9    Q    When you were campaigning outside of the facility in

10   Fontana, did you speak to any drivers from Roadrunner?

11   A    Yes, I did.

12   Q    Do you remember who?

13   A    It was Michael Washington.

14   Q    And when did you speak with him?

15   A    It was sometime in November of 2019.

16   Q    And what did you speak about?

17   A    Well, actually he had pulled over next to us and, you

18   know, asking us -- he noticed our tent with the Teamster signs

19   and he approached us asking us what we were doing there.  We

20   explained to him what we were doing there and he -- he also

21   asked us how -- or what he had to do to also be part of the

22   Union.  He wanted to get involved and he would like be Union.

23   Q    Did you speak to anyone else in the Union about the

24   Universal Truckload drivers?

25        MR. KUNTZ:  Objection.  Relevance --

Exhibit 1(e)
653



1          UNIDENTIFIED SPEAKER:  Hearsay.

2          MR. KUNTZ:  -- and hearsay.

3          JUDGE ROSAS:  Did -- repeat that question.

4     Q    BY MS. KAGEL:  Did you speak to anyone else in the Union

5     about the Universal Truckload drivers?

6     A    Yes.

7          JUDGE ROSAS:  Hold on.

8          MS. KAGEL:  Hold on.

9          JUDGE ROSAS:  All right.  I'll allow that to stay on the

10    record.  Go ahead, let's see what the next question is.

11    Q    BY MS. KAGEL:  And who did you speak to?

12         MR. KUNTZ:  Objection.  Relevance and hearsay.

13         JUDGE ROSAS:  I'll allow that.  I'll allow that.  We don't

14    have anything yet.  Go ahead.  Who did you speak to?

15         THE WITNESS:  Like -- from Universal?  Carlos.

16         JUDGE ROSAS:  You said the Union, Ms. Kagel, right?

17         MS. KAGEL:  Yes.

18    Q    BY MS. KAGEL:  Who from the Union did you speak to about

19    the Universal Truckload drivers?

20    A    That was our lead, Ricardo Hidalgo.

21    Q    And what did you speak about?

22         MR. KUNTZ:  Objection.  Relevance and hearsay, Your Honor.

23         JUDGE ROSAS:  Okay.  Hold on -- hold one once second.  Did

24    you speak to Mr. Hidalgo about Universal Trucking?

25         THE WITNESS:  Yes.

Exhibit 1(e)
654



1          JUDGE ROSAS:  Did you speak to Mr. Hidalgo about Universal

2     Intermodal?

3          THE WITNESS:  Yes.

4          JUDGE ROSAS:  Did you speak to Mr. Hidalgo about

5     Roadrunners?

6          THE WITNESS:  Yes.

7          JUDGE ROSAS:  Okay.  What's your next question?

8     Q     BY MS. KAGEL:  What did you speak about?

9          MR. KUNTZ:  Your Honor, that's the question to which we

10    object to relevance and hearsay.

11         JUDGE ROSAS:  Hold on, sir.

12         Let's put the witness in the waiting room for one second.

13         So he's in the waiting room, so they spoke about

14    unionizing a company, right?  Where are you going with this?

15         MS. KAGEL:  Your Honor, it's just to show the pacing of

16    the campaign.  It also goes to Respondent's defense, as well as

17    the Union's real intent to organize these two sets of

18    employees.

19         JUDGE ROSAS:  What am I missing here?  I mean, that's the

20    Union's business.  They are there -- they're looking to

21    unionize the place, right?

22         MS. KAGEL:  Well --

23         JUDGE ROSAS:  They're not a nonprofit organization just

24    handing out free coffee, right?

25         MS. KAGEL:  Well, Your Honor, Respondent -- one of

Exhibit 1(e)
655



1    Respondent's defenses is that there was no -- that they didn't

2    have any knowledge of the Union's intent to organize the

3    Universal Truckload and Roadrunner drivers.

4         JUDGE ROSAS:  They were --

5         MS. KAGEL:  Or --

6         JUDGE ROSAS:  -- but Counsel -- that's fine, I understand

7    that, but -- and I understand what you think you might have to

8    do, but they entered discussions among themselves, who cares?

9    Isn't it what they did and what -- based on the facts you

10   content the Respondent must have been aware of?

11        MS. KAGEL:  Well, yes, Your Honor, but to also show that

12   the scope of the support, the Union doesn't intend to engage in

13   real organizing campaigns when there is no real interest among

14   the employees.

15        JUDGE ROSAS:  You know -- look -- it is what it is.  I'm

16   going to sustain the objection.

17        Let's bring him back.

18        Next question.

19   Q    BY MS. KAGEL:  Are Roadrunner drivers still working for

20   Roadrunner?

21   A    No.

22   Q    And why did they stop working for Roadrunner?

23   A    Because they were also terminated.

24   Q    And when were they terminated?

25   A    In December 2019.

Exhibit 1(e)
656



1        MS. KAGEL:  One minute.

2   Q    BY MS. KAGEL:  Do you still speak to any of the Universal

3   Truckload drivers?

4        MR. KUNTZ:  Objection.  Relevance.

5        JUDGE ROSAS:  I'd sustain that one.  Next.

6        MS. KAGEL:  One moment, Your Honor.  No further questions,

7   Your Honor.

8        JUDGE ROSAS:  Charging Party.

9        MR. WOJCIECHOWSKI:  No questions, thank you.

10       JUDGE ROSAS:  Respondent cross.

11       MR. KUNTZ:  Can we please see the Jencks statement, Your

12   Honor?

13       JUDGE ROSAS:  Off the record.

14   (Off the record at 11:29 a.m.)

15       JUDGE ROSAS:  Okay.  Let's go back on the record.

16       All right, General Counsel, repeat that.

17       MS. KAGEL:  Your Honor, this witness has provided a

18   statement, a Jencks statement in another case filed by the

19   Union  against the company, Container Connection, which has

20   been mentioned sporadically throughout this hearing.  Container

21   Connection is not part of this complaint that the Union is

22   alleging and that unrelated case, that separate unrelated case

23   that Container Connection is a single entity, or is it --

24   excuse me -- a single employer with some of the entities

25   involved in this case.

Exhibit 1(e)
657



www.escribers.net | 800-257-0885

1          JUDGE ROSAS:  You said, is a single employer or is alleged
2    to be a single employer --
3          MS. KAGEL:  Alleged --
4          JUDGE ROSAS:  -- in this case --
5          MS. KAGEL:  -- to be single employer.
6          JUDGE ROSAS:  Okay.  And that's a separate charge, right?
7    So it's a separate case.
8          MS. KAGEL:  Yes, Your Honor.
9          JUDGE ROSAS:  And it's not part of this complaint, right?
10         MS. KAGEL:  No, Your Honor.
11         JUDGE ROSAS:  Okay.  Does it anything to do with the
12   Compton facility, the Fontana facility, the Slover facility?
13         MS. KAGEL:  No, Your Honor.
14         JUDGE ROSAS:  What facility does it have to deal with?
15         MS. KAGEL:  I would have to bring it up, Your Honor.
16   Could you give me a moment off the record?
17         JUDGE ROSAS:  Yes.
18         MS. KAGEL:  Okay.
19         JUDGE ROSAS:  Mr. Cubillos, we're going to put you in a
20   waiting room at this point already, and we'll communicate with
21   you -- there's going to be some time that the Respondent is
22   going to need to review your prior affidavits, okay?
23         THE WITNESS:  Okay, sir.
24         JUDGE ROSAS:  So we don't we be seeing you back here for a
25   few minutes, okay?  All right.



1              THE WITNESS:  Okay.  Bye, Your Honor.  Thank you.

2              MS. KAGEL:  Your Honor, I don't believe it has anything to

3      do with any of the facilities at issue in this case.

4              JUDGE ROSAS:  It has to do with a facility, right?

5              MS. KAGEL:  Yes.  I'm not seeing the location of a

6      facility --

7              JUDGE ROSAS:  Is it a facility in California?

8              MS. KAGEL:  Yes --

9              JUDGE ROSAS:  All right.

10             MS. KAGEL:  -- Your Honor.

11             JUDGE ROSAS:  But a facility in Southern California?

12             MS. KAGEL:  Yes, Your Honor.

13             MR. KUNTZ:  Your Honor, we'd just like to point out that

14     Container Connection is something that has been brought up by

15     the General Counsel, by the General Counsel's witnesses; in

16     fact, in that context it was making allegations regarding the

17     distribution and flow of work between these different

18     companies.

19             JUDGE ROSAS:  Yeah, but if it has -- if it has to do with,

20     I don't know, Lockheed Martin, okay, in the Port of San Diego,

21     I don't even know if there's a port there.  I'm not going to

22     take it there, okay?  There's no need for you -- for any kind

23     of hints at protected activity going on in other facilities if

24     they're unrelated to this case.

25             Is there any reason why you can't indicate what facility,

Exhibit 1(e)
659



www.escribers.net | 800-257-0885

1    or is that protected at this point?  Is it obvious?  Do they

2    know about it?  Have they been served with this information at

3    some point?

4        MS. KAGEL:  Your Honor, I'm not -- this case is still in

5    the investigation stage and from the face of the affidavit it's

6    not apparent.  I don't think there's a facility address listed.

7    Again, we're willing to turn it over to you, Your Honor, for

8    in-camera --

9        JUDGE ROSAS:  Okay.

10       MS. KAGEL:  -- inspection.

11       JUDGE ROSAS:  All right.  Email it to me and in the

12   meantime what's -- how many pages is the other affidavit?

13       MS. KAGEL:  It's six pages, Your Honor.

14       JUDGE ROSAS:  Okay.  So we'll reconvene in ten minutes and

15   send me that --

16       MR. KUNTZ:  Your Honor --

17       JUDGE ROSAS:  -- other one in the meantime.

18       MS. KAGEL:  Your Honor, if I may make one other point.  If

19   the General Counsel is referring to case number 21CA272323, the

20   charged parties in that case are not only Container Connection,

21   but also Universal Intermodal Services in Southern Counties

22   Express, both of which are Respondents in this case.

23       JUDGE ROSAS:  Is that right?

24       MS. KAGEL:  Your Honor, it's not that case number, but as

25   I stated before, the Union is alleging -- I did state that

Exhibit 1(e)
660



1    those entities are part of the charge because the Union is

2    alleging that there are single employers of Container

3    Connection --

4        JUDGE ROSAS:  Wait, wait, wait, hold on one second.  So

5    did you just say Container Connection is alleged to be a single

6    employer with Univer -- with the same entities in this case?

7        MS. KAGEL:  Yes, but Container Connection is not part of

8    this charge, Your Honor, but --

9        JUDGE ROSAS:  No, no, but it's been mentioned and it's

10   part of -- and those other entities are obviously part of this

11   case, so --

12       MS. DICKINSON:  Your Honor, may I be heard?

13       Thank, Your Honor.  Yes, Your Honor, yes there two cases

14   that are currently under investigation, and yes, they are --

15   Container Connection is listed to be a single employer with all

16   these other entities; no question.  However, that -- the

17   allegations in this case that Mr. -- when you look at his

18   affidavit in-camera, you will see, it relates exclusively to

19   the termination of one particular individual.

20       And that's all he testifies about.  It's recent.  It has

21   nothing to do with all the facts that occurred in this

22   particular case, it is unrelated.  You'll also see it, you

23   know, has other names in it that would be very prejudicial --

24       JUDGE ROSAS:  Hold on one second.  So the individual that

25   you're referring to, it's a charge by an individual who was a



1    former employee of Container Connection?

2        MS. DICKINSON:  It's a charge by the Union, but that the

3    subject of the -- of Mr. Cubillos' affidavit relates to a

4    misclassified driver who was -- who was effectively terminated.

5    They're not letting him back to work.

6        JUDGE ROSAS:  And he was an employee of Container

7    Connection?

8        MS. DICKINSON:  He was an employee of Container

9    Connection, yes.

10       JUDGE ROSAS:  Respondent.

11       MR. KUNTZ:  So Your Honor, this all appears to be based on

12   intention by the General Counsel and the Charging Party that

13   this is a separate allegation, it's somehow not related to what

14   we're litigating here.  But if we ask any questions on cross-

15   examination that are not relevant, then certainly Your Honor

16   can entertain a relevance objection.

17       We're simply asking to see the Jencks statements by the

18   witness.

19       MS. KAGEL:  And Your Honor, we're happy to give it to them

20   after your in-camera review.  We just want to make sure, you

21   know, under the bench book and the rules and regulations, if we

22   maintain that they're not related we can have Your Honor review

23   it in-camera and if you deem that some of it is relevant we can

24   redact the irrelevant parts and hand it over to Respondent.

25       We're not contesting that.  We are willing and able to do

Exhibit 1(e)
662



1    that, Your Honor.

2         JUDGE ROSAS:  Charging Party, let me hear more from you

3    about the sensitive nature of this, it's under investigation,

4    it relates to one individual, it does allege that they're

5    single employers -- a single employer along with the

6    Respondents in this case.  What other -- what interest are you

7    seeking to protect here?  I mean --

8         MS. DICKINSON:  Well, I think -- if you were to review it,

9    Your Honor, you will find that there are individuals named at

10   Container Connection, who the employer may not know that they

11   are in support of the Union.  It has individual's names.  If --

12   I would maintain once you look at it, you will see it was -- is

13   related to this one person's discharge.  It has nothing to do

14   with what's in this case at this time.

15        But if you did determine that parts of it should be turned

16   over because you did determine part of it did relate, I would

17   ask that Your Honor have a significant part of it redacted,

18   including names.

19        JUDGE ROSAS:  Oh, the Union is the Charging Party in all

20   of these cases, right?

21        MS. DICKINSON:  The Union's the Charging Party, right; but

22   there are individuals named and this is in investigation, this

23   is not -- there has not been a regional determination on this

24   yet.

25        JUDGE ROSAS:  No, the interesting thing is, the Union is

Exhibit 1(e)
663



www.escribers.net | 800-257-0885

1    the Charging Party in these cases as it oftentimes is, but the

2    actual interests are not really those of the Union per se, but

3    the pecuniary interest of the -- and job security, financial

4    interest of the individuals named, you know.  If this was -- if

5    you were looking at it strictly on the basis of a party's prior

6    statements, you know, it's -- you know, it's -- it's a Union's

7    prior statement, right?  It's a Union -- it's a Union official?

8        MS. DICKINSON:  It's a former Union rep.  It's Miguel's

9    statement --

10       JUDGE ROSAS:  Of this individual, of this individual?

11       MS. DICKINSON:  Yeah, the current -- yeah, it's a --

12   Miguel --

13       JUDGE ROSAS:  All right.  So what we're going to have to

14   do is -- all right.  You're going to have to send me that

15   affidavit.  I understand the interest, the concerns expressed

16   by the Union and by the General Counsel.  You're going to have

17   to send me that and I'm going to have to go through it and

18   indicate what needs to be redacted.

19       Because they're -- the Respondent is entitled, in order to

20   cross-examine this witness effectively, see what he's

21   potentially said different about any of the things that he's

22   said today.  Okay.  There may be nothing or they may be

23   something; I don't know, but I think they're entitled to know

24   that.  And at the same time I need to protect your interest, so

25   that they don't know whether it's John Doe or Snuffleupagus,

Exhibit 1(e)
664

escribers
www.escribers.net | 800-257-0885

okay, who said this, that, or the other.

So -- and again, people's interest need to be protected. Are there any -- let's just leave it at that. All right. Email that to me and what we're going to do is, we're going to adjourn for an hour, we'll reconvene at 12:45 Pacific Time. In the meantime, how long is that affidavit that you're going to be sending me --

MS. KAGEL: Six pages, Your Honor.

JUDGE ROSAS: -- for in-camera review.

MS. KAGEL: Six pages, Your Honor.

JUDGE ROSAS: Okay. All right. And I will -- I'll try to, at some point during that period of time, to have it redacted and returned to you. Okay?

MS. KAGEL: Thank, Your Honor. I'll send it to you right now and I will cc Mr. Do.

JUDGE ROSAS: Okay. Off the record.

(Off the record at 11:41 a.m.)

JUDGE ROSAS: On the record. I had an opportunity during the recess to review the five -- six-page Jencks affidavit from Mr. Miguel Angel Cubillos, and it's an affidavit that relates to discussions that he had with employees at Container Connection in 2020 and in 2021, and it relates to such matters as alleged misclassification of an employee or employees by Container Connection. He refers to discussions with several employees about their concerns regarding their terms and

eScribers
www.escribers.net | 800-257-0885

1   conditions of employee -- terms and conditions of employment

2   with the company, refers to Teamsters Union Facebook social

3   media publications regarding their plight or alleged plight,

4   and that's it.

5       Respondent, you object.  You want to see this thing; is

6   that correct?

7       MR. KUNTZ:  Correct, Your Honor.

8       JUDGE ROSAS:  All right.  So I'm going to deny the

9   application, and I'm going to instruct General Counsel that you

10  provide the reporter with Administrative Law Judge Exhibit 1(a)

11  as the unredacted version, and 1(b) as the redacted version,

12  okay?  And that will be put in the rejected exhibit file, and

13  under seal.

14  **(Administrative Law Judge Exhibit Numbers 1(a) and 1(b)**

15  **Rejected Under Seal)**

16      JUDGE ROSAS:  Okay, so the parties won't get that, Troy,

17  except for myself and the original bound copy that would go to

18  the Board for review, if at all, okay?

19      Is there anything else that anybody needs to add for the

20  record?

21      MR. KUNTZ:  One quick clarification, Your Honor.  It

22  wasn't clear to us from the discussion before our break whether

23  the Jencks statement that you just ruled upon was the only

24  Jencks statement, or whether there is also another one out

25  there from these cases?

Exhibit 1(e)
666



1    JUDGE ROSAS:  My understanding was you were provided with

2    the other one.

3    MS. KAGEL:  Your Honor, there was no other one.  That was

4    the only one.

5    JUDGE ROSAS:  Oh, I thought there was another one in

6    addition to this one.

7    MS. KAGEL:  No, this is the only potential Jencks

8    statement that we have.

9    JUDGE ROSAS:  He didn't have one, but he had one in

10   connection with another case, which you brought to my

11   attention.

12   MS. KAGEL:  Yes, Your Honor.

13   MR. KUNTZ:  And Your Honor, given the discussion the

14   parties just had, and -- and Your Honor's ruling, could we just

15   ask for a few minutes off the record so I can confer with my

16   co-counsel?

17   JUDGE ROSAS:  Okay.  Let's -- let's resume at 1:40 p.m.

18   MR. KUNTZ:  Thank you.

19   MS. KAGEL:  Thank you.

20   (Off the record at 1:32 p.m.)

21   JUDGE ROSAS:  Okay, back on the record.

22   Respondent?

23   MR. KUNTZ:  Thank you, Your Honor.  I believe we

24   (indiscernible, simultaneous speech) --

25   JUDGE ROSAS:  Oh, we got to bring back -- we got to bring



1    back the witness.  I believe we didn't lose him in purgatory.

2                           **CROSS-EXAMINATION**

3    Q    BY MR. KUNTZ:  Good morning, or excuse me, good afternoon,

4    Mr. Cubillos.

5    A    Good afternoon.

6    Q    I apologize if I mispronounced your name.  My name's

7    Harrison Kuntz.  I'm an attorney for the Respondents in this

8    case, and I'll have just a few cross-examination questions for

9    you, okay?

10   A    Okay.

11   Q    Now, in our experience with these videoconference

12   hearings, we found that it helps if you can wait a second or

13   two after I finish asking the question, just to deal with any

14   lag issues; can you do that for me?

15   A    Sure.

16   Q    And we'll also need you to answer audibly to any question,

17   yes, no, correct, incorrect, rather than head nods or any

18   physical gestures, in order for our court reporter to pick

19   up --

20        JUDGE ROSAS:  Counsel, off the record for a minute.  Hold

21   on.

22   (Off the record at 1:42 p.m.)

23        JUDGE ROSAS:  Okay, back on the record.

24   Q    BY MR. KUNTZ:  Sir, did you understand the instructions I

25   gave regarding verbal rather than physical gestures in your

Exhibit 1(e)
668



1   answers?

2   A    Yes.

3   Q    Thank you.  So to start off, and just to be clear, when

4   you worked for the Union, did you work for the International

5   Union, or for Local 848?

6   A    International Union.

7   Q    Are you familiar with the structure of Local 848?

8   A    No.

9   Q    Are you aware --

10  A    Can I ask you, like, I would like to understand your

11  question better, like, the structure of -- was that secretary

12  position, or if it was the president?

13  Q    I -- I'll give you an example, sir.  Are you aware that

14  Local 848 includes a ports division?

15  A    That's correct.

16  Q    And during the campaigns that you described in your direct

17  testimony, you worked on behalf of that ports division, didn't

18  you?

19  A    Yes.

20  Q    And those -- the ports division refor -- refers to the

21  Ports of Los Angeles and Long Beach, correct?

22  A    That's correct.

23  Q    Now, shifting gears, in your direct testimony, you used

24  the word termination repeatedly; do you recall that?

25  A    Yes.

Exhibit 1(e)
669



1    Q    Does the word termination mean the same thing to you as

2    layoffs?

3         MS. KAGEL:  Objection.  Calls for speculation and

4    relevance.

5         JUDGE ROSAS:  You know, we -- we're using legal terms,

6    I'll give Counsel the leeway, you know, it -- I'm the ultimate

7    decider of -- of what -- what constitutes what, but maybe

8    Counsel's going somewhere.  I'll allow it.

9         MS. BRIDGE:  Excuse me.

10        MR. KUNTZ:  Can you answer that?

11        MS. BRIDGE:  Judge, can I interrupt?  I'm sorry.

12        JUDGE ROSAS:  Yes.

13        MS. BRIDGE:  I don't know who Stephanie Williams is.

14        JUDGE ROSAS:  Yes, yes.  She's a nonparticipant observer.

15        MS. BRIDGE:  Okay, great.  Thank you.

16   Q    BY MR. KUNTZ:  Do you need me to repeat the question, sir?

17   A    Yeah, please.

18   Q    Does the word termination mean the same thing to you as

19   layoffs?

20   A    Yes.

21   Q    So when you described all the employee drivers at various

22   facilities being terminated at once, you meant that they were

23   laid off, correct?

24        MS. KAGEL:  Objection.  It's misstating testimony.

25        JUDGE ROSAS:  I'm going to sustain that.

Exhibit 1(e)
670



1    Q    BY MR. KUNTZ:  Do you recall testifying regarding

2    instances in which many drivers at facilities of the

3    Respondents' were all terminated at the same time?

4         MS. KAGEL:  Objection.  Asked and answered.

5         JUDGE ROSAS:  Overruled.

6    Q    BY MR. KUNTZ:  Do you recall that testimony, sir?

7    A    Could you repeat the question again, please?

8    Q    Do you recall, in your direct testimony, describing

9    instances in which many employees at various of repon --

10   Respondent's facilities were all terminated at the same time?

11   A    Yes.

12   Q    And when you gave that testimony, you were referring to

13   those employees being laid off, correct?

14        MS. KAGEL:  Objection.  Misstates testimony.

15        MR. WOJCIECHOWSKI:  And relevance.

16        JUDGE ROSAS:  I'll allow it.

17        You can answer if you know.

18        THE WITNESS:  But I -- I was -- I understand they were

19   terminated.

20   Q    BY MR. KUNTZ:  In the sense that they no longer worked for

21   Respondents after those events; is that right?

22   A    That's correct.

23   Q    Do you recall also describing both Universal Intermodal

24   Services drivers and Universal Truckload drivers working at the

25   Slover facility?

Exhibit 1(e)
671



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    But you don't know the precise division of labor between

3    Universal Intermodal and Universal Truckload at that facility;

4    do you?

5    A    Say that question again, please.

6    Q    You don't know the precise division of labor between

7    Universal Intermersal -- Intermodal Services and Universal

8    Truckload at that Slover facility, do you?

9         MS. KAGEL:  Objection.  Relevance.

10        JUDGE ROSAS:  If you understand the question, you can

11   answer it.

12        THE WITNESS:  Yes.

13   Q    BY MR. KUNTZ:  You do know how -- you do know how labor

14   was divided at that facility?

15   A    Not really.

16   Q    Okay.  Now, isn't it true that the Union never filed an

17   NLRB petition to represent Universal Truckload facil --

18   Universal Truckload drivers?

19   A    That's correct.

20   Q    And the Union never asked Universal Truckload to

21   voluntarily recognize its drivers at the Slover facility?

22   A    That's correct.

23   Q    And the Union never filed a petition to represent

24   Roadrunner drivers at its Fontana facility?

25   A    That's correct.

Exhibit 1(e)
672



1     Q     And the Union never asked Roadrunner to voluntarily

2     recognize it as the representative of Roadrunner drivers at the

3     Roadrunner Fontana facility?

4          MS. KAGEL:  Objection.  Relevance.

5          JUDGE ROSAS:  You brought it up.  Overruled.

6          THE WITNESS:  Yes.

7     Q     BY MR. KUNTZ:  That's correct?

8     A     That's correct.

9     Q     Now, please correct me if I -- if I misunderstood you, but

10    on your direct testimony, I believe you testified regarding a

11    possible meeting between the Union and Universal Truckload

12    drivers to explain the organizing process to them; is that

13    right?

14         MS. KAGEL:  Objection.  Misstates testimony.

15         JUDGE ROSAS:  Hold on one second.  Are you referring to

16    testimony, or are you asking the witness to assume there was?

17         MR. KUNTZ:  I'm not asking the witness to assume that

18    there was, Your Honor.  I believe the testimony on direct was a

19    bit unclear, and so I'm seeking to clarify it.

20         JUDGE ROSAS:  I'm going to sustain the objection.

21    Q     BY MR. KUNTZ:  Sir, in the course of an organizing

22    campaign, does the Union typically have a meeting with

23    employees to explain the organizing process to them?

24    A     Sometimes -- sometimes we explain to them while we have a

25    conversation on each -- on each one.

Exhibit 1(e)
673



```
 1    Q    And no such meeting ever occurred with Universal Truckload

 2    drivers in the Fon -- in the Slover facility, correct?

 3    A    We met one-on-one.

 4    Q    But there was no group meeting?

 5    A    No group meeting, just amount.

 6    Q    And likewise, the drivers --

 7    A    The drivers that were there.

 8    Q    Sorry?

 9    A    Drivers were there, present, like, tomorrow, the services

10    drivers and Truckload drivers that were present there.

11    Q    But you never said to Truckload facility drivers, hey,

12    we're having a meeting on X date, at a certain time, at a

13    certain place; that never happened?

14    A    It happened after the termination.

15    Q    After the layoffs?

16    A    Yes.

17    Q    And no such meeting ever occurred with Roadrunner drivers,

18    did it?

19    A    Not with me.  I don't know if that happened with my

20    coworker.

21    Q    You're not aware of such a meeting occurring?

22    A    Yes, I remember after the -- the -- the termination.

23    Q    For Roadrunner drivers?

24    A    With Roadrunner drivers.

25    Q    And again, after the layoffs, correct?
```

Exhibit 1(e)
674



1    A    Yes, after the termination.

2    Q    Now, isn't it true that you were involved in the Union

3    making various unfair labor practice allegations against the

4    Respondents in this case?

5    A    Yes.

6    Q    And isn't it true that one of those allegations was that

7    the Respondents fired Kevin Poullard in retaliation for his

8    Union activities?

9         MR. WOJCIECHOWSKI:  Objection.  Relevance.

10        MS. KAGEL:  Objection.  Relevance.

11        JUDGE ROSAS:  So that's a charge that was filed in -- in

12   one of these cases?

13        MS. KAGEL:  As discussed previously, Your Honor, there is

14   no pending allegation concerning Mr. Poullard's termination,

15   and his termination was not discussed on direct examination.

16        MR. KUNTZ:  Your Honor, might I suggest that we discuss

17   this off the -- without the witness present?

18        JUDGE ROSAS:  Mr. Cubillos, we're going to ask you to go

19   to the waiting room for a little longer.  I apologize for the

20   inconvenience.

21        THE WITNESS:  Okay.  Okay, Your Honor.

22        MS. BRIDGE:  Judge, you're the host right now.

23        JUDGE ROSAS:  Oh.  Well, okay.  Off the record.

24   (Off the record at 1:53 p.m.)

25        JUDGE ROSAS:  Okay.  On the record.  Go ahead, Respondent.

Exhibit 1(e)
675



www.escribers.net | 800-257-0885

1          MR. KUNTZ:  Your Honor, this is at least the second

2     witness now where the General Counsel has elicited significant

3     testimony about Kevin Poullard and his Union activities.  For

4     some reason, they keep bringing him up unique to all other

5     employees not named specifically in the complaint.

6          Now, if they were going to keep opening the door, then I

7     think we have -- should have the opportunity to explore the

8     circumstances regarding the end of his employment just the same

9     as the General Counsel has the opportunity to bring up every

10    other aspect of his -- his employment and his Union activities.

11         JUDGE ROSAS:  General Counsel?

12         MS. KAGEL:  Your Honor, Mr. Poullard's tenure of

13    employment or how his employment ended with Respondent has not

14    been brought up in any capacity.  Mr. Poullard is attached to

15    another allegation in which he is not named, but his

16    termination is not at issue in this case, and it is not

17    relevant whatsoever.

18         JUDGE ROSAS:  And it wasn't brought up on the General

19    Counsel's direct examinations.

20         MS. KAGEL:  No, it was one instance.  It had nothing to

21    do -- one instance of communication between the witness, Mr.

22    Cubillos and Mr. Poullard.  It had nothing to do with his

23    termination or anything having to do with his tenure or ending

24    of employment.

25         MR. KUNTZ:  Your Honor, his termination was previously

Exhibit 1(e)
676



1    mentioned by the General Counsel.  And so as the record stands

2    right now, there is an implication, at least, that perhaps that

3    this is an example of unlawful animus, or an exercise of it,

4    regardless of what they've alleged in the complaint.  I don't

5    have --

6         MS. KAGEL:  Your Honor --

7         MR. KUNTZ:  I don't have a long line of questions about

8    this.  Just a couple brief questions to tie up the record on

9    who this employee was and what his circumstances were.

10        MS. KAGEL:  I would just reiterate, Your Honor.  His

11   termination has not been brought up by General Counsel, or

12   elicited through -- through testimony of any General Counsel's

13   witnesses.  So therefore, it's not relevant and simply because

14   it may have been relevant during the entire process getting to

15   this point, it's not relevant in the complaint and he's not

16   named in the complaint.

17        JUDGE ROSAS:  Respondent?

18        MR. KUNTZ:  Well, I would also add that this was -- what

19   we're getting at is that this was an unfair labor practice

20   charge allegation, and these same charges that we are

21   litigating here today, it's essentially procedural history.

22   And I would be very surprised to learn that the procedural

23   history of the case is not relevant to that case.

24        JUDGE ROSAS:  Well, there's procedural history and that's

25   seemingly innocuous as background, and then there's procedural

Exhibit 1(e)
677



1    history unrelated to the allegations in the complaint that

2    could take us down a -- a tenuous collateral path which I'm

3    very adverse to.

4        So I'm going to sustain the objection.  I don't see on

5    this witness' direct examination, anything other than testimony

6    which focuses on essentially en masse layoffs, okay?  At the --

7    at the three companies; Universal Trucking, Universal -- at the

8    two Universals, and Roadrunner.  Yeah.  So I'm going to sustain

9    the objection.

10       MR. KUNTZ:  Okay.

11       JUDGE ROSAS:  Next question.

12       MR. KUNTZ:  Your Honor, given that I may be finished with

13   the witness, but I just have a -- a couple quick minutes off

14   the record?

15       JUDGE ROSAS:  Sure.

16   (Off the record at 1:58 p.m.)

17       JUDGE ROSAS:  All right.  Let's go back on the record.

18       MR. KUNTZ:  Your Honor, subject to recross, Respondent has

19   no further questions for the witness.

20       JUDGE ROSAS:  Any redirect by the General Counsel?

21       MS. KAGEL:  No, Your Honor.

22       JUDGE ROSAS:  Charging Party?

23       MR. WOJCIECHOWSKI:  No, thank you.

24       JUDGE ROSAS:  Thank you, Mr. Cubillos.  So you're excused.

25   Please do not discuss your testimony with anyone until you are

Exhibit 1(e)
678



1    told by the Government that the case is closed, all right?

2    Have a good day.

3         THE WITNESS:  Thank you.  You, too.

4         JUDGE ROSAS:  Okay.

5         General Counsel, next witness.

6         MS. KAGEL:  Yes, Your Honor.  We'll be calling Jose

7    Torres; however, I have to resend the Zoom link.  He says it's

8    not working.  So just give me one moment.

9         JUDGE ROSAS:  Go off the record.

10   (Off the record at 2:02 p.m.)

11        JUDGE ROSAS:  Okay.  Let's -- let's go back on the record.

12   Hold on.  Let's go off the record.

13   (Off the record at 2:06 p.m.)

14        JUDGE ROSAS:  Thank you.  All right.  Back on the record.

15   General Counsel?

16        MS. KAGEL:  Your Honor, we call Jose Torres as a witness.

17        JUDGE ROSAS:  Sir, please raise your right hand.  Do you

18   see me?

19        MR. TORRES:  No, I don't see you.  I lost you.

20        JUDGE ROSAS:  Look at the hand.

21        MR. TORRES:  Sure.  Let me log in again.  Okay.  There.

22        JUDGE ROSAS:  Okay.  Please raise your right hand.

23   Whereupon,

24                         **JOSE TORRES**

25   having been duly sworn, was called as a witness herein and was

Exhibit 1(e)
679



www.escribers.net | 800-257-0885

1   examined and testified, telephonically as follows:

2        JUDGE ROSAS:  All right.  Please state and spell your name

3   and provide us with an address.

4        THE WITNESS:  Sure.  Jose Torres.  That's J-O-S-E,

5   T-O-R-R-E-S.  Address ███████████████, Redlands, California

6   92374.

7        JUDGE ROSAS:  Go ahead.

8                      **DIRECT EXAMINATION**

9   Q    BY MS. KAGEL:  Mr. Torres, what is your full legal name?

10  A    Jose Rojelio (phonetic) Torres Mariscal.

11  Q    How do you spell Mariscal?

12  A    M-A-R-I-S-C-A-L.

13  Q    What name do you usually go by?

14  A    Jose Torres.

15  Q    And are you currently employed?

16  A    No.

17  Q    Did you ever work for Universal Intermodal?

18  A    Yes.

19  Q    When did you work there?

20  A    March 5th --

21       JUDGE ROSAS:  All right.

22       THE WITNESS:  (Audio interference) --

23       JUDGE ROSAS:  Hold on one sec.  We can't hear you, Troy.

24       COURT REPORTER:  Can you hear me now?  The witness is

25   coming in a little low.  Maybe he can speak louder and get

Exhibit 1(e)
680



www.escribers.net | 800-257-0885

1    closer to the microphone.

2          JUDGE ROSAS:  Hold on.  Off the record.

3    (Off the record at 2:08 p.m.)

4          JUDGE ROSAS:  Okay.  Back on the record.

5                      **RESUMED DIRECT EXAMINATION**

6    Q    BY MS. KAGEL:  Mr. Torres, when did you work for Universal

7    Intermodal?

8    A    March 5th through December 2000 -- I'm sorry.  Let me

9    start over.  March 5th, 2018 to December 2019.

10   Q    And how long did you work there?  Oh, I'm sorry.  What was

11   your job when you worked for Universal Intermodal?

12   A    Sorry, I lost you.  Let me -- I don't know where you are

13   on the screen.  Okay, there you are.  Sorry.  Ask the same

14   question again?

15   Q    What was your job when you worked for Universal

16   Intermodal?

17   A    Trucker.

18   Q    And why did you stop working there in December of 2019?

19   A    I was laid off.

20   Q    When you started working for Universal Intermodal what

21   facility, did you work out of?

22   A    Compton, California.

23   Q    Did that ever change?

24   A    Yes.

25   Q    What did it change to?

Exhibit 1(e)
681



```
 1    A    Fontana, California.

 2    Q    Is that the facility on Slover Avenue?

 3    A    Yes.

 4    Q    And when did that change?

 5    A    Approximately January 2019.

 6    Q    And why did it change?

 7    A    I moved.

 8    Q    Was the Fontana facility closer to your new residence than

 9    the Compton facility?

10    A    Yes.

11    Q    How far apart are the Fontana and Compton facilities?

12    A    I would say about an hour and a half.

13    Q    Did any other company work out of the Fontana facility?

14    A    Yes.

15    Q    Which company?

16    A    Universal Truckload.

17    Q    Do you know how many Universal Intermodal drivers worked

18    out of the Fontana facility when you worked there?

19    A    I would say approximately ten.

20    Q    And after you transferred to Fontana, where did you start

21    and end your day?

22    A    Fontana.

23    Q    Did your job duties change after you transferred from the

24    Compton facility to the Fontana facility?

25    A    Slightly.
```

Exhibit 1(e)
682



www.escribers.net | 800-257-0885

1    Q     And what were your job duties as a driver?

2    A     To pick up and deliver containers to and from the ports.

3    Q     And how did your job change slightly when you went from

4    the Compton facility to the Fontana facility?

5    A     Only some customers yards that were closer to the Fontana

6    facility.

7    Q     Did your pay change when you went from the Compton

8    facility to the Fontana facility?

9    A     No.

10   Q     What was your pay?

11   A     $24 per hour.

12   Q     $24 per hour?

13   A     Yes.

14   Q     And who did you report to?

15   A     The dispatcher.

16   Q     You remember who exactly?

17   A     Walter.

18   Q     Did you report to Walter the entire time you worked for

19   Universal Intermodal?

20   A     No.

21   Q     When did you start reporting to Walter?

22   A     When he joined with Southern Counties.

23   Q     And what is Southern Counties?

24   A     A company that also hauls containers to and from the

25   ports.

Exhibit 1(e)
683



1    Q    And do you know --

2    A    (Indiscernible, simultaneous speech) --

3    Q    I'm sorry, I didn't mean to interrupt.

4    A    Seven Counties Express.

5    Q    And when -- when did Walter -- when did you start

6    reporting to Walter?

7    A    I don't have the exact date.  When it became Seven

8    Counties.

9    Q    And how did you get your assignments?

10    A    Through a tablet.

11    Q    And where did those assignments come from?

12    A    Seven Counties.

13    Q    And how do you know that they came --

14    A    (Indiscernible, simultaneous speech) --

15    Q    And how do you know they came from Southern Counties?

16    A    Because the Walter -- I'm sorry.  Walter, the dispatcher

17    would send those messages by tablet.

18    Q    Did Walter work for Southern Counties?

19    A    Yes.

20    Q    I'm sorry, I didn't hear an answer.

21    A    Yes.

22    Q    Did anyone else?

23    A    I was saying yes.

24        MS. KAGEL:  I'm sorry, I froze there.

25        JUDGE ROSAS:  He -- he said yes.

Exhibit 1(e)
684



www.escribers.net | 800-257-0885

```
 1        MS. KAGEL:  Okay.  I'm sorry.  It just froze for a minute.

 2        JUDGE ROSAS:  He said yes.

 3   Q    BY MS. KAGEL:  How do you know Walter worked Southern

 4   Counties?

 5   A    I had a brief conversation, and he mentioned that, yes, he

 6   for Southern Counties.

 7   Q    Did Walter work at the Fontana facility?

 8   A    No.

 9   Q    Where did he work?

10   A    Compton, California.

11   Q    Other than Walter, did you have to report to any other

12   managers?

13   A    Another dispatcher if he was not around.

14   Q    And the truck that you used, who owns that trucks?

15   A    Universal.

16   Q    And where did you pick up the truck?

17   A    Fontana, California.

18   Q    And where did you drop off the truck?

19   A    Fontana, California.

20   Q    Did you use the same truck every day?

21   A    No.

22   Q    When you were working at Universal Intermodal, did a Union

23   ever try and represent you?

24   A    Yes.

25   Q    Which Union?
```

Exhibit 1(e)
685



www.escribers.net | 800-257-0885

1    A    Teamsters.

2    Q    And when did you become aware of the Union?

3    A    Through a driver.

4    Q    And when did you become aware of the Union?

5    A    About October.  I would say about October.

6    Q    I'm going to show you what's been marked for

7    identification as GC Exhibit 24.  Mr. Torres, are you familiar

8    with this?

9    A    Yes.

10   Q    And is that your name there next to name in the middle of

11   that document?

12   A    Yes.

13   Q    Is that your signature there at the bottom?

14   A    Yes.

15   Q    Did you sign it on or around that date there?  November

16   2nd, 2019?

17   A    Yes.

18        MS. KAGEL:  Your Honor, I move to admit GC Exhibit 24 into

19   the record.

20        MR. ADLONG:  No objection, Your Honor.

21        JUDGE ROSAS:  General Counsel's 24 is received.

22   **(General Counsel Exhibit Number 24 Received into Evidence)**

23        MS. KAGEL:  I'm sorry, it's -- everyone is freezing a

24   little bit on my end and disappearing.  Can everyone hear me

25   okay?

Exhibit 1(e)
686



1          THE WITNESS:  I can hear you.

2          JUDGE ROSAS:  Yes.

3          MS. KAGEL:  Okay.

4          JUDGE ROSAS:  General Counsel's 24 is received.

5          MS. KAGEL:  Thank you.

6     Q    BY MS. KAGEL:  Was there an election to vote in the Union?

7     A    Yes.

8     Q    When was it?

9     A    December.

10    Q    Did you support the Union?

11    A    Yes.

12    Q    How did you show your support for the Union?

13    A    I went to the meetings.

14    Q    Did you wear any Union apparel?

15    A    Yes.

16    Q    What apparel did you wear?

17    A    A beanie and a vest -- a safety vest with the Teamsters

18    logo.

19    Q    Would you wear the vest and beanie to work?

20    A    Yes.

21    Q    Did you park your car at the facility in Fontana?

22    A    Yes.

23    Q    Did you have any signs on your car about the Union?

24    A    Yes.

25    Q    Would you put the sign on your car when you parked at the

Exhibit 1(e)
687



1    Fontana facility?

2    A    Yes.

3    Q    Did your work change at all after the election to vote the

4    Union in?

5    A    Yes.

6    Q    All right.  Let's talk about the time before the Union

7    election.  What was a typical day of work like before the Union

8    election?

9        MR. ADLONG:  Objection.  Vague as to time.

10       JUDGE ROSAS:  Put some -- put a month in there at least.

11   Q    BY MS. KAGEL:  What was a typical day of work like in the

12   month before the Union election?

13   A    Pick up about two loads per day from the port.

14   Q    And where would you deliver these loads?

15   A    To the Southern Counties storage yard, or the customer's

16   yard.

17   Q    And where was the Southern County storage yard located?

18   A    Wilmington.

19   Q    What information would you get about an assignment?

20   A    To pick up the freight, the container, and take it to the

21   Southern Counties yard, or take it to a customer's yard.

22   Q    Do you know what a SCAC code is?

23   A    Yes.

24   Q    What is it?

25   A    It's a code that identifies the name of the company that

Exhibit 1(e)
688



1    you are picking up for at the port.

2    Q    Would you get a SCAC code for each assignment?

3    A    No, only for the company.

4    Q    Was the SCAC code always for Universal Intermodal?

5    A    No.  There was a SCAC code for Southern Counties as well.

6    Q    And how often would you get assignments with the Southern

7    Counties SCAC code?

8    A    Once Southern Counties joined with Universal, I would get

9    it often.

10    Q    And you remember when you started getting the SCAC codes

11    with the Southern Counties number?

12    A    As soon as Southern Counties joined with Universal.

13    Q    And what custom --

14    A    (Indiscernible, simultaneous speech) --

15    Q    Oh, I'm sorry.

16    A    I was just going to say I don't know the exact date.

17    Q    What customers would you deliver to in the time before the

18    Union election?

19    A    Ross in Shafter, California.  Converse, Toyo Tires, and

20    Toyota.

21    Q    After you transferred to the Fontana facility, would you

22    ever go to the Compton facility?

23    A    I'm sorry, restate that?

24    Q    After you transferred to the Fontana facility, would you

25    ever go to the Compton facility?

Exhibit 1(e)
689



www.escribers.net | 800-257-0885

1  A    Oh, rarely.  Yes.

2  Q    And how often?

3  A    Only to pick up a check or to pick up a chassis.

4  Q    Would you ever pick up from a rail yard?

5  A    Yes.

6  Q    And how often?

7  A    Very uncommon.

8  Q    Did you ever pick up from the rail yard in 2019?

9  A    I believe so.

10  Q    What shift did you work before the Union election?

11  A    Night.

12      MS. KAGEL:  I'm sorry, Your Honor.  I seem to be -- can we

13  go off the record for a moment?

14      JUDGE ROSAS:  Yeah, why don't you -- he said night shift.

15      MS. KAGEL:  Night shift.  Okay.

16      JUDGE ROSAS:  Now, you're having a continuously bad

17  connection?

18      MS. KAGEL:  Yeah.  I just want to disconnect and reconnect

19  and see if that helps.

20      JUDGE ROSAS:  Yep.  Go ahead.

21      MS. KAGEL:  All right.

22      JUDGE ROSAS:  Go ahead.

23      MS. KAGEL:  I'll do that right now.  Thank you.

24  (Off the record at 2:22 p.m.)

25      JUDGE ROSAS:  Okay.  Back -- back on.

Exhibit 1(e)
690



www.escribers.net | 800-257-0885

1    Q    BY MS. KAGEL:  And Mr. Torres, what were the hours on the

2    night shift?

3    A    Approximately eight per day.

4    Q    But which -- which hours?

5    A    Oh, I'm sorry.  5 p.m. to 2 a.m.

6         MS. KAGEL:  Okay.  I'm sorry, Your Honor.  I'm not sure

7    what's happening with my computer.  Can everyone still hear me?

8    It's switching my sound output for some reason.

9         THE WITNESS:  I can hear you.

10        MS. KAGEL:  Okay.  Thank you.

11        JUDGE ROSAS:  We haven't had any trouble hearing you at

12   any time.

13        MS. KAGEL:  All right.

14        JUDGE ROSAS:  Can you hear me?

15        MS. KAGEL:  Yeah.  Yes, Your Honor.  I'm sorry.  I'm not

16   sure why my computer is giving me issues all of a sudden right

17   now in the middle of this witness.  But I -- I think I can

18   continue going if that's all right.

19                    **RESUMED DIRECT EXAMINATION**

20   Q    BY MS. KAGEL:  All right.  Mr. Torres, now after being in

21   the election, what was a typical day at work like?

22   A    After you do one load or one assignment, you would just

23   bobtail back to the yard.

24        MS. KAGEL:  Your Honor, I apologize.  Can we go off the

25   record again?

Exhibit 1(e)
691



1      JUDGE ROSAS:  Off the record.

2   (Off the record at 2:25 p.m.)

3      JUDGE ROSAS:  Okay, let's try it again.  On the record.

4      MS. KAGEL:  Your Honor, I'm sorry.  Did you want to give

5   Mr. Adlong a chance to come back?

6      JUDGE ROSAS:  Oh, yes.  We're back on the record.

7                  **RESUMED DIRECT EXAMINATION**

8   Q    BY MS. KAGEL:  And Mr. Torres, thank you for your

9   patience.  Let me just ask you my last question since I did not

10  hear the answer.  After the Union election, what was a typical

11  day of work like?

12  A    After you're getting an assignment done, you would just

13  bobtail back to the yard.

14  Q    What does that mean to bobtail?

15  A    It means to drive the truck to the yard with no container,

16  no chassis, no freight.

17  Q    And where were you picking up?

18  A    I would pick up sometimes at the port.  And yeah.

19  Q    And how many loads were you getting a day after the Union

20  election?

21  A    I believe it to be one.  Yeah, it was just one load.

22  One -- one assignment, or one load.

23  Q    And where were --

24  A    (Indiscernible, simultaneous speech) --

25  Q    Where were you dropping off this one load?

Exhibit 1(e)
692



```
 1   A     Franco Storage.

 2   Q     What is Franco Storage?

 3   A     It's a yard similar to Southern Counties Express where you

 4   drop off containers.

 5   Q     And in the time between the Union election, but before

 6   your layoff, how often were you dropping off at Franco Storage

 7   Yard?

 8   A     It was about rare.

 9   Q     In the time that --

10   A     I remember -- I'm sorry.  I remember going, but not that

11   much.

12   Q     When do you remember going?

13   A     I don't have an exact amount.  I just know that it was

14   common for us to go there after the election.

15   Q     Were you delivering to any customers besides Franco Store

16   Yard -- Storage Yard after the Union election?

17   A     I don't recall at the moment.  If there was, it was very

18   rare.

19   Q     Did you ever ask the dispatchers for more loads?

20   A     Yes, I did.

21   Q     And what would they say?

22   A     They said, that's it.  There's no more work.

23   Q     Do you recall ever taking a break, one of your breaks at

24   the Franco Storage Yard?

25   A     Yes.
```

Exhibit 1(e)
693



www.escribers.net | 800-257-0885

1    Q    And when you were taking your breaks at the Franco Storage

2    Yard, did you ever see anyone pick up the containers?

3    A    Yes.

4    Q    Do you know Roadrunner?

5    A    Yes.

6    Q    And what is it?

7    A    A company that has gone into Franco Storage to pick up

8    containers at that yard.

9    Q    Do you know Container Connection?

10   A    Yes.

11   Q    What is it?

12   A    It's another trucking company that also goes into Franco

13   Storage to pick up containers.

14   Q    Do you recall if you ever saw trucks from Roadrunner or

15   Container Connection picking up containers that were dropped

16   off at Franco Storage Yard?

17        MR. ADLONG:  Objection.  Vague as to time.

18        JUDGE ROSAS:  What's the time frame?

19        MS. KAGEL:  Time frame is after the Union election, but

20   before his layoff.

21        JUDGE ROSAS:  You can ans --

22        THE WITNESS:  Repeat the question?

23   Q    BY MS. KAGEL:  Do you recall if you ever saw trucks from

24   Roadrunner or Container Connection picking up the containers at

25   the storage Franco Yard?

Exhibit 1(e)
694



1   A   Yes.

2   Q   Did you ever see trucks from Southern Counties picking up

3   the containers at the Franco Storage Yard?

4   A   Yes.

5   Q   How long would it take you to drive from the Fontana yard

6   to the port?

7   A   It would be about two hours, but it depends on the

8   traffic.

9   Q   And on that one delivery a day from the port to the Franco

10  Storage Yard, how long would that take?

11  A   I'm sorry, can you repeat the question?

12  Q   That one delivery you had from the port to the Franco

13  Storage Yard, how long would that take?

14  A   That would be about 20 minutes.

15  Q   And how far away was the Franco Storage Yard from the

16  Fontana facility?

17  A   About two hours.  An hour and a half, two hours.

18  Q   Did this decrease in work assignments also decrease the

19  number of hours you worked?

20  A   Somewhat, yes.

21  Q   Do you recall experiencing a change in work assignments

22  like this in the previous year in December 2018?

23       MR. ADLONG:  Objection.  Leading.

24       JUDGE ROSAS:  I'll allow it.  You can answer.

25  A   No, there was not the same amount of work.

Exhibit 1(e)
695



www.escribers.net | 800-257-0885

1    Q    BY MS. KAGEL:  Do you recall a change in the number of

2    hours you worked like this in the previous year in December of

3    2018?

4    A    No, it was different.

5    Q    Did you still work the night shift after the Union

6    election?

7    A    Yes.

8    Q    Did Universal ever try to change your shift?

9    A    Yes.

10   Q    And when did Universal try and change your shift?

11   A    About two or maybe three weeks before I was laid off.

12   Q    And what were they trying to change your shift to?

13   A    To the morning shift.

14   Q    How did they inform you that they would be changing your

15   shift?

16   A    By a letter.

17   Q    Did they say when you would start working the day shift?

18   A    Yes.

19        MR. ADLONG:  Objection.  Relevance.

20        MS. KAGEL:  Your -- Your Honor, do you want me to explain?

21   Your Honor, this relates to a notification given to employees

22   about the layoffs and the sudden nature of the layoffs.

23        JUDGE ROSAS:  Respondent?

24        MR. ADLONG:  I guess I don't see how a shift change

25   relates to a notice of a layoff.  The layoff seems -- did you

Exhibit 1(e)
696



1    get this letter?  Yes.  When?  How?  Done.

2        JUDGE ROSAS:  Overruled.

3    Q    BY MS. KAGEL:  Mr. Torres, did Universal say when you

4    would start working the -- the morning shift?

5    A    Yes.

6    Q    And when was that?

7    A    About two or three weeks before the layoff.

8    Q    That's when you would start working the morning shift?

9    A    Exactly.

10   Q    And did you start working the morning shift two to three

11   weeks before the layoff?

12   A    No.

13   Q    When were you supposed to start?

14   A    I was supposed to start about the time that I was laid

15   off.

16   Q    How did you learn about your layoff?

17   A    By mail.

18   Q    Show you what has already been admitted as gee -- Joint

19   Exhibit 6(b).  Give me one moment.  Does this look like the

20   letter you received in the mail from you --

21   A    Yes.

22   Q    -- about your layoff?  Did you ever hear that you might be

23   laid off from the company?

24   A    No.

25   Q    Now, the layoff letter refers to the lease of the Compton

Exhibit 1(e)
697



 1    facility expiring.  Did you know that the lease of the Compton

 2    facility was expiring?

 3    A    I was not notified, but I had a conversation with Walter,

 4    and he mentioned something about --

 5         MR. ADLONG:  Objection.  Rep -- hearsay.

 6         JUDGE ROSAS:  So let's take the first part of that answer,

 7    and let's go to the next question.

 8    Q    BY MS. KAGEL:  And how did you know the lease was

 9    expiring?

10    A    Walter told me.

11         MR. ADLONG:  Objection.  Hearsay.

12         JUDGE ROSAS:  Overruled.  Next question.

13    Q    BY MS. KAGEL:  You can answer, Mr. Torres.

14         JUDGE ROSAS:  He said Walter told him.  Next question.

15         MS. KAGEL:  Oh.

16    Q    BY MR. ADLONG:  And -- and what happened in that

17    conversation?

18         MR. ADLONG:  Objection.  Hearsay.

19         JUDGE ROSAS:  Well --

20    A    He just briefly --

21         JUDGE ROSAS:  -- I prevy -- hold on, hold on.  So as I

22    have before, the -- the -- y'all will be deemed to have a

23    continuing objection.  I'm going to permit any statements from

24    Walter the dispatcher, who the witnesses are testifying

25    essentially was acting within the scope of his employment as a

Exhibit 1(e)
698



1    dispatcher on behalf of Universal Intermodal or SCE, one or the

2    other, and so that it is -- it is admissible, and I'm

3    overruling that and any subsequent objections.

4        MR. ADLONG:  Your Honor, if I may just put an argument on

5    the record.  He is not an alleged 2(11).  He is a nonalleged

6    2(13), and I don't think we're taking the position -- position

7    that he's a 2(11), so it would mean that he's a 2(13).  To the

8    extent he's a 2(13), I can appreciate the position that you --

9    maybe it's like, hey, he's a 2(13) for the purposes of work

10   assignments, but there's nothing to suggest that he's a 2(13)

11   for the purposes of addressing, like, facilities management or

12   operations of the facility and how's it going.  The -- he --

13   the -- there's been no testimony whatsoever of the record -- on

14   the record of that point, so I want to make sure we state that

15   objection and state that position.

16       JUDGE ROSAS:  Okay.  So let me just -- let me just explain

17   to Counsel again -- let's go off the record for a minute.

18   (Off the record at 2:40 p.m.)

19       JUDGE ROSAS:  Counsel, as I've indicated before, your

20   objections relating to whether or not someone was listed as

21   a -- a 2(11) supervisor or 2(13) agent are not applicable in

22   the sense here where it's being prop -- where it's being

23   offered as an opposing party statement in the sense that -- so

24   specifically, it's not hearsay, all right?  It -- it falls

25   under the -- the rubric of an opposing party statement.  What

Exhibit 1(e)
699



1     you're referring to with respect to agents is specifically

2     provided for at 801 -- 801(d) --

3          MR. ADLONG:  (Indiscernible, simultaneous speech) --

4          JUDGE ROSAS:  -- to -- please, Counsel, I'm talking --

5     801(d) -- to (D), capital D.  What I'm referring to is

6     801(d)(2)(C), "was made by a person" who "the party authorized

7     to make a statement on the subject", and as I previously

8     detailed, the testimony as offered appears to indicate that

9     Walter the dispatcher, that's his job to do that, okay, and --

10    and so to the extent that he's having communications with

11    individuals, he's -- he's a dispatcher on behalf of.  Whether

12    he's an agent to bind the company on something that would be

13    essentially an admission, that's one thing, but what we're

14    talking about are facts, and it's not hearsay because it's

15    being made by someone who's an authorized employee:  a person

16    who's authorized to make a statement on the subject, i.e.,

17    dispatching duties, okay?  Is there any other clarification

18    that you need?

19         MR. ADLONG:  I -- I think -- I just respectfully disagree

20    that as it concerns the statements on the lease.  That doesn't

21    turn to dispatching duties.  Dispatching duties I appreciate,

22    and I try to, like, point out I understand that position, but

23    with respect to statements of facilities management and

24    managing the property, there's nothing to suggest that he's

25    authorized with he -- within his position to make statements on

Exhibit 1(e)
700

escribers
www.escribers.net | 800-257-0885

1    that.

2         JUDGE ROSAS:  Okay.  General Counsel, repeat the question.

3         MS. KAGEL:  Your Honor, before I move on, I just want to

4    point out that in Joint Exhibit 11(a), which outlines the

5    management structure provided to us by Respondent, Walter is

6    listed on there on Bates stamp 650 for the time period in

7    question as fleet manager.

8         JUDGE ROSAS:  You're talking about a joint exhibit?

9         MS. KAGEL:  Yes.

10        JUDGE ROSAS:  Now, what -- what -- that's one thing.  Now,

11   what the Respondent is -- is saying is that he's not alleged to

12   be a statutory agent in the --

13        MS. KAGEL:  Uh-huh.

14        JUDGE ROSAS:  -- complaint or a statutory supervisor, but

15   on the other hand, you're saying that he's listed in a

16   management structure in a joint exhibit.

17        MS. KAGEL:  Uh-huh.

18        JUDGE ROSAS:  What's the question?

19        MS. KAGEL:  The question, Your Honor, was in this

20   conversation in which Mr. Torres had with Walter about the

21   lease, what happened during that conversation.

22        JUDGE ROSAS:  About the lease?

23        MS. KAGEL:  Uh-huh.

24        JUDGE ROSAS:  Okay.  So counsel for Respondent, let's hear

25   the answer.  If it goes to anything that's beyond -- that --



1    that -- that borders on speculation, that's one thing, but if

2    we're talking about the operations, which I see as closely

3    related enough to the interaction between Walter and his

4    employees -- I mean, he's their point of contact for the

5    company, okay, so I'm not going to -- I'm not going to strictly

6    construe this as far as what his -- his interaction with the

7    employees.  He's who they communicate with, okay?  I mean,

8    these are the duties of the dispatcher.  I mean, when we say

9    dispatcher, we're not just talking here, according to the

10   testimony, just somebody saying, okay, you're out of here at

11   5:00 on truck such-and-such and you're going to such-and-such,

12   okay?  It appears to be within the scope of his

13   responsibilities.  He appears to be the one with the

14   information that is convey -- conveyed to the employees.  They

15   are employees, right?  Or they were employees; is that correct?

16   Before they were discharged?

17        MS. KAGEL:  Yes, Your Honor.

18        JUDGE ROSAS:  Respondent, do you concede that they were

19   employees?

20        MR. ADLONG:  The Universal Intermodal empl -- Universal

21   Intermodal drivers, yes.

22        JUDGE ROSAS:  And Walter was a Universal Intermodal

23   employee, correct?

24        MR. ADLONG:  Incorrect.

25        JUDGE ROSAS:  He wasn't.  He was assau -- he was an SCE

Exhibit 1(e)
702



1    employee; is that correct?

2        MR. ADLONG:  That is correct.

3        JUDGE ROSAS:  And he was the one to whom they answered

4    and -- and the one who provided them with the information

5    necessary for them to fulfill their duties; is that right?

6        MR. ADLONG:  I'm not sure I would agree to the suggestion

7    that they answered to them.  That's a pretty loaded statement,

8    but I would agree that they talked to him and he would provide

9    loads that they needed to deliver.

10       JUDGE ROSAS:  Well, look, Counsel, let me just assure you

11   if -- if your concerns are -- and those are concerns that

12   relate to section 2(11) and 2(13) of the Act with respect to

13   supervisors and agents, to the extent that any of his answers

14   cross over into questions of legal culpability, you can -- you

15   can argue -- you can argue the -- the hearsay import or the --

16   the -- the -- the lack of the witness' qualifications or -- or

17   Walter's lack of ability to tie the employer on anything that

18   would be tantamount to an admission as a 2(11) supervisor or

19   agent would do, okay, but when it relates to what the facts

20   are, I -- I don't see any reason to exclude the testimony

21   that's simply laying out the facts.  Okay, now whether

22   something has legal significance, you can argue that, but --

23       MR. ADLONG:  Well --

24       JUDGE ROSAS:  -- but -- but the -- but the testimony's

25   coming in.



Exhibit 1(e)
703

www.escribers.net | 800-257-0885

1    MR. ADLONG:  Okay.  Well, that's your ruling.  I mean, we

2    respectfully disagree, and we'll just address it when we need

3    to.

4    JUDGE ROSAS:  Okay, all right.  So Mr. Torres, do you

5    remember the question?

6    THE WITNESS:  Yes.

7    JUDGE ROSAS:  Okay, go ahead.

8    A    So I was not notified by letter that the lease was going

9    to expire.

10                   **RESUMED DIRECT EXAMINATION**

11    Q    BY MS. KAGEL:  The question was in that conversation you

12    had with Walter about the lease, what happened during that

13    conversation?

14    A    Yes, also Walter -- the conversation I had is that he told

15    me that the lease was expiring.

16    Q    Did he say why?

17    A    I asked him, hey, why are all the desks gone and the

18    chairs.  What happened?  He said that they're moving to SCE 5,

19    which is the Southern Counties Express yard number 5.  That's

20    what that means.  He said that they were moving, and I told him

21    why, so because the lease is expiring.

22    Q    And when you said all the desks and chairs were gone,

23    where did this conversation occur?

24    A    When I walked into the yard because he -- he handed me a

25    piece of paper.  I don't know what it was for, some load or

Exhibit 1(e)
704



1    something, and that's when I noticed that -- that the chairs

2    and desks were missing.

3    Q    Was this at the Compton Yard?

4    A    Yes, Compton.

5    Q    Did he say anything else about the lease in this

6    conversation?

7    A    That's what I remember right now.

8    Q    Okay.  And do you remember when this conversation was?

9    A    Sometime in year -- November or December.

10   Q    Okay.  And do you know what happened to your truck in the

11   Fontana Yard after you were laid off?

12   A    No.

13   Q    Now, I'm going to direct you back to Joint Exhibit 6(b).

14   Now, in the layoff letter, it lists Michael Vagts, V-A-G-T-S,

15   as the contact person for questions.  At the time you were laid

16   off, did you know who he was?

17   A    Yes.

18   Q    And who was he?

19   A    He was a person to contact if you had any issues with pay.

20   Q    Did you ever try and contact him after you were laid off?

21   A    Yes.

22   Q    I'm going to direct you -- whoops, sorry.  I'm going to

23   direct you to Joint Exhibit 8(a), which has already been

24   admitted and is five pages total.  I'm going to scroll slowly,

25   and let me know when you're done.

Exhibit 1(e)
705



www.escribers.net | 800-257-0885

1        You recognize this email correspondence?

2    A    Yes.

3    Q    And I would just like to point out as outlined in footnote

4    1 of Joint Exhibit 1, Elvita (sic) Pereda at the top, here, is

5    a Board agent for Region 21 of the National Labor Relations

6    Board who is involved in the investigation process with these

7    cases.  Now, Mr. Torres, is your email address

8    jrtm1970@yahoo.com?

9    A    Yes.

10   Q    Are these all the emails sent between you and Mr. Vagts on

11   June 15th and 16th, 2020?

12   A    Yes.

13   Q    Now, in your email sent to Mr. Vagts on June 15th, 2020,

14   at 11:56 a.m., you referenced being reimbursed $100 for fuel

15   you put in your company truck using your personal credit card.

16   Is this why you sent him the email?

17   A    Yes.

18   Q    Do you recall ever speaking to Mr. Vagts on the phone

19   before sending this email?

20   A    Yes.

21   Q    How many phone conversations did you have with Mr. Vagts

22   before sending this email?

23   A    Maybe two.

24   Q    Now, you referenced that you attached your driver manifest

25   for the date June 14.  Is that's what's Bates stamped as 622

Exhibit 1(e)
706



1    here?

2    A    Yes.

3    Q    And you also attached a credit card bill for $100.  Is

4    that's what is Bates stamped here as 623?

5    A    Yes.

6    Q    And you also attached the check stub for the week ending

7    June 16th and the following week.  Is that what is Bates

8    stamped as 624?

9    A    Yes.

10    Q    Going up to the original email we were speaking about on

11    the page that's Bates stamped --

12        JUDGE ROSAS:  Counsel, go back to that.  You're -- you're

13    flashing through it --

14        MS. KAGEL:  Oh, I'm sorry, Your Honor.

15        JUDGE ROSAS:  -- too quickly, and I'm not picking up

16    dates.

17        MS. KAGEL:  Okay.

18        JUDGE ROSAS:  Go ahead.  What else did you scroll through?

19        MS. KAGEL:  I just scrolled back up to the original email

20    that I was questioning him about on 6/21 --

21        JUDGE ROSAS:  Scroll down.  You're --

22        MS. KAGEL:  Okay.

23        JUDGE ROSAS:  -- looking at time sheets.  I had no clue as

24    to what date you're looking at.

25        MS. KAGEL:  I'm sorry, Your Honor.

Exhibit 1(e)
707



www.escribers.net | 800-257-0885

1    Q    BY MS. KAGEL:  Let me take you through that again, Mr.

2    Torres.  You referenced that you attached your driver manifest

3    for the date June 14th.  Is that on the page that --

4         JUDGE ROSAS:  Of what year, Counsel?

5         MS. KAGEL:  Of 2019, Your Honor.  I'm sorry, 2018.

6    A    Yes.

7    Q    BY MS. KAGEL:  And you also attached the relevant credit

8    card bill for $100.  Is that on the page that's been Bates

9    stamped as 623?

10   A    Yes.

11   Q    And lastly, you said you attached the check stub for the

12   week ending June 15th -- I'm sorry -- June 16th, 2018, and the

13   following week.  Is that's what's been Bates stamped as 624?

14   A    Yes.

15        MS. KAGEL:  Your Honor, may I continue?

16        JUDGE ROSAS:  Yes.

17   Q    BY MS. KAGEL:  Now, I just wanted to clarify, Mr. Torres,

18   going back up to that first email on the page that's been Bates

19   stamped 621, why are some of the headings for the emails in

20   Spanish?

21   A    That's the way my computer's set up.

22   Q    Okay.  Now, I would like to show you what's already been

23   admitted into the record as Joint Exhibit 8(b), which is three

24   pages, and I'll scroll through slowly for you.

25        Are you familiar with this email correspondence?

Exhibit 1(e)
708



 1    A    Yes.

 2    Q    Are these all the emails sent between you and Mr. Vagts

 3    between June 29th and July 7th, 2020?

 4    A    Yes.

 5    Q    Let's look at this email sent on June 30th at 10:32 a.m.

 6    on the page that's been Bates stamped 626.  I just wanted to

 7    ask a clarifying question.  Mr. Vagts writes about some PTO.

 8    Does that stand for paid time off?

 9    A    Yes.

10    Q    Now, scrolling up on the same page, which is Bates stamped

11    626, Mr. Vagts emailed to you where the information about the

12    email is on the page Bates stamped 625.  He sent it on July

13    7th, 2020, at 7:05 a.m., and at the top of the page Bates

14    stamped 626, he wrote that he had attached an agreement you

15    discussed.  I'm going to direct you to what's already been

16    admitted as Joint Exhibit 8(c), which is five pages, and I'm

17    going to go scroll through it.  Does this look like the

18    agreement that Mr. Vagts said he attached to his email?

19    A    Yes.

20         MR. ADLONG:  Objection.

21         JUDGE ROSAS:  You're objecting to the --

22         MR. ADLONG:  Leading the --

23         JUDGE ROSAS:  -- Board exhibit?

24         MR. ADLONG:  I'm -- I'm objecting as to form of the

25    question.  Seems like the appropriate question here would be,

Exhibit 1(e)
709



1    like, what is this document, like, rather than -- the continual

2    yes or no gives the impression --

3         JUDGE ROSAS:  Well, it would be interesting to know.

4    Rephrase.

5    Q    BY MS. KAGEL:  Mr. Torres, are you familiar with this

6    document?

7    A    Yes.

8    Q    And what is it?

9    A    It is the -- they're that -- my boss had sent me.

10   Q    Now, I'm going to go back to Joint Exhibit 8(b), the last

11   email in this email chain which appears on the page Bates

12   stamped 625.  It appears that you forwarded this entire email

13   chain to Ricardo Hidalgo.  Who is he?

14   A    Teamsters representative.

15   Q    Why did you send him this?

16   A    He told me to.

17        MR. ADLONG:  Objection.  Relevance.

18        JUDGE ROSAS:  Do we need to refer the witness to the

19   waiting room?  Ms. --

20        MS. KAGEL:  I don't think so, Your Honor.

21        JUDGE ROSAS:  Well, give me a subject matter.  What does

22   it touch on?

23        MS. KAGEL:  This relates to the direct dealing allegation,

24   Your Honor.

25        MR. ADLONG:  So maybe we do need to refer him to the

Exhibit 1(e)
710



1    waiting room.

2         JUDGE ROSAS:  Hold on, hold on.  So the testimony is that

3    the witness forwarded it to a Union representative, correct?

4         MS. KAGEL:  Yes, Your Honor.

5         JUDGE ROSAS:  And it relates to a direct dealing

6    allegation, so who cares what the Union is going to do with it,

7    if anything?

8         MS. KAGEL:  Your Honor, it also relates to a bargaining

9    allegation and an information request allegation, so provides

10   context --

11        JUDGE ROSAS:  Thank you.

12        MS. KAGEL:  -- to future testimony.

13        JUDGE ROSAS:  Overruled.  You can answer.

14   Q    BY MS. KAGEL:  Mr. Torres, why did you send this to him?

15   A    He told me to.

16   Q    Did you also send to him the agreement which is Joint

17   Exhibit 8(c)?

18   A    Can I see 8(c)?

19   Q    I believe I have it up.  If I don't --

20   A    Okay.

21   Q    -- please let me know.

22   A    Yes, I believe I sent that one as well.

23   Q    Did you ever sign this agreement?

24   A    No.

25   Q    Did Mr. Vagts try and contact you after sending you this

Exhibit 1(e)
711



1    agreement?

2    A    Yes.

3    Q    And how?

4    A    A phone call.

5    Q    Did you call him back?

6    A    No.

7    Q    Did you ever get a check from Universal in connection with

8    this agreement?

9    A    Yes.

10   Q    I'm going to show you what's been marked as Joint Exhibit

11   8(d).  Are you familiar with this document?

12   A    Yes.

13   Q    And what is it?

14   A    It's a check.

15   Q    Is this the check that you received in connection with the

16   agreement?

17   A    Yes.

18   Q    Who took this photo?

19   A    I did.

20   Q    Now, I'd like to read -- clarify some of the points on

21   here.  The signatures under Universal Intermodal on the -- the

22   top right there, that first signature which appears to be Tim

23   Phillips, do you know who he is?

24   A    No.

25   Q    And I may not be getting this correct, but that second

Exhibit 1(e)
712



1    signature, which is Jeffrey Hinsil (sic), do you know who he

2    is?

3    A    No.

4    Q    Now, scrolling down to the attached information to the

5    check, under invoice number, it says, "NLRB settlement".  Do

6    you know why?

7    A    No.

8    Q    Did you ev -- ever file a charge with the NLRB as an

9    individual?

10   A    No.

11   Q    Next to it under description, it says, "MV/NLRB

12   settlement".  Do you know what "MV" stands for?

13   A    No.

14   Q    Do you know why it says "MV/NLRB settlement" here?

15   A    No.

16   Q    Did you cash this check?

17   A    No.

18   Q    Now, while you were still working for Universal

19   Intermodal, if you were not reimbursed for an expense, how

20   would you go about to be reimbursed?

21   A    I would contact my boss.

22   Q    And would you have to sign any kind of settlement before

23   getting your reimbursement?

24   A    No.

25   Q    Did you ever receive a check like the one you received in

Exhibit 1(e)
713



1    Joint Exhibit 8(d)?

2    A    No.

3       MR. ADLONG:  Objection.  Continually as to form, Your

4    Honor.  It's yes or no, yes or no.  The witness should testify

5    in response to open-ended questions.

6       MS. KAGEL:  Your Honor, I'm not suggesting an answer.  He

7    can say --

8       JUDGE ROSAS:  Well --

9       MS. KAGEL:  -- yes or no.

10      JUDGE ROSAS:  -- you know, it's one of those -- it's one

11   of those situations where we'd never get to the bottom of it if

12   we didn't lead a little bit, and this is not -- this is not

13   anything mysterious, so I'm going to overrule the ob -- the

14   objection regarding this line of questioning up to the -- up to

15   this point, at least this far.  Next question.

16   Q    BY MS. KAGEL:  Mr. Torres, were you ever offered more

17   money than what you were owed for reimbursements?

18   A    For this particular --

19      MR. ADLONG:  Objection.  Calls for legal conclusion.

20   Assumes facts not in evidence, (indiscernible) speculation.

21      JUDGE ROSAS:  You need to rephrase the latter part of

22   that.

23   Q    BY MS. KAGEL:  In the time you were working for Universal

24   Intermodal and you had to be reimbursed for expenses, were you

25   ever given more money than you were owed?

Exhibit 1(e)
714



www.escribers.net | 800-257-0885

1          MR. ADLONG:  Objection.

2     A    No.

3          MR. ADLONG:  Calls for speculation.  Lacks foundation.

4          MS. KAGEL:  It's if he knows, Your Honor.

5          JUDGE ROSAS:  Overruled.

6     Q    BY MS. KAGEL:  Do you need me to repeat the question, Mr.

7     Torres?

8     A    Please.

9     Q    In the time when you worked for Universal Intermodal and

10    you were owed expenses, were you ever offered more money than

11    what you were owed?

12    A    Only this situation.

13         MS. KAGEL:  No further questions, Your Honor.

14         JUDGE ROSAS:  Charging Party, anything?

15         MR. WOJCIECHOWSKI:  No, thank you.

16         JUDGE ROSAS:  All right, off the record.

17    (Off the record at 3:05 p.m.)

18         JUDGE ROSAS:  Respondent, cross.

19                    **CROSS-EXAMINATION**

20    Q    BY MR. ADLONG:  Mr. Torres, nice to speak with you this

21    afternoon.  My name is Daniel Adlong.  I'm counsel for the

22    Respondent companies.  I'm going to ask you some questions

23    today, and I think you can tell, but we have a court reporter

24    here who's writing down everything you say and everything I

25    say, and in order to make sure that we capture a complete

Exhibit 1(e)
715



1   record, I'm going to ask that you answer my questions verbally.

2   Typically, a head nod or something like that will work, but

3   here, it won't, so can you do that for me, please?

4   A    Yes.

5   Q    Okay.  The next thing I'm going to say is it's more likely

6   than not that at some point you're probably going to understand

7   or know the question that I'm asking before I ask the question,

8   but rather than answer before I complete my question, can you

9   please wait until I complete each of my questions before you

10  answer verbally?

11  A    Yes.

12  Q    Okay.  And then finally, you remember you're still under

13  oath?

14  A    Yes.

15  Q    Okay.  Now, just a quick question:  Is there anybody else

16  there in the room with you?

17  A    Not in this room.

18  Q    Okay.  So you said that you worked at the ports for

19  Universal Intermodal from March 5th, 2018, till about December

20  tw -- 2019; is that correct?

21  A    Yes.

22  Q    Okay.  Prior to that, you had been a truck driver,

23  correct?

24       MS. KAGEL:  Objection.  Relevance.

25       JUDGE ROSAS:  Overruled.  You -- overruled.  You can

Exhibit 1(e)
716



1    answer.

2    A    Yes.

3    Q    BY MR. ADLONG:  You had worked in the ports, too, correct?

4         MS. KAGEL:  Objection, Your Honor.

5    A    Yes.

6         MS. KAGEL:  It's outside the relevant time period.

7         JUDGE ROSAS:  I'll allow it.  You can answer.

8    A    But it has nothing to do with Intermodal, right?

9    Q    BY MR. ADLONG:  I just asked if you -- you confirmed that

10   you were a truck driver before you worked for Universal

11   Intermodal, and I confirmed that you worked in the ports as a

12   truck driver before you confirmed -- before you worked for

13   Universal Intermodal, correct?

14   A    But what does this have to do with Universal?

15        MR. ADLONG:  Your Honor, could you please instruct him to

16   answer the question?

17        JUDGE ROSAS:  You heard, Counsel, right?  He's entitled to

18   ask you the questions that he deems necessary.  If there's an

19   objection, I'll entertain it.  Otherwise, you're instructed to

20   answer, sir.  Do -- do you understand the question?

21        THE WITNESS:  Yes.

22   A    The answer is yes.

23   Q    BY MR. ADLONG:  Okay, thank you.  Okay, and so from March

24   to January 2019, you worked out of the Compton facility, right?

25        MS. KAGEL:  Objection, Your Honor.  Confusing in terms of

Exhibit 1(e)
717



1    the timeline, March to January 2019.

2         JUDGE ROSAS:  Repeat the time frame.

3    Q    BY MR. ADLONG:  From March 2018 to January 2019, you

4    worked out of the Compton facility, correct?

5    A    Can you repeat the question?

6    Q    From March 2018 to January 2019, you worked out of the

7    Compton facility, correct?

8    A    I don't have the exact dates for Compton facility.

9    Q    Okay.  Your first day you started working for Universal

10   Intermodal, as best I remember, you testified was March 5th,

11   2018; is that still your testimony?

12   A    Yes.

13   Q    Okay.  Then you went to Fontana in January 2019, correct?

14   A    Approximately, yes.

15   Q    Okay.  So is it possible that it was in December 2018 that

16   you went to Fontana?

17        MS. KAGEL:  Objection, Your Honor.  Asked and answered.

18        JUDGE ROSAS:  Overruled.  You can answer.

19   A    It was about January.

20   Q    BY MR. ADLONG:  Okay.  Now, you went to Fontana because

21   you moved to Fontana, correct?

22   A    No.

23   Q    No?  You testified earlier, correct, that you moved to

24   Fontana in or about January 2019, correct?

25   A    No.

Exhibit 1(e)
718



1   Q    No?  When did you move to Fontana?

2   A    I never did.

3   Q    You never did?  Why did you start working out of the

4   Fontana facility?

5   A    Because it was closer to the home.

6   Q    It was closer to your home?

7   A    Yes.

8   Q    And you asked to work out of Fontana, right?

9   A    Yes.

10  Q    It was more convenient for you, correct?

11  A    Yes.

12       MR. ADLONG:  And you continued to receive your load,

13  your -- strike that.

14  Q    BY MR. ADLONG:  You conti -- well, you continued to

15  receive your directions from individuals that were working out

16  of the Compton location, correct?

17  A    Yes.

18  Q    Now, prior to Walter, who was the dispatcher that gave you

19  work?

20  A    I don't remember his name.

21  Q    And then Walter was the dispatcher that began to give you

22  work in what month of what year?

23  A    I don't remember.

24  Q    Okay.  Was it before or after January 2019?

25  A    I don't remember.

Exhibit 1(e)
719



www.escribers.net  |  800-257-0885

1    Q    Was it before or after you moved to Fontana?

2    A    I don't remember.

3    Q    Was it before or after Universal -- before or after the

4    acquisition of Southern Counties?

5         MS. KAGEL:  Objection, Your Honor.  Asked and answered.

6    He doesn't know.

7    A    I don't know.

8         MS. KAGEL:  Mr. --

9         JUDGE ROSAS:  Counsel, don't --

10        MS. KAGEL:  -- Torres, hold on.

11        JUDGE ROSAS:  Counsel, object and don't articulate unless

12   asked to, okay?

13        MS. KAGEL:  Yes, Your Honor.

14        JUDGE ROSAS:  All right.

15        MR. ADLONG:  Your Honor --

16        JUDGE ROSAS:  He answered.  Go ahead, pick up from there.

17        MR. ADLONG:  All right.

18   Q    BY MR. ADLONG:  So you testified that, as a driver, you

19   would retrieve or pick up -- you would pull loads with SCAC

20   codes, correct?

21   A    Yes.

22   Q    And the SCAC code, you would -- at one point when you --

23   when you began, you used an Intermodal -- Universal Intermodal

24   SCAC code, correct?

25   A    Yes.

Exhibit 1(e)
720



www.escribers.net | 800-257-0885

1    Q    And eventually, sometime after January 2019, you began to

2    pull loads with the SCE SCAC code, correct?

3    A    I don't remember the time frame.

4    Q    You would agree that you started to pull SCAC codes with

5    the SCE -- with -- you -- you would agree that you began to

6    pull loads with the SCE SCAC code, correct?

7    A    Yes.

8    Q    And you would agree that you'd pull -- eventually, you

9    would pull more loads with the SCE SCAC code than with the

10   Universal SCAC code, correct?

11   A    Restate the question?

12   Q    You would agree that eventually you began to pull more

13   loads with the SCE SCAC code than with the U -- U -- Universal

14   Intermodal SCAC code?

15   A    Yes.

16   Q    You would agree that by April or May 2019, you were

17   pulling more loads with the SCE SCAC code than the Universal

18   SCAC code, correct?

19        MS. KAGEL:  Objection.  Lack of foundation.

20        JUDGE ROSAS:  Cross-examination.  Overruled.  Did I -- was

21   I muted?

22        MR. ADLONG:  We heard --

23        MS. KAGEL:  No.

24        MR. ADLONG:  -- you.  We're waiting for an answer.

25   A    I don't have the dates.

Exhibit 1(e)
721



www.escribers.net | 800-257-0885

1    Q    BY MR. ADLONG:  Mr. Torres, I appreciate you don't have

2    the exact dates.  I'm just asking for your best rec --

3    recollection.  I -- I don't want you to guess, but an educated

4    estimate is acceptable.  So to the best of your understanding,

5    by April or May 2019, you would agree that you pulled loads

6    that were only for SCE, correct?

7        MS. KAGEL:  Objection.  Asked and answered.

8        JUDGE ROSAS:  Overruled.

9    A    I don't understand the question.

10   Q    BY MR. ADLONG:  Let me try -- let -- let's try to build up

11   to it.  You agree that you pulled -- at some point, you would

12   agree that you only pulled loads with SCE SCAC codes, correct?

13   A    At one point, yes.

14   Q    Okay.  And after that began, it continued to remain that

15   way, correct?

16   A    Not all the time.

17   Q    More often than not you pulled loads exclusively for SCE,

18   correct?

19   A    Yes.

20   Q    And that started in or about April or May 2019; would you

21   agree with that?

22   A    I don't know the dates.

23   Q    Was it in the spring of 2019?

24   A    I don't know.

25       MS. KAGEL:  Objection, Your Honor.  Asked and answered.

Exhibit 1(e)
722



```
 1        JUDGE ROSAS:  Overruled.

 2   Q    BY MR. ADLONG:  Was it in the summer of 2019?

 3   A    You're asking me basically the same question.  I don't

 4   know.

 5   Q    Was it in the winter of 2019?

 6   A    I don't know.

 7        THE WITNESS:  Just for the record, Your Honor, may I say

 8   something?

 9        MR. ADLONG:  Excuse me.  There's no pass -- there's no

10   question pending.

11        JUDGE ROSAS:  Sir, let me -- let me explain something to

12   you.  This usually happens -- the converse, you know, when a

13   witness is answering questions that are not being put to them

14   because they perhaps would like to see it asked a different

15   way.  You ask (sic) the question that's being asked of you.

16   That's what Counsel's entitled to do.  That's cross-

17   examination.

18        THE WITNESS:  Okay.

19        JUDGE ROSAS:  Counsel for the other side, they'll get a

20   turn back again, okay, and they could ask it, perhaps, maybe a

21   way that you might like it asked, but the counsel is entitled

22   to ask it the way he sees it, okay, and if it's a permissible

23   question and not objected to and sustained, he's requi -- he's

24   entitled to get an answer, okay?  So --

25        THE WITNESS:  Yes, sir.
```

Exhibit 1(e)
723



www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  -- you -- you give the answer, yes, no, or

2   you don't know, or if it provides the avenue for a -- a -- a

3   narrative, then you provide that, okay?  All right --

4        THE WITNESS:  Okay.

5        JUDGE ROSAS:  -- let's go.  Next question.

6   Q    BY MR. ADLONG:  As it concerns -- while you can't put a

7   date on it, you testified that at some point you began to pull

8   loads almost exclusively for SCE, but on occasion, you'd pull

9   for Universal Intermodal Services.  At that point, you didn't

10  reach out to your coworkers to ask them what SCAC codes -- who

11  they were pulling for, correct?

12       MS. KAGEL:  Objection.  Relevance.

13       JUDGE ROSAS:  I'm going to sustain that objection.

14       MR. ADLONG:  Your Honor, if I might be heard on it, and

15  I'd -- I'd ask the witness to step away so I can express it.

16       JUDGE ROSAS:  We can put him into the waiting room.  We'll

17  be right back with you, Mr. Torres.

18       MS. BRIDGE:  Judge, you are host again because my VIN

19  expired and I had to come back in.

20       JUDGE ROSAS:  All right.  I just put him in a waiting

21  room, and I'm going to make you the host.  Hopefully, I didn't

22  put him in a break room, but he'll find out what I did.  Okay,

23  go ahead.

24       MR. ADLONG:  Your Honor, they've alleged that we

25  unlawfully closed down the Compton facility, the Fontana

Exhibit 1(e)
724



1    facility, and a railroad -- and a Roadrunner facility, and part

2    of our explanation goes to freight conditions and who was

3    pulling what freight, so it's entirely appropriate to ask the

4    drivers who were driving what SCAC codes they were using, who

5    they were pulling freight for, and what did they understand

6    their coworkers were doing, and who did they understand their

7    coworkers were pulling freight for.

8         JUDGE ROSAS:  So the -- the -- the ruling is based on your

9    question seeking to elicit hearsay which I don't see any

10   indications that the hearsay would be reliable.  Can you tell

11   me how it would be reliable if permitted to be answered?

12        MR. ADLONG:  Well, I -- I think I asked him did he have

13   any knowledge regarding who his -- who his coworkers were

14   pulling freight for.

15        JUDGE ROSAS:  Okay.

16        MR. ADLONG:  That's what -- and so if they --

17        JUDGE ROSAS:  You -- you asked him about discussions you

18   had -- or -- or conversations he had with his coworkers.

19        MR. ADLONG:  Okay, then I'll rephrase the question to ask

20   him if had --

21        JUDGE ROSAS:  And you were (indiscernible, simultaneous

22   speech) --

23        MR. ADLONG:  -- any of those.

24        JUDGE ROSAS:  -- specifically what SCAC codes they

25   observed, right?

Exhibit 1(e)
725



www.escribers.net | 800-257-0885

1      MR. ADLONG:  Again, I -- I can rephrase it without

2   asking -- without asking hearsay questions.  That's fine.

3      MS. KAGEL:  And -- and Your Honor, I would still object on

4   relevance.  This is information he can elicit from --

5   Respondent can elicit from his own witnesses.

6      JUDGE ROSAS:  Well, that may or may not be, but he --

7   he's -- you know, apparently, the SCAC codes are a big deal,

8   so -- so we're going to go there, okay?  Overruled.  I'm going

9   to -- I'm going to reconsider my -- well, no, I'm -- I'm not.

10   The -- the objection is sustained, but Counsel, you're going to

11   try to pursue it a different way.  Okay, let's bring him back.

12      So again, if you can establish at any particular point

13   where certain histor -- certain hearsay would otherwise be

14   considered reliable and that's you look to the Federal Rules,

15   but you know, and -- and I like to refer to sometimes to 807 of

16   the Federal Rules which is the residual, the -- and I like to

17   make that the one that I consider most analogous to why we let

18   things in in administrative hearings because it's reliable

19   somehow circumstances indicate, but you'll -- you'll proceed

20   from there.  Go ahead.  Next question.

21      MS. KAGEL:  Your -- Your Honor, I'm sorry.  Just for rule

22   807 for residual, I -- I'm sorry, isn't there something in

23   there about anything that they want to let in under hearsay

24   we're entitled to know that before the hearing starts?

25      JUDGE ROSAS:  Yeah, and I -- I'll give you a citation when

Exhibit 1(e)
726

www.escribers.net | 800-257-0885

1    we rest today.  I've -- I've ruled on this before, and it's

2    actually a roadmap that ended up there where I allowed a

3    respondent to introduce a prior transcript -- a transcript

4    testimony by a retired witness who was in another state, so you

5    know, it was under oath.  That, to me, is generally reliable,

6    but again, it's a different circumstance.

7         MS. KAGEL:  That's right.

8         JUDGE ROSAS:  So let's not get derailed by that at the

9    moment, but let's see what the next question is because bottom

10   line is it reliable or is it going to be reliable.  In this

11   instance, Counsel, he's not your witness, so I can't assume

12   that you're going to be able to connect it because you can't

13   tell me who you're going to call to follow him because he's not

14   your witness.  So anyway, go with your next question.

15                 **RESUMED CROSS-EXAMINATION**

16   Q    BY MR. ADLONG:  Mr. Torres, do you have any knowledge

17   regarding what SCAC codes your other coworkers in Compton were

18   using to pull loads?

19   A    No.

20   Q    So just to make clear, so you have no idea what SCAC codes

21   they used to pull loads, then; is that correct?

22        MS. KAGEL:  Objection.  Asked and answered.

23        JUDGE ROSAS:  I'll allow it one more time.

24        MS. KAGEL:  Also calls for speculation.

25        JUDGE ROSAS:  Do you know?  Do you know what SCAC codes

Exhibit 1(e)
727



1    were on their trucks?  Do you know what SCAC codes were on

2    their trucks?

3         THE WITNESS:  You're asking me?

4         JUDGE ROSAS:  Yeah.

5         THE WITNESS:  On the trucks, no, I don't know.

6    Q    BY MR. ADLONG:  Now, you testified to dropping containers

7    at the Franco Yard.  Were those containers that you had

8    previously dropped at the Compton location?

9    A    I don't recall that.

10   Q    You don't recall the testimony or you don't recall whether

11   or not those were containers that you had previously dropped at

12   the Compton facility?

13        MS. KAGEL:  Objection.  Compound.

14        JUDGE ROSAS:  Sustained.  Rephrase.

15   Q    BY MR. ADLONG:  Do you remember you testified to dropping

16   containers at the Franco Yard?

17   A    Yes.

18   Q    Were those containers you had previously dropped at the

19   Compton Yard?

20   A    I don't recall that.

21   Q    Now, Mr. Torres, in your previous employment prior to

22   Universal Intermodal, did you have any experience with

23   intermur -- Universal Intermodal's, like, freight cycles?

24        MS. KAGEL:  Objection, Your Honor.  Relevance and outside

25   of the relevant time period.

Exhibit 1(e)
728



1        JUDGE ROSAS:  What's that term again?  Universal what?

2        MR. ADLONG:  I said Intermodal freight cycles.

3        JUDGE ROSAS:  Freight cycles?

4        MR. ADLONG:  Yeah.  I could -- I can go -- come at it a

5    different way if it's causing problems.  I'm happy to do

6    that --

7        JUDGE ROSAS:  Sustained --

8        MR. ADLONG:  -- if that's a problem.

9        JUDGE ROSAS:  -- as to foundation because the judge

10   doesn't know what you're talking about.

11       MR. ADLONG:  Okay.

12       MR. ADLONG:  So you testified earlier that you worked

13   at -- in the ports prior to -- strike that.

14   Q    BY MR. ADLONG:  Let's do this.  Do you have any knowledge

15   regarding how much freight Universal would ha -- Intermodal

16   would have in any given month prior to your employment?

17   A    No.

18   Q    Other than working in December 2018, you have no knowledge

19   regarding what is a regular amount of freight that Universal

20   Intermodal would have at the Compton location, correct?

21       MS. KAGEL:  Objection.  Asked and answered.

22       JUDGE ROSAS:  I'll allow it.  You can answer if you know,

23   sir.

24   A    I don't know.

25       MR. ADLONG:  All right, Ms. Bridge, any chance that you

Exhibit 1(e)
729



www.escribers.net | 800-257-0885

1    can please pull up Joint Exhibit 8(b), please?  Okay, actually,

2    Ms. -- Ms. -- Ms. Bridge, you're going to have to excuse me.  I

3    apologize.  Can you -- actually, you know what, if you'll just

4    go up to the bottom of 8(a).  That's where I would like to

5    start, please.  So if you just go down to the Bates labeled

6    page 621.

7         MS. KAGEL:  You passed it, Ms. Bridge.

8         MS. BRIDGE:  Oh, thank you.

9         MR. ADLONG:  Okay.  Right there.

10   Q    BY MR. ADLONG:  Mr. Torres -- Mr. Torres, I want you to

11   take a look at what's been marked as Joint Exhibit 8(a) and

12   (b), and Ms. Bridge can move those up for you as you request so

13   you can see them.

14        And tell -- can you confirm whether or not those are all

15   the written communications between yourself and Mike Vagts for

16   the time period of June 15th through the last email on Joint

17   Exhibit 8(b), please?

18        Mr. Torres, have you had the opportunity to remov -- re --

19   review Joint Exhibit 8(a) and 8(b) or do you need to see them

20   more?

21   A    No.

22        MS. KAGEL:  No, Your Honor, I think for the record, I

23   don't believe Ms. Bridge showed Mr. Torres 8(b); but I could be

24   mistaken.

25        THE WITNESS:  Is this 8(b)?

Exhibit 1(e)
730



```
 1          MR. ADLONG:  Yes.

 2   A    Okay.  It's dated there, so it's what is dated for that

 3   time frame on the email.

 4   Q    BY MR. ADLONG:  Okay.  Are those are the written

 5   communications you had between yourself and Mr. Vagts regarding

 6   your request?

 7   A    To the best of my knowledge, I have all the written

 8   requests sent over to Molly (phonetic).

 9   Q    Okay, that's not the question that I had for you, Mr.

10   Torres.  My question for you is, what you just reviewed, were

11   those, to the best of your knowledge, all your written

12   communication with Mr. Vagts?

13   A    I'm not sure it's all.

14   Q    Okay.

15   (Counsel confer)

16   Q    Mr. Torres --

17          JUDGE ROSAS:  Well, hold on one second.  Diane, how are we

18   doing?  Do you have to get off at some point?

19          MS. BRIDGE:  Not today, I'm fine.

20          JUDGE ROSAS:  Okay, good.  All right.  Back on.

21   Q    BY MR. ADLONG:  on Mr. Torres, isn't it true that you

22   threatened to take Mr. Vagts to court if he didn't give you

23   money?

24          MS. KAGEL:  Objection, Your Honor.  Relevance.

25          JUDGE ROSAS:  Overruled.
```

Exhibit 1(e)
731



www.escribers.net | 800-257-0885

1       MS. KAGEL:  And calls for a legal conclusion with

2  "threatened."

3       JUDGE ROSAS:  May or may not be.  Overruled.

4       THE WITNESS:  Do you want me to answer, Your Honor?

5       JUDGE ROSAS:  Yes.

6       THE WITNESS:  I did not threaten him.

7       MR. ADLONG:  Ms. Bridge, can you please pull up

8  Respondent's Exhibit 2?

9       MS. KAGEL:  Your Honor, I don't believe General Counsel

10  has received copies of Respondent's Exhibits.  You can correct

11  me if I'm wrong.

12       JUDGE ROSAS:  Did you email it --

13       MR. ADLONG:  We emailed them --

14       JUDGE ROSAS:  -- to General Counsel?

15       MS. KAGEL:  Oh, I'm sorry.  It just came through.  That's

16  my mistake.

17       JUDGE ROSAS:  Okay.

18       MS. KAGEL:  Thank you, Mr. Kuntz, for sending them.

19       MS. BRIDGE:  I just have to in-sync the -- the SharePoint;

20  I'll be right there.

21       MR. ADLONG:

22       MR. DO:  Ms. Bridge, I'm not sure Respondent had access to

23  the SharePoint.  They were emailed to you.

24       MS. BRIDGE:  Okay, I was going to say. they're not showing

25  up here now.  (Audio interference).  Okay.  So I guess I will

Exhibit 1(e)
732



www.escribers.net | 800-257-0885

1    go to my email.

2        MR. DO:  I am uploading them right now.  So you should be

3    able to sync them momentarily.

4        MS. BRIDGE:  oh, okay, thank you.

5        MR. DO:  Apologies, Your Honor.  And they're uploaded, Ms.

6    Bridge, so you can sync them now.

7        MS. BRIDGE:  Thank you.  I do not see them showing up on

8    my SharePoint.

9    (Counsel confer)

10       MR. DO:  They are there's a couple of documents I'm about

11   to two megabytes of may take a moment, but I -- I can see them

12   on my end.  So if you hit sync, you should be able to see them?

13       MS. BRIDGE:  Okay, it'll just take a while to load, I

14   guess?

15       MR. DO:  Potentially.

16       MS. BRIDGE:  Okay, it looks like it's here.  Respondent

17   Exhibit 2, is -- that's what you're asking for?

18       MR. ADLONG:  Yes, please.

19       MS. BRIDGE:  Okay.  For some reason it's not showing up at

20   usual way, but I'm going to try to bring this up.  It says it's

21   loading -- local or shared file is loading.  Okay, I think I

22   finally got it.

23   Q    BY MR. ADLONG:  Mr. Torres, you got fr -- see that from

24   line, Jose Torres, JRTM1970@yahoo.com.  That's your email,

25   correct?

Exhibit 1(e)
733



```
 1    A    Yes.

 2         MR. ADLONG:  Okay, Ms. Bridge, can you, please, go down to

 3    the bottom of this page where it says "Hello, Mike"?  There you

 4    go.

 5    Q    BY MR. ADLONG:  You wrote that email right there that

 6    says, "Hello, Mike, this is Jose.  I'm waiting for your

 7    response for the reimbursement, please," correct?

 8    A    Yes.

 9    Q    And isn't it correct that less than 24 hours later you

10    then wrote him another email on June 19 --

11         MR. ADLONG:  Ms. Bridge, you're in the right spot.

12         Ms. Bridge, could you scroll down, please?  And if you'll

13    just scroll down a little bit more.  That's good for now, Ms.

14    Bridge.  Thank you.

15    Q    BY MR. ADLONG:  And you wrote that email on June 19th at

16    8:30 a.m. again asking for the reimbursement, correct?

17    A    I don't recall sending another message.

18    Q    Do you have any reason to believe that that's not your

19    email, dated June 19, 2020 at 8 a.m.?

20    A    Yeah, it does -- does seem to be that email.  Yes.

21    Q    Okay.  Okay.  So you would agree that you wrote that

22    correct?

23    A    Maybe it got resent because I felt he probably didn't get

24    it.

25    Q    Okay, and then you sent another email three days later,
```

Exhibit 1(e)
734



1   again asking for your money, correct?

2       MS. KAGEL:  Objection, Your Honor.  The document speaks

3   for itself.

4       JUDGE ROSAS:  Sustained.

5       If you've got a question that you're moving on to, just

6   get to it, this is cross.  The document speaks for itself.

7   Q   BY MR. ADLONG:  Okay.  So you would agree then, having

8   reviewed all these emails, you would agree that you wrote these

9   emails, correct, Mr. Torres?

10      MS. KAGEL:  Objection asked and answered.

11      JUDGE ROSAS:  I'll allow that.  Go ahead.

12      This is your email, right?

13      THE WITNESS:  Yes.  The one I'm looking at, yes.

14      JUDGE ROSAS:  Okay.

15      MR. ADLONG:  Ms. Bridge, can you, please -- can you,

16  please, put up Respondent's Exhibit 3?

17      JUDGE ROSAS:  Are you -- are you offering Respondent's 3

18  into evidence?

19      MR. ADLONG:  Yes.  Well, we want to offer Respondent's

20  Exhibit 2 into evidence.  That was the first one that we had --

21      JUDGE ROSAS:  Respondent's 2 -- Respondent's 2?

22      MR. ADLONG:  Yes, Your Honor.

23      MS. KAGEL:  No, objection, Your Honor.

24      JUDGE ROSAS:  Respondent 2 is in evidence.

25      **(Respondent Exhibit Number 2 Received into Evidence)**

Exhibit 1(e)
735



1    Q    BY MR. ADLONG:  Mr. Torres, do  you see this email right

2    here marked as Respondent's Exhibit 3.

3    A    Can I see it in a larger view?  Okay, I see it now.

4    Q    You sent this email to Mr. Vagts on June 29 at 11:31 a.m.,

5    correct?

6    A    Let me read it.  That does seem to be correct, yes.

7    Q    Okay.

8         MR. ADLONG:  Okay, we're going to move for admission of

9    Respondent's Exhibit 3.

10        MS. KAGEL:  Can we just scroll through the document and

11   have the witness identify the attachments, please?

12        JUDGE ROSAS:  This is your voir dire, General Counsel.

13                    **VOIR DIRE EXAMINATION**

14   Q    BY MS. KAGEL:  Mr. Torres, that second page there --

15        MS. KAGEL:  Ms. Bridge, would you mind coming out, please?

16        MS. BRIDGE:  What do you mean "zooming out", make it

17   smaller or --

18        MS. KAGEL:  Make it -- yes, make it smaller so we can see

19   the -- the entire photo -- what appears to be a photo.

20   Q    BY MS. KAGEL:  Mr. Torres, did -- the second page of the

21   Exhibit, is that a photo that you -- what -- what is this?

22   A    It is a receipt.

23   Q    Did you attach it to this email?

24   A    Can you enlarge it, please?  I need to see the signature.

25   Yes, that does seem to be the right one.

Exhibit 1(e)
736



www.escribers.net | 800-257-0885

1       MS. KAGEL:  And Ms. Bridge, could go down to the third

2   page, please?

3   Q    BY MS. KAGEL:  Mr. Torres, do you recognize this document?

4   A    I do, but I need to see it larger.  Okay.  Yes.  Yes, I do

5   recognize it.

6   Q    Did you attach this photo to this email?

7   A    Yes.

8       MS. KAGEL:  No further voir dire, Your Honor.

9       JUDGE ROSAS:  Any objection?

10      MS. KAGEL:  No, Your Honor.

11      JUDGE ROSAS:  Respondent 3 is received.

12      **(Respondent Exhibit Number 3 Received into Evidence)**

13      MR. ADLONG:  We would like to Ms. Bridge, if you could,

14  please, bring up Respondent's Exhibit 4.

15                    **RESUMED CROSS-EXAMINATION**

16  Q    BY MR. ADLONG:  Mr. Torres --

17      MR. ADLONG:  Ms. Bridge, can you, please, show Mr. Torres

18  this email and the attachment?

19  Q    BY MR. ADLONG:  Mr. Torres, this email is an email that

20  you sent Mike Vagts on June 29, 2020 at 11:38 a.m. with the

21  accompanying attached check, correct?

22  A    That does seem to be the right date, according to the

23  email.

24      MR. ADLONG:  We're going to move for admission of Joint --

25  of Respondent's Exhibit 4.

Exhibit 1(e)
737



www.escribers.net | 800-257-0885

1          MS. KAGEL:  Just a brief voir dire, Your Honor.

2          Ms. Bridge, if you could, please, scroll down to the

3     second page.

4                    **VOIR DIRE EXAMINATION**

5     Q    BY MS. KAGEL:  Mr. Torres, what is this attachment?

6     A    That is a bill from my credit card company when they used

7     the $100 or 100 to pay for fuel.

8     Q    And did you attach this photo to the email here?

9     A    Yes.

10    Q    Okay.

11         MS. KAGEL:  No further voir dire and no objection, Your

12    Honor.

13         JUDGE ROSAS:  Respondent 4 is received.

14    **(Respondent Exhibit Number 4 Received into Evidence)**

15         MR. ADLONG:  Ms. Bridge, if you can, please, put up

16    Respondent's Exhibit 5.

17         It's -- Ms. Bridge, can you, please, scroll down so that

18    Mr. Torres can see the attachment?

19                 **RESUMED CROSS-EXAMINATION**

20    Q    BY MR. ADLONG:  Do you recognize this attachment, Mr.

21    Torres?

22    A    Yes, I do.

23    Q    What is it?

24    A    It's a driver manifest.

25    Q    It's your driver manifest, right?

Exhibit 1(e)
738



1    A    Can you enlarge?  Yes, it's my driver manifest.

2        MR. ADLONG:  Ms. Bridge, if you could, please, move up to

3    the email.

4    Q   BY MR. ADLONG:  Mr. Torres, is this in an email that you

5    sent -- you would agree that this is an email that you sent

6    Mike Vagts on June 29, 2020 a minute later at 11:39 a.m.,

7    right?

8    A    It does seem to be, according to email, the date and the

9    time.

10   Q   And you have no reason to disagree with what the email

11   displays, correct?

12   A    For the moment, no.

13       MR. ADLONG:  All right.  We'll move for admission of

14   Respondent's Exhibit 5.

15       MS. KAGEL:  No objection, Your Honor.

16       MR. ADLONG:  Ms. --

17       JUDGE ROSAS:  Respondent's 5 is received.

18   **(Respondent Exhibit Number 5 Received into Evidence)**

19       MR. ADLONG:  Ms. Bridge, if you can, please, show is

20   Respondent's Exhibit 6.

21       All right, Ms. Bridge, if you can, please, scroll down to

22   the next to the attachment, please.

23   Q   BY MR. ADLONG:  Mr. Torres, do you recognize this

24   attachment?

25   A    Yes.

Exhibit 1(e)
739



1    Q    This is your paycheck; is that right?

2    A    Yes.

3    Q    Okay.

4         MR. ADLONG:  Ms. Bridge, if you please go up to the email.

5    Q    BY MR. ADLONG:  This is in an email, correct, Mr. Torres,

6    that you sent Mike Vagts on June 29, 2020 at 11:41 a.m.,

7    correct?

8    A    According to the email, yes.

9    Q    Do you have any reason to disagree with -- that this email

10   is accurate?

11   A    Not at the moment.

12        MR. ADLONG:  We'll move for admission of Respondent's

13   Exhibit 6.

14        MS. KAGEL:  No objection, Your Honor.

15        MR. ADLONG:  Ms. Bridge, can you please pull up

16   Respondent's Exhibit 7

17        JUDGE ROSAS:  Respondent's 6 is received.

18        **(Respondent Exhibit Number 6 Received into Evidence)**

19        MR. ADLONG:  Can you please take you down to the

20   attachment, Ms. Bridge?

21   Q    BY MR. ADLONG:  Do you recognize this document, Mr.

22   Torres?

23   A    Isn't that the same one we talked about?

24   Q    You would think so.  You'd confirm that it is, correct?

25   A    I need to see it in a larger view.

Exhibit 1(e)
740



www.escribers.net | 800-257-0885

1      MR. ADLONG:  Can you, please, do that for him, Ms. Bridge?

2   A    So that does seem to be the right one, yes.

3      MR. ADLONG:  Okay.  Ms. Bridge, can you, please, show him

4   the email now?

5      Can you go down a little bit further, Ms. Bridge, please?

6   Thank you.

7   Q    BY MR. ADLONG:  So Mr. Torres, this is another email that

8   you sent Mike Vagts on June 29, 2020.  This one at 11:42 a.m.,

9   correct.

10   A    That does seem to be the right one.

11   Q    You have no reason to disagree that this is accurate,

12   correct?

13   A    As long as the dates were changed, yes.  That should be

14   accurate according to the email.

15      MR. ADLONG:  So we'll move for admission of Respondent's

16   Exhibit 7.

17      MS. KAGEL:  No objection, Your Honor.

18      JUDGE ROSAS:  Respondent's 7 is received.

19   **(Respondent Exhibit Number 7 Received into Evidence)**

20      MR. ADLONG:  Ms. Bridge, can you, please, put up on

21   Respondent's Exhibit 8?

22      Ms. Bridge, can you please show Mr. Torres the full email

23   string?

24      THE WITNESS:  I could barely read it.  Can you enlarge?

25   Okay.  That does seem to be one of emails.

Exhibit 1(e)
741



www.escribers.net | 800-257-0885

 1         MR. ADLONG:  Okay.  Ms. -- Ms. Bridge, if you can go to

 2     the top once you're at the bottom, please.

 3         All right, if you'll stop there, please, Ms. Bridge.

 4     Q    BY MR. ADLONG:  Mr. Torres, see this email from you to Mr.

 5     Vagts dated July 6th, 2020 at 1:14 p.m.?

 6     A    I see it.

 7     Q    You sent that email to Mr. Vagts, correct?

 8     A    Yes.

 9         MR. ADLONG:  Ms. Bridge, can you please go to the bottom

10     of the string?  I apologize.  You -- okay.

11     Q    BY MR. ADLONG:  You see this email dated June 29, 2020 at

12     11:44; you sent that email, too, correct, Mr. Torres, from you

13     to Mr. Vagts?

14     A    It appears to be that, yes.

15     Q    You have no reason to disa -- you have -- there's nothing

16     that -- you have no reason to disagree that these are accurate

17     representations of the emails that you sent, correct?

18     A    According to the email, no, I have no doubt.

19     Q    Okay.

20         MR. ADLONG:  We're going to move for admission of

21     Respondent's Exhibit 8.

22         MS. KAGEL:  Your Honor, we would object that this Exhibit

23     is cumulative.  It's already included in Joint Exhibit 8(b).

24         JUDGE ROSAS:  There's one piece that's new; the piece on

25     top?

Exhibit 1(e)
742



1       MR. ADLONG:  That's correct, Your Honor.

2       MS. KAGEL:  I don't believe so, Your Honor.

3       JUDGE ROSAS:  Okay.  Voir dire?

4  (Counsel confer)

5                    **<u>VOIR DIRE EXAMINATION</u>**

6  Q    BY MS. KAGEL:  Mr. Torres, do you see that email at the

7  top there of Respondent's 8, dated Monday, July 6th, 2020 at

8  1:14 p.m.?

9  A    Yes, I do.

10 Q    This --

11      MS. KAGEL:  Let's see.  I'm going to -- if -- if Ms.

12 Bridge, will allow me, I can just bring up Joint Exhibit 8(b).

13 Give me one moment.

14      Ms. Bridge, would you mind, please taking off your

15 sharescreen, so I can do it and -- perfect.  Thank you.

16      JUDGE ROSAS:  let me just understand, General Counsel,

17 you're trying to show that this is already in evidence?

18      MS. KAGEL:  Yes, Your Honor.

19      JUDGE ROSAS:  Well, I'm going to receive it anyway.

20      MS. KAGEL:  Okay.

21      JUDGE ROSAS:  It doesn't really matter to me if the

22 Respondent has designated it as one of theirs -- it's -- it's

23 not a big deal.

24      MS. KAGEL:  All right, understood, Your Honor.

25      No -- no further questions from GC.  The objection, the

Exhibit 1(e)
743



1    cumulative remains; however, you've made your ruling.  So we

2    understand.

3                     **RESUMED CROSS-EXAMINATION**

4    Q    BY MR. ADLONG:  Mr. Torres --

5         JUDGE ROSAS:  That was Respondent 8 or 9?

6         MR. ADLONG:  8, Your Honor.

7         JUDGE ROSAS:  8 -- we're still on 8.  Okay.  Respondent 8

8    is received over objection.

9    **(Respondent Exhibit Number 8 Received into Evidence)**

10        Q    BY MR. ADLONG:  Mr. Torres, in addition to these

11   phone -- excuse me, in addition to these emails, you made at

12   least ten phone calls to Mr. Vagts regarding the issues that

13   you emailed him about, correct?

14        MS. KAGEL:  Objection.  Misstates testimony.

15        JUDGE ROSAS:  Overruled.  You can answer if you know.

16        THE WITNESS:  I don't know.

17   Q    BY MR. ADLONG:  You would agree that you call them,

18   correct?

19   A    I called Mike Vagts, yes.

20   Q    You'd agree that you call them more than once, correct?

21   A    More than once, yes.

22   Q    Did you call them more than three times or less than three

23   times?

24   A    I don't recall that.

25   Q    How about more than six times or less than six times?

Exhibit 1(e)
744



www.escribers.net | 800-257-0885

1    A    I don't know that either.

2    Q    And would you say the same thing if I asked you for more

3    than ten times or less than ten times?

4         MS. KAGEL:  Objection.  Asked and answered.

5         JUDGE ROSAS:  One more time; do you -- do you know?

6         THE WITNESS:  I don't know.  And it's the same question.

7    I just know I called them more than once, and that's all I

8    know.

9    Q    BY MR. ADLONG:  Now, Mr. Torres, other than receiving what

10   loads to pull from Mr. -- from Walter, you never participated

11   in the decision-making process regarding the assignment of

12   freight loads to drivers, correct?

13   A    I don't understand the -- that question.

14   Q    Okay.  You never helped Walter assign freight loads to any

15   drivers, correct?

16   A    I still don't understand that question.

17   Q    Did you ever assign drive -- did you ever sign what loads

18   the driver should pull for Universal Intermodal?

19   A    I don't recall that.

20   Q    Did you ever recall assigning loads for any drivers for

21   Southern Counties?

22   A    You mean assign, like a dispatcher?

23   Q    Yes.

24   A    I don't recall none of that.

25   Q    Okay, did you ever recall assigning loads for drivers for

Exhibit 1(e)
745



1    Universal Truckload?

2    A    I don't recall none of that.

3    Q    Did you ever recall assigning loads for any drivers for

4    Roadrunner?

5        MS. KAGEL:  Objection.  Relevance and outside the scope of

6    direct.

7        JUDGE ROSAS:  Counsel, you're asking the witness if he did

8    these things?

9        MR. ADLONG:  Yeah, he didn't understand my first question,

10   so I'm coming out in a different way.

11       JUDGE ROSAS:  You're asking him, but -- but there's an

12   objection now and you've been asking him about things that he

13   did, none of which he testified to having done on direct

14   examination.

15       I'm going to sustain the objection.  Unless -- unless you

16   think -- unless you think there's a basis to -- to indicate

17   otherwise.  Maybe he did.  I mean, you have information about

18   that.  If you have a good faith -- if you have a good-faith

19   belief, then I'll let you pursue it if you can make that

20   representation.

21       MR. ADLONG:  What I'm trying to nail down --

22       JUDGE ROSAS:  if you trying to estab -- if you're just

23   trying to preclude that he didn't do something that he didn't

24   testified to on direct, I say let's move on.

25       MR. ADLONG:  I'm just setting the foundation to ask the

Exhibit 1(e)
746



1    questions about Walter.

2        JUDGE ROSAS:  It's cross-examination.  Go right to it.

3    Q    BY MR. ADLONG:  All right.  Did you ever help Walter

4    assign -- assign loads for any drivers for Universal

5    Intermodal?

6        MS. KAGEL:  Objection.  Asked and answered.

7        JUDGE ROSAS:  Sustained.

8        MR. ADLONG:  He said he didn't understand the question, I

9    came at it from a different angle.

10       JUDGE ROSAS:  I'm sustaining the objection --

11   Q    BY MR. ADLONG:  How often did you --

12       JUDGE ROSAS:  -- about what Walter did, go ahead.

13   Q    BY MR. ADLONG:  How often did you help Walter assign loads

14   to truck drivers?

15       MS. KAGEL:  Objection.  Asked and answered.

16       JUDGE ROSAS:  Oh, so hold on.  So you have a good-faith

17   basis to believe that he may have done this?

18       MR. ADLONG:  The position is essentially we don't want to

19   end up in a position, Your Honor, where later on there's any

20   argument to be made that evidence was put on the record that

21   somebody was a 2(11) or 2(13), and we didn't -- and we didn't

22   pursue it or we didn't do anything about it.

23       JUDGE ROSAS:  I'm sorry.  I may be a little lost here.

24   Are you -- are you saying that Mr. Torres might have been a

25   2(11) or 2 -- 2(13) -- supervisor?

Exhibit 1(e)
747



1      MR. ADLONG:  No.  He -- we're not, but what we're saying

2  is, is that he testified regarding the work that Walter did.

3      JUDGE ROSAS: Sure.

4      MR. ADLONG:  So we're getting evidence regarding that.

5      JUDGE ROSAS:  Absolutely.  Go ahead.  Go ahead.  I may

6  have misunderstood.  Go ahead.  Try it again.

7  Q    BY MR. ADLONG:  You never helped Walter decide what driver

8  would pull any load, correct?

9      MS. KAGEL:  I'm going to object again based on relevance

10  and --

11      JUDGE ROSAS:  Sustained as to this witness assisting or

12  helping Walter do anything.

13  Q    BY MR. ADLONG:  What knowledge do you have regarding how

14  Walter would assign work to drivers?

15  A    I don't have that knowledge.

16  Q    Okay.

17      MR. ADLONG:  No further questions.

18      JUDGE ROSAS:  Okay.  Any redirect by the General Counsel?

19      MS. KAGEL:  No, Your Honor.

20      JUDGE ROSAS:  Charging Party, anything?  No, okay.

21      MR. WOJCIECHOWSKI:  No, thank you.

22      JUDGE ROSAS:  All right, sir -- Mr. Torres, your testimony

23  is concluded for today.  Your excused.

24      Please not discuss your testimony with anyone until you're

25  advised by the Government that the record and the case is

Exhibit 1(e)
748



1    closed.  All right?  Or otherwise recalled or otherwise spoken

2    to.  Okay?

3         THE WITNESS:  Yes, Your Honor, can I just say one thing?

4         JUDGE ROSAS:  Is it related to your testimony?  I'm sorry,

5    you have a -- you have something you want to say regarding your

6    testimony?

7         THE WITNESS:  Yeah, I just want to tell you that the --

8         JUDGE ROSAS:  (Indiscernible, simultaneous speech) --

9         THE WITNESS:  -- (indiscernible, simultaneous speech)

10   acquisition, I never understood (indiscernible, simultaneous

11   speech) --

12        JUDGE ROSAS:  (Indiscernible, simultaneous speech) --

13        MS. KAGEL:  (Indiscernible, simultaneous speech) --

14        JUDGE ROSAS:  Sir, the General Counsel was listening to

15   you.  The people that called you.

16        THE WITNESS:  Okay.

17        JUDGE ROSAS:  They heard your answers.  So if there's

18   an -- everybody here is pretty -- you know, pretty

19   knowledgeable about the proof that they think they have, that

20   why they're calling people and what they need to ask them.

21        THE WITNESS:  Okay.

22        JUDGE ROSAS:  And so they've asked you what they believe

23   they need to ask you.  So -- all sides.  So I think we're done

24   with you and we thank you for offering to help, you know, make

25   sure that the record is -- is full.  But I'm sure these --

Exhibit 1(e)
749



1    these lawyers are very knowledgeable and very intelligent, very

2    capable.  So I'm going to rely on them to do the -- the hauling

3    here.  Okay?  All right.  Have a good day.

4         THE WITNESS:  You, too, Your Honor.

5         JUDGE ROSAS:  All right.

6         Off the record.

7    **(Whereupon, the hearing in the above-entitled matter was**

8    **recessed at 4:33 p.m. until Tuesday, June 22, 2021 at 8:00**

9    **a.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 1(e)
750

www.escribers.net | 800-257-0885

1       **C E R T I F I C A T I O N**

2       This is to certify that the attached proceedings before the

3       National Labor Relations Board (NLRB), Region 21, Case Numbers

4       21-CA-252500, 21-CA-252574, 21-CA-264164, 21-CA-253662, 21-

5       CA259130, 21-CA-254813, 21-CA-255151, Mason-Dixon Intermodal

6       d/b/a Universal Intermodal Services and Mason-Dixon Intermodal

7       d/b/a Universal Intermodal Services and Southern Counties

8       Express, Inc. and Roadrunner Intermodal Services, LLC and

9       International Brotherhood of Teamsters, held via Zoom

10      videoconference at the National Labor Relations Board, Region

11      21, 312 N. Spring Street, 10th Floor, Los Angeles, CA 90012-

12      4701, on June 21, 2021, at 8:03 a.m. was held according to the

13      record, and that this is the original, complete, and true and

14      accurate transcript that has been compared to the reporting or

15      recording, accomplished at the hearing, that the exhibit files

16      have been checked for completeness and no exhibits received in

17      evidence or in the rejected exhibit files are missing.

18

19

20

21                                        _____

22                                        TROY RAY

23                                        Official Reporter

24

25



Exhibit 1(e)
751

www.escribers.net | 800-257-0885

# EXHIBIT 1(F)

Exhibit 1(f)
752

OFFICIAL REPORT OF PROCEEDINGS
BEFORE THE
NATIONAL LABOR RELATIONS BOARD
REGION 21

In the Matter of:

| | | |
|---|---|---|
| Mason-Dixon Intermodal d/b/a | Case Nos. | 21-CA-252500 |
| Universal Intermodal Services, | | 21-CA-252574 |
| Respondent, | | 21-CA-264164 |
| | | 21-CA-253662 |
| and | | 21-CA-259130 |
| | | 21-CA-254813 |
| Mason-Dixon Intermodal d/b/a | | 21-CA-255151 |
| Universal Intermodal Services | | |
| and Southern Counties Express, | | |
| Inc., | | |
| Respondent, | | |

and

Roadrunner Intermodal Services,
LLC,
                    Respondent,

and

Universal Truckload, Inc.,
                    Respondent,

and

International Brotherhood of
Teamsters,
                    Charging Party.

_____

Place: Los Angeles, California (via Zoom Videoconference)

Dates: June 22, 2021

Pages: 724 through 974

Volume: 6

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

Exhibit 1(f)
753

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

**REGION 21**

```
In the Matter of:

MASON-DIXON INTERMODAL D/B/A        Case Nos.  21-CA-252500
UNIVERSAL INTERMODAL SERVICES,                 21-CA-252574
                Respondent,                    21-CA-264164
                                               21-CA-253662
and                                            21-CA-259130
                                               21-CA-254813
MASON-DIXON INTERMODAL D/B/A                   21-CA-255151
UNIVERSAL INTERMODAL SERVICES
AND SOUTHERN COUNTIES EXPRESS,
INC.,
                Respondent,

and

ROADRUNNER INTERMODAL SERVICES,
LLC,
                Respondent,

and

UNIVERSAL TRUCKLOAD, INC.,
                Respondent,

and

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,
                Charging Party.
```

The above-entitled matter came on for hearing, via Zoom

videoconference, pursuant to notice, before **MICHAEL A. ROSAS**,

Administrative Law Judge, at the National Labor Relations

Board, Region 21, 312 North Spring Street, 10th Floor, Los

Angeles, California 90012, on **Tuesday, June 22, 2021, 8:03 a.m.**

Exhibit 1(f)
754

escribers
www.escribers.net | 800-257-0885

```
 1                     A P P E A R A N C E S

 2     On behalf of the Charging Party:

 3         JULIE GUTMAN DICKINSON, ESQ.
           JASON WOJCIECHOWSKI, ESQ.
 4         BUSH GOTTLIEB
           801 North Brand Blvd.
 5         Suite 950
           Glendale, CA 91203-1260
 6         Tel. (818)973-3200

 7     On behalf of the Respondents:

 8         DANIEL A. ADLONG, ESQ.
           HARRISON C. KUNTZ, ESQ.
 9         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC
           Park Tower, 15th Floor
10         695 Town Center Drive
           Costa Mesa, CA 92626
11         Tel. (714)800-7900

12     On behalf of the General Counsel:

13         PHUONG DO, ESQ.
           MOLLY KAGEL, ESQ.
14         NATIONAL LABOR RELATIONS BOARD, REGION 21
           312 N. Spring Street
15         10th Floor
           Los Angeles, CA 90012-4701
16         Tel. (212)894-5200

17

18

19

20

21

22

23

24

25
```

Exhibit 1(f)
755



1                            **I N D E X**

2

3

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------|--------|-------|----------|---------|-----------|
| Michael Washington | 728 | 748 | | | |
| Santos Castaneda | 753 | 766 | 770 | | |
| Maurice Cummings | 772,790 | 801 | | | 788 |
| Todd C. Ellis | 817,829 856,871 876 | 878 | | | 827,855 867,875 |
| Desmond Gibson | 903 | 921 | | | |
| David Johnson | 926,958 | 959 | | | 955 |
| Kevin Poullard | 966 | | | | |

Exhibit 1(f)
756

eScribers
www.escribers.net | 800-257-0885

1                                    **E X H I B I T S**

2

3        **EXHIBIT**                              **IDENTIFIED**        **IN EVIDENCE**

4        **General Counsel:**

5            GC-9                                      967                 968

6            GC-12                                     788                 790

7            GC-13                                     827                 829

8            GC-14                                     854                 856

9            GC-15                                     860                 863

10           GC-16                                     863                 871

11           GC-17                                     864                 871

12           GC-18                                     865                 871

13           GC-19                                     874                 876

14           GC-20                                     874                 874

15           GC-21                                     934                 935

16           GC-22                                     944                 948

17           GC-23                                     859                 859

18           GC-28                                     954              Rejected

19

20

21

22

23

24

25

Exhibit 1(f)
757



www.escribers.net | 800-257-0885

1          <u>P R O C E E D I N G S</u>

2          JUDGE ROSAS:  All right, let's go on the record.

3          General Counsel, (indiscernible, simultaneous speech)?

4          MS. KAGEL:  Your Honor, we call Michael Washington.

5          JUDGE ROSAS:  All right.  Good morning, Mr. Washington.

6          MS. KAGEL:  Took one look and ran.

7          JUDGE ROSAS:  Okay.  Good morning, Mr. Washington.  Please

8     raise your right hand.

9          Can you hear me?

10          MS. KAGEL:  Your Honor, it appears he's still connecting

11     to audio.

12          MR. WASHINGTON:  Yeah, good morning.

13          JUDGE ROSAS:  Good morning.  Please raise your right hand.

14     Whereupon,

15                    **MICHAEL WASHINGTON**

16     having been duly sworn, was called as a witness herein and was

17     examined and testified, telephonically as follows:

18          JUDGE ROSAS:  All right.  Please state and spell your

19     name, and provide us with an address.

20          THE WITNESS:  First name is Michael.  That's spelled

21     M-I-C-H-A-E-L.  Middle initial is -- middle name is Dwayne,

22     that's D-W-A-Y-N-E.  Last name Washington, W-A-S-H-I-N-G-T-O-N.

23          JUDGE ROSAS:  Go ahead, General Counsel.

24                    **DIRECT EXAMINATION**

25     Q    BY MS. KAGEL:  Mr. Washington, good morning.  Thank you

Exhibit 1(f)
758



1    for being --

2    A    Good morning.

3    Q    -- here with us today.

4    A    Good morning.

5    Q    Who is your current employer?

6    A    My current employer is Brisk Transportation.  That's

7    B-R-I-S-K, Transportation.

8    Q    What is your job position there?

9    A    Company driver.

10   Q    Were you ever employed by a company called Roadrunner?

11   A    Yes, ma'am.

12   Q    Where did you -- when did you start working for

13   Roadrunner?

14   A    I started working for Roadrunner in January -- I believe

15   January of 2017.

16   Q    When did you stop working for Roadrunner?

17   A    Oh, December 18th, 19 -- December 18th, 2019.

18   Q    Why did you stop working for Roadrunner?

19   A    Well, I was terminated because Roadrunner was bought out

20   by Universal Trucking or Logistics.

21   Q    Where was the Roadrunner facility that you worked at?

22   A    In Fontana, California.

23   Q    Were there any other Roadrunner facilities?

24   A    Yes, definitely.

25   Q    Where were they?

Exhibit 1(f)
759


www.escribers.net | 800-257-0885

1    A      The City of Commerce, and also I believe, in Wilmington,

2    California.

3    Q      What was your job position at Roadrunner?

4    A      Company -- company driver.

5    Q      What were your job duties as a company driver?

6    A      Well, I would come in at about 4:00 in the morning, pick

7    up my assignment and my truck, and then bobtail to either the

8    City of Industry or Long Beach, Wilmington; it depends on where

9    the load assignment was.

10   Q      And can you just define what bobtail is for us?

11   A      Bobtail is not -- without the -- without the trailer, just

12   the truck without the trailer.

13   Q      Who did you report to?

14   A      Dispatch.

15   Q      What were your hours?

16   A      It varies, Monday through Saturday from 4 a.m. to about 5

17   p.m.; it varied from day to day.

18   Q      And you briefly described this, but can you just go

19   through this again; what was a typical day of work like?

20   A      Say that again, please.

21   Q      I know we just went through this, but could you just

22   repeat what a typical day of work is like?

23   A      Oh, typical of day of work would be, like I said,

24   reporting, punching in, getting my load assignment from the

25   dispatch, bobtailing to, like I said, either the City of

Exhibit 1(f)
760



1    Industry, or Long Beach, or Home Depot; it just depends on

2    where the load assignment was.

3    Q    Did you ever pick up or drop off at the port?

4    A    No.

5    Q    And you mentioned Home Depot; did you ever go to any other

6    customers?

7    A    Yes, Amazon, Trader Joe's, the rails, like the railroad,

8    you know, the railroads and stuff, places like that.

9    Q    How many company drivers were there at the Roadrunner

10   facility?

11   A    Oh, wow.  At that fa -- facility in Fontana, I would say

12   at least 20 company drivers, but they did have owner operators

13   there, too.

14   Q    How many owner operators were there?

15   A    Oh, I would say probably a handful, maybe about five to

16   eight at the most.

17   Q    Are you familiar with a company called Universal

18   Intermodal?

19   A    Yes, now I am, but prior to then, no.

20   Q    And you were talking about Universal Logistics taking over

21   Roadrunner.

22   A    Uh-huh.

23   Q    When was this?

24   A    I -- let's see, when I first got wind of it, it was in

25   November, at the early -- late October, early November of 2019,

Exhibit 1(f)
761



1    just before we were terminated.

2    Q    And how do you know that Universal Logistics took over

3    Roadrunner?

4    A    Because other drivers were talking about it; other company

5    drivers were talking about it amongst themselves.

6    Q    Did you ever have to fill out any new paperwork?

7    A    Say that again, please?

8    Q    Did you ever have to fill out any new paperwork?

9    A    Yes, once --

10    MR. KUNTZ:  Objection.  Vague as to -- vague as to

11    paperwork.

12    JUDGE ROSAS:  Rephrase.

13    Q    BY MS. KAGEL:  Did you ever -- when Universal Logistics

14    took over Roadrunner, did you ever have to fill out a new

15    application?

16    A    Yes, ma'am, another application to -- for Universal,

17    because they had took -- they had taken over everything.

18    Q    And when did you sign this new appli -- or when did you

19    fill out this new application?

20    A    I would say probably late November, early December, me and

21    other employees -- all -- all the company employees.

22    Q    And who had you fill out this application?

23    A    Oh, that's simple, Xochitl Barrera (phonetic throughout),

24    that was the -- I believe the terminal manager, or assistant

25    terminal manager.  She was part of HR.

Exhibit 1(f)
762



www.escribers.net | 800-257-0885

1    Q    Are you familiar with the Teamsters Union?

2    A    Oh, yes, definitely.

3    Q    When did you first hear about the Union?

4    A    With Roadrunner, that is?

5    Q    In general.

6    A    I would say around October of 2019.

7    Q    And how did you first hear about it?

8    A    Through other company drivers.

9    Q    And who was talking about the Union?

10   A    Specific names?

11   Q    Yes, please.

12   A    Oh, wow.  Willie Davis (phonetic), a company driver, a guy

13   named Des, I don't know his last name, Mike Keegan (phonetic),

14   which is also a company driver, and some other drivers.

15   Q    And how many coworkers in total were talking about the

16   Union, to your knowledge?

17   A    Oh, I would say probably about 10 to 12.

18   Q    And where would they talk about the Union?

19   A    Oh, beginning of the shift, end of the shift, in the

20   middle of the shift, at the rails, at Home Depot, lunch breaks,

21   things like that.

22   Q    Would you ever --

23   A    Amongst ourselves.

24   Q    Okay.  And would you ever have these conversations at the

25   Fontana yard?

Exhibit 1(f)
763



1    A    Oh, yeah, yeah, beginning of the shift and after the

2    shift.

3    Q    Would you see a group of coworkers talking about the

4    Union?

5    A    Yeah, I'd say about --

6         MR. KUNTZ:  Objection.  Leading.

7         THE WITNESS:  Oh, I'm sorry.

8         JUDGE ROSAS:  Would -- would you see a bunch of employees

9    talking about the Union?

10        THE WITNESS:  Yes, sir.

11        MS. KAGEL:  Okay.

12        JUDGE ROSAS:  No, no, no.  All right, rephrase that,

13   General Counsel.

14   Q    BY MS. KAGEL:  You said that you would talk about it

15   amongst yourselves.

16   A    Uh-huh.

17   Q    How many people would be in a group when you would talk

18   about the Union?

19   A    I would say, probably about two to three, maybe four, but

20   definitely two to three people.

21   Q    And did you participate in group conversations about the

22   Union?

23   A    Oh, yes.  Yeah, that's how -- that's how I got wind of it.

24   Q    And what would you talk about?

25   A    Pay -- better pay than what Roadrunner was paying, better

Exhibit 1(f)
764



1    benefits, Union wages, I mean, everything from A to Z when it

2    came to the Union.

3    Q    Okay.  And how often would you talk about the Union with

4    your coworkers?

5    A    I wouldn't say -- huh?

6    Q    With your coworkers, excuse me.

7    A    I wouldn't say daily, but I'd say, maybe about two or

8    three days a week.

9    Q    Did you want to be represented by a Union?

10   A    As far as what?

11   Q    Did you want to be represented by the Union?

12   A    Oh, yeah, yeah, yeah, yeah, yeah, because the pay is

13   better, better -- better hours, yeah.

14   Q    Did your coworkers want to be represented by the Union?

15        MR. KUNTZ:  Objection.  Foundation.  Calls for

16   speculation.

17        MS. KAGEL:  My --

18        JUDGE ROSAS:  I'm going to sustain that.

19        MS. KAGEL:  Your Honor, my next question would be how do

20   you know.

21        JUDGE ROSAS:  Rephrase.

22        MS. KAGEL:  Okay.

23   Q    BY MS. KAGEL:  Do you know if your coworkers wanted to be

24   represented by the Union?

25   A    Yes, ma'am, they did.

Exhibit 1(f)
765



1    Q    And how do you know?

2    A    By word of mouth.  We were -- we were talking about it.

3    Hey, Mike, it's a good thing the Union is coming in; are you

4    willing to participate?  Yes.

5    Q    Did you ever talk to any Teamsters organizers?

6    A    No.

7    Q    Do you know if management at Roadrunner knew that the

8    drivers were talking about the Union?

9    A    Oh, yeah.  Oh, yeah, they knew.  They knew.

10   Q    And how do you know?

11   A    Well, because of their -- just talking under their breath,

12   you know, and I would say Xochitl Barrera, which is the -- I

13   think she was -- I want to say HR manager, she didn't think it

14   was going to happen because I don't think Roadrunner would

15   allow it, but she knew, and she talked to other employees about

16   it, like myself.

17   Q    And how do you --

18   A    Go ahead.

19   Q    And -- oh, I'm sorry, you said like yourself?

20   A    Yeah, like myself.  She didn't think it was going to

21   happen.  She would say, Mr. Washington, you know, it's not

22   going to happen.

23   Q    Do you have any other supervisors besides Ms. Barrera?

24   A    Ivan Garcia, I think he was -- I'm pretty sure he was the

25   terminal manager, just those two.

Exhibit 1(f)
766



www.escribers.net | 800-257-0885

1  Q    And do you know if he knew about the Union?

2  A    Oh, yes.

3  Q    And how do you know that he knew?

4  A    By other employees.

5  Q    Um-hum.

6       MR. KUNTZ:  Objection.  Move to strike.  Hearsay.

7       JUDGE ROSAS:  Stricken.

8       MS. KAGEL:  Your Honor, if I may be heard on that?

9       JUDGE ROSAS:  No.  Rephrase.  Take a step back.

10 Q    BY MS. KAGEL:  Did Ivan ever talk to you about the Union?

11 A    No, no, only Xochitl did.

12 Q    Did -- do you know if Ivan spoke to other employees about

13 the Union?

14      MR. KUNTZ:  Objection.  Hearsay.  Lack of foundation.

15      JUDGE ROSAS:  So --

16      MR. KUNTZ:  Your Honor, I also -- I also want to point out

17 that -- could we ask the witness to please give us a second

18 with objections before --

19      JUDGE ROSAS:  Take your time, sir.  Take your time, okay?

20      THE WITNESS:  All right.

21      JUDGE ROSAS:  Because there may be objections and you

22 know, your testimony may be for naught if it's stricken, okay?

23      THE WITNESS:  Yes, sir.

24      JUDGE ROSAS:  So just hold back.

25      THE WITNESS:  All right.

Exhibit 1(f)
767



www.escribers.net | 800-257-0885

1    JUDGE ROSAS:  Take your time.

2    THE WITNESS:  Okay.

3    JUDGE ROSAS:  Ivan is who?  What's the last name again?

4    THE WITNESS:  Garcia.  I believe it's Garcia -- Ivan

5    Garcia.

6    JUDGE ROSAS:  What was Ivan's position, if you know?

7    THE WITNESS:  Oh, I know.  He's terminal manager.  At that

8    time, he was the terminal manager.

9    JUDGE ROSAS:  All right.  So General Counsel, the witness

10   is identifying Ivan Garcia as a manager, right?

11   MS. KAGEL:  Yes, Your Honor.

12   JUDGE ROSAS:  All right.  Repeat the question.

13   Q    BY MS. KAGEL:  Did Mr. Garcia speak to other employees

14   about the Union?

15   A    To be honest with you, no.  (Indiscernible, simultaneous

16   speech) --

17   MR. KUNTZ:  Your Honor, our objection -- can we get a

18   ruling on the objection, please?

19   JUDGE ROSAS:  Sustained.  More foundation.

20   Q    BY MS. KAGEL:  When -- let me go back really quickly.

21   When Ms. Barrera spoke to you about the Union, when was this?

22   A    Yes, she did.  She did.  Definitely she did.

23   Q    Okay.  Mr. Washington, I appreciate your zest to answer my

24   questions, but just give me one sec --

25   A    All right.

Exhibit 1(f)
768



www.escribers.net | 800-257-0885

1    Q     -- make sure I finish the question, okay?

2    A     Okay.

3    Q     Yeah, because the court reporter needs to make sure that

4    he's getting everything down, okay?

5    A     Got you, okay.

6    Q     When Ms. Barrera spoke to you about the Union, when was

7    this?

8    A     Prior to -- prior to me filling out a new application

9    with -- for Universal Trucking.

10   Q     Okay.

11   A     And that was most likely in November.

12   Q     And where were you when you had this conversation with

13   her?

14   A     Oh, in the office -- in her office.

15   Q     Now, you said you were terminated on December 18th --

16   A     Uh-huh.

17   Q     -- of 2019; how were you terminated?

18   A     Well, I was -- I was on my way back to the terminal, and I

19   was -- I received a call from Ivan Garcia, and he said Mr.

20   Washington, I need to see you in my office.  And so when I got

21   back to the yard, I parked my truck, did my pre-trip, and then

22   I went into the office -- his office, the terminal manager's

23   office, and he told me and some other guys that we were

24   terminated, that Universal Trucking or Logistics have bought

25   out Roadrunner, and our services were no longer needed.  And

Exhibit 1(f)
769



1    then he went on to say, if you want to come back, you have to

2    come back as a owner operator, so he let every -- let everybody

3    go that particular day.

4    Q    All right, let me just ask some clarifying questions about

5    that.

6    A    Uh-huh.

7    Q    You said you did a pre-trip; what's a pre-trip?

8    A    Oh, a pre-trip is just going over the truck to make sure

9    there was no broken windows, you know, the tires were inflated,

10   make sure everything was working properly.

11   Q    And you said you were with some other guys in Mr. Garcia's

12   office; who were you with, if you know?

13   A    I would say Willie Davis, I would say, I believe Mike

14   Keegan was in there, and a couple other company drivers.  There

15   was about five of us in there, definitely, about five of us in

16   that office that day.

17   Q    When he said you could come back as an owner operator; did

18   he explain anything else about what you had to do to come back?

19   A    Yeah, just have your own truck.

20   Q    Did you get any paperwork from Mr. Garcia when you were

21   terminated?

22   A    Yes, ma'am, I have -- I received a severance agreement,

23   and also my final paycheck.  And Mr. Gar -- Ivan Garcia said I

24   would not receive my paycheck unless I signed the severance

25   agreement.  And a lot of guys was kind of furious about that

Exhibit 1(f)
770



1  because we felt that since we worked 50 or 60 hours that

2  particular day (sic), that he had no right to hold back our

3  paycheck along with the severance agreement.

4  Q    Did you -- do you have a copy of this agreement?

5  A    No, ma'am, not with me, no.

6  Q    Did he say anything else about that agreement?

7  A    He just said you need to sign on the dotted line, and

8  you'll get your money within 30 days.

9  Q    What kind of agreement was it?

10  A    Severance agreement.

11       MR. KUNTZ:  Objection.  Best evidence rule.  Hearsay.

12       JUDGE ROSAS:  Sustained.

13  Q    BY MS. KAGEL:  Did you sign it?

14  A    Yes, ma'am.

15  Q    And did you eventually get your pay?

16  A    Yeah, it took a while -- it took a while, it took over 30

17  days, yes.

18  Q    And what form was your pay in?

19  A    That was on a -- a -- like a debit card.

20  Q    Did you ever meet with the Union after you were

21  terminated?

22  A    Oh, yes, ma'am.  We were terminated --

23       MR. KUNTZ:  Objection.  Relevance.

24       JUDGE ROSAS:  Generally, General Counsel, what -- what are

25  we talking about?

Exhibit 1(f)
771



www.escribers.net | 800-257-0885

1       MS. KAGEL:  Your Honor, just continued support of the

2   Union and interactions with the Union, even continuing after he

3   was terminated.

4       JUDGE ROSAS:  I'll allow you to answer that.  Go ahead.

5   Yes or no?

6       THE WITNESS:  Can -- can she repeat the question?

7   Q   BY MS. KAGEL:  Did you ever meet with the Union after you

8   were terminated?

9   A   Yes.

10   Q   When was this?

11       MR. KUNTZ:  Objection.  Relevance.

12       JUDGE ROSAS:  I'll -- let's establish a date.

13       MS. KAGEL:  Um-hum.

14   Q   BY MS. KAGEL:  When was this, Mr. Washington?

15   A   Oh, this -- well, the following Tuesday, Tuesday or

16   Wednesday of the following week after termination at the Union

17   hall.

18   Q   Were you the only Roadrunner driver there?

19   A   Oh, no.  There was a lot of us, about 20 of us or more.

20   Q   Were there drivers from other companies?

21       MR. KUNTZ:  Objection.  Again, Your Honor, we're going to

22   continue objecting to the relevance of what -- of Union

23   activities occurring after these layoffs.

24       JUDGE ROSAS:  Right.

25       MS. KAGEL:  And I'd also like to point out, we discussed

Exhibit 1(f)
772



1    this same issue yesterday.

2        JUDGE ROSAS:  All right, let me ask that Mr. Washington be

3    sent to a waiting room.

4        Mr. Washington, we're going to be back with you in a

5    minute, basically excuse you from the proceeding while we are

6    haggling over this, okay?

7        THE WITNESS:  Yes, sir.

8        JUDGE ROSAS:  All right, we'll see you back in a few.

9        THE WITNESS:  All right, thank you.

10        JUDGE ROSAS:  Okay.  So we discussed this yesterday.  Now,

11    the complaint alleges animus on the part of the Respondent; is

12    that correct?

13        MS. KAGEL:  Yes, Your Honor.

14        JUDGE ROSAS:  And it -- it refers to a continuing

15    violation, refusal to call them back?

16        MS. KAGEL:  Yes, Your Honor.

17        MR. KUNTZ:  Your Honor, I -- I don't think that that's

18    actually the case.

19        JUDGE ROSAS:  All right.  What are we dealing with?  Let's

20    look at the complaint.

21        MS. KAGEL:  Well, it's an -- it's an unlawful layoff, Your

22    Honor, and these questions are just to show continued support

23    and the scope of support for the Union, especially by

24    non-Universal Intermodal drivers, namely -- namely the

25    Universal Truckload and Roadrunner drivers.

Exhibit 1(f)
773



1          MS. KAGEL:  And Your Honor, con -- continued support or

2     scope of support, particularly post-layoff, is irrelevant to

3     the allegations of the complaint.

4          JUDGE ROSAS:  It -- it could be relevant to the complaint

5     is there is a contention that the Respondent refuses to call

6     them back because of their support, but let's see what the

7     complaint says.

8          MR. WOJCIECHOWSKI:  Your Honor, also I -- I might think

9     that scope of support would be relevant to -- or supportive of

10    management knowledge.

11         MR. KUNTZ:  Again, I don't understand, Your Honor, how

12    post-layoff support could be relevant to pre-layoff knowledge.

13    In any event, Your Honor, I'll refer you to paragraph 14 of the

14    complaint which, if you're looking at pd -- the pdf version is

15    pa -- page 10 of the pdf.

16         JUDGE ROSAS:  Well, it takes you about two minutes to --

17    to find it in the docket here.  There's so many documents filed

18    already.

19         MS. KAGEL:  Yes, Your Honor, 14(a) is about December 18th,

20    2019, Respondents laid off Respondent Roadrunner's employees,

21    and (b) -- 14(b) is Respondents engaged in the conduct

22    described above because the unit employees assisted the Union

23    and engaged in concerted activities, and employees of

24    Respondent Roadrunner supported and assisted the Union and

25    engaged in concerted activities, and to discourage any

Exhibit 1(f)
774



1   employees from engaging in activities.

2        JUDGE ROSAS:  Can I read the complaint?

3        MS. KAGEL:  Yes, Your Honor, I was -- I'm sorry.

4        JUDGE ROSAS:  Go ahead, General Counsel, what did you want

5   to say?

6        MS. KAGEL:  Your Honor, just the last point I'll make

7   is -- is this post Union ac -- post termination, post layoff,

8   Union activity is further support of Roadrunner employees'

9   Union activities, and essentially why would they be going to a

10   Union meeting immediately after being laid off, if they didn't

11   have interest in the Union prior to being laid off.

12        JUDGE ROSAS:  So you're saying that it's a cushion -- it's

13   an additional layer of evidence to support the allegation that

14   they engaged in protected Union activity before they were laid

15   off?

16        MS. KAGEL:  Yes, Your Honor.

17        JUDGE ROSAS:  Does the Respondent dispute that any of

18   these individuals engaged in Union activity before they were

19   laid off?

20        MR. KUNTZ:  Your Honor, the -- the testimony that we just

21   heard is what it is, of course.

22        I -- I want to point out, Your Honor has ruled on this

23   exact objection with this exact situation twice now already.

24   And the General Counsel keeps coming back to this exact same

25   issue of post-layoff support.  And I just want to express the

Exhibit 1(f)
775



1    hope that we're not going to have to keep doing this throughout

2    the day today.

3       JUDGE ROSAS:  So General Counsel, I'm reviewing the

4    testimony of the witnesses, specifically the cross-examination.

5       All right, Respondent, there was some inquiry by you as to

6    whether or not there were group meetings, or the lack thereof,

7    and that would be presumably anytime, because I just have here,

8    did not engage in any group meetings.

9       MS. KAGEL:  And Your -- Your Honor, can I --

10      JUDGE ROSAS:  What -- what would be -- what would be

11   the -- what would be the point of that inquiry?

12      MR. KUNTZ:  So I believe the witness you're referring to,

13   Your Honor, was the Union organizer that testified yesterday.

14   And that organizer on direct testimony had himself made

15   reference to -- it wasn't entirely clear on direct, but some

16   effort to set up some meetings perhaps, and I believe the

17   cross-examination was clarifying the direct testimony on when

18   those meetings had occurred, if they had occurred, and -- and

19   in fact, it turned out that they had not.

20      MS. KAGEL:  For -- for the record, Your Honor, it was

21   actually -- the testimony was about group meetings before they

22   were laid off, and the witness testified that they did not

23   happen because they were laid off, and in Respondent's attempt

24   to clarify on cross, that's when the post-layoff group meetings

25   came up.

Exhibit 1(f)
776



1        JUDGE ROSAS:  All right.  We have a very narrow door

2    that's been opened.  Overruled.  Let's bring the witness back.

3    I'll give you some very, very limited testimony and you may do

4    that.

5        MS. KAGEL:  Okay.  Thank you, Your Honor.

6        THE WITNESS:  Hello?

7        JUDGE ROSAS:  All right.  Continue, General Counsel.

8                    **RESUMED DIRECT EXAMINATION**

9    Q    BY MS. KAGEL:  Mr. Washington, you were talking about this

10    meeting with the Union the following week after you were

11    terminated.

12    A    Uh-huh.

13    Q    Who led this meeting?

14    A    One of the Union reps.

15    Q    And were there drivers there from other companies?

16    A    Yes, ma'am.

17    Q    What companies?

18    A    Besides Universal, I believe, and I definitely know

19    Roadrunner drivers, and to my knowledge, I -- I think that's

20    it.

21    Q    And how did you find out about this meeting?

22    A    Through the drivers -- the Roadrunner drivers, and the

23    Union rep.

24    Q    Do you know the name of the Union rep?

25    A    No, not right now; no, I don't.

Exhibit 1(f)
777



www.escribers.net | 800-257-0885

1    Q     What happened --

2    A     I know he was high up, though.

3    Q     Okay.  And what happened at this meeting?

4    A     Well, at the meeting, they brought us all into a room at

5    the Union hall.  They had us sign in -- a sign-in sheet, you

6    know, to acknowledge that we were there.  And then also, the

7    Union rep asked us, are you guys aware that you were terminated

8    because the Union was coming in?  And people just shook their

9    head and said no, I -- we weren't aware of that.  He said

10   that's why they terminated you, and we're here to help you.

11   Q     Are you still in touch with the Union?

12   A     Occasionally, yes.

13   Q     All right.

14         MS. KAGEL:  No further questions, Your Honor.

15         JUDGE ROSAS:  Charging Party, anything?

16         MR. WOJCIECHOWSKI:  Nothing, Your Honor.  Thank you.

17         JUDGE ROSAS:  All right.  Off the record.

18   (Off the record at 8:31 a.m.)

19         JUDGE ROSAS:  Okay.  Back on the record.

20                        **CROSS-EXAMINATION**

21   Q     BY MR. KUNTZ:  Good morning, Mr. Washington.

22   A     Good morning.

23   Q     How are you today?

24   A     I'm good.  And yourself?

25   Q     Good.  My name is Harrison Kuntz.  I'm an attorney for the

Exhibit 1(f)
778



 1    Respondents in this case.

 2    A    Yes, sir.

 3    Q    I'll have just a couple of questions for you.

 4    A    Uh-huh.

 5    Q    Before we get started, just a couple quick housekeeping

 6    things --

 7         MS. KAGEL:  Your Honor, I'm sorry.  Is -- is Charging

 8    Party counsel back?

 9         JUDGE ROSAS:  Off the record.

10    (Off the record at 8:35 a.m.)

11         JUDGE ROSAS:  All right.  Back on.

12    Q    BY MS. KAGEL:  So Mr. Washington, when I --

13    A    Yes.

14    Q    -- ask you questions, we'll need you to respond verbally

15    because we have a --

16    A    Yeah.

17    Q    -- court reporter taking down a transcript.  So no head

18    nods or physical gestures, but can you answer -- answer with

19    words on the record, please?

20    A    Yes, sir.

21    Q    And because of the video lag with Zoom hearings, it also

22    helps if, as we discussed before, you can wait a second or two

23    before I ask -- excuse me, after I ask my question, before you

24    answer.

25    A    Okay.

Exhibit 1(f)
779



1    Q    Can you do that for us?

2    A    Yes, sir, I can.

3    Q    Okay.  So first of all, you described being terminated on

4    your direct testimony; is that right?

5    A    That is correct.

6    Q    Does being terminated to you mean the same thing as being

7    laid off?

8    A    No, sir.

9         MS. KAGEL:  Objection, Your Honor.  Calls for a legal

10   conclusion.

11        JUDGE ROSAS:  I'm going to sustain that.

12        MS. KAGEL:  And move to strike his answer as well.

13        JUDGE ROSAS:  I'll leave it.

14        Next question.

15   Q    BY MR. KUNTZ:  Mr. Washington, no one ever informed you

16   that you are being terminated for misconduct, did they?

17   A    No, sir.

18   Q    And to your knowledge, no other Roadrunner drivers were

19   terminated for misconduct in November or December of 2019,

20   correct?

21        MS. KAGEL:  Objection.  Calls for speculation.

22        JUDGE ROSAS:  If you know.  Do you know?

23        THE WITNESS:  Not to my knowledge, no.

24   Q    BY MR. KUNTZ:  You used the term, company drivers; do you

25   recall that?

Exhibit 1(f)
780



www.escribers.net | 800-257-0885

1    A    Yes, sir.

2    Q    And isn't it true that company drivers are drivers who are

3    employees of the company?

4    A    That is correct.

5    Q    You also used the term, owner operators; do you recall

6    that?

7    A    Yes, sir.

8    Q    And isn't it true that owner operators are drivers who are

9    treated by the company as independent contractors?

10   A    Repeat that again, please.

11   Q    Isn't it true that owner operators are drivers who are

12   treated by the company as independent contractors?

13   A    Yes.

14   Q    And owner operators own their own trucks, correct?

15   A    That is correct.

16        MS. KAGEL:  Objection.  Calls for speculation.

17        JUDGE ROSAS:  Overruled.

18        If you know -- I think you answered, right?

19        THE WITNESS:  Yes, sir, I did.

20        MR. KUNTZ:  No further questions for the witness, Your

21   Honor.

22        JUDGE ROSAS:  Any redirect?

23        MS. KAGEL:  No, Your Honor.

24        JUDGE ROSAS:  Thank you, Mr. Washington.  You're excused.

25   Please do not discuss your testimony with anyone unless you're

Exhibit 1(f)
781



1    advised by counsel that the record in the case is closed.  All

2    right?

3        THE WITNESS:  Yes, sir.  All right.

4        JUDGE ROSAS:  Have a good one.  Have a good day.

5        THE WITNESS:  You, too.  Take care, everybody.  Thank you.

6        JUDGE ROSAS:  Next witness.

7        MS. KAGEL:  I'll wait until the witness is excused --

8    there we go.  Your Honor, General Counsel Santos Castaneda.

9    Hopefully, he's in the waiting room?

10       MS. BRIDGE:  He was in the waiting room, but he's not

11   there now.

12       MS. KAGEL:  Okay.  Your Honor, can we have a moment, so I

13   can --

14       JUDGE ROSAS:  Off the record.

15   (Off the record at 8:39 a.m.)

16       JUDGE ROSAS:  Good morning, Mr. Castaneda.  Please raise

17   your right hand.

18       MR. CASTANEDA:  Good morning, Your Honor.

19   Whereupon,

20                      **SANTOS CASTANEDA**

21   having been duly sworn, was called as a witness herein and was

22   examined and testified, telephonically as follows:

23   Whereupon,

24       JUDGE ROSAS:  All right.  Please state and spell your name

25   and provide us with an address.

Exhibit 1(f)
782



www.escribers.net | 800-257-0885

1    THE WITNESS:  Santo's Castaneda, S-A-N-T-O-S

2  C-A-S-T-A-N-E-D-A.  And my home address is --

3    JUDGE ROSAS:  Home or business, wherever you can be

4  subpoenaed.

5    THE WITNESS:  3888 Cherry Avenue, Long Beach, California.

6    JUDGE ROSAS:  Go ahead.

7          **DIRECT EXAMINATION**

8  Q  BY MS. KAGEL:  Mr. Castaneda, thank you for being here

9  with us this morning.  Who is your current employer?

10  A  International Brotherhood of Teamsters.

11  Q  What is your job position with the Teamsters?

12  A  I am a Union labor organizer.

13  Q  How long have you been a -- an organizer with the

14  Teamsters?

15  A  For over five years.

16  Q  What are your job duties as an organizer?

17  A  So my job is basically to educate workers and provide the

18  tools and anything that they need to form a union if they wish

19  to do so.

20  Q  Showing you what's been admitted as Joint Exhibit 2, which

21  is the petition for case 21-RC-251460.  Are you familiar with

22  Union's organizing campaign of the drivers at Universal

23  Intermodal?

24  A  Yes.

25  Q  Did you have any involvement with organizing the drivers

Exhibit 1(f)
783



 1    at Universal Intermodal?

 2    A    Yes.

 3    Q    What was your involvement?

 4    A    I was -- I assisted my colleague, Miguel Cubillos when he

 5    was organizing Universal.

 6         MR. ADLONG:  Your Honor, we're going to object to this

 7    testimony.  It's just cumulative.  We know --

 8         JUDGE ROSAS:  All right.  Hold on, hold on, hold on.

 9         Good objection.  Let's place Mr. Castaneda in the waiting

10    room for a minute.

11         We'll be right back with you, Mr. Castaneda, while we

12    haggle this out.  All right?

13         All right.  General Counsel --

14         MS. KAGEL:  Your Honor --

15         JUDGE ROSAS:  -- does he have a purpose here?

16         MS. KAGEL:  Yes, Your Honor.  I understand that this is

17    the second Union organizer.  But where Mr. Cubillos testified

18    about the Universal Truckload drivers, Mr. Castaneda will

19    testify to the Roadrunner drivers.

20         MR. ADLONG:  We just had a witness testify to the

21    Roadrunner drivers, Your Honor.

22         JUDGE ROSAS:  Overruled.

23         Let's bring him back.

24    Q    BY MS. KAGEL:  Mr. Castaneda, you were talking to us about

25    your involvement with the campaign to organize Universal

Exhibit 1(f)
784



1    Intermodal drivers.

2    A    Yes.

3    Q    Can you continue with your answer, Please?

4    A    So I assisted my coworker Miguel Cubillos when Universal

5    Intermodal campaign was ongoing.  And my involvement in it was

6    to help him do yard visits at the facility, to talk to workers,

7    to help him set up outside the facility.  We would put up

8    tents, signs, and we would talk to the drivers as they arrive

9    to work or as they were leaving the facility.

10   Q    And where were these yard visits?

11   A    This was in the location in Fontana.

12   Q    And you said you put up a tent; how big was the tent?

13        JUDGE ROSAS:  General Counsel, is this the same tent?

14        MS. KAGEL:  Yes, Your Honor.

15        JUDGE ROSAS:  All right.  Sustained.  Next question.

16        MS. KAGEL:  Okay.

17   Q    BY MS. KAGEL:  When did you start campaigning outside of

18   the facility in Fontana?

19   A    To my recollection, I started helping Mr. Cubillos around

20   August 2019.

21   Q    When did you start setting up the tent outside of Fontina?

22        MR. ADLONG:  Objection.

23        JUDGE ROSAS:  Sustained.

24        General Counsel, you said there was a certain focus with

25   this witness, correct?

Exhibit 1(f)
785



1    MS. KAGEL:  Yes, Your Honor.

2    JUDGE ROSAS:  All right, let's -- let's laser in on that.

3    MS. KAGEL:  Okay.  Give me one moment, Your Honor.

4    Q    BY MS. KAGEL:  Is there another company that worked out of

5    the facility in Fontana?

6    A    Not that I remember.

7    Q    Are you familiar with a company called Roadrunner?

8    A    Yes.

9    Q    What is Roadrunner?

10   A    It's a trucking company.

11   Q    And where is Roadrunner's facility located?

12   A    In Fontana as well.

13   Q    Did Roadrunner employee drive -- excuse me.  Did

14   Roadrunner employ drivers?

15   A    I'm sorry.  Can you repeat the question?

16   Q    Did Roadrunner employ drivers?

17   A    Yes.

18   Q    Did you speak to any Roadrunner drivers while you were

19   campaigning outside of the Universal Intermodal facility in

20   Fontana?

21   A    Yes.

22   Q    Who did you speak to?

23   A    I spoke to Mr. Desmond Gibson.

24   Q    When did you speak to him?

25   A    Mid-November 2019.

Exhibit 1(f)
786



www.escribers.net | 800-257-0885

1    Q    What did you speak about?

2    A    We spoke about the Union.  In fact, he stopped one at one

3    of -- at one of our yard visits while we were outside

4    Universal.  He stopped on the side of the road.  So that's how

5    I was able to talk to him.

6    Q    And what did you talk about, about the Union?

7    A    Well, he had questions about what we were doing there on

8    that date, because he saw the Teamsters' sides and we were

9    talking to Universal drivers.  He said that he was a Union

10   member himself and that he knew what the Union was about and he

11   wanted -- he had questions as far as if the Universal drivers

12   were going to be Union and how advanced the process was and

13   things -- and things like that.  So since it was a short

14   conversation on that day, I took his personal information,

15   phone number and home address.  And we agreed on a follow-up

16   conversation.

17   Q    Do you know if there are cameras outside of the Universal

18   Intermodal Fontana facility?

19   A    Yes.

20   Q    And how do you know that there's cameras?

21   A    Well, they're very visible.  They're outside the -- the

22   building, mainly by the entrance where the truckers go in and

23   also in front of the offices of Universal.

24   Q    Did you speak to Mr. Gibson again after talking to him

25   outside of the Fontana facility?

Exhibit 1(f)
787



```
 1    A    Yes, I spoke to him on the phone.

 2    Q    When was that?

 3         MR. ADLONG:  Objection.  Relevance.

 4         JUDGE ROSAS:  Let's get a date.

 5    Q    BY MS. KAGEL:  I guess my next question was, when was

 6    that?

 7    A    I do not recall, but it was about a week and a half after

 8    I spoke to him in person.

 9    Q    And what did you talk about?

10    A    We spoke about the Union and about setting up a meeting to

11    talk in person.  And in this conversation, he also gave me a

12    contact information for one of his coworkers.

13    Q    And which coworker was this?

14    A    Mr. Willie Davis.

15    Q    Did you speak to Mr. Davis?

16    A    Yes, I called him on the phone.

17    Q    And what did you speak about with Mr. Davis?

18    A    When I called him, we also -- I introduced myself as the

19    Union representative.  And at that point, he already knew I was

20    going to call him because Desmond has alre -- already had spoke

21    to him.  And that was early December 2019.

22    Q    Did you ever meet with Mr. Davis in person?

23    A    Yes, I did.

24    Q    And when was that?

25    A    It was the second week of December 2019, and we met during
```

Exhibit 1(f)
788



www.escribers.net | 800-257-0885

1    his lunch at Farmer Boys in Fontana.

2    Q    What did you talk about?

3    A    We talked about the Union.  And he told me about his

4    working conditions, the pay structure, and the work that he

5    did, that he was familiar with the Union and that he was

6    interested in coming together with his workers.

7    Q    How many times did you speak to Mr. Davis?

8    A    I spoke to him multiple time -- times but, mainly, over

9    the phone.

10   Q    Are you familiar with the driver named Freddie Hollings

11   (phonetic)?

12   A    Yes.

13   Q    And who is he?

14   A    He's a truck driver for Roadrunner.

15   Q    And what facility does he work at?

16   A    He works out of a facility in Wilmington, California.

17   Q    Did you speak with him as well?

18   A    Yes.

19   Q    How did you speak with him?

20   A    I spoke to him on the phone to set up a meeting, and then

21   I met with him in person as well.

22   Q    And what did you speak about in this -- when was this

23   meeting in person?

24   A    This was, I will -- I believe, the third week of December

25   2019.

Exhibit 1(f)
789



www.escribers.net | 800-257-0885

1    Q    And what did you speak about with Mr. Hollings?

2    A    We talked about the Union, and we also talked about how --

3    how I was already speaking to some of his coworkers regarding

4    forming a union.  So when I -- when I met with him, we went

5    over the sa -- basically, the same -- kind of the same things

6    as far as the pay structure, the benefits, such as insurance,

7    et cetera.  So he gave me a lot of information.  He had a phone

8    that he used for the company where he had the entire

9    organization of Roadrunner.  So I was able to obtain

10   information, such as who was the dispatcher, supervisors,

11   his -- names of his coworkers.  Basically, I got a list of the

12   name his workers through his phone who were the, you know,

13   human resources, payroll.  We were able to see that through his

14   phone.

15   Q    And how did you get his name?

16   A    I got his name through one of his coworkers.

17   Q    Do you remember who?

18   A    No, I do not recall.  But it was a Universal driver that

19   connected me with him.

20   Q    Do you ever meet any of the Roadrunner drivers at their

21   home?

22   A    Yes.

23   Q    Who?

24        MR. ADLONG:  Your Honor, we're going to object.  It's --

25   it's cumulative.  We understand that there's organizing at

Exhibit 1(f)
790



1    Roadrunner.  What employees they're meeting with at their

2    homes, it seems irrelevant and cumulative.

3         JUDGE ROSAS:  I'll allow a little bit of leeway on this,

4    not too much.  But let's see where it goes.  Overruled.

5         You met with them at their home; who'd you meet with?

6         THE WITNESS:  I met with Mr. Desmond Gibson and --

7    Q    BY MS. KAGEL:  And what -- go ahead.  I'm sorry.

8    A    At this meeting, Miguel Cubillos came along with me.  It

9    was about a two-hour meeting.  This meeting -- this meeting was

10   to go more in detail as far as the Union campaign at

11   Roadrunner.  So the goal was to structure it more like shifts,

12   how many drivers the facility had, supervisors, management, the

13   issues that the workers had, in other words, the things that we

14   wanted to address and change and see if the Union could be the

15   solution for it.  So Mr. -- Desmond did give me information on

16   the company, on the shifts and the way they operated, that

17   the -- the rail terminals that they get the work from, some of

18   the customers that they serve and the issues that they had as

19   far as pay, benefits, and the lack of respect of the company.

20   As far as I can remember, we talked about some of his coworkers

21   also being disciplined by the company.  It was something that

22   he was upset about.  But we covered a lot of information.

23   Q    And when was this meeting?

24   A    This was, I would say, somewhere close to the end of

25   December 2019.

Exhibit 1(f)
791



1   Q   Did you ever talk to anyone in the Union about an

2   organizing campaign at Roadrunner?

3   A   Yes.

4   MR. ADLONG:  Objection.  Relevance.  Hearsay.

5   JUDGE ROSAS:  Did he ever talk to anyone at the Union

6   about what?

7   MS. KAGEL:  About an organizing campaign at Roadrunner.

8   JUDGE ROSAS:  Which you've gone through already, right,

9   the organizing campaign?

10   MS. KAGEL:  Yes, Your Honor.  I can explain the relevance

11   of this questioning.  I don't want to have the witness step

12   out.

13   JUDGE ROSAS:  All right.  We're going to excuse you for

14   one minute, Mr. Castaneda.

15   MR. ADLONG:  Your Honor?

16   JUDGE ROSAS:  Okay.  Go ahead.

17   MR. ADLONG:  Beyond relevance, it's hearsay.

18   JUDGE ROSAS:  Well, let me just see what the General --

19   what the General Counsel is proffering it for.

20   MS. KAGEL:  Your Honor, this again goes to 14(b), to show

21   support of the Union by the Roadrunner employees.  If there was

22   no support from the Roadrunner employees, there would be no

23   reason for the Union to launch an ad campaign of any sort.  So

24   this is just further evidence of support.  And in terms of

25   hearsay, I would argue that this is not hearsay because it goes

Exhibit 1(f)
792



1     towards the intent.

2          JUDGE ROSAS:  So if permitted to answer the question, what

3     do you think he would say?

4          MS. KAGEL:  Your Honor, the Uni -- the witness will

5     testify that there were -- was an official plan within the

6     Union to launch a campaign for Roadrunner employees based on

7     this massive support by the Roadrunner employees.

8          JUDGE ROSAS:  Okay.

9          MS. KAGEL:  And --

10         JUDGE ROSAS:  I'm going to sustain --

11         MR. ADLONG:  Your Honor --

12         JUDGE ROSAS:  -- that objection.

13         See if you can -- if there's anything else you need to

14    elicit regarding the employees, how they interacted with the

15    Union, what they did.  Because, quite frankly, the violations

16    don't inure to the Union.  They basically inure as a result of

17    the activities of the employees, right?

18         MS. KAGEL:  Yes, Your Honor.  I would just again argue

19    that this is the Cushion (phonetic) argument --

20         JUDGE ROSAS:  No.  If there is anything that you need that

21    you haven't already covered, it's not cumulative regarding

22    employee activity.  Protected Union activity on the part of

23    employees, you feel free to go there.

24         Let's bring the witness back.

25         JUDGE ROSAS:  Next question.

Exhibit 1(f)
793



www.escribers.net | 800-257-0885

1    Q    BY MS. KAGEL:  Mr. Castaneda, did the Union ever meet with

2    the Roadrunner drivers as a group to talk about organizing?

3    A    Yes.

4    Q    And when was this?

5    A    This was, as far as I can recall, the last week of

6    December that two Roadrunners -- two or three Roadrunners met

7    with -- together with the Universal -- excuse me, with the

8    Universal drivers at the Teamsters office in Long Beach.

9         MR. ADLONG:  Your Honor, can we just clarify the year,

10   please?

11        THE WITNESS:  2019.

12        MR. ADLONG:  I'm sorry.

13   Q    BY MS. KAGEL:  Now, at that point, when you have this

14   meeting with -- with the Roadrunner drivers and the Universal

15   drivers, were Roadrunner drivers still employed by Roadrunner?

16   A    I don't recall exactly if they were still or not.  What I

17   do remember is that they had already received a letter from

18   Roadrunner that they were going to be -- be laid off or

19   something like that.  I don't recall.

20   Q    I'm going to show you what's already been admitted as

21   Joint Exhibit 6(d).  Is this the letter that you're referring

22   to?

23   A    Yes.

24   Q    Did you have any -- did the Union have any meetings with

25   the Roadrunner -- excuse me.  Did the Union ever meet with the



1    Roadrunner drivers as a group to talk about organizing before

2    they received this letter?

3    A    No.

4    Q    Let me just one ask -- let me ask one last clarifying

5    about that question about that meeting with the Roadrunner

6    drivers after they were laid off; where was that meeting?

7    A    It was in a Teamsters building in Long Beach.

8    Q    Are you still in contact with the Roadrunner drivers now?

9    A    Yes.

10   Q    Have they expressed an interest in returning to work?

11        MR. ADLONG:  Objection.

12        JUDGE ROSAS:  Sustained.

13   A    Yes.

14        MS. KAGEL:  Hold on.

15        MR. ADLONG:  Stricken.  Move to --

16        MS. KAGEL:  Stricken, yeah.

17        One moment, Your Honor.  I may be finished.

18        No further questions for this witness from General

19   Counsel, Your Honor.

20        JUDGE ROSAS:  Charging Party?

21        MR. WOJCIECHOWSKI:  Nothing.  Thank you.

22        JUDGE ROSAS:  All right.  Any Jencks?

23        MS. KAGEL:  No Jencks statements for this witness, Your

24   Honor.

25        JUDGE ROSAS:  Do you need time, Respondent?

Exhibit 1(f)
795



www.escribers.net | 800-257-0885

```
 1          MR. ADLONG:  Give me seven minutes really fast, please.

 2     And if I'm ready before that, I'll come back.

 3          JUDGE ROSAS:  How much?

 4          MR. ADLONG:  Seven minutes, please.

 5          JUDGE ROSAS:  Okay, off the record.

 6     (Off the record at 8:58 a.m.)

 7          JUDGE ROSAS:  All set?

 8          MR. ADLONG:  We're ready to go.

 9          JUDGE ROSAS:  Go ahead.

10                    **CROSS-EXAMINATION**

11     Q    BY MR. ADLONG:  Mr. Castaneda, my name is Daniel Adlong;

12     I'm counsel for the Respondent companies.  I'm going to be

13     asking you some questions today.

14          Traditionally, when people speak, there's a lot of

15     nonverbal communication, but we have a court reporter here

16     who's typing down everything so we can create a record.  So

17     when I ask you questions rather than shaking your head or

18     nodding it back and forth, can you please ensure to answer

19     verbally?

20     A    Yes.

21     Q    Okay.  In addition to that, as I ask questions, there's a

22     very good chance that you already know what the question is

23     before I conclude.  Rather than answering before I finish, can

24     you please wait until I conclude my question?

25     A    Yes.
```

Exhibit 1(f)
796



www.escribers.net | 800-257-0885

1    Q    I'm going to remind you that you're still under oath.  Mr.

2    Castaneda, how many emails did you send the Board agent in

3    preparation for this trial?

4    A    I received one or two.

5    Q    And how many did you respond back with?

6    A    I responded with --

7        MS. KAGEL:  Objection, Your Honor.  Relevance.

8        JUDGE ROSAS:  I'll allow him to answer that.  Let's see

9    where it goes.

10       You can answer.

11   A    I responded to the emails that I received from the Board

12   agent.

13   Q    BY MR. ADLONG:  Okay.

14       MR. ADLONG:  Your Honor, we'd just like to point out that

15   emails are considered Jencks statements.

16       MS. KAGEL:  Your Honor, can we --

17       MR. ADLONG:  And those should be produced.

18       MS. KAGEL:  -- go off the record?  And can we have --

19       JUDGE ROSAS:  Off the record.

20       MS. KAGEL:  -- and can we have the witness removed,

21   please?

22       JUDGE ROSAS:  Okay.  Sure.

23   (Off the record at 9:05 a.m.)

24       JUDGE ROSAS:  Okay.  Back on the record.

25                    **RESUMED CROSS-EXAMINATION**

Exhibit 1(f)
797



www.escribers.net | 800-257-0885

1    Q    Mr. Castaneda, you talked about being at a Universal

2    facility in Fontana with a tent outside, correct?

3    A    Yes.

4    Q    That was a -- that facility was on Slover Avenue, correct?

5    A    Yes.

6    Q    And that's the facility that had the cameras, correct?

7    A    Yes.

8    Q    Other than seeing the cameras and knowing that they

9    existed, you know, nothing else about them, correct?

10   A    No.

11   Q    No, as in no, you don't know anything about them, or no,

12   yes, I do know more about them?

13   A    I did not know any -- anything about the cameras.

14   Q    Okay.  You realize that the Road -- Roadrunner has a

15   facility in Fontana on Calabash?

16   A    Yes.

17   Q    Right?  None of those events that you testified to so far

18   happened at Calabash, though, correct?

19   A    Correct.

20   Q    Now, you said one driver stopped to speak -- you -- you

21   talked about a driver that stopped to speak while you were

22   outside of the tent; do you remember that?

23   A    Yes.

24   Q    That was only one driver who stopped to speak with you and

25   Mr. Cubillos, correct?

Exhibit 1(f)
798



www.escribers.net | 800-257-0885

```
 1    A     Yes.

 2    Q     Can you give me the names -- you said you tes -- you

 3    testified that you spoke with a Willie Davis; is that right?

 4    A     Yes.

 5    Q     And then Mr. Hollings; is that right?

 6    A     Yes.

 7    Q     And then I think the other person you mentioned was

 8    Desmond Gibson, correct?

 9    A     Yes.

10    Q     And those were the people that you testified that you

11    spoke to, correct?

12    A     Correct.

13    Q     Okay.  When you spoke with Mr. Davis, you spoke to him on

14    the phone, correct?

15    A     Correct.

16    Q     And you spoke to -- you met with him at a place other than

17    a Universal facility, correct?

18    A     Correct.

19    Q     And when you spoke with Mr. Hollings, you spoke to him on

20    the phone, correct?

21    A     Correct.

22    Q     And you spoke with him at a location other than a

23    Universal facility, correct?

24    A     Correct.

25    Q     And you spoke to Mr. Gibson on the phone, correct?
```

Exhibit 1(f)
799



www.escribers.net | 800-257-0885

```
1    A    Correct.

2    Q    And then you spoke to him on the street once, right?

3    A    Yes.

4    Q    Okay.

5         MR. ADLONG:  No further questions for this witness.

6         JUDGE ROSAS:  Any redirect?

7         MS. KAGEL:  Just one question, Your Honor.
```

<div align="center">

**REDIRECT EXAMINATION**

</div>

```
9    Q    BY MS. KAGEL:  Mr. Castaneda, did you speak to any other

10   Roadrunner employees besides Mr. Gibson, Mr. Davis, and Mr.

11   Hollings?

12   A    Yes.

13   Q    How many other employees --

14        MR. ADLONG:  Your Honor, we're going to object.  This

15   could have been -- this could have been testimony that was

16   elicited on direct examination.  We kept our testimony specific

17   and focused on her direct examination.  And now she's -- it's

18   completely expanding the scope and it's going to completely

19   open up a whole new line of cross.  This should have been --

20   this should have been addressed at the outset.

21        JUDGE ROSAS:  The question is whether he spoke to other

22   employees where, specifically?

23        MS. KAGEL:  I just said, besides Mr. Gibson, Mr. Davis,

24   Mr. Hollings, and that was going to be my only question.

25        JUDGE ROSAS:  And Respondent, was your question
```

Exhibit 1(f)
800



www.escribers.net | 800-257-0885

1    specifically directed to Fontana, Slover facility?

2         MR. ADLONG:  My question?

3         JUDGE ROSAS:  Your question regarding the witness speaking

4    with these individuals.  This was -- this was specifically at

5    the Slover facility in Fontana; is that correct?

6         MR. ADLONG:  Yeah.  I clarified what -- because there's

7    two Fontana locations, I clarified what Fontana location.  And

8    then I just specifically addressed the employees that she's --

9    that were identified on direct examination.  I got in, I got

10   out, and I moved on.

11        MS. KAGEL:  And that's my intent, too, Your Honor.  I

12   just --

13        JUDGE ROSAS:  All right.

14        MS. KAGEL:  -- want to clarify.

15        JUDGE ROSAS:  There's enough information on direct as well

16   as on cross.  Sustained.

17        Next question.

18        MS. KAGEL:  No further questions, Your Honor.

19        JUDGE ROSAS:  All right.  Thank you, sir.  You're excused.

20   Please do not discuss your testimony with anyone until you're

21   advised that the case is closed.  All right.

22        THE WITNESS:  Thank you.

23        JUDGE ROSAS:  Thank you.  Have a good day.

24        All right.  Next witness.

25        MR. DO:  Your Honor, the General Counsels call Mr. Maurice

Exhibit 1(f)
801



1   Cummings, which I am hoping is already in the waiting room.

2       JUDGE ROSAS:  Okay.  Let's go off the record for a minute.

3   (Off the record at 9:12 a.m.)

4       JUDGE ROSAS:  Back on the record.  General Counsel, you

5   call Maurice Cummings.

6       Mr. Cummings, please raise your right hand.

7   Whereupon,

8                       **MAURICE CUMMINGS**

9   having been duly sworn, was called as a witness herein and was

10  examined and testified, telephonically as follows:

11      JUDGE ROSAS:  All right.  Please state and spell your

12  name, and provide us with an address.

13      THE WITNESS:  Maurice -- Maurice Cummings, M-A-U-R-I-C-E

14  C-U-M-M-I-N-G-S.  My address is ████████████████████

15  San Jacinto, California 92582.

16      JUDGE ROSAS:  Go ahead.

17      MR. DO:  Thank you, Your Honor.

18                     **DIRECT EXAMINATION**

19  Q   BY MR. DO:  Thank you for being here, Mr. Cummings.  In

20  2019, who did you work for?

21  A   Universal Intermodal.

22  Q   And what -- what do you do for Universal Intermodal?

23  A   I'm a truck driver.

24  Q   And what was your job title -- what do you do as a driver?

25  A   Well, we picked up and delivered freight.  Containers or

Exhibit 1(f)
802



1    rail freight.  All freight -- all kind of freight.

2    Q    And how long did you work for Universal Intermodal?

3    A    Five years.

4    Q    Do you still currently work for Universal Intermodal?

5    A    No.

6    Q    And why did you stop working for Universal Intermodal?

7    A    They -- they've let us all go.  They fired us.

8    Q    And when were you fired?

9    A    12 (audio interference), I believe it was.

10   Q    And when you were working for Universal Intermodal, at

11   what facility did you start and end your day?

12   A    At the Fontana facility.

13   Q    Do you know the address of that facility?

14   A    Not right offhand.  It's on Slover Avenue in Fontana.

15   Q    Did you work at that Slover Avenue facility the entire

16   time you were working at Universal?

17   A    I did not.

18   Q    And prior to working at the Slover facility, where did you

19   work?

20   A    We'd work in Colton -- at Colton or -- in Colton.

21   Q    Okay.

22        MR. DO:  Ms. --

23   Q    BY MR. DO:  I -- I think you broke up a bit.  Can you

24   restate your answer for the record, please?

25   A    At a Colton facility in Colton before they --

Exhibit 1(f)
803



```
1            JUDGE ROSAS:  Hold on one second.

2            THE WITNESS:  -- made this new facility.

3            JUDGE ROSAS:  Hold on.  Hold -- Mr. Cummings, hold on one

4    second.  Are you -- you're using a smart phone?

5            THE WITNESS:  Yes, sir.

6            JUDGE ROSAS:  All right.  I wonder -- do you have any

7    other devices in the area?

8            THE WITNESS:  No, sir.

9            JUDGE ROSAS:  No.  Do you have a headphone, just to see if

10   the audio is better?

11           THE WITNESS:  No.  No, sir, I do not.

12           JUDGE ROSAS:  All right.  Well, we'll work with that.

13   Also, can I ask, can you move your phone horizontal instead of

14   vertical?

15           THE WITNESS:  Like this?

16           JUDGE ROSAS:  Yeah.

17           THE WITNESS:  Like this?

18           JUDGE ROSAS:  That's perfect.  That's better.

19           THE WITNESS:  Okay.

20           JUDGE ROSAS:  So you're not cut off.

21           THE WITNESS:  Okay.

22           JUDGE ROSAS:  All right.  Very good.  All right.  Back on

23   the record.

24           MR. DO:  Thank you.

25   Q    BY MR. DO:  So when do -- when did you begin working at
```

Exhibit 1(f)
804



www.escribers.net | 800-257-0885

1   the Fontana facility?

2   A    I believe it was April 2019.  No.  No.

3   Q    And --

4   A    I'm sorry, April 2000- -- I'm sorry, it was either '16 or

5   '17.

6   Q    And why do you start working at the Fontana facility?

7   A    Why did I start working?  Or when?

8   Q    Yes.  Why?

9   A    Because they moved from the Colton yard to the Fontana

10  yard.  They bought a new yard.

11  Q    Can you describe the Slover Avenue facility for us?  What

12  did it look like?

13  A     It's a big lot.  It had an office.  It has a place for

14  repairs.  It has an auto area -- the truck shop.  It has a

15  place for parking trailers and tractors.

16  Q    And was Universal Intermodal the only company that used

17  that facility?

18  A    At first, but then they switched over to Truckline also

19  used it with us.

20  Q    When you're saying Truckline, are you referring to

21  Universal Truckload?

22  A    Yes, Truckload, yes.

23  Q    Primarily, what work did Universal Intermodal drivers do?

24  A    Well, we -- we used to do rail imports, but then they

25  switched over to straight port work.



1    Q    And then Universal Truckload, do you know what work they

2    did?

3    A    They had -- there are some trailers, and then their

4    work -- they did rail work there, then they did LTL, I believe.

5    Q    And just to clarify for the record, what does "LTL" stand

6    for?

7    A    LTL is picking up local loads and trailers from

8    distributors, and picking up and deliver.

9    Q    Okay.  Do you know if Universal Truckload is affiliated

10   with Universal Intermodal?

11   A    Yes, they're the same company.

12   Q    And how do you now that?

13   A    I worked there for five years and I just know that.

14   Q    Do you know what -- do you --

15       MR. DO:  Give me one moment.

16   Q    BY MR. DO:  When -- in 2019, when you were still working

17   for Universal Intermodal, what -- what days did you normally

18   work?

19   A    Well, I used to work six days a week, until the -- you

20   know, the slow down.  Until the -- until we started Union

21   organizing, then they brought us down to four days a week.

22   Q    And on average -- in 2019, on average, how many hours did

23   you do a day?

24   A    Well, before the Union, we used to work -- I used to work

25   65, 70 hours.  But after the Union started organizing, we went

Exhibit 1(f)
806



www.escribers.net | 800-257-0885

1    down to less than 40 hours a day -- 40 hours a week.

2    Q    And what shift did you work?

3    A    I worked the second shift.

4    Q    Is that the same as the night shift?

5    A    Yes, the night shift.

6    Q    Let me ask you about your experience working for Universal

7    Intermodal.  In -- in 2019, step-by-step, what was your typical

8    day like?

9    A    Well, I would come in and pick up my paperwork.  The work,

10   the assignment that we have for the day.  I had loads that had

11   to pick up or deliver.  If I could take an empty, or if I have

12   to go to the port and pick up a load and deliver it.  Before

13   the Union strike, I used to pick up the -- go and take an empty

14   and pick up the load and deliver it to the customer.  Or pick

15   up -- I have to go back, pick up another load and deliver it --

16   and do it two or three times, if we had time.  But after the

17   strike, they -- all that changed.  You know, they -- they

18   just -- they wouldn't let us deliver to the customer, or they

19   just had us take an empty and pick up a load, take it to a drop

20   yard.  One of the many that they had in the area.

21   Q    Okay.  Are you familiar with -- with a company called

22   Southern Counties Express?

23   A    Yes, they bought Southern Counties Express for $85

24   million.

25   Q    And how do you know that?

Exhibit 1(f)
807



www.escribers.net | 800-257-0885

1    A    Well, the -- the upper guys told us what they bid on --

2    spent on the company.

3        MR. KUNTZ:  Your Honor, we'll object to that, and hear --

4    on a hearsay basis and move to strike.

5        JUDGE ROSAS:  What was the latter part of that?  Who told

6    you?

7        THE WITNESS:  (Audio interference).

8        JUDGE ROSAS:  Repeat that.  We didn't hear you.

9        THE WITNESS:  Supervisors.

10       JUDGE ROSAS:  Overruled.

11   Q    BY MR. DO:  At the time of your termination, layoff, in

12   December of 2019, who was your dispatcher?

13   A    Luis.

14   Q    And is Luis the one who you get work from?

15   A    Yes, every day.

16   Q    When you were working --

17       JUDGE ROSAS:  Counsel, off the record.  Off the record.

18   (Off the record at 9:22 a.m.)

19       JUDGE ROSAS:  Back on the record.

20                    **RESUMED DIRECT EXAMINATION**

21   Q    BY MR. DO:  When you worked for Universal Intermodal in

22   2019, what kind of truck were you using?

23   A    I usually use an International, and then I -- I know --

24   they had Macks that they bought a whole fleet of trucks, Mack

25   trucks.  But before that, I was driving a Freightliner.

Exhibit 1(f)
808



1    Q    All right.  Let me -- right before your termination, right

2    before you layoff in 2019, which truck were you using then?

3    A    We were using --

4         MR. KUNTZ:  Objection.  Asked and answered.

5         JUDGE ROSAS:  I didn't --

6         MR. DO:  I'm just trying to clarify.

7         JUDGE ROSAS:  -- get the full -- I didn't get the full

8    crux of the previous answer.  Let -- I'm going to let him

9    answer it.  Overruled.

10        THE WITNESS:  We -- we were driving Mack trucks.

11   Q    BY MR. DO:  Can you describe what that truck looked like?

12   A    They were white with Universal logos on the side.  They

13   were day cabs.  They didn't have any sleepers.

14   Q    Were there any kind of logos on those trucks?

15   A    Yes.  Universal Intermodal.

16   Q    And where would -- and where were those logos located?

17   A    On the sides of the truck, on the doors of both sides of

18   the truck.

19   Q    And when you worked for Universal Intermodal in 2019,

20   where would you pick up your truck?

21   A    In Southern Counties yard.

22   Q    And at the end of your day, where would you drop off the

23   truck?

24   A    At the same place.

25   Q    Did you use the same truck every day?

Exhibit 1(f)
809



www.escribers.net | 800-257-0885

1    A      No, not necessarily.  It might have been needing some

2    repairs.  It might have been in the shop.  We could all -- we

3    could slip sheet different truck -- we could drive different

4    trucks --

5    Q      And was --

6    A      -- if necessary.

7    Q      And when you're not using the same truck, what kind of

8    truck would you use?

9    A      The same.  They had a fleet of Mack trucks.

10   Q      And who owned those trucks?

11   A      Universal Intermodal from -- from my understanding.  Or

12   Mason-Dixon, they're the same company.

13   Q      Did Universal Intermodal have company chassis?

14   A      Yes, they did.

15   Q      What did those look like?

16          MR. KUNTZ:  Your Honor, we're -- Your Honor, I'd like to

17   interpose a cumulative objection.  I think this is maybe the

18   fifth or sixth witness we've heard all of this from.

19          JUDGE ROSAS:  That's correct, Respondent.  Let me ask

20   Respondent, is there any objection -- I know there's been

21   any -- any dispute as to the nature of the chassis that

22   occupied these trucks, the logos, the colors, the type of

23   trucks; is there going to be any contention otherwise?  Because

24   there's been some cross-examination.

25          MR. KUNTZ:  Yeah, and as far as those -- those details of

Exhibit 1(f)
810



1    the trucks, Your Honor, the -- the -- that you mentioned, the

2    logos, the colors, the descriptions, the type of trucks, I

3    don't believe there's any dispute as to any of that, no, Your

4    Honor.

5        JUDGE ROSAS:  What about the chassis?

6        MR. KUNTZ:  I don't believe there's a dispute there

7    either, Your Honor.

8        MR. DO:  Your Honor, may -- may I interpose?  And do you

9    want me to do -- did you want us to do this without the

10   witness?

11       JUDGE ROSAS:  Sure.  Let's -- we're going to excuse you

12   for one minute, Mr. Cummings.

13       THE WITNESS:  Okay.

14       JUDGE ROSAS:  We ask you to step out -- outside the

15   virtual court.  We're going to put you into a waiting room, all

16   right?

17       THE WITNESS:  Okay.

18       JUDGE ROSAS:  Yeah.

19       MR. DO:  Your Honor, thank you.  Your Honor, that's fine.

20   The line of question here is really to lay foundation for my

21   next set of questions, which is the one regarding the usage of

22   those chassis.  So -- you know, which is to say that it didn't

23   matter, you know, that they weren't required to use the

24   Southern Counties Express chassis or Southern Counties Express

25   load.  Again, without the expression, I won't -- it's difficult

Exhibit 1(f)
811



www.escribers.net | 800-257-0885

1    for the --

2         JUDGE ROSAS:   Is there -- is there -- is there a

3    stipulation that you're going to propose regarding the use of

4    the chassis?

5         MR. KUNTZ:   Your Honor, this -- honestly, Your Honor,

6    sorting all this out is probably going to take longer than just

7    letting him proceed.   So I --

8         JUDGE ROSAS:   Okay.   All right.

9         MR. KUNTZ:   -- withdraw the objection.

10        JUDGE ROSAS:   Okay.   We'll proceed on that basis.   Go

11   ahead.   Chassis are fair game.   Let's bring him back.

12   Q    BY MR. DO:   All right.   Thank you, Mr. Cummings.   Welcome

13   back.   So again, the last question that I asked you is did

14   Universal Intermodal have company chassis?

15   A    Yes.

16   Q    And what did they look like?

17   A    They were yellow in color.   Yellow and black in color.

18   Q    And then did Southern Counties Express Company own

19   chassis?

20   A    Yes, they did.   They were pink and black in color.

21   Q    And when you were driving for Universal Intermodal, were

22   you required to use Universal Intermodal chassis in 2019?

23   A    We could use either or because the -- the company owned

24   both -- both companies.   They owned Southern Counties,

25   Universal, and Container Connection, and Roadrunner.   They

Exhibit 1(f)
812



1    bought them all.  So they -- they're still all the same

2    company, so we could interchange chassis at will.

3    Q    All right.  So you mentioned that Dispatcher Luis is the

4    one who would give you work.  Generally, how does Luis contact

5    you?

6    A    Well, generally, they let us -- usually, he contacts us by

7    phoned, or usually, we just come in on the regular time; we

8    come in at 5:00.  We know to come in at 5, and the work would

9    be already ready for us.  The paperwork would be -- be prepared

10   for us.

11   Q    And what information would be contained?  Well, how would

12   you receive that -- that work?  In what form?

13   A    The paper -- paper form.  They'd print it out and they'd

14   give us the dispatch of what we needed to do for that evening.

15   Q    And what information would be contained on that form?

16   A    What empty to pick up, what load to pick up, the numbers

17   that you need to -- to take in the chassis and the information

18   you need to bring out the chassis -- the loaded container.

19   Q    Do you know what a SCAC code is?

20        MR. KUNTZ:  Objection.  Cumulative.

21        JUDGE ROSAS:  You can lead on that and get to your next

22   question.

23        MR. DO:  Sure.

24   Q    BY MR. DO:  Mr. Cummings, you -- you know what a SCAC code

25   is, correct?

Exhibit 1(f)
813



1    A    Yes.

2    Q    And what -- what are -- what do you use the SCAC code for?

3    A    We use the SCAC code to -- to either get in the -- into

4    the -- the container yard, the freight yard, or the ship yard,

5    or take something in and take something out.  We have to have a

6    code in everything that we do, every day.  Each -- each load,

7    you have to have a different code to get in and get out to pick

8    up or delivery.

9    Q    And does Universal Intermodal have its own company --

10   company SCAC code?

11   A    Yes, I believe so.

12   Q    And did Southern Counties Express have its own company

13   SCAC code?

14   A    Yes, I believe so.  They were in --

15        JUDGE ROSAS:  Do you dispute that the companies had

16   their -- their different SCAC codes at this point, Respondent?

17        THE WITNESS:  Yeah, it depends on what --

18        JUDGE ROSAS:  Hold on.  Hold on, sir.

19        MR. DO:  Mr. Cummings, there a question --

20        JUDGE ROSAS:  This is question to the -- to the Company.

21        MR. KUNTZ:  No, Your Honor, there's no dispute as to that.

22   And if this is going to go down the same line that we've gone

23   down with other witnesses regarding when SCAC codes were and

24   weren't used for certain companies, we're going to object to

25   that as cumulative as well.

Exhibit 1(f)
814



1      JUDGE ROSAS:  So there's no dispute there?

2      MR. KUNTZ:  No, Your Honor.

3      JUDGE ROSAS:  Regarding previous testimony.

4      General Counsel?

5      MR. DO:  So the only thing I would say is that the -- and

6  do you mind if we excuse the witness for a moment?

7      JUDGE ROSAS:  Okay.  One more time, Mr. Cummings.  I

8  apologize.

9      MR. DO:  I -- I think the issue, again, this is me just

10  laying foundation so that I can actually get to the questions

11  about, you know, which SCAC code he used.  If they're willing

12  to admit to that, that's fine.  I'll move on.

13      JUDGE ROSAS:  Like I usually tell people at the outset,

14  you can lead on perfumatory stuff, you know, so try to get to

15  it.

16      MR. DO:  Okay.

17      JUDGE ROSAS:  Go right to it.  If it's -- if it's -- if

18  it's excessively leading and -- and Respondent, in my view, it

19  will be sustained, otherwise, you'll get right to it.  If --

20  if --

21      MR. DO:  Okay.

22      JUDGE ROSAS:  -- you know how to get to it, just get right

23  to it.  Okay.

24      MR. DO:  Understood, Your Honor.

25      JUDGE ROSAS:  Let's --

Exhibit 1(f)
815



1    Q    BY MR. DO:  All right.  Again, welcome back, Mr. Cummings.

2    Is it correct that when you worked for Universal Intermodal you

3    would pull loads using Southern Counties Express' SCAC code?

4    A    Yes.

5    Q    And who would assign you those loads?

6    A    Luis.

7    Q    Before your separation, do you -- were you -- were you

8    hired by Southern Counties Express?

9    A    No.

10   Q    And before your separation, do you -- you applied to work

11   for Southern Counties Express?

12   A    No.  They were the same company.

13   Q    And --

14   A    Universal bought them.

15   Q    And when you pulled a load using Southern Counties Express

16   and the SCAC code, who would pay you?

17   A    Universal paid us all.

18   Q    So did you --

19        JUDGE ROSAS:  Going forward -- going forward, no dispute

20   there either, right?

21        MR. DO:  Okay.

22        JUDGE ROSAS:  Universal Intermodal employees always paid

23   by Universal Intermodal, Respondent?

24        MR. KUNTZ:  Correct, Your Honor.  Correct, Your Honor.

25        JUDGE ROSAS:  Okay.

Exhibit 1(f)
816



1        MR. DO:  Understood, Your Honor.

2        JUDGE ROSAS:  Go ahead.

3    Q    BY MR. DO:  And did you have to keep a separate time

4    report for when you were pulling for Southern Counties Express,

5    or when you were pulling for Universal?

6    A    No.

7    Q    In 2019, who were some clients that you typically

8    delivered to?

9    A    Ross, Sears, when they were here, Walmart, Stater

10   Brothers, Ralphs, Albertsons.  They had so many customers.

11   There were numerous.  All your major -- all your major grocery

12   stores and all your major chain stores.

13   Q    And you previously testified that you would deliver to

14   these clients directly; how often would you do that delivery?

15   A    Every day.

16   Q    Prior to the Union, on average, how many loads would you

17   be assigned a day?

18   A    Three, four, five loads a day.

19   Q    So since -- we have some testimony regarding the Union.

20   Are you aware -- were you aware that there was a campaign to

21   organize the Universal employee?

22   A    Yes.

23   Q    Which union was trying to organize the employee?

24   A    Teamsters 848.

25   Q    And were you involved in this campaign?

Exhibit 1(f)
817



1   A   Yes.

2   Q   All right.

3       MR. DO:  Give me one moment.  I'm going to mark for

4   identification as GC Exhibit 12, and I'm going to put that on

5   the screen momentarily.

6   **(General Counsel Exhibit Number 12 Marked for Identification)**

7   Q   BY MR. DO:  Mr. Cummings, do you see the document I just

8   put in front of you?

9   A   Yes.

10  Q   In the name line, is that your name?

11  A   Yes, it is.

12  Q   And on the bottom right, do you recognize that signature?

13  A   That's my signature.

14  Q   And on the date line, it has November 2nd, 2019; is that

15  about the date when you signed this card?

16  A   Yes.

17      MR. DO:  Your Honor, I'm going to move for the admission

18  of GC Exhibit 12.

19      MR. KUNTZ:  Brief voir dire, please, Your Honor.

20      Ms. Bridge, could you please scroll out so that we could

21  see the whole page?  Or zoom out?

22      MR. DO:  Sure.  I -- just, Mr. Kuntz is the one that's

23  actually in control of it.

24      MR. KUNTZ:  Oh, apologies.

25                          <u>**VOIR DIRE EXAMINATION**</u>

Exhibit 1(f)
818



www.escribers.net | 800-257-0885

1   Q    BY MR. KUNTZ:  Mr. Cummings, do you see the black squares

2   on the page?

3   A    Yes.

4   Q    There appear to be three of them, right?

5   A    Yeah.

6   Q    Do you know what the significance of those squares is?

7   A    My signature, and letting me know that I'm joining the

8   Union.

9   Q    My apologies, Mr. Cummings.  I'm referring to the black

10  square in the upper left corner, and then the two squares in

11  the bottom of the page.  Do you know the significance of those

12  squares?

13  A    You're referring to which now?

14  Q    Do you see in the upper left corner of the page there's a

15  black square?

16  A    I see some information, yeah.  Information.

17  Q    To the left of that, do you see a black square?

18  A    Yeah, I see black.  I don't know what that -- I see blank.

19  I see a blank square that's black, yeah.

20  Q    Okay.  And you also see two black squares below that,

21  correct?

22  A    Yeah.  Yes.

23  Q    And you don't know what the significance of those squares

24  is?

25  A    No, I do not.  Because they're blank.  You can't see them.

Exhibit 1(f)
819



www.escribers.net | 800-257-0885

1    Nothing's on them.

2       MR. KUNTZ:  So Your Honor, we'll just note that all of

3    these authorization cards state that the Union and the

4    Government is going to keep them confidential, but formally, no

5    objection.

6       JUDGE ROSAS:  So I have -- just so I have a full sense of

7    what I'm dealing with here, are we -- am I to assume that the

8    other portion of this document that is blackened are also

9    cards, gentlemen?

10      MR. DO:  Yes, Your Honor.  Yes, Your Honor.

11      JUDGE ROSAS:  All right.  General Counsel's 12 is

12   received.

13   **(General Counsel Exhibit Number 12 Received into Evidence)**

14                  <u>**RESUMED DIRECT EXAMINATION**</u>

15   Q    BY MR. DO:  Mr. Cummings, other than signing a Union card,

16   what else did you do to show your support for the campaign?

17   A    Well, we -- we were organizing to have rallies and we'll

18   have campaigns out in front of the -- the building where we

19   worked at, and we would go down to the Union hall and we would

20   have meetings and gatherings with the other drivers to organize

21   what we'd want to do next.  And we'd wear our uni -- we used to

22   wear Teamsters vests and -- to work.

23   Q    So you mentioned that the Union -- well, let me ask you

24   this way, when you would campaign, do you recall seeing the

25   Teamster -- Teamster representative in front of the Slover

Exhibit 1(f)
820



1    Avenue facility?

2    A   Yes, I did.

3    MR. KUNTZ:  Objection.  Cumulative.

4    JUDGE ROSAS:  Outside of the Slover facility in Fontana,

5    correct?

6    THE WITNESS:  Yes.

7    JUDGE ROSAS:  General Counsel.

8    MR. DO:  Your Honor, this is, again, laying foundation,

9    and particularly, because it relates back to the Font -- the

10    Universal Truckload employees as well.  That's my next line of

11    inquiry.

12    JUDGE ROSAS:  So you want to -- all right.  So -- so just

13    leap into it.

14    MR. DO:  Okay.

15    JUDGE ROSAS:  You can refer the witness to inactivity

16    in -- and see where it goes.

17    MR. DO:  Thank you, Your Honor.

18    Q   BY MR. DO:  Mr. Cummings, when you're driving into the

19    Slover Avenue facility, and when the -- the Teamsters were

20    there, could you have missed them?

21    A   No.

22    Q   But did you -- to the best of your knowledge, did the

23    Universal Truckload employee -- well, let me ask this to get

24    us -- did Universal Truckload have employees at this --

25    employee driver at the Slover Avenue facility?

Exhibit 1(f)
821



1    A    Yes.

2    Q    Approximately how many?

3    A    I'm not sure, maybe 10 or 15.  I'm not sure exactly how

4    many were there.

5    Q    To the best of your know -- go ahead.  Okay.  So to the

6    best of your knowledge, did -- were they aware of the Union?

7    A    Oh, yes.

8         MR. KUNTZ:  Objection.  Calls for speculation.  Lack of

9    foundation.

10        JUDGE ROSAS:  Sustained.

11   Q    BY MR. DO:  Okay.  Do you recall -- did you ever see the

12   Universal Truckload employees talking with the Union?

13   A    Yes.

14   Q    Do you recall the Universal Truckload employees talking to

15   other drivers about the Union?

16   A    They talked to me --

17        MR. KUNTZ:  Objection.  Lack of foundation.

18        JUDGE ROSAS:  Did you say Universal Truckload?

19        MR. DO:  Yes.

20        JUDGE ROSAS:  Universal Truckload employees talking to the

21   Union?

22        MR. DO:  The second question is talking to other drivers

23   about the Union, Your Honor.

24        JUDGE ROSAS:  Repeat the question.

25        MR. DO:  Sure.  Yeah, excuse me.  Did -- did Mr. Cummings

Exhibit 1(f)
822



1    see other -- see Universal Truckload employees talking to other

2    drivers about the Union?  And Your Honor, if he's going to --

3    may I?

4         JUDGE ROSAS:  I'm going to sustain that objection.  The

5    question is whether he saw Universal Truckload employees

6    talking to other employees about the Union.

7         MR. DO:  Your Honor, may we do this outside the presence

8    of the witness?

9         JUDGE ROSAS:  Yeah, so -- so the witness is employed by

10   Universal Intermodal, correct?

11        MR. DO:  Correct.

12        JUDGE ROSAS:  Okay.  So I'm going to sustain the objection

13   on the basis of foundation, because you're asking him now about

14   Universal Truckload.

15   Q    BY MR. DO:  All right.  Mr. Cummings, did you have con --

16   did you have any conversation with Universal Truckload

17   employees about the Union?

18   A    Yes, several.

19   Q    All right.

20   A    So many drivers, I talk --

21   Q    Okay.  Approximately how many?

22   A    Several.  So they were inquiring about the Union.  They --

23   they were considering joining.

24   Q    And how many times did you see Universal Truckload

25   employees talking to the Union representative?

Exhibit 1(f)
823



www.escribers.net | 800-257-0885

1    A    A few times I seen them talking to -- they were inquiring

2    about what they were going to do, or if they were going to join

3    or not.  They were considering it.

4    Q    Did the Fontana facility have security cameras?

5    A    Yes.

6    Q    Do you recall a Union election being held on December 4th,

7    2019?

8    A    Yes.

9    Q    And previous in your -- previously in your testimony, you

10   mentioned a strike.  Was there a strike at the -- at your work

11   facility?

12   A    Not during the campaign.

13   Q    Okay.  So what -- in your previous testimony, when you

14   mentioned that your work changed after the strike, were you

15   referring to the Union election?

16   A    Yeah.

17        MR. KUNTZ:  Objection.  Leading.

18        JUDGE ROSAS:  Sustained.

19   Q    BY MR. DO:  Okay.  So in your previous -- previously in

20   your testimony, when you were referring to a strike, what were

21   you referring to?

22   A    I was referring to the Union election.

23   Q    You broke up a little there.

24        MR. DO:  I just want to confirm.  Troy, did you get that?

25        THE COURT REPORTER:  Yes, sir.

Exhibit 1(f)
824



www.escribers.net | 800-257-0885

```
 1        MR. DO:  Okay.

 2   Q    BY MR. DO:  To the best of your recollection, what was the

 3   outcome of that election?

 4   A    That we won the el -- we won the -- the election.

 5   Q    And when you say "we", who are you referring to?

 6   A    The Union.  Us drivers' Union.

 7   Q    You previously testified that after the election your work

 8   changed.  After the election, how many hours of work would you

 9   do a day?

10   A    They dropped us down to less than eight hours a day and

11   four -- four days a week.

12   Q    And after the election, how many loads will you be

13   assigned a day?

14   A    Maybe one to two.

15   Q    And did anyone ever tell you why your hours were reduced?

16   A    No.

17   Q    Did -- did the dispatcher ever tell you anything regarding

18   your hours?

19        MR. KUNTZ:  Objection.

20   A    No.

21        MR. KUNTZ:  Asked and answered.

22        JUDGE ROSAS:  No one dispatcher -- I'll allow it.  You can

23   answer.

24   A    No.

25   Q    BY MR. DO:  After the Union election, did you continue to
```

Exhibit 1(f)
825



www.escribers.net | 800-257-0885

1    deliver directly to clients?

2    A    No.  They didn't allow -- they didn't allow us to.

3    Q    Where were you deliver to -- well, other than -- if you

4    didn't deliver to client, where do you deliver the loads to?

5    A    Well, we -- we -- if we took an empty in and picked up a

6    load, we took it straight to a drop yard.  They had drop yards

7    in Wilmington and Long Beach, different places, or either

8    Fontana Yard or the Dominquez Yard or the -- the Rancho

9    Dominquez Yard or Compton Yard.

10   Q    When -- when you were dropping loads at -- at those yards,

11   did you ever see loads being taken out of the yard?

12   A    Yes, by Southern Counties and Container Connection.

13   Q    And how do you know that it was Southern Counties and

14   conna -- Container Connection who was taking the loads out?

15   A    A lot of the loads that I brought in, I see them taking

16   out, but they wouldn't let us -- they wouldn't allow us to take

17   out the loads anymore.

18   Q    Draw your attention to your layoff.  How did you learn

19   about it?

20   A    Through the mail.

21   Q    What did you receive in the mail?

22   A    I received a letter in the mail just stating that they was

23   laying us off.

24   Q    Okay.  I'm going to show you what's already been marked

25   and admitted -- let me actually look at what its number.  Okay,

Exhibit 1(f)
826



```
 1    I'm going to show you what's already been marked and admitted

 2    as Joint Exhibit 6(b).

 3         MR. KUNTZ:  Objection.  Cumulative.

 4         JUDGE ROSAS:  Do we need to take (audio interference),

 5    Counsel?

 6         MR. DO:  Only to establish --

 7         JUDGE ROSAS:  That's why he's laid off.

 8         MR. DO:  Your Honor, I -- honestly, I can just show this.

 9    I wanted just to confirm the identity of Mr. Vagts.

10         JUDGE ROSAS:  Okay.  Overruled.  You can answer.

11    Q    BY MR. DO:  Okay.  Do you recognize this letter, Mr.

12    Cummings?

13    A    Yes, I do.

14    Q    In this letter, do you see the indiv -- names an

15    individual by the name of Michael Vagts?  Do you know who that

16    is?

17    A    No.

18    Q    And in this letter, it refers to the Compton facility.

19    Were you aware of the Compton facility?

20    A    Yes.

21    Q    Prior to this letter, were you aware that the Compton

22    facility's lease was expiring?

23    A    No.

24    Q    Prior to receiving this letter, did anyone from

25    management, so include managers, supervisors, dispatcher,
```

Exhibit 1(f)
827



1    indicate to you that you might be laid off?

2    A    No.

3         MR. KUNTZ:  Objection as to the inclusion of dispatchers

4    in management.

5         JUDGE ROSAS:  Together?  All right, break it out.

6         MR. DO:  Okay.

7    Q    BY MR. DO:  Mr. Cummings, prior to receiving this -- that

8    letter, did any managers tell you that you might be laid off?

9    A    No.

10   Q    Prior to this letter, did any supervisors tell you that

11   you might be laid off?

12   A    No.

13   Q    Prior to this letter, did any dispatcher tell you that you

14   might be laid off?

15   A    No.

16   Q    Did you speak to anyone at the company regarding this

17   letter?

18   A    Yes, I called the -- the main office.

19   Q    And who -- do you recall who you spoke to?

20   A    No, I just -- corporate -- a corporate person told me

21   that, no, whatever the letter said, that's how it is, and

22   that's it.

23   Q    And -- all right, I'm going to take this off the screen.

24   And just to confirm, you began your day -- where did you begin

25   your day?

Exhibit 1(f)
828



1    A    Fontana facility.

2    Q    And where do you end your day?

3    A    Fontana facility.

4    Q    To the best of your knowledge, is the -- the Fontana

5    facility still operating?

6    A    Yes, I went by there yesterday.

7    Q    Okay.  After the Union election, December 4, 2019, do you

8    know what happened to your trucks?

9        MR. KUNTZ:  Objection.  Lack of foundation.

10   A    (Audio interference) to repeat that.

11       JUDGE ROSAS:  Do you -- hold on.  All right, if -- if you

12   know.

13   A    Repeat the question.

14   Q    BY MR. DO:  Sure.  After the Union election, December 4 of

15   2019, do you know what happened to your truck?

16       THE WITNESS:  It was rumored that they were being moved to

17   Texas or --

18       MR. KUNTZ:  Objection.

19       THE WITNESS:  -- (indiscernible, simultaneous speech).

20       JUDGE ROSAS:  Stricken.

21       MR. DO:  Your Honor, I will note that the -- to the extent

22   that this is hearsay, it's corroborated by documentary evidence

23   by where they were moved.

24       JUDGE ROSAS:  Okay.  You have the documentary evidence in

25   evidence -- admitted already?

Exhibit 1(f)
829



1        MR. DO:  Yes.

2        JUDGE ROSAS:  Okay, who --

3        MR. DO:  Yes, it's in Joint -- a joint exhibit.  I just

4    wanted to --

5        JUDGE ROSAS:  Great.

6        MR. DO:  -- flag that.

7        JUDGE ROSAS:  Great, so you don't need rumor to

8    corroborate it, okay.

9        MR. DO:  Understood.

10   Q    BY MR. DO:  In your experience when you work with

11   Universal Intermodal, when during the year was work most busy?

12   A    Well, we stayed busy most of the time be -- because we

13   would pre-lo -- we would pre-pull a lot of trailers from the

14   port and put them in drop yards or put them in our yards so we

15   could stay busy year around.  So we were prepared -- they were

16   prepared for us to -- when it got slow in the slow season,

17   to -- to work.

18   Q    When was the slow season for the port?

19   A    Usually around Decembers and Christmastime we got slow

20   after, but we were never really slow because we were alway --

21   the company stayed prepared.

22   Q    Okay.  And when -- when there was a slowdown in the -- the

23   port work, what work -- is there any other type of work that

24   you would do?

25   A    Yes, I -- before we -- we used to do railya -- I used to

Exhibit 1(f)
830



1    do rail also -- rail work.

2    Q    And when you did rail work, what truck would you be using?

3    A    The same truck.

4    Q    Were you ever formally employed by Universal Truckload?

5    A    No.

6    Q    Did you ever apply to work for Universal Truckload?

7    A    No.

8    Q    Do you recall if you were ever paid a different rate when

9    you did rail work?

10   A    Yes, $22 for rail and $24 for port.

11   Q    And who would pay you?

12   A    Universal Intermodal.

13        MR. DO:  No furt -- No further question, Your Honor.

14        JUDGE ROSAS:  Charging Party?

15        MR. WOJCIECHOWSKI:  No questions.  Thank you.

16        JUDGE ROSAS:  Any Jencks?

17        MR. DO:  Yes, Your Honor.  Let me confirm the length.

18        JUDGE ROSAS:  Okay, let's go off the record.

19   (Off the record at 9:53 a.m.)

20        JUDGE ROSAS:  Respondent?

21                      <u>**CROSS-EXAMINATION**</u>

22   Q    Good morning, Mr. Cummings.

23   A    Good morning.

24   Q    My name's Harrison Kuntz.  I'm an attorney for the

25   Respondents in this case, and I'm going to have a few cross-

Exhibit 1(f)
831



1    examination questions for you.  Before we get started, I just

2    wanted to note that because of the video format of this, it's

3    helpful if after I ask a question you can give it a second or

4    two before you answer to make sure that there's no lag in the

5    video time that affects things.  Can you do that for us?

6    A    Yes.

7    Q    And can you also answer verbally for us because we have a

8    court reporter taking down a transcript and so gestures like

9    head nods would not be picked up.  Can you do that, please?

10   A    Yes.

11   Q    So Mr. Cummings, I believe you told us that you live in

12   San Jacinto; is that correct?

13   A    That's correct.

14   Q    And did you also live there throughout 2019?

15   A    Yes.

16   Q    How far of a drive is it from San Jacinto to the Slover

17   facility?

18   A    Maybe 40, 45 yard -- miles.

19   Q    And what about from San Jacinto to the Universal

20   Intermodal Compton facility?

21   A    Oh, that's a long way, maybe 60, 75 miles or more.

22   Q    And could you tell us how long that would be approximately

23   in terms of time?

24   A    Okay, from -- from -- to the Slover Yard, maybe an hour,

25   depends on traffic, that time of day that I left, and --

Exhibit 1(f)
832



1    Q    Well --

2    A    -- to the -- you wanted the Compton Yard also?

3    Q    Yes, please.

4    A    The Compton Yard would maybe take a hour and a half to two

5    hours that -- during traffic at that time.

6    Q    So isn't it true that starting and ending your day at the

7    Slover facility was more convenient for you than it would have

8    been to start and end at the Compton facility?

9    A    Yes.

10   Q    Now, Mr. Cummings, do you recall testifying about being

11   fired?

12   A    Yes.

13   Q    No one ever told you that you were fired because of

14   misconduct, did they?

15   A    No.

16   Q    You described for us a time when Universal Intermodal

17   purchased Southern Counties, correct?

18   A    Correct.

19   Q    Were you aware that at the time of the purchase, Southern

20   Counties operated utilizing owner-operators?

21        MR. DO:  Objection.  Foundation.

22   A    Yes.

23        JUDGE ROSAS:  I'll allow it.  You can answer.

24   A    Yes.

25   Q    BY MR. KUNTZ:  Were you aware that at the time of the

Exhibit 1(f)
833



1    purchase, Southern Counties had approximately 200 owner-

2    operators?

3          MR. DO:  Objection.  Foundation --

4          MR. KUNTZ:  Your Honor, it's cross --

5          MR. DO:  -- and speculation.

6          MR. KUNTZ:  -- examination.

7          JUDGE ROSAS:  What's that?

8          MR. KUNTZ:  Your Honor, it's cross-examination.

9          JUDGE ROSAS:  Okay.  All right, that's fine.  You can

10   answer.

11   A    I didn't know how many -- exactly how many drivers they

12   had.  They had quite a few.

13   Q    BY MR. KUNTZ:  Do you recall testifying that at some point

14   you begin pulling loads with Southern Counties SCAC codes?

15   A    Yes.

16   Q    And isn't it true that you began pulling such loads during

17   the first half of 2019?

18         MR. DO:  Objection.  Misstate the testimony.

19         JUDGE ROSAS:  Repeat the question.

20   Q    BY MR. KUNTZ:  Isn't it true that you began pulling such

21   loads in the first half of 2019?

22         JUDGE ROSAS:  That's cross.  It's not referencing his

23   testimony.  You can answer if you know.

24   A    I'm not sure exactly when.

25   Q    BY MR. KUNTZ:  Would it have been before August of 2019?

Exhibit 1(f)
834



```
1    A    I'm not sure.  I know it was after we purchased them --

2    after Universal purchased them.

3    Q    But you're not sure when the earliest that you began

4    pulling those loads was?

5    A    No, no.  I can't recall exact time and dates, no.

6    Q    You listed for us a variety of different customers that

7    you pulled freight for, correct?

8    A    Universal pulled for, yes.

9    Q    Yes.  And -- and you, in fact, in working for Universal,

10   pulled freight for a variety of customers, right?

11   A    Yes.

12   Q    Including Walmart, for example?

13   A    Yes.

14   Q    Amazon?

15        MR. DO:  Your Honor, I'm going to object.  This is not in

16   his testimony.

17        JUDGE ROSAS:  Did he say it was in his testimony.

18        MR. DO:  I'm objecting to foundation because -- and I

19   don't --

20        JUDGE ROSAS:  Overruled.

21   Q    BY MR. KUNTZ:  Did you --

22   A    I don't remember --

23   Q    -- pull loads for --

24   A    Go ahead.

25   Q    Excuse me, I'm sorry.  Did you pull loads for Amazon?
```

Exhibit 1(f)
835



www.escribers.net | 800-257-0885

1    A    No.

2    Q    Okay.  Trader Joe's?

3    A    Yes.

4    Q    Albertsons?

5    A    Yes.

6    Q    Now, it's not your understanding, is it, that Universal or

7    Southern Counties was the only company that pulled freight for

8    those customers?

9         MR. DO:  Objection.  Foundation and speculation.

10        MR. KUNTZ:  Your Honor, I'm only asking for his

11   understanding.

12        JUDGE ROSAS:  I -- I -- hold on.  I -- I put my hand up,

13   so I need to review.  Overruled.  You can answer.

14   A    What was the question again?

15   Q    BY MR. KUNTZ:  It's not your understanding, is it, that

16   Universal or Southern Counties are the only companies that

17   pulled freight for those customers?

18   A    Container Connection was their own pull and Roadrunner,

19   which they bought, plus other companies pull freight.  They

20   have their own -- a lot of these companies have their own

21   trucks and their own drivers that they pull the freight for

22   theirselves, also.  Like Stater Bros., Walmart, they have their

23   own company trucks that they pull stuff for, and we're just

24   part of the trucking industry that pull freight for different

25   companies.

Exhibit 1(f)
836



1    Q    Okay.  And other companies in the industry, competitor

2    companies, might also pull such freight, correct?

3    A    Yes, that's every day.  That's -- that's the industry.

4    Q    Do you recall testifying regarding the slow seasons that

5    would occur occasionally?

6    A    Yes.

7    Q    And I believe you testified those would often occur around

8    Christmastime; is that right?

9    A    Yeah, sometime.

10   Q    And when the slow seasons occurred, in order to keep work

11   up, the company would often use drop yards; is that right?

12   A    Yes.

13   Q    And that occurred prior to 2019, didn't it?

14   A    That happened every year I was there.

15   Q    And isn't it true that in 2019 the amount of work that you

16   were receiving changed prior to the Union election?

17   A    After.

18   Q    Oh.  Mr. Cummings, do you recall giving an affidavit to an

19   NLRB agent in this case?

20   A    Yes.

21   Q    And when you gave that affidavit, you understood that it

22   was important to tell the truth, correct?

23   A    Correct.

24   Q    And in fact, you did tell the truth, right?

25   A    Yes.

Exhibit 1(f)
837



www.escribers.net | 800-257-0885

1         MR. KUNTZ:  Ms. Bridge?

2    A    To the best of my knowledge.

3    Q    BY MR. KUNTZ:  Well, and in fact, your recollection when

4    you gave that affidavit would probably be better than it is

5    now, right?

6    A    I'm not sure.

7    Q    Well, that was closer in time to the things that you were

8    describing in your affidavit, wasn't it?

9    A    Yes.

10        MR. KUNTZ:  Ms. Bridge, could you please pull up the

11   Jencks statement for this witness?

12        MR. DO:  Mr. Kuntz, just give me one moment.  Let me get

13   that onto the SharePoint for Ms. Bridge.

14        MS. BRIDGE:  Thank you.

15        JUDGE ROSAS:  Counsel, you could just put it up.  You

16   could share your screen if you want.

17        MR. DO:  Would you like me to do it, Your Honor, or are

18   you --

19        JUDGE ROSAS:  Mr. Do --

20        MR. DO:  -- preferring Mr. Kuntz?

21        JUDGE ROSAS:  -- I mean, I -- it -- it really doesn't --

22   whatever's easiest.

23        MR. DO:  Mr. Kuntz, is there a specific page you would

24   like for me to put up?

25        MR. KUNTZ:  Page 5, please.

Exhibit 1(f)
838



1          MR. DO:  All righty.

2          MR. KUNTZ:  Perfect.  Thank you.

3          Mr. Cummings, could you please read to yourself on line 18

4    of the -- of this pa -- actually, strike that.

5          Mr. Do, could you please scroll down to the last page?

6          MR. DO:  Sure.

7    Q     BY MR. KUNTZ:  Mr. Cummings, is that your signature shown

8    on the screen?

9    A     That's me, yes.

10   Q     And based on what you've seen of the -- of the document

11   that's up, is this the affidavit that you gave to the NLRB

12   agent?

13   A     Yes.

14         MR. KUNTZ:  Mr. Do, could you please scroll back up to

15   page 5?

16         MR. DO:  Sure.

17   Q     BY MR. KUNTZ:  Now, Mr. Cummings, could you please just

18   read to yourself the paragraph that begins at line 13 through

19   the end of this page and let us know when you're finished?

20         UNIDENTIFIED SPEAKER:  What page is that on?

21         MR. KUNTZ:  Mr. Do, the witness may need to continue on to

22   line --

23         THE WITNESS:  Yeah.

24         MR. KUNTZ:  -- 1 of the following page in order to finish

25   the last sentence.

Exhibit 1(f)
839



www.escribers.net | 800-257-0885

1     MR. DO:  No worries.  Let me know.  Let me know if you

2  need me to zoom in, Mr. Cummings.

3     THE WITNESS:  You can scroll up a little more.

4     MR. DO:  Up or down?

5     THE WITNESS:  Up -- down, down, down, down, down.

6  There -- there you go.

7     MR. KUNTZ:  And Mr. Cummings, you can stop after line 1 of

8  page 6.

9     THE WITNESS:  Okay, we're good.

10  Q   BY MR. KUNTZ:  Okay.  So isn't it true that in your

11  affidavit, you described the same reduction in work process

12  that you described in your direct testimony to us?

13  A   Yes.

14  Q   And isn't it true that in your affidavit you testified

15  that this process changed at least a month or so before your

16  layoff and definitely before the Union election?

17  A   Yes, that -- no, not -- well, yeah, because we are

18  organizing.  They slowed us down when we start organizing.

19  Q   But that happened before the Union election, correct?

20  A   Right, right, right.  Correct.

21     THE WITNESS:  They brought in Union busters and they

22  started organizing so they --

23     MR. KUNTZ:  Ob -- objection --

24     THE WITNESS:  -- (indiscernible, simultaneous speech) --

25     MR. KUNTZ:  -- objection.  Move to strike.  There's no

Exhibit 1(f)
840



1    question pending.

2        JUDGE ROSAS:  Stricken.

3    Q    BY MR. KUNTZ:  Now, isn't it true that your work began to

4    diminish in or about July of -- or August of 2019?

5    A    Yes, when we started organizing --

6    Q    And what was around --

7    A    -- (indiscernible, simultaneous speech) -- go ahead.

8    Q    I'm sorry, finish your answer, please.

9    A    Well, that -- when we started organizing, yeah, it started

10   to slow down.

11   Q    The slowdown occurred in or about July or August of 2019,

12   correct?

13   A    Around that time.

14   Q    And that was a few months after the company, Universal,

15   bought Southern Counties and canair -- Container Connection,

16   correct?

17   A    I don't know exactly when they bought them, yes.

18   Q    But the reduction in work occurred after those purchases,

19   correct?

20   A    Not immediately after.  Actually, the work increased

21   because they -- they acquired two companies, Container

22   Connection and Southern Counties, so the work had increased at

23   that time.

24   Q    But at some --

25   A    When they purch --

Exhibit 1(f)
841



1    Q    -- point -- sure.  At some point that summer, work began

2    shifting between different divisions, correct?

3    A    Correct.

4    Q    And work began shifting from employee drivers to owner-

5    operators, correct?

6    A    We were all doing the same thing.

7    Q    But there was work that moved from -- in your view, from

8    employee drivers over to owner-operators, correct?

9    A    Not when they first purchased, no.  We were all still

10   doing quite a bit of work because when they acquired the

11   company we had more work, so you know, we had more -- actually,

12   it shifted to a -- a -- to the company drivers more because

13   they were going to -- the -- the plan was to get rid of the

14   owner-operators and have all company drivers from corporate --

15   I mean from the -- the head guys there over there were telling

16   us, but then they switched up on us when we -- when we started

17   the Union campaign.

18        MR. KUNTZ:  Mr. Do -- excuse me, strike that.

19   Q    BY MR. KUNTZ:  But just to be clear on the time, it was

20   around July or August when work began to diminish, correct?

21        MR. DO:  Objection.  Asked and answered.

22        JUDGE ROSAS:  Sustained.

23        MR. KUNTZ:  All right.  Mr. Do, could you please bring

24   mis -- bring the Jencks statement up again?

25        MR. DO:  Which page and which line?

Exhibit 1(f)
842



www.escribers.net | 800-257-0885

 1       MR. KUNTZ:  I want the bottom of page 3 and the top of

 2   page 4, please.

 3       MR. DO:  Okay.

 4   Q    BY MR. KUNTZ:  Mr. Cummings, could I please have you read

 5   to yourself the paragraph beginning at line 18 of page 3, and

 6   let's go down to the sentence that ends on line 3 of page 4,

 7   and please let us know when you're finished.

 8   A    Yes, I've -- I -- I've read it.

 9   Q    Okay.  And Mr. Cummings, isn't it true that you stated in

10   your affidavit that in about July or August of 2019 your

11   schedule shifted to a shorter schedule because work shifted to

12   owner-operators?

13   A    Yes, I did make that statement.

14   Q    And that was an accurate statement, correct?

15   A    Correct.

16   Q    Isn't it true that, around that time in July or August of

17   2019, some drivers were quitting Universal Intermodal Services

18   because of the lack of work?

19       MR. DO:  Objection.  Relevance.

20   A    Yes.

21       JUDGE ROSAS:  Overruled.  If you know.

22   A    I'm not sure.

23       MR. KUNTZ:  Okay, Mr. Do, could you please bring the

24   Jencks statement back up.

25       THE WITNESS:  Said yeah.

Exhibit 1(f)
843



www.escribers.net | 800-257-0885

1    Q    BY MR. KUNTZ:  And -- and actually, prior to the

2    objection, Mr. Cummings, did you answer that question with a

3    yes?

4    A    Yes, I did.

5         JUDGE ROSAS:  Stricken.

6         MR. KUNTZ:  Mr. Do, could you please bring up page 4 of

7    the Jencks statement?

8         MR. DO:  Any particular line?

9         MR. KUNTZ:  Lines 9 through 12, please.

10   Q    BY MR. KUNTZ:  Mr. Cummings, could you please read lines 9

11   through 12 on this page to yourself and let us know when you're

12   finished?

13   A    I read it.

14   Q    Does that refresh your recollection regarding whether

15   drivers quit in July or August of 2019 due to lack of work?

16   A    Yes, it does.

17        MR. KUNTZ:  Mr. Do, can you please take the Jencks

18   statement down?

19   Q    BY MR. KUNTZ:  Mr. Cummings, in July or August of 2019,

20   did Universal Intermodal Services drivers begin quitting due to

21   a lack of work?

22   A    Yeah, we lost a few drivers.

23   Q    I'm sorry, I didn't catch that answer.  Can you please

24   repeat that?

25   A    Yes, a few drivers left.

Exhibit 1(f)
844



www.escribers.net | 800-257-0885

1    Q    And it was because of lack of work, correct?

2    A    Yes, and a lack of pay.

3    Q    We're almost finished, Mr. Cummings.  You recall

4    testifying regarding the performance of both rail work and port

5    work by you during the course of your tenure, correct?

6    A    Yes.

7    Q    And during the years immediately prior to your layoff,

8    isn't it true that you performed rail work only at times when

9    the port work got slow?

10   A    No, when I first started there was -- in 2014, we used to

11   do exclusively rail work before we start -- did -- before we

12   did port work.

13   Q    Correct, and I'm asking about the period immediately prior

14   to -- to your layoff, let's say in the two years prior to your

15   layoff.

16   A    We did exclusively port work.  It switched over.

17   Q    There was no time at all when you did rail work during

18   those two years?

19   A    Yes, like on the weekends when I worked weekends.

20   Q    And that was -- was that because there was no port work

21   available at those times?

22   A    Well, they had port work, but they had -- it was lighter.

23   The -- usually ports are closed on the weekend, but the rails

24   are always open 24/7.

25        MR. KUNTZ:  Subject to recross, no further questions for

Exhibit 1(f)
845



1    this witness, Your Honor.

2         JUDGE ROSAS:  Any redirect?

3         MR. DO:  Give me one moment, Your Honor.  No, Your Honor,

4    no redirect.  Shit.

5         JUDGE ROSAS:  Charging Party?

6         MR. WOJCIECHOWSKI:  I caught that.  No, no questions.

7    Thank you.

8         JUDGE ROSAS:  Thank you, sir.  You're excused.  Please do

9    not discuss your testimony with anyone until who are told that

10   the case is over, all right?

11        THE WITNESS:  Okay.

12        JUDGE ROSAS:  Thanks.  Have a good day.

13        THE WITNESS:  Bye.

14        JUDGE ROSAS:  Next witness.

15        MR. DO:  Yes, Your Honor.  The General Counsel would like

16   to call Mr. Todd Christopher Ellis.  I believe he's already in

17   the waiting room, or at least that's what I'm hoping.

18        JUDGE ROSAS:  Ah, so there he is.  Okay.  Good morning --

19   they all right?

20        MR. DO:  Yeah.

21        JUDGE ROSAS:  Good morning, Mr. Ellis.  Do you hear me?

22        MR. ELLIS:  Good morning.

23        JUDGE ROSAS:  Good morning.  Mr. Ellis, can I ask you to

24   turn your phone sideways?

25        MR. ELLIS:  Sure.

Exhibit 1(f)
846



1    JUDGE ROSAS:  Perfect.  Thank you.  Sir, please raise your

2  right hand.

3  Whereupon,

4                          **TODD C. ELLIS**

5  having been duly sworn, was called as a witness herein and was

6  examined and testified, telephonically as follows:

7    JUDGE ROSAS:  All right.  Please state and spell your name

8  and provide us with an address.

9    THE WITNESS:  Todd, T-O-D-D, Christopher,

10  C-H-R-I-S-T-O-P-H-E-R, Ellis, E-L-L-I-S.  1916 West Pampus

11  Lane, Apartment 19, Anaheim, California 92802.

12    JUDGE ROSAS:  Go ahead.

13    MR. DO:  Your Honor, may we go off record for a moment?

14    JUDGE ROSAS:  Okay.

15  (Off the record at 10:37 a.m.)

16                       **DIRECT EXAMINATION**

17  Q   BY MR. DO:  All right, Mr. Ellis, thank you for being

18  here.  In 2019, who do you work for?

19  A   Universal Intermodal Services.

20  Q   And when did you first begin working for Universal

21  Intermodal Services?

22  A   Approximately May, the Labor Day holiday of 2018.

23  Q   What did you do for Universal Intermodal?

24  A   I was hired as a company driver.

25  Q   And what did you do as a company driver?

Exhibit 1(f)
847



www.escribers.net | 800-257-0885

1    A    We pulled container freight from the Ports of Los Angeles

2    and Long Beach.  we also did rail -- railyard movements, and we

3    moved chassis through and all around LA Basin.

4    Q    And do you still work for Universal Intermodal?

5    A    No.

6    Q    When did you stop working for Universal Intermodal?

7    A    Approximately December 19th or the 20th of 2019.

8    Q    And why did you stop working for Universal Intermodal?

9    A    All of a sudden, they laid off the whole fleet.  They --

10    they just told us it was over.

11    Q    Okay.  When you were working for Universal, at what

12    facility did you normally start and end your day?

13    A    It was called Rancho Dominquez, but it's Compton.  It's

14    the Compton Yard.

15    Q    Do you know the address of that facility?

16    A    Yeah, it was 2035 Vista Bella Way.

17    Q    And what was at that facility?

18    A    It was a big facility, a yard, with a big parking lot,

19    about 20 -- 20 tractors -- Universal tractors and enough room

20    for about 50 to 60 containers.

21    Q    And when you worked for Universal Intermodal, what days of

22    the week did you normally work?

23    A    Well, when I started, I worked Monday through Friday,

24    night shift.  I was a night -- night driver, so that was about

25    from 5 p.m. to, like, 3:30 -- or 3:30 a.m., but when they

Exhibit 1(f)
848



1    got -- they acquired a company called Southern Counties

2    Express, that changed to Monday through Thursday.

3    Q    And did you work the weekends?

4    A    With a -- when -- when asked to -- when asked to, which

5    was more than likely the case, so we usually worked Saturday

6    day shift, which -- which was kind of off because I was a night

7    driver but that seemed kind of common in the -- the industry on

8    Saturdays because there's no night gates in the port.

9    Q    You mentioned that Universal Intermodal acquired Southern

10   Counties Express.  Do you recall when that happened?

11   A    It was early 2019.  They also acquired Container

12   Connection and another company I'm not familiar with, but

13   Container Connection and more -- more strongly, Southern

14   Counties Express were the big container companies that they

15   acquired.

16   Q    So to the best of your recollection, after Universal

17   Intermodal acquired Southern Counties Express, was there any

18   staffing changes at the Compton facility?

19   A    Oh, yes.  Oh, yes.

20   Q    What happened?

21   A    Universal -- Universal sent a -- a -- a bigwig from

22   Seattle.  Supposedly he was from the western region of

23   Universal corporate, and he came down to the Compton and the

24   Fontana offices and basically, he -- he did a audit or some --

25   something of that nature and fired everyone, so that -- that

Exhibit 1(f)
849



www.escribers.net | 800-257-0885

1   kind of took care of the office staff at that time.  And that

2   was about right prior to the summer -- prior to the summer of

3   2019.

4   Q    When -- when you --

5   A    So --

6   Q    -- say "everyone", who are -- what job titles were you

7   referring to?

8   A    I'm talking about the complete office staff.  I'm talking

9   about the recruiter that hired me, my driver -- my driver

10   manager, the terminal manager, all the dispatchers, the office

11   personnel.  They all left one by one.  It was like a slow --

12   slow bleed, so to speak, like a -- a slow leak.  It was like

13   one person left and another person left and another person was

14   clearing out their office, and then you'd look up and pretty

15   soon there was -- there was no -- no actual Universal office

16   personnel left.

17   Q    And after that occurred, did you have to report to

18   Southern Counties staff?

19   A    We alway -- we always had to come to work.  It just --

20   when it was all said and done, Southern Counties basically sat

21   a couple dispatchers in the office, and we reported to them

22   when we -- we clocked in and clocked out, and they -- they fed

23   us work by -- by -- via text.

24   Q    And prior --

25   A    So --

Exhibit 1(f)
850



1    Q    -- to -- go ahead.

2    A    Oh.  Well, yeah, they -- they got -- it was basically

3    no -- no more reporting to the terminal manager, no more

4    meetings, no more safety meetings, no more -- so basically no

5    more anything.  We were just dispatched work and responsible to

6    get it done.

7    Q    And prior to your layoff, which -- what's the name of the

8    dispatcher who you work with?

9    A    My Mike -- so Mike said I work with Walter.

10   Q    And just to be clear, what company did Walter come from?

11   A    He's from Southern Counties Express.

12        JUDGE ROSAS:  All right, we can -- you know, we can move

13   past a lot of that, all right?

14        MR. DO:  Yes, Your Honor.  That's all I have for that line

15   of inquiry.

16   Q    BY MR. DO:  All right, let me ask you about your typical

17   day of work at Universal Intermodal.  Step by step, can you

18   describe what a typical day was like?

19   A    A typical day I would arrive at work.  I would go inside,

20   clock in, get dispatched my first assignment.  I would go

21   outside, pre-trip the -- the vehicle, make sure the oil and

22   coolant levels and fuel was okay, no flat tires or anything of

23   that nature, and then I would head off to either one of the

24   yards to get -- grab a chassis or a empty or I would go

25   straight to the port.

Exhibit 1(f)
851



www.escribers.net | 800-257-0885

1    Q    And what information were you given when you were

2    dispatched?

3    A    Basically a text telling me, first of all, who the -- who

4    the load was for, what company we're supposed to use, the

5    prefix, the company code, and the number of the container,

6    the -- the port that we were supposed to receive it from, and

7    the delivery point where we're supposed to take it to, and the

8    appointment time.

9    Q    So when you indicated there's a company coded, are you

10   referring to a SCAC code?

11   A    Yes, SCAC code.

12   Q    Isn't it correct that Universal had a unique SCAC code --

13   Universal Intermodal as a company?

14   A    Yeah.  Yeah, all companies do.  Yes.

15   Q    And is it correct that Southern Counties Express have a

16   unique SCAC code?

17   A    Yes.

18   Q    And prior to your layoff, who's SCAC codes were you using?

19   A    Southern Counties exclusively.

20   Q    Prior to your layoff, were you hired by Southern Counties

21   Express?

22   A    No.  We worked for --

23   Q    Prior to --

24   A    -- Universal Intermodal.

25   Q    Prior to your layoff, did you ever apply to work for

Exhibit 1(f)
852



1    Southern Counties Express?

2    A    No.

3    Q    Af -- before your layoff, how often would you be pulling

4    using Southern Counties Express' SCAC code?

5    A    Pretty much exclusively.  Toward -- towards the end of the

6    year, pretty much exclusively all Southern Counties moves.

7    Q    All right, with regards to your pay, was there any

8    distinction between when you were pulling for Southern Counties

9    Express or when you were pulling for Universal?

10   A    No, we were employees of Universal Intermodal.  They just

11   acquired Southern Counties and just replaced the office staff,

12   and we -- we basically acquired them, but it seemed like we

13   worked for them.  It was -- it was -- I -- I don't want to say

14   it was like a takeover, but it was like Universal acquired

15   Southern Counties, but it almost seemed the opposite effect,

16   like, they swallowed us because we exclusively requested

17   Southern Counties, we used their equipment.  They did

18   everything but service our trucks.

19   Q    Just to be clear, when you were working for Universal

20   prior to your layoff --

21   A    Uh-huh.

22   Q    -- whose truck would you be using?

23   A    I'd be using Universal Intermodal.

24   Q    And to the best of your understanding, who owned that

25   truck?

Exhibit 1(f)
853



1    A    The Universal fleet from Michigan.  I'm pretty sure the --

2    the appropriate people were from Michigan.

3         MR. DO:  Prior to your layoff, who were some drive --

4    who -- my apologies.  Strike that.

5    Q    BY MR. DO:  Prior to your layoff, who were some clients

6    that you would be delivering to?

7    A    Toyota North America, Toyo Tires, Performance Fl --

8    Performance Fleet, Walmart, Target, Eusu Logistics, vary --

9    various container freight -- Whirlpool, Ic -- Ion Fitness,

10   various container freight distributors and receivers.

11   Q    Isn't it correct that Universal Intermodal had chassis --

12   company-owned chassis?

13   A    Yes.

14   Q    And isn't it correct that Southern Counties Express had

15   company-owned chassis?

16   A    Yes.

17        MR. ADLONG:  Objection.  Vague and ambiguous as to

18   company-owned.

19        JUDGE ROSAS:  Rephrase.

20        THE WITNESS:  Rephrase.

21        MR. DO:  Your -- Your Honor, I just want to clarify.  I

22   only led because that -- that was the line of objection I got

23   last time.  I'm trying to speed through it.

24        JUDGE ROSAS:  That's fine.  Just rephrase.

25        MR. DO:  Okay.

Exhibit 1(f)
854



 1   Q    BY MR. DO:  Do you know if Southern Counties Express have

 2   company-owned chassis?

 3        MR. ADLONG:  Objection --

 4   A    Yes.

 5        MR. ADLONG:  -- as to company-owned.

 6        JUDGE ROSAS:  Well, if you know.

 7   Q    BY MR. DO:  Mr. Ellis, you can answer.

 8        JUDGE ROSAS:  Do you know?

 9   A    Well, there are Southern Counties chassis.  There are

10   Universal chassis.  There are port chassis.

11   Q    Okay.  When you were pulling a load using Southern

12   Counties Express SCAC code, were you required to use Southern

13   Counties Express chassis?

14   A    Not always.

15   Q    And when you were delivering to, say, Walmart, were you

16   required to use Southern Counties Express chassis?

17   A    No, they didn't -- they didn't like Southern Counties'

18   chassis.  They wanted us to use port chassis.

19   Q    When you had to use a company chassis, could you use

20   either Southern Counties' chassis or Universal chassis?

21   A    Yeah.  We were -- yes.

22   Q    Was there any distinction between the two?

23   A    No, they were one and the same with the same company.

24   Q    So when you worked in Universal Intermodal, do you recall

25   a Union trying to organize the Universal emp -- employees?

Exhibit 1(f)
855



www.escribers.net | 800-257-0885

1    A    Yes.  Yes, the Teamsters -- the Teamsters Union 848.

2    Q    And just so we're clear, prior to the Union -- prior to

3    that campaign, when you picked up a load from the port, where

4    will you typically deliver it to?

5    A    The receivers, the client, the customer.

6    Q    And how often would you delivery -- would you deliver

7    directly to the client?

8    A    Pretty much all the time.

9    Q    Prior to the Union, approximately how many hours do you

10   do -- hou -- hou -- hours of work do you do a day?

11   A    10 to 12.  Normally, 10 to -- 10 to 12 hours a day.

12   Q    And prior to the Union, on average, how many deliveries

13   did you do a day?

14   A    Two to three, depending on the port traffic and whatnot.

15   Two to three.

16   Q    Did you support the Teamsters Union campaign?

17   A    Yes.

18        MR. DO:  All right, let me mark for identifica --

19   identification as GC Exhibit 13.

20   **(General Counsel Exhibit Number 13 Marked for Identification)**

21   Q    BY MR. DO:  Okay, one moment.  Mr. Ellis, do you see that

22   document I just put in front of you?

23   A    Oh, yes.

24   Q    Do you recognize the name on the name line?

25   A    Yeah.  Yeah, that's me.  That's my name.

Exhibit 1(f)
856



www.escribers.net | 800-257-0885

1   Q    And on the bottom right there's a signature.  Do you

2   recognize that signature?

3   A    That's my signature.

4   Q    And on the date line, it indicates November 3rd, 2019.  Is

5   that on or about the date that you signed this card?

6   A    Yeah.

7        MR. DO:  Your Honor, I'm going to move for the admission

8   of GC 13 into evidence.

9        MR. ADLONG:  Could I have voir dire, Your Honor?

10       MR. KUNTZ:  He shook his head.

11       MR. ADLONG:  Okay.

12                     **VOIR DIRE EXAMINATION**

13  Q    BY MR. ADLONG:  Mr. Ellis, do you see on that page there's

14  four black boxes there?

15  A    Okay, yes.

16  Q    Do you know what those are?

17  A    The four black boxes?  No --

18  Q    Yeah.

19  A    -- I don't know.

20  Q    No, okay.  And then you said that's your signature at the

21  bottom on it -- of it?

22  A    Yeah, that's a --

23  Q    Do you --

24  A    That's a Union -- Union card.

25  Q    Okay, and then you dated that then, too?

Exhibit 1(f)
857



www.escribers.net | 800-257-0885

1    A    That's when I dated it, yeah.

2    Q    Okay.  And then this says all cards are -- all cards kept

3    confidential by the Teamsters and the U.S. government.  Did you

4    authorize them to this -- to -- to break --

5         MR. DO:  Objection.

6    Q    BY MR. ADLONG:  -- that confidentiality.

7         MR. DO:  Objection, Your Honor.  This --

8         MR. ADLONG:  Check --

9         MR. DO:  -- goes beyond the scope of voir dire.

10        JUDGE ROSAS:  I'll allow it.  Go ahead, finish the

11   question.

12   Q    BY MR. ADLONG:  It says all cards kept confidential by the

13   Teamsters Union and the U.S. government.  Have you, like,

14   authorized them to breach -- to get -- to breach this

15   confidentiality and show it to others?

16        MR. DO:  Objection.  Relevance.

17        MR. WOJCIECHOWSKI:  And calls for a legal conclusion

18   regarding breach.

19        JUDGE ROSAS:  What's the relevance?

20        MR. ADLONG:  Well, I mean, we would object to putting this

21   in the record if they're being told it's going to be

22   confidential and he wants this to be confidential, and then

23   they're putting into a public record with all his personal

24   information.  We could get on the record that he signed the

25   card and move on rather than, you know, put something that

Exhibit 1(f)
858



1     there's been representations from the Union that it'll be

2     confidential and now it's not.

3          JUDGE ROSAS:  So are you saying that it's not being

4     confidential because it's being put into this record?

5          MR. ADLONG:  Yeah.  The public record, right?  This is

6     available to anybody who wants it.

7          JUDGE ROSAS:  Got you.  Overruled.  General Counsel's 13

8     is received.

9     **(General Counsel Exhibit Number 13 Received into Evidence)**

10         JUDGE ROSAS:  Next question.

11         MR. DO:  Oh, okay.

12                     **RESUMED DIRECT EXAMINATION**

13    Q    BY MR. DO:  Okay, let me -- my apologies.  To the best of

14    your recollection, when did the Union's campaign begin?

15    A    About -- they went public mid-November, but they started

16    the organizing effort about mid-October 2019.

17    Q    Okay, let me put -- show you what's been marked and

18    already been admitted as GC Exhibit 5.  Do you see the document

19    I put up in front of you?

20    A    Yeah.

21    Q    Do you recognize this document?

22    A    Yeah, one's in English; one's in Spanish.  That's when

23    they went public.  That's the -- the document they were

24    distributing.

25    Q    Where were they distributing this document?

Exhibit 1(f)
859



```
 1   A    At our -- at our worksite, at our workplace.

 2   Q    And -- and just to be clear for the record, who's "they"?

 3   A    The organizers from the Teamsters Local 848.

 4   Q    Is your picture on this flyer?

 5   A    Yeah.  I'm in the left-hand corner, the first one --

 6   Q    Can you --

 7   A    -- from the left.

 8   Q    Okay.  Just to clarify -- clear -- be clear for the

 9   record, he's referring to the bottom-left corner of the page

10   and the second picture up from the bottom-left corner; is that

11   correct?

12   A    Yeah.

13   Q    Other than appearing on the flyer and signing a Union

14   authorization card, what else do you do to show your support

15   for the Union?

16   A    I met with a organizer, and he explained to me exactly

17   the -- so basically, the pros and cons of going -- going Union.

18   We also went to meetings, organizing effort meetings, and we

19   wore vests to work.  They provided us with vests to show our

20   support for the upcoming election, and we wore vests to work.

21   Q    And just to be clear, did you wear the vest while you at

22   work?

23        MR. ADLONG:  Your Honor, we're going to object.  This is

24   cumulative.  What's the purpose of all this?

25        JUDGE ROSAS:  They need to --
```

Exhibit 1(f)
860



1        MR. DO:  I only have one --

2        JUDGE ROSAS:  -- (indiscernible, simultaneous speech) --

3        MR. DO:  -- question --

4        JUDGE ROSAS:  -- the previous testimony?

5        MR. DO:  Quite frank -- frankly, no, Your Honor.  I have

6  one question about that, and I was going to move on.

7        JUDGE ROSAS:  Is this the extent of his Union activities?

8        MR. DO:  No, no, there -- there will be other questions

9  just --

10       JUDGE ROSAS:  I'm going to sustain the objection.  Next

11  question.

12       MR. DO:  Okay.  Okay.

13  Q   BY MR. DO:  You testified that you attended offsite Union

14  meetings with Union organizers.  How many meetings did you

15  attend?

16       MR. ADLONG:  Objection.  Relevance.  Cumulative.

17       JUDGE ROSAS:  I'll allow it.  Go ahead.

18  A   Approximately, three meetings.

19  Q   BY MR. DO:  Without naming anyone, how many employees did

20  you see attending these meetings?

21  A   Everyone that was on the photo.

22  Q   Okay.  Do you know who Romel Mar -- Mallard is?

23  A   Yeah.

24  Q   Who is he?

25  A   He was a coworker by -- when I worked for Universal.

Exhibit 1(f)
861



www.escribers.net | 800-257-0885

1  Q    What facility did he work out of?

2  A    He worked at the Compton facility night shift, as I did.

3  Q    Do you know if he supported the Union's organizing

4  campaign?

5  A    Yeah, he was -- he was the person who -- who pulled me to

6  the side and encouraged me to meet with the organizer.

7  Q    And other than, you know, putting you in touch with the

8  Union organizer, did he do anything else to show his support

9  for the Union?

10  A    Other than wear the vest and -- and walk around and

11  encourage others and talk to others.  He pretty much was the --

12  the leader, like the spokesman on night shift.

13  Q    Do you know who Jonathan Ledesma is?

14  A    Oh, yeah.  I know Jonathan Ledesma well.

15  Q    Who's Jonathan?

16  A    Jonathan Ledesma is the -- he's the daytime leader of

17  this -- of the organization, but he also shared tractors with

18  me, so me and him, we -- we knew each other prior to all this.

19  We -- we shared the same truck.  He work -- worked days; I

20  worked nights.

21  Q    Once the Union went public with its campaign, what -- did

22  management do anything in response?

23       MR. ADLONG:  Objection.

24  A    Management --

25       JUDGE ROSAS:  Well, if you know what the -- what the

Exhibit 1(f)
862



www.escribers.net | 800-257-0085

1    management did.

2    A    Well, they weren't happy about it.

3    Q    So what did they do?

4         THE WITNESS:  They -- they basically wanted to know what

5    was going on and what -- what were our issues.  When we --

6    we -- think -- we showed them a list of grievances that we were

7    having, whether it be equipment failure, failure to communicate

8    with fuel cards, and other things that were going on with the

9    yard, mechanical things.  They basically said they would look

10   into it, and they would handle it, but all they did was --

11        MR. ADLONG:  Objection.

12        THE WITNESS:  -- (indiscernible, simultaneous speech) --

13        MR. ADLONG:  It's hearsay and --

14        THE WITNESS:  That's what happened.

15        JUDGE ROSAS:  All vague.  Sustained.

16        MR. ADLONG:  Can we move to strike the testimony, Your --

17        JUDGE ROSAS:  Sure.

18        MR. ADLONG:  -- Honor.

19        JUDGE ROSAS:  Sure.  Stricken.

20        MR. DO:  Okay.

21   Q    BY MR. DO:  Do you recall attending company-sponsored

22   meetings regarding the Union?

23   A    Yes.

24        MR. ADLONG:  Objection.  Vague and ambiguous as to time.

25        JUDGE ROSAS:  Overruled.

Exhibit 1(f)
863



1    Q    BY MR. DO:  How many of these meetings did you attend?

2    A    I personally attended three meetings.

3    Q    And do you recall what date they occurred?

4    A    They recurred -- they occurred prior to my shift.  I don't

5    recall the exact dates, but they were on Mondays leading up to

6    the election.

7    Q    Do you recall attending a meeting on or around November

8    13, 2009 -- 19?

9    A    That was probably around the first one because I went -- I

10   went on vacation Thanksgiving, so that was probably around the

11   first one.

12   Q    How do you learn about this meeting?

13   A    I arrived to work to clock in and Walter told me, hey,

14   there's a meeting in the break room.

15   Q    And when Walter told you about this meeting, did he tell

16   you that the meeting was mandatory?

17   A    No.

18   Q    Did Walter tell you the consequences of not attending that

19   meeting?

20   A    No, no.  But I was -- I was interested.  I thought -- I

21   thought they were going to address some of the issues that we

22   had.  So I willingly went there.

23   Q    Who led this meeting?

24   A    Actually, Universal sent some consulting firm or something

25   there to tell us -- tell us things about what the consequences

Exhibit 1(f)
864



1   would be if we went Union.

2   Q    And do you -- which employees attended this meeting?

3   A    Everyone on that poster and probably a couple of other

4   people.

5   Q    And to the best of your recollection, what was said during

6   this meeting?

7        MR. ADLONG:  Objection.  Hearsay.

8        JUDGE ROSAS:  By the company?

9        THE WITNESS:  By the consultant?

10       JUDGE ROSAS:  Hold on.

11       Respondent, what are you objecting to?

12       MR. ADLONG:  Well, he's -- he asked what was said during

13   the meeting.  He hasn't identified who the speaker is, so it's

14   vague and ambiguous as to that as well.  It's calling for a

15   narrative also.

16       JUDGE ROSAS:  All right.  Well, why don't you break it

17   down, General Counsel?

18       MR. DO:  Sure, Your Honor.

19   Q    BY MR. DO:  Do you remember the name of the consultant who

20   led this meeting?

21   A    It was a guy named Kirk Cummings.

22   Q    All right.  What did Kirk Cummings say during this

23   meeting?

24   A    He basically said that we were asking for trouble by

25   involving the Teamsters Union in -- in our -- with our job

Exhibit 1(f)
865



1    place, basically.

2    Q    And how did -- and how did he say that?

3    A    Almost verbatim.  He was like, you guys better be careful.

4    You're walking a -- your walking on a -- on a -- you're walking

5    on very shaky ground.  It's only 27 of you.  Who's to say they

6    won't just get rid of you guys.  That's verbatim.

7    Q    And do you recall employees talking to Cummings about

8    issues at work?

9    A    Yes.  That's -- that's what we thought the meeting was --

10   was about and --

11   Q    And so what happened --

12   A    (Audio interference) to address the issues that were going

13   on at our workplace.

14   Q    So tell us some details.  So what happened with that

15   exchange?  Who said what?

16   A    Well, first of all, we -- we all assumed that Universal

17   had finally sent someone to address all the issues that we were

18   having because Southern Counties didn't address issues with

19   mechanical, field cards, or anything of that nature because

20   they were Southern Counties.  They would just deflect to

21   corporate in Michigan.  So we were having problems with getting

22   the trucks maintenance on the vehicles, changing flat tires,

23   equipment, gloves, anything.  We -- we could -- we couldn't go

24   through Southern Counties because they weren't responsible for

25   us.  All they did was dispatch us.  So basically we thought it

Exhibit 1(f)
866



1   was our hope that Universal had sent someone to address these

2   issues.  The first thing Kirk Cummings said is, I don't work

3   for Universal.  I'm a neutral party.  And I'm just here to warn

4   you guys about what you guys are trying to do.

5   Q    And did employees say anything during the meeting?

6   A    Yeah.  People were upset because we've waited a long time

7   and we kind of -- we kind of been waiting for some -- some kind

8   of word back from Universal corporate about the things that

9   were going on at our workplace, you know, and what we got was

10   somebody telling us to vote no on the Union.

11   Q    Did Cummings say anything regarding what he would do after

12   the meeting?

13   A    Well, basically he said he would do us a favor and get on

14   a redeye flight back to Detroit, and he would sit down with the

15   CEO of Universal and -- and let him know all the issues that we

16   were -- we were stewing out to him, and that he would -- he

17   would let him know personally what's going on at this yard --

18   at our yard.  That was the first meeting.

19   Q    Okay.  Let me ask you about the second meeting.  How

20   did -- how did you learn about the second meeting?

21   A    For some reason, the Monday -- the next Monday rolled

22   around and I -- I went to go clock in, but as I walked -- I

23   walked past the break room there were people already gathered

24   in the break room, and they were like, well, it's another

25   meeting.  And again, I saw Mr. Cummings and his film projector.

Exhibit 1(f)
867



1    So I clocked in and we sat down and we started off the first

2    hour and a half of my work shift in that meeting again.

3    Q    Prior to the start -- prior to the start of this meeting,

4    when you first learned about it, were you ever told that this

5    meeting was mandatory?

6    A    No.

7    Q    Let me -- you testified that there were three meetings.

8    Let me ask you about the third meeting.  How do you learn about

9    the third meeting that you attended?

10   A    The third meeting was actually the fourth meeting.  I

11   missed the actual third meeting because I went on vacation to

12   Seattle for Thanksgiving.  When I came back -- well, actually,

13   when I was in -- at the airport, I heard there was a real

14   verbal exchange and that --

15       MR. ADLONG:  Objection.  Hearsay.

16       JUDGE ROSAS:  Sustained.

17       THE WITNESS:  Okay.  Okay.  The third meeting, I was not

18   present for it.

19   Q    BY MR. DO:  The question -- the question remains.  How did

20   you learn about this third meeting that you attended?

21   A    The third meeting I attended was the following Monday.

22   The following Monday after Thanksgiving.

23   Q    And how did you learn about this meeting?

24   A    I was told there's -- there's another meeting in the break

25   room.

Exhibit 1(f)
868



1   Q    And who told you that?

2   A    My dispatcher.  Walter.

3   Q    And when your dispatch -- wen your dispatcher told you

4   about this meeting, did he tell you that the meeting was

5   mandatory?

6   A    No.

7   Q    And which employees attended this meeting?

8   A    Everyone except Romel.

9   Q    Do you know what happened to Romel?

10  A    Yes, I do.

11  Q    What happened to Romel?

12  A    I heard Romel was fired.

13       MR. ADLONG:  Objection.  Hearsay.

14       THE WITNESS:  That's not true.  He was fired.

15       JUDGE ROSAS:  Sustained.

16       MR. DO:  Mr. Ellis.

17       JUDGE ROSAS:  Sustained.  Stricken.

18  Q    BY MR. DO:  How did you learn about what happened to Mr.

19  Mallard?

20  A    I got a phone call when I was (indiscernible, simultaneous

21  speech) --

22       MR. ADLONG:  Objection.  Relevance.

23       JUDGE ROSAS:  Overruled.  You can answer.

24       THE WITNESS:  I had a phone call when I was at the

25  airport.

Exhibit 1(f)
869



www.escribers.net | 800-257-0885

1    Q    BY MR. DO:  And who was that phone call with?

2    A    One of the other drivers.

3    Q    Did you -- during the three meetings that you attended,

4    these company-sponsored meetings, do you normally speak up?

5    A    Yeah.  Yes.

6    Q    And on this last meeting, which you attended sometime in

7    December, around December 2nd, did you speak up during that

8    meeting?

9    A    No.

10   Q    And why not?

11   A    It's the same (indiscernible, simultaneous speech) --

12        MR. ADLONG:  Objection.  Relevance.

13        JUDGE ROSAS:  I'm going to sustain the objection.

14        MR. DO:  Your Honor, may I be heard?

15        JUDGE ROSAS:  Give me a -- a topical hint here.  Where are

16   you going?

17        MR. DO:  The effect of the termination, Your Honor.

18        JUDGE ROSAS:  The effect of the termination on who?

19        MR. DO:  On this individual and his -- his subsequent

20   activity.

21        MR. ADLONG:  Your Honor, that -- that --

22        JUDGE ROSAS:  Just go on to the activity.  Just go to the

23   activity, if any.  Sustained.

24        MR. DO:  Okay.

25   Q    BY MR. DO:  After you learn about what happened to Mr.

Exhibit 1(f)
870



1    Mallard, were you concerned about yourself?

2        MR. ADLONG:  Objection.

3        THE WITNESS:  Of course.

4        MR. ADLONG:  Objection.

5        THE WITNESS:  Of course.

6        JUDGE ROSAS:  Sustained.  Just what he did.

7        MR. ADLONG:  Move to strike.

8        JUDGE ROSAS:  Stricken.

9        MR. DO:  Give me one moment, Your Honor.

10   Q    BY MR. DO:  Prior to the start of this meeting, were you

11   aware of anybody else other than Mr. Mallard who had been

12   terminated?

13   A    Yes.

14   Q    Who else other than Mr. Mallard?

15   A    Jonathan Ledesma.

16   Q    And how do you know he was terminated?

17   A    I share the -- like I said, I shared tractors with him,

18   and he was no longer an employee of Universal.

19   Q    After the -- after termination of Mr. Mallard -- after you

20   learned about the termination of Mr. Mallard and Mr. Ledesma,

21   did that affect your support for the Union?

22        MR. ADLONG:  Objection.  Relevance.  Your Honor, you've

23   ruled on this --

24        JUDGE ROSAS:  Sustained.

25        MR. ADLONG:  -- a number of times.

Exhibit 1(f)
871



www.escribers.net | 800-257-0885

```
 1        JUDGE ROSAS:  Sustained.  Stop.  Sustained.  Next

 2   question.

 3        MR. DO:  Okay.

 4   Q    BY MR. DO:  Following the Union going public with its

 5   campaign, do you recall seeing a new manager at the Compton

 6   facility?

 7   A    Yes.

 8   Q    Do you recall what his name was?

 9   A    Joe Lugo.

10   Q    Do you recall seeing Mr. Lugo prior to the start of the

11   Union's campaign?

12   A    No.

13   Q    Do you recall ever seeing Mr. Lugo speak to employees?

14   A    Only when I first met him.

15   Q    And -- and when -- when did that occur?

16   A    I want to say the week after the first Kirk Cummings

17   meeting, Joe Lugo appeared.

18   Q    Okay.  So after Kirk Cumming -- well, what -- what did --

19        MR. DO:  Strike that.

20   Q    BY MR. DO:  Where did you see Mr. Lugo?

21   A    The -- he was greeting -- greeting drivers as they came to

22   clock in.

23   Q    And where -- where was he relative to the Compton

24   facility?

25   A    He was in the yard of the stair -- of the stairwell, the
```

Exhibit 1(f)
872



1    entrance to the facility.  And he was talking to a group of

2    drivers when I -- when I approached the -- to clock in for the

3    day.

4    Q    How many drivers did you see talking to Mr. Lugo?

5    A    Three to five.  Three to five.  It was pretty normal.

6    Q    And -- and what did Mr. Lugo say to these drivers?

7    A    Well, basically, he had a pen and a notepad, and he was,

8    Hi, my name is Joe Lugo.  I'm from Texas.  I'm with Universal.

9    I'm going to be your new terminal manager.  We're going to get

10   some things straight and, you know, we're going to address

11   these issues that are going on, prolonged situations and issues

12   that are going on on this yard.  And we're going to get things

13   straightened out for you guys.

14   Q    And do you recall employees saying anything during this

15   conversation?

16   A    I think it was more of a -- almost like a relief that we

17   finally had someone from Universal there.  But at the same

18   time, it was almost let's wait and see approach.

19   Q    And during this conversation, did the issue of truck

20   maintenance come up?

21   A    Yeah.  That -- that was the major issue.

22   Q    So what was discussed about truck maintenance?

23   A    We're riding around with flat tires and told to get into

24   another vehicle because they couldn't not address nails in

25   tires, flat tires.  We didn't have anywhere to go get oil or

Exhibit 1(f)
873



1    coolant or anything.  We had to go to truck stops or whatnot.

2    We were told that just buy it and keep the receipt and we'll

3    refund you.  It was -- it was a lot of that going on.  It

4    was -- it was nothing -- Southern Counties basically couldn't

5    do anything.  Their hands were tied because they couldn't

6    actually pay for any kind of maintenance on the trucks.  So

7    we'd have to go through corporate Universal, which is in

8    Michigan.

9    Q    Sure.  Did the employees tell these problems they were

10   having to Mr. Lugo?

11   A    Yeah.  Especially -- especially when he came that first

12   day.

13   Q    And did -- did Mr. Lugo do anything when he was being told

14   this?

15   A    He wrote -- he wrote a lot of the stuff down and he

16   supposedly sat in front of his computer terminal and typed back

17   to Michigan what was going on.

18   Q    Did he tell you -- did he tell you he was going to do

19   anything about it?

20   A    From that initial greeting.  After that, he said he's

21   working on it.

22   Q    And during that first conversation with Mr. Lugo, do you

23   recall him giving anything out to the employees?

24   A    He gave his personal cell phone number, his office number,

25   his email.  If you couldn't type it fast enough in your phone,

Exhibit 1(f)
874



1    he would write it down for you.

2    Q    And what would he write that information on?

3    A    On the paper of that notepad.

4    Q    And did -- did any of the employees take this information?

5    A    Some were, but most were just typing his -- his phone

6    number in.

7    Q    Prior to the Union's campaign, do you recall another

8    instance where a manager came to your facility to ask you about

9    truck issues?

10   A    A manager?  No.  I don't recall offhand, no.

11   Q    Following the Union going public with its campaign, do you

12   recall a new employee telling you that he was afraid to support

13   the Union?

14   A    Yeah.  Yeah.

15   Q    And when where you told this?

16        MR. ADLONG:  Objection.  Relevance.  Calls for hearsay.

17        JUDGE ROSAS:  Rephrase.

18        MR. DO:  Sure.

19   Q    BY MR. DO:  In what context were you told about this

20   employee's concern?

21        MR. ADLONG:  Objection.  Hearsay.  Relevance.

22        JUDGE ROSAS:  Sustained.

23   Q    BY MR. DO:  What were you told by this employee?

24        MR. ADLONG:  Objection.  Hearsay.  Relevance.

25        JUDGE ROSAS:  Is this an employee who's going to be

Exhibit 1(f)
875



1    testifying?

2         MR. DO:  No, Your Honor.  Because the employees is -- this

3    relates to the agreement to waive collective action.  That --

4    that's the relevant here.

5         JUDGE ROSAS:  But you're referring to another employee?

6         MR. DO:  Correct.  And this employee, as I kind of hinted

7    at my -- in my question, he's afraid to support the Union.

8         JUDGE ROSAS:  We don't need that.  Sustained.  Next

9    question.

10        MR. ADLONG:  Your Honor, can we move to strike Mr. Do's

11   representations on the record, too, please, regarding the --

12        JUDGE ROSAS:  Stricken.

13        MR. ADLONG:  Thank you.

14   Q    BY MR. DO:  Do you recall an employee telling you about --

15   do you recall ever being told -- well, let me put it on the

16   screen.  I'm going to put on the screen what's identified and

17   admitted as GC -- I'm sorry, Joint Exhibit 3.

18        Mr. Ellis, let us know when you get a chance to look at

19   it.

20   A    Okay.

21   Q    Do you recognize this document?

22   A    Yeah, Tommy told us that was in his paperwork where he

23   signed up for the company.

24   Q    And who's Tommy?

25   A    (Indiscernible, simultaneous speech) --

Exhibit 1(f)
876



www.escribers.net | 800-257-0885

 1          MR. ADLONG:  Objection.  Mr. Ellis, you'll notice going

 2     forward that there will a lot of questions --

 3          JUDGE ROSAS:  Hold on, counsel.  Don't -- don't address

 4     the witness.

 5          MR. ADLONG:  Okay.  All right.

 6          MR. DO:  Your Honor.

 7          JUDGE ROSAS:  So Mr. -- Mr. Ellis, take your time

 8     answering, because there are going to be a lot of objections.

 9          THE WITNESS:  Okay.

10          JUDGE ROSAS:  And we don't want to interrupt you, okay?

11          THE WITNESS:  All right.

12          JUDGE ROSAS:  You know, it -- it -- if you -- if you kind

13     of move too fast, you know, there's going to be objections and

14     your -- your testimony is going to be either wiped, out or I've

15     got to hear what the lawyers have to say first before we

16     proceed.

17          So fine.  Repeat the question, General Counsel.

18          MR. DO:  Sure.

19     Q    BY MR. DO:  What is this document?

20          JUDGE ROSAS:  Okay.  Go ahead.  If you know.

21          THE WITNESS:  That's some type of waiver that was in our

22     packet when we were -- we were hired.  I don't recall it in

23     my -- in my documents, but it was brought to our attention when

24     we approached a employee about joining the organizing effort.

25     He told us he couldn't do it.

Exhibit 1(f)
877



www.escribers.net | 800-257-0885

1          MR. ADLONG:  Okay.  So Your Honor, I'm going to move to

2     strike the testimony and his -- and his --

3          MR. DO:  Your Honor --

4          MR. ADLONG:  -- and object to any testimony regarding the

5     waiver, because he has just testified that he didn't know what

6     it was and he only learned what it was because another witness

7     who's not a supervisor and not an agent of the company brought

8     it to his attention.

9          MR. DO:  Your Honor --

10          JUDGE ROSAS:  Joint Exhibit 3 -- Joint Exhibit 3 is in

11     evidence.

12          Is that correct, General Counsel?

13          MR. DO:  Correct, Your Honor.

14          JUDGE ROSAS:  So what -- what are we doing with this?

15          MR. DO:  We're trying to prove merely state of mind, Your

16     Honor.

17          JUDGE ROSAS:  This witness' state of mind?

18          MR. DO:  Correct.

19          JUDGE ROSAS:  Again, leap forward to whatever it is that

20     he did.  Some future point.  Sustained.  Moving on.

21     Q    BY MR. DO:  Is this an accurate representation of the

22     document that the other employee provided to you?

23          MR. ADLONG:  Objection.  Hearsay.

24          JUDGE ROSAS:  Have you seen this --

25          MR. ADLONG:  Relevance.

Exhibit 1(f)
878



www.escribers.net | 800-257-0885

1          JUDGE ROSAS:  -- document before?

2          THE WITNESS:  Yes.

3          JUDGE ROSAS:  Okay.  Next question.

4    Q    BY MR. DO:  What did you think when you saw this document

5    for the first time?

6          MR. ADLONG:  Objection.

7          JUDGE ROSAS:  Sustained.

8          MR. ADLONG:  Relevance.

9          JUDGE ROSAS:  It speaks for itself.

10         MR. DO:  Your Honor, I don't think his state of mind does,

11   again, that's -- that's what we're soliciting here.

12         JUDGE ROSAS:  His state of mind.  Let's -- let's excuse

13   Mr. Ellis.  We're going to put you in the waiting room for a

14   minute.  Virtual waiting room.  You don't have to go anywhere,

15   okay?  Just --

16         THE WITNESS:  All right.

17         JUDGE ROSAS:  You're going to go to Purgatory for a few

18   seconds.

19         THE WITNESS:  All right.

20         JUDGE ROSAS:  All right.  State of mind.  Tell me about

21   the state of mind.

22         MR. DO:  Your Honor, we're just trying to establish that

23   this agreement wasn't -- was understood by employees to affect

24   the Union activity, which is one of the -- you know, one of the

25   things that we need to prove with regard to an unlawful rule.

Exhibit 1(f)
879



www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  Well, let's see.  I understand that in the

2   context of Boeing, Counsel; however, this witness hasn't

3   actually acknowledged -- now there may be one in his file.

4   That's usually how things are done.  But that's not the

5   evidence here.  This is somebody else's agreement.  So if you

6   want to elicit that, you're going to have to elicit it from

7   somebody else.  We don't need his commentary, okay?

8        MR. DO:  Well, Your Honor, just to clarify.  He

9   testified -- he's testified that an employee showed him this

10  document.  And I'm asking about his state of mind when he was

11  shown the document.  That's what we're trying to solicit.

12       MR. ADLONG:  But Your Honor.  Again, it's irrelevant.  He

13  can't say for certain that this applied to him and because an

14  employee tells him something, the representations of which we

15  know not, and we don't know how accurate -- it just -- it's --

16  it doesn't -- it doesn't -- it's irrelevant to the analysis.

17       JUDGE ROSAS:  It's not irrelevant.  The problem is that

18  that's -- that may or may not be a tenuous argument as it

19  relates to this particular witness.  I understand what the

20  General Counsel is trying to establish here, but the -- the

21  document has been shown to other witnesses, and they've been

22  asked about it; is that correct?

23       MR. DO:  Yes, Your Honor.

24       JUDGE ROSAS:  Let's see.  So on the cross-examination of

25  Mr. Ledesma --

Exhibit 1(f)
880

www.escribers.net | 800-257-0885

1          MR. ADLONG:  Your Honor --

2          JUDGE ROSAS:  -- he was asked about it.  It was a required

3     agreement, he said, to waive his class action.  It was given to

4     him by Javier the recruiter.  And I don't have the specifics

5     beyond that, but you're saying that he didn't testify to the

6     effect that it had on his state of mind, vis-a-vis, taking

7     collective action or participating with the Union?

8          MR. DO:  Well, Your Honor, I think this is more

9     corroborative than actually -- you know, that he's not the only

10    witness that's testifying to this, we're just trying to

11    corroborate.  That -- that's really what I'm trying to

12    establish here, because, again, you're aware of the Boeing

13    standard and that's what I'm trying to do.

14         MR. ADLONG:  Even -- Your Honor --

15         JUDGE ROSAS:  Yes, but -- but not through this witness.

16    Not through this witness.

17         MR. DO:  That's fine, Your Honor.

18         JUDGE ROSAS:  He's just -- he's just not competent, I

19    don't think, to testify as to his state of mind regarding a

20    document that was signed by someone else.  So if you want to

21    try to redo that through somebody else or amplify, it's got to

22    be through the effect that it has on the reader based on the

23    best evidence, okay?  And this evidence just -- you know, sure,

24    he's identified it.  He saw it.  So that's in the record, okay?

25         MR. DO:  Right.

Exhibit 1(f)
881

escribers

www.escribers.net | 800-257-0885

1          JUDGE ROSAS:  That's in the record.  But -- but I'm not

2    going to allow him to testify as to what he thought, the

3    impression on -- upon him of what somebody else wrote.  He --

4    he -- it's -- you know, he's not going to be able to testify

5    that at some point he, in fact, had a certain impression in his

6    mind based upon something that he signed.  I mean, that's not

7    what's being offered here, right?

8          MR. DO:  Right, Your Honor.  And let me be -- again, in an

9    attempt to avoid to overburden the record, we only omitted one

10   Joint Exhibit 3, or one employee as an exemplar.  So I just

11   want that to be clear.  And -- and again, this is -- this is

12   not necessarily a hill that I -- I (indiscernible, simultaneous

13   speech) --

14         JUDGE ROSAS:  So you have something -- so you have

15   something that is not going to be cumulative going forward,

16   okay?

17         MR. DO:  Okay.  Understood, Your Honor.

18         JUDGE ROSAS:  All right.  All right.  Let's bring him

19   back.  Next question, General Counsel.

20         MR. DO:  Thank you, Your Honor.

21   Q    BY MR. DO:  Welcome back, Ms. Ellis.  Do you recall Union

22   election on December 4, 2019?  Mr. Ellis, did you hear my

23   question?  Hello?

24         MR. DO:  May we go off the record briefly, Your Honor?

25         JUDGE ROSAS:  Off the record.

Exhibit 1(f)
882



1    (Off the record at 11:29 a.m.)

2        JUDGE ROSAS:  Okay.  Back on the record.

3    Q    BY MR. DO:  Mr. Ellis, do you recall a Union election on

4    December 4, 2019?

5    A    Yes.

6    Q    What was the result of that election?

7    A    We voted to allow the Teamsters to represent us in

8    negotiations.

9    Q    After the Union election, did your work change?

10   A    Yes.

11   Q    And how did it change?

12   A    Basically, it slowed.  Instead of the normal workload we

13   were getting, we were just told to pull containers out of the

14   port and drop them off in Southern Counties yard.

15   Q    And after the Union election, did you deliver directly to

16   client?

17   A    No.  We -- we were basically told to drop in a Yard 5.

18   It's the Southern Counties drop yard.  And from there we would

19   grab a chassis and go back to the port and pull more work out.

20   Basically, we're -- we're in between for the Southern Counties

21   drivers.

22   Q    And after the Union -- after the Union election,

23   approximately how many hours would you do a day?

24   A    Six to eight.

25   Q    And how many loads would you be assigned a day?

Exhibit 1(f)
883



1    A    One to -- one, maybe two, if I was lucky.  I would always

2    request if there was any extra I could do because I -- I -- I

3    got a family.  So I would always request towards the end of the

4    night, around midnight can I do anything?

5    Q    All right.

6         MR. DO:  Let me mark for identification as GC Exhibit 14.

7    **(General Counsel Exhibit Number 14 Marked for Identification)**

8    Q    BY MR. DO:  Do you see what I just put in front of you,

9    Mr. Ellis?

10   A    That's a text thread, yes.

11   Q    Do you recognize this text thread?

12   A    Yeah.  It's from my cell phone.

13   Q    And who took this screenshot?

14   A    More than likely I did.

15   Q    And just to be clear, this is a text thread between who?

16   A    Myself and either Walter or -- or the female dispatcher.

17   Q    Do you know the name of that dispatcher?

18   A    Oh, believe her name was Jenny (phonetic).  I can't -- I

19   can't think of it right now.

20   Q    Okay.  And just to be clear, are you on the right-hand

21   side of this exchange or are you on the left-hand side of that

22   exchange?

23   A    I'm on the right-hand side.

24   Q    And then who's on the left-hand side?

25   A    The dispatcher.

Exhibit 1(f)
884



www.escribers.net | 800-257-0885

1    Q    And is this an example one time when you asked for

2    additional work?

3    A    Yes.  Well, this is when I asked -- I asked for a shift.

4    I was wondering why we weren't working the four days anymore.

5         MR. DO:  Your Honor, I'm going to move for the admission

6    of GC-14 into evidence.

7         MR. ADLONG:  Can I voir dire, Your Honor?

8         JUDGE ROSAS:  Go ahead.

9         MR. ADLONG:  Okay.

10                    **VOIR DIRE EXAMINATION**

11   Q    BY MR. ADLONG:  Mr. Ellis, did you take this picture right

12   here?

13   A    Did I take the picture?

14   Q    Yeah, of this screenshot?

15   A    Actually, I -- I saved it and submitted it.  So when you

16   say take, I did take the picture of it from my phone because I

17   use it -- this came from my phone.  What I did was forward it.

18   I forwarded it to someone.

19   Q    Okay.  So you took this screenshot of your phone and then

20   you gave it to somebody, correct?

21   A    Well, I forwarded the -- the -- yeah.

22   Q    Okay.

23        MR. ADLONG:  No objection, Your Honor.

24        JUDGE ROSAS:  General Counsel's 14 is received into

25   evidence.

Exhibit 1(f)
885



1      **(General Counsel Exhibit Number 14 Received into Evidence)**

2          MR. DO:  Okay.

3                          **RESUMED DIRECT EXAMINATION**

4      Q      BY MR. DO:  Mr. Ellis, do you -- do you see that this

5      exchange occurred on December 5th, 2019?

6      A      Yes.

7      Q      I can zoom it.  Was this before or after the Union

8      election?

9      A      After.  The same week.  The week of.

10     Q      Okay.  In December of 2019, was there -- was there work on

11     December 6th, December 7, and December 8 of 2019?

12     A      No.  The election -- the election came and the work kind

13     of slowed, like, just all at once just slow.  It was, like,

14     from working four nights a week to basically two to three

15     nights a week.  And like I said, five to six hours a night, if

16     we're lucky.

17     Q      Other than your work slowing, did you notice any other

18     changes at the Compton facility following the election?

19     A      Changes?  Less -- less containers.  We were using the

20     Southern Counties yards a lot more frequently.  Weren't -- we

21     weren't really bringing empties or con -- or loads to our yard.

22     We were taking everything to their yard.  We were just parking

23     the trucks at our yard.

24     Q      Okay.  And do you recall being told about the lease at the

25     Compton yard?

Exhibit 1(f)
886



1    A    Okay.  Yes, there was a mem -- memo posted.

2    Q    Okay.  Let me show you what's been marked, identified, and

3    admitted as a joint exhibit.  This is Joint Exhibit 6(a).  Do

4    you recognize this document?

5    A    Yes.

6    Q    Where was this posted?

7    A    It was posted right, like, where park there.

8    Q    And to the best of recollection, when was it posted?

9    A    Right around election time -- right around when I came

10   back from vacation, so I want to say late November, early

11   December.

12   Q    When this posting -- when you saw this posting, were you

13   told that you might be laid off?

14   A    No, I -- I saw who wrote the posting and I asked them what

15   was going to happen.

16   Q    So let me ask some details regarding that conversation.  I

17   just want to be clear.  Who were -- who did you speak to?

18   A    I spoke directly to Joe Lugo, the terminal manager,

19   whether it was regarding my vacation, or whether it was

20   regarding this move that we were supposed to be making.

21   Q    And -- and when did this conversation occur?

22   A    I talked to him every day.  Every day that he was in

23   office, I would actually have a conversation with him because I

24   thought things were going to get better -- or we were --

25   just -- just trying to find -- find out what was really going

Exhibit 1(f)
887



www.escribers.net | 800-257-0885

1    to happen or what was going on with this.

2    Q    And -- and what did Mr. Lugo tell you?

3    A    He basically told me to -- to keep -- continue what we're

4    doing.  They're going to work it out and that more than likely

5    we'll be moving over to their -- their Compton yard in the --

6    in the temporary -- in the meantime, until they found us a -- a

7    headquarters or a location.

8    Q    When you -- in your testimony, you mentioned the Compton

9    yard.  What Compton yard are you referring to?

10   A    It's a Southern Counties 5 yard.  It's basically Compton.

11   It's on Del Amo Boulevard.  It's -- it's about a mile and a

12   half away from where the Vista Bella address is.

13   Q    Other than Mr. Lugo, did anybody else tell you that you

14   might be moving to the -- the Del Amo facility?

15   A    Both my -- both my dispatchers when I asked them.  They

16   said that was the plan moving forward.

17         MR. ADLONG:  Objection, hearsay.

18         JUDGE ROSAS:  As to the dispatchers, overruled.

19   Q    BY MR. DO:  During any of these conversations, did -- were

20   you told about the possibility of layoffs?

21   A    No.

22   Q    Okay.  When did you first learn about your separation?

23   A    December 20th.  I had worked the previous night.  I got

24   home, and I had a piece of mail from Universal Intermodal,

25   Michigan.  And I opened it and it was a 2020 calendar and the

Exhibit 1(f)
888



1    basic rah, rah, we had a great year, expect many more good

2    things to come in 2020.  And I was greeted by a phone call the

3    next day from a Union organizer, saying that Universal is

4    sending FedEx separation letters to everyone.  And I kind of

5    took the approach as, wow, that's messed up because I know I'm

6    going to work.  And sure enough, they -- they -- they sent me a

7    separation letter also, which was kind of a shock.  I wasn't

8    expecting that at all.

9    Q    Okay.  Let me show you what --

10       MR. DO:  Let me mark for identification as GC Exhibit 23.

11   **(General Counsel Exhibit Number 23 Marked for Identification)**

12   Q    BY MR. DO:  Do you recognize this document, Mr. Ellis?

13   A    Yeah.  That's the first letter I got from Universal, about

14   12 hours before I got the FedEx letter.

15       MR. DO:  Your Honor, I'm going to move for the admission

16   of Exhibit 23 into evidence.

17       MR. ADLONG:  We're going to object as to relevance, Your

18   Honor.

19       JUDGE ROSAS:  Overruled.  General Counsel's 23 is

20   received.

21   **(General Counsel Exhibit Number 23 Received into Evidence)**

22   Q    BY MR. DO:  And then I'm going to show you what's been

23   already marked and admitted as Joint Exhibit 6(b).  Do you

24   recognize the letter that I'm putting in front of you?

25   A    Yes.

Exhibit 1(f)
889



www.escribers.net | 800-257-0885

1    Q    And what is this?

2    A    That's a separation letter that -- that came FedEx the

3    very next morning -- well, actually the very next afternoon.

4    Q    I -- I just want to confirm, so in this letter,

5    identifying an individual by the name of Michael Vagts, Do you

6    know who that is?

7    A    No.

8    Q    Prior to your separation, have you have any dealings with

9    Mr. Michael Vagts before?

10    A    No.

11    Q    Prior to receiving the phone call from the Teamsters, did

12    you have any indication that you might be separated from the

13    company?

14    A    None at all.  I thought -- I thought actually -- I thought

15    I was -- was ready for the holiday work schedule.  And I was

16    told --

17    Q    Had --

18    A    -- that I'll see you on Monday.

19    Q    Okay.

20    MR. DO:  Let me mark for identification what is GC 15.

21    **(General Counsel Exhibit Number 15 Marked for Identification)**

22    Q    BY MR. DO:  All right.  So this is a long email chain.  I

23    just want to scroll through it for you.  And -- and just to be

24    clear, for the record and also for the parties, the only reason

25    why this is extremely long is so that captures the date.  Do

Exhibit 1(f)
890



www.escribers.net | 800-257-0885

1    you recognize this text exchange?

2    A    Yeah.  And the -- the female dispatcher, her name was

3    Janet (phonetic).

4    Q    Got it.  Do you see that this exchange occurred on --

5    well, let me ask you, who -- who is this exchange between?

6    A    Myself and Janet, because I thought -- Walter actually

7    started the shift, but Janet finished the shift.

8    (Indiscernible, simultaneous speech)

9    Q    Okay.  But again, are you on the right-hand side of this

10   exchange, or on the left-hand side?

11   A    The right-hand side.

12   Q    And then who's the person on the left-hand side, just to

13   clarify?

14   A    After -- I believe after 11 -- 11, I believe it was Janet.

15   Prior to -- like, when the shift started, it was Walter, but

16   then towards the end, it was Janet.

17   Q    Okay.  So this -- who took this screenshot?

18   A    I did -- it came from my phone.

19   Q    Okay.  And this exchange, what day did it occur?

20   A    Well, that's after 12 a.m. Thursday, the 19th, which was

21   actually my day of separation, too.

22   Q    Let me scroll down a bit.  So I'm showing you a message

23   from Ms. Janet around 2:26 p.m.  Is this when you were told to

24   go back to work on the following Monday?

25   A    Well, I asked her, was there going to be any work tonight,

Exhibit 1(f)
891



1    on that Thursday.  And she told me, no, the low volume, but

2    I'll see you on Monday.

3    Q    What Monday was she referring to?

4    A    The following Monday.

5    Q    So this exchange happened on Thursday, December 19.  Was

6    Ms. Janet referring to the following Monday, which is December

7    23, 2019?

8    A    Yeah.  What -- what happened was it was another short

9    night, and I didn't use up all my hours of service, so I was

10   making myself available for day shift the following day.  And

11   what happened was -- she told me due to the low volume of work,

12   there'd be no day shift, which was strange because usually at

13   least day shift would work Monday through Thursday, if not for

14   a few hours.  That's what started happening after the election.

15   We were wor -- only working five to six hours, if we were

16   lucky.  Some nights, we'd only work three to four.  So I had

17   hours of service left over.  So I was like, well, I could be

18   back here at 6 a.m. if you need me.  And she was like, no, that

19   won't be necessary, due to the low work volume that won't -- we

20   won't -- we won't need you guys until Monday.

21   Q    All right.

22        MR. DO:  Your Honor, I'm going to move for the admission

23   of GC-15 into evidence.

24        MR. ADLONG:  No objection, Your Honor.

25        JUDGE ROSAS:  General Counsel's 15 is received.

Exhibit 1(f)
892



www.escribers.net | 800-257-0885

1    **(General Counsel Exhibit Number 15 Received into Evidence)**

2    MR. DO:  Give me one moment, Your Honor.

3    Q    BY MR. DO:  Following your layoff, do you recall Universal

4    Intermodal trying to hire new company drivers?

5    A    They posted a ad on Craigslist saying that they were

6    hiring company drivers.

7    Q    All right.  Let me mark for --

8    A    (Indiscernible) separated us from us.

9    MR. DO:  Let me mark for identification as GC Exhibit 16.

10   So I will represent that this is a three-page document from

11   Bates Stamp 147 until 149.

12   **(General Counsel Exhibit Number 16 Marked for Identification)**

13   Q    BY MR. DO:  Do you recognize this posting?

14   A    Yes.  One of the -- one of my former coworkers sent me

15   that and said, hey, look, they let us know that they're looking

16   for drivers at a lower pay rate.

17   MR. DO:  I'm going to mark --

18   MR. ADLONG:  Object.  Your Honor, this is based on

19   hearsay.

20   MR. DO:  That's not true, Your Honor, that -- the witness

21   testified about it.

22   JUDGE ROSAS:  Hold -- hold on -- hold on.  Repeat --

23   repeat the previous question, the foundation for this.

24   MR. DO:  Sure.  The foundation is, have you seen these

25   before?

Exhibit 1(f)
893



www.escribers.net | 800-257-0885

1      JUDGE ROSAS:  You said yes, right?

2      THE WITNESS:  Yes.

3      JUDGE ROSAS:  And you started to elaborate.

4      THE WITNESS:  Okay.

5      JUDGE ROSAS:  Do we have a time frame?

6      MR. DO:  This is after their layoff, Your Honor.

7      JUDGE ROSAS:  Like I said, do you have a time frame after

8  the layoff?

9      MR. DO:  Yes.  This was between December 20th to about

10  January 5th, (indiscernible, simultaneous speech) --

11      JUDGE ROSAS:  I'm asking the witness.  I'm asking the --

12      MR. DO:  Oh, I'm sorry.

13      JUDGE ROSAS:  Do you know when you saw it?

14      THE WITNESS:  Yes.  It was the week after they laid us

15  off.

16      JUDGE ROSAS:  Overruled.

17      You were offering this in evidence?

18      MR. DO:  I will be, Your Honor, there's two more exhibit

19  that's closely related.

20      JUDGE ROSAS:  Let's -- let's go through.

21      MR. ADLONG:  Your Honor, can I voir dire?

22      JUDGE ROSAS:  Not yet.

23      Go through all of them.

24      MR. DO:  Okay.  I'm -- I'm going to mark for

25  identification as GC Exhibit 17.

Exhibit 1(f)
894



www.escribers.net | 800-257-0885

1   **(General Counsel Exhibit Number 17 Marked for Identification)**

2   Q    BY MR. DO:  Do you see the text exchange I'm putting in

3   front of you?

4   A    Yes.

5   Q    And who took this screenshot?

6        JUDGE ROSAS:  Counsel, you're tabbed on General Counsel

7   16, it appears.

8        MR. DO:  Yes, Your Honor, that's only because I didn't

9   actually click on the button, but I'm showing 17.

10  A    Yeah.  That -- that's an exchange between all the drivers

11  that were let go.

12  Q    BY MR. DO:  And do -- and I just want to confirm, do you

13  see in the middle there's a blue link; a Craigslist link?

14  A    Right.  That's where -- that's where the ad came from.

15  Q    Okay.  And did you -- when you first saw these ads, did

16  you see them on -- on your phone or on a different type of

17  device?

18  A    On my phone.

19  Q    Okay.

20       MR. DO:  I'm going to mark for identification as GC

21  Exhibit 18.

22  **(General Counsel Exhibit Number 18 Marked for Identification)**

23  Q    BY MR. DO:  Do you see this screenshot?  I'm going to

24  scroll through it.

25  A    Yes, I see.

Exhibit 1(f)
895



www.escribers.net | 800-257-0885

```
 1    Q    Okay.  Who took the screenshot?

 2    A    I don't know.  This looks to be that thread -- that --

 3    Q    Okay.

 4    A    -- thread of drivers.

 5    Q    Who provided this screenshot?

 6    A    One of those drivers in that seven.

 7    Q    Is this -- is this screenshot the same posting as the ones

 8  that were included in GC Exhibit 15?

 9         MR. ADLONG:  I'm going to object.  The documents speak for

10  themselves.

11         JUDGE ROSAS:  You said General Counsel's 15?

12         MR. DO:  Yes, Your Honor.  Which -- oh, wait.  I'm sorry.

13  16.  My apologies.

14         JUDGE ROSAS:  So there's an objection?

15         MR. ADLONG:  Yes.

16         JUDGE ROSAS:  What's the objection?

17         MR. ADLONG:  Documents speak for themselves.  He's asking

18  if it's the same document as -- on 18 as it is 15.  You can

19  look at the document --

20         JUDGE ROSAS:  I'll agree.  They can stand for themselves.

21  All right.  You're offering them?

22         MR. DO:  Yes, Your Honor.  I will offer GC Exhibit 16, 17,

23  and 18 to evidence, Your Honor.

24         MR. ADLONG:  Can I voir dire, Your Honor?

25         JUDGE ROSAS:  Always.
```



1                    **VOIR DIRE EXAMINATION**

2    Q    BY MR. ADLONG:  Mr. Ellis --

3    A    Yes.

4    Q    As it concerns GC Exhibit 16 --

5    A    Uh-huh.

6    Q    -- you did not take this screenshot, correct?

7    A    No.

8    Q    And you do not know for certain on what day this

9    screenshot was taken, do you?

10   A    No, I don't.

11   Q    If you go to the second page, so GC Exhibit 16, page 148,

12   you did not take this picture, did you?

13   A    No, I didn't.

14   Q    And you do not know where -- what day this was taken, do

15   you?

16   A    No.  I don't.  I know what day I received it, but I don't

17   know what day it was taken.

18   Q    All right.  So if you go to look at GC Exhibit 149 (sic),

19   you don't you did not take this picture, did you?

20   A    No, I didn't.

21   Q    And you do not know what day was taken, do you?

22   A    No, I didn't take it.

23   Q    And in fact, if you go to GC Exhibit 16, you go to page

24   147, you have no firsthand knowledge whether or not this

25   picture was altered in any way, do you?

Exhibit 1(f)
897



1    A    Firsthand knowledge?  No.  I couldn't -- I couldn't tell

2    you if it was or not.

3    Q    And when you go to GC 148, Exhibit 16, page 148 on this

4    document, you again do not know where this came from or who

5    created it, do you?

6    A    Like I said, it was on the thread of driver -- former

7    drivers.  They sent it to us.

8    Q    Okay.  Answer my question.  Yes or no, please.  You don't

9    know -- you do not know who created this, do you?

10   A    It was a Craigslist ad.

11   Q    Do you know who created the Craigslist ad, yes or no?

12   A    I believe it was Universal Intermodel.

13   Q    I asked, do you know, not what you believe, Mr. Ellis.

14        MR. DO:  Objection.  That's misstated, his answer

15        THE WITNESS:  (Indiscernible, simultaneous speech) --

16        MR. DO:  -- and answer the right question, Your Honor.

17        JUDGE ROSAS:  Hold on.  Repeat the question.

18   Q    BY MR. ADLONG:  Mr. Ellis, do you know -- do you know who

19   created page GC 148 of Exhibit 16?

20   A    It looks like Brooke Hartwell for direct hire.

21   Q    Okay.

22   A    That's what it look --

23   Q    Okay.

24   A    But no.  I couldn't -- I couldn't tell you if Brooke did

25   it or not.  I couldn't tell you that.

Exhibit 1(f)
898



1    Q    Perfect.  Do -- you don't even know who Brooke Hartwell

2    is, do you?

3    A    I didn't know who Mike Vagts was.

4    Q    Okay.  Now, when you go down on GC-17, right here, again,

5    this is another document, if you go to page 151 -- you go to

6    page 151, you don't -- you did not take this picture, do you?

7    A    No.

8    Q    You do not know if this is, in -- in fact, an accurate --

9    an accurate representation of the screenshot that it -- that it

10   appears to depict, do you?

11   A    Well, I actually went and tried to apply, so -- so

12   basically, it was real, if that's what you're trying to imply.

13   It was real.  But no, I --

14   Q    Okay.

15   A    -- didn't make it -- I didn't take it, and no, I couldn't

16   prove to you if it was real or not.

17   Q    Okay.  And now, with respect to GC-19, this was just --

18   this -- this application was on the thread, too, correct?

19        MR. DO:  Objection, Your Honor.  That's -- we're not on

20   19.

21        JUDGE ROSAS:  We're only -- we're only --

22        MR. ADLONG:  Okay.  Okay.

23        JUDGE ROSAS:  -- up through 18 at the moment.

24        MR. ADLONG:  Okay.

25   Q    BY MR. ADLONG:  So -- and isn't it correct, Mr. Ellis,



1    that anyone can post anything on Craigslist?

2    A    Anything -- anybody can post anything on the internet, I

3    believe.

4    Q    Okay.

5        MR. ADLONG:  Your Honor, we're going to object for -- to

6    the admission of GC Exhibit 16 and GC Exhibit 17 and 18.

7        MR. DO:  Your Honor, may I be heard?

8        JUDGE ROSAS:  Sure.

9        MR. DO:  This witness testified this is the first way that

10   he saw this message.

11       MR. ADLONG:  Well, Your Honor, can we have these

12   conversations outside the witness' presence, please?

13       JUDGE ROSAS:  Okay, let -- let -- let it suffice as

14   follows.

15       Mr. Ellis, do you know who gave these documents to the

16   General Counsel that led to them being posted up here today?

17       THE WITNESS:  No, I don't.

18       JUDGE ROSAS:  Have you seen these documents before today?

19       THE WITNESS:  Yes.

20       JUDGE ROSAS:  Okay.  When did you see these documents?

21       THE WITNESS:  As I -- I stated earlier, it was shared in a

22   thread between drivers the week following our separation from

23   Universal.

24       JUDGE ROSAS:  Okay.  All right.  I'm going to overrule the

25   objection, I'm going to receive General Counsel 16, 17, and 18.

Exhibit 1(f)
900



1   **(General Counsel Exhibit Numbers 16 through 18 Received into**

2   **Evidence)**

3       JUDGE ROSAS:  I understand what the Respondent's

4   objections are.  The -- the testimony that he adduced regarding

5   the witness' knowledge, regarding the circumstances by which

6   they were generated, timing and so forth, there is a sufficient

7   layer that's been provided here for their admission, at least

8   into evidence that they are what the witness purports them to

9   be, which are documents that he, at some point in the past,

10  based on the description that he gave us, the time frame,

11  that's in the record as to when he saw these documents.  So

12  your arguments can go to wait at this point.  But they --

13  they're -- they go in for the purpose that he testified, which

14  is that he has seen them before.  And again, you can try to

15  attack that on some addition -- different cross-examination or

16  you can just brief it, okay?

17      So General Counsel 16, 17, and 18 are received in

18  evidence.

19      MR. DO:  Thank you, Your Honor.

20              <u>**RESUMED DIRECT EXAMINATION**</u>

21  Q   BY MR. DO:  I just want to ask one clarifying question on

22  GC-17, so that it's clear on the record.  Who took this

23  screenshot?

24  A   I'm not sure

25  Q   Okay.  All right.  Looking at -- let me draw your

Exhibit 1(f)
901



1    attention to the first page of General Counsel Exhibit 16.

2    Look at this job posting.  Are you qualified for this position?

3    A    Yes.

4         MR. ADLONG:  Your Honor, we're going to object to

5    relevance.  There's no --

6         JUDGE ROSAS:  Hold on.  Let me just see where you're

7    pointing to.

8         MR. DO:  Just his general qualification, Your Honor.

9         JUDGE ROSAS:  So is there somewhere on this document where

10   it refers to required qualifications?

11        MR. DO:  Yes, Your Honor.  Let me see.  I believe it --

12        MR. WOJCIECHOWSKI:  Not to answer for counsel for the GC,

13   but the -- the title of the document refers to CDL Class A

14   drivers.

15        JUDGE ROSAS:  Oh.

16        MR. DO:  There you go.  Thank you, Mr. Wojciechowski.

17        JUDGE ROSAS:  Were you a CDL Class A driver in December of

18   2019?

19        THE WITNESS:  Yes.

20        JUDGE ROSAS:  Okay.  Next question.

21        MR. ADLONG:  Your Honor.

22        MR. DO:  Sure.

23        MR. ADLONG:  Our -- our objection remains as to relevance.

24   We don't have an FES allegation pending, you know.

25        JUDGE ROSAS:  That may be.  But that -- that's fine.  This

Exhibit 1(f)
902



1    is in evidence.  He can establish that.  We'll determine when

2    we brief this, when you all brief it, and I rule as to whether

3    there were any of that is -- is -- is relevant to the ultimate

4    determinations.

5         Next question.

6         MR. DO:  Thank you, Your Honor.

7    Q    BY MR. DO:  At the time of your separation from Universal

8    Intermodal, when you work there, did you begin and -- where did

9    you begin and end your day?

10   A    The Compton yard on Vista Bella.

11   Q    Prior to seeing these Craigslist ads, were you contacted

12   about these positions?

13   A    No.  By who?

14   Q    By Universal?

15   A    No.

16   Q    Were you have offered recall to these positions?

17   A    No.

18   Q    Did you apply to this position?

19   A    Yes.

20   Q    And how did you apply for the position?

21   A    I walked into Southern Counties' office and asked because

22   I couldn't find the physical address that's listed.  And a guy

23   walked me back to a cubicle, and I talked to a lady.  She did

24   the application.

25   Q    And did -- did that -- okay.  So other than the

Exhibit 1(f)
903



1   application, did that -- did that lady give you anything else?

2   A   She gave me a business card with her name and number on

3   it, and told me if I had any questions about the -- about the

4   application to give her a call personally, you know, she -- she

5   sat down with me the following day.

6       MR. DO:  Okay.  I'm going to mark identification as GC

7   Exhibit 20.

8   **(General Counsel Exhibit Number 20 Marked for Identification)**

9   Q   BY MR. DO:  Do you see what I just put in front of you?

10  A   Yeah, that's a -- that's a copy of the business card that

11  she gave me.

12  Q   Okay.

13      MR. DO:  I'm going to move for the addition of GC-20 into

14  evidence, Your Honor.

15      JUDGE ROSAS:  Any objection?

16      MR. ADLONG:  No objection.

17      JUDGE ROSAS:  General Counsel's 20 is received.

18  **(General Counsel Exhibit Number 20 Received into Evidence)**

19      MR. DO:  All right.  Let me show -- mark for

20  identification GC Exhibit 19.

21  **(General Counsel Exhibit Number 19 Marked for Identification)**

22  Q   BY MR. DO:  I'm going to scroll through it.  Do you see

23  what I have in front of you?

24  A   Yes, application.

25  Q   Okay.  Let me scroll through the entire thing.  All right.

Exhibit 1(f)
904



www.escribers.net | 800-257-0885

1    Do you see the entire document?

2    A    Yeah.

3    Q    And since the application that Ms. Manzo provided to you?

4    A    Right.  Yeah.

5        MR. DO:  I'm going to move for the admission of Exhibit

6    19, Your Honor.

7        MR. ADLONG:  Your Honor, do you mind if I voir dire?

8        JUDGE ROSAS:  I don't mind.

9                    **VOIR DIRE EXAMINATION**

10   Q    BY MR. ADLONG:  Did you complete the application that you

11   were given, Mr. Ellis?

12   A    No.  I was told to take it with me, if I had any questions

13   to call her.  No, I didn't complete it.

14   Q    You didn't complete it?

15   A    No.  I didn't complete that one.

16   Q    How did you get this one?

17   A    She gave it to me, the lady from Southern Counties.

18   Q    Did you ever complete an application that she gave to you?

19   A    That she gave to me?  No.

20   Q    No?

21   A    No.

22   Q    And this is the copy that she gave you?

23   A    She gave me a complete application and she told me give --

24   give her a call if I had any questions.

25   Q    And this was the packet, you're saying, that she gave you?

Exhibit 1(f)
905



www.escribers.net | 800-257-0885

 1    A     That's what she gave me and a business card.

 2    Q     Okay.

 3          MR. ADLONG:  Yeah, no -- no objection.

 4          JUDGE ROSAS:  General Counsel's 20, correct?

 5          MR. DO:  This is 19, Your Honor.

 6          JUDGE ROSAS:  19.  General Counsel's 19 is received.

 7    **(General Counsel Exhibit Number 19 Received into Evidence)**

 8                  <u>**RESUMED DIRECT EXAMINATION**</u>

 9    Q     BY MR. DO:  All right.  Earlier in your testimony, you

10    testified about doing rail work.  To the best of your

11    recollection, when did you do rail work?

12    A     Prior to Southern Counties, we did rail work maybe once or

13    twice a week.  The BNSF yards, the Union Pacific yards through

14    Los Angeles Basin.

15    Q     And who would dispatch you on those rail loads?

16    A     Our dispatcher.

17    Q     Who -- who -- which dispatcher are you referring to

18    particularly?

19    A     It started off as Universal, then it continued with

20    Southern Counties.

21    Q     So in your experience, working for Universal Intermodal

22    when during the year was work most busy

23    A     Christmas.  Prior to -- prior to Christmas and prior to

24    the summer.

25    Q     Okay.  And then what about -- when was work slowest?

Exhibit 1(f)
906



 1    A     When Chinese New Year came around.  So that was around

 2    February, early March -- end of February, early March.

 3    Q     And when work slowed down, what would happen?

 4    A     Basically, we were either told there's no work tonight or

 5    the work that they did have for us wasn't as plentiful as

 6    normal.

 7    Q     And would you be doing any other kind of work except for

 8    port work?

 9    A     As needed.  I mean, sometimes we'd do regional runs like

10    Universal had us going to Las Vegas to Phoenix -- like I said,

11    doing rail work -- whatever, that fills the gaps that they had.

12    But the -- the slow season happened at the port.  It really

13    didn't affect the rails and the -- the regional work they had

14    too much.

15    Q     Thank you.

16          MR. DO:  No further questions, Your Honor.

17          JUDGE ROSAS:  Charging party?

18          MR. WOJCIECHOWSKI:  Nothing.  Thank you.

19          JUDGE ROSAS:  All right, we have Jencks?

20          MR. DO:  Yes, Your Honor.  The Jencks statement is 11

21    pages, but there's approximately 50 pages of exhibit.  But

22    those exhibits are all of the ones that we've been admitting.

23          JUDGE ROSAS:  Okay, we're going to take a half an hour

24    break.  Off the record.

25          MR. ADLONG:  Wait, Your Honor?  He said that there's 50

Exhibit 1(f)
907



www.escribers.net | 800-257-0885

1    pages of exhibits.  The documents we just put through are only

2    24.

3         MR. DO:  Right.  But there are some that are in joint

4    exhibits.

5         MR. ADLONG:  Okay, well, do you want to identify them for

6    us so we know which ones they are, please?

7         MR. DO:  Sure.

8         JUDGE ROSAS:  I'm sorry, you got it.

9         MR. ADLONG:  The other thing I was going to say, Your

10   Honor, can we just take lunch now?

11        JUDGE ROSAS:  Well, that's going to be streamlined now.

12   I'll give you 45 minutes.  We'll resume at 12:50 Pacific Time.

13        MR. ADLONG:  Okay.

14        JUDGE ROSAS:  Mr. Ellis, we're going to take a break as

15   you heard.  Please do not discuss your testimony with anyone.

16   Okay?  and we'll see you back in 45 minutes.

17        THE WITNESS:  Thank you.

18   (Off the record at 1:00 p.m.)

19        JUDGE ROSAS:  Respondent, cross.

20        MR. ADLONG:  Okay.

21                      **CROSS-EXAMINATION**

22   Q    BY MR. ADLONG:  Mr. Ellis, I know I've asked you some

23   questions, but I don't think I've introduced myself, which I

24   try to do.  I'm Daniel Adlong, counsel for the Respondent

25   companies.  And I'm going to be asking you some questions

Exhibit 1(f)
908



1    today.

2    A    Okay.

3    Q    Traditionally -- well, not traditionally.  What's

4    happening here is we have a court reporter taking down what is

5    being said, which is, for example, why I asked you to delay a

6    little bit to listen for the objection.  But another part of

7    that is that the -- the -- the court reporter will not be able

8    to capture head movements, headshakes, head nods, which are

9    traditional forms of communication.  So as I ask you questions,

10   they'll be yes, no, correct, incorrect, right, wrong, can you

11   please make sure to answer verbally for me, please?

12   A    Okay.

13   Q    And then the next thing is that I'll ask you questions and

14   at some point, you might already know what the question is

15   going to be before I complete it.  And even though you might

16   know what it is, can you please wait till I conclude my

17   question before you give the answer?

18   A    Okay.

19   Q    Okay.  All right.  Well, I'll remind you that you're still

20   under oath.  And I guess we'll just get to it.  So I wanted to

21   ask, you were employed, you began working for Universal

22   Intermodal in 2018 of -- in May of 2018, correct?

23   A    Correct, yes.

24   Q    And at that time you were a driver, correct?

25   A    Correct.

Exhibit 1(f)
909



1    Q    And in May 2018, when you were moving loads, you would

2    move loads for Universal Intermodal customers, correct?

3    A    Yes, correct.

4    Q    And you would use a Universal Intermodal SCAC code,

5    correct?

6    A    Correct, yes.

7    Q    And that was the only SCAC code that you would use at that

8    time, correct?

9    A    Correct.

10   Q    Okay.  Then in or about March 2019 and just to -- you'd

11   use the Universal Intermodal Services SCAC code, right?

12   A    Yes.

13   Q    Okay.  And then in or about March 2019, Universal

14   Intermodal Services acquired Southern Counties, correct?

15   A    Correct.

16   Q    And prior to the acquisition, you worked Monday through

17   Friday, 5 to 3:30 -- 5 p.m. to 3:30 a.m., correct?

18   A    Correct.

19   Q    Okay.  And then after the acquisition in May -- March

20   2019, you began to work Monday through Thursday, 5 p.m. to 3:30

21   a.m., correct?

22   A    Correct, sometimes on the weekends and Saturdays.

23   Q    And in or -- but your schedule was Monday through

24   Thursday, correct?

25   A    Yeah.

Exhibit 1(f)
910



www.escribers.net | 800-257-0885

1   Q    And then in about March 2019, it was at that time that the

2   employees, the dispatchers, that worked out of the Compton

3   location that were former Universal Intermodal Service

4   employees, they were replaced by Southern County (sic)

5   employees, correct?

6        MR. DO:  Objection.  Miss -- misstate the testimony.

7        JUDGE ROSAS:  He can answer.

8   A    I want to say a little bit later, closer to May --

9   Q    BY MR. ADLONG:  Okay.

10  A    -- closer to May.

11  Q    So in about May 2019, the Universal Intermodal Service

12  dispatchers and employees that worked in the Compton office

13  were replaced by the Southern Count -- by Southern Counties'

14  employees; is that correct?

15  A    The office staff, true.  Yes.

16  Q    Okay.  And now you testified, I think you called him a big

17  wig from Seattle, came to the location, correct?

18  A    Yes.

19  Q    Okay.  You don't know that person's name, right?

20  A    I know his first name is Tony.

21  Q    Tony.  Okay.  Do you have -- and after Tony came, there

22  were changes in the Universal Intermodal Service employees were

23  replaced by Southern County employees, correct?

24  A    Yes.

25  Q    Okay.  Now, it was in or about May 2019.  At that time,



 1    you began to use -- move -- pull loads with the Southern

 2    Counties SCAC code, correct?

 3    A    Yes.

 4    Q    Okay.  Other than Universal Intermodal Service SCAC

 5    codes -- excuse me, other than the Universal Intermodal Service

 6    SCAC code and the Southern Counties SCAC code, did you use any

 7    other SCAC codes?

 8    A    For a second, we used Container Connections, but that was

 9    only for a few weeks.

10    Q    Okay.  And then so from May 2019 until your separation,

11    you would pull loads with either the Universal Intermodal

12    Service SCAC code or the Southern Counties SCAC code; is that

13    correct?

14         MR. DO:  Objection.

15    A    I may --

16         MR. DO:  -- Misstates the testimony.

17    A    -- oh.

18         JUDGE ROSAS:  Repeat the question.

19    Q    BY MR. DO:  Mr. Ellis, so from May 2019 --

20    A    Um-hum.

21    Q    -- until the day of your separation, other than the couple

22    of weeks when you used the Container Connection SCAC code, you

23    either used a Universal Intermodal Ser -- Service SCAC code or

24    a Southern Counties SCAC code to pull loads, correct?

25         JUDGE ROSAS:  Overruled.

Exhibit 1(f)
912



1    A    That's -- this is -- that's incorrect.

2    Q    BY MR. ADLONG:  That's incorrect.  Okay.

3    A    Yeah --

4    Q    What other -- so --

5    A    -- used (audio interference) --

6    Q    -- you --

7    A    -- specifically.

8    Q    -- you -- you used inner -- Universal Intermodal Service

9    SCAC codes to pull loads, correct?

10   A    Yeah.

11   Q    Okay.  You used Southern Counties -- Southern Counties

12   Express SCAC code to pull loads, correct?

13   A    Yes.

14   Q    And you used Container Connection SCAC codes to pull

15   loads, correct?

16   A    Prior to their office -- taking over their office, yes.

17   Q    Okay.  And during your time working for Universal

18   Intermodal Service -- Services, those are the only three SCAC

19   codes that you ever used, correct?

20   A    Yes.

21   Q    Commencing in May 2019, is it safe to say that you almost

22   only pulled loads for Southern Counties?

23   A    Yes, you could say that.

24   Q    Okay.  You never -- you would pull loads for a variety of

25   different clients, correct?

Exhibit 1(f)
913



1    A    Yes.  But we had to use the SCAC code to request the load.

2    Q    Okay.  And that's fine.  I -- I -- but you would use --

3    like, you can pull loads for Walmart; is that correct?

4    A    Yes.

5    Q    You would pull loads for Amazon; is that correct?

6    A    I don't recall Amazon, personally, but I --

7    Q    Okay.

8    A    -- didn't tell you.  But not personally, I never pulled

9    Amazon.

10   Q    Okay.  What other -- what other businesses did you pull

11   loads for?

12   A    Specifically, Toyota, North America, Toyo Tires,

13   Whirlpool, ICON Fitness, Performance Team, and Walmart.

14   Q    Anybody else?

15   A    We did some rails.  We did some rail work.  But there was

16   other companies, like Target that went through Eusu Logistics

17   and stuff like that, but kind of like a distribution hub pulls.

18   Q    Okay.  And when you would pull, for example, you mentioned

19   Eusu Logistics, I -- I saw something about that in -- in some

20   of these documents.  Would you pull loads and deliver them to

21   use -- Eusu Logistics?

22   A    Yeah.  They have a --

23   Q    And --

24   A    -- a -- a terminal in Carson.

25   Q    Okay.  And when you would pull that load, you're pulling



1    the load on behalf of Uni -- of -- you were pulling that load

2    like Eusu Logistics was the client that you were pulling for,

3    correct?

4    A    No, it would be Ross or Target.

5    Q    Okay.  And then you were delivering it to Eusu Logistics?

6    A    Yeah, we would deliver -- deliver to Eusu Logistics.

7    That's a distribution center.

8    Q    Okay.  And at no point during your employment with

9    Universal Intermodal Services, did you ever pull exclusively

10   for only one single client, correct?

11   A    No.

12   Q    No, that's --

13   A    Vary --

14   Q    -- incorrect?

15   A    Well, vary --

16   Q    Was that --

17   A    -- I -- I pulled for various clients.

18   Q    Okay.  And it's standard at the port that one client could

19   have multiple logistics providers pulling loads for them,

20   correct?

21        MR. DO:  Objection.  Foundation.

22        JUDGE ROSAS:  If you know.

23   A    Yes, that's -- that's fair to say.

24   Q    BY MR. ADLONG:  Now, you testified that Joe Lugo came to

25   the Compton location; is that correct?

Exhibit 1(f)
915



www.escribers.net | 800-257-0885

 1    A    Yes, that's correct.

 2    Q    Okay.  And then you saw Joe Logu -- excuse me, and you saw

 3    Joe Lugo for the first time.  And he was speaking to a couple

 4    truck drivers.  Where was that conversation happening?

 5    A    Outside of the office building.  Outside the --

 6    Q    Okay.

 7    A    -- office building, the drive up.

 8    Q    Okay.  And you said the conversations appear to be normal

 9    conversations that somebody would have; is that correct.

10         MR. DO:  Objection.

11    A    It was a interesting --

12         MR. DO:  Misstates the testimony.

13         JUDGE ROSAS:  Rephrase.

14    Q    BY MR. ADLONG:  I'm trying to clarify.  When you testified

15    earlier, you -- is it correct or incorrect that you testified

16    that the conversation that Joe Lugo was having was like normal

17    conversation that would occur between two or three individuals

18    in your estimation?

19         MR. DO:  Objection.  Misstates testimony.

20         MR. ADLONG:  He can say correct or incorrect.

21         JUDGE ROSAS:  I'll -- I'll allow it.

22    A    Okay.  When I -- when I first met Joe Lugo, it was an

23    introduction.  It wasn't like regular conversation.

24    Q    BY MR. ADLONG:  Okay.  And what I'm saying, when you first

25    saw Joe Lugo, he was initially talking to other truck drivers,

Exhibit 1(f)
916



```
 1    correct?

 2    A    He was introducing himself --

 3    Q    Okay.

 4    A    -- essentially.

 5    Q    And he was introducing him -- to self to two or three

 6    truck drivers, correct?

 7    A    Right.

 8    Q    Okay.  And then eventually when you saw him introducing

 9    himself to other truck drivers, shortly thereafter, did you

10    make his -- make his acquaintance?  Were you introduced to him

11    somehow?

12    A    Yeah, I -- I --

13    Q    Okay.

14    A    -- I walked right up to and approached him and stuff and

15    introduced myself.

16    Q    Okay.  And it was at that point where prior to introducing

17    yourself, you saw Mr. Lugo sharing his contact information with

18    other drivers, correct?  And it was --

19    A    Well -- well -- well, during the conversation, yeah.

20    Q    Okay.  And it was during that conversation when you

21    initially introduce yourself that he, too, provided his contact

22    information to you, correct?

23    A    Yes.

24    Q    Okay.  And it was during those conversations that you

25    observed and that you participated in where he talked about
```

Exhibit 1 (f)
917



www.escribers.net | 800-257-0885

 1   different mechanical problems with respect to the trucks,

 2   correct?

 3   A    Yes.

 4   Q    Okay.  And so it was during that conversation where he

 5   expressed, at least, an understanding that there were concerns

 6   with the trucks, correct?

 7   A    Yes.

 8   Q    Okay.  And he expressed that -- at that point, too, he had

 9   also introduced himself as a manager, right?

10   A    Term -- the terminal manager.

11   Q    Okay.  And he expressed that that's something looking

12   into -- that they look into the mechanical problems, correct?

13   A    That's what he said, yes.

14   Q    Okay.  And that was something that you would expect from a

15   terminal manager to look into --

16        MR. DO:  Objection.

17   Q    BY MR. ADLONG:  -- mechanical issues, correct?

18        MR. DO:  Calls for speculation.

19        MR. ADLONG:  This is cross --

20        JUDGE ROSAS:  Sustained.

21        MR. ADLONG:  -- Your Honor.

22        JUDGE ROSAS:  Sustained and slow down.

23        MR. ADLONG:  Okay.

24   Q    BY MR. ADLONG:  Your expectation, Mr. Ellis, would be that

25   a terminal manager would look into the mechanical issues,

Exhibit 1(f)
918



www.escribers.net | 800-257-0885

1    correct?

2         MR. DO:  Objection.  Foundation and speculation.

3         JUDGE ROSAS:  Overruled if he can answer.

4    A    Up until that point, we didn't have any direct contact

5    with Universal.  So just for Joe Lugo's appearance, I would

6    hope that -- that the issues were going to get handled.  But

7    usually you have a driver manager, some kind of -- another

8    contact of -- of reference to go to.  But since he was the only

9    Universal guy there, he was titled the terminal manager.  I was

10   just hoping that the trucks would get fixed.

11   Q    BY MR. ADLONG:  Okay.  So as --

12   A    We usually talk to safety for things like that, the safety

13   person.

14   Q    Okay.  And -- but you would expect that a terminal would

15   have some form of management there; is that correct?

16   A    Yeah, that was the whole issue.

17   Q    Okay.

18   A    That was the whole problem.

19   Q    And then he's a manager that was -- he's the person that

20   introduced himself as a terminal manager, correct?

21   A    Yeah.  That --

22   Q    Okay.

23   A    -- he's the one they -- yes.

24   Q    And he -- the conversation that he had with you was what

25   you would have expected out of a terminal manager, correct?

Exhibit 1(f)
919



```
 1        MR. DO:  Objection.  Asked and answered.

 2        JUDGE ROSAS:  Sustained.

 3   Q    BY MR. ADLONG:  Now, in his role as terminal manager, you

 4   had regular conversations with them, correct?

 5   A    Yes.

 6   Q    Okay.  And during those conversations, you talked about

 7   the day-to-day operations, correct?

 8   A    Yes.

 9   Q    Okay.  And during your conversations, those operational

10   issues included the mechanical issues, correct?

11   A    Yes.  And yes, and other -- among other --

12   Q    Yeah, yeah.  And I'm not saying exclusively, but I'm --

13   what I'm saying --

14   A    Yeah.

15   Q    -- that was one of the topics of conversation, right?

16   A    Yes.

17   Q    Okay.  And that was because -- that was something as a

18   terminal manager, he could work to make sure that you guys had

19   safe trucks, right?

20        MR. DO:  Objection.  Foundation.

21        JUDGE ROSAS:  Overruled.

22   A    My opinion was he was the -- he was the contact from

23   Universal.  So he was the only one I could talk to from

24   Universal face-to-face.  So therefore, I was told to -- any

25   issues that we had to go to him.
```

Exhibit 1(f)
920



www.escribers.net | 800-257-0885

1    Q    Okay.  Now, you attended -- you testified that there were

2    four meetings that the consultants conducted, correct?

3    A    There were four meetings total.

4    Q    You only attended three, though, correct?

5    A    That's correct.

6    Q    Okay.  At one point during the meetings, you had a heated

7    discussion with Mr. Cummings, correct?

8         MR. DO:  Objection.  Relevance.

9         JUDGE ROSAS:  Overruled.

10   A    I would -- I wouldn't call it heated.  I was merely

11   expressing -- did he sit down with the CEO like he said he was

12   going to do.

13   Q    BY MR. ADLONG:  Okay.  Let's see.

14   A    So I don't know if it -- if it -- would heated.

15   Q    But you -- during one of those -- okay.

16        MR. ADLONG:  Ms. Bridge, can you please pull up this

17   Jencks statement for Mr. Ellis?

18        MS. BRIDGE:  Yes.

19   Q    BY MR. ADLONG:  Mr. Ellis?

20   A    Yes.

21   Q    You remember you gave a sworn affidavit to an NLRB agent

22   regarding the allegations that your testifying to today?

23   A    Yes, I remember that.

24   Q    And at that time, you did your best to give, to tell -- to

25   tell the truth, correct?

Exhibit 1(f)
921



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    And you did your best to give an accurate representation

3    of what you remembered, correct?

4    A    Yes.

5    Q    And you'd agree that you gave that affidavit fairly

6    recently after the events in question, correct?

7    A    Yes, about -- yeah, 30 days.  Yeah.

8    Q    Okay.  So you'd agree that your memory there was probably

9    better than it is today, right?

10   A    Oh, yes.  Definitely.

11   Q    Okay.

12        MR. ADLONG:  Ms. Bridge, can you please take it down to

13   page 12 of the PDF?  I'm looking for the signature block,

14   please, Ms. Bridge.  There you go.  Thank you.

15   Q    BY MR. ADLONG:  Do you see this section of the document,

16   Mr. Ellis?

17   A    Yes.

18   Q    Is -- is that your signature there?

19   A    Yes.

20   Q    Okay.  Do you recognize what this document is?

21   A    That's the affidavit I did with the National Labor Board.

22   Q    Okay.  Now, Mr. Ellis, just to go over some things.  On or

23   about November 18, 2019 at 5 a.m. (sic), there was a meeting in

24   the break room at the East Vista Bella Way facility, correct?

25   A    5 p.m.

Exhibit 1(f)
922



1    Q    Okay.  But am I right?

2    A    5 p.m., yeah.  That was the first meeting.

3    Q    And you attended that meeting, right?

4    A    Yes.

5    Q    And it was during that meeting that you made comments in

6    response to some of the things that Mr. Cummings said, right?

7    A    Yes.

8    Q    And it was during that time that you told Mr. Cummings all

9    you wanted to know was who we could talk to about the things

10   that we needed to get addressed, correct?

11   A    Yes.

12   Q    And he responded that the group was there to listen to his

13   presentation, correct?

14   A    Yes.

15   Q    And it was at that point that you would say your exchange

16   had gotten heated, correct?

17   A    No, that was the second meeting, the following --

18   Q    All right.

19   A    -- meeting.

20   Q    Well, let's turn your attention to --

21        MR. ADLONG:  Ms. Bridge, can you please take this to page

22   6 of the affidavit, so -- not of the PDF, but on the affidavit,

23   Ms. Bridge.  So -- yeah, so you're at the right page.  You'd

24   want to go up.

25   Q    BY MR. ADLONG:  Mr. Ellis, I'm going to direct your



1    attention to line 7 through 13, can you please --

2    A    Okay.

3    Q    -- read those?

4    A    7 through 18?

5    Q    7 --

6    Q    Cummings --

7    A    -- through 13, please.

8    A    Yeah, Cummings told me he couldn't --

9    Q    You don't need to read it -- you don't need to read it out

10   loud.  If you can just read it --

11   A    Oh.

12   Q    -- to yourself and let me know when you finish, please.

13   A    Okay.  Yes.  Okay.

14   Q    Okay.  So this refresh your recollection that this --

15   having read that, would you agree now that this exchange had

16   gotten heated?

17   A    Having read that, this exchange happened the second

18   meeting.  You're asking about the first meeting.

19   Q    Do you have the excha --

20   A    This is the second meeting.

21   Q    Okay.

22   A    This is the second meeting.  Because during the first

23   meeting, he said that he would sit down with the CEO and tell

24   him all our issues and our concerns, that he would get back to

25   us.  So when --

Exhibit 1(f)
924



www.escribers.net | 800-257-0885

1    Q    Okay.

2    A    -- he showed the following week, that's when we had the

3    heated exchange because --

4    Q    Okay.

5    A    -- he told us we were just there to sit and listen to the

6    presentation.

7    Q    Okay.  And that was the -- that was the meeting that I

8    identified as November 18, 2019, at 5 p.m., right?

9    A    No, you told me the first meeting.  We're talking about

10   the first meeting.  This is the second meeting.

11   Q    This was a meeting that happened on November 18, 2019; is

12   that correct?

13   A    I -- I can't -- I can't.  I know this is the second

14   meeting.  I couldn't tell you the date per se.

15   Q    Okay.

16   A    This is the second meeting.

17   Q    Okay.

18        MR. ADLONG:  So Ms. Bridge, just to help out Mr. Ellis,

19   can you go to page 5, line 10.

20   Q    BY MR. ADLONG:  And then if you want to read page 5, line

21   10 all the way down to page 6, line 13.

22   A    November 8th, okay.  Yes.  Okay.

23   Q    So having read that, this November 18th, 2019 meeting at

24   5:00 p.m., this is a meeting when you have a heated exchange

25   with Mr. Cummings, correct?

Exhibit 1(f)
925



1    A    I believe this is the second meeting.  And at that time,

2    it must have been November 18th.

3    Q    So is that a yes?

4    A    That we had a heated exchange, yes.

5    Q    Okay.  Thank you.  All right.

6         MR. ADLONG:  All right.  Ms. Bridge, can you please pull

7    up General Counsel's Exhibit 16?

8    Q    BY MR. ADLONG:  Mr. --

9         MR. ADLONG:  Well, Your Honor, could you please ask --

10   yeah, there you go -- Mr. Ellis, if he can like, get himself

11   centered on the camera, so we can see him, please.

12        THE WITNESS:  Okay.

13   Q    BY MR. ADLONG:  Thank you, Mr. Ellis.  We appreciate it.

14        MS. BRIDGE:  Which exhibit did you want, GC-what?

15        MR. ADLONG:  16, please.

16        MS. BRIDGE:  Thank you.

17   Q    BY MR. ADLONG:  All right.  Mr. Ellis, you don't know what

18   day this -- turning your attention to General Counsel's Exhibit

19   16, you don't know what day this posting was put up; do you?

20   A    The original Craigslist ad or when I was made aware?

21   Q    The Craigslist ad, you don't know which day the Craigslist

22   ad was put up; do you?

23   A    It was after our termination, so I don't -- I don't know

24   what actually it was -- was put up.

25   Q    So Mr. Ellis, you testified that you did not -- okay.

Exhibit 1(f)
926



1    Let's see.  Mr. Ellis, on that ad, you see that location,

2    55- -- 550 South Alameda, South Compton, California -- Compton,

3    California?

4    A    Yeah.

5    Q    Okay.  You're not familiar with that facility; are you?

6    A    There's no facility there.  It's just like a yard.  It's

7    just some kind of -- of abandoned yard or some kind of -- it's

8    a -- it's a drainage (indiscernible) yard.  But it had weeds

9    around the gate and everything else.  That's what -- what led

10   me to Southern Counties.

11   Q    And Mr. Ellis, you never turned in an application for this

12   position; did you?

13   A    Not that position, no.

14   Q    Okay.  You don't know who Brooke Hartwell is either; do

15   you, Mr. Ellis?

16   A    No.

17   Q    Okay.  And you've never worked for Uni -- Universal

18   Logistics either; have you?

19        MR. DO:  Objection.  Calls for a legal conclusion.

20   Objection.  Calls for a legal conclusion.

21        JUDGE ROSAS:  Never worked for Universal Logistics?

22        MR. ADLONG:  Yeah.

23        JUDGE ROSAS:  I'll allow it.

24   A    No, I worked Universal Intermodal Services.

25   Q    BY MR. ADLONG:  Mr. Ellis, you don't know of anybody who

Exhibit 1(f)
927



www.escribers.net | 800-257-0885

1    applied and was interviewed for this position; do you?

2         MR. DO:  Objection.  Calls for speculation.

3         JUDGE ROSAS:  Sustained.

4         MR. ADLONG:  Your Honor, can we off the record for five

5    minutes to determine whether or not we have any more cross for

6    this witness?

7         JUDGE ROSAS:  Okay.  Go off the record.

8    (Off the record at 1:32 p.m.)

9         JUDGE ROSAS:  Back on the record.  All right.

10              **RESUMED CROSS-EXAMINATION**

11   Q    BY MR. ADLONG:  Mr. Ellis, you don't know who Leonard

12   Olson is; do you?

13   A    No.

14   Q    You don't know who Kyle Dwyer is either; do you?

15        MR. DO:  Objection.  Relevance.

16        JUDGE ROSAS:  Overruled.

17   A    No.

18        JUDGE ROSAS:  Answer -- he answered.

19   Q    BY MR. ADLONG:  And isn't it correct, Mr. -- Mr. Ellis,

20   that when you went to the Southern Counties facility, you

21   approached a young man at the front desk and you showed him the

22   Craigslist ad and asked if that was where to go to apply to be

23   a company driver, correct?

24   A    Yes.

25   Q    And isn't it correct that he told you that that was

Exhibit 1(f)
928


www.escribers.net | 800-257-0885

1    Southern Counties, and that person was not for Southern

2    Counties?

3    A    Yes, that's what he told me.

4    Q    And isn't it correct that the woman that you spoke with,

5    she also told you that the application for -- was for a company

6    that was not Southern Counties, correct?

7    A    She came when she overheard the conversation and motioned

8    me to the back -- to the -- to her cubicle.  And she said,

9    you're looking to be a company driver.  I was like, yes.

10   Q    Okay.

11   A    So she actually -- she actually never saw me show him the

12   ad.

13   Q    But -- and you understood that you were not applying to be

14   a company driver with Southern Counties, correct?

15   A    No, I was -- I was asking where the address was that --

16   Q    Okay.

17   A    -- was for that ad.

18   Q    And at no time did you -- were you under the impression

19   that you were applying to work for Southern counties, correct?

20   A    No, I was going to work for Universal.

21   Q    That's who you were -- you were -- you were seeking to

22   apply for this ad, correct?

23   A    I wanted to know the location where I can apply.

24   Q    Okay.  To apply for the ad that we have up as Joint -- as

25   General Counsel's Exhibit 16?

Exhibit 1(f)
929



1    A    Yes.

2    Q    And that was the position that you never actually applied

3    for, right?

4    A    Well, she gave me the application.  But I never filled it

5    out.

6    Q    And you had never spoken to this woman before; had you?

7    A    Never.

8    Q    And you don't know what role she plays for Universal --

9    you don't know what role she plays for Universal Intermodal

10   services; do you?

11   A    (Audio interference) she's the recruiter.

12   Q    Okay.  But other than you -- other than her giving you

13   this application, you have no other interaction with her,

14   correct?

15   A    She gave me a business card and told me to call her if I

16   have any problems filling out the application.  I had met --

17   Q    Okay.

18   A    -- at that point, I had met -- I hadn't -- hadn't met her

19   before.

20   Q    And you never followed up with her again, right?

21   A    No.

22        JUDGE ROSAS:  Asked and answered a couple of times.

23        MR. ADLONG:  No further questions for this witness.

24        JUDGE ROSAS:  Redirect.

25        MR. DO:  We have no redirect, Your Honor.

Exhibit 1(f)
930



1          JUDGE ROSAS:  Charging Party.

2          MR. WOJCIECHOWSKI:  Oh, sorry.  No -- no redirect.  Thank

3     you.

4          JUDGE ROSAS:  Thank you, Mr. Ellis.  Your testimony is

5     completed for today.  Please do not discuss your testimony with

6     anyone until you're advised by counsel of the Government that

7     the record in the case is closed.  Okay?

8          THE WITNESS:  Okay.  Thanks a lot.

9          JUDGE ROSAS:  Thank you.  Have a good day.

10         THE WITNESS:  You, too.

11         MR. DO:  Your Honor, I know -- I think I've been

12    forgetting to ask this, but to the extent that there's any

13    Jencks statement in the possession of Mr. Kuntz, I would like

14    to request that those be deleted.

15         MR. KUNTZ:  Again, for the record, Your Honor, both Mr.

16    Adlong and I have deleted all Jencks statements that we've

17    received to this point, and we'll continue to do so.

18         MR. DO:  Thank you.

19         JUDGE ROSAS:  Next witness.

20         MS. KAGEL:  Your Honor, General Counsel calls Desmond

21    Gibson.  It's my understanding he should be in the waiting

22    room.

23         JUDGE ROSAS:  Mr. Gibson, can you turn your video on?

24         MS. KAGEL:  Mr. Gibson, can you hear us?

25         JUDGE ROSAS:  Give him a call.

Exhibit 1(f)
931



1        MS. KAGEL:  Yeah, one second, Your Honor.

2        JUDGE ROSAS:  Off the record, right?

3   (Off the record at 1:39 p.m.)

4        JUDGE ROSAS:  Okay.  All right.  Back on the record.

5        General Counsel, you call Desmond Gibson; is that right?

6        MS. KAGEL:  Yes, Your Honor.

7        JUDGE ROSAS:  Sir, please raise your right hand.

8   Whereupon,

9                    **DESMOND GIBSON**

10  having been duly sworn, was called as a witness herein and was

11  examined and testified, telephonically as follows:

12       JUDGE ROSAS:  State your name, and we have the spelling,

13  and provide us with an address.

14       THE WITNESS:  Desmond Gibson.

15       JUDGE ROSAS:  Where do you live?  Repeat whatever your --

16  whatever you said.

17       All right.  Let's go off the record for a minute.

18  (Off the record at 1:48 p.m.)

19       JUDGE ROSAS:  Back on the record.  All right.  Mr. Gibson,

20  I'm going to swear you in now.  Raise your right hand.

21  Whereupon,

22                    **DESMOND GIBSON**

23  having been duly sworn, was called as a witness herein and was

24  examined and testified, telephonically as follows:

25       JUDGE ROSAS:  All right.  Give us an address.

Exhibit 1(f)
932



```
 1        THE WITNESS:  ███████████████████, Moreno Valley,
 2   California.
 3        JUDGE ROSAS:  Okay.  Go ahead, Counsel.
 4                    DIRECT EXAMINATION
 5   Q    BY MS. KAGEL:  Thank you, Mr. Gibson, for joining us here
 6   today.  And I appreciate you bearing with us and with all the
 7   technology.  Mr. Gibson, do you go by the nickname Dez
 8   (phonetic)?
 9   A    Yes.
10   Q    Who is your current Employer?
11   A    LDI Lexmar.
12   Q    What is your job position?
13   A    I'm a driver.
14   Q    Were you ever employed by a company called Roadrunner?
15   A    Yes.
16   Q    And when did you start working for Roadrunner?
17   A    December 2017.
18   Q    When did you stop working for Roadrunner?
19   A    December '18 -- '19 -- oh, wait, 2008- -- '19.
20   Q    Why did you stop working for Roadrunner?
21   A    We were -- we were laid off.
22   Q    Where was the Roadrunner facility that you worked at?
23   A    It's Carlsbad (sic) in the City of Fontana.
24   Q    Would that be Calabash instead of Carlsbad?
25   A    Yeah.  Cala -- Calabash.
```

Exhibit 1(f)
933



www.escribers.net | 800-257-0885

```
 1    Q    Yeah.

 2    A    All right.

 3    Q    What was -- what was your job position at Roadrunner?

 4    A    Driver.

 5    Q    What were your job duties as a driver?

 6    A    Pickup and delivery.

 7    Q    Where would you pick up?

 8    A    From the railroads or different customers.

 9    Q    And what are -- were some of the customers?

10    A    Adidas -- what is this -- a -- a company that deals with

11    car rims.  I would get mostly a lot of pickups there.  And

12    there was many different ones.  I just -- just can't call them

13    right offhand right now.

14    Q    Who did you report to?

15    A    Dispatch.

16    Q    What were your hours?

17    A    Monday through Friday; I start at 5, end around 5.

18    Q    How long were you on that schedule?

19    A    Mostly about a year.

20    Q    Before you were laid off?

21    A    Well, before -- I was a night driver for a period of time,

22    and then I became a day driver.

23    Q    What days did you work?

24    A    Monday through Friday.

25    Q    What was a typical day of work like?
```

Exhibit 1(f)
934



www.escribers.net | 800-257-0885

1    A    Usually just the same pickup and delivery, nothing --

2    nothing out of the usual; or I might be asked to train a person

3    to ride with me, but it's the same thing.

4    Q    And where did you keep your truck?

5    A    On the yard.

6    Q    Were you assigned a --

7    A    Calabash.

8    Q    Okay.  Were you assigned a truck?

9    A    Yes.

10   Q    How did you get your assignments?

11   A    Through dispatch.

12   Q    And what information did you get about an assignment?

13   A    Where to pick up, where -- where to deliver it.

14   Q    How many drivers like you were at the Roadrunner facility

15   in Fontana?

16   A    About 23.

17   Q    Does that include the night shift?

18   A    That includes the night shift.

19   Q    Were there any owner-operator drivers at the Roadrunner

20   facility?

21   A    Yes.

22   Q    How many?

23   A    I'm gonna give or take 20.

24   Q    Did you ever work with or interact with drivers who worked

25   for Universal Intermodal?

Exhibit 1(f)
935



1    A    No.

2         MR. KUNTZ:  Your Honor, real quickly, I'm not sure if this

3    is the case for the other parties, but we can't see the

4    witness.  Oh, and the -- the image just returned.

5    Q    BY MS. KAGEL:  I'm sorry, I didn't catch your answer, Mr.

6    Gibson.  Did you ever work with or interact with drivers who

7    worked for Universal Intermodal?

8    A    No.

9    Q    Was the Roadrunner facility nearby them?

10   A    Yes.

11   Q    Where was the facility located where the Universal

12   Intermodal drivers worked?

13   A    On Slover.

14   Q    And how far away --

15   A    In the field.

16   Q    -- is that?

17   A    Maybe a mile and a half.

18   Q    Do you know if Universal Intermodal and Roadrunner had any

19   relationship?

20   A    No.

21   Q    Okay.  Do you recall ever driving by the university -- I'm

22   sorry -- the Universal Intermodal facility on your way home

23   from work?

24   A    Yes.

25   Q    And how often would you drive by the Universal Intermodal

Exhibit 1(f)
936



1    facility on your way home from work?

2    A    Monday through Friday.

3    Q    Do you know of the Teamsters Union?

4    A    Yes.

5    Q    Did you ever see any Teamsters Union representatives when

6    you were driving by the Universal Intermodal facility?

7    A    Yes, I -- yes, yes.

8    Q    Where would you see them?

9    A    Standing out front.

10   Q    Do you know why they were there?

11   A    To un -- to unionize.

12   Q    Who were they trying to unionize then?

13   A    Universal.

14        MR. KUNTZ:  Objection.  Lack of foundation.

15        MS. KAGEL:  I was --

16        JUDGE ROSAS:  Sustained.

17        MS. KAGEL:  Okay.

18   Q    BY MS. KAGEL:  Do you know who they were trying to

19   unionize?

20        MR. KUNTZ:  Objection.  Lack of foundation.

21        MS. KAGEL:  I asked him if he knew, Your Honor.

22        JUDGE ROSAS:  Sustained.

23        MS. KAGEL:  Okay.

24   Q    BY MS. KAGEL:  Did you ever speak to them?

25   A    Yes.



1    Q    And did they tell you why they were there?

2    A    Yes.

3    Q    And what did they say?

4         MR. KUNTZ:  Objection.  Hearsay.

5         JUDGE ROSAS:  You're asking him what the Union

6    representative said?

7         MS. KAGEL:  Yes, Your Honor.

8         JUDGE ROSAS:  I'll -- I'll take a wild guess.

9         You can -- you can -- you can -- you can answer.

10   A    Yes, to unionize.

11   Q    BY MS. KAGEL:  And who were they trying to unionize?

12        MR. KUNTZ:  Objection.  Lack of foundation.

13   Q    BY MS. KAGEL:  Did they say who they were trying to

14   unionize?

15        JUDGE ROSAS:  Hold on.  Hold on.

16        MS. KAGEL:  Oh, sorry.

17        JUDGE ROSAS:  The witness testified that he stopped,

18   right?

19        MS. KAGEL:  Yes, Your Honor.

20        JUDGE ROSAS:  Overruled.

21        You can answer.

22   A    The drivers.

23   Q    BY MS. KAGEL:  And when did you stop and talk to the

24   Teamsters representative?

25   A    It was around -- right around Thanksgiving time.

Exhibit 1(f)
938



1    November.

2    Q    And who did you speak to?

3    A    Santos.

4    Q    Do you know his last name?

5    A    No, I do not.

6    Q    And what happened in that conversation?

7    A    The conversation was about Universal going Union, and what

8    about Roadrunner because they're becoming one.

9    Q    Who was becoming one?

10   A    Universal and Roadrunner.

11   Q    And what do you mean by that?

12   A    Well, the rumor was they bought out Roadrunner.

13        MR. KUNTZ:  Objection.

14        JUDGE ROSAS:  Sustained.

15        MR. KUNTZ:  Move to strike.

16        JUDGE ROSAS:  Stricken.

17        MR. KUNTZ:  And Your Honor, again, I'm not sure if this is

18   the case for the other parties, but the witness is frozen on

19   our screen right now.

20        JUDGE ROSAS:  Off the record.

21   (Off the record at 2:07 p.m.)

22        JUDGE ROSAS:  Go ahead, Ms. Kagel.  Next question.

23                    **RESUMED DIRECT EXAMINATION**

24   Q    BY MS. KAGEL:  And what did Santos say to you in this

25   conversation?

Exhibit 1(f)
939



```
 1    A     Who are you?

 2          MS. KAGEL:  Oh, can we go off the record, Your Honor?

 3          JUDGE ROSAS:  Off the record.

 4    (Off the record at 2:09 p.m.)

 5          JUDGE ROSAS:  Back on the record.
```

 6                       **RESUMED DIRECT EXAMINATION**

```
 7    Q     BY MS. KAGEL:  And what did Santos say to you in that

 8    conversation?

 9    A     About unionizing drivers, and it -- it just was small

10    talk, and we exchanged numbers.

11    Q     Did you talk to Santos again after this first

12    conversation?

13    A     Yes.

14    Q     How many times after this first conversation did you talk

15    to Santos?

16    A     Maybe -- maybe three to four times.

17    Q     And how did you talk to Santos?

18    A     By phone.

19    Q     What did you talk about?

20    A     Joining -- I mean, getting together with other drivers and

21    to (audio interference).

22    Q     Hold on.  Hold on, Mr. Gibson.

23          MS. KAGEL:  Sorry, but can we go off the record?

24          JUDGE ROSAS:  Yep.

25    (Off the record at 2:10 p.m.)
```

Exhibit 1(f)
940



www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  Back on.

2        MS. KAGEL:  Okay.

3                    **RESUMED DIRECT EXAMINATION**

4    Q    BY MS. KAGEL:  And in these conversations with Santos,

5    what did you talk about?

6    A    Foreman -- I mean, getting together with the guys from

7    Roadrunner, and what the Union was about.

8    Q    When you say "guys from Roadrunner", are you talking about

9    your coworkers?

10   A    Coworkers.

11   Q    Um-hum.  Did you ever give him any names of coworkers?

12   A    Yes.

13   Q    What names did you give him?

14   A    There's Mike, Willie, and Jose.

15   Q    Did you ever meet with Santos and another Union

16   representative in your home?

17   A    Yes.

18   Q    When was this?

19   A    Early December.

20   Q    Do you know the name of the other Union representative?

21   A    Miguel.

22   Q    And what did you talk about?

23   A    We talked about the Union and what it represents.

24   Q    Did you ever give them any information about Roadrunner?

25   A    Like, what kind of information?

Exhibit 1(f)
941



www.escribers.net | 800-257-0885

```
1    Q    Any information about your shift or your manager?

2    A    No.

3    Q    Okay.  Did you ever speak to other Roadrunner drivers

4    about the Union?

5    A    Yes.

6    Q    When did you start speaking to the other Roadrunner

7    drivers about the Union?

8    A    After I spoke with Santos.

9    Q    The first time?

10   A    Yes.

11   Q    How often would you speak to the other Roadrunner drivers

12   about the Union?

13   A    About every morning, getting, you know, preparing for

14   work, before we left the yard.

15   Q    So where did you have these conversations?

16   A    In the yard get getting in our trucks, warming them up.

17   Q    About how many Roadrunner coworkers do you think you spoke

18   to about the Union?

19   A    I think maybe -- well, just about all of them in the day

20   shift.

21   Q    And how many is that?

22   A    Probably about 11.

23   Q    Did you ever tell Santos about these conversations you had

24   with your coworkers?

25   A    Yes.
```

Exhibit 1(f)
942



1  Q    Do you know -- if you know -- do you know if the coworkers

2  you spoke to about the Union ever talked to Santos themselves?

3      MR. KUNTZ:  Objection.  Calls for speculation.

4      MS. KAGEL:  I said, "if you know", Your Honor,

5      JUDGE ROSAS:  Just if he saw them talking to Santos?

6      MS. KAGEL:  Um-hum.

7      JUDGE ROSAS:  You can answer that.

8  A    No.

9  Q    BY MS. KAGEL:  Did the Union ever have a meeting with the

10  Roadrunner drivers all together before you were laid off?

11  A    No.

12  Q    Why not?

13  A    We were laid off.

14  Q    Do you know if the Union ever won the vote to represent

15  the Universal Intermodal drivers?

16  A    Yes.

17  Q    And how do you know?

18  A    Santos called.

19  Q    And when was that?

20  A    Not that correct on the date, but just maybe a few --

21  maybe about four days before we were all laid off.  About three

22  to four days before we were all laid off.

23  Q    Now, before you were laid off, did you ever have to fill

24  out new paperwork with -- I'm sorry -- a new application for

25  Universal?

Exhibit 1(f)
943



 1    A    Yes.

 2    Q    And when was this?

 3    A    All around December the 11th.

 4    Q    Okay.  And how do you know --

 5    A    Or --

 6    Q    Okay.  And how do you know you had to sign new paperwork?

 7    A    We were called in.

 8    Q    Who called you in?

 9    A    Xochitl.

10    Q    And who is Xochitl?

11    A    That probably is the office manager.

12    Q    And did you go see her?

13    A    Yes.

14    Q    Were you able to see her right away?

15    A    No, she had -- she had drivers -- a couple of drivers

16    already in the office.

17    Q    And what did you see when there -- what did you do when

18    you saw there were a couple of drivers in her office?

19    A    Oh, I went over to -- stepped into Ivan's office.

20    Q    And who's Ivan?

21    A    Ivan -- Ivan would be up under Xochitl.  I don't his

22    exact -- what he does, but he's under her.

23    Q    Did you talk to Ivan?

24    A    Yes.

25    Q    What did you talk about?

Exhibit 1(f)
944



escribers

www.escribers.net | 800-257-0885

```
1    A    Oh, I talked about the Union and Universal, and he just
2    kept replying he didn't know anything about that.
3    Q    And why did you ask him about the Union and Universal?
4    A    Because we already knew that Universal -- that's what --
5    Universal had purchased Roadrunner.
6    Q    So what were you asking about?
7    A    About what does that does -- what does that do for us?
8    Q    Do you know Ivan's last name?
9    A    No.
10   Q    Do you know Xochitl's last name?
11   A    Barrera.
12   Q    Okay.  Did you then go and meet with Ms. Barrera?
13   A    Yes.
14        MR. KUNTZ:  Objection leading.
15        MS. KAGEL:  It's part of the story, Your Honor.
16        JUDGE ROSAS:  Hold on.
17        What's leading?
18        MR. KUNTZ:  The question, I believe, was, "Did you then go
19   and meet with Ms. Barrera"?
20        JUDGE ROSAS:  All right.  Take a step back.
21        MS. KAGEL:  Okay.
22   Q    BY MS. KAGEL:  What did you do after you spoke to Ivan?
23   A    Went and seen Ms. Barrera.
24   Q    Okay.  And what happened in that meeting with Ms. Barrera?
25   A    We were signing paperwork for W-2s, benefits.
```

Exhibit 1(f)
945



www.escribers.net | 800-257-0885

1    Q    Do you know why you were signing this paperwork?

2    A    Switching over from Roadrunner to Universal.

3    Q    Did the paper say anything about Universal on it?

4    A    Yes, yes.

5    Q    What was on it?

6    A    It had the Universal logos on it.

7    Q    And did you and Ms. Barrera talk while you were signing

8    the paperwork?

9    A    Yes, I asked her about the -- Universal going Union and

10   that there -- if we're going to be Universal, what does it do

11   for us; same thing I asked Ivan.

12   Q    What did she say?

13   A    That she didn't know anything about that.

14   Q    I'm showing you what's been previously admitted as Joint

15   Exhibit 6(b).  Give me one moment to share that.  Do you see

16   that there on your phone?

17   A    Yes.

18   Q    Okay, great.  Did you receive this letter?

19   A    Yes.

20   Q    The letter is dated December 18th, 2019.  Did you receive

21   it on that date?

22   A    Yes.

23   Q    How did you receive this letter?

24   A    When we were called into the office, as each driver was

25   let go, we got that paper.

Exhibit 1(f)
946



www.escribers.net | 800-257-0885

1    Q    Whose office did you get called into?

2    A    Ivan.

3    Q    Was anyone else in this meeting in his office besides you

4    and Ivan?

5    A    Yes, there was another gentleman.

6    Q    Who was he?

7    A    Well, I don't know his name, but he was from Container

8    Connection.

9    Q    And how do you know that?

10   A    I've seen him around, but that's where he say he was from.

11   Q    Did he tell you that in this meeting?

12   A    Yes; I asked him.

13   Q    What did he say?

14        MR. KUNTZ:  Objection, Your Honor.  Relevance.  Container

15   Connection is not part of this complaint.

16        MS. KAGEL:  Your Honor, just describing what happened in

17   the meeting where he was terminated, and we're getting the full

18   picture of everyone who was there.

19        JUDGE ROSAS:  Container Connection, not -- not a

20   co-respondent, correct?

21        MS. KAGEL:  No, but I'm -- but Your Honor, I'm just

22   getting a full picture of what happened at this meeting.

23        JUDGE ROSAS:  Sustained.

24        Next question.

25   Q    BY MS. KAGEL:  Did you have to sign any -- when you were

Exhibit 1(f)
947



1    called in and received this letter, did you have to sign

2    anything?

3    A    Yes.

4    Q    What did you have to sign?

5    A    Oh, it was like, three more -- it was like, three or four

6    more documents to initial and sign in order to -- he was

7    explaining -- to get paid.

8    Q    And how did you know you had to sign those in order to get

9    paid?

10    A    Because they wouldn't give you the paperwork if you wasn't

11    signing it.

12    Q    Did -- was there any way -- I'm sorry -- did you ask Ivan

13    if there was any way you could working for Roadrunner?

14        MR. KUNTZ:  Objection.  Leading.

15        JUDGE ROSAS:  Sustained.

16    Q    BY MS. KAGEL:  Do you know if there was any possibility

17    you could go back to Roadrunner?

18    A    If I had my own truck.

19    Q    And how do you know that?

20    A    That's what he stated.

21    Q    That's what who stated?

22    A    Ivan.

23    Q    Was anything said about Universal during this meeting?

24    A    The -- I asked the ge -- the gentleman from pe -- te --

25    Container Connection what -- that's Universal?  He said, yes.

Exhibit 1(f)
948



www.escribers.net | 800-257-0885

1    Q    And did you ever get your pay after signing the paperwork?

2    A    Yes.

3    Q    And what form was the pay in?

4    A    On a -- some type of debit card.

5    Q    Okay.  Now, looking back at this letter, which is Joint

6    Exhibit 6(b), do you know what "soft freight conditions" are?

7    A    That's a form to say it's slow.

8    Q    Now, it says that Roadrunner is "Reducing all company

9    drivers".  Do you know if any company driver positions remained

10   after you were laid off?

11        MR. KUNTZ:  Objection.

12   A    No.

13        MR. KUNTZ:  Lack of foundation

14        MS. KAGEL:  Again, Your Honor, I just asked if he knew.

15        JUDGE ROSAS:  If you know.

16   A    No.

17   Q    BY MS. KAGEL:  Do you know anyone who remained a company

18   driver after December 18th, 2019?

19   A    No.

20   Q    Now, it lists a Michael Vagts, senior HR manager, as a

21   contact person.  Do you know who he is?

22   A    No.

23   Q    Did you ever try and get in touch with him?

24   A    Yes.

25   Q    Did you ever get a hold of him?

Exhibit 1(f)
949



www.escribers.net | 800-257-0885

```
 1    A    No.

 2    Q    Did your work change at all in the time leading up to your

 3    layoff?

 4    A    No.

 5    Q    Did you ever go to a meeting with the Union after you were

 6    laid off?

 7    A    Yes.

 8         MR. KUNTZ:  Objection, relevance.

 9         MS. KAGEL:  Your Honor, we went through this before.

10         JUDGE ROSAS:  Limited leeway.

11         Overruled.

12         MS. KAGEL:  Um-hum.

13    Q    BY MS. KAGEL:  I'm sorry, did you answer Mr. Desmond?

14    A    Yes.

15    Q    Okay.  And when was this?

16         MR. KUNTZ:  Your Honor, can we have a continuing objection

17    to these questions, please?

18         JUDGE ROSAS:  Noted.

19    Q    BY MS. KAGEL:  When was this meeting?

20    A    This was after we were laid off; we met at the Union hall;

21    they called and asked, you know -- invited us down.

22    Q    Were you the only Roadrunner driver?

23    A    No, it's four of us there.

24    Q    What was the meeting about?

25         MR. KUNTZ:  Your Honor, I think this is going beyond the
```

Exhibit 1(f)
950



www.escribers.net | 800-257-0885

1    limited leeway.

2        MS. KAGEL:  I asked these exact same questions before,

3    Your Honor.

4        JUDGE ROSAS:  Just generally.  Go ahead, you can answer.

5    A    It was about being laid off in the -- in the middle of

6    negotiating a contract.

7    Q    Are you still in touch with the Union?

8    A    Yes.

9        MS. KAGEL:  No further questions, Your Honor.

10       JUDGE ROSAS:  Charging Party?

11       MR. WOJCIECHOWSKI:  No questions.  Thank you.

12       JUDGE ROSAS:  Any Jencks?

13       MS. KAGEL:  Yes, Your Honor, there's one Jencks statement;

14   it's a total of ten pages, but the affidavit itself is seven

15   pages, and there's only one exhibit, which is Joint Exhibit

16   6(d), and there are some blank pages in there as well.

17       JUDGE ROSAS:  All right.

18       We'll take 15 minutes.  Off the record.

19   (Off the record at 2:25 p.m.)

20       JUDGE ROSAS:  On the record.

21       Respondent?

22                        **<u>CROSS-EXAMINATION</u>**

23   Q    BY MR. KUNTZ:  Good afternoon, sir.  My name's Harrison

24   Kuntz; I am an attorney with the Respondents in this case.  How

25   are you doing today?

Exhibit 1(f)
951



 1    A    I'm doing all right.

 2    Q    I'm going to have just a couple questions for you.  Can I

 3    ask that in response to those questions, as we've tried to do

 4    so far, you'll wait a second after I finish asking so that any

 5    video lag time doesn't affect our communication; is that okay?

 6    A    Yes.

 7    Q    And you might have noticed we have a court reporter with

 8    us who's transcribing what we're doing, and the Court reporter

 9    doesn't pick up physical gestures like head nods and things

10    like that, so in response to my questions, can you please

11    answer verbally?

12    A    Yeah.

13    Q    Now, Mr. Gibson, isn't it true that during the course of

14    your employment with Roadrunner, you never had regular

15    interaction with drivers of Universal Intermodal Services?

16    A    No.

17    Q    No, you did not?

18    A    No.  No, I did not.

19         JUDGE ROSAS:  You asked for yes or no answers, you got to

20    be stuck with them.  Don't -- don't ask for repeats.

21    Q    BY MR. KUNTZ:  And isn't it true that during the course of

22    your employment with Roadrunner, you never had regular

23    interaction with drivers of Universal Truckload?

24    A    No.

25         MS. KAGEL:  Objection.  Relevance.  Outside the scope.

Exhibit 1(f)
952



www.escribers.net | 800-257-0885

```
 1        JUDGE ROSAS:  Repeat.

 2   Q    BY MR. KUNTZ:  Isn't it true that during the course of

 3   your employment with Roadrunner, you never had regular

 4   interaction with drivers of Universal Truckload?

 5   A    No.

 6        MS. KAGEL:  One moment, Mr. Gibson.

 7        JUDGE ROSAS:  Overruled.  Overruled.

 8        Take your time, Mr. Gibson, okay, because --

 9        THE WITNESS:  Yes.

10        JUDGE ROSAS:  -- there might be some issues with the

11   question and we've got to resolve that, okay, before you're

12   permitted to answer, so take your time.

13        Okay.  Next question.

14   Q    BY MR. KUNTZ:  Do you recall testifying regarding your

15   first interaction with Santos outside of the Slover facility?

16   A    Yes.

17   Q    And isn't it true that during that conversation you asked

18   Santos how the Union organizing Universal Intermodal would

19   affect Roadrunner drivers?

20   A    Yes.

21   Q    And isn't it also true that his response was that he would

22   need to look into that?

23   A    Yes.

24   Q    Do you recall having telephone conversations with Santos

25   after that first conversation with him?
```

Exhibit 1(f)
953



www.escribers.net | 800-257-0885

 1  A    Yes.

 2  Q    And during those conversations, you asked him about the

 3  possibility of the Union organizing Roadrunner, correct?

 4  A    Yes.

 5  Q    And during one of those calls, Santos told you that you

 6  needed to slow down the organizing talk, correct?

 7  A    Yes.

 8  Q    Now, isn't it also true that after Universal bought

 9  Roadrunner, you had conversations with other Roadrunner drivers

10  in which you all expressed concerns about Universal and

11  Roadrunner facilities combining?

12      MS. KAGEL:  Objection.  Confusing as to "concerns".

13      JUDGE ROSAS:  Do you understand the question, sir?

14      THE WITNESS:  Yes.

15      JUDGE ROSAS:  Okay.  Go ahead.

16  A    And that would be yes.

17  Q    BY MR. KUNTZ:  Yes, those conversations did occur?

18      MS. KAGEL:  Objection.  Asked and answered.

19      JUDGE ROSAS:  Sustained.

20  Q    BY MR. KUNTZ:  And isn't it true that those concerns arose

21  from the close proximity of those two facilities?

22  A    Yes.

23  Q    And you were concerned that if those facilities were

24  combined, layoffs would occur?

25  A    No.

Exhibit 1(f)
954



www.escribers.net  |  800-257-0885

1      MS. KAGEL:  Objection.  Foundation.

2      JUDGE ROSAS:  Overruled.

3      If you know.

4   Q   BY MR. KUNTZ:  I don't think we got your answer, Mr.

5   Gibson.

6   A   No.

7      MR. KUNTZ:  No further questions for the witness, Your

8   Honor.

9      JUDGE ROSAS:  Redirect?

10     MS. KAGEL:  No redirect, Your Honor.

11     MR. WOJCIECHOWSKI:  None from Charging Party.  Thank you.

12     JUDGE ROSAS:  Mr. Gibson, your testimony is complete for

13  today.  Please do not discuss your testimony with anyone.

14  Thank you very much for coming.  Have a good day.

15     THE WITNESS:  All right.

16     How do you log out?

17     JUDGE ROSAS:  Next witness.

18     MR. DO:  Your Honor, the General Counsel calls Mr. David

19  Johnson.  My understanding -- he's on the road and he's trying

20  to pull over.  That was my previous conversation with him.  So

21  we can go off the record and I'm going to get him connected.

22     JUDGE ROSAS:  Let's go off the record.

23  (Off the record at 2:46 p.m.)

24     JUDGE ROSAS:  We're on the record.

25     General Counsel, you call David Johnson; is that right?

Exhibit 1(f)
955



```
1          MR. DO:  Correct, Your Honor.

2          THE WITNESS:  Yes.

3          JUDGE ROSAS:  Okay.

4       Mr. Johnson, please raise your right hand.

5    Whereupon,
```

<div align="center">

**DAVID JOHNSON**

</div>

```
7    having been duly sworn, was called as a witness herein and was

8    examined and testified, telephonically as follows:

9          JUDGE ROSAS:  Okay.  State your name and provide us with

10   an address.

11         THE WITNESS:  David Johnson; and my address is ████████

12   ██████ Pahrump, Nevada.

13         JUDGE ROSAS:  Go ahead.

14         MR. DO:  Thank you, Your Honor.
```

<div align="center">

**DIRECT EXAMINATION**

</div>

```
16   Q    BY MR. DO:  Thank you for being here, Mr. Johnson.  In

17   2019, who did you work for?

18   A    I worked for Universal Intermodal.

19   Q    And when did you first begin working for Universal

20   Intermodal?

21   A    In May of 2019.

22   Q    And what did you do for Universal Intermodal?

23   A    I was a truck driver.

24   Q    And what did you do as a company truck driver?

25   A    I picked up freight and delivered freight.
```

Exhibit 1(f)
956



www.escribers.net | 800-257-0885

1    Q    Do you still currently work for Universal Intermodal?

2    A    No.

3    Q    And when did you stop working for Universal Intermodal?

4    A    December 2019.

5    Q    And why did you stop working for Universal Intermodal?

6    A    Universal claimed there was a freight shortage and they

7  had no work, but I believe it was in response to us winning the

8  Teamster (sic) Union election.

9    Q    And were you terminated or you were laid off?

10    A    Laid off.

11    Q    When you first start working -- started working for

12  Universal Intermodal, do you recall having to complete any kind

13  of paperwork?

14    A    Yes.

15    Q    What kind of paperwork did you complete?

16    A    Direct deposit form, safety forms, and I -- I signed a

17  paper that made it so I couldn't file a class action or any

18  legal action against Universal Intermodal.

19    Q    All right.  Let me show you what's been marked and

20  admitted as Joint Exhibit 3.  Do you see the document I'm

21  putting in front of you?

22    A    Yes.

23    Q    Is this the document that you're referring to?

24    A    Yes.

25    Q    And do you recognize that signature?

Exhibit 1(f)
957



www.escribers.net | 800-257-0885

1    A    Yes.

2    Q    Whose signature is that?

3    A    That's my signature.

4    Q    And so just to confirm, you -- you dated this document as

5    May 14, 2019.  Is that when you were --

6    A    Yes.

7    Q    -- completing your application for Universal?

8    A    Yes.

9    Q    Okay.  When you were being onboarded or about to start

10   working from Universal Intermodal, did you have to provide any

11   documents or copies of any document to Universal?

12   A    Yes.

13   Q    What were those documents?

14   A    My driver's license, my Social Security card, my motor --

15   my motor vehicle record, and my TWIC card, and my Social

16   Security card.

17   Q    Let me go back a bit because I forgot to ask you a few

18   questions about what's been -- that I showed you as Joint

19   Exhibit 3.  Who gave you that document?

20   A    Oh, the classic collective?  That was a gentleman in HR.

21   I can't remember his name.

22   Q    And what company did he work for?

23   A    Southern Counties Express.

24   Q    And did you -- what were you told about this document?

25   A    I wasn't told anything about the document.

Exhibit 1(f)
958



www.escribers.net | 800-257-0885

1    Q    Did you believe that you had to sign this document?

2    A    Yes.

3    Q    When you were working for Universal Intermodal, at what

4    facility did you work out of?

5    A    I worked at the Compton facility.

6    Q    Do you know the address of that facility?

7    A    Yes, it's 2013 -- 2035 East Vista Bella Way, Compton,

8    California, 90220.

9    Q    And can you describe the Compton facility for us?  What

10   was there?

11   A    It was an industrial area; mostly just a large, paved

12   parking lot, space for parking for the trucks and cars, and

13   office, and driver's lounge.

14   Q    And when you worked for Universal Intermodal, what days of

15   the week did you normally work?

16   A    I normally worked from Monday to Thursday.

17   Q    And what time of the -- from what time to what time?

18   A    From 5 p.m. to 3 a.m.; sometimes we would get overtime.

19   Q    And when you worked at Universal Intermodal, who was your

20   dispatcher?

21   A    Walter (phonetic throughout).

22   Q    Anyone else?

23   A    I can't recall his name, but there was a day shift

24   dispatch that we sometimes dealt with.

25   Q    And what company did Walter work for?

Exhibit 1(f)
959



www.escribers.net | 800-257-0885

1   A    Southern Counties Express.

2   Q    Let me ask you about a typical day at work at Universal

3   Intermodal.  Step by step, what was a typical day like?

4   A    So -- so step by step, we would come into the yard, we

5   would go into -- go into the office, clock in, get our pre-trip

6   papers, our post-trip pape -- our post-trip papers, get our

7   tablets for our assignments, and then go pre-trip the truck and

8   get our -- get our assignments to our tablets for where we're

9   going to pick up and deliver freight for the day, then we leave

10  the yard and do that.

11  Q    When you'd -- when you'd leave the yard, where will you

12  go?

13  A    We would go to either a storage yard if the container was

14  already loaded; if not, we would go to our other yard and pick

15  up a chassis and then get the container from the L.A. ports,

16  and then we would deliver the port -- the containers to the

17  customer.

18  Q    And what information would you be given about the

19  container that you have to deliver?

20  A    If it was from the port, we would get the SCAC code,

21  appointment number, appointment time window, container number,

22  and container location, as in which port the container's at.

23  Q    To the best of your recollection, did Universal Intermodal

24  have a unique SCAC code?

25  A    Yes.

Exhibit 1(f)
960



www.escribers.net | 800-257-0885

1    Q    And what was it?

2    A    I believe it was UISZ (phonetic).

3    Q    And then the Southern Counties Express have a unique SCAC

4    code?

5    A    Yes.

6    Q    And what was that?

7    A    I believe it was SCEZ (phonetic).

8    Q    When you were working for Universal Intermodal, did you

9    deliver loads using Southern Counties Express SCAC code?

10    A    Yeah, some of the time.

11    Q    And for the other times, who's SCAC code would you use?

12    A    Universal's.

13    Q    All right.  When we were working for Universal, who were

14    some customers that you would deliver to?

15    A    Kohl's, Converse, Macy's, Toyo Tires.  Hello?

16    Q    We can hear you.

17    A    Oh, okay.  Zoom closed because it over -- my app's in my

18    phone overheated so, but can we keep talking or?

19        MR. DO:  Your Honor, can we go off the record for a

20    moment?

21        JUDGE ROSAS:  Off the record.

22    (Off the record at 3:00 p.m.)

23        JUDGE ROSAS:  Go ahead, General Counsel.

24        MR. DO:  Thank you, Your Honor.

25                    **RESUMED DIRECT EXAMINATION**

Exhibit 1(f)
961



www.escribers.net | 800-257-0885

```
 1    Q    BY MR. DO:  Mr. Johnson, when you --

 2    A    Oh, why's it upside down?  Weird.  Go ahead.

 3    Q    Okay.  Okay.  Ready, Mr. Johnson?  When you worked for

 4   Universal Intermodal, you drove a white Universal Intermodal

 5   truck; isn't that right?

 6    A    Yes.

 7    Q    And who owned that truck?

 8    A    Universal Intermodal.

 9    Q    You know what a chassis is, right?

10    A    Yes.

11    Q    Universal Intermodal own -- have company-owned chassis,

12   right?

13    A    Yes.

14    Q    What did they look like?

15    A    Universal chassis were black and yellow.

16    Q    And then Southern Counties Express have company-owned

17   chassis, right?

18    A    Yes.

19    Q    And what did they look like?

20    A    They were black and pink.

21    Q    And where would you get the chassis you would use when you

22   make a delivery?

23    A    The chassis would be at the Compton yard and sometimes

24   at -- well, most of the times at the Del Amo in Santa Fe yard.

25    Q    And who -- who owned the Santa Fe Del Amo yard?
```

Exhibit 1(f)
962



www.escribers.net | 800-257-0885

1  A    Southern Counties Express.

2  Q    To the best of your recollection, were there Universal

3  Intermodal chassis at that location?

4  A    Yes.

5  Q    When you were driving -- you test -- you previously

6  testified that you would go and make deliveries using Southern

7  Counties Express SCAC code.  When you were making a delivery

8  using that SCAC code, were you required to use Southern

9  Counties Express chassis?

10  A    No, no.

11  Q    Before December of 2019 -- well, let me ask you this --

12  when you worked for Universal Intermodal, do you recall a Union

13  trying to organize the Universal em -- employees?

14  A    Do I re -- could you repeat that?

15  Q    Sure.  When you worked for Universal Intermodal, do you

16  recall a Union trying to organize the Universal employees?

17  A    Yes.

18  Q    And prior to the Union, on average, how many hours did you

19  do -- did you work a day?

20  A    Between 10 to 13.

21  Q    And before the Union, approximately how many deliveries

22  would you do a day?

23  A    Around two to four.

24  Q    Prior to the Union, how often would you deliver directly

25  to a client?

Exhibit 1(f)
963



1    A    The majority of the time.

2    Q    Okay.  What Union was trying to organize the Universal

3    Intermodal employees?

4    A    Teamsters 848.

5    Q    Did you support that campaign?

6    A    Yes.

7         MR. DO:  I'm going to mark for identification as GC-21.

8    **(General Counsel Exhibit Number 21 Marked for Identification)**

9    Q    BY MR. DO:  Mr. Johnson, do you see the document that I

10   just put in front of you?

11   A    Yes.

12   Q    Is this your name?

13   A    Yes.

14   Q    And then do you recognize the signature in the bottom

15   right?

16   A    Yes.

17   Q    Whose signature is that?

18   A    That's my signature.

19   Q    And it's dated November 2nd, 2019.  Is that on or about

20   the date that you signed this card?

21   A    Yes.

22        MR. DO:  Your Honor, I'm going to move for the admission

23   of GC Exhibit 21 into evidence.

24        JUDGE ROSAS:  Respondent?

25        MR. ADLONG:  No objection, Your Honor.

Exhibit 1(f)
964



www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  General Counsel's 21's received.

2    **(General Counsel Exhibit Number 21 Received into Evidence)**

3    Q    BY MR. DO:  To the best of your knowledge, when did you

4    first learn about the Union's campaign?

5    A    Late October.

6    Q    And other than signing the Union authorization card, did

7    you do anything else to show your support for the Union?

8    A    Yes.

9    Q    What did you do?

10   A    I attended the Union meetings at the Union hall, and I

11   wore the Union safety vest.

12   Q    Did you wear the Union vest while at work?

13   A    Yes.

14   Q    Did you see other employees wearing the vest while at

15   work?

16   A    Yes.

17   Q    You mentioned that you attended Union meetings.

18   Approximately how many did you attend?

19   A    Around five or six.

20   Q    And without naming anyone in particular, approximately how

21   many employees -- Universal employees -- did you see at those

22   meetings?

23   A    I recall seeing between 15 to 17.

24   Q    Do you know who Romel Mallard is?

25   A    Yes.

Exhibit 1(f)
965



1    Q    Who is he?

2    A    He's my former coworker.

3         MR. ADLONG:  Objection, Your Honor.  This is cumulative

4    with respect to Mallard, Ledesma.  They've testified; they put

5    on the record their Union activity; we've heard it from a bunch

6    of different employees.  At this point, I don't know what it --

7    what it -- purpose it serves.

8         JUDGE ROSAS:  What's different -- what's the difference

9    here, Counsel?

10        MR. DO:  That this -- you know, Mr. Johnson works on the

11   same shift as Mr. Mallard, Your Honor.

12        JUDGE ROSAS:  Okay.

13        All right.  You can answer that.  You work on the same

14   shift as he does -- or did?

15   A    Yes.  Yes.

16   Q    BY MR. DO: All right.  And did you know -- did Mr.

17   Mallard support the Union's campaign?

18   A    Yes, he did.

19   Q    And how do you know that?

20   A    I saw him at the Union hall meetings, and I saw him wear

21   the Teamsters Union safety vest.

22   Q    And to the best of your recollection, when did the Union

23   go public with its campaign?

24   A    Early November.

25   Q    And what did the Union do once it went public with its

Exhibit 1(f)
966



1    campaign?

2    A    They did the initial -- initial round of elections to --

3    so we could go for the main election.

4    Q    What do you mean by that?

5    A    And --

6    Q    Go ahead.

7    A    They needed the initial votes to see how interested

8    Universal employees were in becoming unionized, and we won the

9    majority vote, and we moved forward with the campaign.

10   Q    And once the Union went public with its -- with its

11   campaign, do you recall seeing Union official at your

12   workplace?

13   A    Yes.

14   Q    Where were they?

15   A    They were outside of the Universal Intermodal property at

16   the Compton facility.

17   Q    Once the Union began -- went public with its campaign, did

18   management do anything in response to that campaign?

19   A    Yes.

20   Q    And what did the company do?

21   A    They brought out several people from out of state and in

22   state Union -- Union busters, and they started having their own

23   meetings and making us attend those meetings to basically tell

24   us why we shouldn't be Un -- for Union or pro Union.

25   Q    To the best of your recollection, how many of these

Exhibit 1(f)
967



1    meetings that was the -- how many company-sponsored meeting

2    about the Union did you attend?

3    A    I would say one to two a week between early November and

4    early December, so around four or five.

5    Q    And who led these meetings?

6    A    Who ran them?

7    Q    Do you recall their names?

8    A    I believe his name was Kirk -- Kirk Cummings.

9    Q    And let me show you what's already been marked and

10   admitted as GC Exhibit 7.  Do you recognize this person?

11   A    Yes.

12   Q    Who is it?

13        MR. ADLONG:  Your Honor, we're going to object.  This is

14   cumulative.  What Mr. Cummings looks like makes absolutely no

15   difference to the decision --

16        JUDGE ROSAS:  I'll sustain that.

17        MR. ADLONG:  -- and to the events.

18        JUDGE ROSAS:  Next question.

19        MR. DO:  Sure, Your Honor.

20        JUDGE ROSAS:  If you need to come back to it for any

21   reason based on any issues of subsequent testimony, the -- you

22   can revisit it, but otherwise, we can move on.

23        MR. DO:  That's fine, Your Honor.

24   Q    BY MR. DO:  What did Kirk -- what did Kirk Cummings do for

25   Universal?



 1    A     I believe he did labor relations.

 2    Q     And when was the first time that you saw Mr. Cummings?

 3    A     Around November 11th, 2019.

 4    Q     And you mentioned that you attended meetings led by him.

 5    Who notified you of those meetings?

 6    A     Dispatch -- Walter.

 7    Q     And for the meetings that you attended, when Walter told

 8    you about the meetings, did he tell you that there were

 9    mandatory?

10    A     No.

11    Q     And did he -- did Walter ever tell you the consequences of

12    not attending the meetings?

13    A     No.

14    Q     Do you recall attending a meeting when an employee walked

15    out of the meeting?

16    A     Yes.

17    Q     So I'm going to ask you some specific question about that

18    meeting.  When did that meeting occur?

19    A     November 25th, 2019.

20    Q     And where was that meeting held?

21    A     At the Compton facility.

22    Q     And who attended that meeting?

23    A     Me, along with my former coworkers.

24    Q     Can you name some of them?

25    A     Sure, Romel Mallard, Todd, Albert (phonetic), Lincoln

Exhibit 1(f)
969



1   (phonetic), and Dontae (phonetic), and that's all I can recall

2   right now.

3   Q    And who was leading that meeting?

4   A    Kirk Cummings.

5   Q    And to the best of your recollection, what happened during

6   that meeting?

7   A    He was meeting a -- he had -- he was having a PowerPoint

8   presentation and his points were about why we should think

9   twice about becoming the Union members, and voting yes because

10  we may end up with less than what we have now, we may end up

11  with more, we may end up with the same, and be the same; why we

12  should study the Union bylaws before we become too gung ho

13  about it, and -- oh, go ahead.

14  Q    Go -- go ahead.  What happened?  Anything else happen?

15  A    Well -- yeah, so Romel interjected and he said, why

16  haven't we seen anybody from Universal show any concern for the

17  drivers until we decided to campaign to vote yes for the

18  Teamsters Union?  And then he stood up and pointed at certain

19  points that were on the PowerPoint and Kirk -- he said, just

20  sit down, calm down, and let me lead my meeting, this is my

21  meeting, let me speak, you know, you can speak after I'm done.

22  And they got into a verbal altercation and Romel -- well, why,

23  I can't speak -- I can't even speak.  And then he said, okay,

24  well, I'll just leave.  And he walked out.

25  Q    And during the exchange between Mallard and Cummings, did

Exhibit 1(f)
970



1    the two yell at each other?

2    A    No.

3    Q    And during the exchange between Mallard and Cummings, was

4    either person physically aggressive toward the other?

5    A    No.

6    Q    During the exchange between Mallard and Cummings, did Mr.

7    Mallard curse at the presenter?

8    A    No.

9    Q    Following that -- that meeting -- after Mr. Mallard left,

10    how long did that meeting last?

11    A    The meeting lasted about ten more minutes.

12    Q    And then at the end of that meeting, did anything else

13    happen?

14    A    Me and my former coworkers walked out.  And once we were

15    outside on the steps, a gentleman who worked for Southern

16    Counties or -- no, I believe Universal Intermodal, told us that

17    we need to fill out our pre-trip sheets and he has an onsite

18    mechanic and all of our issues and complaints and concerns

19    about the trucks' safety and mechanical issues will be

20    addressed as soon as possible and to just keep filling out or

21    pre- and post-trip forms.

22    Q    Do you know that -- do you remember the name of this

23    person?

24    A    I believe his name was Michael Vagts.

25    Q    The -- we -- we -- once the Union started its campaign, do

Exhibit 1(f)
971



1    you recall seeing a new manager at the Compton facility?

2    A    Can you repeat that?

3    Q    Sure.  Once the Union went public with its campaign, do

4    you recall a new manager at the facility?

5    A    I don't recall.

6    Q    Okay.  Do you remember what was the job title of the

7    person who spoke to you after the -- at the end of Mr.

8    Cummings' meeting?

9    A    I believe he was a manager.

10   Q    Okay.  In the past, when drivers had issue with their

11   truck, how would they report those issues?

12   A    With pre- and post-trip forms.

13   Q    And what would happen after those com -- complaints were

14   made?

15   A    The trucks wouldn't be repaired and sometimes they would

16   come and repair them, but they would just leave them at the

17   Universal Fontana facility.  They wouldn't return the trucks.

18   Q    This manager that you testified about, who spoke to the

19   employees after Mr. Cummings' meeting, have you seen him

20   prior -- have you ever seen him before, prior to the Union?

21   A    No.

22   Q    Do you recall a Union election occurring on or around

23   December 4, 2019?

24   A    Yes.

25   Q    Do you know -- do you know the outcome of that election?

Exhibit 1(f)
972



1    A    Yes.

2    Q    What was the outcome?

3    A    We won the Union vote and we became Teamsters 848 members.

4    Q    And after the election, did the amount of work you were

5    being assigned change in any way?

6    A    Yes.

7    Q    How did it change?

8    A    We received much less work for the -- for our nightshift.

9    Q    So let me ask you something specific.  After the Union

10   election, approximately how many hours of work were you being

11   assigned a day?

12   A    After the election, we worked from anywhere between six to

13   eight hours on average.

14   Q    After the Union election, how many loads were you being

15   assigned each day?

16   A    After the election, we would make between one to three

17   deliveries a day.

18   Q    And did you cont -- after the Union election, did you

19   deliver to clients?

20   A    Yes.

21   Q    Okay.  And after the election, did you deliver to storage

22   yard?

23   A    Yes.

24   Q    And which storage yard would you deliver to?

25   A    The Franco (phonetic) storage yard.

Exhibit 1(f)
973



www.escribers.net | 800-257-0885

1   Q    Prior to the Union election, had you delivered to that

2   yard before?

3   A    No.

4   Q    And where is the Franco storage yard located?

5   A    I do not recall.

6   Q    Okay.  Did you notice -- other than the change to the

7   number of loads and the number of hours you were being

8   assigned, were there any other changes to your workplace after

9   the Union election?

10  A    Could you be more specific?

11  Q    Sure.  Was there any change to the -- the physical

12  facility at the Compton facility?

13  A    Oh.  Yes.  There are a lot less containers and chassis in

14  the -- in the yard for -- specifically for company routes.

15       MR. DO:  I'm going to mark for identification what is

16  being identified as -- or marked as General Counsel Exhibit 22.

17  Q    BY MR. DO:  Do you see what I'm showing you, Mr. Johnson?

18  A    Yes.

19  Q    What is this?

20  A    That is the holiday work schedule.

21  Q    And what holi -- what year -- what year is this referring

22  to?

23  A    Could you repeat that?

24  Q    Sure.  So on the top, it says "December Holiday Work

25  Schedule."  For what year?

Exhibit 1(f)
974



www.escribers.net | 800-257-0885

1    A    2019.

2    Q    And did you ever see this document?

3    A    Yes.

4    Q    Where was it posted?

5    A    It was posted in the -- in the -- where we check in at in

6    the office.

7    Q    Okay.  And were you ever given this document?

8    A    Yes, I was mailed -- I was mailed it.

9    Q    Were -- were you told -- did anyone tell you about why

10   there was a change in the -- the work schedule?

11        MR. ADLONG:  Objection, lack of foundation.

12        JUDGE ROSAS:  Sustained, no question.

13        MR. DO:  Okay.  Sure, Your Honor.

14   Q    BY MR. DO:  Did anybody ever tell you anything about this

15   document?

16   A    Yeah, that's the -- that's the --

17        MR. ADLONG:  Objection, calls for hearsay.

18        JUDGE ROSAS:  Sustained.  Sustained.  Establish more

19   foundation.

20        MR. DO:  Sure.  Thank you, Your Honor.

21        THE WITNESS:  Walter had told me that --

22   Q    BY MR. DO:  Who gave you this doc -- yeah.

23        JUDGE ROSAS:  There's no question, sir.  No question at

24   the moment.

25        THE WITNESS:  Yeah.  Walt -- Walter told me --

Exhibit 1(f)
975



1       MR. DO:  Wait.  Hold on.  Hold on, Mr. Johnson.

2       JUDGE ROSAS:  No question.

3       MR. DO:  Thank you, Mr. Johnson.

4   Q   BY MR. DO:  Who gave you this document?

5   A   Walter.

6   Q   And that's your dispatcher, correct?

7   A   Yes.

8   Q   When Walter gave you the document, did he tell you

9  anything about the document?

10      MR. ADLONG:  Objection, vague as to time.

11      JUDGE ROSAS:  I'll allow it.  You can probe on cross.

12      You can answer.

13      THE WITNESS:  Yeah, he said work was slowing down.  He was

14  told to give us this -- he was told to give this document and

15  he doesn't have any specific details.

16   Q   BY MR. DO:  And when did you get this document, to the

17  best of your recollection?

18   A   To the best of my recollection, around December -- on or

19  around December 10th.

20   Q   Based on this calendar, were you expecting to work the

21  week of December 23rd?

22   A   Could you repeat that?

23   Q   Sure.  Based on this document, when Walter gave it to you,

24  were you expecting to work on the week beginning on December

25  23rd?  Here, let me zoom in for you.

Exhibit 1(f)
976



www.escribers.net | 800-257-0885

1    A    Hold on.  He -- you're kind of breaking up.  Hold on.

2    Turning the volume up.  Hello?

3         MR. DO:  Your Honor, may we go off the record?  Hold on,

4    Your Honor.

5         THE WITNESS:  All right.

6         JUDGE ROSAS:  Are you back on?

7         THE WITNESS:  Could you repeat that?

8         JUDGE ROSAS:  Go ahead.

9         MR. DO:  Okay.

10   Q    BY MR. DO:  Sure.  Based on this calendar that you

11   received from Walter, were you expecting to -- to go to work on

12   Decem -- the week of December 23rd?

13   A    No.

14   Q    And on -- so on this calendar, it indicate night drivers

15   who work dayshifts, starting time 6 a.m.  Do you see that?

16   A    Yes.

17   Q    What did that mean?

18        MR. ADLONG:  Objection, calls for speculation, lacks

19   foundation, (indiscernible, simultaneous speech).

20        JUDGE ROSAS:  Hold on a second.  So General Counsel's 22

21   is marked for identification but it's not in evidence.

22        MR. DO:  I -- I can move it into evidence, Your Honor.

23        JUDGE ROSAS:  Okay.  Any objection, voir dire?

24        MR. ADLONG:  No objection.

25        JUDGE ROSAS:  General Counsel's 22 is received.

Exhibit 1(f)
977



www.escribers.net | 800-257-0885

1    **(General Counsel Exhibit Number 22 Received into Evidence)**

2        JUDGE ROSAS:  All right.  What's the question?

3        What's the question?

4        MS. KAGEL:  Your Honor, I believe Mr. Do's screen is

5    frozen.  Hold on.

6        JUDGE ROSAS:  Off the record.

7    (Off the record at 3:34 p.m.)

8        JUDGE ROSAS:  There goes Mr. Johnson.  You see it?  Okay.

9    All right.  Back on the record.  Next question.

10       MR. DO:  Thank you, Your Honor.

11                  **RESUMED DIRECT EXAMINATION**

12   Q    BY MR. DO:  You're a night -- you're a night driver at the

13   Compton facility, right, Mr. Johnson?

14   A    Yes.

15   Q    At the time that you received this calendar, did you have

16   any reason to believe that layoff was possible?

17   A    No.

18   Q    Pri -- prior to December 4, were you ever told that --

19       MR. DO:  Strike that.  Your -- I'm going to show to the

20   witness what is already marked and admitted as -- as Joint

21   Exhibit 6(a).

22       MS. KAGEL:  Give me one moment.  It's up.

23       MR. DO:  Thank you, Molly -- thank you, Ms. Kagel.

24   Q    BY MR. DO:  Mr. Johnson, do you recognize this?

25   A    Yes.

Exhibit 1(f)
978



www.escribers.net | 800-257-0885

1    Q    And do you recall seeing this document?

2    A    Yes.

3    Q    Where was it posted?

4    A    In the office, next to where we check in at.

5    Q    And approximately, to the best of your recollection, when

6    was it posted?

7    A    It was posted in early December.

8    Q    Other than this posting, do you recall -- did you attend

9    any kind of meeting to discuss the Compton lease?

10   A    Yes.

11   Q    To the best of your recollect -- recollection, when did

12   that meeting occur?

13   A    That meeting -- early December.

14   Q    And what was said about -- who led this meeting?

15   A    Can you repeat that?

16   Q    Sure.  Who led that meeting?

17   A    It was Walter and the dayshift dispatch.  I don't remember

18   his name.

19   Q    And what did they tell you about the Compton lease?

20   A    They told us that the lease was expiring, they don't know

21   where they're going to house the Compton drivers, it could be

22   the yard on Santa Fe and Del Amo, it could be the Alameda

23   facility, Southern Counties yard, or it could be a new -- whole

24   other building, just sit tight and as soon as they get more

25   info, they'll gi -- be giving it to us as drivers.

Exhibit 1(f)
979



www.escribers.net | 800-257-0885

1    Q    During this meeting, was layoff mentioned?

2    A    No.

3    Q    How did you learn about your layoff?

4    A    I learned about my layoff in the way -- package I got

5    through the mail.

6    Q    All right.

7         MR. DO:  Can we put on screen what's been marked and

8    already admitted at Joint Exhibit 6(b)?

9    Q    BY MR. DO:  Mr. Johnson, do you --

10        MR. DO:  Go -- thank you.

11   Q    BY MR. DO:  Mr. Johnson, do you recognize this document?

12   A    Yes.

13   Q    What is it?

14   A    That is our layoff letter.

15   Q    And when did you receive it?

16   A    I received it and I saw it first on December 27th, 2019.

17   Q    And prior to getting your -- prior to receiving this

18   letter, were you ever told that the Compton employees would

19   potentially be laid off?

20   A    No.

21   Q    In this letter, it refers to an individual by the name of

22   Michael Vagts.  Do you know who that is?

23   A    Yes.

24   Q    And who is he?

25   A    He's the operations manager for Universal Intermodal.

Exhibit 1(f)
980



```
 1    Q    Other -- around the same time when you received your
 2    layoff notice, do you recall receiving any other documents from
 3    Universal?
 4    A    Yes.
 5    Q    What did you receive?
 6    A    A holiday calendar.
 7    Q    Was anything else included with the holiday calendar?
 8    A    No.
 9    Q    Okay.
10         MR. DO:  Let me mark for -- I'm sorry, not mark for
11    identification.  It's already been marked and admitted at
12    GC-23.
13         MS. KAGEL:  It's up.
14         MR. ADLONG:  Your Honor, we're going to object as to
15    cumulative.
16         MR. DO:  So Your -- Your Honor, I can't see you.  So I
17    don't know if you acknowledged the objection.
18         JUDGE ROSAS:  I'm considering at the moment.  Hold on.
19         MR. DO:  I see.  Thank you, Your Honor.
20         JUDGE ROSAS:  What -- do you recall receiving this, sir?
21         THE WITNESS:  Yes.
22         JUDGE ROSAS:  And do you recall when you received it?
23         THE WITNESS:  Yes.
24         JUDGE ROSAS:  Okay.  When was that?
25         THE WITNESS:  December 27th, 2019.
```

Exhibit 1(f)
981



www.escribers.net | 800-257-0885

1        JUDGE ROSAS:  Okay.

2        Next question.

3        MR. DO:  Thank you, Your Honor.

4    Q    BY MR. DO:  Following your layoff, do you recall Universal

5    Intermodal trying to hire new company drivers?

6    A    Yes.

7        MR. DO:  Can we please put on the screen what's already

8    been marked and admitted as Joint -- General Counsel's 16,

9    please?

10        Ms. Kagel, can you just scroll the three page of that

11    document?

12    Q    BY MR. DO:  Mr. Johnson, do you recognize these webpages?

13    A    Yes.

14    Q    And what are they?

15    A    They're Craigslist ads for Universal Intermodal, looking

16    for Class A driver.

17    Q    And when did you see these ads?

18    A    I saw them in December of 2019.

19    Q    Did you see them before or after your layoff?

20    A    After my layoff.

21    Q    Are these an accurate representation of the posting that

22    you saw when you looked up -- that you saw?

23    A    Yes.

24    Q    Are you aware that Universal Intermodal had a facility at

25    550 South Alameda Street?

Exhibit 1(f)
982



www.escribers.net | 800-257-0885

1        MR. ADLONG:  Your Honor, I'm going to object.  It assumes

2   facts not in evidence.  This right here is an advertisement for

3   Universal Logistics, and it asks for Universal Dedicated of

4   Arlington.  There's nothing to establish that we have a

5   facility in Alameda or that Uni -- or that it's Universal

6   Intermodals.

7        MR. DO:  Your Honor, if (indiscernible, simultaneous

8   speech).

9        JUDGE ROSAS:  You can probe about that.  Overruled.

10       Answer the question.

11   Q    BY MR. DO:  Again, Mr. Johnson, are you aware that

12   Univer -- at the time that you saw these posting, were you

13   aware that Universal had a facility located at 550 South

14   Alameda Street?

15   A    No.

16   Q    When you saw these po -- well, at the time of your layoff,

17   did you have a Class A commercial drivers' license?

18   A    Yes.

19   Q    At the time of your layoff, were you beginning and ending

20   your day in Compton, California?

21   A    Yes.

22   Q    After your layoff, were you ever offered -- you know,

23   offered recall or rehired?

24   A    No.

25   Q    Following your layoff, did any employees of the -- view of

Exhibit 1(f)
983



1    the Union change?

2    A    Could you repeat that?

3         MR. ADLONG:  Objection, Your Honor.  Objection, relevance.

4         JUDGE ROSAS:  Repeat that question, following his layoff?

5         MR. DO:  Yes, following his layoff, is he aware of any

6    employees' view of the Union changing.

7         JUDGE ROSAS:  Is he aware of any employees' what?

8         MR. DO:  View toward the Union changing.

9         MR. ADLONG:  Objection.

10        JUDGE ROSAS:  I'm sorry.  State the entire sentence.

11        MR. DO:  Sure, Your Honor.  Following your layoff, are you

12   aware of any employees' view of the Union changing.

13        MR. ADLONG:  Objec --

14        JUDGE ROSAS:  I'm going to sustain that.

15        MR. DO:  Okay.

16        MR. ADLONG:  Can we move to strike his response, Your

17   Honor.

18        JUDGE ROSAS:  Stricken.

19        MR. DO:  Can I mark for identification GC Exhibit 17?  I'm

20   sorry.  That's not 17.  Give me one moment.  GC Exhibit 28.

21        **(General Counsel Exhibit Number 28 Marked for Identification)**

22        MS. KAGEL:  Sorry.  It's up.

23   Q    BY MR. DO:  Do you recognize this picture, Mr. Johnson?

24   A    Yes.

25   Q    Who took this screenshot?

Exhibit 1(f)
984



1    A    I did.

2    Q    What -- what is this a screenshop -- a screenshot of?

3    A    It's a screenshot of the Universal Teamsters website group

4    chat.

5         MR. DO:  Your Honor, I'm going to move for the admission

6    of GC-28 into evidence.

7         MR. ADLONG:  Well, Your Honor --

8         JUDGE ROSAS:  Voir dire?

9         MR. ADLONG:  Yeah.

10                      **VOIR DIRE EXAMINATION**

11   Q    BY MR. ADLONG:  Mr. Johnson, did you say you took this

12   picture?

13   A    Yes.

14   Q    And this is just communications between mem -- between

15   employee drivers that work for Universal?

16   A    Yes.

17   Q    Do you know on what date these messages were -- okay.  One

18   here says December 25th.  Before that, do you know what date

19   those messages were exchanged?

20   A    Could you repeat that?

21   Q    So do you see at the bottom of the picture, it says

22   December 25, 2019?

23   A    Yes.

24   Q    Do you know what date the messages above are from?

25   A    I do not recall.

Exhibit 1(f)
985



www.escribers.net | 800-257-0885

1   Q    Okay.

2       MR. ADLONG:  Your Honor, we're going to move to -- we're

3   going to object on the basis of relevance.  We're not sure -- I

4   mean, these are communications after the layoff.  They don't go

5   to any of the complaint allegations.  And there's redacted

6   phone numbers too.

7       THE WITNESS:  I can confirm that they were asking about --

8       JUDGE ROSAS:  Hold -- hold on, sir.  There's no

9   question -- there's no question pending to you.

10      Can you scroll down to the end of the document?

11      MR. ADLONG:  And on top of it, it's hearsay.  It's -- it's

12  just communications between drivers.

13      JUDGE ROSAS:  Hold -- hold on.

14      Who -- who -- who's the author of what in this document?

15  Are -- are there any entries by you on this chat?

16      THE WITNESS:  No.

17      JUDGE ROSAS:  No?  Okay.  Do you know who made entries on

18  this chat?

19      THE WITNESS:  Yes.

20      JUDGE ROSAS:  Who?

21      THE WITNESS:  It was Miguel -- Miguel from the Teamsters

22  Union, Miguel Cubillos and a gentleman named Jose.

23      JUDGE ROSAS:  Is Jose from the Union or is he an employee?

24      THE WITNESS:  He was an employee.

25      JUDGE ROSAS:  So which posts are by Miguel and which posts

Exhibit 1(f)
986



1    are by Jose?

2        THE WITNESS:  The 626 post is by Jose.  And then the 619

3    removal action is by Miguel.

4        JUDGE ROSAS:  Can you scroll down once more?

5        Do you know who 310 is?

6        THE WITNESS:  I believe that's Todd.

7        JUDGE ROSAS:  General Counsel, what's -- what's the

8    relevance of this exchange?

9        MR. DO:  Your Honor, again, it's to show the effects of

10   the layoff on these employees.

11       MR. ADLONG:  Your Honor, that -- it's irrelevant to the

12   analysis regarding any of the complaint allegations.  We've had

13   this objection sustained before.

14       JUDGE ROSAS:  Hold -- hold on one second.  Can you scroll

15   down to the rest of it again?  Is that the bot -- that -- is

16   that the end of it?

17       MS. KAGEL:  Yes -- yes, Your Honor.

18       JUDGE ROSAS:  All right.  Let -- let me go off the record

19   for a minute.

20   (Off the record at 3:54 p.m.)

21       JUDGE ROSAS:  All right.  So -- so General Counsel, what's

22   the -- what's the probative value of General Counsel's 28?

23   What's it being offered for?

24       MR. DO:  Thank you, Your Honor.  General Counsel 28 shows

25   the chilling effect of the Respondent's conduct on the Union's

Exhibit 1(f)
987



1    organizing campaign.

2        JUDGE ROSAS:  Okay.  I -- I think at this juncture, it --

3    it's clear that it -- it -- it's not relevant to my

4    determination on the merits of the charges that are alleged in

5    this case.  So I'm going to sustain the objection.  General

6    Counsel's 28 for identification is going to be put into the

7    rejected exhibit folder.

8    **(General Counsel Exhibit Number 28 Rejected)**

9        JUDGE ROSAS:  Okay.  Next question.

10                    <u>RESUMED DIRECT EXAMINATION</u>

11   Q    BY MR. DO:  Mr. Johnson, when you were hired to work for

12   Universal Intermodal, were you required to maintain a valid

13   commercials drivers' license?

14   A    Yes.

15   Q    Were you required to maintain a California commercials

16   drivers' license?

17   A    No.

18   Q    Did anybody ever tell you that you had to maintain a

19   California's drivers' license?

20   A    No.

21   Q    Prior to the Union's campaign, are you aware of any

22   employee who has been terminated or disciplined for not

23   maintaining a California commercials drivers' license?

24   A    Could you repeat that?

25   Q    Sure.  Prior to the Union's campaign, are you aware of any

Exhibit 1(f)
988



1    employee who has ever been disciplined or terminated for

2    failing to maintain a California commercial drivers' license?

3    A    No.

4        MR. DO:  No further questions, Your Honor.

5        JUDGE ROSAS:  Charging Party?

6        MR. WOJCIECHOWSKI:  No questions, thank you.

7        JUDGE ROSAS:  Any Jencks?

8        MR. DO:  Yes, Your Honor.  Give me one moment.  So there

9    is two affidavits and the total length of which is -- one

10   affidavit is nine pages long and the other is four pages long.

11   And there are exhibits in that second affidavit but that's

12   already been presented on the record.

13       JUDGE ROSAS:  How much time you guys need?

14       MR. ADLONG:  You want to give us 15.  If we're done before

15   that, we'll come back?

16       JUDGE ROSAS:  Sounds good.  Off the record.

17   (Off the record at 3:59 p.m.)

18       JUDGE ROSAS:  Okay.  Respondent, cross-examination.

19                      **CROSS-EXAMINATION**

20   Q    BY MR. ADLONG:  Mr. Johnson, my name's Daniel Adlong.  I'm

21   Counsel for the Respondent.  I'm going to be asking you some

22   questions.  You know, traditionally, when you ask --

23   A    Hello?

24   Q    Traditionally, when you ask -- when we have

25   conversations -- can you just make sure to give me verbal

Exhibit 1(f)
989



www.escribers.net | 800-257-0885

 1    responses every time I ask you a question, please?

 2    A    Could you repeat that?

 3    Q    Can you please make sure to give me verbal responses every

 4    time I ask you a question, please?

 5    A    Yes.

 6    Q    And even though you might know what my question is, can

 7    you please wait until I finish before you answer?

 8    A    Sure, yes.  Hello?

 9    Q    Your video's off, Mr. Johnson.

10    A    It says safe driving mode.  I don't know if somebody

11    turned that off.  Hello?

12    Q    Hey.  So Mr. Johnson, you started working for Universal

13    Intermodal in May 2019, right?

14    A    Yes.

15    Q    And at that point, the dispatcher you worked with was

16    Walter, correct?

17    A    Yes.

18    Q    And Walter was a Southern Counties Express employee

19    dispatcher, correct?

20    A    Yes.

21    Q    And you're familiar with SCAC codes, right?

22    A    Yes.

23    Q    And you usually would use a Southern Counties Express SCAC

24    code, correct?

25    A    No.

Exhibit 1(f)
990



www.escribers.net | 800-257-0885

1    Q    What would you usually use?

2    A    I'd say half the time I used Universal, half the time I

3    used Southern Counties.

4    Q    And those were the two SCAC codes that you would use?

5    A    Yes.

6    Q    Okay.  Now, when referring to the meetings, you called

7    some individuals union busters.

8    A    Well --

9    Q    Did they introduce them -- you called -- some of the

10    individuals during the company meetings about unionization, you

11    called them union busters.  Where did you learn that term?

12    A    From coworkers and union members.

13    Q    Okay.  So the -- the -- the individuals didn't say, hey,

14    I'm a union buster and I'm here to talk to you, right?

15    A    No.

16    Q    Now, Mr. Johnson, you don't know what the company policy

17    is exactly regarding the required licenses to drive, correct?

18    A    No.

19    Q    No, you don't know what it is?  Or no, that's incorrect?

20    A    I do know what it is.

21    Q    You do know what it is?

22    A    Yes.

23    Q    What's the policy?

24    A    A valid Class A commercial drivers' license when I

25    applied.

Exhibit 1(f)
991



www.escribers.net | 800-257-0885

1    Q    Okay.  I didn't hear the last thing you said.  Could you

2    repeat it, please?

3    A    When I applied, the application just said a valid Class A

4    commercial drivers' license.

5    Q    Okay.  And other than reading the application, you never

6    reviewed the company's policies specifically with respect to

7    licenses, correct?

8    A    I went over the company policy, yes.

9    Q    Regarding licenses?

10   A    Yeah, I read the handbook.

11   Q    Okay.

12   A    From to back cover.

13   Q    What are the company -- okay.  What did it say?

14   A    A valid Class A drivers' license from what I recall.

15   Q    Okay.

16   A    Yeah.

17   Q    Okay.  So other than that, you don't remember anything

18   else specifically?

19   A    No.

20   Q    Okay.

21        MR. ADLONG:  Now, Ms. Bridge, can you please pull up

22   General Counsel's Exhibit 16, I think it is.

23   Q    BY MR. ADLONG:  So Mr. Johnson, you recognize this

24   document.  That's what you testified to, correct?

25   A    When you say document, you mean this Craigslist page?

Exhibit 1(f)
992



1   Q   Yeah.

2   A   Yes.

3   Q   But you didn't take this photo, did you?

4   A   I did take that photo.

5   Q   You did?

6   A   Yes.

7   Q   Did -- and this is -- okay.  Mr. --

8       MR. ADLONG:  Ms. -- Ms. Bridge --

9   Q   BY MR. ADLONG:  Okay.  Let me just ask you this.  Mr.

10  Johnson --

11      MR. DO:  Mr. Adlong --

12  Q   BY MR. ADLONG:  Mr. -- Mr. Johnson, you don't know what's

13  at --

14  A   What?

15  Q   You're not familiar with any facility at 550 South Alameda

16  Street in Compton, right?

17  A   No.

18  Q   Are you familiar with the -- with the location at 550

19  South Alameda Street in Compton?

20  A   No.

21  Q   Do you know Leonard Olson?

22  A   Could you repeat that?

23  Q   Do you know who Leonard Olson is?

24  A   Leonard -- could you repeat that again?

25  Q   Do you know who Leonard Olson is, the individual

Exhibit 1(f)
993



1    identified on the -- on the Craigslist ad?

2    A    No.

3    Q    Do you know who Kyle Dwyer is, individual in -- identified

4    on the Craigslist ad?

5    A    No.

6    Q    Do you know who Brooke Hartwell is, the individual

7    identified on the Craigslist ad?

8    A    Yes.

9    Q    Who is she?

10   A    She's a recruiter and she dealt with my onboarding, onto

11   Universal Intermodal when I applied.

12   Q    Okay.  And then when you applied, did you -- you didn't

13   apply for this Universal -- Universal Logistics position, did

14   you?

15   A    It just said local Class A drivers, same as this

16   (indiscernible).

17   Q    Okay.  You did not apply for this position identified in

18   this Craigslist ad, correct?

19   A    Correct.  This was long after I had quit working for

20   Universal.

21   Q    And you've never worked for Universal Dedicated of

22   Arlington, correct?

23   A    No.

24   Q    Correct or incorrect, Mr. Do -- Mr. Johnson?

25        JUDGE ROSAS:  He said no.

Exhibit 1(f)
994



1        THE WITNESS:  Can you repeat that?

2        JUDGE ROSAS:  Next question.  He said no.

3        MR. ADLONG:  All right.  No further questions for this

4    witness.

5        MR. DO:  No redirect, Your Honor.

6        MR. WOJCIECHOWSKI:  Nor from the Charging Party.

7        JUDGE ROSAS:  Mr. Johnson, that ends our chapter with you

8    for today.  Thank you for taking the time to stop along the

9    road there and testify.  Please don't discuss your testimony

10   with anyone until you're told by the -- by Counsel that the --

11   that the case is over.  All right?

12       THE WITNESS:  Okay.  Understood.

13       JUDGE ROSAS:  Thank you.  Have a good day.

14       MR. DO:  Thank you.

15       THE WITNESS:  All right.  So I press leave now?

16       JUDGE ROSAS:  Yes.  Thank you.

17       THE WITNESS:  All right.  Thank you.  Have a good one.

18       JUDGE ROSAS:  Next witness.

19       MS. KAGEL:  Yes, Your Honor.  It should be Kevin Poullard.

20   I -- we might need one minute just to get him the waiting room

21   but --

22       JUDGE ROSAS:  Off the record.

23   (Off the record at 4:28 p.m.)

24       JUDGE ROSAS:  General Counsel.

25       MR. KUNTZ:  Your Honor, briefly, it appears that the name

Exhibit 1(f)
995


www.escribers.net | 800-257-0885

1    attributed to the witness is Union representative.

2        JUDGE ROSAS:  Correct.  It's got to be changed.

3        MS. BRIDGE:  I'm changing it now.

4        JUDGE ROSAS:  Thank you, Ms. Bridge.

5        Okay.  Go ahead.

6        MS. KAGEL:  Your Honor, I believe you have to swear him

7    in.

8    Whereupon,

9                          **KEVIN POULLARD**

10   having been duly sworn, was called as a witness herein and was

11   examined and testified, telephonically as follows:

12       JUDGE ROSAS:  All right.  State your name and your address

13   for the record.

14       THE WITNESS:  Kevin Poullard, ████████████████

15   ██████████, Beaumont, California.

16       JUDGE ROSAS:  Go ahead.

17                      **DIRECT EXAMINATION**

18   Q    BY MS. KAGEL:  Mr. Poullard, thank you for being here.  In

19   2019, did you work for Universal Intermodal?

20   A    Yes, I did.

21   Q    What was your job when you worked for Universal

22   Intermodal?

23   A    I was an Intermodal driver.

24   Q    What facility did you work out of when you worked for

25   Universal Intermodal?

Exhibit 1(f)
996



1   A    I picked up my truck in Fontana, but I was dispatched out

2   of Compton.

3   Q    And when you worked there, did any union try to organize

4   the Universal Intermodal drivers?

5   A    Yes.

6   Q    Which union?

7   A    Teamsters.

8   Q    I'm going to show you what's been marked as GC Exhibit 9.

9   Can you see that document?

10  A    No, I can't.

11  Q    You don't see the document there that I've shared?

12  A    Yes, I see it now.

13  Q    Okay.  In the middle there --

14  A    Yes, I see it.

15  Q    -- is that your name?

16  A    Yes, it is.

17  Q    And that signature at the bottom, do you recognize it?

18  A    Yes, I do.

19  Q    And whose signature is it?

20  A    Mine.

21  Q    And did you sign this card on or around the date shown

22  there, November 3rd, 2019?

23  A    Yes, I did.

24       MS. KAGEL:  Your Honor, I move to admit GC Exhibit 9 into

25  the record.

Exhibit 1(f)
997



1       MR. KUNTZ:  No objection, Your Honor.

2       JUDGE ROSAS:  General Counsel's 9 is received.

3   **(General Counsel Exhibit Number 9 Received into Evidence)**

4   Q    BY MS. KAGEL:  Mr. Poullard, in October 2019, did you have

5   any issues with your license?

6   A    Yes, I did.

7   Q    What issues?

8   A    Child support.

9   Q    Could you work?

10  A    No.

11  Q    Why not?

12  A    Because I license was suspended.

13  Q    How long was you license suspended?

14  A    Approximately two weeks.

15  Q    When did you return to work?

16  A    I don't recall the exact date.

17  Q    When you returned to work, did anyone from management ever

18  talk to you about the Union?

19      JUDGE ROSAS:  Off -- off the record.

20  (Off the record at 4:33 p.m.)

21      JUDGE ROSAS:  Back on.

22                  **RESUMED DIRECT EXAMINATION**

23  Q    BY MS. KAGEL:  Mr. Poullard, when you returned to work,

24  did anyone from management ever talk to you about the Union?

25  A    Yes.

Exhibit 1(f)
998



1   Q     Who?

2   A     I don't -- I don't remember his name.

3   Q     Do you remember what he looked like?

4   A     Yes, I do.

5   Q     What did he look like?

6   A     He was a tall, Caucasian male.

7   Q     Was he a coworker?

8   A     I don't exactly know what his position was.  But no, he

9   wasn't a coworker.

10   Q     Did he say if he was from Universal?

11   A     He did.

12   Q     What did he say?

13   A     He said -- he asked me -- I mean, he told me that they

14   were -- he was there for Universal and that he -- that he

15   wanted to speak with (audio interference).

16   Q     Before we lost you, Mr. Poullard, you said that he was

17   there from Universal and he was there to speak, and then we

18   lost you.

19   A     Yeah, he asked me if I -- if I had a second to attend the

20   meeting.  And I told him no.  And he asked me, did -- was I

21   aware of the Union.  And I told him -- I mean, he asked me how

22   did I feel about the Union.  I told him -- I asked him how

23   (audio interference) about the Union.  And he said that he had

24   (audio interference) and I didn't know, you know, much about

25   the Union so I really couldn't comment on that.

Exhibit 1(f)
999



www.escribers.net | 800-257-0885

1    Q    When he asked you if you were aware of the Union, what did

2    you say?

3    A    I told him (audio interference).

4    Q    You told him no?

5    A    Yes.

6    Q    When you returned to work after you license was suspended,

7    was it November?  (Audio interference).

8         Mr. Poullard, when your license was suspended when you

9    returned to work, was it in November?

10   A    Yes.

11   Q    And where were you when you spoke to this man?

12   A    I was in the lobby of Universal (audio interference).

13   Q    Mr. Poullard?

14   A    Yes.

15   Q    Okay.  You said this was in the lobby.  At what facility?

16   A    Fontana.

17   Q    And when you declined to attend the meeting, were you ever

18   disciplined for not attending the meeting?

19   A    No, I wasn't.

20   Q    Did you work the next day?  (Audio interference).

21        Did you work the next day, after this man spoke to you?

22   A    Yes, I did.

23   Q    Do you know Miguel Cubillos?

24   A    Yes, I do.

25   Q    Who is he?

Exhibit 1(f)
1000



www.escribers.net  |  800-257-0885

1    A    He was a member of the Teamsters Union.

2    Q    Did you see Miguel when you went into work the next day?

3    A    Yes, I did.

4    Q    Where was he?

5    A    He was standing out closer to the street in -- in front of

6    the office.

7    Q    Did you stop and talk to him?

8    A    Yes, I did.

9    Q    What did you talk about?

10   A    I told him that the man had asked me questions about the

11   Union, from Universal.  (Audio interference).

12   Q    You can continue, Mr. Poullard.  You said that you told

13   him that a man from Universal talked to you.

14   A    Yes, I did.  And he asked -- and I told him that he had

15   asked me about the Union.

16   Q    What did Miguel say?

17   A    He told me that the guy wasn't from Universal, that he was

18   a union buster.

19   Q    Do you recall if Miguel gave you a safety vest with the

20   Union logo on it when you spoke to him that day?

21   A    Yes, he did.

22        MS. KAGEL:  No further questions, Your Honor.

23        JUDGE ROSAS:  Charging Party?

24        MR. WOJCIECHOWSKI:  Nothing.  Thank you.

25        JUDGE ROSAS:  Okay.  While we're trying to get him back,

Exhibit 1(f)
1001



1    is there a Jencks statement?

2        MS. KAGEL:  There is, Your Honor.  It's nine pages.  I

3    will say that most of it does not relate to what Mr. Poullard

4    testified to.  So we could send it to you to redact it or we

5    can just -- but in the spirit of moving quickly and ending the

6    day, we'll waive that and reserve our right to object if it

7    does too far out of field.

8        JUDGE ROSAS:  Okay.

9        MS. KAGEL:  Okay.

10        JUDGE ROSAS:  All right.  So it's nine pages.

11        MS. KAGEL:  Yeah.

12        JUDGE ROSAS:  Let's go off the record.

13    (Off the record at 4:39 p.m.)

14        MS. KAGEL:  Mr. Poullard, can you hear us?

15        THE WITNESS:  Yes.

16        MR. KUNTZ:  Your -- Your Honor, Respondent has not cross-

17    examination for the witness.

18        JUDGE ROSAS:  Mr. Poullard, your testimony is complete at

19    this point.  Do not discuss your testimony until you're advised

20    otherwise by Counsel that the case is over.  Okay?  Thank you

21    for participating and have a good day.

22        THE WITNESS:  Yes, sir.

23        MR. KUNTZ:  And also for the record, Your Hon -- Your

24    Honor, we just want to confirm one final time that we've

25    deleted all the Jencks material.

Exhibit 1(f)
1002



1      MS. KAGEL:  Thank you, Mr. Kuntz.

2      JUDGE ROSAS:  Okay.  General Counsel, any other witnesses?

3      MS. KAGEL:  Not for today, Your Honor.

4      JUDGE ROSAS:  Okay.  What do you have?

5      MS. KAGEL:  We will have two more witnesses, Your Honor,

6  after we come back from the break, Ms. Gutman-Dickinson and

7  another Union organizer.  They would be too long to do at this

8  point, Your Honor.

9      MR. ADLONG:  Your Honor, can we ask, how much time do you

10  think it's going to take on cross and direct to complete Ms.

11  Gutman-Dickinson and Mr. Hidalgo's testimony?

12      JUDGE ROSAS:  Well, let's go off the record.

13  (Off the record at 4:49 p.m.)

14  **(Whereupon, the hearing in the above-entitled matter was**

15  **recessed at 4:49 p.m., until Monday, July 26, 2021 at 8:00**

16  **a.m.)**

17

18

19

20

21

22

23

24

25

Exhibit 1(f)
1003



www.escribers.net | 800-257-0885

1                    **C E R T I F I C A T I O N**

2    This is to certify that the attached proceedings before the

3    National Labor Relations Board (NLRB), Region 21, Case Numbers

4    21-CA-252500, 21-CA-252574, 21-CA-264164, 21-CA-253662, 21-

5    CA259130, 21-CA-254813, 21-CA-255151, Mason-Dixon Intermodal

6    d/b/a Universal Intermodal Services and Mason-Dixon Intermodal

7    d/b/a Universal Intermodal Services and Southern Counties

8    Express, Inc. and Roadrunner Intermodal Services, LLC and

9    International Brotherhood of Teamsters, held via Zoom

10    videoconference at the National Labor Relations Board, Region

11    21, 312 N. Spring Street, 10th Floor, Los Angeles, CA 90012-

12    4701, on June 22, 2021, at 8:03 a.m. was held according to the

13    record, and that this is the original, complete, and true and

14    accurate transcript that has been compared to the reporting or

15    recording, accomplished at the hearing, that the exhibit files

16    have been checked for completeness and no exhibits received in

17    evidence or in the rejected exhibit files are missing.

18

19

20

21                          _____

                            TROY A. RAY

22

                            Official Reporter

23

24

25

