# EXHIBIT 3(A)

Exhibit 3(a)
2156

OFFICIAL REPORT OF PROCEEDINGS

BEFORE THE

NATIONAL LABOR RELATIONS BOARD

REGION 21

In the Matter of:

| | |
|---|---|
| MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES, <br> Respondent, <br><br> and <br><br> MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES AND SOUTHERN COUNTIES EXPRESS, INC., <br> Respondent, <br><br> and <br><br> ROADRUNNER INTERMODAL SERVICES, LLC, <br> Respondent, <br><br> and <br><br> UNIVERSAL TRUCKLOAD, INC., <br> Respondent, <br><br> and <br><br> INTERNATIONAL BROTHERHOOD OF TEAMSTERS, <br> Charging Party. | Case Nos.  21-CA-252500 <br> 21-CA-252574 <br> 21-CA-264164 <br> 21-CA-253662 <br> 21-CA-259130 <br> 21-CA-254813 <br> 21-CA-255151 |

_____

_____

GENERAL COUNSEL EXHIBITS

Place: Los Angeles, California (via Zoom Videoconference)

Dates: June 22, 2021

OFFICIAL REPORTERS
eScribers, LLC
E-Reporting and E-Transcription
7227 North 16th Street, Suite 207
Phoenix, AZ 85020
(602) 263-0885



www.escribers.net | 800-257-0885

Exhibit 3(a)
2157

<u>Stipulation Regarding Individual Subpoenas Duces Tecum issued May 19, 2021, to Respondents Mason-Dixon Intermodal d/b/a Universal Intermodal Services, Mason-Dixon International d/b/a Universal Intermodal Services, Southern Counties Express, Inc., Roadrunner Intermodal Services, LLC, and Universal Truckload, Inc.</u>

Phuong Do, Region 21 Field Attorney, and Respondents, in their individual capacities through Counsel, have met and conferred and, in the interests of judicial economy, stipulate as follows:

1.  Joe Lugo was an agent and supervisor of Respondent Universal Intermodal Services within the meaning of Sections 2(11) and 2(13) of the National Labor Relations Act ("Act") from the time period November 18, 2019 through December 20, 2019.

2.  Michael Vagts was an agent and supervisor of Respondent Universal Intermodal Services, Inc. within the meaning of Sections 2(11) and 2(13) of the Act from the period January 1, 2019 through July 30, 2020.

3.  Dennis Glackin was an agent and supervisor of Respondent Logistics Insight Corp., within the meaning of Sections 2(11) and 2(13) of the Act from the period January 1, 2019 through December 20, 2020, and was an agent and supervisor of Universal Management Services, Inc. within the meaning of Sections 2(11) and 2(13) of the Act from the period December 21, 2020 through June 16, 2021.

4.  Tony Milles was an agent and supervisor of Respondent Universal Intermodal Services, Inc., within the meaning of Sections 2(11) and 2(13) of the Act from the period January 1, 2019 through July 30, 2020.

5.  Tim Phillips was an agent and supervisor of Respondent Universal Management Services, Inc., within the meaning of Sections 2(11) and 2(13) of the Act from the period January 1, 2019 through July 30, 2020.

6.  Don Taylor was an agent and supervisor of Respondent Universal Intermodal Services, Inc., within the meaning of Sections 2(11) and 2(13) of the Act from the period January 1, 2019 through July 30, 2020.

7.  Mike Erskine was an agent and supervisor of Respondent Universal Truckload, Inc., within the meaning of Sections 2(11) and 2(13) of the Act from the period January 1, 2019 through December 13, 2019, and was an agent and supervisor of Universal Capacity Solutions, Inc. within the meaning of Sections 2(11) and 2(13) of the Act from the period December 16, 2019 through July 30, 2020.

8.  Chris Howder was an agent and supervisor of Respondent Universal Truckload, Inc., within the meaning of Sections 2(11) and 2(13) of the Act from the period January 1, 2019 through December 13, 2019 and was an agent and supervisor of Universal Capacity Solutions, Inc., within the meaning of Sections 2(11) and 2(13) of the Act from the period December 16, 2019 through March 27, 2020.

Exhibit 3(a)
2158

GCx1(ccc)

GC1(ccc)                              XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

       21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

         3              6/16/21            T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2159

9. Kirk Cummings was an agent of Universal Intermodal Services, Inc. within the meaning of Section 2(13) of the Act for the purposes of labor relations from the period November 11, 2019 until December 13, 2019.

This stipulation amends each respective Respondent's Answer at paragraph 7(a) and 7(b).

Exhibit 3(a)
2160

2

Re:   Mason-Dixon Intermodal d/b/a Universal Intermodal Services; Mason-Dixon Intermodal d/b/a Universal Intermodal Services and Southern Counties Express, Inc.; Roadrunner Intermodal Services, LLC; Universal Truckload, Inc.

Cases 21-CA-252500; 21-CA-252574; 21-CA-264164; 21-CA-253662; 21-CA-259130; 21-CA-254813; 21-CA-255151

## GENERAL COUNSEL'S EXHIBIT NO. 1

### INDEX
### AND
### DESCRIPTION OF FORMAL DOCUMENTS

**GC Exhibit 1 (a)**   Charge in 21-CA-252500, filed November 26, 2019.

**(b)**   Notice of Filing of Charge in 21-CA-252500, dated November 26, 2019.

**(c)**   Affidavit of Service of 1(a), dated November 26, 2019.

**(d)**   First Amended Charge in 21-CA-252500, filed November 27, 2019.

**(e)**   Notice of Filing of First Amended Charge in 21-CA-252500, dated November 29, 2019.

**(f)**   Affidavit of Service of 1(d), dated November 29, 2019.

**(g)**   Second Amended Charge in 21-CA-252500, filed December 16, 2019.

**(h)**   Notice of Filing of Second Amended Charge in 21-CA-233024, dated December 17, 2019.

**(i)**   Affidavit of Service of 1(g), dated December 17, 2019.

**(j)**   Third Amended Charge in 21-CA-252500, filed December 30, 2019.

**(k)**   Notice of Filing of Third Amended Charge in 21-CA-233024, dated January 2, 2020.

**(l)**   Affidavit of Service of 1(j), dated January 2, 2020.

**(m)**   Charge in 21-CA-252574, filed November 27, 2019.

**GC Exhibit 1(bbb)**

Exhibit 3(a)
2161

GC1(bbb)                     XX
**EXHIBIT NO.**_____  **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

5               6/14/21            T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2162

**GC Exhibit 1 (n)**    Notice of Filing of Charge in 21-CA-252574, dated November 27, 2019.

**(o)**    Affidavit of Service of 1(m), dated November 27, 2019.

**(p)**    First Amended Charge in 21-CA-252574, filed December 16, 2019.

**(q)**    Notice of Filing of First Amended Charge in 21-CA-252574, dated December 17, 2019.

**(r)**    Affidavit of Service of 1(p), dated December 17, 2019.

**(s)**    Second Amended Charge in 21-CA-252574, filed March 16, 2021.

**(t)**    Notice of Filing of Second Amended Charge in 21-CA-252574, dated March 17, 2021.

**(u)**    Affidavit of Service of 1(s), dated March 17, 2021.

**(v)**    Charge in 21-CA-264164 filed August 5, 2020.

**(w)**    Notice of Filing of Charge in 21-CA-264164, dated August 6, 2020.

**(x)**    Affidavit of Service of 1(v), dated August 6, 2020.

**(y)**    Charge in 21-CA-253662, filed December 20, 2019.

**(z)**    Notice of Filing of Charge in 21-CA-253662, dated December 20, 2019.

**(aa)**    Affidavit of Service of 1(y), dated December 20, 2019.

**(bb)**    First Amended Charge in 21-CA-253662, filed January 15, 2020.

**(cc)**    Notice of Filing of First Amended Charge in 21-CA-253662, dated January 15, 2020.

**(dd)**    Affidavit of Service of 1(bb), dated January 15, 2020.

**(ee)**    Second Amended Charge in 21-CA-253662, filed June 1, 2020.

**(ff)**    Notice of Filing of Second Amended Charge in 21-CA-253662, dated June 2, 2020.

**(gg)**    Affidavit of Service of 1(ee), dated June 2, 2020.

**GC Exhibit 1(bbb)**

Exhibit 3(a)
2163    2

**GC Exhibit 1 (hh)**   Charge in 21-CA-259130, filed April 14, 2020.

**(ii)**   Notice of Filing of Charge in 21-CA-259130, dated April 15, 2020.

**(jj)**   Affidavit of Service of 1(hh), dated April 15, 2020.

**(kk)**   First Amended Charge in 21-CA-259130, filed June 1, 2020.

**(ll)**   Notice of Filing of First Amended Charge in 21-CA-259130, dated June 2, 2020.

**(mm)**   Affidavit of Service of 1(kk), dated June 2, 2020.

**(nn)**   Charge in 21-CA-254813, filed January 16, 2020.

**(oo)**   Notice of Filing of Charge in 21-CA-254813, dated January 17, 2020.

**(pp)**   Affidavit of Service of 1(nn), dated January 17, 2020.

**(qq)**   Charge in 21-CA-255151, filed January 24, 2020.

**(rr)**   Notice of Filing of Charge in 21-CA-255151, dated January 28, 2020.

**(ss)**   Affidavit of Service of 1(qq), dated January 28, 2020.

**(tt)**   Order Consolidating Cases, Consolidated Complaint and Notice of Hearing, dated March 17, 2021, with forms NLRB-4338 and NLRB-4668 attached.

**(uu)**   Affidavit of Service of 1(tt), dated March 17, 2021.

**(vv)**   Southern Counties Express, Inc.'s Answer to Consolidated Complaint, dated March 31, 2021, Certificate of Service attached.

**(ww)**   Universal Truckload, Inc.'s Answer to Consolidated Complaint, dated March 31, 2021, Certificate of Service attached.

**(xx)**   Mason-Dixon Intermodal d/b/a Universal Intermodal Services' Answer to Consolidated Complaint, dated March 31, 2021, Certificate of Service attached.

**(yy)**   Roadrunner Intermodal Services LLC's Answer to Consolidated Complaint, dated March 31, 2021, Certificate of Service attached.

**(zz)**   Respondent's Request for Appointment of Settlement Judge, dated April 19, 2021, Proof of Service attached.

**GC Exhibit 1(bbb)**

Exhibit 3(a)
2164

3

**GC Exhibit 1 (aaa)**  Charging Party's Opposition to Request for Appointment of Settlement Judge, dated April 23, 2021, Certificate of Service attached.

**(bbb)**  Index and Description of Formal Documents.

**GC Exhibit 1(bbb)**

Exhibit 3(a)
2165

**United States of America**
**Before the National Labor Relations Board**
**Region 21**

| | |
|---|---|
| Mason-Dixon Intermodal d/b/a Universal Intermodal Services<br>          Respondent,<br><br>and<br><br>Mason-Dixon Intermodal d/b/a Universal Intermodal Services and Southern Counties Express, Inc.<br>          Respondent,<br><br>and<br><br>Roadrunner Intermodal Services, LLC<br>          Respondent,<br><br>and<br><br>Universal Truckload, Inc.,<br>          Respondent,<br><br>and<br><br>International Brotherhood of Teamsters,<br>          Charging Party. | CASE NO.   21-CA-252500<br>              21-CA-252574<br>              21-CA-264164<br>              21-CA-253662<br>              21-CA-259130<br>              21-CA-254813<br>              21-CA-255151<br><br>**Opposition to Request for Appointment of Settlement Judge** |

        Charging Party International Brotherhood of Teamsters respectfully opposes the

request by Respondents dated April 19, 2021 for appointment of a settlement judge

pursuant to section 102.35(b) of the Board's Rules and Regulations. While Charging

Party agrees that Respondents and Charging Party have engaged in good-faith attempts at

a potential settlement and that such a settlement may be reached, Charging Party

respectfully disagrees that appointment of a settlement judge is a valuable use of the

GC1(aaa)                          XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____


     21-CA-252500, et al.            MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____


           4               6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2167

resources of the agency or of the parties due to the significant investment of time that would be required for the parties, including the representatives of Region 21—who have been enmeshed in the details of this case for close to a year and a half—to get a settlement judge up to speed on the entire matter as well as the discussions the parties have already had to date toward settlement. If a settlement, whether Board or non-Board, is feasible in this matter, Charging Party has every confidence that the parties will be able to reach it on their own.

Dated this 23rd day of April, 2021.

By: *s/ Jason Wojciechowski*
JULIE GUTMAN DICKINSON
JASON WOJCIECHOWSKI
HECTOR DE HARO
BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260
Telephone: (818) 973-3200
Facsimile: (818) 973-3201

Attorneys for International Brotherhood of Teamsters

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Los Angeles, State of California.  My business address is 801 North Brand Boulevard, Suite 950, Glendale, CA 91203-1260.

On April 23, 2021, I served true copies of the following document(s) described as **OPPOSITION TO REQUEST FOR APPOINTMENT OF SETTLEMENT JUDGE** on the interested parties in this action as follows:

**SERVICE LIST**

Phuong Do                                     **VIA EMAIL**
312 N Spring Street, 10th Floor
Los Angeles, CA 90012-4701
Email: Phuong.Do@nlrb.com

Daniel A. Adlong                              **VIA EMAIL**
OGLETREE DEAKINS NASH
SMOAK & STEWART, PC
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA 92626
Email: daniel.adlong@ogletree.com

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address nguzman@bushgottlieb.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on April 23, 2021, at Arleta, California.

_____
NELLY GUZMAN

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

Exhibit 3(a)
2169
749660v1  11135-29006

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

| | |
|---|---|
| **MASON-DIXON INTERMODAL D/B/A**<br>**UNIVERSAL INTERMODAL SERVICES** | **Cases**   **21-CA-252500** |
| | **21-CA-252574** |
| **Respondent** | **21-CA-264164** |
| | **21-CA-253662** |
| **and** | **21-CA-259130** |
| | **21-CA-254813** |
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL** | **21-CA-255151** |
| **INTERMODAL SERVICES AND SOUTHERN COUNTIES** | |
| **EXPRESS, INC.** | |

**Respondent**

**and**

**ROADRUNNER INTERMODAL SERVICES, LLC**

**Respondent**

**and**

**UNIVERSAL TRUCKLOAD, INC.**

**Respondent**

**and**

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**

**Charging Party**

**REQUEST FOR APPOINTMENT OF SETTLEMENT JUDGE**

Pursuant to §102.35(b) of the Board's Rules, Respondents Mason-Dixon Intermodal d/b/a

Universal Intermodal Services, Mason-Dixon Intermodal d/b/a Universal Intermodal Services and

Southern Counties Express, Inc., Roadrunner Intermodal Services, LLC, and Universal Truckload,

1

Exhibit 3(a)
2170

**GC Exhibit 1(zz)**

GC1(zz)                    XX
EXHIBIT NO._____ RECEIVED _____ REJECTED _____

     21-CA-252500, et al.        MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

          4           6/14/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2171

Inc. (collectively, "Respondents") hereby respectfully request appointment of a Settlement Judge in the above-captioned matter.

Respondents aver that they have engaged in good faith negotiations with representatives of the Charging Party International Brotherhood of Teamsters regarding potential settlement of this matter. Respondents believe appointment of a Settlement Judge will substantially assist the parties in resolving certain issues necessary to reach a settlement agreement, including questions of permissibility of certain potential settlement provisions under the Act.

Date: April 19, 2021                                   Respectfully submitted,

/s/ *Daniel A. Adlong*
Daniel A. Adlong, Esq.
OGLETREE DEAKINS NASH
SMOAK & STEWART, PC
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA 92626
Telephone:   714-800-7900
Facsimile:   714-754-1298
Email:  daniel.adlong@ogletree.com

Exhibit 3(a)
2172

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 19th day of April 2021, the foregoing **REQUEST FOR APPOINTMENT OF SETTLEMENT JUDGE**, was filed via electronic filing and served via e-mail upon:

Phuong Do
Phuong.Do@nlrb.gov


Julie Gutman Dickinson, Esq.
Hector De Haro, Esq.
Jason Wojciechowski, Esq.
BUSH GOTTLIEB
801 North Brand Blvd., Suite 950
Glendale, CA 91203-1260
jgutmandickinson@bushgottlieb.com
hdeharo@bushgottlieb.com
jasonw@bushgottlieb.com

ATTORNEY FOR THE CHARGING PARTY




/s/ *Daniel A. Adlong*
Daniel Adlong, Esq.

46621677.1

Exhibit 3(a)
2173

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

| | | |
|---|---|---|
| **MASON-DIXON INTERMODAL D/B/A** | | |
| **UNIVERSAL INTERMODAL SERVICES** | **Cases** | **21-CA-252500** |
| | | **21-CA-252574** |
| **and** | | **21-CA-264164** |
| | | |
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL** | | |
| **INTERMODAL SERVICES AND SOUTHERN COUNTIES** | | |
| **EXPRESS, INC.** | | **21-CA-253662** |
| | | **21-CA-259130** |
| **and** | | |
| | | |
| **ROADRUNNER INTERMODAL SERVICES, LLC** | | **21-CA-254813** |
| | | |
| **and** | | |
| | | |
| **UNIVERSAL TRUCKLOAD, INC.** | | **21-CA-255151** |
| | | |
| **and** | | |
| | | |
| **INTERNATIONAL BROTHERHOOD OF TEAMSTERS** | | |

**ROADRUNNER INTERMODAL SERVICES LLC'S**
**ANSWER TO CONSOLIDATED COMPLAINT**

Respondent Roadrunner Intermodal Services, LLC ("Respondent"), through undersigned counsel and pursuant to Sections 102.20-21 of the Rules and Regulations of the National Labor Relations Board, answers the Consolidated Complaint in the above-referenced matter as follows.

Respondent answers each correspondingly numbered and lettered and unnumbered and unlettered paragraph and subparagraph of the Complaint as follows.

Respondent answers the first unnumbered and unlettered paragraph of the Consolidated Complaint that starts at the first page of the Consolidated Complaint by denying that it has engaged

1

Exhibit 3(a)
2174

**GC Exhibit 1(yy)**

EXHIBIT NO. GC1(yy)_____   RECEIVED XX_____ REJECTED _____

CASE NO 21-CA-252500, et al._____ CASE NAME MASON-DIXON INTERMODAL_____

NO OF PAGES 7_____ DATE: 6/14/21_____ REPORTER: T. RAY_____

Exhibit 3(a)
2175

in unfair labor practices as alleged, and otherwise is without knowledge or information sufficient to form a belief as to the truth of the averments of this unnumbered paragraph.

1.    (a)–(o) Admitted.

2.    (a)–(i) Admitted.

3.    (a) Denied. (b) Denied.

4.    (a) Denied. (b) Denied.

5.    Admitted.

6.    Admitted.

7.    (a) Denied. (b) Denied.

8.    (a) Admitted.  (b) Admitted.  (c) Admitted.  (d) Denied.

9.    (a) Admitted.  (b) Denied.

10.    Denied.

11.    (a) Denied. (b) Denied.

12.    (a)–(d) Denied.

13.    (a)–(d) Denied.

14.    (a) Denied. (b) Denied.

15.    (a) Denied. (b) Denied.

16.    (a)–(f) Denied.

17.    (a)–(c) Denied.

18.    (a) Admitted.  (b) Denied. (c) Denied.

19.    (a)–(c) Denied.

20.    Denied.

21.    (a)–(c) Denied.

22.    Denied.

2

Exhibit 3(a)
2176

23.     Denied.

24.     Denied.

25.     Denied.

Respondent responds to the unnumbered and unlettered paragraph following the bolded "WHEREFORE" at the thirteenth page of the Complaint by denying that it has violated the Act in any manner and denying that any remedy is warranted.

Respondent responds to the unnumbered and unlettered paragraphs after the heading "Answer Requirement" at the thirteenth, fourteenth, and fifteenth pages of the Complaint by stating that these are informational paragraphs and do not require an admission or denial from the Respondent.

Respondent further responds to each and every numbered, lettered, unnumbered and unlettered paragraph and subparagraph of the Complaint by stating that any allegation not admitted specifically is denied.

## **FIRST DEFENSE**

The General Counsel will fail to show animus, which thus eliminates the ability to demonstrate a violation of the Act. Respondent has been in partnership with the Teamsters for over 20 years. During that time, 33% of the employees in United States and Canada have become subject to collective-bargaining agreements. The Teamsters represent nearly 60% of those employees. That number further anticipates growing with the addition of a further 400 or more Teamster represented jobs in the United States operations in 2021.

## **SECOND DEFENSE**

Some or all of the claims against Respondent fail because they do not state a claim for which relief may be granted under the Act.

3

Exhibit 3(a)
2177

## THIRD DEFENSE

Some or all of the claims against Respondent fail because the acts alleged are not illegal under the Act.

## FOURTH DEFENSE

Respondent's purported conduct does not have a reasonable tendency to interfere with, restrain, or coerce employees in the exercise of rights guaranteed by Section 7 of the National Labor Relations Act.

## FIFTH DEFENSE

Respondent reserves the right, upon any disclosure of the General Counsel's request for relief, to assert that some or all of the requests for relief sought against Respondent are, in addition to being unavailable because Respondent did not commit any violations of the Act, beyond the scope permitted by the Act and constitute improper requests for relief, or are punitive requests for relief not permitted by the Act.

## SIXTH DEFENSE

At the time that Acting General Counsel Peter Ohr issued the Complaint, he acted as an agent of the National Labor Relations Board (the "Board") and purported to exercise authority belonging to the Board. Yet, because the legality of Mr. Ohr's appointment is under challenge, the Board lacked a statutorily required authority when the Complaint was issued. Currently, Ohr is acting ultra vires, or without lawful authority to issue the Complaint, and could not issue the Complaint on the Board's behalf. *See Noel Canning v. NLRB*, 573 U.S. 513 (2014); Section 3(d) of the National Labor Relations Act; 29 U.S.C. § 153(d).

## SEVENTH DEFENSE

Respondent reserves the right to present additional defenses as permitted by the National Labor Relations Act and the Board's Rules and Regulations.

Exhibit 3(a)
2178

WHEREFORE, Respondent Roadrunner Intermodal Services, LLC denies that it engaged in any act which violated the National Labor Relations Act. Respondent requests that the Complaint be dismissed in its entirety with prejudice and that Respondent be awarded its costs and attorneys' fees in connection with this matter, and other relief as deemed appropriate.

Date: March 31, 2021                                  Respectfully submitted,


/s/ *Daniel A. Adlong*
Daniel A. Adlong, Esq.
OGLETREE DEAKINS NASH
SMOAK & STEWART, PC
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA 92626
Telephone:   714-800-7900
Facsimile:     714-754-1298
Email: daniel.adlong@ogletree.com

5

Exhibit 3(a)
2179

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 31st day of March 2021, the foregoing, **ROADRUNNER INTERMODAL SERVICES LLC'S ANSWER TO CONSOLIDATED COMPLAINT**, was filed via electronic filing with:

> Mr. William B. Cowen, Regional Director
> NATIONAL LABOR RELATIONS BOARD
> Region 21
> 312 North Spring Street, Suite 10150
> Los Angeles, CA 90012

and served via e-mail upon:

> Phuong Do
> Phuong.Do@nlrb.gov
>
>
> Julie Gutman Dickinson, Esq.
> Hector De Haro, Esq.
> Jason Wojciechowski, Esq.
> BUSH GOTTLIEB
> 801 North Brand Blvd., Suite 950
> Glendale, CA 91203-1260
> jgutmandickinson@bushgottlieb.com
> hdeharo@bushgottlieb.com
> jasonw@bushgottlieb.com
>
> ATTORNEY FOR THE CHARGING PARTY

> /s/ *Daniel A. Adlong*
> Daniel Adlong, Esq.

6

Exhibit 3(a)
2180

**UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
REGION 21**

| | |
|---|---|
| **MASON-DIXON INTERMODAL D/B/A**<br>**UNIVERSAL INTERMODAL SERVICES** | **Cases     21-CA-252500**<br>**21-CA-252574** |
| **and** | **21-CA-264164** |
| | |
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL**<br>**INTERMODAL SERVICES AND SOUTHERN COUNTIES**<br>**EXPRESS, INC.** | **21-CA-253662**<br>**21-CA-259130** |
| **and** | |
| | |
| **ROADRUNNER INTERMODAL SERVICES, LLC** | **21-CA-254813** |
| **and** | |
| | |
| **UNIVERSAL TRUCKLOAD, INC.** | **21-CA-255151** |
| **and** | |
| | |
| **INTERNATIONAL BROTHERHOOD OF TEAMSTERS** | |

**<u>MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES'
ANSWER TO CONSOLIDATED COMPLAINT</u>**

Respondent    Mason-Dixon    Intermodal    d/b/a    Universal    Intermodal    Services

("Respondent"), through undersigned counsel and pursuant to Sections 102.20-21 of the Rules and

Regulations of the National Labor Relations Board, answers the Consolidated Complaint in the

above-referenced matter as follows.

Respondent answers each correspondingly numbered and lettered and unnumbered and

unlettered paragraph and subparagraph of the Complaint as follows.

1

Exhibit 3(a)
2181

GC Exhibit 1(xx)

GC1(xx)                                    XX
**EXHIBIT NO.**_____  **RECEIVED** _____  **REJECTED** _____


     21-CA-252500, et al.        MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____


        7            6/14/21          T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2182

Respondent answers the first unnumbered and unlettered paragraph of the Consolidated Complaint that starts at the first page of the Consolidated Complaint by denying that it has engaged in unfair labor practices as alleged, and otherwise is without knowledge or information sufficient to form a belief as to the truth of the averments of this unnumbered paragraph.

1.      (a)–(o) Admitted.

2.      (a)–(i) Admitted.

3.      (a) Denied. (b) Denied.

4.      (a) Denied. (b) Denied.

5.      Admitted.

6.      Admitted.

7.      (a) Denied. (b) Denied.

8.      (a) Admitted. (b) Admitted. (c) Admitted. (d) Denied.

9.      (a) Admitted. (b) Denied.

10.     Denied.

11.     (a) Denied. (b) Denied.

12.     (a)–(d) Denied.

13.     (a)–(d) Denied.

14.     (a) Denied. (b) Denied.

15.     (a) Denied. (b) Denied.

16.     (a)–(f) Denied.

17.     (a)–(c) Denied.

18.     (a) Admitted. (b) Denied. (c) Denied.

19.     (a)–(c) Denied.

20.     Denied.

Exhibit 3(a)
2183

21.      (a)–(c) Denied.

22.      Denied.

23.      Denied.

24.      Denied.

25.      Denied.

Respondent responds to the unnumbered and unlettered paragraph following the bolded "WHEREFORE" at the thirteenth page of the Complaint by denying that it has violated the Act in any manner and denying that any remedy is warranted.

Respondent responds to the unnumbered and unlettered paragraphs after the heading "Answer Requirement" at the thirteenth, fourteenth, and fifteenth pages of the Complaint by stating that these are informational paragraphs and do not require an admission or denial from the Respondent.

Respondent further responds to each and every numbered, lettered, unnumbered and unlettered paragraph and subparagraph of the Complaint by stating that any allegation not admitted specifically is denied.

## FIRST DEFENSE

Since at least November 2020, there has been bargaining with the Union, including multiple in person meetings, to reconstitute a bargaining unit with an agreed upon collective-bargaining agreement that returns drivers to work and business to Los Angeles.

## SECOND DEFENSE

The General Counsel will fail to show animus, which thus eliminates the ability to demonstrate a violation of the Act. Respondent has been in partnership with the Teamsters for over 20 years. During that time, 33% of the employees in United States and Canada have become subject to collective-bargaining agreements. The Teamsters represent nearly 60% of those

Exhibit 3(a)
2184

employees. That number further anticipates growing with the addition of a further 400 or more Teamster represented jobs in the United States operations in 2021.

## THIRD DEFENSE

Some or all of the claims against Respondent fail because they do not state a claim for which relief may be granted under the Act.

## FOURTH DEFENSE

Some or all of the claims against Respondent fail because the acts alleged are not illegal under the Act.

## FIFTH DEFENSE

Respondent's purported conduct does not have a reasonable tendency to interfere with, restrain, or coerce employees in the exercise of rights guaranteed by Section 7 of the National Labor Relations Act.

## SIXTH DEFENSE

Respondent reserves the right, upon any disclosure of the General Counsel's request for relief, to assert that some or all of the requests for relief sought against Respondent are, in addition to being unavailable because Respondent did not commit any violations of the Act, beyond the scope permitted by the Act and constitute improper requests for relief, or are punitive requests for relief not permitted by the Act.

## SEVENTH DEFENSE

At the time that Acting General Counsel Peter Ohr issued the Complaint, he acted as an agent of the National Labor Relations Board (the "Board") and purported to exercise authority belonging to the Board. Yet, because the legality of Mr. Ohr's appointment is under challenge, the Board lacked a statutorily required authority when the Complaint was issued. Currently, Ohr is acting ultra vires, or without lawful authority to issue the Complaint, and could not issue the

4

Exhibit 3(a)
2185

Complaint on the Board's behalf.  *See Noel Canning v. NLRB*, 573 U.S. 513 (2014); Section 3(d) of the National Labor Relations Act; 29 U.S.C. § 153(d).

<div align="center">**EIGHTH DEFENSE**</div>

Respondent reserves the right to present additional defenses as permitted by the National Labor Relations Act and the Board's Rules and Regulations.

WHEREFORE, Respondent Mason-Dixon Intermodal d/b/a Universal Intermodal Services denies that it engaged in any act which violated the National Labor Relations Act. Respondent requests that the Complaint be dismissed in its entirety with prejudice and that Respondent be awarded its costs and attorneys' fees in connection with this matter, and other relief as deemed appropriate.

Date: March 31, 2021                               Respectfully submitted,

                                          /s/ *Daniel A. Adlong*
                                          Daniel A. Adlong, Esq.
                                          OGLETREE DEAKINS NASH
                                          SMOAK & STEWART, PC
                                          Park Tower, Fifteenth Floor
                                          695 Town Center Drive
                                          Costa Mesa, CA 92626
                                          Telephone:   714-800-7900
                                          Facsimile:   714-754-1298
                                          Email:  daniel.adlong@ogletree.com

<div align="center">5</div>

Exhibit 3(a)
2186

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 31st day of March 2021, the foregoing, **MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES' ANSWER TO CONSOLIDATED COMPLAINT**, was filed via electronic filing with:

> Mr. William B. Cowen, Regional Director
> NATIONAL LABOR RELATIONS BOARD
> Region 21
> 312 North Spring Street, Suite 10150
> Los Angeles, CA 90012

and served via e-mail upon:

> Phuong Do
> Phuong.Do@nlrb.gov
>
>
> Julie Gutman Dickinson, Esq.
> Hector De Haro, Esq.
> Jason Wojciechowski, Esq.
> BUSH GOTTLIEB
> 801 North Brand Blvd., Suite 950
> Glendale, CA 91203-1260
> jgutmandickinson@bushgottlieb.com
> hdeharo@bushgottlieb.com
> jasonw@bushgottlieb.com
>
> ATTORNEY FOR THE CHARGING PARTY

> /s/  *Daniel A. Adlong*
> Daniel Adlong, Esq.

6

Exhibit 3(a)
2187

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

| | | |
|---|---|---|
| **MASON-DIXON INTERMODAL D/B/A** | | |
| **UNIVERSAL INTERMODAL SERVICES** | **Cases** | **21-CA-252500** |
| | | **21-CA-252574** |
| **and** | | **21-CA-264164** |
| | | |
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL** | | |
| **INTERMODAL SERVICES AND SOUTHERN COUNTIES** | | |
| **EXPRESS, INC.** | | **21-CA-253662** |
| | | **21-CA-259130** |
| **and** | | |
| | | |
| **ROADRUNNER INTERMODAL SERVICES, LLC** | | **21-CA-254813** |
| | | |
| **and** | | |
| | | |
| **UNIVERSAL TRUCKLOAD, INC.** | | **21-CA-255151** |
| | | |
| **and** | | |
| | | |
| **INTERNATIONAL BROTHERHOOD OF TEAMSTERS** | | |

**UNIVERSAL TRUCKLOAD, INC.'S**
**ANSWER TO CONSOLIDATED COMPLAINT**

Respondent Universal Truckload, Inc. ("Respondent"), through undersigned counsel and pursuant to Sections 102.20-21 of the Rules and Regulations of the National Labor Relations Board, answers the Consolidated Complaint in the above-referenced matter as follows.

Respondent answers each correspondingly numbered and lettered and unnumbered and unlettered paragraph and subparagraph of the Complaint as follows.

Respondent answers the first unnumbered and unlettered paragraph of the Consolidated Complaint that starts at the first page of the Consolidated Complaint by denying that it has engaged

1

Exhibit 3(a)
2188

**GC Exhibit 1(ww)**

GC1(ww)                              XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

        21-CA-252500, et al.            MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

        7                  6/14/21            T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2189

in unfair labor practices as alleged, and otherwise is without knowledge or information sufficient to form a belief as to the truth of the averments of this unnumbered paragraph.

1.  (a)–(o) Admitted.

2.  (a)–(i) Admitted.

3.  (a) Denied. (b) Denied.

4.  (a) Denied. (b) Denied.

5.  Admitted.

6.  Admitted.

7.  (a) Denied. (b) Denied.

8.  (a) Admitted.  (b) Admitted.  (c) Admitted.  (d) Denied.

9.  (a) Admitted.  (b) Denied.

10.  Denied.

11.  (a) Denied. (b) Denied.

12.  (a)–(d) Denied.

13.  (a)–(d) Denied.

14.  (a) Denied. (b) Denied.

15.  (a) Denied. (b) Denied.

16.  (a)–(f) Denied.

17.  (a)–(c) Denied.

18.  (a) Admitted.  (b) Denied. (c) Denied.

19.  (a)–(c) Denied.

20.  Denied.

21.  (a)–(c) Denied.

22.  Denied.

2

Exhibit 3(a)
2190

23.      Denied.

24.      Denied.

25.      Denied.

Respondent responds to the unnumbered and unlettered paragraph following the bolded "WHEREFORE" at the thirteenth page of the Complaint by denying that it has violated the Act in any manner and denying that any remedy is warranted.

Respondent responds to the unnumbered and unlettered paragraphs after the heading "Answer Requirement" at the thirteenth, fourteenth, and fifteenth pages of the Complaint by stating that these are informational paragraphs and do not require an admission or denial from the Respondent.

Respondent further responds to each and every numbered, lettered, unnumbered and unlettered paragraph and subparagraph of the Complaint by stating that any allegation not admitted specifically is denied.

### FIRST DEFENSE

The General Counsel will fail to show animus, which thus eliminates the ability to demonstrate a violation of the Act. Respondent has been in partnership with the Teamsters for over 20 years. During that time, 33% of the employees in United States and Canada have become subject to collective-bargaining agreements. The Teamsters represent nearly 60% of those employees. That number further anticipates growing with the addition of a further 400 or more Teamster represented jobs in the United States operations in 2021.

### SECOND DEFENSE

Some or all of the claims against Respondent fail because they do not state a claim for which relief may be granted under the Act.

3

Exhibit 3(a)
2191

**THIRD DEFENSE**

Some or all of the claims against Respondent fail because the acts alleged are not illegal under the Act.

**FOURTH DEFENSE**

Respondent's purported conduct does not have a reasonable tendency to interfere with, restrain, or coerce employees in the exercise of rights guaranteed by Section 7 of the National Labor Relations Act.

**FIFTH DEFENSE**

Respondent reserves the right, upon any disclosure of the General Counsel's request for relief, to assert that some or all of the requests for relief sought against Respondent are, in addition to being unavailable because Respondent did not commit any violations of the Act, beyond the scope permitted by the Act and constitute improper requests for relief, or are punitive requests for relief not permitted by the Act.

**SIXTH DEFENSE**

At the time that Acting General Counsel Peter Ohr issued the Complaint, he acted as an agent of the National Labor Relations Board (the "Board") and purported to exercise authority belonging to the Board. Yet, because the legality of Mr. Ohr's appointment is under challenge, the Board lacked a statutorily required authority when the Complaint was issued. Currently, Ohr is acting ultra vires, or without lawful authority to issue the Complaint, and could not issue the Complaint on the Board's behalf. *See Noel Canning v. NLRB*, 573 U.S. 513 (2014); Section 3(d) of the National Labor Relations Act; 29 U.S.C. § 153(d).

**SEVENTH DEFENSE**

Respondent reserves the right to present additional defenses as permitted by the National Labor Relations Act and the Board's Rules and Regulations.

4

Exhibit 3(a)
2192

WHEREFORE, Respondent Universal Truckload, Inc. denies that it engaged in any act which violated the National Labor Relations Act. Respondent requests that the Complaint be dismissed in its entirety with prejudice and that Respondent be awarded its costs and attorneys' fees in connection with this matter, and other relief as deemed appropriate.

Date: March 31, 2021                          Respectfully submitted,


_/s/ Daniel A. Adlong_
Daniel A. Adlong, Esq.
OGLETREE DEAKINS NASH
SMOAK & STEWART, PC
Park Tower, Fifteenth Floor
695 Town Center Drive
Costa Mesa, CA 92626
Telephone:   714-800-7900
Facsimile:    714-754-1298
Email:  daniel.adlong@ogletree.com

5

Exhibit 3(a)
2193

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 31st day of March 2021, the foregoing, **UNIVERSAL TRUCKLOAD, INC.'S ANSWER TO CONSOLIDATED COMPLAINT**, was filed via electronic filing with:

> Mr. William B. Cowen, Regional Director
> NATIONAL LABOR RELATIONS BOARD
> Region 21
> 312 North Spring Street, Suite 10150
> Los Angeles, CA 90012

and served via e-mail upon:

> Phuong Do
> Phuong.Do@nlrb.gov
>
>
> Julie Gutman Dickinson, Esq.
> Hector De Haro, Esq.
> Jason Wojciechowski, Esq.
> BUSH GOTTLIEB
> 801 North Brand Blvd., Suite 950
> Glendale, CA 91203-1260
> jgutmandickinson@bushgottlieb.com
> hdeharo@bushgottlieb.com
> jasonw@bushgottlieb.com
>
> ATTORNEY FOR THE CHARGING PARTY

<div align="right">

/s/  *Daniel A. Adlong*
Daniel Adlong, Esq.

</div>

Exhibit 3(a)
2194

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

| | | |
|---|---|---|
| **MASON-DIXON INTERMODAL D/B/A** | | |
| **UNIVERSAL INTERMODAL SERVICES** | **Cases** | **21-CA-252500** |
| | | **21-CA-252574** |
| **and** | | **21-CA-264164** |
| | | |
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL** | | |
| **INTERMODAL SERVICES AND SOUTHERN COUNTIES** | | |
| **EXPRESS, INC.** | | **21-CA-253662** |
| | | **21-CA-259130** |
| **and** | | |
| | | |
| **ROADRUNNER INTERMODAL SERVICES, LLC** | | **21-CA-254813** |
| | | |
| **and** | | |
| | | |
| **UNIVERSAL TRUCKLOAD, INC.** | | **21-CA-255151** |
| | | |
| **and** | | |
| | | |
| **INTERNATIONAL BROTHERHOOD OF TEAMSTERS** | | |

**SOUTHERN COUNTIES EXPRESS, INC.'S**
**ANSWER TO CONSOLIDATED COMPLAINT**

Respondent Southern Counties Express, Inc. ("Respondent"), through undersigned counsel and pursuant to Sections 102.20-21 of the Rules and Regulations of the National Labor Relations Board, answers the Consolidated Complaint in the above-referenced matter as follows.

Respondent answers each correspondingly numbered and lettered and unnumbered and unlettered paragraph and subparagraph of the Complaint as follows.

Respondent answers the first unnumbered and unlettered paragraph of the Consolidated Complaint that starts at the first page of the Consolidated Complaint by denying that it has engaged

1

Exhibit 3(a)
2195

**GC Exhibit 1(vv)**

GC1(vv)                          XX
EXHIBIT NO._____  RECEIVED _____  REJECTED _____

     21-CA-252500, et al.        MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

     7              6/14/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2196

in unfair labor practices as alleged, and otherwise is without knowledge or information sufficient to form a belief as to the truth of the averments of this unnumbered paragraph.

1.  (a)–(o) Admitted.

2.  (a)–(i) Admitted.

3.  (a) Denied. (b) Denied.

4.  (a) Denied. (b) Denied.

5.  Admitted.

6.  Admitted.

7.  (a) Denied. (b) Denied.

8.  (a) Admitted.  (b) Admitted.  (c) Admitted.  (d) Denied.

9.  (a) Admitted.  (b) Denied.

10.  Denied.

11.  (a) Denied. (b) Denied.

12.  (a)–(d) Denied.

13.  (a)–(d) Denied.

14.  (a) Denied. (b) Denied.

15.  (a) Denied. (b) Denied.

16.  (a)–(f) Denied.

17.  (a)–(c) Denied.

18.  (a) Admitted.  (b) Denied. (c) Denied.

19.  (a)–(c) Denied.

20.  Denied.

21.  (a)–(c) Denied.

22.  Denied.

2

Exhibit 3(a)
2197

23.     Denied.

24.     Denied.

25.     Denied.

Respondent responds to the unnumbered and unlettered paragraph following the bolded "WHEREFORE" at the thirteenth page of the Complaint by denying that it has violated the Act in any manner and denying that any remedy is warranted.

Respondent responds to the unnumbered and unlettered paragraphs after the heading "Answer Requirement" at the thirteenth, fourteenth, and fifteenth pages of the Complaint by stating that these are informational paragraphs and do not require an admission or denial from the Respondent.

Respondent further responds to each and every numbered, lettered, unnumbered and unlettered paragraph and subparagraph of the Complaint by stating that any allegation not admitted specifically is denied.

## FIRST DEFENSE

The General Counsel will fail to show animus, which thus eliminates the ability to demonstrate a violation of the Act. Respondent has been in partnership with the Teamsters for over 20 years. During that time, 33% of the employees in United States and Canada have become subject to collective-bargaining agreements. The Teamsters represent nearly 60% of those employees. That number further anticipates growing with the addition of a further 400 or more Teamster represented jobs in the United States operations in 2021.

## SECOND DEFENSE

Some or all of the claims against Respondent fail because they do not state a claim for which relief may be granted under the Act.

3

Exhibit 3(a)
2198

**THIRD DEFENSE**

Some or all of the claims against Respondent fail because the acts alleged are not illegal under the Act.

**FOURTH DEFENSE**

Respondent's purported conduct does not have a reasonable tendency to interfere with, restrain, or coerce employees in the exercise of rights guaranteed by Section 7 of the National Labor Relations Act.

**FIFTH DEFENSE**

Respondent reserves the right, upon any disclosure of the General Counsel's request for relief, to assert that some or all of the requests for relief sought against Respondent are, in addition to being unavailable because Respondent did not commit any violations of the Act, beyond the scope permitted by the Act and constitute improper requests for relief, or are punitive requests for relief not permitted by the Act.

**SIXTH DEFENSE**

At the time that Acting General Counsel Peter Ohr issued the Complaint, he acted as an agent of the National Labor Relations Board (the "Board") and purported to exercise authority belonging to the Board. Yet, because the legality of Mr. Ohr's appointment is under challenge, the Board lacked a statutorily required authority when the Complaint was issued. Currently, Ohr is acting ultra vires, or without lawful authority to issue the Complaint, and could not issue the Complaint on the Board's behalf. *See Noel Canning v. NLRB*, 573 U.S. 513 (2014); Section 3(d) of the National Labor Relations Act; 29 U.S.C. § 153(d).

**SEVENTH DEFENSE**

Respondent reserves the right to present additional defenses as permitted by the National Labor Relations Act and the Board's Rules and Regulations.

Exhibit 3(a)
2199

WHEREFORE, Respondent Southern Counties Express, Inc. denies that it engaged in any act which violated the National Labor Relations Act.  Respondent requests that the Complaint be dismissed in its entirety with prejudice and that Respondent be awarded its costs and attorneys' fees in connection with this matter, and other relief as deemed appropriate.


Date: March 31, 2021                                    Respectfully submitted,


                                                          /s/ *Daniel A. Adlong*
                                                          Daniel A. Adlong, Esq.
                                                          OGLETREE DEAKINS NASH
                                                          SMOAK & STEWART, PC
                                                          Park Tower, Fifteenth Floor
                                                          695 Town Center Drive
                                                          Costa Mesa, CA 92626
                                                          Telephone:   714-800-7900
                                                          Facsimile:    714-754-1298
                                                          Email:  daniel.adlong@ogletree.com

5

Exhibit 3(a)
2200

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 31st day of March 2021, the foregoing, **SOUTHERN COUNTIES EXPRESS, INC.'S ANSWER TO CONSOLIDATED COMPLAINT**, was filed via electronic filing with:

> Mr. William B. Cowen, Regional Director
> NATIONAL LABOR RELATIONS BOARD
> Region 21
> 312 North Spring Street, Suite 10150
> Los Angeles, CA 90012

and served via e-mail upon:

> Phuong Do
> Phuong.Do@nlrb.gov
>
>
> Julie Gutman Dickinson, Esq.
> Hector De Haro, Esq.
> Jason Wojciechowski, Esq.
> BUSH GOTTLIEB
> 801 North Brand Blvd., Suite 950
> Glendale, CA 91203-1260
> jgutmandickinson@bushgottlieb.com
> hdeharo@bushgottlieb.com
> jasonw@bushgottlieb.com
>
> ATTORNEY FOR THE CHARGING PARTY

> /s/ *Daniel A. Adlong*
> Daniel Adlong, Esq.

6

Exhibit 3(a)
2201

**UNITED STATES OF AMERICA**
**BEFORE THE NATIONAL LABOR RELATIONS BOARD**
**REGION 21**

| | | |
|---|---|---|
| **MASON-DIXON INTERMODAL D/B/A** | | |
| **UNIVERSAL INTERMODAL SERVICES** | **Cases** | **21-CA-252500** |
| | | **21-CA-252574** |
| **and** | | **21-CA-264164** |
| | | |
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL** | | |
| **INTERMODAL SERVICES AND SOUTHERN COUNTIES** | | |
| **EXPRESS, INC.** | | **21-CA-253662** |
| | | **21-CA-259130** |
| **and** | | |
| | | |
| **ROADRUNNER INTERMODAL SERVICES, LLC** | | **21-CA-254813** |
| | | |
| **and** | | |
| | | |
| **UNIVERSAL TRUCKLOAD, INC.** | | **21-CA-255151** |

**AFFIDAVIT OF SERVICE OF:  Order Consolidating Cases, Consolidated  Complaint and Notice of Hearing (with forms NLRB-4338 and NLRB-4668 attached)**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on **March 17, 2021**, I served the above-entitled document(s) by **e-issuance or regular mail,** as noted below, upon the following persons, addressed to them at the following addresses:

Joe Lugo, General Manger                          **E-ISSUANCE**
Mason-Dixon Intermodal d/b/a Universal
  Intermodal Services
Email: jlugo@universalintermodal.com

Rodolfo R. Agraz, Esq.                             **E-ISSUANCE**
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Email: fito.agraz@ogletree.com

Daniel A. Adlong, Esq.                             **E-ISSUANCE**
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Email: daniel.adlong@ogletree.com

Exhibit 3(a)
2202

**GC Exhibit 1(uu)**

GC1(uu)                           XX
EXHIBIT NO._____  RECEIVED _____ REJECTED _____


     21-CA-252500, et al.           MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


          3              6/14/21            T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2203

Southern Counties Express      **FIRST CLASS MAIL**
18020 S. Santa Fe Avenue
Rancho Dominguez, CA 90220

Michael Vagts, Senior HR Manager    **FIRST CLASS MAIL**
Roadrunner Intermodal Services
11184 Almond Ave.
Fontana, CA 92337

Michael Vagts, Senior HR Manager    **FIRST CLASS MAIL**
Roadrunner Intermodal Services
1815 O Street
Wilmington, CA 90744

Michael Vagts, Senior HR Manager    **FIRST CLASS MAIL**
Universal Truckload, Inc.
15033 Slover Ave.
Fontana, CA 92337

Universal Intermodal Services & Southern   **FIRST CLASS MAIL**
   Counties Express, a single employer
2035 E. Vista Bella Way
Compton, CA 90220

Julie Gutman Dickinson, Esq.     **E-ISSUANCE**
Bush Gottlieb, A Law Corporation
Email: jgutmandickinson@bushgottlieb.com

Hector De Haro, Esq.       **E-ISSUANCE**
Bush Gottlieb, A Law Corporation
Email: hdeharo@bushgottlieb.com

Raven L. Hall, Staff Attorney     **E-ISSUANCE**
International Brotherhood of Teamsters
Email: rhall@teamster.org

Jason Wojciechowski, Esq.      **E-ISSUANCE**
Bush Gottlieb, A Law Corporation
Email: jasonw@bushgottlieb.com

| March 17, 2021 | Aide Carretero, Designated Agent of NLRB |
| --- | --- |
| Date | Name |

| | /s/ Aide Carretero |
| --- | --- |
| | Signature |

Exhibit 3(a)
2204

UNITED STATES OF AMERICA
BEFORE THE NATIONAL LABOR RELATIONS BOARD
Region 21


| | | |
|---|---|---|
| **MASON-DIXON INTERMODAL D/B/A** | | |
| **UNIVERSAL INTERMODAL SERVICES** | **Cases** | **21-CA-252500** |
| | | **21-CA-252574** |
| **and** | | **21-CA-264164** |
| | | |
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL** | | |
| **INTERMODAL SERVICES AND SOUTHERN COUNTIES** | | |
| **EXPRESS, INC.** | | **21-CA-253662** |
| | | **21-CA-259130** |
| **and** | | |
| | | |
| **ROADRUNNER INTERMODAL SERVICES, LLC** | | **21-CA-254813** |
| | | |
| **and** | | |
| | | |
| **UNIVERSAL TRUCKLOAD, INC.** | | **21-CA-255151** |
| | | |
| **and** | | |
| | | |
| **INTERNATIONAL BROTHERHOOD OF** | | |
| **TEAMSTERS** | | |

ORDER CONSOLIDATING CASES,
CONSOLIDATED COMPLAINT, AND NOTICE OF HEARING


Pursuant to Section 102.33 of the Rules and Regulations of the National Labor

Relations Board (the Board) and to avoid unnecessary costs or delay, IT IS ORDERED that Case

21-CA-252500, which is based on a charge filed by International Brotherhood of Teamsters

(Union) against Mason-Dixon International d/b/a Universal Intermodal Services, whose correct

name is Mason-Dixon Intermodal d/b/a Universal Intermodal Services, Case 21-CA-252574,

which is based on a charge filed by the Union against Mason-Dixon International d/b/a Universal

Intermodal Services, whose correct name is Mason-Dixon Intermodal d/b/a Universal Intermodal

Exhibit 3(a)
2205

**GC Exhibt 1(tt)**

EXHIBIT NO. `GC1(tt)` _____   RECEIVED `XX` _____   REJECTED _____

CASE NO `21-CA-252500, et al.` _____ CASE NAME `MASON-DIXON INTERMODAL` _____

NO OF PAGES `28` _____ DATE: `6/14/21` _____ REPORTER: `T. RAY` _____

Exhibit 3(a)
2206

Services, Case 21-CA-264164, which is based on a charge filed by the Union against Universal

Intermodal Services, whose correct name is Mason-Dixon Intermodal d/b/a Universal Intermodal

Services, Case 21-CA-253662, which is based on a charge filed by the Union against Mason-

Dixon Intermodal d/b/a Universal Intermodal Services and Southern Counties Express, whose

correct name is Southern Counties Express, Inc., Case 21-CA-259130, which is based on a

charge filed by the Union against Universal Intermodal Services, whose correct name is Mason-

Dixon Intermodal d/b/a Universal Intermodal Services (hereinafter referred to as Respondent

Universal Intermodal) and Southern Counties Express, whose correct name is Southern Counties

Express, Inc. (hereinafter referred to as Respondent Southern Counties), Case 21-CA-254813,

which is based on a charge filed by the Union against Roadrunner Intermodal Services, whose

correct name is Roadrunner Intermodal Services, LLC (Respondent Roadrunner), and Case 21-

CA-255151, which is based on a charge filed by the Union against Universal Truckload, Inc.,

(Respondent Universal Truckload) are consolidated.  Respondent Universal Intermodal,

Respondent Southern Counties, Respondent Roadrunner, and Respondent Universal Truckload

are referred to collectively hereinafter as Respondents.

       This Order Consolidating Cases, Consolidated Complaint, and Notice of Hearing, which

is based on these charges, is issued pursuant to Section 10(b) of the National Labor Relations Act

(the Act), 29 U.S.C. Sec. 151 et seq., and Section 102.15 of the Board's Rules and Regulations,

and alleges Respondents have violated the Act as described below.

       1.     (a)     The charge in Case 21-CA-252500 was filed by the Union on November

26, 2019, and a copy was served on Respondent Universal Intermodal by U.S. mail on

November 26, 2019.

Exhibit 3(a)
2207

(b)      The first amended charge in Case 21-CA-252500 was filed by the Union on November 27, 2019, and a copy was served on Respondent Universal Intermodal by U.S. mail on November 29, 2019.

(c)      The second amended charge in Case 21-CA-252500 was filed by the Union on December 16, 2019, and a copy was served on Respondent Universal Intermodal by U.S. mail on December 17, 2019.

(d)      The third amended charge in Case 21-CA-252500 was filed by the Union on December 30, 2019, and a copy was served on Respondent Universal Intermodal by U.S. mail on January 2, 2020.

(e)      The charge in Case 21-CA-252574 was filed by the Union on November 27, 2019, and a copy was served on Respondent Universal Intermodal by U.S. mail on November 27, 2019.

(f)      The first amended charge in Case 21-CA-252574 was filed by the Union on December 16, 2019, and a copy was served on Respondent Universal Intermodal by U.S. mail on December 17, 2019.

(g)      The second amended charge in Case 21-CA-252574 was filed by the Union on March 17, 2021, and a copy was served on Respondent Universal Intermodal by U.S. mail on March 17, 2021.

(h)      The charge in Case 21-CA-264164 was filed by the Union on August 5, 2020, and a copy was served on Respondent Universal Intermodal by U.S. mail on August 5, 2020.

Exhibit 3(a)
2208

(i)     The charge in Case 21-CA-253662 was filed by the Union on December 20, 2019, and a copy was served on Respondent Universal Intermodal by U.S. mail on December 20, 2019.

(j)     The first amended charge in Case 21-CA-253662 was filed by the Union on January 15, 2020, and a copy was served on Respondent Universal Intermodal by U.S. mail on January 15, 2020.

(k)     The second amended charge in Case 21-CA-253662 was filed by the Union on June 1, 2020, and a copy was served on Respondent Universal Intermodal and Respondent Southern Counties by U.S. mail on June 2, 2020.

(l)     The charge in Case 21-CA-259130 was filed by the Union on April 14, 2020, and a copy was served on Respondent Universal Intermodal by U.S. mail on April 15, 2020.

(m)     The first amended charge in Case 21-CA-259130 was filed by the Union on June 1, 2020, and a copy was served on Respondent Universal Intermodal and Respondent Southern Counties by U.S. mail on June 2, 2020.

(n)     The charge in Case 21-CA-254813 was filed by the Union on January 16, 2020, and a copy was served on Respondent Roadrunner by U.S. mail on January 17, 2020.

(o)     The charge in Case 21-CA-255151 was filed by the Union on January 24, 2020, and a copy was served on Respondent Universal Truckload by U.S. mail on January 28, 2020.

2.     (a)     At all material times, Respondent Universal Intermodal, a Michigan corporation, with a former office located at 2035 Bella Vista Way, Compton, California (Compton facility), has been engaged in the business of providing transportation services.

Exhibit 3(a)
2209

(b)     During the calendar year 2019, a representative period, Respondent Universal Intermodal purchased and received at its Compton, California facility goods valued in excess of $50,000 directly from points outside the State of California.

(c)     At all material times, Respondent Southern Counties, a California corporation, with a principal office located at 18020 South Santa Fe Avenue, Rancho Dominguez, California (Rancho Dominguez facility) has been engaged in the business of providing full-service harbor drayage, transloading, warehousing and project cargo services in Southern California.

(d)     During the calendar year 2019, a representative period, Respondent Southern Counties purchased and received at its Rancho Dominguez, California facility goods valued in excess of $50,000 directly from points outside the State of California.

(e)     At all material times, Respondent Universal Truckload, a Delaware corporation, with an office and place of business located at 15033 Slover Avenue, Fontana, California (Slover facility) has been engaged in the business of customized transportation and logistics solutions.

(f)     During that calendar year 2019, a representative period, Respondent Universal Truckload purchased and received at its Slover facility goods valued in excess of $50,000 directly from points outside the State of California.

(g)     At all material times, Respondent Roadrunner, a limited liability company with offices and places of business located at 1815 East O Street, Wilmington, California (Wilmington facility) and 11272 Calabash Avenue, Fontana, California (Fontana facility) has been engaged in the business of a nationwide drayage provider, servicing major port and rail locations throughout the United States.

Exhibit 3(a)
2210

(h)     During the calendar year 2020, a representative period, Respondent Roadrunner performed services valued in excess of $50,000 in States other than the State of California.

(i)     At all material times until about December 19, 2019, Respondent Universal Intermodal utilized the Slover facility for certain of its drivers.

3.     (a)     At all material times, Respondents have been affiliated business enterprises under control of Universal Logistics Holdings, Inc. through Universal Management Services with common officers, ownership, directors, management, and supervision; have administered a common labor policy; have shared common premises and facilities; have provided services for and made sales to each other; have interchanged personal with each other; have interrelated operations services and have held themselves out to the public as a single-integrated enterprise.

(b)     Based on its operations described above in paragraph 3, Respondents constitute a single-integrated business enterprise and a single employer within the meaning of the Act.

4.     (a)     At all material times, Respondents have had substantially identical management, business purposes, operations, equipment, customers, and supervision, and ownership.

(b)     Based on the operations and conduct described above in paragraph 4(a), Respondents are, and have been at all material times, alter egos within the meaning of the Act.

5.     At all material times, Respondents have been an employer engaged in commerce within the meaning of Section 2(2), (6) and (7) of the Act.

Exhibit 3(a)
2211

6.     At all material times, the Union has been a labor organization within the meaning of Section 2(5) of the Act.

7.     (a)     At all material times, the following individuals held the positions set forth opposite their respective names and have been supervisors of Respondents within the meaning of Section 2(11) of the Act and agents of Respondents within the meaning of Section 2(13) of the Act.

| | |
|---|---|
| Joe Lugo | General Manager of Respondent Universal Intermodal |
| Micheal Vagts | Director of Labor and Contractor Relations of Universal Management Services, Inc. |
| Dennis Glackin | Vice President of Labor Relations of Universal Management Services, Inc. |
| Tony Miles | Regional Director of the West Coast |
| Tom Phillips | Chief Executive Officer of Universal Management Services, Inc. |
| Don Taylor | President of Respondent Universal Intermodal |
| Mike Erskine | Vice President of Respondent Universal Truckload |
| Chris Howder | Director of Universal Management Services, Inc. |

(b)     At all material times, Labor Consultant Kirk Cummings has been an agent of Respondents within the meaning of Section 2(13) of the Act.

8.     (a)     The following employees of Respondent Universal Intermodal (the Unit) constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

All full-time and regular part-time port drivers employed by Respondent Universal Intermodal working or dispatched out of Respondent Universal Intermodal's facility located at 2035 Vista Bella Way, Compton, California; excluding all other employees,

7

Exhibit 3(a)
2212

dispatchers, mechanics, office clerical employees, professional employees, confidential employees, managerial employees, guards, and supervisors as defined in the Act.

(b)     On December 4, 2019, an election was conducted in the Unit.

(c)     On January 8, 2020, the Board certified the Union as the exclusive collective-bargaining representative of the Unit.

(d)     At all times since December 4, 2019, based on Section 9(a) of the Act, the Union has been the exclusive collective-bargaining representative of the Unit.

9.     (a)     At all material times, and since at least May 27, 2019, Respondents have maintained as a condition of employment for all Respondent Universal Intermodal employees at the Compton facility and Slover facility an agreement entitled Agreement to Waive Participation in Class and Collective Actions (Agreement) that contains provisions prohibiting employees from engaging in protected concerted activity.

(b)     At all material times, and at least since May 27, 2019, employees would reasonably conclude that the provisions of the Agreement described above in paragraph 9(a) and attached as Exhibit 1, restrict their access to the Board and its processes.

10.     About November 12, 2019, Respondents, by Kirk Cummins, at the Slover facility, interrogated an employee about the employee's support for the Union.

11.     Respondents, by Joe Lugo:

(a)     About November 14 or 18, 2019, at the Compton facility, by soliciting employee complaints and grievances, promised its employees increased benefits and improved terms and conditions of employment if they refrained from union organizational activity.

(b)     About November 25, 2019, at the Compton facility, by soliciting employee complaints and grievances, promised its employees increased benefits and improved terms and conditions of employment if they refrained from union organizational activity.

Exhibit 3(a)
2213

12.     (a)     About November 25, 2019, Respondents discharged Respondent Universal Intermodal employee Romel Mallard.

(b)     About November 25, 2019, Respondents suspended Respondent Universal Intermodal employee Jonathan Ledesma.

(c)     About November 27, 2019, Respondents discharged Respondent Universal Intermodal employee Jonathan Ledesma.

(d)     Respondents engaged in the conduct described above in paragraphs 12 (a) through (c) because the named employees of Respondent Universal Intermodal assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities.

13.     (a)     About December 5, 2019, Respondents reduced the work assigned to the Unit employees.

(b)     Respondents engaged in the conduct described above in paragraph 13(a) because the Unit employees assisted the Union and engaged in concerted activities, and a majority voted in favor of the Union in an election conducted on December 4, 2019, and to discourage employees from engaging in these activities.

(c)     The subject set forth above in paragraph 13(a) relates to wages, hours, and other terms and conditions of employment of the Unit and is a mandatory subject for the purposes of collective bargaining.

(d)     Respondents engaged in the conduct described above in paragraph 13(a) without prior notice to the Union and without affording the Union an opportunity to bargain with Respondent with respect to this conduct or the effects of this conduct.

Exhibit 3(a)
2214

14.     (a)     About December 18, 2019, Respondents laid off Respondent Roadrunner's employees.

(b)     Respondents engaged in the conduct described above in paragraph 14(a) because the Unit employees assisted the Union and engaged in concerted activities, and employees of Respondent Roadrunner supported and assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities.

15.     (a)     About December 20, 2019, Respondents laid off Respondent Universal Truckload's employees.

(b)     Respondents engaged in the conduct described above in paragraph 15(a) because the Unit employees assisted the Union and engaged in concerted activities, and employees of Respondent Universal Truckload supported and assisted the Union and engaged in concerted activities, and to discourage employees from engaging in these activities.

16.     (a)     About December 20, 2019, Respondents closed Respondent Universal Intermodal's Compton facility and laid off the Unit employees.

(b)     About December 20, 2019, Respondents moved the work formerly assigned to the Unit employees to drivers working under the direction of Respondent Southern Counties.

(c)     Respondents engaged in the conduct described above in paragraphs 16(a) and (b) because the Unit employees assisted the Union and engaged in concerted activities, and a majority voted in favor of the Union in an election conducted on December 4, 2019, and to discourage employees from engaging in these activities.

Exhibit 3(a)
2215

(d)      Respondents engaged in the conduct described above in paragraphs 16(a) and (b) to discourage employees at Respondents' other facilities from supporting or assisting the Union or engaging in concerted activities.

(e)      The subjects set forth above in paragraphs 16(a) and (b) relate to wages, hours, and other terms and conditions of employment of the Unit and are mandatory subjects for the purposes of collective bargaining.

(f)      Respondents engaged in the conduct described above in paragraphs 16(a) and (b) without prior notice to the Union and without affording the Union an opportunity to bargain with Respondent with respect to this conduct or the effects of this conduct.

17.      (a)      About January 18, 2020, the Union requested that Respondent Universal Intermodal bargain collectively about the terms and conditions of employment for the Unit employees.

(b)      Since about January 31, 2020, Respondent Universal Intermodal has failed and refused to bargain collectively about the subjects set forth above in paragraph 17(a).

(c)      The subjects set forth above in paragraph 17(a) relate to the wages, hours, and other terms and conditions of employment of the Unit and are mandatory subjects for the purposes of collective bargaining.

18.      (a)      Since about January 18, 2020, the Union has requested in writing that Respondent Universal Intermodal and Respondent Southern Counties furnish the Union with the information contained in the letter attached as Exhibit 2.

(b)      The information requested by the Union, as described above in paragraph 18(a) is necessary for, and relevant to, the Union's performance of its duties as the exclusive collective-bargaining representative of the Unit.

Exhibit 3(a)
2216

(c)      Since about July 15, 2020, Respondent Universal Intermodal and Respondent Southern Counties have failed and refused to furnish the Union with the information requested by it as described above in paragraph 18(a).

19.      (a)      Since about July 15, 2020, the Union has requested that Respondent Universal Intermodal furnish the Union with all documents reviewed and relied upon by Respondent Universal Intermodal to settle all claims involving a Unit employee for $250.

(b)      The information requested by the Union, as described above in paragraph 19(a) is necessary for, and relevant to, the Union's performance of its duties as the exclusive collective-bargaining representative of the Unit.

(c)      Since about July 15, 2020, Respondent Universal Intermodal has failed and refused to furnish the Union with the information requested by it as described above in paragraph 19(a).

20.      About July 7, 2020, Respondent Universal Intermodal by Michael Vagts bypassed the Union and dealt directly with an employee in the Unit by offering to settle his claim for reimbursement without giving the Union an opportunity to be present.

21.      (a)      About July 15, 2020, the Union requested that Respondent Universal Intermodal bargain collectively about issues related to a Unit employee's employment.

(b)      Since about July 15, 2020, Respondent Universal Intermodal has failed and refused to bargain collectively about the subjects set forth above in paragraph 21(a).

(c)      The subjects set forth above in paragraph 21(a) relate to the wages, hours, and other terms and conditions of employment of the Unit and are mandatory subjects for the purposes of collective bargaining.

12

Exhibit 3(a)
2217

22.     By the conduct described above in paragraphs 9 through 11, Respondents have been interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in Section 7 of the Act in violation of Section 8(a)(1) of the Act.

23.     By the conduct described above in paragraphs 12, 13(a) and (b), 14, 15, and 16 (a) through (d), Respondents have been discriminating in regard to the hire or tenure or terms or conditions of employment of its employees, thereby discouraging membership in a labor organization in violation of Section 8(a)(1) and (3) of the Act.

24.     By the conduct described above in paragraphs 13(c) and (d), 16 (a), (b), (e), and (f), and 17 through 21, Respondents have been failing and refusing to bargain collectively with the exclusive collective-bargaining representative of its employees in violation of Section 8(a)(1) and (5) of the Act.

25.     The unfair labor practices of Respondents described above affect commerce within the meaning of Section 2(6) and (7) of the Act.

WHEREFORE, as part of the remedy for the unfair labor practices alleged above in paragraphs 9 through 21, the Acting General Counsel seeks an Order restoring the Unit, returning the work to Unit employees and requiring Respondents to bargain in good faith with the Union, on request, for the period required by *Mar-Jac Poultry Co.,* 136 NLRB 785 (1962), as the recognized bargaining representative in the appropriate unit.  The Acting General Counsel also seeks reinstatement of the employees laid off by Respondents at Respondent Universal Truckload and Respondent Roadrunner facilities.  The Acting General Counsel further seeks all other relief as may be just and proper to remedy the unfair labor practices alleged.

## **ANSWER REQUIREMENT**

Exhibit 3(a)
2218

Respondents are notified that, pursuant to Sections 102.20 and 102.21 of the Board's Rules and Regulations, each must file an answer to the consolidated complaint.  The answer must be **electronically filed with this office on or before March 31, 2021**.  Respondents should also serve a copy of the answer on each of the other parties.

An answer must be filed electronically through the Agency's website.  To file electronically, go to www.nlrb.gov, click on **E-File Documents,** enter the NLRB Case Number, and follow the detailed instructions.  The responsibility for the receipt and usability of the answer rests exclusively upon the sender.  Unless notification on the Agency's website informs users that the Agency's E-Filing system is officially determined to be in technical failure because it is unable to receive documents for a continuous period of more than 2 hours after 12:00 noon (Eastern Time) on the due date for filing, a failure to timely file the answer will not be excused on the basis that the transmission could not be accomplished because the Agency's website was off-line or unavailable for some other reason.  The Board's Rules and Regulations require that an answer be signed by counsel or non-attorney representative for represented parties or by the party if not represented.  See Section 102.21.  If the answer being filed electronically is a pdf document containing the required signature, no paper copies of the answer need to be transmitted to the Regional Office.  However, if the electronic version of an answer to a complaint is not a pdf file containing the required signature, then the E-filing rules require that such answer containing the required signature continue to be submitted to the Regional Office by traditional means within three (3) business days after the date of electronic filing.  Service of the answer on each of the other parties must still be accomplished by means allowed under the Board's Rules and Regulations.  The answer may not be filed by facsimile transmission.  If no answer is filed,

Exhibit 3(a)
2219

or if an answer is filed untimely, the Board may find, pursuant to a Motion for Default Judgment, that the allegations in the consolidated complaint as to the nonresponding Respondent are true.

## NOTICE OF HEARING

PLEASE TAKE NOTICE that on **June 14, 2021, at 9 am**, a hearing in the above-entitled matter will commence.  The hearing will be conducted via videoconferencing using the Zoom for Government platform, or by such other means and method as directed by the Administrative Law Judge.  The hearing will continue on consecutive days until concluded.  At the hearing, Respondents and any other party to this proceeding have the right to appear and present testimony regarding the allegations in this consolidated complaint.  The procedures to be followed at the hearing are described in the attached Form NLRB-4668.  The procedure to request a postponement of the hearing is described in the attached Form NLRB-4338.

Dated: March 17, 2021.

William B. Cowen, Regional Director
National Labor Relations Board, Region 21
US Court House
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Attachments

Exhibit 3(a)
2220

FORM NLRB 4338
(6-90)

<div align="center">

**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**
**NOTICE**

</div>

Case 21-CA-252500, et al.

The issuance of the notice of formal hearing in this case does not mean that the matter cannot be disposed of by agreement of the parties. On the contrary, it is the policy of this office to encourage voluntary adjustments. The examiner or attorney assigned to the case will be pleased to receive and to act promptly upon your suggestions or comments to this end.

An agreement between the parties, approved by the Regional Director, would serve to cancel the hearing. However, unless otherwise specifically ordered, the hearing will be held at the date, hour, and place indicated. Postponements *will not be granted* unless good and sufficient grounds are shown *and* the following requirements are met:

(1) The request must be in writing. An original and two copies must be filed with the Regional Director when appropriate under 29 CFR 102.16(a) or with the Division of Judges when appropriate under 29 CFR 102.16(b).

(2) Grounds must be set forth in *detail*;

(3) Alternative dates for any rescheduled hearing must be given;

(4) The positions of all other parties must be ascertained in advance by the requesting party and set forth in the request; and

(5) Copies must be simultaneously served on all other parties (listed below), and that fact must be noted on the request.

Except under the most extreme conditions, no request for postponement will be granted during the three days immediately preceding the date of hearing.

Julie Gutman Dickinson, Esq.   Michael Vagts, Senior HR Manager
Bush Gottlieb, A Law Corporation  Roadrunner Intermodal Services
801 North Brand Blvd., Suite 950  1815 O Street
Glendale, CA 91203-1260    Wilmington, CA 90744

Hector De Haro, Esq.     Michael Vagts, Senior HR Manager
Bush Gottlieb, A Law Corporation  Universal Truckload, Inc.
801 N Brand Blvd., Suite 950   15033 Slover Ave.
Glendale, CA 91203     Fontana, CA 92337

Raven L. Hall, Staff Attorney   Michael Vagts, Senior HR Manager
International Brotherhood of Teamsters Roadrunner Intermodal Services
25 Louisiana Ave NW     11184 Almond Ave.
Washington, DC 20001    Fontana, CA 92337

Exhibit 3(a)
2221

16

Joe Lugo, General Manger
Mason-Dixon Intermodal d/b/a Universal
  Intermodal Services
2035 E. Vista Bella Way
Compton, CA 90220

Southern Counties Express
18020 S. Santa Fe Avenue
Rancho Dominguez, CA 90220

Rodolfo R. Agraz, Esq.
Ogletree, Deakins, Nash, Smoak
  & Stewart, P.C.
Preston Commons West
8117 Preston Road, Suite 500
Dallas, TX 75225

Universal Intermodal Services & Southern
  Counties Express, a single employer
2035 E. Vista Bella Way
Compton, CA 90220

Daniel A. Adlong, Esq.
Ogletree, Deakins, Nash, Smoak
  & Stewart, P.C., Park Tower
695 Town Center Drive, Suite 1500
Costa Mesa, CA 92626-1924

Jason Wojciechowski, Esq.
Bush Gottlieb, A Law Corporation
801 N. Brand Blvd., Suite 950
Glendale, CA 91203

Exhibit 3(a)
2222
17

Form NLRB-4668
(6-2014)

# Procedures in NLRB Unfair Labor Practice Hearings

The attached complaint has scheduled a hearing that will be conducted by an administrative law judge (ALJ) of the National Labor Relations Board who will be an independent, impartial finder of facts and applicable law. **You may be represented at this hearing by an attorney or other representative.** If you are not currently represented by an attorney, and wish to have one represent you at the hearing, you should make such arrangements as soon as possible. A more complete description of the hearing process and the ALJ's role may be found at Sections 102.34, 102.35, and 102.45 of the Board's Rules and Regulations. The Board's Rules and regulations are available at the following link: www.nlrb.gov/sites/default/files/attachments/basic-page/node-1717/rules_and_regs_part_102.pdf.

The NLRB allows you to file certain documents electronically and you are encouraged to do so because it ensures that your government resources are used efficiently. To e-file go to the NLRB's website at www.nlrb.gov, click on "e-file documents," enter the 10-digit case number on the complaint (the first number if there is more than one), and follow the prompts. You will receive a confirmation number and an e-mail notification that the documents were successfully filed.

**Although this matter is set for trial, this does not mean that this matter cannot be resolved through a settlement agreement**. The NLRB recognizes that adjustments or settlements consistent with the policies of the National Labor Relations Act reduce government expenditures and promote amity in labor relations and encourages the parties to engage in settlement efforts.

## I.     BEFORE THE HEARING

The rules pertaining to the Board's pre-hearing procedures, including rules concerning filing an answer, requesting a postponement, filing other motions, and obtaining subpoenas to compel the attendance of witnesses and production of documents from other parties, may be found at Sections 102.20 through 102.32 of the Board's Rules and Regulations. In addition, you should be aware of the following:

- **Special Needs:** If you or any of the witnesses you wish to have testify at the hearing have special needs and require auxiliary aids to participate in the hearing, you should notify the Regional Director as soon as possible and request the necessary assistance. Assistance will be provided to persons who have handicaps falling within the provisions of Section 504 of the Rehabilitation Act of 1973, as amended, and 29 C.F.R. 100.603.

- **Pre-hearing Conference:** One or more weeks before the hearing, the ALJ may conduct a telephonic prehearing conference with the parties. During the conference, the ALJ will explore whether the case may be settled, discuss the issues to be litigated and any logistical issues related to the hearing, and attempt to resolve or narrow outstanding issues, such as disputes relating to subpoenaed witnesses and documents. This conference is usually not recorded, but during the hearing the ALJ or the parties sometimes refer to discussions at the pre-hearing conference. You do not have to wait until the prehearing conference to meet with the other parties to discuss settling this case or any other issues.

## II.     DURING THE HEARING

The rules pertaining to the Board's hearing procedures are found at Sections 102.34 through 102.43 of the Board's Rules and Regulations. Please note in particular the following:

- **Witnesses and Evidence**: At the hearing, you will have the right to call, examine, and cross-examine witnesses and to introduce into the record documents and other evidence.

- **Exhibits: Each exhibit offered in evidence must be provided in duplicate to the court reporter and a copy of each of each exhibit should be supplied to the ALJ and each party when the exhibit is offered**

Exhibit 3(a)
2223

Form NLRB-4668
(6-2014)

**in evidence.**  If a copy of any exhibit is not available when the original is received, it will be the responsibility of the party offering such exhibit to submit the copy to the ALJ before the close of hearing. If a copy is not submitted, and the filing has not been waived by the ALJ, any ruling receiving the exhibit may be rescinded and the exhibit rejected.

- **Transcripts**:  An official court reporter will make the only official transcript of the proceedings, and all citations in briefs and arguments must refer to the official record. The Board will not certify any transcript other than the official transcript for use in any court litigation.  Proposed corrections of the transcript should be submitted, either by way of stipulation or motion, to the ALJ for approval.  Everything said at the hearing while the hearing is in session will be recorded by the official reporter unless the ALJ specifically directs off-the-record discussion.  If any party wishes to make off-the-record statements, a request to go off the record should be directed to the ALJ.

- **Oral Argument:**  You are entitled, on request, to a reasonable period of time at the close of the hearing for oral argument, which shall be included in the transcript of the hearing.  Alternatively, the ALJ may ask for oral argument if, at the close of the hearing, if it is believed that such argument would be beneficial to the understanding of the contentions of the parties and the factual issues involved.

- **Date for Filing Post-Hearing Brief**:  Before the hearing closes, you may request to file a written brief or proposed findings and conclusions, or both, with the ALJ.  The ALJ has the discretion to grant this request and to will set a deadline for filing, up to 35 days.

## III.    AFTER THE HEARING

The Rules pertaining to filing post-hearing briefs and the procedures after the ALJ issues a decision are found at Sections 102.42 through 102.48 of the Board's Rules and Regulations.  Please note in particular the following:

- **Extension of Time for Filing Brief with the ALJ:**  If you need an extension of time to file a post-hearing brief, you must follow Section 102.42 of the Board's Rules and Regulations, which requires you to file a request with the appropriate chief or associate chief administrative law judge, depending on where the trial occurred.  You must immediately serve a copy of any request for an extension of time on all other parties and furnish proof of that service with your request.  You are encouraged to seek the agreement of the other parties and state their positions in your request.

- **ALJ's Decision:**  In due course, the ALJ will prepare and file with the Board a decision in this matter.  Upon receipt of this decision, the Board will enter an order transferring the case to the Board and specifying when exceptions are due to the ALJ's decision.  The Board will serve copies of that order and the ALJ's decision on all parties.

- **Exceptions to the ALJ's Decision**:  The procedure to be followed with respect to appealing all or any part of the ALJ's decision (by filing exceptions with the Board), submitting briefs, requests for oral argument before the Board, and related matters is set forth in the Board's Rules and Regulations, particularly in Section 102.46 and following sections.  A summary of the more pertinent of these provisions will be provided to the parties with the order transferring the matter to the Board.

Exhibit 3(a)
2224
19

## UNIVERSAL INTERMODAL SERVICES, INC.

## AGREEMENT TO WAIVE PARTICIPATION IN CLASS AND COLLECTIVE ACTIONS

In exchange for Universal Intermodal Services, Inc. ("Company") agreeing to hire you, you agree to bring any claim you may have against the Company on an individual basis only and not on behalf of or with any other present or former employee, and you expressly agree to waive any right you may have to bring or participate in any class or collective action, private attorney general action, group action, or to join with any other current or former employee in bringing a lawsuit or asserting claims against the Company or its current, future, and former parents, subsidiaries, affiliates, shareholders, members, directors, officers, employees, insurers, benefit plans, agents, and the predecessors, successors, and assigns of each of them. This waiver applies both during the time you are employed by the Company and after your employment ends. Signing this waiver does not change the at-will nature of your employment with the Company. By signing below, you acknowledge that this waiver is a condition of your employment with the Company.

You may choose to opt out of this condition of employment within your first 60 days of employment by delivering written notice of your decision to the Company via US mail, Attn: Qualifications and Onboarding 12341 East Nine Mile Road Warren, MI 48089 or by emailing fileupdate a goutsi.com. If you violate this agreement and/or the Company is required to enforce this waiver in court or in any other forum, you agree to pay the Company's reasonable attorneys' fees and costs associated with doing so. If any term of this waiver is unenforceable in any jurisdiction, such unenforceability shall not affect any other term of this waiver or render unenforceable such term in any other jurisdiction.

The foregoing has been read and agreed to:

Signature: _____

Employee's Printed Name: _____

Date: _____

Exhibit 3(a)
2225

**EXHIBIT 1**

# BUSH GOTTLIEB
## A Law Corporation

David E. Ahdoot
Robert A. Bush
Hector De Haro
Lisa C. Demidovich#
Erica Deutsch
Peter S. Dickinson+
Ira L. Gottlieb*
Julie Gutman Dickinson
Joseph A. Kohanski*

* Also admitted in New York
+ Also admitted in Nevada
# Also admitted in Washington DC
~ Admitted in Washington DC

801 North Brand Boulevard, Suite 950
Glendale, California 91203
Telephone (818) 973-3200
Facsimile (818) 973-3201
www.bushgottlieb.com

Adam Kornetsky~
Dana S. Martinez
Garrett A. McCoy
Kirk M. Prestegard
Dexter Rappleye
Estephanie Villalpando
Jason Wojciechowski
Vanessa C. Wright

11135-29006

January 18, 2020

Direct Dial: (818) 973-3228
jgutmandickinson@bushgottlieb.com

**VIA E-MAIL, FAX, AND U.S. MAIL**

Tony Milles
Mason-Dixon International d/b/a Universal
Intermodal Services
9515 10th Ave South
Seattle, CA 98108
P: 206 762 6100
F: 586 467 0904
tmilles@universalintermodal.com

John S. Ferrer
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1909 K Street NW, Suite 1000
Washington, D.C. 20006
P: 202 263 0173
F: 202 887 0866
john.ferrer@ogletree.com

Re:     Union's Demand to Bargain and Request for Information

Dear Mr. Milles and Mr. Ferrer:

As you are aware, on January 8, 2020, the International Brotherhood of Teamsters (the "Union") was certified as the exclusive bargaining representative for "All full-time and regular part-time port drivers employed by the Employer working or dispatched out of the Employer's facility currently located at 2035 Vista Bella Way, Compton, California," with the Employer being Mason-Dixon Intermodal d/b/a Universal Intermodal Services. This letter is to demand bargaining over the terms and conditions of employment for those employees. Please immediately provide your availability for bargaining sessions in January and February 2020.

The Union has also become aware that after employees voted to unionize, the Employer, without giving notice to the Union, unilaterally terminated all bargaining unit employees and closed the Compton facility, assigning the work previously done by those bargaining unit employees to non-union employees at other locations. In addition to constituting unlawful discrimination and retaliation, these actions are clear violations of the Employer's duty to bargain with the Union. Accordingly, the Union demands that the Employer  restore the status quo by reinstating all unlawfully terminated employees, and bargain with the Union over the  decision to close the facility and relocate unit work. In addition to bargaining over the decision itself, the Union demands the Employer bargain over the effects of these decisions on the bargaining unit.

**EXHIBIT 2**

**VIA E-MAIL AND U.S. MAIL**
Universal
January 17, 2020
Page 2

In preparation for our upcoming contract negotiations, the Union needs certain information in order to develop proposals and prepare for productive negotiations. Because we hope to arrive at a collective bargaining agreement expeditiously, please provide this information as soon as possible, and by no later than Friday, January 31, 2020.  Please identify any information that is not readily available, and provide a timeline of when that information will be made available to the Union so that we can plan accordingly. In addition, please identify any portion of this request for which the Employer does not maintain information, or where information is otherwise not available.

1.      **Employee specific information:** A list of all bargaining unit employees containing the following information in excel spreadsheet format. "Bargaining unit employees" includes any and all employees who were terminated at any point from October 2019 through the present. Unless indicated otherwise, these requests should be construed as asking for the information for the 12-month period from January 17, 2019 through the present. For each individual employee please include the following information:



b.      sex or gender;

c.      race;

d.      employee number or social security number;



i.      wage rate, including:

 i.      base wage rate;

 ii.      whether the employee has received a higher rate of pay because they have opted out of insurance or other benefits;

 iii.      amounts paid for any premiums or differentials, e.g. for certifications, specialties, or endorsements;

 iv.      step and or grade on pay scale;

**VIA E-MAIL AND U.S. MAIL**
Universal
January 17, 2020
Page 3

v.   all wage increases granted in the past two years and dates on which they
were granted;



n.   number of hours missed as a result of the employee being called off or as a result
of the Employer otherwise canceling that employee's scheduled shift;

o.   total amounts paid for any hiring, recruitment, relocation or retention bonuses;

p.   amount employee and employer contributed to all retirement plans.  Please
breakout information by retirement plan and by employee/employer contribution;

q.   amounts paid to employee for missed breaks;

**VIA E-MAIL AND U.S. MAIL**
Universal
January 17, 2020
Page 4



6.    **Employer policies:** A copy of all policies and procedures related to employment conditions and benefits, including all current work rules and a copy of all employee handbooks or manuals:

     a.    This request includes, without limitation:

          i.     company leave policies;

          ii.    attendance policies;

          iii.   policies with respect to diseases, disability or illness;

**VIA E-MAIL AND U.S. MAIL**
Universal
January 17, 2020
Page 5

      iv.    policies with respect to promotions or raises;

      v.    training programs;

      vi.    temporary help/hiring policies;

      vii.    layoff/recall policies;

      viii.    drug and alcohol policies;

      ix.    holiday gift policies.

      x.    policies with respect to the use of any bulletin boards, or other locations, where notices to employees are regularly posted;

      xi.    policies regarding the use of computer equipment to which employees have access

    b.    For any leave policy—such as sick leave, vacation leave, PTO, family leave, maternity/paternity leave, Family Medical Leave, or State leave—please include information regarding accrual rates, maximum accruals, limits on utilization, procedures for cash-out, list of employees who have utilized such leave in the past five years, a list of employees who have been denied such leave;

7.    **Health and Safety:** Any reports or logs related to injuries on the job, and/or workplace health and safety;

8.    **Discipline:** Copies of all disciplinary notices, warnings, or records of disciplinary personnel actions for the last year received by, or assessed against, bargain unit employees;

9.    **Individual Agreements:** Identify any employee with whom the Employer has any oral or written agreement, and provide a copy of such agreement if in writing, or describe the terms and conditions of the agreement;

10.    **Employee Evaluations:** Copies of any employee evaluations in the past five years;

11.    **Recent Terminations/Relocation/Layoffs/Transfer of Unit Work:** Please provide the following information related to the Employer's unilateral and unlawful decision to terminate unit members in December 2019, and relocate bargaining unit work to related facilities:

VIA E-MAIL AND U.S. MAIL
Universal
January 17, 2020
Page 6

a.  Bylaws, articles of incorporation, and corporate structure for the Employer and any parent, subsidiary, or related company;

b.  Financial statements for the last five years for the Employer and any parent, subsidiary, or related company;

c.  Copies of any reports from consultants, investment advisors, certified public accountants, or others concerning the value of the company;

d.  Audited financial statements for 2018 and 2019;

e.  Monthly financial statements from January 2018 through the present;

f.  A monthly list of all customers serviced by bargaining unit employees, from January 2018 through present, including the volume of work completed for each customer;

g.  A list of any customers or contracts lost by the Employer from January 2018 through the present, including documents showing why and when that occurred;

h.  For each customer or contract serviced by bargaining unit employees as of November 2019, a description of whether the Employer or any related company is currently completing that work;

i.  Correspondences, proposals, plans, agreements, or other documents regarding Employer's decision to layoff or terminate bargaining unit employees in December 2019;

j.  Correspondences, proposals, plans, agreements, or other documents regarding Employer's decision to relocate bargaining unit work to other facilities in December 2019;

k.  Documents supporting the Employer's contention that the terminations/layoffs/plant closure/relocation in December 2019 was economically necessary;

■  ████████████████████████████████████████████

m.  Correspondences, proposals, plans, agreements, or other documents regarding Employer's re-negotiation for the lease at 2035 Vista Bella Way, Compton, California;

**VIA E-MAIL AND U.S. MAIL**

n.  Correspondences, proposals, plans, agreements, or other documents regarding Employer's search or efforts to obtain a lease on another property in Southern California in 2019;

o.  Correspondences, proposals, plans, agreements, or other documents regarding contingency plans if the Employer did not renew the lease at 2035 Vista Bella Way, Compton, California; and

p.  Correspondences, proposals, plans, agreements, or other documents regarding new hiring of employee drivers or owner-operators by the Employer or any related entity in Southern California since October 2018.

The Union reserves the right to request additional information in the future as may be necessary to properly represent bargaining unit employees. These requests include a continuing duty to provide additional information that becomes available after these requests have been answered. The Union believes that all of these requests are valid and demands relevant information under the National Labor Relations Board's standards. Should the Employer have any concerns, the Union stands ready to negotiate over the Employer's concerns to work out a mutually agreeable resolution. We respectfully request that the information be provided in the most useable format.

We look forward to receiving this information by no later than January 31, 2020. If any information is not immediately available or cannot be provided by January 31, 2010, identify which items and provide an explanation or timeframe so that we may properly prepare.

Thank you in advance. Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Bush Gottlieb
A Law Corporation

Julie Gutman Dickinson

cc: Fred Potter, Port Division Director, International Brotherhood of Teamsters
Eric Tate, Port Division International Representative, International Brotherhood of Teamsters /Secretary-Treasurer, Teamsters Local 848

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

**UNIVERSAL TRUCKLOAD, INC.**

    Charged Party

    and

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**

    Charging Party

**Case 21-CA-255151**

## AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER

I, the undersigned employee of the National Labor Relations Board, state under oath that on January 28, 2020, I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Michael Vagts, Senior HR Manager
Universal Truckload, Inc.
15033 Slover Ave.
Fontana, CA 92337

| | |
|---|---|
| January 28, 2020 | Helen Alo, Designated Agent of NLRB |
| Date | Name |

HELEN ALO

Digitally signed by HELEN ALO
Date: 2020.01.28 14:11:36
-08'00'

Signature

Exhibit 3(a)
2233

**GC Exhibit 1(ss)**

GC1(ss)                              XX
EXHIBIT NO._____  RECEIVED _____  REJECTED _____


    21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


        2              6/14/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2234



UNITED STATES GOVERNMENT
**NATIONAL LABOR RELATIONS BOARD**

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

January 28, 2020

Michael Vagts, Senior HR Manager
Universal Truckload, Inc.
15033 Slover Ave.
Fontana, CA 92337

Re:    Universal Truckload, Inc.
Case 21-CA-255151

Dear Mr. Vagts:

Enclosed is a copy of a charge that has been filed in this case.  This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:**  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If this Board agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Right to Representation:**  You have the right to be represented by an attorney or other representative in any proceeding before us.  If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*.  This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board.  Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** We seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations set forth in the charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation.  In this way, the case can be fully investigated more quickly.

Full and complete cooperation includes providing witnesses to give sworn affidavits to a Board agent, and providing all relevant documentary evidence requested by the Board agent.  Sending us your written account of the facts and a statement of your position is not enough to be considered full and complete cooperation.  A refusal to fully cooperate during the investigation might cause a case to be litigated unnecessarily.

In addition, either you or your representative must complete the enclosed Commerce Questionnaire to enable us to determine whether the NLRB has jurisdiction over this dispute.  If you

Exhibit 3(a)
2235

**GC Exhibit 1(rr)**

```
                    GC1(rr)                    XX
EXHIBIT NO._____  RECEIVED _____ REJECTED _____


         21-CA-252500, et al.        MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


              6              6/14/21           T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____
```

Exhibit 3(a)
2236

Universal Truckload, Inc.                                    - 2 -                                    January 28, 2020
Case 21-CA-255151

recently submitted this information in another case, or if you need assistance completing the form, please contact the Board agent.

We will not honor any request to place limitations on our use of position statements or evidence beyond those prescribed by the Freedom of Information Act and the Federal Records Act.  Thus, we will not honor any claim of confidentiality except as provided by Exemption 4 of FOIA, 5 U.S.C. Sec. 552(b)(4), and any material you submit may be introduced as evidence at any hearing before an administrative law judge.  We are also required by the Federal Records Act to keep copies of documents gathered in our investigation for some years after a case closes.  Further, the Freedom of Information Act may require that we disclose such records in closed cases upon request, unless there is an applicable exemption.  Examples of those exemptions are those that protect confidential financial information or personal privacy interests.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

Exhibit 3(a)
2237

Universal Truckload, Inc.                          - 3 -                          January 28, 2020
Case 21-CA-255151

We can provide assistance for persons with limited English proficiency or disability.  Please let us know if you or any of your witnesses would like such assistance.

Very truly yours,

William B. Cowen
Regional Director

Enclosures:
1.  Copy of Charge
2.  Commerce Questionnaire

WBC.hta

Exhibit 3(a)
2238



**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

January 28, 2020

International Brotherhood of Teamsters
25 Louisiana Avenue, NW
Washington, DC 20001-2130

Re:     Universal Truckload, Inc.
         Case 21-CA-255151

Dear Sir or Madam:

The charge that you filed in this case on January 24, 2020, has been docketed as case number 21-CA-255151.  This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:**  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If this Board agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Right to Representation:**  You have the right to be represented by an attorney or other representative in any proceeding before us.  If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*.  This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board.  Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession.  Because we seek to resolve labor disputes promptly, you should be ready to promptly present your affidavit(s) and other evidence.  If you have not yet scheduled a date and time for the Board agent to take your affidavit, please contact the Board agent to schedule the affidavit(s).  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed without investigation.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

Exhibit 3(a)
2239

Universal Truckload, Inc.                - 2 -                    January 28, 2020
Case 21-CA-255151

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

We can provide assistance for persons with limited English proficiency or disability.  Please let us know if you or any of your witnesses would like such assistance.

Very truly yours,

William B. Cowen
Regional Director

Enclosures

cc:    Jason Wojciechowski, Attorney at Law
       Bush Gottlieb, A Law Corporation
       801 N. Brand Blvd., Suite 950
       Glendale, CA 91203

Exhibit 3(a)
2240

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 21-CA-255151 | 01-24-2020 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br>Universal Truckload, Inc. | b. Tel. No.<br>586-920-0100 |
|---|---|
| | c. Cell No. |
| | f. Fax. No. |

| d. Address *(Street, city, state, and ZIP code)*<br>15033 Slover Ave.<br>Fontana, CA 92337 | e. Employer Representative<br>Michael Vagts<br>Senior HR Manager | g. e-mail |
|---|---|---|
| | | h. Number of workers employed<br>12 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Trucking | j. Identify principal product or service<br>Trucking |
|---|---|

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and

(list subsections)     (3)                               of the National Labor Relations Act, and thest unfair labor

practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of

the Act and the Postal Reorganization Act.

**2. Basis of the Charge** *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, through its officers, supervisors, and agents, has laid off employees in retaliation for similarly situated employees organizing a union at a related company, Mason Dixon d/b/a Universal Intermodal, and in retaliation for other union and protected concerted activity, and in order to chill union and protected concerted activity.

**3. Full name of party filing charge** *(if labor organization, give full name, including local name and number)*

International Brotherhood of Teamsters

| 4a. Address *(Street and number, city, state, and ZIP code)*<br>25 Louisiana NW<br>Washington, D.C. 20001 | 4b. Tel. No. |
|---|---|
| | 4c. Cell No. |
| | 4d. Fax. No. |
| | 4e. e-mail<br>rhidalgo@teamster.org |

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief. | | Tel. No.<br>818-973-3208 |
|---|---|---|
| *(signature of representative or person making charge)* | Jason Wojciechowski, Attorney<br>*(Print/type name and title or office, if any)* | Office, if any, Cell No. |
| Bush Gottlieb<br>801 N. Brand Blvd., Suite 950<br>Glendale, CA 91203<br>Address | Date   Jan. 23, 2020 | Fax No.<br><br>e-mail<br>jasonw@bushgottlieb.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

Exhibit X(a)
2241

**GC Exhibit 1(qq)**

GC1(qq)                         XX
EXHIBIT NO._____   RECEIVED _____ REJECTED _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

2              6/14/21            T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2242

## UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

**ROADRUNNER INTERMODAL SERVICES**

     Charged Party

     and

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**

     Charging Party

**Case 21-CA-254813**

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, state under oath that on January 17, 2020, I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Michael Vagts, Senior HR Manager
Roadrunner Intermodal Services
11184 Almond Ave.
Fontana, CA 92337

Michael Vagts, Senior HR Manager
Roadrunner Intermodal Services
1815 O Street
Wilmington, CA 90744

| | |
|---|---|
| January 17, 2020 | Helen Alo, Designated Agent of NLRB |
| Date | Name |

HELEN ALO

Digitally signed by HELEN ALO
Date: 2020.01.17 14:37:34 -08'00'

Signature

Exhibit 3(a)
2243

**GC Exhibit 1(pp)**

GC1(pp)                          XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____


       21-CA-252500, et al.        MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____


              2              6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2244



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Download
NLRB
Mobile App

January 17, 2020

Michael Vagts, Senior HR Manager
Roadrunner Intermodal Services
11184 Almond Ave.
Fontana, CA 92337

Michael Vagts, Senior HR Manager
Roadrunner Intermodal Services
1815 O Street
Wilmington, CA 90744

Re:   Roadrunner Intermodal Services
Case 21-CA-254813

Dear Mr. Vagts:

Enclosed is a copy of a charge that has been filed in this case.  This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:**  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If this Board agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Right to Representation:**  You have the right to be represented by an attorney or other representative in any proceeding before us.  If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance.*  This form is available on our website, [www.nlrb.gov](www.nlrb.gov), or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board.  Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** We seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations set forth in the charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation.  In this way, the case can be fully investigated more quickly.

Exhibit 3(a)
2245

**GC Exhibit 1(oo)**

```
            GC1(oo)                    XX
EXHIBIT NO._____ RECEIVED _____ REJECTED _____


        21-CA-252500, et al.        MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


        4              6/14/21              T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____
```

Exhibit 3(a)
2246

Roadrunner Intermodal Services               - 2 -                    January 17, 2020
Case 21-CA-254813

Full and complete cooperation includes providing witnesses to give sworn affidavits to a Board agent, and providing all relevant documentary evidence requested by the Board agent. Sending us your written account of the facts and a statement of your position is not enough to be considered full and complete cooperation. A refusal to fully cooperate during the investigation might cause a case to be litigated unnecessarily.

In addition, either you or your representative must complete the enclosed Commerce Questionnaire to enable us to determine whether the NLRB has jurisdiction over this dispute. If you recently submitted this information in another case, or if you need assistance completing the form, please contact the Board agent.

We will not honor any request to place limitations on our use of position statements or evidence beyond those prescribed by the Freedom of Information Act and the Federal Records Act. Thus, we will not honor any claim of confidentiality except as provided by Exemption 4 of FOIA, 5 U.S.C. Sec. 552(b)(4), and any material you submit may be introduced as evidence at any hearing before an administrative law judge. We are also required by the Federal Records Act to keep copies of documents gathered in our investigation for some years after a case closes. Further, the Freedom of Information Act may require that we disclose such records in closed cases upon request, unless there is an applicable exemption. Examples of those exemptions are those that protect confidential financial information or personal privacy interests.

**Preservation of all Potential Evidence:** Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:** Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov). You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible. Failure to comply with Section 102.5 will result in rejection of your submission. The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format). Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format). If you have questions

Exhibit 3(a)
2247

Roadrunner Intermodal Services      - 3 -      January 17, 2020
Case 21-CA-254813

about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

We can provide assistance for persons with limited English proficiency or disability. Please let us know if you or any of your witnesses would like such assistance.

Very truly yours,

William B. Cowen
Regional Director

Enclosures:
1. Copy of Charge
2. Commerce Questionnaire

WBC.hta

Exhibit 3(a)
2248

FORM NLRB-501
(2-16)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
| --- | --- |
| Case | Date Filed |
| 21-CA-254813 | 01-16-2020 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | | b. Tel. No. |
| --- | --- | --- |
| Roadrunner Intermodal Services | | 586-920-0100 |
| | | c. Cell No. |

| d. Address (Street, city, state, and ZIP code) | e. Employer Representative | f. Fax. No. |
| --- | --- | --- |
| 11184 Almond Ave., Fontana, CA 92337 | Michael Vagts | |
| | Senior HR Manager | g. e-mail |
| 1815 O St., Wilmington, CA 90744 | | |
| | | h. Number of workers employed |
| | | 27 |

| i. Type of Establishment (factory, mine, wholesaler, etc.) | j. Identify principal product or service |
| --- | --- |
| Trucking | Trucking |

2. Basis of the Charge (set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections).   (3)                                                                                                                                of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

Within the last six months, the Employer, through its officers, supervisors, and agents, has laid off employees in retaliation for similarly situated employees organizing a union at a related company, Mason-Dixon d/b/a Universal Intermodal, in retaliation for other union and protected concerted activity, and in order to chill union and protected concerted activity.

3. Full name of party filing charge (if labor organization, give full name, including local name and number)

International Brotherhood of Teamsters

| 4a. Address (Street and number, city, state, and ZIP code) | 4b. Tel. No. |
| --- | --- |
| 25 Louisiana NW | 818-973-3208 |
| Washington, DC 20001 | 4c. Cell No. |
| | Office, if any, Cell No. |
| | 4d. Fax No. |
| | Fax No. |
| | 4e. e-mail |
| | rhidalgo@teamster.org |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit (to be filled in when charge is filed by a labor organization)

## 6. DECLARATION

I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

_(signature of representative or person making charge)_

Bush Gottlieb
801 N. Brand Blvd., Suite 950
Glendale, CA 91203
Address

Jason Wojciechowski, Attorney

_(Print/type name and title or office, if any)_

| Tel. No. | |
| --- | --- |
| | e-mail |
| | jasonw@bushgottlieb.com |

Date   Jan. 16, 2020

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**

**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

2249

**GC Exhibit 1(nn)**

GC1(nn)                         XX
EXHIBIT NO._____  RECEIVED _____ REJECTED _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

2            6/14/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2250

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **UNIVERSAL INTERMODAL SERVICES & SOUTHERN COUNTIES EXPRESS, A SINGLE EMPLOYER**<br><br>          Charged Party<br><br>     and<br><br>**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**<br><br>          Charging Party | **Case 21-CA-259130** |

**AFFIDAVIT OF SERVICE OF FIRST AMENDED CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on June 2, 2020**,** I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Universal Intermodal Services & Southern
Counties Express, a single employer
2035 E. Vista Bella Way
Compton, CA 90220

Southern Counties Express
18020 S. Santa Fe Avenue
Rancho Dominguez, CA 90220

| | |
|---|---|
| June 2, 2020 | Charisse Willis, Designated Agent of the NLRB |
| Date | Name |
| | |
| | /s/ Charisse Willis |
| | Signature |

Exhibit 3(a)
2251

**GC Exhibit 1(mm)**

GC1(mm)                              XX
**EXHIBIT NO.**_____  **RECEIVED** _____ **REJECTED** _____

     21-CA-252500, et al.              MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

         2                6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2252



UNITED STATES GOVERNMENT
# NATIONAL LABOR RELATIONS BOARD



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213) 894-5200
Fax: (213) 894-2778

Download
NLRB
Mobile App

June 2, 2020

Universal Intermodal Services & Southern Counties
Express, a single employer
2035 E. Vista Bella Way
Compton, CA 90220

Southern Counties Express
18020 S. Santa Fe Avenue
Rancho Dominguez, CA 90220

> Re:  Universal Intermodal Services & Southern
>      Counties Express, a single employer
>      Case 21-CA-259130

Dear Sir or Madam:

Enclosed is a copy of the first amended charge that has been filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213) 634-6520.  If the agent is not available, you may contact Supervisory Attorney Stephanie Cahn whose telephone number is (213) 634-6501.

**Presentation of Your Evidence:**  As you know, we seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations in the first amended charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation.  In this way, the case can be fully investigated more quickly.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

Exhibit 3(a)
2253

**GC Exhibit 1(II)**

GC1(11)                              XX
**EXHIBIT NO.** _____ **RECEIVED** _____ **REJECTED** _____


21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____


5                  6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2254

Universal Intermodal Services & Southern      - 2 -                                    June 2, 2020
Counties Express, a single employer
Case 21-CA-259130

     **Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

     If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Very truly yours,

William B. Cowen
Regional Director

Enclosure:  Copy of first amended charge

WBC/cw

Exhibit 3(a)
2255



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213) 894-5200
Fax: (213) 894-2778



Download
NLRB
Mobile App

June 2, 2020

International Brotherhood of Teamsters
25 Louisiana Avenue
Washington, DC 20001

> Re:    Universal Intermodal Services & Southern
>        Counties Express, a single employer
>        Case 21-CA-259130

Dear Sir or Madam:

We have docketed the first amended charge that you filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213) 634-6520.  If the agent is not available, you may contact Supervisory Attorney Stephanie Cahn whose telephone number is (213) 634-6501.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession. If you have additional evidence regarding the allegations in the first amended charge and you have not yet scheduled a date and time for the Board agent to obtain that evidence, please contact the Board agent to arrange to present that evidence.  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:**  It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to

Exhibit 3(a)
2256

Universal Intermodal Services & Southern        - 2 -                                      June 2, 2020
Counties Express, a single employer
Case 21-CA-259130

comply with Section 102.5 will result in rejection of your submission.  The Region will make its
determination on the merits solely based on the evidence properly submitted. All evidence
submitted electronically should be in the form in which it is normally used and maintained in the
course of business (i.e., native format).  Where evidence submitted electronically is not in native
format, it should be submitted in a manner that retains the essential functionality of the native
format (i.e., in a machine-readable and searchable electronic format).  If you have questions
about the submission of evidence or expect to deliver a large quantity of electronic records,
please promptly contact the Board agent investigating the charge.

    If the Agency does not issue a formal complaint in this matter, parties will be notified of
the Regional Director's decision by email.  Please ensure that the agent handling your case has
your current email address.

                                                        Very truly yours,

                                                        William B. Cowen
                                                        Regional Director

cc:     Jason Wojciechowski, Attorney at Law
        Bush Gottlieb, A Law Corporation
        801 North Brand Blvd. Suite 950
        Glendale, CA 91203

WBC/cw

Exhibit 3(a)
2257

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
FIRST AMENDED **CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 21-CA-259130 | 6-1-2020 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | b. Tel. No. |
|---|---|
| Universal Intermodal Services & Southern Counties Express, a single employer | 310.900.2160 |

c. Cell No.

f. Fax. No.

| d. Address *(Street, city, state, and ZIP code)* | e. Employer Representative | g. e-mail |
|---|---|---|
| Universal Intermodal Services: 2035 E. Vista Bella Way, Compton, CA 90220 | Tony Miles, General Manager | |
| Southern Counties Express: 18020 S. Santa Fe Ave., Rancho Dominguez, CA 90220 | | h. Number of workers employed: 27 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)* | j. Identify principal product or service |
|---|---|
| Trucking | Trucking |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and

(list subsections)   (5)   of the National Labor Relations Act, and thest unfair labor

practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of

the Act and the Postal Reorganization Act.

**2. Basis of the Charge** *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, through its officers, supervisors, and agents, has failed and refused to provide relevant information to the Union upon request and/or unreasonably delayed in providing that information, and has failed and refused to bargain with the Union in good faith for a collective-bargaining agreement.

The Union requests that the Board seek Section 10(j) injunctive relief.

**3. Full name of party filing charge** *(if labor organization, give full name, including local name and number)*

International Brotherhood of Teamsters

| 4a. Address *(Street and number, city, state, and ZIP code)* | 4b. Tel. No. |
|---|---|
| 25 Louisiana NW Washington, DC 20001 | |
| | 4c. Cell No.: 310.251.6876 |
| | 4d. Fax. No. |
| | 4e. e-mail: rhidalgo@teamster.org |

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION | Tel. No. |
|---|---|
| I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. | 818.973.3208 |
| *(signature of representative or person making charge)*        Jason Wojciechowski, Attorney | Office, if any, Cell No. |
| *(Print/type name and title or office, if any)* | Fax No. |
| Address  Bush Gottlieb 801 N. Brand Blvd., Suite 950 Glendale, CA 91203        Date  June 1, 2020 | e-mail: jasonw@bushgottlieb.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

**GC Exhibit 1(kk)**

GC1(kk)                                    XX
**EXHIBIT NO.**_____   **RECEIVED** _____   **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2          6/14/21          T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2259

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

**UNIVERSAL INTERMODAL SERVICES**

      Charged Party

      and

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**

      Charging Party

**Case 21-CA-259130**

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, state under oath that on **,** I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Universal Intermodal Services
2035 E. Vista Bella Way
Compton, CA 90220

| April 15, 2020 | Charisse Willis, Designated Agent of the NLRB |
|---|---|
| Date | Name |

|  | /s/ *Charisse Willis* |
|---|---|
|  | Signature |

Exhibit 3(a)
2260

**GC Exhibit 1(jj)**

GC1(jj)                          XX
EXHIBIT NO._____ RECEIVED _____ REJECTED _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

2              6/14/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2261



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213) 894-5200
Fax: (213) 894-2778

Download
NLRB
Mobile App

April 15, 2020

Universal Intermodal Services
2035 E. Vista Bella Way
Compton, CA 90220

Re:    Universal Intermodal Services
Case 21-CA-259130

Dear Sir or Madam:

Enclosed is a copy of a charge that has been filed in this case. This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:** This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213) 634-6520. If this Board agent is not available, you may contact Supervisory Attorney Stephanie Cahn whose telephone number is (213) 634-6501.

**Right to Representation:** You have the right to be represented by an attorney or other representative in any proceeding before us. If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*. This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board. Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** We seek prompt resolutions of labor disputes. Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations set forth in the charge as soon as possible. If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation. In this way, the case can be fully investigated more quickly.

Full and complete cooperation includes providing witnesses to give sworn affidavits to a Board agent, and providing all relevant documentary evidence requested by the Board

Exhibit 3(a)
2262

**GC Exhibit 1(ii)**

GC1(ii)                          XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____


        21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____


            7                6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2263

Universal Intermodal Services                - 2 -                    April 15, 2020
Case 21-CA-259130

agent.  Sending us your written account of the facts and a statement of your position is not enough to be considered full and complete cooperation.  A refusal to fully cooperate during the investigation might cause a case to be litigated unnecessarily.

In addition, either you or your representative must complete the enclosed Commerce Questionnaire to enable us to determine whether the NLRB has jurisdiction over this dispute.  If you recently submitted this information in another case, or if you need assistance completing the form, please contact the Board agent.

We will not honor any request to place limitations on our use of position statements or evidence beyond those prescribed by the Freedom of Information Act and the Federal Records Act.  Thus, we will not honor any claim of confidentiality except as provided by Exemption 4 of FOIA, 5 U.S.C. Sec. 552(b)(4), and any material you submit may be introduced as evidence at any hearing before an administrative law judge.  We are also required by the Federal Records Act to keep copies of documents gathered in our investigation for some years after a case closes.  Further, the Freedom of Information Act may require that we disclose such records in closed cases upon request, unless there is an applicable exemption.  Examples of those exemptions are those that protect confidential financial information or personal privacy interests.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

Exhibit 3(a)
2264

Universal Intermodal Services        - 3 -        April 15, 2020
Case 21-CA-259130

       If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

       Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

       We can provide assistance for persons with limited English proficiency or disability. Please let us know if you or any of your witnesses would like such assistance.

       Very truly yours,

       William B. Cowen
       Regional Director

Enclosures:
    1. Copy of Charge
    2. Commerce Questionnaire

WBC/cw

Exhibit 3(a)
2265





UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD



Download
NLRB
Mobile App

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213) 894-5200
Fax: (213) 894-2778

April 15, 2020

International Brotherhood of Teamsters
25 Louisiana NW
Washington, DC 20001

        Re:    Universal Intermodal Services
              Case 21-CA-259130

Dear Sir or Madam:

The charge that you filed in this case on April 14, 2020 has been docketed as case number 21-CA-259130.  This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:**  This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213) 634-6520.  If this Board agent is not available, you may contact Supervisory Attorney Stephanie Cahn whose telephone number is (213) 634-6501.

**Right to Representation:**  You have the right to be represented by an attorney or other representative in any proceeding before us.  If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*.  This form is available on our website, <u>www.nlrb.gov</u>, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board.  Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession. Because we seek to resolve labor disputes promptly, you should be ready to promptly present your affidavit(s) and other evidence.  If you have not yet scheduled a date and time for the Board agent to take your affidavit, please contact the Board agent to schedule the affidavit(s).  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed without investigation.

Exhibit 3(a)
2266

Universal Intermodal Services                - 2 -                April 15, 2020
Case 21-CA-259130

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

Exhibit 3(a)
2267

Universal Intermodal Services        - 3 -        April 15, 2020
Case 21-CA-259130

      We can provide assistance for persons with limited English proficiency or disability. Please let us know if you or any of your witnesses would like such assistance.

Very truly yours,

William B. Cowen
Regional Director

cc:    Jason Wojciechowski, Attorney at Law
       Bush Gottlieb, A Law Corporation
       801 North Brand Blvd, Suite 950
       Glendale, CA 91203

WBC/cw

Exhibit 3(a)
2268

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case <br> 21-CA-259130 | Date Filed <br> 4-14-2020 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer <br> Universal Intermodal Services | b. Tel. No. <br> 206-762-6100 |
|---|---|
| | c. Cell No. <br> 586-718-4606 |
| | f. Fax. No. <br> 586-467-0904 |

| d. Address *(Street, city, state, and ZIP code)* <br> 2035 E. Vista Bella Way, Compton, CA 90220 | e. Employer Representative <br> Tony Miles, General Manager | g. e-mail |
|---|---|---|
| | | h. Number of workers employed <br> 27 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)* <br> Trucking | j. Identify principal product or service <br> Trucking |
|---|---|

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and

(list subsections)   (5)                                                                                       of the National Labor Relations Act, and thest unfair labor

practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of

the Act and the Postal Reorganization Act.

**2. Basis of the Charge** *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, through its officers, supervisors, and agents, has failed and refused to provide relevant information to the Union upon request and/or unreasonably delayed in providing that information, and has failed and refused to bargain with the Union in good faith for a collective-bargaining agreement.

The Union requests that the Board seek Section 10(j) injunctive relief.

**3. Full name of party filing charge** *(if labor organization, give full name, including local name and number)*

International Brotherhood of Teamsters

| 4a. Address *(Street and number, city, state, and ZIP code)* <br> 25 Louisiana NW <br> Washington, DC 20001 | 4b. Tel. No. |
|---|---|
| | 4c. Cell No. |
| | 4d. Fax No. |
| | 4e. e-mail <br> rhidalgo@teamster.org |

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION <br> I declare that I have read the above charge and that the statements <br> are true to the best of my knowledge and belief. | Tel. No. <br> 818-973-3208 |
|---|---|
| *(signature of representative or person making charge)*        Jason Wojciechowski, Attorney <br> *(Print/type name and title or office, if any)* | Office, if any, Cell No. |
| | Fax No. |
| Bush Gottlieb <br> 801 N. Brand Blvd., Suite 950 <br> Address   Glendale, CA 91203                    Date   April 14, 2020 | e-mail <br> jasonw@bushgottlieb.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

Exhibit 0(a)
2269

**GC Exhibit 1(hh)**

GC1(hh)                              XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

       21-CA-252500, et al.           MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

              2                6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2270

# UNITED STATES OF AMERICA

# BEFORE THE NATIONAL LABOR RELATIONS BOARD

<table>
<tr>
<td>

**MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES**

       Charged Party

  and

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**

       Charging Party

</td>
<td>

**Case 21-CA-253662**

</td>
</tr>
</table>

## AFFIDAVIT OF SERVICE OF SECOND AMENDED CHARGE AGAINST EMPLOYER

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on June 2, 2020, I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

John S. Ferrer, Attorney at Law
Ogletree Deakins Law Firm
1909 K Street, N.W., Suite 1000
Washington, DC 20006-1134

Tony Miles, General Manger
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Vista Bella Way
Compton, CA 90220

Southern Counties Express
18020 S. Santa Fe Avenue
Rancho Dominguez, CA 90220

| | |
|---|---|
| June 2, 2020 | Charisse Willis, Designated Agent of the NLRB |
| Date | Name |
| | /s/ *Charisse Willis* |
| | Signature |

Exhibit 3(a)
2271

**GC Exhibit 1(gg)**

GC1(gg)                              XX
**EXHIBIT NO.** _____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.        MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2              6/14/21           T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2272



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213) 894-5200
Fax: (213) 894-2778



Download
NLRB
Mobile App

June 2, 2020

Tony Miles, General Manger
Universal Intermodal Services
2035 E. Vista Bella Way
Compton, CA 90220

Southern Counties Express
18020 S. Santa Fe Avenue
Rancho Dominguez, CA 90220

> Re:   Mason-Dixon Intermodal d/b/a Universal
> Intermodal Services & Southern Counties
> Express, a single employer
> Case 21-CA-253662

Dear Mr. Lugo:

Enclosed is a copy of the second amended charge that has been filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213) 634-6520.  If the agent is not available, you may contact Supervisory Attorney Stephanie Cahn whose telephone number is (213) 634-6501.

**Presentation of Your Evidence:**  As you know, we seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations in the second amended charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation.  In this way, the case can be fully investigated more quickly.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

Exhibit 3(a)
2273

**GC Exhibit 1(ff)**

GC1(ff)                          XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

5                6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2274

Mason-Dixon Intermodal d/b/a Universal     - 2 -                  June 2, 2020
Intermodal Services & Southern Counties
Express, a single employer
Case 21-CA-253662

     **Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

     If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

                              Very truly yours,

                              William B. Cowen
                              Regional Director

Enclosure:  Copy of second amended charge

cc:         John S. Ferrer, Attorney at Law
             Ogletree Deakins Law Firm
             1909 K Street, N.W., Suite 1000
             Washington, DC 20006-1134

WBC/cw

Exhibit 3(a)
2275



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD




REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213) 894-5200
Fax: (213) 894-2778

Download
NLRB
Mobile App

June 2, 2020

Michael T. Manley, Counsel
International Brotherhood of Teamsters
25 Louisiana, N.W.
Washington, DC 20001

> Re:   Mason-Dixon Intermodal d/b/a Universal
> Intermodal Services & Southern Counties
> Express, a single employer
> Case 21-CA-253662

Dear Mr. Manley:

We have docketed the second amended charge that you filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213) 634-6520.  If the agent is not available, you may contact Supervisory Attorney Stephanie Cahn whose telephone number is (213) 634-6501.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession. If you have additional evidence regarding the allegations in the second amended charge and you have not yet scheduled a date and time for the Board agent to obtain that evidence, please contact the Board agent to arrange to present that evidence.  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the

Exhibit 3(a)
2276

Mason-Dixon Intermodal d/b/a Universal    - 2 -    June 2, 2020
Intermodal Services & Southern Counties
Express, a single employer
Case 21-CA-253662

Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Very truly yours,

William B. Cowen
Regional Director

cc:    Jason Wojciechowski, Attorney at Law
       Bush Gottlieb, a Law Corporation
       801 North Brand Blvd., Suite 950
       Glendale, CA 91203

WBC/cw

Exhibit 3(a)
2277

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
SECOND AMENDED **CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 21-CA-253662 | **06-01-2020** |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br>Mason-Dixon Intermodal d/b/a Universal Intermodal Services & Southern Counties Express, a single employer | | b. Tel. No.<br>206.762.6100 |
|---|---|---|
| | | c. Cell No.<br>586.718.4606 |
| | | f. Fax. No.<br>586.467.0904 |
| d. Address *(Street, city, state, and ZIP code)*<br>Universal Intermodal Services: 2035 E. Vista Bella Way, Compton, CA 90220<br>Southern Counties Express: 18020 S. Santa Fe Ave., Rancho Dominguez, CA 90220 | e. Employer Representative<br>Tony Miles, General Manager | g. e-mail |
| | | h. Number of workers employed<br>27 |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Trucking | j. Identify principal product or service<br>Trucking | |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections)    (3), (5)                            of the National Labor Relations Act, and thest unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

**2. Basis of the Charge** *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, through its officers, supervisors, and agents, has reduced the hours of bargaining-unit employees and announced the closure of operations and layoff of its employees, and in fact relocated its operations and the work performed by bargaining-unit employees, in retaliation for employees organizing a union and for other union and protected concerted activity. The Employer also took all of the above action without notice to the Union or an opportunity to bargain.

The Union requests that the Board seek Section 10(j) injunctive relief.

**3. Full name of party filing charge** *(if labor organization, give full name, including local name and number)*
International Brotherhood of Teamsters

| 4a. Address *(Street and number, city, state, and ZIP code)*<br>25 Louisiana NW<br>Washington, DC 20001 | 4b. Tel. No. |
|---|---|
| | 4c. Cell No.<br>310.251.6876 |
| | 4d. Fax. No. |
| | 4e. e-mail<br>rhidalgo@teamster.org |

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief. | | Tel. No.<br>818.973.3208 |
|---|---|---|
| *(signature of representative or person making charge)* | Jason Wojciechowski, Attorney<br>*(Print/type name and title or office, if any)* | Office, if any, Cell No. |
| | | Fax No. |
| Address    Bush Gottlieb<br>801 N. Brand Blvd., Suite 950<br>Glendale, CA 91203 | Date   June 1, 2020 | e-mail<br>jasonw@bushgottlieb.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

**GC Exhibit 1(ee)**

GC1(ee)                          XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2                 6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2279

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES**<br><br>   Charged Party<br><br> and<br><br>**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**<br><br>   Charging Party | **Case 21-CA-253662** |

**AFFIDAVIT OF SERVICE OF FIRST AMENDED CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on January 15, 2020, I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Joe Lugo, General Manger
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Vista Bella Way
Compton, CA 90220

John S. Ferrer, Attorney at Law
Ogletree Deakins Law Firm
1909 K Street, NW, Suite 1000
Washington, DC 20006-1134

| | |
|---|---|
| January 15, 2020 | **Helen Alo**, Designated Agent of NLRB |
| Date | Name |

*/s/ Helen Alo*
_____
Signature

Exhibit 3(a)
2280

**GC Exhibit 1(dd)**

GC1(dd)                              XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

    21-CA-252500, et al.            MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

      2                 6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2281



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

January 15, 2020

Joe Lugo, General Manger
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Vista Bella Way
Compton, CA 90220

> Re: Mason-Dixon Intermodal d/b/a Universal
> Intermodal Services
> Case 21-CA-253662

Dear Mr. Lugo:

Enclosed is a copy of the first amended charge that has been filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As you know, we seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations in the first amended charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation. In this way, the case can be fully investigated more quickly.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the

Exhibit 3(a)
2282

**GC Exhibit 1(cc)**

GC1(cc)                          XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

     21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

        5              6/14/21          T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2283

Mason-Dixon Intermodal d/b/a Universal          - 2 -                    January 15, 2020
Intermodal Services
Case 21-CA-253662

merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

      If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

      Very truly yours,

      William B. Cowen
      Regional Director

Enclosure:  Copy of first amended charge

cc:    John S. Ferrer, Attorney at Law
      Ogletree Deakins Law Firm
      1909 K Street, NW, Suite 1000
      Washington, DC 20006-1134

WBC.hta

Exhibit 3(a)
2284



UNITED STATES GOVERNMENT
# NATIONAL LABOR RELATIONS BOARD

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

January 15, 2020

Michael T. Manley, Counsel
International Brotherhood of Teamsters
25 Louisiana, N.W.
Washington, DC 20001

Re:     Mason-Dixon Intermodal d/b/a Universal
          Intermodal Services
          Case 21-CA-253662

Dear Mr. Manley:

We have docketed the first amended charge that you filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession.  If you have additional evidence regarding the allegations in the first amended charge and you have not yet scheduled a date and time for the Board agent to obtain that evidence, please contact the Board agent to arrange to present that evidence.  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including exhibits, sworn statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the

Exhibit 3(a)
2285

Mason-Dixon Intermodal d/b/a Universal          - 2 -                    January 15, 2020
Intermodal Services
Case 21-CA-253662

merits solely based on the evidence properly submitted. All evidence submitted electronically
should be in the form in which it is normally used and maintained in the course of business (i.e.,
native format).  Where evidence submitted electronically is not in native format, it should be
submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-
readable and searchable electronic format).  If you have questions about the submission of evidence
or expect to deliver a large quantity of electronic records, please promptly contact the Board agent
investigating the charge.

     If the Agency does not issue a formal complaint in this matter, parties will be notified of the
Regional Director's decision by email.  Please ensure that the agent handling your case has your
current email address.

     Very truly yours,

     William B. Cowen
     Regional Director

Enclosure:  Copy of first amended charge

cc:   Jason Wojciechowski, Attorney at Law
      Bush Gottlieb, A Law Corporation
      801 North Brand Boulevard, Suite 950
      Glendale, CA 91203

WBC.hta

Exhibit 3(a)
2286

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
AMENDED **CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case<br>**21-CA-253662** | Date Filed<br>**01-15-2020** |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br>Mason-Dixon Intermodal d/b/a Universal Intermodal Services | b. Tel. No.<br>206-762-6100 |
|---|---|
| | c. Cell No.<br>586-718-4606 |
| | f. Fax. No.<br>586-467-0904 |
| d. Address *(Street, city, state, and ZIP code)*<br>2035 E. Vista Bella Way<br>Compton, CA 90220 | e. Employer Representative<br>Tony Miles<br>General Manager |
| | g. e-mail |
| | h. Number of workers employed<br>27 |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Trucking | j. Identify principal product or service<br>Trucking |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and

(list subsections)　　(3), (5)　　of the National Labor Relations Act, and thest unfair labor

practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of

the Act and the Postal Reorganization Act.

### 2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, through its officers, supervisors, and agents, has reduced the hours of bargaining-unit employees and announced the closure of operations and layoff of its employees, and in fact relocated its operations and the work performed by bargaining-unit employees, in retaliation for employees organizing a union and for other union and protected concerted activity. The Employer also took all of the above action without notice to the Union or an opportunity to bargain.

The Union requests that the Board seek Section 10(j) injunctive relief.

### 3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*

International Brotherhood of Teamsters

| 4a. Address *(Street and number, city, state, and ZIP code)*<br>25 Louisiana NW<br>Washington, DC 20001 | 4b. Tel. No. |
|---|---|
| | 4c. Cell No. |
| | 4d. Fax. No. |
| | 4e. e-mail<br>rhidalgo@teamster.org |

### 5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief. | Tel. No.<br>818-973-3208 |
|---|---|
| *(signature of representative or person making charge)*　　Jason Wojciechowski, Attorney<br>　　　　　　　　　　　　　　*(Print/type name and title or office, if any)* | Office, if any, Cell No. |
| Bush Gottlieb<br>801 N. Brand Blvd., Suite 950<br>Glendale, CA 91203 | Fax. No. |
| Address　　　　　　　　　　　　　Date　　Jan. 15, 2020 | e-mail<br>jasonw@bushgottlieb.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

Exhibit 10(a)
2287

**GC Exhibit 1(bb)**

GC1(bb)                            XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2              6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2288

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES**<br><br>Charged Party<br><br>and<br><br>**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**<br><br>Charging Party | **Case 21-CA-253662** |

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, state under oath that on December 20, 2019, I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Tony Miles, General Manager
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Bella Way
Compton, CA 90220

John S. Ferrer, Attorney at Law
Ogletree, Deakins, Nash,
Smoak & Stewart, LLC
1909 K Street, NW, Suite 1000
Washington, DC 20006-1134

| | |
|---|---|
| December 20, 2019 | Helen Alo, Designated Agent of NLRB |
| Date | Name |
| | HELEN ALO  Digitally signed by HELEN ALO<br>Date: 2019.12.20 16:10:36 -08'00' |
| | Signature |

Exhibit 3(a)<br>2289

**GC Exhibit 1(aa)**

```
                 GC1(aa)                    XX
EXHIBIT NO._____  RECEIVED _____ REJECTED _____


           21-CA-252500, et al.        MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


               2              6/14/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____
```

Exhibit 3(a)
2290



**UNITED STATES GOVERNMENT**
## NATIONAL LABOR RELATIONS BOARD



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Download
NLRB
Mobile App

December 20, 2019

Tony Miles, General Manager
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Bella Way
Compton, CA 90220

Re:     Mason-Dixon Intermodal d/b/a Universal
        Intermodal Services
        Case 21-CA-253662

Dear Mr. Miles:

Enclosed is a copy of a charge that has been filed in this case.  This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:**  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If this Board agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Right to Representation:**  You have the right to be represented by an attorney or other representative in any proceeding before us.  If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*.  This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board.  Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** We seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations set forth in the charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation.  In this way, the case can be fully investigated more quickly.

Full and complete cooperation includes providing witnesses to give sworn affidavits to a Board agent, and providing all relevant documentary evidence requested by the Board agent.  Sending us your written account of the facts and a statement of your position is not enough to be considered full and complete cooperation.  A refusal to fully cooperate during the investigation might cause a case to be litigated unnecessarily.

Exhibit 3(a)
2291

**GC Exhibit 1(z)**

GC1(z)                                        XX
EXHIBIT NO._____   RECEIVED _____   REJECTED _____

        21-CA-252500, et al.              MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

            6                 6/14/21              T. RAY
NO OF PAGES _____   DATE: _____   REPORTER: _____

Exhibit 3(a)
2292

Mason-Dixon Intermodal d/b/a Universal        - 2 -                    December 20, 2019
Intermodal Services
Case 21-CA-253662

    In addition, either you or your representative must complete the enclosed Commerce Questionnaire to enable us to determine whether the NLRB has jurisdiction over this dispute.  If you recently submitted this information in another case, or if you need assistance completing the form, please contact the Board agent.

    We will not honor any request to place limitations on our use of position statements or evidence beyond those prescribed by the Freedom of Information Act and the Federal Records Act.  Thus, we will not honor any claim of confidentiality except as provided by Exemption 4 of FOIA, 5 U.S.C. Sec. 552(b)(4), and any material you submit may be introduced as evidence at any hearing before an administrative law judge.  We are also required by the Federal Records Act to keep copies of documents gathered in our investigation for some years after a case closes.  Further, the Freedom of Information Act may require that we disclose such records in closed cases upon request, unless there is an applicable exemption.  Examples of those exemptions are those that protect confidential financial information or personal privacy interests.

    **Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

    **Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

    **Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

    If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

    Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office

Exhibit 3(a)
2293

Mason-Dixon Intermodal d/b/a Universal     - 3 -         December 20, 2019
Intermodal Services
Case 21-CA-253662

upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

      We can provide assistance for persons with limited English proficiency or disability.  Please let us know if you or any of your witnesses would like such assistance.

               Very truly yours,

               William B. Cowen
               Regional Director

Enclosures:
        1.  Copy of Charge
        2.  Commerce Questionnaire

cc:      John S. Ferrer, Attorney at Law
        Ogletree, Deakins, Nash,
        Smoak & Stewart, LLC
        1909 K Street, NW, Suite 1000
        Washington, DC 20006-1134

WBC.

Exhibit 3(a)
2294



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Download
NLRB
Mobile App

December 20, 2019

Michael T. Manley, Counsel
International Brotherhood of Teamsters
25 Louisiana, N.W.
Washington, DC 20001

Re:     Mason-Dixon Intermodal d/b/a Universal
        Intermodal Services
        Case 21-CA-253662

Dear Mr. Manley:

The charge that you filed in this case on December 20, 2019 has been docketed as case number 21-CA-253662. This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:** This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520. If this Board agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Right to Representation:** You have the right to be represented by an attorney or other representative in any proceeding before us. If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*. This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board. Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession. Because we seek to resolve labor disputes promptly, you should be ready to promptly present your affidavit(s) and other evidence. If you have not yet scheduled a date and time for the Board agent to take your affidavit, please contact the Board agent to schedule the affidavit(s). If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed without investigation.

**Preservation of all Potential Evidence:** Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text

Exhibit 3(a)
2295

Mason-Dixon Intermodal d/b/a Universal          - 2 -                    December 20, 2019
Intermodal Services
Case 21-CA-253662

messages, electronic documents, emails, and any data created by proprietary software tools) related
to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to
prohibit affiants from recording the interview conducted by Board agents when subscribing Agency
affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the
affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the
Region's investigation.

**Procedures:** Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must
submit all documentary evidence, including statements of position, exhibits, sworn statements,
and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site
(www.nlrb.gov).  You must e-file all documents electronically or provide a written statement
explaining why electronic submission is not possible or feasible.   Failure to comply with Section
102.5 will result in rejection of your submission.  The Region will make its determination on the
merits solely based on the evidence properly submitted. All evidence submitted electronically
should be in the form in which it is normally used and maintained in the course of business (i.e.,
native format).  Where evidence submitted electronically is not in native format, it should be
submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-
readable and searchable electronic format).  If you have questions about the submission of evidence
or expect to deliver a large quantity of electronic records, please promptly contact the Board agent
investigating the charge.

If the Agency does not issue a formal complaint in this matter, parties will be notified of the
Regional Director's decision by email.  Please ensure that the agent handling your case has your
current email address.

Information about the Agency, the procedures we follow in unfair labor practice cases and
our customer service standards is available on our website, www.nlrb.gov or from an NLRB office
upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to
parties involved in an investigation of an unfair labor practice charge.

We can provide assistance for persons with limited English proficiency or disability.  Please
let us know if you or any of your witnesses would like such assistance.

Very truly yours,

William B. Cowen
Regional Director

Enclosures

cc:     Jason Wojciechowski, Attorney at Law
        Bush Gottlieb, A Law Corporation
        801 North Brand Boulevard, Suite 950
        Glendale, CA 91203

WBC.hta

Exhibit 3(a)
2296

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| **21-CA-253662** | **12-20-2019** |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | | b. Tel. No. |
|---|---|---|
| *Mason-Dixon Intermodal d/b/a Universal Intermodal Services* | | 206-762-6100 |
| | | c. Cell No. |
| | | 586-718-4606 |
| | | f. Fax. No. |
| | | 586-467-0904 |

| d. Address *(Street, city, state, and ZIP code)* | e. Employer Representative | g. e-mail |
|---|---|---|
| 2035 E. Bella Way | Tony Miles | |
| Compton, CA 90220 | General Manager | h. Number of workers employed |
| | | 27 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)* | j. Identify principal product or service |
|---|---|
| Trucking | Trucking |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and

(list subsections)      (3), (5)                                    of the National Labor Relations Act, and thest unfair labor

practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of

the Act and the Postal Reorganization Act.

**2. Basis of the Charge** *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

*Within the last six months, the Employer, through its officers, supervisors, and agents has reduced the hours of bargaining-unit employees and announced the closure of operations and layoff of its employees in retaliation for employees organizing a union and for other union and protected concerted activity, and without notice to the Union or an opportunity to bargain over the decision or its effects.*

**3. Full name of party filing charge** *(if labor organization, give full name, including local name and number)*
International Brotherhood of Teamsters

| 4a. Address *(Street and number, city, state, and ZIP code)* | 4b. Tel. No. |
|---|---|
| 25 Louisiana NW | |
| Washington, DC 20001 | 4c. Cell No. |
| | 4d. Fax No. |
| | 4e. e-mail |
| | rhidalgo@teamster.org |

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION | Tel. No. |
|---|---|
| I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. | 818-973-3208 |
| *(signature of representative or person making charge)*        Jason Wojciechowski, Attorney        *(Print/type name and title or office, if any)* | Office, if any, Cell No. |
| | Fax No. |
| Bush Gottlieb<br>801 N. Brand Blvd., Suite 950<br>Glendale, CA 91203<br>Address                                                          Date    Dec. 20, 2019 | e-mail<br>jasonw@bushgottlieb.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

**GC Exhibit 1(y)**

GC1(y)
XX
**EXHIBIT NO.** _____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.            MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2              6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2298

# UNITED STATES OF AMERICA

# BEFORE THE NATIONAL LABOR RELATIONS BOARD

**UNIVERSAL INTERMODAL SERVICES**

       Charged Party

       and

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**

       Charging Party

**Case 21-CA-264164**

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, state under oath that on August 5, 2020**,** I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Universal Intermodal Services
2035 East Vista Bella Way
Compton, CA 90220

| | |
|---|---|
| August 6, 2020 | Charisse Willis, Designated Agent of the NLRB |
| Date | Name |

/s/ *Charisse Willis*

Signature

Exhibit 3(a)
2299

**GC Exhibit 1(x)**

GC1(x)                              XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

      21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

              2              6/14/21           T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2300



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213) 894-5200
Fax: (213) 894-2778

Download
NLRB
Mobile App

August 6, 2020

Universal Intermodal Services
2035 East Vista Bella Way
Compton, CA 90220

<div align="center">

Re:  Universal Intermodal Services
Case 21-CA-264164

</div>

Dear Sir or Madam:

Enclosed is a copy of a charge that has been filed in this case.  This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:**  This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213) 634-6520.  If this Board agent is not available, you may contact Supervisory Attorney Stephanie Cahn whose telephone number is (213) 634-6501.

**Right to Representation:**  You have the right to be represented by an attorney or other representative in any proceeding before us.  If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance.*  This form is available on our website, [www.nlrb.gov](www.nlrb.gov), or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board.  Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** We seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations set forth in the charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation.  In this way, the case can be fully investigated more quickly.

Full and complete cooperation includes providing witnesses to give sworn affidavits to a Board agent, and providing all relevant documentary evidence requested by the Board agent.  Sending us your written account of the facts and a statement of your position is not

Exhibit 3(a)
2301

**GC Exhibit 1(w)**

GC1(w)                                    XX
**EXHIBIT NO.**_____  **RECEIVED** _____  **REJECTED** _____

        21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

        7                  6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2302

Universal Intermodal Services        - 2 -        August 6, 2020
Case 21-CA-264164

enough to be considered full and complete cooperation.  A refusal to fully cooperate during the investigation might cause a case to be litigated unnecessarily.

In addition, either you or your representative must complete the enclosed Commerce Questionnaire to enable us to determine whether the NLRB has jurisdiction over this dispute.  If you recently submitted this information in another case, or if you need assistance completing the form, please contact the Board agent.

We will not honor requests to limit our use of position statements or evidence. Specifically, any material you submit may be introduced as evidence at a hearing before an administrative law judge regardless of claims of confidentiality. However, certain evidence produced at a hearing may be protected from public disclosure by demonstrated claims of confidentiality.

Further, the Freedom of Information Act may require that we disclose position statements or evidence in closed cases upon request, unless an exemption applies, such as those protecting confidential financial information or personal privacy interests.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Correspondence:**  All documents submitted to the Region regarding your case MUST be filed through the Agency's website, www.nlrb.gov. This includes all formal pleadings, briefs, as well as affidavits, documentary evidence, and position statements. The Agency requests all evidence submitted electronically to be in the form it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).

If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge. If you cannot e-file your documents, you must provide a statement explaining why you do not have access to the means for filing electronically or why filing electronically would impose an undue burden.

Exhibit 3(a)
2303

Universal Intermodal Services        - 3 -        August 6, 2020
Case 21-CA-264164

In addition, this Region will be issuing case-related correspondence and documents, including complaints, compliance specifications, dismissal letters, deferral letters, and withdrawal letters, electronically to the email address you provide.  Please ensure that you receive important case-related correspondence, please ensure that the Board Agent assigned to your case has your preferred email address.  These steps will ensure that you receive correspondence faster and at a significantly lower cost to the taxpayer.   If there is some reason you are unable to receive correspondence via email, please contact the agent assigned to your case to discuss the circumstances that prevent you from using email.

Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

We can provide assistance for persons with limited English proficiency or disability. Please let us know if you or any of your witnesses would like such assistance.

Very truly yours,

William B. Cowen
Regional Director

Enclosures:
1. Copy of Charge
2. Commerce Questionnaire

WBC/cw

Exhibit 3(a)
2304



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD





REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213) 894-5200
Fax: (213) 894-2778

Download
NLRB
Mobile App

August 6, 2020

International Brotherhood of Teamsters
25 Louisiana St, NW
Washington, DC 20001-2198

> Re:   Universal Intermodal Services
>        Case 21-CA-264164

Dear Sir or Madam:

The charge that you filed in this case on August 05, 2020 has been docketed as case number 21-CA-264164. This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:** This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213) 634-6520. If this Board agent is not available, you may contact Supervisory Attorney Stephanie Cahn whose telephone number is (213) 634-6501.

**Right to Representation:** You have the right to be represented by an attorney or other representative in any proceeding before us. If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*. This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board. Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession. Because we seek to resolve labor disputes promptly, you should be ready to promptly present your affidavit(s) and other evidence. If you have not yet scheduled a date and time for the Board agent to take your affidavit, please contact the Board agent to schedule the affidavit(s). If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed without investigation.

Exhibit 3(a)
2305

Universal Intermodal Services                     - 2 -                          August 6, 2020
Case 21-CA-264164

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Correspondence:**  All documents submitted to the Region regarding your case MUST be filed through the Agency's website, www.nlrb.gov. This includes all formal pleadings, briefs, as well as affidavits, documentary evidence, and position statements. The Agency requests all evidence submitted electronically to be in the form it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).

If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge. If you cannot e-file your documents, you must provide a statement explaining why you do not have access to the means for filing electronically or why filing electronically would impose an undue burden.

In addition, this Region will be issuing case-related correspondence and documents, including complaints, compliance specifications, dismissal letters, deferral letters, and withdrawal letters, electronically to the email address you provide.  Please ensure that you receive important case-related correspondence, please ensure that the Board Agent assigned to your case has your preferred email address.  These steps will ensure that you receive correspondence faster and at a significantly lower cost to the taxpayer.  If there is some reason you are unable to receive correspondence via email, please contact the agent assigned to your case to discuss the circumstances that prevent you from using email.

Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

Exhibit 3(a)
2306

Universal Intermodal Services       - 3 -              August 6, 2020
Case 21-CA-264164

        We can provide assistance for persons with limited English proficiency or disability. Please let us know if you or any of your witnesses would like such assistance.

Very truly yours,

William B. Cowen
Regional Director

cc:    Jason Wojciechowski, Attorney at Law
       Bush Gottlieb, A Law Corporation
       801 N. Brand Blvd., Suite 950
       Glendale, CA 91203

Copy of charge only sent to:

       Bradley T. Raymond, General Counsel
       International Brotherhood of Teamsters
       25 Louisiana Avenue NW
       Washington, DC 20001-2130

WBC/cw

Exhibit 3(a)
2307

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case<br>21-CA-264164 | Date Filed<br>8-5-2020 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br>Universal Intermodal Services | b. Tel. No.<br>202.762.6100 |
|---|---|
| | c. Cell No.<br>586.718.4606 |
| | f. Fax. No.<br>586.467.0904 |

| d. Address *(Street, city, state, and ZIP code)*<br><br>2035 East Vista Bella Way<br>Compton, Calif. 90220 | e. Employer Representative<br><br>Tony Miles, General Manager | g. e-mail |
|---|---|---|
| | | h. Number of workers employed<br>27 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Trucking | j. Identify principal product or service<br>Trucking |
|---|---|

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and
(list subsections)  **(5)**                              of the National Labor Relations Act, and thest unfair labor
practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of
the Act and the Postal Reorganization Act.

**2. Basis of the Charge** *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, through its officers, supervisors, and agents, has bargained in bad faith with the Union by (1) engaging in direct dealing with a bargaining-unit employee over mandatory subjects of Bargaining; (2) failed and refused to bargain with the Union over that employee's terms and conditions of employment; and (3) failed and refused to provide information relevant to that employee on request, and/or unreasonably delayed in providing information.

**3. Full name of party filing charge** *(if labor organization, give full name, including local name and number)*
International Brotherhood of Teamsters

| 4a. Address *(Street and number, city, state, and ZIP code)*<br><br>25 Louisiana NW<br>Washington, DC 20001 | 4b. Tel. No. |
|---|---|
| | 4c. Cell No. |
| | 4d. Fax. No. |
| | 4e. e-mail<br>rhidalgo@teamster.org |

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** *(to be filled in when charge is filed by a labor organization)*

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief.<br><br>*(signature of representative or person making charge)*   Jason Wojciechowski, Attorney<br><br>                                                *(Print/type name and title or office, if any)* | Tel. No.<br>818.973.3208 |
|---|---|
| | Office, if any, Cell No. |
| | Fax No. |
| Address   Bush Gottlieb<br>801 N. Brand Blvd., Suite 950<br>Glendale, Calif. 91203              Date   August 5, 2020 | e-mail<br>jasonw@bushgottlieb.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

Exhibit (v)
2308

**GC Exhibit 1(v)**

GC1(v)                          XX
**EXHIBIT NO.** _____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.        MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2              6/14/21          T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2309

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES**<br><br>       Charged Party<br><br>   and<br><br>**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**<br><br>      Charging Party | **Case 21-CA-252574** |

**AFFIDAVIT OF SERVICE OF SECOND AMENDED CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on **March 17, 2021,** I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Joe Lugo, General Manger
Mason-Dixon Intermodal d/b/a
Universal Intermodal Services
2035 E. Vista Bella Way
Compton, CA 90220

Daniel A. Adlong, ESQ.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Park Tower
695 Town Center Drive, Suite 1500
Costa Mesa, CA 92626-1924

| March 17, 2021 | Aide Carretero, Designated Agent of NLRB |
|---|---|
| Date | Name |

| /s/ Aide Carretero |
|---|
| Signature |

Exhibit 3(a)
2310

**GC Exhibit 1(u)**

GC1(u)                          XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2            6/14/21          T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2311



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Download
NLRB
Mobile App

March 17, 2021

Daniel A. Adlong, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Park Tower
695 Town Center Drive, Suite 1500
Costa Mesa, CA 92626-1924

Re:     Mason-Dixon Intermodal d/b/a
        Universal Intermodal Services
        Case 21-CA-252574

Dear Mr. Adlong:

Enclosed is a copy of the second amended charge that has been filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As you know, we seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations in the second amended charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation.  In this way, the case can be fully investigated more quickly.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

Exhibit 3(a)
2312

**GC Exhibit 1(t)**

GC1(t)                              XX
**EXHIBIT NO.**_____  **RECEIVED** _____  **REJECTED** _____


21-CA-252500, et al.            MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____


5                 6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2313

Mason-Dixon Intermodal d/b/a Universal          - 2 -                    March 17, 2021
Intermodal Services
Case 21-CA-252574


     **Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

     If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.


          Very truly yours,


          WILLIAM B. COWEN
          Regional Director


Enclosure:  Copy of second amended charge


cc:    Joe Lugo, General Manger
       Mason-Dixon Intermodal d/b/a Universal
       Intermodal Services
       2035 E. Vista Bella Way
       Compton, CA 90220

Exhibit 3(a)
2314



**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

March 17, 2021

Julie Gutman Dickinson, Attorney at Law
Hector De Haro, Attorney at Law
Bush Gottlieb, A Law Corporation
801 North Brand Blvd, Suite 950
Glendale, CA 91203-1260

Re:   Mason-Dixon Intermodal d/b/a
      Universal Intermodal Services
      Case 21-CA-252574

Dear Ms. Dickinson and Mr. De Haro:

We have docketed the second amended charge that you filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession. If you have additional evidence regarding the allegations in the second amended charge and you have not yet scheduled a date and time for the Board agent to obtain that evidence, please contact the Board agent to arrange to present that evidence.  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

Exhibit 3(a)
2315

Mason-Dixon Intermodal d/b/a                - 2 -                    March 17, 2021
Universal Intermodal Services
Case 21-CA-252574


    **Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.  Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

    If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.


                                        Very truly yours,



                                        WILLIAM B. COWEN
                                        Regional Director

cc:     Raven L. Hall, Staff Attorney
        International Brotherhood of Teamsters
        25 Louisiana Ave NW
        Washington, DC 20001


Exhibit 3(a)
2316

FORM EXEMPT UNDER 44 U.S.C. 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**SECOND AMENDED CHARGE
AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 21-CA-252574 | Date Filed 3/16/2021 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer |  |
|---|---|
| Mason-Dixon International d/b/a Universal Intermodal Services | b. Tel. No. 206 762 6100 |
| | c. Cell No. 586 718 4606 |
| | f. Fax No. 586 467 0904 |

| d. Address *(Street, city, state, and ZIP code)* 2035 E Bella Way Compton, CA 90220 | e. Employer Representative Tony Miles General Manager | g. e-Mail tmiles@universalintermodal.com |
|---|---|---|
| | | h. Number of workers employed 27 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)* Trucking | j. Identify principal product or service Trucking |
|---|---|

k. The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* (3) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, acting through its agents and representatives, has:
(1) discharged its employee, Romel Mallard, in retaliation for his protected concerted activities and support for the Teamsters;
(2) interfered with Section 7 activity by soliciting grievances and promising improvements; and
(3) maintained work rules that prevent or discourage employees from contacting and/or filing charges with the NLRB.
Charging Party requests relief under Section 10(j).

| 3. Full name of party filing charge *(if labor organization, give full name, including local name and number)* | |
|---|---|
| International Brotherhood of Teamsters | |

| 4a. Address *(Street and number, city, state, and ZIP code)* 25 Louisiana N.W. Washington, D.C. 20001 | 4b. Tel. No. 202 624 8711 |
|---|---|
| | 4c. Cell No. 202 437 5357 |
| | 4d. Fax No. 202 624 6884 |
| | 4e. e-Mail rhall@teamster.org |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*   International Brotherhood of Teamsters

| 6. DECLARATION I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. | Tel. No. 818 973 3228 |
|---|---|
| By *(signature of representative or person making charge)*   Julie Gutman Dickinson, Attorney *(Print/type name and title or office, if any)* | Office, if any, Cell No. 213 200 0260 |
| | Fax No. 818 973 3201 |
| Bush Gottlieb, ALC 801 N. Brand Blvd., Ste. 950, Glendale, CA  91203   3/16/2021 Address                                                                 *(date)* | e-Mail jgd@bushgottlieb.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq*. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

**GC Exhibit 1(s)**

GC1(s)                                    XX
**EXHIBIT NO.**_____   **RECEIVED** _____   **REJECTED** _____

      21-CA-252500, et al.           MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

            2              6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2318

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES**<br><br>　　　　Charged Party<br><br>　　and<br><br>**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**<br><br>　　　　Charging Party | **Case 21-CA-252574** |

**AFFIDAVIT OF SERVICE OF FIRST AMENDED CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on December 17, 2019, I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Tony Miles, General Manager
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Bella Way
Compton, CA 90220

John S. Ferrer, Attorney at Law
Ogletree, Deakins, Nash, Smoak & Stewart, LLC
1909 K Street, NW, Suite 1000
Washington, DC 20006-1134

_____
December 17, 2019
Date

_____
Helen Alo, Designated Agent of NLRB
Name

HELEN ALO
Digitally signed by HELEN ALO
Date: 2019.12.17 11:43:03
-08'00'
_____
Signature

Exhibit 3(a)
2319

**GC Exhibit 1(r)**

```
          GC1(r)                    XX
EXHIBIT NO._____  RECEIVED _____ REJECTED _____


      21-CA-252500, et al.        MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


          2              6/14/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____
```

Exhibit 3(a)
2320



UNITED STATES GOVERNMENT
**NATIONAL LABOR RELATIONS BOARD**



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Download
NLRB
Mobile App

December 17, 2019

Tony Miles, General Manager
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Bella Way
Compton, CA 90220

Re:   Mason-Dixon Intermodal d/b/a Universal
       Intermodal Services
       Case 21-CA-252574

Dear Mr. Miles:

Enclosed is a copy of the first amended charge that has been filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As you know, we seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations in the first amended charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation. In this way, the case can be fully investigated more quickly.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be

Exhibit 3(a)
2321

**GC Exhibit 1(q)**

GC1(q)                                      XX
EXHIBIT NO._____   RECEIVED _____ REJECTED _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

5                6/14/21            T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2322

Mason-Dixon Intermodal d/b/a Universal        - 2 -                    December 17, 2019
Intermodal Services
Case 21-CA-252574

submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Very truly yours,

William B. Cowen
Regional Director

Enclosure:  Copy of first amended charge

cc:      John S. Ferrer, Attorney at Law
         Ogletree, Deakins, Nash, Smoak & Stewart, LLC
         1909 K Street, NW, Suite 1000
         Washington, DC 20006-1134

WBC.hta

Exhibit 3(a)
2323



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Download
NLRB
Mobile App



December 17, 2019

Michael T. Manley, Attorney at Law
International Brotherhood of Teamsters
25 Louisiana, N.W.
Washington, DC 20001

Re:   Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
Case 21-CA-252574

Dear Mr. Manley:

We have docketed the first amended charge that you filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession.  If you have additional evidence regarding the allegations in the first amended charge and you have not yet scheduled a date and time for the Board agent to obtain that evidence, please contact the Board agent to arrange to present that evidence.  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.  Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e.,

Exhibit 3(a)
2324

Mason-Dixon Intermodal d/b/a Universal          - 2 -                    December 17, 2019
Intermodal Services
Case 21-CA-252574

native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Very truly yours,

William B. Cowen
Regional Director

Enclosure:  Copy of first amended charge

cc:     Hector De Haro, Attorney at Law
        Bush Gottlieb, A Law Corporation
        801 N Brand Blvd., Suite 950
        Glendale, CA 91203

WBC.hta

Exhibit 3(a)
2325

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**
FIRST AMENDED CHARGE

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case<br>21-CA-252574 | Date Filed<br>**12-16-2019** |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer<br><br>Mason-Dixon International a/b/a/ Universal Intermodal Services | | b. Tel. No.<br>206 762 6100 |
|---|---|---|
| | | c. Cell No.<br>586 718 4606 |
| | | f. Fax. No.<br>586 467 0904 |
| d. Address *(Street, city, state, and ZIP code)*<br><br>2035 E Bella Way<br>Compton, CA 90220 | e. Employer Representative<br><br>Tony Miles<br>General Manager | g. e-mail<br>tmiles@universalintermodal.com |
| | | h. Number of workers employed<br>27 |
| i. Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Trucking | j. Identify principal product or service<br>Trucking | |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and

(list subsections)   (3)                                            of the National Labor Relations Act, and thest unfair labor

practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of

the Act and the Postal Reorganization Act.

### 2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, acting through its agents and representatives, has:
(1) discharged its employee, Romel Mallard, in retaliation for his protected concerted activities and support for the Teamsters;
(2) threatened employees that supporting the Union would be futile;
(3) interfered with Section 7 activity by soliciting grievances and promising improvements; and
(4) maintained work rules that prevent or discourage employees from contacting and/or filing charges with the NLRB.
Charging Party requests relief under Section 10(j) and requests to proceed with the election scheduled for December 4, 2019.

### 3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
International Brotherhood of Teamsters

| 4a. Address *(Street and number, city, state, and ZIP code)*<br>25 Louisiana N.W.<br>Washington, D.C. 20001 | 4b. Tel. No.<br>202 624 8711 |
|---|---|
| | 4c. Cell No.<br>202 437 5357 |
| | 4d. Fax. No.<br>202 624 6884 |
| | 4e. e-mail<br>mmanley@teamster.org |

### 5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*
International Brotherhood of Teamsters

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief. | Tel. No.<br>818 973 3260 |
|---|---|
| *(signature)*          Hector De Haro, attorney | Office, if any, Cell No. |
| *(signature of representative or person making charge)*   *(Print/type name and title or office, if any)* | Fax No.<br>818 973 3201 |
| Bush Gottlieb, a law corporation<br>Address 801 N Brand Blvd., Suite 950, Glendale, CA 91203   Date Dec 16, 2019 | e-mail<br>hdeharo@bushgottlieb.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

Exhibit 9(a)
2326

**GC Exhibit 1(p)**

GC1(p)                                    XX
**EXHIBIT NO.** _____   **RECEIVED** _____   **REJECTED** _____

21-CA-252500, et al.              MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2                    6/14/21                T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2327

## UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

**MASON-DIXON INTERMODAL D/B/A
UNIVERSAL INTERMODAL SERVICES**

      Charged Party

      and

**INTERNATIONAL BROTHERHOOD OF
TEAMSTERS**

      Charging Party

**Case 21-CA-252574**

### AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER

I, the undersigned employee of the National Labor Relations Board, state under oath that on November 27, 2019, I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Tony Miles, General Manager
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
9515 10th Avenue South
Seattle, WA 98108

John S. Ferrer, Attorney at Law
Ogletree, Deakins, Nash, Smoak & Stewart, LLC
1909 K Street, NW, Suite 1000
Washington, DC 20006-1134

| | |
|---|---|
| November 27, 2019 | Helen Alo, Designated Agent of NLRB |
| Date | Name |

HELEN ALO
Digitally signed by HELEN ALO
Date: 2019.11.27 13:23:20
-08'00'

Signature

Exhibit 3(a)
2328

**GC Exhibit 1(o)**

GC1(o)                              XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.              MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2              6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2329



UNITED STATES GOVERNMENT
**NATIONAL LABOR RELATIONS BOARD**



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Download
NLRB
Mobile App

November 27, 2019

Tony Miller, General Manager
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
9515 10th Ave. South
Seattle, WA 98108

Re:     Mason-Dixon Intermodal d/b/a Universal
        Intermodal Services
        Case 21-CA-252574

Dear Mr. Miller:

Enclosed is a copy of a charge that has been filed in this case. This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:** This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520. If this Board agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Right to Representation:** You have the right to be represented by an attorney or other representative in any proceeding before us. If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*. This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board. Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** We seek prompt resolutions of labor disputes. Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations set forth in the charge as soon as possible. If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation. In this way, the case can be fully investigated more quickly. **Due to the nature of the allegations in the enclosed unfair labor practice charge, we have identified this case as one in which injunctive relief pursuant to Section 10(j) of the Act may be appropriate.** Therefore, in addition to investigating the merits of the unfair labor practice allegations, the Board agent will also inquire into those factors relevant to making a determination as to whether or not 10(j) injunctive relief is appropriate in this case. Accordingly, please include your position on the appropriateness of Section 10(j) relief when you submit your evidence relevant to the investigation.

Exhibit 3(a)
2330

**GC Exhibit 1(n)**

GC1(n)                          XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

6              6/14/21            T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2331

Mason-Dixon Intermodal d/b/a Universal          - 2 -                    November 27, 2019
Intermodal Services
Case 21-CA-252574

     Full and complete cooperation includes providing witnesses to give sworn affidavits to a Board agent, and providing all relevant documentary evidence requested by the Board agent.  Sending us your written account of the facts and a statement of your position is not enough to be considered full and complete cooperation.  A refusal to fully cooperate during the investigation might cause a case to be litigated unnecessarily.

     In addition, either you or your representative must complete the enclosed Commerce Questionnaire to enable us to determine whether the NLRB has jurisdiction over this dispute.  If you recently submitted this information in another case, or if you need assistance completing the form, please contact the Board agent.

     We will not honor any request to place limitations on our use of position statements or evidence beyond those prescribed by the Freedom of Information Act and the Federal Records Act.  Thus, we will not honor any claim of confidentiality except as provided by Exemption 4 of FOIA, 5 U.S.C. Sec. 552(b)(4), and any material you submit may be introduced as evidence at any hearing before an administrative law judge.  We are also required by the Federal Records Act to keep copies of documents gathered in our investigation for some years after a case closes.  Further, the Freedom of Information Act may require that we disclose such records in closed cases upon request, unless there is an applicable exemption.  Examples of those exemptions are those that protect confidential financial information or personal privacy interests.

     **Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

     **Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

     **Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

Exhibit 3(a)
2332

Mason-Dixon Intermodal d/b/a Universal          - 3 -          November 27, 2019
Intermodal Services
Case 21-CA-252574

If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

We can provide assistance for persons with limited English proficiency or disability.  Please let us know if you or any of your witnesses would like such assistance.

Very truly yours,

William B. Cowen
Regional Director

Enclosures:
    1.  Copy of Charge
    2.  Commerce Questionnaire

cc:    John S. Ferrer, Attorney at Law
       Ogletree, Deakins, Nash, Smoak & Stewart, LLC
       1909 K Street, NW, Suite 1000
       Washington, DC 20006-1134

WBC.hta

Exhibit 3(a)
2333



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

November 27, 2019

Michael T. Manley, Counsel
International Brotherhood of Teamsters
25 Louisiana Ave., NW
Washington, DC 20001

Re:     Mason-Dixon Intermodal d/b/a Universal
        Intermodal Services
        Case 21-CA-252574

Dear Mr. Manley:

The charge that you filed in this case on November 27, 2019, has been docketed as case number 21-CA-252574.  This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:**  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If this Board agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Right to Representation:**  You have the right to be represented by an attorney or other representative in any proceeding before us.  If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*.  This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board.  Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession.  Because we seek to resolve labor disputes promptly, you should be ready to promptly present your affidavit(s) and other evidence.  If you have not yet scheduled a date and time for the Board agent to take your affidavit, please contact the Board agent to schedule the affidavit(s).  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed without investigation.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text

Exhibit 3(a)
2334

Mason-Dixon Intermodal d/b/a Universal     - 2 -        November 27, 2019
Intermodal Services
Case 21-CA-252574

messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

       **Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

       **Procedures:** Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov). You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible. Failure to comply with Section 102.5 will result in rejection of your submission. The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format). Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format). If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

       If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email. Please ensure that the agent handling your case has your current email address.

       Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request. *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

       We can provide assistance for persons with limited English proficiency or disability. Please let us know if you or any of your witnesses would like such assistance.

                          Very truly yours,

                          William B. Cowen
                          Regional Director

Enclosures

cc:    Julie Gutman Dickinson, Attorne at Law
      Bush Gottlieb, A Law Corporation
      801 North Brand Blvd., Suite 950
      Glendale, CA 91203-1260

WBC.hta

Exhibit 3(a)
2335

FORM EXEMPT UNDER 44 U.S.C 3512

INTERNET
FORM NLRB-501
(2-08)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 21-CA-252574 | 11-27-2019 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| | |
|---|---|
| a.  Name of Employer<br><br>Mason-Dixon Intermodal d/b/a Universal Intermodal Services | b.  Tel. No.<br>(206) 762-6100 |
| | c.  Cell No.<br>(586) 718-4606 |
| | f.  Fax No.<br>(586) 467-0904 |
| d.  Address *(Street, city, state, and ZIP code)*<br><br>9515 10th Ave, South<br>WA Seattle 98108-____ | e.  Employer Representative<br><br>Tony Miles<br>General Manager |
| | g.  e-Mail<br>tmiles@universalintermodal.com |
| | h.  Number of workers employed<br>27 |

| | |
|---|---|
| i.  Type of Establishment *(factory, mine, wholesaler, etc.)*<br>Trucking | j.  Identify principal product or service<br>trucking |

k.  The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and *(list subsections)* 3                                                                   of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices are unfair practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2.  Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*


--See additional page--


3.  Full name of party filing charge *(if labor organization, give full name, including local name and number)*
Michael Thomas Manley                              Title:
International Brotherhood of Teamsters

| | |
|---|---|
| 4a.  Address *(Street and number, city, state, and ZIP code)*<br><br>25 Louisiana, N.W.<br>DC Washington 20001-____ | 4b.  Tel. No.<br>(202) 624-8711 |
| | 4c.  Cell No.<br>(202) 437-5357 |
| | 4d.  Fax No.<br>(202) 624-6884 |
| | 4e.  e-Mail<br>mmanley@teamster.org |

5.  Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*

| 6.  DECLARATION<br>I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief. | Tel. No.<br>(202) 624-8711 |
|---|---|
| By   Michael T Manley                    Title:  Michael T Manley<br>(signature of representative or person making charge)          Counsel<br>                                        (Print/type name and title or office, if any) | Office, if any, Cell No.<br>(202) 437-5357 |
| | Fax No.<br>(202) 624-6884 |
| Address   25 Louisiana, N.W.<br>Washington DC 20001-____          11/27/2019 13:18:44<br>                                        (date) | e-Mail<br>mmanley@teamster.org |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information will cause the NLRB to decline to invoke its processes.

2336

**GC Exhibit 1(m)**

GC1(m)                              XX
**EXHIBIT NO.** _____  **RECEIVED** _____  **REJECTED** _____

        21-CA-252500, et al.           MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

        3                6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2337

## Basis of the Charge

**8(a)(3)**

Within the previous six months, the Employer discharged an employee(s) because the employee(s) joined or supported a labor organization and in order to discourage union activities and/or membership.

| Name of employee discharged | Approximate date of discharge |
|---|---|
| Romel Mallard | November 26, 2019 |

**8(a)(3)**

Within the previous six months, the Employer disciplined or retaliated against an employee(s) because the employee(s) joined or supported a labor organization and in order to discourage union activities and/or membership.

| Name of employee disciplined/retaliated against | Type of discipline/retaliation | Approximate date of discipline/retaliation |
|---|---|---|
| Michael Payan | suspension | 11/27/2019 |

**8(a)(1)**

Within the previous six-months, the Employer has interfered with, restrained, and coerced its employees in the exercise of rights protected by Section 7 of the Act by maintaining work rules that prevent or discourage employees from contacting and/or filing charges with the National Labor Relations Board.

Exhibit 3(a)
2338

**GC Exhibit 1(m)**

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES**<br><br>Charged Party<br><br>and<br><br>**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**<br><br>Charging Party | **Case 21-CA-252500** |

**AFFIDAVIT OF SERVICE OF THIRD AMENDED CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on January 2, 2020, I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Joe Lugo, General Manger
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Bella Way
Compton, CA 90220

John S. Ferrer, Attorney at Law
Ogletree Deakins Law Firm
1909 K Street, NW, Suite 1000
Washington, DC 20006-1134

January 2, 2020
_____
Date

Helen Alo, Designated Agent of NLRB
_____
Name

HELEN ALO
Digitally signed by HELEN ALO
Date: 2020.01.02 10:32:02 -08'00'
_____
Signature

Exhibit 3(a)
2339

**GC Exhibit 1(l)**

GC1(1)                          XX
**EXHIBIT NO.**_____   **RECEIVED** _____   **REJECTED** _____

        21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

        2                6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2340



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Download
NLRB
Mobile App

January 2, 2020

Joe Lugo, General Manger
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Bella Way
Compton, CA 90220

Re:   Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
Case 21-CA-252500

Dear Mr. Lugo:

Enclosed is a copy of the third amended charge that has been filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As you know, we seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations in the third amended charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation. In this way, the case can be fully investigated more quickly.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically

Exhibit 3(a)
2341

**GC Exhibit 1(k)**

GC1(k)                          XX
EXHIBIT NO._____  RECEIVED _____ REJECTED _____

     21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

        5              6/14/21           T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2342

Mason-Dixon Intermodal d/b/a Universal          - 2 -                    January 2, 2020
Intermodal Services
Case 21-CA-252500

should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Very truly yours,

William B. Cowen
Regional Director

Enclosure:  Copy of third amended charge

cc:     John S. Ferrer, Attorney at Law
        Ogletree Deakins Law Firm
        1909 K Street, NW, Suite 1000
        Washington, DC 20006-1134

WBC.hta

Exhibit 3(a)
2343



**UNITED STATES GOVERNMENT**
**NATIONAL LABOR RELATIONS BOARD**

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

January 2, 2020

Michael T. Manley, Attorney at Law
International Brotherhood of Teamsters
25 Louisiana Ave., NW
Washington, DC 20001

Re:     Mason-Dixon Intermodal d/b/a Universal
         Intermodal Services
         Case 21-CA-252500

Dear Mr. Manley:

We have docketed the third amended charge that you filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession.  If you have additional evidence regarding the allegations in the third amended charge and you have not yet scheduled a date and time for the Board agent to obtain that evidence, please contact the Board agent to arrange to present that evidence.  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control. Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.  Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e.,

Exhibit 3(a)
2344

Mason-Dixon Intermodal d/b/a Universal          - 2 -                    January 2, 2020
Intermodal Services
Case 21-CA-252500

native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

      If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

      Very truly yours,

      William B. Cowen
      Regional Director

Enclosure:  Copy of third amended charge

cc:    Hector De Haro, Attorney at Law
      Bush Gottlieb, A Law Corporation
      801 N Brand Blvd., Suite 950
      Glendale, CA 91203

WBC.hta

Exhibit 3(a)
2345

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**
THIRD AMENDED CHARGE

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case<br>21-CA-252500 | Date Filed<br>12-30-2019 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

| 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT | | |
|---|---|---|
| a. Name of Employer<br><br>Mason-Dixon International a/b/a/ Universal Intermodal Services | | b. Tel. No.<br>206 762 6100 |
| | | c. Cell No.<br>586 718 4606 |
| | | f. Fax. No.<br>586 467 0904 |
| d. Address *(Street, city, state, and ZIP code)*<br><br>2035 E Bella Way<br>Compton, CA 90220 | e. Employer Representative<br><br>Tony Miles<br>General Manager | g. e-mail |
| | | h. Number of workers employed<br>27 |
| i. Type of Establishment *(factory, mine, wholesale, etc.)*<br>Trucking | j. Identify principal product or service<br>Trucking | |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and

(list subsections)  (3)                                                of the National Labor Relations Act, and thest unfair labor

practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of

the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, acting through its agents and representatives, has:
(1) suspended and discharged its employee, Jonathan Ledesma, in retaliation for his protected concerted activities and support for the
Teamsters; (2) discharged its employee, Kevin Poullard, in retaliation for his protected concerted activities and support for the Teamsters;
and (3) unlawfully interrogated employees regarding their support for the Union and/or their protected concerted activities.

Charging Party requests relief under Section 10(j) and requests to proceed with the election scheduled for December 4, 2019.

| 3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*<br>International Brotherhood of Teamsters | | |
|---|---|---|
| 4a. Address *(Street and number, city, state, and ZIP code)*<br>25 Louisiana N.W.<br>Washington, D.C. 20001 | | 4b. Tel. No.<br>202 624 8711 |
| | | 4c. Cell No.<br>202 437 5357 |
| | | 4d. Fax No.<br>202 624 6884 |
| | | 4e. e-mail<br>mmanley@teamster.org |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*
International Brotherhood of Teamsters

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief.<br><br>Hector De Haro, attorney | Tel. No.<br>818 973 3260 |
|---|---|
| | Office, if any, Cell No. |
| *(signature of representative or person making charge)*      *(Print/type name and title or office, if any)* | Fax No.<br>818 973 3201 |
| Bush Gottlieb, a law corporation<br>Address 801 N Brand Blvd., Suite 950, Glendale, CA 91203      Date Dec 30, 2019 | e-mail<br>hdeharo@bushgottlieb.com |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to
assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses of the information are fully
set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the
NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

Exhibit 3(a)
2346

**GC Exhibit 1(j)**

GC1(j)                                    XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.        MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2              6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2347

# UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

| | |
|---|---|
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES**<br><br>Charged Party<br><br>and<br><br>**INTERNATIONAL BROTHERHOOD OF TEAMSTERS**<br><br>Charging Party | **Case 21-CA-252500** |

## AFFIDAVIT OF SERVICE OF SECOND AMENDED CHARGE AGAINST EMPLOYER

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on December 17, 2019, I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Tony Miles, General Manager
Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Bella Way
Compton,CA 90220

John S. Ferrer, ESQ., Attorney at Law
Ogletree, Deakins, Nash, Smoak & Stewart, LLC
1909 K Street, NW, Suite 1000
Washington, DC 20006-1134

| | |
|---|---|
| December 17, 2019 | Helen Alo, Designated Agent of NLRB |
| Date | Name |

HELEN ALO
Digitally signed by HELEN ALO
Date: 2019.12.17 10:06:33
-08'00'

Signature

Exhibit 3(a)
2348

**GC Exhibit 1(i)**

GC1(i)                              XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____


        21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____


            2              6/14/21           T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2349



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

December 17, 2019

Tony Miles, General Manager
Mason-Dixon Intermodal d/b/a
Universal Intermodal Services
2035 E. Bella Way
Compton,CA 90220

Re:   Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
Case 21-CA-252500

Dear Mr. Miles:

Enclosed is a copy of the second amended charge that has been filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As you know, we seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations in the second amended charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation.  In this way, the case can be fully investigated more quickly.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its

Exhibit 3(a)
2350

GC1(h)                    XX

**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.        MASON-DIXON INTERMODAL

**CASE NO** _____ **CASE NAME** _____

5           6/14/21          T. RAY

**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2351

Mason-Dixon Intermodal d/b/a Universal          - 2 -                     December 17, 2019
Intermodal Services
Case 21-CA-252500

determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e., native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigate
ng the charge.

　　　　If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

                                        Very truly yours,

                                        William B. Cowen
                                        Regional Director

Enclosure:  Copy of second amended charge

cc:     John S. Ferrer, Attorney at Law
        Ogletree, Deakins, Nash, Smoak & Stewart, LLC
        1909 K Street, NW, Suite 1000
        Washington, DC 20006-1134

WBC.hta

Exhibit 3(a)
2352



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

December 17, 2019

Michael T. Manley, Attorney at Law
International Brotherhood of Teamsters
25 Louisiana Ave NW
Washington, DC 20001

> Re:   Mason-Dixon Intermodal d/b/a Universal
> Intermodal Services
> Case 21-CA-252500

Dear Mr. Manley:

We have docketed the second amended charge that you filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession.  If you have additional evidence regarding the allegations in the second amended charge and you have not yet scheduled a date and time for the Board agent to obtain that evidence, please contact the Board agent to arrange to present that evidence.  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.  Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its determination on the merits solely based on the evidence properly submitted. All evidence submitted electronically should be in the form in which it is normally used and maintained in the course of business (i.e.,

Exhibit 3(a)
2353

Mason-Dixon Intermodal d/b/a Universal          - 2 -                    December 17, 2019
Intermodal Services
Case 21-CA-252500

native format).  Where evidence submitted electronically is not in native format, it should be submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-readable and searchable electronic format).  If you have questions about the submission of evidence or expect to deliver a large quantity of electronic records, please promptly contact the Board agent investigating the charge.

   If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

       Very truly yours,

       William B. Cowen
       Regional Director

Enclosure:  Copy of second amended charge

cc:  Hector de Haro, Attorney at Law
    Bush Gottlieb, A Law Corporation
    801 North Brand Blvd., Suite 950
    Glendale, CA 91203-1260

WBC.hta

Exhibit 3(a)
2354

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**
SECOND AMENDED CHARGE

FORM NLRB-501
(2-18)

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case 21-CA-252500 | Date Filed 12-16-2019 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| | |
|---|---|
| a. Name of Employer Mason-Dixon International a/b/a/ Universal Intermodal Services | b. Tel. No. 206 762 6100 |
| | c. Cell No. 586 718 4606 |
| | f. Fax. No. 586 467 0904 |
| d. Address (Street, city, state, and ZIP code) 2035 E Bella Way Compton, CA 90220 | e. Employer Representative Tony Miles General Manager | g. e-mail |
| | h. Number of workers employed 27 |
| i. Type of Establishment (factory, mine, wholesaler, etc.) Trucking | j. Identify principal product or service Trucking |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (3) (list subsections) of the National Labor Relations Act, and these unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

2. Basis of the Charge *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, acting through its agents and representatives, has:
(1) discharged its employee, Jonathan Ledesma, in retaliation for his protected concerted activities and support for the Teamsters;
(2) discharged its employee, Kevin Poullard, in retaliation for his protected concerted activities and support for the Teamsters; and
(3) unlawfully interrogated employees regarding their support for the Union and/or their protected concerted activities.

Charging Party requests relief under Section 10(j) and requests to proceed with the election scheduled for December 4, 2019.

3. Full name of party filing charge *(if labor organization, give full name, including local name and number)*
International Brotherhood of Teamsters

| 4a. Address *(Street and number, city, state, and ZIP code)* 25 Louisiana N.W. Washington, D.C. 20001 | 4b. Tel. No. 202 624 8711 |
|---|---|
| | 4c. Cell No. 202 437 5357 |
| | 4d. Fax No. 202 624 6884 |
| | 4e. e-mail mmanley@teamster.org |

5. Full name of national or international labor organization of which it is an affiliate or constituent unit *(to be filled in when charge is filed by a labor organization)*
International Brotherhood of Teamsters

6. DECLARATION
I declare that I have read the above charge and that the statements
are true to the best of my knowledge and belief.

| (signature of representative or person making charge) | Tel. No. 818 973 3260 |
|---|---|
| Hector De Haro, attorney | Office, if any, Cell No. |
| *(Print/type name and title of office, if any)* | Fax No. 818 973 3201 |
| Bush Gottlieb, a law corporation | e-mail hdeharo@bushgottlieb.com |
| Address 801 N Brand Blvd., Suite 950, Glendale, CA 91203   Date Dec 16, 2019 | |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

GC1(g)                              XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2              6/14/21            T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2356

## UNITED STATES OF AMERICA

## BEFORE THE NATIONAL LABOR RELATIONS BOARD

**MASON-DIXON INTERMODAL D/B/A
UNIVERSAL INTERMODAL SERVICES**

        Charged Party

   and

**INTERNATIONAL BROTHERHOOD OF
TEAMSTERS**

        Charging Party

**Case 21-CA-252500**

### AFFIDAVIT OF SERVICE OF FIRST AMENDED CHARGE AGAINST EMPLOYER

I, the undersigned employee of the National Labor Relations Board, being duly sworn, say that on November 29, 2019**,** I served the above-entitled document(s) by regular mail upon the following persons, addressed to them at the following addresses:

Tony Miles, General Manager
Intermodal Services
9515 10th Avenue South
Seattle, WA 98108

John S. Ferrer, Attorney at Law
Ogletree, Deakins, Nash, Smoak & Stewart, LLC
1909 K Street, NW, Suite 1000
Washington, DC 20006-1134

Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Bella Way,
Compton, CA 90220

| | |
|---|---|
| November 29, 2019 | Mara Estudillo, Designated Agent of NLRB |
| Date | Name |
| | *Mara Estudillo* |
| | Signature |

Exhibit 3(a)
2357

**GC Exhibit 1(f)**

GC1(f)                              XX
**EXHIBIT NO.** _____ **RECEIVED** _____ **REJECTED** _____

       21-CA-252500, et al.              MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

             2              6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2358



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD



REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778

Download
NLRB
Mobile App

November 29, 2019

Mason-Dixon Intermodal d/b/a Universal Intermodal Services
2035 E. Bella Way,
Compton, CA 90220

> Re:   Mason-Dixon Intermodal d/b/a Universal
>        Intermodal Services
>        Case 21-CA-252500

Dear Sir or Madam:

Enclosed is a copy of the first amended charge that has been filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney Stephanie Cahn whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As you know, we seek prompt resolutions of labor disputes.  Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations in the first amended charge as soon as possible.  If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation.  In this way, the case can be fully investigated more quickly.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:**  It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a written statement explaining why electronic submission is not possible or feasible.   Failure to comply with Section 102.5 will result in rejection of your submission.  The Region will make its

Exhibit 3(a)
2359

**GC Exhibit 1(e)**

GC1(e)                                    XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.            MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

      5                6/14/21                T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2360

Mason-Dixon Intermodal d/b/a Universal            - 2 -                          November 29, 2019
Intermodal Services
Case 21-CA-252500

determination on the merits solely based on the evidence properly submitted. All evidence
submitted electronically should be in the form in which it is normally used and maintained in the
course of business (i.e., native format).  Where evidence submitted electronically is not in native
format, it should be submitted in a manner that retains the essential functionality of the native
format (i.e., in a machine-readable and searchable electronic format).  If you have questions
about the submission of evidence or expect to deliver a large quantity of electronic records,
please promptly contact the Board agent investigating the charge.

If the Agency does not issue a formal complaint in this matter, parties will be notified of
the Regional Director's decision by email.  Please ensure that the agent handling your case has
your current email address.

Very truly yours,

William B. Cowen
Regional Director

Enclosure:  Copy of first amended charge

cc:      Tony Miles, General Manager
         Intermodal Services
         9515 10th Avenue South
         Seattle, WA 98108

         John S. Ferrer, Attorney at Law
         Ogletree, Deakins, Nash, Smoak & Stewart, LLC
         1909 K Street, NW, Suite 1000
         Washington, DC 20006-1134

Exhibit 3(a)
2361



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

November 29, 2019

Michael Manley, Staff Attorney
International Brotherhood of Teamsters
25 Louisiana Ave NW
Washington, DC 20001

                Re:     Mason-Dixon Intermodal d/b/a Universal
                              Intermodal Services
                              Case 21-CA-252500

Dear Mr. Manley:

We have docketed the first amended charge that you filed in this case.

**Investigator**:  This charge is being investigated by Field Attorney Phuong Do whose telephone number is (213)634-6520.  If the agent is not available, you may contact Supervisory Attorney Stephanie Cahn whose telephone number is (213)634-6501.

**Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession.  If you have additional evidence regarding the allegations in the first amended charge and you have not yet scheduled a date and time for the Board agent to obtain that evidence, please contact the Board agent to arrange to present that evidence.  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text messages, electronic documents, emails, and any data created by proprietary software tools) related to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to prohibit affiants from recording the interview conducted by Board agents when subscribing Agency affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must submit all documentary evidence, including statements of position, exhibits, sworn statements, and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site (www.nlrb.gov).  You must e-file all documents electronically or provide a

Exhibit 3(a)
2362

Mason-Dixon Intermodal d/b/a Universal            - 2 -                          November 29, 2019
Intermodal Services
Case 21-CA-252500

written statement explaining why electronic submission is not possible or feasible.   Failure to
comply with Section 102.5 will result in rejection of your submission.  The Region will make its
determination on the merits solely based on the evidence properly submitted. All evidence
submitted electronically should be in the form in which it is normally used and maintained in the
course of business (i.e., native format).  Where evidence submitted electronically is not in native
format, it should be submitted in a manner that retains the essential functionality of the native
format (i.e., in a machine-readable and searchable electronic format).  If you have questions
about the submission of evidence or expect to deliver a large quantity of electronic records,
please promptly contact the Board agent investigating the charge.

      If the Agency does not issue a formal complaint in this matter, parties will be notified of
the Regional Director's decision by email.  Please ensure that the agent handling your case has
your current email address.

Very truly yours,

William B. Cowen
Regional Director

cc:     Julie Gutman Dickinson, Attorne at Law
        Bush Gottlieb, A Law Corporation
        801 North Brand Blvd., Suite 950
        Glendale, CA 91203-1260

Exhibit 3(a)
2363

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

*First Amended*

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| 21-CA-252500 | 11-27-19 |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

## 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | b. Tel. No. |
|---|---|
| Mason-Dixon Intermodal d/b/a Universal Intermodal Services | 206-762-6100 |

c. Cell No.
586-718-4606

f. Fax. No.
586-467-0904

| d. Address *(Street, city, state, and ZIP code)* | e. Employer Representative | g. e-mail |
|---|---|---|
| 2035 E. Bella Way<br>Compton, CA 90220 | Tony Miles, General Manager<br>9515 10th Ave South<br>Seattle, WA 98108 | tmiles@universalintermodal.com |
| | | h. Number of workers employed<br>27 |

| i. Type of Establishment *(factory, mine, wholesaler, etc.)* | j. Identify principal product or service |
|---|---|
| trucking | trucking |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections)   8(a)(1) and 8(a)(3)   of the National Labor Relations Act, and thest unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

**2. Basis of the Charge** *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six months, the Employer, acting through its agents and representatives, discharged its employee, Jonathan Ledesma,  in retaliation for his concerted protected actities and support for the Teamsters.

Within the last six months, the Employer, acting through its agents and representatives, discharged its employee, Kevin Poullard, in retaliation for his concerted protected activities and support for the Teamsters.

Charging Party request relief under Section 10(j) and request to proceed with the election schedule for December 4, 2019.

| 3. Full name of party filing charge *(if labor organization, give full name, including local name and number)* | |
|---|---|
| International Brotherhood of Teamsters | |

| 4a. Address *(Street and number, city, state, and ZIP code)* | 4b. Tel. No.<br>202-624-8711 |
|---|---|
| 25 Louisiana, N.W.<br>Washington, D.C. 20001 | 4c. Cell No.<br>202-437-5357 |
| | 4d. Fax No.<br>202-624-6884 |
| | 4e. e-mail |

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** *(to be filled in when charge is filed by a labor organization)*

International Brotherhood of Teamsters

| 6. DECLARATION<br>I declare that I have read the above charge and that the statements<br>are true to the best of my knowledge and belief. | Tel. No.<br>202-624-8711 |
|---|---|
| *(signature)* Michael T. Manley | Office, if any, Cell No.<br>202-437-5357 |
| *(signature of representative or person making charge)*   *(Print/type name and title or office, if any)* | Fax No.<br>202-624-6884 |
| 25 Louisiana, N.W., Washington, D.C. 20001 | e-mail |
| Address   Date   11/27/2019 | mmanley@teamster.org |

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
PRIVACY ACT STATEMENT

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

Exhibit 3(a)
2364

**GC Exhibit 1(d)**

GC1(d)                                    XX
**EXHIBIT NO.**_____  **RECEIVED** _____  **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____  **CASE NAME** _____

2                6/14/21              T. RAY
**NO OF PAGES** _____  **DATE:** _____  **REPORTER:** _____

Exhibit 3(a)
2365

**UNITED STATES OF AMERICA**

**BEFORE THE NATIONAL LABOR RELATIONS BOARD**

| | |
|---|---|
| **MASON-DIXON INTERMODAL D/B/A UNIVERSAL SERVICES** | |
| Charged Party | |
| and | **Case 21-CA-252500** |
| **INTERNATIONAL BROTHERHOOD OF TEAMSTERS** | |
| Charging Party | |

**AFFIDAVIT OF SERVICE OF CHARGE AGAINST EMPLOYER**

I, the undersigned employee of the National Labor Relations Board, state under oath that on November 26, 2019, I served the above-entitled document(s) by post-paid regular mail upon the following persons, addressed to them at the following addresses:

Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Bella Way
Compton, CA 90220

Tony Miles, General Manager
Intermodal Services
9515 10th Avenue South
Seattle, WA 98108

John S. Ferrer, Attorney at Law
Ogletree, Deakins, Nash, Smoak & Stewart, LLC
1909 K Street, NW, Suite 1000
Washington, DC 20006-1134

| | |
|---|---|
| November 26, 2019 | Helen Alo, Designated Agent of NLRB |
| Date | Name |

HELEN ALO
Digitally signed by HELEN ALO
Date: 2019.11.26 16:13:34 -08'00'

Signature

Exhibit 3(a)
2366

**GC Exhibit 1(c)**

GC1(c)                                        XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.            MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2                    6/14/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2367



UNITED STATES GOVERNMENT
**NATIONAL LABOR RELATIONS BOARD**

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

November 26, 2019

Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
2035 E. Bella Way
Compton, CA 90220

        Re:    Mason-Dixon Intermodal d/b/a Universal
                  Services
                  Case 21-CA-252500

Dear Sir or Madam:

Enclosed is a copy of a charge that has been filed in this case. This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

**Investigator:** This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520. If this Board agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

**Right to Representation:** You have the right to be represented by an attorney or other representative in any proceeding before us. If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*. This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board. Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

**Presentation of Your Evidence:** We seek prompt resolutions of labor disputes. Therefore, I urge you or your representative to submit a complete written account of the facts and a statement of your position with respect to the allegations set forth in the charge as soon as possible. If the Board agent later asks for more evidence, I strongly urge you or your representative to cooperate fully by promptly presenting all evidence relevant to the investigation. In this way, the case can be fully investigated more quickly. **Due to the nature of the allegations in the enclosed unfair labor practice charge, we have identified this case as one in which injunctive relief pursuant to Section 10(j) of the Act may be appropriate.** Therefore, in addition to investigating the merits of the unfair labor practice allegations, the Board agent will also inquire into those factors relevant to making a determination as to whether or not 10(j) injunctive relief is appropriate in this case. Accordingly, please include your position on the appropriateness of Section 10(j) relief when you submit your evidence relevant to the investigation.

Exhibit 3(a)
2368

**GC Exhibit 1(b)**

```
              GC1(b)                    XX
EXHIBIT NO._____  RECEIVED _____ REJECTED _____


     21-CA-252500, et al.        MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


          6            6/14/21           T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____
```

Exhibit 3(a)
2369

Mason-Dixon Intermodal d/b/a Universal          - 2 -                    November 26, 2019
Services
Case 21-CA-252500

Full and complete cooperation includes providing witnesses to give sworn affidavits to a
Board agent, and providing all relevant documentary evidence requested by the Board
agent.  Sending us your written account of the facts and a statement of your position is not enough
to be considered full and complete cooperation.  A refusal to fully cooperate during the
investigation might cause a case to be litigated unnecessarily.

In addition, either you or your representative must complete the enclosed Commerce
Questionnaire to enable us to determine whether the NLRB has jurisdiction over this dispute.  If you
recently submitted this information in another case, or if you need assistance completing the form,
please contact the Board agent.

We will not honor any request to place limitations on our use of position statements or
evidence beyond those prescribed by the Freedom of Information Act and the Federal Records
Act.  Thus, we will not honor any claim of confidentiality except as provided by Exemption 4 of
FOIA, 5 U.S.C. Sec. 552(b)(4), and any material you submit may be introduced as evidence at any
hearing before an administrative law judge.  We are also required by the Federal Records Act to
keep copies of documents gathered in our investigation for some years after a case closes.  Further,
the Freedom of Information Act may require that we disclose such records in closed cases upon
request, unless there is an applicable exemption.  Examples of those exemptions are those that
protect confidential financial information or personal privacy interests.

**Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve
all relevant documents and electronically stored information (ESI) in this case, and to take all steps
necessary to avoid the inadvertent loss of information in your possession, custody or control.
Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text
messages, electronic documents, emails, and any data created by proprietary software tools) related
to the above-captioned case.

**Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to
prohibit affiants from recording the interview conducted by Board agents when subscribing Agency
affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the
affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the
Region's investigation.

**Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must
submit all documentary evidence, including statements of position, exhibits, sworn statements,
and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site
(www.nlrb.gov).  You must e-file all documents electronically or provide a written statement
explaining why electronic submission is not possible or feasible.   Failure to comply with Section
102.5 will result in rejection of your submission.  The Region will make its determination on the
merits solely based on the evidence properly submitted. All evidence submitted electronically
should be in the form in which it is normally used and maintained in the course of business (i.e.,
native format).  Where evidence submitted electronically is not in native format, it should be
submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-
readable and searchable electronic format).  If you have questions about the submission of evidence
or expect to deliver a large quantity of electronic records, please promptly contact the Board agent
investigating the charge.

Exhibit 3(a)
2370

Mason-Dixon Intermodal d/b/a Universal          - 3 -                    November 26, 2019
Services
Case 21-CA-252500

If the Agency does not issue a formal complaint in this matter, parties will be notified of the Regional Director's decision by email.  Please ensure that the agent handling your case has your current email address.

Information about the Agency, the procedures we follow in unfair labor practice cases and our customer service standards is available on our website, www.nlrb.gov or from an NLRB office upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to parties involved in an investigation of an unfair labor practice charge.

We can provide assistance for persons with limited English proficiency or disability.  Please let us know if you or any of your witnesses would like such assistance.

Very truly yours,

William B. Cowen
Regional Director

Enclosures:
1.  Copy of Charge
2.  Commerce Questionnaire

cc:     Tony Miles, General Manager
Intermodal Services
9515 10th Avenue South
Seattle, WA 98108

John S. Ferrer, Attorney at Law
Ogletree, Deakins, Nash, Smoak & Stewart, LLC
1909 K Street, NW, Suite 1000
Washington, DC 20006-1134

WBC.hta

Exhibit 3(a)
2371



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 21
US Court House, Spring Street
312 N Spring Street, 10th Floor
Los Angeles, CA 90012

Agency Website: www.nlrb.gov
Telephone: (213)894-5200
Fax: (213)894-2778



Download
NLRB
Mobile App

November 26, 2019

Michael Manley, Staff Attorney
International Brotherhood of Teamsters
25 Louisiana Ave., NW
Washington, DC 20001

      Re:  Mason-Dixon Intermodal d/b/a Universal
         Services
         Case 21-CA-252500

Dear Mr. Manley:

   The charge that you filed in this case on November 26, 2019, has been docketed as case number 21-CA-252500.  This letter tells you how to contact the Board agent who will be investigating the charge, explains your right to be represented, discusses presenting your evidence, and provides a brief explanation of our procedures, including how to submit documents to the NLRB.

   **Investigator:**  This charge is being investigated by Field Attorney PHUONG DO whose telephone number is (213)634-6520.  If this Board agent is not available, you may contact Supervisory Attorney STEPHANIE CAHN whose telephone number is (213)634-6501.

   **Right to Representation:**  You have the right to be represented by an attorney or other representative in any proceeding before us.  If you choose to be represented, your representative must notify us in writing of this fact as soon as possible by completing *Form NLRB-4701, Notice of Appearance*.  This form is available on our website, www.nlrb.gov, or from an NLRB office upon your request.

   If you are contacted by someone about representing you in this case, please be assured that no organization or person seeking your business has any "inside knowledge" or favored relationship with the National Labor Relations Board.  Their knowledge regarding this proceeding was only obtained through access to information that must be made available to any member of the public under the Freedom of Information Act.

   **Presentation of Your Evidence:**  As the party who filed the charge in this case, it is your responsibility to meet with the Board agent to provide a sworn affidavit, or provide other witnesses to provide sworn affidavits, and to provide relevant documents within your possession.  Because we seek to resolve labor disputes promptly, you should be ready to promptly present your affidavit(s) and other evidence.  If you have not yet scheduled a date and time for the Board agent to take your affidavit, please contact the Board agent to schedule the affidavit(s).  If you fail to cooperate in promptly presenting your evidence, your charge may be dismissed without investigation.

   **Preservation of all Potential Evidence:**  Please be mindful of your obligation to preserve all relevant documents and electronically stored information (ESI) in this case, and to take all steps necessary to avoid the inadvertent loss of information in your possession, custody or control.  Relevant information includes, but is not limited to, paper documents and all ESI (e.g. SMS text

Exhibit 3(a)
2372

Mason-Dixon Intermodal d/b/a Universal          - 2 -                         November 26, 2019
Services
Case 21-CA-252500

messages, electronic documents, emails, and any data created by proprietary software tools) related
to the above-captioned case.

   **Prohibition on Recording Affidavit Interviews:** It is the policy of the General Counsel to
prohibit affiants from recording the interview conducted by Board agents when subscribing Agency
affidavits. Such recordings may impede the Agency's ability to safeguard the confidentiality of the
affidavit itself, protect the privacy of the affiant and potentially compromise the integrity of the
Region's investigation.

   **Procedures:**  Pursuant to Section 102.5 of the Board's Rules and Regulations, parties must
submit all documentary evidence, including statements of position, exhibits, sworn statements,
and/or other evidence, by electronically submitting (E-Filing) them through the Agency's web site
(www.nlrb.gov).  You must e-file all documents electronically or provide a written statement
explaining why electronic submission is not possible or feasible.   Failure to comply with Section
102.5 will result in rejection of your submission.  The Region will make its determination on the
merits solely based on the evidence properly submitted. All evidence submitted electronically
should be in the form in which it is normally used and maintained in the course of business (i.e.,
native format).  Where evidence submitted electronically is not in native format, it should be
submitted in a manner that retains the essential functionality of the native format (i.e., in a machine-
readable and searchable electronic format).  If you have questions about the submission of evidence
or expect to deliver a large quantity of electronic records, please promptly contact the Board agent
investigating the charge.

   If the Agency does not issue a formal complaint in this matter, parties will be notified of the
Regional Director's decision by email.  Please ensure that the agent handling your case has your
current email address.

   Information about the Agency, the procedures we follow in unfair labor practice cases and
our customer service standards is available on our website, www.nlrb.gov or from an NLRB office
upon your request.  *NLRB Form 4541, Investigative Procedures* offers information that is helpful to
parties involved in an investigation of an unfair labor practice charge.

   We can provide assistance for persons with limited English proficiency or disability.  Please
let us know if you or any of your witnesses would like such assistance.

                                             Very truly yours,

                                             William B. Cowen
                                             Regional Director

Enclosures

cc:   Julie Gutman Dickinson, Attorne at Law
      Bush Gottlieb, A Law Corporation
      801 North Brand Blvd., Suite 950
      Glendale, CA 91203-1260

WBC.hta

Exhibit 3(a)
2373

FORM NLRB-501
(2-18)

UNITED STATES OF AMERICA
NATIONAL LABOR RELATIONS BOARD
**CHARGE AGAINST EMPLOYER**

| DO NOT WRITE IN THIS SPACE | |
|---|---|
| Case | Date Filed |
| **21-CA-252500** | **11-26-2019** |

**INSTRUCTIONS:**
File an original with NLRB Regional Director for the region in which the alleged unfair labor practice occurred or is occurring.

### 1. EMPLOYER AGAINST WHOM CHARGE IS BROUGHT

| a. Name of Employer | b. Tel. No. |
|---|---|
| Mason-Dixon Intermodal d/b/a Universal Intermodal Services | 206-762-6100 |

c. Cell No.
586-718-4606

f. Fax. No.
586-467-0904

| d. Address *(Street, city, state, and ZIP code)* | e. Employer Representative | g. e-mail |
|---|---|---|
| 2035 E. Bella Way<br>Compton, CA 90220 | Tony Miles, General Manager<br>9515 10th Ave South<br>Seattle, WA 98108 | tmiles@universalintermodal.com |

h. Number of workers employed
27

| i. Type of Establishment *(factory, mine, wholesaler, etc.)* | j. Identify principal product or service |
|---|---|
| trucking | trucking |

The above-named employer has engaged in and is engaging in unfair labor practices within the meaning of section 8(a), subsections (1) and (list subsections)   8(a)(1) and 8(a)(3                of the National Labor Relations Act, and thest unfair labor practices are practices affecting commerce within the meaning of the Act, or these unfair labor practices affecting commerce within the meaning of the Act and the Postal Reorganization Act.

**2. Basis of the Charge** *(set forth a clear and concise statement of the facts constituting the alleged unfair labor practices)*

Within the last six (6) months, the Employer, acting through its agents and representatives has suspended its employee, Jonathan Ledesma, in retaliation for his support of the Union.

Within the last six (6) months, the Empoyer, acting through its agents and representatives has suspended its employee, Jonathan Ledesma, in retaliation for his concerted protected activities.

Charging Party requests relief under Section10(j) of the Act,  U.S.C. 160(j)

**3. Full name of party filing charge** *(if labor organization, give full name, including local name and number)*
International Brotherhood of Teamsters

| 4a. Address *(Street and number, city, state, and ZIP code)* | 4b. Tel. No. |
|---|---|
| 25 Louisiana Avenue, N.W.<br>Washington, D.C. 20001 | 202-624-8711 |

4c. Cell No.
202-437-5357

4d. Fax No.
202-624-6884

4e. e-mail
mmanley@teamster.org

**5. Full name of national or international labor organization of which it is an affiliate or constituent unit** *(to be filled in when charge is filed by a labor organization)*

International Brotherhood of Teamsters

### 6. DECLARATION
I declare that I have read the above charge and that the statements are true to the best of my knowledge and belief.

*Michael T Manley* (signature)

*(signature of representative or person making charge)*

Michael T. Manley, Staff Attorney

*(Print/type name and title or office, if any)*

Address   25 Louisiana Ave. N.W., Washington, D.C. 20001

Date   11/26/2019

Tel. No.
202-624-8711

Office, if any, Cell No.
202-437-5357

Fax No.
202-624-6884

e-mail
mmanley@teamster.org

**WILLFUL FALSE STATEMENTS ON THIS CHARGE CAN BE PUNISHED BY FINE AND IMPRISONMENT (U.S. CODE, TITLE 18, SECTION 1001)**
**PRIVACY ACT STATEMENT**

Solicitation of the information on this form is authorized by the National Labor Relations Act (NLRA), 29 U.S.C. § 151 *et seq.* The principal use of the information is to assist the National Labor Relations Board (NLRB) in processing unfair labor practice and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). The NLRB will further explain these uses upon request. Disclosure of this information to the NLRB is voluntary; however, failure to supply the information may cause the NLRB to decline to invoke its processes.

**GC Exhibit 1(a)**

GC1(a)                              XX
**EXHIBIT NO.**_____  **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2              6/14/21         T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2375

**From:** Mike Vagts
**Sent:** Tuesday, February 26, 2019 8:57 AM
**To:** Dennis Glackin; Tim Monahan
**Cc:** Michael Hott; Ryan Heath
**Subject:** 9004 LA

Good morning,

Intermodal is considering closing their 9004 LA office. They have roughly 33 drivers and 5 office employees. This wouldn't qualify under the WARN Act correct, and if not, what are your thoughts on the proper timeframe and handling of the closing?

Thank you

**From:** Don Taylor
**Sent:** Monday, February 25, 2019 1:38 PM
**To:** Mike Vagts
**Subject:** RE: 9004

Can you find what timeframe would be needed to eliminate the office?

**Don Taylor**
*Vice President of Southern Operations*
T: (866) 938-1598 x 2307  Direct: (586) 467-0934
Cell: (205) 937-0796
dtaylor@universalintermodal.com

Universal Intermodal Services, INC.
12755 E 9 Mile RD
Warren, MI 48089

**<image002.png>**

**www.UniversalLogistics.com**

*Please follow us on social media!*
<image003.jpg>  <image004.png>

## Please Vote For Universal – Click Below!

Inbound Logistics 2019 Top 10 3PL Excellence Awards

SupplyChainBrain 100 Great Supply Chain Partners 2019

# GC Ex 2(a)(a)

Exhibit 3(a)
2376

GC000001

GC2(a)                                    XX
EXHIBIT NO._____ RECEIVED _____ REJECTED _____

        21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

        3                6/15/21              T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2377

**From:** Mike Vagts <MVagts@universalintermodal.com>
**Sent:** Monday, February 25, 2019 1:36 PM
**To:** Don Taylor <DTaylor@universalintermodal.com>
**Subject:** Re: 9004

You were going to discuss and let me know? I would want to discuss with Dennis and Tim M.

Sent from my iPhone

On Feb 25, 2019, at 10:20 AM, Don Taylor <DTaylor@universalintermodal.com> wrote:

What is the timeframe on closing this office out?

**Don Taylor**
*Vice President of Southern Operations*
T: (866) 938-1598 x 2307  Direct: (586) 467-0934
Cell: (205) 937-0796
dtaylor@universalintermodal.com

Universal Intermodal Services, INC.
12755 E 9 Mile RD
Warren, MI 48089

<image002.png>

**www.UniversalLogistics.com**

*Please follow us on social media!*
<image003.jpg>  <image004.png>

<image001.png>

## Please Vote For Universal – Click Below!

Inbound Logistics 2019 Top 10 3PL Excellence Awards

SupplyChainBrain 100 Great Supply Chain Partners 2019

This message may contain information that is privileged, confidential, and exempt from disclosure, and is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately. Unless stated to the contrary, nothing in this message constitutes an electronic signature. LIMITATION OF LIABILITY for loss or damage on this shipment is applicable. See 49 U.S.C. 14706. Notwithstanding anything to the contrary herein, in no event shall CARRIER be liable for any delay, loss or damage claim, regardless of cause, in an amount greater than $100,000 per shipment unless Shipper has declared a stated value, in writing, and has paid an additional charge Fifty Cents (.50) per One Hundred Dollars ($100.00) of each stated value.

Exhibit 3(a)
2378

GC000002



March 6, 2019


Re: Notice of Closing

To: All Rancho Dominguez Universal Intermodal Employees


We regret to inform you that Universal Intermodal Services, Inc., is ceasing operations at the 2035 Vista Bella Way, Rancho Dominguez, CA 90220 facility. The last day of operations at the location will be March 30, 2019.

Our hope is that this notice allows adequate time to explore new employment opportunities within Universal or outside the organization.


If you have any questions or want additional information concerning this matter, please contact Michael Vagts, Sr. HR Manager, at 586-920-0100.


Sincerely,



Michael Vagts
Sr. HR Manager
Universal Intermodal Services, Inc.


**GC Ex 2(b)**
**(b**

Exhibit 3(a)
2379                                                                                    GC000003

GC2(b)                              XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.        MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2               6/15/21          T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2380

Exhibits
UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
#### WASHINGTON, D.C. 20549

## FORM 10-K

(Mark One)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2019

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File Number: 0-51142

# UNIVERSAL LOGISTICS HOLDINGS, INC.

(Exact Name of Registrant as Specified in Its Charter)

| Michigan | 38-3640097 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |

12755 E. Nine Mile Road
Warren, Michigan 48089
(Address, including Zip Code of Principal Executive Offices)

(586) 920-0100
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, no par value | ULH | The NASDAQ Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large Accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Exchange Act Rule 12b-2). Yes ☐ No ☒

As of June 29, 2019, the last business day of the registrant's most recently completed second quarter, the aggregate market value of the registrant's common stock held by non-affiliates of the registrant, based upon the closing sale price of the common stock on June 28, 2019, as reported by The Nasdaq Stock Market, was approximately $184.7 million (assuming, but not admitting for any purpose, that all (a) directors and executive officers of the registrant are affiliates, and (b) the number of shares held by such directors and executive officers does not include shares that such persons could have acquired within 60 days of June 29, 2019).

The number of shares of common stock, no par value, outstanding as of March 9, 2020, was 27,238,448.

#### DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Proxy Statement for the Registrant's 2020 Annual Meeting of Shareholders are incorporated by reference in Part III of this Form 10-K.

<div align="right">

# GC Ex 3

</div>

Exhibit 3(a)
2381

GC000004

GC3                          XX
**EXHIBIT NO.**_____  **RECEIVED** _____  **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

128              6/15/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2382

UNIVERSAL LOGISTICS HOLDINGS, INC.
2019 ANNUAL REPORT ON FORM 10-K
TABLE OF CONTENTS
PART I

| Item 1. | Business | 3 |
|---|---|---|
| Item 1A. | Risk Factors | 8 |
| Item 1B. | Unresolved Securities & Exchange Commission Staff Comments | 16 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 17 |
| Item 4. | Mine Safety Disclosures | 17 |

PART II

| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 18 |
|---|---|---|
| Item 6. | Selected Financial Data | 20 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| Item 7A. | Quantitative and Qualitative Disclosures about Market Risk | 35 |
| Item 8. | Financial Statements and Supplementary Data | 37 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 70 |
| Item 9A. | Controls and Procedures | 70 |
| Item 9B. | Other Information | 74 |

PART III

| Item 10. | Directors, Executive Officers and Corporate Governance | 75 |
|---|---|---|
| Item 11. | Executive Compensation | 75 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 75 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 75 |
| Item 14. | Principal Accounting Fees and Services | 75 |

PART IV

| Item 15. | Exhibits and Financial Statement Schedules | 76 |
|---|---|---|
| Signatures | | 78 |

EX-4.2 Description of Capital Stock
EX-21.1 List of Subsidiaries
EX-23.1 Consent of BDO
EX-31.1 Section 302 CEO Certification
EX-31.2 Section 302 CFO Certification
EX-32.1 Section 906 CEO and CFO Certification
EX-101.INS XBRL Instance Document
EX-101.SCH XBRL Schema Document
EX-101.CAL XBRL Calculation Linkbase Document
EX-101.DEF XBRL Definition Linkbase Document
EX-101.LAB XBRL Labels Linkbase Document
EX-101.PRE XBRLPresentation Linkbase Document

Exhibit 3(a)
2383

GC000005

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K ("Form 10-K") contains forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995, that involve risks and uncertainties. Many of the forward-looking statements are located in Part II, Item 7 of this Form 10-K under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations." Forward-looking statements provide current expectations of future events based on certain assumptions and include any statement that does not directly relate to any historical or current fact. Forward-looking statements can also be identified by words such as "future," "anticipates," "believes," "estimates," "expects," "intends," "will," "would," "could," "can," "may," and similar terms. Forward-looking statements are not guarantees of future performance and the Company's actual results may differ significantly from the results discussed in the forward-looking statements. Factors that might cause such differences include, but are not limited to, those discussed in Part I, Item 1A of this Form 10-K under the heading "Risk Factors," which are incorporated herein by reference. All information presented herein is based on the Company's fiscal calendar. Unless otherwise stated, references to particular years, quarters, months or periods refer to the Company's fiscal years ended December 31 and the associated quarters, months and periods of those fiscal years. Each of the terms "Universal," the "Company," "we," "us" and "our" as used herein refers collectively to Universal Logistics Holdings, Inc. and its subsidiaries, unless otherwise stated. The Company assumes no obligation to revise or update any forward-looking statements for any reason, except as required by law.

## PART I

### ITEM 1:      BUSINESS
#### Company Background

We are a leading asset-light provider of customized transportation and logistics solutions throughout the United States, and in Mexico, Canada and Colombia. We offer our customers a broad array of services across their entire supply chain, including truckload, brokerage, intermodal, dedicated, and value-added services.

We provide a comprehensive suite of transportation and logistics solutions that allow our customers to reduce costs and manage their global supply chains more efficiently. We market and deliver our services in several ways:

- Through a direct sales and marketing network focused on selling our portfolio of services to large customers in specific industry sectors;
- Through a network of agents who solicit freight business directly from shippers; and
- Through company-managed facilities and full service freight forwarding and customs house brokerage offices.

On February 1, 2018, we acquired Fore Transportation, Inc. and certain of its affiliates (collectively, "Fore"). Fore provides its customers with intermodal solutions, including local and regional drayage services in the Chicagoland area.

On August 10, 2018, we acquired Southern Counties Express, Inc. and certain of its affiliates (collectively, "Southern Counties"). Southern Counties provides full-service harbor drayage, transloading, warehousing, and project cargo services in southern California.

On October 12, 2018, we acquired Specialized Rail Service, Inc. ("Specialized Rail"). Specialized Rail offers local and regional intermodal drayage services from its operations in Clearfield, Utah and Las Vegas, Nevada.

On December 7, 2018, we acquired Deco Logistics, Inc., d/b/a Container Connection, and Oaktree Logistics, Inc. (collectively, "Container Connection"). Based in Riverside, California, Container Connection offers harbor drayage services to the Ports of Los Angeles and Long Beach for customers primarily located within the Inland Empire and Central Valley areas.

On April 22, 2019, the Company acquired Michael's Cartage, Inc. ("Michael's"). Headquartered in Bridgeview, Illinois, Michael's provides intermodal drayage services to customers primarily within a 300-mile radius of the Chicagoland area.

On November 5, 2019, the Company acquired Roadrunner Intermodal Services, LLC, Morgan Southern, Inc., Wando Trucking, LLC, and Central Cal Transportation, LLC (collectively, "Roadrunner Intermodal"). Roadrunner Intermodal is a nationwide drayage provider, servicing major port and rail locations throughout the United States.

3

Exhibit 3(a)
2384

GC000006

At December 31, 2019 , we had an agent network totaling approximately 313 agents, and we operated 64 company-managed terminal locations and serviced 55 value-added programs at locations throughout the United States and in Mexico, Canada and Colombia.

We were incorporated in Michigan on December 11, 2001. We have been a publicly held company since February 11, 2005, the date of our initial public offering.

Our principal executive offices are located at 12755 E. Nine Mile Road, Warren, Michigan 48089.

## Operations

We broadly group our revenues into the following service categories: truckload, brokerage, intermodal, dedicated and value-added services.

*Truckload* . Our truckload services include dry van, flatbed, heavy-haul and refrigerated operations. Truckload services represented approximately $251.6 million, or 16.6%, of our operating revenues in 2019. We transport a wide variety of general commodities, including automotive parts, machinery, building materials, paper, food, consumer goods, furniture, steel and other metals on behalf of customers in various industries. Our transportation services are provided through a network of owner-operators and employee drivers.

*Brokerage* . We provide customers freight brokerage services by utilizing third-party transportation providers to transport goods. Brokerage services also include full service domestic and international freight forwarding, and customs brokerage. In 2019, brokerage services represented approximately $354.9 million, or 23.5%, of our operating revenues.

*Intermodal* . Intermodal operations include steamship-truck, rail-truck, and support services. Intermodal support services represented $390.3 million, or 25.8%, of our operating revenues in 2019. Our intermodal support services are primarily short-to-medium distance delivery of both international and domestic containers between the port or railhead and the customer and drayage services.

*Dedicated* . Our dedicated services are primarily provided in support of automotive customers using van equipment. Dedicated services also include our final mile and ground expedited services. In 2019, dedicated services represented approximately $138.7 million, or 9.2%, of our operating revenues. Our dedicated services are primarily short run or round-trip moves within a defined geographic area provided through a network of union and non-union employee drivers, owner-operators, and contract drivers.

*Value-Added* . Our value-added services, which are typically dedicated to individual customer requirements, include material handling, consolidation, sequencing, sub-assembly, cross-dock services, kitting, repacking, warehousing and returnable container management. Value-added services represented approximately $376.5 million, or 24.9%, of our operating revenues in 2019. Our facilities and services are often directly integrated into the production processes of our customers and represent a critical piece of their supply chains.

## Business and Growth Strategy

The key elements of our strategy are as follows:

*Make strategic acquisitions.* The transportation and logistics industry is highly fragmented, with hundreds of small and mid-sized competitors that are either specialized in specific vertical markets, specific service offerings, or limited to local and regional coverage. We expect to selectively evaluate and pursue acquisitions that will enhance our service capabilities, expand our geographic network and/or diversify our customer base.

*Expand our network of agents and owner-operators.* Increasing the number of agents and owner-operators has been a driver of our historical growth in transactional transportation services. We intend to continue to recruit qualified agents and owner-operators in order to penetrate new markets, and expand our operations in existing markets. Our agents typically focus on a small number of shippers in a particular market and are attuned to the specific transportation needs of that core group of shippers, while remaining alert to growth opportunities.

*Continue to capitalize on strong industry fundamentals and outsourcing trends* . We believe long-term industry growth will be supported by manufacturers seeking to outsource non-core logistics functions to cost-effective third-party providers that can efficiently manage increasingly complex global supply chains. We intend to leverage our integrated suite of transportation and logistics services, our network of facilities, our long-term customer relationships, and our reputation for operational excellence to capitalize on favorable industry fundamentals and growth expectations.

4

Exhibit 3(a)
2385

GC000007

Exhibit 3(a)
2386

GC000008

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

*Target further penetration of key customers in the North American automotive industry.* The automotive industry is one of the largest users of global outsourced logistics services, providing us g rowth opportunities with both existing and new customers. Of our customers generating revenues greater than $100,000 per year, this sector comprised approximately 27 % of operating revenues in 2019 . We intend to capitalize on anticipated continued growth in outsourcing of higher value logistics services in the automotive sector such as sub-assembly and sequencing, which link directly into production lines and require specialized capabilities, technological expertise and strict quality controls.

*Continue to expand penetration in other vertical markets .* We have a history of providing highly complex value-added logistics services to automotive and other industrial customers. We have developed standardized, modular systems for material handling processes and have extensive experience in rapid implementation and workforce training. These capabilities and our broad portfolio of logistics services are transferable across vertical markets. We believe we can leverage the expertise we initially developed in the automotive sector. In addition to automotive, our targeted industries include aerospace, energy, government services, healthcare, industrial retail, consumer goods, and steel and metals.

## Competition and Industry

The transportation and logistics service industry is highly competitive and extremely fragmented. We compete based on quality and reliability of service, price, breadth of logistics solutions, and IT capabilities. We compete with asset and non-asset based truckload and less-than-truckload carriers, intermodal transportation, logistics providers and, in some aspects of our business, railroads. We also compete with other motor carriers for owner-operators and agents.

Our customers may choose not to outsource their logistics operations and, rather, to retain or restore such activities as their own internal operations. In our largest vertical market, the automotive industry, we compete more frequently with a relatively small number of privately-owned firms or with subsidiaries of large public companies. These vendors have the scope and capabilities to provide the breadth of services required by the large and complex supply chains of automotive original equipment manufacturers (OEMs).

We also encounter competition from regional and local third-party logistics providers, integrated transportation companies that operate their own aircraft, cargo sales agents and brokers, surface freight forwarders and carriers, airlines, associations of shippers organized to consolidate their members' shipments to obtain lower freight rates, and internet-based freight exchanges.

In December 2017, federal regulations mandated the use of electronic logging devices (ELDs) across our industry. In December 2019, the next phase of the ELD mandate went into effect requiring carriers previously grandfathered-in for the use of automatic on-board recording devices to switch to ELDs for logging hours of service. These devices have arguably reduced effective industry capacity to date by more strictly enforcing a driver's hours of service and, as a result, miles that can be driven each day. We are using ELDs in our entire fleet and have adapted our network and customer base to the utilization constraints.

The transportation industry is continuously impacted by new rules and regulations intended to improve the overall safety of the industry. Compliance with such increasingly complex rules continues to constrain the supply of qualified drivers. We believe that our industry will continue to be hindered by an insufficient quantity of qualified drivers which creates significant competition for this declining pool.

## Customers

Revenue is generated from customers throughout the United States, and in Mexico, Canada and Colombia. Our customers are largely concentrated in the automotive, steel, oil and gas, alternative energy and manufacturing industries.

A significant percentage of our revenues is derived from the domestic auto industry. Of our customers generating revenues greater than $100,000 per year, aggregate sales in the automotive industry totaled 27%, 36% and 40% of revenues during the fiscal years ended December 31, 2019, 2018 and 2017, respectively. During 2019, 2018 and 2017, General Motors accounted for approximately 12%, 13% and 16% of our total operating revenues, respectively. Sales to our top 10 customers, including General Motors, totaled 39% in 2019. A significant percentage of our revenue also results from our providing capacity to other transportation companies that aggregate loads from a variety of shippers in these and other industries.

5

Exhibit 3(a)
2387

## Independent Contractor Network

We utilize a network of agents and owner-operators located throughout the United States and in Ontario, Canada. These agents and owner-operators are independent contractors.

A significant percentage of the interaction with our shippers is provided by our agents. Our agents solicited and controlled approximately 32% of the freight we hauled in 2019, with the balance of the freight being generated by company-managed terminals, full service freight forwarding and customs house brokerage offices. Our top 100 agents in 2019 generated approximately 21% of our annual operating revenues. Our agents typically focus on three or four shippers within a particular market and solicit most of their freight business from this core group. By focusing on a relatively small number of shippers, each agent is acutely aware of the specific transportation needs of that core group of shippers, while remaining alert to growth opportunities.

We also contract with owner-operators to provide greater flexibility in responding to fluctuations in customer demand. Owner-operators provide their own trucks and are contractually responsible for all associated expenses, included financing costs, fuel, maintenance, insurance, and taxes, among other things. They are also responsible for maintaining compliance with Federal Motor Carrier Safety Administration regulations.

## Revenue Equipment

The following table represents our equipment used to provide transportation services as of December 31, 2019:

| Type of Equipment | Company-owned or Leased | Owner-Operator Provided | Total |
|---|---|---|---|
| Tractors | 1,514 | 3,517 | 5,031 |
| Yard Tractors | 217 | - | 217 |
| Trailers | 3,932 | 1,782 | 5,714 |
| Chassis | 3,293 | 1 | 3,294 |
| Containers | 738 | - | 738 |

## Employees and Contractors

As of December 31, 2019, we had 6,541 employees. During the year ended December 31, 2019, we also engaged, on average, the full-time equivalency of 1,487 individuals on a contract basis. As of December 31, 2019, approximately 29% of our employees in the United States, Canada and Colombia and 86% of our employees in Mexico were members of unions and subject to collective bargaining agreements. We believe our union and employee relationships are good.

## Risk Management and Insurance

Our customers and federal regulations generally require that we provide insurance for auto liability and general liability claims up to $1.0 million per occurrence. Accordingly, in the United States, we purchase such insurance from a licensed casualty insurance carrier, which is a related party, providing a minimum $1.0 million of coverage for individual auto liability and general liability claims. We are generally self-insured for auto and general liability claims above $1.0 million, unless riders are sought to satisfy individual customer or vendor contract requirements. In certain of our businesses, we have secured additional auto liability coverage where we are self-insured for claims above $7.0 million. In Mexico, our operations and investment in equipment are insured through an internationally recognized, third-party insurance underwriter.

We typically self-insure for the risk of motor cargo liability claims and material handling claims. Accordingly, we establish financial reserves for anticipated losses and expenses related to motor cargo liability and material handling claims, and we periodically evaluate and adjust those reserves to reflect our experience. Any such adjustments could have a materially adverse effect on our operations and financial results.

To reduce our exposure to claims incurred while a vehicle is being operated without a trailer attached or is being operated with an attached trailer which does not contain or carry any cargo, we require our owner-operators to maintain non-trucking use liability coverage (which the industry refers to as deadhead bobtail coverage) of $2.0 million per occurrence.

6

Exhibit 3(a)
2388

GC000010

In brokerage arrangements, our exposure to liability associated with accidents incurred by other third-party carriers who haul freight on our behalf is reduced by various factors, including the extent to which the third party providers maintain their own insurance coverage.

## Technology

We use multifaceted software tools and hardware platforms that support seamless integration with the IT networks of our customers and vendors through electronic data exchange systems. These tools enhance our relationships and ability to effectively communicate with customers and vendors. Our tools and platforms provide real-time, web-based visibility into the supply chains of our customers.

In our logistics segment, we customize our proprietary Warehouse Management System (WMS) to meet the needs of individual customers. Our WMS allows us to send our customers an advance shipping notice through a simple, web-based interface that can be used by a variety of vendors. It also enables us to clearly identify and communicate to the customer any vendor-related problems that may cause delays in production. We also use cross-dock and container-return-management applications that automate the cycle of material receipt and empty container return.

Our proprietary and third-party transportation management system allows full operational control and visibility from dispatch to delivery, and from invoicing to receivables collections. For our employee drivers, the system provides automated dispatch to hand-held devices, satellite tracking for quality control and electronic status broadcasts to customers when requested. Our international and domestic air freight and ocean forwarding services use similar systems with added functionalities for managing air and ocean freight transportation requirements. All of these systems have customer-oriented web interfaces that allow for full shipment tracking and visibility, as well as for customer shipment input. We also provide systems that allow agents to list pending freight shipments and owner-operators with available capacity, and track particular shipments at various points in the shipping route.

We believe that these tools improve our services and quality controls, strengthen our relationships with our customers, and enhance our value proposition. Any significant disruption or failure of these systems could have a materially adverse effect on our operations and financial results.

## Government Regulation

Our operations are regulated and licensed by various U.S. federal and state agencies, as well as comparable agencies in Mexico, Canada, and Colombia. Interstate motor carrier operations are subject to the broad regulatory powers, to include drug and alcohol testing, safety and insurance requirements, prescribed by the Federal Motor Carrier Safety Administration (FMCSA), which is an agency of the U.S. Department of Transportation (DOT). Matters such as weight and equipment dimensions also are subject to United States federal and state regulation. We operate in the United States under operating authority granted by the DOT. We are also subject to regulations relating to testing and specifications of transportation equipment and product handling requirements. In addition, our drivers and owner-operators must have a commercial driver's license and comply with safety and fitness regulations promulgated by the FMCSA, including those relating to drug and alcohol testing.

Our international operations, which include not only facilities in Mexico, Canada and Colombia but also transportation shipments managed by our specialized service operations, are impacted by a wide variety of U.S. government regulations and applicable international treaties. These include regulations of the U.S. Department of State, U.S. Department of Commerce, and the U.S. Department of Treasury. Regulations also cover specific commodities, destinations and end-users. Part of our specialized services operations is engaged in the arrangement of imported and exported freight. As such, we are subject to the regulations of the U.S. Customs and Border Protection, which include significant notice and registration requirements. In various Canadian provinces, we operate transportation services under authority granted by the Ministries of Transportation and Communications.

Transportation-related regulations are greatly affected by U.S. national security legislation and related regulations. We believe we are in compliance with applicable material regulations and that the costs of regulatory compliance are an ordinary operating cost of our business that we may not be able to recoup from rates charged to customers.

## Environmental Regulation

We are subject to various federal, state and local environmental laws and regulations that focus on, among other things: the emission and discharge of hazardous materials into the environment or their presence at our properties or in our vehicles; fuel storage tanks; transportation of certain materials; and the discharge or retention of storm water. Under specific environmental laws, we could also be held responsible for any costs relating to contamination at our past or present facilities and at third-party waste disposal sites, as well as costs associated with cleanup of accidents involving our vehicles. We do not believe that the cost of future compliance with current

7

Exhibit 3(a)
2389

GC000011

environmental laws or regulations will have a material adverse effect on our operations, financial condition, competitive position or capital expenditures for fiscal year 201 9 . However, future changes to laws or regulations may adversely affect our operations and could result in unforeseen costs to our business.

## Seasonality

Generally, demand for our value-added services delivered to existing customers increases during the second calendar quarter of each year as a result of the automotive industry's spring selling season. Conversely, such demand generally decreases during the third quarter of each year due to the impact of scheduled OEM customer plant shutdowns in July for vacations and changeovers in production lines for new model years.

Our value-added services business is also impacted in the fourth quarter by plant shutdowns during the December holiday period. Prolonged adverse weather conditions, particularly in winter months, can also adversely impact margins due to productivity declines and related challenges meeting customer service requirements.

Our transportation services business is generally impacted by decreased activity during the post-holiday winter season and, in certain states, during hurricane season. At these times, some shippers reduce their shipments, and inclement weather impedes trucking operations or underlying customer demand.

## Available Information

We make available free of charge on or through our website, www.universallogistics.com, our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and all amendments to those reports as soon as reasonably practicable after such material is electronically filed with or furnished to the Securities and Exchange Commission (SEC). The contents of our website are not incorporated into this filing.

## ITEM 1A:     RISK FACTORS

Set forth below, and elsewhere in this Report and in other documents we file with the SEC, are risks and uncertainties that could cause our actual results to differ materially from the results contemplated by the forward-looking statements contained in this Report.

### Risks Related to Our Business

*Our business is subject to general economic and business factors that are largely beyond our control, any of which could have a material adverse effect on our operating results.*

Our business is dependent upon a number of general economic and business factors that may adversely affect our results of operations. These factors include significant increases or rapid fluctuations in fuel prices, excess capacity in the transportation and logistics industry, surpluses in the market for used equipment, interest rates, fuel taxes, license and registration fees, insurance premiums, self-insurance levels, and difficulty in attracting and retaining qualified drivers and independent contractors.

We operate in a highly competitive and fragmented industry, and our business may suffer if we are unable to adequately address any downward pricing pressures or other factors that may adversely affect our ability to compete with other carriers.

Further, we are affected by recessionary economic cycles and downturns in customers' business cycles, particularly in market segments and industries, such as the automotive industry, where we have a significant concentration of customers. Economic conditions may also adversely affect our customers and their ability to pay for our services.

Deterioration in the United States and world economies could exacerbate any difficulties experienced by our customers and suppliers in obtaining financing, which, in turn, could materially and adversely impact our business, financial condition, results of operations and cash flows.

8

Exhibit 3(a)
2390

GC000012

*We operate in the highly competitive and fragmented transportation and logistics industry, and our business may suffer if we are unable to adequately address factors that may adversely affect our revenue and costs relative to our competitors.*

Numerous competitive factors could impair our ability to maintain our current profitability. These factors include the following:

- we compete with many other truckload carriers and logistics companies of varying sizes, some of which have more equipment, a broader coverage network, a wider range of services and greater capital resources than we do;
- some of our competitors periodically reduce their rates to gain business, especially during times of reduced growth rates in the economy, which may limit our ability to maintain or increase rates, maintain our operating margins or maintain significant growth in our business;
- many customers reduce the number of carriers they use by selecting so-called "core carriers" as approved service providers, and in some instances we may not be selected;
- some companies hire lead logistics providers to manage their logistics operations, and these lead logistics providers may hire logistics providers on a non-neutral basis which may reduce the number of business opportunities available to us;
- many customers periodically accept bids from multiple carriers and providers for their shipping and logistic service needs, and this process may result in the loss of some of our business to competitors and/or price reductions;
- the trend toward consolidation in the trucking and third-party logistics industries may create other large providers with greater financial resources and other competitive advantages relating to their size and with whom we may have difficulty competing;
- advances in technology require increased investments to remain competitive, and our customers may not be willing to accept higher rates to cover the cost of these investments;
- competition from Internet-based and other brokerage companies may adversely affect our relationships with our customers and freight rates;
- economies of scale that may be passed on to smaller providers by procurement aggregation providers may improve the ability of smaller providers to compete with us;
- some areas of our service coverage requires trucks with engines no older than 2011 in order to comply with environmental rules; and
- an inability to continue to access capital markets to finance equipment acquisition could put us at a competitive disadvantage.

*Our revenue is largely dependent on North American automotive industry production volume, and may be negatively affected by future downturns in North American automobile production.*

A significant portion of our larger customers are concentrated in the North American automotive industry. For customers generating annual revenues over $100,000, 27% of our revenues were derived from customers in the North American automotive industry during 2019. Our business and growth largely depend on continued demand for its services from customers in this industry. Any future downturns in North American automobile production, which also impacts our steel and metals customers, could similarly affect our revenues in future periods.

*Our business derives a large portion of revenue from a few major customers, and the loss of any one or more of them as customers, or a reduction in their operations, could have a material adverse effect on our business.*

A large portion of our revenue is generated from a limited number of major customers concentrated in the automotive, steel and metals, and energy industries. Our top 10 customers accounted for approximately 39% of our operating revenues during 2019. Our contracts with customers generally contain cancellation clauses, and there can be no assurance that these customers will continue to utilize our services or that they will continue at the same levels. Further, there can be no assurance that these customers will not be affected by a future downturn in demand, which would result in a reduction in their operations and corresponding need for our services. Moreover, our customers may individually lose market share, apart from general economic trends. If our major customers lose U.S. market share, they may have less need for services. A reduction in or termination of services by one or more of our major customers could have a material adverse effect on our business and results of operations.

9

Exhibit 3(a)
2391

GC000013

*We may be adversely impacted by fluctuations in the price and availability of diesel fuel.*

Diesel fuel represents a significant operating expense for the Company, and we do not currently hedge against the risk of diesel fuel price increases. An increase in diesel fuel prices or diesel fuel taxes, or any change in federal or state regulations that results in such an increase, could have a material adverse effect on our operating results to the extent we are unable to recoup such increases from customers in the form of increased freight rates or through fuel surcharges. Historically, we have been able to offset, to a certain extent, diesel fuel price increases through fuel surcharges to our customers, but we cannot be certain that we will be able to do so in the future. We continuously monitor the components of our pricing, including base freight rates and fuel surcharges, and address individual account profitability issues with our customers when necessary. While we have historically been able to adjust our pricing to help offset changes to the cost of diesel fuel through changes to base rates and/or fuel surcharges, we cannot be certain that we will be able to do so in the future.

*Difficulty in attracting drivers could affect our profitability and ability to grow.*

The transportation industry routinely experiences difficulty in attracting and retaining qualified drivers, including independent contractors, resulting in intense competition for drivers. We have from time to time experienced under-utilization and increased expenses due to a shortage of qualified drivers. If we are unable to attract drivers when needed or contract with independent contractors when needed, we could be required to further adjust our driver compensation packages, increase driver recruiting efforts, or let trucks sit idle, any of which could adversely affect our growth and profitability.

*If we are unable to retain our key employees, our business, financial condition and results of operations could be harmed.*

We are highly dependent upon the services of our key employees and executive officers. The loss of any of their services could have a material adverse effect on our operations and future profitability. We must continue to develop and retain a core group of managers if we are to realize our goal of expanding our operations and continuing our growth. We cannot assure that we will be able to do so.

*A significant labor dispute involving us or one or more of our customers, or that could otherwise affect our operations, could reduce our revenues and harm our profitability.*

A substantial number of our employees and of the employees of our largest customers are members of industrial trade unions and are employed under the terms of collective bargaining agreements. Each of our unionized facilities has a separate agreement with the union that represents the workers at only that facility. During 2019, a labor strike by the United Auto Workers of its employees at the facilities of our largest customer, General Motors, caused an extended shutdown of General Motors' manufacturing operations and, in turn, materially and adversely impacted our operating results during the third and fourth quarters of 2019. Any future labor disputes involving either us or our customers could similarly affect our operations. If the UAW and our automotive customers and their suppliers are unable to negotiate new contracts in the future and our customers' plants experience slowdowns or closures as a result, our revenue and profitability could be negatively impacted. A labor dispute involving another supplier to our customers that results in a slowdown or closure of our customers' plants to which we provide services could also have a material adverse effect on our business. Significant increases in labor costs as a result of the renegotiation of collective bargaining agreements could also be harmful to our business and our profitability. As of December 31, 2019, approximately 29% of our employees in the United States, Canada and Colombia, and 86% of our employees in Mexico were members of unions and subject to collective bargaining agreements.

In addition, strikes, work stoppages and slowdowns by our employees may affect our ability to meet our customers' needs, and customers may do more business with competitors if they believe that such actions may adversely affect our ability to provide service. We may face permanent loss of customers if we are unable to provide uninterrupted service. The terms of our future collective bargaining agreements also may affect our competitive position and results of operations.

*Ongoing insurance and claims expenses could significantly reduce our earnings and cash flows.*

Our future insurance and claims expenses might exceed historical levels, which could reduce our earnings and cash flows. The Company is self-insured for health and workers' compensation insurance coverage up to certain limits. If medical costs continue to increase, or if the severity or number of claims increase, and if we are unable to offset the resulting increases in expenses with higher freight rates, our earnings could be materially and adversely affected.

10

Exhibit 3(a)
2392

GC000014

Exhibit 3(a)
2393

GC000015

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

*We face litigation risks that could have a material adverse effect on the operation of our business.*

We face litigation risks regarding a variety of issues, including without limitation, accidents involving our trucks and employees, alleged violations of federal and state labor and employment laws, securities laws, environmental liability and other matters. These proceedings may be time-consuming, expensive and disruptive to normal business operations. The defense of such lawsuits could result in significant expense and the diversion of our management's time and attention from the operation of our business. In recent years, several insurance companies have stopped offering coverage to trucking companies as a result of increases in the severity of automobile liability claims and higher costs of settlements and verdicts. Recent jury awards in the trucking industry have reached into the tens and even hundreds of millions of dollars. Trends in such awards, commonly referred to as nuclear verdicts, could adversely affect our ability to obtain suitable insurance coverage or could significantly increase our cost for obtaining such coverage, which would adversely affect our financial condition, results of operations, liquidity and cash flows. Costs we incur to defend or to satisfy a judgment or settlement of these claims may not be covered by insurance or could exceed the amount of that coverage or increase our insurance costs and could have a material adverse effect on our financial condition, results of operations, liquidity and cash flows.

*Purchase price increases for new revenue equipment and/or decreases in the value of used revenue equipment could have an adverse effect on our results of operations, cash flows and financial condition.*

During the last decade, the purchase price of new revenue equipment has increased significantly as equipment manufacturers recover increased materials costs and engine design costs resulting from compliance with increasingly stringent EPA engine emission standards. Additional EPA emission mandates in the future could result in higher purchase prices of revenue equipment which could result in higher than anticipated depreciation expenses. If we were unable to offset any such increase in expenses with freight rate increases, our cash flows and results of operations could be adversely affected. If the market price for used equipment continues to decline, then we could incur substantial losses upon disposition of our revenue equipment which could adversely affect our results of operations and financial condition.

*We have significant ongoing capital requirements that could affect our liquidity and profitability if we are unable to generate sufficient cash from operations or obtain sufficient financing on favorable terms.*

The transportation and logistics industry is capital intensive. If we are unable to generate sufficient cash from operations in the future, we may have to limit our growth, enter into unfavorable financing arrangements, or operate our revenue equipment for longer periods, any of which could have a material adverse effect on our profitability.

*We have a significant amount of debt, which could restrict our growth, place us at a competitive disadvantage or otherwise materially adversely affect our financial health.*

Our significant debt levels could have important consequences such as the following:

- impair our ability to obtain additional future financing for working capital, capital expenditures, acquisitions or general corporate expenses;
- limit our ability to use operating cash flow in other areas of our business due to the necessity of dedicating a substantial portion of these funds for payments on our indebtedness;
- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;
- make it more difficult for us to satisfy our obligations;
- increase our vulnerability to general adverse economic and industry conditions; and

- place us at a competitive disadvantage compared to our competitors.

Our ability to make scheduled payments on, or to refinance, our debt and other obligations will depend on our financial and operating performance, which, in turn, is subject to our ability to implement our strategic initiatives, prevailing economic conditions and certain financial, business and other factors beyond our control. If our cash flow and capital resources are insufficient to fund our debt service and other obligations, we may be forced to reduce or delay expansion plans and capital expenditures, sell material assets or operations, obtain additional capital or restructure our debt. We cannot provide any assurance that our operating performance, cash flow and capital resources will be sufficient to pay our debt obligations when they become due. We also cannot provide assurance that we would be able to dispose of material assets or operations or restructure our debt or other obligations if necessary or, even if we were able to take such actions, that we could do so on terms that are acceptable to us.

11

Exhibit 3(a)
2394

GC000016

*Disruptions in the credit markets may adversely affect our business, including the availability and cost of short-term funds for liquidity requirements and our ability to meet long-term commitments, which could adversely affect our results of operations, cash flows and financial condition.*

If cash from operations is not sufficient, we may be required to rely on the capital and credit markets to meet our financial commitments and short-term liquidity needs. Disruptions in the capital and credit markets, as have been experienced during recent years, could adversely affect our ability to draw on our revolving credit facilities. Our access to funds under the credit facilities is dependent on the ability of banks to meet their funding commitments. A bank may not be able to meet their funding commitments if they experience shortages of capital and liquidity or if they experience excessive volumes of borrowing requests from other borrowers within a short period of time.

Longer term disruptions in the capital and credit markets as a result of uncertainty, changing or increased regulation, reduced alternatives, or failures of significant financial institutions could adversely affect our access to liquidity needed for our business. Any disruption could require us to take measures to conserve cash until the markets stabilize or until alternative credit arrangements or other funding for our business needs can be arranged, which could adversely affect our growth and profitability.

*We have substantial fixed costs and, as a result, our operating income fluctuates disproportionately with changes in our net sales.*

A significant portion of our expenses are fixed costs that that neither increase nor decrease proportionately with sales. There can be no assurance that we would be able to reduce our fixed costs proportionately in response to a decline in our sales and therefore our competitiveness could be significantly impacted. As a result, a decline in our sales would result in a higher percentage decline in our income from operations and net income.

*We operate in a highly regulated industry and increased costs of compliance with, or liability for violation of, existing or future regulations could have a material adverse effect on our business.*

The U.S. Federal Motor Carrier Safety Administration, or FMCSA, and various state and local agencies exercise broad powers over our business, generally governing such activities as authorization to engage in motor carrier operations, drug and alcohol testing, safety and insurance requirements. Our owner-operators must comply with the safety and fitness regulations promulgated by the FMCSA, including those relating to drug and alcohol testing and hours-of-service. There also are regulations specifically relating to the trucking industry, including testing and specifications of equipment and product handling requirements. These measures could disrupt or impede the timing of our deliveries and we may fail to meet the needs of our customers. The cost of complying with these regulatory measures, or any future measures, could have a materially adverse effect on our business or results of operations.

*A determination that owner-operators are employees, rather than independent contractors, could expose us to various liabilities and additional costs.*

Federal and state legislation as well as tax and other regulatory authorities often seek to assert that independent contractors in the transportation service industry, such as our owner-operators, are employees rather than independent contractors. For example, on September 18, 2019, the state of California passed Assembly Bill 5 (AB5) which codified a standard test for determining a worker's status as an employee or independent contractor for purposes of determining employee benefits such as paid vacation, sick leave, meals and rest breaks, and overtime, known as the ABC test . The ABC test is generally thought to lower the threshold for classifying a worker as an employee as opposed to an independent contractor. AB 5 was scheduled to go into effect on January 1, 2020; however, a California Federal District judge issued a preliminary injunction enjoining California from enforcing AB 5 as to motor carriers. California can appeal the decision to grant the preliminary injunction.

While new in California, versions of the ABC test have existed in a number of other states over the years and have been challenged in various courts as violating the federal government's exclusive right to regulate motor carriers in interstate commerce. There can be no assurance that these interpretations and tax laws that consider these persons independent contractors will not change, that other federal or state legislation will not be enacted or that various authorities will not successfully assert a position that reclassifies independent contractors to be employees. If our owner-operators are determined to be our employees, that determination could materially increase our exposure under a variety of federal and state tax, workers' compensation, unemployment benefits, labor, employment and tort laws, as well as our potential liability for employee benefits. In addition, such changes may be applied retroactively, and if so, we may be required to pay additional amounts to compensate for prior periods. Any of the above increased costs would adversely affect our business and operating results.

12

Exhibit 3(a)
2395

GC000017

*Further changes in U.S. tax laws and regulations may impact our effective tax rate and may adversely affect our business, financial condition, and operating results.*

The Tax Cuts and Jobs Act had a favorable impact on our effective tax rate and our net income for 2018. We also have benefited from certain other tax provisions, such as those relating to capital expenditure deductions. However, future changes in the U.S. tax laws, including any changes related to capital expenditure deductions or any significant changes to federal tax rates, interest expense deductions, or the taxation of business entities, could have a materially adverse effect on our growth opportunities, business, and results of operations.

*Our results of operations may be affected by seasonal factors.*

Our productivity may decrease during the winter season when severe winter weather impedes operations. Also, some shippers may reduce their shipments after the winter holiday season. At the same time, operating expenses may increase and fuel efficiency may decline due to engine idling during periods of inclement weather. Harsh weather conditions generally also result in higher accident frequency, increased freight claims, and higher equipment repair expenditures. Generally, demand for our value-added services delivered to existing customers increases during the second calendar quarter of each year as a result of the automotive industry's spring selling season and decreases during the third quarter of each year due to the impact of scheduled OEM customer plant shutdowns in July for vacations and changeovers in production lines for new model years. Our value-added services business is also impacted in the fourth quarter by plant shutdowns during the December holiday period.

*Our operations are subject to various environmental laws and regulations, the violation of which could result in substantial fines or penalties.*

We are subject to various environmental laws and regulations dealing with the handling of hazardous materials, underground fuel storage tanks, and discharge and retention of storm-water. We operate in industrial areas, where truck terminals and other industrial activities are located, and where groundwater or other forms of environmental contamination could occur. In prior years, we also maintained bulk fuel storage and fuel islands at two of our facilities. Our operations may involve the risks of fuel spillage or seepage, environmental damage, and hazardous waste disposal, among others. If we are involved in a spill or other accident involving hazardous substances, or if we are found to be in violation of applicable laws or regulations, it could have a materially adverse effect on our business and operating results. If we should fail to comply with applicable environmental regulations, we could be subject to substantial fines or penalties and to civil and criminal liability.

*We may incur additional operating expenses or liabilities as a result of potential future requirements to address climate change issues.*

Federal, state and local governments, as well as some of our customers, are beginning to respond to global warming issues. This increased focus on sustainability may result in new legislation or regulations and customer requirements that could negatively affect us as we may incur additional costs or be required to make changes to our operations in order to comply with any new regulations or customer requirements. Legislation or regulations that potentially impose restrictions, caps, taxes, or other controls on emissions of greenhouse gases such as carbon dioxide, a by-product of burning fossil fuels such as those used in the Company's trucks, could adversely affect our operations and financial results. More specifically, legislative or regulatory actions related to climate change could adversely impact the Company by increasing our fuel costs and reducing fuel efficiency and could result in the creation of substantial additional capital expenditures and operating costs in the form of taxes, emissions allowances, or required equipment upgrades. Any of these factors could impair our operating efficiency and productivity and result in higher operating costs. In addition, revenues could decrease if we are unable to meet regulatory or customer sustainability requirements. These additional costs, changes in operations, or loss of revenues could have a material adverse effect on our business, financial condition and results of operations.

*Our business may be disrupted by natural disasters and severe weather conditions causing supply chain disruptions.*

Natural disasters such as earthquakes, tsunamis, hurricanes, tornadoes, floods or other adverse weather and climate conditions, whether occurring in the United States or abroad, could disrupt our operations or the operations of our customers or could damage or destroy infrastructure necessary to transport products as part of the supply chain. Specifically, these events may damage or destroy or assets, disrupt fuel supplies, increase fuel costs, disrupt freight shipments or routes, and affect regional economies. As a result, these events could make it difficult or impossible for us to provide logistics and transportation services; disrupt or prevent our ability to perform functions at the corporate level; and/or otherwise impede our ability to continue business operations in a continuous manner consistent with the level and extent of business activities prior to the occurrence of the unexpected event, which could adversely affect our business and results of operations or make our results more volatile.

13

Exhibit 3(a)
2396

GC000018

*Our information technology systems are subject to certain cyber risks and disasters that are beyond our control.*

We depend heavily on the proper functioning and availability of our information, communications, and data processing systems, including operating and financial reporting systems, in operating our business. Our systems and those of our technology and communications providers are vulnerable to interruptions caused by natural disasters, power loss, telecommunication and internet failures, cyber-attack, and other events beyond our control. Accordingly, information security and the continued development and enhancement of the controls and processes designed to protect our systems, computers, software, data and networks from attack, damage or unauthorized access remain a priority for us.

Although our information systems are protected through physical and software security as well as redundant backup systems, they remain susceptible to cyber security risks. Some of our software systems are utilized by third parties who provide outsourced processing services which may increase the risk of a cyber-security incident.

A successful cyber-attack or catastrophic natural disaster could significantly affect our operating and financial systems and could temporarily disrupt our ability to provide required services to our customers, impact our ability to manage our operations and perform vital financial processes, any of which could have a materially adverse effect on our business.

*We are subject to certain risks arising from doing business in Mexico.*

As we continue to grow our business in Mexico, we are subject to greater risks of doing business internationally, including fluctuations in foreign currencies, changes in the economic strength of Mexico, difficulties in enforcing contractual obligations and intellectual property rights, burdens of complying with a wide variety of international and U.S. export and import laws, and social, political, and economic instability. We also face additional risks associated with our Mexico business, including potential restrictive trade policies and imposition of any import or export tariffs, taxes, duties or fees, as well as potential disruptions or delays at border crossings due to immigration-related issues or other factors. If we are unable to address business concerns related to our international operations in a timely and cost efficient manner, our financial position, results of operations or cash flows could be adversely affected. The agreement permitting cross border movements for both United States and Mexican based carriers in the United States and Mexico presents additional risks in the form of potential increased competition and the potential for increased congestion in our lanes that cross the border between countries.

*Our business may be harmed by public health crises, terrorist attacks, future war or anti-terrorism measures.*

The rapid spread of a contagious illness such as the coronavirus, or fear of such an event, could significantly disrupt global and domestic supply chains for our customers or result in various travel restrictions, any of which could have a material adverse effect on our business and results of operations. It is unknown how extensive supply chains may be affected by the currently developing situation with the coronavirus. In addition, in order to prevent terrorist attacks, federal, state and municipal authorities have implemented and continue to follow various security measures, including checkpoints and travel restrictions on large trucks. Our international operations in Canada and Mexico may be affected significantly if there are any disruptions or closures of border traffic due to security measures. Such measures may have costs associated with them, which, in connection with the transportation services we provide, we or our owner-operators could be forced to bear. Further, a public health crisis, terrorist attack, war, or risk of such an event also may have an adverse effect on the economy. A decline in economic activity could adversely affect our revenue or restrict our future growth. Instability in the financial markets as a result of a health pandemic, terrorism or war also could affect our ability to raise capital. In addition, the insurance premiums charged for some or all of the coverage currently maintained by us could increase dramatically or such coverage could be unavailable in the future.

*We may be unable to successfully integrate businesses we acquire into our operations.*

Integrating businesses we acquire may involve unanticipated delays, costs or other operational or financial problems. Successful integration of the businesses we acquire depends on a number of factors, including our ability to transition acquired companies to our management information systems. In integrating businesses we acquire, we may not achieve expected economies of scale or profitability or realize sufficient revenues to justify our investment. We also face the risk that an unexpected problem at one of the companies we acquire will require substantial time and attention from senior management, diverting management's attention from other aspects of our business. We cannot be certain that our management and operational controls will be able to support us as we grow.

14

Exhibit 3(a)
2397

GC000019

*Discontinuation, reform or replacement of LIBOR may adversely affect our variable rate debt.*

Borrowings under our credit facilities are at variable rates of interest, primarily based on London Interbank Offered Rate ("LIBOR"). LIBOR tends to fluctuate based on general interest rates, rates set by the U.S. Federal Reserve Board and other central banks, the supply of and demand for credit in the London interbank market, and general economic conditions. In July 2017, the Financial Conduct Authority in the U.K. announced a desire to phase out LIBOR as a benchmark by the end of 2021. Financial industry working groups are developing replacement rates and methodologies to transition existing agreements that depend on LIBOR as a reference rate; however, we can provide no assurance that market-accepted rates and transition methodologies will be available and finalized at the time of LIBOR cessation. If clear market standards and transition methodologies have not been developed by the time LIBOR becomes unavailable, we may have difficulty reaching agreement on acceptable replacement rates under our credit facilities. If we are unable to negotiate replacement rates on favorable terms, it could have a material adverse effect on our earnings and cash flows .

## Risks Related to Our Common Stock

*Because Matthew T. Moroun and Manuel J. Moroun hold a controlling interest in us, the influence of our public shareholders over significant corporate actions is limited, and we are not subject to certain corporate governance standards that apply to other publicly traded companies.*

As of December 31, 2019, Matthew T. Moroun, the Chairman of our Board of Directors, and Manuel J. Moroun, a member of our Board of Directors, together own approximately 71% of our outstanding common stock. As a result, the Moroun family has the power to:

- control all matters submitted to our shareholders;
- elect our directors;
- adopt, extend or remove any anti-takeover provisions that are available to us; and
- exercise control over our business, policies and affairs.

This concentration of ownership could limit the price that some investors might be willing to pay for shares of our common stock. Our ability to engage in significant transactions, such as a merger, acquisition or liquidation, will require the consent of the Moroun family. Conflicts of interest could arise between us and the Moroun family, and any conflict of interest may be resolved in a manner that does not favor us. Accordingly, the Moroun family could cause us to enter into transactions or agreements of which our other shareholders would not approve or make decisions with which they may disagree. Because of the level of ownership held by the Moroun family, we have elected to be treated as a controlled company in accordance with the rules of the NASDAQ Stock Market. Accordingly, we are not required to comply with NASDAQ Stock Market rules which would otherwise require a majority of our board to be comprised of independent directors and require our board to have a compensation committee and a nominating and corporate governance committee comprised of independent directors.

The Moroun family may continue to retain control of us for the foreseeable future and may decide not to enter into a transaction in which shareholders would receive consideration for our common stock that is much higher than the then-current market price of our common stock. In addition, the Moroun family could elect to sell a controlling interest in us to a third-party and our other shareholders may not be able to participate in such transaction or, if they are able to participate in such a transaction, such shareholders may receive less than the then current fair market value of their shares. Any decision regarding their ownership of us that the Moroun family may make at some future time will be in their absolute discretion, subject to applicable laws and fiduciary duties.

*Our stock trading volume may not provide adequate liquidity for investors.*

Although shares of our common stock are traded on the NASDAQ Global Market, the average daily trading volume in our common stock is less than that of other larger transportation and logistics companies. A public trading market having the desired characteristics of depth, liquidity and orderliness depends on the presence in the marketplace of a sufficient number of willing buyers and sellers of the common stock at any given time. This presence depends on the individual decisions of investors and general economic and market conditions over which we have no control. Given the daily average trading volume of our common stock, significant sales of the common stock in a brief period of time, or the expectation of these sales, could cause a decline in the price of our common stock. Additionally, low trading volumes may limit a shareholder's ability to sell shares of our common stock.

15

Exhibit 3(a)
2398

GC000020

*Our ability to pay regular dividends on our common stock is subject to the discretion of our Board of Directors and will depend on, among other things, our financial condition, results of operations, capital requirements, any covenants included in our credit facilities any legal or contractual restrictions on the payment of dividends and other factors the Board of Directors deems relevant.*

We have adopted a cash dividend policy which anticipates a total annual dividend of $0.42 per share of common stock. However, the payment of future dividends will be at the discretion of our Board of Directors and will depend, among other things, on our financial condition, results of operations, capital requirements, any covenants included in our credit facilities, any legal or contractual restrictions on the payment of dividends and other factors the Board of Directors deem relevant. As a consequence of these limitations and restrictions, we may not be able to make, or may have to reduce or eliminate, the payment of dividends on our common stock. Additionally, any change in the level of our dividends or the suspension of the payment thereof could adversely affect the market price of our common stock.

*Our articles of incorporation and bylaws have, and under Michigan law are subject to, provisions that could deter or prevent a change of control.*

Our articles of incorporation and bylaws contain provisions that might enable our management to resist a proposed takeover of our Company. These provisions could discourage, delay or prevent a change of control of our Company or an acquisition of our Company at a price that our shareholders may find attractive. These provisions also may discourage proxy contests and make it more difficult for our shareholders to elect directors and take other corporate actions. The existence of these provisions could limit the price that investors might be willing to pay in the future for shares of our common stock. These provisions include:

- a requirement that special meetings of our shareholders may be called only by our Board of Directors, the Chairman of our Board of Directors, our Chief Executive Officer or the holders of a majority of our outstanding common stock;
- advance notice requirements for shareholder proposals and nominations;
- the authority of our Board of Directors to issue, without shareholder approval, preferred stock with such terms as the Board of Directors may determine, including in connection with our implementation of any shareholders rights plan; and
- an exclusive forum bylaw provision requiring that any derivative action brought on behalf of the corporation, any action asserting a claim of breach of a legal or fiduciary duty and any similar claim under the Michigan Business Corporation Act or our articles of incorporation must be brought exclusively in the Circuit Court of the County of Macomb in the State of Michigan or the United States District Court for the Eastern District of Michigan, Southern Division.

In addition, certain provisions of Michigan law that apply to us could discourage or prevent a change of control or acquisition of our Company.

## ITEM 1B:    UNRESOLVED SECURITIES & EXCHANGE COMMISSION STAFF COMMENTS

None.

## ITEM 2:    PROPERTIES

We are headquartered and maintain our corporate administrative offices in Warren, Michigan. We own our corporate administrative offices, as well as 23 terminal yards and other properties in the following locations: Dearborn, Michigan; Romulus, Michigan; Jacksonville, Florida; Garden City, Georgia; Harvey, Illinois; Gary, Indiana; Louisville, Kentucky; Albany, Missouri; Rural Hall, North Carolina; South Kearny, New Jersey; Cleveland, Ohio; Columbus, Ohio; Reading, Ohio; Latty, Ohio; York County, Pennsylvania; Wall, Pennsylvania; Mount Pleasant, South Carolina; Memphis, Tennessee; Dallas, Texas; Houston, Texas; Millwood, West Virginia and Clearfield, Utah.

As of December 31, 2019, we also leased 113 operating, terminal and yard, and administrative facilities in various U.S. cities located in 25 states, in Milton, Ontario; Windsor, Ontario; and in San Luis Potosí, Mexico. Generally, our facilities are utilized by both of our operating segments for various administrative, transportation-related or value-added services. We also deliver value-added services under our logistics segment inside or linked to 29 facilities provided by customers. Certain of our leased facilities are leased from entities controlled by our majority shareholders. These facilities are leased on either a month-to-month basis or extended terms. For more information on our lease arrangements, see Part II, Item 8: Notes 11, 13 and 16 to the Consolidated Financial Statements.

Exhibit 3(a)
2399

GC000021

## ITEM 3: LEGAL PROCEEDINGS

The Company was plaintiff in a lawsuit that was filed on June 11, 2015 against, among others, Dalton Logistics, Inc. ("Dalton") in the United States District Court for the Southern District of Texas. The Company was seeking approximately $1.9 million in damages from a debtor relating to unpaid freight charges. In response to the filing of the complaint, the shareholders of Dalton filed a counterclaim against the Company alleging that the Company, in connection with certain unrelated negotiations with the defendant, breached an alleged agreement to acquire Dalton. The respective claims proceeded to trial and, on July 21, 2017, a jury returned two separate verdicts: one in favor of Universal for $1.9 million, and a second in favor of the defendant for approximately $5.7 million. On October 30, 2017, the court entered a judgment against Universal for the $5.7 million, but ignored the $1.9 million jury award in favor of Universal. The Company filed an appeal with the United States Court of Appeals for the Fifth Circuit to overturn the verdict and the judgment. On January 3, 2020, the appellate court upheld the verdict and the judgement against Universal. In connection with the ruling, the Company recorded a pre-tax charge to net income of $2.9 million in the fourth quarter of 2019. The Company expects to fund the $5.7 million judgement, plus $0.8 million of accrued interest, in the first quarter of 2020.

As previously disclosed, a predecessor to a subsidiary of the Company was a party to a legal proceeding captioned Denton v. UACL, et al. (the "Denton Litigation"). The Company resolved the Denton Litigation on September 24, 2019 (the "Final Denton Settlement"). Under the terms of the Final Denton Settlement, the Company agreed to pay plaintiffs $36 million in cash, exclusive of amounts previously paid, based on an opinion issued by the Appellate Court of Illinois First Judicial District on September 24, 2019 affirming the trial court judgment. In connection with the Final Denton Settlement, the Company recorded a pre-tax charge to net income of $24.8 million in the third quarter of 2019. On October 23, 2019, the Company funded the $36.0 million payment. The Company's participation in the Final Denton Settlement does not constitute an admission by the Company of any fault or liability, and the Company does not admit any fault or liability.

The Company is involved in certain other claims and pending litigation arising from the ordinary conduct of business. We also provide accruals for claims within our self-insured retention amounts. Based on the knowledge of the facts, and in certain cases, opinions of outside counsel, in the Company's opinion the resolution of these claims and pending litigation will not have a material effect on our financial position, results of operations or cash flows. However, if we experience claims that are not covered by our insurance or that exceed our estimated claim reserve, it could increase the volatility of our earnings and have a materially adverse effect on our financial condition, results of operations or cash flows.

## ITEM 4: MINE SAFETY DISCLOSURES

Not applicable.

17

Exhibit 3(a)
2400

GC000022

PART II

**ITEM 5:    MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND  ISSUER PURCHASES OF EQUITY SECURITIES**

### Market Information

Our common stock is traded on The NASDAQ Global Market under the symbol ULH.

As of March 9, 2020, there were approximately 14 record holders of our common stock, based upon data available to us  from our transfer agent.  We believe, however, that we have a significantly greater number of shareholders because a  substantial number of our common shares are held at The Depository Trust & Clearing Corporation on behalf of our shareholders.

### Dividends

On February 21, 2018, our Board of Directors approved an increase in the Company's annual cash dividend policy from  $0.28 per share to $0.42 per share beginning in 2018. In addition, under our current dividend policy, after taking into account  the regular quarterly dividends made during the year, the Board of Directors also evaluates the potential declaration of an  annual special dividend payable in the first quarter of each year. The Board of Directors did not declare a special dividend in the  first quarter of 2020.

Currently, we anticipate continuing to pay cash dividends on a quarterly basis, but we cannot guarantee that such  dividends will be paid in the future. Future dividend policy and the payment of dividends, if any, will be determined by the Board of  Directors in light of circumstances then existing, including our earnings, financial condition and other factors deemed  relevant by the Board of Directors.

Limitations on our ability to pay dividends are described under the section captioned "Liquidity and Capital Resources  – Revolving Credit, Promissory Notes and Term Loan Agreements" in Item 7 of this Form 10-K.

### Securities Authorized for Issuance under Equity Compensation Plans

See Part III, Item 12, "Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters" of  this Annual Report for a presentation of compensation plans under which equity securities of the Company are authorized for  issuance.

### Purchases of Equity Securities by the Issuer

On June 30, 2014, the Company announced that it had been authorized to purchase up to 800,000 shares of its  common stock from time to time in the open market. As of December 31, 2019, the Company may purchase 751,153 shares of  its common stock under this authorization. No specific expiration date has been assigned to the authorization.

There were no purchases of our equity securities by or on behalf of us or any affiliated purchaser within the fourth quarter  of 2019.

18

Exhibit 3(a)
2401
GC000023

**Performance Graph**

The graph below matches Universal Logistics Holdings, Inc.'s cumulative 5-year total shareholder return on common stock with the cumulative total returns of the NASDAQ Composite index and the NASDAQ Transportation index. The graph tracks the performance of a $100 investment in our common stock and in each index (with the reinvestment of all dividends) from December 31, 2014 to December 31, 2019.



COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN*
Among Universal Logistics Holdings, Inc., the NASDAQ Composite Index
and the NASDAQ Transportation Index

*$100 invested on 12/31/14 in stock or index, including reinvestment of dividends.
Fiscal year ending December 31.

|  | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 |
|---|---|---|---|---|---|---|
| Universal Logistics Holdings, Inc. | 100.00 | 49.94 | 59.30 | 87.71 | 67.80 | 73.20 |
| NASDAQ Composite | 100.00 | 106.96 | 116.45 | 150.96 | 146.67 | 200.49 |
| NASDAQ Transportation | 100.00 | 86.61 | 104.22 | 128.89 | 117.83 | 137.84 |

*The stock price performance included in this graph is not necessarily indicative of future stock price performance.*

19

Exhibit 3(a)
2402

GC000024

Exhibit 3(a)
2403

GC000025

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

ITEM 6:      SELECTE D FINANCIAL DATA

The following table sets forth the selected historical financial and operating data as of and for the periods presented. The selected historical balance sheet data at December 31, 2019, 2018, 2017, 2016 and 2015 and the selected historical statement of income data for the years ended December 31, 2019, 2018, 2017, 2016 and 2015 have been derived from our audited consolidated financial statements. The selected historical financial and operating data presented below should be read in conjunction with the information included under the heading "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this Form 10-K. The following financial and operating data may not be indicative of our future performance.

| | Years ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| | (In thousands, except per share information, operating data and percentages) | | | | |
| **Statements of Income Data:** | | | | | |
| Operating revenues | $1,511,998 | $1,461,708 | $1,216,665 | $1,072,751 | $1,128,773 |
| Operating expenses: | | | | | |
| Purchased transportation and equipment rent | 723,079 | 716,019 | 577,485 | 509,775 | 567,558 |
| Direct personnel and related benefits | 368,243 | 354,654 | 314,364 | 265,316 | 222,454 |
| Operating supplies and expenses | 120,767 | 122,736 | 115,420 | 103,013 | 113,545 |
| Commission expense | 31,204 | 37,381 | 33,213 | 32,350 | 37,844 |
| Occupancy expense | 36,645 | 30,701 | 30,575 | 31,923 | 27,004 |
| General and administrative (1) | 44,497 | 31,523 | 31,518 | 29,368 | 30,687 |
| Insurance and claims (1) | 47,418 | 30,475 | 41,881 | 17,724 | 21,413 |
| Depreciation and amortization | 74,765 | 54,425 | 46,995 | 36,702 | 34,873 |
| Total operating expenses | 1,446,618 | 1,377,914 | 1,191,451 | 1,026,171 | 1,055,378 |
| Income from operations | 65,380 | 83,794 | 25,214 | 46,580 | 73,395 |
| Interest income | 73 | 76 | 92 | 157 | 55 |
| Interest expense | (17,085) | (14,669) | (9,538) | (8,266) | (9,235) |
| Other non-operating income | 1,818 | 188 | 1,373 | 934 | 790 |
| Income before for income taxes | 50,186 | 69,389 | 17,141 | 39,405 | 65,005 |
| Income tax (benefit) expense | 12,600 | 17,211 | (11,012) | 15,161 | 25,004 |
| Net income | $ 37,586 | $ 52,178 | $ 28,153 | $ 24,244 | $ 40,001 |
| Earnings per common share: | | | | | |
| Basic | $ 1.34 | $ 1.84 | $ 0.99 | $ 0.85 | $ 1.37 |
| Diluted | $ 1.34 | $ 1.84 | $ 0.99 | $ 0.85 | $ 1.37 |
| Weighted average number of common shares outstanding: | | | | | |
| Basic | 28,069 | 28,383 | 28,425 | 28,411 | 29,233 |
| Diluted | 28,070 | 28,390 | 28,428 | 28,411 | 29,235 |
| Dividends declared per common share | $ 0.42 | $ 0.53 | $ 0.28 | $ 0.28 | $ 0.28 |
| **Balance Sheet Data (at end of period):** | | | | | |
| Cash and cash equivalents | $ 7,726 | $ 5,727 | $ 1,672 | $ 1,755 | $ 12,930 |
| Total assets | $ 987,997 | $ 843,147 | $ 610,592 | $ 570,457 | $ 503,155 |
| Total debt | $ 459,729 | $ 403,155 | $ 249,239 | $ 262,850 | $ 234,913 |

20

Exhibit 3(a)
2404

GC000026

Exhibit 3(a)
2405

GC000027

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

|  | Years ended December 31, | | | | |
|  | 2019 | 2018 | 2017 | 2016 | 2015 |
|  | (In thousands, except per share information, operating data and percentages) | | | | |
| **Other Data:** | | | | | |
| EBITDA (2) | $ 141,963 | $ 138,407 | $ 73,582 | $ 84,216 | $ 109,058 |
| Adjusted EBITDA (2) | $ 171,955 | $ 147,407 | $ 90,937 | $ 84,216 | $ 109,058 |
| Operating margin (3) | 4.3% | 5.7% | 2.1% | 4.3% | 6.5% |
| Adjusted operating margin (2) (3) | 6.3% | 6.3% | 3.5% | 4.3% | 6.5% |
| EBITDA margin (2) (3) | 9.4% | 9.5% | 6.0% | 7.9% | 9.7% |
| Adjusted EBITDA margin (3) | 11.4% | 10.1% | 7.5% | 7.9% | 9.7% |
| Return on average assets (4) | 4.1% | 7.2% | 4.8% | 4.5% | 7.8% |
| Average number of employees | 6,438 | 7,283 | 7,253 | 5,573 | 4,397 |
| Average number of full time equivalents | 1,487 | 1,405 | 1,731 | 2,172 | 1,606 |
| Average number of tractors | 4,690 | 4,057 | 3,996 | 4,335 | 4,142 |
| Number of value-added programs | 55 | 50 | 50 | 47 | 49 |
| Number of agents (5) | 211 | 230 | 232 | 253 | 264 |
| Operating revenues per loaded mile (6) | $ 3.70 | $ 3.38 | $ 2.89 | $ 2.72 | $ 2.96 |
| Operating revenues per load (6) | $ 657 | $ 859 | $ 822 | $ 730 | $ 809 |
| Average length of haul (in miles) (6) | 177 | 254 | 284 | 269 | 274 |
| Fuel surcharge revenues (where separately identified) | $ 89,646 | $ 85,061 | $ 59,511 | $ 50,869 | $ 75,743 |

( 1 )  See Item 8, Note 16 to the Consolidated Financial Statements for further information on settled legal matters.

(2)  Non-GAAP financial measure. See "Non-GAAP Financial Measures" below for a discussion of our non-GAAP financial measures and a reconciliation of such measures to the most comparable GAAP measure.

( 3 )  Operating margin, adjusted operating margin, EBITDA margin, and adjusted EBITDA margin are computed by dividing income from operations, adjusted income from operations, EBITDA, and adjusted EBITDA, respectively, by total operating revenues for each of the periods indicated.

( 4 )  Net income divided by total average assets during the period. Average assets are the sum of our total assets at the end of the fiscal year and our total assets at the end of the prior fiscal year divided by two.

( 5 )  Includes only those agents who generated at least $100,000 in operating revenues during the period indicated.

( 6 )  Includes fuel surcharges, where separately identifiable, and excludes data from our freight forwarding division in order to improve the relevance of the statistical data related to our brokerage services and improve the comparability to our peer companies. Also excludes final mile delivery and shuttle service loads.

21

Exhibit 3(a)
2406

GC000028

Exhibit 3(a)
2407

GC000029

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

**Non-GAAP Financial Measures**

In addition to providing consolidated financial statements based on generally accepted accounting principles in the United States of America (GAAP), we are providing additional financial measures that are not required by or prepared in accordance with GAAP (non-GAAP). We present adjusted income from operations; earnings before interest, taxes, depreciation and amortization expenses (EBITDA); adjusted EBITDA; adjusted operating margin; EBITDA margin; and adjusted EBITDA margin as supplemental measures of our performance. We define adjusted income from operations as income from operations adjusted to eliminate the impact of certain items that we do not consider indicative of our ongoing operating performance, including charges related to certain litigation taken in 2019, 2018 and 2017. We define EBITDA as net income plus (i) interest expense, net, (ii) provision for income taxes and (iii) depreciation and amortization. Adjusted EBITDA is further adjusted to eliminate the impact of certain items that we do not consider indicative of our ongoing operating performance, including charges taken related to certain litigation in 2019, 2018 and 2017. Adjusted operating margin, EBITDA margin, and adjusted EBITDA margin are computed by dividing adjusted income from operations, EBITDA, and adjusted EBITDA, respectively, by total operating revenues. The comparable GAAP measure, operating margin, is computed by dividing income from operations by total operating revenues.

The calculations of adjusted income from operations, EBITDA, and adjusted EBITDA are itemized below. You are encouraged to evaluate these adjustments and the reasons we consider them appropriate for supplemental analysis. In evaluating adjusted income from operations, EBITDA and adjusted EBITDA, you should be aware that in the future we may incur expenses that are the same as or similar to some of the adjustments in this presentation. Our presentation of adjusted income from operations, EBITDA and adjusted EBITDA should not be construed as an inference that our future results will be unaffected by unusual or non-recurring items.

In accordance with the requirements of Regulation G issued by the Securities and Exchange Commission, we are presenting the most directly comparable GAAP financial measure and reconciling the non-GAAP financial measure to the comparable GAAP measure. Set forth below is a reconciliation of income from operations, the most comparable GAAP measure, to adjusted income from operations; and of net income, the most comparable GAAP measure, to EBITDA and adjusted EBITDA for each of the periods indicated:

| | Years ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| | (In thousands, except per share information, operating data and percentages) | | | | |
| **Adjusted income from operations** | | | | | |
| Income from operations | $ 65,380 | $ 83,794 | $ 25,214 | $ 46,580 | $ 73,395 |
| Litigation charges (1) | 29,992 | 9,000 | 17,355 | — | — |
| Adjusted income from operations | $ 95,372 | $ 92,794 | $ 42,569 | $ 46,580 | $ 73,395 |
| **Adjusted EBITDA** | | | | | |
| Net income | $ 37,586 | $ 52,178 | $ 28,153 | $ 24,244 | $ 40,001 |
| Income tax (benefit) expense | 12,600 | 17,211 | (11,012) | 15,161 | 25,004 |
| Interest expense, net | 17,012 | 14,593 | 9,446 | 8,109 | 9,180 |
| Depreciation and amortization | 74,765 | 54,425 | 46,995 | 36,702 | 34,873 |
| EBITDA | 141,963 | 138,407 | 73,582 | 84,216 | 109,058 |
| Litigation charges (1) | 29,992 | 9,000 | 17,355 | — | — |
| Adjusted EBITDA | $ 171,955 | $ 147,407 | $ 90,937 | $ 84,216 | $ 109,058 |

(1)   Represents charges recorded in 2019, 2018 and 2017 related to certain litigation.

We present adjusted income from operations, EBITDA and adjusted EBITDA, and the related metrics of adjusted operating margin, EBITDA margin and adjusted EBITDA margin, in this Form 10-K because we believe they assist investors and analysts in comparing our performance across reporting periods on a consistent basis by excluding items that we do not believe are indicative of our core operating performance.

These performance metrics have limited utility as analytical tools. Some of these limitations are:

- Adjusted income from operations and adjusted EBITDA do not reflect our cash expenditures, or future requirements, for capital expenditures or contractual commitments;

- Adjusted income from operations and adjusted EBITDA do not reflect changes in, or cash requirements for, our working capital needs;

- Adjusted income from operations and adjusted EBITDA do not reflect the significant interest expense, or the cash requirements necessary to service interest or principal payments, on our debt;

- Although depreciation and amortization are non-cash charges, the assets being depreciated and amortized will often have to be replaced in the future, and adjusted EBITDA does not reflect any cash requirements for such replacements;

Exhibit6345
2408

GC000030

Exhibit 3(a)
2409

GC000031

Exhibit 3(a)
2410

GC000032

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

- Adjusted income from operations and adjusted EBITDA do not ref lect the impact of certain cash charges resulting from matters we consider not to be indicative of our ongoing operations; and

- Other companies in our industry may calculate adjusted income from operations, EBITDA and adjusted EBITDA differently than we do, limiting its usefulness as a comparative measure.

Because of these limitations, adjusted income from operations, EBITDA and adjusted EBITDA, and the related metrics of adjusted operating margin, EBITDA margin and adjusted EBITDA margin, should not be considered in isolation or as a substitute for performance measures calculated in accordance with GAAP. We compensate for these limitations by relying primarily on our GAAP results and using these non-GAAP metrics as secondary, supplemental measures.

23

Exhibit 3(a)
2411

GC000033

**ITEM 7:**     MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### Overview

We are a leading asset-light provider of customized transportation and logistics solutions throughout the United States, and in Mexico, Canada and Colombia. We provide a comprehensive suite of transportation and logistics solutions that allow our customers to reduce costs and manage their global supply chains more efficiently. We market our services through a direct sales and marketing network focused on selling our portfolio of services to large customers in specific industry sectors, through a contract network of agents who solicit freight business directly from shippers, and through company-managed facilities and full-service freight forwarding and customs house brokerage offices.

Our network of agents and owner-operators is located throughout the United States and in Ontario, Canada, and we operate, manage or provide services at 119 logistics locations in the United States, Mexico, Canada and Colombia. Twenty-nine of our value-added service operations are located inside customer plants or distribution operations; the other facilities are generally located close to our customers' plants to optimize the efficiency of their component supply chains and production processes. Our facilities and services are often directly integrated into the production processes of our customers and represent a critical piece of their supply chains. To support our asset-light business model, we generally coordinate the duration of real estate leases associated with our value-added services with the end date of the related customer contract associated with such facility, or use month-to-month leases, in order to mitigate exposure to unrecovered lease costs.

We offer our customers a wide range of transportation services by utilizing a diverse fleet of tractors and trailing equipment provided by us, our owner-operators and third-party transportation companies. Our owner-operators provided us with 3,517 tractors and 1,782 trailers. We own 1,731 tractors, 3,932 trailers, 3,293 chassis and 738 containers. Our agents and owner-operators are independent contractors who earn a fixed commission calculated as a percentage of the revenue or gross profit they generate for us and who bring an entrepreneurial spirit to our business. Our transportation services are provided through a network of both union and non-union employee drivers, owner-operators, contract drivers, and third-party transportation companies.

As of December 31, 2019, we employed 6,541 people in the United States, Mexico, Canada, and Colombia, including 2,174 employees subject to collective bargaining agreements. We also engaged contract staffing vendors to supply an average of 1,487 additional personnel on a full-time-equivalent basis.

Our use of agents, owner-operators, third-party providers and contract staffing vendors allows us to maintain both a highly flexible cost structure and a scalable business operation, while reducing investment requirements. These benefits are passed on to our customers in the form of cost savings and increased operating efficiency, while enhancing our cash generation and the returns on our invested capital and assets.

We believe that our flexible business model also offers us substantial opportunities to grow through a mixture of organic growth and acquisitions. We intend to continue our organic growth by recruiting new agents and owner-operators, expanding into new industry verticals and targeting further penetration of our key customers. We believe our integrated suite of transportation and logistics services, our network of facilities in the United States, Mexico, Canada, and Colombia, our long-term customer relationships and our reputation for operational excellence will allow us to capitalize on these growth opportunities. We also expect to continue to make strategic acquisitions of companies that complement our asset light business model, as well as companies that derive a portion of their revenues from asset based operations.

### Factors Affecting Our Revenues

*Operating Revenues* . We generate substantially all of our revenues through fees charged to customers for the transportation of freight and for the customized logistics services we provide. We also derive revenue from fuel surcharges, where separately identifiable, loading and unloading activities, equipment detention, container management and storage and other related services. Operations aggregated in our transportation segment are associated with individual freight shipments coordinated by our agents, company-managed terminals and specialized services operations. In contrast, operations aggregated in our logistics segment deliver value-added services and transportation services to specific customers on a dedicated basis, generally pursuant to contract terms of one year or longer. Our segments are distinguished by the amount of forward visibility we have in regards to pricing and volumes, and also by the extent to which we dedicate resources and company-owned equipment. Fees charged to customers by our full service international freight forwarding and customs house brokerage are based on the specific means of forwarding or delivering freight on a shipment-by-shipment basis.

24

Exhibit 3(a)
2412

GC000034

Our transportation revenue s are primarily influenced by fluctuations in freight volumes and shipping rates. The main factors that affect these are competition, available truck capacity, and economic market conditions. Our value-added contract business is substantially driven by the level of demand for outsourced logistics services. Major factors that affect our revenues include changes in manufacturing supply chain requirements, production levels in specific industries, pricing trends due to levels of competition and resource costs in logistics and transportation, and economic market conditions.

We recognize revenue as control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration the Company expects to receive in exchange for its services. For our transportation services businesses, which include truckload, brokerage, intermodal and dedicated services, revenue is recognized over-time as the performance obligations on the in-transit services are completed. For the Company's value-added service businesses, we have elected to use the "right to invoice" practical expedient, reflecting that a customer obtains the benefit associated with value-added services as they are provided. For additional information on revenue recognition, s ee Item 8, Note 3 to the Consolidated Financial Statements.

### Factors Affecting Our Expenses

*Purchased transportation and equipment rent* . Purchased transportation and equipment rent represents the amounts we pay to our owner-operators or other third party equipment providers to haul freight and, to the extent required to deliver certain logistics services, the cost of equipment leased under short-term contracts from third parties. The amount of the purchased transportation we pay to our owner-operators is primarily based on a contractually agreed-upon percentage of our revenue for each load hauled, net of any rental income we receive by leasing our trailers to owner-operators. The expense also includes the amount of fuel surcharge, where separately identifiable, that we receive from our customers and pass through to our owner-operators. Our strategy is to maintain a highly flexible business model that employs a cost structure that is mostly variable in nature. As a result, purchased transportation and equipment rent is the largest component of our costs and increases or decreases proportionally with changes in the amount of revenue generated by our owner-operators and other third party providers and with the production volumes of our customers. We recognize purchased transportation and equipment rent as the services are provided.

*Direct personnel and related benefits.* Direct personnel and related benefits include the salaries, wages and fringe benefits of our employees, as well as costs related to contract labor utilized in selling and operating activities. These costs are a significant component of our cost structure and increase or decrease proportionately with the expansion, addition or closing of operating facilities. As of December 31, 2019, approximately 29% of our employees in the United States, Canada and Colombia, and 86% of our employees in Mexico were subject to collective bargaining agreements. Any changes in union agreements will affect our personnel and related benefits cost. The operations in the United States, Mexico and Canada that are subject to collective bargaining agreements have separate, individualized agreements with several different unions that represent employees in these operations. While there are some facilities with multiple unions, each collective bargaining agreement with each union covers a single facility for that union. Such agreements have expiration dates that are generally independent of other collective bargaining agreements and include economics and operating terms tailored to the specific operational requirements of a customer. Our operation in Mexico provides competitive compensation within the Mexican statutory framework for managerial and supervisory personnel.

*Operating supplies and expenses.* These expenses include items such as fuel, tires and parts repair items primarily related to the maintenance of company owned/leased tractors, trailers and lift equipment, as well as licenses, dock supplies, communication, utilities, operating taxes and other general operating expenses. Because we maintain a flexible business model, our operating expenses generally relate to equipment utilization, fluctuations in customer demand and the related impact on our operating capacity. Our transportation services provided by company owned equipment depend on the availability and pricing of diesel fuel. Although we often include fuel surcharges in our billing to customers to offset increases in fuel costs, other operating costs have been, and may continue to be, impacted by fluctuating fuel prices. We recognize these expenses as they are incurred and the related income as it is earned.

*Commission expense.* Commission expense represents the amount we pay our agents for generating shipments on our behalf. The commissions we pay to our agents are generally established through informal oral agreements and are based on a percentage of revenue or gross profit generated by each load hauled. Traditionally, commission expense increases or decreases in proportion to the revenues generated through our agents. We recognize commission expense at the time we recognize the associated revenue.

*Occupancy expense.* Occupancy expense includes all costs related to the lease and tenancy of terminals and operating facilities, except utilities, unless such costs are otherwise covered by our customers. Although occupancy expense is generally related to fluctuations in overall customer demand, our contracting and pricing strategies help mitigate the cost impact of changing production volumes. To minimize potential exposure to inactive or underutilized facilities that are dedicated to a single customer, we strive where possible to enter into lease agreements that are coterminous with individual customer

Exhibit 3(a)
2413

GC000035

contracts, and we seek contract pricing terms that recover fixed occupancy costs, regardless of production volume. Occupancy expense may also include certain lease termination and related occupancy costs that are accelerated for accounting purposes into the fiscal year in which such a decision was implemented.

25

Exhibit 3(a)
2414

GC000036

*General and ad ministrative expense.* General and administrative expense includes the salaries, wages and benefits of administrative personnel, related support costs, taxes (other than income and property taxes), adjustments due to foreign currency transactions, bad debt expense, and other general expenses, including gains or losses on the sale or disposal of assets. These expenses are generally not directly related to levels of operating activity and may contain other expenses related to general business operations. We recognize general and administrative expense when it is incurred.

*Insurance and claims.* Insurance and claims expense represents our insurance premiums and the accruals we make for claims within our self-insured retention amounts. Our insurance premiums are generally calculated based on a mixture of a percentage of line-haul revenue and the size of our fleet. Our accruals have primarily related to cargo and property damage claims. We may also make accruals for personal injuries and property damage to third parties, physical damage to our equipment, general liability and workers' compensation claims if we experience a claim in excess of our insurance coverage. To reduce our exposure to non-trucking use liability claims (claims incurred while the vehicle is being operated without a trailer attached or is being operated with an attached trailer which does not contain or carry any cargo), we require our owner-operators to maintain non-trucking use liability coverage, which the industry refers to as deadhead bobtail coverage, of $2.0 million per occurrence. Our exposure to liability associated with accidents incurred by other third party providers who haul freight on our behalf is reduced by various factors including the extent to which they maintain their own insurance coverage. Our insurance expense varies primarily based upon the frequency and severity of our accident experience, insurance rates, our coverage limits and our self-insured retention amounts.

*Depreciation and amortization.* Depreciation and amortization expense relates primarily to the depreciation of owned tractors, trailers, computer and operating equipment, and buildings as well as the amortization of the intangible assets recorded for our acquired customer contracts and customer and agent relationships. We estimate the salvage value and useful lives of depreciable assets based on current market conditions and experience with past dispositions.

## Operating Revenues

We broadly group our services into the following categories: truckload services, brokerage services, intermodal services, dedicated services and value-added services. Our truckload, brokerage and intermodal services associated with individual freight shipments coordinated by our agents and company-managed terminals are generally aggregated into our reportable transportation segment, while our dedicated and value-added services to specific customers on a contractual basis make up our logistics segment. The following table sets forth operating revenues resulting from each of these service categories for the years ended December 31, 2019, 2018 and 2017, presented as a percentage of total operating revenues:

| | Years ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Operating revenues: | | | |
| Truckload services | 16.6% | 21.5% | 24.9% |
| Brokerage services | 23.5% | 25.1% | 22.9% |
| Intermodal services | 25.8% | 17.2% | 12.6% |
| Dedicated services | 9.2% | 9.9% | 9.8% |
| Value-added services | 24.9% | 26.3% | 29.8% |
| Total operating revenues | 100.0% | 100.0% | 100.0% |

26

Exhibit 3(a)
2415

GC000037

## Results of Operations

The following table sets forth items derived from our Consolidated Statements of Income for the years ended December 31, 2019, 2018 and 2017, presented as a percentage of operating revenues:

| | Years ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Operating revenues | 100.0% | 100.0% | 100.0% |
| Operating expenses: | | | |
|    Purchased transportation and equipment rent | 47.8 | 49.0 | 47.5 |
|    Direct personnel and related benefits | 24.4 | 24.3 | 25.8 |
|    Operating supplies and expenses | 8.0 | 8.4 | 9.5 |
|    Commission expense | 2.1 | 2.6 | 2.7 |
|    Occupancy expense | 2.4 | 2.1 | 2.5 |
|    General and administrative | 2.9 | 2.2 | 2.6 |
|    Insurance and claims | 3.1 | 2.1 | 3.4 |
|    Depreciation and amortization | 4.9 | 3.7 | 3.9 |
|     Total operating expenses | 95.7 | 94.3 | 97.9 |
| Income from operations | 4.3 | 5.7 | 2.1 |
| Interest and other non-operating income (expense), net | (1.0) | (0.9) | (0.7) |
| Income before for income taxes | 3.3 | 4.7 | 1.4 |
| Income tax (benefit) expense | 0.8 | 1.1 | (0.9) |
| Net income | 2.5% | 3.6% | 2.3% |

### 2019 Compared to 2018

*Operating revenues* . Operating revenues for 2019 increased $50.3 million, or 3.4%, to $1,512.0 million from $1,461.7 million in 2018. The increase in operating revenues is primarily the result of incremental revenues from Universal's recent intermodal acquisitions. Included in operating revenues are separately-identified fuel surcharges of $89.6 million in 2019 compared to $85.1 million in 2018. Consolidated income from operations decreased $18.4 million, or 22.0%, to $65.4 million for 2019 compared to $83.8 million during the same period last year. Included in 2019 income from operations were $30.0 million in litigation related charges compared to $9.0 million in 2018. Revenues from our transportation segment increased $64.3 million, or 6.8%, while income from operations decreased $31.4 million, or 60.8%, compared to the same period last year. The increase in operating revenues was attributable to Universal's recent intermodal acquisitions, while the decrease in operating income was primarily the result of $24.8 million in litigation charges in our transportation segment during 2019. The transportation segment was further impacted by a soft transportation rate environment throughout the year. In our logistics segment, revenues decreased $13.6 million, or 2.7%, over the same period last year primarily due to the adverse impact of the United Auto Workers ("UAW") strike at Universal's largest customer during the third and fourth quarters of 2019. Despite the impacts from the strike, income from operations in our logistics segment increased $16.6 million or 53.2% due to improved operating performance in our dedicated transportation businesses as well as our operations supporting Class 8 heavy-truck production. Additionally, included in 2018 operating income in our logistics segment were $9.0 million in litigation charges.

Operating revenues from truckload services decreased $62.2 million to $251.6 million during 2019, compared to $313.8 million for the same period last year. Included in truckload revenues during 2019 were $26.3 million in separately-identified fuel surcharges compared to $34.3 million during the same period last year. During the year, Universal's average operating revenue per load, excluding fuel surcharges, decreased 1.0% to $965. There was also an 18.7% decrease in the number of loads hauled. During 2019, Universal hauled 233,829 loads compared to 287,782 during the same period last year.

Revenues during 2019 from brokerage services decreased $12.6 million, or 3.4%, to $354.9 million compared to $367.6 million during the same period last year. The decrease reflects a 10.0% decrease in average operating revenue per load, which was partially offset by an increase in the number of brokerage loads moved. The number of brokerage loads moved during 2019 increased 8.3% to 228,203 compared to 210,713 during the same period last year.

Intermodal services revenues increased $139.2 million to $390.3 million during 2019, up from $251.1 million during the same period last year. Intermodal revenues included $150.4 million of incremental revenues related to Universal's recent acquisitions. Intermodal revenues for 2019 also included $47.1 million in separately identified fuel surcharges, compared to $30.3 million in the same period last year. During 2019, Universal moved 671,184 intermodal loads compared to 455,752 in 2018, an increase of 47.3%, while also increasing its average operating revenue per load, excluding fuel surcharges, by 5.2%.

27

Exhibit 3(a)
2416

GC000038

Exhibit 3(a)
2417

GC000039

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

Operating revenues from dedicated services decreased $5.7 million in 2019 to $138.7 million compared to $144.3 million in the prior year. Included in dedicated revenues in 2019 were $16.1 million in separately-identified fuel surcharges compared to $17.9 million during the same period last year. The decrease in operating revenues was primarily attributable to the impact the UAW labor strike had on operations supporting General Motors.

Value-added services revenues decreased $8.4 million to $376.5 million during 2019 compared to $384.9 million in the same period last year. Operations supporting passenger vehicle programs declined during the period due to extended plant shut-downs and reduced production levels during a plant ramp up, as well as halted production during the UAW labor strike. The impact was partially offset by strong growth in our operations supporting heavy-truck production where 2019 revenues increased $6.7 million compared to the previous year.

*Purchased transportation and equipment rent* . Purchased transportation and equipment rental costs for 2019 increased by $7.1 million, or 1.0%, to $723.1 million from $716.0 million during the same period last year. Purchased transportation and equipment rent generally increases or decreases in proportion to the revenues generated through owner-operators and other third party providers, and is generally correlated with changes in demand for transportation-related services, including truckload, brokerage, intermodal and to a lesser extent, dedicated services. The absolute increase in purchased transportation and equipment rental costs was primarily the result of an increase in transportation-related service revenues. Universal's 2019 transportation-related service revenues increased 5.4% compared to the same period last year. As a percentage of operating revenues, purchased transportation and equipment rent expense decreased to 47.8% compared to 49.0% in 2018. The decrease was primarily attributable to an increase in the mix of intermodal revenues, where the cost of transportation is typically lower than our other transportation businesses. As a percentage of revenues, intermodal services increased to 25.8% in 2019 compared to 17.2% in 2018. Also contributing to the decrease as a percentage was an increase in the mix of company drivers used in our dedicated operations compared to the use of owner-operators in prior periods.

*Direct personnel and related benefits* . Direct personnel and related benefits for 2019 increased by $13.6 million, or 3.8%, to $368.2 million compared to $354.7 million during the same period last year. Trends in these expenses are generally correlated with changes in operating facilities and headcount requirements and, therefore, increase and decrease with the level of demand for our value-added services and staffing needs of our operations. However, in 2019, we experienced extended plant shut-downs in operations supporting passenger vehicles, and thus value-added revenues associated with those operations were lower compared to the prior year. Increases in direct personnel and related benefits were primarily driven by increases in labor costs in our dedicated transportation business as well as company-managed brokerage operations. A portion of the increase was also attributable to incremental personnel and related benefits from acquired companies, which totaled $19.3 million. As a percentage of operating revenues, personnel and related benefits slightly increased to 24.4% for 2019, compared to 24.3% for 2018. The percentage is derived on an aggregate basis from both existing and new programs, and from customer operations at various stages in their lifecycles. Individual operations may be impacted by additional production shifts or by overtime at selected operations. While generalizations about the impact of personnel and related benefits costs as a percentage of total revenue are difficult, we manage compensation and staffing levels, including the use of contract labor, to maintain target economics based on near-term projections of demand for our services.

*Operating supplies and expenses* . Operating supplies and expenses decreased by $2.0 million, or 1.6%, to $120.8 million for 2019 compared to $122.7 million for 2018. These expenses include items such as fuel, maintenance, cost of materials, communications, utilities and other operating expenses, and generally relate to fluctuations in customer demand. The main elements of the decrease included decreases of $4.6 million in operating supplies and material costs in operations supporting heavy-truck programs, $1.5 million in fuel expense on company tractors, $0.9 million in professional fees, $0.3 million in utilities, and $0.3 million in plate expenses. These decreases were partially offset by increases of $2.2 million in bad debt expense, $1.7 million in vehicle and other maintenance, $0.7 million in permit expenses, $0.6 million in travel and entertainment, and $0.6 million in communications expenses.

*Commission expense* . Commission expense for 2019 decreased by $6.2 million, or 16.5%, to $31.2 million from $37.4 million for 2018. Commission expense decreased due to decreased revenue in the agency based truckload business. As a percentage of operating revenues, commission expense decreased to 2.1% for 2019, compared to 2.6% one year earlier.

*Occupancy expense* . Occupancy expenses increased by $5.9 million, or 19.4%, to $36.6 million for 2019. This compares to $30.7 million for 2018. The increase was primarily attributable to an increase in building rents due to new locations added from recent acquisitions as well as a redundant facility temporarily kept open in preparation of a relocation at of one of our operations supporting heavy-truck production.

*General and administrative* . General and administrative expense for 2019 increased by $13.0 million to $44.5 million from $31.5 million in 2018. The increase was attributable to a $7.0 million increase in professional fees and a $5.9 million increase in salaries, wages, and benefits. Included in the increase in professional fees was a $5.1 million charge for a previously disclosed legal matter. As a percentage of operating revenues, general and administrative expense was 2.9% for 2019 compared to 2.2% for 2018.

Exhibit 3(a)
2418

GC000040

*Insurance and claims* . Insurance and claims expense for 2019 increased by $16.9 million to $47.4 million from $30.5 million in 2018. As a percentage of operating revenues, insurance and claims increased to 3.1% for 2019 compared to 2.1% for 2018. Included in 2019 were $24.8 million in pre-tax charges for the settlement of a legal matter. 2018 included $9.0 million in similar charges. Excluding these items, insurance and claims expense was $22.6 million in 2019 and $21.5 million in 2018. The increase in insurance and claims expense, excluding the legal settlements, is primarily due to $4.0 million of increases in insurance premiums partially offset by $2.9 million in decrease in cargo claims.

*Depreciation and amortization* . Depreciation and amortization expense for 2019 increased by $20.3 million, or 37.4%, to $74.8 million from $54.4 million for 2018. Depreciation expense increased $10.3 million in 2019 and amortization expense increased $10.0 million. The increase in depreciation expense is attributable to additional cost from the continued recapitalization of our fleet, while the increase in amortization expense is attributable to amortization of intangible assets acquired in connection with Universal's recent acquisitions.

*Interest expense, net* . Net interest expense was $17.0 million for 2019 compared to $14.6 million for 2018. The increase of net interest expense reflects an increase in outstanding borrowing. As of December 31, 2019, our outstanding borrowings totaled $459.7 million compared to $403.2 million at the same time last year.

*Other non-operating income* . Other non-operating income was $1.8 million for 2019 compared to $0.2 million for 2018. Included in other non-operating income during 2019 were $1.5 million of gains on marketable securities compared to $1.3 million of losses in 2018. Additionally, included in other non-operating income in 2018 were gains of $1.0 million from life insurance policies.

*Income tax (benefit) expense* . Income tax expense for 2019 was $12.6 million, compared to $17.2 million for 2018, based on an effective tax rate of 25.1% and 24.8% respectively. The decrease in income tax expense in 2019 is primarily the result of a decrease in taxable income.

### 2018 Compared to 2017

*Operating revenues* . Operating revenues for 2018 increased $245.0 million, or 20.1%, to $1,461.7 million from $1,216.7 million during 2017. Operating revenues increased due to several factors including significant operations in support of heavy-truck programs, a strong pricing environment across our transportation services and an increase in fuel surcharges. Included in operating revenues are separately-identified fuel surcharges of $85.1 million for 2018 compared to $59.5 million for 2017. Also included in operating revenues are $70.9 million of revenues attributable to the acquisitions of Fore Transportation, Southern Counties, Specialized Rail Services, and Container Connection in 2018. Operating income increased by $58.6 million to $83.8 million compared to $25.2 million during 2017. Included in the 2017 results were $17.4 million of charges associated with on-going litigation. Operating results for 2018 included $9.0 million of pre-tax charges for the settlement of a legal matter. The increase in operating income was due to improved performance in both our transportation and logistics segments as well as $5.1 million of operating income attributable to the acquisitions of Fore Transportation, Southern Counties, Specialized Rail Services, and Container Connection. Revenues from our transportation segment increased $198.9 million, or 26.5%, and income from operations increased $37.1 million. The increase in income was primarily attributable to increased revenues and improved operating margins in several of our transportation segment businesses as well as $5.1 million of operating income attributable to our acquisitions. In our logistics segment, revenues increased $45.8 million, or 9.9% over 2017, while income from operations increased $20.5 million. The increase was primarily due to operations supporting heavy truck programs as well as an increase in both shuttle moves and over-the-road loads hauled in our dedicated services. Operating income in our logistics segment was negatively impacted in 2017 by certain large underperforming value-added operations, including a program we ultimately exited in Mexico.

Operating revenues from truckload services increased $10.9 million to $313.8 million during 2018, compared to $302.9 million for 2017. Included in truckload revenues during 2018 were $34.3 million in separately-identified fuel surcharges compared to $28.4 million during 2017. During the year, Universal's average operating revenue per load, excluding fuel surcharges, increased 11.6% to $975, primarily due to an increase in revenue per mile. These increases were partially offset by an 8.5% decrease in the number of loads hauled. During 2018, Universal hauled 287,782 loads compared to 314,530 loads in 2017.

Revenues during 2018 from brokerage services increased $89.4 million, or 32.1%, to $367.6 million compared to $278.2 million during 2017. The growth is due to increases in the average operating revenue per load and in the number of loads hauled. Overall, Universal's average operating revenue per load from brokerage services during 2018 increased 17.3% to $1,665, up from $1,420 in 2017. The number of brokerage loads hauled during 2018 increased 13.4% to 210,713 compared to 185,892 during 2017.

Intermodal services revenues increased $97.4 million to $251.1 million during 2018, up from $153.7 million during 2017. Intermodal revenues included $70.9 million of revenues from Universal's acquisitions of Fore Transportation, Southern Counties, Specialized

29

Exhibit 3(a)
2419

GC000041

Rail Services, and Container Connection in 2018. The increase reflects a $14 . 3 million i ncrease in fuel surcharges and an increase in the number of loads hauled. Compared to 2017 , the number of intermodal loads hauled during 2018 increased by 31 . 3 %. The growth is also due to a 21.7% increase in the average operating revenue per load, excluding fuel surcharges, to $482 per load in 2018, compared to $396 per load in 2017.

Operating revenues from dedicated services in 2018 increased $24.6 million to $144.3 million compared to $119.8 million in the prior year. Included in dedicated revenues in 2018 were $17.9 million in separately-identified fuel surcharges compared to $12.9 million during 2017. The increase was primarily attributable to increases in both shuttle moves and in the number of over-the-road loads hauled.

Value-added services revenues increased $22.8 million to $384.9 million during 2018 compared to $362.1 million in 2017. Operations supporting passenger vehicle programs declined during the period, while those supporting heavy-truck production continued to record strong growth. Operations supporting the heavy truck market continued to positively impact value-added services contributing $19.9 million of incremental revenues in 2018. Overall, value-added services grew by 6.3% compared to the prior year.

*Purchased transportation and equipment rent* . Purchased transportation and equipment rental costs for 2018 increased by $138.5 million, or 24.0%, to $716.0 million from $577.5 million during 2017. Purchased transportation and equipment rent generally increases or decreases in proportion to the revenues generated through owner-operators and other third party providers, and is generally correlated with changes in demand for transportation-related services, which includes truckload, brokerage, intermodal and dedicated services. The absolute increase in purchased transportation and equipment rental costs was primarily the result of an increase in transportation-related service revenues. Transportation-related service revenues in 2018 increased 26.0% compared to 2017. As a percentage of operating revenues, purchased transportation and equipment rent expense increased to 49.0% compared to 47.5% during the prior year. The increase as a percentage of operating revenue is due to a change in business mix, primarily the increase of brokerage services, which typically pay higher purchased transportation rates. As a percent of revenue, brokerage services increased to 25.1% in 2018 compared to 22.9% in 2017. Transportation-related revenues increased to 73.7% of operating revenue in 2018 compared to 70.2% in 2017.

*Direct personnel and related benefits* . Direct personnel and related benefits for 2018 increased by $40.3 million, or 12.8%, to $354.7 million compared to $314.4 million during 2017. Trends in these expenses are generally correlated with changes in operating facilities and headcount requirements and, therefore, increase and decrease with the level of demand for our value-added services and staffing needs of our operations. A portion of the increase was also attributable to $6.0 million of personnel and related benefits attributable to the acquisitions of Fore Transportation, Southern Counties, Specialized Rail Services, and Container Connection. As a percentage of operating revenues, personnel and related benefits decreased to 24.3% for 2018, compared to 25.8% for 2017. The percentage is derived on an aggregate basis from both existing and new programs, and from customer operations at various stages in their lifecycles. Individual operations may be impacted by additional production shifts or by overtime at selected operations. While generalizations about the impact of personnel and related benefits costs as a percentage of total revenue are difficult, we manage compensation and staffing levels, including the use of contract labor, to maintain target economics based on near-term projections of demand for our services.

*Operating supplies and expenses* . Operating supplies and expenses increased by $7.3 million, or 6.3%, to $122.7 million for 2018 compared to $115.4 million for 2017. These expenses include items such as fuel, maintenance, cost of materials, communications, utilities and other operating expenses, and generally relate to fluctuations in customer demand. The main elements of the increase are increases of $7.6 million in fuel expense on company equipment, $2.1 million in operating supplies and material costs in operations supporting heavy-truck programs, $1.9 million in professional fees, $0.9 million in permits, $0.5 million in license plate expense, and $0.5 million in communications expense. Partially offsetting the increase in operating supplies and expenses were $6.1 million of decreases in travel and entertainment. This was primarily due to higher meals costs in 2017 related to extended implementation and higher than anticipated customer production schedules at value-added programs in 2017.

*Commission expense* . Commission expense for 2018 increased by $4.2 million, or 12.7%, to $37.4 million from $33.2 million for 2017. Commission expense generally increases or decreases in proportion to our transportation-related services, except in cases where we generate a higher proportion of our revenues at company-managed terminals where no commissions are paid. As a percentage of operating revenues, commission expense decreased slightly to 2.6% for 2018, compared to 2.7% one year earlier.

*Occupancy expense* . Occupancy expenses increased by $0.1 million, or 0.3%, to $30.7 million for 2018. This compares to $30.6 million for 2017. Occupancy expense remained relatively stable, while we experienced a $0.5 million increase in property taxes which was partially offset by a $0.4 million decrease in building rents.

30

Exhibit 3(a)
2420

GC000042

*General and administrative* . General and administrative expense for 201 8 remained at $ 31 . 5 million . As a percentage of operating revenues, general and administrative expense was 2.2 % for 201 8 compared to 2.6% for 201 7, as a result of our efforts to keep overhead expenditures stable while growing the business.

*Insurance and claims* . Insurance and claims expense for 2018 decreased by $11.4 million to $30.5 million from $41.9 million in 2017. As a percentage of operating revenues, insurance and claims decreased to 2.1% for 2018 compared to 3.4% for 2017. Included in 2018 were $9.0 million in pre-tax charges for the settlement of a legal matter, while 2017 included a $15.6 million charge for an on-going legal matter. Excluding these items, insurance and claims expense was $21.5 million in 2018 compared to $26.3 million in 2017. The decrease in insurance and claims expense, excluding the previously mentioned legal items, is primarily due to a $2.0 million decrease in premiums and a $3.6 million decrease in cargo claims.

*Depreciation and amortization* . Depreciation and amortization expense for 2018 increased by $7.4 million, or 15.7%, to $54.4 million from $47.0 million for 2017. Depreciation expense increased $7.6 million in 2018 due to elevated levels of capital expenditures in recent years. The overall increase in depreciation and amortization expense was partially offset by reductions in amortization expense as certain intangible assets became fully amortized. The reduction in amortization was partially offset by $1.9 million of amortization of intangibles related to the Fore Transportation, Southern Counties, Specialized Rail Services, and Container Connection acquisitions in 2018.

*Interest expense, net* . Net interest expense was $14.6 million for 2018 compared to $9.4 million for 2017. The increase of net interest expense reflects an increase in outstanding borrowing and in interest rates on our variable rate debt. As of December 31, 2019, our outstanding borrowings totaled $403.2 million compared to $249.2 million at the same time last year.

*Other non-operating income* . Other non-operating income was $0.2 million for 2018 compared to $1.4 million for 2017. Included in other non-operating income during 2018 were $1.3 million of losses on marketable securities and $1.0 million of life insurance gains. This compares to $0.9 million of gains on marketable securities in 2017 and no life insurance proceeds in 2017.

*Income tax (benefit) expense* . Income tax expense for 2018 was $17.2 million, compared to a tax benefit of $11.0 million for 2017, based on an effective tax rate of 24.8% and (64.2%), respectively. The increase in income taxes is due to an increase in operating income in 2018, in addition to a $18.2 million income tax benefit recorded in the fourth quarter of 2017 as a result of the Tax Cuts and Jobs Act.


## Liquidity and Capital Resources

Our primary sources of liquidity are funds generated by operations, loans and extensions of credit under our credit facilities, on margin against our marketable securities and from installment notes, and proceeds from the sales of marketable securities. We use secured, asset lending to fund a substantial portion of purchases of tractors, trailers and material handling equipment.

We employ an asset-light operating strategy which we believe lowers our capital expenditure requirements. In general, our facilities used in our value-added services are leased on terms that are either substantially matched to our customer's contracts, are month-to-month or are provided to us by our customers. We also utilize owner-operators and third-party carriers to provide a significant portion of our transportation and specialized services. A significant portion of the tractors and trailers used in our business are provided by our owner-operators. In addition, our use of agents reduces our overall need for large terminals. As a result, our capital expenditure requirements are limited in comparison to most large transportation and logistics service providers, which maintain significant properties and sizable fleets of owned tractors and trailers.

In 2019, our capital expenditures totaled $79.8 million. These expenditures primarily consisted of transportation equipment, property and investments in support of our value-added service operations. Our asset-light business model depends somewhat on the customized solutions we implement for specific customers. As a result, our capital expenditures will depend on specific new contracts and the overall age and condition of our owned transportation equipment. In 2020, exclusive of acquisitions of businesses, we expect our capital expenditures to be in the range of 4% to 5% of operating revenues. We expect to make these capital expenditures for the acquisition of transportation equipment, to support our new and existing value-added service operations, and for the acquisition of real property and improvements to our existing terminal yard and container facilities.

We have a cash dividend policy that anticipates a regular dividend of $0.42 per share of common stock, payable in quarterly increments of $0.105 per share of common stock. After taking into account the regular quarterly dividends made during the year, the Board of Directors also evaluates the potential declaration of an annual special dividend payable in the first quarter of each year. The Board of Directors did not declare a special dividend in the first quarter of 2020. On February 6, 2020, our Board of Directors declared the regular quarterly cash dividend of $0.105 per share of common stock payable April 6, 2020 to shareholders of record at the close of business on March 2, 2020. During the year ended December 31, 2019, we paid a total of $0.53 per common share, or

Exhibit 3(a)
2421

$ 1 5.0 million. Future dividend policy and the payment of dividends, if any, will be determined by the Board of Directors in light of circumstances then existing, including our earnings, financial condition and other factors deemed relevant by the Board of Directors.

The Company was a party to a legal proceeding captioned Dalton which was resolved on January 3, 2020. In connection with the ruling, the Company expects to fund the $5.7 million judgement, plus $0.8 million of accrued interest in the first quarter of 2020.

We expect that our cash flows from operations, working capital and available borrowings will be sufficient to meet our capital commitments, to fund our operational needs for at least the next twelve months, and to fund mandatory debt repayments. Based on the availability of borrowings under our credit facilities, against our marketable security portfolio and other financing sources, and assuming the continuation of our current level of profitability, we do not expect that we will experience any liquidity constraints in the foreseeable future.

We continue to evaluate business development opportunities, including potential acquisitions that fit our strategic plans. There can be no assurance that we will identify any opportunities that fit our strategic plans or will be able to execute any such opportunities on terms acceptable to us. Depending on prospective consideration to be paid for an acquisition, any such opportunities would be financed first from available cash and cash equivalents and availability of borrowings under our credit facilities.

### Revolving Credit, Promissory Notes and Term Loan Agreements

Our secured credit facility (the "Credit Facility") provides for maximum borrowings of $350 million in the form of a $150 million term loan and a $200 million revolver at a variable rate of interest based on LIBOR or a base rate and matures on November 26, 2023. The Credit Facility, which is secured by cash, deposits, accounts receivable, and selected other assets of the applicable borrowers, includes customary affirmative and negative covenants and events of default, as well as financial covenants requiring minimum fixed charge coverage and leverage ratios, and customary mandatory prepayments provisions. Our Credit Facility includes an accordion feature which allows us to increase availability by up to $100 million upon our request. At December 31, 2019, we were in compliance with all covenants under the Credit Facility, and $48.8 million was available for borrowing.

A wholly-owned subsidiary issued a series of promissory notes in order to finance transportation equipment (the "Equipment Financing"). The notes issued in connection with the Equipment Financing, which are secured by liens on selected titled vehicles, include certain affirmative and negative covenants, are generally payable in 60 monthly installments and bear interest at fixed rates ranging from 3.09% to 5.13%. At December 31, 2019, we were in compliance with all covenants.

A wholly-owned subsidiary issued a series of promissory notes in order to finance certain purchases of real property (the "Real Estate Financing"). The promissory notes, which are secured by first mortgages and assignment of leases on specific parcels of real estate and improvements, include certain affirmative and negative covenants and are generally payable in 120 monthly installments. Each of the notes bears interest at LIBOR plus 2.25%. At December 31, 2019, we were in compliance with all covenants.

We also maintain a short-term line of credit secured by our portfolio of marketable securities (the "Margin Facility"). It bears interest at LIBOR plus 1.10%. The amount available under the Margin Facility is based on a percentage of the market value of the underlying securities. We did not have any amounts advanced against the line as of December 31, 2019, and the maximum available borrowings were $4.8 million.

### Discussion of Cash Flows

At December 31, 2019, we had cash and cash equivalents of $7.7 million compared to $5.7 million at December 31, 2018. Operating activities provided $128.0 million in net cash and financing activities provided an additional $16.7 million. During 2019, we used $143.1 million in investing activities.

The $128.0 million in net cash provided by operations was primarily attributed to $37.6 million of net income, which reflects non-cash depreciation and amortization, noncash lease expense, gains on marketable equity securities and equipment sales, amortization of debt issuance costs, stock-based compensation, provisions for doubtful accounts and a change in deferred income taxes totaling $112.8 million, net. Net cash provided by operating activities also reflects an aggregate increase in net working capital totaling $22.4 million. The primary drivers behind the increase in working capital were principal reductions in operating lease liabilities during the period, decreases in accruals for insurance and claims, trade accounts payable, accrued expenses and other current liabilities, and increases in prepaid expenses and other assets. These were partially offset by a decrease in trade and other accounts receivables and affiliated transactions. Affiliate transactions increased net cash provided by operating activities by $0.6 million resulting from a decrease in accounts receivable from affiliates of $3.5 million and decrease in accounts payable to affiliates of $2.9 million.

Exhibit 3(a)
2422

GC000044

Exhibit 3(a)
2423

GC000045

The $ 143.1 million in net cash used in investing activities consisted of $ 79.8 million in capital expenditures and $ 76.0 million for the acquisition of Michael's Cartage and Roadrunner Int ermodal, and payment of acquisition related liabilities. These uses were partially offset by $ 11.2 million in proceeds from the sale of equipment and $ 1.6 million in proceeds from the sale of marketable securities.

Financing activities provided $16.7 million in net cash during 2019. We paid $24.8 million for purchases of common stock through a "Dutch auction" tender offer and cash dividends $15.0 million. At December 31, 2019, w e had outstanding borrowings of $459.7 million compared to $403.2 million at December 31, 2018. During the period, we had net borrowings on our revolving lines of credit and margin facility totaling $70.1 million and borrowed an additional $56.5 million for new equipment. We also made term loan, and equipment and real estate note payments totaling $70.0 million during the period.

## Contractual Obligations

The following summarizes our contractual obligations at December 31, 2019, and the effect such obligations are expected to have on our liquidity and cash flow in future periods (in thousands):

| | | Payments due by period | | | |
|---|---|---|---|---|---|
| | Total | Less Than 1 Year | 1 – 3 Years | 3 – 5 Years | More Than 5 Years |
| Long-term debt | 459,729 | 60,062 | 96,699 | 293,004 | 9,964 |
| Interest on debt (1) | 50,790 | 15,512 | 24,819 | 9,777 | 682 |
| Operating lease obligations (2) | 106,984 | 31,785 | 33,673 | 16,977 | 24,549 |
| Purchase obligations | 32,218 | 32,218 | — | — | — |
| Legal settlement | 6,548 | 6,548 | — | — | — |
| Total | $ 656,269 | $ 146,125 | $ 155,191 | $ 319,758 | $ 35,195 |

(1)   Interest payments on debt include fixed rate interest and variable rate interest based on the debt balance and applicable rate at December 31, 2019. Total interest reported includes $9.9 million of fixed rate interest and $40.9 million of variable rate interest.

(2)   Certain operating lease obligations in a currency other than the U.S. dollar will be affected by the exchange rate in effect at the time each cash payment is made.

At December 31, 2019, the total amount of gross unrecognized tax benefits was $0.3 million. This amount is not included in the above table as the Company cannot reasonably estimate the timing of cash settlements, if any, with taxing authorities. At December 31, 2019, the Company has insurance and claims liabilities of $23.0 million, of which $9.9 million are covered by insurance. These amounts are not included in the above table as the Company cannot reasonably estimate the timing of cash settlements on these liabilities.

## Off-Balance Sheet Arrangements

None.

## Legal Matters

We are subject to various legal proceedings and other contingencies, the outcomes of which are subject to significant uncertainty. We accrue for estimated losses if it is probable that an asset has been impaired or a liability has been incurred and the amount of the loss can be reasonably estimated. We use judgment and evaluate, with the assistance of legal counsel, whether a loss contingency arising from litigation should be disclosed or recorded. The outcome of legal proceedings is inherently uncertain, so typically a loss cannot be precisely estimated. Accordingly, if the outcome of legal proceedings is different than is anticipated by us, we would have to record the matter at the actual amount at which it was resolved, in the period resolved, impacting our results of operations and financial position for the period. See Item 8, Note 16 to the Consolidated Financial Statements.

## Critical Accounting Policies

Our financial statements have been prepared in accordance with U.S. generally accepted accounting principles. The preparation of these financial statements requires us to make estimates and judgments that affect the reported amounts of assets, liabilities, operating revenues and operating expenses.

Critical accounting policies are those that are both (1) important to the portrayal of our financial condition and results of operations and (2) require management's most difficult, subjective or complex judgments, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. As the number of variables and assumptions affecting the possible future resolution

Exhibit 3(a)
2424

Exhibit 3(a)
2425

GC000047

Exhibit 3(a)
2426

GC000048

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

of the uncertainties increase, those judgments become even more subjective and complex. In order to provide an understanding about how our management forms its judgments about future events, including the variables and assumptions underlying the estimate s, and the sensitivity of those judgments to different circumstances, we have identified our critical accounting policies below.

*Revenue Recognition*

We recognize revenue as control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration the Company expects to receive in exchange for its services. For our transportation services businesses, which include truckload, brokerage, intermodal and dedicated services, revenue is recognized over-time as the performance obligations on the in-transit services are completed. For the Company's value-added service businesses, we have elected to use the "right to invoice" practical expedient, reflecting that a customer obtains the benefit associated with value-added services as they are provided. For additional information on revenue recognition, s ee Item 8, Note 3 to the Consolidated Financial Statements.

*Allowance for Uncollectible Receivables*

The allowance for potentially uncollectible receivables is based on a combination of historical data, cash payment trends, specific customer issues, write-off trends, general economic conditions and other factors. Management continuously monitors these factors to arrive at the estimate of accounts receivable that may be ultimately uncollectible. The receivables analyzed include trade receivables, as well as loans and advances made to owner-operators. All other balances are reviewed on a pooled basis. This analysis requires us to make significant estimates. Changes in the facts and circumstances that these estimates are based upon and changes in the general economic environment could result in a material change to the allowance for uncollectible receivables. These changes include, but are not limited to, deterioration of customers' financial position, changes in our relationships with our customers, agents and owner-operators and unforeseen issues relating to individual receivables. Based on our 2019 allowance for uncollectible receivables, a 10% increase in the allowance would increase our bad debt expense by $0.3 million.

*Insurance and Claim Costs*

We maintain auto liability, workers compensation and general liability insurance with licensed insurance carriers. We are self-insured for all cargo and equipment damage claims. Insurance and claims expense represents premiums paid by us and the accruals made for claims within our self-insured retention amounts. A liability is recognized for the estimated cost of all self-insured claims including an estimate of incurred but not reported claims based on historical experience and for claims expected to exceed our policy limits. In addition, legal expenses related to auto liability claims are covered under our policy. We are responsible for all other legal expenses related to claims.

We establish reserves for anticipated losses and expenses related to cargo and equipment damage claims and auto liability claims. The reserves consist of specific reserves for all known claims and an estimate for claims incurred but not reported, and losses arising from known claims ultimately settling in excess of insurance coverage using loss development factors based upon industry data and past experience. In determining the reserves, we specifically review all known claims and record a liability based upon our best estimate of the amount to be paid. In making our estimate, we consider the amount and validity of the claim, as well as our past experience with similar claims. In establishing the reserve for claims incurred but not reported, we consider our past claims history, including the length of time it takes for claims to be reported to us. Based on our past experience, the time between when a claim occurs and when it is reported to us is short. As a result, we believe that the number of incurred but not reported claims at any given point in time is small. These reserves are periodically reviewed and adjusted to reflect our experience and updated information relating to specific claims. As of December 31, 2019, we did not have any reserves for workers' compensation or general liability claims. If we experience claims that are not covered by our insurance or that exceed our estimated claim reserve, it could increase the volatility of our earnings and have a materially adverse effect on our financial condition, results of operations or cash flows. Based on our 2019 reserve for claims incurred but not reported, a 10% increase in claims incurred but not reported, would increase our insurance and claims expense by approximately $0.5 million.

*Valuation of Long-Lived Assets, including Goodwill and Intangible Assets*

We are required to test goodwill for impairment annually or more frequently, whenever events occur or circumstances change that would more likely than not reduce the fair value of a reporting unit with goodwill below its carrying amount. We annually test goodwill impairment during the third quarter. Goodwill represents the excess purchase price over the fair value of assets

Exhibit 3(a)
2427

acquired in connection with our acquisitions. We continually assess whether any indicators of impairment exist, which requires a significant amount of judgment. Such indicators may include a sustained significant decline in our share price and market capitalization; a decline in our expected future cash flows; a significant adverse change in legal factors or in the business climate; unanticipated competition; overall weaknesses in our industry; and slower growth rates. Adverse changes in these factors could have a significant impact on the recoverability of goodwill and could have a material impact on our consolidated financial statements. The Company has the option to

34

Exhibit 3(a)
2428

GC000050

first assess qualitative factors such as current performance and overall economic conditions to determine whether or not it is necessary to perform a quantitative goodwill impairment test. If we choose that option, then we wo uld not be required to perform a quantitative goodwill impairment test unless we determine that, based on a qualitative assessment, it is more likely than not that the fair value of a reporting unit is less than its carrying value. If we determine that it is more likely than not, or if we choose not to perform a qualitative assessment, we then proceed with the quantitative assessment. Under the quantitative test, i f the fair value of a reporting unit exceeds its carrying amount, then goodwill of the reporti ng unit is considered to not be impaired. If the carrying amount of the reporting unit exceeds its fair value, then an impairment loss is recognized in an amount equal to the excess, up to the value of the goodwill . During the third quarter of 201 9 , we com pleted our goodwill impairment testing by performing a quantitative assessment. Based on the results of this test, no impairment loss was recognized. We estimate that a 10% decrease in the fair value of our reporting units would not have caused an impairme nt loss to be recognized.

We evaluate the carrying value of long-lived assets, other than goodwill, for impairment by analyzing the operating performance and anticipated future cash flows for those assets, whenever events or changes in circumstances indicate that the carrying amounts of such assets may not be recoverable. We evaluate the need to adjust the carrying value of the underlying assets if the sum of the expected cash flows is less than the carrying value. Our projection of future cash flows, the level of actual cash flows, the methods of estimation used for determining fair values and salvage values can impact impairment. Any changes in management's judgments could result in greater or lesser annual depreciation and amortization expense or impairment charges in the future. Depreciation and amortization of long-lived assets is calculated using the straight-line method over the estimated useful lives of the assets.

## Recently Issued Accounting Pronouncements Not Currently Effective

See Item 8: Note 2 to the Consolidated Financial Statements for discussion of new accounting pronouncements.

## ITEM 7A:    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

### Interest Rate Risk

Our principal exposure to interest rate risk relates to outstanding borrowing under our Credit Facility, Real Estate Financing and Margin Facility, all of which charge interest at floating rates. Borrowings under the credit agreements with each of the banks bear interest at LIBOR or a base rate, plus an applicable margin. Our Margin Facility bears interest at a floating rate equal to LIBOR plus 1.10%. As of December 31, 2019, we had total variable interest rate borrowings of $331.2 million. Assuming variable rate debt levels remain at $331.2 million for a full year, a 100 basis point increase in interest rates on our variable rate debt would increase interest expense approximately $3.3 million annually.

In connection with the Real Estate Financing, we entered into interest rate swap agreements to fix a portion of the interest rates on our variable rate debt that has a combined notional amount of $15.5 million at December 31, 2019. Under the swap agreements, the Company receives interest at the one-month LIBOR rate plus 2.25%, and pays a fixed rate. The March 2016 swap (swap A) became effective October 2016, has a rate of 4.16% (amortizing notional amount of $10.0 million) and expires July 2026, and an additional March 2016 swap (swap B) became effective October 2016, has a rate of 3.83% (amortizing notional amount of $5.5 million) and expires May 2022. At December 31, 2019, the fair value of the two swap agreements was a liability of $0.1 million. Since these swap agreements qualify for hedge accounting, the changes in fair value are recorded in other comprehensive income (loss), net of tax.

Included in cash and cash equivalents is approximately $18,000 in short-term investment grade instruments. The interest rates on these instruments are adjusted to market rates at least monthly. In addition, we have the ability to put these instruments back to the issuer at any time. Accordingly, any future interest rate risk on these short-term investments would not be material.

### Commodity Price Risk

Fluctuations in fuel prices can affect our profitability by affecting our ability to retain or recruit owner-operators. Our owner-operators bear the costs of operating their tractors, including the cost of fuel. The tractors operated by our owner-operators consume large amounts of diesel fuel. Diesel fuel prices fluctuate greatly due to economic, political and other factors beyond our control. To address fluctuations in fuel prices, we seek to impose fuel surcharges on our customers and pass these surcharges on to our owner-operators. Historically, these arrangements have not fully protected our owner-operators from fuel price increases. If costs for fuel escalate significantly it could make it more difficult to attract additional qualified owner-operators and retain our current owner-operators. If we lose the services of a significant number of owner-operators or are unable to attract additional owner-operators, it could have a materially adverse effect on our financial condition, results of operations and cash flows.

Exposure to market risk for fluctuations in fuel prices also relates to a small portion of our transportation service contracts for which the cost of fuel is integral to service delivery and the service contract does not have a mechanism to adjust for increases in fuel prices. Increases and decreases in the price of fuel are generally passed on to our customers for which we realize

Exhibit 3(a)
2429

GC000051

minimal changes in

35

Exhibit 3(a)
2430

GC000052

profitability during periods of steady market fuel prices. However, profitability may be positively or negatively impacted by sudden increases or decreases in market fuel prices during a short period of t ime as customer pricing for fuel services is established based on market fuel costs. We believe the exposure to fuel price fluctuations would not materially impact our results of operations, cash flows or financial position. Based upon our 201 9 fuel consum ption, a 10% increase in the average annual price per gallon of diesel fuel would increase our annual fuel expense on company owned tractors by approximately $ 2.1 million.

### Equity Securities Risk

We hold certain actively traded marketable equity securities, which subjects the Company to fluctuations in the fair market value of its investment portfolio based on current market price. The recorded value of marketable equity securities increased to $9.4 million at December 31, 2019 from $9.3 million at December 31, 2018. The increase resulted from an increase in market value of the portfolio of approximately $1.2 million and purchases of approximately $0.1 million, offset by sales of marketable equity securities of approximately $1.6 million, with realized gains on sales of $0.3 million. A 10% decrease in the market price of our marketable equity securities would cause a corresponding 10% decrease in the carrying amounts of these securities, or approximately $0.9 million. For additional information with respect to the marketable equity securities, see Item 8, Note 5 to the Consolidated Financial Statements.

### Foreign Exchange Risk

In the years ended December 31, 2019 and 2018, 2.1% and 2.4%, respectively, of our revenues were derived from services provided outside the United States, principally in Mexico, Canada and Colombia. Exposure to market risk for changes in foreign currency exchange rates relates primarily to selling services and incurring costs in currencies other than the local currency and to the carrying value of net investments in foreign subsidiaries. As a result, we are exposed to foreign currency exchange rate risk due primarily to translation of the accounts of our Mexican, Canadian and Colombian operations from their local currencies into U.S. dollars and also to the extent we engage in cross-border transactions. The majority of our exposure to fluctuations in the Mexican peso, Canadian dollar, and Colombian peso is naturally hedged, since a substantial portion of our revenues and operating costs are denominated in each country's local currency. Based on 2019 expenditures denominated in foreign currencies, a 10% decrease in the exchange rates would increase our annual operating expenses by approximately $1.8 million. Historically, we have not entered into financial instruments for trading or speculative purposes. Short-term exposures to fluctuating foreign currency exchange rates are related primarily to intercompany transactions. The duration of these exposures is minimized by ongoing settlement of intercompany trading obligations.

The net investments in our Mexican, Canadian and Colombian operations are exposed to foreign currency translation gains and losses, which are included as a component of accumulated other comprehensive income in our statement of shareholders' equity. Adjustments from the translation of the net investment in these operations increased equity by approximately $1.4 million for the year ended December 31, 2019.

36

Exhibit 3(a)
2431

GC000053

**ITEM 8:        F INANCIAL STATEMENTS A ND SUPPLEMENTARY DATA**
**Report of Independent Registered Public Accounting Firm**
Shareholders and Board of Directors
Universal Logistics Holdings, Inc.
Warren, Michigan
**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Universal Logistics Holdings, Inc. (the "Company") as of December 31, 2019 and 2018, the related consolidated statements of income, comprehensive income, cash flows and shareholders' equity for each of the three years in the period ended December 31, 2019 and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 and 2018, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2019 **,** in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated March 16, 2020 expressed an unqualified opinion thereon.

**Change in Accounting Principles**

As discussed in Note 2, the Company changed its method of accounting for leases in 2019 and its methods of accounting for i) revenue from contracts with customers and ii) investments in equity securities in 2018.
**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.
/s/ BDO USA, LLP
We have served as the Company's auditor since 2013.
Troy, Michigan
March 16, 2020

Exhibit 3(a)
2432

GC000054

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Consolidated Balance Sheets
December 31, 2019 and 2018
(In thousands, except share data)

| Assets | | 2019 | | 2018 |
|---|---|---:|---|---:|
| Current assets: | | | | |
| Cash and cash equivalents | $ | 7,726 | $ | 5,727 |
| Marketable securities | | 9,369 | | 9,333 |
| Accounts receivable – net of allowance for doubtful accounts of $2,545 and $1,772, respectively | | 210,534 | | 215,991 |
| Other receivables | | 19,065 | | 19,130 |
| Prepaid expenses and other | | 19,676 | | 19,830 |
| Due from affiliates | | 1,705 | | 5,247 |
| Prepaid income taxes | | 3,768 | | — |
| Total current assets | | 271,843 | | 275,258 |
| Property and equipment, net | | 339,823 | | 303,234 |
| Operating lease right-of-use asset | | 87,209 | | — |
| Goodwill | | 168,451 | | 145,152 |
| Intangible assets – net of accumulated amortization of $78,366 and $62,624, respectively | | 116,111 | | 113,775 |
| Deferred income taxes | | 1,460 | | 2,549 |
| Other assets | | 3,100 | | 3,179 |
| Total assets | $ | 987,997 | $ | 843,147 |
| **Liabilities and Shareholders' Equity** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ | 91,909 | $ | 92,019 |
| Current portion of long-term debt | | 59,476 | | 51,903 |
| Current portion of operating lease liabilities | | 27,484 | | — |
| Accrued expenses and other current liabilities | | 34,825 | | 25,126 |
| Insurance and claims | | 23,039 | | 31,679 |
| Due to affiliates | | 14,842 | | 17,764 |
| Income taxes payable | | — | | 2,678 |
| Total current liabilities | | 251,575 | | 221,169 |
| Long-term liabilities: | | | | |
| Long-term debt, net of current portion | | 398,136 | | 348,549 |
| Operating lease liability, net of current portion | | 61,674 | | — |
| Deferred income taxes | | 65,692 | | 59,228 |
| Other long-term liabilities | | 5,703 | | 4,902 |
| Total long-term liabilities | | 531,205 | | 412,679 |
| Shareholders' equity: | | | | |
| Common stock, no par value. Authorized 100,000,000 shares; 30,970,452 and 30,965,452 shares issued; 27,282,230 and 28,378,827 shares outstanding, respectively | | 30,972 | | 30,967 |
| Paid-in capital | | 4,298 | | 4,230 |
| Treasury stock, at cost; 3,688,222 and 2,586,625 shares, respectively | | (77,247) | | (52,462) |
| Retained earnings | | 251,204 | | 231,525 |
| Accumulated other comprehensive income (loss): | | | | |
| Interest rate swaps, net of income taxes of $(32) and $94, respectively | | (105) | | 298 |
| Foreign currency translation adjustments | | (3,905) | | (5,259) |
| Total shareholders' equity | | 205,217 | | 209,299 |
| Total liabilities and shareholders' equity | $ | 987,997 | $ | 843,147 |

See accompanying notes to consolidated financial statements.

Exhibit 3(a)
2433

GC000055

Exhibit 3(a)
2434

GC000056

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

**UNIVERSAL LOGISTICS HOLDINGS, INC.**

Consolidated Statements of Income

Years ended December 31, 2019, 2018 and 2017

(In thousands, except per share data)

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Operating revenues: | | | |
| Truckload services, including related party amounts of $1,636, $900 and $1,100, respectively | $ 251,574 | $ 313,811 | $ 302,914 |
| Brokerage services | 354,940 | 367,579 | 278,187 |
| Intermodal services | 390,299 | 251,074 | 153,726 |
| Dedicated services | 138,664 | 144,348 | 119,760 |
| Value-added services | 376,521 | 384,896 | 362,078 |
| Total operating revenues | 1,511,998 | 1,461,708 | 1,216,665 |
| Operating expenses: | | | |
| Purchased transportation and equipment rent, including related party amounts of $65, $1,240 and $35, respectively | 723,079 | 716,019 | 577,485 |
| Direct personnel and related benefits, including related party amounts of $31,932, $38,811 and $35,743, respectively | 368,243 | 354,654 | 314,364 |
| Operating supplies and expenses, including related party amounts of $895, $2,428 and $2,652, respectively | 120,767 | 122,736 | 115,420 |
| Commission expense | 31,204 | 37,381 | 33,213 |
| Occupancy expense, including related party amounts of $11,794, $14,295 and $17,046, respectively | 36,645 | 30,701 | 30,575 |
| General and administrative, including related party amounts of $7,633, $7,407 and $6,742, respectively | 44,497 | 31,523 | 31,518 |
| Insurance and claims, including related party amounts of $17,570, $14,246 and $16,281, respectively | 47,418 | 30,475 | 41,881 |
| Depreciation and amortization | 74,765 | 54,425 | 46,995 |
| Total operating expenses | 1,446,618 | 1,377,914 | 1,191,451 |
| Income from operations | 65,380 | 83,794 | 25,214 |
| Interest income | 73 | 76 | 92 |
| Interest expense | (17,085) | (14,669) | (9,538) |
| Other non-operating income | 1,818 | 188 | 1,373 |
| Income before income taxes | 50,186 | 69,389 | 17,141 |
| Income tax expense (benefit) | 12,600 | 17,211 | (11,012) |
| Net income | $ 37,586 | $ 52,178 | $ 28,153 |
| Earnings per common share: | | | |
| Basic | $ 1.34 | $ 1.84 | $ 0.99 |
| Diluted | $ 1.34 | $ 1.84 | $ 0.99 |
| Weighted average number of common shares outstanding: | | | |
| Basic | 28,069 | 28,383 | 28,425 |
| Diluted | 28,070 | 28,390 | 28,428 |
| Dividends declared per common share | $ 0.42 | $ 0.53 | $ 0.28 |

**See accompanying notes to consolidated financial statements.**

39

Exhibit 3(a)
2435

GC000057

Exhibit 3(a)
2436

GC000058

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

**UNIVERSAL LOGISTICS HOLDINGS, INC.**

Consolidated Statements of Comprehensive Income

Years ended December 31, 2019, 2018 and 2017

(In thousands, except per share data)

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Net Income | $ 37,586 | $ 52,178 | $ 28,153 |
| Other comprehensive income (loss): | | | |
| Unrealized changes in fair value of interest rate swaps, net of income taxes of $(126), $31 and $1, respectively | (403) | 101 | 98 |
| Foreign currency translation adjustments | 1,354 | (526) | 672 |
| Unrealized holding gains on available-for-sale securities arising during the period, net of income taxes of $0, $0 and $(38), respectively (1) | — | — | 1,683 |
| Realized gains on available-for-sale securities reclassified into income, net of income taxes of $0, $0 and $384, respectively (1) | — | — | (539) |
| Total other comprehensive income (loss) | 951 | (425) | 1,914 |
| Total comprehensive income | $ 38,537 | $ 51,753 | $ 30,067 |

(1) In accordance with the adoption of ASU 2016-01 on January 1, 2018 (see Note 2), unrealized holding gains and losses on equity securities have been reclassified to income for the current period and to retained earnings for historical amounts recorded in Accumulated Other Comprehensive Income at December 31, 2017.

**See accompanying notes to consolidated financial statements.**

40

Exhibit 3(a)
2437

GC000059

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Consolidated Statements of Cash Flows
Years ended December 31, 2019, 2018 and 2017
(In thousands)

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Net income | $ 37,586 | $ 52,178 | $ 28,153 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 74,765 | 54,425 | 46,995 |
| Noncash lease expense | 29,904 | — | — |
| Amortization of debt issuance costs | 586 | 1,329 | 321 |
| (Gain) loss on marketable equity securities | (1,540) | 1,306 | (923) |
| (Gain) loss on disposal of property and equipment | (1,245) | (354) | (10) |
| Gain on life insurance policies | — | (1,025) | — |
| Write-off of debt issuance costs | — | 366 | — |
| Stock-based compensation | 73 | 413 | 414 |
| Provision for doubtful accounts | 3,133 | 924 | 1,533 |
| Deferred income taxes | 7,161 | 6,583 | (19,014) |
| Change in assets and liabilities: | | | |
| Trade and other accounts receivable | 21,798 | (26,466) | (29,398) |
| Prepaid income taxes, prepaid expenses and other assets | (2,230) | 2,509 | 8,051 |
| Accounts payable, accrued expenses, accrued income taxes, insurance and claims and other current liabilities | (13,791) | (2,139) | 40,633 |
| Principal reduction in operating lease liabilities | (29,061) | — | — |
| Due to/from affiliates, net | 623 | 3,238 | 7,192 |
| Other long-term liabilities | 274 | 1,614 | (98) |
| Net cash provided by operating activities | 128,036 | 94,901 | 83,849 |
| Cash flows from investing activities: | | | |
| Capital expenditures | (79,753) | (66,585) | (63,360) |
| Proceeds from the sale of property and equipment | 11,152 | 3,897 | 1,211 |
| Purchases of marketable securities | (92) | (1,228) | (401) |
| Proceeds from sale of marketable securities | 1,596 | 5,733 | 1,261 |
| Proceeds from life insurance policies | — | 2,583 | — |
| Acquisitions of businesses | (75,963) | (173,599) | — |
| Net cash used in investing activities | (143,060) | (229,199) | (61,289) |
| Cash flows from financing activities: | | | |
| Proceeds from borrowing - revolving debt | 379,458 | 488,571 | 316,458 |
| Repayments of debt - revolving debt | (308,821) | (477,667) | (320,833) |
| Proceeds from borrowing - term debt | 56,494 | 255,169 | 39,069 |
| Repayments of debt - term debt | (70,016) | (112,157) | (48,305) |
| Repayments under margin account | (541) | — | — |
| Dividends paid | (15,042) | (10,930) | (7,960) |
| Payment of capital lease obligations | — | (92) | (100) |
| Purchases of treasury stock | (24,785) | (930) | (1,488) |
| Capitalized financing costs | — | (3,137) | — |
| Net cash provided by (used in) financing activities | 16,747 | 138,827 | (23,159) |
| Effect of exchange rate changes on cash and cash equivalents | 276 | (474) | 516 |
| Net increase (decrease) in cash | 1,999 | 4,055 | (83) |
| Cash and cash equivalents – January 1 | 5,727 | 1,672 | 1,755 |
| Cash and cash equivalents – December 31 | $ 7,726 | $ 5,727 | $ 1,672 |

See accompanying notes to consolidated financial statements.

41

Exhibit 3(a)
2438

GC000060

Exhibit 3(a)
2439

GC000061

Exhibits
UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Consolidated Statements of Cash Flows - Continued
Years ended December 31, 2019, 2018 and 2017
(In thousands)

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Supplemental cash flow information:** | | | |
| Cash paid for interest | $ 16,349 | $ 13,323 | $ 9,104 |
| Cash paid for income taxes | $ 12,459 | $ 4,792 | $ 2,207 |
| **Non-cash operating and financing activities:** | | | |

During the year ended December 31, 2019, the Company had non-cash activities resulting from $2.9 million of declared dividends that were unpaid as of the end of the year.

**See accompanying notes to consolidated financial statements.**

42

Exhibit 3(a)
2440

GC000062

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Consolidated Statements of Shareholders' Equity
Years ended December 31, 2019, 2018 and 2017
(In thousands)

| | Common stock | Paid-in capital | Treasury stock | Retained earnings | Accumulated other comprehensive income (loss) | Total |
|---|---|---|---|---|---|---|
| Balances – December 31, 2016 | $ 30,919 | $ 3,451 | $ (50,044) | $ 166,033 | $ (2,627) | $ 147,732 |
| Net income | — | — | — | 28,153 | — | 28,153 |
| Comprehensive loss | — | — | — | — | 1,914 | 1,914 |
| Dividends paid ($0.28 per share) | — | — | — | (7,960) | — | (7,960) |
| Stock based compensation | 24 | 390 | — | — | — | 414 |
| Purchases of treasury stock | — | — | (1,488) | — | — | (1,488) |
| Balances – December 31, 2017 | $ 30,943 | $ 3,841 | $ (51,532) | $ 186,226 | $ (713) | $ 168,765 |
| Net income | — | — | — | 52,178 | — | 52,178 |
| Comprehensive loss | — | — | — | — | (425) | (425) |
| Dividends paid ($0.385 per share) | — | — | — | (10,930) | — | (10,930) |
| Cumulative effect adjustment - ASU 2014-09 revenue recognition | — | — | — | 228 | — | 228 |
| Cumulative effect adjustment - ASU 2016-01 financial instruments | — | — | — | 3,823 | (3,823) | — |
| Stock based compensation | 24 | 389 | — | — | — | 413 |
| Purchases of treasury stock | — | — | (930) | — | — | (930) |
| Balances – December 31, 2018 | $ 30,967 | $ 4,230 | $ (52,462) | $ 231,525 | $ (4,961) | $ 209,299 |
| Net income | — | — | — | 37,586 | — | 37,586 |
| Comprehensive income | — | — | — | — | 951 | 951 |
| Dividends paid ($0.530 per share) | — | — | — | (15,042) | — | (15,042) |
| Dividends payable ($0.105 per share) | — | — | — | (2,865) | — | (2,865) |
| Stock based compensation | 5 | 68 | — | — | — | 73 |
| Purchases of treasury stock | — | — | (24,785) | — | — | (24,785) |
| Balances – December 31, 2019 | $ 30,972 | $ 4,298 | $ (77,247) | $ 251,204 | $ (4,010) | $ 205,217 |

**See accompanying notes to consolidated financial statements.**

43

Exhibit 3(a)
2441

GC000063

Exhibit 3(a)
2442

GC000064

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

### UNIVERSAL LOGISTICS HOLDINGS, INC.

Notes to Consolidated Financial Statements

December 31, 2019, 2018 and 2017

## (1)   Summary of Significant Accounting Policies

### (a) Business

Universal Logistics Holdings, Inc. ("Universal" or the "Company"), through its subsidiaries, is a leading asset-light provider of customized transportation and logistics solutions throughout the United States, and in Mexico, Canada and Colombia. We provide our customers with supply chain solutions that can be scaled to meet their changing demands. We offer our customers a broad array of services across their entire supply chain, including truckload, brokerage, intermodal, dedicated and value-added services. Our customized solutions and flexible business model are designed to provide us with a highly variable cost model.

### (b) Basis of Presentation

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All significant intercompany accounts and transactions relating to these entities have been eliminated.

Our fiscal year consists of four quarters, each with thirteen weeks.

Certain immaterial reclassifications have been made to the prior consolidated financial statements in order for them to conform to the December 31, 2019 presentation. These reclassifications had no effect on reported consolidated net income, comprehensive income, earnings per common share, cash flows, total assets, or stockholders' equity as previously reported.

### (c) Use of Estimates

The preparation of the consolidated financial statements requires management of the Company to make a number of estimates and assumptions related to the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the period. Significant items subject to such estimates and assumptions include the fair value of assets and liabilities acquired in business combinations; carrying amounts of property and equipment and intangible assets; marketable securities; valuation allowances for receivables; and liabilities related to insurance and claim costs. Actual results could differ from those estimates.

### (d) Cash and Cash Equivalents

We consider all highly liquid investments, purchased with a maturity of three months or less, to be cash equivalents.  Accounts at banks with an aggregate excess of the amount of checks issued over cash balances are included as accounts payable  in current liabilities in the consolidated balance sheets, and changes in such accounts are reported as cash flows from  operating activities in the consolidated statements of cash flows.

### (e) Marketable Securities

Marketable equity securities are measured at fair value, with changes in fair value recognized in net income. At December 31, 2019 and 2018, the Company's marketable securities, all of which are available-for-sale, consist of common and preferred stocks with readily determinable fair values. The cost of securities sold is based on the specific identification method,  and interest and dividends are included in non-operating income (expense). See Note 5 "Marketable Securities" for further information on our portfolio.

### (f) Accounts Receivable

Accounts receivable are recorded at the net invoiced amount, net of an allowance for doubtful accounts, and do not bear interest. They include unbilled amounts for services rendered in the respective period but not yet billed to the customer until a future date, which typically occurs within one month. In order to reflect customer receivables at their estimated net  realizable value, we record charges against revenue based upon current information. These charges generally arise from rate  changes, errors, and revenue adjustments that may arise from contract disputes or differences in calculation methods employed by the customer. The allowance for doubtful accounts is our best estimate of the amount of probable credit losses in our existing accounts receivable. We determine the allowance based on historical write-off experience and the aging of our outstanding accounts receivable. Balances are considered past due based on invoiced terms. Account balances are charged off  against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. We do not have any off-balance-sheet credit exposure related to our customers. Accounts receivable from affiliates are shown separately and include trade receivables from the sale of services to affiliates.

Exhibit 3(a)
2443

Exhibit 3(a)
2444

GC000066

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**(1)   Summary of Significant Accounting Policies—continued**

*( g  Inventories
)*

Included in prepaid expenses and other is inventory used in a portion of our value-added service operations. Inventories are stated at net realizable value. Cost is determined using the first-in, first-out method. Provisions for excess and obsolete inventories are based on our assessment of excess and obsolete inventory on a product-by-product basis.

At December 31, inventory consists of the following (in thousands):

|  | 2019 | 2018 |
|---|---|---|
| Finished goods | $ 5,776 | $ 4,920 |
| Raw materials and supplies | 1,387 | 1,831 |
| Total | $ 7,163 | $ 6,751 |

**(h)  Property and Equipment**

Property and equipment, including leasehold improvements, are carried at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the estimated useful lives of the assets as follows:

| Description | Life in Years |
|---|---|
| Transportation equipment | 3 - 15 |
| Other operating assets | 3 - 15 |
| Information technology equipment | 3 - 5 |
| Buildings and related assets | 10 - 39 |

The amounts recorded for depreciation expense were $59.0 million, $48.7 million, and $41.0 million for the years ended December 31, 2019, 2018 and 2017, respectively.

Tire repairs, replacement tires, replacement batteries, consumable tools used in our logistics services, and routine repairs and maintenance on vehicles are expensed as incurred. Parts and fuel inventories are included in prepaid expenses and other. We capitalize certain costs associated with vehicle repairs and maintenance that materially extend the life or increase the value of the vehicle or pool of vehicles.

45

Exhibit 3(a)
2445

GC000067

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**(1)   Summary of Significant Accounting Policies—continued**

*(i) Intangible Assets*

Intangible assets subject to amortization consist of agent and customer relationships, customer contracts, tradenames, and non-competition agreements that have been acquired in business combinations. These assets are amortized either over the period of economic benefit or on a straight-line basis over the estimated useful lives of the related intangible asset. The estimated useful lives of these intangible assets range from three to nineteen years. The useful lives of acquired trademarks are indefinite and, therefore, not subject to amortization.

Our identifiable intangible assets as of December 31, 2019 and 2018 are as follows (in thousands):

| | 2019 | | | 2018 | | |
|---|---|---|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Definite Lived Intangibles: | | | | | | |
| Agent and customer relationships | $ 164,657 | $ 55,880 | $ 108,777 | $ 150,189 | $ 41,947 | $ 108,242 |
| Customer contracts | 20,600 | 20,600 | — | 20,600 | 20,600 | — |
| Tradenames | 4,000 | 1,333 | 2,667 | 2,000 | — | 2,000 |
| Non-compete agreements | 2,720 | 553 | 2,167 | 1,110 | 77 | 1,033 |
| Indefinite Lived Intangibles: | | | | | | |
| Trademarks | 2,500 | — | 2,500 | 2,500 | — | 2,500 |
| Total Identifiable Intangible Assets | $ 194,477 | $ 78,366 | $ 116,111 | $ 176,399 | $ 62,624 | $ 113,775 |

Estimated amortization expense by year is as follows (in thousands):

| | |
|---|---|
| 2020 | $ 16,137 |
| 2021 | 14,604 |
| 2022 | 12,190 |
| 2023 | 11,313 |
| 2024 | 10,285 |
| Thereafter | 49,082 |
| Total | $ 113,611 |

The amounts recorded for amortization expense were $15.7 million, $5.7 million, and $6.0 million for the years ended December 31, 2019, 2018 and 2017, respectively.

46

Exhibit 3(a)
2446

GC000068

Exhibit 3(a)
2447

GC000069

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

**UNIVERSAL LOGISTICS HOLDINGS, INC.**

Notes to Consolidated Financial Statements – (Continued)

December 31, 2019, 2018 and 2017

**(1)     Summary of Significant Accounting Policies—continued**

### (j) Goodwill

Goodwill represents the excess purchase price over the fair value of assets acquired in connection with the Company's acquisitions. Under Financial Accounting Standards Board ("FASB") Accounting Standards Codification, or ASC, Topic 350 "*Intangibles – Goodwill and Other*", we are required to test goodwill for impairment annually (in our third fiscal quarter) or more frequently, whenever events occur or circumstances change that would more likely than not reduce the fair value of a reporting unit with goodwill below its carrying amount. We have the option to first assess qualitative factors such as current performance and overall economic conditions to determine whether or not it is necessary to perform a quantitative goodwill impairment test. If we choose that option, then we would not be required to perform a quantitative goodwill impairment test unless we determine that, based on a qualitative assessment, it is more likely than not that the fair value of a reporting unit is less than its carrying value. If we determine that it is more likely than not, or if we choose not to perform a qualitative assessment, we then proceed with the quantitative assessment. Under the quantitative test, if the fair value of a reporting unit exceeds its carrying amount, then goodwill of the reporting unit is considered to not be impaired. If the carrying amount of the reporting unit exceeds its fair value, then an impairment loss is recognized in an amount equal to the excess, up to the value of the goodwill. During the third quarter of 2019, we completed our goodwill impairment testing by performing a quantitative assessment. Based on the results of this test, no impairment loss was recognized.

The changes in the carrying amount of goodwill for the years ended December 31, 2019 and 2018 are as follows (in thousands):

| | | |
|---|---:|---:|
| Balance as of January 1, 2018 | $ | 74,484 |
| Business acquisitions | | 70,668 |
| Balance as of December 31, 2018 | | 145,152 |
| Business acquisitions | | 16,520 |
| Purchase accounting adjustments | | 6,779 |
| Balance as of December 31, 2019 | $ | 168,451 |

During 2019, the Company made purchase accounting adjustments to the preliminary purchase price allocations of the Company's December 7, 2018 acquisition of Deco Logistics, Inc., d/b/a Container Connection, and Oaktree Logistics, Inc., October 12, 2018 acquisition of Specialized Rail Service, Inc. and August 10, 2018 acquisition of Southern Counties Express, Inc. The adjustments resulted in an increase in goodwill of $6.8 million, $1.3 million in current liabilities, and $1.2 million in deferred tax liabilities, with offsetting decreases in intangible assets of $3.6 million, $3.4 million in property and equipment, $1.2 million in other assets and $0.1 million in current assets. The Company also paid an additional $1.0 million in cash.

At December 31, 2019 and 2018, $112.2 million and $88.9 million of goodwill was recorded in our transportation segment, respectively. At both December 31, 2019 and 2018, $56.3 million of goodwill was recorded in our logistics segment.

### (k) Long-Lived Assets

Long-lived assets, other than goodwill and indefinite lived intangibles such as property and equipment and purchased intangible assets subject to amortization are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset or group may not be recoverable. If circumstances require a long-lived asset to be tested for possible impairment, we first compare the undiscounted cash flows expected to be generated by a long-lived asset or group to its carrying value. If the carrying value of the long-lived asset or group is deemed to not be recoverable on an undiscounted cash flow basis, an impairment charge is recognized to the extent that the carrying value exceeds its fair value. Fair value is determined through various valuation techniques including discounted cash flow models, quoted market prices and independent third-party appraisals. Changes in management's judgment relating to salvage values and/ or estimated useful lives could result in greater or lesser annual depreciation expense or impairment charges in the future. Indefinite lived intangibles are tested for impairment annually by comparing the carrying value of the assets to their fair value.

### (l) Contingent Consideration

Contingent consideration arrangements granted in connection with a business combination are evaluated to determine whether contingent consideration is, in substance, additional purchase price of an acquired enterprise or compensation for services, use of property or profit sharing. Additional purchase price is added to the fair value of consideration transferred in the business combination and compensation is included in operating expenses in the period it is incurred. Contingent consideration related to additional purchase price is measured to fair value at each reporting date until the contingency is

Exhibit 3(a)
2448

GC000070

resolved. None of the acquired companies in 2018 or 2019 had contingent consideration arrangements.

47

Exhibit 3(a)
2449

GC000071

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**(1)    Summary of Significant Accounting Policies—continued**

**(m)    Fair Value of Financial Instruments**

For cash equivalents, accounts receivables, accounts payable, and accrued expenses, the carrying amounts are reasonable estimates of fair value as the assets are readily redeemable or short-term in nature and the liabilities are short-term in nature. Marketable securities, consisting of equity securities, are carried at fair market value as determined by quoted market prices. Our revolving credit and term loan agreements consist of variable rate borrowings. The carrying value of these borrowings approximates fair value because the applicable interest rates are adjusted frequently based on short-term market rates. For our equipment promissory notes, the fair values are estimated using discounted cash flow analyses, based on our current incremental borrowing rates for similar types of borrowing arrangements. See Note 10 "Fair Value Measurement and Disclosures" for further information.

**(n)    Deferred Compensation**

Deferred compensation relates to our bonus plans. Annual bonuses may be awarded to certain operating, sales and management personnel based on overall Company performance and achievement of specific employee or departmental objectives. Such bonuses are typically paid in annual installments over a five-year period. All bonus amounts earned by and due to employees in the current year are included in accrued expenses and other current liabilities. Those that are payable in subsequent years are included in other long-term liabilities.

**(o)    Closing Costs**

Our customers may discontinue or alter their business activity in a location earlier than anticipated, prompting us to exit a customer-dedicated facility. We recognize exit costs associated with operations that close or are identified for closure as an accrued liability in the Consolidated Balance Sheets. Such charges include lease termination costs, employee termination charges, asset impairment charges, and other exit-related costs associated with a plan approved by management. If we close an operating facility before its lease expires, costs to terminate a lease are recognized when an early termination provision is exercised, or we record a liability for non-cancellable lease obligations based on the fair value of remaining lease payments, reduced by any existing or prospective sublease rentals. Employee termination costs are recognized in the period that the closure is communicated to affected employees. The recognition of exit and disposal charges requires us to make certain assumptions and estimates as to the amount and timing of such charges. Subsequently, adjustments are made for changes in estimates in the period in which the change becomes known.

**(p)    Revenue Recognition**

Revenue is recognized as control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration the Company expects to receive in exchange for its services.

For our transportation services businesses, which include truckload, brokerage, intermodal and dedicated services, the adoption of the standard changed the timing of revenue recognition from "at delivery" to "over-time" as the performance obligations on the in-transit services are completed. A performance obligation is created when a customer submits a bill of lading for the transportation of goods from origin to destination. Performance obligations are satisfied as the shipments move from origin to destination, and transportation revenue is recognized based on the percentage of the service that has been completed at the end of the reporting period.

Value-added services, which are typically dedicated to individual customer requirements, include material handling, consolidation, sequencing, sub-assembly, cross-dock services, kitting, repacking, warehousing and returnable container management. For our value-added service businesses, the adoption of the standard did not change the timing of revenue recognition. We have elected to use the "right to invoice" practical expedient, reflecting that a customer obtains the benefit associated with value-added services as they are provided.

We are the primary obligor when rendering services, and assume the corresponding credit risk with customers. We have discretion in setting sales prices and, as a result, our earnings may vary. In addition, we have discretion to choose and negotiate terms with our multiple suppliers for the services ordered by our customers. This includes owner-operators with whom we contract to deliver our transportation services. As such, revenue and the related purchased transportation and commissions are recognized on a gross basis. Fuel surcharges, where separately identifiable, of $89.6 million, $85.1 million and $59.5 million for the years ended December 31, 2019, 2018 and 2017, respectively, are included in operating revenues.

See Note 3 "*Revenue Recognition,*" for more information on revenue recognition.

Exhibit 5(a)
2450

GC000072

Exhibit 3(a)
2451

GC000073

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**(1)   Summary of Significant Accounting Policies—continued**

### (q) Insurance & Claims

Insurance and claims expense represents charges for premiums and the accruals made for claims within our self-insured retention amounts. The accruals are primarily related to auto liability, general liability, cargo and equipment damage, and service failure claims. A liability is recognized for the estimated cost of all self-insured claims including an estimate of incurred but not reported claims based on historical experience and for claims expected to exceed our policy limits. We may also make accruals for personal injury and property damage to third parties, and workers' compensation claims if a claim exceeds our insurance coverage. Such accruals are based upon individual cases and estimates of ultimate losses, incurred but not reported losses, and losses arising from known claims ultimately settling in excess of insurance coverage using loss development factors based upon industry data and past experience. Since the reported accrual is an estimate, the ultimate liability may be materially different from the amount recorded.

If adjustments to previously established accruals are required, such amounts are included in operating expenses in the current period. We maintain insurance with licensed insurance carriers. Legal expenses related to auto liability claims are covered under our insurance policy. We are responsible for all other legal expenses related to claims.

In brokerage arrangements, our exposure to liability associated with accidents incurred by other third-party carriers, who haul freight on our behalf, is reduced by various factors including the extent to which the third party providers maintain their own insurance coverage.

Our insurance expense varies primarily based upon the frequency and severity of our accident experience, insurance rates, coverage limits, and self-insured retention amounts.

### (r) Stock Based Compensation

We record compensation expense for the grant of stock based awards. Compensation expense is measured at the grant date, based on the calculated fair value of the award, and recognized as an expense over the requisite service period (generally the vesting period of the grant). See Note 15 "Stock Based Compensation" for further information.

### (s) Income Taxes

Deferred income taxes are provided for temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

We are no longer subject to U.S. federal income tax examinations by tax authorities for years before 2016. In addition, we file income tax returns in various state, local and foreign jurisdictions. Historically, we have been responsible for filing separate state, local and foreign income tax returns for our self and our subsidiaries. We are no longer subject to state or foreign jurisdiction income tax examinations for years before 2015 and 2014, respectively.

We recognize the effect of income tax positions only if those positions are more likely than not of being sustained. Recognized income tax positions are measured at the largest amount that is greater than 50% likely of being realized. Changes in recognition or measurement are reflected in the period in which the change in judgment occurs. We recognize interest related to unrecognized tax benefits in income tax expense and penalties in other operating expenses.

### (t) Foreign Currency Translation

The financial statements of the Company's subsidiaries operating in Mexico, Canada and Colombia are prepared to conform to U.S. GAAP and translated into U.S. Dollars by applying a current exchange rate. The local currency has been determined to be the functional currency. Items appearing in the Consolidated Statements of Income are translated using average exchange rates during each period. Assets and liabilities of international operations are translated at period-end exchange rates. Translation gains and losses are reported in accumulated other comprehensive income (loss) as a component of shareholders' equity.

Exhibit 3(a)
2452

GC000074

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

## (1)   Summary of Significant Accounting Policies—continued

*( u*  *Segment Information*
*)*

We report our financial results in two reportable segments, the transportation segment and the logistics segment, based on the nature of the underlying customer commitment and the types of investments required to support these commitments. This presentation reflects the manner in which management evaluates our operating segments, including an evaluation of economic characteristics and applicable aggregation criteria.

Operations aggregated in our transportation segment are associated with individual freight shipments coordinated by our agents, company-managed terminals and specialized services operations. In contrast, operations aggregated in our logistics segment deliver value-added services or transportation services to specific customers on a dedicated basis, generally pursuant to contract terms of one year or longer. Other non-reportable operating segments are comprised of the Company's subsidiaries that provide support services to other subsidiaries and to owner-operators, including shop maintenance and equipment leasing.

*(v)*  *Concentrations of Credit Risk*

Financial instruments, which potentially subject us to concentrations of credit risk, consist principally of cash and cash equivalents, marketable securities and accounts receivable. We maintain our cash and cash equivalents and marketable securities with high quality financial institutions. We perform ongoing credit evaluations of our customers and generally do not require collateral. Our customers are generally concentrated in the automotive, retail and consumer goods, wind energy, building materials, machinery and metals industries. During the fiscal years ended December 31, 2019, 2018 and 2017, aggregate sales in the automotive industry totaled 27%, 36% and 40% of revenue, respectively. In 2019, 2018 and 2017, General Motors accounted for approximately 12%, 13% and 16% of our total operating revenues, respectively. In 2019, sales to our top 10 customers, including General Motors, totaled 39%.

## (2 )   Recent Accounting Pronouncements

On January 1, 2019, the Company adopted Accounting Standards Update ("ASU") 2016-02, *Leases* . The ASU requires a lessee to recognize the assets and liabilities that arise from leases, including operating leases. Under the new requirements, a lessee will recognize in the statement of financial position a liability to make lease payments (the lease liability) and the right-of-use asset representing the right to the underlying asset for the lease term. For leases with a term of 12 months or less, the lessee is permitted to make an accounting policy election by class of underlying asset not to recognize lease assets and lease liabilities. In July 2018, the FASB issued additional authoritative guidance providing companies with the option to apply this ASU to new and existing leases within the scope of the guidance as of the beginning of the period of adoption. We elected this transition method of applying the new lease standard on January 1, 2019. In doing so, we also elected the package of practical expedients provided under the guidance; however, we did not elect the hindsight practical expedient when determining the lease term for existing leases. The practical expedient package applies to leases that commenced prior to adoption of the new standard and permits companies not to reassess whether existing or expired contracts are or contain a lease, the lease classification, and any initial direct costs. Upon adoption of the standard, we recorded offsetting lease assets and lease liabilities, resulting in an $88.8 million increase in total assets, a $26.0 million increase in total current liabilities and a $62.8 million increase in total long-term liabilities in our consolidated balance sheet. Subsequent to the adoption on January 1, 2019, the Company identified and recorded an additional ROU asset and corresponding lease liability of $5.0 million in the quarter ended June 30, 2019 and $2.5 million in the quarter ended December 31, 2019, respectively, as an out of period adjustment, although each lease was entered into prior to December 31, 2018. The amount of accrued rent as of adoption was not material. Prior  period amounts were not adjusted and are reported under the accounting standards in effect for those periods. The adoption of the standard did not have a material impact on our results of operations or cash flows. See Note 13"Leases" for additional information pertaining to leases.

On January 1, 2019, the Company adopted ASU 2018-02, *Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income* , which amends existing guidance for reporting comprehensive income to reflect changes resulting from the Tax Cuts and Jobs Act of 2017. The amendment provides the option to reclassify stranded tax effects within accumulated other comprehensive income (AOCI) to retained earnings in each period in which the effect of the change in the U.S. federal corporate income tax rate in the Act is recorded. The adoption of this standard did not have a material impact on our financial condition, results of operations, or cash flows .

Exhibit 3(a)
2453

GC000075

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**( 2 )  Recent Accounting Prono uncements - continued**

In June 2016, the FASB issued ASU 2016-13, ("ASU 2016-13"), *Accounting for Credit Losses* (Topic 326). ASU 2016-13 requires the use of an "expected loss" model on certain types of financial instruments. The standard also amends the impairment model for available-for-sale debt securities and requires estimated credit losses to be recorded as allowances instead of reductions to amortized cost of the securities. The new standard will become effective for us beginning with the first quarter 2023, and is not expected to have a material impact on our consolidated financial statements.

In December 2019, the FASB issued ASU 2019-12, Income Taxes (Topic 740): "Simplifying the Accounting for Income Taxes." The ASU simplifies the accounting for income taxes by removing certain exceptions to the general principles in Topic 740. The ASU also clarifies and amends existing guidance to improve consistent application among reporting entities. This ASU is effective for fiscal years beginning after December 15, 2020, including interim periods within that reporting period; however, early adoption is permitted. We are currently evaluating the impact of this standard on our consolidated financial statements.

**( 3 )  Revenue Recognition**

On January 1, 2018, the Company adopted Accounting Standards Update (" ASU") 2014-09, *Revenue from Contracts with Customers* , using the modified retrospective transition method with a cumulative adjustment to retained earnings of approximately $0.2 million . Our t ransportation services businesses include truckload, brokerage, intermodal and dedicated services. T he adoption of ASU 2014-09 changed the timing of revenue recognition for transportation services from at delivery to over-time as the performance obligations on the in-transit services are completed. The following table shows the amount by which financial statement lines were affected by the adoption of the new standard.

| | Year Ended December 31, 2018 | | |
|---|---|---|---|
| Consolidated Statement of Income | Under ASC 605 | Adjustment | As Reported |
| Truckload services revenue | $  309,884 | $   3,927 | $  313,811 |
| Brokerage services revenue | 364,644 | 2,935 | 367,579 |
| Intermodal services revenue | 250,165 | 909 | 251,074 |
| Dedicated services revenue | 143,977 | 371 | 144,348 |
| Purchased transportation and equipment rent expense | 709,628 | 6,391 | 716,019 |
| Commission expense | 37,181 | 200 | 37,381 |
| Income tax expense | 16,826 | 385 | 17,211 |
| Net income | 51,012 | 1,166 | 52,178 |
| | As of December 31, 2018 | | |
| Consolidated Balance Sheet | Under ASC 605 | Adjustment | As Reported |
| Prepaid expenses and other | $   17,929 | $   1,901 | $   19,830 |
| Accounts payable | 90,596 | 1,423 | 92,019 |
| Income taxes payable | 2,293 | 385 | 2,678 |
| Retained earnings | 230,359 | 1,166 | 231,525 |

The Company broadly groups its services into the following categories: truckload services, brokerage services, intermodal services, dedicated services and value-added services. We disaggregate these categories and report our service lines separately on the Consolidated Statements of Income.

Truckload services include dry van, flatbed, heavy-haul and refrigerated operations. We transport a wide variety of general commodities, including automotive parts, machinery, building materials, paper, food, consumer goods, furniture, steel and other metals on behalf of customers in various industries.

To complement our available capacity, we provide customers freight brokerage services by utilizing third-party transportation providers to move freight. Brokerage services also include full service domestic and international freight forwarding, and customs brokerage.

Intermodal services include rail-truck, steamship-truck and support services. Our intermodal support services are primarily short-to-medium distance delivery of both international and domestic containers between the port or railhead and the customer and drayage services.

Exhibit 3(a)
2454

GC000076

Exhibit 3(a)
2455

GC000077

Exhibits
UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172
### UNIVERSAL LOGISTICS HOLDINGS, INC.
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

### ( 3)   Revenue Recognition —continued

Dedicated services are primarily provided in support of automotive and retail customers using van equipment. Dedicated services also include our final mile and ground expedited services. Our dedicated services are primarily short run or round-trip moves within a defined geographic area.

Transportation services are short-term in nature; agreements governing their provision generally have a term of less than one year. They do not contain significant financing components. In accordance with ASU 2014-09, the Company recognizes revenue over the period transportation services are provided to the customer, including service performed as of the end of the reporting period for loads currently in-transit, in order to recognize the value that is transferred to a customer over the course of the transportation service.

We determine revenue in-transit using the input method, under which revenue is recognized based on the duration of time that has lapsed from the departure date (start of transportation services) to the arrival date (completion of transportation services). Measurement of revenue in-transit requires the application of significant judgment. We calculate the estimated percentage of an order's transit time that is complete at period end, and we apply that percentage of completion to the order's estimated revenue.

Value-added services, which are typically dedicated to individual customer requirements, include material handling, consolidation, sequencing, sub-assembly, cross-dock services, kitting, repacking, warehousing and returnable container management. Value-added revenues are substantially driven by the level of demand for outsourced logistics services. Major factors that affect value-added service revenue includes changes in manufacturing supply chain requirements and production levels in specific industries, particularly the North American automotive and Class-8 heavy-truck industries.

Revenue is recognized as control of the promised goods or services is transferred to our customers, in an amount that reflects the consideration the Company expects to receive in exchange for its services.

For the Company's value-added service businesses, the adoption of ASU 2014-09 did not change the timing of revenue recognition. The contracts in our value-added services businesses are negotiated agreements, which contain both fixed and variable components. The variability of revenues is driven by volumes and transactions, which are known as of an invoice date. Value-added service contracts typically have terms that extend beyond one year, and they do not include financing components. The timing of revenue recognition for value-added services will remain the same, as we have elected to use the "right to invoice" practical expedient, reflecting that a customer obtains the benefit associated with value-added services as they are provided.

The following table provides information related to contract balances associated with our contracts with customers (in thousands):

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Prepaid expenses and other - contract assets | $      1,156 | $      1,901 |

We generally receive payment for performance obligations within 45 days of completion of transportation services and 65 days for completion of value-added services. Contract assets in the table above generally relate to revenue in-transit at the end of the reporting period.

### *Practical expedients*

The Company elected to use the following practical expedients that are available under ASC 606: (i) to apply the new revenue standard to a portfolio of contracts (or performance obligations) with similar characteristics, as we reasonably expect that the effects on the financial statements of applying this guidance to the portfolio would not differ materially from applying this guidance to the individual contracts; (ii) to recognize commission expense when incurred, which we consider to be a cost to obtain a contract, because the amortization period is less than one year; and (iii) to recognize revenue in the value-added services portfolio in the amount of consideration to which we have a right to invoice, that corresponds directly with the value to the customer of the service completed to date.

The Company does not disclose the value of unsatisfied performance obligations for (i) contracts with an original expected length of one year or less and (ii) contracts for which we recognize revenue at the amount to which we have the right to invoice for services performed.
See also Note 19 for additional information on revenue reported by segment and by geographic region.

Exhibit 3(a)
2457

GC000079

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

( 4)   Acquisitions

2019 Acquisitions

On November 5, 2019, the Company acquired Roadrunner Intermodal Services, LLC, Morgan Southern, Inc., Wando Trucking, LLC, and Central Cal Transportation, LLC (collectively, "Roadrunner Intermodal") from Roadrunner Transportation Systems, Inc. Roadrunner Intermodal is a nationwide drayage provider, servicing major port and rail locations throughout the United States. The total cash purchase price was $54.9 million, subject to post-closing adjustments. The Company used available cash and borrowings on its revolving credit facility to finance the acquisition, and is in the process of finalizing the purchase accounting for this transaction. Approximately $0.3 million of transaction related costs were incurred in the acquisition.

On April 22, 2019, the Company acquired Michael's Cartage, Inc. ("Michael's"). Headquartered in Bridgeview, Illinois, Michael's provides intermodal drayage services to customers primarily within a 300-mile radius of the Chicagoland area. The total cash purchase price was $22.0 million, subject to post-closing adjustments. The Company used available cash and borrowings on its revolving credit facility to finance the acquisition, and is in the process of finalizing the purchase accounting for this transaction. Approximately $0.4 million of transaction related costs were incurred in the acquisition.

The Company accounted for the acquisitions in accordance with ASC 805, " *Business Combinations* ." Assets acquired and liabilities assumed were recorded at their estimated fair value at acquisition, with the remaining unallocated purchase price recorded as goodwill. The goodwill recorded is included in our transportation segment, and is non-deductible for income tax purposes. For each acquisition, the purchase price was allocated to major classes of assets acquired and liabilities assumed at estimated fair values as of the acquisition date. These values are based, in part, upon preliminary appraisals for certain assets and subject to change when additional information concerning final asset and liability values is obtained. The final purchase price allocations may result in adjustments to certain assets and liabilities, including the residual amount allocated to goodwill. The preliminary allocation of the purchase price in each transaction is as follows (in thousands):

|  | Michael's | | Roadrunner Intermodal | |
|---|---|---|---|---|
| Current assets | $ | 4,474 | $ | 16,002 |
| Property and equipment | | 2,831 | | 26,414 |
| Goodwill | | 4,795 | | 11,725 |
| Intangible assets | | 9,000 | | 12,668 |
| Other assets | | 1,499 | | 3,599 |
| Current liabilities | | (979) | | (11,315) |
| Long-term liabilities | | - | | (2,439) |
| Deferred tax liabilities, net | | - | | (3,280) |
| | $ | 21,620 | $ | 53,374 |

The intangible assets represent the acquired company's customer relationships and non-competition agreements. The acquired customer relationships are being amortized over a period of 11 years and the non-competition agreements are being amortized over a period of five years. The Company used the discounted cash flow method to estimate the fair value of these acquired intangible assets.

2018 Acquisitions

On December 7, 2018, the Company acquired all of the outstanding shares of Deco Logistics, Inc., d/b/a Container Connection, and Oaktree Logistics, Inc. (collectively, "Container Connection"). Based in Riverside, California, Container Connection offers harbor drayage services to the Ports of Los Angeles and Long Beach for customers primarily located within the Inland Empire and Central Valley areas. Container Connection also offers warehousing, secured parking and yard space. The total purchase price was $61.5 million. To finance the acquisition, the Company used loan proceeds under its credit and security agreement. Approximately $0.4 million of transaction related costs were incurred in the acquisition, which are reflected in general and administrative expenses in the Consolidated Statements of Income.

On October 12, 2018, the Company acquired all of the outstanding shares of Specialized Rail Service, Inc. ("Specialized Rail"). Specialized Rail offers local and regional intermodal drayage services, as well as transloading, cross-docking, warehousing and distribution, and intermodal facility management. Specialized Rail operates a fleet of over 140 tractors and has facilities in Clearfield, Utah and Las Vegas, Nevada. The total cash purchase price was $12.7 million. To finance the acquisition, the Company used loan proceeds under an amended revolving credit facility. Approximately $0.3 million of transaction related costs were incurred in the acquisition, which are reflected in general and administrative expenses in the Consolidated Statements of Income.

53

Exhibit 3(a)
2458
GC000080

Exhibit 3(a)
2459

GC000081

UNIVERSAL LOGISTICS HOLDINGS, INC.
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

## (4)   Acquisitions—continued

On August 10, 2018, the Company acquired all of the outstanding shares of Southern Counties Express, Inc. and certain of its affiliates (collectively, "Southern Counties"). Southern Counties provides full-service harbor drayage, transloading, warehousing, and project cargo services in southern California. The total purchase price was $65.4 million. To finance the acquisition, the Company used loan proceeds under an amended and restated revolving credit and term loan agreement. Approximately $0.6 million of transaction related costs were incurred in the acquisition, which are reflected in general and administrative expenses in the Consolidated Statements of Income.

On February 1, 2018, the Company acquired all of the outstanding shares of Fore Transportation, Inc. and certain of its affiliates (collectively, "Fore"). Fore provides its customers with intermodal solutions, including local and regional drayage services. One of the acquired companies owns and leases real property and improvements, including a 28-acre terminal that serves as Fore's corporate headquarters and a container storage facility. The total cash purchase price was $35.1 million. To fund the acquisition, the Company used a combination of cash and loan proceeds under its margin credit facility, revolving credit facility and secured real estate financing. Approximately $0.2 million of transaction related costs were incurred in the acquisition, which are reflected in general and administrative expenses in the Consolidated Statements of Income.

We believe that each acquisition strategically enhances our service offerings in specific geographic regions, and we expect each of them to further diversify our customer base.

The Company accounted for the acquisitions in accordance with ASC 805, " *Business Combinations* ." Assets acquired and liabilities assumed were recorded at their estimated fair value at acquisition, with the remaining unallocated purchase price recorded as goodwill. The goodwill recorded is included in our transportation segment, and is non-deductible for income tax purposes. For each acquisition, the purchase price was allocated to major classes of assets acquired and liabilities assumed at estimated fair values as of the acquisition date. These values are based, in part, upon preliminary appraisals for certain assets and subject to change when additional information concerning final asset and liability values is obtained. The final purchase price allocations may result in adjustments to certain assets and liabilities, including the residual amount allocated to goodwill. The allocation of the purchase price in each transaction is as follows (in thousands):

| | Container Connection | Specialized Rail | Southern Counties | Fore |
|---|---|---|---|---|
| Current assets | $ 6,458 | $ 4,054 | $ 5,359 | $ 6,077 |
| Property and equipment | 50 | 2,710 | 4,598 | 10,864 |
| Goodwill | 31,699 | 4,130 | 31,204 | 10,414 |
| Intangible assets | 31,510 | 5,342 | 35,690 | 12,108 |
| Other assets | - | 109 | 262 | - |
| Current liabilities | (1,102) | (1,992) | (3,027) | (1,234) |
| Deferred tax liabilities, net | (7,086) | (1,676) | (8,690) | (3,123) |
| | $ 61,529 | $ 12,677 | $ 65,396 | $ 35,106 |

The intangible assets represent the acquired companies' customer relationships, trade names, and non-competition agreements. The acquired customer relationships are being amortized over a period of seven years to 12 years, tradenames are being amortized over a period of three years, and the non-competition agreements are being amortized over a period of five years. The Company used the discounted cash flow method to estimate the fair value of these acquired intangible assets, and comparable land sales and replacement cost methodology to value land and buildings, respectively.

54

Exhibit 3(a)
2460

GC000082

Exhibit 3(a)
2461

GC000083

Exhibits
UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172
**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**(4)   Acquisitions—continued**

The following unaudited pro forma results of operations present consolidated information of the Company as if the 2018 and 2019 Acquisitions were acquired on January 1, 2018 (in thousands, except per share data):

| | Pro Forma Twelve Month Ended | |
| --- | --- | --- |
| | December 31, 2019 | December 31, 2018 |
| Operating revenues | $ 1,624,219 | $ 1,731,702 |
| Income from operations | $ 65,013 | $ 103,085 |
| Net income | $ 36,036 | $ 60,697 |
| Earnings per common share: | | |
| Basic | $ 1.28 | $ 2.14 |
| Diluted | $ 1.28 | $ 2.14 |

The unaudited pro forma consolidated results are presented for illustrative purposes and do not purport to represent what the results of operations would actually have been had we acquired the 2018 and 2019 acquisitions on January 1, 2018. Further, the financial information does not purport to project the future operating results of the Company on a consolidated basis.

For the year ended December 31, 2019, actual revenue and operating income of the 2019 acquired companies was $32.1 million and $0.1 million, respectively. For the year ended December 31, 2018, actual revenue and operating income of the 2018 acquired companies was $70.9 million and $5.1 million, respectively.

**(5)   Marketable Securities**

Marketable equity securities are carried at fair value, with gains and losses in fair market value included in the determination of net income. The fair value of marketable equity securities is determined based on quoted market prices in active markets, as described in Note 10.

The following table sets forth market value, cost, and unrealized gains (losses) on equity securities at December 31 ( in thousands ):

| | 2019 | 2018 |
| --- | --- | --- |
| Fair value | $ 9,369 | $ 9,333 |
| Cost | 8,136 | 11,143 |
| Unrealized gains (losses) | $ 1,233 | $ (1,810) |

The following table sets forth the gross unrealized gains and losses on the Company's marketable securities at December 31 ( in thousands ):

| | 2019 | 2018 |
| --- | --- | --- |
| Gross unrealized gains | $ 1,337 | $ 89 |
| Gross unrealized losses | (104) | (1,899) |
| Net unrealized gains (losses) | $ 1,233 | $ (1,810) |

The following table shows the Company's net realized gains on marketable equity securities (in thousands):

| | 2019 | 2018 | 2016 |
| --- | --- | --- | --- |
| Realized gain | | | |
| Sale proceeds | $ 1,596 | $ 5,733 | $ 1,261 |
| Cost of securities sold | 1,289 | 5,229 | 338 |
| Realized gain | $ 307 | $ 504 | $ 923 |
| Realized gain, net of taxes | $ 230 | $ 379 | $ 1,516 |

During the years ended December 31, 2019 and 2018 , our marketable equity securities portfolio experienced a net unrealized pre-tax gain (loss) in market value of approximately $1,233,000 and $(1,810,000), respectively, which were reported in other non-operating income (expense) for the period.

55

Exhibit 3(a)
2462

GC000084

Exhibit 3(a)
2463

GC000085

Exhibits
UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172
**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**( 6 )  Accounts Receivable**

Accounts receivable amounts appearing in the consolidated financial statements include both billed and unbilled receivables. We bill customers in accordance with contract terms, which may result in a brief timing difference between when revenue is recognized and when invoices are rendered. Unbilled receivables, which usually are billed within one month, totaled $29.1 million and $28.8 million at December 31, 2019 and 2018, respectively.

Accounts receivable are presented net of an allowance for doubtful accounts. Following is a summary of the activity in the allowance for doubtful accounts for the years ended December 31 (in thousands):

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Balance at beginning of year | $ 1,772 | $ 1,330 | $ 1,613 |
| Provision for doubtful accounts | 3,133 | 924 | 1,533 |
| Acquisition of businesses | 350 | 253 | - |
| Uncollectible accounts written off | (2,710) | (735) | (1,816) |
| Balance at end of year | $ 2,545 | $ 1,772 | $ 1,330 |

**( 7 )  Property and Equipment**

Property and equipment at December 31 consists of the following (in thousands):

|  | 2019 | 2018 |
|---|---|---|
| Transportation equipment | $ 333,899 | $ 267,094 |
| Land, buildings and related assets | 129,819 | 128,805 |
| Other operating assets | 116,191 | 104,559 |
| Information technology equipment | 29,880 | 26,135 |
| Construction in process | 96 | 7,960 |
| Total property and equipment | 609,885 | 534,553 |
| Less accumulated depreciation | (270,062) | (231,319) |
| Total property and equipment, net | $ 339,823 | $ 303,234 |

**( 8 )  Accrued Expenses and Other Current Liabilities**

Accrued expenses consist of the following items at December 31 (in thousands):

|  | 2019 | 2018 |
|---|---|---|
| Payroll related items | $ 14,390 | $ 11,476 |
| Driver escrow liabilities | 5,249 | 3,923 |
| Legal settlements | 6,948 | — |
| Commissions, taxes and other | 8,238 | 9,727 |
| Total | $ 34,825 | $ 25,126 |

56

Exhibit 3(a)
2464

GC000086

Exhibit 3(a)
2465

GC000087

Exhibits
UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172
**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**( 9 )  Debt**

Debt is comprised of the following (in thousands):

| | Interest Rates at December 31, 2019 | December 31, 2019 | December 31, 2018 |
|---|---|---|---|
| Outstanding Debt: | | | |
| Credit and Security Agreement (1) | | | |
| Term Loan | 3.26% | $  142,500 | $  150,000 |
| Revolver | 3.26% | 151,225 | 80,588 |
| Equipment Financing (2) | 3.09% to 5.13% | 128,512 | 126,162 |
| Real Estate Financing (3) | 4.01% | 37,492 | 45,864 |
| Margin Facility (4) | 2.86% | — | 541 |
| Unamortized debt issuance costs | | (2,117) | (2,703) |
| | | 457,612 | 400,452 |
| Less current portion of long-term debt | | 59,476 | 51,903 |
| Total long-term debt, net of current portion | | $  398,136 | $  348,549 |

(1) The Credit and Security Agreement (the "Credit Agreement") provides for maximum borrowings of $350 million in the form of a $150 million term loan and a $200 million revolver. Term loan proceeds were advanced on November 27, 2018 and mature on November 26, 2023. The term loan will be repaid in consecutive quarterly installments, as defined in the Credit Agreement, commencing March 31, 2019, with the remaining balance due at maturity. Borrowings under the revolving credit facility may be made until and mature on November 26, 2023. At closing, proceeds from the Credit Agreement were used to pay off certain existing indebtedness and to pay fees and expenses associated with the Credit Agreement. Borrowings under the Credit Agreement bear interest at LIBOR or a base rate, plus an applicable margin for each based the Company's leverage ratio. The Credit Agreement is secured by a first priority pledge of the capital stock of applicable subsidiaries, as well as first priority perfected security interest in cash, deposits, accounts receivable, and selected other assets of the applicable borrowers. The Credit Agreement includes customary affirmative and negative covenants and events of default, as well as financial covenants requiring minimum fixed charge coverage and leverage ratios, and customary mandatory prepayments provisions. At December 31, 2019, we were in compliance with all covenants under the facility, and $48.8 million was available for borrowing on the revolver.

(2) The Equipment Financing consists of a series of promissory notes issued by a wholly-owned subsidiary in order to finance transportation equipment. The equipment notes, which are secured by liens on selected titled vehicles, include certain affirmative and negative covenants and are generally payable in 60 monthly installments and bear interest at fixed rates ranging from 3.09% to 5.13%. At December 31, 2019, we were in compliance with all covenants.

57

Exhibit 3(a)
2466

GC000088

UNIVERSAL LOGISTICS HOLDINGS, INC.
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**( 9 )  Debt—continued**

(3) The Real Estate Financing consists of a series of promissory notes issued by a wholly-owned subsidiary in order to finance certain real property. The promissory notes, which are secured by first mortgages and assignment of leases on specific parcels of real estate and improvements, include certain affirmative and negative covenants and are generally payable in 120 monthly installments. Each of the notes bears interest at LIBOR plus 2.25%. At December 31, 2019, we were in compliance with all covenants.

(4) The Margin Facility is a short-term line of credit secured by our portfolio of marketable securities. It bears interest at LIBOR plus 1.10%. The amount available under the line of credit is based on a percentage of the market value of the underlying securities. At December 31, 2019 and 2018, the maximum available borrowings under the line of credit were $4.8 million and $5.0 million, respectively.

The following table reflects the maturities of our principal repayment obligations as of December 31, 2019 (in thousands):

| Years Ending<br>December 31 | Term | Revolver | Equipment<br>Financing | Real Estate<br>Financing | Margin Facility | Total |
|---|---|---|---|---|---|---|
| 2020 | 11,250 | $ — | $ 43,301 | $ 5,511 | $ — | $ 60,062 |
| 2021 | 11,250 | — | 32,824 | 5,511 | — | 49,585 |
| 2022 | 15,000 | — | 26,603 | 5,511 | — | 47,114 |
| 2023 | 105,000 | 151,225 | 18,158 | 5,511 | — | 279,894 |
| 2024 | — | — | 7,598 | 5,512 | — | 13,110 |
| Thereafter | — | — | 28 | 9,936 | — | 9,964 |
| Total | $ 142,500 | $ 151,225 | $ 128,512 | $ 37,492 | $ — | $ 459,729 |

The Company is also party to two interest rate swap agreements that qualify for hedge accounting. The swap agreements were executed to fix a portion of the interest rates on its variable rate debt that have a combined notional amount of $15.5 million at December 31, 2019. Under the swap agreements, the Company receives interest at the one-month LIBOR rate plus 2.25%, and pays a fixed rate. The March 2016 swap (swap A) became effective October 2016, has a rate of 4.16% (amortizing notional amount of $10.0 million) and expires July 2026, and an additional March 2016 swap (swap B) became effective October 2016, has a rate of 3.83% (amortizing notional amount of $5.5 million) and expires May 2022. At December 31, 2019 and 2018, the fair value of the two swap agreements was a liability of $0.1 million and an asset of $0.4 million, respectively. Since these swap agreements qualify for hedge accounting, the changes in fair value are recorded in other comprehensive income (loss), net of tax. See Note 10, "Fair Value Measurement and Disclosures" for additional information pertaining to interest rate swaps.

**( 10 ) Fair Value Measurement and Disclosures**

ASC Topic 820, "*Fair Value Measurements and Disclosures,*" defines fair value as the exchange price that would be received for an asset or paid to transfer a liability in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants at the measurement date and expanded disclosures with respect to fair value measurements.

ASC Topic 820 also establishes a three-level fair value hierarchy that prioritizes the inputs used to measure fair value. This hierarchy requires entities to maximize the use of observable inputs and minimize the use of unobservable inputs. The three levels of inputs used to measure fair value are as follows:

- Level 1 — Quoted prices in active markets for identical assets or liabilities.

- Level 2 — Observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets; quoted prices for identical or similar assets and liabilities in markets that are not active; or other inputs that are observable or can be corroborated by observable market data.

- Level 3 — Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities. This includes certain pricing models, discounted cash flow methodologies and similar techniques that use significant unobservable inputs.

58

Exhibit 3(a)
2467

GC000089

Exhibit 3(a)
2468

GC000090

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**( 10 ) Fair Value Measure ment and Disclosures—continued**

We have segregated all financial assets that are measured at fair value on a recurring basis into the most appropriate level within the fair value hierarchy based on the inputs used to determine the fair value at the measurement date in the tables below (in thousands):

| | December 31, 2019 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Fair Value Measurement |
| **Assets** | | | | |
| Cash equivalents | $ 18 | $ — | $ — | $ 18 |
| Marketable securities | 9,369 | — | — | 9,369 |
| Total Assets | $ 9,387 | $ — | $ — | $ 9,387 |
| **Liabilities** | | | | |
| Interest rate swaps | $ — | $ 137 | $ — | $ 137 |
| Total Liabilities | $ — | $ 137 | $ — | $ 137 |

| | December 31, 2018 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Fair Value Measurement |
| **Assets** | | | | |
| Marketable securities | $ 9,333 | $ — | $ — | $ 9,333 |
| Interest rate swaps | — | 392 | — | 392 |
| Total Assets | $ 9,333 | $ 392 | $ — | $ 9,725 |

The valuation techniques used to measure fair value for the items in the tables above are as follows:

- Cash equivalents – This category consists of money market funds which are listed as Level 1 assets and measured at fair value based on quoted prices for identical instruments in active markets.

- Marketable securities – Marketable securities represent equity securities, which consist of common and preferred stocks, are actively traded on public exchanges and are listed as Level 1 assets. Fair value was measured based on quoted prices for these securities in active markets.

- Interest rate swaps – The fair value of our interest rate swaps is determined using a methodology of netting the discounted future fixed cash payments (or receipts) and the discounted expected variable cash receipts (or payments). The variable cash receipts (or payments) are based on the expectation of future interest rates (forward curves) derived from observed market interest rate curves. The fair value measurement also incorporates credit valuation adjustments reflecting both the Company's nonperformance risk and the respective counterparty's nonperformance risk.

Our revolving credit and term loan agreements and our real estate promissory notes all consists of variable rate borrowings. We categorize borrowings under these credit agreements as Level 2 in the fair value hierarchy. The carrying value of these borrowings approximate fair value because the applicable interest rates are adjusted frequently based on short-term market rates.

For our equipment promissory notes with fixed rates, the fair values are estimated using discounted cash flow analyses, based on our current incremental borrowing rates for similar types of borrowing arrangements. We categorize borrowings under this credit agreement as Level 2 in the fair value hierarchy. The carrying values and estimated fair values of these promissory notes at December 31, 2019 is summarized as follows:

| | 2019 | |
|---|---|---|
| | Carrying Value | Estimated Fair Value |
| Equipment promissory notes | $ 128,512 | $ 130,929 |

We have not elected the fair value option for any of our financial instruments.

59

Exhibit 3(a)
2469
GC000091

Exhibit 3(a)
2470

GC000092

Exhibits
UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172
**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

## ( 11 ) Transactions with Affiliates

CenTra, Inc. ("CenTra"), an affiliate of the Company that is owned by our controlling shareholders, provides administrative support services to Universal in the ordinary course of business, including legal, human resources, tax, and IT infrastructure and related services. The cost of these services is based on the actual or estimated utilization of the specific service.

Universal also purchases other services from CenTra and other affiliates under common control with CenTra. Following is a schedule of cost incurred and included in operating expenses for services provided by affiliates for the years ended December 31 (in thousands):

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Administrative support services | $ 4,085 | $ 3,094 | $ 2,771 |
| Truck fuel, tolls and maintenance | 895 | 2,428 | 2,652 |
| Real estate rent and related costs | 11,794 | 14,295 | 17,046 |
| Insurance and employee benefit plans | 53,050 | 57,370 | 55,995 |
| Contracted transportation services | 65 | 1,240 | 35 |
| Total | $ 69,889 | $ 78,427 | $ 78,499 |

We pay CenTra the direct variable cost of maintenance, fueling and other operational support costs for services delivered at our affiliate's trucking terminals that are geographically remote from our own facilities. Such costs are billed when incurred, paid on a routine basis, and reflect actual labor utilization, repair parts costs or quantities of fuel purchased. In connection with our transportation services, we also pay tolls and other fees for international bridge crossings to certain related entities which are under common control with CenTra.

A significant number of our operating locations are located in facilities leased from affiliates. At 28 facilities, occupancy is based on either month-to-month or contractual, multi-year lease arrangements which are billed and paid monthly. Leasing properties provided by an affiliate that owns a substantial commercial property portfolio affords us significant operating flexibility. However, we are not limited to such arrangements. See Note 13, "Leases" for further information regarding the cost of leased properties.

We purchase workers' compensation, property and casualty, cargo, warehousing and other general liability insurance from an insurance company controlled by our majority shareholders. Our employee health care benefits and 401(k) programs are also provided by this affiliate.

Other services from affiliates, including contracted transportation services, are delivered to us on a per-transaction-basis or pursuant to separate contractual arrangements provided in the ordinary course of business. At December 31, 2019 and 2018, amounts due to affiliates were $14.8 million and $17.8 million, respectively. In our Consolidated Balance Sheets, we record our insured claims liability and the related recovery from an affiliate insurance provider in insurance and claims, and other receivables. At December 31, 2019 and 2018, there were $9.9 million and $10.5 million, respectively, included in each of these accounts for insured claims.

During 2018, we made purchases of used equipment from an affiliate totaling $8,300, and purchased wheels and tires from an affiliate for new trailering equipment totaling $466,000 during the same period. There were no such purchases made during 2019 .

*Services provided by Universal to Affiliates*

We periodically assist CenTra and other affiliates under common control with CenTra by providing selected transportation and logistics services in connection with their specific customer contracts or purchase orders. Truck fueling and administrative expenses are presented net in operating expense. Following is a schedule of services provided to CenTra and affiliates for the years ended December 31 (in thousands):

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Purchased transportation and equipment rent | $ 1,636 | $ 900 | $ 1,100 |
| Total | $ 1,636 | $ 900 | $ 1,100 |

At December 31, 2019 and 2018, amounts due from affiliates were $1.7 million and $5.2 million, respectively.

Exhibit 3(a)
2471

GC000093

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**(11)  Transactions with Affiliates—continued**

During 2019, we also sold a vacant parcel of land to an affiliate for $2.5 million. The sales price was established by an independent third party appraisal. The Company's basis in the land was $2.4 million, resulting in a gain of $0.1 million.

In August 2019, our Board of Directors authorized the repurchase of up to 600,000 shares of our common stock through a "Dutch auction" tender offer. Subject to certain limitations and legal requirements, we could repurchase up to an additional 2% of our outstanding shares. Following the expiration of the tender offer, we accepted 1,101,597 shares tendered through this offer for purchase at a final purchase price of $22.50 per share, for a total purchase price of approximately $24.8 million. The tender offer expired on September 13, 2019. The total amount of shares purchased in the tender offer includes 600,000 shares tendered by a director of the Company, Mr. Manuel J. Moroun, and 10,000 shares tendered by the Company's Chief Financial Officer, Mr. Jude Beres. We used funds borrowed under our existing line of credit and from our available cash and cash equivalents to fund the purchase of the accepted shares.

**( 12 ) Income Taxes**

A summary of income (loss) related to U.S. and non-U.S. operations are as follows (in thousands):

| | | Year Ended December 31, | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Operations | | | |
| U.S. Domestic | $    50,102 | $    71,441 | $    28,360 |
| Foreign | 84 | (2,052) | (11,219) |
| Total pre-tax income | $    50,186 | $    69,389 | $    17,141 |

The provision (benefit) for income taxes attributable to income from continuing operations for the years ended December 31 consists of the following (in thousands):

| | 2019 | 2018 | 2017 |
| --- | --- | --- | --- |
| Current: | | | |
| U.S. Federal | $    2,772 | $    7,266 | $    5,394 |
| State | 2,450 | 3,556 | 2,227 |
| Foreign | 294 | 427 | 688 |
| Total current | 5,516 | 11,249 | 8,309 |
| Deferred: | | | |
| U.S. Federal | 6,392 | 5,873 | (14,264) |
| State | (440) | (855) | (1,113) |
| Foreign | 1,132 | 944 | (3,944) |
| Total deferred | 7,084 | 5,962 | (19,321) |
| Total | $    12,600 | $    17,211 | $    (11,012) |

On December 22, 2017, the Tax Cuts and Jobs Act was signed into law, significantly changing the U.S. tax code by providing for, among other things, lower corporate income tax rates and requiring companies to pay a one-time transition tax on deemed repatriated earnings of foreign subsidiaries . Effective January 1, 2018, the Tax Cuts and Jobs Act permanently reduced the U.S. corporate income tax rate from 35% to 21% . In accordance with U.S. GAAP, the reduction in the enacted rate caused the Company to revalue its ending net deferred tax assets and liabilities and caused the Company to record a provisional tax benefit of $18.2 million in its consolidated financial statements for the year ended December 31, 2017. With respect to the transition tax on deemed repatriated foreign earnings, the Company determined that, based upon information currently available, the transition tax did not have a material impact on its results of operations, financial position or cash flows.

61

Exhibit 3(a)
2472

GC000094

Exhibit 3(a)
2473

GC000095

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

## ( 12 ) Inc ome Taxes—continued

Deferred income tax assets and liabilities at December 31 consist of the following (in thousands):

|  | 2019 | 2018 |
|---|---|---|
| Domestic deferred tax assets: |  |  |
| Allowance for doubtful accounts | $ 602 | $ 425 |
| Other assets | 3,355 | 4,561 |
| Accrued expenses | 4,132 | 4,982 |
| Total domestic deferred tax assets | $ 8,089 | $ 9,968 |
| Domestic deferred tax liabilities: |  |  |
| Prepaid expenses | $ 782 | $ 696 |
| Marketable securities | 1,014 | 1,004 |
| Intangible assets | 20,578 | 25,907 |
| Property and equipment | 51,407 | 41,589 |
| Total domestic deferred tax liabilities | $ 73,781 | $ 69,196 |
| Net domestic deferred tax liabilities | $ 65,692 | $ 59,228 |
| Foreign deferred tax assets |  |  |
| Net operating losses | $ 3,543 | $ 3,499 |
| Other assets | 102 | 927 |
| Valuation allowance - foreign | (2,185) | (1,877) |
| Total foreign deferred tax asset | $ 1,460 | $ 2,549 |
| Net deferred tax liability | $ 64,232 | $ 56,679 |

In assessing whether deferred tax assets may be realized in the future, management considers whether it is more likely than not that some portion of such tax assets will not be realized. The deferred tax assets and liabilities were reviewed separately by jurisdictions when measuring the need for valuation allowances. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income (both ordinary income and taxable capital gains) during the periods in which those temporary differences reverse. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Valuation allowances are established when necessary to reduce deferred tax assets when it is more likely than not that a portion or all of the deferred tax assets will not be realized. Based upon the level of historical taxable income, reversal of existing taxable temporary differences, projections for future taxable income over the periods in which the domestic deferred tax assets are expected to reverse, and our ability to generate future capital gains, management believes it is more likely than not that we will realize the benefits of these deductible differences. Thus, no valuation allowance has been established for the domestic deferred tax assets. We had foreign net operating loss carryforward associated with our Mexican subsidiary with a tax effect of $1.4 million as of December 31, 2019. The net operating loss carryforward will expire in 2027. Although realization is not assured, the Company has concluded that it is more likely than not that the deferred tax asset will be fully realized and as such no valuation allowance has been provided. At December 31, 2019, w e also had foreign net operating loss carryforwards associated with our Canadian and German subsidiaries with a tax effect of $2.2 million. Based on the anticipated earnings projections, management has recorded a full valuation allowance for the deferred tax assets associated with these entities.

Exhibit 3(a)
2474

GC000096

UNIVERSAL LOGISTICS HOLDINGS, INC.
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**( 12 ) Income Taxes—continued**

Income tax expense attributable to income from continuing operations differs from the statutory rates as follows:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Federal statutory rate | 21% | 21% | 35% |
| Change in tax law | 0% | 0% | -106% |
| Non-deductible expense | 0% | 0% | 2% |
| State, net of federal benefit | 3% | 3% | 4% |
| Foreign | 2% | 2% | 1% |
| Other | -1% | -1% | 0% |
| Effective tax rate | 25% | 25% | -64% |

As of December 31, 2019, the total amount of unrecognized tax benefit representing uncertainty in certain tax positions was $0.3 million. These uncertain tax positions are based on recognition thresholds and measurement attributes for the financial statement recognition and measurements of a tax position taken or expected to be taken in a tax return. Any prospective adjustments to our accrual for uncertain tax positions will be recorded as an increase or decrease to the provision for income taxes and would impact our effective tax rate. At December 31, 2019, there are no positions for which it is reasonably possible that the total amounts of unrecognized tax benefits would significantly increase or decrease within 12 months. As of December 31, 2019, the amount of accrued interest and penalties was $0.1 million and $0.1 million, respectively.

The changes in our gross unrecognized tax benefits during the years ended December 31 are as follows (in thousands):

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Unrecognized tax benefit – beginning of year | $ 331 | $ 367 | $ 416 |
| Increases related to prior year tax positions | 20 | 26 | 22 |
| Increases related to current year tax positions | 29 | 30 | 9 |
| Decreases related to prior year tax positions | (101) | (92) | (80) |
| Unrecognized tax benefit – end of year | $ 279 | $ 331 | $ 367 |

**( 13 ) Leases**

We lease office space, warehouses, freight distribution centers, terminal yards and equipment under non-cancelable operating lease arrangements. Except where we deliver services within facilities provided by our customers, we lease warehouse and freight distribution centers used in our logistics operations, often in connection with a specific customer program. Where facilities are substantially dedicated to a single customer and our lease is with an independent property owner, we attempt to align lease terms with the expected duration of the underlying customer program. In most cases, we expect our facility leases will be renewed or replaced by other leases in the ordinary course of business. Where possible, we contractually secure the recovery of certain occupancy costs, including rent, during the term of a customer program.

On January 1, 2019, we adopted ASU 2016-02, Leases, which required us to recognize a right-of-use asset and a corresponding lease liability on our balance sheet for most leases classified as operating leases under previous guidance. Right-of-use assets represent our right to use an underlying asset over the lease term and lease liabilities represent the obligation to make lease payments resulting from the lease agreement. We recognize a right-of-use asset and a lease liability on the effective date of a lease agreement.

We initially record these assets and liabilities based on the present value of lease payments over the lease term using our incremental borrowing rate applicable to the leased asset or the implicit rate in the lease if it is readily determinable. Most of our leases did not provide a readily determinable implicit rate, and therefore we estimated our incremental borrowing rate based on information available at lease commencement. The incremental borrowing rate is defined as the rate of interest that we would have to pay to borrow, on a collateralized basis and over a similar term, an amount equal to the lease payments in a similar economic environment. We elected to utilize a portfolio approach and applied the rates to a portfolio of leases with similar underlying assets and terms. Upon adoption of the new lease standard, discount rates used for existing leases were established at January 1, 2019. ASU 2016-02 was adopted as of the effective date, and as such prior period amounts are reported under the accounting standards in effect for those periods (ASC 840).

Exhibit 3(a)
2475

GC000097

Exhibit 3(a)
2476

GC000098

Exhibits
UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172
**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

## ( 13 ) Leases - continued

As of December 31, 2019, our obligations under operating lease arrangements primarily related to the rental of office space, warehouses, freight distribution centers, terminal yards and equipment. Our lease obligations typically do not include options to purchase the leased property, nor do they contain residual value guarantees or material restrictive covenants. Options to extend or terminate an agreement are included in the lease term when it becomes reasonably certain the option will be exercised. As of December 31, 2019, we were not reasonably certain of exercising any renewal or termination options, and as such, no adjustments were made to the right-of-use lease assets or corresponding liabilities.

We did not separate lease and nonlease components of contracts for purposes of determining the right-of use lease asset and corresponding liability. Variable lease components that do not depend on an index or a rate, and variable nonlease components were also not contemplated in the calculation of the right-of-use asset and corresponding liability. For facility leases, variable lease costs include the costs of common area maintenance, taxes, and insurance for which we pay the lessors an estimate that is adjusted to actual expense on a quarterly or annual basis depending on the underlying contract terms. For equipment leases, variable lease costs may include additional fees associated with using equipment in excess of estimated amounts. Leases with an initial term of 12 months or less, short-term leases, are not recorded on the balance sheet. Lease expense for short-term and long-term operating leases is recognized on a straight-line basis over the lease term.

The following table summarizes our lease costs for the year ended December 31, 2019 and related information (in thousands):

| Lease cost | With Affiliates | | With Third Parties | | Total | |
|---|---|---|---|---|---|---|
| Operating lease cost | $ | 10,611 | $ | 23,464 | $ | 34,075 |
| Short-term lease cost | | 380 | | 3,592 | | 3,972 |
| Variable lease cost | | 824 | | 2,769 | | 3,593 |
| Sublease income | | - | | (2,760) | | (2,760) |
| Total lease cost | $ | 11,815 | $ | 27,065 | $ | 38,880 |

The following table summarizes other lease related information as of and for the year ended December 31, 2019 (in thousands):

| Other information | With Affiliates | | With Third Parties | | Total | |
|---|---|---|---|---|---|---|
| Cash paid for amounts included in the measurement of operating leases | $ | 11,628 | $ | 21,530 | $ | 33,158 |
| Right-of-use asset change due to acquisition of new business | $ | - | $ | 3,661 | $ | 3,661 |
| Right-of-use asset change due to lease termination | $ | (15,533) | $ | - | $ | (15,533) |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $ | 20,956 | $ | 18,847 | $ | 39,803 |
| Weighted-average remaining lease term (in years) | | 6.9 | | 4.1 | | 5.1 |
| Weighted-average discount rate | | 8.0% | | 4.7% | | 6.1% |

Future minimum lease payments under these operating leases as of December 31, 2019, are as follows (in thousands):

| | With Affiliates | | With Third Parties | | Total | |
|---|---|---|---|---|---|---|
| Year one | $ | 9,368 | $ | 22,417 | $ | 31,785 |
| Year two | | 6,919 | | 13,784 | | 20,703 |
| Year three | | 4,703 | | 8,267 | | 12,970 |
| Year four | | 3,712 | | 5,760 | | 9,472 |
| Year five | | 3,573 | | 3,932 | | 7,505 |
| Thereafter | | 16,616 | | 7,933 | | 24,549 |
| Total required lease payments | $ | 44,891 | $ | 62,093 | $ | 106,984 |
| Less amounts representing interest | | | | | | (17,826) |
| Present value of lease liabilities | | | | | $ | 89,158 |

Exhibit 3(a)
2477

GC000099

Exhibit 3(a)
2478

GC000100

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

**UNIVERSAL LOGISTICS HOLDINGS, INC.**

Notes to Consolidated Financial Statements – (Continued)

December 31, 2019, 2018 and 2017

**(13)  Leases – continued**

Under ASC 840, future minimum lease payments with initial or remaining non-cancelable lease terms in excess of one year as of December 31, 2018 were as follows:

| Years Ending December 31 | With Affiliates | | With Third Parties | | Total | |
|---|---|---|---|---|---|---|
| 2019 | $ | 9,501 | $ | 12,841 | $ | 22,342 |
| 2020 | | 6,604 | | 10,456 | | 17,060 |
| 2021 | | 5,408 | | 3,928 | | 9,336 |
| 2022 | | 3,919 | | 1,331 | | 5,250 |
| 2023 | | 3,592 | | 833 | | 4,425 |
| Thereafter | | 8,331 | | — | | 8,331 |
| Total required payments | $ | 37,355 | $ | 29,389 | $ | 66,744 |

During 2019, the Company determined that the future minimum lease payment schedule included in the 2018 Annual Report on Form 10-K excluded certain lease commitments (see Note 2 "Recent Accounting Pronouncements"). The table understated our lease payments by $7.5 million in total ($0.4 million in 2019, $3.8 million in 2020, $1.2 million in 2021, $1.3 million in  2022, and $0.8 million in 2023). The table above has been revised to reflect the corrected amounts.

Rental expense for facilities, vehicles and other equipment leased from third parties under operating leases was $22.6 million and $17.9 million for the years ended December 31, 2018 and 2017, respectively.

**(1 4 ) Retirement Plans**

We offer 401(k) defined contribution plans to our employees. The plans are administered by a company controlled by our principal shareholders and include different matching provisions depending on which subsidiary or affiliate is involved. In the plans available to certain employees not subject to collective bargaining agreements, we matched contributions up to $600 annually for each employee who is not considered highly compensated through December 31, 2008, after which some matching contributions were suspended as a response to market conditions at certain subsidiaries. Three other 401(k) plans are provided to employees of specific operations and offer matching contributions that range from zero to $2,080 per participant annually. The total expense for contributions for 401(k) plans, including plans related to collective bargaining agreements, was $0.7 million, $0.6 million and $0.5 million for the years ended December 31, 2019, 2018 and 2017, respectively.

In connection with a collective bargaining agreement that covered 11 Canadian employees at December 31, 2019, we  are required to make defined contributions into the Canada Wide Industrial Pension Plan. At December 31, 2019 and 2018, the required contributions totaled approximately $36,000 and $39,000, respectively.

**(1 5 ) Stock Based Compensation**

On April 23, 2014, our Board of Directors adopted the 2014 Amended and Restated Stock Incentive Plan, or the Plan. The Plan was approved by our shareholders at the 2014 Annual Meeting and became effective as of the date it was adopted by the Board of Directors. The Plan replaced our 2004 Stock Incentive Plan and carried forward the shares of common stock  that remained available for issuance under the 2004 Stock Incentive Plan. The grants may be made in the form of stock options, restricted stock bonuses, restricted stock purchase rights, stock appreciation rights, phantom stock units, restricted stock  units or unrestricted common stock. Restricted stock awards currently outstanding under the 2004 Stock Incentive Plan will remain outstanding in accordance with the terms of that plan.

On February 22, 2017 and February 24, 2016, the Company granted 10,000 and 10,000 shares, respectively, of restricted stock to our former Chief Executive Officer. The restricted stock grants have fair values of $13.45 per share and $15.55  per share, respectively, based on the closing price of the Company's stock on each grant date. For each award, 25% of the shares vested immediately on the grant dates, and the remaining shares vest in three equal installments with the final vesting of the 2017 award to occur on March 5, 2020, in each case subject to continued employment with the Company.

On February 20, 2019, the Company granted 44,500 shares of restricted stock to certain of its employees, including  12,000 shares to our former Chief Executive Officer and 10,000 shares to our Chief Financial Officer. The restricted stock grants have a grant date fair value of $23.56 per share, based on the closing price of the Company's stock, and will vest in four  equal increments on each February 20 in 2020, 2021, 2022 and 2023, in each case subject to continued employment with the Company.

Exhibit 3(a)
2479

GC000101

UNIVERSAL LOGISTICS HOLDINGS, INC.
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**( 1 5 ) Stock Based Compensation - continued**

A grantee's vesting of restricted stock awards may be accelerated under certain conditions, including retirement.

A summary of the status of our non-vested shares as of December 31, 2019, and changes during the year ended December 31, 2019, is presented below:

| | Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Non-vested at January 1, 2018 | 7,500 | $ | 14.15 |
| Granted | 44,500 | $ | 23.56 |
| Vested | (5,000) | $ | 14.50 |
| Forfeited | (5,000) | $ | 23.56 |
| Balance at December 31, 2019 | 42,000 | $ | 22.96 |

During the years ended December 31, 2019, 2018 and 2017, the total grant date fair value of vested shares recognized as compensation cost was $73,000, $413,000, and $414,000, respectively. As of December 31, 2019, there was $1.0 million of total unrecognized compensation cost related to non-vested share-based compensation arrangements granted under the Plan. That cost is expected to be recognized on a straight-line basis over the remaining vesting period. That cost is expected to be recognized on a straight-line basis over the remaining vesting period. As a result, the Company expects to recognize stock-based compensation expense of approximately $0.3 million in 2020, and $0.2 million in each year of 2021, 2022 and 2023.

**( 1 6 ) Commitments and Contingencies**

Our principal commitments relate to long-term real estate leases and payment obligations to equipment vendors.

The Company was plaintiff in a lawsuit filed on June 11, 2015 against, among others, Dalton Logistics, Inc. ("Dalton") in the United States District Court for the Southern District of Texas. The Company was seeking approximately $1.9 million in damages from a debtor relating to unpaid freight charges. In response to the filing of the complaint, the shareholders of Dalton filed a counterclaim against the Company alleging that the Company, in connection with certain unrelated negotiations with the defendant, breached an alleged agreement to acquire Dalton. The respective claims proceeded to trial and, on July 21, 2017, a jury returned two separate verdicts: One in favor of Universal for $1.9 million, and a second in favor of the defendant for approximately $5.7 million. On October 30, 2017, the court entered a judgment against Universal for the $5.7 million, but ignored the $1.9 million jury award in favor of Universal. The Company filed an appeal with the United States Court of Appeals for the Fifth Circuit to overturn the verdict and the judgment. On January 3, 2020, the appellate court upheld the verdict and the judgement against Universal. In connection with the ruling, the Company recorded a pre-tax charge to net income of $2.9 million in the fourth quarter of 2019. As of December 31, 2019, the $5.7 million judgement, plus $0.8 million of interest has been accrued. The Company expects to fund the judgement and accrued interest in the first quarter of 2020.

As previously disclosed, a predecessor to a subsidiary of the Company was a party to a legal proceeding captioned Denton v. UACL, et al. (the "Denton Litigation"). The Company resolved the Denton Litigation on September 24, 2019 (the "Final Denton Settlement"). Under the terms of the Final Denton Settlement, the Company agreed to pay plaintiffs $36.0 million in cash, exclusive of amounts previously paid, based on an opinion issued by the Appellate Court of Illinois First Judicial District on September 24, 2019 affirming the trial court judgment. In connection with the Final Denton Settlement, the Company recorded a pre-tax charge to net income of $24.8 million in the third quarter of 2019. On October 23, 2019, the Company funded the $36.0 million payment.

The Company is involved in certain other claims and pending litigation arising from the ordinary conduct of business. We also provide accruals for claims within our self-insured retention amounts. Based on the knowledge of the facts, and in certain cases, opinions of outside counsel, in the Company's opinion the resolution of these claims and pending litigation will not have a material effect on our financial position, results of operations or cash flows. However, if we experience claims that are not covered by our insurance or that exceed our estimated claim reserve, it could increase the volatility of our earnings and have a materially adverse effect on our financial condition, results of operations or cash flows.

At December 31, 2019, approximately 29% of our employees in the United States, Canada and Colombia are subject to collective bargaining agreements that are renegotiated periodically, of which 21% are subject to contracts that expire in 2020. Of our employees in Mexico, 92% are subject to such collective bargaining agreements, and our contract expiring in 2020 is currently being negotiated.

Exhibit 3(a)
2480

**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

## (17) Earnings Per Share

Basic earnings per common share amounts are based on the weighted average number of common shares outstanding, excluding outstanding non-vested restricted stock. Diluted earnings per common share include dilutive common stock equivalents determined by the treasury stock method. For the years ended December 31, 2019, 2018 and 2017, there were 910, 6,912 and 2,922 weighted average non-vested shares of restricted stock, respectively, included in the denominator for the calculation of diluted earnings per share.

For the year ended December 31, 2019 and 2017, 44,500 and 2,500 shares, respectively, were excluded from the calculation of diluted earnings per share because such shares were anti-dilutive. For the year ended December 31, 2018, no shares were excluded from the calculation of diluted earnings per share.

## (18) Quarterly Financial Data (unaudited)

| | 2019 | | | |
|---|---|---|---|---|
| | 1st quarter | 2nd quarter | 3rd quarter | 4th quarter |
| | (in thousands, except per share information) | | | |
| Operating revenue | $ 377,406 | $ 383,175 | $ 375,486 | $ 375,931 |
| Operating income | 26,513 | 30,716 | (7,352) | 15,503 |
| Income before income taxes | 23,097 | 26,714 | (11,268) | 11,643 |
| Income tax expense | 5,800 | 6,742 | (2,848) | 2,906 |
| Net income | $ 17,297 | $ 19,972 | $ (8,420) | $ 8,737 |
| Earnings per common share: | | | | |
| Basic | $ 0.61 | $ 0.70 | $ (0.30) | $ 0.32 |
| Diluted | $ 0.61 | $ 0.70 | $ (0.30) | $ 0.32 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 28,380 | 28,383 | 28,263 | 27,282 |
| Diluted | 28,381 | 28,385 | 28,264 | 27,283 |

| | 2018 | | | |
|---|---|---|---|---|
| | 1st quarter | 2nd quarter | 3rd quarter | 4th quarter |
| | (in thousands, except per share information) | | | |
| Operating revenue | $ 335,113 | $ 365,925 | $ 374,292 | $ 386,378 |
| Operating income (loss) | 17,104 | 26,252 | 22,530 | 17,908 |
| Income (loss) before income taxes | 14,156 | 23,634 | 19,973 | 11,626 |
| Income tax (benefit) expense | 3,722 | 5,965 | 4,918 | 2,606 |
| Net income (loss) | $ 10,434 | $ 17,669 | $ 15,055 | $ 9,020 |
| Earnings per common share: | | | | |
| Basic | $ 0.37 | $ 0.62 | $ 0.53 | $ 0.32 |
| Diluted | $ 0.37 | $ 0.62 | $ 0.53 | $ 0.32 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 28,386 | 28,395 | 28,382 | 28,370 |
| Diluted | 28,393 | 28,402 | 28,392 | 28,374 |

Exhibit 3(a)
2481

GC000103

Exhibit 3(a)
2482

GC000104

Exhibits
UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172
**UNIVERSAL LOGISTICS HOLDINGS, INC.**
Notes to Consolidated Financial Statements – (Continued)
December 31, 2019, 2018 and 2017

**( 1 9 ) Segment Reporting**

We report our financial results in two reportable segments, the transportation segment and the logistics segment, based on the nature of the underlying customer commitment and the types of investments required to support these commitments. This presentation reflects the manner in which management evaluates our operating segments, including an evaluation of economic characteristics and applicable aggregation criteria.

Operations aggregated in our transportation segment are associated with individual freight shipments coordinated by our agents, company-managed terminals and specialized services operations. In contrast, operations aggregated in our logistics segment deliver value-added services or transportation services to specific customers on a dedicated basis, generally pursuant to contract terms of one year or longer. Other non-reportable operating segments are comprised of the Company's subsidiaries that provide support services to other subsidiaries and to owner-operators, including shop maintenance and equipment leasing.

The following tables summarize information about our reportable segments as of and for the fiscal years ended December 31, 2019, 2018 and 2017 (in thousands):

| 2019 | Transportation | Logistics | Other | Total |
|---|---|---|---|---|
| Operating revenues | $ 1,013,548 | $ 497,315 | $ 1,135 | $ 1,511,998 |
| Eliminated inter-segment revenues | (1,921) | (835) | — | (2,756) |
| Depreciation and amortization | 39,239 | 33,670 | 1,856 | 74,765 |
| Income from operations | 20,226 | 47,694 | (2,540) | 65,380 |
| Capital expenditures | 18,830 | 58,547 | 2,376 | 79,753 |
| Total assets | 618,931 | 348,972 | 20,094 | 987,997 |
| **2018** | **Transportation** | **Logistics** | **Other** | **Total** |
| Operating revenues | $ 949,242 | $ 510,918 | $ 1,548 | $ 1,461,708 |
| Eliminated inter-segment revenues | (1,673) | (12,451) | — | (14,124) |
| Depreciation and amortization | 27,128 | 26,125 | 1,172 | 54,425 |
| Income from operations | 51,634 | 31,136 | 1,024 | 83,794 |
| Capital expenditures | 32,267 | 33,312 | 1,006 | 66,585 |
| Total assets | 525,906 | 298,455 | 18,786 | 843,147 |
| **2017** | **Transportation** | **Logistics** | **Other** | **Total** |
| Operating revenues | $ 750,302 | $ 465,070 | $ 1,293 | $ 1,216,665 |
| Eliminated inter-segment revenues | (1,064) | (8,095) | — | (9,159) |
| Depreciation and amortization | 17,661 | 29,136 | 198 | 46,995 |
| Income from operations | 14,512 | 10,597 | 105 | 25,214 |
| Capital expenditures | 12,330 | 50,597 | 433 | 63,360 |
| Total assets | 291,736 | 293,773 | 25,083 | 610,592 |

We provide a portfolio of transportation and logistics services to a wide range of customers throughout the United States  and in Mexico, Canada and Colombia. Revenues attributed to geographic areas are as follows (in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| United States | $ 1,480,637 | $ 1,426,897 | $ 1,179,115 |
| Mexico | 16,100 | 18,716 | 24,346 |
| Canada | 13,552 | 14,188 | 11,538 |
| Colombia | 1,709 | 1,907 | 1,666 |
| Total | $ 1,511,998 | $ 1,461,708 | $ 1,216,665 |

68

Exhibit 3(a)
2483

GC000105

Exhibit 3(a)
2484

GC000106

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

**UNIVERSAL LOGISTICS HOLDINGS, INC.**

Notes to Consolidated Financial Statements – (Continued)

December 31, 2019, 2018 and 2017

**(19) Segment Reporting—continued**

Net long-lived property and equipment assets by geographic area are presented in the table below (in thousands):

| | Year Ended December 31, | |
| | 2019 | 2018 |
|---|---|---|
| United States | $ 319,348 | $ 284,321 |
| Mexico | 19,587 | 18,612 |
| Canada | 242 | 295 |
| Colombia | 646 | 6 |
| Total | $ 339,823 | $ 303,234 |

**(20) Subsequent Events**

On February 6, 2020, our Board of Directors declared the regular quarterly cash dividend of $0.105 per share of common stock, payable to shareholders of record at the close of business on March 2, 2020 and is expected to be paid on April 6, 2020. Declaration of future cash dividends is subject to final determination by the Board of Directors each quarter after its review of our financial condition, results of operations, capital requirements, any legal or contractual restrictions on the payment of dividends and other factors the Board of Directors deems relevant.

Exhibit 3(a)
2485

GC000107

**ITEM 9:    CHANGES IN AND DISAGREEMENTS WITH ACCO UNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURES**

None.

**ITEM 9A:    CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Based on an evaluation under the supervision and with the participation of the Company's management, the Company's principal executive officer and principal financial officer have concluded that the Company's disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") were effective as of December 31, 2019 to provide reasonable assurance that information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms and (ii) accumulated and communicated to the Company's management, including its principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosure.

**Inherent Limitations over Internal Controls**

The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles ("GAAP"). The Company's internal control over financial reporting includes those policies and procedures that:

 (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the Company's assets;

 (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that the Company's receipts and expenditures are being made only in accordance with authorizations of the Company's management and directors; and

 (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Management, including the Company's Chief Executive Officer and Chief Financial Officer, does not expect that the Company's internal controls will prevent or detect all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of internal controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected. Also, any evaluation of the effectiveness of controls in future periods are subject to the risk that those internal controls may become inadequate because of changes in business conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**Changes in Internal Control over Financial Reporting**

There were no changes in the Company's internal control over financial reporting during the fourth quarter of 2019, which were identified in connection with management's evaluation required by paragraph (d) of rules 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

70

Exhibit 3(a)
2486

GC000108

**Management's Annual Report on Internal Control over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Management conducted an assessment of the effectiveness of the Company's internal control over financial reporting based on the criteria set forth in *Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission* , which is commonly referred to as the 2013 framework.

The scope of management's assessment as of December 31, 2019 did not include an assessment of the internal controls over financial reporting during 2019 for Roadrunner Intermodal Services, LLC, Morgan Southern, Inc., Wando Trucking, LLC, or Central Cal Transportation, LLC (collectively, "Roadrunner Intermodal") or Michael's Cartage, Inc. (collectively the "Acquired Companies"), each of which was acquired during 2019. Management has excluded from its assessment of the effectiveness of the Company's internal control over financial reporting as of December 31, 2019 the Acquired Companies' internal control over financial reporting associated with total assets of $83.5 million, operating revenues of $32.1 million and net income of $0.1 million, all of which are included in the consolidated financial statements Universal Logistics Holdings, Inc. as of and for the year ended December 31, 2019. For the fiscal year ending December 31, 2020, the scope of management's assessment on internal control over financial reporting will include the Acquired Companies' operations.

Based on the Company's assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2019. The Company's independent registered public accounting firm, BDO USA LLP, has issued an audit report on the Company's internal control over financial reporting, which appears below.

71

Exhibit 3(a)
2487

GC000109

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Universal Logistics Holdings, Inc.
Warren, Michigan

**Opinion on Internal Control over Financial Reporting**

We have audited Universal Logistics Holdings, Inc.'s (the "Company's") internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO criteria"). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on the COSO criteria .

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the consolidated balance sheets of the Company as of December 31, 2019 and 2018, the related consolidated statements of income, comprehensive income, cash flows and shareholders' equity for each of the three years in the period ended December 31, 2019, and the related notes and our report dated March 16, 2020 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Item 9A, Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

As indicated in the accompanying "Item 9A, Management's Annual Report on Internal Control Over Financial Reporting", management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of Roadrunner Intermodal Services, LLC, Morgan Southern, Inc., Wando Trucking, LLC, or Central Cal Transportation, LLC (collectively, "Roadrunner Intermodal") or Michael's Cartage, Inc. (collectively the "Acquired Companies"), which were acquired in 2019 and which are included in the consolidated balance sheet of Universal Logistics Holdings, Inc. as of December 31, 2019, and the related consolidated statements of income, comprehensive income, shareholders' equity, and cash flows for the year then ended. The Acquired Companies had $83.5 million of total assets as of December 31, 2019, and $32.1 million and $0.1 million of revenues and net income, respectively, for the year then ended. Management did not assess the effectiveness of internal control over financial reporting of the Acquired Companies because of the timing of the acquisitions which were completed on various dates in 2019. Our audit of internal control over financial reporting of Universal Logistics Holdings, Inc. also did not include an evaluation of the internal control over financial reporting of the Acquired Companies .

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Exhibit 3(a)
2488

Because of its inherent limitations, internal control over financial reporting may not prevent or detect mis statements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become  inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorat e.

/s/ BDO USA, LLP

Troy, Michigan
March 16, 2020

73

Exhibit 3(a)
2489

GC000111

**ITEM 9B:     OTHE R INFORMATION**

None.

74

Exhibit 3(a)
2490

GC000112

## PART III

Portions of the information required by Part III of Form 10-K are, pursuant to General Instruction G(3) of Form 10-K, incorporated by reference from our definitive Proxy Statement to be filed pursuant to Regulation 14A for our Annual Meeting of Shareholders to be held on April 30, 2020. We will, within 120 days of the end of our fiscal year, file with the Securities and Exchange Commission a definitive proxy statement pursuant to Regulation 14A.

## ITEM 10:    DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE

The information required by this Item is incorporated herein by reference to the definitive Proxy Statement to be filed pursuant to Regulation 14A for our Annual Meeting of Shareholders to be held on April 30, 2020.

## ITEM 11:    EXECUTIVE COMPENSATION

The information required by this Item is incorporated herein by reference to the definitive Proxy Statement to be filed pursuant to Regulation 14A for our Annual Meeting of Shareholders to be held on April 30, 2020.

## ITEM 12:    SECURITY OWNERSHIP OF CERTAIN BENEFI  CIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

The information required by this Item is incorporated herein by reference to the definitive Proxy Statement to be filed pursuant to Regulation 14A for our Annual Meeting of Shareholders to be held on April 30, 2020.

The following table presents information about equity plans under which equity securities of the Company are authorized for issuance at December 31, 2019:

| Plan Category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | | Number of securities remaining available for future issuance |
|---|---|---|---|---|
| Equity compensation plans approved by security holders | 42,000 | $ | — (1) | 162,380 |
| Equity compensation plans not approved by security holders | — | $ | — | — |
| Total | 42,000 | $ | — (1) | 162,380 |

(1) Reflects shares to be issued under restricted stock bonus awards, which do not have an exercise price. As of December 31, 2019, the Company has no outstanding options, warrants or rights that require payment of an exercise price.

## ITEM 13:    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The information required by this Item is incorporated herein by reference to the definitive Proxy Statement to be filed pursuant to Regulation 14A for our Annual Meeting of Shareholders to be held on April 30, 2020.

## ITEM 14:    PRINCIPAL ACCOUNTING FEES AND SERVICES

The information required by this Item is incorporated herein by reference to the definitive Proxy Statement to be filed pursuant to Regulation 14A for our Annual Meeting of Shareholders to be held on April 30, 2020.

Exhibit 3(a)
2491

GC000113

Exhibit 3(a)
2492

GC000114

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

## PART IV

### ITEM 15:   EXHIBITS AND  FINANCIAL STATEMENT SCHEDULES

(1)    Financial Statements

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | 37 |
| Consolidated Balance Sheets | 38 |
| Consolidated Statements of Income | 39 |
| Consolidated Statements of Comprehensive Income | 40 |
| Consolidated Statements of Cash Flows | 41 |
| Consolidated Statements of Shareholders' Equity | 43 |
| Notes to Consolidated Financial Statements | 44 |

(2)    Financial Statement Schedules

Financial statement schedules have been omitted since they are either not required, not applicable, or the information is otherwise included elsewhere in this Form 10-K.

(3)    Exhibits

| Exhibit No. | Description |
|---|---|
| 2.1 | Stock Purchase Agreement dated as of August 10, 2018 among Mason Dixon Intermodal, Inc., The Brian and Rocio Griley Family Trust u/t/d March 18, 2008 and Donald Griley Irrevocable Trust f/b/o Patrick Griley u/t/d March 1, 2008 (incorporated by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on  August 16, 2018) |
| 2.2 | Stock Purchase Agreement dated as of December 7, 2018 among Mason Dixon Intermodal, Inc., James H. Horvitz, Robert Sweet, The Horvitz Family Special Needs Gift Trust, dated July 18, 2014, (each a "Seller" and collectively the "Sellers"), Robin L. Horvitz, and J. Horvitz in his capacity as representative of the Sellers (incorporated by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed on December  11, 2018) |
| 3.1 | Amended and Restated Articles of Incorporation (incorporated by reference to Exhibit 3.1 to the  Registrant's Registration Statement on Form S-1 filed on November 15, 2004) |
| 3.2 | Amendment to Restated Articles of Incorporation (incorporated by reference to Exhibit 3(i)-1 and   3(i)-2 to the Registrant's Current Report on Form 8-K filed on November 1, 2012) |
| 3.3 | Certificate of Amendment to Restated Articles of Incorporation (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on May 2, 2016) |
| 3.4 | Fifth Amended and Restated Bylaws, effective December 13, 2019 (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K filed on December 16, 2019) |
| 4.1 | Specimen Common Share Certificate (incorporated by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form S-1 filed on November 15, 2004) |
| 4.2* | Description of Capital Stock of the Registrant |
| 4.3 | Amended and Restated Registration Rights Agreement among the Registrant, Matthew T. Moroun, the Manuel J. Moroun Revocable Trust and the M.J. Moroun 2012 Annuity Trust (incorporated by reference to Exhibit 4.1 to the Registrant's Current Report on Form 8-K filed July 26, 2012 ) |
| 10.1+ | Consulting Agreement between the Registrant and Manuel J. Moroun (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on April 26, 2013) |
| 10.2+ | Amendment No. 1 to Consulting Agreement, dated April 26, 2018, with Manuel J. Moroun (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed on April 27, 2018) |
| 10.3+ | Employment Agreement between the Registrant and Jeff Rogers (incorporated by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K filed on March 16, 2015) |

76

Exhibit 3(a)
2493

GC000115

| Exhibit No. | Description |
|---|---|
| 10. 4 | Service Level Agreement between the Registrant and Data System Services, LLC (incorporated by reference to Exhibit 10.7 to the Registrant's Annual Report on Form 10-K filed on March 16, 2015) |
| 10.5+ | 2014 Amended and Restated Stock Option and Incentive Plan (incorporated by reference to Appendix A to the Registrant's Schedule 14A filed on April 29, 2014) |
| 10.6+ | Form of Restricted Stock Bonus Award Agreement under the 2014 Amended and Restated Stock Option and Incentive Plan (incorporated by reference to Exhibit B of Appendix A to the Registrant's Schedule 14A filed on April 29, 2014) |
| 10.7 | Credit and Security Agreement dated as of November 27, 2018 among Universal Management Services, Inc., Cavalry Logistics, LLC, Fore Transportation, Inc., Logistics Insight Corp., Mason Dixon Intermodal, Inc., Southern Counties Express, Inc., Specialized Rail Service, Inc., Universal Logistics Solutions International, Inc., Universal Specialized, Inc., Universal Truckload, Inc., Westport Axle Corp., and Westport Machining, LLC, as borrowers, certain subsidiaries of Universal Logistics Holdings, Inc., as guarantors, and KeyBank National Association as administrative agent and lender (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on November 29, 2018) |
| 10.8 | Loan and Financing Agreement dated as of February 1, 2018 between UTSI Finance and Flagstar (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K filed on February 6, 2018) |
| 10.9 | Promissory Note dated as of February 1, 2018 by UTSI Finance in favor of Flagstar (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K filed on February 6, 2018) |
| 10.10 | Commercial Mortgage dated as of February 1, 2018 between UTSI Finance and Flagstar (incorporated by reference to Exhibit 10.4 to the Registrant's Current Report on Form 8-K filed on February 6, 2018) |
| 10.11 | Amendment No. 2 to Master Security Agreement, dated as of April 24, 2018, with Key Equipment Finance, a division of KeyBank National Association (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on April 27, 2018) |
| 10.12+ | Employment Agreement between the Registrant and Tim Phillips (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on January 14, 2020) |
| 10.13+* | Separation Agreement between the Registrant and Jeff Roger s |
| 21.1* | Subsidiaries of the Registrant |
| 23.1* | Consent of BDO USA LLP, independent registered public accounting firm |
| 24* | Powers of Attorney (see signature page) |
| 31.1* | Chief Executive Officer certification, as adopted pursuant to section 302 of the Sarbanes-Oxley Act of 2002 |
| 31.2* | Chief Financial Officer certification, as adopted pursuant to section 302 of the Sarbanes-Oxley Act of 2002 |
| 32.1** | Chief Executive Officer and Chief Financial Officer certification pursuant to 18 U.S.C. Section 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002 |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Schema Document |
| 101.CAL* | XBRL Calculation Linkbase Document |
| 101.DEF* | XBRL Definition Linkbase Document |
| 101.LAB* | XBRL Labels Linkbase Document |
| 101.PRE* | XBRL Presentation Linkbase Document |

+    Indicates a management contract, compensatory plan or arrangement.

*    Filed herewith.

**    Furnished herewith.

Exhibit 3(a)
2494

GC000116

Exhibit 3(a)
2495

GC000117

Exhibits

UNIVERSAL LOGISTICS HOLDINGS, INC. 10-K 9292573 2020-03-16 0001564590-20-011172

### SIGNA TURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

<div align="right">

**Universal Logistics Holdings, Inc.**

(Registrant)

By:   */s/ Jude Beres*
</div>

Jude Beres, Chief Financial Officer

Date: March 16, 2020

### POWER OF ATTORNEY

Know all persons by these presents, that each person whose signature appears below constitutes and appoints Tim Phillips and Jude Beres, jointly and severally, his attorneys-in-fact, each with the power of substitution, for him in any and all capacities, to sign any amendments to this Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each of said attorneys-in-fact, or his substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| */s/ Tim Phillips* | Chief Executive Officer | March 16, 2020 |
| Tim Phillips | (Principal Executive Officer) | |
| */s/ Jude Beres* | Chief Financial Officer and Treasurer | March 16, 2020 |
| Jude Beres | (Principal Financial and Accounting Officer) | |
| */s/ Matthew T. Moroun* | Chairman of the Board | March 16, 2020 |
| Matthew T. Moroun | | |
| */s/ Manuel J. Moroun* | Director | March 16, 2020 |
| Manuel J. Moroun | | |
| */s/ Grant Belanger* | Director | March 16, 2020 |
| Grant Belanger | | |
| */s/ Frederick P. Calderone* | Director | March 16, 2020 |
| Frederick P. Calderone | | |
| */s/ Daniel J. Deane* | Director | March 16, 2020 |
| Daniel J. Deane | | |
| */s/ Clarence W. Gooden* | Director | March 16, 2020 |
| Clarence W. Gooden | | |
| */s/ Michael A. Regan* | Director | March 16, 2020 |
| Michael A. Regan | | |
| */s/ Richard P. Urban* | Director | March 16, 2020 |
| Richard P. Urban | | |
| */s/ H.E. "Scott" Wolfe* | Director | March 16, 2020 |
| H. E. "Scott" Wolfe | | |

78

Exhibit 3(a)
2496

GC000118

Exhibit 10.13

## SEPARATION AGREEMENT AND GENERAL RELEASE

**PLEASE READ THIS DOCUMENT CAREFULLY. IT CONTAINS A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

This SEPARATION AGREEMENT AND GENERAL RELEASE ("Agreement"), dated as of January 10, 2020, is by and between Jeffrey Rogers ("Employee"), and Universal Management Services, Inc. (the "Company").

Recitals:

A. In connection with Employee's separation from service as an employee of the Company, and in order to promote a smooth and amicable transition of duties, the Company has decided to offer the separation compensation set forth in this Agreement, the receipt and retention of which is conditioned upon Employee's compliance with the terms and conditions of this Agreement.

B. Accordingly, Employee and the Company agree as follows:

Agreement:

1. Separation. Employee's separation from service with the Company, and from any other positions or appointments that he may hold by or through the Company and its affiliates, including as an officer or director of any subsidiary of the Company, is effective as of the date of this Agreement (the "Separation Date"). Employee agrees to execute, promptly upon request by the Company or any of its affiliates, any additional documents necessary to effectuate the resignations. After the Separation Date, Employee will no longer be authorized or permitted to incur any expenses, obligations or liabilities on behalf of the Company or its affiliates.

2. Consideration. In consideration of Employee's release of any and all claims in accordance with Section 4 of this Agreement, and other promises of Employee contained in this Agreement, the Company shall pay to Employee the following consideration, contingent upon Employee's execution of this Agreement and Employee's continued full compliance with the terms of this Agreement:

a. Sixteen (16) weeks of severance pay, at the rate of $12,500.00 per week, less applicable federal, state, and local taxes and other deductions as may be required by law to be made from wage payments to employees, provided that such payments shall commence within 10 days after the expiration of the revocation period set forth in Section 7 of this Agreement; and

b. the sum of $125,000.00, at the rate of $12,500.00 per week, for ten (10) weeks in exchange for the non-disparagement covenant set forth in Section 8 of this Agreement, for which Employee will be issued a Form 1099, provided that such payments shall commence immediately after the payments set forth in Subsection 2(a) of this Agreement have been completed, and provided further that nothing in this subparagraph is intended to place a limit on the potential damages to which the Company might be entitled in the event of a violation of Section 8.

c. The Board of Directors have granted an additional $100,000 less applicable federal, state, and local taxes and other deductions as may be required by law to be made from wage payments to employees, in addition to the severance obligations under EMPLOYEE'S employment agreement. This is for EMPLOYEE'S discretionary use; extend EMPLOYEE'S separation pay, extend Cobra payments or take a lump sum payment.

3. Consultation. During the period of time that Employee is receiving payments from the Company under Section 2, Employee agrees to be reasonably available for consultation by the Company with no additional remuneration.

Exhibit 3(a)
2497

4. <u>Waiver and Release</u> . As a material inducement to the Company to enter into this Agreement, Employee, on his or her own behalf and that of his or her heirs, attorneys, agents, administrators, representatives, successors and assigns (collectively, the "Releasing Parties"), voluntarily and knowingly waives, releases, and discharges the Company and its predecessors, successors, subsidiaries, affiliates, shareholders, employees, officers, directors, members, assignees, agents, and attorneys (collectively, the "Releasees"), both when acting in their respective capacities on behalf of the Company and in their individual capacities, from any and all claims, liabilities, demands, and causes of action, known or unknown, fixed or contingent (collectively, "Claims"), that the Releasing Parties may have or claim to have against any of the Releasees, arising out of or related to any matter, event, fact, act, omission, cause or thing which existed, arose, or occurred prior to Employee signing this Agreement. This waiver and release includes, but is not limited, to:

a. Claims arising under any federal, state, or local laws including, without limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Civil Rights Act of 1991, and the Family and Medical Leave Act;

b. Claims for breach of contract, express or implied, including any Claims for breach of any implied covenant of good faith and fair dealing;

c. any tort Claims, including, without limitation, any Claims for personal injury, harm or damages, whether the result of intentional, unintentional, negligent, reckless, or grossly negligent acts or omissions;

d. any Claims for wrongful discharge or other claims arising out of any legal restrictions on the right to terminate employees;

e. any Claims for unpaid wages, including, but not limited to, commissions, bonuses, and paid time off; and

    f.     any Claims for attorneys' fees or costs.

This waiver and release does not include Claims for alleged breach of this Agreement or for workers compensation benefits. Employee also agrees not to file a lawsuit against any of the Released Parties in connection with the released Claims. Employee agrees that if anyone makes a Claim or undertakes an investigation involving him in any way, Employee waives any and all rights and claims to financial recovery resulting from such Claim or investigation. Employee further represents that Employee has not assigned to any other person any of such Claims, and that Employee has the full right to grant this release. It is agreed that this is a general release and it is to be broadly construed as a release of all Claims, except those that cannot be released by law. By signing this Agreement, Employee acknowledges that Employee is doing so knowingly and voluntarily, that Employee understands that he or she may be releasing Claims he or she may not know about, and that he or she is waiving all rights Employee may have had under any law that is intended to protect Employee from waiving unknown Claims.

5. <u>No Obligation to Rehire</u>. Employee's separation from employment with the Company is effective as of January 10, 2020, and Employee agrees that the Company is under no obligation to rehire Employee.

6. <u>Independent Determination</u>. Employee understands that Employee has been given a period of 21 days from the date Employee first received this Agreement in which to review and consider it, and that Employee may use as much or as little of this 21-day period as Employee desires. Employee further understands that Employee has the right to discuss all aspects of this Agreement with an attorney of Employee's choosing and that, although whether or not to consult with an attorney is Employee's decision, the Company encourages Employee to do so. By signing this Agreement, Employee acknowledges and agrees that he or she is entering into this Agreement knowingly and voluntarily, that he or she has used as much, if any, of the 21-day period as desired, and that he or she has exercised the right to consult with an attorney to the full extent desired.

Exhibit 3(a)
2498

GC000120

7. <u>Revocation</u> . Employee has the right to revoke this Agreement within seven days after signing it. Revocation can be made only by delivering a written notice of revocation to Peter J. Dwyer, Jr., President HR-1 Corp, 12225 Stephens Road, S uite 100, Warren, Michigan 48089. For such revocation to be effective, it must be received no later than the close of business on the seventh day after Employee signs this Agreement. This Agreement will not be effective or enforceable until the revocation period has expired without Employee having exercised Employee's right of revocation.

8.<u>Non-Disclosure and Non-Disparagement</u>. Employee agrees not to disclose confidential, sensitive, or proprietary information concerning the Company obtained by Employee during his employment with the Company. For purposes of this Agreement, "confidential, sensitive, or proprietary" information would include, without limitation, all materials and information (whether written or not) about the services, processes, research, customers, personnel, finances, purchasing, sales, marketing, accounting, costs, pricing, improvements, discoveries, business methods, inventions and other business aspects of the Company and its affiliates which are not generally known and accessible to the public at large or which provide the Company with a competitive advantage. Employee agrees that Employee will not: (a) make any statements to representatives of any press or media, Company employee, government entity, customer or vendor, which is disparaging of the Company, its reputation, or the character, competence or reputation of any officer, director, executive, employee, shareholder or agent of the Company or any of its affiliated entities; (b) directly or indirectly provide information, issue statements, or take any action that would be reasonably likely to damage the Company's reputation, cause the Company embarrassment or humiliation, or otherwise cause or contribute to the Company being held in disrepute; (c) directly or indirectly seek to cause any person or organization to discontinue or limit their current employment or business relationship with the Company; or (d) encourage or assist others to issue such statements or take such actions prohibited in this Section. In response to inquiries from third parties, Employee and the Company shall confirm only that Employee has separated from the Company on mutually acceptable terms. Employee agrees that the Company also may confirm to third parties Employee's dates of employment, titles and positions. Notwithstanding anything in this Agreement to the contrary, any confidentiality, non-disclosure, non-disparagement or similar provision in this Agreement does not prohibit or restrict any party under this Agreement from initiating communications directly with, or responding to any inquiry from, or providing testimony before, the SEC, any other self-regulatory organization or any other state or federal regulatory authority, regarding this Agreement or its underlying facts or circumstances.

9.<u>Company Trade Secrets</u>. Employee acknowledges that, to the extent the Company derives independent economic value from any of its confidential, proprietary or sensitive information and takes reasonable measures to maintain its secrecy, such information will be considered a trade secret under applicable law. Employee further acknowledges that under the Defend Trade Secrets Act of 2016, an individual may not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. Employee further acknowledges that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the employer's trade secrets to the attorney and use the trade secret information in the court proceeding if the individual: (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

10.<u>Return of Consideration</u>. In the event that Employee breaches this Agreement, the Company shall cease making payments to Employee pursuant to Sections 2 and 3 of this Agreement, and Employee shall be required to return to Company any consideration already received by Employee pursuant to Sections 2 and 3 of this Agreement.

11.<u>Priority over Employment Agreement</u>. The consideration set forth in Section 2 of this Agreement supersedes, modifies and replaces any and all payments, rights, and benefits contemplated by Section 8(d) of the Employment Agreement dated as of June 3, 2014 between Employee and the Company (the "Employment Agreement"). This Agreement shall have no effect on Employee's entitlement to reimbursement for COBRA premiums for medical and dental coverage for a period of six months from the Separation Date. Except as modified by this Agreement, the terms and conditions of the Employment Agreement that were intended to survive termination of employment, including but not limited to Section 5 (Covenant Not to Compete) and Section 6 (No Interference with Employment Relationships) thereof, shall continue in full force and effect and are incorporated by reference into this Agreement.

Exhibit 3(a)
2499

GC000121

12. Restricted Stock Agreements. Under the Restricted Stock Bonus Award Agreement dated as of February 22, 2017 between Employee and the Company (the "2017 Award Agreement"), the remaining tranche of 2,500 shares of restricted stock scheduled to vest on March 5, 2020 shall fully vest on the Termination Date, and the shares shall remain subject to the terms of the 2017 Award Agreement. The shares of restricted stock granted to Employee under the Restricted Stock Bonus Award Agreement dated as of February 20, 2019 between Employee and the Company (the "2019 Award Agreement") are forfeited as of the Separation Date in accordance with the terms of the 2019 Award Agreement.

13. Miscellaneous. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement. The parties acknowledge and agree that this Agreement does not constitute, is not intended to be, and shall not be construed, interpreted, or treated in any respect as an admission of liability or wrongdoing for any purposes whatsoever. This Agreement contains all of the understandings and agreements between Employee and the Company regarding the subject matter hereof, and supersedes all earlier negotiations and understandings, written or oral. This Agreement may not be modified except by written instrument signed by both Employee and Company. This Agreement shall be governed by and construed in accordance with the internal laws of the State of Michigan.

14. Representation. Employee represents and agrees that Employee has thoroughly read this Agreement in its entirety; that Employee has had a reasonable time to consider its terms; that Employee fully understands all of its terms; that Employee has not relied upon any representations, promises, or statements, oral or written, that are not set forth in this Agreement; and that Employee has entered into this Agreement voluntarily and upon Employee's own free will.

Employee agrees to keep the terms, amount, and facts, of this Agreement completely confidential and, unless required to do so by law or court order, Employee will not disclose any information concerning this Agreement to anyone (other than Employee's immediate family, attorneys and tax advisors, if any, all of whom shall be informed of and bound by this confidentiality provision). Employee understands that this confidentiality provision is a material part of this Agreement and agrees that, should Employee violate this provision, Employee shall be required to return to Company the consideration received by Employee as set forth in Paragraph 2 of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year indicated above.

**EMPLOYEE:**
JEFFREY ROGERS


*/s/ Jeff Rogers*


Date: January 27, 2020

**COMPANY:**
UNIVERSAL MANAGEMENT SERVICES, INC.
By: HR-1 Corp.
Its: Authorized Agent
By: */s/ Pete J. Dwyer, Jr.*
Name: Peter J. Dwyer, Jr.
Title: President
Date: January 27, 2020

Exhibit 3(a)
2500

GC000122

Exhibit 21.1

### Principal Subsidiaries of Universal Logistics Holdings, Inc.

| Name of Subsidiary | Jurisdiction of Incorporation/ Organization |
| --- | --- |
| Apa Holdings, LLC | Illinois |
| Aquarius Financial, Inc. | California |
| Cavalry Logistics International, Inc. | Illinois |
| Cavalry Logistics International of Canada, Inc. | Canada |
| Deco Logistics, Inc. dba Container Connection | California |
| Diversified Contract Services, Inc. | Michigan |
| Fore Transportation, Inc. | Illinois |
| Fore Transport, Inc. | Illinois |
| LGSI Equipment of Indiana, LLC | Indiana |
| Linc Logistics, LLC | Michigan |
| Logistics Insight Corp. | Michigan |
| Logistics Insight Corporation, S. de R.L. de C.V. | Mexico |
| Logistics Insight GmbH | Germany |
| Michael's Cartage, Inc. | Illinois |
| Morgan Southern, Inc. | Delaware |
| Oaktree Logistics, Inc. | California |
| Roadrunner Intermodal Services, LLC | Delaware |
| Southern Counties Express, Inc. | California |
| Specialized Rail Service, Inc. | Nevada |
| Stafflinc de Mexico, S. de R.L. de C.V. | Mexico |
| UACL Leasing, LLC | Indiana |
| UACL Logistics Canada, Ltd. | Canada |
| Universal Logistics Solutions Canada, Ltd. | Canada |
| ULINC Staffing de Mexico, S. de R.L. de C.V. | Mexico |
| Universal Capacity Solutions, LLC | Tennessee |
| Universal Dedicated of Arlington, TX, LLC | Michigan |
| Universal Dedicated of Detroit, MI, LLC | Michigan |
| Universal Dedicated of Fort Wayne, IN, LLC | Michigan |
| Universal Dedicated of Nebraska & Wisconsin, LLC | Michigan |
| Universal Dedicated of Romulus, MI, LLC | Michigan |
| Universal Dedicated of Smyrna, TN, LLC | Michigan |
| Universal Fuel Sales, LLC | Michigan |
| Universal Intermodal Services, Inc. | Michigan |
| Universal LINC de Colombia, SAS | Colombia |
| Universal On-Demand, Inc. | Michigan |
| Universal Management Services, Inc. | Michigan |
| Universal Specialized, LLC | Michigan |
| Universal Truckload, LLC | Delaware |
| UT Rent A Car, Inc. | Michigan |
| UTS Realty, LLC | Michigan |
| UTSI Finance, Inc. | Michigan |
| Wando Trucking, LLC | Delaware |
| Westport Axle Co., LLC | Kentucky |
| Westport Machining, LLC | Michigan |

Exhibit 3(a)
2501

GC000123

Exhibit 23.1

### Consent of Independent Registered Public Accounting Firm

Universal Logistics Holdings, Inc.

Warren, Michigan

We hereby consent to the incorporation by reference in the Registration Statements on Form S3 (No. 333-221215) and Form S-8 (No.333-198376) of Universal Logistics Holdings, Inc., of our reports dated March 16, 2020, relating to the consolidated financial statements, and the effectiveness of Universal Logistics Holdings, Inc.'s internal control over financial reporting, which appear in this Form 10-K.

/s/ BDO USA, LLP

Troy, Michigan

March 16, 2020

Exhibit 3(a)
2502

GC000124

Exhibit 31.1

## CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
## PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT

I, Tim Phillips, certify that:

1.  I have reviewed this annual report on Form 10-K of Universal Logistics Holdings, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 16, 2020

_/s/ Tim Phillips_
Tim Phillips
Chief Executive Officer

Exhibit 3(a)
2503

Exhibit 31.2

## CERTIFICATION OF THE CHIEF FINANCIAL OFFICER
## PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT

I, Jude Beres, certify that:

1.  I have reviewed this annual report on Form 10-K of Universal Logistics Holdings, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 16, 2020

*/s/ Jude Beres*
Jude Beres
Chief Financial Officer

Exhibit 3(a)
2504

GC000126

Exhibit 32.1

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER AND
## CHIEF FINANCIAL OFFICER
## PURSUANT TO 18 U.S.C. SECTION 1350,
## AS ADOPTED PURSUANT TO
## SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report, or the Report, of Universal Logistics Holdings, Inc., or the Company, on Form 10-K for the year ended December 31, 2019, as filed with the Securities and Exchange Commission on the date hereof, each of the undersigned, Tim Phillips, as Chief Executive Officer of the Company, and Jude Beres, as Chief Financial Officer of the Company, certifies, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, to the best of his knowledge, respectively, that (1) the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: March 16, 2020

*/s/ Tim Phillips*
Tim Phillips
Chief Executive Officer
*/s/ Jude Beres*
Jude Beres
Chief Financial Officer

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

Exhibit 3(a)
2505

GC000127

<div align="right">Exhibit 4.2</div>

## DESCRIPTION OF CAPITAL STOCK

The following is a summary of the material terms of the capital stock of Universal Logistics Holdings, Inc. (the "Company") and the provisions of the Company's Amended and Restated Articles of Incorporation, as amended ("Articles"), and Amended and Restated Bylaws ("Bylaws"). It also summarizes relevant provisions of the Michigan Business Corporation Act, which we refer to as Michigan law, or the "MBCA." Since the terms of our Articles, Bylaws and Michigan law are more detailed than the general information provided below, we urge you to read the actual provisions of those documents and Michigan law. The following summary of our capital stock is subject in all respects to Michigan law, our Articles and our Bylaws. If you would like to read our Articles or Bylaws, these documents are on file with the Securities and Exchange Commission.

### General

The authorized capital stock of the Company consists of 100,000,000 shares of common stock, no par value, and 5,000,000 shares of preferred stock, no par value. As of December 31, 2019, there were 30,970,452 shares of our common stock issued and 27,282,230 shares of our common stock outstanding and no shares of our preferred stock were issued and outstanding. Our common stock is listed on the NASDAQ Stock Market.

### Common Stock

All of the outstanding shares of our common stock are fully paid and non-assessable.

*Voting Rights.* Each holder of our common stock is entitled to cast one vote for each share held of record on all matters submitted to a vote of shareholders, including the election of directors. Holders of our common stock have no cumulative voting rights.

*Dividends.* Holders of our common stock are entitled to receive dividends or other distributions declared by the board of directors. The right of the board of directors to declare dividends is subject to the right of any holders of our preferred stock and the availability under Michigan law of sufficient funds to pay dividends.

*Liquidation Rights.* If the Company is dissolved, our common shareholders will share ratably in the distribution of all assets that remain after we pay all of our liabilities and satisfy our obligations to the holders of any of our preferred stock.

*Preemptive and Other Rights.* Holders of our common stock have no preemptive rights to purchase or subscribe for any stock or other securities of the Company, and there are no conversion rights or redemption or sinking fund provisions with respect to our common stock.

*Transfer Agent.* The transfer agent and registrar for our common stock is Computershare Trust Company, N.A.

### Preferred Stock

The board of directors is authorized to issue shares of our preferred stock at any time, without shareholder approval. It has the authority to determine all aspects of those shares, including the following:

- the designation and number of shares;
- the dividend rate and preferences, if any, which dividends on that series of preferred stock will have compared to any other class or series of our capital stock;
- the voting rights, if any;
- the conversion or exchange privileges, if any, applicable to that series;
- the redemption price or prices and the other terms of redemption, if any, applicable to that series; and
- any purchase, retirement or sinking fund provisions applicable to that series.

Exhibit 3(a)
2506

GC000128

Any of these terms could have an adverse effect on the availability of earnings for distribution to the holders of our common stock or for other corporate purposes. We have no agreements or understandings for the issuance of any shares of preferred stock.

## Provisions That May Discourage Takeovers

Michigan law and our Bylaws contain provisions that may have the effect of discouraging transactions involving an actual or threatened change of control. These provisions could protect the continuity of our directors and management and possibly deprive shareholders of an opportunity to sell their shares of common stock at prices higher than the prevailing market prices. The following description is subject in its entirety to applicable Michigan law and our Articles and Bylaws.

*Ownership of Controlling Shares by the Moroun Family.* As of March 9, 2020, our Chairman, Matthew T. Moroun, and his father, Manuel J. Moroun, beneficially own in the aggregate 19,458,772 shares, or 71.44%, of our outstanding common stock. Beneficial ownership of and voting control over this block of shares by the Moroun family could render it more difficult or discourage an attempt to obtain control of the Company by means of a merger, tender offer, proxy contest or otherwise and possibly deprive other shareholders of an opportunity to sell their shares at prices higher than the prevailing market prices.

*Availability of Authorized but Unissued Shares.* All of our preferred stock and a substantial amount of our common stock are authorized but unissued and not reserved for any particular purpose. Our board of directors may issue shares of authorized common or preferred stock without shareholder approval. If our board of directors decides to issue shares to persons friendly to current management, this could render more difficult or discourage an attempt to obtain control of the Company by means of a merger, tender offer, proxy contest or otherwise. Authorized but unissued shares also could be used to dilute the stock ownership of persons seeking to obtain control of the Company, including dilution through a shareholder rights plan of the type commonly known as a "poison pill," which the board of directors could adopt without a shareholder vote.

*Issuance of Preferred Stock.* In addition, our board of directors could issue preferred shares having voting rights that adversely affect the voting power of our common shareholders, which could have the effect of delaying, deferring or impeding a change in control of the Company.

*No Cumulative Voting.* Under Michigan law, shareholders do not have cumulative voting rights for the election of directors unless the Articles so provide. Our Articles do not provide for cumulative voting.

*Limitations on Nomination of Directors.* Under our Bylaws, in order for a shareholder to nominate a candidate for director, notice of the nomination must be given to us not less than 90 days before the first anniversary of the preceding year's annual meeting. The shareholder submitting the notice of nomination must describe various matters as specified in our Bylaws, including the name, age and address of each proposed nominee, his or her occupation, the number of shares held by the nominee and any other information that would be required under SEC rules in a proxy statement soliciting proxies for the election of the nominee.

*Limitation on Calling Special Meetings of Shareholders.* Michigan law allows the board of directors or officers, directors or shareholders authorized in our corporation's Bylaws to call special meetings of shareholders. Our Bylaws provide that a special meeting may be called by our board of directors, the Chairman of the Board or the Chief Executive Officer or shall be called by the Chief Executive Officer or Secretary at the request of shareholders holding a majority of the shares of stock entitled to vote at the proposed special meeting. Business to be transacted at a special meeting is limited by our Bylaws to the purpose or purposes stated in the notice of the meeting.

## Business Combinations

We are subject to Chapter 7A of the MBCA, which provides that a business combination subject to Chapter 7A between a covered Michigan corporation or any of its subsidiaries and a beneficial owner of shares entitled to 10% or more of the voting power of such corporation generally require the affirmative vote of 90% of the votes of each class of stock entitled to vote, and not less than 2/3 of each class of stock entitled to vote (excluding voting shares owned by such 10% owner), voting as a separate class. Such requirements do not apply if (1) the corporation's board of directors approves the transaction prior to the time the 10% owner becomes such or (2) the transaction satisfies certain fairness standards, certain other conditions are met and the 10% owner has been such for at least five years. Chapter 7A business combinations include, among other transactions, mergers, significant asset transfers, certain disproportionate issuances of shares to an interested shareholder, certain reclassifications and recapitalizations disproportionately favorable to such shareholder, and the adoption of a plan of liquidation or dissolution in

Exhibit 3(a)
2507

GC000129

which such a shareholder would receive anything other than cash. Chapter 7A does not cover business combinations effected by purchase of shares from other shareholders in the open market or acquired through a tender offer.

## Choice of Forum

Our Bylaws, to the fullest extent permitted by law, provide that the Circuit Court of the County of Macomb in the State of Michigan or the United States District Court for the Eastern District of Michigan, Southern Division, are the sole and exclusive forums for (i) any derivative action or proceeding brought on behalf of the Company, (ii) any action asserting a claim of breach of a fiduciary duty owed to the Company or the Company's shareholders by any of the Company's directors, officers, employees or agents, (iii) any action asserting a claim against the Company arising under the MBCA, our Articles or our Bylaws or (iv) any action asserting a claim against the Company that is governed by the internal affairs doctrine. We may consent in writing to alternative forums.

Exhibit 3(a)
2508

GC000130

**GC Ex 4**

GC000131



**Authorization For Representation — Autorizar Para Representar**

I, the undersigned employee of — Yo, el firmando empleado de

Company - Compania  UNIVERSAL INTERMODAL SERVICES

Address - Domicilio  2035 E. VISTA BELLA WAY COMPTON 90221

authorize Teamsters Local 848 to represent me in negotiations for better wages, hours and working conditions.

autorizo Teamsters Local 848 que me represente en negociar para mejores sueldos, horas y condiciónes de trabaja.

Name - Nombre  Romel Maillard    Date/Fecha  11·2·19

Address - Domicilio  [REDACTED]  PARAMOUNT CA 90723

Present wage rate / Sueldo por hora  $24 PER HR    home-phone / casa-telefono  323)437-9024

Kind of work / Clase de trabajo  TRUCK DRIVER

Shift: Day ___ Swing ___ Graveyard ✓

Turno: Dia ___ Medio ___ Noche ___

Signature / Su Firma  Romel Maillard

**All cards kept confidential by the Teamsters Union and the U.S. Government**

**Toda tarjeta firmeda es confidencial de la Union y el gobierno.**

Exhibit 3(a)

GC4                          XX
EXHIBIT NO._____   RECEIVED _____   REJECTED _____


         21-CA-252500, et al.            MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


            2              6/17/21           T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2510



# On December 4th
# WE'RE VOTING
# 'Teamsters YES'

     





We are voting Teamsters YES at Universal Intermodal Services and we urge you to join us!

Once we vote to form our union, we will begin negotiating a contract that addresses our issues like:

- *Fair pay;*
- *Improved benefits;*
- *A voice on the job.*

We are in the final stretch. Let's stay strong, united and focused and get the job done.

Vote Teamsters YES! on December 4th.









     



## For More Information, Call Miguel Cubillos at (619) 203-7177.

GC Ex 5

Exhibit 3(a)
2511

GC000132

GC5                              XX
EXHIBIT NO._____  RECEIVED _____  REJECTED _____

       21-CA-252500, et al.        MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

         3              6/17/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2512



# el 4 de diciembre
# VAMOS A VOTAR
# 'Teamsters SI'

**ORGANIZING FOR POWER**

     





¡Estamos votando Teamsters SÍ en Universal Intermodal Services y te invitamos a que te unas a nosotros YA!

Una vez que votemos para formar nuestra Union, comenzaremos a negociar un contrato que atienda nuestros problemas, como:

- ***Pago justo.***
- ***Mejor Beneficios.***
- ***Una voz en el trabajo.***







Estamos en el tramo final. Mantengámonos fuertes, unidos, enfocados y hagamos lo que nos toca.

Vota Teamsters ¡SÍ! el 4 de diciembre.







     

**Para más información, llame a Miguel Cubillos al (619) 203-7177.**

Exhibit 3(a)
2513

GC000133



79%  11:07 AM

✕  1                                    ⧉  🗑  ⋮

Wednesday, Nov 20 • 1:42 AM

**D**  Chassis info?

Wednesday, Nov 20 • 2:55 AM

HJCZ147046

Wednesday, Nov 20 • 5:03 PM

**D**  What time may you arrive?
We have a meeting today.

Thursday, Nov 21 • 2:32 AM

Chassi info SSAZ414452

Thursday, Nov 21 • 10:00 PM

**D**  Chassis info

Chassi info SCEP 442937.
Empty info OOCU6932970

⊕  🖼  Text message          😊  
                                    SMS

**GC Ex 6**

Exhibit 3(a)
2514                                                           GC000134

GC6                           XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

      21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

             2              6/17/21           T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2515



**GC Ex 7**

Exhibit 3(a)
2516

GC000135

GC7                          XX
EXHIBIT NO._____   RECEIVED _____ REJECTED _____


   21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


      2             6/17/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2517

**GC Ex 8**

GC000136

**Authorization For Representation — Autorizar Para Representar**

**I, the undersigned employee of — Yo, el firmando empleado de**

Company - Compania _Universal Intermodal Services_

Address - Domicilio _2035 E. Vista Bella Way, Compton, CA 90221_

authorize Teamsters Local 848 to represent me in negotiations for better wages, hours and working conditions.

autorizo Teamsters Local 848 que me represente en negociar para mejores sueldos, horas y condiciónes de trabaja.

Name - Nombre _Jonathan Ledesma_     Date Fecha _11/2/19_

Address - Domicilio ▮▮▮▮▮▮ _Los Angeles, CA 90001_
                     number - street - calle - numero          city - zip - ciudad - zona

Present wage rate Sueldo por hora _$24_     home - phone casa - telefono _(323) 835-3170_

Kind of work Clase de trabajo _Driver_     Shift: Day _X_ Swing ___ Graveyard ___
                                            Turno: Dia ___ Medio ___ Noche ___

Signature Su Firma _Jonathan Ledesma_

**All cards kept confidential by the Teamsters Union and the U.S. Government**

**Toda tarjeta firmeda es confidencial de la Union y el gobierno.**

Exhibit 3(a)
2518

GC8                         XX
EXHIBIT NO._____   RECEIVED _____ REJECTED _____

   21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

          2              6/17/21              T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2519

**Authorization For Representation — Autorizar Para Representar**

**I, the undersigned employee of — Yo, el firmando empleado de**

Company - Compania  *Universal Intermodel Services*

Address - Domicilio  *15033 Slover Ave Fontana CA 92337*

authorize Teamsters Local 848 to represent me in negotiations for better wages, hours and working conditions.

autorizo Teamsters Local 848 que me represente en negociar por mejores sueldos, horas y condiciónes de trabaja.

Name - Nombre  *Kevin Paullard*   Date Fecha  *11-3-19*

Address - Domicilio  ▮▮▮▮▮▮▮▮▮▮▮   *Beaumont CA 92223*
　　　　　　　　　　　number - street - calle - numero    city - zip - ciudad - zona

Present wage rate
Sueldo por hora  *$ 19.00 hr*   home-phone casa-telefono  *951 350-5851*

Kind of work   Shift: Day ✓ Swing ___ Graveyard ___

Clase de trabajo  *Driver*   Turno: Dia ___ Medio ___ Noche ___

Signature
Su Firma  _____

**All cards kept confidential by the Teamsters Union and the U.S. Government**
**Toda tarjeta firmada es confidencial de la Union y el gobierno.**



**GC Ex 9**

Exhibit 3(a)
2520

GC000137

```
              GC9                        XX
EXHIBIT NO._____  RECEIVED _____ REJECTED _____


        21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


              2              6/22/21           T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____
```

Exhibit 3(a)
2521

**GC Ex 10**

GC000138

**Authorization For Representation — Autorizar Para Representar**

I, the undersigned employee of — Yo, el firmando empleado de

Company - Compania _Universal Intermodal Serv_

Address - Domicilio _15033 Slover Ave. Fontana CA 92337_

authorize Teamsters Local 848 to represent me in negotiations for better wages, hours and working conditions.

autorizo Teamsters Local 848 que me represente en negociar para mejores sueldos, horas y condiciónes de trabaja.

Name - Nombre _Julio C Carlos_    Date Fecha _NOV, 3 2019_

Address - Domicilio ▆▆▆▆▆▆▆    _San Jacinto 92583_
number - street - calle - numero    city - zip - ciudad - zona

Present wage rate
Sueldo por hora _24_    home - phone casa - telefono _951-581-3136_

Kind of work    Shift: Day ___ Swing ✓ Graveyard ___
Clase de trabajo _Class A truck driver_    Turno: Dia ___ Medio ___ Noche ___

Signature
Su Firma _____

**All cards kept confidential by the Teamsters Union and the U.S. Government**
**Toda tarjeta firmeda es confidencial de la Union y el gobierno.**

Exhibit 3(a)
2522

GC10                          XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2                   6/21/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2523



11:29 AM

+1 586-571-6665

Dec 9, 2019 7:53 PM

**1142366**

Dec 9, 2019 7:56 PM

Sent

Dec 9, 2019 7:56 PM

am i having a load after this

Dec 9, 2019 9:33 PM

No, BT back to Fontana yard

Dec 9, 2019 9:34 PM

4:00 clock out time

Dec 10, 2019 3:56 AM

scez 450223

Dec 10, 2019 7:19 PM

Sent

Dec 10, 2019 7:20 PM

is there another load

~~Dec 10, 2019 10:57 PM~~

Enter message

Send

GC
Ex
11

GC000139

GC11                          XX
EXHIBIT NO._____   RECEIVED _____   REJECTED _____


     21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


          5                6/21/21            T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2525

**+1 586-571-6665**

Dec 12, 2019 7:45 PM

Sent

Dec 12, 2019 7:47 PM

you got another load

Dec 12, 2019 10:05 PM

Nothing, BT back to Fontana yard

Dec 12, 2019 10:07 PM

what i was just getting warmed up.

Dec 12, 2019 10:09 PM

Yeah, we have nothing else on the board

Dec 12, 2019 10:09 PM

ok..!

Dec 12, 2019 10:10 PM

stoped to getting my 15 min rest break then
using the restroom then getting my lunch 10 - 4

Dec 13, 2019 12:10 AM

Enter message    Send

**11.33 AM**

**+1 586-571-6665**

using the restroom then getting my lunch 10 - 4

Dec 13, 2019 12:10 AM

**10-4**

Dec 13, 2019 12:10 AM

2:30 clock out time

Dec 13, 2019 2:13 AM

The week of the 23rd thru the 27th there is only going to be day side work.  Start time for those dates will be at 5am

Dec 16, 2019 1:17 PM

hey anyword on my missing hours

Dec 16, 2019 2:48 PM

You have an empty that you are pick up at City of Industry since Jose has no truck,
To avoid missing your pier E appointment, you can drop at the yard then terminate the empty later.

Dec 16, 2019 5:39 PM

can you send it to my tablet

Dec 16, 2019 5:44 PM

Enter message  Send

  

**+1 586-571-6665**

getting my 15 min break..

Dec 19, 2019 9:59 PM

10-4

Dec 19, 2019 10:01 PM

is there another load

Dec 19, 2019 10:30 PM

That's it for tonightBT to Fontana

Dec 19, 2019 10:32 PM

getting my 15 min then lunch break

Dec 20, 2019 12:45 AM

Advise your clock out time

Dec 20, 2019 1:47 AM

You should be done for the night? Clock out
time?

Dec 20, 2019 2:26 AM

2:30 clock out time..

Dec 20, 2019 2:27 AM

Enter message

Send

**GC Ex 12**

GC000143

**Authorization For Representation — Autorizar Para Representar**

**I, the undersigned employee of — Yo, el firmando empleado de**

Company - Compania _UNIVERSAL TRANSMIN't_ Steven

Address - Domicilio _15033 SILVER Santa CA 92226_

authorize Teamsters Local 848 to represent me in negotiations for better wages, hours and working conditions.

autorizo Teamsters Local 848 que me represente en negociar para mejores sueldos, horas y condiciónes de trabaja.

Name - Nombre _STEVE IS CUMMING_   Date Fecha _11-2-19_

Address - Domicilio _[redacted]_   number - street - calle - numero   city - zip - ciudad - zona

Present wage rate   _24/Hour_   home-phone casa-teléfono _94-749 52X5_
Sueldo por hora

Kind of work   _Truck Driver_   Shift: Day ___ Swing ___ Graveyard ___
Clase de trabajo   Turno: Dia ___ Medio ___ Noche ___

Signature
Su Firma _____

**All cards kept confidential by the Teamsters Union and the U.S. Government**

**Toda tarjeta firmada es confidencial de la Union y el gobierno.**

Exhibit 3(a)
2529

GC12                          XX
EXHIBIT NO._____   RECEIVED _____ REJECTED _____

     21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

          2              6/22/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2530

**GC Ex 13**

GC000144

**Authorization For Representation — Autorizar Para Representar**

I, the undersigned employee of — Yo, el firmando empleado de

Company - Compania _UNIVERSAL INTERMODAL SERVICE_

Address - Domicilio _2055 E. VISTA BELLA Way N. Rancho Dominguez CA 90746_

authorize Teamsters Local 848 to represent me in negotiations for better wages, hours and working conditions.

autorizo Teamsters Local 848 que me represente en negociar para mejores sueldos, horas y condiciónes de trabaja.

| | | |
|---|---|---|
| Name - Nombre _Todd C. Ellis_ | Date Fecha | _11/3/19_ |
| Address - Domicilio ▮▮▮▮▮▮▮▮ | | _Long Beach CA 90806_ |
| | number - street - calle - numero | city - zip - ciudad - zona |
| Present wage rate Sueldo por hora _24.00 PER HOUR_ | home-phone casa-telefono | _310 484-5581_ |
| Kind of work Clase de trabajo _Truck Driver_ | Shift: Day ___ Swing ___ Graveyard ___ Turno: Día ___ Medio ___ Noche ___ |
| Signature Su Firma | | |

**All cards kept confidential by the Teamsters Union and the U.S. Government**

**Toda tarjeta firmada es confidencial de la Union y el gobierno.**

Exhibit 3(a)
2531

GC13                          XX
EXHIBIT NO._____ RECEIVED _____ REJECTED _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

2                6/22/21              T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2532

### Nightside Dispatch Universal Ranch...
+15865716665

Lunch Break doe..

10:30 PM

**10-4** 10:31 PM

**Thursday, December 5, 2019**

GACZ701285 45FT EMCEZJ8139 SEAL# TO TJ MAXX/YUSEN

12:30 AM

Bobtail outta Yusen Logistics Carson

1:07 AM

**10-4**

**That's it for tonight** 1:07 AM

No NIGHTSIDE work tonight?

4:52 PM

Yes that's correct no night work

4:55 PM

**Friday, December 6, 2019**

**No work for tonight** 11:51 AM

**Monday, December 9, 2019**

In tractor 7221 2412270 plate #

5:39 PM

OOLU9591365

**GC Ex 14**

GC000145

Exhibit 3(a)
2533

Enter message   SEND

```
            GC14                    XX
EXHIBIT NO._____  RECEIVED _____ REJECTED _____


       21-CA-252500, et al.        MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____


             2              6/22/21           T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____
```

Exhibit 3(a)
2534



Nightside Dispatch Universal Ranch...
PCT/Cosco

Thursday, December 19, 2019

Another truck squeezed in now

They said they went to lunch and should be going soon

It's moving now.

10-4

But they kept letting drivers jump in the line..

Cosco loadout WHLU5223303 TLXZ513662 LABP CHASSIS WHLG252574 SEAL# TO NRT COMPTON

Security is saying I have to take an MTY here now.

Ok, that's fine, then take it to SCE5

Find any?

Okay.. I finally located one of the 7 SCExpress MTYS Security swears that are in the facility I noticed my Drive Time had run out because I didn't take lunch so I'm at NRT hooked up to MTY CCLU5067800 TLXZ465017 M.O.L. CHASSIS with inspection stickers from YTI YUSEN/ NYK so I will say it's a Port C

⊙ VIEW ALL                    >

Ok, sounds good. Just take it to SCE5

10/4
Just letting you know what's going on out here with me.🧍😅

Thank you

Bobtail at SC5 yard

That's all for tonight man

No Franco yard to Icon fitness Beaumont ?

Nope, nothing

10/4..

Is this Alex? Or Janet?

Hi it's Janet

Hello Ms Janet!!!😘 I would like to make myself available for Dayside DISPATCH tomorrow morning 6am please...😊

Due to the low volume there will be no work tomorrow for day side drivers. We start back on Monday at 6am

Okay...10/4.. & thanks😊

Your welcome

The 5 digit pin# for ITS LOADOUT 50600?

Yes

10/4

GESU6238752 GACZ403509 DCLI CHASSIS SEAL# CNB247348 LOADOUT FROM ITS TO FRANCO STORAGE YARD

10-4

Bobtail at Franco STORAGE yard Where to Bro?

Back to the yard, that's it for tonight

Do I have to take a lunch for 5 hrs?

Before you work 8 hours, I can't confirm it but I believe after 5 hours on duty you can take a 30 minute lunch

Okay.. when I get to the yard..

✎ Enter message

GC15                              XX
**EXHIBIT NO.**_____ **RECEIVED** _____ **REJECTED** _____

21-CA-252500, et al.          MASON-DIXON INTERMODAL
**CASE NO** _____ **CASE NAME** _____

2                6/22/21              T. RAY
**NO OF PAGES** _____ **DATE:** _____ **REPORTER:** _____

Exhibit 3(a)
2536



New Year, New You! Co
https://losangeles.craigslist.org/lgb/trp/d/compton-new-year-new-you-come-driver/7045058279.html

CL los angeles > long beach / 562 > jobs > transportation post | account

reply favorite hide flag Posted 10 days ago print

## New Year, New You! Come Driver for Universal and make $22/Hr (Compton, CA)

Careers That Move FORWARD

© craigslist - Map data © OpenStreetMap
(google map)

compensation: **$22 Hourly + Overtime**

employment type: **full-time**

## Local CDL Class A Drivers Wanted

To apply in person, please go to **550 S Alameda S. Compton, CA. 90221** between 8am and 5pm and ask for **Leonard Olson or Kyle Dwyer.**

To apply online go to https://careers.universallogistics.com/ (Be sure to put **"Universal Dedicated of Arlington"** when it asks for what division. Also be sure to put **Brooke Hartwell** as the recruiter you talked to.) **After completion of the application call Brooke at** (586)467-0951.

This is a direct hire position. You will be starting and ending your day in Compton, CA every day hauling for Boeing, a customer of Universal. *Light touch activities*
**Pay:** $22/Hr
**Shifts:** Day Shift, 7AM - 5PM.
**Benefits:** Blue Cross Blue Shield medical, dental and vision
Monday through Friday only
Paid Holidays and Paid Days Off

To apply online go to https://careers.universallogistics.com/ (Be sure to put **"Universal Dedicated of Arlington"** when it asks for what division. Also be sure to put **Brooke Hartwell** as the recruiter you talked to.) **After completion of the application call Brooke at** (586)467-0951.

## Call Brooke Hartwell for Direct Hire (586)467-0951

- Principals only. Recruiters, please don't contact this job poster.
- do NOT contact us with unsolicited services or offers

post id: 7045058279 posted: 10 days ago email to friend best of

**GC Ex 16**

GC16                              XX
EXHIBIT NO._____  RECEIVED _____ REJECTED _____

         21-CA-252500, et al.          MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

           4                 6/22/21              T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2538



New Year, New You! Come I | New Year, New You! Co

https://losangeles.craigslist.org/lgb/trp/d/compton-new-year-new-you-come-driver/7047335207.html

CL los angeles > long beach / 562 > jobs > transportation    post | account

reply  favorite  hide  flag    Posted 6 days ago    print

# New Year, New You! Come Driver for Universal and make $22/Hr (Compton, CA)

Careers That Move FORWARD

© craigslist - Map data © OpenStreetMap

(google map)

compensation: **$22 Hourly + Overtime**

employment type: **full-time**

## Local CDL Class A Drivers Wanted

To apply in person, please go to **550 S Alameda S. Compton, CA. 90221** between 8am and 5pm and ask for **Leonard Olson or Kyle Dwyer.**

To apply online go to https://careers.universallogistics.com/ (Be sure to put **"Universal Dedicated of Arlington"** when it asks for what division. Also be sure to put **Brooke Hartwell** as the recruiter you talked to.) **After completion of the application call Brooke at (586)467-0951.**

This is a direct hire position. You will be starting and ending your day in Compton, CA every day hauling for Boeing, a customer of Universal. *Light touch activities*
**Pay:** $22/Hr
**Shifts:** Day Shift, 7AM - 5PM.
**Benefits:** Blue Cross Blue Shield medical, dental and vision
Monday through Friday only
Paid Holidays and Paid Days Off

To apply online go to https://careers.universallogistics.com/ (Be sure to put **"Universal Dedicated of Arlington"** when it asks for what division. Also be sure to put **Brooke Hartwell** as the recruiter you talked to.) **After completion of the application call Brooke at (586)467-0951.**

## Call Brooke Hartwell for Direct Hire (586)467-0951

- Principals only. Recruiters, please don't contact this job poster.
- do NOT contact us with unsolicited services or offers

post id: 7047335207    posted: 6 days ago    email to friend    best of



New Year, New You! Come Driver for Universal and make $22/Hr (Compton, CA)

**Local CDL Class A Drivers Wanted**

To apply in person, please go to **550 S Alameda S. Compton, CA. 90221** between 8am and 5pm and ask for **Leonard Olson or Kyle Dwyer.**

To apply online go to https://careers.universallogistics.com/ (Be sure to put **"Universal Dedicated of Arlington"** when it asks for what division. Also be sure to put **Brooke Hartwell** as the recruiter you talked to.) **After completion of the application call Brooke at (586)467-0951.**

This is a direct hire position. You will be starting and ending your day in Compton, CA every day hauling for Boeing, a customer of Universal. *Light touch activities*
**Pay:** $22/Hr
**Shifts:** Day Shift, 7AM - 5PM.
**Benefits:** Blue Cross Blue Shield medical, dental and vision
Monday through Friday only
Paid Holidays and Paid Days Off

To apply online go to https://careers.universallogistics.com/ (Be sure to put **"Universal Dedicated of Arlington"** when it asks for what division. Also be sure to put **Brooke Hartwell** as the recruiter you talked to.) **After completion of the application call Brooke at (586)467-0951.**

**Call Brooke Hartwell for Direct Hire (586)467-0951**

· Principals only. Recruiters, please don't contact this job poster.
· do NOT contact us with unsolicited services or offers

post id: 7049195830       posted: 3 days ago       email to friend       best of [?]

compensation: **$22 Hourly + Overtime**

employment type: **full-time**

Exhibit 3(a)
2540

GC000149

**<**     **Tim Yungsta From UNIVER...(7)**     ⋮

When your job fire you but you come back in through a temp agency



8:38 PM

ALEX ALVAREZ UNIVERSAL

 https://losangeles.craigslist.org/lgb/trp/d/compton-new-year-new-you-come-driver/7049195830.html    MMS 8:38 PM

ALEX ALVAREZ UNIVERSAL

 I'm gona START using their saying new year new you    MMS 8:39 PM

Not for 22!!! 



**GC Ex 17**

Exhibit 3(a)
2541

 Enter message     SEND   GC000150

GC17                        XX
EXHIBIT NO._____  RECEIVED _____  REJECTED _____

21-CA-252500, et al.           MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

2            6/22/21         T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2542



CL long beach / 562 > transportation                                ...

reply  ☆  ☒  ⚑

**New Year, New You! Come Driver for Universal and make $22/Hr (Compton, CA)**



*Careers That Move* **FORWARD** ▶▶

## Local CDL Class A

## Drivers Wanted

To apply in person, please go to **550 S Alameda S. Compton, CA. 90221** between 8am and 5pm and ask for **Leonard Olson or Kyle Dwyer.**

To apply online go to **https://careers.universallogisti cs.com/** (Be sure to put **"Universal Dedicated of Arlington"** when it asks for what division. Also be sure to put **Brooke Hartwell** as the recruiter you talked to.) **After completion of the application call Brooke at (586)467-0951.**

This is a direct hire position. You will be starting and ending your day in Compton, CA every day hauling for Boeing, a customer of Universal. *Light touch activities*
**Pay:** $22/Hr
**Shifts:** Day Shift, 7AM - 5PM.
**Benefits:** Blue Cross Blue Shield medical, dental and vision
Monday through Friday only
Paid Holidays and Paid Days Off

To apply online go to **https://careers.universallogisti cs.com/** (Be sure to put **"Universal Dedicated of Arlington"** when it asks for what division. Also be sure to put **Brooke Hartwell** as the recruiter you talked to.) **After completion of the application call Brooke at (586)467-0951.**

## Call Brooke Hartwell

## for Direct Hire (586)467-

## 0951



© craigslist - Map data © OpenStreetMap
(google map)

compensation: **$22 Hourly + Overtime**

employment type: **full-time**

**GC Ex 18**

• Principals only. Recruiters, please don't contact this job poster.
• do NOT contact us with unsolicited services or offers

post id: 7049195830        posted: **3 days ago**        email to friend

♥ best of 🏆

Exhibit 3(a)
2543

GC000151

GC18                      XX
EXHIBIT NO._____   RECEIVED _____ REJECTED _____

      21-CA-252500, et al.        MASON-DIXON INTERMODAL
CASE NO _____ CASE NAME _____

          2            6/22/21          T. RAY
NO OF PAGES _____ DATE: _____ REPORTER: _____

Exhibit 3(a)
2544