# EXHIBIT 5

Exhibit 5
2759

Universal Intermodal Services
Case 21-CA-259130

## Confidential Witness Affidavit

**I <u>Julie Gutman Dickinson</u>, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

My business telephone number (including area code) is (818) 973-3228

My cell phone number (including area code) is (213) 200-0260

My e-mail address is JGD@bushgottlieb.com

I am an attorney/managing partner with Bush Gottlieb, a Law Corporation located at 801 North Brand Blvd, Suite 950, Glendale, California 91203.

1    This affidavit is part of the investigation of case 21-CA-259130. This investigation

2    relates to the processing of cases: 21-CA-252500, 21-CA-252574, 21-CA-253662, 21-CA-

3    254813, and 21-CA-255151.

4    My firm currently represents the International Brotherhood of Teamsters (Union) in the

5    processing of the above cases. As part of this representation, my firm is representing the Union

6    in its attempt to bargain a contract with Universal Intermodal Services (Employer), the employer

7    in RC case 21-RC-251460. The current case relates to the Employer's refusal to bargain with the

8    Union over a first contract, refusing and unreasonably delaying in providing the Union with

9    requested information relevant and necessary to collective bargaining, for effects bargaining, and

10   for bargaining regarding its decision to eliminate its unionized workforce, and relocate work

11   performed by this  unionized workforce to another location.

**Privacy Act Statement**

The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation.  The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006).  Additional information about these uses is available at the NLRB website, www.nlrb.gov.  Providing this information to the NLRB is voluntary.  However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

- 1 -                                    Initials    JGD

Exhibit 5
2760

Case 21-CA-259130

1    The certification in case 21-RC-251460 was issued on January 8, 2020.

2    Following the certification of the Union, I sent a demand to bargain and request for

3    information letter to the Employer on January 18, 2020. This seven-page letter is attached hereto

4    as **Exhibit 1**. In this letter, I requested to bargain over a collective-bargaining agreement, to

5    bargain over the decision to eliminate the unionized workforce, to bargain over the relocation of

6    the unit work, and to bargain over the effects of that decision. I also requested 11 types of

7    information, with sub-requests, from the Employer. The information I requested included, *inter*

8    *alia*, employee specific work information, wages, bonuses, benefits, job descriptions,

9    disciplinary notices,  policies, information related to the decision to layoff/transfer unit work,  etc

10   . . . . I requested that the Employer provide this information by January 31, 2020. The Employer

11   failed to provide the Union with any of the requested information by the January 31, 2020

12   deadline. To the current date, the Employer, as explained later, belatedly provided the Union

13   with only some of the requested information. However, the Employer failed and refused to

14   provide the Union with relevant and necessary information in response to numerous of the

15   Union's information requests. A specific list of all items the Union still needs is outlined later in

16   this statement.

17   On January 31, 2020, I received a letter from John Ferrer, an attorney representing the

18   Employer. This 2-page letter is attached hereto as **Exhibit 2**. In this letter, in response my

19   January 18, 2020 letter, Ferrer offered to meet with the Union to engage in effects bargaining

20   related to the Employer's decision to cease operation  out of  the Compton location at issue in

21   21-RC-251460 and lay-off the unit employees in December 2019. Based on the Employer's

22   unwillingness to bargain with the Union over a contract, the Employer also objected to the

23   Union's information requests on the grounds that such requests were irrelevant or overly broad.

- 2 -                    Initials: _____ JGD _____

Exhibit 5
2761

Case 21-CA-259130

1      On February 7, 2020, I sent a letter to Ferrer. This 2-page letter is attached hereto as

2    **Exhibit 3**. In this letter, I again reiterated the Union's request to bargain and explained the

3    Union's position on the relevance of the information requested in my January 18, 2020 letter. In

4    that regard, I explained to Ferrer that the Union's information requests were not only relevant to

5    collective bargaining but also relevant to bargaining over the decision and effects of the

6    Employer's decision to lay-off its unionized work force, which at the time the Employer

7    maintained was a decision it did not need to bargain over. In this letter, I again demanded that the

8    Employer provide the Union with the requested information, and to do so by no later than

9    February 14, 2020. As explained below, the Employer failed to provide the Union any

10    information by February 14, 2020.

11       From between February 11 through February 25, 2020, Ferrer and I exchanged several

12    emails discussing when the parties would set a phone call to talk about a meeting between the

13    parties and then setting a date for that meeting. This 4-page email chain is attached hereto as

14    **Exhibit 4.**

15       As referenced in **Exhibit 4**, on or around February 18, 2020 at around noon, I had a

16    conference call with John Ferrer, attorney for the Employer; Rodolfo Agraz, attorney for the

17    Employer; Jason Wojciechowski, attorney for the Union; Mike Manley, representative for the

18    Union; and Raven Hall, representative for the Union. Basically, during this call the Employer's

19    attorneys made it clear to the Union that it was the Employer's position that if they sat down to

20    meet with us, that it would not be for bargaining of a collective- bargaining agreement. The

21    Employer told us that it was their position that they did not have to bargain with us over a

22    contract because the cessation of business being done by the unionized work force was done for

23    a legitimate business purpose. The Employer took the position that they would meet with us for

Initials: _____JGD_____

Exhibit 5
2762

1   effects bargaining and that they would discuss with the Union their reasons for the decision to

2   cease doing business through the unionized work force. The Employer's representatives did

3   emphasize that despite meeting with us they reserved their position that they did not have any

4   obligation to bargain over the decision itself.

5          In response, I told the Employer that the Union was willing to sit down with the

6   Employer to hear their reasons for the decision to cease doing business through the unionized

7   work force. I also told them that we would be willing to bargain over the effects of that decision.

8   However, I told the Employer that we would also reserve our rights with regard to all of the

9   current NLRB charges and any future charges. I explained that the Union believes that the

10  Employer has a duty to bargain in good faith with the Union over a collective-bargaining

11  agreement and to provide us with all information pertinent for that purpose. I also made it clear

12  that the Union believes that the Employer has a duty to bargain with the Union over its decision

13  to cease doing business with the unionized workforce and to relocate that work to another

14  location.  After I made these points, I also brought up the fact that the Union had requested

15  information a month ago but has yet to receive any information.

16         At this point, I asked Ferrer to pull up my January 18, 2020 letter. Ferrer and I then spoke

17  about the letter. Ferrer told me that the Employer would be providing the Union with some of the

18  requested information, but that for certain items the Employer did not believe the requests were

19  relevant. At this point, Ferrer identified several items that he had issues with. For each item he

20  thought was not relevant,  I explained to him the Union's position on the relevance of those

21  requests. After my explanations, Ferrer would simply tell me that he saw what I was saying and

22  that the Employer would take a look at the items and see what it can produce. At some point

23  during this phone meeting, I also offered to enter into a limited confidentiality agreement with

- 4 -                    Initials:   JGD

Exhibit 5
2763

Case 21-CA-259130

1   the Employer with regard to any information that may be considered proprietary and

2   confidential. Ferrer said he would pass that along to the Employer.   I told Ferrer that it was

3   unacceptable that the Employer had not produced one piece of information for an entire month.

4   Ferrer said he would see what he could do.  At the end of the meeting, I offered to Ferrer several

5   dates in early March that the Union could meet. Ferrer told me that it may not be able to occur

6   until mid-March, but that he would get back to me the next day about when the Employer was

7   available. This is all I recall about this conversation at this time.

8   As shown in **Exhibit 4**, after not hearing from Ferrer the next day, on February 20, 2020,

9   I sent Ferrer an email offering a specific meeting date  (March 12) and also setting another

10   information production deadline for February 24, 2020. Ferrer responded to this email on

11   February 25, 2020 agreeing to meet on March 12 and stating that he needed until March 4, 2020

12   to provide information in response to the Union's information request.

13   On March 4, 2020, I received an email from Ferrer in response to my information

14   requests. This email included four attachments, including a letter dated March 4, 2020 and

15   Attachments A through D. A three-page document that includes the March 4, 2020 email and the

16   attached letter dated March 4, 2020 is attached hereto as **Exhibit 5**. I have also provided the

17   Region with the contents of Attachments A through D. In the attached letter dated March 4,

18   2020, Ferrer objected to the Union's requests. Specifically, he objected to Union information

19   requests 6, 7, and 10 on relevance grounds and information requests 11 on confidentiality

20   grounds.

21   On March 6, 2020, I received a second email from the Employer with some additional

22   information. This email is a part of a three-page email chain that relates to my March 10, 2020

Initials: _____ JGD _____

Exhibit 5
2764

Case 21-CA-259130

1  response to the Employer. This three-page email chain is attached hereto as **Exhibit 6**. I have

2  provided the Region with the attachments of this email.

3        On March 10, 2020, I replied to Ferrer's email explaining the deficiency of the

4  Employer's production. Addressing the Employer's specific objections, I explained that Union

5  requests 6 and 7 relate to presumptively relevant information and that the Union would be

6  willing to enter into an appropriate confidentiality agreement to obtain information related to

7  Union request 11. In this email, I also demanded that the Employer provide all relevant material

8  on or before the time we met on  March 12, 2020.

9        On March 11, 2020, Ferrer emailed me back again providing some additional

10  supplemental information. The three-page email chain that includes Ferrer's March 11, 2020

11  email is attached hereto as **Exhibit 7**. I have also provided the Region with the attachments that

12  Ferrer provided in that email. Again, the information provided was delayed and was incomplete.

13        On March 12, 2020 at around noon, the Union and Employer met for an effects

14  bargaining session at the Bush Gottlieb office located at 801 North Brand Blvd, Suite 950,

15  Glendale, CA. The persons present at this meeting for the Union included Union representatives

16  Eric Tate and Ricardo Hidalgo, Union counsel Hector De Haro, Union counsel Jason

17  Wojciechowski, and me. The persons present for the Employer at this meeting included

18  Employer Counsel Rodolfo Agraz, Regional Director of the West Coast for Universal Intermodal

19  Services Tony Milles, and Vice President of Labor Relations and Human Resources for

20  Universal Logistics Holdings, Inc. Dennis Glackin. This meeting started with the parties

21  discussing the scope of the meeting. This discussion was similar to the conversation that the

22  parties had during the February 18, 2020 phone call. I did make it clear, however, that the Union

23  was meeting with the Employer notwithstanding its failure to provide the Union with relevant

Initials: _____JGD_____

Exhibit 5
2765

Case 21-CA-259130

1   and necessary information to bargain over the issues at this meeting. I also made it clear that the

2   Union was reserving its rights to continue to seek that information. I then said that it was the

3   Union's position that the Employer laid-off its unionized work force and relocated unit work in

4   retaliation for the employees' decision to unionize, in violation of Sections 8(a)(1) and 8(a)(3) of

5   the NLRA. I told the Employer that it took this decision without notice to the Union, depriving

6   the Union of the ability to bargain over the decision or its effects in violation of Section 8(a)(5)

7   of the NLRA. I told the Employer that the Union was vigorously pursuing the existing NLRB

8   charges, including by seeking injunctive relief to reinstate all employees, and to reestablish the

9   unit in one location. I also told the Employer that they had an obligation to reinstate the laid-off

10  employees, reestablish the unit, and to give the Union notice before any contemplated lay-offs or

11  relocation of unit work. Additionally, I said that the Employer also has a duty to bargain in good

12  faith with the Union to reach a collective bargaining agreement and to provide the Union with all

13  relevant information necessary for that purpose. I then told the Employer that while the Union

14  has agreed to sit down with Employer to hear their reasons for the lay-offs and to bargain over

15  the effects of that lay-off, the Union was doing  so while reserving all the positions that I

16  outlined above and also with regard to any existing or future NLRB charges.

17          At this point, the Employer reiterated its position from the February 18, 2020 phone call,

18  stating , inter alia, that it had no duty to bargain for a collective bargaining agreement or to

19  bargain over the decision. It was here solely to bargain over the effects of the decision , and to

20  discuss the reasons for the decision per the Union's request.

21          After the parties talked about the scope of the meeting, the parties began to talk about the

22  reasons for the layoff. Agraz told us that the Employer laid-off the unionized employees not

23  because of any labor  costs or labor issues but because of the downward flow of freight such as

- 7 -          Initials: ___JGD___

Exhibit 5
2766

Case 21-CA-259130

1   the downturn that happened the previous week. I believe Agraz was referencing a slowdown in

2   imports that happened in March due to the corona virus outbreak in China. At this point, the

3   Union asked Agraz if he had any information to support this claim, because the lay-off was

4   before the coronavirus outbreak. Agraz told us that he did not have information at that time.

5   Agraz then told us another reason for the closure was because of the expiring lease of the

6   Compton facility. Agraz went into details about how maintaining that facility was costing the

7   Employer 1.5 million dollars a year. Agraz made the final point that it was merely an

8   entrepreneurial decision to close the location with the unionized workforce.

9       At this point, I asked Agraz when that decision was made. Agraz responded December 6.

10  I then  stated how ironic it was that the decision was made two days after the union election on

11  December 4,  where the employees overwhelmingly voted to be represented by the Union. Agraz

12  responded by saying that while that may be (referring to the union election),  the Employer had

13  been thinking about the decision since March. I then asked Agraz to confirm that his  position

14  was that  the Employer had being thinking about the closure since March, but did not

15  communicate it to the employees or the Union until December 18. Agraz responded yes that was

16  his understanding. I asked Agraz why the Employer waited until December 18 to communicate

17  anything about a decision it had been thinking about since March. Agraz said that he could not

18  answer that question at this time, but there may be some documents about it. I requested that

19  Agraz provide the Union with those documents. Agraz told me that he would look at the

20  documents and see what he could give us.

21      At this point, Hidalgo and I asked the Employer about Southern Counties Yard 5, about

22  whether it was still operating, because that was where the unionized employees were previously

23  told that they would be moving to. Agraz acknowledged that Southern Counties Yard 5 was still

- 8 -

Initials:  _____JGD_____

Exhibit 5
2767

Case 21-CA-259130

1  operating, but that there were no more employees working for Universal Intermodal at that

2  location. Agraz said that it was a business decision to no longer have employee drivers for

3  Universal after December 20, 2020. At this point, the Union asked the Employer who was doing

4  the work that the unionized workforce had been doing out of Compton/Fontana. Agraz

5  responded "independent contractors." The Union asked where these independent contractors

6  were coming from. At this point Agraz did not answer our question and instead the parties took a

7  quick caucus. I recall that after the caucus the Union asked the Employer again who was doing

8  the work that was performed by the laid-off work force. At this point, Milles responded by

9  saying "independent contractors of Universal slash Southern Counties." I then asked if all the

10 work that was being done by the unionized employees at Universal was now being done by

11 independent contractors of Universal/Southern Counties. Agraz and Milles both responded yes,

12 only independent contractors. Milles said further that, "Universal /Southern Counties was now

13 out of the business of using employee company drivers since December 20, 2020." At this point,

14 Hidalgo asked about whose SCAC code was being used by the Employer. The Employer did not

15 respond.

16      After this discussion, I switched the conversation to discuss the Employer's failure to

17 provide the Union with information. I specifically said that I was disappointed that I did not get

18 any of the information related to the Employer's decision to lay-off employees, such as items in

19 request 11. Agraz said that the Employer would not provide that information because it was not

20 relevant. I told Agraz that the Employer was changing its position, because during the February

21 18, 2020 call, I reminded him that Ferrer had told me that he could see how the requested

22 information could be relevant and that I saw what they were doing was gross bad faith. Agraz

23 said that the Employer would review it again and would get back to me as soon as possible.

Initials: ___JGD___

Exhibit 5
2768

Case 21-CA-259130

1        At this point in the discussion, the parties began to talk about effects bargaining

2    proposals. Broadly speaking,  the Employer offered an agreement that provided for partial back-

3    pay and an agreement that if Universal were to employ port-drivers in Compton, CA ,as

4    employees, in the future, that it would recognize the Union as the representative of these new

5    employees upon a showing of majority support. The Union countered with a proposal that

6    required the Employer to pay full back-pay to the employees, to reinstate them,  and to

7    reconstitute the unit in one place at any other location nearby. While the parties were willing to

8    change the back-pay component of their offer, the Employer refused to reconstitute the unit.

9    Toward the end of the meeting the Union in effect made an  offer that would require

10    reinstatement and the reconstituting of the unit and less than full back-pay. Once the Union made

11    this offer, I told the Employer that we would give the Employer 10 days after the meeting to let

12    us know if they accepted our new offer and to provided us with all of the requested information

13    that remained outstanding . I also reminded the Employer that we were open to entering into a

14    confidentiality agreement with the Employer regarding any confidential and proprietary

15    information.  The Employer representatives  stated that they  would get back to us within 10

16    days.  This is all I recall about this meeting at this time.

17        Since the meeting on March 12, 2020, the Employer has not provided the Union with any

18    further information that it has requested. The Employer has also not responded to the Union's

19    offer to enter into a confidentiality agreement to address what the Employer considers

20    confidential and proprietary information. The Employer has not made any offers of

21    accommodations to the Union. Furthermore, it is my understanding that there was an informal

22    meeting between Union representative Eric Tate and Richard Silverman, a Universal VP, on

23    March 23, 2020.  Tate informed me that during this informal meeting, Silverman made clear that

Initials: _____JGD_____

Exhibit 5
2769

Case 21-CA-259130

1   the  Employer rejected the Union's effects bargaining proposal and would not be presenting us

2   with any counter-proposal or any additional information. Based on my communication with Tate,

3   the Union has not renewed its requests for information since the March 12, 2020 meeting. The

4   Union has not done so because based on Tate's conversation with the Employer's representative

5   further attempt to request information would be futile.

6         At this time, the Union maintains that it is still missing the following list of information:

7         1(b) – sex/gender of employees,

8         1(c) – race of employees,

9         1(d) – date of birth of employees,

10        1(i)(ii)–(v) – various sub-items related to the employees' wage rate,

11        1(n) – hours canceled,

12        1(o) – bonuses paid,

13        1(p) – retirement plan contributions,

14        1(q) – missed break payments,

15        6 – policies, work rules, handbooks,

16        7 – health and safety logs,

17        8 – disciplinary notices,

18        11 – yes to (l) and a partial response to (i), but nothing else.

19         The Union maintains that requests, 1, 6, 7, and 8 are all presumptively relevant

20   information necessary for the Union to effectively represent the unit employees both for

21   bargaining a contract and to bargain over the effects of the Employer's decision to lay off the

22   unionized employees. The Union will provide the Region a position statement later outlining the

23   relevance of the various sub-items of the Union request 11, which includes requests for financial

Initials: ___JGD___

Exhibit 5
2770

Case 21-CA-259130

1   information and other information, which we also maintain are relevant to bargain over the

2   decision to layoff and relocate/transfer unit work.

3          Since the meeting on March 12, 2020, the Union and Employer have not met to bargain

4   over a new contract. In fact, the Employer remains unwilling to enter into general contract

5   negotiations with the Union. The Employer has insisted, as shown in **Exhibits 2 & 7,** and as

6   they stated on February 18 and March 12, that it would only meet with the Union to engage in

7   effects bargaining. The Union has not requested to meet again with the Employer since March

8   12, 2020 as it would be futile based on what Tate reported to me following his meeting with

9   Universal principal Silverman on March 23, 2020. The Union has heard nothing from the

10  Employer since that time.

**I am being provided a copy of this Confidential Witness Affidavit for my review.  I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 12 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.**

Date:  _05/05/2020_          Signature: _Julie Gutman D___

                                                            **Julie Gutman Dickinson**

**Signed and sworn to before me by telephone on  May 5, 2020**

PHUONG DO   Digitally signed by PHUONG DO
             Date: 2020.05.06 11:45:18 -07'00'

**Phuong Do**
**Board Agent**
**National Labor Relations Board**

- 12 -          Initials: _JGD_

Exhibit 5
2771

# EXHIBIT 1

Exhibit 5
2772

# BUSH GOTTLIEB
## A Law Corporation

David E. Ahdoot
Robert A. Bush
Hector De Haro
Lisa C. Demidovich#
Erica Deutsch
Peter S. Dickinson+
Ira L. Gottlieb*
Julie Gutman Dickinson
Joseph A. Kohanski*

* Also admitted in New York
+ Also admitted in Nevada
# Also admitted in Washington DC
~ Admitted in Washington DC

801 North Brand Boulevard, Suite 950
Glendale, California 91203
Telephone (818) 973-3200
Facsimile (818) 973-3201
www.bushgottlieb.com

January 18, 2020

Adam Kornetsky~
Dana S. Martinez
Garrett A. McCoy
Kirk M. Prestegard
Dexter Rappleye
Estephanie Villalpando
Jason Wojciechowski
Vanessa C. Wright

11135-29006

Direct Dial: (818) 973-3228
jgutmandickinson@bushgottlieb.com

**VIA E-MAIL, FAX, AND U.S. MAIL**

Tony Milles
Mason-Dixon International d/b/a Universal
Intermodal Services
9515 10th Ave South
Seattle, CA 98108
P: 206 762 6100
F: 586 467 0904
tmilles@universalintermodal.com

John S. Ferrer
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1909 K Street NW, Suite 1000
Washington, D.C. 20006
P: 202 263 0173
F: 202 887 0866
john.ferrer@ogletree.com

Re:     Union's Demand to Bargain and Request for Information

Dear Mr. Milles and Mr. Ferrer:

As you are aware, on January 8, 2020, the International Brotherhood of Teamsters (the "Union") was certified as the exclusive bargaining representative for "All full-time and regular part-time port drivers employed by the Employer working or dispatched out of the Employer's facility currently located at 2035 Vista Bella Way, Compton, California," with the Employer being Mason-Dixon Intermodal d/b/a Universal Intermodal Services. This letter is to demand bargaining over the terms and conditions of employment for those employees. Please immediately provide your availability for bargaining sessions in January and February 2020.

The Union has also become aware that after employees voted to unionize, the Employer, without giving notice to the Union, unilaterally terminated all bargaining unit employees and closed the Compton facility, assigning the work previously done by those bargaining unit employees to non-union employees at other locations. In addition to constituting unlawful discrimination and retaliation, these actions are clear violations of the Employer's duty to bargain with the Union. Accordingly, the Union demands that the Employer  restore the status quo by reinstating all unlawfully terminated employees, and bargain with the Union over the  decision to close the facility and relocate unit work. In addition to bargaining over the decision itself, the Union demands the Employer bargain over the effects of these decisions on the bargaining unit.

**VIA E-MAIL AND U.S. MAIL**
Universal
January 17, 2020
Page 2

In preparation for our upcoming contract negotiations, the Union needs certain information in order to develop proposals and prepare for productive negotiations. Because we hope to arrive at a collective bargaining agreement expeditiously, please provide this information as soon as possible, and by no later than Friday, January 31, 2020.  Please identify any information that is not readily available, and provide a timeline of when that information will be made available to the Union so that we can plan accordingly. In addition, please identify any portion of this request for which the Employer does not maintain information, or where information is otherwise not available.

1. **Employee specific information:** A list of all bargaining unit employees containing the following information in excel spreadsheet format. "Bargaining unit employees" includes any and all employees who were terminated at any point from October 2019 through the present. Unless indicated otherwise, these requests should be construed as asking for the information for the 12-month period from January 17, 2019 through the present. For each individual employee please include the following information:

   a.  name;

   b.  sex or gender;

   c.  race;

   d.  employee number or social security number;

   e.  address;

   f.  date of birth;

   g.  phone number;

   h.  job classification;

   i.  wage rate, including:

      i.  base wage rate;

      ii.  whether the employee has received a higher rate of pay because they have opted out of insurance or other benefits;

      iii.  amounts paid for any premiums or differentials, e.g. for certifications, specialties, or endorsements;

      iv.  step and or grade on pay scale;

VIA E-MAIL AND U.S. MAIL
Universal
January 17, 2020
Page 3

      v.    all wage increases granted in the past two years and dates on which they were granted;

j.    status (full-time, part-time, temporary, or other);

k.    schedule or hours worked;

l.    date of hire;

m.    number of hours worked and total paid, including:

      i.    number of hours and total paid as straight time

      ii.    number of overtime hours worked for which the employee received any time of overtime premium, with an indication of whether the overtime was mandatory, and total paid;

      iii.    number of hours worked and total paid for shift (night, evening and weekend) differentials.  Please specify the amount of the differential;

      iv.    number of hours spent on-call and total paid to the employee for being on on-call;

      v.    number of hours and total paid for reporting pay;

      vi.    number of hours and total paid for holidays;

      vii.    number of PTO or vacation hours used, total paid for PTO or vacation, and the remaining balance in employee leave banks;

      viii.    number of sick leave hours used, total paid for sick leave, and the remaining balance in employee leave banks;

      ix.    number of hours and total paid for bereavement leave;

n.    number of hours missed as a result of the employee being called off or as a result of the Employer otherwise canceling that employee's scheduled shift;

o.    total amounts paid for any hiring, recruitment, relocation or retention bonuses;

p.    amount employee and employer contributed to all retirement plans.  Please breakout information by retirement plan and by employee/employer contribution;

q.    amounts paid to employee for missed breaks;

**VIA E-MAIL AND U.S. MAIL**
Universal
January 17, 2020
Page 4

2.    **Fringe Benefits:** Please provide the following information for any health plans maintained by the Employer:

    a.    Plan summaries for any and all insurance plans, health and otherwise, that bargaining unit employees are eligible to participate in and copies of the plan documents and the summary plan description documents;

    b.    For any self-funded health plans, total claims paid for the last 3 plan years;

    c.    A listing of all employees currently participating in such plans, including a breakdown of coverage levels, i.e. employee, employee/children, employee/spouse, and employee/family coverage and the amounts the employer and employee pay per month for each level of coverage; and

    d.    A copy of Form 5500s for the health plans;

3.    **Fringe Benefits:** Please provide the following information for any 401(k) plans or other pension plans maintained by the Employer:

    a.    Summary plan descriptions and complete plan documents;

    b.    The three most recent IRS Form 5500s (and all schedules) filed for the 401(k) plans;

4.    **Fringe Benefits:** Copies of any other company fringe benefit plans including profit sharing, severance, stock incentive, apprenticeship, training, legal services, child care, or any other plans or benefits which relate to bargaining unit employees;

5.    **Job Descriptions:** Copies of all current bargaining unit job descriptions and any previous job descriptions in effect at any point in the preceding three years;

6.    **Employer policies:** A copy of all policies and procedures related to employment conditions and benefits, including all current work rules and a copy of all employee handbooks or manuals:

    a.    This request includes, without limitation:

        i.    company leave policies;

        ii.    attendance policies;

        iii.    policies with respect to diseases, disability or illness;

VIA E-MAIL AND U.S. MAIL
Universal
January 17, 2020
Page 5

      iv.     policies with respect to promotions or raises;

      v.      training programs;

      vi.     temporary help/hiring policies;

      vii.    layoff/recall policies;

      viii.   drug and alcohol policies;

      ix.     holiday gift policies.

      x.      policies with respect to the use of any bulletin boards, or other locations, where notices to employees are regularly posted;

      xi.     policies regarding the use of computer equipment to which employees have access

   b.     For any leave policy—such as sick leave, vacation leave, PTO, family leave, maternity/paternity leave, Family Medical Leave, or State leave—please include information regarding accrual rates, maximum accruals, limits on utilization, procedures for cash-out, list of employees who have utilized such leave in the past five years, a list of employees who have been denied such leave;

7.    **Health and Safety:** Any reports or logs related to injuries on the job, and/or workplace health and safety;

8.    **Discipline:** Copies of all disciplinary notices, warnings, or records of disciplinary personnel actions for the last year received by, or assessed against, bargain unit employees;

9.    **Individual Agreements:** Identify any employee with whom the Employer has any oral or written agreement, and provide a copy of such agreement if in writing, or describe the terms and conditions of the agreement;

10.   **Employee Evaluations:** Copies of any employee evaluations in the past five years;

11.   **Recent Terminations/Relocation/Layoffs/Transfer of Unit Work:** Please provide the following information related to the Employer's unilateral and unlawful decision to terminate unit members in December 2019, and relocate bargaining unit work to related facilities:

VIA E-MAIL AND U.S. MAIL
Universal
January 17, 2020
Page 6

    a.    Bylaws, articles of incorporation, and corporate structure for the Employer and any parent, subsidiary, or related company;

    b.    Financial statements for the last five years for the Employer and any parent, subsidiary, or related company;

    c.    Copies of any reports from consultants, investment advisors, certified public accountants, or others concerning the value of the company;

    d.    Audited financial statements for 2018 and 2019;

    e.    Monthly financial statements from January 2018 through the present;

    f.    A monthly list of all customers serviced by bargaining unit employees, from January 2018 through present, including the volume of work completed for each customer;

    g.    A list of any customers or contracts lost by the Employer from January 2018 through the present, including documents showing why and when that occurred;

    h.    For each customer or contract serviced by bargaining unit employees as of November 2019, a description of whether the Employer or any related company is currently completing that work;

    i.    Correspondences, proposals, plans, agreements, or other documents regarding Employer's decision to layoff or terminate bargaining unit employees in December 2019;

    j.    Correspondences, proposals, plans, agreements, or other documents regarding Employer's decision to relocate bargaining unit work to other facilities in December 2019;

    k.    Documents supporting the Employer's contention that the terminations/layoffs/plant closure/relocation in December 2019 was economically necessary;

    l.    A copy of the Employer's most recent lease for the facility located at 2035 Vista Bella Way, Compton, California;

    m.    Correspondences, proposals, plans, agreements, or other documents regarding Employer's re-negotiation for the lease at 2035 Vista Bella Way, Compton, California;

**VIA E-MAIL AND U.S. MAIL**

Universal
January 17, 2020
Page 7

n.    Correspondences, proposals, plans, agreements, or other documents regarding
      Employer's search or efforts to obtain a lease on another property in Southern
      California in 2019;

o.    Correspondences, proposals, plans, agreements, or other documents regarding
      contingency plans if the Employer did not renew the lease at 2035 Vista Bella
      Way, Compton, California; and

p.    Correspondences, proposals, plans, agreements, or other documents regarding
      new hiring of employee drivers or owner-operators by the Employer or any
      related entity in Southern California since October 2018.

