WILLIAM PATE (SB # 45734)
William.pate@nlrb.gov
STEPHANIE CAHN (SB # 189277)
Stephanie.cahn@nlrb.gov
MOLLY KAGEL (SB # 304328)
Molly.kagel@nlrb.gov
National Labor Relations Board, Region 21
312 North Spring Street, 10th Floor
Los Angeles, CA 90012
Telephone:  (213) 894-6512
Facsimile:   (213) 894-2778

Attorneys for Petitioner

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM B. COWEN, Regional Director of Region 21 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>                                  Petitioner,<br><br>v.<br><br>MASON-DIXON INTERMODAL D/B/A UNIVERSAL INTERMODAL SERVICES, SOUTHERN COUNTIES EXPRESS, INC., ROADRUNNER INTERMODAL SERVICES, LLC., AND UNIVERSAL TRUCKLOAD, INC.,<br>                                  Respondents. | Case No.:  2:21-cv-05683<br><br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR TEMPORARY INJUNCTION UNDER SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT, AS AMENDED [29 U.S.C. § 160(j)]<br><br>Date:  August 23, 2021<br>Time:  9:00 a.m.<br>Courtroom: First Street Courthouse<br>                    Courtroom 7C, 7th Floor |

# **TABLE OF CONTENTS**

**I. INTRODUCTION** ……………...………………………………..……………………**1**

**II. THE STATUTORY SCHEME FOR INJUNCTIVE RELIEF** ……………......**3**

    **A.**    **Likelihood of Success on the Merits** ……….……………………......**4**

    **B.**    **Irreparable Harm, Balancing of the Equities, and the Public**

        **Interest** ……………………………………………………………......**5**

**III. STATEMENT OF FACTS** ……………………………………......………..**6**

    **A.**    **Respondents are Engaged in the Same Industry and Owned by**

        **the Same Parent Company** ………………………………......**6**

    **B.**    **The Unit Overwhelmingly Supported and Voted For the Union** .....**8**

    **C.**    **Respondents' Aggressive Anti-Union Response Resulted in a**

        **Myriad of Unlawful Conduct, Including the Discharge of Two**

        **Leading Union Supporters**…………………………….. ………......**9**

    **D.**    **Immediately After the Union Election, Respondents Retaliated by**

        **Drastically Reducing the Unit's Workload and**

        **Hours**…………………………………………...............................**12**

    **E.**    **Without Warning, Respondents Abruptly Closed the Compton**

        **Facility and Laid Off the Unit Employees** ...………… …..……….**13**

    **F.**    **Respondents Lay Off All Company Drivers at Universal Truckload**

        **and Roadrunner After They Were Exposed to and Expressed**

        **Interest in the Union**…………………………………………….**14**

    **G.**    **Respondents Have Refused to Bargain with the Union Over**

        **the Closure of the Compton Facility and the Layoff of the Unit**

        **Employees and Have Refused to Provide the Union with Necessary**

        **and Relevant Information** ………......………………………..**15**

    **H.**    **Respondents' Actions Undermined Union Support in the Unit**

        **and Quashed Organizing Efforts at Other Facilities** ……………**16**

**IV. ARGUMENT**……………………………………………………………………**..17**

    **A.**    **There Is a Strong Likelihood of Success that Respondent**

        **Violated Section 8(a)(1), (3), and (5) of the Act** ………..……….….......**17**

        **i.**    *Respondents Constitute a Single Employer and Alter-Egos*

            *of One Another* …………………………………………….……**17**

        **ii.**   *Respondents Unlawfully Interrogated Employees about*

            *Their Union Support*……………………………………….......**18**

        **iii.**  *Respondents Unlawfully Solicited Grievances and*

            *Promised Benefits* …..………………………………………**18**

        **iv.**  *Respondents Terminated Mallard and Ledesma for*

            *Their Union Support*………………………………….…......**19**

        **v.**   *Respondents Unlawfully Closed the Compton Facility*

            *and Laid off the Unit*……………………………..……**21**

        **vi.**  *Respondents Laid Off the UT and RR Employees to*

            *Quash Union Support* …………………………….........……**23**

        **vii.** *Respondents Have Continually Bargained in Bad Faith*

            *with the Union* .………………………………….……….…**23**

    **C.**    **Interim Relief is Necessary to Prevent Irreparable Harm to the**

        **Employees' Statutory Rights and to Protect the Efficacy of the**

        **Board's Final Order**……………………………………………**..25**

**V. CONCLUSION** ……………………………………………..……**35**

**TABLE OF AUTHORITIES**

**Federal Cases**

*Aguayo v. Quadrtech Corp.*, 129 F.Supp.2d 1273 (C.D. Cal. 2000)………………23, 29

*Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744 (9th Cir. 1988)………26, 27, 30, 33, 34

*Alliance for the Wild Rockies v. Cotrell*, 632 F.3d 1127 (9th Cir. 2011)……………..3, 4

*Angle v. Sacks*, 382 F.2d 655 (10th Cir. 1967)…………………………...26, 28, 29, 30

*Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367 (11th Cir. 1992)…………………..28, 34

*Asseo v. Bultman Enters., Inc.*, 913 F. Supp. 89 (D.P.R. 1995)………………………..27

*Asseo v. Pan Am. Grain Co.*, 805 F.2d 23 (1st Cir. 1986)…………………………28, 34

*Bernstein v. Carter & Sons Freightways, Inc.*, 983 F. Supp. 994 (D. Kan. 1997)……..29

*Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001)…………………26, 34

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,

    598 3d 30 (2d Cir. 2010)……………………………………………………..4

*Denholm v. Smyrna Ready Mix Concrete*, 2021 WL 297571 (E.D. Ky. 2021)…….29, 33

*Dunbar v. Carrier Corp.*, 66 F. Supp. 2d 346 (N.D.N.Y. 1999)………………………29

*Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902 (3d Cir. 1981)….30, 31

*Electrical Workers v. NLRB*, 426 F.2d 1243 (D.C. Cir. 1970)…………………………28

*Fibreboard Paper Prod. Corp. v. NLRB*, 379 U.S. 203 (1964)………………………22

*First National Maintenance Corp. v. NLRB*, 452 U.S. 666 (1981)……………………22

*Frankl v. HTH Corp. (Frankl I)*, 650 F.3d 1334

    (9th Cir. 2011)…………………………………….3, 4, 5, 17, 25, 26, 28, 29, 34

*Frankl v. HTH Corp. (Frankl II)*, 693 F.3d 1051 (9th Cir. 2012)…………………..20, 30

*Franks Bros. Co. v. NLRB*, 321 U.S. 702 (1944)………………………………………28

*Golden Day Schools, Inc. v. NLRB*, 644 F.2d 834 (9th Cir. 1981)………………...20, 22

*Gottfried v. Frankel*, 818 F.2d 485 (6th Cir. 1987)……………………………………34

*Healthcare Emp. Local 399 v. NLRB*, 463 F.3d 909 (9th Cir. 2006)………….19, 20, 22

*Hirsch v. Dorsey Trailers*, 147 F.3d 243 (3d Cir. 1998)………………………………34

*Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029

    (W.D. Tenn. 2011)……………………………………………………………32, 33

*Hubbel v. Patrish LLC*, 903 F. Supp. 2d 813 (E.D. Mo. 2012)………………………..31

*Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047 (2d Cir. 1980)………………26, 30, 31

*Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566 (7th Cir. 2011)……………………..27

*Louisiana-Pacific Corp. v. NLRB*, 858 F.2d 576 (9th Cir. 1988)………………………28

*Maram v. Universidad Interamericana*, 722 F.2d 953 (1st Cir. 1983…………………33

*Mattina v. Chinatown Carting Corp.*, 290 F. Supp. 2d 386 (S.D.N.Y. 2003)………….33

*Miller v. California Pacific Medical Center,* 19 F.3d 449 (9th Cir. 1994)………3, 4, 5, 6

*Muffley v. Spartan Mining Co.*, 570 F.3d 534 (4th Cir. 2009)……………………..33, 34

*Penello v. United Mine Workers*, 88 F. Supp. 935 (D.D.C. 1950)……………………..31

*NLRB v. Acme Industrial Co.*, 385 U.S. 432 (1967)…………………………………....24

*NLRB v. C & C Plywood Corp.*, 385 U.S. 421 (1967)…………………………………27

*NLRB v. DA Clothing Co.*, 159 F.3d 1352 (3d Cir. 1998)……………………………...18

*NLRB v. Electro-Voice*, 83 F.3d 1559 (7th Cir. 1996)……………………...25, 26, 27, 31

*NLRB v. Katz*, 369 U.S. 736 (1962)……………………………………………………23

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937)…………………….25, 27-28

*NLRB v. Link-Belt Co.*, 311 U.S. 584 (1941)………………………………………..26

*NLRB v. Teamsters Local No. 439, Int'l Bhd. of Teamsters, AFL-CIO,*

    1753d 1173 (9th Cir. 1999)………………………………………………………25

*NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983)……………………………19, 25

*NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149 (1956)……………………………..24

*Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176 (D. Haw. 2010)……………………..32, 33

*Overstreet v. Gunderson Rail Servs., LLC,* 587 Fed. App'x 379 (9th Cir. 2014)……...31

*Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918 (D. Ariz. 2014)………..25, 32

*Overstreet v. Shamrock Foods Co.*, 2016 WL 8505125 (D. Ariz. 2016)………………27

*Overstreet v. Shamrock Foods Co.*, 679 F. App'x 561 (9th Cir. 2017)……………….26

*Overstreet v. Thomas Davis Medical Centers, P.C.*,

    9 F.Supp.2d 1162 (D. Ariz. 1997)……………………………….…………..31

*Overstreet ex rel. NLRB v. El Paso Disposal, LP*, 625 F.3d 844 (5th Cir. 2010)….…..34

*Pascarell v. Vibra Screw Inc.*, 904 F.2d 8741 (3d Cir. 1990)……………………..27, 33

*Pate v. Bodega Latina Corporation*, 2015 WL 12661924 (C.D. Cal. 2015)………...33

*Paulsen v. PrimeFlight Aviation Servs., Inc.*, 718 F. App'x 42 (2d Cir. 2017)……...32

*Portland Willamette Co. v. NLRB*, 534 F.2d 1331 (9th Cir. 1976)…………………25

*Power Inc. v. NLRB*, 40 F.3d 409 (D.C. Cir. 1994)………………………….......26

*Pye v. Excel Case Ready*, 238 F.3d 69 (1st Cir. 2001)…………….25, 26, 27, 30, 31, 34