The Union reserves the right to request additional information in the future as may be necessary
to properly represent bargaining unit employees. These requests include a continuing duty to
provide additional information that becomes available after these requests have been answered.
The Union believes that all of these requests are valid and demands relevant information under
the National Labor Relations Board's standards. Should the Employer have any concerns, the
Union stands ready to negotiate over the Employer's concerns to work out a mutually agreeable
resolution. We respectfully request that the information be provided in the most useable format.

We look forward to receiving this information by no later than January 31, 2020. If any
information is not immediately available or cannot be provided by January 31, 2010, identify
which items and provide an explanation or timeframe so that we may properly prepare.

Thank you in advance. Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Bush Gottlieb
A Law Corporation

Julie Gutman Dickinson

cc: Fred Potter, Port Division Director, International Brotherhood of Teamsters
    Eric Tate, Port Division International Representative, International Brotherhood of
    Teamsters /Secretary-Treasurer, Teamsters Local 848

# EXHIBIT 2

Exhibit 5
2780

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*Attorneys at Law*

1909 K Street NW, Suite 1000
Washington, DC 20006
Telephone:  202-887-0855
Facsimile:  202-887-0866
www.ogletree.com

# Ogletree
# Deakins

John S. Ferrer
202-263-0173
john.ferrer@ogletree.com

January 31, 2020

<u>Sent via Regular Mail and Electronic Mail</u>
Julie Gutman Dickinson
Bush Gottlieb, A Law Corporation
801 North Brand Boulevard, Suite 950
Glendale, CA 91203
jgutmandickinson@bushgottlieb.com

**RE:   Union's Demand to Bargain and Request for Information**

Dear Ms. Gutman Dickinson:

As you know, we represent Mason-Dixon International d/b/a Universal Intermodal Services ("Universal" or the "Company").  This letter shall respond to the Union's January 18, 2020 demand to bargain and request for information.

Universal is aware that NLRB Region 21 recently certified the Union as the exclusive bargaining representative for the port drivers formerly employed by the Company at its Compton terminal.  As the Union is aware, prior to the Union's certification, the Company made the difficult decision to close the Compton terminal and lay off the port drivers.  Contrary to the Union's allegations, the Company made this decision for legitimate business reasons unrelated to any protected or union activities of the port drivers.  Labor costs were not a factor in the decision to close the terminal.

Without waiving any defenses to the Union's pending unfair labor practice charges against the Company, Universal is willing to meet with the Union to discuss the reasons for its decision to close the Compton terminal.  In addition, the Company is willing to bargain over the effects of the closure.

Given the limited scope of the proposed discussions, the Union's current request for information seeks irrelevant information and is overly broad.  As such, please narrow the Union's requests and/or explain the relevance of the requests, and the Company will respond accordingly.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Jackson ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Exhibit 5
2781

Julie Gutman Dickinson
January 31, 2020
Page 2

Sincerely,

John S. Ferrer

JSF:mlr

41622049.2

Exhibit 5
2782

# EXHIBIT 3

Exhibit 5
2783

# BUSH GOTTLIEB
## A Law Corporation

David E. Ahdoot
Robert A. Bush
Hector De Haro
Lisa C. Demidovich#
Erica Deutsch
Peter S. Dickinson+
Ira L. Gottlieb*
Julie Gutman Dickinson
Joseph A. Kohanski*

801 North Brand Boulevard, Suite 950
Glendale, California 91203
Telephone (818) 973-3200
Facsimile (818) 973-3201
www.bushgottlieb.com

Adam Kornetsky~
Dana S. Martinez
Garrett A. McCoy
Kirk M. Prestegard
Dexter Rappleye
Estephanie Villalpando
Jason Wojciechowski
Vanessa C. Wright

11135-29006

* Also admitted in New York
+ Also admitted in Nevada
# Also admitted in Washington DC
~ Admitted in Washington DC

February 7, 2020

**VIA E-MAIL AND U.S. MAIL**

John S. Ferrer
Ogletree, Deakins, Nash, Smoak & Stewart,
P.C.
1909 K Street NW, Suite 1000
Washington, D.C. 20006
john.ferrer@ogletree.com

Re:     Union's Demand to Bargain and Request for Information

Dear Mr. Ferrer:

I write in response to your letter dated January 31, 2020, replying to the Union's January 18, 2020 demand to bargain and request for information.  Please provide us with several dates and times in February that you are available so that we can get meetings on our calendar as soon as possible.

Our agreement to meet and bargain over the effects of your decision to terminate employees and transfer work to another facility is not and should not be construed as a waiver of any claims or arguments we have now or may in the future regarding the charges filed with Region 21 of the National Labor Relations Board.  Our agreement to meet and bargain over the effects of your decision is not and should not be construed as any sort of admission that the charges we have filed with Region 21 somehow lack merit, as the Union maintains that Universal had a duty to bargain not only regarding the effects of its actions after the fact, but to bargain about the decision itself before the fact.  At our meeting, the Union would be happy to discuss a global settlement that resolves all of these outstanding issues.

With regards to the information requested by the Union, the Board employs a liberal discovery-type standard when determining relevance, and it has further held that information is *presumptively* relevant "[w]here the requested information concerns wage rates, job descriptions, and other information pertaining to employees within the bargaining unit." *Pfizer, Inc.*, 268 NLRB 916, 918 (1984).  Here, nearly every piece of information requested by the Union is regarding unit employees and is therefore presumptively relevant.  To the extent that any request seeks information not directly related to unit employees, such requests are also

**VIA E-MAIL AND U.S. MAIL**
John S. Ferrer
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Page 2

relevant "with regard to the [Union's] formulation of future bargaining proposals." *Elec. S., Inc.,* 327 NLRB 270, 271 (1998).

Even if we assume for the sake of argument that Universal only has a duty to bargain regarding how the terminations and transfer of unit work effected the bargaining unit, all of the requests are relevant on their face. The items encompassed by Request 11 are directly related to the Employer's rationale  for both the terminations and the transfer of unit work.  Further, nearly every single other request seeks information that is necessary for the Union to craft proposals that could mitigate the employer's  actions—from the hours and wages information sought in Request 1, to the information regarding fringe benefits sought in Requests 2-4, to the job descriptions, leave policies, and individual agreements sought in Requests 5, 6, and 9.  Without all of this information, it will be impossible for the Union to adequately discharge its duties as the employees' exclusive bargaining representative, and this information is therefore directly relevant to any effects bargaining that will occur.

We look forward to receiving your available dates and the information we have requested. Please provide all of the requested information in advance of our first meeting and, in any event, no later than February 14, 2020. Thank you in advance.  Should you have any questions, please do not hesitate to contact me.

Very truly yours,

Bush Gottlieb
A Law Corporation

Julie Gutman Dickinson

cc:    Fred Potter, Port Division Director, International Brotherhood of Teamsters
       Eric Tate, Port Division International Representative, International Brotherhood of
       Teamsters /Secretary-Treasurer, Teamsters Local 848

# EXHIBIT 4

Exhibit 5
2786

| | |
|---|---|
| **From:** | Ferrer, John S. |
| **To:** | Julie Gutman Dickinson |
| **Cc:** | Agraz, Rodolfo R. (Fito); Sheryl Brennan |
| **Subject:** | RE: Universal Intermodal Services-Teamsters |
| **Date:** | Tuesday, February 25, 2020 3:16:25 PM |

Hi Julie –

Sorry for the delay in getting back to you.  I was traveling last week.

The Company is available to meet with the Union on March 12, at noon, in your offices.  However, we will need until March 4 to respond to the Union's information requests.  We trust that will provide sufficient time for the Union to review the information prior to our meeting.

Regards,

John

**John S. Ferrer | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
1909 K Street, N.W., Suite 1000 | Washington, DC 20006 | Telephone: 202-263-0173 | Fax: 202-887-0866
john.ferrer@ogletree.com | www.ogletree.com | Bio

**From:** Julie Gutman Dickinson <JGD@bushgottlieb.com>
**Sent:** Thursday, February 20, 2020 4:18 PM
**To:** Ferrer, John S. <john.ferrer@ogletreedeakins.com>
**Cc:** Agraz, Rodolfo R. (Fito) <Fito.Agraz@ogletreedeakins.com>; Sheryl Brennan <sbrennan@bushgottlieb.com>
**Subject:** RE: Universal Intermodal Services-Teamsters

Hi John,

We are available for a meeting on Thursday, March 12 , occurring anytime between 12 noon and 6 pm.  I am happy to host the meeting at  my office. Please confirm or call if you would like to discuss. We are also looking forward to receiving the information responsive to the requests for information contained  in our letter dated January 18, 2020, by no later than Monday, February 24, 2020.

Thank you,

Julie

**Julie Gutman Dickinson**
**Bush Gottlieb, a Law Corporation**
801 North Brand Boulevard, Suite 950, Glendale, CA  91203
Direct (818) 973-3228 | Cell (213) 200-0260 | Fax (818) 973-3201
www.bushgottlieb.com

_____

Exhibit 5
2787

DISCLAIMER: This e-mail message and/or any attachments are intended only for the personal use of the recipient(s) named above. This message and/or any attachments may be an attorney-client communication and such, is privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy, rely on or distribute this message or any attachments. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.  All rights reserved, without limitation or prejudice.

---

**From:** Ferrer, John S. <john.ferrer@ogletree.com>
**Sent:** Thursday, February 13, 2020 1:55 PM
**To:** Julie Gutman Dickinson <JGD@bushgottlieb.com>
**Cc:** Agraz, Rodolfo R. (Fito) <Fito.Agraz@ogletreedeakins.com>; Sheryl Brennan <sbrennan@bushgottlieb.com>
**Subject:** RE: Universal Intermodal Services-Teamsters

Julie – That works for us.  I will send the call invite now.

Thanks,

John

**John S. Ferrer | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
1909 K Street, N.W., Suite 1000 | Washington, DC 20006 | Telephone: 202-263-0173 | Fax: 202-887-0866
john.ferrer@ogletree.com | www.ogletree.com | Bio

---

**From:** Julie Gutman Dickinson <JGD@bushgottlieb.com>
**Sent:** Thursday, February 13, 2020 3:40 PM
**To:** Ferrer, John S. <john.ferrer@ogletreedeakins.com>
**Cc:** Agraz, Rodolfo R. (Fito) <Fito.Agraz@ogletreedeakins.com>; Sheryl Brennan <sbrennan@bushgottlieb.com>
**Subject:** RE: Universal Intermodal Services-Teamsters

Hi John. I did not get a calendar invite or conference call number yet.  There is another attorney I would like to bring into the call with me who is not available on Monday since it is a holiday.  Would you be able to move the call to Tuesday at 12 noon Pacific?  If so, either you can send an outlook invitation and call in number or we can do so.

Thanks,

Julie

**Julie Gutman Dickinson**
**Bush Gottlieb, a Law Corporation**
801 North Brand Boulevard, Suite 950, Glendale, CA  91203
Direct (818) 973-3228 | Cell (213) 200-0260 | Fax (818) 973-3201
www.bushgottlieb.com

_____

Exhibit 5
2788

DISCLAIMER: This e-mail message and/or any attachments are intended only for the personal use of the recipient(s) named above. This message and/or any attachments may be an attorney-client communication and such, is privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy, rely on or distribute this message or any attachments. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.  All rights reserved, without limitation or prejudice.

---

**From:** Ferrer, John S. <john.ferrer@ogletree.com>
**Sent:** Wednesday, February 12, 2020 11:17 AM
**To:** Julie Gutman Dickinson <JGD@bushgottlieb.com>
**Cc:** Agraz, Rodolfo R. (Fito) <Fito.Agraz@ogletreedeakins.com>
**Subject:** RE: Universal Intermodal Services-Teamsters

Julie – We can do Monday at 11:00am PT.  I'll send a conference call number.

Thanks,

John

**John S. Ferrer | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
1909 K Street, N.W., Suite 1000 | Washington, DC 20006 | Telephone: 202-263-0173 | Fax: 202-887-0866
john.ferrer@ogletree.com | www.ogletree.com | Bio

---

**From:** Julie Gutman Dickinson <JGD@bushgottlieb.com>
**Sent:** Wednesday, February 12, 2020 2:10 AM
**To:** Ferrer, John S. <john.ferrer@ogletreedeakins.com>
**Cc:** Agraz, Rodolfo R. (Fito) <Fito.Agraz@ogletreedeakins.com>
**Subject:** RE: Universal Intermodal Services-Teamsters

Dear John ,
Unfortunately neither Wednesday nor Thursday during the timeframes you suggested  work for me.   I am available to set a time during the weekend . I can talk on Saturday  anytime between 1:30 and 4:30 pm Pacific or on Sunday anytime between 2:30 pm and 6:30 pm Pacific.  Alternatively, I can talk Monday anytime between 10 am and 12 noon Pacific , or between 3 and 6 pm Pacific.  Let me know if any of these timeframes work for you.
Thanks,
Julie
**Julie Gutman Dickinson**
**Bush Gottlieb, a Law Corporation**
801 North Brand Boulevard, Suite 950, Glendale, CA  91203
Direct (818) 973-3228 | Cell (213) 200-0260 | Fax (818) 973-3201
www.bushgottlieb.com

_____

DISCLAIMER: This e-mail message and/or any attachments are intended only for the personal use of the recipient(s) named above. This message and/or any attachments may be an attorney-client communication and such, is privileged

Exhibit 5
2789

and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy, rely on or distribute this message or any attachments. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.  All rights reserved, without limitation or prejudice.

---

**From:** Ferrer, John S. <john.ferrer@ogletree.com>
**Sent:** Tuesday, February 11, 2020 8:10 AM
**To:** Julie Gutman Dickinson <JGD@bushgottlieb.com>
**Cc:** Agraz, Rodolfo R. (Fito) <Fito.Agraz@ogletreedeakins.com>
**Subject:** Universal Intermodal Services-Teamsters

Hi Julie –

We think it would be helpful to set up a call with you to discuss the meeting between Mason-Dixon Intermodal d/b/a Universal Intermodal Services and the Teamsters regarding the Compton terminal closure.  Please let us know if you're available for a call tomorrow (2/12) after 1:00pm PT.  We are also available on Thursday (2/13) after 3:00pm PT, if necessary.

Thanks,

John

**John S. Ferrer | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
1909 K Street, N.W., Suite 1000 | Washington, DC 20006 | Telephone: 202-263-0173 | Fax: 202-887-0866
john.ferrer@ogletree.com | www.ogletree.com | Bio

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

Exhibit 5
2790

# EXHIBIT 5

Exhibit 5
2791

**Jason Wojciechowski**

| | |
|---|---|
| **From:** | Rodriguez, Martha (Marti) <marti.rodriguez@ogletree.com> |
| **Sent:** | Wednesday, March 4, 2020 4:59 PM |
| **To:** | Julie Gutman Dickinson |
| **Cc:** | Ferrer, John S. |
| **Subject:** | Universal's Response to Union's RFI |
| **Attachments:** | 2020-3-4 Response to Teamsters RFI .pdf; Attachment A to Universal Response.pdf; Attachment B to Universal Response.pdf; Attachment C to Universal Response.pdf; Attachment D to Universal Response.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

## Sent on behalf of John Ferrer:

Ms. Gutman Dickinson,

Please receive the enclosed Response to Request for Information.

Please note, if the email bounces back due to size of attachments, I will break down and re-send.

Thank you,

Marti Rodz.

**Martha (Marti) Rodriguez, LTC4 Technology Certified | Practice Assistant | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
1909 K Street, N.W., Suite 1000 | Washington, DC 20006 | Telephone: 202-263-0268 | Fax: 202-887-0866
marti.rodriguez@ogletree.com | www.ogletree.com

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

Exhibit 5
2792

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*Attorneys at Law*

1909 K Street NW, Suite 1000
Washington, DC 20006
Telephone:  202-887-0855
Facsimile:  202-887-0866
www.ogletree.com

# Ogletree Deakins

John S. Ferrer
202-263-0173
john.ferrer@ogletree.com

March 4, 2020

**SENT VIA ELECTRONIC MAIL ONLY**

Julie Gutman Dickinson
Bush Gottlieb
801 North Brand Boulevard
Suite 950
Glendale, CA 91203

RE:    Request for Information

Dear Ms. Gutman Dickinson:

This letter and enclosed documents will serve as the response of Mason-Dixon International d/b/a Universal Intermodal Services ("Universal" or the "Company") to the Union's information requests contained in your January 18, 2020 letter.

As the Union is aware, the Company has agreed to meet with the Union to discuss the closure of the Compton terminal and layoff of the port drivers, and to bargain over the effects of the closure. Given the limited scope of these discussions, the Company maintains that the Union's request for information seeks irrelevant information and is overly broad. For example, Requests 5, 6, 7 and 10 seek job descriptions, employment policies, health and safety reports, and disciplinary records; information which is wholly unrelated to the closure of the Compton terminal or the effects of the closure.

The Company also objects to the Union's requests to the extent they seek information that is confidential, proprietary, or constitute trade secrets.  Namely, Request 11 seeks confidential and proprietary business information, such as financial statements, customer lists, and customer contracts. The Company is willing to discuss with the Union the potential disclosure of certain information pursuant to a confidentiality agreement.

Without waiving any objections to the Union's information requests or defenses to the Union's pending charges, the Company further responds as follows:

In response to Request 1, see Attachment A, which is a list of port drivers, including employment dates, job classification, and hourly wage rates.  See also Attachment B, which includes copies of employee payroll records.  The Company will supplement this response with driver work hours.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Jackson ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Exhibit 5
2793

Julie Gutman Dickinson
March 4, 2020
Page 2

In response to Requests 2-4, see Attachment C, which includes copies of benefit plans/summary plan descriptions, benefit plan details, insurance costs, and a list of other fringe benefits.

In response to Request 11, see Attachment D, which includes a copy of the Compton terminal lease and correspondence regarding the terminal closure.

Further, the Company does not possess documents responsive to Requests 5, 9 and 10.

The Company reserves the right to supplement or modify its responses at any time if it becomes necessary or appropriate to do so.

Sincerely,

John S. Ferrer

JSF:mlr

Exhibit 5
2794

# EXHIBIT 6

Exhibit 5
2795

## Jason Wojciechowski

| | |
|---|---|
| **From:** | Julie Gutman Dickinson |
| **Sent:** | Tuesday, March 10, 2020 8:37 AM |
| **To:** | Ferrer, John S. |
| **Cc:** | Rodriguez, Martha (Marti); Jason Wojciechowski; Sheryl Brennan |
| **Subject:** | RE: Universal's Response to Union's RFI |

Dear John,

The Union appreciates your efforts to provide a small portion of the relevant information that the Union requested on January 18, 2020. Unfortunately, a large amount of information has still not been produced even though over seven weeks have passed. Below, I will identify the information that has still not been produced. Please provide this missing information immediately, but  by no later than the time we meet on Thursday, March 12, 2020, or the Union will take all steps necessary to compel the production of such information.

Most significantly,  other than a lease and two memos to employees, Universal has failed to provide documents in response to Request 11 (a) through (p), which seeks documents related to Universal's reason for, and alleged need, to shut down the newly organized unit—a topic that Universal has explicitly agreed to discuss at our upcoming meeting. Please provide all responsive documents immediately.  In the interest of moving forward, the Union would be willing to discuss a reasonable and limited confidentiality agreement  for responsive documents that contain clearly confidential information .

Moreover, the Union would once again like to emphasize the fact that it continues to be the recognized exclusive bargaining representative for the terminated employees and that, as such, the Union has a right to relevant information, and that information related to unit employees—such as discipline records from Request 8 , lists of policies applicable to employees from Request 6, and  Health and Safety reports regarding unit employees from Request 7--are *presumptively* relevant and Universal does not have a basis for withholding such information. *See Pfizer, Inc.,* 268 NLRB 916, 918 (1984); *see also Elec. S., Inc.,* 327 NLRB 270, 271 (1998) (information relevant when it can be used by the Union in fashioning its bargaining proposals). Thus, please provide all information responsive to these requests immediately.

Finally, Universal also failed to respond to portions of the first four requests. With Request 1, Universal failed to provide any information regarding employees past raises, or any contact information for the employees in question. For Requests 2-4, Universal failed to provide a breakdown of which employees are participating in which plans and at what level, and it also did not provide any Form 5500s for these benefit plans. Once again, all of this information is presumptively relevant—as admitted by Universal in providing us other responsive documents—and there is no justification for Universal failing to produce these documents.

The Union looks forward to sitting down with Universal, but it must emphasize that the information above is critical and necessary to the Union exercising its role as an exclusive representative and protecting its members' interests. Until such time as this information is provided, meaningful negotiations will be stifled.  Indeed, as we stated in our letter dated January 31, 2020 and reiterated on our conference call of February 18, 2020, even if we assume for the sake of argument that Universal only has a duty to bargain  regarding how the terminations and transfer of unit work effected the bargaining unit, (which we vigorously dispute) all of the requests are relevant on their face.. If Universal does not produce this information or reach agreement with the Union about what will be produced, by the time that we meet on March 12, 2020, the Union will consider Universal's actions an outright failure to bargain in good faith and will take all appropriate steps to obtain the information.

Sincerely,

Julie

Exhibit 5
2796

**Julie Gutman Dickinson**

**Bush Gottlieb, a Law Corporation**
801 North Brand Boulevard, Suite 950, Glendale, CA  91203
Direct (818) 973-3228 | Cell (213) 200-0260 | Fax (818) 973-3201
www.bushgottlieb.com

_____

DISCLAIMER: This e-mail message and/or any attachments are intended only for the personal use of the recipient(s) named above. This message and/or any attachments may be an attorney-client communication and such, is privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy, rely on or distribute this message or any attachments. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.  All rights reserved, without limitation or prejudice.

**From:** Ferrer, John S. <john.ferrer@ogletree.com>
**Sent:** Friday, March 6, 2020 6:12 PM
**To:** Julie Gutman Dickinson <JGD@bushgottlieb.com>
**Cc:** Rodriguez, Martha (Marti) <Marti.Rodriguez@ogletreedeakins.com>
**Subject:** RE: Universal's Response to Union's RFI

Hi Julie –

This shall supplement the Company's March 4, 2020 response.  In response to Request 1 of the Union's RFI, please find attached:

- A revised port driver list, including Daw Cheng and Jesus Parra;
- Daw Cheng's payroll records (Jesus Parra was on worker's comp in 2019); and
- Port drivers weekly hours for 2019.

John

**John S. Ferrer | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
1909 K Street, N.W., Suite 1000 | Washington, DC 20006 | Telephone: 202-263-0173 | Fax: 202-887-0866
john.ferrer@ogletree.com | www.ogletree.com | Bio

**From:** Rodriguez, Martha (Marti) <Marti.Rodriguez@ogletreedeakins.com>
**Sent:** Wednesday, March 04, 2020 7:59 PM
**To:** jgutmandickinson@bushgottlieb.com
**Cc:** Ferrer, John S. <john.ferrer@ogletreedeakins.com>
**Subject:** Universal's Response to Union's RFI

## <u>Sent on behalf of John Ferrer:</u>

Ms. Gutman Dickinson,

Please receive the enclosed Response to Request for Information.

Please note, if the email bounces back due to size of attachments, I will break down and re-send.

Exhibit 5
2797

Thank you,

Marti Rodz.


**Martha (Marti) Rodriguez, LTC4 Technology Certified | Practice Assistant | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
1909 K Street, N.W., Suite 1000 | Washington, DC 20006 | Telephone: 202-263-0268 | Fax: 202-887-0866
marti.rodriguez@ogletree.com | www.ogletree.com


*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

Exhibit 5
2798

# EXHIBIT 7

Exhibit 5
2799

**Jason Wojciechowski**

| | |
|---|---|
| **From:** | Ferrer, John S. <john.ferrer@ogletree.com> |
| **Sent:** | Wednesday, March 11, 2020 3:18 PM |
| **To:** | Julie Gutman Dickinson |
| **Cc:** | Jason Wojciechowski; Sheryl Brennan; Agraz, Rodolfo R. (Fito) |
| **Subject:** | RE: Universal's Response to Union's RFI |
| **Attachments:** | Voter List 21-RC-251460 final.docx; Employee Benefits Participation.pdf; UISI 2018 5500.pdf |

Julie –

In further response to Request 1, please find attached employee contact information, which is included in the voter list the Union was previously provided.  In addition, in response to Requests 2-4, please find information regarding employee participation in the Company's benefit plans and the most recent Form 5500.

While the parties may disagree at this time on the Company's bargaining obligations, we understand the Union's position, and we trust the Union understands the Company's position.  We believe the information provided is responsive to the Union's information request considering the parties' respective positions and the limited context of the meeting tomorrow.  The Company looks forward to meeting with the Union's team tomorrow to discuss a global resolution of the pending matters.

Regards,

John

**John S. Ferrer | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
1909 K Street, N.W., Suite 1000 | Washington, DC 20006 | Telephone: 202-263-0173 | Fax: 202-887-0866
john.ferrer@ogletree.com | www.ogletree.com | Bio

**From:** Julie Gutman Dickinson <JGD@bushgottlieb.com>
**Sent:** Tuesday, March 10, 2020 11:37 AM
**To:** Ferrer, John S. <john.ferrer@ogletreedeakins.com>
**Cc:** Rodriguez, Martha (Marti) <Marti.Rodriguez@ogletreedeakins.com>; Jason Wojciechowski <jasonw@bushgottlieb.com>; Sheryl Brennan <sbrennan@bushgottlieb.com>
**Subject:** RE: Universal's Response to Union's RFI

Dear John,

The Union appreciates your efforts to provide a small portion of the relevant information that the Union requested on January 18, 2020. Unfortunately, a large amount of information has still not been produced even though over seven weeks have passed. Below, I will identify the information that has still not been produced. Please provide this missing information immediately, but  by no later than the time we meet on Thursday, March 12, 2020, or the Union will take all steps necessary to compel the production of such information.