*Radio & Television Broad. Technicians Loc. Union 1264 v.*

    *Broad. Serv. of Mobile, Inc.*, ...380 U.S. 255 (1965)……………………………17

*Radio Officers' Union v. NLRB*, 347 U.S. 17 (1954)……………………………25, 27

*Rose Hills Mortuary v. NLRB*, 203 F.3d 832 (9th Cir. 1999)…………………………20

*Rubin v. American Reclamation, Inc.*, 2012 WL 3018335 (C.D. Cal. 2012)………...26

*Rubin v. Hospital of Barstow*, 2016 WL 4547152 (C.D. Cal. 2016)……………...29, 34

*Rubin v. Vista Del Sol Health Services*, 80 F. Supp. 3d 1058

    (C.D. Cal. 2015)…..………………………………………….…..25, 29, 30, 33

*Rubin v. Vista del Sol Health Services, Inc.*, 2015 WL 306292

    (C.D. Cal. Jan. 22, 2015)………………………………….………………32

*Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962

    (6th Cir. 2001)........................................................................26, 29, 30

*Scott v. Stephen Dunn & Associates,* 241 F.3d 652 (9th Cir. 2001)………..3, 4, 5, 30, 31

*Seeler v. The Trading Port, Inc.*, 517 F.2d 33 (2d Cir. 1975)…………………………31

*Shamrock Cartage, Inc.*, 2018 WL 6528432 (S.D. Ohio 2018)………………………32

*Sharp v. Webco Indus., Inc.*, 225 F.3d 1130 (10th Cir. 2000)……………………26, 30

*Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466 (9th Cir. 1966)………………...20

*Silverman v. Whittal & Shon*, 1986 WL 15735 (S.D.N.Y. 1986)…………………27, 30

*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180 (9th Cir. 2011)……………...28, 29

*Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 263 (1965)……………..…21

*United Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767 (9th Cir. 2017)……………32

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981)…………………………………..4

*Walsh v. Mountain View Care & Rehab. Ctr., LLC*, 2019 WL 2865891

    (M.D. Pa. July 2, 2019)……………………………………………………32

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)……………3

**<u>Board Cases</u>**

*Canton, Carp's, Inc.*, 125 NLRB 483 (1959)…………………………………...17

*Cofab, Inc.*, 322 NLRB 162 (1996) ..……………………………………….18

*Electrolux Home Products, Inc.*, 368 NLRB No. 34 (2019)……………..…20, 21

*Family Laundry, Inc.*, 121 NLRB 1619…………………………………………17

*Int'l Shipping Agency, Inc.*, 369 NLRB No. 79 (2020)………………………..21, 29, 31

*Island Architectural Woodwork, Inc. & Verde Demountable Partitions, Inc.*,

    *Alter Egos & Ne. Reg'l Council of Carpenters*, 364 NLRB No. 73

    (Aug. 12, 2016)……………………………………………………………18

*Martin Marietta*, 214 NLRB 646 (1974)……………………………………...14

*Metro One Loss Prevention Services*, 356 NLRB 89 (2010)…………………………18

*Montgomery Ward & Co.*, 316 NLRB 12483 (1995)…………………………...23

*Ohio Power Co.*, 216 NLRB 987 (1975)……………………………………..24

*Overton Markets, Inc.*, 142 NLRB 615 (1961)…………………………………17

*Pacific Design Center*, 339 NLRB 415 (2003)………………………………19

*Perfect T.V., Inc.*, 134 NLRB 575 (1961)……………………………………17

*Reliance Electric Co.*, 191 NLRB 44 (1971)…………………………………19

*Rossmore House Hotel*, 269 NLRB 1176 (1984)………………………………18

*Sakrete of Northern California, Inc.*, 137 NLRB 1220 (1963)………………………17

*Stoody Co.*, 320 NLRB 18 (1995)……………………………………………18

*Thesis Painting, Inc.*, 365 NLRB No. 142 (2017)…………………………………22

*T-Mobile USA, Inc.*, 368 NLRB No. 81 (Sept. 30, 2019)…………………………………19

*V.I.P. Radio, Inc.*, 128 NLRB 113………………………………………………………17

*Wright Line*, 251 NLRB 1083 (1980)…………………………………………..19, 21

**Federal Statutes**

29 U.S.C. § 151……………………………………………………......25

29 U.S.C. § 157……………………………………………………...2, 24

29 U.S.C. § 158(a)(1) …………………………………………………......2

29 U.S.C. § 158(a)(3) …………………………………………………2, 19

29 U.S.C. § 158(a)(5) …………………………………………………......2

29 U.S.C. § 160(j) ………………………………………………...........1

**Other**

S. Rep. No. 105, 80th Cong., 1st Sess. at 8, 27 reprinted in 1 Leg. Hist. 414, 433
(LMRA 1947) ……………………………………………………..................3

# I.   **INTRODUCTION**

This case involves an unlawful crusade by Mason-Dixon Intermodal d/b/a Universal Intermodal Services (UI); Southern Counties Express, Inc. (SCE); Roadrunner Intermodal Services, LLC (RR); and Universal Truckload, Inc. (UT), collectively referred to as "Respondents," to defeat its employees' right under Section 7 of the National Labor Relations Act (Act) to form or join a union. Immediately after employees working for UI (Unit) voted to join International Brotherhood of Teamsters (Union), Respondents engaged in a campaign of retaliation by discharging key union activists, closing the facility where the Unit voted to join the Union, and laying off all employee drivers working for UI, UT, and RR. Without an immediate injunction, Respondents' illegal efforts will succeed, permanently thwarting the intent of Congress, the Board's remedial authority, and the employees' statutory rights.

On behalf of the National Labor Relations Board (Board), the Regional Director (RD) of Region 21 of the Board (Petitioner) seeks a preliminary injunction pursuant to Section 10(j)[1] of the Act, as amended, 29 U.S.C. § 160(j) against Respondents. Petitioner seeks an injunction pending the Board's final disposition of a complaint based on the unfair labor practice charges filed by the Union. On March 17, 2021, Petitioner issued a Consolidated Complaint and Notice of Hearing (Complaint). (Pet. Exh. 3(a), pp. 2205-32). The matters were litigated at a hearing before Board Administrative Law Judge Michael A. Rosas on June 14, 2021 through June 22, 2021 and are scheduled to resume on July 26, 2021, continuing on consecutive days thereafter until concluded.

---

[1] Section 10(j) provides: The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States District Court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

This petition is based on the substantial likelihood that the Board will find that Respondents have engaged in the unlawful conduct alleged in the Complaint and that it is just and proper for this Court to grant temporary injunctive relief pending a final decision on the merits by the Board. The Complaint alleges that Respondents violated 29 U.S.C. § 158(a)(1), (3), and (5) (Section 8(a)(1), (3), and (5))[2] of the Act, in part, by: interrogating employees about union activities; soliciting employee complaints and grievances and promising employees increased benefits and improved terms and conditions of employment if they refrained from union activity; suspending and/or discharging Unit employees Romel Mallard (Mallard) and Jonathan Ledesma (Ledesma) in late November, 2019, because of their union activity; reducing work assigned to the Unit because the Unit voted to be represented by the Union and doing so without providing either notice to or bargaining with the Union; laying off RR and UT employees because they supported the Union and because the Unit voted to be represented by the Union; closing UI's Compton facility, laying off the Unit, and moving the Unit work to SCE because the Unit voted to be represented by the Union and in order to discourage employees at Respondents' other facilities from supporting or assisting the Union; laying off the Unit and moving the Unit work without providing notice to or bargaining with the

---

[2] Section 8(a)(1) of the Act prohibits employers from interfering with, restraining, or coercing employees in the exercise of their rights guaranteed in Section 7 of the Act, 29 U.S.C. § 157, herein Section 7. Section 7 provides that employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities. Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to discriminate in regard to hire or tenure of employment or any term or condition of employment in order to encourage or discourage membership in any labor organization. Section 8(a)(5) of the Act makes it an unfair labor practice for an employer to refuse to recognize or bargain with the certified collective bargaining representative of its employees, to deal directly with employees, and to implement changes to terms and conditions of employment without providing notice or opportunity to bargain.

Union; refusing to bargain with the Union over the terms and conditions of employment for Unit employees; and refusing to furnish the Union with requested information.

Based on these numerous and egregious unfair labor practices, in particular the discriminatory termination of two pro-Union employees and the mass layoff of UI, RR, and UT employees immediately after the Unit voted to be represented by the Union, accompanied by the unlawful refusal to bargain with the Union, it is just and proper for this Court to issue a preliminary injunction in order to protect employees' statutory rights, preserve the Board's remedial authority, avoid irreparable loss of support for the Union, and prevent Respondents from benefiting from their unlawful conduct.

## II. THE STATUTORY SCHEME FOR INJUNCTIVE RELIEF

Section 10(j) of the Act authorizes United States district courts to grant temporary injunctions that are "just and proper" pending the Board's resolution of unfair labor practice proceedings. Congress recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint. *See Scott v. Stephen Dunn & Associates,* 241 F.3d 652, 659 (9th Cir. 2001); *Miller v. California Pacific Medical Center,* 19 F.3d 449, 455 n.3 (9th Cir. 1994) (en banc) (quoting S. Rep. No. 105, 80th Cong., 1st Sess. At 8, 27 reprinted in 1 Leg. Hist. 414, 433 (LMRA 1947)).

In the Ninth Circuit, district courts rely on traditional equitable principles to determine if interim relief is appropriate. *Frankl v. HTH Corp. (Frankl I)*, 650 F.3d 1334, 1355 (9th Cir. 2011), cert. denied 566 U.S. 904 (2012). Thus, to obtain a preliminary injunction, the RD must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the Board's favor, and (4) that an injunction is in the public interest. *Id.*, citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 374 (2008). These elements are evaluated on a "sliding scale" in which the required showing of likelihood of success decreases as the showing of irreparable harm increases. *See Alliance for the Wild Rockies v. Cotrell*, 632 F.3d 1127, 1131–1134 (9th Cir. 2011).

When "the balance of hardships tips sharply" in the RD's favor, the Director may establish only that "serious questions going to the merits" exist so long as there is a likelihood of irreparable harm and the injunction is in the public interest. *Frankl I*, 650 F.3d at 1355, quoting *Alliance for the Wild Rockies*, 632 F.3d at 1135. The "serious questions" standard permits the district court to grant an injunction where it "cannot determine with certainty that the [Regional Director] is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Alliance for the Wild Rockies*, 632 F.3d at 1133, quoting *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

A.    **Likelihood of Success on the Merits**

Likelihood of success in a Section 10(j) proceeding "is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the RD occurred and that . . . [the Ninth Circuit] would grant a petition enforcing that order." *Frankl I*, 650 F.3d at 1355. In evaluating the likelihood of success, "'it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals.'" *Id.* at 1356, quoting *Miller*, 19 F.3d at 460.