Most significantly,  other than a lease and two memos to employees, Universal has failed to provide documents in response to Request 11 (a) through (p), which seeks documents related to Universal's reason for, and alleged need, to shut down the newly organized unit—a topic that Universal has explicitly agreed to discuss at our upcoming meeting.

Exhibit 5
2800

Please provide all responsive documents immediately.  In the interest of moving forward, the Union would be willing to discuss a reasonable and limited confidentiality agreement  for responsive documents that contain clearly confidential information .

Moreover, the Union would once again like to emphasize the fact that it continues to be the recognized exclusive bargaining representative for the terminated employees and that, as such, the Union has a right to relevant information, and that information related to unit employees—such as discipline records from Request 8 , lists of policies applicable to employees from Request 6, and  Health and Safety reports regarding unit employees from Request 7--are *presumptively* relevant and Universal does not have a basis for withholding such information. *See Pfizer, Inc.,* 268 NLRB 916, 918 (1984); *see also Elec. S., Inc.,* 327 NLRB 270, 271 (1998) (information relevant when it can be used by the Union in fashioning its bargaining proposals). Thus, please provide all information responsive to these requests immediately.

Finally, Universal also failed to respond to portions of the first four requests. With Request 1, Universal failed to provide any information regarding employees past raises, or any contact information for the employees in question. For Requests 2-4, Universal failed to provide a breakdown of which employees are participating in which plans and at what level, and it also did not provide any Form 5500s for these benefit plans. Once again, all of this information is presumptively relevant—as admitted by Universal in providing us other responsive documents—and there is no justification for Universal failing to produce these documents.

The Union looks forward to sitting down with Universal, but it must emphasize that the information above is critical and necessary to the Union exercising its role as an exclusive representative and protecting its members' interests. Until such time as this information is provided, meaningful negotiations will be stifled.  Indeed, as we stated in our letter dated January 31, 2020 and reiterated on our conference call of February 18, 2020, even if we assume for the sake of argument that Universal only has a duty to bargain  regarding how the terminations and transfer of unit work effected the bargaining unit, (which we vigorously dispute) all of the requests are relevant on their face.. If Universal does not produce this information or reach agreement with the Union about what will be produced, by the time that we meet on March 12, 2020, the Union will consider Universal's actions an outright failure to bargain in good faith and will take all appropriate steps to obtain the information.

Sincerely,

Julie

**Julie Gutman Dickinson**
**Bush Gottlieb, a Law Corporation**
801 North Brand Boulevard, Suite 950, Glendale, CA  91203
Direct (818) 973-3228 | Cell (213) 200-0260 | Fax (818) 973-3201
www.bushgottlieb.com

_____

DISCLAIMER: This e-mail message and/or any attachments are intended only for the personal use of the recipient(s) named above. This message and/or any attachments may be an attorney-client communication and such, is privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy, rely on or distribute this message or any attachments. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.  All rights reserved, without limitation or prejudice.

**From:** Ferrer, John S. <john.ferrer@ogletree.com>
**Sent:** Friday, March 6, 2020 6:12 PM
**To:** Julie Gutman Dickinson <JGD@bushgottlieb.com>
**Cc:** Rodriguez, Martha (Marti) <Marti.Rodriguez@ogletreedeakins.com>
**Subject:** RE: Universal's Response to Union's RFI

Hi Julie –

Exhibit 5
2801

This shall supplement the Company's March 4, 2020 response.  In response to Request 1 of the Union's RFI, please find attached:

- A revised port driver list, including Daw Cheng and Jesus Parra;
- Daw Cheng's payroll records (Jesus Parra was on worker's comp in 2019); and
- Port drivers weekly hours for 2019.

John

**John S. Ferrer | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
1909 K Street, N.W., Suite 1000 | Washington, DC 20006 | Telephone: 202-263-0173 | Fax: 202-887-0866
john.ferrer@ogletree.com | www.ogletree.com | Bio

---

**From:** Rodriguez, Martha (Marti) <Marti.Rodriguez@ogletreedeakins.com>
**Sent:** Wednesday, March 04, 2020 7:59 PM
**To:** jgutmandickinson@bushgottlieb.com
**Cc:** Ferrer, John S. <john.ferrer@ogletreedeakins.com>
**Subject:** Universal's Response to Union's RFI

## Sent on behalf of John Ferrer:

Ms. Gutman Dickinson,

Please receive the enclosed Response to Request for Information.

Please note, if the email bounces back due to size of attachments, I will break down and re-send.

Thank you,

Marti Rodz.

**Martha (Marti) Rodriguez, LTC4 Technology Certified | Practice Assistant | Ogletree, Deakins, Nash, Smoak & Stewart, P.C.**
1909 K Street, N.W., Suite 1000 | Washington, DC 20006 | Telephone: 202-263-0268 | Fax: 202-887-0866
marti.rodriguez@ogletree.com | www.ogletree.com

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

*This transmission is intended only for the proper recipient(s). It is confidential and may contain attorney-client privileged information. If you are not the proper recipient, please notify the sender immediately and delete this message. Any unauthorized review, copying, or use of this message is prohibited.*

Exhibit 5
2802

# EXHIBIT 6(A)

Exhibit 6(a)
2803

Universal Intermodal Services
21-CA-252500 et al.

### Confidential Witness Affidavit

**I, <u>Ricardo Hidalgo</u>, am being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

My work address is 25 Louisiana Ave., NW, Washington, DC 20001

My work phone number (including area code) is (310) 251-6876

My email address is rhidalgo@teamsters.org

1        I am employed by the International Brotherhood of Teamsters (the Union) as a n International Organizer.

2        I've held this position for 17 years. As an International Organizer, I oversee international and local organizing

3        campaigns on behalf of the Union.  I am also responsible for overseeing the Teamsters' Port organizing

4        campaign; organizing port drivers in Los Angeles and Long Beach, California.

5        On about November 8, 2019, the Union filed a petition, 21-RC-251460 Universal Intermodal Services,

6        to represent a unit of drivers working for the Employer's facility in East Vista Bella Way (also known as the

7        Compton facility). On December 4, 2019, the Union won the election to represent the drivers, about 28 of them.

8        After the election, the Employer filed objections to the election. Three of the four objections were dismissed,

9        and the Employer withdrew the remaining objection the day before the hearing.

10       Thereafter, on January 8, 2020, the Union was certified as the bargaining representative of the following

11       unit:

12       Included: All full-time and regular part-time port drivers employed by the Employer working or

13       dispatched out of the Employer's facility currently located at 2035 Vista Bella Way, Compton,

14       California.

Exhibit 6(a)
2804

Case 21-CA-252500 Universal Intermodal Services

1     Excluded: All other employees, dispatchers, mechanics, office clerical employees, professional

2     employees, confidential employees, managerial employees, guards, and supervisors as defined in

3     the Act.

4     At the East Vista Bella Way facility, drivers are responsible for transporting containers from the

5     ports of Long Beach and Los Angeles to the Employer's customers.

6     Eight of the twenty-eight drivers in the unit were housed in Fontana, California, meaning that they

7     picked up and dropped off their work trucks in Fontana. This facility is located at 15033 Slover Ave.,

8     Fontana, California 92337. This company is known as Universal Truck Load Services. However, the eight

9     unionized drivers received their dispatch assignments from the East Vista Bella Way facility, which is why

10    they were part of the unit. These drivers also went to the East Vista Bella Way facility for meetings and to

11    pick up their paychecks.

12    The Employer's facility in Fontana-Universal Truck Load employs other drivers in addition to the

13    eight unionized drivers (there were also seven independent contractors out of this Fontana facility). There

14    were about 20 non-unionized drivers working out of the Fontana facility. These drivers operate domestic

15    trailers (these stay in the city, unlike the containers, which travel internationally) (herein domestic drivers).

16    On November 11, 2019, the Union went to the Employer's Fontana facility to handbill and organize the

17    drivers that were part of the East Vista Bella Way facility unit. I was not at the Fontana facility on this day,

18    but Union Organizers Miguel Cubillos and Santos Castaneda were at the Employer's facility for about 4-5

19    hours handbillling (from about 2pm to 7pm).

20    From talking to Miguel, during that week and the following weeks, 11 of the Universal Truck Load

21    Services domestic drivers that the Union was not initially seeking to organize expressed an interest in the

22    Union by providing Miguel with their contact information. None of these Universal Truck Load Services

23    domestic drivers signed an authorization card because the Union wanted to focus first on organizing the

Exhibit 6(a)
2805

Case 21-CA-252500 Universal Intermodal Services

1   East Vista Bella Way facility drivers. After the Union won the East Vista Bella Way facility election, the

2   Union, through Miguel Cubillos, followed up with the Universal Truck Load Service drivers in Fontana

3   through phone and in person. These were the initial stages of organizing this unit. There were no official

4   meetings with these drivers at this point. Thereafter, on December 18, 2019, the Employer issued the

5   Universal Truck Load Services domestic drivers a termination letter. Attached herein as **Exhibit A** is a copy

6   of the termination letter issued to the Universal Truck Load Services domestic drivers. Miguel Cubillos

7   would be a better person to ask as to which driver he was in contact with regarding the organizing drive.

8   Even though the letter says that the drivers would be allowed to work until December 20, 2019, it is the

9   Union's understanding that the drivers' last day of work was in fact December 18, 2019. After the domestic

10  drivers were laid off, the Union helped some of these drivers with unemployment claims and we are still

11  trying to help them find new work.

12          Down the street from the 15033 Slover Ave., Fontana, California 92337 Universal Truck Load

13  Services facility, the Employer also has another facility know as the Roadrunner Intermodal facility located

14  at 11252 Calabash Ave., Fontana, California 92337. The Employer acquired this facility on November 5,

15  2019. It is my understanding that the Employer acquired the entire facility, including the drivers that were

16  employed by the predecessor, about 28 of them. These drivers transport container goods from the rails to

17  the Employer's customers. Some of these drivers saw the Union organizers at the Universal Truck Load

18  Service facility (which is down the street) and stopped by to see what was going on. It is my understanding

19  from talking to Miguel Cubillos that four of the 28 drivers from the Roadrunner Intermodal facility

20  expressed an interest in being represented by the Union. Like with Universal Truck Load Services domestic

21  drivers, after the Union won the East Vista Bella Way facility election, the Union then started to organize

22  these drivers. Like with the Universal Truck Load Service domestic drivers, who were terminated on

23  December 18, 2019, the Roadrunner Intermodal drivers were also terminated on December 18, 2019.

- 3 -

Exhibit 6(a)
2806

Case 21-CA-252500 Universal Intermodal Services

1    Attached herein as **Exhibit B** is a copy of the notice given to the Roadrunner Intermodal drivers. Although

2    the letter says that they would work until December 20, 2019, their last day of work as was also December

3    18, 2019. From talking to Union Organizer Santos Castaneda, when the drivers were issued their

4    termination notice, they were told that they were good drivers and that if they bought/brought their own

5    truck and came back, they could work as an independent contractor for the Employer. I do not know who

6    made this statement to the drivers.  The Union is still in touch with the Roadrunner Intermodal drivers.

7    Desmond Gibson is the driver that we've been primarily in touch with at the Roadrunner Intermodal facility.

8            Regarding the drivers working at the Employer's Universal Intermodal Services out of  East Vista

9    Bella Way, these drivers transport container to and from the ports to the Employer's customers (at this

10   facility, the Employer had only one independent contractor). Shortly after the Union won the election on

11   December 4, 2019, the Union started hearing from the drivers that the Employer had reduced their work.

12   For example, before the December 4, 2019 election, drivers worked about 8-12 hours per day. However,

13   after the election, on December 5 and 6, 2019 (and the entire next week), drivers went from working about

14   8-12 hours per day to about 4-6  hours per day. The week of December 16, 2019, they were given a four-

15   day weekend (unpaid). The four day weekend was supposed to be from December 18, 2019 through

16   December 21, 2019. Drivers Tod Ellis, Jonathan Ledesma, and David Johnson are three drivers who would

17   testify as to the reduction of work. At no point did the Employer notify or bargain with the Union about the

18   reduction of work. I have been the point of contact for the Union all along and not once did the Employer

19   reach out to me about the issue. The Union learned about the reduction of work through the drivers, who

20   either called me directly or one of the Union organizers to let them know what was going on.

21           Although the Universal Intermodal Service drivers were supposed to return to work on December

22   22, 2019, on December 20, 2019, drivers were mailed an overnight letter from the Employer, letting them

23   know that they were being terminated effective immediately. Attached herein as **Exhibit C** is a copy of the

Exhibit 6(a)
2807

Case 21-CA-252500 Universal Intermodal Services

1    termination letter issued to the Universal Intermodal Service drivers. Again, even though the letter states

2    that the lease expires on December 31, 2019, the last day of work for these drivers was December 18, 2019.

3    At no point did the Employer contact that Union to notify and bargain with the Union about the termination

4    of the drivers and the fact that the facility was closing down. The Union learned about the termination and

5    closure of the facility through the drivers.  While the letter to the drivers states that the lease would end on

6    December 31, 2019, the Union does not believe the facility actually closed on this date because we saw

7    some trucks go in and out of the facility after this day. However, today, from what we have seen, the

8    Universal Intermodal Service facility is no longer operational. I do not know when was their last day of

9    operation.

10       In addition, from talking to the unit drivers, sometime around late November 2019, the Employer

11   posted a flyer about the lease ending and drivers going to work for Southern Counties Five. Attached herein

12   as **Exhibit D** is a copy of the flyer that was posted.

13       In addition to Universal Intermodal Services, the Employer also has a second facility in Campton,

14   California, which is called Southern Counties Five, located at 2727 E. Del Amo Blvd., Long Beach, CA

15   90810. At this facility, the Employer only hires independent contractors, and currently has about 300

16   independent contractors. However, these independent contractors perform the same type of work as the

17   Universal Intermodal Service drivers, transporting containers to and from the ports to the Employer's

18   customers. From talking to the Universal Intermodal Service drivers, even though they were under another

19   Employer's name (Universal Intermodal Service), most of their work (if not all of their work) actually came

20   from Southern Counties Five. For example, when the Universal Intermodal Service drivers would go to the

21   ports, they would say they were there on behalf of Southern Counties Five.

22       From talking to the Universal Intermodal Service drivers, while the Universal Intermodal Service

23   facility was still up and running, on multiple times they were told by Joel Lugo, the General Manager, that

- 5 -

Exhibit 6(a)
2808

Case 21-CA-252500 Universal Intermodal Services

1    they might be relocated to the Southern Counties Five facility, which is literally only a few minutes away

2    from the Universal Intermodal Service facility. However, none of the drivers from the Universal Intermodal

3    Service facility went to work to the Southern Counties Five facility.

4         Driver Tod Ellis told the Union that he was able to get a job application at Southern Counties Express

5    (located at 18020 S. Santa Fe, Rancho Dominguez, CA 90221) to work for Universal at 550 S. Alameda

6    Street, Compton, California, which is known as the Central Transport facility. However, the Employer is

7    just referring to this facility as "Universal." In addition, the Employer has also posted job openings for work

8    at the 550 S. Alameda Street facility online, again referring to the Employer as "Universal." These job

9    postings have appeared on Craig's List. I do not know how many drivers or independent contractors work

10   out the Employer's 550 S. Alameda Street facility. I also do not know how many drivers the Employer has

11   hired to work at this facility since December 2019 through the present. None of the former drivers that used

12   to work for Universal Intermodal Services (the unit drivers) have applied for work at 550 S. Alameda Street

13   because they pay less than what the Employer use to pay them. It is my understanding that the drivers

14   working out of 550 S. Alameda mainly do domestic trailers and a small percentage of transporting

15   containers to and from the ports.

16        I do not know what happened to Joel Lugo, the General Manager that worked at Universal

17   Intermodal Services. Universal Intermodal Services also had three dispatchers at the facility, but I believe

18   they were actually employed by Southern Counties ~~Five~~ express nut. I do not know what happened to the dispatchers.

19        In terms of the work, it is the Union's understanding that the work previously performed by

20   Universal Intermodal Services is being performed by the Southern Counties ~~Five~~ Express nut facility; Southern Counties

21   Express Five facility is down the street from East Vista Bella Way; these facilities had the same customers because

22   the Universal Intermodal Service drivers performed work under Southern Counties ~~Five facility~~ express nut; and the

- 6 -

Exhibit 6(a)
2809

Case 21-CA-252500 Universal Intermodal Services

1   Employer has an abundance of independent contractors at this facility to perform the work previously

2   performed by unit drivers.

3        With regards to the Universal Intermodal Service unit, we've had about five general Union

4   meetings: October 2, 2019 (the week before we filed the petition), October 19, 2019, November 24, 2019,

5   December 1, 2019, and December 20, 2019. All of these meetings took place at Union hall in Long Beach,

6   California. For the November 24, 2019 meeting, there were about 18 drivers from Universal Intermodal

7   Services. Similarly, we had about 18 drivers at the December 1, 2019 meeting. Out of the 28 drivers, 20 of

8   them voted in favor of the Union.

9        On December 20th nH 19, 2019, upon learning that the Employer was closing three facilities, including the

10  unionized facility, that same day, the Union scheduled a meeting with the drivers from the three facilities:

11  Universal Intermodal Services (12 drivers attended the meeting), Roadrunner Intermodal (4 drivers from

12  this facility attended the meeting), and Truckload  Services (four drivers from this facility attended this

13  meeting). The meeting was held at the Union hall in Long Beach. I was present at this meeting along with

14  Santos Castaneda, Miguel Cubillos, and Eddie Rodriguez (another Union organizer). The meeting lasted

15  about one hour. The purpose of the meeting was to understand what the drivers had heard about the

16  termination/closure of their respective facilities, we helped some drivers file for unemployment, and at the

17  end of the meeting, and we also distributed food and food vouchers and toys.

18       At the meeting on December 20, 2019, drivers made comments about how they were afraid that this

19  (referring to the termination and closure of the facility) was going to happen for supporting the Union. I

20  can't remember which drivers made this comment, but several of them made comments acknowledging that

21  they knew this would happen. In specific, driver Tod Ellis made a comment about how the Employer's

22  consultant, at a captive audience meeting prior to the election, said something to the drivers like, "what do

23  you guys think you could do, there's only 28 of you and 300 Sothern California Counties drivers? What do

- 7 -

Exhibit 6(a)
2810

Exhibit 6(a)
2811

Case 21-CA-252500 Universal Intermodal Services

1    you think you guys can do to the company," which Tod thought was said to tell drivers that they could not

2    affect the company. Other drivers, I can't remember which ones, also said they had heard a similar comment

3    from the consultant and made comments about how the Employer knew what they were going from the

4    beginning. There have been no other union meetings since December 20, 2019.

5         Driver Lincoln Cabus apparently made a comment to another driver (I can't remember who) about

6    how he was sorry about voting for the Union because of what happened—being terminated. This comment

7    was made to Union Organizer Jorge Majorga shortly after the drivers received their termination notice about

8    how.

9         Unit drivers continued to wear union insignia after the election until their termination. However,

10   once their work started to decrease, we did notice that some of the drivers were not as enthusiastic to talk

11   to us.



12

13

14

15

16

17

18

19

20

21

22

23



Exhibit 6(a)
2812

Case 21-CA-252500 Universal Intermodal Services

1    Unit drivers Jonathan Ledesma and Tod Ellis are our main point of contacts with the unionized

2    drivers. Jonathan was actually unlawfully terminated by the Employer on November 27, 2019 (the Union

3    filed a charge with the NLRB over his termination). Both Jonathan and Tod still support the Union and

4    wish to return to work for this Employer. Out of the 28 drivers that used to work for the Universal

5    Intermodal Service facility, 23 still want to return to work for this Employer.

**I am being provided a copy of this Confidential Witness Affidavit for my review.  I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 9 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct.  However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.**

**Date:** 1/21/2020          **Signature:**

Ricardo Hidalgo

**Signed and sworn to before me on** ___January 21, 2020 at Los Angeles, California.

Elvira T. Pereda
Board Agent
National Labor Relations Board

- 9 -

Exhibit 6(a)
2813



December 18, 2019

TO: All Truckload CA Company Drivers

FM: Universal Management

RE: Workforce Reduction


Soft freight conditions in 2019 have necessitated that we evaluate our current staffing levels heading into the New Year 2020, as a result with much consideration, we regret to inform you that Universal Truckload, Inc. is reducing all company driver positions effective Friday, December 20, 2019. Final pay will be processed in accordance to Friday, December 20, 2019.

If you have any questions or want additional information concerning this matter, please contact your local management or Michael Vagis, Sr. HR Manager, at 586-920-0100.



Universal Management

Exhibit 6(a)
2814

RH  Hidalgo  EX  A¹|₁



as in 2019 have necessitated that we evaluate our curre
to the New Year 2020, as a result with much consideration.
that Roadrunner Intermodal Services is reducing all company
active Friday, December 20, 2019. Final pay will be processed at
Friday, December 20, 2019

If you have any questions or want additional information please
contact your local management or Michael Vogts Sr HR Manager at

Roadrunner Management

Exhibit 6(a)
2815

RH  Hidalgo  Ex  B '/1





December 20, 2019

Dear Driver,

You were previously made aware by both a posting at the facility on November 22, 2019 and in a meeting on November 25, 2019 that Universal Intermodal Services' lease on the Compton terminal located at 2035 Vista Bella Way, Compton, CA expires on December 31, 2019. The Company has not found a suitable location to relocate the Compton operations. The lease expiration combined with a weakening in the truckload and intermodal sectors has forced Universal Intermodal Services to make the painful decision to discontinue operations in Compton, CA.

Included with this letter is your final paycheck, including any other monies owed you. Please direct all questions to Michael Vagts, at mvagts@universallogistics.com or 586.920.0259.

Sincerely,


Joe Lugo - General Manager
Universal Intermodal Services – Rancho Dominguez Operation

Exhibit 6(a)
2816

8H  Hidalgo. Ex C 1/1

Exhibit 6(a)
2817

**IMPORTANT**

...... Universal's lease on the Compton terminal expires ...... and it will not be renewed. While the company is ...... options, no decision has been made regarding the ...... location of the Compton operations, nor has a new location ...... determined.

As ...... as more information becomes available to me, I will share that with you.

RH  Hidalgo  Ex  D 'I(

Exhibit 6(a)
2818

# EXHIBIT 6(B)

Exhibit 6(b)
2820

Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
Case 21-CA-252500

## Supplemental Confidential Witness Affidavit

**I <u>Ricardo Hildalgo</u>, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

My work address is 25 Louisiana Ave., NW, Washington, DC 20001

My work phone number (including area code) is (310) 251-6876

My email address is rhidalgo@teamsters.org

1    I previously provided an affidavit in this case on January 21, 2020. This affidavit

2   supplements the testimony I gave in that affidavit. I am giving this affidavit over the phone.

3    On March 12, 2020 at around noon, the Union and Universal Intermodal and Universal

4   Logistics Holdings representatives (collectively Employer) met for an effect bargaining session

5   at the Bush Gottlieb office located at 801 North Brand Ave, Suite 950, Glendale, CA. This

6   meeting related to Universal Intermodal's closure of a facility in Compton, CA and the effects of

7   that closure on the unit of employees certified in case 21-RC-251460. The persons present at this

8   meeting for the Union included Union assistant to the director of the port division Eric Tate,

9   Union counsel Julie Gutman Dickinson, Union counsel Hector De Haro, Union counsel Jason

10   Wojciechowski, and I. Union counsel Hector De Haro attended the meeting prior to the first

11   caucus in the meeting and Union counsel Jason Wojciechowski attended the meeting after the

12   first caucus. The persons present for the Employer at this meeting included Employer Counsel

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

- 1 -

Initials _____

Exhibit 6(b)
2821

Scanned with CamScanner

Case 21-CA-252500                                                          March 31, 2020

1    ~~Roberto~~ Rodolfo Agraz, regional director of the west coast for Universal Intermodal Services Tony

2    Milles, and vice president of labor relations and human resources for Universal Logistics

3    Holdings, Inc. Dennis Glackin. During this meeting, I received copies of the Employer

4    representatives' business cards. I will provide the Board Agent with a copy of these business

5    cards at a later time. This meeting started with Agraz and Dickinson discussing the scope of the

6    meeting and about some information that Dickinson had requested. I do not recall specifically

7    their discussion because I was not aware of the scope of the information Dickinson had

8    requested, but I recall that Agraz at some point took the position that some of the information

9    Dickinson requested was not pertinent. At some point, this meeting shifted to being about the

10   Employer's reasons for closing the Compton facility and the effects of that closure. At this point

11   Agraz presented an offer of settlement from the Employer. This offer included partial backpay

12   for the effected employees, an offer to recognize the Union as the representative of the same unit   RH

13   if the Employer decided to reform the unit within some time in the future, ~~and that if~~ the       IN COMPTON and under an employee model and IF the

14   Employer ~~decides to reform the unit that it~~ would offer these employees an opportunity for        UNION showed proof of

15   rehire. After the Employer made this offer, the parties caucus for approximately 30 minutes.         majority support

16   Upon the parties' return from the caucus the Union presented the Employer with our

17   counteroffer, which included ~~reconstituting the unit~~ Reinstating the UNionized workforce and AT one location RH and also full backpay. At this point,

18   Dickinson started inquiring about the Employer's reasoning for closing down the Compton

19   facility. Agraz told us that the Employer closed the Compton facility because of an expiring lease

20   and because of the weakening of the shipping sector. Dickinson asked Agraz when that decision

21   was made. Agraz told us that it was made on December 6. While explaining the Employer's

22   closure of the Compton facility, Agraz said that the Employer had gotten out of that business. At

23   this point, I asked Agraz what he meant and if he meant that the Employer got out of the trucking

- 2 -                                    Initials: _____

Exhibit 6(b)
2822

Scanned with CamScanner

Case 21-CA-252500                                                    March 31, 2020

1    business. Agraz told us that no, his client just got out of the business of employing employee

2    drivers. Agraz said that his client was now in the business of using only independent contractors.

3    I asked Agraz then who was doing the work that the unit used to do. Milles jumped into the

4    conversation and said that the work was being done by Southern Counties' independent

5    contractors. Milles also made a comment about Universal and Southern Counties being the same

6    thing. I asked the Employer whose SCAC code the Employer was using while performing the

7    work. A SCAC (Standard Carrier Alpha Code) code is a unique identifier code that is used

8    within the trucking industry to describe who control the underlying work. I asked this question to

9    figure out which company was actually responsible for the work that used to be performed by the

10   unit employees but is now being done by Southern Counties contractors. In response to my

11   question, the Employer representatives refused to provide that information because they said it

12   was not relevant. At this point the parties had some additional discussion about the settlement

13   offer, but no agreement was reached. Toward the end of the meeting, the Union provided the

14   Employer with another settlement offer and gave the Employer 10 days to accept that offer. This

15   is all I recall about the meeting at the time.

16          //

17          //

18          //

19          //

20          //

21          Since the March 12, 2020 meeting it is my understanding that the Employer and Union's

22   counsel may have been in contact about issue regarding this Compton unit, but I was not

- 3 -                        Initials: _____

Exhibit 6(b)
2823

Scanned with CamScanner

Case 21-CA-252500                                          March 31, 2020

1    included in those communications. I am not aware of any additional meetings between the

2    Employer and the Union regarding this unit at this time.

**I am being provided a copy of this Confidential Witness Affidavit for my review. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.**

**I have read this Confidential Witness Affidavit consisting of 4 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.**

Date: 4 | 7 | 2020 _____     Signature: _____

                                                    Ricardo Hildalgo

Signed and sworn to before me by telephone on April 7, 2020 _____

_____
**Phuong Do**
**Board Agent**
**National Labor Relations Board**

- 4 -          Initials: _____

Exhibit 6(b)
2824

Scanned with CamScanner

# EXHIBIT 6(C)

Universal Intermodal Services
Case 21-CA-264164

### Confidential Witness Affidavit

**I, Ricardo Hidalgo, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

My work address is 25 Louisiana Ave., NW, Washington, DC 20001

My work phone number (including area code) is (310) 251-6876

My email address is RHidalgo@teamster.org

1      I previously provided an affidavit to the NLRB, Region 21, in Cases 21-CA-252500

2    et al.