The RD need not prove, however, that the respondent committed the alleged unfair labor practices by a preponderance of the evidence as required in the underlying administrative proceeding. *See Scott*, 241 F.3d at 662. Such a standard would "improperly equat[e] 'likelihood of success' with 'success.'" *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 394 (1981). Rather, the RD makes a threshold showing of likelihood of success by producing "some evidence" in support of the unfair labor practice charge "together with an arguable legal theory." *Frankl I*, 650 F.3d at 1356; *see also* S*cott*, 241 F.3d at 662 (RD need only show "a better than negligible chance of success"). Moreover, "[a] conflict in the evidence does not preclude the RD from making the requisite showing for a section 10(j) injunction." *Scott*, 241 F.3d at 662. Thus, in a Section 10(j)

proceeding, the district court should sustain the RD's factual allegations if they are reasonable and, "'even on an issue of law, the district court should be hospitable to the views of the [RD], however novel.'" *Frankl I*, 650 F.3d at 1356, quoting *Miller*, 19 F.3d at 460.

## B.    Irreparable Harm, Balancing of the Equities, and the Public Interest

In applying traditional equitable principles to a Section 10(j) petition, courts must consider the matter in light of the underlying purposes of Section 10(j), which are "to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Miller*, 19 F.3d at 459–60. In evaluating the likelihood of irreparable harm to the Act's policies and in considering the balancing of equities, district courts must "take into account the probability that declining to issue the injunction will permit the alleged[] unfair labor practices to reach fruition and thereby render meaningless the Board's remedial authority." *Id.*; *see also Frankl I*, 650 F.3d at 1362.

Likely irreparable injury is established in a Section 10(j) case if "a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." *Frankl I*, 650 F.3d at 1362. The RD can make the requisite showing of likely irreparable harm either through evidence that such harm is occurring, *see, e.g., Scott*, 241 F.3d at 667, 668, or from "inferences from the nature of the particular unfair labor practice at issue [which] remain available." *Frankl I*, 650 F.3d at 1362. Therefore, the same evidence and legal conclusions establishing likelihood of success, together with permissible inferences regarding the likely interim and long-run impact of the unfair labor practices, support a finding of irreparable harm. *Id.* at 1363. Thus, "a likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances." *Id.*

1
2
3
4
5

The public interest in a Section 10(j) case "'is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge.'" *Id.* at 1365, quoting *Miller*, 19 F.3d at 460. A strong showing of likelihood of success and likely irreparable harm will establish that Section 10(j) relief is in the public interest. *Id.*

6

### III.   STATEMENT OF FACTS

7
8

**A.   Respondents are Engaged in the Same Industry and Owned by the Same Parent Company**

9
10
11
12
13
14
15
16

Respondents provide transportation services and operate facilities located in Southern California (CA).[3] Up until December, 2019,[4] UI operated a facility located at 2035 Bella Vista Way in Compton, CA (Compton facility). Presently, SCE operates a facility located at 18020 South Santa Fe Avenue in Rancho Dominguez, CA (SCE 5 Yard); UT operates a facility located at 15033 Slover Avenue in Fontana, CA (Slover facility), where a portion of UI's employees worked until December; and RR operates facilities located at 1815 East O Street in Wilmington, CA (Wilmington facility) and at 11272 Calabash Avenue in Fontana, CA (Fontana facility). (Pet. Exh. 3(a), pp. 2205-32).

17
18
19
20
21
22
23

Universal Logistics Holdings, Inc. (ULH), a publicly traded logistics company, is the parent company of approximately 44 wholly-owned subsidiaries, which includes UI, SCE, UT, and RR. (Pet. Exh. 2(a), pp. 1676 & 3(a), pp. 2381-2508). Because it is a holding company, ULH does not have any employees; rather, all of its corporate officers, managers, and supervisors are employed through Universal Management Services (UMS). (Pet. Exh. 1(b), pp. 61-64, 186-87). ULH is located at 12755 E. Nine Mile Road

24
25
26
27
28

---

[3] UI provides transportation services; SCE provides full-service harbor drayage, transloading, warehousing and project cargo services; UT provides customized transportation and logistics solutions; RR provides drayage services. (Pet. Exh. 3(a), pp. 2205-32, 2384-85, 2458-60).

[4] From here on, all dates will be in 2019 unless otherwise indicated.

in Warren, Michigan, which also houses the headquarters of UI and UT. (Pet. Exh. 1(b), p. 113).

In providing transportation services, UI specifically utilized and relied on company drivers to pick up containers from the ports to deliver to its storage yard or clients' distributions centers and take empty containers from its yard or its clients' yard to the ports.[5] (Pet. Exh. 1(d), pp. 373, 469; 1(e), p. 567; 1(f), pp. 848, 960). Approximately eight of UI's company drivers worked out of the Slover facility with UT company drivers; however, those eight drivers still received their work from dispatchers housed at the Compton facility and are part of the Unit. (Pet. Exh. 1(e), pp. 622-23, 633; 6(a), p. 2805). Since at least March, when ULH acquired SCE, UI began utilizing SCE dispatchers and managers to direct the work of its company drivers in servicing SCE clients. (Pet. Exh. 1(d), pp. 370, 372-73; 1(e), p. 683; 1(f), pp.849-851). Since its layoff of drivers in December, UI now uses SCE drivers to perform its work. (Pet. Exh. 5, p. 2768; 6(a), p. 2809; 7(b), p. 2892).

Until December, UT utilized owner-operator and company drivers to pick up containers from a rail yard in Fontana, CA to bring to its storage yard or clients' distributions centers; and to pick up containers from its clients to deliver them to the Fontana rail yard. (Pet. Exh. 1(e), p. 568). UT not only shared the Slover facility with UI, but also its equipment, staff, and work; for example, at times throughout their employment, Unit drivers would be assigned rail work normally done by UT drivers, sometimes by dispatchers at the Slover facility. (Pet. Exh. 1(e), pp. 606, 621, 650 & 1(f), pp. 778, 802-03, 805, 830-31, 845, 906, 914). In December, UT laid off its approximately 12 drivers, now relying on its owner-operator drivers to fulfill its work. (Pet. Exh. 9, p. 2912).

---

[5] "Company drivers" refer to drivers directly employed by the company and "owner-operators" refer to drivers who are considered by Respondents to be independent contractors.

Acquired by ULH in November, RR similarly used a combination of owner-operator and company drivers to service port and rail locations while providing drayage services. (Pet. Exh. 3(a), pp. 2384, 2458). In December, RR transitioned to solely utilizing its owner-operators to fulfill its work after laying off its approximately 26 company drivers. (Pet. Exh. 1(f), pp. 761, 935 & 8, p. 2898).

While Respondents have different local management to run the day-to-day operations of each facility, ULH controls the overall business of Respondents. Specifically, UMS Vice President of Labor Relations Dennis Glackin (Glackin), who is an executive of ULH but paid by UMS, admitted that it is the executives, officers, and directors of ULH that would make and enact decisions such as closing the Compton facility, laying off the UI, UT, and RR drivers, and where and how to redirect the affected business.[6] (Pet. Exh. 1(b), pp. 64, 77-8, 109, 114-15, 170-78, 180-95, 204-09, 211-12, 214-17; 1(d), pp. 347-48; 2(a), pp. 1689-1698). Additionally, when distributing lay off letters to the company drivers of UI, UT, and RR, UMS director Michael Vagts was listed as the contact for questions and Glackin was copied on Mallard and Ledesma's termination letters. (Pet. Exh. 2(a), pp. 1192, 1145, 1149-53). ULH subsidiaries also regularly comingle business purpose, operations, management, supervision, premises, equipment, and customers. (Pet. Exh.1(d) pp. 378-85, 486-88, 490-94; 1(e), pp. 569-70, 573-74, 595, 683, 689, 690; 1(f), pp. 809-810, 812-13, 816-17, 848-55, 906, 958-963).

**B.      The Unit Overwhelmingly Supported and Voted For the Union**

In late summer, the Union began a campaign to represent the drivers of UI. After gaining the necessary support, on November 8, the Union filed a petition with the Petitioner to hold a representation election for the Unit. (Pet. Exh. 2(a), p. 1019). In the following weeks, the Union set up tents and signs in front of both the Compton and Slover facilities so Union organizers could speak to the Unit. (Pet. Exh. 1(d), p. 395; 1(e),

---

[6] Glackin was also presented as the Custodian of Records for all Respondents. (Pet. Exh. 1(b), p. 100).

pp. 572, 582, 642; 1(f), p. 785). The Union provided the Unit with Union signs to place in their cars and with apparel emblazoned with the Union logo, such as safety vests and beanies, to wear to work. (Pet. Exh. 1(d), pp. 393, 492; 1(e), pp. 576, 582, 687; 1(f), pp. 860, 965, 1001).

On December 4, an election was held for the Unit.[7] Twenty-eight drivers were eligible to vote in the election, including the eight drivers housed at the Slover facility. On December 4, the Unit voted overwhelmingly in favor of the Union. UI filed objections to the election, which it withdrew on the eve of the hearing. On January 8, 2020, Petitioner certified the Union as the representative of the Unit. (Pet. Exh. 2(a), pp. 1024-41).

**C.      Respondents' Aggressive Anti-Union Response Resulted in a Myriad of Unlawful Conduct, Including the Discharge of Two Leading Union Supporters**

Once the Union started campaigning publicly in front of the Compton and Slover facilities, UI hired new personnel to quell the Union support amongst the Unit. After the Union set up its tents, UI brought in General Manager Joe Lugo (Lugo) to directly address the issues the Unit had with their working conditions and hired Kirk Cummings (Cummings), a labor consultant, who, along with his associate, held anti-Union meetings with drivers. (Pet. Exh. 1(d), pp. 396, 486, 497). In mid-November, Lugo spoke to a group of Unit drivers, taking notes of their issues while instructing them to bring any complaints they had about their trucks directly to him. He then gave out his contact information, including his personal cell number. (Pet. Exh. 1(f), pp. 872-875). According to the Unit, this was the first time a manager had come to the facility to speak to drivers directly about their issues or provide their contact information to the drivers. (Pet. Exh. 1(d), p. 398 & 1(f), p. 875).

---

[7] The Unit consists of "All full-time and regular part-time port drivers employed by [UI] working or dispatched out of the [] facility currently located at 2035 Vista Bella Way, Compton, California."  (Pet. Exh. 2(a), pp. 1039-41).

Around November 12, Cummings approached Unit driver Kevin Poullard at the Slover facility and asked him if he was aware of the Union. Poullard said no, despite the fact that he had signed a Union authorization card earlier in the month. Cummings then asked Poullard how Poullard felt about the Union and, instead of answering, Poullard asked Cummings how he felt about the Union. Cummings then invited Poullard to a meeting and Poullard declined. The following day, Poullard recounted the interaction to Union Organizer Miguel Cubillos, who then gave Poullard a Union safety vest to wear to work. (Pet. Exh. 1(e), pp. 643-45; 1(f), pp. 998-1001; 3(a), pp. 2516, 2520, 2580, 2715-16).