3      I am employed by the International Brotherhood of Teamsters (the Union) as a n

4    International Organizer. As an International Organizer, I oversee international and local

5    organizing campaigns on behalf of the Union. I am also responsible for overseeing the

6    Teamsters Port organizing campaign; organizing port drivers in Los Angeles and Long

7    Beach, California.

8      The Union represents the port drivers who were employed by Universal Intermodal

9    (the Employer) at its 2035 Vista Bella Way Compton, California facility, including drivers

10    that worked out of the Employer's Fontana facility. Driver Jose Torres worked for the

11    Employer out of its Fontana facility until he, like all of the other unit drivers, was laid off

12    around Christmas of 2019.

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

Initials _____

Exhbit 6(c)
2826

Scanned with CamScanner

Case 21-CA-264164

1          On about July 8, 2020, I received an email from driver Jose Torres. In his email to

2    me, Jose informed me that he had received something from the Employer and he wanted

3    me to review it. Jose forwarded me a copy of the settlement the Employer wanted him to

4    sign. A copy of the settlement is attached herein as **Exhibit A**.

5          At no point did the Employer consult with the Union about the terms and conditions

6    included in the settlement or about the fact that it was going to be asking Jose to sign it. In

7    fact, I first learned about the Employer settlement when Jose sent me a copy. Aside from

8    Jose, I'm not aware of any other former unit driver employee being asked to sign a

9    settlement by the Employer.  Upon learning what was going on, I asked Jose not to sign

10   the settlement.

11         Then, on about July 15, 2020, I emailed Mike Vagts, the Employer's Director of

12   Labor and Contract Relations. Mike had sent Jose the settlement. In my email to Mike, I

13   asked him to stop dealing directly with Jose. I also asked Mike to negotiate with the Union

14   regarding matters involving Jose's employment. Lastly, I asked Mike to provide the Union

15   with "all documents reviewed and relied upon by [the Employer] in its proposal to settle

16   all claims involving Mr. Torres for $250."

17         Thereafter, on July 22, 2020, Mike responded to my email, claiming that the

18   Employer was not forcing Jose to sign the settlement. In response, on July 28, 2020, I again

19   emailed Mike, reiterating what I had already stated in my July 15 email to Mike: asking

20   that the Employer stop dealing directly with Jose; asking for the information that the

21   Employer used or relied in coming up with the $250.00 settlement proposal; and again,

22   asking the Employer to negotiate with the Union about this mater. Mike did not respond to

23   my July 28, 2020 email.

- 2 -      Initials: _____

Scanned with CamScanner

Case 21-CA-264164

1          A copy of the emails exchanged between Mike and I are attached herein as **Exhibit**

2    **B.**

3          As of today, the Employer has not provided the Union with any of the information

4    requested in the Union's July 15 and July 28 emails.

5          Since my July 28, 2020 email to Mike, there has been no other communications,

6    either in written or verbally, between the Employer and the Union regarding this issue.

7    ///

I am being provided a copy of this Confidential Witness Affidavit for my review.  I
understand that this affidavit is a confidential law enforcement record and should not be
shown to any person other than my attorney or other person representing me in this
proceeding.

I have read this Confidential Witness Affidavit consisting of three (3) pages, including this
page, I fully understand it, and I state under penalty of perjury that it is true and correct.
However, if after reviewing this affidavit again, I remember anything else that is important
or I wish to make any changes, I will immediately notify the Board agent.

Date:    _8|25|2020_          Signature:    _____
                                            Ricardo Hidalgo

Signed and sworn to before me by telephone on _08/19/2020._

_____
**ELVIRA PEREDA**
**Board Agent**
**National Labor Relations Board**

- 3 -                          Initials: _____

Exhibit 6(c)
2828

Scanned with CamScanner

# EXHIBIT 7(A)

Exhibit 7(a)
2829

**Ogletree Deakins**

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

*Attorneys at Law*

1909 K Street NW, Suite 1000
Washington, DC 20006
Telephone:  202-887-0855
Facsimile:  202-887-0866
www.ogletree.com

John S. Ferrer
202-263-0173
john.ferrer@ogletree.com

January 22, 2020

**VIA NLRB E-FILING**

Phuong Do
Field Attorney
National Labor Relations Board, Region 21
312 N. Spring Street, 10th Floor
Los Angeles, CA 90012

RE:   **Mason-Dixon Intermodal d/b/a Universal Intermodal Services, Cases 21-CA-252500, 252574, 253662**

Dear Mr. Do:

Respondent Mason-Dixon Intermodal d/b/a Universal Intermodal Services ("Universal" or "the Company") submits this letter in response to the Region's request for the Company's position regarding the above-referenced Charges filed by the International Brotherhood of Teamsters ("the Union") in the above-referenced matters.[1]  Universal adamantly denies the allegations in the Union's Charges.  For the reasons discussed herein, the Charges should be dismissed and the Region should not seek the extraordinary remedy of injunctive relief.

---

[1] This position statement is intended to assist the National Labor Relations Board ("NLRB") with its assessment of the Charges and appropriateness of Section 10(j) relief.  To the extent any issue or allegation in the Charges or the Region's EAJA letters is not specifically addressed, the fact that it is not addressed should not be considered an admission by Universal.  This position statement is not a responsive pleading, and, although believed to be true and correct in all respects, it is not an affidavit. Inclusion of information in this position statement does not constitute a waiver of any objection that the Company may have in response to future discovery or information requests, or to the introduction of evidence in this or any subsequent proceeding; nor does it constitute a waiver of any objection as to timeliness of the Charges or any other legal argument the Company may assert in the future.  Universal reserves the right to amend or supplement this position statement and address any new issues or evidence that may arise in this matter.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Jackson ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Exhibit 7(a)
2830

Phuong Do
January 22, 2020
Page 2

## I.      Relevant Background[2]

Universal provides customized intermodal services, including port and rail drayage, throughout the United States.  On or about October 10, 2015, the Company entered into a lease for a property located at 2035 Vista Bella Way, Rancho Dominguez, California ("Compton terminal"). [Exhibit A.]  From the Compton terminal, the Company provided intermodal services through the ports of Los Angeles and Long Beach using employee-drivers.  On or about January 1, 2018, the Company agreed to extend the lease of the Compton terminal for two years with an expiration date of December 31, 2019.  *Id.*

### A.      The Compton Terminal was Unprofitable.

From its inception, the Compton terminal struggled to make a profit.  From 2016-2019, the Compton terminal had total operating losses in excess of $1.4 million and net losses in excess of $2.8 million.  The Compton terminal suffered net losses of approximately $775,000 in 2016, $1 million in 2017, and $1.9 million in 2018.[3]

In the midst of another first quarter loss in 2019, the Company began considering closing the Compton terminal in February 2019.[4]  [Exhibit B.]  The Company drafted a letter to the drivers to announce a March 30, 2019 closure of the Compton terminal.  [Exhibit C.]  However, the Company decided to hold off closing the terminal at that time and to try implementing certain operational changes.  The changes included replacing the dispatchers, modifying routes, and streamlining moves through the dispatch of employee-drivers and contractor-drivers in a more efficient manner.

While the Compton terminal saw marginal revenues in the second and third quarters of 2019, customer demand unexpectedly dropped.  Moreover, the volume of freight moving through the ports of Los Angeles and Long Beach decreased significantly industry-wide in 2019.[5]  It was reported that exports moving through the Port of Los Angeles in September 2019 declined by 11% and imports declined by approximately 3% from the prior year.  Things got worse in October 2019, as exports fell 19% from the prior year – the twelfth consecutive month of declining exports in the

---

[2] All information in this position statement, as well as any documents submitted to the Region, is being provided to the NLRB solely for purposes of cooperating with its investigation in this matter. As such, Universal requests that the NLRB treat these documents as confidential and not disclose their content to anyone, including any other parties, any employees, the Union, or their attorneys, without the Company's express written permission, subject of course to the requirements of the Freedom of Information Act.

[3] The Company is willing to produce relevant financial statements for the Region's review pursuant to a confidentiality and protective agreement.

[4] The Compton terminal lost approximately $244,000 in the first quarter of 2019.

[5] The downturn appears to be the result of the United States-China trade dispute and the related tariffs.

Exhibit 7(a)
2831

Phuong Do
January 22, 2020
Page 3

United States.  [Exhibit D.]  As a result of the general decline in laden volumes through the ports of Los Angeles and Long Beach, the total number of moves completed by Compton port drivers decreased by approximately 30% overall in the fourth quarter of 2019 compared to 2018.

On or about November 22, 2019, the Company posted a notice to drivers that the lease on the Compton terminal was expiring on December 31, 2019 and would not be renewed.  [Exhibit E.]  The Company also provided this information to drivers in a meeting on or about November 25, 2019.  *Id.*

On or about December 6, 2019, due to the lack of profitability of the Compton operations and the lease expiration, the Company decided to close the Compton terminal and lay off all personnel, including managers, dispatchers, drivers and office employees.  The port drivers were notified of the terminal closure by letter dated December 16, 2019, along with their final paycheck. [Exhibit F.]

### B.     The Union's Petition and Election.

On or about November 8, 2019, in Case 21-RC-251460, the Union filed a petition to represent Company drivers working out of the Compton and Fontana terminals.  The parties entered into a Stipulated Election Agreement that provided the employee-drivers working out of the Compton terminal only an opportunity to vote in a secret ballot election.  On December 4, 2019, a majority of the port drivers voted to be represented by the Union.  On December 11, 2019, the Company filed timely objections to the election.  The Regional Director ordered a hearing on one of the Company's objections, which the Company later withdrew.[6]  On January 8, 2020, the Regional Director issued a Certification of Representative.

### II.     The Company Did Not Reduce Work Hours, Close The Compton Terminal, Lay Off Employees and Relocate Work in Retaliation for Port Drivers Organizing a Union.

Under the Board's analysis set forth in *Wright Line, Inc.*, 251 NLRB 1083 (1980), to establish a claim of unlawful discrimination under the Act, the Charging Party must first make a *prima facie* case by showing:  (1) the affected employees engaged in protected activity; (2) the employer knew of the activity; and (3) the employer bore animus against the affected employees' protected activity.  *See Praxair Dist., Inc.*, 357 NLRB No. 91 (2011).  Mere suspicion, surmise and conjecture are insufficient to form the basis for a violation.  *See Cardinal Home Prods., Inc.*, 338 NLRB 1004, 1009 (2003).  As discussed below, the Union cannot establish that the Company took any of the alleged adverse actions because of employees' protected activities.

As an initial matter, the Union's claim that the Company reduced the work hours of drivers is factually baseless.  As such, the Union cannot show that any driver's hours were reduced due to any alleged protected activities.

---

[6] Contemporaneous with its withdrawal request on January 8, 2020, the Company requested that the Regional Director dismiss the Union's petition since the petitioned-for unit no longer existed.

Exhibit 7(a)
2832

Phuong Do
January 22, 2020
Page 4

Contrary to the Union's Charges, the decision by certain drivers to organize a union had absolutely nothing to do with the Company's decision to discontinue operations at the Compton terminal. As described above, the Company's decision to close the Compton terminal was due to legitimate business reasons. First, it cannot be disputed that the Compton terminal was unprofitable. Indeed, the Company was prepared to close the Compton terminal in February/March 2019 – several months before the Union filed its petition to represent the port drivers. [Exhibit B.] Unfortunately, despite attempts to curtail the terminal's losses, a drop in customer demand and a significant downturn in the volume of freight moving through the Los Angeles and Long Beach ports in the fourth quarter of 2019 made it evident the Compton terminal would continue to be unprofitable. By closing the Compton terminal, it is estimated that the Company will experience annual cost-savings (unrelated to labor costs) of approximately $1.3 million.

Second, there is also no dispute that the Company's lease was expiring at the end of December 2019, and that the Company informed the drivers in November, before the secret ballot election, that the Compton terminal lease would not be renewed. [Exhibit E.] The lease expiration combined with the lack of profitability forced Universal to make the difficult decision to discontinue the operations at the Compton terminal. *Id*. Certainly, the Company had legitimate business reasons to discontinue the Compton operations and to lay off the port drivers. *See Pac. Micronesia Corp.*, 337 NLRB 469, 471 (2002) (finding that the downturn in the Asian economy was a legitimate reason for the company to conduct a reduction in force); *Jumbo Produce*, 294 NLRB 998, 1005 (1989) (finding that the company shut down its packaging operations for business reasons because it was no longer profitable); *Brown Truck & Trailer Mfg. Co., Inc.*, 106 NLRB 999, 1000 (1953) (finding respondent had a valid economic justification and did not violate Section 8(a)(3) by discharging its employees and closing its plant where the plant was losing money consistently). *See also The Museum of Modern Art & Tech.*, 347 NLRB 986 (2006) (finding no animus to support a Section 8(a)(3) violation where respondent closed a facility and laid off workers when the lease was unable to be renewed).

Further, assuming, *arguendo*, the Union could support an inference that union activity was a motivating factor for the Company's actions (which the Union clearly cannot do), based on the business reasons described above, the Company would have taken the same action even in the absence of union activity. Board precedent is replete with cases, including recent decisions, where the Board has upheld an employer's decision to close a facility notwithstanding an inference that the decision was linked to union activity. *See Dura-Line Corp.*, 366 NLRB No. 126 (July 12, 2018) (finding that employer was justified in closing a plant and relocating production due to need for a modernized plant, and that it was implausible that the employer's $20 million dollar relocation and expansion was purposed by an attempt to relieve itself of the union); *Gunderson Rail Services*, 364 NLRB No. 30 (2016) (finding that despite "apparent and pronounced" union animus, employer's decision to close a facility was part of plan to increase profits and meet Wall Street demands); *Litton Mellonics Systems Division*, 258 NLRB 623, 625-26 (1981) (holding that respondent demonstrated that closing facility constituted a reasonable business decision based on unsatisfactory physical conditions even though the employer threatened employees with job loss if they continued to engage in protected activity); *Nu-Skin Int'l*, 320 NLRB 385, 404-405 (1995) (finding employer relocated business based on financial considerations notwithstanding its threats to close the facility if the employees voted for the union).

Exhibit 7(a)
2833

Phuong Do
January 22, 2020
Page 5

Here, unlike the cases cited above, there is no credible evidence that the Company bore any animus towards employees' union activities.  In sum, the Union cannot establish that the Company's decision to close the Compton terminal and lay off drivers was due to any union animus.  Moreover, contrary to the Union's claim, the work performed by the port drivers out of the Company terminal was not relocated to any other Universal location.[7]  Accordingly, the Union's Charges should be dismissed.

## III.    The Company Had No Obligation to Bargain Over the Decision to Close the Compton Terminal.

As described above, the Company's decision to close the Compton terminal occurred prior to the Union's certification as the collective bargaining representative of the port drivers.  For the reasons described below, the Company had no obligation to bargain over the decision to close the Compton terminal.

The legal rights and responsibilities of employers faced with the closure of a facility are well established, as set forth in the United States Supreme Court's decision in *First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981).  In *First National Maintenance*, the Court held that a decision to close part of a business for purely economic reasons is not a mandatory subject of bargaining.  In reaching this conclusion, the Supreme Court opined:

> Some management decisions, such as choice of advertising and promotion, product type and design, and financing arrangements, have only an indirect and attenuated impact on the employment relationship.  *See Fibreboard*, 379 U.S. at 223, 85 S.Ct., at 409 (Stewart, J., concurring). Other management decisions, such as the order of succession of layoffs and recalls, production quotas, and work rules, are almost exclusively "an aspect of the relationship" between employer and employee.  *Chemical Workers*, 404 U.S., at 178, 92 S.Ct., at 397.  The present case [involving the closing of part of a business] concerns a third type of management decision, one that had a direct impact on employment, since jobs were inexorably eliminated by the termination, but had as its focus only the economic profitability of the [operation], a concern under these facts wholly apart from the employment relationship.  This decision, involving a change in the scope and direction of the enterprise, is akin to the decision whether to be in business at all, "not in [itself] primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment."

---

[7] In your January 8, 2020 letter, you indicate that the Union alleges that the Company relocated work "to other Employer facilities in Southern California, including a facility on 550 S. Alameda St., Compton, CA 90221."  Universal does not own or operate any facility located at 550 S. Alameda Street in Compton.  As noted above, the operations at the Compton terminal ceased and no work was relocated to any other Company location in California.

Exhibit 7(a)
2834

Phuong Do
January 22, 2020
Page 6

*Id.* at 676-677 (Stewart, J., concurring) and *Textile Workers v. Darlington Co.*, 380 U.S. 263, 268 (1965) ("an employer has the absolute right to terminate his entire business for any reason he pleases").

Based on the lack of profitability and the expiration of the lease, Universal decided to cease its operations at the Compton terminal. The work performed by the port drivers out of the Compton terminal was not transferred to any other Universal location. The decision to close the Compton terminal was clearly a fundamental change in the scope and direction of the business. Moreover, the closure was unrelated to labor costs. *See, e.g.*, *El Paso Electric Co.*, 357 NLRB No. 186 (2012) (no duty to bargain regarding plant closing decision where labor costs were not a factor in the decision). Accordingly, the Company's decision to close the Compton terminal was not a mandatory subject of bargaining, and therefore the Company had no duty to bargain over such decision.

## IV.    The Company Did Not Discharge Any Employees in Violation of the Act.

The Union also alleges that the Company discharged port drivers Jonathon Ledesma, Romel Mallard, and Kevin Poullard because of their protected concerted activities and support for the Union. Here, the Union cannot meet its *prima facie* burden under the *Wright Line* analysis because it cannot establish that the Company bore any animus towards the alleged protected activities of any of the alleged discriminatees. During the time period leading up to the NLRB election, which was held on December 4, 2019, many port drivers openly expressed their support for the Union, including by wearing vests with the Teamsters logo. At no point did Universal discriminate against any employees for expressing their support or opposition of the Union. Drivers were free to voice their opinions on unionization without retaliation. Even if the Region were to determine that the Union somehow met its *prima facie* burden, the Union cannot establish a causal connection between the alleged protected activities of the discriminatees and their discharges. Those shortcomings are fatal to the Union's Charges.

### A.    The Company Discharged Jonathan Ledesma for Legitimate, Nondiscriminatory Reasons.

The Company had legitimate business reasons for terminating Ledesma's employment; namely, he did not have the requisite commercial driver's license ("CDL") for the state of California. During preparation for a recent state audit, it was discovered that Ledesma did not possess a California CDL, which is required by the Federal Motor Carrier Safety Regulations and state of California. *See* CFR Title 49, Part 383; California Vehicle Code, Section 12505. Instead, Ledesma produced an Arizona driver's license. On or about November 25, 2019, Ledesma admitted that he did not have the required Calfornia CDL. As a result, he was put out of service. Accordingly, Ledesma was discharged on November 27, 2019 for violating federal and state licensing requirements. [Exhibit G.] Moreover, the Company has discharged other employees for licensing issues. Clearly, Ledesma's discharge was totally unrelated to his alleged protected activities. As such, the Union's Charge regarding Ledesma should be dismissed in its entirety. *See, e.g., In Re Overnite Transp. Co.*, No. 26-CA-18099-R, 2002 WL 1049709 (May 20, 2002) (respondent lawfully terminated commercial drivers for failing to comply with DOT regulations).

Exhibit 7(a)
2835

Phuong Do
January 22, 2020
Page 7

    **B.**   **The Company Discharged Romel Mallard for Legitimate, Nondiscriminatory Reasons.**

       Similarly, the Company had legitimate, nondiscriminatory reasons for terminating the employment of Romel Mallard. Mallard was discharged on November 26, 2019 for insubordination. [Exhibit H.] Specifically, at a mandatory meeting of drivers held by the Company on or about November 25, Mallard became very upset and disruptive in response to a fellow driver's comments in opposition of the Union. Mallard became very loud, jumped out of his chair, and approached the front of the room where the presentation was taking place. Even though he was informed that attendance at the meeting was required, Mallard stormed out of the room. Notably, by this time, the Company had held approximately eight meetings to discuss the Union's petition. This was Mallard's third meeting where the Union's petition and NLRB election process were discussed. Mallard – and several other drivers – had openly expressed their support for the Union during these meetings without any interference or retaliation by the Company. The sole reason Mallard was discharged was because of his gross insubordination at the November 25 meeting. The Union cannot use Mallard's apparent union support to shield him from his own misconduct. As the Board made clear in *Neptco, Inc.*, "the Act is not a shield protecting employees from their own misconduct or insubordination." *Neptco, Inc.*, 346 NLRB 18, 19-20 (2005) (reversing ALJ's finding of discriminatory discharge when ALJ found union animus based solely on conjecture and speculation). The Union's Charge with respect to Mallard is without merit and should be dismissed.

    **C.**   **The Company Discharged Kevin Poullard for Legitimate, Nondiscriminatory Reasons.**

       The Union also cannot establish its *prima facie* burden of establishing that Kevin Poullard was discharged for his alleged protected activities. It is undisputed that Poullard was a "no-call/no-show" on November 20, 2019, as he failed to report to work as scheduled and failed to notify his supervisor or manager. The Company has a "Call Off Procedure and Policy" that expressly states: "A No Call No Show is unacceptable, and subject to management review for disciplinary measures up to and including termination." [Exhibit I (emphasis in original).] Consistent with this policy, Poullard's employment was terminated. [Exhibit J.] The Company has discharged other employees under the no-call/no-show policy. [Exhibit K.] Again, like the other alleged discriminatees, Poullard's discharge was totally unrelated to any purported protected activities. The Union's Charge regarding Poullard should be dismissed. *See, e.g., Mid-W. Tel. Serv., Inc.*, 358 NLRB 1326, 1335 (2012) (respondent's discharge of employee for poor attendance record did not violate the Act); *AT&T Mobility Servs., LLC*, No. 20-CA-215835, 2019 WL 1571069 (Apr. 9, 2019) (employer met its burden when it terminated employee for repeated absences at work).

**V.**    **The Company Did Not Violate Section 8(a)(1) of the Act as Alleged.**

    **A.**   **The Company Did Not Make Threats of Futility or Job Loss.**

       For a brief period prior to the election, the Company retained a seasoned labor relations consultant, Kirk Cummings, to educate its drivers regarding employee rights under the NLRA, the

Exhibit 7(a)
2836

Phuong Do
January 22, 2020
Page 8

NLRB election process, and collective bargaining.[8]   Cummings met with the Company's employees approximately 9-10 times over the course of two weeks prior to the election, including on or about November 13, 2019.  Cummings adamantly denies that he ever told employees "they would not get what they want with the Union."  In fact, the first page of Cummings' presentation to employees that day (and thereafter) was entitled "No Predictions" and states "Universal would bargain in good faith" if employees chose a union and "no one can predict the outcome of collective bargaining with a union."  [Exhibit L.]  Cummings also informed employees that his discussion was regarding "what could or may happen, not necessarily what will happen" during collective bargaining.  *Id*.  All of these statements are accurate and lawful.  In addition, Cummings denies he told employees "there was a chance that employees would come out … with nothing at all."  At one point, Cummings did tell employees that they could get more, the same, or less as a result of collective bargaining, which is of course lawful.  *See Wild Oats Markets, Inc*., 344 NLRB 717 (2005) (respondent did not violate the Act by informing employees that in collective bargaining they could lose the benefits they had now, as this was a factually accurate observation regarding a possible negative outcome of bargaining).  *See also Winkle Bus Co.*, 347 NLRB 1203, 1208 (2006) ("[A]bsent threats or promise of benefit, an employer is entitled to explain the advantages and disadvantages of collective bargaining to its employees in an effort to convince them that they would be better off without a union.")

In a desperate attempt to establish union animus, the Union recently amended its Charges to claim Cummings told employees that they were "asking for trouble" and suggested that Universal may just get rid of the employees.  This claim is completely bogus and fanciful.  Cummings, again, an experienced consultant, denies ever making such statements or ever suggesting in any way the Company would discharge employees for selecting a union.  Indeed, during one meeting, in response to an employee's question, Cummings told employees that it would be unlawful for an employer to close its facility in retaliation for employees choosing a union.

## B.       The Company Did Not Unlawfully Solicit Grievances and Promise Improvements.

The Union's claims that the Company violated Section 8(a)(1) of the Act by soliciting grievances and promising improvements are completely baseless.  Joe Lugo, former General Manager of the Compton terminal, and Cummings adamantly deny ever soliciting grievances from employees and promising to address them if employees reject the Union.  In any event, the statements attributed to Lugo and an unnamed labor consultant, even if made, clearly do not violate the law.  As a new manager at the time, employees voluntarily shared with Lugo that they had equipment issues that needed to be fixed.  As General Manager, it was Lugo's responsibility to ensure that drivers had roadworthy, safety-compliant equipment.  Any assurances that Lugo may have provided to employees that he would address their equipment issues had absolutely nothing to do with the election.  *See, e.g., Cont'l Kitchen Corp*., 246 NLRB 611, 614 (1979) (finding an

---

[8] The Company does not admit that Cummings was a Section 2(13) agent at any time during his brief engagement with the Company.

Exhibit 7(a)
2837

Phuong Do
January 22, 2020
Page 9

employer's promise to fix a leaky roof was not unlawful, and that inquiries related to repairs were unrelated to employee's support of the union).  Indeed, there is no evidence or contention that Lugo ever promised to fix employees' issues if they rejected the Union.

Similarly, to the extent Lugo directed employees to complete pre-trip forms had nothing to do with the election.  State regulations require drivers to complete a written pre- and post-trip form, also known as a driver vehicle inspection report.  The form provided a space for employees to note any equipment issues.  Because not every driver was completing the written form, Lugo told them to do so.  Clearly, this was not an unlawful solicitation of a grievance or promise of a benefit.

Lugo also denies ever promising employees that he would simplify the pre-trip form.  Employees were already using an electronic tablet to complete the form, however, as noted above, most were not completing the required written form.  At some point, in response to an employee's question about having to do both the electronic and written forms, Lugo stated that the Company probably would try to streamline the process in the future.

Finally, it was the Company's past practice to have a mechanic fix equipment issues for the Compton drivers.  Telling employees that a mechanic would repair their equipment is clearly not unlawful.

In sum, the Union's allegations that the Company violated Section 8(a)(1) of the Act are frivolous and should be dismissed.

## VI.    Union is Not Entitled to Extraordinary Injunctive Relief.

It is well-established "that injunctive relief pursuant to Section 10(j) is an extraordinary remedy, to be requested by the Board and granted by a district court only under very limited circumstances."  *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 374 (11th. Cir. 1992).  *Accord, Kinney v. International Union of Operating Eng'rs, Local 150*, 994 F.2d 1271, 1277 (7th Cir. 1993); *Kobell v. Suburban Lines*, 731 F.2d 1076, 1091 n.26 (3d Cir. 1984); *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1192 (5th Cir. 1975), *cert. denied*, 426 U.S. 934 (1976); *Minnesota Mining & Mfg. Corp. v. Meter*, 385 F.2d 265, 269 (8th Cir. 1967). "It is an extraordinary tool because it injects the legal system into disputes before a full airing of the facts and a careful consideration of the law, and mistakes can be costly."  *Kinney, 994* F.2d at 1277.  Section 10(j) relief is appropriate only in "the <u>unusual</u> likelihood (compared to other cases before the Board) of ultimate remedial failure" and "was not intended to undermine the normal processes of labor law adjudication: administrative resolution by the NLRB followed, if necessary, by enforcement in the courts of appeals."  *Kobell*, 731 F.2d at 1091 n.26.  This "essential principle is what dams the potential flood of § 10(j) injunction petitions."  *Arlook*, 952 F.2d at 374.