In a series of meetings held with the Unit throughout November and early December, Cummings and his associate lectured the drivers on the dangers of the Union. In mid-November, Ledesma, a zealous Union supporter, spoke up at one of these anti-Union meetings, stating that Cummings could stop his presentation because Ledesma spoke for the majority of the drivers and the drivers have "already decided that [the Unit drivers] are going Union." (Pet. Exh. 1(d), pp. 501-503). In an anti-Union meeting on November 18, Cummings asked the morning-shift drivers, including Ledesma, if any of them were Spanish speakers as his associate would lead a Spanish meeting the following day. When one driver said that all of the drivers spoke Spanish and that it would save time for the drivers to meet at a Spanish meeting, Ledesma agreed and proceeded to leave the meeting room. The other drivers, save for two, followed him. (Pet. Exh. 1(d), pp. 504-505).

On November 25, Lugo asked to meet with Ledesma and took him to an office where a safety manager was waiting. The safety manager told Ledesma he was suspended because he did not possess a CA Commercial Driver's License (CDL), which meant he was driving in violation of federal regulations. Ledesma, who had a valid Arizona (AZ) CDL that UI knew about, countered that he had never received notice about needing a CA CDL. (Pet. Exh. 1(d), pp. 507-510). As far back as October 2018, Ledesma contacted UI's corporate headquarters when his fuel card did not work and UI corporate attributed

it to the fact that he did not have a CA CDL. Ledesma informed the representative that he had an AZ CDL and he was asked for the AZ CDL's information. Ledesma provided the information, which appears in his personnel file, and he was informed within half an hour that his fuel card was active. (Pet. Exh. 1(d), pp. 481-482 & 2(a), pp. 1075-76). Similarly, in about May, Ledesma's dispatcher informed him that his AZ CDL was temporarily suspended because he had a pending driving citation. Ledesma resolved the issue that same day and immediately returned to work. (Pet. Exh. 1(d), pp. 482-483).

As a result of his suspension, Ledesma promptly started the process to obtain a CA CDL. On November 27, two days after being suspended, Ledesma was informed by Lugo that he was being terminated for failing to comply with federal law. (Pet. Exh. 2(a), p. 1092 & 1(d) pp. 510-13). No investigation was conducted by Respondents. (Pet. Exh. 1(b), pp. 129-135 & 2(a), pp. 1044-91).

On November 25, Cummings held an anti-Union meeting with Unit drivers, including Mallard, another prominent Union supporter. During this meeting, a driver asked Cummings if UI would be willing to discuss issues if the Unit did not support the Union. Mallard commented that this was unlikely as the employees had met with UI the previous year to discuss their workplace issues and nothing has come from it. Mallard then cast doubts on the truthfulness of the presentation about the Union and Cummings interjected that he did not want Mallard to speak. In response, Mallard told Cummings, "if I can't talk, then I can't listen" and Mallard left the meeting and walked to his truck. About ten minutes later, Mallard returned to the meeting when a Unit driver brought Mallard to hear Lugo address the drivers. Lugo reiterated that the drivers could bring their issues directly to him and he would fix them. (Pet. Exh. 1(d), pp. 405-09 & 1(f) pp. 970-72).

On November 26, Lugo and a SCE safety manager informed Mallard that UI was terminating him for insubordination. With no investigation or explanation, Mallard then received a letter confirming that he was terminated for insubordination. (Pet. Exh. 1(b), pp. 121-29; 1(d), p. 409; 2(a), pp. 1094-1145; 7(a), p. 2836). Respondents later

- 11 -

represented that Mallard was terminated for walking out of the meeting. (Pet. Exh. 7(a), pp. 2836).

In late November, a memo announcing the expiration of the lease at the Compton facility, which UI would not be renewing, was posted by the time clock. It stated: "While the company is considering its options, no decision has been made regarding the relocation of the Compton operations, nor has a new location been determined." (Pet. Exh. 2(a), p. 1147). When questioned by Unit drivers, Lugo and multiple dispatchers responded that the Unit would most likely be relocating to the SCE 5 Yard. UI gave no indication that the Unit may be terminated or laid off. (Pet. Exh. 1(e), pp. 704-05; 1(f), pp. 886-88, 979-80; 3(a), p. 2535).

**D.     Immediately After the Union Election, Respondents Retaliated by Drastically Reducing the Unit's Workload and Hours**

Prior to the election held on December 4, the Unit worked an average of eight-to-twelve hour shifts, receiving about two or three assignments per day. (Pet. Exh. 1(e), pp. 688, 691 & 1(f), pp. 806-07, 856, 963). Immediately following the Unit's overwhelming vote in favor of the Union, the work for the Unit was reduced dramatically. From December 5 to December 20, the Unit drivers were only being assigned one or two loads per day, which equated to approximately three to eight hours of work per shift. (Pet. Exh. 1(e), pp. 574-75, 585, 692; 1(f), pp. 825, 883-84, 886, 973; 3(a), pp. 2524-2529). Respondents' records show that, compared to the eight weeks preceding the December 4, election, the work assigned to the Unit employees decreased approximately 34% during the week of December 8 through 14 and 54% during the week of December 15 through 21. (Pet. Exh. 2(a), pp. 1171-1653). While UI blamed the sudden lack of work on freight conditions, that explanation is incongruous with the business cycles of past years where a slowdown in freight conditions usually occurred around the Lunar New Year celebrations, not in December. (Pet. Exh. 1(e), pp. 695-96 & 1(f) 906-07).

The work of UI drivers changed as well after the election. Rather than delivering loads to or picking up loads from clients, the Unit was directed to drop off their one-load-per-

day at the Franco Storage Yard, a distribution site. (Pet. Exh. 1(e), pp. 585-86, 692-93 & 1(f), pp. 826, 883, 973-74). From there, an owner-operator working either for SCE or Container Connection, another ULH subsidiary, would pick up the loads for final delivery. (Pet. Exh. 1(e), pp. 693-95 & 1(f), p. 826). The slowdown in work was so drastic that the night shift Unit drivers were directed to report to work during the morning shift for the weeks of December 23 to January 3, 2020. (Pet. Exh. 1(e), pp. 592, 696-97& 3(a), pp. 2524-28, 2564). That change in scheduling never came to fruition as UI suddenly laid off the Unit employees. (Pet. Exh. 1(e), p. 697).

**E.    Without Warning, Respondents Abruptly Closed the Compton Facility and Laid Off the Unit Employees**

While UI had plenty of notice that their lease was expiring and gave the Unit the impression that they either would be transferred to the SCE 5 Yard or a new facility, on December 20, UI sent a letter informing the Unit, including those housed at the Slover facility, that they were laid off, effective that day. (Pet. Exh. 1(b), p. 101 & 2(a), p. 1149). The letter attributed the closure to the lease expiration and a "weakening in the truckload and intermodal sectors" and directed the Unit to contact Michael Vagts for any questions. UI equipment was either transferred to the SCE 5 Yard or out of state to related operations owned by Respondents. (Pet. Exh. 1(e), pp. 593, 704 & 2(a), pp. 1706-829).

While Respondents presented documentary evidence that they had considered closing the Compton facility at one point in February, Respondents represented that the decision to close the facility was not actually made until December 6, two days after the Union won the election.[8] (Pet. Exh. 1(b), p. 105; 2(a), pp. 2376-79; 5, p. 2767; 6(b), p. 2822;

---

[8] Even though the Region issued five investigative subpoenas duces tecum to Respondents during the investigation, which Respondents contested and forced the Region to seek subpoena enforcement in District Court, the only evidence Respondents offered in support of the closure has been news articles describing general business declines at the Ports of Los Angeles and Long Beach due to the US-China trade dispute. (Pet. Exh. 2(a), pp. 1830-36, 51-56, 78-82, 94-98, 1909-13, 2831-34, 65-71).

7(a), p. 2832). Further, after the Union filed a petition to represent the Unit on November 8, UI never mentioned that the lease was expiring or that they were considering closing the Compton facility and laying off the Unit.[9] Finally, Respondents failed to fulfill their obligation to provide the Union, the representative of the Unit, with either notice about or an opportunity to bargain over the decision to close the Compton facility and lay off the Unit. (Pet. Exh. 1(b), p. 179; 1(c), pp. 233-35; 6(a), p. 2808).

Despite Respondents ceasing operations at the Compton facility and laying off the Unit, in the weeks following, UI posted job openings for company drivers at a facility located at 550 S. Alameda St. in Compton, CA, 4.1 miles north of the Compton facility, on Craigslist. (Pet. Exh. 1(f), pp. 893, 982 & 3(a), pp. 2537-40, 2543). Job applicants would meet with a SCE recruiter and be provided with an application for UI. (Pet. Exh. 1(f), pp. 903-04 & 3(a), pp. 3545-60).

**F.      Respondents Lay Off All Company Drivers at Universal Truckload and Roadrunner After They Were Exposed to and Expressed Interest in the Union**

Because of the active Union campaign at the Slover facility, UT drivers were extremely familiar with the Union. In November and December, the Union organizers had many conversations, both in person and on the phone, with UT drivers who expressed interest in being represented by the Union. UT drivers also discussed the Union amongst themselves while working. It is well-settled that the Slover facility had multiple cameras on the outside of their buildings. (Pet. Exh. 1(e), pp. 583-84, 624-27, 649-52 & 1(f), pp. 822-824).

Similarly, because RR's Fontana facility was less than a mile-and-a-half down the road from the Slover facility, the RR drivers were also exposed to the Union from November through December. One RR driver pulled over to speak to a Union

---

[9] Board law allows for the dismissal of a petition in the event of a plant closure. *See Martin Marietta,* 214 NLRB 646 (1974) (dismissal of a petition due to little likelihood of any continuity of employment for the petitioned-for employees due to plant closure).

Representative outside the Slover Facility, conveying interest in being represented by the Union. RR drivers were so enthusiastic about the Union that they would speak about the Union daily to each other while working and began supplying the Union with detailed information about their work for both the Wilmington and Fontana facilities. (Pet. Exh. 1(e), pp. 652-53 & 1(f), pp. 763-66, 786-92, 936, 938-43). After the Union won the election to represent the Unit, one RR driver was called in to fill out paperwork.  When he went in to fill out the paperwork, the RR driver asked two managers about the Union's role with the RR drivers. Similarly, a RR manager directly told another RR driver that RR would not let the Union come in. (Pet. Exh. 1(f), pp. 767-69, 944-46).