Injunctive relief under Section 10(j) is an equitable remedy which is subject to the district court's discretion.  A district court in the Ninth Circuit may issue a preliminary injunction if:  (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities or harms tips in the plaintiff's favor; and (4) the injunction is in the public interest.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2010) (*quoting Winter v. NRDC*, 555 U.S. 7 (2008)).  The United States

Exhibit 7(a)
2838

Phuong Do
January 22, 2020
Page 10

Supreme Court has emphasized that a plaintiff seeking preliminary injunction must show that irreparable harm *is likely*, not merely a possibility. *Winter v. NRDC*, 555 U.S. 7 (2008).

Applying these principles to the instant case, there is no basis to conclude that Section 10(j) injunctive relief is warranted.

### A.     The Union is Not Likely to Succeed on the Merits.

The Union will not succeed on the merits of its Charges related to the discharges of Ledesma, Mallard and Poullard or the closure of the Compton terminal and related layoffs because it cannot demonstrate that the Company acted with any illegal motive.  As detailed above, Ledesma, Mallard and Poullard were discharged for legitimate, nondiscriminatory reasons, not for any alleged protected activities.  The decision to close the Compton terminal was due to the terminal's continued poor financial performance and expiration of the lease.

For the reasons discussed above, there is also no basis for a bargaining order in this case. Instead, the traditional remedy of back pay is available to make the alleged discriminatees whole if a violation were established through the Board's normal processes. *See Transmarine Navigation Corp.*, 170 NLRB 389 (1968) (holding that the standard remedy granted when an employer fails to bargain over the effects of closing a department consists of limited back pay.)

Finally, the alleged independent violations of Section 8(a)(1) are without merit.  In any event, there can be no question that the traditional remedies for such claims – a notice posting and cease and desist order – would be available from the Board at the conclusion of any administrative proceedings.  Clearly, the Union's Section 8(a)(1) allegations are not appropriate for injunctive relief.

### B.     The Union Cannot Show Irreparable Harm as the Board's Traditional Remedies Would Be Available.

The Region should also reject the idea of pursuing Section 10(j) relief in this case because there is no risk of irreparable harm.  The General Counsel has acknowledged that the most important factor when reviewing whether a complaint warrants Section 10(j) relief is "the potential threat that the Board's ultimate remedial order will be ineffective to remedy the unfair labor practices and to protect statutory rights."  Memorandum GC 02-07 (August 9, 2002).  Courts have also cautioned that injunctive relief is only appropriate in "the unusual likelihood of ultimate remedial failure" and that injunctive relief is "not intended to undermine normal processes of labor law adjudication." *Kobell,* 731 F.2d at 1091 n.26.  The purpose of Section 10(j) is only to preserve the Board's ultimate remedial authority.  It "is not to be a substitute for the exercise of that power." *Kobell*, 731 F.2d at 1091.

The Company made the decision to cease operations at the terminal for business reasons wholly unrelated to employees' union activities.  Accordingly, there is no terminal and there are no positions to reinstate the alleged discriminatees. *See Overstreet ex rel. N.L.R.B. v. Gunderson Rail Servs., LLC*, 587 F. App'x 379, 381 (9th Cir. 2014) (holding that Section 10(j) relief was inappropriate where NLRB sought to force the company to re-open a facility after laying off employees to avoid financial losses).  Should the Region issue a complaint, and in the unlikely

Exhibit 7(a)
2839

Phuong Do
January 22, 2020
Page 11

event the Board finds a violation, the traditional remedy of back pay is available to make the alleged discriminatees whole.

Moreover, the Union cannot show that an interim bargaining order is necessary to preserve the ultimate remedial power of the Board.  *See Overstreet,* 587 F. App'x at 381 (denying preliminary injunction seeking order requiring employer to bargain in good faith with union); *L.A. Mem'l Coliseum Comm'n, v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980) (same); *see also Henderson et al. v. Bluefield Hospital Co., LLC et al.*, Nos. 16-2331, 16-2332 (4th Cir. Aug. 28, 2018) (petition for injunctive relief seeking bargaining order denied as the Board failed to demonstrate sufficiently that the effectiveness of its remedial power was in jeopardy).  The ultimate remedial power of the Board can be exercised through the administrative hearing process. There is simply no sound reason for the Region to pursue Section 10(j) relief at this time.

### C.    The Balance of Equities Strongly Weighs Against Injunctive Relief.

In considering the balance of equities, a district court has a duty to "balance the interests of all parties and weigh the damage to each." *L.A. Mem'l Coliseum*, 634 F.2d at 1203.  The balance of equities does not favor an injunction here because, as explained above, adequate traditional remedies would be available if the Board finds that a violation occurred.  Moreover, any interim order requiring the Company to reinstate the Compton terminal and the alleged discriminatees would ignore the Company's equities and cause it economic harm.

In *Overstreet*, the Ninth Circuit reversed the lower court's issuance of a preliminary injunction requiring respondent to reopen its repair facility, reinstate employees, and bargain in good faith with the union because the court failed to give serious consideration to the respondent's equities.  *Overstreet,* 587 F. App'x at 379.  Specifically, the respondent there claimed that an order to reopen its facility would require it to operate a facility that was (and would continue to be) wholly unprofitable due to the loss of its major customer.  The respondent also noted that a majority of the employees at that facility had already accepted relocation options or severance packages. While the Ninth Circuit recognized the Regional Director's need to protect the integrity of the collective bargaining process and to preserve the Board's remedial power, the court found that "such equities have less weight in this context because they can be vindicated after a final judgment." *Id.*  The Court of Appeals concluded that these equities were "outweighed by the potential economic harm caused by a reopening order under the circumstances of this case." *Id.* (citations omitted).

As mentioned above, the Compton terminal was (and would continue to be) unprofitable. In light of the likely economic harm that would result from an order requiring the Company to reinstate its Compton terminal and employees, the balance of equities clearly weigh against the issuance of an injunction.  As the Ninth Circuit found in *Overstreet*, if it is determined that the closure at issue constitutes an unfair labor practice, an order for reinstatement, back pay, and bargaining regarding the effects of the closure may issue following final judgment.  In short, the extreme consequences of an injunction are not warranted and would be grossly unfair to the Company absent a final determination on the merits that an actual violation of the Act occurred.

Exhibit 7(a)
2840

Phuong Do
January 22, 2020
Page 12

    **D.**    **The Public Interest Mandates Denial of Injunctive Relief.**

    Finally, the public interest weighs heavily against awarding injunctive relief in this case. The Board's administrative processes are more than sufficient to ultimately remedy any established violations that may be asserted in a complaint. Given the NLRB's limited financial resources, the Agency clearly would be acting contrary to the public's interest if it were to expend its own limited resources on an unwarranted and unnecessary injunction. Of course, the Company also would unfairly be required to expend its resources on unnecessary injunction litigation. Clearly, the public interest does not support any such action. Accordingly, injunctive relief is not appropriate for this matter.

**VII.**    **CONCLUSION**

    For the foregoing reasons, Universal did not violate the Act as alleged. The Union's Charges should be dismissed in their entirety.

                         Sincerely,

                         John S. Ferrer

JSF:mlr

Exhibit 7(a)
2841

# EXHIBIT A

Exhibit 7(a)
2842

FIRST AMENDMENT TO LEASE

This First Amendment to Lease ("Amendment") is entered into on November 6, 2017, by and between Vista Bella, LLC ("Lessor") and Universal Intermodal Services, Inc. ("Lessee").

RECITALS

WHEREAS, Lessor and Lessee entered into that certain Lease dated October 1, 2015, (the "Lease") relating to that certain real property commonly known as 2035 Vista Bella Way, Rancho Dominguez, California (the "Premises).

NOW THEREFORE, in consideration of the terms, covenants and conditions set forth herein, and for the good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree to amend the Lease as follows:

Paragraph 1.3   Term   Lessor and Lessee desires to extend the term of the Lease for a period of two (2) years, commencing January 1, 2018, and expiring on December 31, 2019.

Paragraph 1.5   Base Rent.  The Base Rent for the extension period shall be as follows:

| | |
|---|---|
| January 1, 2018 – December 31, 2018 | $17,000.00 per month |
| January 1, 2019 – December 31, 2019 | $17,510.00 per month |

Paragraph 1.6(b)   Security Deposit:  Lessor and Lessee acknowledge the current security deposit on file in the amount of $14,000.00.

Paragraph 1.9(b)   Payment to Broker   Lessee shall pay the Lease Commission, in the amount of $20,000.00, made payable to ADG Commercial, at Lease execution.

Paragraph 56   Utilities:  Lessee shall continue to pay Lessor the additional sum of $300.00 per month for utilities.

All other terms and conditions shall continue and remain in full force and effect except as specifically amended herein.

Lessor:

Vista Bella, LLC

Courtney Cuff, Managing Member

Lessee:

Universal Intermodal Services, Inc.

Timothy Phillip, President

Jeffrey A. House, Vice President

VIS – Universal Int – 1ˢᵗ Amd

Exhibit 7(a)
2843

# COMMENCEMENT DATE MEMORANDUM

This Commencement Date Certificate is entered into by Landlord and Tenant pursuant to Section 3 of the Lease dated October 10, 2015.

1.   <u>Definitions</u>:   In this Certificate the following terms have the meanings given to them:

      A.   LANDLORD: Vista Bella, LLC

      B.   TENANT:   Universal Intermodal Services, Inc.

      C.   LEASE:   Lease dated the 10th day of October, 2015.

      D.   PREMISES: 2035 Vista Bella Way, Rancho Dominguez, CA – East yard

2.   <u>Confirmation of Lease Commencement</u>: Landlord and Tenant confirm that the Early Occupancy date is January 1, 2016.  The Lease Commencement Date of the Lease is January 1, 2016, and the Lease Expiration Date is the December 31, 2017.   Sections 1.3, 1.4, and 1.5, of the Lease are accordingly amended.

Landlord and Tenant have executed this Commencement Date Memorandum as of the dates set forth below.

**LANDLORD:  Vista Bella, LLC**

By: _____          Date: _____
     T. Courtney Dubar
     Managing Member

**TENANT:  Universal Intermodal Services, Inc.**

By: _____       Date: _5/5/2016_____

By: _____          Date: _____

Exhibit 7(a)
2844

**AIR COMMERCIAL REAL ESTATE ASSOCIATION**
**STANDARD INDUSTRIAL/COMMERCIAL LAND LEASE -- GROSS**

(DO NOT USE THIS FORM FOR BUILDINGS OR FOR LEASES PROVIDING FOR THE CONSTRUCTION OF BUILDINGS)

1.     Basic Provisions ("Basic Provisions").

    1.1     **Parties:** This Lease ("Lease"), dated for reference purposes only <u>October 10, 2015</u>
is made by and between <u>Vista Bella, LLC</u>
    ("Lessor")
and <u>Universal Intermodal, Inc.</u>
       <u>Services</u>    ("Lessee"),
(collectively the "Parties," or individually a "Party").

    1.2     **Premises:** That certain real property, including all improvements thereon or to be provided by Lessor under the terms of this Lease,
and commonly known as <u>2035 Vista Bella Way, (Part of Larger East Yard)</u>
located in the County of <u>Los Angeles</u>, State of <u>California</u>
and generally described as (describe briefly the nature of the property and the improvements on the property, if any, and, if applicable, the "Project", if
the property is located within a Project) <u>Approx. 1.3 acres of yard outlined in Exhibit A (attached). Tenant
shall also have common area parking in front of office for vehicle parking.</u>
    ("Premises"). (See also Paragraph 2)

    1.3     **Term:** <u>2</u> years and <u>--</u> months ("Original Term") commencing <u>30 days after Lease</u>
<u>execution</u> ("Commencement Date") and ending <u>24 months after Lease commencement</u>
("Expiration Date"). (See also Paragraph 3)

    1.4     **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing
<u>Upon completion of Lessor's Tenant Improvements</u> (If any) ("Early Possession Date"). (See also Paragraphs 3.2
and 3.3)

    1.5     **Base Rent:** $<u>14,000.00</u> per month ("Base Rent"), payable on the <u>established commencement</u>
day of each month commencing <u>30 days after Lease execution</u>. (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph _____

    1.6     **Base Rent and Other Monies Paid Upon Execution:**
        (a)     Base Rent: $<u>14,000.00</u> for the period <u>first (1st) months rent</u>

        (b)     Security Deposit: $<u>14,000.00</u> ("Security Deposit"). (See also Paragraph 5)
        (c)     Other: $<u>--</u> for <u>--</u>

        (d)     Total Due Upon Execution of this Lease: $<u>28,000.00</u>

    1.7     **Agreed Use:** <u>Parking, storage and general office for a trucking/trailer hauling</u>
<u>company and any other lawful related use thereto.</u> (See also Paragraph 6)

    1.8     **Insuring Party:** Lessor is the "Insuring Party". The annual "Base Premium" is $<u>tbd</u> (See also Paragraph 8)

    1.9     **Real Estate Brokers:** (See also Paragraph 15 and 25)
        (a) **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check
applicable boxes):
☐ <u>n/a</u>     represents Lessor exclusively ("Lessor's Broker");
☐ <u>n/a</u>     represents Lessee exclusively ("Lessee's Broker"); or
☑ <u>ADG Commercial</u>     represents both Lessor and Lessee ("Dual Agency").
        (b) **Payment to Brokers:** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage
fee agreed to in a separate written agreement (or if there is no such agreement, the sum of <u>--</u> or <u>6</u> % of the total Base
Rent) for the brokerage services rendered by the Brokers.

    1.10     **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by <u>n/a</u>
    ("Guarantor"). (See also Paragraph 37)

    1.11     **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
☑ an Addendum consisting of Paragraphs <u>51</u> through <u>56</u> ;
☑ a plot plan depicting the Premises; Exhibit A
☐ a current set of the Rules and Regulations;
☐ a Work Letter;
☑ other (specify): <u>Outline of 1st floor office space. (Approx. 110' x 60')</u>

2.     **Premises.**

    2.1     **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and
upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in

INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION     FORM LG-9-07/14E

INITIALS

Exhibit 7(a)
2845

the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different.  **Note:** Lessee is advised to verify the actual size prior to executing this Lease.

2.2     **Condition.**  Lessor shall deliver the Premises to Lessee free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and warrants that the existing electrical, plumbing, lighting, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense.  The warranty period shall be 30 days. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense. Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3     **Compliance.**  Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that such improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee.  **NOTE:** Lessee is responsible for determining whether or not the **Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense.

2.4     **Acknowledgements.**  Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the improvements, if any, security, environmental  aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5     **Lessee as Prior Owner/Occupant.**  The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

3.     **Term.**

3.1     **Term.**  The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2     **Early Possession.**  Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date.  Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises.  If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such early possession.  All other terms of this Lease (including but not limited to the obligations to pay Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period.  Any such Early Possession shall not affect the Expiration Date.

3.3     **Delay In Possession.**  Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date.  If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however,  be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee.  If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder.  If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4     **Lessee Compliance.**  Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance.  Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.     **Rent.**

4.1     **Rent Defined.**  All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("Rent").

4.2     **Payment.**   .  Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease.   Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating.  In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future payments to be made by Lessee to be by cashier's check.  Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Operating Expense Increase, and any remaining amount to any other outstanding charges or costs.

5.     **Security Deposit.**  Lessee shall deposit with Lessor upon  execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent.  Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

6.     **Use.**

6.1     **Use.**  Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose.  Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a

INITIALS

INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM LG-9-07/14E

Exhibit 7(a)
2846

nuisance, or that disturbs occupants or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not be significantly more burdensome to the Premises. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2     **Hazardous Substances.**

(a)  **Reportable Uses Require Consent.**  The term "**Hazardous Substance**" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory.  Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof.  Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements.  "**Reportable Use**" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)  **Duty to Inform Lessor.**  If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)  **Lessee Remediation.**  Lessee shall not cause or permit any Hazardous Substance to be spilled or released, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)  **Lessee Indemnification.**  Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from adjacent properties not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)  **Lessor Indemnification.**  Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)  **Investigations and Remediations.**  Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment.  Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)  **Lessor Termination Option.**  If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice.

6.3     **Lessee's Compliance with Applicable Requirements.**  Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the such Requirements, without regard to whether said Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.

6.4     **Inspection; Compliance.**  Lessor and Lessor's "**Lender**" (as defined in Paragraph 30) and consultants shall have the right to enter onto Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting the condition of the Premises and for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of a written request therefor.

7.     **Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

7.1     **Lessee's Obligations.**

(a) **In General.**  Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, in good order, condition and repair (whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, lighting facilities, landscaping, driveways, parking lots, fences, retaining walls, signs, sidewalks and parkways located on, or adjacent to the Premises. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.  Lessee shall, during the term of this Lease, keep the appearance of the Premises in a first-class condition (including, e.g. graffiti removal).

(b) **Service Contracts.**  Lessee shall, at Lessee's sole expense, procure and maintain a contract, with copies to Lessor, in customary form and substance for, and with a contractor specializing and experienced in the maintenance of the landscaping and irrigation systems, However, Lessor reserves the right, upon notice to Lessee, to procure and maintain such service contract, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

INITIALS

INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM LG-9-07/14E

Exhibit 7(a)
2847

(c) Failure to Perform. If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

7.2     Lessor's Obligations. Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 9 (Damage or Destruction) and 14 (Condemnation), it is intended by the Parties hereto that Lessor have no obligation, in any manner whatsoever, to repair and maintain the Premises. It is the intention of the Parties that the terms of this Lease govern the respective obligations of the Parties as to maintenance and repair of the Premises, and they expressly waive the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3     Utility Installations; Trade Fixtures; Alterations.

(a) Definitions. The term "Utility Installations" refers to security and fire protection systems, lighting fixtures, plumbing, and fencing on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b) Consent. Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the Premises without such consent but upon notice to Lessor, as long as the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) Liens; Bonds. Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4     Ownership; Removal; Surrender; and Restoration.

(a) Ownership. Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) Removal. By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) Surrender; Restoration. Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) to the level specified in Applicable Requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.     Insurance; Indemnity.

8.1     Payment of Premium Increases.

(a) Lessee shall pay to Lessor any insurance cost increase ("Insurance Cost Increase") occurring during the term of this Lease. Insurance Cost Increase is defined as any increase in the actual cost of the insurance required under Paragraph 8.2(b), 8.3(a) and 8.3(b) over and above the Base Premium as hereinafter defined calculated on an annual basis. Insurance Cost Increase shall include but not be limited to increases resulting from the nature of Lessee's occupancy, any act or omission of Lessee, requirements of the holder of mortgage or deed of trust covering the Premises, increased valuation of the Premises and/or a premium rate increase. The parties are encouraged to fill in the Base Premium in paragraph 1.8 with a reasonable premium for such insurance based on the Agreed Use of the Premises. If the parties fail to insert a dollar amount in Paragraph 1.8, then the Base Premium shall be the lowest annual premium reasonably obtainable for the required insurance as of the commencement of the Original Term for the Agreed Use of the Premises. In no event, however, shall Lessee be responsible for any portion of the increase in the premium cost attributable to liability insurance carried by Lessor under Paragraph 8.2(b) in excess of $2,000,000 per occurrence.

(b) Lessee shall pay any such Insurance Cost Increase to Lessor within 30 days after receipt by Lessee of a copy of the premium statement or other reasonable evidence of the amount due. If the insurance policies maintained hereunder cover other property besides the Premises, Lessor shall also deliver to Lessee a statement of the amount of such Insurance Cost Increase attributable only to the Premises showing in reasonable detail the manner in which such amount was computed. Premiums for policy periods commencing prior to, or extending beyond the term of this Lease, shall be prorated to correspond to the term of this Lease.

8.2     Liability Insurance.

(a) Carried by Lessee. Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any cross-liability exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b) Carried by Lessor. Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3     Property Insurance, Improvements and Rental Value.

(a) Improvements. The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee and not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender or included in the Base Premium), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition,

INITIALS

INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM LG-9-07/14E

Exhibit 7(a)
2848

reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence, and Lessee shall be liable for such deductible amount in the event of an Insured Loss.

(b) **Rental Value.** The Insuring Party shall obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period. Lessee shall be liable for any deductible amount in the event of such loss.

(c) **Adjacent Premises.** If the Premises are part of a larger property owned by Lessor, the Lessee shall pay for any increase in the premiums for the property insurance of such adjacent property if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

8.4   Lessee's Property; Coverage; Worker's Compensation Insurance.

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

(b) **Worker's Compensation Insurance.** Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements. Such policy shall include a "Waiver of Subrogation" endorsement. Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

(c) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5   **Insurance Policies.** Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6   **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7   **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8   **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, from any cause, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9   **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/ costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessor of its obligation to maintain the insurance specified in this Lease.

9.   **Damage or Destruction.**

9.1   **Insured Loss.** If the improvements on the Premises are damaged and such damage is an Insured Loss, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds (except as to the deductible which is Lessee's responsibility) as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises.

9.2   **Uninsured Loss.** If the improvements on the Premises are damaged and such damage is not an Insured Loss, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice.

9.3   **Abatement of Rent; Lessee's Remedies.**

(a) **Abatement.** In the event the improvement on the Premises are damaged or a Hazardous Substance Condition for which Lessee is not responsible under this Lease occurs ('Hazardous Substance Condition' shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance on or under the Premises which requires remediation), the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b) **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within such 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.4   **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

9.5   **Waiver Statutes.** Lessor and Lessee agree that the terms of this Lease shall govern the effect of any damage to or destruction of

INITIALS

INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM LG-9-07/14E

Exhibit 7(a)
2849

the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

10.  **Real Property Taxes.**
    10.1   **Definition.** As used herein, the term "Real Property Taxes" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Premises or the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Building address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Premises are located. Real Property Taxes shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Premises, and (ii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.
    10.2

      (a) **Payment of Taxes.** Lessor shall pay the Real Property Taxes applicable to the Premises provided, however, that Lessee shall pay to Lessor the amount, if any, by which Real Property Taxes applicable to the Premises increase over the fiscal tax year during which the Commencement Date Occurs ("Tax Increase"). Payment of any such Tax Increase shall be made by Lessee to Lessor within 30 days after receipt of Lessor's written statement setting forth the amount due and computation thereof. If any such taxes shall cover any period of time prior to or after the expiration or termination of this Lease, Lessee's share of such taxes shall be prorated to cover only that portion of the tax bill applicable to the period that this Lease is in effect. In the event Lessee incurs a late charge on any Rent payment, Lessor may estimate the current Real Property Taxes, and require that the Tax increase be paid in advance to Lessor by Lessee monthly in advance with the payment of the Base Rent. Such monthly payment shall be an amount equal to the amount of the estimated installment of the Tax Increase divided by the number of months remaining before the month in which said installment becomes delinquent. When the actual amount of the applicable Tax Increase is known, the amount of such equal monthly advance payments shall be adjusted as required to provide the funds needed to pay the applicable Tax Increase. If the amount collected by Lessor is insufficient to pay the Tax Increase when due, Lessee shall pay Lessor, upon demand, such additional sums as are necessary to pay such obligations. Advance payments may be intermingled with other moneys of Lessor and shall not bear interest. In the event of a Breach by Lessee in the performance of its obligations under this Lease, then any such advance payments may be treated by Lessor as an additional Security Deposit.
      (b) **Additional Improvements.** Notwithstanding anything to the contrary in this Paragraph 10.2, Lessee shall pay to Lessor upon demand therefor the entirety of any increase in Real Property Taxes by reason of Alterations or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessor subsequent to the execution of this Lease by the Parties.
    10.3   **Joint Assessment.** If the Premises are not separately assessed, Lessee's liability shall be an equitable proportion of the Tax Increase for all of the land and improvements included within the tax parcel assessed, such proportion to be conclusively determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.
    10.4   **Personal Property Taxes.** Lessee shall pay, prior to delinquency, all taxes assessed against and levied upon Lessee Owned Alterations, Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.  **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. If any such services are not separately metered or billed to Lessee, Lessee shall pay a reasonable proportion, to be determined by Lessor, of all charges jointly metered or billed. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.  **Assignment and Subletting.**
    12.1   **Lessor's Consent Required.**
      (a) Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.
      (b) Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.
      (c) The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.
      (d) An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.
      (e) Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.
      (f) Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.
      (g) Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.
    12.2   **Terms and Conditions Applicable to Assignment and Subletting.**
      (a) Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.
      (b) Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.
      (c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.
      (d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.
      (e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)
      (f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.
      (g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)
    12.3   **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

INITIALS

PAGE 6 OF 12



INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM LG-9-07/14E

Exhibit 7(a)
2850

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease.  Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

13.  **Default; Breach; Remedies.**

13.1  **Default; Breach.**  A "**Default**" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "**Breach**" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within an applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee. In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 42, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 40 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. §101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph (f) is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2  **Remedies.**  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b) Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c) Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located.  The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3  **Inducement Recapture.**  Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "**Inducement Provisions**," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

INITIALS

FORM LG-9-07/14E

Exhibit 7(a)
2851

acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    Late Charges.   Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The Parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    Interest.   Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the 31st day after it was due. The interest ("Interest") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    Breach by Lessor.
(a) Notice of Breach.   Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b) Performance by Lessee on Behalf of Lessor.   In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.    Condemnation.   If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 25% of the Premises, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.    Brokerage Fees.
15.1    Additional Commission.   In addition to the payments owed pursuant to Paragraph 1.9 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires any rights to the Premises or other premises owned by Lessor and located within the same Project, if any, within which the Premises is located, (c) if Lease remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.

15.2    Assumption of Obligations.   Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.9, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessee's Broker for the limited purpose of collecting any brokerage fee owed.

15.3    Representations and Indemnities of Broker Relationships.   Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.    Estoppel Certificates.
(a) Each Party (as "Responding Party") shall within 10 days after written notice from the other Party (the "Requesting Party") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "Estoppel Certificate" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b) If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate. In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c) If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.    Definition of Lessor.   The term "Lessor" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.    Severability.   The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

INITIALS

PAGE 8 OF 12

INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM LG-9-07/14E

Exhibit 7(a)
2852

19.     Days.  Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.     Limitation on Liability.  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.     Time of Essence.  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.     No Prior or Other Agreements; Broker Disclaimer.  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.  Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises.  Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

23.     Notices.
        23.1     Notice Requirements.  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23.  The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices.  Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice.  A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.
        23.2     Date of Notice.  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon.  If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid.  Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier.  Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt.  If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.     Waivers.
        (a)     No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof.  Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.
        (b)     The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee.  Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.
        (c)     THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

25.     Disclosures Regarding The Nature of a Real Estate Agency Relationship.
        (a)     When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:
        (i)     Lessor's Agent.  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations:  To the Lessor:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  To the Lessee and the Lessor:  a. Diligent exercise of reasonable skills and care in performance of the agent's duties.  b. A duty of honest and fair dealing and good faith.  c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.
        (ii)     Lessee's Agent.  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not acting only for a Lessee has the following affirmative obligations.  To the Lessee:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  To the Lessee and the Lessor:  a. Diligent exercise of reasonable skills and care in performance of the agent's duties.  b. A duty of honest and fair dealing and good faith.  c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.
        (iii)     Agent Representing Both Lessor and Lessee.  A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee.  In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee:  a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee.  b. Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii).  In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered.  The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests.  Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.
        (b)     Brokers have no responsibility with respect to any default or breach hereof by either Party.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.
        (c)     Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.     No Right To Holdover.  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination.  Holdover Base Rent shall be calculated on monthly basis.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.     Cumulative Remedies.  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.     Covenants and Conditions; Construction of Agreement.  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease,  all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

INITIALS

INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM LG-9-07/14E

Exhibit 7(a)
2853

29.    **Binding Effect; Choice of Law.** This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.    **Subordination; Attornment; Non-Disturbance.**

30.1    **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "Security Device"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "Lender") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2    **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3    **Non-Disturbance.** With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "Non-Disturbance Agreement") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises.

30.4    **Self-Executing.** The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

31.    **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "Prevailing Party" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.    **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect to Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33.    **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

34.    **Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "for sublease" signs, Lessee shall not place any sign upon the Premises without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

35.    **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.    **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.    **Guarantor.**

37.1    **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association.