Around December 18, UT drivers were notified either by their dispatchers or by letter that they were being laid off. (Pet. Exh. 1(e), pp. 621-22 & 2(a), p. 1151). Around the same time, RR drivers were called into their manager's office and were informed that they were being laid off. (Pet. Exh. 1(f), pp. 769-71, 946-49). Both the UT and RR lay-off letters attributed their layoffs to "soft freight conditions," despite the fact that UT and RR work remained the same at the time they were laid off. The letter instructed the drivers to contact Michael Vagts with any questions. (Pet. Exh. 1(e), p. 628; 1(f), p. 950; 2(a), pp. 1151-53). After they were laid off, several UT and RR drivers attended a meeting hosted by the Union. (Pet. Exh. 1(e), pp. 628-29 & 1(f) 772, 777-78, 794-95, 950-51).

## G.   Respondents Have Refused to Bargain with the Union Over the Closure of the Compton Facility and the Layoff of the Unit Employees and Have Refused to Provide the Union with Necessary and Relevant Information

On January 18, 2020, after the Union was certified to represent Unit employees, the Union demanded recognition and bargaining from UI and requested information relevant to and necessary for bargaining on behalf of the Unit. On January 31, 2020, UI refused to comply with either request, maintaining that position until the Union met with UI on March 12, 2020. (Pet. Exh. 2(a), pp. 1155-1164). At that meeting, UI stated its willingness to negotiate only over effects of the December layoff, sustaining its refusal to

bargain over a contract, and refused to provide the majority of the relevant information requested by the Union.[10] (Pet. Exh. 3(a), pp. 2226-32; 5, pp. 2760-71). Further, UI admitted at this meeting that the work formerly done by the Unit was now being completed by drivers of SCE. (Pet. Exh. 5, p. 2768; 6(b), pp. 2822-23; 7(b), p. 2892).

**H. Respondents' Actions Undermined Union Support in the Unit and Quashed Organizing Efforts at Other Facilities**

Respondents' swift unlawful conduct has resulted in disaffection in the UI Unit as multiple employees have demanded that the Union cease communicating with them. One employee responded to a Union group text with a middle finger emoji, conveying his discontent with the Union. (Pet. Exh. 1(f), pp.984-88 & 3(b), p. 2733). Other employees have been forced to leave the area to find employment, raising the risk they will never return under a final Board order. (Pet. Exh. 1(d), p. 513 & 10, p. 2927). Moreover, through its sudden layoffs of UT and RR company drivers, Respondents have effectually nipped employees' nascent organizing efforts in the bud at those facilities because the drivers correctly believe their layoff was a direct retaliatory reaction to their Union support. (Pet. Exh. 1(f), p. 778 & 10, p. 2926).

Despite Respondents' illegal conduct, a core of the Unit, UT, and RR drivers remain in contact with the Union and would readily accept interim reinstatement. Before the Unit's layoff, the Union was in contact with all of the Unit drivers. Currently, the Union remains in contact with around 15 to 16 of those employees and those and other Unit drivers are interested in returning to work if offered reinstatement. On April 4, 2021, former Unit employees protested Respondents' transfer of their work to SCE in front of the SCE 5 Yard. Likewise, the Union is in contact with around six UT and RR drivers since their layoff and those drivers and other UT and RR drivers are interested in returning to work

---

[10] The outstanding information requests are attached to the Complaint. (Pet. Exh. 3(a), pp. 2226-32).

if offered reinstatement. (Pet. Exh. 1(f), p. 795; 6(a), p. 2813; 10, pp.2926-2928; 11, pp. 2929-2931).

## IV.   ARGUMENT

### A.   There Is a Strong Likelihood of Success that Respondent Violated Section 8(a)(1), (3), and (5) of the Act

The overwhelming evidence in the record here, together with settled Board law, demonstrate that the Board will likely find Respondents violated Section 8(a)(1), (3), and (5) of the Act. Petitioner, therefore, easily meets the required "some evidence" in support of the unfair-labor-practice charge "together with an arguable legal theory" and has a strong likelihood of success on the merits. *Frankl I*, 650 F.3d at 1356

### (i)   *Respondents Constitute a Single Employer and Alter-Egos of One Another*

The Board looks at four factors in determining whether separate entities constitute a single employer: (1) interrelations of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control.[11] Testimony of UMS Vice President Glackin and documents provided by Respondents reveal that ULH, through UMS officials, exercised substantial direct and immediate control of the labor policies of its subsidiaries, including specifically with regards to the discharge and lay-offs of UI, RR, and UT employees. The evidence shows that these companies have common corporate ownership, management, and that this corporate management holds centralized control over their labor relations. Further, through their comingling of facilities, management, equipment, and customers, Respondents demonstrate that they do not maintain an arm's length relationship to one another and maintain significant interrelated

---

[11] *Radio & Television Broad. Technicians Loc. Union 1264 v. Broad. Serv. of Mobile, Inc.*, 380 U.S. 255, 256–57 (1965), citing *Sakrete of Northern California, Inc.*, 137 NLRB 1220 (1963), aff'd 332 F.2d 902 (9th Cir. 1964), cert. denied, 379 U.S. 961 (1965); *Family Laundry, Inc.*, 121 NLRB 1619 (1958); *Canton, Carp's, Inc.*, 125 NLRB 483 (1959); *V.I.P. Radio, Inc.*, 128 NLRB 113 (1960); *Perfect T.V., Inc.*, 134 NLRB 575 (1961); *Overton Markets, Inc.*, 142 NLRB 615 (1961).

operations. The Board uses these same factors to determine whether employers are alter-egos of one another as well.[12] Using the same factors, Respondents' alter-ego status is similarly established by noting that these companies have "substantially identical ownership, business purpose, operations, management, supervision, premises, equipment, and customers."[13] As such, the Board will find that Respondents constitute a single employer and are alter-egos of one another.

(ii)     *Respondents Unlawfully Interrogated Employees about Their Union Support*

In determining whether questioning of employees coercively interferes with their rights, the Board considers as follows: (1) whether proper assurances were given concerning the questioning; (2) the background and timing of the interrogation; (3) the nature of the information sought; (4) the identity of the questioner; (5) the place and method of the interrogation.[14] On November 12, Cummings approached Unit driver Poullard at work and asked him about his union sentiments. The interaction was sufficiently coercive that Poullard felt the need to lie in response about his awareness and support of the Union. Applying the above-described test to these circumstances, the Board is likely to find these interrogations violate Section 8(a)(1) of the Act.

(iii)     *Respondents Unlawfully Solicited Grievances and Promised Benefits*

Where an employer does not already have a practice of soliciting employee feedback, its solicitation of grievances during a union campaign raises a "compelling inference that [the employer] is implicitly promising to correct those inequities he discovers as a result

---

[12] *Island Architectural Woodwork, Inc. & Verde Demountable Partitions, Inc., Alter Egos & Ne. Reg'l Council of Carpenters*, 364 NLRB No. 73 (Aug. 12, 2016), citing *Cofab, Inc.*, 322 NLRB 162, 163 (1996), enfd. sub. nom. *NLRB v. DA Clothing Co.*, 159 F.3d 1352 (3d Cir. 1998) (unpublished table decision).

[13] *Ibid.*

[14] *Metro One Loss Prevention Services*, 356 NLRB 89, 101–02 (2010); *Wisconsin Porcelain Co.*, 349 NLRB 151, 153 (2007); *Stoody Co.*, 320 NLRB 18, 18–19 (1995); *Rossmore House Hotel*, 269 NLRB 1176, 1177–78 (1984), aff'd. 760 F.2d 1006 (9th Cir. 1985).

of his inquiries and likewise urging on his employees that the combined program of inquiry and correction will make union representation unnecessary."[15] In mid-November and on November 25, Lugo, who had never done this before, met with drivers in order to solicit employees' complaints. Lugo's solicitations and promises to remediate the employees' problems were done in direct response to the Union campaign and upcoming election. Given this analysis, the Board is likely to find that Respondents unlawfully solicited grievances and promised benefits, in violation of Section 8(a)(1) of the Act.

### (iv)   *Respondents Terminated Mallard and Ledesma for Their Union Support*

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer "to encourage or discourage membership in any labor organization" "by discrimination in regard to hire or tenure of employment or any term or condition of employment." 29 U.S.C. § 158(a)(3). To establish that Respondent violated Section 8(a)(3), the General Counsel must make "a *prima facie* showing sufficient to support the inference that union activity was a 'motivating factor' in the employer's decision," by proving the following elements: (1) engagement in union activities by the alleged discriminatees; (2) employer knowledge of such activities; (3) employer adverse action against the alleged discriminatees; and (4) employer anti-union animus.[16] Once the General Counsel establishes a *prima facie* case, the burden shifts to the employer to demonstrate that it would have taken the same action even in the absence of the protected conduct.[17]

Through its conduct, such as interrogating an employee about the Union, and unlawfully soliciting complaints while making promises of remedies, there is no doubt

---

[15] *T-Mobile USA, Inc.*, 368 NLRB No. 81 (Sept. 30, 2019), citing *Reliance Electric Co.*, 191 NLRB 44, 46 (1971), enfd. 457 F.2d 503 (6th Cir. 1972).

[16] *Wright Line*, 251 NLRB 1083, 1089 (1980), enfd. 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982); *NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393 (1983). *See also Pacific Design Center*, 339 NLRB 415, 418 (2003).

[17] *Wright Line*, 251 NLRB at 1089; *Transp. Mgmt. Corp.*, 462 U.S. at 399–03; *Healthcare Emp. Local 399 v. NLRB*, 463 F.3d 909, 919 (9th Cir. 2006).

that Respondents had an overt hostility regarding the Union. Accordingly, there is compelling evidence to show that Respondents held a general deep-seated animus toward the Union's campaign and the employees' involvement with that campaign. The timing of Mallard and Ledesma's discharges, two open Union activists, merely days prior to the representation election and after both had spoken up in favor of the Union during UI's anti-Union meetings, renders Respondents' anti-Union motive "stunningly obvious."[18]

Regarding Mallard's termination, a *prima facie* case can be easily established. Mallard, through his wearing of a Union vest and his comments during anti-Union meetings, was an open and vocal supporter of the Union. There is no doubt that UI and its representatives knew about Mallard's pro-Union sentiments. Finally, the evidence clearly portrays that Mallard was terminated for his Union activity as he was disparately terminated for "insubordination" when he walked out of an anti-union meeting after voicing his support for the Union, in contrast to employees in other shifts, including almost all of the morning shift employees, who walked out of their own meeting, and Poullard, who declined to attend a meeting when asked.[19] Again, this evidence, combined with the lack of evidence of any investigation or similar disciplines, strongly support the finding that Mallard was unlawfully terminated because of his pro-union sentiment.[20]

---

[18] *Healthcare Employees Local 399*, 463 F.3d at 920; *see also Golden Day Schools, Inc. v. NLRB*, 644 F.2d 834, 838 (9th Cir. 1981) (timing of discharge indicated discriminatory motive).