37.2    **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.    **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.    **Options.** If Lessee is granted any Option, as defined below, then the following provisions shall apply:

39.1    **Definition.** "Option" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first refusal or first offer to purchase the Premises or other property of Lessor.

39.2    **Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3    **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4    **Effect of Default on Options.**

(a) Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii)

PAGE 10 OF 12

INITIALS                                                                                    INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                FORM LG-9-07/14E

Exhibit 7(a)
2854

during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b) The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c) An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

40.      **Multiple Properties.** If the Premises are a part of a group of properties controlled by Lessor, Lessee agrees that it will abide by and conform to all reasonable rules and regulations which Lessor may make from time to time for the management, safety, and care of said properties, including the care and cleanliness of the grounds and including the parking, loading and unloading of vehicles, and to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessee also agrees to pay its fair share of common expenses incurred in connection with such rules and regulations.

41.      **Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

42.      **Reservations.** Lessor reserves to itself the right, from time to time, to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, and to cause the recordation of parcel maps and restrictions, so long as such easements, rights, dedications, maps and restrictions do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate any such easement rights, dedication, map or restrictions.

43.      **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

44.      **Authority; Multiple Parties; Execution.**

(a)      If either Party hereto is a corporation, trust, limited liability company,  partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b)      If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c)      This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45.      **Conflict.** Any conflict between the printed provisions of this Lease and typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46.      **Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47.      **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48.      **Waiver of Jury Trial.**   THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49.      **Arbitration of Disputes.** An Addendum requiring the Arbitration of disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ is not attached to this Lease.

50.      **Accessibility; Americans with Disabilities Act.**

(a)      The Premises: ☑ have not undergone an inspection by a Certified Access Specialist (CASp). ☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. ☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.

(b)      Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

<u>ATTENTION:</u>  NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE CONDITION AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.
<u>WARNING:</u>  IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at: _____                    Executed at: _____

PAGE 11 OF 12

INITIALS                                                         INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM LG-9-07/14E

Exhibit 7(a)
2855

On: _____          On: _____

By LESSOR:                            By LESSEE:
Vista Bella, LLC                      Universal Intermodal, Inc.
                                                        Services
By: _____          By: _____
Name Printed: T. Courtney Dugar       Name Printed: Timothy Phill, s
Title: _____        Title: President

By: _____           By: _____
Name Printed: _____          Name Printed: Jeffrey A. Himele
Title: _____         Title: VP/OPS!
Address: PO Box 1267                   Address: _____
Sunset Beach, CA 90742
Telephone: ( ___ ) _____            Telephone: ( ___ ) _____
Facsimile: ( ___ ) _____            Facsimile: ( ___ ) _____
Email: _____         Email: _____
Email: _____         Email: _____
Federal ID No. _____        Federal ID No. _____

BROKER:                                BROKER:
ADG Commercial                         _____
_____                _____

Att: _____           Att: _____
Title: _____          Title: _____
Address: 2801 E. Spring St., 272        Address: 12755 E. 9 mile Rd.
Long Beach, CA 90803                    Warren, MI 48089
Telephone:(562)243-0882                 Telephone:( ___ )
Facsimile:( ___ )                       Facsimile:( ___ )
Email: _____           Email: _____
Federal ID No. _____          Federal ID No. _____
Broker/Agent BRE License #: 01064469    Broker/Agent BRE License #: _____
_____                 _____
_____                 _____

NOTICE:  These forms are often modified to meet changing requirements of law and industry needs.  Always write or call to make sure you
are utilizing the most current form:  AIR Commercial Real Estate Association,  500 N Brand Blvd, Suite 900, Glendale, CA 91203.
Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

© Copyright 2008 - By AIR Commercial Real Estate Association.  All rights reserved.
No part of these works may be reproduced in any form without permission in writing.


INITIALS

PAGE 12 OF 12

INITIALS

©2008 - AIR COMMERCIAL REAL ESTATE ASSOCIATION          FORM LG-9-07/14E

Exhibit 7(a)
2856

ADDENDUM TO STANDARD AIR INDUSTRIAL/COMMERCIAL LAND LEASE-GROSS
By and Between
Vista Bella, LLC (Lessor)
And
Universal Intermodal Inc. (Lessee)
Dated: October 10, 2015

52. **Tenant Improvements:**    Lessor shall deliver the premises free and clear of all debris and vehicles. Further Lessor and Lessor's sole and separate cost shall do the following:

     i)     Remove all debris and old furniture from office space.

     ii)    Fix overhead outside yard lights so to provide lighting during night/dark hours.

     iii)   Provide that the entrance gate shall be operable to both Lessor and Lessee 24/7.

     iv)   Slurry Coat the yard area.

53. **Security:**    Lessee at Lessee's sole and separate cost shall have the right to install a "guard shack" in a mutually agreeable location. Lessee shall have the right to have a guard secure the gate 24 hours, 7 days a week.

54. **Truck Repair/**
    **Maintenance Prohibited:**    Yard area shall be kept in a professional manner and all truck repair or maintenance shall be prohibited on site.

55. **Office Parking Area:**    Lessee shall have six (6) "unreserved" parking spaces in front of office area "see exhibit A".

56. **Utilities:**    In addition to rent, Lessee shall pay Lessor $300.00 for gas, water and electrical per month.



Exhibit 7(a)
2857

EXHIBIT A



EXISTING 1-STORY CONCRETE TILT-UP BUILDING
234,771 SF
424'-6" x 722'-7"

EXISTING BUILDING
(NOT MTESC RELATED)

Universal

MASSIVE

EXISTING BUILDING
(NOT MTESC RELATED)

CAR
Parking

1st Floor
offices

VIA BARON

VISTA BELLA WAY

174 TRAILER PARKING SPACES
28 TRAILER PARKING SPACES OFF-SITE
202 TOTAL TRAILER PARKING SPACES

92 TOTAL CAR PARKING SPACES

FINISHED SITE PLAN

NEW SPEED CORPORATE SERVICES, INC.

NB
NEW SPEED

Exhibit 7(a)
2858



Exhibit 7(a)
2859

# EXHIBIT B

Exhibit 7(a)
2860

**From:** Mike Vagts
**Sent:** Tuesday, February 26, 2019 8:57 AM
**To:** Dennis Glackin; Tim Monahan
**Cc:** Michael Hott; Ryan Heath
**Subject:** 9004 LA

Good morning,

Intermodal is considering closing their 9004 LA office. They have roughly 33 drivers and 5 office employees. This wouldn't qualify under the WARN Act correct, and if not, what are your thoughts on the proper timeframe and handling of the closing?


Thank you

**From:** Don Taylor
**Sent:** Monday, February 25, 2019 1:38 PM
**To:** Mike Vagts
**Subject:** RE: 9004

Can you find what timeframe would be needed to eliminate the office?



**Don Taylor**
*Vice President of Southern Operations*
T: (866) 938-1598 x 2307  Direct: (586) 467-0934
Cell: (205) 937-0796
dtaylor@universalintermodal.com

Universal Intermodal Services, INC.
12755 E 9 Mile RD
Warren, MI 48089

**<image002.png>**

**www.UniversalLogistics.com**

*Please follow us on social media!*
<image003.jpg>  <image004.png>


## Please Vote For Universal – Click Below!

Inbound Logistics 2019 Top 10 3PL Excellence Awards

SupplyChainBrain 100 Great Supply Chain Partners 2019

Exhibit 7(a)
2861

**From:** Mike Vagts <MVagts@universalintermodal.com>
**Sent:** Monday, February 25, 2019 1:36 PM
**To:** Don Taylor <DTaylor@universalintermodal.com>
**Subject:** Re: 9004

You were going to discuss and let me know? I would want to discuss with Dennis and Tim M.

Sent from my iPhone

On Feb 25, 2019, at 10:20 AM, Don Taylor <DTaylor@universalintermodal.com> wrote:

What is the timeframe on closing this office out?

**Don Taylor**
*Vice President of Southern Operations*
T: (866) 938-1598 x 2307  Direct: (586) 467-0934
Cell: (205) 937-0796
dtaylor@universalintermodal.com

Universal Intermodal Services, INC.
12755 E 9 Mile RD
Warren, MI 48089

**<image002.png>**

**www.UniversalLogistics.com**

*Please follow us on social media!*
<image003.jpg>  <image004.png>

<image001.png>

## Please Vote For Universal – Click Below!

Inbound Logistics 2019 Top 10 3PL Excellence Awards

SupplyChainBrain 100 Great Supply Chain Partners 2019

This message may contain information that is privileged, confidential, and exempt from disclosure, and is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately. Unless stated to the contrary, nothing in this message constitutes an electronic signature. LIMITATION OF LIABILITY for loss or damage on this shipment is applicable. See 49 U.S.C. 14706. Notwithstanding anything to the contrary herein, in no event shall CARRIER be liable for any delay, loss or damage claim, regardless of cause, in an amount greater than $100,000 per shipment unless Shipper has declared a stated value, in writing, and has paid an additional charge Fifty Cents (.50) per One Hundred Dollars ($100.00) of each stated value.

Exhibit 7(a)
2862

# EXHIBIT C

Exhibit 7(a)
2863



March 6, 2019


Re: Notice of Closing

To: All Rancho Dominguez Universal Intermodal Employees


We regret to inform you that Universal Intermodal Services, Inc., is ceasing operations at the 2035 Vista Bella Way, Rancho Dominguez, CA 90220 facility. The last day of operations at the location will be March 30, 2019.

Our hope is that this notice allows adequate time to explore new employment opportunities within Universal or outside the organization.


If you have any questions or want additional information concerning this matter, please contact Michael Vagts, Sr. HR Manager, at 586-920-0100.


Sincerely,



Michael Vagts
Sr. HR Manager
Universal Intermodal Services, Inc.

Exhibit 7(a)
2864

# EXHIBIT D

Exhibit 7(a)
2865



Published on *JOC.com* (https://www.joc.com)

Home > Port of LA warns of sharp Q4 volume drop on tariffs

**Ari Ashe, Associate Editor** | Nov 12, 2019 4:26PM EST



A panel (left to right: Gold, Seroka, Angela Hofmann, Rufus Yerxa) discuss how tariffs are hurting US ports, trucking, rail, shippers, and consumers. Photo credit: Ari Ashe/JOC.com.

The Port of Los Angeles is bracing for a 10 percent year-over-year decline in imports in the fourth quarter, after laden volumes through the LA-Long Beach gateway plunged 12.4 in October.

Additionally, Gene Seroka, executive director of the port of LA, said conversations with Chinese

Exhibit 7(a)
2866

factory managers over the last four weeks give little hope for a pre-Lunar New Year surge in January.

"We are not seeing any type of advancing of cargo like we saw last year in the third and fourth quarters because inventories haven't been worked down fast enough," said Seroka.

He said he saw no signs of a rise in manufacturing activity during a recent two-week visit to China ahead of the next round of United States tariffs due to go into effect Dec. 15 — a 25 percent levy on hundreds of consumer and industrial goods. Seroka spoke at an event in Washington, DC to unveil a study entitled "By the Numbers: Jeopardizing the National Benefits of Trade through America's Busiest Port Complex."

The study said tariffs on US imports from China threaten nearly 1.5 million US jobs and more than $186 billion of economic activity. Tariffs have already cost US companies some $38 billion, researchers said, not all of which can be passed down the supply chain to the consumer.

Tariffs also mean fewer headhaul opportunities out of the West Coast for truck drivers and empty miles on backhauls as retaliatory tariffs in China lower the number of exports from California.

Cargo volumes in Los Angeles for October reflect how the tariffs caused a slowdown in trade. Laden container traffic declined 19 percent year over year to 553,100 TEU, according to monthly port statistics. Laden exports also fell 19 percent to 140,331 TEU, the 12th consecutive month of declining US exports. There was also a 25 percent decline in ship calls in October compared with a year ago. The study finds tariffs impact more than 90 percent of exports shipped out of Los Angeles, which originate from 22 states.

The Port of Los Angeles believes little will change in the short term. It forecasts November volumes will be down at least 10 percent, while December will also be soft.

"[Beneficial cargo owners] spent a lot of time and money advancing goods ahead of the Jan. 1, 2019 deadline, which ended up getting postponed twice," Jonathan Gold, vice president of supply chain for the National Retail Federation, said at the event. "Those who put the time and effort to bring cargo in earlier got hit with extra costs they had not originally anticipated, so I think folks are being more careful this time around."

Texas is being particularly hurt by the tariff-generated volume declines because nearly $25 billion in economic activity for the state is connected to trade through Los Angeles and Long Beach, according to the study.

## Trucking, rail hurt, too

The declines are trickling inland, where intermodal volumes began the fourth quarter lower than the last two peak seasons and the worst October for US intermodal since 2016. Truckload volumes remain higher than a year ago, according to DAT Solutions and American Trucking Associations, but spot and contract rates are lower. Less-than-truckload (LTL) volumes are generally down, based on third-quarter earnings, especially those with shippers in manufacturing.

The softness in manufacturing and export declines in Los Angeles has caused a disjointed supply chain, according to Seroka.

"It's difficult for a trucker to get a paying load both inbound and outbound at the same time," he

Exhibit 7(a)
2867

said. "The western railroads are seeing displaced crews, assets, and engine power because of that heavy one-way trade."

Without a backhaul, truck drivers and railroads have to choose between moving empty trailers or containers and collecting little to no revenue or be stuck in a market until freight becomes available.

For truckload, it's a choice of moving cheap freight or sitting without a load and being idle for a day. For drayage, it's fewer matchback opportunities to repurpose an import box to an exporter.

Tariffs do result in more fluid terminal operations, fewer chassis meltdowns and domestic container shortages, and better intermodal service because less volume is moving through the system. But trade associations and the cargo owners they represent would prefer to tackle these choke points from a position of strength in US trade.

*Contact Ari Ashe at ari.ashe@ihsmarkit.com and follow him on Twitter: @arijashe.*

Port News › US Ports › Port of Los Angeles
Port News › US Ports › Port of Long Beach
Regulation & Policy › Trade Data › Asia Trade Data
North America › United States › California

**Source URL:** https://www.joc.com/port-news/us-ports/port-los-angeles/port-la-warns-sharp-q4-volume-drop-tariffs_20191112.html

Exhibit 7(a)
2868

≡ **FreightWaves & Our Products**

⏸ **DATVF.ATLPHL** 1.760 ▼ -0.042  -2.3%    **DATVF.CHIATL** 2.149 ▼ -0.023  -1.1%    **DATVF.DAL**



POWERED BY **POSSIBILITIES.**
MANUFACTURING & SUPPLY CHAIN EXPO | MARCH 9–12

THE HIGHLIGHT OF MY TIME AT
MODEX IS SEEING THE ARRAY
OF EXCITING NEW TECHNOLOGIES.
RANDY V. BRADLEY, UNIVERSITY OF TENNESSEE

American Shipper    Container    Maritime    News    Shipping    Trade and Compliance

# Port of Los Angeles September volumes lower than in 2018

Largest U.S. container port says exports moving through its terminals declined 11% in September as 'ill-advised U.S.-China trade war continues to wreak havoc.'

Chris Dupin  •  Friday, October 11, 2019    💬 0    🔥 546    🔖 1 minute read



Exhibit 7(a)
2869

The Port of Los Angeles said its terminals handled 779,903 TEUs in September 2019, a 2.7% decline from the same month last year. In contrast, volumes at the port are up 4.7% year-on-year in the first nine months of 2019 to about 7.1 million TEU.

"The ill-advised U.S.-China trade war continues to wreak havoc on American exporters and manufacturers," said Port of Los Angeles Executive Director Gene Seroka. "We've seen declining exports for 11 consecutive months while our fastest growing market segment is exporting empty containers back to Asia. It's likely we'll see softer volumes in the fourth quarter. We must have a negotiated settlement of the trade war as it is beginning to impact the more than 3 million jobs in the U.S. that are tied to this port complex."

September 2019 imports decreased 2.9% to 402,320 TEUs compared to the previous year. Exports decreased 11% to 130,769 TEUs, marking the eleventh consecutive monthly decline of exports.

It was expected that fourth quarter import volumes into the U.S. this year might be lower than in 2018 because many companies had pulled forward shipments last year in the face of threatened higher tariffs.

Six West Coast ports — Port of Long Beach, Port of Los Angeles, Port of Oakland, Port of Portland, Port of Seattle and Port of Tacoma —sent a letter to President Donald Trump on Sept. 23 sharing their concerns about the long-term impacts of the escalating trade conflict between China and the United States.

In that letter they told Trump that "the impacts of the back-and-forth tariffs between the United States and China have hit our exporters particularly hard, and we are hearing deep concern from our customers about their increasing challenges due to rising U.S. tariffs and Chinese retaliation."

Exhibit 7(a)
2870

They noted that "California is the largest exporter to China of any state in the nation; in 2018, California ports collectively saw a decrease of about 30% in exports to China."

The letter said the ports "support a balanced trading relationship with our global partners but are deeply concerned that the continued imposition of ever-increasing tariffs leads to higher costs on U.S. businesses and consumers and loss of valuable markets without any long-term strategic benefit."

 Tags   Port of Los Angeles   Seroka   U.S. - China trade war

Exhibit 7(a)
2871

# EXHIBIT E

Exhibit 7(a)
2872



***IMPORTANT***

TO: Compton Drivers
From: Joe Lugo

As you all are aware, Universal's lease on the Compton terminal expires on 12/31/2019, and it will not be renewed.  While the company is considering its options, no decision has been made regarding the potential relocation of the Compton operations, nor has a new location been determined.

As soon as more information becomes available to me, I will share that with you.

Universal Team

RE: Uptick in Rear En

We have seen an upt
combination of speed
often produce bodily
avoided by doing the

- Keep at least
- Consult your
- Look ahead a
- Avoid freque
- When stoppe
- Be cautious i
- Avoid sudden
- If a vehicle c
- Avoid distrac
- Follow poste
- Keep your w

65 MPH
65 MPH
55 MPH
55 MPH
40 MPH
40 MPH

The above

**Universal** INTERMODAL

**COMPANY MEMO**

Date: July 2, 2019

To: Intermodal Terminals, Agents, & Drivers

From: Chris VanZant

CC: Phil Canady, Jeff Hinkle, Don Taylor

RE: Passengers & Firearms

Team,

Just a reminder to all of our staff, agents, and drivers of the passenger and firearms policies Universal has in place. There is "zero tolerance" for unauthorized passengers and/or possession of firearms. Either offence can lead to cancellation of contract or termination of a company employee.

Exhibit 7(a)
2873

# EXHIBIT F

Exhibit 7(a)
2874



December 16, 2019

Dear Driver,

You were previously made aware by both a posting at the facility on November 22, 2019 and in a meeting on November 25, 2019 that Universal Intermodal Services' lease on the Compton terminal located at 2035 Vista Bella Way, Compton, CA expires on December 31, 2019. The Company has not found a suitable location to relocate the Compton operations. The lease expiration combined with a weakening in the truckload and intermodal sectors has forced Universal Intermodal Services to make the painful decision to discontinue operations in Compton, CA.

Included with this letter is your final paycheck, including any other monies owed you. Please direct all questions to Michael Vagts, at mvagts@universallogistics.com or 586.920.0259.

Sincerely,

Joe Lugo - General Manager
Universal Intermodal Services – Rancho Dominguez Operation

Universal Intermodal Services, Inc.
2035 Vista Bella Way
Rancho Dominguez, CA 90220

Exhibit 7(a)
2875

# EXHIBIT G

Exhibit 7(a)
2876



November 27, 2019

VIA: Certified Mail, U.S. Mail
Mr. Jonathon Ledesma
████████▮ ████
Los Angeles, CA 90001

RE: Letter of Termination

Dear Mr. Ledesma,

You were suspended pending a safety investigation on November 25, 2019. Based on the outcome of that investigation, this letter will confirm your discharge from employment with Universal Intermodal Services, Inc. effective November 27, 2019 for violation of Federal Motor Carrier Safety Regulations (FMCSR) licensing requirements.

Please be advised that we will respond to all reference checks from prospective employers with simply your dates of employment and position held.

If you have any questions, please feel free to contact me at 310-609-1684 ext 3560.

Sincerely,

Joe Lugo - General Manager
Universal Intermodal Services – Rancho Dominguez Operation

CC: Richard Silverwood – Corporate Labor
    Dennis Glackin – Corporate Labor

Universal Intermodal Ser
2035 Vista Bella V
Rancho Dominguez, CA 90220

Exhibit 7(a)
2877

---

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
Domestic Mail Only

For delivery information, visit our website at *www.usps.com®*.

LOS ANGELES, CA 90001

Certified Mail Fee  $3.50

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)          $  $0.00
☐ Return Receipt (electronic)        $  $0.00
☐ Certified Mail Restricted Delivery $  $0.00
☐ Adult Signature Required           $  $0.00
☐ Adult Signature Restricted Delivery $

Postage  $0.55

Total Postage and Fees  $6.85

Sent To  Jonathan Ledesma
Street and Apt. No., or PO Box No.
City, State, ZIP+4®  Los Angeles, CA 90001

7019 1640 0000 8360 4889

$2.80

NOV 27 2019 Postmark Here

USPS 11/27/2019

PS Form 3800, April 2015 PSN 7530-02-000-9047   See Reverse for Instructions

# EXHIBIT H

Exhibit 7(a)
2878



November 26, 2019

VIA: Certified Mail, U.S. Mail
Mr. Romel Mallard

████████████████

Paramount, CA 90723

RE: Letter of Termination

Dear Mr. Mallard,

This letter will confirm your discharge from employment with Universal Intermodal Services, Inc. effective November 26, 2019 for insubordination.

Please be advised that we will respond to all reference checks from prospective employers with simply your dates of employment and position held.

If you have any questions, please feel free to contact me at 310-609-1684

Sincerely,

Joe Lugo - General Manager
Universal Intermodal Services – Rancho Dominguez Operation



CC: Richard Silverwood – Corporate Labor
    Dennis Glackin – Corporate Labor

Universal Intermodal Services, Inc.
2035 Vista Bella Way
Rancho Dominguez, CA 90220

Exhibit 7(a)
2879

# EXHIBIT I

Exhibit 7(a)
2880

CALL OFF PROCEDURE AND POLICY

To be successful, you need to be at work and on time every day!  This is very important to our company and customers.

We realize circumstances may arise which make it difficult to be at work.  <u>If at any time you are unable to report for work it is your responsibility to call your Supervisor or Manager.</u>

Email alone is not an accepted form of communication with regard to calling off work.

Unless an employee is able to provide medical documentation of their inability to report the absence, an instance where notification is not received by your Supervisor or Manager will be considered a No Call No Show.  <u>A No Call No Show is unacceptable, and subject to management review for disciplinary measures up to and including termination. On the 3rd consecutive No Call/No Show day your employment will be separated as a "voluntary quit".</u>

Similarly, if you are going to be late for your scheduled hours, you must call your Supervisor or Manager before the time is missed or as soon as possible.  Again, email is not an accepted form of communication when an employee will be late for work.

In either case, should you reach your Supervisor's or Manager's voice mail, please leave a message with the following information:

1. Your first and last name
2. Reason for absence or tardiness
3. Expected duration of absence/tardiness
4. Phone number where you may be reached

If employee is out three or more days due to illness, a doctor's note releasing the employee back to work will be required to return to work and must be received on or before the employee returns to work.  It is the employee's responsibility to obtain the doctor's release.

I have received, read and understand the Company's Call Off Procedure and Policy.


_____
Employee Name (Print)


_____                    _____
Employee Signature                                                  Date


Exhibit 7(a)
2881

# EXHIBIT J

Exhibit 7(a)
2882



November 20, 2019

VIA: Certified Mail, U.S. Mail
Mr. Kevin Poullard
████████████
Beaumont, CA 92223

RE: Letter of Termination

Dear Mr. Poullard,

This letter will confirm your discharge from employment with Universal Intermodal Services, Inc. effective November 20, 2019 for attendance, not reporting to work and failure to report off work, No-call-no-show.

Please be advised that we will respond to all reference checks from prospective employers with simply your dates of employment and position held.

If you have any questions, please feel free to contact me at 956-535-3239.


Sincerely,

Joe Lugo - General Manager
Universal Intermodal Services – Rancho Dominguez Operation




CC: Richard Silverwood – Corporate Labor
     Dennis Glackin – Corporate Labor



Universal Intermodal Services, Inc.
2035 Vista Bella Way
Rancho Dominguez, CA 90220

Exhibit 7(a)
2883



Exhibit 7(a)
2884

# EXHIBIT K

Exhibit 7(a)
2885

# AMERICAN - EMPLOYEE STATUS NOTIFICATION

FORM #9.56 A REV 4-2008 MDH

| CNO | | AID | 90060121 |
|---|---|---|---|
| PGR | | EID | |

EFFECTIVE DATE  **01/10/17**

COMPANY  **Universal Intermodal**

LOCATION  **9233 — Colton, CA**

## WORK STATUS

- [X] FULL TIME
- [ ] PART TIME
- [ ] CASUAL
- [ ] NEW HIRE
- [ ] RE-HIRE
- [X] CURRENT EMPLOYEE

## ACTIVITY

- [ ] TITLE CHANGE
- [ ] TRANSFER
- [ ] RATE CHANGE
- [ ] NAME CHANGE
- [ ] ADDRESS CHANGE
- [ ] PHONE NO. CHANGE
- [ ] STATE TAX CHANGE
- [ ] FROM W-4 CHANGE
- [ ] WORK SCHEDULE CHANGE
- [ ] OTHER - EXPLAIN IN REMARKS BOX

## SEPARATION

- [ ] RETIREMENT
- [ ] DEATH
- [ ] VOLUNTARY
- [X] INVOLUNTARY
- [ ] OTHER

### BASIC INFORMATION

FIRST NAME  **Nestor**
MIDDLE NAME
LAST NAME  **Aguilar**

STREET ADDRESS  REDACTED
CITY  **Bloomington**
STATE  **CA**
ZIP  **92316**

TELEPHONE NUMBER  REDACTED
DATE OF BIRTH  REDACTED

CITIZENSHIP
- [ ] US  [ ] MX  [ ] CN
- [ ] MALE
- [ ] FEMALE

R A C E
- [ ] (A) WHITE
- [ ] (B) BLACK
- [ ] (C) HISPANIC
- [ ] (D) ASIAN
- [ ] (E) AMERICAN INDIAN
- [ ] (P) PACIFIC ISLANDER
- [ ] (T) TWO OR MORE RACES

SOCIAL SECURITY NUMBER  REDACTED

VETERAN STATUS:
- [ ] NON-VETERAN
- [ ] OTHER VETERAN
- [ ] OTHER SPEC. DISABLED
- [ ] SPEC. DISABLED VETERAN
- [ ] VIETNAM ERA VETERAN
- [ ] VIETNAM ERA SPEC. DISABLED VETERAN
- [ ] VETERAN

ORIGINAL HIRE DATE  **6/24/2016**
SENIORITY DATE  / /
LATEST HIRE DATE (REHIRE ONLY)  / /

CAR ALLOWANCE  [ ] YES  [ ] NO
LEASE CAR  [ ] YES  [ ] NO

CURRENT RATE  AM / CN / MX
AMOUNT OF CHANGE
NEW RATE  AM / CN / MX
CURRENT JOB TITLE

REASON FOR RATE CHANGE:
- [ ] ANNUAL
- [ ] MERIT
- [ ] REVIEW
- [ ] PARITY
- [ ] QUARTERLY
- [ ] JOB RE-ASSIGNMENT
- [ ] RETENTION
- [ ] DEMOTION
- [ ] PROMOTION
- [ ] 6 MONTH
- [ ] OTHER

NEW JOB TITLE

PAY BASIS:
- [ ] WEEKLY (SALARY)
- [ ] HOURLY

NEXT REVIEW DATE

HR USE ONLY:
ACCT. DISTRIBUTION
JOB CODE

### LAST DAY WORKED

WAS EMPLOYEE OFFERED ANOTHER JOB  [ ] YES  [ ] NO

WOULD REHIRE?  [ ] YES  [ ] NO

IF VOLUNTARY, WHAT COMPANY IS EMPLOYEE JOINING?