[19] *See Frankl v. HTH Corp. (Frankl II)*, 693 F.3d 1051, 1060 (9th Cir. 2012) (employer's disparate treatment of union activists versus other employees indicative of unlawful animus); *see also Rose Hills Mortuary v. NLRB*, 203 F.3d 832 (table) (9th Cir. 1999) (same).

[20] *See Electrolux Home Products, Inc.*, 368 NLRB No. 34, slip op. at 3 (2019) ("Board may infer from the pretextual nature of an employer's proffered justification that the employer acted out of union animus, '*at least where . . . the surrounding facts tend to reinforce that inference.*'") (quoting *Shattuck Denn Mining Corp. v. NLRB*, 362 F.2d 466, 470 (9th Cir. 1966)) (emphasis in original).

- 20 -

Similarly, a *prima facie* case also exists with Ledesma's termination. As with Mallard, UI had knowledge of Ledesma's indisputable Union support as he wore a Union vest to work and made pro-Union comments during anti-Union meetings. The evidence clearly shows that, for at least a year, UI knew that Ledesma possessed an AZ CDL rather than a CA CDL. It was only after Ledesma demonstrated his open support of the Union that UI used his AZ CDL as a pretext to terminate him. Although Ledesma also immediately set about obtaining a CA CDL, UI did not afford him this opportunity, again reaffirming the pretextual nature of his discharge.[21] This timing, combined with UI's inability to produce documents explaining why it raised this issue of Ledesma's license right before the election, signifies that UI made the decision to terminate Ledesma because of his Union activity.

Given this compelling evidence, it is likely that the Board will find that Respondents unlawfully terminated both Mallard and Ledesma in retaliation for their Union activity and in violation of Section 8(a)(3) of the Act.

**(v)**      ***Respondents Unlawfully Closed the Compton Facility and Laid off the Unit.***

Because UI has admitted that work previously performed by the Unit was moved to SCE, *Wright Line* is the applicable case law under which to analyze UI's decision to close the Compton facility and lay off the Unit.[22] UI is unable to demonstrate that it would have closed the facility absent employees' selection of the Union. UI only offered evidence that it considered closing the facility in February and, ultimately, decided not to

---

[21] *See Electrolux Home Products, Inc.*, 368 NLRB No. 34, slip op. at 3.

[22] *See Int'l Shipping Agency, Inc.*, 369 NLRB No. 79, slip op. at 3 (2020) (holding that where an employer's action is less than a partial closing, but is rather a discriminatory relocation or subcontracting, *Wright Line* applies, and the General Counsel need not satisfy *Darlington*'s requirement that the partial closure was, *inter alia*, motivated by a "purpose to chill unionism in any of the employer's remaining plants" (citing *Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 263 (1965)).

do so.[23] It was only on November 22, after the Union filed its representation petition, that UI informed employees that it would not be renewing the Compton facility's lease. Even then, however, the notice specifically stated that UI was "considering its options" and that "no decision has been made regarding the potential relocation of the Compton operations" and UI represented that the Unit and work would be moved to SCE 5. Respondents did not make the firm decision to close the Compton facility and lay off Unit employees until December 6, immediately after the Union won the election.[24] Given the above, it is likely that the Board will find that Respondents' unlawfully decided to close the Compton Facility and lay off the Unit, in violation of Section 8(a)(1) and (3) of the Act.

This conduct further violated Section 8(a)(5) of the Act as it was done without notifying or bargaining with the Union, which was eventually certified as the 9(a) representative for the Unit. In addition to informing the Union of its decision to close operations, Respondents also have an obligation to afford the Union notice of and an opportunity to bargain over the decision to transfer the Unit's work to SCE drivers. An employer's decision to implement layoffs is a mandatory subject such that an employer must afford a union notice and opportunity to bargain to impasse before implementation.[25] Similarly, the "'contracting out' of the work previously performed by members of an existing bargaining unit is a subject about which the Act requires employers and the

---

[23] UI was unable to offer any evidence related to the decision to close the Compton facility, apart from the aborted February 2019 effort, other than the news articles describing general business declines at the Ports of Los Angeles and Long Beach due to the US-China trade dispute.

[24] *See Healthcare Employees Local 399*, 463 F.3d at 920 (timing of the employer's adverse action rendered its anti-Union motive "stunningly obvious"); *see also Golden Day Schools, Inc.*, 644 F.2d at 838 (same).

[25] *See Thesis Painting, Inc.*, 365 NLRB No. 142, slip op. at 1 (2017). *See generally First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 277 (1981).

representatives of their employees to bargain collectively."[26]  Therefore, it is likely that the Board will find that Respondents violated Section 8(a)(5) of the Act when they laid off the Unit and transferred the work without first bargaining with the Union.

**(vi)  *Respondents Laid Off the UT and RR Employees to Quash Union Support***

The Union's organizing campaign at UI sparked the interest to organize at both UT and RR and employees at both locations contacted the Union to discuss the prospect of organizing. Applying *Wright Line*, Respondents had direct knowledge of RR employees' interest, inasmuch as multiple RR employees spoke to their managers directly about the Union at RR. Moreover, Respondents' knowledge of both UT and RR employees' Union activity can be inferred from the timing of the layoffs —the same day, December 18, 2019, and shortly after the Union's victory at UI—as well as its general knowledge of Union organizing at the shared UI and UT Slover facility.[27] Outside of presenting news articles about business in general at the ports, Respondents have not demonstrated that they would have laid off the employees in the absence of their Union activity.[28] Given Respondents' inability to justify the decision to layoff the UT and RR drivers, it is likely the Board will find that Respondents violated Section 8(a)(1) and (3) of the Act.

**(vii)  *Respondents Have Continually Bargained in Bad Faith with the Union***

Section 8(d) of the Act establishes that there is a "mutual obligation" for an employer and union to meet and confer in good faith  "with respect to wages, hours, and other

---

[26] *Fibreboard Paper Prod. Corp. v. NLRB*, 379 U.S. 203, 209, (1964).

[27] *See Montgomery Ward & Co.*, 316 NLRB 1248, 1253 (1995) (timing of discriminatory action and respondent's general knowledge of union activities can demonstrate knowledge), *enforced*, 97 F.3d 1448 (4th Cir. 1996).

[28] *See, e.g., Aguayo v. Quadrtech Corp.*, 129 F.Supp.2d 1273, 1278 (C.D. Cal. 2000) (employer's presentation of generic news articles about the pressures of globalization, rather than "empirical evidence as to its current and/or projected financial health" insufficient to meet its *Wright Line* burden that it laid off employees and relocated for nondiscriminatory reasons).

terms and conditions of employment . . . ."[29] This duty may be violated, "without a general failure of subjective good faith . . . if a party has refused even to negotiate in fact – 'to meet and confer' – about any of the mandatory subjects.[30] On January 18, 2020, the Union demanded recognition and to bargain over Unit employees' terms and conditions of employment and Respondents immediately stated, and continued to sustain, its refusal to do so. Because Respondents have refused to honor its obligation to meet and confer over mandatory subjects of bargaining, the Board will likely find that Respondents have violated Section 8(a)(5) of the Act.

Respondents are also obligated under the Act to furnish the Union with requested information that is potentially relevant and that would be useful in discharging its statutory duties, which includes information necessary to evaluate a party's claims made during negotiations.[31] The Union can show the relevance of the outstanding information requests, which includes evaluating the legitimacy of Respondents' explanations for closing the Compton facility and laying off the Unit.  Furthermore, the Union has already offered those explanations, even when the requested information was presumptively relevant, and the Union was not required to provide an explanation on the requests' relevance.[32] Further, the Union has proffered solutions to accommodate potential Respondent concerns, such as entering into a confidentiality agreement. As such, the Board is likely to find that, in refusing to provide the Union with this relevant requested information, Respondents have violated Section 8(a)(5) of the Act.

---

[29] 29 U.S.C. § 157
[30] *NLRB v. Katz*, 369 U.S. 736, 743 (1962).
[31] *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 435-436 (1967); *NLRB v. Truitt Manufacturing Co.*, 351 U.S. 149, 152-154 (1956).
[32] The Board has long held that information pertaining to the bargaining unit is presumptively relevant and no showing of relevance is required. *Ohio Power Co.*, 216 NLRB 987, 991 (1975), *enfd*. 531 F.2d 1381 (6th Cir. 1976).

**B.     Interim Relief is Necessary to Prevent Irreparable Harm to the Employees'
Statutory Rights and to Protect the Efficacy of the Board's Final Order**

Congress has declared that "encouraging … collective bargaining" is the "policy of the United States."[33] Section 7 of the Act grants employees the decision "to bargain collectively through representatives of their own choosing."[34] Making that choice "without restraint or coercion by their employer" is a "fundamental right."[35] Without timely interim relief, Respondents' mass layoffs and closure of the Compton facility will irreparably harm the national policy encouraging collective bargaining, the employees' right to choose union representation, and the Board's remedial power. In short, Respondents will forever benefit from its illegal conduct.

Respondents' closure of the Compton facility, and its mass layoff of all employee drivers at UI, UT, and RR, will predictably chill employee support for the Union.[36] Many courts, including the Ninth Circuit and the Central District of California, have recognized that the discriminatory termination of union supporters can effectively end an organizing

---

[33] 29 U.S.C. § 151.

[34] *Id.* § 157. *See Transp. Mgmt. Corp.*, 462 U.S. at 397 ("Employees of an employer covered by the NLRA have the right to form, join, or assist labor organizations.").

[35] *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937). *See also NLRB v. Teamsters Local No. 439, Int'l Bhd. of Teamsters, AFL-CIO*, 175 F.3d 1173, 1175 (9th Cir. 1999), citing and quoting *Radio Officers' Union v. NLRB*, 347 U.S. 17, 40 (1954) ("holding that '[t]he policy of the Act is to insulate employees' jobs from their organizational rights'").

[36] *See Portland Willamette Co. v. NLRB*, 534 F.2d 1331, 1334 (9th Cir. 1976) ("discharge for participation in union activities" creates "visible and continuing obstacles to the future exercise of employee rights"); *Rubin v. Vista Del Sol Health Services*, 80 F. Supp. 3d 1058, 1103 (C.D. Cal. 2015) ("the fear of employer retaliation after the firing of union supporters is exactly the irreparable harm contemplated by § 10(j)") (quoting *Pye v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001)); *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 929 (D. Ariz. 2014) (quoting *Frankl I*, 650 F.3d at 1363; *NLRB v. Electro-Voice*, 83 F.3d 1559, 1573 (7th Cir. 1996) ("[T]he employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them.").

campaign absent interim relief.[37] Accordingly, multiple courts, including the Ninth Circuit, have endorsed inferences of irreparable harm based on the unlawful terminations themselves.[38]

Indeed, Respondents' conduct has eroded employee support of the Union. Following the mass layoffs, multiple employees became disaffected and asked the Union to stop communicating with them. One Universal Intermodal employee responded to a group chat with a middle finger emoji directed at the Union, and UT and RR employees believe their discharges were due to their nascent organizing activity.