### APPROVALS

SUPERVISOR / MANAGER  DATE  1/10/17

SUPERVISOR / MANAGER  DATE

SUPERVISOR / MANAGER  DATE

HUMAN RESOURCES  DATE

HUMAN RESOURCES  DATE

### EMPLOYEE WORK SCHEDULE

| | START | END | LUNCH |
|---|---|---|---|
| SUNDAY | | | |
| MONDAY | | | |
| TUESDAY | " | | |
| WEDNESDAY | " | " | |
| THURSDAY | " | " | |
| FRIDAY | " | " | |
| SATURDAY | | | |

### REMARKS

No call, No show

HR USE ONLY:
ENTERED

---

## Form W-4  Employee's Withholding Allowance Certificate

OMB No. 1545-0074

**20____**

Department of the Treasury
Internal Revenue Service

► Whether you are entitled to claim a certain number of allowances or exemption from withholding is subject to review by the IRS. Your employer may be required to send a copy of this form to the IRS.

1  Type or print your first name and middle initial.     Last name

2  Your social security number

3  Home address (number and street or rural route)
- [ ] Single  [ ] Married  [ ] Married, but withhold at higher Single rate.
Note. If married, but legally separated, or spouse is a nonresident alien, check the "Single" box.

4  City or town, state, and ZIP code
If your last name differs from that shown on your social security card, check here. You must call 1-800-772-1213 for a replacement card. ► [ ]

5  Total number of allowances you are claiming (from line H above **or** from the applicable worksheet on page 2)  | 5 |

6  Additional amount, if any, you want withheld from each paycheck  | 6 | $ |

7  I claim exemption from withholding for 2008, and I certify that I meet **both** of the following conditions for exemption.
- Last year I had a right to a refund of **all** federal income tax withheld because I had **no** tax liability **and**
- This year I expect a refund of **all** federal income tax withheld because I expect to have **no** tax liability.

If you meet both conditions, write "Exempt" here  ►  | 7 |

Under penalties of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief, it is true, correct, and complete.

Employee's signature
(Form is not valid unless you sign it.) ►

Date ►

8  Employer's name and address (Employer: Complete lines 8 and 10 only if sending to the IRS.)

9  Office code (optional)

10  Employer identification number (EIN)

# EXHIBIT L

Exhibit 7(a)
2887

Exhibit 7(a)
2888

# <u>No</u> Predictions

The purpose of the presentation is to provide you with information regarding the NLRB election and your rights as employees during an election, as well as to provide you with **information and the facts** about the Teamsters and other unions, and the obligations of union membership.

No predictions or assumptions can or should be made about the future applications of law or the outcome of the process if employees decide to hand over their rights to the union.

Universal would bargain in good faith if employees decide to surrender their rights as individuals to the union. Unfortunately, no one can predict the outcome of collective bargaining with a union.

This presentation is a discussion of **FACTS** and what could or may happen, not necessarily what will happen. Remember, no one has a crystal ball to predict the future.

2

# EXHIBIT 7(B)

Exhibit 7(b)
2889



OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
*Attorneys at Law*
1909 K Street NW, Suite 1000
Washington, DC 20006
Telephone:  202-887-0855
Facsimile:  202-887-0866
www.ogletree.com

John S. Ferrer
202-263-0173
john.ferrer@ogletree.com

March 27, 2020

**VIA NLRB E-FILING**

Phuong Do
Field Attorney
National Labor Relations Board, Region 21
312 N. Spring Street, 10th Floor
Los Angeles, CA 90012

RE: **Mason-Dixon Intermodal d/b/a Universal Intermodal Services,
Cases 21-CA-252500, 252574, 253662**

Dear Mr. Do:

This letter constitutes the supplemental position statement of Mason-Dixon Intermodal d/b/a Universal Intermodal Services (sometimes referred to herein as "Universal Intermodal" or "the Company") in response to the Region's supplemental request for evidence regarding the above-referenced Charges filed by the International Brotherhood of Teamsters ("the Union").[1]  For

---

[1] This position statement is intended to assist the National Labor Relations Board ("NLRB") with its assessment of the Charges and appropriateness of Section 10(j) relief.  To the extent any issue or allegation in the Charges or the Region's EAJA letters is not specifically addressed, the fact that it is not addressed should not be considered an admission by Universal Intermodal.  This position statement is not a responsive pleading, and, although believed to be true and correct in all respects, it is not an affidavit.  Inclusion of information in this position statement does not constitute a waiver of any objection that the Company may have in response to future discovery or information requests, or to the introduction of evidence in this or any subsequent proceeding; nor does it constitute a waiver of any objection as to timeliness of the Charges or any other legal argument the Company may assert in the future.  Universal Intermodal reserves the right to amend or supplement this position statement and address any new issues or evidence that may arise in this matter.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Jackson ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Exhibit 7(b)
2890

Phuong Do
March 27, 2020
Page 2

the reasons discussed herein and the Company's January 22, 2020 position statement, the Charges should be dismissed and the Region should not seek the extraordinary remedy of injunctive relief.[2]

## RESPONSES TO SUPPLEMENTAL REQUESTS FOR INFORMATION

1.      **The Company Closed Down the Compton Terminal for Legitimate, Nondiscriminatory Reasons; All Employees Were Laid Off and All Equipment Was Removed.**

As described in Universal Intermodal's January 22 position statement, the Company's decision to discontinue operations at the Compton terminal was due to legitimate business reasons. There is no dispute the terminal was unprofitable and that its lease expired at the end of 2019.[3] Further, the decrease in freight movement industry-wide was projected to continue in 2020.[4]

As we previously informed the Region, the closure impacted all personnel at the Compton terminal, not just drivers.  All terminal personnel were laid off, including General Manager Joe Lugo, and Fleet Managers Elvia Rivera, Alejandro Badillo and Walter Esquivel.  While the Company maintains that no other employer is relevant to the Charges, upon information and belief, none of the laid off employees currently work for any entity related to Universal Intermodal or its parent company, Universal Logistics Holdings, Inc.[5]  The Company did not utilize any owner-operator drivers at the Compton terminal.

---

[2] All information in this position statement, as well as any documents submitted to the Region, is being provided to the NLRB solely for purposes of cooperating with its investigation in this matter. As such, Universal Intermodal requests that the NLRB treat these documents as confidential and not disclose their content to anyone, including any other parties, any employees, the Union, or their attorneys, without the Company's express written permission, subject of course to the requirements of the Freedom of Information Act.

[3] The Company remains prepared to discuss a confidentiality and protective agreement with the Region, pursuant to which the Company is willing to show the Region relevant financial statements.

[4] Of course, the unprecedented COVID-19 outbreak has dramatically slowed down the supply chain related to the ports, and has caused further financial strain on Universal Intermodal and intermodal companies industry-wide.

[5] In your February 4, 2020 letter, the Region requests information regarding "all companies related to the Employer and its parent company (Universal Logistics Holdings, Inc.)," including all entities listed in Universal Logistics Holdings' 10-K filing.  That list currently includes approximately 44 companies, the vast majority of which have no operations in the state of California.  As the Union's Charges allege unlawful conduct by Universal Intermodal involving drivers employed at a single facility in Compton, California, the Region's request is unquestionably broad and the relevance is unclear.  Please explain the relevance of the Region's request and the Company will respond accordingly.

Exhibit 7(b)
2891

Phuong Do
March 27, 2020
Page 3

In addition, all equipment at the Compton terminal was disposed of due to the closure.  All of the trucks except for one were transferred to Las Vegas back to the owner/lessor, LSGI Equipment.[6]  Office equipment (e.g., computers, monitors, copiers, phones, etc.) was moved to a warehouse in Rancho Dominguez, California.

**2.      The Fontana Terminal is Not Relevant to the Charges.**

The Region has inquired about the terminal located at 15033 Slover Avenue, Fontana, California.  However, the Fontana terminal is not relevant to the Union's Charges.  It is undisputed that all of the port drivers at issue in the Charges were employed by Universal Intermodal at or out of its Compton terminal.  As the Region knows, the Union's petition in Case 21-RC-251460 sought to represent Company drivers purportedly working out of the Compton and Fontana terminals. The Union mistakenly believed a small number of the port drivers at issue worked at the Fontana terminal.  During discussions for an election agreement involving the Union and Region, it was explained that approximately a handful of Compton port drivers were permitted to park their trucks at the Fontana terminal solely for personal convenience.  It was further explained those drivers fell under the Compton operations, as they reported to, were managed by, and were dispatched out of the Compton terminal.  Because those drivers had no meaningful contact at all with the Fontana terminal, the parties stipulated, with Region approval, that the bargaining unit consisted only of port drivers employed by Universal Intermodal working out of the Compton terminal.  Indeed, the Certification of Representative names the Compton terminal only.  Accordingly, the Fontana terminal is not relevant to the Charges.

**3.      The Customers Previously Serviced by the Compton Terminal are Not Being Serviced by any other Universal Intermodal Location.**

As stated in the Company's January 20 position statement, Universal Intermodal did not relocate work previously performed by the Compton port drivers to any other Universal Intermodal location.  Pursuant to operational changes made in or about March 2019 to address the Compton terminal's profitability issues, the terminal began primarily servicing customers of Southern Counties Express, Inc. ("SCE") pursuant to an Interline Agreement.  Prior to the terminal's closure in December 2019, the customers serviced by Universal Intermodal were primarily SCE's customers.  Accordingly, following the Compton terminal's closure, upon information and belief, those customers continued to be serviced by SCE.

The Region has requested a list of former and current clients that were serviced by the Company from the Compton terminal.  Universal Intermodal considers such information to be confidential, proprietary and trade secrets.  However, like the financial information referenced above, the Company is willing to produce relevant customer information for the Region's review pursuant to a confidentiality and protective agreement.

---

[6] One truck was transferred to Arlington, Texas.

Exhibit 7(b)
2892

Phuong Do
March 27, 2020
Page 4

**4.      Jonathan Ledesma Was Discharged for Legitimate, Nondiscriminatory Reasons.**

As described in our January 22 position statement, the Company had legitimate business reasons for terminating Ledesma's employment; namely, he did not have the requisite commercial driver's license ("CDL") for the state of California.  It cannot be disputed that a California CDL is required by the Federal Motor Carrier Safety Regulations and state of California.  *See* CFR Title 49, Part 383; California Vehicle Code, Section 12505.  There is no dispute that Ledesma did not have the required California CDL.  The Company was not aware of Ledesma's violation until November 2019.  At that time, Universal Intermodal had no choice but to discharge Ledesma for violating federal and state licensing requirements.  Moreover, the Company has discharged other employees for licensing issues.  The Union's Charge regarding Ledesma should be dismissed in its entirety.

**5.      Romel Mallard Was Discharged for Legitimate, Nondiscriminatory Reasons.**

As you know, Mallard was discharged for insubordination during a mandatory meeting.  The drivers were told verbally that the meeting was mandatory.  Indeed, despite being expressly told that attendance at the meeting was required, Mallard stormed out of the meeting and did not return.  The Union's Charge with respect to Mallard is without merit and should be dismissed.

**6.      Kevin Poullard Was Discharged for Legitimate, Nondiscriminatory Reasons.**

Poullard also was discharged for legitimate, nondiscriminatory reasons.  It is undisputed that Poullard was a "no-call/no-show" on November 20, 2019, as he failed to report to work as scheduled and failed to notify his supervisor or manager.  [See attached as Exhibit A, text messages regarding Poullard's no-call/no-show on November 20, 2019.]  Poullard was discharged pursuant to the Company's no-call, no-show policy.  Moreover, the Company has discharged other employees under the no-call/no-show policy.  Because Poullard's discharge was totally unrelated to any purported protected activities, the Union's Charge regarding Poullard should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons stated in the Company's January 22, 2020 position statement, Universal Intermodal did not violate the Act as alleged.  Further, Section 10(j) relief is inappropriate.  The Union's Charges should be dismissed in their entirety.

Sincerely,

John S. Ferrer

JSF:mlr

42294504.2

Exhibit 7(b)
2893

# EXHIBIT A

Exhibit 7(b)
2894



**+1 (951) 438-4652** ›

Text Message
Thu, Nov 21, 4:34 AM

Good morning this is Kevin I will not be able to make it in today because I have no gas but next week will be better I promise because I will have my check and I'll have my own money and I will not have to depend on anyone to send me money for gas sorry for any inconvenience

Why didn't you call yesterday to advise us you were not coming in?

Thu, Nov 21, 7:00 AM

I didn't have a phone

Please call the office ASAP

Text Message

Exhibit 7(b)
2895

# EXHIBIT 8

Exhibit 8
2896



**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

*Attorneys at Law*

1909 K Street NW, Suite 1000
Washington, DC 20006
Telephone:  202-887-0855
Facsimile:  202-887-0866
www.ogletree.com

John S. Ferrer
202-263-0173
john.ferrer@ogletree.com

February 20, 2020

**VIA NLRB E-FILING**

Phuong Do
Field Attorney
National Labor Relations Board, Region 21
312 N. Spring Street, 10th Floor
Los Angeles, CA 90012

RE:   **Roadrunner Intermodal Services, Case 21-CA-254813**

Dear Mr. Do:

Roadrunner Intermodal Services, LLC ("Roadrunner" or "the Company") submits this letter in response to the Region's request for the Company's position regarding the Charge filed by the International Brotherhood of Teamsters ("the Union") in the above-referenced matter.[1] Roadrunner adamantly denies the allegations in the Union's Charge.  For the reasons discussed herein, the Charge should be dismissed in its entirety.

---

[1] This position statement is intended to assist the National Labor Relations Board ("NLRB") with its assessment of the Charge.  To the extent any issue or allegation in the Charge or the Region's EAJA letter is not specifically addressed, the fact that it is not addressed should not be considered an admission by Roadrunner.  This position statement is not a responsive pleading, and, although believed to be true and correct in all respects, it is not an affidavit.  Inclusion of information in this position statement does not constitute a waiver of any objection that the Company may have in response to future discovery or information requests, or to the introduction of evidence in this or any subsequent proceeding; nor does it constitute a waiver of any objection as to timeliness of the Charge or any other legal argument the Company may assert in the future.  Roadrunner reserves the right to amend or supplement this position statement and address any new issues or evidence that may arise in this matter.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston Indianapolis ▪ Jackson ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Exhibit 8
2897

Phuong Do
February 20, 2020
Page 2

Specifically, the Union's Charge fails because the Union cannot meet its *prima facie* burden of establishing that Roadrunner laid off any employees due to any alleged union or protected concerted activities.  First, the Union cannot demonstrate that the Company had any direct knowledge of any employees' union activities prior to the layoff decision.  Second, even if the Company had knowledge of employees' alleged union activities, the Union cannot demonstrate that the Company bore any animus whatsoever towards such activities.  Moreover, even if the Union could meet its *prima facie* burden, the Company had legitimate business reasons for the reduction in force; namely, sustained low freight volumes in 2019 and decreased profit margins. The Union's Charge is completely baseless and should be dismissed.

## I.      Relevant Background[2]

Roadrunner provides transportation services, including drayage and trucking services, throughout the United States.  In or about November 2019, Universal Logistics Holdings, Inc. acquired Roadrunner.  The Company operates a terminal located at 11272 Calabash Avenue, Fontana, California ("Fontana terminal").[3]  From its Fontana terminal, Roadrunner provides domestic and international drayage services through the ports and railways of Los Angeles and Long Beach.

Like other trucking companies operating in the State of California, the Company's Fontana terminal experienced consistently weak freight volumes in 2019.  The volume of freight moving through the ports of Los Angeles and Long Beach decreased significantly industry-wide in 2019.[4] It was reported that exports moving through the Port of Los Angeles in September 2019 declined by 11% and imports declined by approximately 3% from the prior year.  In October 2019, exports fell 19% from the prior year – the twelfth consecutive month of declining exports in the United States.  [Exhibit A.]

In early December, due to weak freight conditions, decreased profit margins, and expected soft volumes in the months ahead, the Company made the difficult decision to lay off approximately 26 employee drivers from its Fontana terminal effective December 20, 2019.  The drivers were notified of the reduction in force by letter dated December 18, 2019.  [Exhibit B.]

---

[2] All information in this position statement, as well as any documents submitted to the Region, is being provided to the NLRB solely for purposes of cooperating with its investigation in this matter. As such, Roadrunner requests that the NLRB treat these documents as confidential and not disclose their content to anyone, including any other parties, any employees, the Union, or their attorneys, without the Company's express written permission, subject of course to the requirements of the Freedom of Information Act.

[3] Roadrunner does not operate a facility at 11184 Almond Avenue.  Upon information and belief, this facility was closed prior to Universal Logistics Holdings' acquisition of Roadrunner.

[4] The downturn appears to be the result of the United States-China trade dispute and the related tariffs.

Exhibit 8
2898

Phuong Do
February 20, 2020
Page 3

## II.      The Union Cannot Establish A *Prima Facie* Case Of Unlawful Discrimination.

Under the Board's analysis set forth in *Wright Line, Inc.*, 251 NLRB 1083 (1980), to establish a claim of unlawful discrimination under the Act, the Charging Party must first make a *prima facie* case by showing:  (1) the affected employees engaged in protected activity; (2) the employer knew of the activity; and (3) the employer bore animus against the affected employees' protected activity.  *See Praxair Dist., Inc.*, 357 NLRB No. 91 (2011).  Mere suspicion, surmise and conjecture are insufficient to form the basis for a violation.  *See Cardinal Home Prods., Inc.*, 338 NLRB 1004, 1009 (2003).  As discussed below, the Union cannot establish that the Company laid off employees for any alleged protected activities.

As an initial matter, the Union's Charge fails because there is no credible evidence that the Company was aware of any union or protected concerted activities of the Fontana-based employees.  The Teamsters' Charge alleges the layoffs were due to organizing activity at a different employer, by different group of employees, in a different geographic location.  This allegation is clearly frivolous.  While Roadrunner and Mason-Dixon Intermodal d/b/a Universal Intermodal Services ("Universal") are both subsidiaries of Universal Logistics Holdings, Roadrunner and Universal are separate employers, with separate employees and separate operations.  Moreover, upon information and belief, the Teamsters' organizing activity involved Universal employee-drivers operating out of Universal's Compton, California facility.  Compton is approximately 60 miles away from Fontana.  The Company is not aware of any union organizing activity involving Roadrunner's employee-drivers at Fontana.  Accordingly, the Union cannot meet its *prima facie* burden of proving that Roadrunner knew of any employees' union or protected activities at any relevant time and, without that knowledge, any such activities could not have motivated the Company's layoff decisions.  *See Banner Health Sys.*, 358 NLRB No. 93 (2012) (finding that the General Counsel failed to establish that the employer knew of the employee's protected activity at the time of the discipline); *Ellison Media Co.*, 344 NLRB 1112, 1112 (2005) (concluding that there was no prima facie case where there was no evidence the employer knew of the alleged protected activity at the time of discharge).

There is no credible evidence that Roadrunner's decision to lay off its drivers was motivated by any anti-union animus.  As described above, the Company's layoff decisions were due to legitimate business reasons – weak freight conditions and decreased profit margins.  In this regard, it is undisputed that freight volumes were drastically down industry-wide in 2019.  In sum, the Union cannot establish that the Company's decision to lay off drivers was due to any employees' union or protected activities.  Accordingly, the Union's Charge should be dismissed.

## VII.     CONCLUSION

For the foregoing reasons, Roadrunner did not violate the Act as alleged.  The Union's Charge should be dismissed in its entirety.

Exhibit 8
2899

Phuong Do
February 20, 2020
Page 4

Sincerely,

John S. Ferrer

JSF:mlr

Exhibit 8
2900

# EXHIBIT A

Exhibit 8
2901

 JOC.com

Published on *JOC.com* (https://www.joc.com)

Home > Port of LA warns of sharp Q4 volume drop on tariffs

**Ari Ashe, Associate Editor** | Nov 12, 2019 4:26PM EST



A panel (left to right: Gold, Seroka, Angela Hofmann, Rufus Yerxa) discuss how tariffs are hurting US ports, trucking, rail, shippers, and consumers. Photo credit: Ari Ashe/JOC.com.

The Port of Los Angeles is bracing for a 10 percent year-over-year decline in imports in the fourth quarter, after laden volumes through the LA-Long Beach gateway plunged 12.4 in October.

Additionally, Gene Seroka, executive director of the port of LA, said conversations with Chinese

Exhibit 8
2902

factory managers over the last four weeks give little hope for a pre-Lunar New Year surge in January.

"We are not seeing any type of advancing of cargo like we saw last year in the third and fourth quarters because inventories haven't been worked down fast enough," said Seroka.

He said he saw no signs of a rise in manufacturing activity during a recent two-week visit to China ahead of the next round of United States tariffs due to go into effect Dec. 15 — a 25 percent levy on hundreds of consumer and industrial goods. Seroka spoke at an event in Washington, DC to unveil a study entitled "By the Numbers: Jeopardizing the National Benefits of Trade through America's Busiest Port Complex."

The study said tariffs on US imports from China threaten nearly 1.5 million US jobs and more than $186 billion of economic activity. Tariffs have already cost US companies some $38 billion, researchers said, not all of which can be passed down the supply chain to the consumer.

Tariffs also mean fewer headhaul opportunities out of the West Coast for truck drivers and empty miles on backhauls as retaliatory tariffs in China lower the number of exports from California.

Cargo volumes in Los Angeles for October reflect how the tariffs caused a slowdown in trade. Laden container traffic declined 19 percent year over year to 553,100 TEU, according to monthly port statistics. Laden exports also fell 19 percent to 140,331 TEU, the 12th consecutive month of declining US exports. There was also a 25 percent decline in ship calls in October compared with a year ago. The study finds tariffs impact more than 90 percent of exports shipped out of Los Angeles, which originate from 22 states.

The Port of Los Angeles believes little will change in the short term. It forecasts November volumes will be down at least 10 percent, while December will also be soft.

"[Beneficial cargo owners] spent a lot of time and money advancing goods ahead of the Jan. 1, 2019 deadline, which ended up getting postponed twice," Jonathan Gold, vice president of supply chain for the National Retail Federation, said at the event. "Those who put the time and effort to bring cargo in earlier got hit with extra costs they had not originally anticipated, so I think folks are being more careful this time around."

Texas is being particularly hurt by the tariff-generated volume declines because nearly $25 billion in economic activity for the state is connected to trade through Los Angeles and Long Beach, according to the study.

## Trucking, rail hurt, too

The declines are trickling inland, where intermodal volumes began the fourth quarter lower than the last two peak seasons and the worst October for US intermodal since 2016. Truckload volumes remain higher than a year ago, according to DAT Solutions and American Trucking Associations, but spot and contract rates are lower. Less-than-truckload (LTL) volumes are generally down, based on third-quarter earnings, especially those with shippers in manufacturing.

The softness in manufacturing and export declines in Los Angeles has caused a disjointed supply chain, according to Seroka.

"It's difficult for a trucker to get a paying load both inbound and outbound at the same time," he

Exhibit 8
2903

said. "The western railroads are seeing displaced crews, assets, and engine power because of that heavy one-way trade."

Without a backhaul, truck drivers and railroads have to choose between moving empty trailers or containers and collecting little to no revenue or be stuck in a market until freight becomes available.

For truckload, it's a choice of moving cheap freight or sitting without a load and being idle for a day. For drayage, it's fewer matchback opportunities to repurpose an import box to an exporter.

Tariffs do result in more fluid terminal operations, fewer chassis meltdowns and domestic container shortages, and better intermodal service because less volume is moving through the system. But trade associations and the cargo owners they represent would prefer to tackle these choke points from a position of strength in US trade.

*Contact Ari Ashe at* _ari.ashe@ihsmarkit.com_ *and follow him on Twitter:* _@arijashe_.

Port News › US Ports › Port of Los Angeles
Port News › US Ports › Port of Long Beach
Regulation & Policy › Trade Data › Asia Trade Data
North America › United States › California

**Source URL:** https://www.joc.com/port-news/us-ports/port-los-angeles/port-la-warns-sharp-q4-volume-drop-tariffs_20191112.html

Exhibit 8
2904

☰ FreightWaves & Our Products

**DATVF.ATLPHL** 1.760 ▼ -0.042  -2.3%   **DATVF.CHIATL** 2.149 ▼ -0.023  -1.1%   **DATVF.DAL**



American Shipper   Container   Maritime   News   Shipping   Trade and Compliance

# Port of Los Angeles September volumes lower than in 2018

Largest U.S. container port says exports moving through its terminals declined 11% in September as 'ill-advised U.S.-China trade war continues to wreak havoc.'

Chris Dupin  •  Friday, October 11, 2019   💬 0   🔥 546   🔖 1 minute read



Exhibit 8
2905

The Port of Los Angeles said its terminals handled 779,903 TEUs in September 2019, a 2.7% decline from the same month last year. In contrast, volumes at the port are up 4.7% year-on-year in the first nine months of 2019 to about 7.1 million TEU.

"The ill-advised U.S.-China trade war continues to wreak havoc on American exporters and manufacturers," said Port of Los Angeles Executive Director Gene Seroka. "We've seen declining exports for 11 consecutive months while our fastest growing market segment is exporting empty containers back to Asia. It's likely we'll see softer volumes in the fourth quarter. We must have a negotiated settlement of the trade war as it is beginning to impact the more than 3 million jobs in the U.S. that are tied to this port complex."

September 2019 imports decreased 2.9% to 402,320 TEUs compared to the previous year. Exports decreased 11% to 130,769 TEUs, marking the eleventh consecutive monthly decline of exports.

It was expected that fourth quarter import volumes into the U.S. this year might be lower than in 2018 because many companies had pulled forward shipments last year in the face of threatened higher tariffs.

Six West Coast ports — Port of Long Beach, Port of Los Angeles, Port of Oakland, Port of Portland, Port of Seattle and Port of Tacoma —sent a letter to President Donald Trump on Sept. 23 sharing their concerns about the long-term impacts of the escalating trade conflict between China and the United States.

In that letter they told Trump that "the impacts of the back-and-forth tariffs between the United States and China have hit our exporters particularly hard, and we are hearing deep concern from our customers about their increasing challenges due to rising U.S. tariffs and Chinese retaliation."

Exhibit 8
2906

They noted that "California is the largest exporter to China of any state in the nation; in 2018, California ports collectively saw a decrease of about 30% in exports to China."

The letter said the ports "support a balanced trading relationship with our global partners but are deeply concerned that the continued imposition of ever-increasing tariffs leads to higher costs on U.S. businesses and consumers and loss of valuable markets without any long-term strategic benefit."



🏷 Tags   Port of Los Angeles   Seroka   U.S. - China trade war

Exhibit 8
2907

# EXHIBIT B

Exhibit 8
2908

December 18, 2019

TO: All Roadrunner CA Company Drivers

FM: Roadrunner Management

RE: Workforce Reduction


Soft freight conditions in 2019 have necessitated that we evaluate our current staffing levels heading into the New Year 2020, as a result with much consideration, we regret to inform you that Roadrunner Intermodal Services is reducing all company driver positions effective Friday, December 20, 2019.  Final pay will be processed in accordance to Friday, December 20, 2019.

If you have any questions or want additional information concerning this matter, please contact your local management or Michael Vagts, Sr. HR Manager, at 586-920-0100.


~ Roadrunner Management

Exhibit 8
2909

# EXHIBIT 9

Exhibit 9
2910

# Ogletree Deakins

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

*Attorneys at Law*

1909 K Street NW, Suite 1000
Washington, DC 20006
Telephone:  202-887-0855
Facsimile:  202-887-0866
www.ogletree.com

John S. Ferrer
202-263-0173
john.ferrer@ogletree.com

February 20, 2020

**VIA NLRB E-FILING**

Phuong Do
Field Attorney
National Labor Relations Board, Region 21
312 N. Spring Street, 10th Floor
Los Angeles, CA 90012

RE:     Universal Truckload, Inc., Case 21-CA-255151

Dear Mr. Do:

Universal Truckload, Inc. ("Truckload" or "the Company") submits this letter in response to the Region's request for the Company's position regarding the Charge filed by the International Brotherhood of Teamsters ("the Union") in the above-referenced matter.[1]  Truckload adamantly denies the allegations in the Union's Charge.  For the reasons discussed herein, the Charge should be dismissed in its entirety.