The employees' organizational efforts are doomed unless the discriminatees are immediately reinstated under the protection of an interim injunction. "[I]n the labor field,

---

[37] *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 749 (9th Cir. 1988); *Overstreet v. Shamrock Foods Co.*, 679 F. App'x 561 (9th Cir. 2017), *affirming* 2016 WL 8505125, at *5-6 (D. Ariz. 2016); *Rubin v. American Reclamation, Inc.*, 2012 WL 3018335 at *4 (C.D. Cal. 2012) (discriminatory discharge of Union activists causes "fear of retaliation"); *Sharp v. Webco Indus., Inc.*, 225 F.3d 1130, 1135 (10th Cir. 2000); *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 971 (6th Cir. 2001); *Pye*, 238 F.3d at 74-75; *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1053 (2d Cir. 1980); *Electro-Voice, Inc.*, 83 F.3d at 1572-73.

[38] *See Frankl I*, 650 F.3d at 1363 ("a likelihood of success as to a § 8(a)(3) violation with regard to union activists that occurred during contract negotiations or an organizing drive largely establishes likely irreparable harm, absent unusual circumstances"); *Angle v. Sacks*, 382 F.2d 655, 660 (10th Cir. 1967) (independent evidence of irreparable harm not required because illegal discharges during an organizing campaign "operate predictably to destroy or severely inhibit employee interest in union representation, and activity toward that end"). *Cf. Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 297-98 (7th Cir. 2001) (interim instatement of employees illegally refused hire just and proper even where "the Director chose not to make an independent case on irreparable harm"). *See also NLRB v. Link-Belt Co.*, 311 U.S. 584, 598 (1941) (discharge of activists during organizing campaign "effectively ... restrain[ed] the employees' choice" and "tend[ed] to have as potent an effect as direct statements to the employees that they could not afford to risk selection of [the union].""); *Power Inc. v. NLRB*, 40 F.3d 409, 423 (D.C. Cir. 1994) (holding that the Board properly "concluded that it is 'difficult to imagine any act of management better calculated to chill union support'" than illegal discharges).

as in few others, time is crucially important in obtaining relief."[39] A final Board

reinstatement order cannot revive employee interest in unionization because it will not

come until years after the discriminatory mass layoffs[40]—too late to erase their chilling

effect.[41] The discriminatees will have experienced a prolonged absence from the

workplace as a result of organizing activity.[42] At that point, no worker "in his right mind"

will participate in a union campaign.[43] This is exactly the type of irreparable harm Section

10(j) is designed to address.[44] Furthermore, by the time the Board can act, the

discriminatees will likely have taken other jobs and be unavailable for reinstatement,

itself an irreparable injury to the unionization effort.[45] Thus, Respondents will succeed in

permanently frustrating the employees' right to freely choose union representation.[46] It

---

[39] *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430 (1967).

[40] *See, e.g.*, *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011) (noting the "notoriously glacial" pace of Board proceedings).

[41] *See Pye*, 238 F.3d at 75 (unremedied interference with unionization effort "would make the Board's remedial process ineffective simply because it is not immediate"); *Electro-Voice*, 83 F.3d at 1573 ("As time passes, … the spark to organize is extinguished."); *Overstreet v. Shamrock Foods Co.*, 2016 WL 8505125, at *6 (D. Ariz. 2016).

[42] *See Pascarell v. Vibra Screw Inc.*, 904 F.2d 874, 881 (3d Cir. 1990) (even if open union supporters are "ultimately reinstated by the Board . . . [e]mployees will not risk the uncertainty and hardship attendant upon even temporary lay-off if that is the price they must pay for union activity"); *Asseo v. Bultman Enters., Inc.*, 913 F. Supp. 89, 97 (D.P.R. 1995) ("Even those who remain willing to accept employment [under a final Board order] may be inclined to withdraw their support of the Union because of its inability to adequately represent their interests . . . .").

[43] *Silverman v. Whittal & Shon*, 1986 WL 15735, *1 (S.D.N.Y. 1986).

[44] *Pye*, 238 F.3d at 75.

[45] *Id.*; *American Reclamation*, 2012 WL 3018335 at *4 (unless interim relief granted, "it can fairly be anticipated that the unlawfully laid-off and discharged employees will find new jobs elsewhere); *accord Aguayo,* 853 F.2d at 749.

[46] *Cf. Radio Officers' Union*, 347 U.S. at 40 ("The policy of the Act is to insulate employees' jobs from their organizational rights. … to allow employees to freely exercise their right to join unions … without imperiling their livelihood."); *Jones & Laughlin Steel*

will defeat the nascent campaigns at UT and RR, and thwart the Board's certification of the Union at UI and frustrate the employees' choice to be represented there. The Board's order will be an "empty formality."[47]

The egregious nature of the mass layoffs is compounded by Respondents' failure to engage in good-faith bargaining for an initial contract covering the Unit at UI.[48] As recognized by the Ninth Circuit, this "delay in bargaining weakens support for the union, and a Board order cannot remedy this diminished level of support."[49] This is particularly true in this case, where the Union is newly certified and has yet to prove its worth to the Unit.[50] Absent immediate relief requiring, *inter alia*, good faith bargaining, Respondents will defeat the Union by virtue of its illegal conduct.[51] In addition, while Respondents are

---

*Corp.*, 301 U.S. at 34 ("collective action would be a mockery if representation were made futile by interference with freedom of choice.").

[47] *Angle*, 382 F.2d at 660.

[48] *See Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011) ("failure to bargain will likely cause a myriad of irreparable harms"); *Louisiana-Pacific Corp. v. NLRB*, 858 F.2d 576, 578, 579 (9th Cir. 1988) (illegal "repudiation of the bargaining obligation" is "a serious unfair labor practice" that "disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions"), quoting *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944).

[49] *Small*, 661 F.3d at 1192. S*ee also Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26–27 (1st Cir. 1986) ("Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining.") (quoting *Electrical Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970)).

[50] *See Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 373 (11th Cir. 1992) (bargaining units are "highly susceptible to management misconduct" where union was recently certified and employees are bargaining for first contract).

[51] *See Small*, 661 F.3d at 1193 ("[w]ith only limited support . . . the [u]nion will be unable to bargain effectively regardless of the ultimate relief granted by the Board"); *Frankl I*, 650 F.3d at 1362 ("the result of an unremedied refusal to bargain with a union, standing alone, is to discredit the organization in the eyes of the employees, to drive them to a second choice, or to persuade them to abandon collective bargaining altogether").

benefiting from its unlawful refusal to bargain, the Unit is forever losing the benefits of collective bargaining and representation by their chosen Union.[52]

Immediate reinstatement of the discriminatees to UI, UT, and RR, and a court order requiring UI to bargain with the Union in good faith in the UI unit offers the best chance of avoiding this unjust result.[53] Because fear of retaliation may completely extinguish employee willingness to support the Union by the time a Board order issues,

---

[52] *See Frankl I*, 650 F.3d at 1363; *Rubin v. Hospital of Barstow*, 2016 WL 4547152 at *6 (C.D. Cal. 2016) ("[f]ailure to bargain in good faith threatens industrial peace, deprives employees of a wide range of economic and non-economic[] benefits brought about by labor unions, and also weakens support for a union in a way that cannot be remedied by subsequent relief") (citing *Small*, 661 F.3d at 1192).

[53] *Angle*, 382 F.2d at 661 (interim reinstatement is "best visible means" of rectifying chill of protected activity); *Schaub*, 250 F.3d at 971 (interim reinstatement of discharged union activist "combats the substantially diminished prospects of unionizing [the employer] if [the discriminatee] were not to return until after the Board reached a final resolution of th[e] case"); *Vista Del Sol Health Services*, 80 F. Supp. 3d at 1106 (interim reinstatement "will undoubtedly serve to revive the union's organizational campaign").
In order to accomplish interim reinstatement at UI, Respondents must restore the lawful status quo with regard to the level of employee driver work at that entity. *See Aguayo*, 129 F. Supp.2nd at 1277-78 (where employer terminated majority of workforce and moved production to Mexico following vote in favor of union, injunctive relief granted to restore status quo and prevent the employer from relocating); *Denholm v. Smyrna Ready Mix Concrete*, 2021 WL 297571, *12 (E.D. Ky. 2021) ("restore Respondent's Winchester, Kentucky facility to the status quo that existed prior to January 7, 2020, including transferring back work and reinstating employees"); *Bernstein v. Carter & Sons Freightways, Inc.*, 983 F. Supp. 994, 997, 1007 (D. Kan. 1997) (where employer subcontracted operations during union organizing campaign and argued that it considered closure prior to the onset of union activities, employer ordered to restore operations and reinstate discriminatees on an interim basis); *Dunbar v. Carrier Corp.*, 66 F. Supp. 2d 346, 353-54 (N.D.N.Y. 1999) (where employer unlawfully insisted to impasse during bargaining and was in process of relocating unit work to newly-purchased facility, employer ordered to cease and desist from relocating and to affirmatively restore bargaining unit work). If a downturn in business prevents complete restoration of the lawful status quo in this regard, Respondents must place those discriminatees that it is unable to reinstate on a preferential hiring list. *See Int'l Shipping Agency, Inc.*, 369 NLRB No. 79, slip op. at 7.

- 29 -

interim reinstatement, including of discharged employees Ledesma and Mallard, is necessary now to erase the chill before it is too late to prevent remedial failure.[54] It will mitigate the chilling effect on the organizing campaigns by sending an affirmative signal that the Union, the Board, and the courts will *timely* protect employees if they face retaliation for supporting the Union.[55] Similarly, immediate good-faith bargaining at UI, including providing relevant requested information, will prevent disaffection in that unit and preserve the Union's ability to negotiate effectively for a first contract.[56] Indeed, a majority of the Unit remains interested in being represented by the Union, and in fact recently protested together in front of SCE's yard. The Union also remains in touch with many of the UT and RR employees and would be willing to continue organizing those units under the protection of an interim injunction.