---

[1] This position statement is intended to assist the National Labor Relations Board ("NLRB") with its assessment of the Charge.  To the extent any issue or allegation in the Charge or the Region's EAJA letter is not specifically addressed, the fact that it is not addressed should not be considered an admission by Truckload.  This position statement is not a responsive pleading, and, although believed to be true and correct in all respects, it is not an affidavit.  Inclusion of information in this position statement does not constitute a waiver of any objection that the Company may have in response to future discovery or information requests, or to the introduction of evidence in this or any subsequent proceeding; nor does it constitute a waiver of any objection as to timeliness of the Charge or any other legal argument the Company may assert in the future.  Truckload reserves the right to amend or supplement this position statement and address any new issues or evidence that may arise in this matter.

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Jackson ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

Exhibit 9
2911

Phuong Do
February 20, 2020
Page 2

Specifically, the Union's Charge fails because the Union cannot meet its *prima facie* burden of establishing that Truckload laid off any employees due to any alleged union or protected concerted activities. First, the Union cannot demonstrate that the Company had any direct knowledge of any employees' union activities prior to the layoff decision. Second, even if the Company had knowledge of employees' alleged union activities, the Union cannot demonstrate that the Company bore any animus whatsoever towards such activities. Moreover, even if the Union could meet its *prima facie* burden, the Company had legitimate business reasons for the reduction in force; namely, sustained low freight volumes in 2019 and decreased profit margins. The layoffs were also consistent with the Company's movement towards an owner-operator model. The Union's Charge is completely baseless and should be dismissed.

## I.     Relevant Background[2]

Truckload provides transportation and logistics solutions throughout the United States. The Company operates a terminal located at 15033 Slover Avenue, Fontana, California ("Fontana terminal"). From its Fontana terminal, the Company provides local and regional dry van transportation services.

Like other trucking companies operating in the State of California, the Company's Fontana terminal experienced consistently weak freight volumes in 2019. The volume of freight moving through the ports of Los Angeles and Long Beach decreased significantly industry-wide in 2019.[3] It was reported that exports moving through the Port of Los Angeles in September 2019 declined by 11% and imports declined by approximately 3% from the prior year. In October 2019, exports fell 19% from the prior year – the twelfth consecutive month of declining exports in the United States. [Exhibit A.]

In early December, due to weak freight conditions and decreased profit margins, the Company made the difficult decision to lay off approximately 12 employee drivers from its Fontana terminal effective December 20, 2019. The layoff decision was also consistent with the Company's movement towards an owner-operator model at its facilities nationwide.[4] The drivers were notified of the reduction in force by letter dated December 18, 2019. [Exhibit B.]

---

[2] All information in this position statement, as well as any documents submitted to the Region, is being provided to the NLRB solely for purposes of cooperating with its investigation in this matter. As such, Truckload requests that the NLRB treat these documents as confidential and not disclose their content to anyone, including any other parties, any employees, the Union, or their attorneys, without the Company's express written permission, subject of course to the requirements of the Freedom of Information Act.

[3] The downturn appears to be the result of the United States-China trade dispute and the related tariffs.

[4] For example, Truckload has removed company assets and utilizes exclusively owner-operators at its facilities located in Alabama, Florida, Ohio, North Carolina, New York, Pennsylvania and Texas.

Exhibit 9
2912

Phuong Do
February 20, 2020
Page 3

## II.     The Union Cannot Establish A *Prima Facie* Case Of Unlawful Discrimination.

Under the Board's analysis set forth in *Wright Line, Inc*., 251 NLRB 1083 (1980), to establish a claim of unlawful discrimination under the Act, the Charging Party must first make a *prima facie* case by showing:  (1) the affected employees engaged in protected activity; (2) the employer knew of the activity; and (3) the employer bore animus against the affected employees' protected activity.  *See Praxair Dist., Inc*., 357 NLRB No. 91 (2011).  Mere suspicion, surmise and conjecture are insufficient to form the basis for a violation.  *See Cardinal Home Prods., Inc*., 338 NLRB 1004, 1009 (2003).  As discussed below, the Union cannot establish that the Company laid off employees for any alleged protected activities.

As an initial matter, the Union's Charge fails because there is no credible evidence that the Company was aware of any union or protected concerted activities of the Fontana-based employees.  The Teamsters' Charge alleges the layoffs were due to organizing activity at a different employer, by a different group of employees, in a different geographic location.  This allegation is clearly frivolous.  While Truckload and Mason-Dixon Intermodal d/b/a Universal Intermodal Services ("Universal") are both subsidiaries of Universal Logistics Holdings, Truckload and Universal are separate employers, with separate employees and separate operations.  Moreover, upon information and belief, the Teamsters' organizing activity involved Universal employee-drivers operating out of Universal's Compton, California facility.   Compton is approximately 60 miles away from Fontana.  The Company is not aware of any union organizing activity involving Truckload's employee-drivers at Fontana.  Accordingly, the Union cannot meet its *prima facie* burden of proving that Truckload knew of any employees' union or protected activities at any relevant time and, without that knowledge, any such activities could not have motivated the Company's layoff decisions.  *See Banner Health Sys*., 358 NLRB No. 93 (2012) (finding that the General Counsel failed to establish that the employer knew of the employee's protected activity at the time of the discipline); *Ellison Media Co*., 344 NLRB 1112, 1112 (2005) (concluding that there was no prima facie case where there was no evidence the employer knew of the alleged protected activity at the time of discharge).

There is no credible evidence that Truckload's decision to lay off its drivers was motivated by any anti-union animus.  As described above, the Company's layoff decisions were due to legitimate business reasons – weak freight conditions and decreased profit margins.  In this regard, it is undisputed that freight volumes were drastically down industry-wide in 2019.  Further, the decision was consistent with the Company's movement towards an owner-operator model nationwide.  In sum, the Union cannot establish that the Company's decision to lay off drivers was due to any employees' union or protected activities.  Accordingly, the Union's Charge should be dismissed.

## VII.     CONCLUSION

For the foregoing reasons, Truckload did not violate the Act as alleged.  The Union's Charge should be dismissed in their entirety.

Exhibit 9
2913

Phuong Do
February 20, 2020
Page 4

Sincerely,

John S. Ferrer

JSF:mlr

Exhibit 9
2914

# EXHIBIT A

Exhibit 9
2915

 JOC.com

Published on *JOC.com* (https://www.joc.com)

Home > Port of LA warns of sharp Q4 volume drop on tariffs

**Ari Ashe, Associate Editor** | Nov 12, 2019 4:26PM EST



A panel (left to right: Gold, Seroka, Angela Hofmann, Rufus Yerxa) discuss how tariffs are hurting US ports, trucking, rail, shippers, and consumers. Photo credit: Ari Ashe/JOC.com.

The Port of Los Angeles is bracing for a 10 percent year-over-year decline in imports in the fourth quarter, after laden volumes through the LA-Long Beach gateway plunged 12.4 in October.

Additionally, Gene Seroka, executive director of the port of LA, said conversations with Chinese

Exhibit 9
2916

factory managers over the last four weeks give little hope for a pre-Lunar New Year surge in January.

"We are not seeing any type of advancing of cargo like we saw last year in the third and fourth quarters because inventories haven't been worked down fast enough," said Seroka.

He said he saw no signs of a rise in manufacturing activity during a recent two-week visit to China ahead of the next round of United States tariffs due to go into effect Dec. 15 — a 25 percent levy on hundreds of consumer and industrial goods. Seroka spoke at an event in Washington, DC to unveil a study entitled "By the Numbers: Jeopardizing the National Benefits of Trade through America's Busiest Port Complex."

The study said tariffs on US imports from China threaten nearly 1.5 million US jobs and more than $186 billion of economic activity. Tariffs have already cost US companies some $38 billion, researchers said, not all of which can be passed down the supply chain to the consumer.

Tariffs also mean fewer headhaul opportunities out of the West Coast for truck drivers and empty miles on backhauls as retaliatory tariffs in China lower the number of exports from California.

Cargo volumes in Los Angeles for October reflect how the tariffs caused a slowdown in trade. Laden container traffic declined 19 percent year over year to 553,100 TEU, according to monthly port statistics. Laden exports also fell 19 percent to 140,331 TEU, the 12th consecutive month of declining US exports. There was also a 25 percent decline in ship calls in October compared with a year ago. The study finds tariffs impact more than 90 percent of exports shipped out of Los Angeles, which originate from 22 states.

The Port of Los Angeles believes little will change in the short term. It forecasts November volumes will be down at least 10 percent, while December will also be soft.

"[Beneficial cargo owners] spent a lot of time and money advancing goods ahead of the Jan. 1, 2019 deadline, which ended up getting postponed twice," Jonathan Gold, vice president of supply chain for the National Retail Federation, said at the event. "Those who put the time and effort to bring cargo in earlier got hit with extra costs they had not originally anticipated, so I think folks are being more careful this time around."

Texas is being particularly hurt by the tariff-generated volume declines because nearly $25 billion in economic activity for the state is connected to trade through Los Angeles and Long Beach, according to the study.

## Trucking, rail hurt, too

The declines are trickling inland, where intermodal volumes began the fourth quarter lower than the last two peak seasons and the worst October for US intermodal since 2016. Truckload volumes remain higher than a year ago, according to DAT Solutions and American Trucking Associations, but spot and contract rates are lower. Less-than-truckload (LTL) volumes are generally down, based on third-quarter earnings, especially those with shippers in manufacturing.

The softness in manufacturing and export declines in Los Angeles has caused a disjointed supply chain, according to Seroka.

"It's difficult for a trucker to get a paying load both inbound and outbound at the same time," he

Exhibit 9
2917

said. "The western railroads are seeing displaced crews, assets, and engine power because of that heavy one-way trade."

Without a backhaul, truck drivers and railroads have to choose between moving empty trailers or containers and collecting little to no revenue or be stuck in a market until freight becomes available.

For truckload, it's a choice of moving cheap freight or sitting without a load and being idle for a day. For drayage, it's fewer matchback opportunities to repurpose an import box to an exporter.

Tariffs do result in more fluid terminal operations, fewer chassis meltdowns and domestic container shortages, and better intermodal service because less volume is moving through the system. But trade associations and the cargo owners they represent would prefer to tackle these choke points from a position of strength in US trade.

*Contact Ari Ashe at _ari.ashe@ihsmarkit.com_ and follow him on Twitter: _@arijashe_.*

Port News › US Ports › Port of Los Angeles
Port News › US Ports › Port of Long Beach
Regulation & Policy › Trade Data › Asia Trade Data
North America › United States › California

**Source URL:** https://www.joc.com/port-news/us-ports/port-los-angeles/port-la-warns-sharp-q4-volume-drop-tariffs_20191112.html

Exhibit 9
2918

☰ **FreightWaves & Our Products**

❚❚   **DATVF.ATLPHL** 1.760 ▼ -0.042  -2.3%    **DATVF.CHIATL** 2.149 ▼ -0.023  -1.1%    **DATVF.DAL**



American Shipper   Container   Maritime   News   Shipping   Trade and Compliance

# Port of Los Angeles September volumes lower than in 2018

Largest U.S. container port says exports moving through its terminals declined 11% in September as 'ill-advised U.S.-China trade war continues to wreak havoc.'

Chris Dupin  •  Friday, October 11, 2019    💬 0    🔥 546    🔖 1 minute read



Exhibit 9
2919

The Port of Los Angeles said its terminals handled 779,903 TEUs in September 2019, a 2.7% decline from the same month last year. In contrast, volumes at the port are up 4.7% year-on-year in the first nine months of 2019 to about 7.1 million TEU.

"The ill-advised U.S.-China trade war continues to wreak havoc on American exporters and manufacturers," said Port of Los Angeles Executive Director Gene Seroka. "We've seen declining exports for 11 consecutive months while our fastest growing market segment is exporting empty containers back to Asia. It's likely we'll see softer volumes in the fourth quarter. We must have a negotiated settlement of the trade war as it is beginning to impact the more than 3 million jobs in the U.S. that are tied to this port complex."

September 2019 imports decreased 2.9% to 402,320 TEUs compared to the previous year. Exports decreased 11% to 130,769 TEUs, marking the eleventh consecutive monthly decline of exports.

It was expected that fourth quarter import volumes into the U.S. this year might be lower than in 2018 because many companies had pulled forward shipments last year in the face of threatened higher tariffs.

Six West Coast ports — Port of Long Beach, Port of Los Angeles, Port of Oakland, Port of Portland, Port of Seattle and Port of Tacoma —sent a letter to President Donald Trump on Sept. 23 sharing their concerns about the long-term impacts of the escalating trade conflict between China and the United States.

In that letter they told Trump that "the impacts of the back-and-forth tariffs between the United States and China have hit our exporters particularly hard, and we are hearing deep concern from our customers about their increasing challenges due to rising U.S. tariffs and Chinese retaliation."

Exhibit 9
2920

They noted that "California is the largest exporter to China of any state in the nation; in 2018, California ports collectively saw a decrease of about 30% in exports to China."

The letter said the ports "support a balanced trading relationship with our global partners but are deeply concerned that the continued imposition of ever-increasing tariffs leads to higher costs on U.S. businesses and consumers and loss of valuable markets without any long-term strategic benefit."


Tags    Port of Los Angeles    Seroka    U.S. - China trade war

Exhibit 9
2921

# EXHIBIT B

Exhibit 9
2922

December 18, 2019

TO: All Truckload CA Company Drivers

FM: Universal Management

RE: Workforce Reduction

Soft freight conditions in 2019 have necessitated that we evaluate our current staffing levels heading into the New Year 2020, as a result with much consideration, we regret to inform you that Universal Truckload, Inc. is reducing all company driver positions effective Friday, December 20, 2019.  Final pay will be processed in accordance to Friday, December 20, 2019.

If you have any questions or want additional information concerning this matter, please contact your local management or Michael Vagts, Sr. HR Manager, at 586-920-0100.

~ Universal Management

Exhibit 9
2923

# EXHIBIT 10

Exhibit 10
2924

Mason-Dixon Intermodal d/b/a Universal
Intermodal Services
Case 21-CA-252500

### Confidential Witness Affidavit

I **Edribay Rodriguez**, being first duly sworn upon my oath, state as follows:

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

I work for the International Brotherhood of Teamsters (Union) and I currently perform work for the Union's port division, which is located at 3888 Cherry Ave., Long Beach, CA

My work phone number (including area code) is 925-351-4389

My e-mail address is erodriguez@teamsters.org

1    I am an International Organizer for the Union. I am the Lead Organizer for the Union's

2    campaign to organize in the ports in the West Coast. I have been in this role for about a year. I

3    am involved in the Union's campaign at the Port of Long Beach and at the Port of Los Angeles. I

4    was an Organizer for the Union before becoming a Lead Organizer. I have been involved with

5    the Union's port campaign since January 2018. I am familiar with the Union's campaign to

6    organize drivers at Universal Intermodal (UI), Universal Truckload (UT), Roadrunner

7    Intermodal Services (RR). As the lead organizer, I supervise the organizers who are responsible

8    for these campaigns. Currently, organizer Santos Castaneda and I are responsible for the UI, UT,

9    and RR's organizing campaign. The campaign to organize the UI drivers is one of the current top

10   priorities for the Union. These drivers were laid-off back in December 2019.

**Privacy Act Statement**
The NLRB is asking you for the information on this form on the authority of the National Labor Relations Act (NLRA), 29 U.S.C. § 151 et seq. The principal use of the information is to assist the NLRB in processing representation and/or unfair labor practice cases and related proceedings or litigation. The routine uses for the information are fully set forth in the Federal Register, 71 Fed. Reg. 74942-43 (Dec. 13, 2006). Additional information about these uses is available at the NLRB website, www.nlrb.gov. Providing this information to the NLRB is voluntary. However, if you do not provide the information, the NLRB may refuse to continue processing an unfair labor practice or representation case, or may issue you a subpoena and seek enforcement of the subpoena in federal court.

- 1 -                              Initials _____

Exhibit 10
2925

Scanned with CamScanner

Case 21-CA-252500

1    Since the UI employees' lay-off, the Union keeps in contact with the UI drivers through

2    phone calls, a Whatsapp chat group, and in-person meetings at the Union's hall. Since the UT

3    employees' lay-off, the Union keeps in contact with the UT drivers through phone calls, a

4    Whatsapp chat group, and in-person meetings at the Union's hall. Since the RR employees' lay-

5    off, the Union keeps in contact with the RR drivers through phone calls and in-person meetings.

6    Before the UI employees' lay-off, the Union was in contact with 100% of those

7    employees. Currently, the Union remains in contact with around 15 to 16 of the UI employees.

8    Based on the Union's communication with these 15 or 16 drivers, and some other drivers

9    previously, the former UI employees remain interested in returning to work if they are offered

10   reinstatement.

11   Currently, the Union is in contact with around 6 RR and UT drivers since their lay-off.

12   Based on the Union's communication with these drivers, and some other drivers previously, the

13   former RR and UT employees remain interested in returning to work if they are offered

14   reinstatement.

15   The Union's contact with some of the UI, UT, and RR employees have dropped off due

16   to the drivers' lay-off. Many employees no longer want to support the Union because they

17   believe that they were laid-off because of the Union. Some employees have expressed anger at

18   the Union. Some employees have expressed sadness at being laid-off because of the Union's

19   campaign. Others who had been strong Union supporters, such as former employee David Lopez,

20   told us at the Teamsters to stop contacting them unless we had something good to report. I have

21   provided the Board Agent with a video of employee David Lopez on the day that the Union won

22   the December 4, 2019 election, where he states that voting for and belonging to the Teamsters

23   Union after 25 years as a driver was one of the three most important and happiest days of his life.

- 2 -                    Initials: _____

Exhibit 10
2926

Scanned with CamScanner

Case 21-CA-252500

1    I am aware that some former employees have found other jobs. I am aware that some former

2    employees, such Jonathan Ledesma and David Johnson, have moved out of state.

3         Since the NLRB issued its complaint and because of the trial, many drivers have reached

4    back out to the Union and have become more enthusiastic about the campaign. This renewed

5    interest in the campaign led to a Union meeting with the employees.

6         On or around late March 2021 on a Sunday at 11 am, the Union held a meeting for the

7    laid-off UI, UT, and RR employees at its hall. About 16 employees attended this meeting.

8    During this meeting, the Union informed the employees of the upcoming trial and about what

9    would happen next. During this meeting we also explained to the employees about the 10(j)-

10   injunction process. We also asked the employees if they would want to return to work. All the

11   employees at the meeting, including those who had moved out of the state or found other jobs,

12   indicated that they would return to work if offered reinstatement. This is all I recall about this

13   meeting at this time.

14        //

15        //

16        //

17        //

18        //

19        //

20        //

21        On or around early April 2021, given the renewed enthusiasm for the Union's campaign.

22   The Union held a ULP strike in front of the Universal/Southern Counties Express (SCE) facility

23   located at 2851 East Las Hermanas Street in Compton and also did ambulatory picketing at

- 3 -          Initials: _____

Exhibit 10
2927

Scanned with CamScanner

Case 21-CA-252500

1   various port terminals where Universal/SCE were operating at. This strike lasted for five days for

2   around 12 hours each day. Approximately 6 former UI employees were at the strike. Other port

3   drivers, Union organizers, and other sympathizers also participated in this strike.


**I am being provided a copy of this Confidential Witness Affidavit for my review. I
understand that this affidavit is a confidential law enforcement record and should not be
shown to any person other than my attorney or other person representing me in this
proceeding.**

**I have read this Confidential Witness Affidavit consisting of 4 pages, including this page, I
fully understand it, and I state under penalty of perjury that it is true and correct.
However, if after reviewing this affidavit again, I remember anything else that is important
or I wish to make any changes, I will immediately notify the Board agent.**

Date: _July/9/ 2021_          Signature: _____

                                             Edribay Rodriguez

**Signed and sworn to before me by telephone on** ___July/8/2021___

_____
**Phuong Do**
**Board Agent**
**National Labor Relations Board**


- 4 -          Initials: _____

Exhibit 10
2928

Scanned with CamScanner

# EXHIBIT 11

Exhibit 11
2929









# California port truck drivers go on strike

By: AJOT | Apr 13 2021 at 08:50 AM

*Strike follows NLRB complaint alleging 20 violations of labor law by Universal Logistics Holdings-affiliated companies*

On Monday essential port truck drivers, including drivers who were illegally fired after voting to form a union, went on strike to protest flagrant violations of federal labor law, and rampant misclassification by affiliated enterprises of Universal Logistics Holdings (ULH), a multi-billion dollar logistics company and one of the largest trucking companies serving Southern California.



Drivers organized a picket line outside ULH's Southern Counties Express trucking yard, demanding that ULH's affiliated enterprises follow the law, reinstate the unit of illegally fired drivers with back pay, respect drivers' right to form a union, bargain in good faith for a fair contract, and cease misclassifying drivers as independent contractors.

"The Teamsters refuse to stand by as Universal Logistics Holdings affiliated enterprises illegally fire unionized drivers and deliberately transfer their work to locations with drivers misclassified as independent contractors in order to keep making billions in profits off of their backs, avoiding accountability," said International Brotherhood of Teamsters Port Division Director Ron Herrera. "We demand justice and accountability for this lawbreaking company, and we stand in solidarity with striking drivers. Port truck drivers have been the backbone of our economy throughout the pandemic and they have kept our communities going through these hard times."

The drivers' unfair labor practice strike comes just weeks after the National Labor Relations Board issued a complaint against numerous ULH-affiliated companies, including Southern Counties Express and Universal Intermodal Services, finding over 20 egregious violations of federal labor law.

The Board complaint alleges that ULH/Universal Intermodal Services violated the law by terminating its workforce of unionized drivers shortly following their union election victory in December 2019, as well as by failing and refusing to bargain in good faith for a contract. The company then unlawfully transferred work from the recently unionized facility to ULH/Southern Counties Express, the complaint alleges. Not only are ULH/Southern Counties Express and sister company ULH/Container Connection non-unionized, but drivers at both ULH-affiliated enterprises are also misclassified as independent contractors.

"As Universal employees, we practiced our basic right to organize, demand basic protections and fair wages and join a union — and for that Universal broke the law and retaliated against us," said port truck driver Romel Mallard. "We refuse to stay silent and will not back down in the face of Universal's lawbreaking, which hurts all drivers. We demand that they follow the law, provide us back pay, and recognize and bargain with the union that we rightfully won."

**Christmas Retaliation**

Exhibit 11
2830

### Trending News

 Investigators to begin underwater search for downed Hawaii jet's black boxes

 Carriers and ports agree on plan for next generation Southeast US chassis pool

 229% surge in China-US shipping costs drives inflation pressure

 Western fires halt hundreds of Canada Rail cars, slowing exports

 Egypt waves goodbye to Suez Canal saga with payoff and a party

### From Our Sponsors

 How NordicTrack Ran the Last Mile

 CenterPoint Properties' Texas expansion fulfilling growing demand for logistically advantaged space



### Upcoming Events

| Aug 18 | CONECT Boston Cargo Facilities Tour |
| Sep 01 | Home Delivery World 2021 |
| Sep 07 | Commercial UAV Expo |
| Sep 07 | Traffic Club of Chicago 113th Annual Dinner, Golf Outing & Networking Lunch |
| Sep 12 | IANA's Intermodal EXPO |

View all Events

Employees at both Universal Intermodal Services began organizing in late 2019. Almost immediately, the company hired multiple drivers in an attempt to intimidate other employees seeking to do the same. When employees at one location nonetheless voted to unionize, the employer took retaliatory and preemptive action shortly before Christmas and terminated the entire workforce — not only at that facility, but also numerous workers at two other locations where nascent union organizing efforts existed.

Universal's unlawful efforts grew even more insidious when the company transferred work from the unionized Universal employee company, Universal Intermodal Services, to a Universal company with misclassified drivers, Southern Counties Express, as part of its effort to rid itself of union supporters and avoid unionization.

In its complaint, the NLRB also alleged the ULH-affiliated companies operating at the Ports of Los Angeles and Long Beach are a single integrated business enterprise constituting a "single employer" and "alter egos" under the National Labor Relations Act (NLRA). The board alleged numerous other violations of federal labor law, including:

- Suspending and terminating two lead union supporters in retaliation for their union activity shortly after they began exercising their rights to organize a union;
- Terminating/laying off all Roadrunner company drivers in retaliation for and to prevent union activity;
- Terminating/laying off all Universal Truckload company drivers in retaliation for and to prevent union activity;
- Reducing drivers' hours and pay after their union election in retaliation for their union activity and without bargaining with the union;
- Terminating/laying off entire Universal Intermodal Services unionized workforce following their election victory and moving the work to another ULH-affiliated enterprise, Southern Counties Express, in retaliation for their union activity and without bargaining with the union;
- Failing and refusing to bargain with the union for a first contract and over a multitude of mandatory subjects of bargaining; and
- A host of other hallmark violations of the NLRA, such as unlawful interrogation, soliciting grievances and promising benefits, discouraging employees from filing charges with the NLRB, refusing to provide the union with information it is required to provide, and dealing directly with unit employees.

**Misclassification Rampant Throughout Port Trucking Industry**

The COVID-19 pandemic has illustrated the crisis of misclassified drivers being denied basic protections like sick leave, unemployment insurance, disability insurance, worker compensation and health insurance because of their misclassification as independent contractors.

Just last week, a driver for another ULH-affiliated company, Container Connection, spoke out at a California Senate Labor Committee hearing about the impacts of misclassification on drivers and their families, including wage theft, a lack of safety net protections and an unsafe workplace. He also shared his story on the steps of the Capitol to advocate for three bills to address port driver misclassification, SB 338 (Gonzalez), SB 700 (Durazo) and AB 794 (Carillo).

The driver shared that in March, he and a co-worker filed a Cal/OSHA complaint alleging a systemic failure to protect drivers and demanding that Cal/OSHA conduct an immediate on-site investigation into Container Connection's lack of a COVID-19 Prevention Program. The complaint details a long list of COVID-19 hazards present throughout the course of the drivers' day-to-day work, during which they pick up shipping containers at the port and transport them to the warehouses of such companies as Whirlpool and Ross. At virtually every point along the way, the complaint alleges, ULH/Container Connection fails to implement procedures to keep drivers safe from COVID-19.

Misclassification also cheats city, state and local government—and ultimately the public—of tax dollars, and puts high-road employers that comply with the law at a competitive disadvantage. Prior to its purchase by ULH, Container Connection also engaged in shell games to avoid millions of dollars in wage theft judgments, eventually paying workers only after the Labor Commissioner's Office issued "Stop Work" orders demanding it stop doing work in California until it paid its workers.

*This article does not necessarily reflect the opinion of the AJOT editorial board or Fleur de lis Publishing, Inc. and its owners.*



## More

| AJOT Channels | AJOT Resources | AJOT Membership | American Journal of Transportation |
| --- | --- | --- | --- |
| Air Cargo News | Events Calendar | Terms of Use | 116 Court Street, Suite 5 |
| Maritime News | Submit Press Release | Privacy | Plymouth, MA 02360 |
| Intermodal News | Submit Industry Event | Cookies Policy | (508) 927-4188 |
| International Trade | Submit Expert Insight | Login | |
| Ports & Terminals | Advertising | Join AJOT | |
| Logistics | Subscriptions | Reset Password | |
| | Contact | | |

© Copyright 1999–2021 American Journal of Transportation. All Rights Reserved.

**Latest Print Edition:**



| Warehousing and Distribution 2021 |
| --- |
| Temperature-Controlled Logistics Tri-Annual |
| Global 100 Container Ports 2021 |
| North American Offshore Wind |
| **View Digital Edition #727** |



The 2+2 on Innovation in Logistics