The balance of harms favors injunctive relief. Respondents will suffer little, if any, harm if injunctive relief is granted. Upon interim reinstatement, Respondents will have the benefit of experienced former employees,[57] whose statutory rights outweigh any employment rights of replacement employees,[58] and it will retain its managerial right to

---

[54] *See Aguayo*, 853 F.2d at 746, 749 (eleven members of organizing committee); *Pye*, 238 F.3d at 75 (interim reinstatement of five employee organizers held just and proper); *Schaub*, 250 F.3d at 971 (one employee organizer); *Sharp*, 225 F.3d at 1135 (six union supporters); *Angle*, 382 F.2d at 660-61 (four employee organizers); *Silverman*, 1986 WL 15735, \*1 (six union activists); *Vista Del Sol Health Services*, 80 F. Supp. 3d at 1108 (ordering interim reinstatement).

[55] *See Aguayo*, 853 F.2d at 750 (interim reinstatement "would revive the union's organizational campaign"); *Pye*, 238 F.3d at 75 (interim reinstatement of union supporters appropriate to preserve "spark to unionize"); *Kaynard*, 625 F.2d at 1053 (reinstatement of "active and open" union supporters just and proper to avoid "serious adverse impact on employee interest in unionization").

[56] *See Scott*, 241 F.3d at 669 ("[s]uccessful bargaining could restore the employees' interest in the Union"); *Frankl II*, 693 F.3d at 1066 (information).

[57] *See Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906 (3d Cir. 1981).

[58] *See Aguayo*, 853 F.2d at 750; *Pye*, 238 F.3d at 73, 75.

impose lawful discipline.[59] In fact, interim reinstatement helps reduce Respondents' ultimate financial liability because it cuts off any continued accrual of backpay.[60] Moreover, an interim bargaining order under Section 10(j) is not permanent.[61] The order would not compel agreement to any specific term or condition of employment advanced by the Union in negotiations. Rather, it only requires bargaining with the Union in good faith to an agreement or a bona fide impasse.[62] Any agreement reached between the parties under a Section 10(j) decree can contain a condition subsequent to take into account the possibility of the Board's ultimate refusal to grant a final bargaining order remedy.[63] Also, the costs in terms of time and money spent on collective bargaining is a burden that falls on both parties and does not defeat a request for an interim bargaining order.[64]

*Overstreet v. Gunderson Rail Servs., LLC*[65] is distinguishable from this case. In *Gunderson*, the district court's order required the respondent to reopen a facility it had already closed. Here, by contrast, the proposed order seeks only to have the Unit reconstituted at a location in or near Compton, CA. Respondents already have one such location—its subsidiary SCE's facility, which is a mere three miles from the closed Compton facility.[66] Respondents have already admitted it transferred the unit work

---

[59] *See Eisenberg*, 651 F.2d at 906; *Electro-Voice*, 83 F.3d at 1573; *Pye*, 238 F.3d at 75.
[60] *See Hubbel v. Patrish LLC*, 903 F. Supp. 2d 813, 818 (E.D. Mo. 2012).
[61] *See Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) ("there is nothing permanent about any bargaining order . . . particularly an interim order which will last only until the final Board decision").
[62] *See Overstreet v. Thomas Davis Medical Centers, P.C.*, 9 F.Supp.2d 1162, 1167 (D. Ariz. 1997); *Penello v. United Mine Workers*, 88 F. Supp. 935, 943 (D.D.C. 1950).
[63] *See, e.g.*, *Kaynard*, 625 F.2d at 1054.
[64] *See Scott*, 241 F.3d at 669.
[65] 587 Fed. App'x 379 (9th Cir. 2014).
[66] *See Int'l Shipping Agency, Inc.*, 369 NLRB No. 79, slip op. at 7 ("We shall require the Respondent to offer each of the discriminatorily terminated MTS and TTS employees reinstatement to any position in its existing operations that he or she is capable of filling").

- 31 -

formerly performed by the UI Unit to independent contractors at SCE. Indeed, after UI informed Unit employees in advance of the representation election that it would not be renewing the lease at the Compton facility, multiple managers stated that UI was considering basing the Unit employees temporarily or permanently out of the SCE 5 Yard. Moreover, as Respondents have not closed the RR Fontana facility or the UT Slover facility, both located in Fontana, CA, Respondents can rehire the discharged drivers at those locations.

The other requested relief is also just and proper. A cease-and-desist order is a standard provision in any Section 10(j) preliminary injunction; it is necessary to restrain Respondents from engaging in future unlawful conduct and assures employees that their rights will be protected.[67] The employees will not feel free to exercise their statutory rights absent interim rescission of the discriminatory suspension issued to Ledesma.[68] Reading of the district court's order in front of the employees and a representative of the Board is an "effective but *moderate* way to let in a warming wind of information and, more important, reassurance."[69] Relatedly, posting the order during the pendency of the

---

[67] *Paulsen v. PrimeFlight Aviation Servs., Inc.*, 718 F. App'x 42, 45 (2d Cir. 2017) (summary order); *see also, e.g.*, *Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029, 1052 (W.D. Tenn. 2011) (cease-and-desist order appropriate "to prevent irreparable chilling of support for the Union among employees and to protect the NLRB's remedial powers.").

[68] *See, e.g.*, *Walsh v. Mountain View Care & Rehab. Ctr., LLC*, 2019 WL 2865891, at *1-2 (M.D. Pa. July 2, 2019) (interim rescission of discriminatory suspension); *Lindsey v. Shamrock Cartage, Inc.*, 2018 WL 6528432, at *5 (S.D. Ohio 2018) (suspension).

[69] *United Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767, 788-89 (9th Cir. 2017); *see also Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1206-07 (D. Haw. 2010) (ordering reading of court order), *aff'd*, 650 F.3d 1334 (9th Cir. 2011); *Rubin v. Vista del Sol Health Services, Inc.*, 2015 WL 306292, at *2 (C.D. Cal. Jan. 22, 2015); *One Call Locators Ltd.*, 46 F. Supp. 3d at 932.

administrative proceedings, as well as mailing it, will further inform and reassure employees of their rights.[70]

The passage of approximately nineteen months from Respondents' mass layoffs does not obviate the need for injunctive relief. This was a complex investigation of violations occurring at more than one location by a group of integrated companies. The Board must have time to "investigate and deliberate" before initiating Section 10(j) proceedings,[71] including investigating the relationship between the companies and Respondents' financial defenses. Moreover, the passage of time was largely caused by Respondents' lack of cooperation in the complex investigation. Even after Respondents forced the Region to seek subpoena enforcement in district court for the five issued investigative subpoenas, it then took nearly six months until Respondents finally produced some responsive documents, after which the Region immediately issued complaint.[72] Failing to pursue Section 10(j) relief due to delay caused by Respondents' recalcitrance effectively rewards and encourages such behavior to the detriment of employees' rights.

Even with some passage of time, delay is significant only if the harm has occurred and the parties cannot be returned to the status quo, such that a final Board order is likely

---

[70] *See, e.g.*, *Hooks*, 775 F. Supp. 2d at 1054 (ordering posting); *Norelli*, 699 F. Supp. 2d at 1207; *Denholm*, 2021 WL 297571, *12; *Mattina v. Chinatown Carting Corp.*, 290 F. Supp. 2d 386, 396 (S.D.N.Y. 2003) (order mailing).

[71] *Pate v. Bodega Latina Corporation*, 2015 WL 12661924 at *6 (C.D. Cal. 2015) (citing *Aguayo*, 853 F.2d at 750. *See also Pascarell*, 904 F.2d at 881 (Board requires time to thoroughly investigate unlawful activity); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 539, 544–45 (4th Cir. 2009) ("[c]omplicated labor disputes like this one require time to investigate and litigate"); *Maram v. Universidad Interamericana*, 722 F.2d 953, 960 (1st Cir. 1983) (the Board "cannot operate overnight").

[72] *See Vista Del Sol Health Services*, 80 F. Supp. 3d at 1104-5 (Board's delay substantially mitigated by fact that respondent contested investigative subpoenas and forced Board to seek judicial enforcement of the subpoenas).

to be as effective as interim relief.[73]  Here, the passage of time has not yet "so weakened the Union that even interim relief could not salvage it."[74]  The majority of the UI unit still desire the Union as their collective bargaining representative and desire to return to work, and the Union also remains in touch with many of the UT and RR employees, who also desire to return.[75]  Seeking injunctive relief now, approximately two and a half months after issuance of complaint, can still restore the lawful status quo and fits well within the parameters that the Ninth Circuit and other courts have found appropriate.[76]

In sum, interim relief will vindicate the employees' statutory right to a free choice regarding unionization and preserve the Board's remedial power. In addition, it will serve the public interest by effectuating the will of Congress and ensuring that Respondents' unfair labor practices do not permanently succeed.[77]

---

[73] *See Aguayo*, 853 F.2d at 750; *Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987).

[74] *Arlook*, 952 F.2d at 374.

[75] *Rubin v. Hospital of Barstow, Inc.*, 2016 WL 4547152 at *6 ("[w]here the union remains willing to represent the employees and bargain on their behalf during an interim bargaining order, as is the case here, interim relief is warranted").

[76] *See Frankl I*, 650 F.3d at 1363-1365 (Section 10(j) petition filed 16 months after complaint issued); *Overstreet ex rel. NLRB v. El Paso Disposal, LP*, 625 F.3d 844, 856 (5th Cir. 2010) (affirming injunction despite nineteen-month passage of time between initial complaint and 10(j) petition); *Muffley*, 570 F.3d at 544–45 (eighteen-months between issuance of complaint and request for relief under 10(j) did not render injunction inappropriate); *Bloedorn*, 276 F.3d at 299 (injunction issued more than 2 years after violation); *Hirsch v. Dorsey Trailers*, 147 F.3d 243, 248-49 (3d Cir. 1998) (14-month passage of time).

[77] *See Frankl I*, 650 F.3d at 1365 ("In § 10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed…."); *Pye*, 238 F.3d at 75 ("Section 10(j) interim relief is designed to prevent employers from using unfair labor practices in the short run to permanently destroy employee interest in collective bargaining."); *Asseo*, 805 F.2d at 28 ("[T]he public has an interest in ensuring that the purposes of the Act be furthered.").

# V. **CONCLUSION**

Interim relief is just and proper to prevent further frustration of the policies and remedial purposes of the Act. Petitioner has shown that it has a strong likelihood of success on the merits and that irreparable harm is clear. The balance of equities and public policy favor an injunction. Unless enjoined by this Court, Respondent's multiple unfair labor practices will continue to undermine the employees' statutory rights and the Board's remedial powers. Accordingly, Petitioner respectfully requests that this Court grant the requested relief.

Dated at Los Angeles, California, this 20th of July, 2021.

Respectfully submitted,

/s/ Molly Kagel

Molly Kagel
Counsel for Petitioner
National Labor Relations Board, Region 21
312 North Spring Street, 10th Floor
Los Angeles, CA 90012
Telephone: 213-634-6511
Fax: (213) 854-2778
Email: molly.kagel@nlrb.gov